**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *IN RE HYZON MOTORS INC. SECURITIES LITIGATION*<br><br>This Document Relates to:<br>     ALL ACTIONS. | Master File No. 6:21-cv-06612-CJS-MWP<br><br><u>CLASS ACTION</u><br><br>**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><br>**<u>JURY TRIAL DEMANDED</u>** |

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................1

II.     JURISDICTION AND VENUE .........................................................................13

III.    PARTIES ..........................................................................................................14

    A.    Lead Plaintiff ..........................................................................................14

    B.    Corporate Defendant...............................................................................14

    C.    Executive Defendants .............................................................................15

    D.    Other Relevant Persons and Entities......................................................18

        1.    Hyzon's Parent Company .............................................................18

        2.    Short Seller Activist Investment Firms........................................18

IV.     SUMMARY OF THE FRAUD .........................................................................21

    A.    Hyzon: A Repackaging of a Flailing Chinese Company.........................21

    B.    Take Two: Horizon Spins Off Hyzon to Rebrand Its EV Enterprise and Attract More Lucrative Investments from U.S. Capital Markets.......................27

    C.    Hyzon's Efforts to Take Advantage of SPAC Mania .............................29

    D.    Formation of SPAC DCRB......................................................................33

    E.    Hyzon Finds Its SPAC Savior; Hypes Purported Big-Name Customers, Contracts, and MOUs to Support its Bloated $2 Billion Valuation and Lofty Projections ....34

    F.    Surreptitious Edits to Committed-Orders and Customer-Base Claims ................40

    G.    Defendants' Media and Conference Blitz to Sell the SPAC Merger to Investors; Announcement of a Major Vehicle Supply Agreement with Hiringa ..................44

    H.    Defendants Double Down on Revenue Projections and 2021 Deliveries Despite Dropping of Committed Customers and Growing Supply Chain Concerns..........48

    I.    Defendants Succeed in Falsely Persuading Shareholders to Approve the Merger Due to Their Committed Orders, Top Tier Customer, and Projected Revenue Claims ................................................................................................53

    J.    Hyzon Announces Blockbuster Deal with Fantastical Purchaser Shanghai HongYun.................................................................................................57

    K.    The Truth Emerges: Short Seller Blue Orca Exposes Hyzon's Fraudulent Conduct with a Detailed Investigative Report....................................................61

1. Shanghai HongYun Is a Sham Counterparty ..............................................61

2. Hiringa Is a "Channel Partner" With No Intent to Receive Vehicles in 2021..................................................................................................................63

3. The Company Lists "Phantom Customers" in Its Investor Materials........66

L. Hyzon's Telling Admissions in Responding to Blue Orca's Revelations .............72

M. Iceberg Research Releases its Own Investigative Report.......................................74

N. Hyzon's Purported Pivot to the Asian Market to Meet Its Delivery Goals ...........75

O. Iceberg's Follow-Up Report ................................................................................77

P. Hyzon's Doubling Down on Shanghai HongYun as Its Prized Customer ...........78

Q. No Longer Able to Hide: Hyzon Discloses Poor 2021 Financial Results and Receipt of SEC Subpoena Regarding Blue Orca Allegations ...............................80

V. LEAD PLAINTIFF'S INDEPENDENT INVESTIGATION CONFIRMING FACTS CONSISTENT WITH BLUE ORCA AND ICEBERG'S FINDINGS ...........................83

A. China-Based Investigation Firm, Its Experience, and Its Extensive Investigation of Shanghai HongYun......................................................................................83

B. Shanghai HongYun Was in Fact Incorporated 3 Days Before Deal Announcement ................................................................................................85

C. Confirmed: HongYun's Has No Paid-In Capital ...................................................87

D. Confirmed: Shanghai HongYun Has No Real Operations ....................................89

E. HongYun Has No Corporate Owners, Only Individual Owners with Shallow Pockets and Business Experience ........................................................................91

F. No Corporate Parents, One Suspicious Subsidiary.................................................94

G. No Website Plus No Employees Equals No Ability to Conduct Business ...........95

H. No Hydrogen Experience or "Deep Connections" to Large Chinese Conglomerates ................................................................................................97

I. No Ability To Negotiate Supply Agreements for HFCEVs or To Participate in Government-Sanctioned RFPs (Not At Least Without Outside Aid)...................98

VI. MATERIALLY FALSE AND MISLEADING STATEMENTS....................................101

A. Statements Concerning Hyzon's 100% Committed and Highly Probable Orders................................................................................................................102

B. Statements Concerning Hiringa ..........................................................................118

C. Statements Concerning Shanghai HongYun........................................................121

VII.    ADDITIONAL ALLEGATIONS OF SCIENTER..............................................126

      A.    Motive and Circumstantial Evidence of Scienter .................................127

      B.    Scienter as to Hyzon's Purported Committed Orders...........................129

      C.    Scienter as to Hyzon's Characterization of Its Relationship with Hiringa ..........131

      D.    Scienter as to HongYun ......................................................................133

      E.    Repeated Edits to Investor Presentations Supports the Inference of Scienter .....137

      F.    SEC Investigation Supports the Inference of Scienter..........................137

      G.    Defendants' Imputed Knowledge about Hyzon's Core Operations ...................138

VIII.   LOSS CAUSATION..................................................................................140

      A.    Corrective Disclosures ........................................................................141

      B.    Materialization of Risks ......................................................................143

IX.     NO SAFE HARBOR................................................................................145

X.      CLASS ACTION ALLEGATIONS ..........................................................145

XI.     CLAIMS BROUGHT PURSUANT TO THE EXCHANGE ACT................148

COUNT I   VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 AGAINST ALL DEFENDANTS................................................................148

COUNT II   VIOLATION OF SECTION 20(A) OF THE EXCHANGE ACT  AGAINST THE INDIVIDUAL DEFENDANTS..................................................................151

XII.    PRAYER FOR RELIEF ..........................................................................152

XIII.   DEMAND FOR TRIAL BY JURY ..........................................................152

EXHIBITS
  A    Blue Orca Report (Sept. 28, 2021)
  B    Iceberg Research Report (Oct. 6, 2021)

Lead Plaintiff Alfred Miller ("Lead Plaintiff"), by and through his undersigned counsel, brings this consolidated action pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, on behalf of himself and all other persons or entities who purchased or otherwise acquired securities of Hyzon Motors Inc. f/k/a Decarbonization Plus Acquisition Corporation ("Hyzon" or the "Company") during the period from February 9, 2021 to January 12, 2022, inclusive (the "Class Period"), and were damaged thereby (the "Class"). Lead Plaintiff alleges the following based upon personal knowledge as to himself, upon his own acts, and upon information and belief as to all other matters. Lead Plaintiff's information and belief is based on the ongoing independent investigation of its undersigned counsel, including from: (i) the Company's public filings with the SEC; (ii) research reports from securities and financial analysts; (iii) the Company's press releases and reports; (iv) the Company's website and marketing materials; (v) news and media reports concerning the Company and other facts related to this action; (vi) price and volume data for Company securities; (vii) consultation with investigators; (viii) accounts from former Company employees; and (ix) additional materials and data concerning the Company and industry as identified herein.

## I.    INTRODUCTION

1.    This is a federal securities class action against Hyzon, a "SPAC"[1]-repackaging of a flailing Chinese hydrogen-fuel-cell business covered in a glittering new wrapper of misleading deal announcements, illusory customer contracts, and fantastical financial projections. As with

---

[1] A special purpose acquisition company, also known as a "SPAC" or "blank check company" for short, is a shell company listed on a public exchange established for the purpose of raising capital to finance the purchase of another private company; thus making the acquired company public without going through the traditional initial public offering process. *See* Part IV.D, *infra*.

other Electric Vehicle SPACs ("EV SPACs") of similar vintage, investors would eventually come to learn that Hyzon is just another promotional stock scheme designed to enrich insiders. Through the diligent research of credible investment analysts, the truth began to emerge on September 28, 2021, when an activist short seller revealed that the Company's largest "customer," a sham Chinese entity formed three days before the deal announcement with no capital, no physical office or salaried employees, no public corporate backers, and no verifiable business connections, was incorporated so that Hyzon could fill its projected delivery gap and, in turn, keep Hyzon's stock price inflated. Similarly, this investment analyst revealed that Hyzon's next largest "customer," Hiringa Energy ("Hiringa"), which supposedly signed a binding order for 20 hydrogen-fuel-cell-powered electric vehicles ("HFCEVs") to be delivered before the end of 2021 under a larger supply agreement for 1,500 HFCEVs, was not really a Hyzon customer; instead, the small New Zealand startup company acts merely as an unpaid "channel partner" with no obligation, intention, or capability to purchase the volume of vehicles Hyzon claimed were "binding orders" in its press releases and public interviews. In addition, Hyzon incited investor interest in its unproven vehicle retrofitting business by touting the names of big household brands like Coca-Cola, Heineken, and other Fortune 500 companies as "top tier customers" and "partners" in its pre-SPAC-Merger investor presentations. It was only after other EV SPACs like Lordstown Motors and XL Fleet got into trouble for falsifying their books of business that Hyzon quietly dropped these purported big-name customers from its investor materials. Yet despite apparently losing its most prominent customers, supposedly accounting for $700 million in future orders from North America, Europe, and elsewhere, Hyzon's 2021+ financial projections remained the same.

2.      Hyzon's rise and subsequent fall began approximately one year before the Class Period, in January 2020, when Defendants Craig Knight and George Gu, the then current and

former CEOs of Hyzon's corporate grandparent Horizon Fuel Cell Technologies Ltd. (collectively, with its subsidiaries, "Horizon"), decided to hit restart and spin-off Horizon's commercial vehicle unit as a standalone entity. At the end of 2019, Horizon's fuel-cell sales and free cash flow imploded when its tentpole customer, responsible for nearly 75% of Horizon's vehicle-fuel-cell sales, defaulted on its payments, causing Horizon to be delisted from its foreign securities exchange. Using funds from Horizon's dwindling reserves, Hyzon set up shop out of the General Motors ("GM") retired fuel cell plant in Honeoye Falls, New York, with the plan of using the plant as a base of operations for repackaging Horizon's commercial vehicle operations. But, in the words of Defendant Knight, "It costs a lot of money to set up factories,"[2] and Hyzon needed to raise a lot of cash from outside sources to expand its operations in the U.S. and European markets.

3.      Accordingly, Knight and Gu developed a compelling, yet misleading, narrative about their ability to build upon Horizon's purported commercial success and the purportedly growing demand for hydrogen fuel cell technology, to attract outside investment and eventually catch the attention of SPACs hungry for EV opportunities. The lynchpin of this new narrative rested on a revisionist account of Horizon's purported "success." In both interviews and press releases pre-dating the Class Period, Hyzon's two co-founders repeatedly touted Horizon's purported deployment of over 400 fuel cell stacks in commercial vehicles during its tenure, which they claimed proved a growing demand for HFCEVs. Additionally, Hyzon's co-founders made increasingly bold boasts in their pre- and post-SPAC acquisition public statements, social medial

---

[2] Alan Adler, "Singapore spinoff Hyzon Motors makes US fuel cell trucking play," FREIGHTWAVES.COM (Nov. 24, 2020), *available at* https://www.freightwaves.com/news/singapore-spinoff-hyzon-motors-makes-us-fuel-cell-trucking-play ("'It costs a lot of money to set up factories,' [Knight] said. 'We see that as something we can safely outsource. Focusing on the core technology within the fuel cell powertrains is where we can add value. We see ourselves as being the enabler of the transition to zero emissions.'").

posts, and investor presentations about Hyzon's growing back log of "100% committed orders" and top tier customers, further selling investors on the idea that Hyzon "was not a pipe dream" (*see, e.g.*, @hyzonmotors Feb. 17, 2021 tweet, displayed below) and could break through as a leading global supplier of electric vehicles.

**Hyzon Motors Twitter**
*February 17, 2021*[3]

On the SPAC IPO and business model:

> **"This isn't a pipe dream. This will be realized within the next two years."**

~ Defendant Craig Knight



4.      After limited success in raising private investment cash, the Company announced in a February 9, 2021 press release (the beginning of the Class Period) that it succeeded on joining the "SPAC" bandwagon, such that it would be taken public by merging (the "SPAC Merger") with blank-check SPAC, Decarbonization Plus Acquisition Corporation ("DCRB"), in a deal valuing the repackaged hydrogen fuel cell distributor at a fantastical valuation of ***$2.6 billion—more than 10x the reported 2020 market cap for Horizon***.[4] Having no actual vehicle sales or ability to

---

[3] *Available at* https://twitter.com/hyzonmotors/status/1362009002465316870.

[4] "Market cap" or "market capitalization" refers to refers to the total value of all a company's shares of stock, calculated by multiplying the price of a stock by its total number of outstanding shares. For example, a company with 2 million shares selling at $5 a share would have a market cap of $1 million.

generate meaningful revenue, Hyzon could only trade on the promise of future business success. As such, it became incumbent on Defendants to convince DCRB shareholders that it could make good on its business promises for them to approve the SPAC Merger. Additionally, for Horizon and the Individual Defendants to profit off their hundreds of millions of "locked-up" post-merger stocks and options, through liquidation or secured lending, Defendants would need to keep investors' expectations high.

5.      In a field crowded by other zero revenue EV SPACs, Defendants achieved these goals by telling investors through numerous, pre-merger press releases, investor presentations, and interviews with major media outlets that it had already secured major customers and multi-million-dollar orders, in addition to its inherited sales obligations from Horizon. In soliciting materials talking up the SPAC Merger, Defendants repeatedly claimed that Hyzon would deliver 85 vehicles and earn nearly $40 million in revenue in 2021. They also emphasized that Hyzon had "100% certain" orders from 13 private and public sector customers, ranging from heavy duty, refuse, and transportation uses, and that the revenue from its 100% certain and high probability orders (that is orders that were 70%+ likely) equaled nearly quadruple its forecasted 2021 revenues. Blended in with these sales and revenue promises were logos of several blue chip and Fortune 500 companies, which Hyzon claimed were top tier customers. As can be seen in the following slides, which were reused in several Hyzon investor presentations, Hyzon also went so far as to include a global map of its top customers and orders, falsely listing major companies like Heineken and Ikea as committed purchasers who were in the last mile of finalizing multi-million-dollar purchase orders with 2021 deliveries.

**Excerpts from Hyzon February 9, 2021 Investor Presentation[5]**

*Slide 5: Listing logos of "top tier customers/ end users/ partners"*



*Slide 18: Displaying map with logos of "100% Certain" and "High Probability" Orders*



6.      Defendants' press releases and other direct communications with investors further publicized massive "binding purchases" with what we now know were fake customers like Hiringa. To secure shareholder approval of the transaction in the wake of the SPAC Merger announcement, Hyzon repeatedly claimed in news articles, fireside chats, and investor presentations that Hiringa—a small, 20-person startup operating out of a house in New Zealand—

---

[5] Hyzon, "Accelerating the Hydrogen Transition; Investor Presentation," at 5 (Feb. 9, 2021), *available at* https://www.sec.gov/Archives/edgar/data/1716583/000119312521033234/ d109364dex993.htm.

had placed a "**binding order**" for 20 HFCEVs (24% of Hyzon's 2021 projected deliveries) that would enter service in New Zealand by the end of 2021, as part of a larger vehicle supply agreement for up to 1,500 vehicles. To reach a more tech-savvy investor population, the Company also pushed its narrative, and relatedly, its false and misleading customer and order misrepresentations, through digital mediums like YouTube and Twitter, as can be seen in the following @hyzonmotors tweet concerning Hyzon's purported tentpole purchaser, Hiringa.

**Hyzon Motor's Twitter Account**
February 17, 2021[6]

    *"We're excited to announce we have signed an **agreement for the build and supply of up to 1,500 hydrogen fuel cell-powered trucks** to New Zealand's Hiringa Energy by 2026."*



7.      These "top tier customers" and "committed orders" generated considerable enthusiasm for Hyzon, with media outlets highlighting the Company's relationship with the major brands depicted,[7] and emphasizing Hyzon's significant new deal with its "customer" Hiringa.[8] The touted sales pipeline kept investors' expectations, and thus Hyzon's stock price, artificially high. Defendants, however, could not legitimately sustain these initial claims. In the months between the merger's announcement in February and its closing in July—the same time that EV SPAC

---

[6] *Available at* https://twitter.com/hyzonmotors/status/1362043459444613124.

[7] "Hydrogen Vehicle Maker Hyzon Raises $626 Million in SPAC IPO," 24/7 WALL ST. (Feb. 9, 2021), *available at* https://247wallst.com/autos/2021/02/09/hydrogen-vehicle-maker-hyzon-raises-626-million-in-spac-ipo/.

[8] "Hiringa Energy orders 1500 hydrogen fuel cell trucks from Hyzon Motors for New Zealand," electrive.com (Feb. 18, 2021), *available at* https://www.electrive.com/2021/02/18/hiringa-energy-orders-1500-hydrogen-fuel-cell-trucks-from-hyzon-motors-for-new-zealand/.

Lordstown was outed for faking customer orders and exaggerating its book of business—Defendants surreptitiously began to remove several reported customers from the Company's investor materials and presentations. Without explanation or acknowledgment, purported customers including Heineken, Ikea, and Nestle were removed from the Company's disclosures altogether. Despite dropping customers with purportedly "100% certain" or "highly probable" 2021 orders, Hyzon did not update its financial projections; instead, in its investor communications and public interviews, Hyzon doubled down in April 2021 on its claim that it would deliver 85 vehicles in 2021 and increased its 2021 revenue forecast to $55 million.

8.      On July 17, 2021, on the back of these false and misleading claims, Hyzon closed its $6.3 billion merger with DCRB, which in turn, granted millions of dollars in "locked up" stock and stock options to Horizon, Knight, and Gu. With half the year remaining, however, the Company had only delivered two of 85 promised vehicles. Desperate to fill the growingly apparent demand gap for its HFCEVs, Defendants made their biggest gambit to date: on September 9, 2021, they issued a press release announcing that they had signed a memorandum of understanding ("MoU") with a mysterious Chinese logistics company, Shanghai Hydrogen HongYun Automotive Co., Ltd. ("Shanghai HongYun") for the sale of 500 vehicles. Hyzon further represented that Shanghai HongYun's core team had solid operational experience in leasing, maintenance, and logistics, and that, under the MoU, it expected to deliver 100 vehicles (a number greater than its total 2021 projections of 85) to Shanghai HongYun by the end of 2021. The September 9, 2021 announcement of this miraculous deal, worth as much as $250 million, caused Hyzon's stock to shoot up by 29% in a single trading day.[9]

---

[9] *See* "Why EV Stock Hyzon Motors Is Skyrocketing Today: The electric heavy-duty vehicle manufacturer just bagged a huge order," THE MOTLEY FOOL (Sep. 9, 2021), *available at* https://www.fool.com/investing/2021/09/09/why-ev-stock-hyzon-motors-is-popping-16-today/.

9.     Unbeknownst to investors, however, was the fact that Shanghai HongYun was a shell company incorporated just three days before the deal announcement with no paid-in capital, no physical office, no salaried employees, no digital presence, no hydrogen-fuel-cell, maintenance, or leasing operations, no verifiable business connections to hydrogen-fuel users that could be monetized, and, most importantly, virtually no ability to purchase even a fraction of its HFCEV commitment (at least, without undisclosed outside financing assistance).

10.    The truth about Shanghai HongYun and Hyzon's other misrepresentations began to emerge just three weeks later, on September 28, 2021, when short seller analyst Blue Orca Capital published a scathing report on Hyzon's purported deals and customers ("Blue Orca Report").[10] In addition to disclosing Shanghai HongYun's origins, Blue Orca revealed that it had interviewed the CEO of Hyzon's second largest customer, Hiringa, who reported that the company was not a customer, but rather a "channel partner" with no binding obligations to purchase vehicles and no expectations to take delivery of Hyzon vehicles for third-party purchasers until mid-2022. The Report further contended that: (1) Hyzon's dropped big-name customers (*e.g.*, Coca-Cola, Ikea, Heineken) were "phantom customers;" (2) former Hyzon executives interviewed by Blue Orca had departed because of misrepresentations on customer contracts; (3) Hyzon's financial projections were "pure fantasy"; and (4) two CTO resignations in 15 months reflected these employees' "little faith in either the Company or the technology (or both)."[11]

---

[10] *See* Ex. A, Blue Orca Capital Report on Hyzon Motors Inc. (Sept. 28, 2021), *available at* http://blueorcacapitol.com.

[11] Soren Aandahl, the publicly known owner of Blue Orca Capital, defended the findings and conclusions in the Blue Orca Report in a 19-minute interview with famed short activist Carson Block of Muddy Waters on Zer0es TV, which is incorporated by reference herein. *See* https://www.zer0es.tv/big-announcements/is-hyzon-motors-the-chinese-lordstown/.

11.     Unsurprisingly, the revelations in the Blue Orca Report caused Hyzon shares to plummet, declining $2.58 per share, or 28%, in a single trading day. A week later, Hyzon issued a rebuttal statement that rejected what it deemed to be "misleading and inaccurate claims" by Blue Orca, glossed over certain issues, and offered minimal new insights about the Company's relationships with its purported customers, in an attempt to downplay Blue Orca's critiques. The "weak" tenor of the report did not go unnoticed. In the following days, a second analyst, Iceberg Research, issued its own report agreeing with Blue Orca's findings and adding its own allegations concerning Hyzon's exaggerated claims about the superiority of its fuel cell technology ("Iceberg Research Report").[12]

12.     Lead Plaintiff's independent investigation, aided by an investigation firm based in China, similarly corroborates Blue Orca and Iceberg Research's findings on Hyzon, Horizon, and Shanghai HongYun. Moreover, Lead Plaintiff's investigators have uncovered additional information about Shanghai HongYun's operations, or lack thereof, plausibly suggesting, among other things, that: (1) Shanghai HongYun has no physical office, as confirmed by site visits; (2) Shanghai HongYun has no real employees (other than its shareholders); (3) Shanghai HongYun lacks the business infrastructure and operational footprint to conduct the day-to-day sales, marketing, or leasing services claimed by Defendants; (4) Shanghai HongYun is not legally able, given its present lack of paid-in capital, to obtain a license to offer the leasing services advertised by Defendants; (5) it would be virtually impossible for Shanghai HongYun, given its lack of paid-in capital, lack of verifiable business history, and lack of financial records, to compete in public tenders for contracts from large businesses in China, most of which are state-owned

---

[12] Ex. B, Iceberg Research, "Hyzon Motors Inc: Trouble at the ParentCo" (Oct. 6, 2021), *available at* https://iceberg-research.com/2021/10/06/hyzon-motors-inc-trouble-at-the-parentco/.

enterprises; and (6) based on these facts, the most plausible inference is that a Hyzon-affiliated entity has played some undisclosed part in negotiating and/or establishing Shanghai HongYun's purported operations and financing its obligations under its agreement with Hyzon.

13.     Despite these revelations, Defendants have refused to address directly the facts uncovered about Shanghai HongYun or to provide investors with verifiable information that can put attacks on its business model to rest. Instead, they continue to tout their limited, self-reported successes. Hyzon's most recent financial update—a one page report from January 12, 2022 (the last day of the Class Period)—tells a different story. Despite purportedly delivering 62 vehicles to Shanghai HongYun and 87 vehicles in total for 2021 (two more vehicles than its projected target), the Company "anticipates [its] 2021 financial results" will be "materially lower than forecast revenues and margins."[13] Additionally, the Company has received a subpoena from the SEC demanding documents and information concerning the very issues identified by the Blue Orca Report, which also serve as a cornerstone for this litigation.

14.     Given this overwhelming evidence, Defendants cannot simply claim that they did not know their actions and statements were fraudulent. Hyzon's sole product is its HFCEVs. Its ability to generate revenue hinges on its ability to achieve production scale and make actual deliveries. And because committed orders and an engaged customer base for HFCEVs are core to the Company's success, the materially false statements and omissions detailed herein, and repeated often by Defendants, could not have occurred without Defendants' knowledge and approval. With respect to the Company's investment materials, Defendants edited and/or updated their statements at least four times to remove certain phantom big-named customers. And by the time that Hyzon

---

[13] Press Release, Hyzon, "Hyzon Motors provides update on 2021 deliveries and financial expectations" (Jan. 12, 2022), https://hyzonmotors.com/hyzon-motors-provides-update-on-2021-deliveries-and-financial-expectations/.

entered into its agreement with Shanghai HongYun, Defendants also would have known or became aware in the course of doing even a modicum of diligence, that their newest customer, which had committed to purchase more than 70% of Hyzon's 2021 vehicle deliveries, was a fake company with no financial resources of its own. The following table of Hyzon's publicly reported 2021 deliveries depicts just how much Hyzon depended on its sham savior to fill its 2021 delivery gap, as Shanghai HongYun alone accounts for over 70% of Hyzon's reported deliveries in 2021.

**Hyzon Reported 2021 HFCEV Deliveries (excluding trial leases)[14]**

| End-User | #Trucks Delivered | %Total | First Shipment Date |
|---|---|---|---|
| Royal Friesland | 1 | 1% | July 2021 |
| Municipality of Groningen | <15 | <17% | July 2021 |
| Municipality of Rotterdam | <2 | <2% | July 2021 |
| **Shanghai HongYun** | **29** **33** | **71%** | **November 2021** **December 2021** |
| Jan Bakker | <3 | <3% | Unconfirmed |
| JuVe/MPREIS | <4 | <5% | Unconfirmed |
| Total | 87 | 100% | CY 2021 |

15.   Defendants nevertheless proceeded with their fraudulent scheme for the most basic of business reasons: Defendants stood to make obscenely large profits from the hype that was EV SPAC mania and the massive amounts of Hyzon stock they would acquire or retain once shareholders approved the SPAC Merger. As a result of the SPAC Merger, Horizon, whose vehicle commercialization attempt bottomed out at about $190 million before being delisted, gained control (indirectly) of nearly 156 million shares (62%) of Hyzon Class A common stock, worth more than $1.5 billion the morning markets opened after the merger's close. Defendants Knight

---

[14] Based on the reports in Hyzon's public statements, which are discussed herein.

and Gu also gained nearly 200,000 shares and over 5.7 million stock options, worth more than $45 million in total for each Defendant,[15] in exchange for their pre-merger Hyzon holdings.

16.     But the truth ultimately emerged. The Company's stock fell hard. And thousands of outside investors who were misled by Defendants' fraudulent scheme suffered substantial losses. All told, Hyzon's stock lost over $3.4 billion in shareholder value, down nearly 75% from its Class Period high. Accordingly, Defendants must be held accountable.

## II.     JURISDICTION AND VENUE

17.     The action arises under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and § 78t(a)) and Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder by the SEC.

18.     The court has jurisdiction over this action's subject matter under Section 27 of the Exchange Act (exclusive jurisdiction over Exchange Act violations) and 28 U.S.C. § 1331 (federal question jurisdiction).

19.     Venue is proper in this District under Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) and (d). At all relevant times, Hyzon conducted business and maintained its headquarters, located at 475 Quaker Meeting House Rd, Honeoye Falls, NY 14472, in this District. Additionally, many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred, in substantial part, in this District.

---

[15] Based on the opening stock price for the first trading day after the merger closed, July 19, 2021, and a $2.00 exercise price per option.  *See* Hyzon, Form S1 Registration Statement, at F-69 (July 30, 2021), https://www.sec.gov/Archives/edgar/data/0001716583/000119312521231686/d47714ds1.htm.

20.     In connection with the acts alleged herein, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of national securities exchanges.

## III.   PARTIES

### A.   Lead Plaintiff

21.     Lead Plaintiff Alfred Miller, M.D. is a retired physician who currently resides in San Antonio, Texas. As set forth in the certification filed with this Court (ECF No. 12-1), Dr. Miller personally purchased Hyzon securities at artificially inflated prices during the Class Period, retained those shares throughout the Class Period, and suffered substantial losses upon the revelation of the corrective disclosures alleged herein.

### B.   Corporate Defendant

22.     Defendant Hyzon Motors Inc. f/k/a Decarbonization Plus Acquisition Corporation ("Hyzon") is a holding company for the Hyzon business, which purports to be a leading global supplier of zero-emission, hydrogen-fuel-cell-powered heavy vehicles for the commercial vehicle market and, in particular, back-to-base vehicle fleet operations. Organized under Delaware law and headquartered at 475 Quaker Meeting House Road, Honeoye Falls, NY, the Company operates in offices around the world, including in the United States, the Netherlands, Singapore, Australia, and China.

23.     On July 16, 2021, DCRB—a publicly traded special purpose acquisition company formed for the purpose of acquiring a private owned company and taking it public, DCRB Merger Sub Inc. ("Merger Sub")—DCRB's directly owned subsidiary, and the pre-merger entity Hyzon Motors Inc. consummated a business combination (referred to herein as "SPAC Merger") to take Hyzon public. Upon completion of the SPAC Merger, DCRB renamed itself as Hyzon Motors, Inc., and the entity previously known as Hyzon Motors, Inc. was renamed Hyzon Motors USA

Inc. ("Old Hyzon" or "Hyzon USA"). Hyzon USA also became a wholly owned subsidiary, and the only business of, the post-merger Hyzon f/k/a DCRB. As such, explanations of Hyzon's conduct includes conduct of DCRB by way of its agent and subsidiary Hyzon USA. Moreover, certain of the claims alleged herein are based on conduct of the entity now known as Hyzon, when that entity was known as Hyzon USA, Merger Sub, and/or DCRB (collectively referred to herein as the "Company"), and because any liability of that entity survived its name change, Hyzon remains liable for such conduct.

24.     Prior to the SPAC Merger, DCRB-issued securities traded on the National Association of Securities Dealers Automated Quotations ("Nasdaq"), which is an efficient market, under the ticker symbols "DCRBU" for Units, "DCRB" for common stock, and "DCRBW" for warrants. Since the completion of the SPAC Merger, Hyzon's stock has traded on the Nasdaq under the ticker symbol "HYZN." As of January 12, 2022, Hyzon had approximately 247.5 million shares of commons stock outstanding, owned by at least hundreds or thousands of investors.

25.     As part of its business operations, Hyzon has founded or acquired wholly owned subsidiaries, including Hyzon Automobile Technology (Shanghai) Co., Ltd. (based in China); Hyzon Motors Australia PTY LTD (based in Australia); Hyzon Motors Europe B.V. (based in the Netherlands); Hyzon Motors PTE. LTD. (based in Singapore); and Hyzon Motors Innovation GmbH (based in Germany).

## C.     Executive Defendants

26.     Defendant Erik Anderson ("Anderson") is a Director of Hyzon's Board of Directors who previously served as the President and Chief Executive Officer of DCRB throughout the Class Period until the July 2021 SPAC Merger. Prior to the Class Period, Defendant Anderson founded WestRiver Group ("WRG"), an investment firm purporting to provide integrated capital solutions

to the global innovation economy. He has served as Chief Executive Officer of WRG since its inception in 2002.

27.    Defendant Peter Haskopoulos ("Haskopoulos") served as Decarbonization Plus Acquisition Corporation's Chief Financial Officer ("CFO"), Chief Accounting Officer ("CAO"), and Secretary throughout the Class Period until the July 2021 SPAC Merger. According to his social media profiles, he has served in similar roles for related SPACs in addition to serving as the Chief Financial Officer of Riverstone Holdings LLCs, a multinational private equity firm.

28.    Defendant Craig Knight ("Knight") is the former Chief Commercial Officer and co-founder of Hyzon USA and currently serves as the Chief Executive Officer of Hyzon, a position he has held since August 2021. Before co-founding Hyzon, Knight served as the Chief Commercial Officer and, thereafter, the Chief Executive Officer, of Hyzon's corporate grandparent, Horizon Fuel Cell Technologies, for which Knight was a founding shareholder.

29.    Defendant Mark Gordon ("Gordon") has served as the Company's CFO since the July 2021 merger and served as Hyzon Motors USA's CFO from August 2020 until the July 2021 merger. Defendant Gordon is a member of the Company's Board of Directors.

30.    Defendant George Gu is the Executive Chairman of Hyzon's Board of Directors and served as Chief Executive Officer of Hyzon USA (and then Hyzon) from January 2000, when he co-founded Hyzon USA, until August 2021. Before co-founding Hyzon, Gu co-founded Hyzon's parent company, Horizon, in 2003 and served as its Chief Executive Officer until August 2019, when he transitioned to the role of Chairman of Horizon's Board of Directors. In January 2020, Gu, along with Defendant Knight, co-founded Hyzon as a standalone entity from Horizon.

31.    Defendant Robert Tichio is the Chairman of DRCB's Board of Directors, as well as a partner and managing director of Riverstone Holdings. During the Class Period, he directly

participated in the selling of the SPAC merger to investors, making multiple public statements along with Hyzon's senior management regarding the veracity and magnitude of Hyzon's committed orders, revenue forecasts, and general business operations.

32.     Defendants Anderson, Haskopoulos, Knight, Gordon, Gu, and Tichio are collectively referred to herein as the "Individual Defendants."

33.     Each of the Individual Defendants:

    (a)     directly participated in the management of the Company;

    (b)     was directly involved in the day-to-day operations of the Company at the highest levels;

    (c)     was privy to confidential proprietary information concerning the Company and its business and operations;

    (d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein in the Company's public statements and its filings with the SEC;

    (e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

    (f)     was aware of or recklessly disregarded the fact that the false and misleading statements discussed herein were being issued concerning the Company; and/or

    (g)     approved or ratified these statements in violation of the federal securities laws.

34.     Because of their respective positions of control and authority, their respective abilities to exercise power and influence over Hyzon's conduct, and their respective access to material inside information about Hyzon during the Class Period, the Individual Defendants at the time of the wrongs alleged herein, were each a controlling person within the meaning of Section 20(a) of the Exchange Act.

35.     The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of respondeat superior and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

36.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under respondeat superior and agency principles.

37.     The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

**D.     Other Relevant Persons and Entities**

**1.     Hyzon's Parent Company**

38.     Horizon Fuel Cell Technologies ("Horizon"), Hyzon's corporate grandparent, is a Singapore-based company purporting to be a world leading developer and manufacturer of various fuel cell electric energy solutions and products. Before Horizon spun off Hyzon into a standalone subsidiary, Hyzon operated as the Heavy Vehicle Business Unit ("HVBU") of Horizon and, from 2019 to 2020, was responsible for the development of fuel cell systems for Horizon's fuel-cell powered commercial vehicles. As of the date of this amended complaint, Horizon maintains majority control of Hyzon through its subsidiaries, controlling nearly 63% of Hyzon's shares.

**2.     Short Seller Activist Investment Firms**

39.     With regulators stymied, activist short seller firms have been, and continue to be, important adjuncts to ferreting out fraud in companies originating in or operating from foreign nations, including Singapore and China. Short sellers do the on-the-ground legwork in foreign nations—staking out foreign factories, for instance—to show that these companies have so little activity that they could not possibly be doing the types or magnitudes of business that they claim. With respect to this action, not one, but two separate short seller activist firms—Blue Orca and Iceberg Research—issued reports that brought the fraud scheme at issue in this action to light.

40.     Established in 2018, Blue Orca Capital ("Blue Orca") describes itself as a Texas-based "activist investment firm" managed and founded by Soren Aandahl, a former director of Glaucus Research Group and CIO of Glaucus Investments, which conducts investigative research on public companies in Asia-Pacific, Europe, and North America. The firm does so while taking publicly disclosed short positions that reflect their research. The firm has exposed accounting problems and fraud at several companies, primarily in China but also in other countries in Asia, Europe, and North America. Its founder, Soren Aandahl appears frequently as a commentator on *Blomberg Television* and *CNBC.* And unlike other short sellers, such as those who anonymously post on crowd sourced online resources, such as SeekingAlpha.com, Blue Orca and Soren Aandahl publish their analyses in their names and have since appeared in financial media publicly defending their analyses and conclusions.

41.     In May 2018, for example, shortly after Aandahl established Blue Orca, the firm issued a report claiming that Samsonite International SA, the worlds' largest luggage maker, had questionable accounting practices and poor corporate governance. In particular, the report alleged that Samsonite concealed slowing growth through debt-fueled acquisitions and had used accounting methods to massage earnings and inflate profit margins. The report further accused Samsonite's CEO of falsely claiming to have a doctorate degree in business administration on his resume, despite never completing the program. The firm disclosed that, in light of these claims, it had taken a short position on Samsonite. Eight days later, Samsonite's CEO stepped down from his role, citing personal reasons. In addition to Samsonite, both Blue Orca and Aandahl have issued reports and public statements concerning allegedly false and misleading statements and omissions by other corporate entities, at least one of which remain the subject matter of active securities fraud

class actions filed in federal court. *See Gloster v. Standard Lithium Ltd. et al.*, No. 1:22-cv-507 (E.D.N.Y.).

42.     Like Blue Orca, Iceberg Research is an activist short seller firm that "identifies substantial earnings misrepresentation[s] and accounting irregularities in financial statements issued by public companies[,] . . . locate[s] these notes in financial documentation," and then publishes its findings "to provide a complete picture for investors."[16] Established in 2015 by Arnauld Vaugner, the firm is best known for its reports on Noble Group, once one of the largest commodity trading firms in the world. Starting in 2015, Iceberg Research began posting reports accusing Noble of substantially overvaluing its assets and camouflaging its debt through financial engineering in a similar manner to the now notorious Enron. Iceberg supported these claims by citing accounting inaccuracies in Noble's public filings. Noble eventually fell apart after Iceberg's series of reports, losing nearly 99% of its stock value until the company was liquidated in November 2018.

43.     Beyond Noble, Iceberg Research has reported wrongdoings by other companies, including Tutor Perini, an American construction firm alleged to have overvalued its stocks in its financial report, and Tibet Water Resources, a Chinese company that allegedly reported brewery activities that did not exist. The firm's research has also been mentioned in various publications, including the Financial Times, the Wall Street Journal, Reuters, Quartz, South China Morning Post, and Business Times.

---

[16] "About Iceberg Research," ICEBERG-RESEARCH.COM, https://iceberg-research.com/about/.

## IV.    SUMMARY OF THE FRAUD

### A.    Hyzon: A Repackaging of a Flailing Chinese Company

44.    Since its inception, Hyzon has painted itself as a new and vital innovator in the inevitable, zero-emissions frontier. But very little about Hyzon's operations and technology is new or innovative. In truth, Hyzon operates as a second life for Horizon's failed attempts to commercially market its fuel-cell technology over the past seventeen years through its Chinese subsidiaries. By reorganizing and rebranding Horizon's flailing electric vehicle operation as Hyzon, Defendants were able to jettison their economically tarnished reputation and hopefully begin anew. But like most enterprises built on a flawed foundation, Hyzon was pre-destined to repeat Horizon's economic flailing again.

45.    Accordingly, Hyzon's business story, including the fraudulent scheme alleged herein, must begin with the story of its ultimate parent company, Horizon, the Singapore-based fuel-cell manufacturer formerly managed by Defendants Knight and Gu. In its first few years, Horizon initially focused its efforts on the commercialization of small-scale hydrogen-fuel-cell powered projects. In 2004, for example, Horizon launched its first proton-exchange membrane ("PEM") fuel cell stack as an alternative to other fuel-cell technologies. That same year, Horizon also began to develop, produce, and ship hydrogen-themed science experiment kits for students.

46.    As research and development progressed, however, Horizon shifted its trajectory to scaling up the size of its fuel cells for larger, power consuming equipment and applications. In 2015, Horizon began to develop fuel cells for transportation applications and general hydrogen-electric-based mobility. In 2018, Horizon successfully manufactured hydrogen fuel cells to power mid-sized buses and light delivery trucks. And in 2019, Horizon announced the commencement

of volume production of its "high-performance" VLS-II series fuel stacks for commercial vehicles, with an initial focus on heavy duty trucks.

47.     As part of these commercialization efforts, Horizon vehicle operations increasingly centered on China, where it established at least two subsidiary companies—(1) Jiangsu Horizon New Energy Technology Co., Ltd. ("JS Horizon"), based in Changzhou City, Jiangsu Province, China, and (2) Shanghai Horizon New Energy Technology Co.—to provide fuel cell stacks, hydrogen generator, and hydrogen storage solutions to East Asian markets (collectively with Horizon, "Horizon"). Through these companies, Horizon would sell its fuel cell technology to a third-party original equipment manufacturers manufacturer ("OEMs"), which would then either retrofit an existing vehicle to utilize the fuel cell stacks or construct a new vehicle by installing the fuel cell stacks into the empty shell and chassis of an established vehicle brand.

48.     Using this business model, Horizon managed to enjoy some initial success by selling to a small number of light-to-medium sized commercial vehicle operators in China. According to its public filings with the National Equities Exchange and Quotations ("NEEQ"), the over-the-counter exchange for small and medium-sized Chinese enterprises not listed on the Shenzhen or Shanghai stock exchanges, Horizon and/or its subsidiaries reportedly installed its fuel-cell battery systems in approximately 400 vehicles by the end of 2019.[17] Horizon, in turn, experienced an incredible jump in revenue, with revenues up nearly 540% over the years preceding its commercial vehicle enterprise, as illustrated in the chart below.

---

[17] *See* JS Horizon 2019 Annual Report, at 2, *available at* http://www.neeq.com.cn/disclosure/2020/2020-04-30/1588243669_066387.pdf.

**Horizon Compliance and Financial Filing for FY 2019 with Singapore Government[18]**

Corporate Compliance and Financial Profile of HORIZON FUEL CELL
TECHNOLOGIES PTE. LTD. (200310637H)

| Balance Sheet | 2019 Group | 2018 Group | 2017 Group |
|---|---|---|---|
| Total Assets | 32,311,228.00 | 12,202,391.00 | 13,442,244.00 |
| Total Current Assets | 27,431,885.00 | 9,873,964.00 | 11,569,226.00 |
| Total Liabilities | 34,049,223.00 | 20,220,442.00 | 19,941,232.00 |
| Total Current Liabilities | 14,053,526.00 | 1,785,531.00 | 1,506,321.00 |
| Retained Earnings (Accumulated Loss) | -26,030,159.00 | -26,042,863.00 | -23,233,200.00 |
| Profit and Loss | | | |
| Revenue | 28,896,728.00 | 4,489,463.00 | 3,422,103.00 |
| Profit(Loss) before tax from continuing operations | -145,215.00 | -3,425,936.00 | -3,279,219.00 |
| Profit(Loss) after tax from continuing operations | -145,215.00 | -3,425,936.00 | -3,279,219.00 |
| Profit(Loss) after tax from discontinued operations | * | * | * |
| EBIT | -64,661.00 | -3,425,936.00 | -3,279,219.00 |

49.    Behind the scenes, however, laid in wait one fatal liability. Because Horizon could not breach a diversified customer base, its revenue and sales numbers depended primarily on one purchaser, Shanghai SunLong Bus Co., Ltd. ("Shanghai SunLong"), which in 2019 accounted for nearly three quarters of JS Horizon's vehicle sales and 85% of its trade receivables (see Table of Horizon's Top 5 Major Customers below). Thus, as illustrated in the table below, if Shanghai SunLong were to experience financial hardship and become no longer able to pay its debts, Horizon's business would implode.

---

[18] As displayed in Iceberg Research, "Hyzon Motors Inc: Trouble at the ParentCo," at 3 (Oct. 6, 2021), https://iceberg-research.com/2021/10/06/hyzon-motors-inc-trouble-at-the-parentco/.

**JS Horizon 2019 Annual Report[19]**
Table of Top 5 Major Customers

| Rank 序号 | Customer 客户 | Annual Sales (RMB) 销售金额 | % Annual Shares 年度销售占比% | 是否存在关联关系 |
|---|---|---|---|---|
| 1 | 上海申龙客车有限公司 Shanghai SunLong | 150,000,000.00 | 74.24% | 否 |
| 2 | 南通亿能能源科技有限公司 | 18,390,605.52 | 9.10% | 否 |
| 3 | Horizon Fuel Cell Europe s.r.o. | 8,361,567.27 | 4.14% | 否 |
| 4 | 上海杰宁新能源科技有限公司 | 4,601,769.91 | 2.28% | 否 |
| 5 | Horizon Fuel Cell Americas Inc. | 3,953,594.78 | 1.96% | 否 |
| | 合计 | 185,307,537.48 | 91.72% | - |

50. This fatal risk materialized at the end of 2019, when Shanghai SunLong's parent company Tungshu Optoelectonic Technology, defaulted on three bonds in the course of one month,[20] and Horizon no longer could collect on its largest account's receivables. As a result, Horizon's free cash flow plummeted to RMB -49.7 million (-$7 million); its reported sales fell approximately 36%; and Horizon collected approximately only RMB 1 million of its RMB 56.5 million ($8 million) SunLong receivables.[21]

51. By the end of 2020—during a relative peak of EV stock market mania—Horizon's fuel cell sales plummeted, resulting in only 100 additional fuel cells sold, give or take, in 2020, and only 38 fuel cells during the first half of 2021, representing an 81% decline from its sales in 2019.[22]

---

[19] JS Horizon 2019 Annual Report at 16, *supra* n.17.

[20] Yujing Liu, "Third bond default by Chinese electronics firm within a month points to wider corporate governance issues," South China Morning Post (Dec. 3, 2019), https://www.scmp.com/business/china-business/article/3040265/third-bond-default-chinese-electronics-firm-within-month.

[21] Horizon 1H 2020 Semi-Annual Report, at 12, 90, http://www.neeq.com.cn/disclosure/2020/2020-07-31/1596191199_148674.pdf.

[22] This estimate derives from information in Hyzon's SPAC investor materials, in which it claims that Horizon had sold a total of 500 fuel cells by the end of 2020, *see* Hyzon July 2021 Investor Presentation, *available at* https://s28.q4cdn.com/786762755/files/doc_presentations/2021/07/Hyzon-Motors-Investor-Presentation-July-2021.pdf, viewed in combination with Horizon's financial reports, reporting deliver of nearly 400 fuel cell systems by the end of 2019.

**Declining Annual Sales of Horizon Fuel Cells from 2019-2021[23]**



52.     According to reporting by the Orange Group, a Chinese focused research organization, as of June 2021—a month before the SPAC Merger—Horizon and Hyzon had sold, in total, only 538 vehicle fuel cell stacks since the inception of Horizon's electric vehicle enterprise, 369 of which were installed in vehicles in China.[24]

53.     Horizon conceded the plummet in its enterprise value in its later filings with NEEQ, which revealed that the enterprise value of its EV vehicle sector bottomed out with a market capitalization of merely $190 million as of January 2021.[25]

---

[23] Ex. A, Blue Orca Report (citing Hyzon July 2021 Investor Presentation, *supra*, n.22; JS Horizon 2019 Annual Report, *supra* n.17; Orange Club Research, "Top 15 Hydrogen Fuel Cell Systems in China," https://www.shangyexinzhi.com/article/4198728.html ("Orange Club Report")).

[24] *See* Orange Club Report, *infra*, n.23.

[25] According to Horizon's regulatory filings, at that time, Horizon had nearly 36.1 million total shares outstanding with an average exercise price of approximately RMB 36.04. JS Horizon Equity Incentive Plan (Jan. 26, 2021), *available at* http://www.neeq.com.cn/disclosure/2021/2021-01-26/1611654052_860439.pdf; *see also* JS Horizon Report on Private Issuance of Shares, *available at* http://www.neeq.com.cn/disclosure/2020/2020-08-27/1598516135_141306.pdf (August 2020 private investment round valuing Horizon's equity at approximately $200 million).

**Horizon EV Vehicle Enterprise Value as of January 2021**[26]

| | RMB M | USD M |
|---|---|---|
| Total Shares Outstanding (m) | 36.1 | 36.1 |
| Share Price (RMB, USD) | 36.04 | 5.54 |
| Equity Value | 1,300 | 200 |
| (-) Cash and Equivalents | (60) | (9) |
| (-) Equity Investments | (3) | (0) |
| **Enterprise Value** | **1,237** | **190** |

54.     Further, Horizon conceded in its last publicly filed report with NEEQ that there was little demand for its fuel cell technology.

**Horizon 1H 2020
Semi-Annual Report**[27]

**Material Risks:**
目前，燃料电池技术总体普及
程度不高，产业化 面临挑战

*"At present, **the overall
popularity of fuel cell
technology is not high**, and
the commercialization faces
challenges."*



55.     In March 2021, with chances of recovery low and plans to spin-off Hyzon underway, Horizon de-registered from NEEQ in March 2021. As a result, Horizon filed no annual report for year 2020. As discussed below, however, it would find new, more lucrative means to access capitol through Hyzon's "separate," U.S.-based operations.

---

[26] *See* JS Horizon Equity Incentive Plan (Jan. 26, 2021), *available at* http://www.neeq.com.cn/disclosure/2021/2021-01-26/1611654052_860439.pdf.

[27] Horizon 1H 2020 Semi-Annual Report, at 4, *supra* n.21.

**B.    Take Two: Horizon Spins Off Hyzon to Rebrand Its EV Enterprise and Attract More Lucrative Investments from U.S. Capital Markets**

56.    Desperate to build momentum for its EV enterprise anew, Horizon and, in particular, Defendants Knight and Gu, realized that to achieve their purported decarbonization goals, they had to reset operations and somehow expand beyond its limited customer base. From their failed experiment with JS Horizon, they knew that they could not sustain commercialization by staying in East Asia, given low demand, low sales prices, and limited investor interest. Western capital markets, specifically the United States, on the other hand, provided a more lucrative sales and investment playground, particularly given the manic investor interest in zero-dollar revenue EV companies similar to JS Horizon. As such, in January 2020—just weeks after the beginning of JS Horizon's financial fall and weeks before it would be delisted on NEEQ – Defendants Knight and Gu filed paperwork establishing Hyzon as a spin-off and spiritual successor of Horizon's in-house HFCEV commercial vehicle unit.

57.    As initially conceived, Hyzon was to focus on the development of heavy-duty HFCEVs and hydrogen fuel cell stacks exceeding 100kW using Horizon's fuel-cell technology. Nearly two months later, in March 2020, the company officially launched with reported plans to start its integration facility in Honeoye Falls, NY by mid-year. In discussing this launch with media outlets, Gu, at the time, both the CEO of Hyzon and the Chairman of Horizon's Board of Directors, repeatedly proclaimed: "We have seen incredible growth in Asia in recent years at Horizon, and now with the experience gained from hundreds of trucks in commercial service, we aim to bring our technology to the roads of the world."[28]

---

[28] "Hyzon Motors Inc is Officially Launched with a Hydrogen Fuel Cell Heavy Vehicle Integration Facility in NY State, USA," FUELCELLWORKS (Mar. 16, 2020), https://fuelcellsworks.com/news/hyzon-motors-inc-is-officially-launched-with-a-hydrogen-fuel-cell-heavy-vehicle-integration-facility-in-ny-state-usa/.

58.     Before it could even produce a single fuel cell or retrofitted vehicle, Hyzon began issuing a barrage of press releases announcing new purported deals with global customers and partners. For example, on July 13, 2020, Hyzon USA issued a press release announcing that it had co-founded a European subsidiary, Hyzon Motors Europe B.V. ("Hyzon Europe") and that it had opened a European headquarters in Groningen, Netherlands.[29] Likewise, on August 16, 2020, the Company announced that it had entered into an agreement for Hyzon to supply hydrogen fuel cell-powered coaches to Western Australian iron ore miner Fortescue Metals Group's ("Fortescue") Christmas Creek operations.[30]

59.     It was during this infancy period that Hyzon also announced its first blockbuster deal. Specifically, on August 31, 2020, Hyzon USA and the New Zealand-based energy company, Hiringa Energy ("Hiringa") issued a joint press release stating that they had signed a "Heads of Agreement that secure[d] access for Hiringa and its fleet partners to the supply of [over 1500] zero emission Heavy Goods Vehicles (HGV) powered by zero emission hydrogen fuel cell technology,"

---

[29] As reported by various news outlets, this European branch was not, in fact, directly operated by Hyzon USA.  Rather, the company merely changed the sign on front door of recently established European partner and Netherlands-based vehicle retrofitter, Holthausen Clean Technology ("Holthausen"), which then used a capital infusion provided by Defendants to establish Hyzon Motors Europe.

[30] *See* News Release, Hyzon, "Hydrogen Mining Buses Mid-2021: West Oz Fuel-Cell Deal," (Aug. 17, 2020), https://hyzonmotors.com/hydrogen-mining-buses-mid-2021-west-oz-fuel-cell-deal/. According to Soliciting Materials (Form DEFA14A) filed by DCRB with the SEC on June 22, 2021 (nearly one year after the initial announcement), Fortescue had contracted for the delivery of "up to 10 of Hyzon's custom-built coaches." Since the 2020 announcement, Defendants, including Hyzon and Knight, have repeatedly cited the transaction, including in Soliciting Materials (Form DEFA14A), Prospectus (Form S-1), and Current Reports (Form 8-K) and press releases, as proof of existing customers, orders, and validation of Hyzon's technology. But to date, Hyzon has not reported that it has delivered such vehicles.

with 20 trucks to be deployed by the end of 2021,[31] as shown in the following excerpt from the company's August 31, 2020 press release:

## Hiringa Energy and HYZON Motors to deploy fuel cell-powered heavy trucks in New Zealand in 2021

31 August 2020
PRESS RELEASE

New Zealand's Hiringa Energy and US-based HYZON Motors Inc. have signed a Heads of Agreement that secures access for Hiringa and its fleet partners to the supply of zero emission Heavy Goods Vehicles (HGV) powered by zero emission hydrogen fuel cell technology.

The heavy fuel cell electric vehicles (FCEVs) will be tailored to meet the demanding and unique requirements of the New Zealand heavy freight and road transport sector and it is expected that the vehicles will enter service in New Zealand from the start of 2021.

This agreement supports Hiringa and its partners' strategy to roll out over 1,500 FCEVs by 2026, driving the cost of the technology down and unlocking widespread adoption of zero emission heavy transport.

Notably, the announcement did not disclose that Hiringa was essentially an unpaid channel partner with no plans to purchase for its own end use Horizon vehicles, leading investors to believe, among other things, that (1) Hyzon had at least one deep-pockets customer through Hiringa and (2) there was serious commercial demand for Hyzon's HCFEVs.

## C.    Hyzon's Efforts to Take Advantage of SPAC Mania

60.    Around the same time that the Company began pushing its new brand, several more-established EV startups, including Nikola and Lordstown Motors, all announced that they

---

[31] Press Release, Hiringa and Hyzon, "Hiringa Energy and HYZON Motors to deploy fuel cell-powered heavy trucks in New Zealand in 2021" (Aug. 31, 2020), https://www.hiringa.co.nz/post/hiringa-energy-and-hyzon-motors-to-deploy-fuel-cell-powered-heavy-trucks-in-new-zealand-in-2021.

each were going public through the resurging fad of SPAC deals. As discussed above, a special purpose acquisition company, "SPAC" for short, is a company established for the purpose of raising capital to finance the purchase of another company. As part of the SPAC process, the SPACs first lists itself on a stock exchange and raises proceeds through an initial public offering. The listed SPAC then identifies a target investment company, normally an unlisted private company, to execute a reverse takeover, thereby bringing the private company public. Notably, the target company can go public quicker and cheaper by cutting out the rules of a traditional initial public offering ("IPO"). The sponsors, on the other hand, usually stand to make millions no matter how the acquisition works out.

61.     These SPAC mergers were so attractive to emerging companies and deep-pocketed investors that the market and its intermediaries (lawyers, bankers, etc.) struggled to keep pace. As depicted in the following chart, in just the first quarter of 2021 alone, nearly 300 SPACs launched on U.S.-based stock exchanges, raising nearly $83 billion in total funds, even for zero-revenue companies like Hyzon.

**The Rise and Fall of SPAC Mania**[32]



62.     It was for these very reasons that Hyzon oriented itself and its public image so that it too could attract quick and massive capital influxes, especially of the magnitude offered by a SPAC acquisition.[33] Between October 2020 and February 2021, Hyzon issued weekly-to-biweekly press releases and offered executive interviews all highlighting key investors and partnership opportunities in order to court these blank check investors. Market analysts responded to these

---

[32] Image available at https://www.cbinsights.com/research/spac-mania-slowdown/. Note, in April 2021, the SEC issued new rules increasing government scrutiny of SPAC deals.

[33] *See* Press Release, Hyzon, "Fortescue Strikes Deal to Build Fleet of Hydrogen-Fueled Buses" (Sept. 9, 2020), https://investors.hyzonmotors.com/news/news-details/2020/-Fortescue-Strikes-Deal-to-Build-Fleet-of-Hydrogen-Fueled-Buses/default.aspx ("The use of hydrogen and fuel-cell technology in commercial vehicles isn't new. However, investor interest has intensified since U.S. startup Nikola Corp. listed its shares in early June. ***Despite zero revenue, Nikola quickly saw its market value surge to almost $29 billion. . . . Hyzon has similarly big ambitions.***" (Emphasis added)).

updates with fervent excitement. Some analysts such as Climate Capital even went so far to boldly question whether Hyzon could be the "Tesla of trucking."[34]



63.     During this time, Defendants Knight and Gu also took measures to ensure that Horizon and each of them personally would be well compensated in the event their repackaging gambit would pay off. On November 12, 2020, before Hyzon had actually made any new vehicle sales or deliveries, the Company awarded both Knight and Gu 3.125 million options for Hyzon common stock, exercisable at a price of $2.00 per share at any point before 2035.[35]

64.     On January 12, 2021, after Hyzon USA had accumulated capital and was on the verge of finalizing a SPAC merger, it entered into an intellectual property agreement with JS Horizon, pursuant to which each of Hyzon and JS Horizon conveyed to the other certain intellectual property rights relating to their core fuel cell and mobility product technologies, and under which Hyzon inexplicably agreed to pay JS Horizon two fixed payments totaling $10 million. At that same time, Hyzon USA entered into the "Horizon Supply Agreement" with JS

---

[34] *See* "The Climate Elevator Pitch: Is Hyzon the Tesla of Trucking," CLIMATE & CAPITAL MEDIA (Dec. 4, 2020), https://www.climateandcapitalmedia.com/the-climate-elevator-pitch-is-hyzon-the-tesla-of-trucking/.

[35] *See* Hyzon, Proxy Statement for Special meeting of Stockholders of DCRB, at 195-96, F-69 (June 21, 2021), *available at* https://www.sec.gov/Archives/edgar/data/0001716583/000119312521194105/d924103ddefm14a.htm.

Horizon to supply certain fuel cell components, for which Hyzon made a $5 million prepaid deposit payment for long lead time components that had not yet been received. In doing so, Hyzon created a direct channel for transmitting funds acquired from new investment capital, not sales of vehicles, to Horizon. (This was in addition to Horizon's majority equity stake in Hyzon). Moreover, Hyzon committed its business model to relying on others, rather than its own hydrogen fuel cell technology and production capabilities.

**D.     Formation of SPAC DCRB**

65.     On September 22, 2020, DCRB filed an S-1 Registration Statement with the SEC and organized as a SPAC. (DCRB would amend the S-1 Registration Statement several times up through October 2020).

66.     At the time, DCRB was led by Defendants Anderson and Haskopoulos. DCRB sought to raise up to $345 million through its IPO, which could be used to fund an acquisition or invest into an acquisition target. At the time of the S-1 Registration Statement, it did not appear that DCRB had any intention of acquiring Hyzon. At that time, it was reported that DCRB would be targeting an acquisition whose principal effort was developing and advancing a platform that decarbonizes the most carbon-intensive sectors of the economy, including the energy, agriculture, industrial, transportation, commercial, and residential sectors.

67.     On October 22, 2020, DCRB successfully completed its IPO, generating gross proceeds to the Company of $200 million. Simultaneously with the consummation of the IPO, DCRB completed a private sale to DCRB's sponsor, Decarbonization Plus Acquisition Sponsor, LLC, generating additional gross proceeds to DCRB of approximately $6 million.

E.     **Hyzon Finds Its SPAC Savior; Hypes Purported Big-Name Customers, Contracts, and MOUs to Support its Bloated $2 Billion Valuation and Lofty Projections**

68.     The Class Period begins on February 9, 2021, when Hyzon announced that it and DCRB had agreed to a merger, which, if approved by DCRB's shareholders, would take Hyzon public and list it on Nasdaq. Under the terms of the business combination agreement and plan of reorganization (the "Business Combination Agreement"), DCRB would offer new shares to Old Hyzon's pre-SPAC-Merger shareholders and would conduct a large private offering of securities to raise additional capital. With the $220 million in gross proceeds DCRB had raised in its October 22, 2020 IPO combined with proceeds from other contemporaneous stock offerings, it was expected that the SPAC Merger would provide Hyzon with $626 million in new cash.

69.     In the press release publicizing the SPAC Merger, Defendants represented that the gross proceeds raised from the transaction would be used to "fully fund and accelerate Hyzon's well-defined growth strategy in the hydrogen fuel cell-powered, zero-emission commercial transportation sector.[36] Additionally, they emphasized that Hyzon's sought-out SPAC transaction had an "implied enterprise value" of **$2.1 billion**—approximately 10 times that of the enterprise value ascribed to its Chinese parent JS Horizon just one-month ago. To justify the hefty valuation, Defendants stressed that "Hyzon's technology [was] already commercialized with [an] existing global footprint, and [Hyzon's] sales pipeline with blue-chip Fortune 100s and municipalities."[37]

70.     Defendants also went out of their way to highlight Hyzon's deals in place and delivery schedule, in an attempt to bolster Hyzon's technology and business model:

---

[36] *See* Media Release, Hyzon, "Hyzon Motors, the Leading Hydrogen Fuel Cell Heavy Vehicle Company, Announces Business Combination with Decarbonization Plus Acquisition Corporation; Combined Company Expected to be Listed on Nasdaq" (Feb. 9, 2021), https://hyzonmotors.com/wp-content/uploads/2021/02/Hyzon-DCRB-Transaction-Press-Release-02.09.21-Final.pdf.

[37] *Id.*

Craig Knight, Chief Executive Officer and Co-Founder of Hyzon, said, "We are excited to partner with DCRB at an important inflection point for our company, hydrogen and society. ***Deliveries of Hyzon fuel cell powered heavy trucks to customers in Europe and North America will occur this year, well ahead of our competitors, and our committed sales pipeline is proof that the world is truly recognizing the need to develop innovative solutions to mitigate climate change and accelerate efforts to move the world economy down the path to net-zero emissions.***"[38]

71.     The same day that they announced the SPAC Merger (February 9, 2021), DCRB and Old Hyzon's senior executives, including Defendants Knight, Gordon, and Tichio, hosted a conference call with investors.[39] During that call, the senior executives emphasized the future revenue coming Hyzon's way through its committed sales pipeline and big brand-named customers. For example, Tichio, as Chairman of DRCB, relayed that: "***The Company [Hyzon] has a sales pipeline for 2021 that is 100 percent under contract or MOU, providing real runway visibility***, ***and its customers include some of the most recognizable global brands and the largest municipalities in the world***." (As discussed below, these statements were false and misleading because, when placed in context, and viewed with Hyzon's contemporaneously published investor presentations, they suggested that Hyzon's 2021 sales pipeline, totaling at least $37 million in revenue, consisted solely of "100% certain" contracts and MoUs, when no such "100% certain" pipeline existed).

72.     These contracts and MOUs already in place, according to Defendant Gordon, covered Hyzon's 2021 revenue projection of $37 million 100 percent, and foreshadowed exponential growth for Hyzon over the next five years to follow:

[T]aking just the medium and heavy duty truck and bus segments into account, Hyzon's projections are compelling. ***Hyzon forecasts***

---

[38] *Id.* (emphasis added).

[39] Full transcript available at https://www.sec.gov/Archives/edgar/data/1716583/000119312521033234/d109364dex992.htm.

> ***to grow from $37 million on revenue on 85 units sold in 2021***, to
> $3.3 billion in revenue on nearly 10,000 units sold during 2025.
> ***Our 2021 forecast is 100 percent covered by contracts and***
> ***MOUs,*** while our 2022 forecast is almost 50 percent contract and
> MOU covered, and more than 100 percent covered when high-
> probability orders are taken into account. Thirty percent of 2025
> revenue is accounted for under current MOUs.[40]

73. During the same conference call, DCRB and Old Hyzon's executives also published an investor presentation entitled "Accelerating the Hydrogen Transition" ("February 9, 2021 Investor Presentation"), which touted its "Top Tier Customers/End Users/Partners", "Customer Deployments", and "Vehicle Customers."[41]

74. Significantly, on page 5 of the February 9, 2021 Investor Presentation (shown below), in a slide entitled "Investment Overview," Hyzon claimed, among other things, that it had a "***2021 backlog of ~$40 million under contract or [Memorandum of Understanding] from blue-chip Fortune 100s and municipalities*** with exceptional (and rapidly growing) 2022+ visibility."[42] Lower on that slide, in a section referred to as "Top Tier Customers/End Users/Partners," the company also listed logos of ***14 companies***, specifically: AirProducts, Heineken, Ikea, Fortescue Metals Group ("Fortescue"), Korea Zinc, Neom, TotalEnergies SE, Coca-Cola, The Edeka Group, PSA International, State of Berlin, Port of Antwerp, Port de Barcelona, and Bank of America (depicted below).

---

[40] *Id.* (emphasis added).

[41] Available at https://www.sec.gov/Archives/edgar/data/1716583/000119312521033234/d109364dex993.htm (attached Hyzon's Feb. 9, 2021 Form 8-K as exhibit 99.3).

[42] *Id.* (emphasis added).



As discussed herein, Hyzon misrepresented or overstated the nature of its relationships with several of these large logo-represented entities and has since edited iterations of this presentation several times to eliminate reference to these brand-named customers, without any indication or notice to investors regarding the extent or meaning of the surreptitious changes.

75.     The February 9, 2021 Investor Presentation also included a slide on page 18 touting Hyzon's "100% Certain" and "High Probability [70%+]" Orders (shown below). In particular, the Presentation claimed that Hyzon had 100% certain contracted orders **"[f]rom 13 private and public sector customers"** and that these 100% certain orders totaled nearly $40 million in value for its 2021 revenue forecast.[43] Immediately next to that claim, the Presentation displayed a global map of Hyzon's purported customer base that includes logos for 14 entities and a description of that entity's purported order. As depicted below, these entities were Air Products, **Coca-Cola,**

---

[43] *Id.* (emphasis added).

- 37 -

*Heineken*, TotalEnergies, The Edeka Group, Frieslnd Campina, *Ikea*, Russell Logistics, Neom, Korea Zinc, Centurion, PSA, Fortescue, and Hiringa.[44]



76.     Notably, for Heineken, the map graphic above indicated a "2021 Delivery (Finalizing [Purchase Order], 5 / $2mm) 500+ / $20mm+." In other words, according to Defendants, Hyzon and Heineken were near finalizing a purchase order for 5 trucks to be delivered in 2021, resulting in $2 million in revenue.

77.     For Ikea, the map graphic similarly details an order for a "2021 Delivery (Finalizing Contract, 2 / $1mm) 500+ / $20mm+." In other words, according to Defendants, Hyzon and Ikea were near finalizing a purchase order for 2 trucks to be delivered in 2021, resulting in $1 million in revenue.

---

[44] *Id.* (emphasis added). At the bottom of the slide, Hyzon notes: "Logos representative. Some sales made to 3PL customers that are not the end users depicted here . . . ."

78.     Also, as it will become relevant later, the map included information regarding Hyzon and Horizon's historic deals, including that Horizon had 70 vehicles with Horizon fuel cells "delivered to date by other OEMs" to a leading steel company based in East Asia.

79.     In another, distinct graphic of "Vehicle Customers" on page 29 (shown below), the February 9, 2021 Investor Presentation further lists fifteen entities: Air Products, The Edeka Group, Coca-Cola, Heineken, Ikea, Fortescue, Neom, Korea Zinc, State of Berlin, Port of Antwerp, Nestle, SoCalGas, Port de Barcelona, PSA, and Total Energy.



80.     The Company also included a slide for its summary projected financials (shown below), claiming that it expected to sell 85 vehicles and earn $37 million in total revenue in 2021, presumptively on the "100 certain" and "high probability" contracts and customers identified in the presentation.



## F.   Surreptitious Edits to Committed-Orders and Customer-Base Claims

81.     The very next day, on February 10, 2021, the Company filed two Soliciting

Materials (two Form DEFA14As), one of which included a different version of the February 9,

2021 PowerPoint presentation shown to Hyzon's investors.[45] Notably, on slide 5 of the February

10, 2021 Presentation (partial slide shown below), the Company dropped, without justification,

two entities from the same slide in the February 9, 2021 Investor Presentation—Air Products and

PSA—as listed "Top Tier Customers/End Users/Partners" and replaced them with Viva Energy

Australia ("Viva").



---

[45] Full presentation available at https://www.sec.gov/Archives/edgar/data/1716583/
000119312521036457/d17930ddefa14a.htm.

82.     Likewise, on slides 18 and 29 of the February 10, 2021 (partial slide shown below), the Company dropped, without explanation, purported customers Air Products, Centurion, and Nestle, from its infographics and added other purported partners and entities to fill the holes. Despite these edits, the company made no indication that the brand-named entities previously referenced were no longer customers, nor did the Company amend its claims about its revenue under contract or MoU or its summary projected financials.




**Feb. 9, 2021 Presentation ("x" added)**          **Feb. 10, 2021 Edits to Presentation**

83.     On February 12, 2021, the Company filed a second Form DEFA14A appending a further edited version of the February 9, 2021 Investor Presentation. Again, the Company included no explanation in the edited presentation regarding any changes, particularly regarding customers. On slide 5 of the February 12, 2021 presentation (partial slide shown below), for example, the Company dropped the Coca-Cola logo as a top tier customer, but added other entities, such that the total number of top tier customers (14) matched that of the original February 9, 2021 presentation:

**February 9, 2021 Version (shown to investors)**



**February 12, 2021 Version**

84.    Notably, on slide 18 of the February 12, 2021 Investor Presentation (shown below), the Company removed all company logos from the presentation's customer map and omitted the number of private and public contracted orders that were 100 percent certain. Nevertheless, the Company left the general descriptors of the companies and the contracts from the previous versions, including descriptors for a "beverage company," *i.e.,* Coca-Cola, and a global brewer, *i.e.,* "Heineken." Further, it maintained, among other things, that it had "~$40mm under contract or MOU for 2021 revenue forecast."



85.     Finally, on slide 29 of the February 12, 2021 Investor Presentation (partial slide shown below), the Company added and removed major logos from its chart of "Vehicle Customers", including removing the Coca-Cola and Ikea logos:

 

**Feb. 9, 2021 Presentation ("x" added)**     **Feb. 12, 2021 Edits to Presentation**

86.     Despite these edits, the company made no changes to its claims about its revenue under contract or MoU or its summary projected financials.

87.     Nevertheless, Hyzon achieved early credibility from the investment community by promoting orders from these name brand customers. For example, in a February 9, 2021 article talking up the SPAC merger, 24/7 Wall St. emphasized Hyzon's "'advanced discussions' with Coca-Cola for delivery of more than 500 heavy trucks for in excess of $200 million."[46]

---

[46] "Hydrogen Vehicle Maker Hyzon Raises $626 Million in SPAC IPO," 24/7 WALL ST. (Feb. 9, 2021), *available at* https://247wallst.com/autos/2021/02/09/hydrogen-vehicle-maker-hyzon-raises-626-million-in-spac-ipo/.

**G.      Defendants' Media and Conference Blitz to Sell the SPAC Merger to Investors; Announcement of a Major Vehicle Supply Agreement with Hiringa**

88.      After filing the February 2021 Investor Presentations, Defendants began a cable, digital, and in-person media blitz campaign in the United States, Australia, and other locations in an effort to persuade shareholder to approve the SPAC merger and to garner investor interest. Hyzon did so by repeatedly and falsely touting its existing committed customer base in a series of press releases, investor calls, social media posts, and industry conferences. As illustrated in the following screenshots, Defendant Knight also discussed the SPAC Merger in interviews with several financial news outlets, emphasizing the "secured orders" already in place.

**Def. Knight Interview with auszbiz[47]**
*February 11, 2021*

> *"[The SPAC process] was an expedient way for us to go about the process, get the money we need on the balance sheet, gives us the firepower we need to execute . . . on our plan to deploy thousands of fuel-cell-powered commercial vehicles within the next three years."*



**Def. Knight Interview with CNBC[48]**
*February 9, 2021*

> *"We have a long technology base which has been out over a long time and a strong global network . . . . We think that's evidenced by the fact that we have secured orders already from customers in three different continents."*



---

[47] Full interview available at https://www.youtube.com/watch?v=kbSaGHASeJY&ab_channel=HyzonMotors.

[48] Full interview available at https://www.cnbc.com/video/2021/02/09/hydrogen-based-truck-maker-hyzon-motors-ceo-on-spac-merger.html.

89.     It was in the midst of this media blitz that Hyzon provided its biggest update to date concerning the Company's August 2020 Heads of Agreement with Hiringa for the supply of 1,500 vehicles. Specifically, on February 17, 2021, the Company announced that it advanced its partnership with Hiringa, and that "the two companies ha[d] signed a vehicle supply agreement," with "the first batch of [twenty] vehicles . . . expected to enter service in New Zealand by the end of 2021."[49] Moreover, the Company reiterated its "plans to have up to 1,500 fuel cell trucks on the road in New Zealand by 2026 . . . ." To reach a broad investment and EV audience, Hyzon posted the news about its Hiringa deal on both its webpage and its Twitter account @HyzonMotors by issuing the following tweet.

**February 17, 2021 Tweet**



---

[49] Press Release, Hyzon, Hyzon Motors and Hiringa Energy advance partnership to decarbonize heavy road transport in New Zealand (Feb. 17, 2021), https://hyzonmotors.com/hyzon-motors-and-hiringa-energy-advance-partnership-to-decarbonize-heavy-road-transport-in-new-zealand/.

90.     The news was well-received by the EV media, lauding the new "customer" of Hyzon's "ordering a total of 1,500 fuel cell trucks over the next five years till 2026."[50]

91.     Eleven days later (February 28), Defendant Knight participated in a fireside chat with Alan Adler, Detroit Bureau Chief at FreightWaves, touting, among other things, Hyzon's business relationships with partners like Hiringa. DCRB filed Soliciting Materials (a Form DEFA14A) containing a transcript of this fireside chat with the SEC on March 4, 2021.[51]

92.     Thereafter, on March 8, 2021, the Company issued a press release, which again reminded investors of the major vehicle supply agreement Hyzon had with Hiringa for the delivery of 1,500 trucks over the next five years, with first shipments planned for the second half of 2021:

> Hyzon and Hiringa Energy (New Zealand) recently announced that the two companies had signed a ***vehicle supply agreement***. Hyzon is targeting the ***delivery of 1,500 fuel cell*** powered heavy trucks by 2026 as part of the agreement with Hiringa. As binding orders for those trucks are placed, Hyzon anticipates fulfilling them from the Groningen facility, ***with first shipments planned for the second half of 2021***.[52]

The press release did not disclose that Hiringa was merely a channel partner, not a customer or end-user of HFCEVs. Hyzon would go on to make virtually identical representations and

---

[50] "Hiringa Energy orders 1500 hydrogen fuel cell trucks from Hyzon Motors for New Zealand," ELECTRIVE.COM (Feb. 18, 2021), *available at* https://www.electrive.com/2021/02/18/hiringa-energy-orders-1500-hydrogen-fuel-cell-trucks-from-hyzon-motors-for-new-zealand/.

[51] Available at https://www.sec.gov/Archives/edgar/data/0001716583/000119312521068375/d134706ddefa14a.htm. In addition, on March 1, 2021, DCRB filed its 2020 Annual Report, signed by Defendants Anderson and Haskopoulos, on a Form 10-K with the SEC, which referenced and referred investors to "the Form 8-K filed with the SEC on February 9, 2021 for additional information" regarding the merger, the materials for which included the deceptive February 9, 2021 Investor Presentation. Available at https://www.sec.gov/Archives/edgar/data/0001716583/000121390021012580/f10k2020_decarbonization.htm.

[52] Press Release, Hyzon, "Hydrogen Now™" Event to Showcase Virtual Ride Along in a Zero-Emission, Hydrogen Fuel Cell Powered Truck at Hyzon's Production-Ready Groningen Facility" (Mar. 8, 2021), https://hyzonmotors.com/hyzon-motors-announces-hydrogen-now-event-to-showcase-virtual-ride-along-in-a-zero-emission-hydrogen-fuel-cell-powered-truck-at-its-production-ready-groningen-facility/ (emphasis added).

omissions regarding its relationship with Hiringa in Preliminary Proxy Soliciting materials on

Form PRER14A filed with the SEC on March 17, May 14, June 4, June 12, June 16, June 21, June

30, and July 12.[53]

93.     On March 10, 2021, Defendants Knight, Gordon, and Tichio participated in the

Cowen Mobility Disruption Virtual Summit, during which they emphasized Hyzon's customer

commitments in place bolstering Hyzon's 2021 outlook. As Knight explained:

> [W]e now have more customer commitments than we have 2021
> revenue forecasts, so we're feeling quite confident about our 2021
> outlook. Basically, **customer commitments are documented
> orders, tender wins, that sort of thing, and the high probability
> orders** – coming back to your question – **are really those
> scenarios where you've been told you've been selected as the
> vendor but you haven't yet got the contract in place**, or you've,
> you know, the customer has given you a written confirmation by
> email that they're ordering, and you're going through contract
> discussion, etc., talking about specifications, performance
> acceptance criteria and that sort of thing.[54]

These statements, however, were misleading, as, when viewed by themselves and in context of

Hyzon's other contemporaneous statements, they (1) falsely suggested that as of March 10, 2021

Hyzon's 2021 revenue forecasts were covered by "100% certain" orders and (2) deceptively

reinforced investors' belief that Hyzon had deals in place with big-name brands listed in its

investor presentations like Heineken and Coca-Cola who, in truth, were not real customers.

---

[53] *See also* Mar. 17, 2021 Preliminary Proxy Statement, *available at* https://www.sec.gov/
Archives/edgar/data/0001716583/000119312521084245/d46419dprem14a.htm ("To date, Hyzon
has received binding orders for Hyzon-branded commercial vehicles and coach buses in an
aggregate value of approximately $18.2 million from companies around the world, including
Hiringa and Fortescue Metals Group Ltd. ***Hiringa has placed a binding order for the first 20
trucks*** . . . and aims to deploy up to 1,500 fuel cell powered heavy trucks manufactured by
Hyzon to fleet operators in New Zealand by 2026 as part of a partnership to decarbonize heavy
road transport in New Zealand. ***Hyzon expects the first shipments of four trucks to occur by the
first quarter of 2022.***" (Emphasis added)).

[54] Emphasis added. Full transcript available at https://www.sec.gov/Archives/edgar/data/
0001716583/000119312521083405/d150330ddefa14a.htm.

94.     On April 23, 2021, the Company announced that it and Raven SR, a renewable

fuels company, had entered into a Memorandum of Understanding under which the two agreed to

work towards building up to 100 hydrogen hubs across the US and globally, with the first two hubs

to be built in California. Conspicuously missing from the press release, however, was any mention

that Defendant Gordon—Hyzon's CFO—was the chief information officer of Ascent Hydrogen,

a private equity firm that had invested heavily in Raven.

## H.     Defendants Double Down on Revenue Projections and 2021 Deliveries Despite Dropping of Committed Customers and Growing Supply Chain Concerns

95.     Throughout the second quarter of 2021, Hyzon continued to reaffirm its previous

vehicles-delivered and revenue projections, as well as its purported 20-vehicle delivery to Hiringa

by the end of 2021. For example, on April 29, 2021, the Company published an "Analyst Day

Presentation," conveying customer and financial information similar to the information provided

in its February 9, 2021 Investor Presentation. On Slide 8 of the April 29, 2021 Presentation (partial

slide shown below), for example, the Company again gave an investment overview, claiming that

it had **"$55 million of backlog under contract or MOU** (up from $40 million in February 9, 2021

transaction announcement presentation)", as well as an "[e]xpanding" list of "Top Tier Customers

/ End Users / Partners" which secretly removed formerly touted "top customers" and replaced them

with lesser domestically known customers and partners.[55]



96.     On Slide 35 of the April 29, 2021 Presentation (shown below), the Company again

included a map of its customer deployments, still stripped of logos, claiming to have a southeast-

---

[55] Apr. 29, 2021 Analyst Day Presentation, *available at* https://www.sec.gov/Archives/edgar/
data/0001716583/000119312521138263/d165937ddefa14a.htm (emphasis in original).

based beverage company, *i.e.*, Coca-Cola, a global brewer, *i.e.*, Heineken, and a leading retailer, *i.e.*, Ikea as customers—the latter two companies with contracts or purchase orders being "finaliz[ed]." The "Customer Deployment" map also included a reference to Hiringa.



97.     Furthermore, on slide 59 of the April 29, 2021 Presentation (partial slide shown below), the Company again edited the visual listing of Hyzon's vehicle customers, this time removing without explanation the logo for Heineken and, in its place, inserting a duplicate logo for grocer group FrieslandCampina.

 

**Feb. 12, 2021 Edited Presentation**　　　**Apr. 29, 2021 Presentation**

98.　　Additionally, on Slide 25 of the April 29, 2021 Presentation, the Company repeated its claim that it had a "vehicle supply agreement ***to supply trucks to New Zealand-based Hiringa Energy***; ***first deliveries expected by EOY 2021***" without clarifying that Hiringa was not a customer but rather a channel partner.[56]

99.　　Despite the Company's purportedly increasing short-term backlog and the changes to its list of committed customers, including the promised delivery trucks to Hiringa, the Company maintained in the April presentation its earlier projections for 2021 revenue and vehicles delivered, ~$37 million and 85 vehicles, respectively.[57]

---

[56] *Id.* (emphasis added).

[57] On May 13, 2021, the Company filed an amendment to the 2020 Annual Report, signed by Defendants Anderson and Haskopoulos, on a Form 10-K/A with the SEC. And on May 24, 2021, the Company filed its quarterly report for the quarter ended March 31, 2021 on Form 10-Q with the SEC (the "1Q21 Report"). Both the 10-KA and 1Q21 Report referred investors to "the Form 8-K filed with the SEC on February 9, 2021 for additional information" regarding the merger, which materials included the deceptive February 9, 2021 Presentation.

100. Thereafter, Defendants continuously reaffirmed the certainty of Hyzon's ambitious revenue and vehicles-delivered forecast, even though its announced agreements, if actually fulfilled, totaled only a fraction of Hyzon's 2021 targets.[58] Additionally, Defendants told investors that its 2021 targets would not be affected by global supply chain issues.

101. On June 16, 2021, Defendant Knight participated in a fireside chat hosted by Bernstein. Knight said, among other things, the following regarding revenue targets:

> We've had a couple places in Europe recently, we're engaging with customers about the first one or two vehicles, and they want to already order 10 or 20 or more recently, we're now seeing [inaudible], a major retailer, they wanted 70 vehicles straight away, subject to the first four vehicles meeting all the various performance criteria. They wanted to commit to 70.
>
> …
>
> [T]he other thing we've had to do is order a lot of work in progress materials earlier than we would normally have had, because of supply chain challenges in the market and all the rest of it. ***I'd like to remain a little conservative on this but providing there are no more nasty surprises in supply chains and those kind of things, we'll definitely hit this year's targets***.
>
> ***We see ourselves making this year's goal, making this year's targets, and we are working very hard to have the foundations there so that next year's targets are very achievable***.[59]

---

[58] *See, e.g.*, Feb. 17, 2021 Hiringa Press Release, *supra* n.49; Press Release, Hyzon, "Hyzon Motors Gives Update on Status of 15 Hydrogen Fleet Vehicles to Be Delivered to Groningen Municipality in 2021" (Apr. 19, 2021), https://hyzonmotors.com/status-update-groningen-municipality-hydrogen-fleet/; Press Release, Hyzon, "Hyzon Announces New 50 Tonne Fuel Cell Truck Orders with Leading Dutch Transport Companies, Jan Bakker and Millenaar & van Schaik" (May 29, 2021), *available at* https://hyzonmotors.com/hyzon-announces-new-50-tonne-fuel-cell-truck-orders-with-leading-dutch-transport-companies-jan-bakker-and-millenaar-van-schaik/ ("expect[ing] to deliver up to three vehicles in Q4 of 2021"); Press Release, Hyzon, "Hyzon Motors Announces Order for up to 70 Hydrogen Trucks for Austrian Supermarket Chain," *available at* https://hyzonmotors.com/hyzon-motors-announces-order-for-up-to-70-hydrogen-trucks-for-austrian-supermarket-chain/ ("initial delivery" of at least three vehicles "planned for Q4 of 2021").

[59] Emphasis added. Full transcript on file with the SEC and available at https://www.sec.gov/Archives/edgar/data/1716583/000119312521193298/d111504ddefa14a.htm.

102.     Similarly, on June 29, 2021, Defendants Tichio and Knight attended a virtually held Fireside Chat, hosted by IPO Edge, during which they referred the audience to, and provided them with, the February and April 2021 PowerPoint presentations described above. In response to a question about Hyzon's lack of positive revenue, Tichio stated:

> [I]f you take a look at 2021, ***the company is you know projecting $37 million of revenue [from] vehicles that will actually roll off its lot this year.*** That is what we had communicated back in February. ***We still feel extraordinarily comfortable with that assessment,*** in that belief in terms of the pathway for the company and that the company has already demonstrated publicly through its online virtual tour with respect to its actual vehicles that were that that are on the road that are functioning and that are all regaining fantastic commercial traction right now.[60]

103.     Further, he elaborated that, concerning the Company's backlog, "80% [of which] is outside of North America":

> [There are] two sorts of buckets which is contracted ordered 100% certainty . . . from public and private sector customers . . . Then there are high probability orders, and those are companies that have many times express indications to scale their truck orders and grow the conversion of their fleets over time . . . .[61]

104.     Defendant Knight also expounded upon Horizon, Hyzon's operations in China, and Hyzon's customers around the globe, disclosing that Hyzon's projected revenue and delivery targets already included sales to East Asia:

> So the parent company is a Singapore-based company with operations in China . . . It's a natural place to have operation. So ***there's quite substantial operations under Horizon the parent company in China***. And through the license agreement and the commercial agreement between Horizon and Hyzon, Horizon will

---

[60] Emphasis added. Full transcript filed in soliciting materials (Form DEFA14A) with the SEC and available at https://www.sec.gov/Archives/edgar/data/0001716583/000119312521203891/d174425ddefa14a.htm. IPO Editor-in-Chief noted, in response, that Hyzon's 2021 revenue projections and 2023 positive income projections set it apart from other EV SPACs, which were not predicting positive income until 2025 or 2026. *Id.*

[61] *Id.*

continue to sell fuel cell stacks within China, for example, into various applications. However, Horizon will never make trucks and buses. . . . Also **Hyzon is supplying complete vehicles in China, as well**, which Horizon will never do.[62]

**Images of Defendants from IPO Edge Virtual Fireside Chat**



| **John Jannarone** | **Defendant Knight** | **Defendant Tichio** |
| *Editor-in-Chief, IPO Edge* | *Hyzon CEO* | *DCRB Chairman* |

**I.    Defendants Succeed in Falsely Persuading Shareholders to Approve the Merger Due to Their Committed Orders, Top Tier Customer, and Projected Revenue Claims**

105.    In the final days before the special shareholder meeting, Defendants put on a full court press to persuade shareholders to approve the SPAC Merger. Within a week's span, the Company announced a host of new deals, primarily in the European market,[63] as well as the first and only delivery of a Hyzon-branded HCFEV.[64] Based on these deal announcements, on July 13,

---

[62] *Id.* (emphasis added).

[63] *See* Press Release, Hyzon, "Hyzon Motors signs Australian subsidiary of Korea Zinc, world's largest zinc producer, as the second customer for its ultra-heavy-duty 154-ton class hydrogen truck" (July 9, 2021), *available at* https://www.sec.gov/Archives/edgar/data/0001716583/000119312521212084/d191589ddefa14a.htm; Press Release, Hyzon, "Hyzon Motors deepens strategic hydrogen mobility partnership with TotalEnergies SE" (July 12, 2021), *available at* https://www.sec.gov/Archives/edgar/data/0001716583/000119312521213185/d193162ddefa14a.htm; Press Release, Hyzon, "Hyzon Motors delivers first hydrogen-powered vehicle to support multinational dairy company's operations, transition fleet to zero-emissions" (July 13, 2021), https://hyzonmotors.com/hyzon-motors-to-supply-first-hydrogen-powered-vehicle-to-support-multinational-dairy-companys-operations-transition-fleet-to-zero-emissions/.

[64] Press Release, Hyzon, "Hyzon Motors delivers first hydrogen-powered vehicle to support multinational dairy company's operations, transition fleet to zero-emissions" (July 13, 2021), https://hyzonmotors.com/hyzon-motors-to-supply-first-hydrogen-powered-vehicle-to-support-multinational-dairy-companys-operations-transition-fleet-to-zero-emissions/.

2021, Defendants issued a business update asserting that Hyzon had doubled its 2021 revenue

forecast due to new sales while simultaneously reducing its costs per vehicle. Specifically, it stated:

> ***Orders and non-binding MoUs have increased to represent up to
> $83M, up more than 50% from $55M as of April 29, 2021, and
> over 100% from February 12, 2021***. Expected 2022 deliveries
> include up to 70 trucks from Austrian grocery retailer MPREIS
> currently under an MoU.
>
> The growing list of orders and non-binding MoUs comes ***from the
> rapidly developing European market as well as Australia***, thanks
> to the company's international footprint.
>
> …
>
> ***Simultaneously, Hyzon has successfully reduced costs in excess
> of $50,000 per vehicle for manufacturing components and sub-
> systems***, with savings over 80% for certain auxiliary power
> systems, power distribution unit and on-board chargers and over
> 40% for battery, eMotor, and inverter components. These savings
> are expected to grow as operations scale and Hyzon continues to
> evolve vehicle and component designs.[65]

106.    Two days later, on Thursday, July 15, 2021, Hyzon's shareholders resoundingly

approved the SPAC Merger with 95% of shareholders voting in favor.[66] The pre-merger entities

closed their deal and completed the approved combination the following day (July 16). Concurrent

with the completion of the business combination, DCRB changed its name to Hyzon.

107.    Hyzon's Class A common stock and warrants began trading on the Nasdaq Global

Select Market ("Nasdaq") under the symbols "HYZN" and "HYZNW," respectively, on July 19,

2021, the first open day for trading after the merger closed. On or about that same day, the

---

[65] Press Release, Hyzon, "Hyzon Motors issues business update, confirms 2021 prior guidance and
on track for 2022" (July 13, 2021), *available at* https://hyzonmotors.com/business-update-
confirms-2021-guidance-on-track/ (emphasis added).

[66] Press Release, Hyzon, "Hyzon Motors Completes Business Combination with
Decarbonization Plus Acquisition Corporation," PR Newswire (July 16, 2021),
https://www.prnewswire.com/news-releases/hyzon-motors-completes-business-combination-
with-decarbonization-plus-acquisition-corporation-301335887.html.

Company made public on its website an updated version of its investor presentation ("July 19, 2019 Investor Presentation"), [67] which contained slides listing customer logos, geographic deployments, and financial projections that were virtually identical to the graphics and projections included in its April 29, 2021 Analyst Day Presentation.

108.   Defendant Knight then reiterated the Company's misleading claims about its 2021 backlog and committed orders (which as discussed below, never materialized because they were based, in part, on false statements) in media interviews conducted throughout the following week, including the following interview with Bloomberg News.

**Def. Knight Bloomberg Interview**[68]
*July 19, 2021*

> *"Recent orders in Europe include with TotalEnergies in France, with major retailer Emprise in Austria.*
> *. . .*
> *Hyzon motors will have vehicles on the road in four continents by the end of this year."*



109.   Less than a month after the SPAC Merger's close, on August 11, 2021, the Company announced its Second Quarter 2021 Financial Results, reporting a second-quarter loss of $9.4 million, or $0.10 per share, and only $1 million in actual revenue.[69] Despite its delivery of only three vehicles to date, the Company reaffirmed its 2021 sales outlook, including its target of 85 vehicles delivered.

---

[67] Available at https://s28.q4cdn.com/786762755/files/doc_presentations/2021/07/Hyzon-Motors-Investor-Presentation-July-2021.pdf.

[68] Full interview available at https://www.bloomberg.com/news/videos/2021-07-19/-bloomberg-markets-america-07-19-21-video.

[69] Press Release, Hyzon, Hyzon Motors Announces Second Quarter 2021 Financial Results (Aug. 11, 2021), *available at*, https://www.sec.gov/Archives/edgar/data/1716583/0001193 12521242649/d175854dex991.htm

110.    Defendants Gordon and Knight emphasized their confidence in these sales and delivery targets, even in the presence of global supply chain challenges, during Hyzon's inaugural earnings call, held on the very same day. In particular, Gordon confirmed that Hyzon "remain[ed] on track to reach our forecast of 85 vehicles shipped by the end of 2021."[70] Additionally, Knight explained that Hyzon was re-affirming that the Company would deliver 85 vehicles before the end of the year, even in the presence of global supply chain challenges:

> [A]t the moment, we believe that the shipment of at least 85 vehicles is not a great risk for us because of inventories we've already secured and deliveries that to us from our vendors that are expected to take place over the next month or two given very early order confirmation. Most of the work-in-progress orders go back to around April for us. We didn't wait until the transaction close to deal with sourcing inventory.
>
> . . . back in March and April when we started to see some of these challenges around delivery times getting pushed out, we started ordering – *rapidly ordering ahead of when we were planning to order so that we could get hold of what we need to deliver on our 85-plus vehicle shipments this year.*[71]

111.    Analysts reacted positively to Defendants' re-affirmation of the projected delivery of 85 trucks by year end. For example, in an August 12, 2021 report, analysts at Colliers noted that "HYZN re-affirmed its 2021 sales outlook for 85 vehicles," and explained that "[g]iven our higher level of confidence in the story, we are increasing our top line estimates" and increasing its Hyzon target price to $22 from $15.[72]

112.    Similarly, on August 12, 2021, Wedbush Securities initiated coverage on Hyzon, with famed securities analyst Daniel Ives penning a bullish research report on the company and

---

[70] Full transcript not file with the SEC or Hyzon, but available at https://seekingalpha.com/article/4448350-hyzon-motors-inc-hyzn-ceo-craig-knight-on-q2-2021-results-earnings-call-transcript.

[71] *Id.* (emphasis added).

[72] Colliers, "Hyzon Motors Q2:21 Update" (Aug. 12, 2021) (subscription required).

recommending Hyzon as an outperform (buy) with a price target of $10 per share.[73] Only weeks

later, on August 30, 2021, Ives of Wedbush bumped his target price up again to $15 per share.

On September 2, 2021, JPMorgan initiated coverage of Hyzon with an Overweight (buy)

rating and a price target of $18 at the end of 2022.[74] According to JPMorgan, Hyzon's first

targets are the "hard-to-decarbonize commercial and heavy-duty transportation sectors, starting

first with hydrogen fuel cell-based heavy-duty trucking and buses with plans to expand to rail,

marine, and aviation in the future."[75] JPMorgan stated it expects the company "to be a leader in

emerging fuel cell-based mobility applications."[76]With each of these analyst announcements,

Hyzon's stock steadily increased.

## J.    Hyzon Announces Blockbuster Deal with Fantastical Purchaser Shanghai HongYun

113.   By the beginning of September 2021, Hyzon appeared by all counts to be

prospering. The issuance of its second quarter report reaffirming its 2021 projections and the

positive analyst coverage that followed propelled Hyzon's stock price out of a post-merger slump,

from a relatively low of $6.55 per share on August 11 to $10.40 on September 2—a 59% increase.

But with only four months left in the year, the precarious gap between Hyzon's committed

---

[73] *See* Wedbush, "Hydrogen Play Poised to Be a Winner; Initiating at OUTPERFORM and $10 PT," (Aug. 31, 2021) (subscription required); Wedbush, "Hyzon Motors, Hydrogen Play Front and Center With Trucking Demand Building; PT to $15," (Aug. 31, 2021) (same); Clark Schultz, "Hyzon Motors is called a first-mover hydrogen truck play by Wedbush," SEEKINGALPHA.COM (Aug. 31, 2021) (reporting change in Wedbush coverage), https://seekingalpha.com/news/3735508-hyzon-motors-is-called-a-first-mover-hydrogen-truck-play-by-wedbush.

[74] Shanthi Rexaline,"Why JPMorgan Is Bullish On Hydrogen Fuel Cell Stock Hyzon Motors," BENZINGA.COM (Sept. 9, 2021) (reporting coverage), https://www.benzinga.com/analyst-ratings/analyst-color/21/09/22870061/why-jpmorgan-is-bullish-on-hydrogen-fuel-cell-stock-hyzon-motors.

[75] *Id.*

[76] *Id.*

deliveries/customers and its actual state of affairs was becoming increasingly evident. Even if Hyzon succeeded in fulfilling all its announced committed deliveries, including deliveries to Hiringa (which as discussed below, was not actually a customer), it was still short on its projected delivery target of 85 vehicles in 2021 by nearly half, as depicted in the table below.

**Hyzon Announced 2021 HFCEV Deliveries as of September 2, 2021**[77]

| End-User | #Trucks Committed | %Total of 85-Vehicle Commitment |
|---|---|---|
| Royal Friesland | 1 | 1% |
| Municipality of Groningen | 15 | <17% |
| Municipality of Rotterdam | 2 | <2% |
| Jan Bakker | 3 | <3% |
| JuVe/MPREIS | 4 | <5% |
| Hiringa (no intent to receive)[78] | 20 | 24% |
| **Total Announced** | **45** | 53% |
| **Hyzon FY 2021 Target** | **85** | 100% |

114.    Desperate to fill this gap, and thus maintain the confidence of investors and analysts, Defendants rushed to find (or perhaps, fabricate) some fantastic purchaser who could help Hyzon save face. Thus entered Shanghai HongYun.

115.    On September 9, 2021, Defendants announced that Hyzon had secured a major new deal "for the purchase of 500 hydrogen-powered electric trucks" from a virtually unknown, Shanghai, China logistics company, Shanghai HongYun.[79] This incredible deal instantly made

---

[77] Based on Hyzon's public statements, as identified in the preceding paragraphs and footnotes.

[78] *See* Section IV.K.2, *infra*, ¶¶ 124-128.

[79] Press Release, Hyzon, "Hyzon Motors to supply up to 500 hydrogen fuel cell electric vehicles to Shanghai logistics company," https://hyzonmotors.com/hyzon-motors-to-supply-up-to-500-hydrogen-fuel-cell-electric-vehicles-to-shanghai-logistics-company/.

Shanghai HongYun Hyzon's largest customer and, if fully realized, would allow Hyzon to exceed

its projected delivery of 85 trucks before the end of the year. According to the press release, an

***"initial order of 100 vehicles [wa]s expected before the end of 2021***," with the remaining 400 to

"be ordered in 2022."[80]

116.    Additionally, the press release included several representations about Shanghai

HongYun itself, explaining how the customer's leadership team and its operation experience

would make it a source for other major deals in China:

> [Shanghai] HongYun Automobile focuses on providing logistics
> solutions primarily through hydrogen-powered fuel cell electric
> vehicles. The company provides ***operation, leasing and
> maintenance service for customers across the country***, including
> one of the world's largest steelmakers. After Hyzon delivers the
> vehicles, ***HongYun will be responsible for the subsequent
> commercial arrangements with its end customers***.
>
> . . .
>
> Shanghai Hongyun Automobile Co., Ltd. is committed to become
> the leader in hydrogen-powered fuel cell vehicle operation. ***The
> core team of the company has solid operation experience and
> master the real time vehicle data management***, they had built up a
> deep cooperation with several large logistics group in China
> including Baowu Group, Zhejiang Eurasian Supply Chain, Jiaoyun
> Hubei Logistics Group, Kuodao Logistics, Changxin International
> Logistics etc. ***At present, the company is focusing on the
> operation of hydrogen-powered heavy duty trucks by leveraging
> its rich end user resources in logistics industry***.[81]

117.    In the aftermath of this press release, investment analysts became increasingly

bullish on Hyzon, noting that, if the deal were successful, it could pave the way for Hyzon to gain

a foothold in China. On September 9, 2021, analysts at Fox Advisors "reiterate[d]" their $15 target

for Hyzon, despite supply chain concerns, due to the "sizable [Shanghai HongYun] memorandum

---

[80] *Id.* (emphasis added).

[81] *Id.* (emphasis added).

of understanding" and Hyzon's "express[ed] confidence in its ability to deliver at least 85 vehicles in 2201E." [82]

118.    Additionally, the Shanghai HongYun announcement caused Hyzon's stock price to soar, increasing $2.07 per share (29%) to a $10.87 per share closing price on September 9, 2021.

**Price Increase After Shanghai HongYun Announcement**



119.    On the heels of Hyzon's announcement of its mega deal with Shanghai HongYun, the financial media went so far to as ask whether Hyzon could "be the Tesla of [h]ydrogen [v]ehicles" given its breakthrough into "the potentially colossal Chinese hydrogen vehicle market" and the "significant revenue" the Shanghai HongYun order would bring.[83]

120.    Investors would soon learn through multiple disclosures over the next four months, however, that this was a sham deal. As discussed below, Shanghai HongYun was, in reality, a

---

[82] Steven Fox CFA and Aneesha Patel, Fox Advisors, "Hyzon Motors: More Order Momentum to Consider" (Sept. 9, 2021) (subscription required).

[83] Rhian Hunt, "Could Hyzon Motors be the Tesla of Hydrogen Vehicles?" The Motley Fool (Sept. 20, 2021), https://www.fool.com/investing/2021/09/20/is-hyzon-motors-the-tesla-of-hydrogen-trucks/

sham shell counterparty founded three days before the critical MoU announcement. Additionally, Shanghai HongYun had no paid-in capital, no operating footprint, and no ability to purchase Hydrogen HFCEVs or to execute on agreements to supply HFCEVs to end-user on its own merits. Accordingly, it would not be possible for Hyzon to earn the 2021 revenues it projected—a fact Hyzon would concede on January 12, 2022 (Class Period last day).

## K.   The Truth Emerges: Short Seller Blue Orca Exposes Hyzon's Fraudulent Conduct with a Detailed Investigative Report

121.   On September 28, 2021, Blue Orca published a Report, attached hereto and incorporated by reference as Exhibit A, which at its core claimed that Hyzon misrepresented or omitted material information about its supposed major customers. This Report constituted the first public disclosure of Hyzon's fraudulent conduct.

122.   Among other things, the Blue Orca Report revealed that (i) Hyzon's largest customer, Shanghai HongYun, appeared to be "a fake-looking Chinese shell entity" formed three days before Hyzon announced a deal with the customer; (ii) Hyzon's next largest customer, Hiringa, was "not really a customer," but rather a channel customer; and (iii) Hyzon overstated orders and financial projections. As a result of these other factors, the Report expressed that, in Blue Orca's opinion, Hyzon was "akin to a *Chinese Lordstown Motors*," another EV SPAC similarly found to have engaged in gross fraud.[84]

## 1.   Shanghai HongYun Is a Sham Counterparty

123.   With respect to Shanghai HongYun, the Blue Orca Report pointed to several factors later confirmed by Lead Plaintiff's independent investigation, *see* Part V, *infra*, including Shanghai

---

[84] Blue Orca Report (Ex. A) at 1-2.

HongYun's suspicious date of formation, it having no paid-in capital, and its lack of any verifiable web presence, all suggesting that Hyzon's largest customer was fake:

> **Hyzon's Largest Customer is a Fake-Looking Chinese Shell Entity Formed 3 Days Before Deal Announced.**
>
> We think Hyzon's largest customer looks fake. On September 9, 2021, Hyzon's stock shot up 29% largely on the strength of a pre-market announcement by the Company that it had secured a major new vehicle deal.
>
> Hyzon announced [link omitted] that it had signed a Memorandum of Understanding ("MoU") with a new Chinese customer, Shanghai Hydrogen HongYun Automotive Co., Ltd. ("Shanghai HongYun"), for the sale of 500 trucks. **In the announcement, Hyzon claimed that the customer expects to order 100 of these trucks in 2021, with the remaining 400 trucks to be ordered in 2022. This makes Shanghai HongYun by far one of Hyzon's largest near-term customers.**
>
> [Image omitted.]
>
> **To put the size of the order in context, the 100-truck-order supposedly placed in 2021 is larger than the Company's previously guided total deliveries for the year.** The market duly reacted, causing Hyzon's stock to rip as high as 29% on the day.
>
> **If authentic, Hyzon's deal with Shanghai HongYun is worth as much as $250 million.** For a commitment of that size, we would typically expect the counterparty to be a deep-pocketed and well-established logistics company with sufficient operating footprint, infrastructure and track record to purchase and deploy 500 new hydrogen fueled trucks.
>
> But when we looked up Shanghai HongYun on China's National Enterprise Credit Information Publicity System, we found that **Shanghai HongYun was established only three days before Hyzon announced the deal**.
>
> [Image omitted.]
>
> The Chinese corporate registry also shows that Shanghai HongYun has **no paid in capital**.
>
> [Image omitted.]

With no paid in capital, the customer appears to be merely an empty shell company. **Shanghai HongYun does not yet have an official phone number, email, WeChat or website that we could find.**

[Image omitted.]

Hyzon cannot claim that HongYun is the subsidiary of a larger corporation because its two sole shareholders are individuals.

\*        \*        \*

**In our opinion, such evidence suggests that Hyzon announced a bogus deal with a fake looking Chinese customer to pump its stock price.**[85]

## 2.    Hiringa Is a "Channel Partner" With No Intent to Receive Vehicles in 2021

124.    Blue Orca also examined Hyzon's investor presentations and public statements and discovered numerous misrepresentations about its supposed second largest customer Hiringa, for which, Hyzon had committed to build and supply 1,500 HFCEVs:

> **Channel Checks Reveal Next Largest Customer Not Really a Customer; Significant 2021 Delivery and Guidance Miss**
>
> ***Hyzon's next largest customer is a tiny New Zealand startup who told us they are not really a customer.*** Based on our conversation, we do not think that Hiringa has the obligation, the intention, or the capability to purchase the trucks Hyzon claimed in its announcement.
>
> Hiringa has long been a key customer in Hyzon's SPAC narrative. At the height of SPAC mania in February 2021, Hyzon announced that it had signed an agreement to build and supply 1,500 hydrogen powered vehicles for Hiringa, with the first batch of 20 trucks "expected to enter service" in 2021.
>
> [Image omitted.]
>
> Hyzon also highlighted the Hiringa contract in a YouTube promotional video by its CEO Craig Knight in March 2021.

---

[85] *Id.* (some emphasis added) (internal footnotes omitted).

[Image and link omitted.][86]

125.    To assess the veracity of Hyzon's claims about Hiringa, Blue Orca contacted senior Hiringa executives. These executives reported that, while Hiringa remained interested in Hyzon, it was "**not actually a customer,** but a **'channel partner' for Hyzon's vehicles**," that is, Hiringa did not intend to pay for or take title over the trucks, but rather would just facilitate the sale of hydrogen trucks to third parties.[87]

> *"We're effectively a channel partner model if you like."*
>
> *"**Our business model is not to buy the trucks. We do the refueling . . . . We're effectively an unpaid market channel.**"*
>
> *"There's no point in us being the middleman. So [the end customer] will physically pay for the trucks and they will physically take title."*
>
> *-Hiringa Executive.*[88]

126.    In Blue Orca's opinion, this description of Hiringa's relationship with Hyzon made more sense, "as **Hiringa does not have anywhere near the financial resources to pay for 1,500 trucks, being a company with less than 20 employees according to LinkedIn and supposedly operating out of a house in New Zealand**. Rather than purchasing 1,500 trucks, **Hiringa plans to build fuel stations** with the hope of facilitating future purchases from end customers."[89] Hiringa also informed Blue Orca that "**the 1,500-truck agreement claimed by Hyzon in its investor presentations is not a binding order, and that it merely represents a right, not an obligation, to buy.**"[90]

---

[86] *Id.* at 5-6 (some emphasis added).

[87] *Id.* at 5 (emphasis added).

[88] *Id.* (emphasis added).

[89] *Id.* at 6 (emphasis added).

[90] *Id.*

*"That's a right to buy, not an obligation to buy."*

*"At the end of the day it's not binding. **That's not a binding purchase.** It's a purchasing framework."*

*-Hiringa Executive*[91]

127.    Blue Orca also noted the following, in pertinent part, regarding the Company's

delivery schedule and abilities:

> **Significant 2021 Delivery and Guidance Miss**. *According to Hyzon, Hiringa will account for 24% of the Company's projected deliveries in 2021. Yet Hiringa stated point blank that no deliveries would be taken in 2021*, and the first validation trucks would be delivered for testing in *March or April 2022*, at the earliest. *Hiringa supposedly accounts for 24% of Hyzon's projected 2021 deliveries, so we expect a major guidance miss.* We think it is highly misleading for Hyzon to continually reaffirm delivery and revenue guidance and characterize such revenues as "100% certain" when Hiringa admits that it will not take any deliveries this year.[92]

128.    Again, Blue Orca checked Hyzon's claim that it would deliver 20 trucks to Hiringa

by the first quarter of 2022 with Hiringa's executives. As relayed in the Report:

> Yet Hiringa's executive said that *Hiringa will not take any deliveries of Hyzon trucks in 2021 and expects to receive the first four validation vehicles in March or April 2022, at the earliest.*
>
> Hiringa: *"Realistically with the supply chains, I think they will be arriving in March or April [2022]. There's also some work to do in quarter one in the Netherlands before they ship."*
>
> Blue Orca: *"So you don't actually expect trucks this year? You expect them in the first quarter of 2022?"*
>
> Hiringa: *"…**March through May, if you like, or April through June [2022] is when we are going to be doing validation in New Zealand**… it's not [a] full commercial operation."*

---

[91] *Id.* at 5 (some emphasis added) (internal footnotes omitted).

[92] *Id.* at 1 (some emphasis added).

*Blue Orca: "So you don't expect any trucks to be delivered from Hyzon until at least March or April next year. **And those are the four validation units?**"*

*Hiringa: "Yep, yep."*

*- Hiringa Executive*

This directly contradicts Hyzon's claims to investors. **According to Hyzon's disclosures, Hiringa will account for 24% of the Company's deliveries in 2021**, making it the key to whether Hyzon meets its revenue and delivery guidance for this year. But ***Hiringa told us point blank that no deliveries would be taken in 2021, and the first validation trucks would be delivered in March or April 2022, at the earliest***.

Furthermore, Hiringa told us that the remaining 16 trucks ordered from Hyzon would be fulfilled based on testing results of the initial four validation vehicles, which they expect to carry out between March and June 2022 at the earliest.

We asked Hiringa if there was any possibility that they might bring forward the order for the 16 trucks, but Hiringa told us that they do not want to take delivery until they build the commercial hydrogen fuel station infrastructure in New Zealand – which Hiringa indicated would not be until the second half of 2022.

*"We don't have the [commercial] stations until the second half of the [2022] calendar year. So, we don't want to hold [on to] 16 trucks…"*

*- Hiringa Executive[93]*

3.     **The Company Lists "Phantom Customers" in Its Investor Materials**

129.     Blue Orca further examined Hyzon's early investor materials from before the SPAC acquisition and determined that Hyzon explicitly or implicitly exaggerated its big-name customers, particularly those with 100% committed orders. According to the report:

**Phantom Big-Name Customers Suggest Overstated Orders and Financial Projections**

In its much hyped initial investor [link omitted] presentation filed in February 2021, Hyzon generated considerable buzz around its

---

[93] *Id.* at 7.

SPAC with a deck that included a number of big household names listed as "top tier customers," including Coca Cola, Nestle, Ikea, and Heineken.

[Image omitted.]

For example, the February deck showed that Hyzon was **finalizing** purchase orders with the likes of **Heineken** and **Ikea** for vehicles to be delivered in 2021. Hyzon also projected **hundreds of millions in revenues from Coca-Cola** in the next five years.



Source: *Hyzon Investor Presentation February 2021*

These names generated considerable enthusiasm, and Hyzon's stock price predictably exploded with investor interest. Yet like many other rotten EV SPACs (e.g. Lordstown Motors), these name brand customer relationships appear to have been largely illusory.

Two months later, Hyzon's April investor presentation showed a very different customer list with most of the notable name brands missing.

- 67 -



Source: *Hyzon February 2021 Investor Presentation* , *Hyzon April 2021 Investor Presentation*

**Coca Cola. Gone. Heineken. Gone. Ikea. Gone.**

In the four months between February 2021 and July 2021, nearly all of Hyzon's previously named blue chip customers disappeared from its disclosures altogether.

In total, Hyzon dropped blue chip customers with orders worth $700 million in future orders from its subsequent investor presentations.

[Image omitted.]

Hyzon achieved early credibility in a crowded field of zero revenue EV SPACs in part by promoting orders from name brand customers, yet without a word it has dropped almost all of these supposed customers from mention in its subsequent investor presentations.

*       *       *

Between the top of SPAC mania in February and the lukewarm market conditions in July, multiple EV SPACs were exposed for faking customer orders, exaggerating their backlog and exaggerating future revenues, including XL Fleet, Nikola, and Lordstown Motors [links omitted].[94]

---

[94] *Id.* 8-10 (emphasis in original).

130.    To corroborate these investigative findings, Blue Orca contacted and interviewed former Hyzon employees, who relayed that they left Hyzon, in part, because of concerns over how the company was representing customer demand to investors:

> Hyzon's apparent misrepresentation of its key customers at the time of its SPAC is consistent with the comments of one of its former senior executives with whom we spoke. The former executive indicated that he and other early senior Hyzon executives, all of whom left the Company, became uncomfortable with how Hyzon was presenting customer orders to investors.

> *"I just didn't like the way it was being presented. A lot of the stuff that they are saying is open to interpretation how you read that. Saying that they've got all of these orders and things. But a lot of them are **all MoUs which as you know in the business mean basically nothing.***

> *They were going out, kind of selling it as really what it wasn't at the time. **A bit like unfortunately what Nikola was doing. It's kind of a lot of hype, and getting money through that hype from people who don't really understand***

> *You know it's great to show all these pictures of renderings of trucks and orders that you may have, but these orders, **most of them… 90% of them are MoUs so there's no binding contract, and if you look from when they've announced those [contracts], still none of those have been built or delivered.***

> ***The only three vehicles they have is what's on their website. These are all prototype vehicles.** They're not production vehicles of any type. They've basically been hand built at the facilities. These are the things that I think, if you're going to announce that, say that. Be honest about it.*

> ***I was very uncomfortable with that**. A lot of these, if you look at their website, they've loaded lots of them on there of signed meetings they had. All these are MoUs that they've signed. **None of them are binding in any way whatsoever.***"

> *- Former Senior Hyzon Executive*[95]

---

[95] *Id.* at 11 (some emphasis added).

131.    Based on this information, Blue Orca concluded that "Hyzon was either initially misleading the market or it lost these orders between February and July. Either way, [it could] not see a scenario in which Hyzon's revenue projections could remain unchanged."[96]

132.    After the release of the Report, Blue Orca's Chief Investment Officer Soren Aandahl appeared for a 19-minute interview with famed short-seller activist Carson Block of Muddy Waters on Zer0es TV, explaining the firm's investigation, findings, and conclusions, all of which are incorporated by reference herein.

**Zer0esTV Interview of Soren Aandahl re: Hyzon Motors[97]**



133.    These revelations devastated investors' confidence in Hyzon and caused a major sell off.[98] The intraday volume of trading in Hyzon's shares reportedly topped 14 million compared

---

[96] *Id.* at 11.

[97] "Is Hyzon Motors the Chinese Lordstown," ZER0ES TV (Sept. 28, 2021), https://www.zer0es.tv/big-announcements/is-hyzon-motors-the-chinese-lordstown/.

[98] "Hyzon Motors Stock Crashes on Scathing Short-Seller Report: A short-seller has made some serious allegations about the electric vehicle stock. Here's what you should do," MOTLEY FOOL (Sept. 28, 2021), *available at* https://www.fool.com/investing/2021/09/28/hyzon-motors-stock-crashes-short-seller-report/.

with its daily average of 1.7 million. Additionally, Hyzon shares fell $2.58 per share, or 28%, from a close price of $9.21 per share on September 27, 2021 to a close price of $6.63 per share on September 28, 2021, damaging investors.

134.    In a statement issued the same day, Hyzon simply asserted that while it "disagree[d] with the conclusions of the [Blue Orca Report, which it believe[d] [we]re based on a number of factual inaccuracies," it was "reviewing the report carefully and intends to respond further in due course."[99] As such, investment analysts waited to hear Hyzon's full throated response before formally adjusting their outlooks.

**HYZN Stock Price After Blue Orca Report Publication[100]**



---

[99] MT Newswire, "Hyzon Motors Disagrees With Blue Orca Capital's Claims—Shares Plunge Amid Heavy Trading Volume" (Sept. 28, 2021).

[100] Note: Total loss calculated by multiplying difference in closing prices with total number of outstanding HYZN shares.

**L.      Hyzon's Telling Admissions in Responding to Blue Orca's Revelations**

135.    One week after Blue Orca published its market-shocking investigative report, Hyzon issued a public response, which characterized the Report as inaccurate or misleading and attempted to rebut, in pertinent part, the Blue Orca Report's primary fraud claims.[101]

136.    With respect to its largest customer, Shanghai HongYun, Hyzon did not deny that Shanghai HongYun was a shell entity established just days before the September 9, 2021 press release, clarifying for the first time that the customer was actually "a special purpose entity[102] seeking to provide third-party clean energy logistics services to corporate customers" and that it "was established in the wake of the Shanghai government's August 26, 2021 announcement that Shanghai would be among the first participants in China's national hydrogen fuel cell vehicle pilot program."[103] This response did not elaborate on Shanghai HongYun's origins or address the deficiencies in HongYun's government filings that were identified in Blue Orca's Report. Moreover, Hyzon double-downed on its earlier representations, maintaining that:

> ***Consistent with the terms of the MoU, Hyzon expects that Shanghai HongYun will be able to leverage its existing relationships to enter into long-term logistics service agreements with end users for Hyzon's hydrogen-powered vehicles***. Hyzon expects to receive binding purchase orders from Shanghai

---

[101] Press Release, Hyzon, "Hyzon Motors issues statement strongly rejecting misleading and inaccurate short seller report" (Oct. 5, 2021), https://investors.hyzonmotors.com/news/news-details/2021/Hyzon-Motors-issues-statement-strongly-rejecting-misleading-and-inaccurate-short-seller-report/default.aspx ("Hyzon Oct. 5, 2021 Response").

[102] A "special purpose entity," also called a "special purpose vehicle" is a "is a device used by corporations to create ostensibly independent entities that take on a particular liability and thereby obviate the necessity to include that debt on the corporate balance sheet." *Merck & Co. v. United States*, 652 F.3d 475, 486 (3d Cir. 2011).

[103] Hyzon Oct. 5, 2021 Response, *supra* n.101. As discussed below, Hyzon did not further clarify the origin of this purported special purpose entity. Moreover, HongYun's filings with the Chinese government refute any claim that HongYun is a subsidiary of a corporate entity.

HongYun for these vehicles, which ***Hyzon anticipates will include upfront deposits and installment payments***.[104]

137.   Hyzon similarly confirmed Blue Orca's accusations concerning its representation of Hiringa, including that it was not a customer but merely a channel provider:

> ***Hyzon has never suggested that Hiringa is an end user of hydrogen trucks.*** Instead, as Hyzon explained in its February 17, 2021 press release, the partnership between the companies is intended to accelerate the decarbonization of heavy transport in New Zealand through the buildout of hydrogen infrastructure and the supply of fuel cell electric trucks and buses. Hyzon continues to see significant potential in the New Zealand market through its partnership with Hiringa, which already has resulted in a Vehicle Supply Agreement for 20 trucks to be delivered to TR Group Ltd., one of New Zealand's largest truck and trailer leasing and rental companies. ***Hyzon plans to start supplying trucks to TR Group Ltd. in the first half of 2022***, timed to coincide with the availability of hydrogen filling infrastructure in New Zealand.[105]

Notably, Hyzon's response conceded that it no longer expected to supply HFCEVs to Hiringa in 2021.

138.   Additionally, Hyzon addressed Blue Orca's contention that it had overstated or misrepresented its committed customer base, effectively conceding that Hyzon was no longer in discussions for at least for some of the major logos whose deals were baked into Hyzon's guidance:

> The short seller report falsely claims that Hyzon overstated its relationship with certain customers in its investor presentations. Like any innovative company in a nascent industry, Hyzon continues to pursue a wide range of potential opportunities, any one of which may or may not ultimately result in a commitment to purchase vehicles from Hyzon. Contrary to the short seller's claims, no customers or potential customers "disappeared" from any investor presentation; rather, Hyzon anonymized certain customer and potential customer names in its July 2021 investor presentation. Hyzon already has entered into signed agreements with certain entities identified as potential customers in its investor presentations, including the Southern California Gas Company,

---

[104] Hyzon Oct. 5, 2021 Response, *supra* n.101 (emphasis added).

[105] *Id.*

Ark Energy and the Municipality of Groningen. ***Hyzon continues to engage in active discussions with a majority of the companies that the short seller report misleadingly claims "disappeared"*** from its investor presentations, as well as with a large number of other prominent companies across the globe.[106]

## M.   Iceberg Research Releases its Own Investigative Report

139.   On October 6, 2021, the day after Hyzon issued a rebuttal to the Blue Orca Report, Iceberg Research issued its own investigative report (i) agreeing with and corroborating Blue Orca's findings, and (ii) criticizing Hyzon's "weak" rebuttal for failing to adequately address the issues raised in the Blue Orca Report.[107] Additionally, the report included new information about Hyzon's origins and its corporate governance:

> **Horizon's Surge in 2019 Sales Was With a Major Client in Financial Distress**
>
> The bull case for Hyzon is largely supported by the fuel cell technology and expertise of its 63%-shareholder, Singapore-based Horizon, also Hyzon's key source of hydrogen fuel cells under a supply agreement signed in January 2021.
>
> *             *             *
>
> We found that almost all Horizon's sales come from its Chinese subsidiary Jiangsu Qingneng New Energy Technologies Co., Ltd — [foreign language characters omitted] ("Qingneng"). Qingneng was listed on China's OTC exchange — National Equities Exchange and Quotations (NEEQ) market — between June 2018 and March 2021. ***Qingneng's financials show most of the 2019 spike was due to one customer, Shanghai SunLong Bus Co., Ltd ([foreign language characters omitted]), (which accounted for 74% (RMB 150m) of Qingneng's sales and 85% (RMB 56.5m) of trade receivables at the end of 2019.***
>
> [chart omitted]
>
> Qingneng and Horizon never disclosed that SunLong was and is still in financial distress. SunLong's parent company Shenzhen-

---

[106] *Id.* (emphasis added).

[107] Ex. B, Iceberg Research, "Hyzon Motors Inc: Trouble at ParentCo" (Oct. 5, 2021), *available at* https://iceberg-research.com/2021/10/06/hyzon-motors-inc-trouble-at-the-parentco/.

listed Tunghsu Optoelectronic Technology defaulted on three bonds (RMB 4.7bn or ~$666m) towards the end of 2019, despite reporting a $2.6bn cash stack at the end of September. The filings of both Qingneng and Beijing SinoHytec ([foreign language characters omitted), a much larger fuel cell peer and also a SunLong supplier, show SunLong's struggles continued in 2020.

Qingneng's free cash flow plunged to negative RMB49.7m ($7m) for the 1H20 period. The drop was mainly due to sales, which fell 36% YoY to RMB 16m ($2.4m), and poor collections on its SunLong receivables. We estimate that Qingneng collected just RMB 1m of its end-2019 SunLong receivables (RMB 56.5m or $8m).

Yet, just 5% of the SunLong receivables were recognised [sic] as bad debts at the end of June 2020. Qingneng chose to sweep this problem under the carpet. By contrast, SinoHytec recognized SunLong's problems and impaired 28% of its SunLong receivables in the 1H20 period, up from 16% at the end of 2019.

[chart omitted]

### Hyzon's Corporate Governance Put Its Minority Shareholders at Risk

The same Horizon that did not disclose its customer default now has extensive control of Hyzon through its 63%-shareholding. Both entities share common directors i.e., Chairman George Gu . . . and CEO Craig Knight. The remaining shareholder base is fragmented with each owning less than 5%. Horizon is the only fuel cell supplier for Hyzon.[108]

140.     As a result of the October 6 Iceberg Report, Hyzon's stock retained a downward course, dropping $0.51 per share (8.0%) to close at $5.88 per share on October 6, 2021.

## N.    Hyzon's Purported Pivot to the Asian Market to Meet Its Delivery Goals

141.     On November 12, 2021, the Company announced its 3Q 2021 financial and operational results, reporting only $962,000 in revenue for the quarter ended September 30, 2021

---

[108] *Id.* (some emphasis added).

and that it had delivered only two vehicles as of third quarter 2021.[109] Nevertheless, Defendants reaffirmed its forecast for 85 vehicles shipped before December 31, 2021. A principal reason for reason reaffirming the guidance, the company explained, is that it had purportedly received the first two purchase orders, for 62 trucks in total, pursuant to terms of the previously announced MOU to supply Shanghai HongYun.

142.    On the Q3 2021 Earnings Call held later on November 12, 2021, Defendant Knight told the audience that Hyzon was on track to meet its guidance of shipping 85 vehicles by the end of 2021 due to the Company's conscious decision to shift the mix of delivery locations from predominantly European to predominantly Asian customers, in China specifically:

> ***Today, we are again reaffirming our guidance of expecting to ship 85 vehicles by the end of 2021***. We continue to expect to meet this target due to the strength of the global footprint of Hyzon's business, with facilities and operations in Asia, North America and Europe, a feature which has shown enormous benefits during the current dislocations and which we expect will underpin our competitive advantage well into the future.
>
> …
>
> ***As a result of that global footprint and our deep historical relationships within Asia, when global supply chain challenges worsened***, especially in the last few months, we were able to make ***a conscious decision to shift the mix of delivery locations from predominantly European to predominantly Asian customers, in China specifically***. We did that because we could. Hyzon's near-term focus is getting our vehicles on the road and into customers' hands. And wherever we can do that, letting customers see for themselves the advantages of fuel cell electric vehicles that are available today, we will do it, and we have done exactly that.

---

[109] Press Release, Hyzon, "Hyzon Motors, Inc. Announces Third Quarter 2021 Financial and Operational Results with Significant Milestones Achieved and Building Momentum Across Asia, Europe and North America" (Nov. 12, 2021), *available at* https://www.sec.gov/Archives/edgar/data/1716583/000119312521327194/d145723dex991.htm; *see also* Form 10-Q (Quarterly Report -3Q21) (Nov. 12, 2021), https://www.sec.gov/Archives/edgar/data/0001716583/000119312521328352/d202784d10q.htm.

- 76 -

> ***During the third quarter, Hyzon delivered two vehicles to
> customers in Europe, one to the municipality of Groningen, one
> to the municipality of Rotterdam, both in the Netherlands*** . . . .
> These first two deliveries are not trials. They were deliveries of
> vehicles to be used by these customers in real-world everyday
> applications. ***This resulted in Hyzon's first vehicle revenues,
> which totaled $1 million, in the third quarter***.
>
> …
>
> Importantly, given the pivot we were able to make in our near-term
> focus from Europe to Asia, we haven't had a slowdown in the pace
> of our orders. As we announced this morning, ***Hyzon has received
> the first two purchase orders from Shanghai Hydrogen HongYun
> Automotive in China for a total of 62 trucks. The end user of
> these trucks is a large industrial conglomerate***.[110]

**O.      Iceberg's Follow-Up Report**

143.    Shortly thereafter, on November 16, 2021, Iceberg issued a shorter, follow up report

reiterating its and Blue Orca's suspicions that HongYun was a fake, shell company "brought in to

plug the order gap" between Hyzon's projected and actual number of delivered vehicles.[111] This

"Follow-Up Report" stated, in pertinent parts, that:

> **Hyzon ended the third quarter with the sale of only two trucks
> recorded at the start of August. No other vehicle seems to have
> been delivered since then and we are 45 days from the end of
> the year. Still, Hyzon maintains it will sell 85 trucks in 2021**.
> This has reinvigorated its share price.
>
> Sell-side analysts on Hyzon's 12 November earnings call scratched
> their heads over where the remaining 83 deliveries would go.
> These vehicles were supposed to be delivered in Europe, initially.
> But Hyzon declared the company made a '*conscious decision to
> shift the mix of delivery locations from predominantly European to
> predominantly Asian customers, in China, specifically*.'

---

[110] Emphasis added. Full transcript available at https://s28.q4cdn.com/786762755/files/
doc_financials/2021/q3/Q3-Earnings-transcript.pdf.

[111] Iceberg Research, "Hyzon Unleashes a Load of Hot Air with Its 3Q21 Results" (Nov. 16,
2021), https://iceberg-research.com/2021/11/16/hyzon-unleashes-a-load-of-hot-air-with-its-
3q21-results/ ("Iceberg Research Follow-Up Report").

Meanwhile the now infamous Shanghai Hydrogen HongYun Automotive Co., Ltd (上海氢力鸿运汽车有限公司) has ordered 62 trucks. We believe that HongYun was brought in to plug the order gap. As a reminder, this HongYun was set up three days before Hyzon announced a major deal for 500 trucks. HongYun had no paid in capital, no WeChat account, and no website. Hyzon was unable to give any reassuring information on this customer's financial substance in its weak rebuttal on 5 October.

How HongYun will finance its purchase remains a mystery. ***We strongly doubt Hyzon will meet its sales guidance unless it provides HongYun with financing (directly or via leases).***

A mysterious "large industrial conglomerate" is supposed to be the "end-user" of these 62 trucks, not HongYun. ***It is strange that a conglomerate would plunge headlong into using so many trucks without any pilot tests.***

\*      \*      \*

We contacted Hyzon to ask about counterparty risk with HongYun, and whether any financing will be provided. We have not received any answer.[112]

144.    The November 16, 2021 Iceberg Research Report further claimed that Hyzon had tried to hide the investment link between Defendant Gordon and its announced hub partner Raven through Raven's investor, Ascent Hydrogen Fund. Specifically, Iceberg Research alleged that, before its October report, Ascent's website showed Defendant Gordon as Ascent's CIO and former Hyzon Chairman George Gu as an advisor; however, after it published its report, Ascent took down that webpage.[113] (As of the date of this Complaint, the webpage has since been restored.)

**P.    Hyzon's Doubling Down on Shanghai HongYun as Its Prized Customer**

145.    Thereafter, Defendants persisted in claiming HongYun as a legitimate customer of Hyzon. For example, on December 8, 2021, Hyzon issued a press release announcing that it had

---

[112] *Id.* (emphasis added).

[113] *Id.*

delivered in November "29 fuel cell electric trucks to be used by a major steel conglomerate in China through [Shanghai HongYun]."[114] According to the press release:

> The 49-ton trucks . . . are expected to haul steel coils in the conglomerate's fleet in coming months. ***HongYun plans to provide operation, leasing and maintenance services*** for industrial and municipal customers in targeted locations in China, which is expected to be a massive market for fuel cell technologies in the coming years. ***Hong[Y]un has further orders for 33 more trucks confirmed with Hyzon***.[115]

The press release also featured a photo of the vehicle fleet, in which Hyzon trucks can be seen wearing the partner logo for Chinese steel manufacturer, Baowu, above the front windshield.



The Company had not disclosed any pilot test program with Baowu, despite the reported size of the purported purchase. And, unlike many of Hyzon's press releases, this press release omitted a section about the customer/partner involved, Shanghai HongYun.

146.    On December 16, 2021, Defendant Knight spoke at the Bank of America Hydrogen Conference and, while discussing Hyzon's customer base, elaborated on the company's sales to steel companies. Specifically, he reported:

---

[114] Press Release, Hyzon, "Hyzon Motors delivers 29 hydrogen fuel cell electric heavy duty trucks to reduce carbon emissions in the steel industry" (Dec. 8, 2021), https://investors.hyzonmotors.com/news/news-details/2021/Hyzon-Motors-delivers-29-hydrogen-fuel-cell-electric-heavy-duty-trucks-to-reduce-carbon-emissions-in-the-steel-industry/default.aspx.

[115] *Id.* (emphasis added).

> We've announced the supply of house owned vehicles to two of the biggest steel companies in the world here in the last several weeks. These are back to base operations, supplying trucks to a customer, who already has hydrogen on hand, right.[116]

147.    Defendant Knight also responded for the first time to questions regarding Blue Orca and Iceberg Research's allegations, primarily by digging in his feet as to Hyzon's positions. Regarding Shanghai HongYun, Knight claimed:

> [T[urn[ing] . . . to that criticism from the short report, which was that, essentially that Hyzon is faking the kind of customer opportunity and faking capabilities, for example. So, let's take a look at the customer insight first. ***We were criticized for announcing a deal with a brand new Chinese company. Well, there was a good reason why that was a brand new Chinese company, because in the two weeks preceding that announcement, the[] formal national policy in China on supporting the fuel cell heavy vehicles was announced.***

> And that's what we had been waiting for in working with the partners in China, with the counterparties in China. We had been waiting for the policy to be formalized, put into law, so that we could sign our agreements. We only announced it because we knew we had agreements to supply, because it wasn't a fabrication. It wasn't an MOU of a vague concept. I mean, we've already announced, we've already delivered the first 29 vehicles under that particular counterparty's arrangement, which is Shanghai Automotive. So, that's one case.[117]

## Q.    No Longer Able to Hide: Hyzon Discloses Poor 2021 Financial Results and Receipt of SEC Subpoena Regarding Blue Orca Allegations

148.    On January 12, 2022 (the last day of the Class Period), the Company provided an update on its 2021 deliveries and financial expectations, in which it disclosed that its 2021 financial

---

[116] Dec. 16, 2021 Bank of America Hydrogen Conference Tr., *available at* https://research.alpha-sense.com?docid=T-CP_2597133&utm_source=alphasense%20platform &utm_medium=document%20share&utm_content=T-CP_2597133&utm_campaign= 1647880590608.

[117] *Id.* (emphasis added).

projections were, in fact, not based on the reality of its situation.[118] Therein, the Company reported, among other things that it had "delivery of 87 fuel cell powered heavy-duty vehicles in 2021 under commercial sales agreements." Additionally, it revealed:

> The ***Company anticipates the 2021 financial results will reflect both lower average selling price per vehicle due to product mix and multi-year revenue recognition for the majority of sales***, which will result in materially lower than forecast revenues and margins. As highlighted during Hyzon's third quarter earnings call, the Company proactively shifted its deployment focus to Asia where average selling prices are approximately half of other regions. Global supply chain disruptions rocked many industries and sectors, with European and North American vehicle assembly particularly hard hit.[119]

149.    The same day, the Company filed a Form 8-K. signed by Defendant Knight, which included a copy of this financial update and further disclosed that it had received a subpoena from the SEC "for production of documents and information, including related to the allegations made in the report issued by Blue Orca Capital."[120] This investigation remains ongoing.

150.    These dual updates, individually and in combination with each other and the September 28, 2021 Blue Orca Report, shattered investors' confidence in Hyzon. As one example, Fox Media adjusted its target from $15 to $10 on January 9, 2021 due, in part, to the lower average sales price of Hyzon's HFCEVs in China compared to Europe or North America.[121] Additionally,

---

[118] Press Release, Hyzon, "Hyzon Motors provides update on 2021 deliveries and financial expectations" (Jan. 12, 2022), *available at* https://www.sec.gov/Archives/edgar/data/1716583/000119312522007235/d277686dex991.htm (emphasis added) (further disclosing that the applications for its delivered trucks included "refuse collection with a leading European supplier of refuse collection vehicles, sewer cleaning with European municipalities, and heavy-duty use cases such as steel coil haulage with the largest steel company in the world").

[119] *Id.* (emphasis added).

[120] Form 8-K (Current Report) (Jan. 12, 2022), https://www.sec.gov/ix?doc=/Archives/edgar/data/1716583/000119312522007235/d277686d8k.htm.

[121] Fox Advisors, "Significant Delivery Progress Meets More Sales Mix Issues" (Jan. 12, 2022) (subscription required).

Colliers decided to move "to the sidelines in light of the uncertainty around how the investigation itself might unfold . . . ."[122]

151.    On this news, Hyzon's stock price dropped $1.55, or nearly 23%, from a close price of $6.81 per share on January 12, 2021 to a close price of $5.26 per share on January 13, 2021. Hyzon's share price continued to tumble for the next five trading days, as the market continued to digest the news, hitting an all-time low of $4.25 on January 21, 2022.[123]

**HYZN Stock Price After Jan. 12, 2022 Updates Published[124]**



---

[122] Colliers, "Hyzon: Stepping Aside on SEC Investigation and Transferring Coverage" (Jan. 13, 2022) (subscription required); *see also* Akanksha Bakshi, "Colliers Downgrades Hyzon Motors Citing SEC Probe," Markets Insider (Jan. 13, 2022), https://markets.businessinsider.com/news/stocks/colliers-downgrades-hyzon-motors-citing-sec-probe-1031101305 (reporting Colliers downgrade).

[123] According to a press release issued by Hyzon on February 24, 2022, the Company plans to release its fourth quarter and full year ended December 31, 2021, financial and operational results before the market opens on Wednesday, March 23, 2022.

[124] Note: Total loss calculated by multiplying difference in closing prices with total number of outstanding HYZN shares.

## V.   LEAD PLAINTIFF'S INDEPENDENT INVESTIGATION CONFIRMING FACTS CONSISTENT WITH BLUE ORCA AND ICEBERG'S FINDINGS

152.    As noted in the Blue Orca and Iceberg Research Reports, Hyzon's largest customer to date, Shanghai HongYun, is a fake-looking Chinese shell entity formed just three days before Hyzon announced it and Shanghai HongYun had entered into an MoU. As reported, Shanghai HongYun has no paid in capital, no official phone number, no email, and no website. The Blue Orca and Iceberg Research Reports further demonstrate that Shanghai HongYun's two individual shareholders lack the experience and resources to make such a purchasing commitment.

153.    Lead Plaintiff's independent investigation and analysis corroborates these activist analysts' findings and conclusions pertaining to Shanghai HongYun's origins and purchasing/logistics abilities.

### A.   China-Based Investigation Firm, Its Experience, and Its Extensive Investigation of Shanghai HongYun

154.    To aid in his investigation, Lead Plaintiff engaged an investigative and consultancy firm based in China ("Investigation Firm"), owned and operated by Investigator C-1, to review the Blue Orca and Iceberg Research Reports and thereafter conduct an independent assessment of data gathered from various government and other reputable sources.

155.    As background, Investigator C-1 is a permanent resident of China, who has resided in the country for over twenty years. Throughout their time in China, they have built relationships with many people in the government, as well as in the private and public sectors. As such, they have access to several types of resources. Additionally, they have been appointed as an expert, advisor, and/or honorary director to several local and regional trade organizations and civil society groups and alliances in China. In their investigative research role, Investigator C-1 utilized their firm's resources, and, on occasion, resources provided by third parties previously vetted by the

Investigation Firm to ensure professionality and to avoid potential conflicts of interest, political or otherwise.

156.    Among other things, Investigator C-1 and their Investigation Firm researched: (1) the official business information for Shanghai HongYun filed with local and national governmental entities; (2) the amount of Shanghai HongYun's capital, both registered and paid-in; (3) the extent of Shanghai HongYun's day-to-day operations; (4) the sources of Shanghai HongYun's capital, *i.e.*, its two individual shareholders; (5) Shanghai HongYun's corporate family; (6) the number of employees Shanghai HongYun maintains; (7) the experience of Shanghai HongYun's shareholders/executive team; and (8) Shanghai HongYun's ability to engage in the types of business it purports to perform, as announced by Hyzon.

157.    To do so, Investigator C-1 collected data and documents from various corporate data service providers and government websites, including "TianYanCha," a premier source for governments, consulting agencies, legal service providers, and media outlets seeking to perform comprehensive business background checks.[125] All data was then counterchecked among various sources to ensure accuracy and quality. Investigator C-1 and their team also conducted physical site checks to assess physical conditions and conduct in-person interviews.

158.    Based on the analysis of this data, Investigator C-1 observed significant abnormalities supporting Blue Orca and Iceberg Research's conclusions, including irregularities suggesting that Shanghai HongYun is a fake shell company, that Shanghai HongYun has not purchased HFCEVs from Hyzon for itself or purported end users, and that Hyzon lacks a requisite level of institutional competence, business contacts, and financial resources to be able to negotiate

---

[125] *See* "Data Search Platform TianYanCha Knows Chinese Businesses," Synced Review (June 28, 2018), available at https://medium.com/syncedreview/data-search-platform-tianyancha-knows-chinese-businesses-3a0a5e725c70 .

or obtain sales agreements concerning the purchase or delivery of HFCEVs in the quantities reported by Hyzon.

**B.     Shanghai HongYun Was in Fact Incorporated 3 Days Before Deal Announcement**

159.    In announcing a deal the magnitude of Shanghai HongYun's, one would reasonably think the entity has an established track record for purchasing and deploying vehicles. The Investigation Firm confirmed that is not the case with Shanghai HongYun.

160.    As part of their research, Investigator C-1 collected Shanghai HongYun's official business registration information and related information on file with Chinese authorities. Investigator C-1 confirmed that, as reported in China's National Enterprise Credit Information Publicity System[126] and elsewhere, Shanghai HongYun (official name is 上海氢力鸿运汽车有限公司):

- was incorporated on September 6, 2021 in Shanghai;

- lists its majority shareholder, Kou Jian, as its legal representative;

- has a registered capital of RMB 30 million;

- has a registered business address of Room 237, 4th Floor, No. 8, Lane 3156, Hongyin Road, Lingang New Area, China (Shanghai) Pilot Free Trade Zone; and

- has a registered scope of business includes vehicle leasing, logistics and auto parts sales.

This basic registration information is also publicly accessible on Shanghai HongYun's NECIPS profile (screenshot and translation provided below).

---

[126] The National Enterprise Credit Information Publicity System ("NECIPS") is a national database for all legal entities registered in China. The database includes profiles of legal entities, which include key information such as shareholders, directors, legal representatives, general managers, and supervisors, as well as identifying information like addresses, email addresses, and phone numbers. It can be accessed at http://sh.gsxt.gov.cn/index.html.

**Shanghai HongYun's NECIPS Profile[127]**



**Translation:**

**📷 照面信息**
**I Face-to-face information**

统一社会信用代码：91310000MA7AH8B707
Unified Social Credit Code: 91310000MA7AH8B707

企业名称：上海氢力鸿运汽车有限公司
Company Name: Shanghai Hydrogen Power Hongyun Automobile Co.

类型：有限责任公司(自然人投资或控股)
Type: Limited liability company

法定代表人：寇健
Legal Representative: Jian Kou

注册资本：3000 万人民币
Registered capital: 30 million RMB

成立日期：2021年09月06日
Date of Establishment: 09/06/21

营业期自：2021年09月06日
Business term from: 09/06/21

营业期至：2041年09月05日
Business term until: 09/05/41

登记机关：自由贸易试验区临港新片区市场监督管理局
Registration authority: Free Trade Pilot Zone Lingang New Area Market Supervision Administration

核准日期：2021年12月03日
Approval date: 12/03/21

登记状态：存续（在营、开业、在册）
Registration status: in existence (in business, open, on the register)

住所：中国（上海）自由贸易试验区临港新片区鸿音路3156弄8号4层237室
Residence: Room 237, 4/F, No. 8, Lane 3156, Hongyin Road, Lingang New Area, China (Shanghai) Pilot

161.   Investigator C-1 observed that HongYun registered using a virtual address that shared the same location as a community cultural center cinema. They also noted that because the company was newly incorporated, it had yet to file any financial statements or documents. Investigator C-1 was unable to locate any licenses or certifications for Shanghai HongYun, such as licenses to offer leasing or other financing, or to move large commercial vehicles, which strongly suggests that Shanghai HongYun is not legally permitted to engage in such activities.

---

[127] Available at http://sh.gsxt.gov.cn/index.html.

## C.  Confirmed: HongYun's Has No Paid-In Capital

162.  Shanghai HongYun's purchase of 62 vehicles to date, if genuine, would generate at least $15 million in revenue for Hyzon; the MoU for 500 vehicles would similarly generate as much as $125 million.[128] For a commitment of that size, one would reasonably expect the counterparty to be a deep-pocketed, credit worthy entity. Shanghai HongYun, however, is not. The following NECIPS screen shot obtained by Investigator C-1 reveals the extent of Shanghai HongYun's two investor's capital commitments to the Company.

**NECIPS: HongYun Shareholder Capital Commitments**

■ 股东信息

| 股东名称 | Shareholder·Name¶ | | 寇健 | Kou·Jian¶ |
|---|---|---|---|---|
| 认缴额 (万元) | Subscribed·Capital¶ | | 1530 | RMB·15.3m¶ |
| 实缴额 (万元) | Paid-In·Capital¶ | | | None¶ |

■ 股东信息

| 股东名称 | Shareholder·Name¶ | | 熊月香 | Xiong·Yue·Xiang¶ |
|---|---|---|---|---|
| 认缴额 (万元) | Subscribed·Capital¶ | | 1470 | RMB·14.7m¶ |
| 实缴额 (万元) | Paid-In·Capital¶ | | | None¶ |

163.  As discussed above, Investigator C-1 found that, as of February 2022, Shanghai HongYun had registered RMB 30 million in capital. In Chinese business, registered capital is the amount of capital **committed** by shareholders and typically approximates the amount of money that is **expected to be injected** into the company in the coming years. This is distinct from paid-in capital, which refers to the amount of capital that shareholders have **actually contributed** to a company's corporate bank account.

---

[128] Based on Hyzon's own disclosure of truck prices in its July 16, 2021 Investor Presentation, *supra* n.67, at 23, and Hyzon's January 12, 2022 statements, *see supra* ¶ 148, that average selling prices in Asia are approximately half of other regions.

164.    Under the Company Law of China,[129] companies must use a subscription system for each shareholder's capital contribution. Under this system, shareholders may satisfy their capital commitments after the company's formation, sometimes even decades after incorporation, as long as the company's incorporating articles permit it. It is therefore possible for a shell company without any assets to claim RMB 30 million (approximately USD $5 million) in registered capital, but nothing in committed capital. Investigator C-1 explained that such financial statements should raise red flags for business relations, as having no paid-in capital indicates that a company may not be able to meet its financial obligations, pay for its order of products, or deliver on its supply contracts.

165.    Investigator C-I reported that, as of February 2022, there are no official records indicating that either of Shanghai HongYun's shareholders have paid any part of their capital commitments to Shanghai HongYun. They further reported that, according to Shanghai HongYun's government filings, the shareholders have ***up until December 31, 2040 to pay up their respective capital commitments***. As such, Shanghai HongYun currently lacks the financial ability to pay for ordered products or to deliver on any supply contracts, including its purchases from Hyzon. Without paid-in capital or a sufficient financial history, Shanghai HongYun similarly lacks access to the magnitude of financing required to execute its Hyzon MoU. Finally, given the background of Shanghai HongYun's shareholders (discussed in greater detail below), it is unlikely that Shanghai HongYun will have sufficient paid-in capital anytime soon.

---

[129] The Company Law of China was enacted on December 29, 1993 enacted "to standardize the organization and activities of companies, protect the lawful rights and interests of companies, shareholders and creditors, safeguard the social and economic order and promote the development of the socialist market economy." Company Law of the People's Republic of China, Art. 1. For an English translation of the law, see http://www.china.org.cn/english/government/207344.htm.

**D.      Confirmed: Shanghai HongYun Has No Real Operations**

166.      To verify Shanghai HongYun's business operations, Investigator C-1 and their team conducted site visits in February 2022 at Shanghai HongYun's registered office and (as discussed below) other locations associated with Shanghai HongYun's founding and controlling shareholder, Kou Jian. Upon arrival, Investigator C-1 found that Shanghai HongYun's entire building—which primarily houses a community center—has been closed for renovations since as early as August 10, 2021—well before the company was founded. Investigator C-1 documented these findings in the following photographs.

**Investigator Site Visit: February 23, 2022**

 

**Photo 1**: Entire building (under refurbishment)          **Photo 2**: Main entrance (no public access)

 

**Photo 3**: Notice on the refurbishment         **Photo 4:** Locked side entrance

167.    Investigator C-1 was also unable to locate any signs or logos indicating actual business operations by Shanghai HongYun. Additionally, no vehicles that were readily attributable to Shanghai HongYun were found at the office site.

168.    Investigator C-1 also attempted to call the office number for Shanghai HongYun, which, Investigator C-1 reports, was shared by multiple companies, two of which were not legally related to Shanghai HongYun or its shareholders. Investigator C-1 relayed that most of the time their calls went unanswered. Additionally, they stated that the only time their call was answered, a male person answered the phone, did not introduce the receiving company name, and instead asked questions of the investigator.

169.    Investigator C-1 observed that these activities were highly suspicious, as in Chinese culture, a receptionist who answers phones is traditionally a woman and, regardless of gender, would customarily greet callers with the company name, rather than by asking questions about the

identity of the caller. Investigator C-1 thus concluded that Shanghai HongYun likely does not have a receptionist and, to the extent the Company existed, was likely operating as a group of micro-enterprises sharing common resources, including phone lines. Investigator C-1 was ultimately unable to connect with a person who represented Shanghai HongYun or its sales team, further corroborating suspicions about Shanghai HongYun's ability, or lack thereof, to independently find HFCEV purchases or to negotiate such deals.

**E.    HongYun Has No Corporate Owners, Only Individual Owners with Shallow Pockets and Business Experience**

170.    Investigator C-1 confirmed that Shanghai HongYun has one primary shareholder, Kou Jian (寇健), who owns 51% of the company and serves as the Chief Executive Officer. They also reported that HongYun's minority shareholder, Xiong Yuexiang (who replaced Zhong Dequan on December 3, 2021, after the purported vehicle deliveries by Hyzon), owns 49% and purportedly serves as a supervisor.

171.    To verify Hyzon's claims about Shanghai HongYun's core management team, Investigator C-1 researched, collected, and identified background information Kou Jian and his business network. Investigator C-1 also visited Kou Jian's business addresses to verify the existence of actual business operations.

172.    According to Investigator C-1, as of February 2022, Kou Jian is a majority or minority shareholder in five companies, with the first company listed in the investigator-provided tables below, LanZhong, being Kou Jian's core business.

**Simplified Table of Kou Jian Companies Identifying Core Businesses**

| Company | Year Incorp. | Registered Capital | Shareholding | Core Business |
|---|---|---|---|---|
| 上海兰众实业有限公司 (LanZhong) | 2015-01-20 | RMB 5.0m | 90% | Volvox Distributor |
| 上海誉景鸿程投资管理咨询有限公司 (YuJing) | 2011-08-03 | RMB 0.5m | 80% | Bookkeeping Services |
| 上海氢力鸿运汽车有限公司 (HongYun) | 2021-09-06 | RMB 30m | 51% | Vehicle Leasing |
| 上海木雅国际货物运输代理有限公司 (MuYa) | 2010-03-16 | RMB 5m | 20% | Freight Services |
| 上海昊樑家具有限公司 (HaoLiang) | 2018-10-17 | RMB 0.1m | 5% | Furniture and furnishing |

**Detailed Table of Kou Jian's Corporate Investments**



三、寇健投资的企业信息

| 序号<br>Serial # | 企业名称<br>Business Name | 工商注册号<br>Business Registration Number | 企业类型<br>Business Type | 企业状态<br>Company Status | 注册资本<br>(人民币)<br>Registered Capital (RMB) | 认缴出资<br>Capitol Commitment | 出资比例<br>Contribution Ratio |
|---|---|---|---|---|---|---|---|
| 1 | 上海誉景鸿程投资管理咨询有限公司<br>Shanghai Yujing | 310107000629505 | 有限责任公司(自然人投资或控股) | 存续(在营、开业、在册) | 50万元<br>500k | 40.0<br>400k | 80% |
| 2 | 上海木雅国际货物运输代理有限公司<br>Shanghai Muya | 310107000584647 | 有限责任公司(自然人投资或控股) | 存续(在营、开业、在册) | 500万元<br>5 million | 100.0<br>1 million | 20% |
| 3 | 上海兰众实业有限公司<br>Shanghai Lanzhong | 310107000777149 | 有限责任公司(自然人投资或控股) | 存续(在营、开业、在册) | 500万元<br>5 million | 450.0<br>4.5 million | 90% |
| 4 | 上海昊樑家具有限公司 Shanghai Haoliang Furniture | 310107001051119 | 有限责任公司(自然人投资或控股) | 存续(在营、开业、在册) | 10万元<br>100k | 0.5<br>50k | 5% |
| 5 | 上海氢力鸿运汽车有限公司<br>Shanghai HongYun | | 有限责任公司(自然人投资或控股) | 存续(在营、开业、在册) | 3000万元<br>30 million | 1530.0<br>15.3 million | 51% |

Notably, the combined sum of registered capital for all of Kou Jian's enterprises to date, excluding HongYun, total a mere RMB 11.6 million. Kou Jian's commitments, in turn, total only RMB 5.9— less than 40% of his capital commitments to Shanghai HongYun.

173.    Investigator C-1 also reported that Kou Jian serves as legal representative for four companies:

| Company Name | Share % | Date Est.: | Registered Capital: | Business Type: |
|---|---|---|---|---|
| Shanghai HongYun | 51 | 2021 | RMB 30mm | |
| Shenzhen Hydrogen HongYun Automobile Co. | n/a | 2021 | RMB 30mm | HongYun Subsidiary |
| Shanghai LanZhong Industrial Co. | 90% | 2015 | RMB 5mm | Paint Distributor |
| Shanghai Yujing Hongcheng Investment | 80% | 2011 | RMB 500k | Bookkeeping |

174.    With respect to Kou Jian's primary business, LanZhong, Investigator C-1 found that the company was incorporated in 2015 with a registered capital of RMB 5 million (paid in full) and primarily deals with chemicals, paints, and associated ingredients. In particular, LanZhong is the sole distributor of Ecotec Naturfarben GmbH's Volvox (a name brand paint product in China. Investigator C-1 further found that, based on the company's latest social security record, it has only one salaried staff member, and Kou handles all sales activities. Additionally, they noted that the company shares a phone number with two other companies and has vacated both of its registered business addresses.

175.    Investigator C-1 found that Kou Jian's other businesses were similarly situated with respect to sharing a phone number, having only one to five salaried employees, and having no in-person operations. Investigator C-1's team documented each of their site visits with photographs of each purported office location, including the following reported location for three of Kou Jian's related companies.

**Investigator Site Visits:** Kou Jian companies
*Registered address for Yujing, LanZhong, and HaoLiang*





**Before demolition (source Baidu map)**          **Current Demolished Site**

176.    Based on this business information and their experience as an investigator, Investigator C-1 concluded that Kou Jian and, by association Shanghai HongYun, have no technology-based experience, especially in the area of hydrogen fuel cells or electric vehicles. Additionally, they failed to see how Shanghai HongYun or its core team "had built a deep cooperation with several large logistics group in China," as represented by Hyzon.

## F.    No Corporate Parents, One Suspicious Subsidiary

177.    As discussed above, Investigator C-1 confirmed that HongYun is not owned, in whole or in part, by any corporate entity, despite Hyzon's claim that HongYun is a special purpose entity.

178.    Further, they identified that Shanghai HongYun is the direct and sole owner of one subsidiary, Shenzhen Hydrogen HongYun Automobile Co. 深圳氢力鸿运汽车有限公司 ("HongYun SZX"). According to its corporate records, HongYun SZX was incorporated on October 28, 2021 in Shenzhen with a registered capital of RMB30 million. Investigator C-1 reports that, as of February 15, 2022, HongYun has not paid up its capital commitments. Moreover,

HongYunSZX shares its registered address with another company. Investigator C-1 reports that this is highly unusual and against Chinese business law.

## G.    No Website Plus No Employees Equals No Ability to Conduct Business

179.    In addition to researching government filings and performing site visits, Investigator C-1 searched for other indicia of business activity, including web presence and employee recruitment. In doing so, they confirmed the short seller reports that HongYun lacks any website or WeChat official account. Moreover, they found that the company had virtually no online presence other than a few announcements made in September 2021—when Hyzon announced the Hyzon-HongYun memorandum of understanding—which cite JS Horizon, not HongYun, as the source of information.

180.    Investigator C-1 opined that it is very unusual for a Chinese business to not have a website, WeChat official account, or any web presence—as these are the primary ways for Chinese and foreign businesses to communicate with customers in China. With respect to WeChat in particular, the app, owned by Chinese media company Tencent, is China's most popular social media app with currently more than 1.1 billion users. According to Forbes, "[it is estimated that WeChat is used by 90% of the Chinese population and is one of the primary ways for Chinese and foreign businesses to build a customer base."[130] Investigator C-1 confirmed that having a WeChat account is crucial to reaching potential clients in China, and that its important is so great that it may be considered an essential part of setting up a company in China.

---

[130] Saul Estrin, "WeChat and the World: How to Do Business in China and Beyond," Forbes.com (Nov. 29, 2020), *available at* https://www.forbes.com/sites/londonschool ofeconomics/2020/11/29/wechat-and-the-world-how-to-do-business-in-china-and-beyond/?sh=5b498d0e4d8f.

181.    These facts, when viewed in combination with Lead Plaintiff's independent investigation into Shanghai HongYun's registered business phone number, suggest that, to the extent the company is real, there are no publicly feasible means for actual or potential customers of HFCEVs to learn about HongYun or to contact the company to submit an inquiry or order.

182.    Investigator C-1 also investigated whether, and to what extent, Shanghai HongYun actually has a "core team" of managing or associate employees. To do so, they checked whether Shanghai HongYun had registered any employees with the local Social Insurance and Housing Fund Bureaus, as required by Chinese law. Additionally, they examined whether Shanghai HongYun had made legally required social security payments to the local government for its employees. Investigator C-1 also searched every major employee recruitment site operating in China to corroborate government records and to determine whether Shanghai HongYun was currently recruiting employees.

183.    As of February 2022, Investigator C-1 has been unable to identify any employees registered as working for Shanghai HongYun. Nor have they found records indicating that Shanghai HongYun made social security payments for any employees as of February 2022. These results are corroborated by Investigator C-1's social media and recruiting research. Simply put, Investigator C-1 found no online profile or recruiting efforts by Shanghai HongYun. Nor were they able to identify any employees listed as working for Shanghai HongYun on professional websites equivalent to LinkedIn in the United States.

184.    As part of their efforts, Investigator C-1 discovered that, though Shanghai HongYun had no active employee recruitment efforts, Hyzon's subsidiary, Hyzon Automobile Technology (Shanghai) Co., Ltd., was actively recruiting for nearly 30 positions, including engineers, supervisors, and a director of vehicle operations.

**Screenshot of Hyzon Shanghai Employment Listings on Liepin.com**



185.    Based on this information, Investigator C-1 concluded that (1) Shanghai HongYun either has no real employees or is not withholding legally required social security payments for employees; (2) Shanghai HongYun is unable to conduct day-to-day sales, marketing, or leasing business operations; and (3) it is possible that Hyzon Shanghai has played some part in Shanghai HongYun's operations and obligations under its MoU with Hyzon.

**H.      No Hydrogen Experience or "Deep Connections" to Large Chinese Conglomerates**

186.    Based on the corporate and shareholder information discussed above, as well as Investigator C-1's detailed investigation into each of Kou Jian's companies, including site visits, Investigator C-1 concluded that neither Shanghai HongYun nor its shareholders/executives have any apparent business connections or relations to the China-based steel conglomerates Hyzon purports is the ultimate end-user of its vehicles.

187.    Investigator C-1 was also unable to identify any information in Shanghai HongYun's corporate information, the corporate information for Kou Jian's other companies, or

online that corroborated Hyzon's dual claims about Shanghai HongYun's expertise and business

acumen, specifically:

- that Shanghai HongYun's "core team" consisting of Kou Jian and other shareholders or employees identified herein had "solid operation experience and master the real time vehicle data management," or

- that Shanghai HongYun had "built up a deep cooperation" with Baowu Group, Zhejiang Eurasian Supply Chain, Jiaoyun Hubei Logistics Group, Kuodao Logistics, Changxin International.

188.    Accordingly, if Hyzon actually delivered HFCEVs to steel conglomerates in China

in 2021,[131] such sales likely originated not through Shanghai HongYun, but rather through Hyzon

and Horizon's historic business relationships with steel conglomerate customers in the region—a

material omission from Hyzon's public statements. *See* Part IV.E, *supra*, ¶¶ 76-78 (discussing

Horizon/Hyzon's historic deals, including that Horizon had 70 vehicles "delivered to date by other

OEMS with Horizon fuel cells" to a leading steel company based in East Asia).

## I.    No Ability To Negotiate Supply Agreements for HFCEVs or To Participate in Government-Sanctioned RFPs (Not At Least Without Outside Aid)

189.    In addition to the abovementioned research, Investigator C-1 scrutinized Shanghai

HongYun's ability to negotiate agreements and/or memorandums of understanding concerning the

purchase, supply, or leasing of hydrogen fuel cell powered vehicles.

190.    As discussed above, Investigator C-1 confirmed that Shanghai HongYun had no

direct phone line, no website, and no WeChat account, suggesting that it had little to no ability to

build the customer base necessary in China to purchase for itself, or as a channel partner, up to 100

HCFEVs from Hyzon in 2021, or make upfront or installment payments for any vehicles.

---

[131] To date, Investigator C-1 has been unable to identify any media or other news that independently corroborates Hyzon's claim that it purportedly delivered 29 and 33 Hyzon HFCEVs to major steel conglomerate(s) based in China.

191.    Additionally, Investigator C-1 researched Shanghai HongYun's ability to pass through vehicles to the customers identified in Hyzon's public statements, specifically, as recounted by Defendant Knight, "two of the biggest steel companies in the world."[132] Investigator C-1 reported that in China, the biggest steel and logistical companies are typically state-owned enterprises ("SOE"), *i.e.*, legal entities that are created by the Chinese government in order to partake in commercial activities on the government's behalf. Baowu (more formerly known as China Baowu Steel Group Corp. Ltd.), for example, the world's largest steel manufacturer, which purportedly received Hyzon HFCEVs through Shanghai HongYun, is one such state-owned entity. According to Investigator C-1, most procurement for Chinese government entities and SOEs like Baowu typically follows public invitation tendering, during which procuring entities offer projects to all qualified bidders. Investigator C-1 stressed that this is a standard practice for all government entities and SOE procurements. Additionally, Investigator C-1 noted that Chinese laws on procurement and tendering clearly outline this tendering process. The following graphic from the US-China Business Council explains this multi-step process for American businesses interested in operating in China (and is incorporated by reference):

---

[132] *See* Part IV.P, *supra*, ¶ 146.

**The Tendering Process for Chinese SOEs[133]**

| Public announcement | A procuring entity issues a public tendering announcement on state-approved media, including approved newspapers and government websites. The announcement includes information about the procuring entity, the project timeline, and the product quantity for purchase. Government entities often conduct procurement activities through a procuring agency, while some SOEs establish subsidiaries specifically for the purpose of assisting with procurement. |
| --- | --- |
| Prequalification | Procuring entities can require bidders to provide documents certifying their qualifications ahead of the tendering process. |
| Prepare and issue tendering information | Procuring entities prepare tender documents, which include technical requirements and product specifications, relevant national and industry standards, metrics for assessing bidder qualifications, price requirements, evaluation criteria, and contract terms. Once the procuring entity releases these documents, suppliers are required to have a minimum of 20 days to submit their bids. |
| Bidder evaluation | The procuring entity organizes a bid evaluation committee, in which at least two-thirds of members are certified industry experts and the remainder are representatives of the procuring entity. The committee assesses bids based on predetermined criteria and ultimately submits a report and recommendation to the procuring entity. There are no standard criteria for evaluating bidders, but most committees will consider price, quality, and other requirements issued in tendering documents. |
| Winner selection and contract signing | The procuring entity selects a winner based on the expert committee's recommendation. The procuring entity then notifies the winning bidder, publicly releases the outcome in state-approved media outlets, and signs a contract with the bidder within 30 days. |

---

[133] The US-China Business Council, *Government Procurement and Sales to State-Owned Enterprises in China, Challenges and Best Practices* (Sept. 2021).

192.    In Investigator C-1's opinion, it would be very difficult for Shanghai HongYun, given its lack of paid-in capital, lack of business history, and lack of financial records, to qualify for an invitation to prepare and submit tendering information to an SOE. Additionally, they noted that if Shanghai HongYun managed to obtain a deal from these companies through the procurement process, there would typically be a big announcement. Shanghai HongYun, however, has virtually little web presence, and Investigator C-1 was unable to find any news of the awarding of a procurement contract to Shanghai HongYun for the provision of hydrogen-fuel-cell-powered commercial vehicles.

193.    Finally, Investigator C-1 reported that, as to Shanghai HongYun's present ability to lease vehicles, Shanghai HongYun is not presently able to obtain a license to offer leasing services, a financial tool, without paid-in capital.[134] Further, they relayed that, even if Shanghai HongYun had paid-in capital, it would likely take many months, possibly years, for it to obtain a license to be legally permitted to offer lease-based financing. As such, Investigator C-1 concluded that Shanghai HongYun has no leasing operation.

## VI.    MATERIALLY FALSE AND MISLEADING STATEMENTS

194.    Lead Plaintiff alleges that the statements highlighted in bold and italics within this Section were materially false, misleading, and omitted to disclose material information. In some instances, graphical material is alleged to be false and misleading and no bold and italic text has

---

[134] *See also* China Banking Regulatory Commission, "Measures Administering Finance Leasing Companies," Art. 2 ("Unless it is otherwise prescribed by any law or regulation, no entity or individual may engage in the finance leasing business or use the words "finance leasing" in its name without approval of the CBRC."); *id.* Art. 10 ("The minimum registered capital of a finance leasing company is *RMB 100 million* Yuan or any freely convertible currency with equivalent value, and *the registered capital shall be the paid-in money*." (emphasis added)). English translation of Finance Leasing Decree available at http://www.asianlii.org/cn/legis/cen/laws/maflc413/.

been applied. As alleged herein, the false and misleading statements artificially inflated or artificially maintained the price of Hyzon's Stock. As described below, Defendants created an impression of a state of affairs related to the Company's contracted orders and customer base that differed in a material way from the one that actually existed.

195.    Each statement attributed to Defendants Knight and Gu prior to the close of the SPAC Merger was also made by Old Hyzon, which was acquired by Defendant Hyzon, and thus was also made by Hyzon. Likewise, each statement attributed to Defendants Knight and Gu after the close of the SPAC Merger was also made by Defendant Hyzon, because in both cases the two were speaking on behalf of the pre- or post-merger entity as a senior executive. Likewise, each statement by Defendant Gordon was also made by Defendant Hyzon Motors because he was speaking as the CFO of the pre- and post-merger Company. Further, each statement by Defendants Anderson, Haskopoulos, and Tichio prior to the SPAC Merger were also made by Defendant Hyzon Motors because they were the CEO, CFO, and Chairman, respectively, of Hyzon Motors, which prior to the SPAC Merger was known as DCRB. Each statement contained in a public filing, presentation, or press release issued by an entity was made by that entity. The use of three asterisks in the middle of a quoted passage signifies the omission of a paragraph. That a statement is not included in this Section or marked as false and misleading in this Section does not imply its accuracy. The reference to a statement being "misleading" includes statements that are misleading due to the omission of truthful information.

## A.    Statements Concerning Hyzon's 100% Committed and Highly Probable Orders

196.    Statements touting the number and nature of Hyzon's committed orders were false and misleading for the following reasons, both together and individually: (a) Hyzon did not have any pre-orders and instead had non-binding memorandums of understanding; (b) Hyzon counted

orders from entities that did not sign agreements or purchase orders to buy the vehicles, either because they had not signed any agreement at all or because they had signed an agreement to try out HFCEVs on a trial basis; (c) Hyzon counted orders from businesses that could not plausibly be expected to order the listed number of trucks; (d) Hyzon counted pre-orders from entities that merely operated as intermediaries for ultimate purchasers, or who had no such operations but sought to open such lines of business, even though such orders could not reasonably be counted as orders; (e) Hyzon counted orders even though the conditions precedent for Hyzon to receive such orders and deliver vehicles had not been satisfied; and (f) Hyzon counted orders from persons and entities that Hyzon knew or was reckless in not knowing did not intend to order HFCEVs or the number of trucks Hyzon used in its count. The number of pre-orders was material because it was a key fact broadcasted to investors, served as a signal of demand for Hyzon's HFCEVs, served as a signal of expected future revenues, served as an indicator of industry opinions of Hyzon and its HFCEVs, and served as an indicator of the capabilities and success of Hyzon's sales and marketing functions.

197.    On February 9, 2021, the Company filed a Form 8-K with the SEC that included, as an exhibit, a press release entitled "Hyzon Motors, the Leading Hydrogen Fuel Cell Heavy Vehicle Company, Announces Business Combination with Decarbonization Plus Acquisition Corporation; Combined Company Expected to be Listed on Nasdaq," which included statements by Defendants Knight and Gu and other senior Hyzon executives. Thus, Hyzon and, in part, Knight and Gu stated the following:

> Craig Knight, Chief Executive Officer, and Co-Founder of Hyzon, said, "We are excited to partner with DCRB at an important inflection point for our company, hydrogen and society. ***Deliveries of Hyzon fuel cell powered heavy trucks to customers in Europe and North America will occur this year, well ahead of our competitors, and our committed sales pipeline is proof that the***

> *world is truly recognizing the need to develop innovative*
> *solutions to mitigate climate change and accelerate efforts to*
> *move the world economy down the path to net-zero emissions.*"

> George Gu, Chairman and Co-Founder of Hyzon remarked, "***This***
> ***business combination will enable us to expand deployments of our***
> ***zero-emission hydrogen fuel cell powered heavy vehicles globally,***
> ***and to continue leading the hydrogen transition.*** We are incredibly
> excited about the dynamic mobility category as municipalities and
> Fortune 100 companies are rapidly embracing hydrogen as the
> essential pathway to a net-zero economy. The number of countries
> cementing and then enhancing their national hydrogen strategies
> expands almost weekly, and we are extremely encouraged by both
> investor and public interest in the hydrogen economy"

198.    The statement(s) in the prior paragraph touted Hyzon's supposed pre-orders and

therefore was false and misleading for the reasons set forth in paragraph 196. Furthermore, the

statements were especially misleading because the use of the words "will occur" and "committed"

implied that the pre-orders were concrete, when in reality, the purported "deliveries" in Europe

and North America were anything but concrete and often, for example, were based on supposed

deals where the persons or entities signed a non-binding MoU, did not even sign a non-binding

MoU, or were clearly not in a position to order the number of trucks Hyzon was counting from

them.

199.    Also attached as an exhibit to the February 9, 2021 Form 8-K was a transcript from

a conference call held by Defendants Knight, Gordon, and Tichio with investors, touting the

announced business combination, the Company's history of commercialization of HFCEVs, and

its committed sales pipeline. Thus, Hyzon, Knight, and Gordon made the following statements:

> "Our success is not built on the outcomes of one or two trials in a
> location with peculiar characteristics; we're securing orders with
> customers of varying types, with varying criteria for long-term
> scaling up within their systems.
>
> . . .

> [T]aking just the medium and heavy duty truck and bus segments into account, Hyzon's projections are compelling. ***Hyzon forecasts to grow from $37 million on revenue on 85 units sold in 2021***, to $3.3 billion in revenue on nearly 10,000 units sold during 2025. ***Our 2021 forecast is 100 percent covered by contracts and MOUs,*** while our 2022 forecast is almost 50 percent contract and MOU covered, and more than 100 percent covered when high-probability orders are taken into account. Thirty percent of 2025 revenue is accounted for under current MOUs.

200.    The statement(s) in the prior paragraph celebrated Hyzon's purported 2021 revenue forecasts, were premised on its reported committed orders and customers base, and therefore was false and misleading for the reasons set forth in paragraph 196. Furthermore, the statements are especially misleading because they boast that Hyzon's revenue forecasts were "100 percent covered" by contracts and MoUs that were highly fabricated or exaggerated. As discussed above, for example, Hyzon's claim in its investor presentations that Heineken was a "top tier customer" that was "finalizing" a purchase order for 5 vehicles, valuing over $2 million in revenue, for 2021 delivery was baseless and ultimately removed from Hyzon's presentations. Additionally, it was false and misleading for Hyzon to repeat its forecast that it would earn approximately $37 million in revenue in 2021, even though it frequently removed high revenue agreements by large, purportedly committed or high probability customers like Heineken, Coca-Cola, and others from its investor presentations, without correspondingly updating its revenue forecast projections.

201.    On February 9, 2021, also as an attached exhibit to a Form 8-K filed with the SEC, the Company submitted a copy of its February 9 Investor Presentation entitled "Accelerating the Hydrogen Transition." Hyzon therefore made statements therein. On Slide 5, Hyzon repeated its claim, discussed in the preceding paragraph, that it had a "**2021 backlog of ~$40 million under contract or [Memorandum of Understanding]** from blue-chip Fortune 100s and municipalities with exceptional (and rapidly growing) 2022+ visibility." The Company reported that "80% of

near-term backlog to customers in **Europe, Asia and Australia**." Further, it included the following graphics, which contain false and misleading statements:







202.    The statement(s) in the above depicted graphics were premised on Hyzon's reported committed orders and customers base, and therefore was false and misleading for the reasons set forth in paragraph 196 and 200. Furthermore, it was especially misleading to boast that the pre-orders had come from a number of established companies, including Coca-Cola, Heineken, and Ikea, when these pre-orders were highly fabricated. For example, the representation that Heineken was a "top tier customer" that was "finalizing" a purchase order for 5 vehicles, valuing over $2 million in revenue, for 2021 delivery was baseless and ultimately removed from Hyzon's presentations. It was also false misleading for Hyzon to state that it had 100% contracted orders from 13 private and public entities adjacent to a map displaying logos for 14 entities, thus suggesting that nearly all of the logos displayed were for customers with 100% committed orders. It was particularly false and misleading for Hyzon to repeat its forecast that it would earn approximately $37 million in revenue in 2021, even though it frequently removed high revenue agreements by large, purportedly committed or high probability customers like Heineken, Coca-Cola, and others from its investor presentations, without correspondingly updating its revenue forecast projections. Finally, it was false and misleading for the Company to list the logos of companies like Nestle, Coca-Cola, and Heineken as "vehicle customers" when those business were not actually customers and, at best, only had discussed the possibility of purchasing vehicles from Hyzon.

203.    The very next day, the Company filed Soliciting Materials in a Form DEFA14As, which included an edited version of the February 9, 2021 PowerPoint Presentation that was shown to Hyzon's investors during the February 9, 2021 Conference Call. Therein, Hyzon included the following graphics, which contain false and misleading statements:







The Company made no changes to its false and misleading statements in the Presentation regarding its projected financials.

204.    The statement(s) in the prior paragraph were premised on its reported committed orders and customers base, and therefore was false and misleading for the reasons set forth in paragraphs 196, 200, and 202. Additionally, it was especially false and misleading for the Company to drop customers, including Air Products, Centurion, and Nestle, from the presentations infographics, to place other purported partners and entities in those dropped customers places, and to omit other material information, without including any explanation or explicit indication, either in the edited PowerPoint presentation itself, or some other notice or filing to investors, particularly those who had viewed the original presentation on February 9. Further, it was false and misleading to drop such big-name customers without making any changes to its vehicle delivery or revenue forecasts.

205.    On February 12, 2021, the Company filed additional Soliciting Materials in Form DEFA14As with the SEC, which included a second edited version of the February 9, 2021 PowerPoint Presentation. Therein, Hyzon included the following graphics, which contain false and misleading statements:





The Company made no changes to its false and misleading statements in the Presentation regarding its projected financials.

206.     The statement(s) in the prior paragraph were premised on its reported committed orders and customers base, and therefore was false and misleading for the reasons set forth in

paragraphs 196, 200, 202, and 204. Furthermore, it was particularly false and misleading for the Company to surreptitiously drop the logo of Coca-Cola as a top-tier customer, and to add logos of other entities in its stead, such that the total number of top tier customers (14) matched that of the original February 9, 2021 presentation, thus masking its unannounced edits. Moreover, it was false and misleading for the Company to omit the number of private and public contract orders that were "100 percent certain," a figure provided in prior Presentations shown to investors, as it obscured information about which of the customer deployments depicted in the adjacent map were in fact 100 percent certain or high probability orders.

207.    On April 29, 2021, Hyzon filed a Form DEFA14A with the SEC containing a copy of a PowerPoint presentation entitled "Hyzon Motors[,] The Leader in Hydrogen Mobility[,] Analyst Day Presentation," conveying information similar to the slides in its February 9-12, 2021 Investor Presentations. On Slide 8 of the presentation, the Company again gave an investment overviewing, claiming it had **"$55 million of backlog under contract or MOU** (up from $40 million in February 9, 2021 transaction announcement presentation)" and that "80% of near-term backlog to customers in **Europe, Asia and Australia**." (Emphasis in original.) Hyzon included the following graphics, which contain false and misleading statements:

       





The Company made no changes to its false and misleading statements in the Presentation regarding its projected financials.

208.    The statement(s) in the prior paragraph were premised on its reported committed orders and customers base, and therefore was false and misleading for the reasons set forth in paragraphs 196, 200, 202, 204, and 206. In addition, it was particularly false and misleading for

the Company to describe its top customer list as "expanding," as the term suggests that changes to the list were additive and that no previously listed entities were deleted. It was further false and misleading for the Company to maintain its earlier projections for 2021 revenue and vehicles delivered, nearly $37 million and 85 vehicles respectively, even though it had removed multiple customers, as compared to previous presentations, and filled those gaps inserted duplicate logos for grocer group FrieslandCampina. Additionally, Hyzon's claim attributing "80% of near-term backlog to customers in Europe, Asia and Australia" was false and misleading, as it suggested that Hyzon had sizeable customer commitments in 2021 to customers in Europe and Australia, even though the bulk of its deliveries (more than 70%) were to Asia. The claim was also false and misleading because it suggested Hyzon had a near-term backlog to customers outside these continents, even though Hyzon has announced virtually no confirmed sales or deliveries to customers in other continents, such as North America.

209.    On or about July 19, 2021, the Company made public on its website a new version of its investor presentation ("July 2019 Investor Presentation"), which it did not file with the SEC. Therein, the Company removed many of the slides from its previous presentations touting its top tier customers and partners. With respect to its customer base, on slide 23, the Company only included the following whitewashed map of its customer deployments, which was virtually identical to the deployment map featured in the April 29, 2021 Investor Presentation:

On slide 36, the Presentation repeated the claim that it, in the near term, it had "$55M of revenue under contract or MOU already," with "~75% of sales into Asia & Australia, ~25% into Europe." Further, the Company maintained on slide 40, entitled "Summary Projected Financials," that it expected to deliver 85 vehicles and earn nearly $37 million in total revenue in 2021.

210.    The statement(s) in the prior paragraph were premised on its reported committed orders and customers base, and therefore was false and misleading for the reasons set forth in paragraphs 196, 200, 202, 204, 206, and 208.

211.    On June 16, 2021, Defendant Knight participated in a fireside chat hosted by Bernstein. Knight said, among other things, the following regarding revenue targets:

> We've had a couple places in Europe recently, we're engaging with customers about the first one or two vehicles, and they want to already order 10 or 20 or more recently, we're now seeing [inaudible], a major retailer, they wanted 70 vehicles straight away, subject to the first four vehicles meeting all the various performance criteria. They wanted to commit to 70.
>
> …

> *I'd like to remain a little conservative on this but providing there are no more nasty surprises in supply chains and those kind of things, we'll definitely hit this year's targets.*

212.     The statement(s) in the prior paragraph were premised on its reported committed orders and customers base, and therefore was false and misleading for the reasons set forth in paragraphs 196, 200, 202, 204, 206, and 208. Additionally, it was particularly false and misleading for Defendant Knight to reaffirm the Company's forecasted delivery and revenue targets, thus perpetuating the Defendants' prior false and misleading statements about their committed orders and customer base.

213.     On June 29, 2021, Defendants Tichio and Knight attended a virtually held Fireside Chat, hosted by IPO Edge, during which they referred the audience to, and provided them with, the February and April 2021 PowerPoint presentations described above . In response to a question about Hyzon's lack of positive revenue, Tichio stated:

> [I]f you take a look at 2021, *the company is you know projecting $37 million of revenue [from] vehicles that will actually roll off its lot this year.* That is what we had communicated back in February. *We still feel extraordinarily comfortable with that assessment,* in that belief in terms of the pathway for the company and that the company has already demonstrated publicly through its online virtual tour with respect to its actual vehicles that were that that are on the road that are functioning and that are all regaining fantastic commercial traction right now.

214.     These statement(s) in the prior paragraph were premised on its reported committed orders and customers base, and therefore was false and misleading for the reasons set forth in paragraphs 196, 200, 202, 204, 206, and 208. Additionally, it was particularly false and misleading for Defendant Tichio to reaffirm the Company's forecasted delivery and revenue targets, thus perpetuating the Defendants' prior false and misleading statements about their committed orders and customer base.

215.    On July 13, 201, Defendants issued a business update asserting that Hyzon had doubled its 2021 revenue forecast due to new sales while simultaneously reducing its costs per vehicle. Specifically, it stated:

> **Orders and non-binding MoUs have increased to represent up to $83M, up more than 50% from $55M as of April 29, 2021, and over 100% from February 12, 2021**. Expected 2022 deliveries include up to 70 trucks from Austrian grocery retailer MPREIS currently under an MoU.
>
> The growing list of orders and non-binding MoUs comes **from the rapidly developing European market as well as Australia**, thanks to the company's international footprint.
>
> …
>
> **Simultaneously, Hyzon has successfully reduced costs in excess of $50,000 per vehicle for manufacturing components and sub-systems**, with savings over 80% for certain auxiliary power systems, power distribution unit and on-board chargers and over 40% for battery, eMotor, and inverter components.

216.    These statement(s) in the prior paragraph were premised on its reported committed orders and customers base, and therefore was false and misleading for the reasons set forth in paragraphs 196, 200, 202, 204, 206, and 208. Additionally, it was particularly false and misleading for Defendants to reaffirm the Company's forecasted delivery and revenue targets, thus perpetuating the Defendants' prior false and misleading statements about their committed orders and customer base.

217.    On October 5, 2021, the Company issued a public statement "strongly rejecting" the Blue Orca Report. Therein, Hyzon made the following false and misleading statements concerning its customers:

> The short seller report falsely claims that Hyzon overstated its relationship with certain customers in its investor presentations. Like any innovative company in a nascent industry, Hyzon continues to pursue a wide range of potential opportunities, any one of which may or may not ultimately result in a commitment to

purchase vehicles from Hyzon. Contrary to the short seller's claims, ***no customers or potential customers "disappeared" from any investor presentation; rather, Hyzon anonymized certain customer and potential customer names in its July 2021 investor presentation***. Hyzon already has entered into signed agreements with certain entities identified as potential customers in its investor presentations, including the Southern California Gas Company, Ark Energy and the Municipality of Groningen. Hyzon continues to engage in active discussions with a majority of the companies that the short seller report misleadingly claims "disappeared" from its investor presentations, as well as with a large number of other prominent companies across the globe.

218.    The statement(s) in the prior paragraph are false and misleading for the reasons set forth in paragraphs 196, 200, 202, 204, 206, and 208. Furthermore, it was exceptionally false and misleading for the Company to claim that the only made anonymization-based changes to the lists of customers identified in its July 21 investor presentations, given the series of changes documented herein between its three February investor presentations, its April presentation, and its July presentation. Moreover, in light of the information provided in those earlier presentations, it is readily apparent that beyond the anonymization of certain information, certain customers or potential customers, did in fact disappear from Hyzon's presentations. In addition, it was false and misleading for the Company to cite agreements with specific "potential customers" identified in its investor presentations as evidence that it did not overstate its relations with customers, without addressing the big-brand customers like Heineken and Ikea that were discussed above and specifically referenced as focal points in the Blue Orca Report prompting Hyzon's response. Finally, it was egregiously false and misleading for the Company to not disclose in this rebuttal that, as a result of the Company's "proactive shift" to deployment in Asia, where average selling prices were lower, it expected to earn lower than forecasted 2021 revenues, despite its earlier affirmations that it would meet its target of nearly $37 million, as by this date, Defendants were aware they would not be able to hit that target.

B.   **Statements Concerning Hiringa**

219.   Statements touting the number of vehicles to be supplied to Hiringa were false and misleading for the following reasons, both together and individually: (a) Hyzon did not have any orders from Hiringa and instead had a non-binding MOU; (b) Hyzon counted Hiringa, which merely operated as intermediaries for ultimate purchasers; (c) Hyzon counted orders from potential customers of Hiringa that could not plausibly be expected to order the listed number of trucks; (d) Hyzon counted orders from Hiringa partners, even though the conditions precedent for those customers to receive such orders had not been satisfied; and (e) Hyzon counted orders from persons and entities that Hyzon knew or was reckless in not knowing did not intend to order the number of trucks Hyzon used in its count. The number of orders was material because it was a key fact broadcasted to investors, served as a signal of demand for Hyzon HFCEVs, served as a signal of expected future revenues, served as an indicator of industry opinions of Hyzon and its HFCEVs, and served as an indicator of the capabilities and success of Hyzon's sales and marketing functions.

220.   On February 17, 2021, for example, the Company announced that it had advanced its partnership with Hiringa, and that the "the two companies ha[d] signed a vehicle supply agreement, with ***Hyzon commissioned to build and supply Hiringa with zero emission Heavy Goods Vehicles (HGV)***." According to its press release, "***the first batch of vehicles are expected to enter service in New Zealand by the end of 2021***." Moreover, it claimed that "***Hyzon plans to have up to 1,500 fuel cell trucks on the road in New Zealand by 2026*** . . . ."

221.   The statements in the paragraph above touting the supply of vehicles to Hiringa vehicles were false and misleading for the reasons set forth in paragraph 219. Additionally, these statements were especially misleading because they use the word "supply" as an active verb, with Hiringa as the direct object, suggesting that Hiringa was in fact the ultimate purchaser and end-

user of the 1500+ HFCEVs. Furthermore, they were false and misleading because they did not disclose the identity of any end users of the first batch of vehicles or that Hiringa was a channel partner, further suggesting that Hiringa was in fact a customer and end user. The false and misleading nature of these statements are compounded by the fact that Hiringa would not take any deliveries in 2021, especially not until after a first validation trial and after Hiringa had built up a commercial hydrogen fuel station infrastructure—material preconditions not disclosed in this or other public statements by Hyzon which Hyzon would have known, or should have been aware of, from any amount of due diligence and from its relationship with Hiringa.

222.   Also on February 17, 2021, Hyzon posted a tweet of the Hiringa deal, describing it as "***an agreement for the build and supply of up to 1,500 hydrogen fuel cell-powered trucks to New Zealand's Hiringa Energy by 2026***."

223.   The statements in the paragraph above touting the supply of vehicles to Hiringa vehicles were false and misleading for the reasons set forth in paragraphs 219 and 221.

224.   On March 8, 2021, the Company issued a press release entitled "Hydrogen Now™ Event to Showcase Virtual Ride Along in a Zero-Emission, Hydrogen Fuel Cell Powered Truck at Hyzon's Production-Ready Groningen Facility," in which it made the following false and misleading statement(s):

> Hyzon and Hiringa Energy (New Zealand) recently announced that the two companies had signed a vehicle supply agreement. Hyzon is targeting the delivery of 1,500 fuel cell powered heavy trucks by 2026 as part of the agreement with Hiringa. As binding orders for those trucks are placed, Hyzon anticipates fulfilling them from the Groningen facility, with first shipments planned for the second half of 2021.

225.   The statements in the paragraph above touting the supply of vehicles to Hiringa vehicles were false and misleading for the reasons set forth in paragraphs 219 and 221.

Furthermore, it was exceptionally false and misleading for Hyzon to omit that Hiringa was, in fact, a channel partner and not an end-user who would be using the trucks in the announced "binding orders."

226.    On March 17, 2021, the Company filed Soliciting Materials in a Form DEFA14A with the SEC, containing, in particular, a preliminary proxy statement, which included the following false and misleading claim:

> To date, Hyzon has **received binding orders** for Hyzon-branded commercial vehicles and coach buses in an aggregate value of approximately $18.2 million from companies around the world, including Hiringa and Fortescue Metals Group Ltd. **Hiringa has placed a binding order for the first 20 trucks** which are expected to be powered by green hydrogen supplied through Hiringa's nationwide refueling infrastructure and aims to deploy up to 1,500 fuel cell powered heavy trucks manufactured by Hyzon to fleet operators in New Zealand by 2026 as part of a partnership to decarbonize heavy road transport in New Zealand. Hyzon expects the first shipments of four trucks to occur by the first quarter of 2022.
>
> . . .
>
> Hyzon's existing customers which have placed binding orders include leaders in the transportation and logistics and mining sectors, such as **Hiringa (supported by logistics companies in New Zealand)**.

227.    The statements in the paragraph above touting the supply of vehicles to Hiringa vehicles were false and misleading for the reasons set forth in paragraphs 219 and 221. Additionally, it was exceptionally false and misleading for Hyzon to omit that Hiringa was, in fact, a channel partner and not an end-user who would be using the trucks in the announced "binding orders." The use of the phrase "supported by logistics companies" with respect to Hiringa, suggesting that Hiringa was the purchaser and final end user of Hyzon vehicles, compounded the false and misleading nature of these statements.

228.     On April 29, 2021, the Company filed Soliciting Materials in a Form DEFA14A with the SEC containing a copy of a PowerPoint presentation entitled "Hyzon Motors[,] The Leader in Hydrogen Mobility[,] Analyst Day Presentation," in which the Company made the following false and misleading claim: "*Announced vehicle supply agreement to supply trucks to New Zealand-based Hiringa Energy; first deliveries expected by EOY 2021.*"

229.     The statements in the paragraph above touting the supply of vehicles to Hiringa vehicles were false and misleading for the reasons set forth in paragraphs 219, 221, and 227.

230.     On October 5, 2022, Hyzon issued a press release denying the Blue Orca Reports allegations, in which it represented that "*Hyzon has never suggested that Hiringa is an end user of hydrogen trucks.*"

231.     The statements in the paragraph above touting the supply of vehicles to Hiringa vehicles were false and misleading for the reasons set forth in paragraphs 219 through 229.

C.     **Statements Concerning Shanghai HongYun**

232.     Statements touting the number and nature of Hyzon's agreement to deliver vehicles to Shanghai HongYun were false and misleading for the following reasons, both together and individually: (a) Hyzon did not have any pre-orders with Shanghai HongYun or any entity affiliated with Shanghai HongYun and instead had non-binding memorandums of understanding; (b) Hyzon counted orders from entities that did not sign agreements or purchase orders to buy the vehicles, either because they had not signed any agreement at all, as of the date of the announcement. or because they had signed an agreement to try out HFCEVs on a trial basis; (c) Hyzon counted orders from businesses that could not plausibly be expected to order the listed number of trucks; (d) Hyzon counted pre-orders from entities that merely operated as intermediaries for ultimate purchasers, or who had no such operations but sought to open such

lines of business, even though such orders could not reasonably be counted as orders; (e) Hyzon counted orders even though the conditions precedent for Hyzon to receive such orders and deliver vehicles had not been satisfied; and (f) Hyzon counted orders from persons and entities that Hyzon knew or was reckless in not knowing did not intend to order HFCEVs or the number of trucks Hyzon used in its count. The number of pre-orders was material because it was a key fact broadcasted to investors, served as a signal of demand for Hyzon's HFCEVs, served as a signal of expected future revenues, served as an indicator of industry opinions of Hyzon and its HFCEVs, and served as an indicator of the capabilities and success of Hyzon's sales and marketing functions.

233.    On September 9, 2021, Hyzon issued a press release entitled "Hyzon Motors to supply up to 500 hydrogen fuel cell electric vehicles to Shanghai logistics company," which included, in pertinent part, the following false and misleading statements regarding the Company's deals and delivery schedule:

> …*the initial order of 100 vehicles is expected before the end of 2021* while the other 400 vehicles will be ordered in 2022.
>
> HongYun Automobile focuses *on providing logistics solutions primarily through hydrogen-powered fuel cell electric vehicles*. The *company provides operation, leasing and maintenance service for customers across the country, including one of the world's largest steelmakers*. After Hyzon delivers the vehicles, HongYun will be responsible for the subsequent commercial arrangements with its end customers.

(Emphasis added.) The press release also stated the following regarding Hyzon's purported customer, Shanghai HongYun.

> **About Hongyun**
> Shanghai Hongyun Automobile Co., Ltd. is committed to become the leader in hydrogen-powered fuel cell vehicle operation. *The core team of the company has solid operation experience and master the real time vehicle data management*, they had built up a deep cooperation with several large logistics group in China including Baowu Group, Zhejiang Eurasian Supply Chain, Jiaoyun Hubei Logistics Group, Kuodao Logistics, Changxin International

Logistics etc. ***At present, the company is focusing on the operation of hydrogen-powered heavy duty trucks by leveraging its rich end user resources in logistics industry***.

234.     The statements in the paragraph above touting Shanghai's order of vehicles were false and misleading for the reasons set forth in paragraph 232. Additionally, the statements describing Shanghai HongYun's business operations and relations were exceptionally false and misleading because Shanghai HongYun (1) is either a fake company or a shell company with no reported affiliations with any credible business; (2) was established and registered with the Chinse government just three days before the MOU was announced; (3) had, and continues to have, zero paid-in capital for operations; (4) has no employees other than (possibly) its shareholders; (5) has no legitimate physical office location or working contact information; (6) has no corporate investors, only individual shareholders; (7) has no web presence on the internet or popular social media platforms in China, including WeChat; and (8) does not qualify, due to its lack of paid-in capital, for a license to import or export goods, such as HFCEVs. Further, the statements concerning Shanghai HongYun's core team were exceptionally false and misleading because Shanghai HongYun's primary shareholder is primarily a distributor of European paint supplies, because neither of HongYun's shareholders have significant business experience in real-time vehicle data management, and because neither of Shanghai HongYun's shareholders have reported, noteworthy business relationships with hydrogen-fuel-cell-related industries.

235.     On October 5, 2021, the Company issued a public statement "strongly rejecting" the Blue Orca Report. Therein, Hyzon made the following false and misleading statements concerning HongYun:

Hyzon is excited about its partnership with Shanghai Hydrogen HongYun Automotive Co., Ltd. ("Shanghai HongYun"), ***which is a special purpose entity seeking to provide third-party clean energy logistics services to corporate customers***. Shanghai

HongYun was established in the wake of the Shanghai government's August 26, 2021 announcement that Shanghai would be among the first participants in China's national hydrogen fuel cell vehicle pilot program.

As Hyzon announced on September 9, 2021, Hyzon and Shanghai HongYun entered into a non-binding memorandum of understanding ("MoU") under which the parties would negotiate definitive vehicle supply agreements pursuant to which Shanghai *HongYun is expected to order 100 trucks in 2021* and an additional 400 trucks in 2022. Notwithstanding the short seller's claims, however, Hyzon specifically disclosed in its September 9, 2021 announcement that Shanghai HongYun was not yet a customer of Hyzon. Consistent with the terms of the MoU, *Hyzon expects that Shanghai HongYun will be able to leverage its existing relationships to enter into long-term logistics service agreements with end users for Hyzon's hydrogen-powered vehicles*. Hyzon expects to receive binding purchase orders from Shanghai HongYun for these vehicles, which *Hyzon anticipates will include upfront deposits and installment payments*.

236.     The statements in the paragraph above touting Shanghai's order of vehicles were false and misleading for the reasons set forth in paragraphs 232 and 234. In addition, the statement that HongYun was "a special purpose entity" was exceptionally false and misleading because, as discussed above, Hyzon knew, or should have been aware that, Shanghai HongYun is owned and controlled by individual shareholders and has no corporate parents, no publicly registered corporate shareholders, and no readily apparent corporate relationships with clean energy entities (other than Hyzon). For similar reasons, the statement concerning Shanghai Hyzon's expectation that HongYun's ability to leverage its existing relationship was extraordinarily false and misleading, as Shanghai HongYun's corporate records indicate that neither it nor its shareholders had such existing relationships that would allow them to plausibly sell Hyzon HFCEVs to end users. Furthermore, Shanghai HongYun's publicly available corporate records document that Shanghai HongYun had, and continues to have no paid-in capital in its corporate accounts. As such, Hyzon's representations regarding Shanghai HongYun's ability to provide upfront deposits

and installment payments was also exceptionally false and misleading. Finally, the statements are false and misleading as they fail to disclose a possible pre-existing relationship between Shanghai HongYun, its corporate leadership, Hyzon, and/or Horizon.

237.    On November 12, 2021, the Company filed a Form 8-K, signed by Defendant Knight, with the SEC, which included a press release issued that day entitled, "Hyzon Motors, Inc. Announces Third Quarter 2021 Financial and Operational Results with Significant Milestones Achieved and Building Momentum Across Asia, Europe and North America." In that announcement, Hyzon, reported that it had "*[r]eceived the first two purchase orders, for 62 trucks in total, pursuant to terms of the previously announced MOU to supply Shanghai Hydrogen Hongyun Automotive.*"

238.    The statements in the paragraph above touting Shanghai HongYun's order of vehicles were false and misleading for the reasons set forth in paragraphs 232, 234, and 236.

239.    On November 12, 2021, the Company held an Earnings Call on its Q3 2021 results in which Defendants Knight and Gordon participated. On that call, Defendant Knight, and thus Hyzon, told the audience that "Hyzon has received *the **first two purchase orders from Shanghai Hydrogen HongYun Automotive in China for a total of 62 trucks. The end user of these trucks is a large industrial conglomerate.***"

240.    The statements in the paragraph above touting Shanghai HongYun's order of vehicles were false and misleading for the reasons set forth in paragraphs 232, 234, and 236. Additionally, this statement was exceptionally false and misleading because (1) neither Shanghai HongYun nor its shareholders have a prior business relationship with the large industrial conglomerate; (2) Shanghai HongYun lacks publicly available contact information or a web presence through which a large industrial conglomerate could contact the company; and

(3) Shanghai HongYun, with its zero paid-in capital, lacks sufficient capital, as well as a sufficient financial history, to submit bids for proposals issued by Chinese state owned entities ("SOEs").

241.    On December 8, 2021, Hyzon issued a press release announced that it had delivered in November "29 fuel cell electric trucks to be used by a major steel conglomerate in China through [Shanghai HongYun]." According to the press release:

> The 49-ton trucks . . . are expected to haul steel coils in the conglomerate's fleet in coming months. ***HongYun plans to provide operation, leasing and maintenance services*** for industrial and municipal customers in targeted locations in China, which is expected to be a massive market for fuel cell technologies in the coming years. ***Hong[Y]un has further orders for 33 more trucks confirmed with Hyzon***.

242.    The statements in the paragraph above claiming that Shanghai HongYun was to provide operation, leasing, and maintenance services were false and misleading for the reasons set forth in paragraphs 232, 234, 236m and 240. Additionally, such statements were especially false and misleading because Shanghai HongYun lacks a physical office location to conduct business, particularly maintenance services, Shanghai HongYun has no employees to perform such services, and Hyzon lacks the requisite paid-in capital to acquire a license to offer financing options such as vehicle leases.

## VII.    ADDITIONAL ALLEGATIONS OF SCIENTER

243.    The allegations in this Section allege scienter as to each Defendant. The inference and conclusion that Defendants acted with scienter, that is, that they intended to mislead the investing public or were reckless as to the possibility of misleading the investing public, is supported by the following facts. While organized into sub-Sections for readability, the following allegations of scienter are mutually corroborating.

A.      **Motive and Circumstantial Evidence of Scienter**

244.    ***Defendants' misrepresentations were necessary to the repackaging of its flailing parent company Horizon through a take public SPAC merger that would increase the corporate entity's enterprise value by 10 times and insert much needed capital.*** As noted above, for the past 17 years, Hyzon's parent company Horizon developed the same fuel cell technology Hyzon relies on, has been manufacturing the same fuel cells as Hyzon makes, and has similarly attempted to sell the fuel cells to electric vehicle makers. Horizon, however, failed to gain traction. By the end of 2019, Horizon's largest and only notable customer went insolvent, which correspondingly caused JS Horizon's vehicle sales and cash flow to plummet throughout 2020, a period in which other electric vehicle manufacturers were flourishing. Consequently, in January 2021, just months before Hyzon would go public, Horizon was valued in the Chinese over-the-counter market as a micro-cap stock at only $200 million. Ultimately, this financial downturn would push Horizon to deregister its stocks from the NEEQ exchange. It was from this tumultuous background that Hyzon was spun off into a standalone entity based in the United States and its financial systems.

245.    From the very beginning, everything about Hyzon's business was built on rebooting Horizon's failed vehicle endeavor in a new market with a new customer base curious about the potential benefits of hydrogen fuel cell power. To do so, Hyzon quickly realized that it needed to excite commercial-customer demand. Additionally, it needed to acquire substantial amounts of capital to simultaneously build its American-based facilities and invest in hydrogen networks that could sustain the operation of the very HFCEVs Hyzon was attempting to sell. Hyzon and its corporate family, however, lacked access to a national stock exchange through which they could acquire sufficient funds. Further, the Company's initial efforts to attract customers, such as Air Drivers, was failing to convert into actual sales of fuel cells.

246.    Hyzon and its then-senior team thus settled on a development strategy in which it would sell investors on the misleading narrative that Hyzon's vehicles were in high demand and that the Company had received firm commitments from purchasers, including over $700 million in orders from large Fortune 500 and household named companies. Without such representations about order quantities and committed customers, Defendants likely would have never received shareholder approval for the take public SPAC merger and Hyzon would not have gone public. Instead, these false representations paved the way for Hyzon to be listed on the Nasdaq with an enterprise value of over $2 billion (or 10 times the value of Horizon just months ago) and allow the Company to raise $600 million in proceeds.

247.    Just as with other EV operators at the time, this unique motive—the motive to avoid the existential risk of insolvency by raising money under false premises in a take-public merger— goes far beyond the ordinary motive of executives to manage a company profitably. This motive strengthens the inference of scienter—*i.e.*, the common-sense conclusion that Defendants Knight, Gu, and Gordon succumbed to this motive and defrauded investors—is compelling, especially in conjunction with the other allegations of scienter alleged herein.

248.    ***Defendants benefitted immensely by convincing shareholders to approve the take public merger under false pretenses***. Defendants' scienter is further evident from the shockingly large profits they stood to make after the SPAC Merger, given their massive amounts of Hyzon stock. For example, as part of the Business Combination, the Sponsor Decarbonization Plus Acquisition Sponsor, LLC paid $25,000 for over 1 million "founders shares" that were subsequently transferred to Defendant Anderson's firm WRG DCRB Investors, LLC and other DCRB directors which were worth approximately ***$56.4 million***.

249.    Likewise, in advance of the SPAC Merger, Hyzon USA, under the control of Defendants Gu and Knight, granted each of those Defendants 3.125 million options for Hyzon common stock, exercisable at a price of $2.00 per share, for the purpose of reaping greater financial gains from the overhyped success of the SPAC Merger. Upon completion of the SPAC Merger, Gu and Knight were awarded more-or-less 200,000 shares of Class A Common Hyzon stock, and over 5.7 million stock options, exercisable at $2.00 per share, in exchange for their outstanding pre-merger holdings. On the first day of trading after the SPAC Merger closed, July 19, 2021, Hyzon stock opened at a price of $9.70 per share. Accordingly, in the immediate aftermath of the SPAC Merger, Defendants Gu's shares and options, if exercised, in total, were worth more than **$46 million** after the merger. Similarly, Defendant Knight's shares and options, if fully exercised, were worth (net) nearly **$45 million**.[135]

250.    Because of DCRB's February 8, 2021 Lock-Up Agreement, Defendants were barred from selling or otherwise transferring their stock until six months after the SPAC Merger closed. As such, Defendants could not cash out their stocks until January 17, 2022, and had a compelling motive to keep stock prices inflated through the continuation of their fraudulent scheme.

## B.    Scienter as to Hyzon's Purported Committed Orders

251.    Many facts show that Defendants viewed the touting of committed and high probability orders as a key tool to persuade investor to highly value Hyzon's stock. These facts directly indicate that Defendants understood the importance of the information to investors and the

---

[135] Defendant Anderson maintained his pre-SPAC Merger stock holdings of approximately 630,947 shares, and thus had a powerful motive to inflate the Company's share price until he could cash out. Defendants Haskopoulos and Gordon received no Hyzon stock from the completion of the SPAC Merger, but retained financial interest by means of their employment and their indirect business relationships, in Gordon's case, his relation with Ascent and Raven.

risk that investors would be misled if Defendants misrepresented those pre-orders. They also support the inference that the now-admitted misrepresentations were either a deliberate effort to mislead investors or the product of a reckless indifference to the possibility of investors being so misled.

252.    As detailed herein, Defendants routinely used their book of supposed 100% committed and high probability orders to market the Company to investors, including in media appearances, proxy and soliciting materials, other SEC filings, press releases, and in various other events. For example, in the Company's Investor Presentations, filed as soliciting materials, the Company repeatedly touted its forecasted revenue and vehicle deliveries for 2021 next to images and graphics depicting logos for its "Top Tier Customers" and those with purportedly final or near-final purchasing agreements. This fact directly indicates that Defendants understood the importance of the information to investors and the risk that investors would be misled if Defendants misrepresented its committed orders and customer base. It also supports the inference that the misrepresentations were either a deliberate effort to mislead investors or the product of a reckless indifference to the possibility of investors being so misled. Positive media buzz in response to Defendants' representations—of which Defendants, given their positions, would be aware—further confirmed that such representations were material to investors.

253.    Further, reports by former employees of Hyzon establish that some Hyzon employees became uncomfortable with how Hyzon was presenting customer orders to investors. As reported by Blue Orca, one of Hyzon's former senior executives with whom Blue Orca interviewed, stated:

> I just didn't like the way it was being presented. A lot of the stuff that they are saying is open to interpretation how you read that. Saying that they've got all of these orders and things. But a lot of

them are all MoUs which as you know in the business mean basically nothing.

They were going out, kind of selling it as really what it wasn't at the time. A bit like unfortunately what Nikola was doing. It's kind of a lot of hype, and getting money through that hype from people who don't really understand

You know it's great to show all these pictures of renderings of trucks and orders that you may have, but these orders, most of them« 90% of them are MoUs so there's no binding contract, and if you look from when they've announced those [contracts], still none of those have been built or delivered.

The only three vehicles they have is what's on their website. These are all prototype vehicles. They're not production vehicles of any type. They've basically been hand built at the facilities. These are the things that I think, if you're going to announce that, say that. Be honest about it.

I was very uncomfortable with that. A lot of these, if you look at their website, they've loaded lots of them on there of signed meetings they had. All these are MoUs that they've signed. None of them are binding in any way whatsoever.

Given Hyzon's size and the importance of the information conveyed to investors, it is absurd to suggest that Defendants and other Senior Executives did not know, or would not reasonably be aware of, these concerns.

254.    Defendants' blatant misrepresentations as to the nature of their committed orders further demonstrates that their true motive was to mislead investors.

## C.    Scienter as to Hyzon's Characterization of Its Relationship with Hiringa

255.    Many facts show that Defendants used Hiringa as a key customer in Hyzon's SPAC narrative to persuade investors to place a high value on Hyzon's stock. Defendants used Hiringa as the first major deal Hyzon announced after the Company revealed its plans of the take public merger, claiming that Hyzon had signed an agreement to build and supply 1,500 hydrogen powered vehicles for Hiringa, with the first batch of 20 trucks "expected to enter service" in 2021, thereby

- 131 -

accounting for 24% of Hyzon's guided deliveries in the year (85). Defendants then went on to repeatedly highlight the Hiringa contract in investor presentations and YouTube promotional videos hosted by Defendant Knight, and reaffirm Hyzon's guidance of 85 truck deliveries and $37 million in revenues in 2021.

256.    As revealed through the Blue Orca Report, Hiringa is not a customer of Hyzon, but merely a channel partner for Hyzon's vehicles. In Blue Orca's interview of a Hiringa senior executive, the Hiringa senior executive confirmed that Hiringa does not intend to pay for or take title over the trucks, but merely facilitate the sale of hydrogen trucks to third parties by acting as an unpaid conduit between Hyzon and New Zealand heavy truck operators. Rather than purchasing 1,500 trucks, Hiringa confirmed that its plans were merely to build fuel stations with the hope of facilitating future purchases from end customers. Hiringa also informed Blue Orca that the 1,500-truck agreement claimed by Hyzon in its investor presentations is not a binding order, and that it merely represents a right, not an obligation, to buy. Blue Orca also reported that Hiringa likely could never purchase the Hyzon trucks since the small amount of capital that Hiringa had raised to date is ringfenced for building hydrogen infrastructure projects i.e., refueling stations, and not for buying trucks.

257.    Moreover, Hiringa directly contradicted Defendants' claims that Hyzon would be delivering 20 trucks to Hiringa before year end, as the Hiringa senior executive told Blue Orca that it will not take any deliveries of Hyzon trucks in 2021 and expects to receive the first four validation vehicles in March or April 2022, at the earliest. Furthermore, Hiringa told Blue Orca that the remaining 16 trucks ordered from Hyzon would be fulfilled based on testing results of the initial four validation vehicles, which they expect to carry out between March and June 2022 at the earliest. The Hiringa executive also confirmed that there was no possibility that they might

bring forward the order for the 16 trucks, as Hiringa did not want to take delivery until Hiringa builds the commercial hydrogen fuel station infrastructure in New Zealand, which Hiringa indicated would not be until the second half of 2022. Hyzon would have been aware of Hiringa's goals and its end-users' preconditions from its negotiations with Hiringa and any reasonable diligence it likely conducted.

258.    In its October 5, 2021 response to the Blue Orca Report, Defendants effectively admitted that Hiringa has and never will be a customer and is merely a channel partner, confirming that Hiringa is not an "end user of hydrogen trucks" and characterizing the partnership between the companies as one "intended to accelerate the decarbonization of heavy transport in New Zealand through the buildout of hydrogen infrastructure and the supply of fuel cell electric trucks and buses." Defendants did not dispute that Hyzon would not be supplying Hiringa with 20 trucks, as previously represented.

259.    These facts directly indicate that Defendants understood the importance of the information to investors and the risk that investors would be misled if Defendants misrepresented its relationship with and the importance of Hiringa. It also supports the inference that the now-admitted misrepresentations regarding Hyzon's true relationship with Hiringa were either a deliberate effort to mislead investors or the product of a reckless indifference to the possibility of investors being so misled.

**D.    Scienter as to HongYun**

260.    Many facts show that Defendants viewed Hyzon's deal announcement with HongYun as a key tool to deceive investors into believing that Hyzon had secured a major Chinese customer which would allow the Company to meet its guided 2021 deliveries and would pave the way for other large truck deals in the near future. On September 9, 2021, Defendants made a major

announcement that Hyzon had secured a 500-vehicle deal with HongYun under which HongYun was expected to order 100 trucks in 2021 and an additional 400 trucks in 2022, the news of which caused Hyzon's stock price to skyrocket 26% in a single trading day. For Hyzon, the size of the announced Shanghai HongYun deal was immense, as the 100-truck-order supposedly placed in 2021 was larger than the Company's previously guided total deliveries for the year:

| Number of Vehicles | FY2021 | FY2022 |
|---|---|---|
| Shanghai HongYun | 100 | 400 |
| Company Delivery Guidance as of July 2021 | 85 | 658 |

*Source: Hyzon Disclosures including investor presentations*

261.    But due diligence into Shanghai HongYun and its shareholders' corporate registry filings, as well as site visits to Shanghai HongYun's purported place of operations, confirm this supposedly large Chinese customer of Hyzon is a fake company established to serve as a pretend counterparty to a sham agreement to pump up Hyzon's stock price.

262.    As disclosed in the Blue Orca and Iceberg Reports and corroborated by Lead Plaintiff's independent investigation, Shanghai HongYun and its shareholders did not have the capital, business experience, or business connections necessary to purchase *any* HFCEVs from Hyzon for its own use or for purported industrial conglomerate end-users, as evidenced by the fact that:

(a)    Shanghai HongYun was a new company formed just three days before Hyzon announced Shanghai HongYun's expected initial order of 100 vehicles before the end of 2021;

(b)    Shanghai HongYun had no paid-in capital and thus lacked the ability to pay for ordered products or to deliver on a supply contract (without additional financing assistance from Hyzon);

(c)    Shanghai HongYun conducts no operations and has no operational footprint, as it has no official phone number, email, WeChat account, or website;

(d)    Shanghai HongYun is not a subsidiary of a larger company, as it has no corporate parents and instead was owned by two individual shareholders who seemingly own a handful of small companies that collectively have nowhere near the capital or capability to purchase the number of trucks that Hyzon claims;

(e)    Shanghai HongYun had no employees other than its shareholders;

(f)    Shanghai HongYun's controlling shareholder Kou Jian, whose primary business was distributing paint supplies for a European manufacturer, had no experience or publicly verifiable business contacts in the hydrogen fuel cell, electric vehicle, or industrial steel industries; and

(g)    Based on its registered and paid-in capital, Shanghai HongYun could not plausibly qualify to submit tenders as part of the procurement process typically employed by the Chinese government and SOEs, *i.e.*, the most likely purchasers of Hyzon's HFCEVs.

263.    Defendants either knew or recklessly disregarded these facts, as any reasonable company would perform due diligence before announcing a deal representing nearly 74% of its sales (by number of vehicles delivered) in a single year, and as much as $250 million over the course of the contract.

264.    ***Defendants' admissions concerning Shanghai HongYun support scienter***. After being confronted with the Blue Orca report, Defendants made several admissions reflecting their knowledge or at a minimum reckless disregard for the truth of their statements concerning Shanghai HongYun. Despite previously claiming in Hyzon's September 9, 2021 press release that Shanghai HongYun "***focuses*** on providing logistics solutions primarily through hydrogen-powered fuel cell electric vehicles," in Hyzon's October 5, 2021 response to the Blue Orca Report, Defendants admitted that Shanghai HongYun ***seeking*** to provide third-party clean energy logistics services to corporate customers. Similarly, despite previously claiming HongYun "provides operation, leasing and maintenance service for customers across the country, including one of the world's largest steelmakers," in Hyzon's October 5, 2021 press release Defendants characterized Shanghai HongYun as a "special purpose entity." In in Hyzon's October 5, 2021 press release,

Defendants also do not dispute that Shanghai HongYun was formed three days before Hyzon announced its deal with Shanghai HongYun, claiming "Shanghai HongYun was established in the wake of the Shanghai government's August 26, 2021 announcement that Shanghai would be among the first participants in China's national hydrogen fuel cell vehicle pilot program." Nevertheless, Defendants continued to propagate the false notion that Shanghai HongYun was a legitimate and unaffiliated counterparty, claiming that "Hyzon expects that Shanghai HongYun will be able to *leverage its existing relationships* to enter into long-term logistics service agreements with end users for Hyzon's hydrogen-powered vehicles," despite the fact the company was admittedly only formed one month ago and its shareholders have no experience in the relevant industry. Moreover, Defendants stated, "Hyzon expects to receive binding purchase orders from Shanghai HongYun for these vehicles, which Hyzon anticipates will include upfront deposits and installment payments," despite the fact that the Company lacked the requisite licenses and financial wherewithal to make such purchase orders. Defendants' admissions, combined with their attempt to trump up the legitimacy of Shanghai HongYun, firmly shows Defendants' true intent was to mislead investors about the September 9, 2021 Shanghai HongYun deal announcement and its significance as customer.

265.    *Defendants' doubling down by keeping Shanghai HongYun charade alive confirms their scienter*. Since Hyzon's October 5, 2022 response to Blue Orca, Defendants have continued to promulgate the falsehood that shell entity Shanghai HongYun is a legitimate customer making large orders from Hyzon. In particular, in discussing its 3Q21 results on November 12, 2021, Hyzon declared the company made a "conscious decision to shift the mix of delivery locations from predominantly European to predominantly Asian customers, in China, specifically." To that end, the Company announced that Shanghai HongYun had ordered 62 trucks,

as part of the first of two purchase orders. And on December 8, 2021, Hyzon announced that it had delivered 29 fuel cell trucks to Shanghai HongYun to be used by an unnamed major steel conglomerate in China, that Shanghai HongYun plans to provide operation, leasing, and maintenance services for industrial and municipal customers in targeted locations in China, and that Shanghai HongYun had further ordered 33 more trucks confirmed with Hyzon. Despite analysts such as Iceberg Research (i) suggesting that Shanghai HongYun was brought in to plug the order and delivery gap, (ii) asking Defendants about Hyzon's counterparty risk with Shanghai HongYun, and (iii) inquiring whether Hyzon provided HongYun with financing, Hyzon has failed to provide any answers.

E.    **Repeated Edits to Investor Presentations Supports the Inference of Scienter**

266.    The fact that Defendants repeatedly edited the Company's investor presentations to remove questionably listed customers suggests that they knew, were aware, or were reckless in not knowing that certain companies were improperly listed as "Top Tier Customers" or depicted near graphics for committed or highly probable orders. Throughout the Class Period, Defendants edited and/or updated the information contained in the February 9, 2021 Investor Presentation at least four times. Nevertheless, even after removing certain purported customers from the Company's investor presentations, Defendants continued to make similar false and misleading statements concerning other purported customers. For example, even though the Company removed the logo of Heineken from its Top Tier Customers graphic and its customer deployment map, the Company continued to tout that it was finalizing a purchase order for 5 vehicles with a "global brewer."

F.    **SEC Investigation Supports the Inference of Scienter**

267.    While the existence of government investigations is not alone sufficient to establish scienter, they do add support to the inference of scienter when combined with the other facts alleged herein.

268.     The fact that the SEC is investigating Defendants over the same conduct alleged in this Complaint supports the inference of scienter. Prior to the announcement of an SEC investigation, the agency typically engages in fact finding to determine if the matter is sufficiently suspicious to warrant their attention. That the SEC has presumably been investigating Hyzon for many months and began such investigation even before the Blue Orca Report was published, provides support for the inference of scienter. Defendants have admitted that the SEC's investigation relates to the same conduct alleged in the short seller reports, that is, the same alleged conduct that gave rise to this case.

## G.     Defendants' Imputed Knowledge about Hyzon's Core Operations

269.     As described herein, Hyzon's HFCEVs are its only product, whereby the vast majority of its revenue would be generated from sales of Hyzon HFCEVs once it reached production and made actual deliveries. As a result, and given that Hyzon was a pre-revenue company, its ability to (1) lock in customers (that is, obtain "serious" real pre-orders) and (2) fulfill the orders on time (i.e., meet touted production deadlines) was immensely important to Hyzon's financial success.

270.     Because committed orders and customer base for HFCEVs were core to the Company's success, the materially false statements and omissions detailed herein could not have occurred without the Individual Defendants' knowledge and approval. Defendants frequently touted the importance of Hyzon's committed orders and customer network, with, for example, its repeated affirmations that it has more customer commitments than it had 2021 revenue forecasts. Further, Defendants frequently boasted of Hyzon's ability to be first to market and that it would be able to ship 85 vehicles worldwide in 2021. Given the multitude of statements concerning its committed orders and production capabilities during the Class Period, as well as its importance to

the company's financial success, it is unreasonable to think that the Individual Defendants—who were responsible for tracking or reporting Hyzon's revenue—would be unaware of the financial significance and status of its HCFEVs.

271.   The Individual Defendants were highly sophisticated and in positions to know that their statements concerning both committed orders and Hyzon's customer base were false. For example, Defendant Knight co-founded Hyzon in 2020 and was an early investor in Horizon in 2006, meaning he has been significantly involved in the hydrogen fuel cell and automotive industry for over 15 years. Defendant Gu founded Horizon in 2003, co-founded Hyzon in 2020, and thus has similarly been involved in Hyzon's core industries for over 15 years. Defendant Gordon served as the CFO of Old Hyzon up until he was selected as Hyzon's CFO after the SPAC Merger. He has also served as a portfolio manager at several prominent investment management firms. Defendants Anderson, Haskopoulos, and Tichio served as the CEO, CFO, and Chairman, respectively, of DCRB, and were the signatories to quarterly and annual reports filed with the SEC prior to the approval of the SPAC Merger. These Defendants were actively involved in the evaluation of hundreds of companies, including Hyzon.

272.   The sophistication of the Individual Defendants strengthens the allegations of scienter, by undermining an exculpating explanation for the fraud.

273.   At all relevant times during the Class Period, Hyzon has remained a small-to-medium sized company with about 120 employees, and a smaller, tight-knit upper management team. Given Hyzon's size, and that Hyzon's HFCEV sales are purported to be the major focus of Hyzon's business operations, it may be strongly inferred that Defendants Knight, Gu, and Gordon were fully aware of the status of all material matters involving Hyzon's core business operations

throughout the Class Period, including the truth as to the matters alleged herein to have been materially misrepresented to and/or concealed from Lead Plaintiff and the members of the Class.

274.    Similarly, by virtue of the combination of Hyzon's size and limited operations, the due diligence that DCRB and Defendants Anderson, Haskopoulos, and Tichio conducted into Hyzon's business and operations before acquiring Hyzon through a SPAC Merger, and their ability to access material non-public information concerning Hyzon (and in particular information concerning Hyzon's core operations and purported sales commitments) by virtue of their position as directors and controlling shareholders of Hyzon, it may be strongly inferred that Defendants Anderson, Haskopoulos, and Tichio were all fully aware at all times during the Class Period of the status of all material matters involving Hyzon's core operations, including the truth as to the matters alleged herein to have been materially misrepresented to and/or concealed from Lead Plaintiff and the members of the Class.

## VIII.   LOSS CAUSATION

275.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Lead Plaintiff and other Class members have suffered significant losses and damages.

276.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and engaged in a fraudulent course of conduct that artificially inflated the price of Hyzon's securities and operated as a fraud or deceit on Class Period purchasers of Hyzon's securities. By failing to disclose the true state of Hyzon's business and operations, Defendants presented a misleading picture of Hyzon's condition and value, which had the intended effect and caused Hyzon's stock to trade at artificially inflated prices during the Class Period. Shareholders invested based on these false premises. And Hyzon stock could not have been issued, or would

have been sold at dramatically lower prices, had investors been aware of Defendants' fraudulent scheme.

277.    Because Lead Plaintiff was unaware that Defendants' representations identified above were false and misleading (and that Defendants omitted and failed to disclose that its financial results were achieved through a fraudulent scheme), Lead Plaintiff paid an artificially inflated and unreasonable price for their purchases of Hyzon's stock.

## A.    Corrective Disclosures

278.    As Defendants' materially false, misleading, and incomplete statements, and fraudulent scheme were disclosed, the price of Hyzon's securities fell, as the prior inflation came out of the Company's stock price.

(a)    On September 28, 2021, Blue Orca published its report, which partially revealed Defendants' fraud concerning the misleading nature of its publicly touted committed orders and customer base. Following these revelations, Hyzon's stock fell $2.58 per share, or 28.0%, from a close price of $9.21 on September 27, 2021 to close price of $6.63 per share on September 28, 2021, in reaction to the truth, when measured close-to-close. The disclosures on September 28, 2021, did not reveal the full extent of Defendants' fraud, including the risks that Hyzon bore, given the extent of its fabricated committed orders and customers and its inability to sell HFCEVs at its forecasted prices.

(b)    On October 6, 2021, the day after Hyzon issued a rebuttal to the Blue Orca Report, Iceberg Research issued its own investigative report agreeing with and corroborating Blue Orca's findings, criticizing Hyzon's rebuttal for failing to adequately address the issues raised by Blue Orca, and reporting new information

about the finances of Hyzon's parent companies. As a result, Hyzon's stock reversed course, dropping $0.51 per share (8.0%) from a close price of $6.39 per share on October 5, 2021 to close at $5.88 per share on October 6, 2021. The disclosures on October 6, 2021, did not reveal the full extent of Defendants' fraud, including the risks that Hyzon bore, given the extent of its fabricated committed orders and customers and its inability to sell HFCEVs at its forecasted prices.

(c)     On January 12, 2022, Hyzon filed a Form 8-K with the SEC, which provided an update on its 2021 deliveries and financial expectations, reporting that it anticipated its 2021 financial results would be "materially lower than forecast revenues and margins." In addition, the Company disclosed that it had received a subpoena from the SEC "for production of documents and information, including related to the allegations made in the report issued by Blue Orca Capital." This update shook investors' confidence in Hyzon. On this news, Hyzon's stock price dropped $1.55 or nearly 23%, from a close price of $6.81 per share on January 12, 2021 to a close price of $5.26 per share on January 13, 2021. Hyzon's share price continued to tumble for the next five trading days, as the market continued to digest the news, hitting an all-time low of $4.25 on January 21, 2022.

279.    The decline in the price of Hyzon's stock was a direct result of the nature and extent of Defendants' fraud (or results of its fraud) being revealed to investors and the market. The timing and magnitude of Hyzon's stock price declines negates any inference that the loss suffered by Lead Plaintiff and other Class members was caused by changed market conditions, macroeconomic, or industry factors, or other matters unrelated to Defendants' fraudulent conduct.

280.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Lead Plaintiff and other Class members. Had Defendants disclosed complete, accurate, and truthful information concerning these matters during the Class Period, Lead Plaintiff and other Class members would not have purchased or otherwise acquired Hyzon's securities or would not have purchased or otherwise acquired these securities at the artificially inflated prices that they paid. It was also foreseeable to Defendants that misrepresenting and concealing these material facts from the public would artificially inflate the price of Hyzon securities and that the corrective disclosure of the Defendants' misrepresentations and omissions would cause the price of Hyzon securities to decline.

**B.      Materialization of Risks**

281.     As detailed herein, Defendants engaged in a scheme and/or course of conduct to deceive Lead Plaintiff which artificially inflated the price of Hyzon stock and operated as a fraud or deceit on Lead Plaintiff by failing to disclose and misrepresenting the adverse facts detailed herein.

282.     Hyzon's financial results and future business prospects were based upon false and misleading statements and omissions regarding its purported customer base, its binding or committed orders, its publicized supply agreements with sham purchasers like Hiring and Shanghai HongYun, as well as undisclosed material weaknesses in its business strategy, its connection to Horizon, and its sales and revenue models.

283.     Throughout the period during which Lead Plaintiff purchased his Hyzon stock, the prices of these securities were artificially inflated as a result of Defendants' materially false and misleading statements and omissions as alleged herein.

284.    Defendants' false statements served to conceal the risks that the fraud scheme would be publicly exposed, as well as the risks related to Defendants' dissemination of false and misleading statements in investor materials, press releases, interviews, and social media posts.

285.    It was foreseeable that public exposure of the scheme would lead to negative financial and legal consequences to Defendants, including: (i) publication of short seller reports challenging Hyzon's business and revenue claims; (ii) substantial drops in vehicle selling price, revenue capture, and reported revenue; (iii) analyst downgrades; and (iv) the threat of an SEC civil or criminal investigation. The materialization of any one or more of these factors would lead to a significant decline in the price of Hyzon's stock.

286.    The value of Lead Plaintiff's investments in Hyzon stock was negatively impacted when the concealed risks materialized in at least the following respects:

    (a)    Publication of short seller reports identifying material risks: ¶¶ 121-134, 139-140.

    (b)    Decreased vehicle selling price, revenue capture, and reported revenue: ¶¶ 123-25, 142, 143, 147, 148.

    (c)    Analyst downgrades: ¶ 150.

    (d)    Threat of SEC civil or criminal investigation: ¶ 149.

287.    The declines in the price of the Hyzon stock and resulting losses are directly attributable to the materialization of risks that were previously misrepresented or concealed by the Defendants.

288.    Had Lead Plaintiff known of the material adverse information not disclosed by the Defendants or been aware of the truth behind their material misstatements, they would not have purchased the Hyzon stock at artificially inflated prices.

289.    As a result of their purchases of the Hyzon stock, Lead Plaintiff suffered economic loss and damages, as contemplated by the federal securities laws.

## IX.    NO SAFE HARBOR

290.    The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pled herein, as the statements alleged to be false and misleading herein all relate to then existing facts and conditions. In addition, to the extent any of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward looking statements" when made, and were unaccompanied by meaningful cautionary statements that identified important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

291.    Alternatively, to the extent that the statutory safe harbor is found to apply to any forward-looking statements pleaded herein, Defendants are nonetheless liable for such statements because, at the time each such statement was made, the speaker had actual knowledge that it was materially false or misleading, and/or the statement was authorized or approved by an executive officer of Hyzon who knew that the statement was materially false or misleading when made.

## X.    CLASS ACTION ALLEGATIONS

292.    Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publicly traded securities of Hyzon and/or the publicly traded securities of Decarbonization Plus Acquisition Corporation during the Class Period (the "Class") and were damaged thereby. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

293.    The members of the Class are so numerous that joinder of all members is impracticable. During the Class Period, the Company's securities and Decarbonization Plus Acquisition Corporation's securities were actively traded on the Nasdaq. While the exact number of Class members is unknown to Lead Plaintiff at this time and can be ascertained only through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

294.    Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

295.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

296.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

      (a)    whether Defendants' acts as alleged violated the federal securities laws;

      (b)    whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

      (c)    whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

(e)     whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(f)     whether the prices of the Company's securities and the securities of Decarbonization Plus Acquisition Corporation during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

(g)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

297.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

298.    Lead Plaintiff will rely, in part, upon the presumption of reliance established by the fraud on-the-market doctrine in that:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     the omissions and misrepresentations were material;

(c)     the Company's securities are traded in efficient markets;

(d)     the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

(e)     the Company traded on the Nasdaq, and was covered by market analysts;

(f)     the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

    (g)    Lead Plaintiff and members of the Class purchased and/or sold the Company's securities between the time Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

    (h)    Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

299.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

300.    Alternatively, Lead Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

301.    Additionally, Defendants corrupted the market for Hyzon securities through a course of conduct that misled the market as to the value of Hyzon securities, to the extent that these Defendants disrupted the integrity of the market for Hyzon securities. Lead Plaintiff and the Class members are not required to provide further proof of reliance, pursuant to the Supreme Court's decision in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## XI.    CLAIMS BROUGHT PURSUANT TO THE EXCHANGE ACT

### COUNT I

### VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 AGAINST ALL DEFENDANTS

302.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

303.   This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

304.   During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

305.   Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

306.   Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

307.    Defendant Hyzon is liable for all materially false and misleading statements made during the Class Period, as alleged above. The Individual Defendants, who are senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Lead Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

308.    As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

309.    Had Lead Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

310.    As a result of the wrongful conduct alleged herein, Lead Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

311.    By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Lead Plaintiff and the other members

of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

<b>COUNT II</b>

<b>VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT<br>AGAINST THE INDIVIDUAL DEFENDANTS</b>

312.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

313.   During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

314.   As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

315.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

316.    The Individual Defendants, therefore, acted as controlling persons of the Company. By reason of their senior management positions of the Company, the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. The Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Lead Plaintiff and the other members of the Class complain.

317.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## XII.    PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiff as the Class Representative;

B.    Requiring Defendants to pay damages sustained by Lead Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Lead Plaintiff and the other members of the Class prejudgment and post judgment interest, as well as their reasonable attorneys' fees, expert fees, and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## XIII.    DEMAND FOR TRIAL BY JURY

Lead Plaintiff hereby demands a trial by jury.

DATED this 21st day of March 2022      Respectfully submitted,

**HAGENS BERMAN SOBOL SHAPIRO LLP**

By: * /s/ Steve W. Berman         *
    STEVE W. BERMAN (*pro hac vice*)

    1301 Second Avenue, Suite 2000
    Seattle, WA 98101
    Telephone: (206) 623-7292
    Facsimile:  (206) 623-0594
    steve@hbsslaw.com

    Reed R. Kathrein (*pro hac vice*)
    Lucas E. Gilmore (*pro hac vice*)
    HAGENS BERMAN SOBOL SHAPIRO LLP
    715 Hearst Avenue, Suite 202
    Berkeley, CA  94710
    Telephone: (510) 725-3000
    Facsimile:  (510) 725-3001
    reed@hbsslaw.com
    lucasg@hbsslaw.com

    Raffi Melanson (admission pending)
    HAGENS BERMAN SOBOL SHAPIRO LLP
    55 Cambridge Pkwy, Suite 300
    Telephone: (617) 482-3700
    Facsimile: (617) 482-3003
    raffim@hbsslaw.com

    Nathaniel A. Tarnor (SBN 4742797)
    HAGENS BERMAN SOBOL SHAPIRO LLP
    322 8th Avenue, Suite 802
    New York, NY 10001
    Telephone: (212) 752-5455
    Facsimile: (917) 310-2980
    nathant@hbsslaw.com

    Brian J. Schall (*pro hac vice* forthcoming)
    THE SCHALL LAW FIRM
    2049 Century Park East, Suite 2460
    Los Angeles, CA 90067
    Telephone: 310-301-3335
    Facsimile: 310-388-0192
    brian@schallfirm.com

    *Attorneys for Plaintiff Alfred Miller*

**CERTIFICATE OF SERVICE**

I hereby certify that I am the ECF User whose ID and password are being used to electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the e-mail addresses registered, as denoted on the Electronic Mail Notice List, and I hereby certify that I have caused to be mailed a paper copy of the foregoing document via the United States Postal Service to the non-CM/ECF participants indicated on the Manual Notice List generated by the CM/ECF system.

By: _/s/ Steve W. Berman_
STEVE W. BERMAN