UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
                                                              :
                                                              :
                                                              :
IN RE HYZON MOTORS INC.                                       :    Case No. 6:21-cv-06612-CJS-MWP
SECURITIES LITIGATION                                         :
                                                              :
                                                              :
                                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Jacob M. Croke (*crokej@sullcrom.com*)
Arun Bodapati[†] (*bodapatia@sullcrom.com*)
Alexander Peacocke[†] (*peacockea@sullcrom.com*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004-2498
Telephone:      (212) 558-4000
Facsimile:      (212) 558-3588

Laura Kabler Oswell[†] (*oswelll@sullcrom.com*)
SULLIVAN & CROMWELL LLP
1870 Embarcadero Road
Palo Alto, CA 94303
Tel: (650) 461-5679
Fax: (650) 461-5746

*Attorneys for Defendants Hyzon Motors Inc., Erik Anderson, Peter Haskopoulos, Craig Knight, Mark Gordon, George Gu and Robert Tichio*

[†] Application for admission *pro hac vice* pending

May 20, 2022

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT .................................................................................................1

FACTUAL BACKGROUND AND PLAINTIFF'S ALLEGATIONS...........................................4

      A.    Horizon Develops Leading Fuel Cell Technology and Forms Legacy Hyzon........4

      B.    Legacy Hyzon and DCRB Announce the Merger .....................................................5

      C.    Completion of the Merger and Hyzon's Subsequent Statements ..........................10

      D.    The Short Seller Reports and Hyzon's Responses..................................................12

      E.    The Instant Action and Plaintiff's Insufficient Investigation ...............................15

LEGAL STANDARD.................................................................................................................15

ARGUMENT ..............................................................................................................................16

I.      **PLAINTIFF DOES NOT ALLEGE ANY ACTIONABLE MISSTATEMENTS. ....16**

      A.    Plaintiff's Allegations Depend Largely on Unreliable and Uncorroborated
           Claims by Self-Interested Short Sellers. ...............................................................17

      B.    Plaintiff's "Puzzle Pleading" Fails to Specify with Particularity Why Each
           Supposed Misstatement Was False or Misleading..................................................18

      C.    Defendants' Statements Were Not Misleading.......................................................19

           1.    Hyzon Repeatedly Disclosed that Many of its Business Relationships
                 Involved Non-Binding Agreements. ...........................................................20

           2.    Defendants Accurately Disclosed the Nature of Hiringa's Orders and
                 Its Partnerships with End-User Fleet Operators.........................................21

           3.    Plaintiff Does Not Allege Particularized Factual Support for His Claim
                 That HongYun Did Not Order and Receive Hyzon FCEVs. .....................23

      D.    Many Statements Challenged by Plaintiff Are Legally Inactionable. ...................24

           1.    The PSLRA Safe Harbor Protects Forward-Looking Statements
                 Regarding Revenue and Delivery Projections. ..........................................25

            2.    Reasonable Investors Do Not Rely on Vague, Optimistic Puffery............27

            3.    Any Opinions Did Not Supply False Facts or Omit Material Ones. .........28

II.    PLAINTIFF DOES NOT RAISE A COGENT AND COMPELLING
       INFERENCE THAT ANY DEFENDANT ACTED WITH SCIENTER. ...................29

       A.    Plaintiff's Generic, Group-Pleaded Allegations of Motive Are Insufficient. ........30

       B.    Plaintiff's Speculations of Recklessness Lack Adequate Basis in Fact. .................33

             1.    Plaintiff Fails To Plead That Defendants Knowingly or Recklessly
                   Misrepresented Hyzon's Business Relationships. .....................................33

             2.    Defendants Did Not Knowingly or Recklessly Portray Hiringa as an
                   End User of Hyzon Vehicles......................................................................35

             3.    The CAC Lacks Specific Facts Suggesting Defendants Believed or
                   Recklessly Disregarded That HongYun Was a "Sham" Company. ..........35

             4.    The Edits to Investor Presentations Do Not Reflect Misstatements
                   Knowingly or Recklessly Made..................................................................37

             5.    Neither the SEC Investigation nor the Core Operations Doctrine
                   Support an Inference of Scienter.................................................................38

III.   PLAINTIFF DOES NOT PLEAD LOSS CAUSATION AS A MATTER OF
       LAW... ..............................................................................................................................38

IV.    PLAINTIFF'S FAILURE TO ADEQUATELY PLEAD A SECTION 10(B)
       CLAIM NECESSITATES DISMISSAL OF THE SECTION 20(A) CLAIM. ..........40

CONCLUSION......................................................................................................................40

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abramson* v. *Newlink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020)....................................................................................27

*In re Adient plc Sec. Litig.*,
2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020)......................................................19, 31

*In re Advanced Battery Techs., Inc.*,
781 F.3d 638 (2d Cir. 2015)....................................................................................36

*In re AmTrust Fin. Servs., Inc. Sec. Litig.*,
2019 WL 4257110 (S.D.N.Y. Sept. 9, 2019)..........................................................28

*In re Aratana Therapeutics Inc. Sec. Litig.*,
315 F. Supp. 3d 737 (S.D.N.Y. 2018)......................................................................27

*ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007).........................................................................19, 24, 40

*In re Bausch & Lomb, Inc. Sec. Litig.*,
2003 WL 23101782 (W.D.N.Y. Mar. 28, 2003)...........................................20, 25, 26

*In re BHP Billiton Ltd. Sec. Litig.*,
276 F. Supp. 3d 65 (S.D.N.Y. 2017)........................................................................26

*Bratusov* v. *Comscore, Inc.*,
2020 WL 3447989 (S.D.N.Y. June 24, 2020) .........................................................34

*In re Bristol-Myers Squibb Sec. Litig.*,
312 F. Supp. 2d 549 (S.D.N.Y. 2004)......................................................................31

*C.D.T.S.* v. *UBS AG*,
2013 WL 6576031 (S.D.N.Y. Dec. 13, 2013) .........................................................19

*City of Dearborn Heights Act 345 Police & Fire R* v. *Axonyx, Inc.*,
374 F. App'x 83 (2d Cir. 2010) ..............................................................................34

*In re Corning Sec. Litig.*,
2004 WL 1056063 (W.D.N.Y. Apr. 9, 2004) ..........................................................25

*Cox* v. *Blackberry Ltd.*,
660 F. App'x 23 (2d Cir. 2016) ..............................................................................38

*In re DDAVP Direct Purchaser Antitrust Litig.*,
  585 F.3d 677 (2d Cir. 2009)................................................................................29

*In re Dell, Inc. Sec. Litig.*,
  591 F. Supp. 2d 877 (W.D. Tex. 2008)................................................................40

*Dura Pharms., Inc.* v. *Broudo*,
  544 U.S. 336 (2005).........................................................................................39

*ECA Loc. 134 IBEW* v. *JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009)......................................................................... *passim*

*In re EveryWare Glob., Inc. Sec. Litig.*,
  175 F. Supp. 3d 837 (S.D. Ohio 2016) ................................................................32

*In re Express Scripts Holdings Co. Sec. Litig.*,
  773 F. App'x 9 (2d Cir. 2019) ..........................................................................34

*Gamm* v. *Sanderson Farms, Inc.*,
  944 F.3d 455 (2d Cir. 2019)...............................................................................23

*Gregory* v. *ProNAi Therapeutics Inc.*,
  297 F. Supp. 3d 372 (S.D.N.Y. 2018 )..................................................................27

*In re Hardinge, Inc. Sec. Litig.*,
  696 F. Supp. 2d 309 (W.D.N.Y. 2010)................................................................38

*In re Hebron Tech. Co., Ltd. Sec. Litig.*,
  2021 WL 4341500 (S.D.N.Y. Sept. 22, 2021)......................................................17

*In re Henry Schein, Inc. Sec. Litig.*,
  2019 WL 8638851 (E.D.N.Y. Sept. 27, 2019) ......................................................38

*In re Ideanomics, Inc. Sec. Litig.*,
  2022 WL 784812 (S.D.N.Y. Mar. 15, 2022) .......................................................40

*Ind. Pub. Ret. Sys.* v. *SAIC, Inc.*,
  818 F.3d 85 (2d Cir. 2016)...........................................................................27, 28

*In re Int'l Bus. Machines Corp. Sec. Litig.*,
  163 F.3d 102 (2d Cir. 1998)...........................................................................16, 27

*Jones* v. *Perez*,
  550 F. App'x 24 (2d Cir. 2013) .........................................................................34

*Kabrovski* v. *City of Rochester, New York*,
  149 F. Supp. 3d 413 (W.D.N.Y. 2015)..................................................................4

*Kalnit* v. *Eichler*,
    264 F.3d 131 (2d Cir. 2001)...........................................................................................30, 32

*Lachman* v. *Revlon, Inc.*,
    487 F. Supp. 3d 111 (E.D.N.Y. 2020) ...................................................................................19

*Lehmann* v. *Ohr Pharm., Inc.*,
    830 F. App'x 349 (2d Cir. 2020) ...........................................................................................31

*Lentell* v. *Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005)..................................................................................................39

*Lipow* v. *Net1 UEPS Techs., Inc.*,
    131 F. Supp. 3d 144 (S.D.N.Y. 2015)...................................................................................30

*Long Miao* v. *Fanhua, Inc.*,
    442 F. Supp. 3d 774 (S.D.N.Y. 2020)......................................................................17, 18, 33

*In re Longtop Fin. Techs. Ltd. Sec. Litig.*,
    910 F. Supp. 2d 561 (S.D.N.Y. 2012)....................................................................................17

*Loos* v. *Immersion Corp.*,
    762 F.3d 880 (9th Cir. 2014) ................................................................................................40

*Meyer* v. *Greene*,
    710 F.3d 1189 (11th Cir. 2013) ............................................................................................40

*Murdeshwar* v. *Search Media Holdings Ltd.*,
    2011 WL 7704347 (S.D. Fla. Aug. 8, 2011)..........................................................................32

*Novak* v. *Kasaks*,
    216 F.3d 300 (2d Cir. 2000).......................................................................................33, 34, 37

*Omnicare, Inc.* v. *Laborers Dist. Council Const. Indus. Pension Fund*,
    575 U.S. 175 (2015)..........................................................................................................19, 28

*In re Omnicom Grp., Inc. Sec. Litig.*,
    597 F.3d 501 (2d Cir. 2010)..............................................................................................39, 40

*Parkcentral Glob. Hub Ltd.* v. *Porsche Auto. Holdings SE*,
    763 F.3d 198 (2d Cir. 2014)....................................................................................................4

*In re PXRE Grp., Ltd. Sec. Litig.*,
    600 F Supp. 2d 510 (S.D.N.Y. 2009)................................................................................31, 33

*Rombach* v. *Chang*,
    355 F.3d 164 (2d Cir. 2004)............................................................................................19, 32

*Rothman* v. *Gregor*,
   220 F.3d 81 (2d Cir. 2000)......................................................................................34

*S. Cherry St., LLC* v. *Hennessee Grp. LLC*,
   573 F.3d 98 (2d Cir. 2009)......................................................................................33

*Sachsenberg* v. *IRSA Inversiones y Representaciones Sociedad Anónima*,
   339 F. Supp. 3d 169 (S.D.N.Y. 2018).......................................................................38

*Saltz* v. *First Frontier, L.P.*,
   485 F. App'x 461 (2d Cir. 2012) .............................................................................36

*San Leandro Emergency Med. Grp. Profit Sharing Plan* v. *Philip Morris Cos.*,
   75 F.3d 801 (2d Cir. 1996)......................................................................................26

*Set Cap. LLC* v. *Credit Suisse Group AG*,
   996 F.3d 64 (2d Cir. 2021)......................................................................................38

*Singh* v. *Cigna Corp.*,
   918 F.3d 57 (2d Cir. 2019)......................................................................................24

*Slayton* v. *Am. Express Co.*,
   604 F.3d 758 (2d Cir. 2010)...............................................................................25, 34

*In re Sotheby's Holdings, Inc.*,
   2000 WL 1234601 (S.D.N.Y. Aug. 31, 2000)............................................................30

*Strougo* v. *Barclays PLC*,
   105 F. Supp. 3d 330 (S.D.N.Y. 2015).......................................................................28

*In re Synchrony Financial Sec. Litig.*,
   988 F.3d 157 (2d Cir. 2021)......................................................................................25

*Teamsters Loc. 445 Freight Div. Pension Fund* v. *Dynex Cap. Inc.*,
   531 F.3d 190 (2d Cir. 2008)......................................................................................36

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)........................................................................................16, 29, 35

*Tongue* v. *Sanofi*,
   816 F.3d 199 (2d Cir. 2016)......................................................................................28

*In re UBS AG Sec. Litig.*,
   2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012).......................................................29, 37

*Wilson* v. *LSB Indus.*,
   2017 WL 7052046 (S.D.N.Y. Mar. 2, 2017) ..............................................................28

**Statutes, Rules and Regulations**

15 U.S.C. § 78j(b) ................................................................................................... *passim*

15 U.S.C. § 78t(a) .............................................................................................15, 40

15 U.S.C. § 78u-4 .............................................................................................16, 29

15 U.S.C. § 78u-5 .............................................................................................25, 26

Federal Rule of Civil Procedure 9(b) ...................................................................1, 16, 24

17 C.F.R. § 240.10b-5 ......................................................................................15, 16

## PRELIMINARY STATEMENT

Hyzon Motors Inc. ("Hyzon") is a leading global supplier of zero-emission hydrogen fuel cell-powered commercial vehicles ("FCEVs").  Shortly after going public in July 2021, Hyzon (like many companies) was subjected to attacks from short-sellers who stood to profit by causing Hyzon's share price to decline.  Lead Plaintiff Alfred Miller ("Plaintiff") now parrots those attacks to accuse Hyzon and certain of its current and former executives and directors—Erik Anderson, Peter Haskopoulos, Craig Knight, Mark Gordon, George Gu and Robert Tichio (collectively with Hyzon, "Defendants")—of making misleading statements regarding Hyzon's business partnerships and financial prospects.  Plaintiff's consolidated amended class action complaint (the "CAC," ECF No. 34) falls far short of the stringent pleading requirements that apply to securities class actions and should be dismissed with prejudice for at least three reasons.

*First*, the Private Securities Litigation Reform Act ("PSLRA") and Federal Rule of Civil Procedure 9(b) require plaintiffs to specify with particularity why each alleged misstatement is misleading.  Plaintiff instead cribs his claims from the uncorroborated speculation of short sellers and tries to paper over the gaps in his pleading by citing a laundry list of vague and generalized reasons that Plaintiff claims apply to each and every supposed misstatement.  Even setting aside the failures of Plaintiff's "puzzle pleading," Defendants' statements are not false or misleading, particularly when read in context.

Plaintiff's allegations boil down to three claims:  Defendants (1) touted orders that were nonbinding or nonexistent; (2) portrayed Hiringa Energy as an "end user" of Hyzon vehicles, rather than as an intermediary that would help develop hydrogen infrastructure and supply Hyzon vehicles to fleet operators; and (3) announced a fake deal with a "sham" entity called Shanghai HongYun Automobile Co. Ltd. that did not have the capacity to purchase Hyzon vehicles.  Plaintiff fails to establish falsity as to any of the alleged misstatements adopted from the short sellers:

- ***Hyzon did not misrepresent its customer relationships or projected vehicle deliveries***. Hyzon repeatedly disclosed that its vehicle delivery projections included "non-binding MOUs" that "may not be converted into binding orders or sales." Moreover, as Plaintiff begrudgingly acknowledges, despite the twin headwinds of a global supply chain crisis and pandemic, Hyzon not only met but *exceeded* its projected number of vehicle deliveries in 2021. Plaintiff's claim that Hyzon must have overstated certain business relationships because it anonymized certain logos and names in investor presentations is nonsensical.

- ***Hyzon accurately disclosed its relationship and agreements with Hiringa***. Hyzon repeatedly described Hiringa as focused on developing hydrogen infrastructure and supporting "its fleet partners" in transitioning to using FCEVs. Hyzon never claimed that Hiringa was the intended ultimate end user of the Hyzon vehicles. Plaintiff's claim that Hyzon "did not have any orders from Hiringa" also is contradicted by the very short seller report on which Plaintiff bases his claims, which confirms that Hiringa expected to receive an initial batch of four vehicles in early 2022, with another 16 vehicles to follow.

- ***Hyzon has valid agreements with HongYun and HongYun could—and did—purchase Hyzon vehicles***. Plaintiff's allegations regarding HongYun are the only claims that Plaintiff purports to have independently investigated. Despite dedicating nearly 20 pages of the CAC to Plaintiff's anonymous investigator's "findings," Plaintiff does not plead any facts to support the notion that Hyzon did not receive binding purchase orders from HongYun or that Hyzon did not deliver those vehicles. Indeed, the CAC cites a Hyzon press release announcing the delivery of vehicles to HongYun and even includes a photograph of Hyzon trucks bearing the logo of HongYun's end user partner, the largest steel conglomerate in the world.

- ***Many of the alleged misstatements are inactionable as a matter of law***. Several of the alleged misstatements also are (1) properly qualified forward-looking projections protected under the PSLRA; (2) generalized statements of optimism (or "puffery") that are immaterial as a matter of law; or (3) sincerely held opinions that neither embed inaccurate facts nor omit material information.

*Second*, Plaintiff does not come close to meeting the PSLRA's requirement to plead allegations giving rise to a strong inference of scienter that is cogent and at least as compelling as nonculpable inferences. Plaintiff pleads nothing to suggest that defendants Tichio or Haskopoulos acted with scienter (or any other mental state) with respect to any of the alleged misstatements. That alone warrants dismissal of all claims as to those individuals. Plaintiff also indiscriminately alleges that "Defendants" had two motives to make misstatements, ignoring that these purported motives cannot possibly apply to all Defendants. Plaintiff first claims that Defendants made misstatements to save Hyzon's parent company from insolvency, but ignores that Haskopoulos, Tichio and Anderson had no affiliation with or interest in that entity. Plaintiff next claims that Defendants made misstatements to profit from their holdings of "founder shares" or awards of Hyzon shares, but does not allege that Gordon, Haskopoulos or Tichio received any such shares. Moreover, Plaintiff does not allege that *any* defendant sold *any* shares, let alone under the unusual circumstances needed to imply scienter. The alleged motives are so generic that they could be attributed to practically any corporate entity or officer. While Plaintiff suggests that "Defendants" knowingly or recklessly made false statements about Hyzon's customer relationships, Hiringa and HongYun, Plaintiff relies on nothing more than hindsight and the circular claim that Defendants knew their statements were false because the short sellers said they were false to support these claims. This is insufficient as a matter of law.

*Finally*, Plaintiff fails to adequately allege that Defendants' statements caused any decline in Hyzon's share price. Hyzon repeatedly disclosed the risk that it might not achieve its revenue targets from the very day that Plaintiff alleges misstatements were first made. Hyzon also did not conceal material information regarding its business partners and customer orders—to the contrary, the short sellers admittedly relied on publicly available information to cast Hyzon's

-3-

business in a false light.  Any ensuing drops in Hyzon's stock price are more properly attributed to broader market trends (including the impacts of the global supply chain crisis and pandemic) or to the negative tone of the short sellers' self-serving reports and investors' general concerns, not because any hidden information was revealed.  These deficiencies are fatal to Plaintiff's claims, and it is highly unlikely that Plaintiff could resolve them by repleading.  The Court should dismiss the CAC with prejudice.

**FACTUAL BACKGROUND AND PLAINTIFF'S ALLEGATIONS[1]**

**A.      Horizon Develops Leading Fuel Cell Technology and Forms Legacy Hyzon**

Hyzon is a Rochester-based supplier of hydrogen FCEVs for the commercial market.  (CAC ¶ 22.)  Hyzon's ultimate corporate parent and majority shareholder is Horizon Fuel Cell Technologies PTE Ltd. ("Horizon"), a Singapore-based developer and manufacturer of fuel cell electric energy products co-founded by George Gu and Craig Knight in 2003.  (*Id.* ¶¶ 28, 30, 38.)  Horizon grew from small-scale projects to producing fuel cells for mid-sized buses, light delivery trucks and heavy duty vehicles.  (*Id.* ¶¶ 45-46.)  In 2020, Horizon formed a US-based subsidiary, Hyzon Motors USA, Inc. ("Legacy Hyzon").  (Id. ¶¶ 23, 56.)  Gu served as Legacy Hyzon's CEO, Knight served as Legacy Hyzon's Chief Commercial Officer and Mark Gordon served as Legacy Hyzon's CFO.  (*Id.* ¶¶ 28-30.)

---

[1]      In deciding this motion, the Court need only consider well-pleaded factual allegations.  *See Parkcentral Glob. Hub Ltd.* v. *Porsche Auto. Holdings SE*, 763 F.3d 198, 202 (2d Cir. 2014).  The Court also may consider documents incorporated by reference, or integral to and relied upon, in the complaint.  *See Kabrovski* v. *City of Rochester, New York*, 149 F. Supp. 3d 413, 418 (W.D.N.Y. 2015).  The Court thus may consider the many documents containing the statements challenged by Plaintiff, which Defendants have attached as exhibits in support of this motion.

B.    **Legacy Hyzon and DCRB Announce the Merger**

On February 9, 2021, Legacy Hyzon announced that it would merge with Decarbonization Plus Acquisition Corporation ("DCRB"), following months of due diligence and negotiations. (*Id.* ¶¶ 67-68.) DCRB went public in the fall of 2020 to raise capital to finance a business combination with a company "developing and advancing a platform that decarbonizes the most carbon-intensive sectors of the economy," including transportation. (*Id.* ¶¶ 65-67.) Erik Anderson served as DCRB's CEO, Peter Haskopoulos served as DCRB's CFO and Robert Tichio served as the Chairman of DCRB's Board of Directors. (*Id.* ¶¶ 26-27, 31.)

In the press release announcing this business combination (the "Merger"), Knight stated that "[d]eliveries of Hyzon fuel cell powered heavy trucks to customers in Europe and North America will occur this year, well ahead of our competitors" (Statement 1A,[2] *id.* ¶ 197), and that the company's "committed sales pipeline is proof that the world is truly recognizing the need to develop innovative solutions to mitigate climate change and accelerate efforts to move the world economy down the path to net-zero emissions." (Statement 1B, *id.*) Gu added that "[t]his business combination will enable us to expand deployments of our zero-emission hydrogen fuel cell powered heavy vehicles globally, and to continue leading the hydrogen transition." (Statement 1C, *id.*) The press release warned that these statements were subject to "Hyzon's ability to realize the anticipated benefits of the business combination," which may be affected by "the ability of Hyzon to accurately estimate supply and demand for its vehicles," COVID-19, and, "risks relating to the uncertainty of the projected financial information . . . including the conversion of pre-orders into

---

[2]    Defendants use these shorthand definitions to refer to the statements that Plaintiff has identified as allegedly misleading. The number refers to the exhibit where the statement may be read in its original context, and the letters differentiate each alleged misstatement within a given document. For the Court's convenience, Defendants have prepared a chart setting forth each statement and why it is inactionable. (*See* Appendix 1.)

binding orders." (Ex. 1 (Feb. 9, 2021 Press Release) at 4.)

Legacy Hyzon and DCRB also held an investor call and published an investor presentation describing the transaction and Legacy Hyzon's business prospects. (CAC ¶¶ 71, 73.) The presentation included information on Legacy Hyzon's management, fuel cell technology and projected financials, as well as information regarding Legacy Hyzon's "backlog" or "pipeline," which included orders under contract, orders subject to non-binding memoranda of understanding ("MoUs" or "MOUs") or potential orders that Legacy Hyzon considered probable based on the status of negotiations. (*Id.* ¶¶ 74-75, 80.) The call opened with a cautionary statement regarding financial predictions and other forward-looking statements, and the operator encouraged listeners to consult the press release and DCRB's SEC filings for a discussion of potential risks. (Ex. 2 (Feb. 9, 2021 Investor Call) at 1.) On the call, Gordon said "Hyzon forecasts to grow from $37 million on revenue on 85 units sold in 2021." (Statement 2A, CAC ¶ 199.) He added that Legacy Hyzon's "2021 forecast [was] 100 percent covered by contracts and MOUs." (Statement 2B, *id.*)

The accompanying investor presentation opened with an overview slide stating that Legacy Hyzon had a "2021 backlog of ~$40 million under contract or MoU" (Statement 3A, *id.* ¶ 201), with "80% of near-term backlog [corresponding] to customers in Europe, Asia and Australia." (Statement 3B, *id.*) The presentation also (1) identified certain "Top Tier Customers/End-Users/Partners" by name (Statement 3C, *id.*); (2) described the status of negotiations with actual and potential customers on a map with those customers' logos (Statement 3D, *id.*); (3) stated that Legacy Hyzon had "[c]ontracted Orders (100% Certain) from 13 private and public sector customers" (Statement 3E, *id.*); and (4) used certain companies' logos to depict "Vehicle Customers." (Statement 3F, *id.*) The presentation cautioned that Legacy Hyzon's arrangements with these "[c]ustomers [were] at various stages of contract negotiations,

-6-

not all subject to binding purchases," that "[s]ome sales [were] made to [third party logistics] customers [rather than] the end users depicted here (as is typical for the industry)" and that "[n]on-binding pre-orders, signed [MOUs] or heads of terms in our sales pipeline may not be converted into binding orders or sales." (Ex. 3 (Feb. 9, 2021 Investor Presentation) at 18, 29, 54.)

Legacy Hyzon and DCRB filed updated versions of this presentation with the SEC on February 10 and February 12, 2021. (CAC ¶¶ 81, 83.) In the updated presentations, some of the logos referencing "Top Tier Customers/End-Users/Partners" were revised (Statements 4A and 5A, *id*. ¶¶ 203, 205), and on the slides describing the status of negotiations, the content remained substantively unchanged but the logos were removed and names anonymized (*e.g.*, "Heineken" became "Global Brewer"). (Statements 4B and 5B, *id.*; *see also id.* ¶ 84.) The updated presentations also revised the list of logos depicting "Vehicle Customers" (Statements 4C and 5C, *id.* ¶¶ 203, 205), and the February 12 presentation removed a reference to how many customers had "100% Certain" orders (Statement 5D, *id.* ¶ 205). The updated presentations retained the cautionary statements identified above. (Ex. 4 (Feb. 10, 2021 Investor Presentation) at 18, 29, 54; Ex. 5 (Feb. 12, 2021 Investor Presentation) at 18, 29, 54.)

Between the announcement of the Merger and its closing, Legacy Hyzon continued to update the market on its business prospects.

***Hiringa.*** On February 17, 2021, Legacy Hyzon announced that it "ha[d] signed a vehicle supply agreement ["VSA"]" with New Zealand-based clean energy startup Hiringa Energy ("Hiringa"), pursuant to which Hyzon would "build and supply Hiringa with [FCEVs]." (Statement 6A, CAC ¶ 220.) The companies stated that "the first batch of vehicles are expected to enter service in New Zealand by the end of 2021." (Statement 6B, *id.*) The press release noted that these companies previously had entered into a preliminary agreement to explore partnership

opportunities for Hyzon to deploy FCEVs and for Hiringa to build hydrogen refueling infrastructure, and referenced Hyzon's "plans to have up to 1,500 fuel cell trucks on the road in New Zealand by 2026." (Statement 6C, *id.* ¶ 220; Ex. 6 (Hiringa Press Release) at 1.) Legacy Hyzon also linked to this press release on Twitter, adding that it had "signed an agreement for the build and supply of up to 1,500 hydrogen fuel cell-powered trucks to New Zealand's Hiringa Energy by 2026." (Statement 7, CAC ¶ 222; *see also* Ex. 7 (Hyzon Hiringa Twitter Post).)

On March 8, 2021, Legacy Hyzon issued a press release about a "virtual ride along" livestreamed from its facility in Groningen, the Netherlands. (Ex. 8 (Hydrogen Now Press Release) at 1.) The press release reiterated that Legacy Hyzon and Hiringa had signed a VSA (Statement 8A, CAC ¶ 224) and that Legacy Hyzon was "targeting the delivery of 1,500 fuel cell powered heavy trucks by 2026 as part of the [VSA] with Hiringa" (Statement 8B, *id.*), and also added that "[a]s binding orders for those trucks are placed, Hyzon anticipates fulfilling them from the Groningen facility, with first shipments planned for the second half of 2021." (Statement 8C, *id.*) This release included a cautionary note regarding forward-looking statements and referenced the "Risk Factors" section of the February 9, 2021 investor presentation. (Ex. 8 at 2; Ex. 3 at 54.)

DCRB further discussed the Hiringa VSA in its March 17, 2021 proxy statement. (CAC ¶ 226.) In a section discussing vehicle orders, DCRB stated that "Hiringa has placed a binding order for the first 20 trucks," with the first four expected to be delivered by the first quarter of 2022. (Statement 9A, *id.*) DCRB explained that Hiringa would be "supported by logistics companies in New Zealand" (Statement 9B, *id.*) and "aim[ed] to deploy up to 1,500 fuel cell powered heavy trucks manufactured by Hyzon to fleet operators in New Zealand by 2026," and that Hyzon's vehicles would be "powered by green hydrogen supplied through Hiringa's nationwide refueling infrastructure." (Ex. 9 (Mar. 17, 2021 proxy statement) at 127.)

***April 2021 Investor Presentation.***  On April 29, 2021, DCRB and Legacy Hyzon published an updated investor presentation.  (*Id*. ¶ 95.)  This version noted that Legacy Hyzon had "[a]nnounced [a VSA] to supply trucks to [Hiringa]" (Statement 10A, *id*. ¶ 228), with "first deliveries expected by EOY 2021."  (Statement 10B, *id*.)  It added that Hyzon had "55 million of backlog under contract or MOU" (Statement 10C, *id.* ¶ 207), with "80% of near-term backlog to customers in Europe, Asia and Australia."  (Statement 10D, *id.*)  As in earlier presentations, this included slides with logos for certain "Expanding Top Tier Customers/End Users/Partners" (Statement 10E, *id.*) and "Vehicle Customers" (Statement 10F, *id.*), as well as a slide discussing the status of negotiations with certain customers identified by industry and location (Statement 10G, *id.*).  Legacy Hyzon again cautioned that not all customers had signed binding agreements and that some sales involved third-party logistics providers acting on behalf of the end users depicted.  (Ex. 10 (Apr. 29, 2021 Investor Presentation) at 35, 59; CAC ¶ 96.)

***June 2021 "Fireside Chats."***  As the Merger drew closer, certain defendants also discussed Legacy Hyzon's forward-looking revenue targets and projections.  During a June 16, 2021 "fireside chat" with investment research firm Bernstein, in response to a question about Legacy Hyzon's revenue targets over the next several years, Knight said, "I'd like to remain a little conservative on this but providing there are no more nasty surprises in supply chains and those kind of things, we'll definitely hit this year's targets."  (Statement 11, *id*. ¶ 211.)  During a June 29, 2021 "fireside chat" with IPO Edge, Tichio stated "If you take a look at 2021, the company is you know projecting $37 million of revenue [from] vehicles that will actually roll off its lot this year . . . .  We still feel extraordinarily comfortable with that assessment[.]"  (Statement 12, *id*. ¶ 213.)  DCRB's SEC filings enclosing transcripts of these fireside chats included cautionary language warning that such forward-looking statements were subject to "the ability of Hyzon to

accurately estimate supply and demand for its vehicles"; "risks relating to the uncertainty of the projected financial information with respect to Hyzon, including the conversion of pre-orders into binding orders"; and, among other things, "the possibility that Hyzon may be adversely affected by other economic, business, and/or competitive factors." (Ex. 11 (Fireside Chat with Bernstein) at 18-19; Ex. 12 (Fireside Chat with IPO Edge) at 53).

*July 2021 Business Update*. On July 13, 2021, Legacy Hyzon issued an update on recent business developments. (CAC ¶ 215.) That release stated "Orders and non-binding MoUs have increased to represent up to $83M, up more than 50% from $55M as of April 29, 2021, and over 100% from February 12, 2021" (Statement 13A, *id.*), that the "growing list of orders and non-binding MoUs comes from the rapidly developing European market as well as Australia" (Statement 13B, *id.*) and that Legacy Hyzon had "successfully reduced costs in excess of $50,000 per vehicle for manufacturing components and sub-systems." (Statement 13C, *id.*) Legacy Hyzon noted that the backlog figure included "orders [which] include terms permitting the counterparty to cancel or suspend some or all of their obligations." (Ex. 13 (July 13, 2021 Press Release) at 5.)

C.    **Completion of the Merger and Hyzon's Subsequent Statements**

The Merger closed on July 16, 2021, with 95% of voting shareholders approving the transaction. (CAC ¶ 106.) As part of the Merger, DCRB acquired Legacy Hyzon and was renamed Hyzon. (*Id.* ¶ 23.) Anderson, Gu, Knight and Gordon joined Hyzon's Board of Directors, with Knight also serving as Hyzon's CEO and Gordon serving as Hyzon's CFO. (*Id.* ¶¶ 26, 28-30.) Haskopoulos and Tichio did not have ongoing roles with Hyzon. (*See id.* ¶¶ 27, 31.)

On July 19, 2021, Hyzon published an updated investor presentation. (*Id.* ¶ 107.) This presentation opened with disclaimers referencing the risk factors described in DCRB's June 21, 2021 proxy statement and warned that "assumptions and estimates underlying such projected financial information are inherently uncertain and are subject to a wide variety of

-10-

significant business, economic, competitive and other risks and uncertainties." (Ex. 14 (July 2021 Investor Presentation) at 2-3.)  Hyzon stated that it had "$55M of revenue under contract or MOU already," with "~75% of sales into Asia & Australia, ~25% into Europe" (Statement 14A, CAC ¶ 209), and reiterated its projection that it would deliver 85 vehicles and earn $37 million in revenue in 2021.  (Statement 14B, *id.*)  This presentation also included a slide noting the status of negotiations with certain customers identified by industry and location.  (Statement 14C, *id.*)

On September 9, 2021, Hyzon announced it had signed a "non-binding MoU" with Shanghai HongYun Automobile Co. Ltd. ("HongYun") to supply "up to 500" FCEVs, "subject to execution of a definitive vehicle supply agreement."  (*Id*. ¶ 233; Ex. 15 (HongYun MOU Press Release) at 1.)  Hyzon stated that the "initial order of 100 vehicles is expected before the end of 2021." (Statement 15A, CAC ¶ 233).  Hyzon also warned of "risks related to the ability to convert non-binding [MOUs] into binding orders or sales (including because of the current or prospective financial resources of the counterparties to Hyzon's non-binding [MOUs] and letters of intent)." (Ex. 15 at 2.)  Hyzon stated that HongYun was a Shanghai-based logistics company "focus[ed] on providing logistics solutions primarily through hydrogen-powered fuel cell electric vehicles," and that HongYun "provides operation, leasing and maintenance service for customers across the country, including one of the world's largest steelmakers." (Statement 15B, CAC ¶ 233.)  Hyzon's press release also stated that the "core team of [HongYun] has solid operation experience and master the real time vehicle data management" (Statement 15C, *id*.), and that "[a]t present, [HongYun] is focusing on the operation of hydrogen-powered heavy duty trucks by leveraging its rich end user resources in logistics industry." (Statement 15D, *id*.).  The press release also stated that "[a]fter Hyzon delivers the vehicles, HongYun will be responsible for the subsequent commercial arrangements with its end customers." (Ex. 15 at 1.)

D.      **The Short Seller Reports and Hyzon's Responses**

On September 28, 2021, Blue Orca Capital ("Blue Orca"), a short selling firm, published a report making several claims regarding Hyzon. ("Blue Orca Report," CAC ¶¶ 121-22.) The Blue Orca Report acknowledged that Blue Orca stood "to realize significant gains if [the] price of [Hyzon's stock] declines," and claimed, among other things, that: (1) HongYun was a shell entity formed three days before Hyzon announced the MOU; (2) Hiringa was a "channel partner" rather than a customer of Hyzon, and had "neither the capability nor the current intention to purchase trucks from Hyzon"; and (3) that Hyzon had overstated its relationship with certain "big-name customers" in its early investor presentations, as evidenced by the removal of certain logos and names in later presentations. (*See* CAC Ex. A at 1-2.) Blue Orca acknowledged that these statements reflected its "opinion," and claimed to have "conducted research and analysis based on public information in a manner that any person could have done if they had been interested in doing so." (*Id.* at 20.) The Blue Orca Report's claims depended in significant part on statements attributed to anonymous sources, purportedly including a former Hyzon employee and a Hiringa employee, neither of whom was described in detail. (*See, e.g.*, *id.* at 5-7, 11.)

On October 5, 2021, Hyzon issued a response to the Blue Orca Report. (CAC ¶ 135.) Hyzon stated that HongYun was "a special purpose entity seeking to provide third-party clean energy logistics services to corporate customers" (Statement 16A, *id.* ¶ 235), and explained that the HongYun corporate entity in question had been established in the wake of an August 2021 announcement by the Shanghai government regarding a hydrogen FCEV pilot program. (*Id.*) Hyzon also reiterated that "HongYun is expected to order 100 trucks in 2021" (Statement 16B, *id.*), that "Hyzon expects that Shanghai HongYun will be able to leverage its existing relationships to enter into long-term logistics service agreements with end users for Hyzon's hydrogen-powered vehicles" (Statement 16C, *id.*) and that "Hyzon anticipates [HongYun's orders] will include

-12-

upfront deposits and installment payments." (Statement 16D, *id.*) As to Hiringa, Hyzon noted that it "ha[d] never suggested that Hiringa [was] an end user of hydrogen trucks" (Statement 16E, *id.* ¶ 230), but rather that Hyzon and Hiringa had partnered together to develop hydrogen infrastructure and deliver FCEVs, and that this relationship "already has resulted in a [VSA] for 20 trucks to be delivered to TR Group Ltd., one of New Zealand's largest truck and trailer leasing and rental companies." (Ex. 16 (Blue Orca Response) at 2.) Hyzon also explained that "[c]ontrary to the short seller's claims, no customers or potential customers 'disappeared' from any investor presentation; rather, Hyzon anonymized certain customer and potential customer names in its July 2021 investor presentation." (Statement 16F, *id.* ¶ 217.)

The next day, Iceberg Research ("Iceberg"), another short seller that stood "to realize significant gains in the event that the price of [Hyzon's] securities decline[d]," published a report cursorily stating that it agreed with Blue Orca's claims. ("Iceberg Report," CAC Ex. B at 1, 9.) Iceberg also purported to offer "new information" on Hyzon, suggesting that Horizon had spun off Hyzon as part of an effort to raise money. (*See id.* at 1, 4-5.) Iceberg based its claims primarily on public filings by another Horizon subsidiary, which Iceberg interpreted to suggest Horizon was struggling financially. (*Id.* at 2-5.)

Hyzon continued to provide business updates in press releases and earnings calls:

- On November 12, 2021, Hyzon filed a Form 8-K regarding its third quarter results, which included a press release stating that Hyzon had "[r]eceived the first two purchase orders, for 62 trucks in total, pursuant to the terms of the previously announced MOU to supply [HongYun]." (Statement 17, CAC ¶ 237; *see also* Ex. 17 (Q3 2021 Press Release) at 1.) In an earnings call that day, Knight repeated that "Hyzon has received the first two purchase orders from [HongYun] in China for a total of 62 trucks. The end user of these trucks is a large industrial conglomerate." (Statement 18, CAC ¶ 239.) Knight also explained that "when global supply chain challenges worsened, especially in the last few months, we were

able to make a conscious decision to shift the mix of delivery locations from predominantly European to predominantly Asian customers, in China specifically" (*id*. ¶ 142), and that "as we've said in the past, the [average sales price] of the vehicles in China are substantially below what they are in Europe." (Ex. 18 (Q3 2021 Earnings Call) at 12.)

- On December 8, 2021, Hyzon issued a press release announcing it had delivered "29 fuel cell electric trucks to be used by a major steel conglomerate in China through [HongYun]." (CAC ¶ 241.) The press release stated that the trucks were "expected to haul steel coils in the conglomerate's fleet in the coming months," that "HongYun plans to provide operation, leasing and maintenance services for industrial and municipal customers" in China (Statement 19A, *id*.), and that HongYun had "further orders for 33 more trucks confirmed with Hyzon." (Statement 19B, *id*.) The press release also featured a photo of a group of the delivered Hyzon vehicles, bearing the logo of BaoWu Steel, the world's largest steel manufacturer. (*Id*. ¶¶ 145, 191; *see also* Ex. 19 (HongYun Delivery Press Release) at 1.)



- On January 12, 2022, Hyzon filed a Form 8-K announcing it had delivered 87 vehicles in 2021, exceeding its previously stated goal of 85 deliveries. (*Id*. ¶¶ 72, 148.) Hyzon noted that as discussed during its third quarter 2021 earnings call, global supply chain disruptions had impacted European and North American vehicle assembly, prompting Hyzon to shift vehicle deployment to Asia, where average sales prices were approximately half of those in other regions. (*Id*.) Hyzon added that due to lower average selling prices and delayed revenue recognition for certain sales, it expected that its 2021 financial results would reflect materially lower than forecast revenues and margins. (*Id*. ¶ 148.) Hyzon also disclosed that it had received an SEC subpoena "for production of documents and information, including related to the allegations made in the [Blue Orca Report]." (*Id*. ¶ 149.)

**E.        The Instant Action and Plaintiff's Insufficient Investigation**

Hyzon shareholders filed multiple putative securities class actions beginning on September 30, 2021.  (*See* ECF No. 1.)  On December 14, 2021, the Court consolidated the actions and appointed Plaintiff to lead the putative class.  (ECF Nos. 21, 22.)  On March 21, 2021, Plaintiff filed the two-count CAC.  (ECF No. 34.)  Count I alleges that Defendants violated Section 10(b) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder.  (CAC ¶¶ 302-11.)  Count II alleges the individual defendants violated Section 20(a) of the Exchange Act.  (*Id*. ¶¶ 312-17.)

The CAC largely relies on allegations in the short seller reports to claim that Defendants knowingly made false and misleading statements to inflate Hyzon's stock price.  (*See id*. ¶¶ 121-31, 139.)  Plaintiff does not allege that he investigated or tried to corroborate the short sellers' claims, with the only exception being that Plaintiff claims to have engaged an unidentified investigator ("Investigator C-1") to review certain of the HongYun-related allegations.  (*Id.* ¶¶ 153-54.)  Plaintiff alleges that Investigator C-1 was unable to determine that HongYun had a web presence, registered employees, paid capital commitments, a physical office space, or apparent connections to large conglomerates.  (*Id.* ¶¶ 159-93.)  Plaintiff alleges that based on these "findings," Investigator C-1 concluded that—in his opinion—it would be difficult for HongYun to compete for contracts from large Chinese businesses like BaoWu Steel.  (*Id.* ¶¶ 189-92.)  Notably absent from Investigator C-1's "findings" are any assertions that Hyzon did not deliver vehicles to HongYun, or that the vehicles were not in fact being used by BaoWu Steel.  Plaintiff does not allege that Investigator C-1 reviewed any of the short sellers' other claims or any other alleged misstatements in the CAC.

## LEGAL STANDARD

To state a claim under Section 10(b) of the Exchange Act or Rule 10b-5, a plaintiff must allege that a defendant (1) made misstatements or omissions of material fact; (2) with

scienter; (3) in connection with the purchase or sale of securities; (4) upon which the plaintiff relied; and (5) that plaintiff's reliance was the proximate cause of their injury. *In re Int'l Bus. Machines Corp. Sec. Litig.* ("*IBM*"), 163 F.3d 102, 106 (2d Cir. 1998). These claims are subject to "[e]xacting pleading requirements." *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). Under Rule 9(b), plaintiffs must "state with particularity the circumstances constituting fraud," and the PSLRA requires plaintiffs to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

**ARGUMENT**

**I.     PLAINTIFF DOES NOT ALLEGE ANY ACTIONABLE MISSTATEMENTS.**

Plaintiff does not come close to meeting the pleading standard outlined above. At the outset, only a small fraction of the purported misstatements are alleged to have been spoken by any of the individual defendants. Rather than providing a specific basis for the individual defendants' involvement in making the statements attributed to Hyzon, Plaintiff relies on cursory references to their corporate positions. That is plainly insufficient. Plaintiff never alleges that Anderson or Haskopoulos made any misstatements at all, warranting dismissal of the claims against them on that basis alone. Similarly, Tichio and Haskopoulos cannot be liable for any misstatements regarding HongYun—neither defendant had a role with Hyzon following the July 2021 Merger, and the first alleged misstatements about HongYun were made in September 2021.

As for the allegedly false and misleading statements themselves, Plaintiff divides them into three categories: (1) "Statements Concerning Hyzon's 100% Committed and Highly Probable Orders"; (2) "Statements Concerning Hiringa"; and (3) "Statements Concerning [HongYun]." (CAC ¶¶ 196-242.) None are sufficient to state a claim. *First*, Plaintiff relies almost

-16-

exclusively on the uncorroborated speculation of two short seller reports that this Court should not credit. *Second*, Plaintiff's "puzzle pleading" does not specify why each alleged misstatement is false, improperly placing the burden on the Court to determine the specific reason from a generic list of possible ones. *Third*, none of the alleged misstatements are false or misleading, particularly when viewed in context. *Finally*, many of Defendants' statements also are inactionable forward-looking projections, opinions or puffery.

    **A.**    **Plaintiff's Allegations Depend Largely on Unreliable and Uncorroborated Claims by Self-Interested Short Sellers.**

The vast majority of Plaintiff's allegations are simply cribbed from the Blue Orca and Iceberg short seller reports.[3] Both short sellers acknowledged that they would profit from a decline in Hyzon's share price, giving them "an obvious motive to exaggerate the infirmities of the securities in which they speculate." *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 910 F. Supp. 2d 561, 577 (S.D.N.Y. 2012). Considering this obvious motive and the heightened pleading standard applicable to securities fraud claims, courts do not reflexively credit claims based on short seller reports, but rather consider whether "there is a basis to view the short seller's factual allegations as reliable as opposed to fabricated based on self-interest—for example, where facts are cited that tend to substantiate these allegations or reveal the basis for the short-seller's factual assertions." *In re Hebron Tech. Co., Ltd. Sec. Litig.*, 2021 WL 4341500, at *13 (S.D.N.Y. Sept. 22, 2021). Courts also apply "close scrutiny where a short-seller report relied upon by a securities plaintiff itself relies on 'confidential' or anonymous sources, without corroboration." *Long Miao* v. *Fanhua, Inc.*, 442 F. Supp. 3d 774, 801 (S.D.N.Y. 2020).

---

[3]    Because Plaintiff relies on the Iceberg Report almost exclusively for his scienter claims, Defendants address Plaintiff's allegations based on the Iceberg Report in Section II below.

The Blue Orca Report's claims concerning Hyzon's customer relationships and Hiringa relied almost entirely on the second-hand recounting of purported statements by an anonymous former Hyzon employee and an unnamed Hiringa employee.  Plaintiff does not allege that he made any effort to corroborate those purported statements, and the Blue Orca Report itself lacks sufficient corroboration.  This Court therefore should disregard these purported statements as lacking indicia of reliability and dismiss all claims based on them.  *Long Miao*, 442 F. Supp. at 797 (holding that claims based on uncorroborated "statements made by anonymous—and often vaguely described—interviewees, with whom plaintiff's counsel has not had contact, but whom counsel has learned about secondhand from citations in a short-seller's report . . . . cannot sustain a §10(b) claim").  To permit such claims to proceed would allow a form of double hearsay to defeat the stringent pleading rules in securities fraud cases, despite Plaintiff (and the Court) having no basis to assess the accuracy of those alleged statements.

**B.      Plaintiff's "Puzzle Pleading" Fails to Specify with Particularity Why Each Supposed Misstatement Was False or Misleading.**

For each of Plaintiff's three "categories," Plaintiff claims that "statements" in that category were "false and misleading for the following reasons, both together and individually" and then provides a laundry list of vague or generalized reasons.  (CAC ¶¶ 196, 219, 232.)  Plaintiff then lists alleged misstatements, often without explaining with particularity *why* any alleged misstatement is false or misleading beyond copy-pasted boilerplate referring back to earlier lists of vague or generalized reasons.  (*See, e.g.*, CAC ¶ 210 ("The statement(s) in the prior paragraph were premised on its reported committed orders and customers base, and therefore was false and misleading for the reasons set forth in paragraphs 196, 200, 202, 204, 206, and 208.").)

Plaintiff's cross-reference, "puzzle" pleading does not come close to the particularity required to plead securities fraud claims under the PSLRA and warrants dismissal of

the CAC in its entirety.  To allege fraud with specificity, plaintiffs must "do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so."  *Rombach* v. *Chang*, 355 F.3d 164, 174 (2d Cir. 2004).  Courts in this Circuit routinely dismiss securities fraud complaints where "[i]nstead of explaining what aspect of each quoted statement is materially false or misleading and why, plaintiffs reproduce the same conclusory formula" intended "to cover *all* of the allegedly material misrepresentations."  *See, e.g.*, *Lachman* v. *Revlon, Inc.*, 487 F. Supp. 3d 111, 127–28 (E.D.N.Y. 2020) (internal quotation marks omitted).  This is precisely the approach Plaintiff has followed here:  rather than detail why and how each statement is misleading, Plaintiff leaves that task to this Court.  Plaintiff may not do so.

### C.      Defendants' Statements Were Not Misleading.

Plaintiff also has not adequately alleged that any statements were false or misleading.  "As to falsity, a claim for securities fraud premised on a misstatement cannot occur unless an alleged material misstatement was false *at the time it was made*."  *In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *12 (S.D.N.Y. Apr. 2, 2020) (emphasis in original) (internal quotation marks omitted).  "To state a claim, plaintiffs must do more than assert in a conclusory fashion that statements were or must have been false—they must allege facts supportive of how and why this is the case."  *C.D.T.S.* v. *UBS AG*, 2013 WL 6576031, at *3 (S.D.N.Y. Dec. 13, 2013).  This requires "specific allegations," rather than speculative inferences.  *See ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 103 (2d Cir. 2007).  Courts also must bear in mind that "an investor reads each statement . . . in light of all its surrounding text, including hedges, disclaimers, and apparently conflicting information" and "takes into account the customs and practices of the relevant industry."  *Omnicare, Inc.* v. *Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 190 (2015).

-19-

### 1. Hyzon Repeatedly Disclosed that Many of its Business Relationships Involved Non-Binding Agreements.

Plaintiff alleges that Hyzon's statements regarding its potential partnerships and sales pipeline were misleading because Hyzon (1) "did not have any pre-orders and instead had non-binding [MOUs]," and (2) purportedly counted orders from entities that did not sign agreements, did not intend to order vehicles, could not plausibly be expected to order vehicles, were merely intermediaries, or had not satisfied conditions precedent to confirm a sale. (CAC ¶ 196.) In addition to statements that are inactionable as a matter of law, which Defendants address in Section I.D, Plaintiff alleges that the following statements are misleading for one or more of the aforementioned reasons: Statements 2B–5D, 10C–G, 13A–14A, 14C and 16F. Plaintiff has failed to plead any basis on which to claim that these statements would mislead a reasonable investor.

*First*, Plaintiff offers no factual support for the assertion that Hyzon "did not have any pre-orders and instead had non-binding [MoUs]" other than the uncorroborated Blue Orca Report. (CAC ¶ 196.) *See In re Bausch & Lomb, Inc. Sec. Litig.*, 2003 WL 23101782, at \*19 (W.D.N.Y. Mar. 28, 2003) (rejecting falsity claims where "plaintiff's characterizations . . . [had] no factual basis"). Plaintiff cries foul that Hyzon counted non-binding MOUs in its backlog, but Hyzon never made any secret of that—Hyzon expressly disclosed that its 2021 forecast was "covered by contracts and MOUs" (*id.* ¶ 199), that its backlog included actual and prospective orders "under contract or MOU" (*id.* ¶ 201) and that "[n]on-binding pre-orders [and] signed [MOUs] . . . in our sales pipeline may not be converted into binding orders or sales." (*See, e.g.*, Ex. 3 at 54; *see also* Ex. 13 at 5 (noting that backlog included "orders [which] include terms permitting the counterparty to cancel or suspend some or all of their obligations").) Plaintiff's allegation that Hyzon lacked any customer orders also is undermined by other allegations in the CAC. Plaintiff acknowledges that Hyzon *exceeded* its projected vehicle deliveries in 2021 (CAC

¶ 148) and offers no explanation as to how Hyzon could have done so without any orders.

*Second*, Plaintiff pleads no facts supporting an inference that Hyzon was counting orders from entities that had no intention or ability to buy vehicles. For example, Plaintiff does not specifically allege that any potential customer had disclaimed interest in purchasing Hyzon's FCEVs. Instead, Plaintiff conclusorily claims that Legacy Hyzon used the logos of major companies in its investor presentations in order to raise investor interest, and that Legacy Hyzon's revisions to the lists of logos in subsequent investor presentations demonstrate that Legacy Hyzon had not been in meaningful negotiations with those companies. But Plaintiff provides no support for this accusation, and the anonymization of certain potential customers in later presentations does not support such an inference. The presentations were clear that the logos represented "[c]ustomers [who] were at various stages of contract negotiations, not all subject to binding purchases" (CAC ¶ 79), and Hyzon remained in discussions with many of those same potential customers long after the logos were anonymized. (*See* Ex. 16 at 2.) Plaintiff's conclusory theory is devoid of the particularized facts required by the PSLRA.

**2.     Defendants Accurately Disclosed the Nature of Hiringa's Orders and Its Partnerships with End-User Fleet Operators.**

Plaintiff next alleges that Hyzon's statements regarding Hiringa were misleading because Hyzon (1) represented Hiringa as an end user of FCEVs; (2) did not have binding orders from Hiringa; (3) did not identify Hiringa's end user partners; and (4) counted orders from Hiringa customers that could not plausibly order the number of trucks estimated. (CAC ¶¶ 219, 221.)[4] In addition to statements that are inactionable as a matter of law, Plaintiff alleges that the following

---

[4]     Plaintiff also alleges that Defendants misrepresented that Hiringa would take deliveries of FCEVs in 2021 (CAC ¶¶ 219, 221), but as explained below in Section I.D.1, these statements were forward-looking projections protected by the PSLRA's safe harbor provision.

statements are misleading for one or more of the aforementioned reasons:  Statements 6A, 7, 8A, 9A, 9B, 10A and 16E.  None of these statements are false or misleading.

*First*, Hyzon did not portray Hiringa as an ultimate end user of Hyzon's vehicles. Hyzon's February 17, 2021 press release explicitly stated that "Hiringa will build a green hydrogen refuelling network for vehicle fuel supply," that Hiringa executives were "pleased leading New Zealand brands are stepping up to participate in this exciting initiative" and that Hyzon and Hiringa looked forward to "roll[ing] out over 1,500 heavy FCEVs by 2026[,] *alongside our partners*." (Ex. 6 (emphasis added).)   The press release also referred to Hyzon and Hiringa's earlier agreement, which "secure[d] access for Hiringa *and its fleet partners*" to Hyzon's FCEVs.  (CAC ¶ 59.)  Hyzon repeated these facts just one month after the first alleged misstatements.  (*See id*. ¶ 226.)  Hyzon's statement that it would "supply" Hiringa with vehicles did not imply that Hiringa was an end user, especially given that any such implication was contradicted by repeated references to Hiringa's actual role in the same documents.

*Second*, Plaintiff's claim that Hyzon did not have any "binding orders" with Hiringa is a mischaracterization of the Blue Orca Report's rendition of a statement by an unnamed Hiringa employee.  As noted above, that statement should not be credited because Plaintiff made no attempt to corroborate it.  Moreover, the Blue Orca Report does not actually claim that the unnamed employee said Hiringa did not place *any* binding orders—rather, he claimed only that the VSA for 1,500 trucks was not binding.  (*See* CAC Ex. A at 6.)  Hyzon has never suggested otherwise.  (*See* CAC ¶ 224 (noting the signing of the VSA and adding that vehicles would be built "[a]s binding orders . . . are placed").)  In fact, the Blue Orca Report states that the unnamed Hiringa employee *confirmed* that Hiringa expected to receive four vehicles in early 2022, with sixteen more vehicles to follow.  (*Id*. ¶ 128.)  That is completely consistent with Hyzon's only reference to a binding

order, made more than six months prior to the Blue Orca Report: "Hiringa has placed a binding order for the first 20 trucks . . . Hyzon expects the first shipments of four trucks to occur by the first quarter of 2022." (*Id.* ¶ 226.)

Finally, Defendants did identify Hiringa's end user partners (*see* Ex. 16 at 2 (noting that the Hiringa relationship "already has resulted in a [VSA] for 20 trucks to be delivered to TR Group Ltd., one of New Zealand's largest truck and trailer leasing and rental companies")), and Plaintiff never explains why Hiringa's partners could not plausibly order the projected number of vehicles. Plaintiff's claims regarding Hiringa lack any basis in fact and must be dismissed.

### 3.    Plaintiff Does Not Allege Particularized Factual Support for His Claim That HongYun Did Not Order and Receive Hyzon FCEVs.

Plaintiff claims that the statements regarding HongYun were false because (1) HongYun was either a fake company or a shell company without the ability to purchase FCEVs; (2) Hyzon allegedly had only non-binding MoUs with HongYun, not binding purchase orders; and (3) Hyzon allegedly counted orders from businesses that had not signed agreements or could not plausibly be expected to order the number of vehicles suggested. (CAC ¶¶ 232, 234.) In addition to statements that are inactionable as a matter of law, Plaintiff alleges that the following statements are misleading for one or more of the aforementioned reasons: Statements 15B, 15D, 16A and 17–19B. Plaintiff fails to allege any facts indicating that these statements were false.

First, if Plaintiff means to suggest that Defendants invented a "fake" company to boost Hyzon's sales, he offers no facts to support such a claim. Allegations of underlying unlawful conduct that render statements false or misleading must themselves be pleaded with particularity—something Plaintiff plainly has not done. *See Gamm* v. *Sanderson Farms, Inc.*, 944 F.3d 455, 463 (2d Cir. 2019). To the extent that Plaintiff wishes to premise his claim on an underlying fraud related to HongYun, he must explain what that supposed fraud is.

*Second*, Plaintiff does not plead any facts supporting the claim that Hyzon did not receive binding purchase orders from and deliver trucks to HongYun.  On the contrary, Plaintiff bizarrely cites to a press release announcing Hyzon's delivery of trucks to HongYun and even includes in the CAC a photograph of Hyzon trucks emblazoned with the logo of the world's largest steel manufacturer, but then suggests that his eyes must be deceiving him because Hyzon never "disclosed any pilot test program" with that steel manufacturer.  (*Id*. ¶¶ 143, 145.)

*Third*, Plaintiff fails to plead facts suggesting that HongYun's end user customers could not plausibly order the number of trucks projected by Hyzon.[5]  The press release showing Hyzon trucks bearing BaoWu Steel's logo seriously undermines Plaintiff's claims.  Ultimately, Plaintiff relies only on the speculative inference that Hyzon's statements regarding HongYun must be untrue based on the conclusions of the short sellers and Plaintiff's "investigator."  That inference does not substitute for the particularized pleading required by the PSLRA and Rule 9(b); falsity requires "specific allegations," rather than speculative inferences.  *See ATSI*, 493 F.3d at 103.

### D.      Many Statements Challenged by Plaintiff Are Legally Inactionable.

Many of Defendants' statements also are indistinguishable from statements that the Supreme Court and Second Circuit have held are not actionable as a matter of law, including (1) forward-looking projections, which are protected under the PSLRA absent certain exceptions inapplicable here; (2) "puffery," vague optimism that is immaterial as a matter of law; and (3) sincerely held opinions that neither embed inaccurate facts nor omit material information.[6]

---

[5]      Relatedly, Plaintiff suggests that statements about HongYun were misleading because "Hyzon counted pre-orders from entities that merely operated as intermediaries for ultimate purchasers." (CAC ¶ 232.)  But Plaintiff ignores Hyzon's repeated reminders that dealing directly with third party logistics partners rather than end users was "typical for the industry." (*Id*. ¶ 75.)

[6]      "An alleged misrepresentation is material if there is a substantial likelihood that a reasonable person would consider it important in deciding whether to buy or sell shares of stock." *Singh* v. *Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019) (cleaned up).

1. **The PSLRA Safe Harbor Protects Forward-Looking Statements Regarding Revenue and Delivery Projections.**

The CAC challenges several forward-looking statements, which are protected by the PSLRA's safe harbor. *See* 15 U.S.C. § 78u-5(c). "To prove that a forward-looking statement constitutes a material misrepresentation under the safe harbor provision, plaintiffs must demonstrate through specific factual support that defendants lacked a reasonable basis for their belief." *In re Corning Sec. Litig.*, 2004 WL 1056063, at *13 (W.D.N.Y. Apr. 9, 2004).[7]

Statements 2A, 11, 12 and 14B all concern Hyzon's "projection of revenues" and "future economic performance," which are explicitly covered by the PSLRA's safe harbor. *See* 15 U.S.C. § 78u-5(i)(1). Plaintiff does not allege with particularity that Defendants (1) did not genuinely believe these statements; (2) knew that they had no reasonable basis for such statements; or (3) were aware of undisclosed facts tending to seriously undermine the accuracy of the statements. *See Slayton* v. *Am. Express Co.*, 604 F.3d 758, 775 (2d Cir. 2010). In particular, Plaintiff does not address Hyzon's explanation that it anticipated recording lower-than-forecast revenues primarily because supply chain disruptions prompted it to prioritize vehicle sales in Asia, where prices were approximately half of those in other markets. (CAC ¶ 148.) The CAC's claims lack the specificity required to infer that Defendants knew any of these projections were false. *See, e.g.*, *In re Synchrony Financial Sec. Litig.*, 988 F.3d 157, 172 (2d Cir. 2021) ("Economic prognostication, though faulty, does not, without more, amount to fraud.").

Moreover, the allegedly false statements were accompanied by cautionary language. For example, Statement 2A ("Hyzon forecasts to grow from $37 million on revenue on

---

[7]   Even if a particular forward-looking statement is excluded from the safe harbor provision's protections, the "bespeaks caution" doctrine protects that statement if accompanied by cautionary language pertaining to the risk realized. *See Bausch & Lomb*, 2003 WL 23101782, at *2.

85 units sold in 2021") was qualified by a warning that "risks relating to the uncertainty of the projected financial information with respect to Hyzon[] includ[ed] the conversion of pre-orders into binding orders," and that Hyzon's ability "to accurately estimate supply and demand for its vehicles" could be affected by numerous factors. (*See* Ex. 1; Ex. 2 (referring to risks in Ex. 1).) The revenue projection in Statement 14B similarly was prefaced by the disclaimer that the "assumptions and estimates underlying such projected financial information are inherently uncertain and are subject to a wide variety of significant business, economic, competitive and other risks and uncertainties." (Ex. 14 at 2.) *See In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 84 (S.D.N.Y. 2017) (applying safe harbor protection where "presentation was accompanied by a disclaimer . . . warning investors that actual results could differ from projected results, including because of the risk factors identified in" the company's SEC filings).

Statements 1A, 6B, 6C, 8B, 8C, 10B, 15A and 16B–D are projections regarding Hyzon's delivery targets. The PSLRA exempts from liability statements like these, which concern "the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer." 15 U.S.C. § 78u-5(i)(1)(B). Many of these statements specifically noted that Hyzon's delivery targets were predicated on executing further binding orders and cautioned that issues like the global supply chain disruptions and pandemic could significantly impact delivery targets and timing. *See, e.g.*, Statements 8C, 15A; *Bausch & Lomb*, 2003 WL 23101782, at *18 (holding that bespeaks caution doctrine protected statements that were subject to risks including "successful execution of marketing strategies"). Again, Plaintiff has "not alleged circumstances to show that the defendants lacked a reasonable basis for their optimistic, but qualified, predictions as to the company's future performance." *San Leandro Emergency Med. Grp. Profit Sharing Plan* v. *Philip Morris Cos.*, 75 F.3d 801, 813 (2d Cir. 1996).

Plaintiff's failure to allege actual knowledge of falsity renders these statements inactionable.

### 2. Reasonable Investors Do Not Rely on Vague, Optimistic Puffery.

"Puffery," statements "too general to cause a reasonable investor to rely upon them," *ECA Loc. 134 IBEW* v. *JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009), are "not sufficiently material, as a matter of law, to support a claim for securities fraud." *IBM*, 163 F.3d at 109; *Abramson* v. *Newlink Genetics Corp.*, 965 F.3d 165, 173 (2d Cir. 2020) ("Generic, indefinite statements of corporate optimism typically are not actionable.").

Statements 1B and 1C—that Hyzon's "committed sales pipeline is proof that the world is truly recognizing the need to develop innovative solutions to mitigate climate change and accelerate efforts to move the world economy down the path to net-zero emissions," and that the "business combination will enable [Hyzon] to expand deployments of [FCEVs] globally, and to continue leading the hydrogen transition"—are classic puffery. Even if Plaintiff believes these statements misrepresented the contours of Hyzon's "committed sales pipeline," the statements provide no specifics about that pipeline beyond its bare existence. Simply claiming that these statements were false "does not cure their generality, which is what prevents them from rising to the level of materiality required to form the basis for assessing a potential investment." *Ind. Pub. Ret. Sys.* v. *SAIC, Inc.*, 818 F.3d 85, 97-98 (2d Cir. 2016); *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 757 (S.D.N.Y. 2018) (statement that Aratana had "made remarkable progress towards . . . advancing our expanding pipeline towards commercialization" was puffery). References to Hyzon's role as a "leader" in its field and to the world recognizing the need to mitigate climate change also are vague generalizations and legally inactionable. *See, e.g.*, *Gregory* v. *ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 399 (S.D.N.Y. 2018 ) (statements describing defendants as "a leader in developing and commercializing" therapies and claiming "strengthened competitiveness" constituted puffery).

Statements 15C and 15D, that "[t]he core team of [HongYun] has solid operation experience and master the real time vehicle data management," and that HongYun was "leveraging its rich end user resources in logistics industry," also are far too generic for a reasonable investor to rely on and cannot form the basis of a claim. The Second Circuit has held that statements regarding "operational excellence" are inactionable. *See SAIC*, 818 F.3d at 97. Similarly, the references to HongYun's "master[y]" over vehicle data management and "rich end user resources" are too vague to be meaningful. *See, e.g.*, *Strougo* v. *Barclays PLC*, 105 F. Supp. 3d 330, 343-47 (S.D.N.Y. 2015) (description of compliance function as "world-class" was puffery).

### 3. Any Opinions Did Not Supply False Facts or Omit Material Ones.

Statement 12—Tichio's statement that "[w]e still feel extraordinarily comfortable" with Legacy Hyzon's forward-looking revenue projections—is a classic form of opinion. *See Wilson* v. *LSB Indus.*, 2017 WL 7052046, at *1 (S.D.N.Y. Mar. 2, 2017) ("projections" and "forecasts" "necessarily require judgment and are, therefore, statements of opinion or belief"). Such opinions may be misleading only under two inapplicable circumstances. First, "liability for making a false statement of opinion may lie if either 'the speaker did not hold the belief [he] professed' or 'the supporting fact[s] [he] supplied were untrue.'" *Tongue* v. *Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (quoting *Omnicare*, 575 U.S. at 185–86). Plaintiff does not allege that Tichio did not sincerely hold the belief he expressed. *See In re AmTrust Fin. Servs., Inc. Sec. Litig.*, 2019 WL 4257110, at *25-26 (S.D.N.Y. Sept. 9, 2019) (plaintiff must plead facts suggesting the defendant actually "reached a conclusion different from the one stated"). Second, opinions may be actionable "if the speaker omits information [that] makes the statement misleading to a reasonable investor" reading the statement fairly and in context. *Wilson*, 2017 WL 7052046 at *1. Plaintiff, at best, suggests that Statement 12 was misleading because Tichio did not mention that some of Hyzon's negotiations had not yet resulted in binding orders. However, "[t]hat such a

-28-

dialogue was ongoing did not prevent Defendants from expressing optimism, even exceptional optimism, about the likelihood of [success]." *Sanofi*, 816 F.3d at 211. Statement 12 is just such an optimistic opinion.[8]

## II.    PLAINTIFF DOES NOT RAISE A COGENT AND COMPELLING INFERENCE THAT ANY DEFENDANT ACTED WITH SCIENTER.

The PSLRA requires plaintiffs to "state with particularity facts giving rise to a strong inference" of scienter. 15 U.S.C. § 78u-4(b)(2)(A). To qualify as "strong," the inference "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *ECA*, 553 F.3d at 198. This standard requires the Court to "engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged." *Tellabs*, 551 U.S. at 314. If a "plausible nonculpable explanation[]" is more likely than fraud, then the plaintiff has failed to plead scienter. *Id.* at 324. Moreover, "omissions and ambiguities count against inferring scienter." *Id.* at 326.

Importantly, Plaintiff must plead "a factual basis for scienter for each defendant; guilt by association is impermissible." *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 695 (2d Cir. 2009). Plaintiff "may not rely upon blanket references to acts or omissions by all of the defendants" to plead scienter, but "must state with particularity facts giving rise to a strong inference that *each defendant* acted with scienter." *In re UBS AG Sec. Litig.*, 2012 WL

---

8    The CAC identifies only one other statement by Tichio, which it does not even specifically allege to be misleading:  that Legacy Hyzon "ha[d] a sales pipeline for 2021 that is 100 percent under contract or MOU, providing real runway visibility, and its customers include some of the most recognizable global brands and the largest municipalities in the world." (CAC ¶ 71; *see id.* ¶ 194 (stating that alleged misstatements are identified in ¶¶ 195-242).) Regardless, a statement of "runway visibility" is puffery, and the CAC fails to adequately allege that Hyzon did not have such a sales pipeline. Accordingly, the claims against Tichio must be dismissed.

4471265, at *9 (S.D.N.Y. Sept. 28, 2012) (emphasis in original) (internal quotation marks and citations omitted).  The CAC alleges nothing to suggest that Haskopoulos or Tichio acted with scienter with respect to any alleged misstatement, which in itself warrants dismissal of all claims against them.[9]

Scienter requires particularized facts that (1) show each defendant had a motive and opportunity to commit fraud; or (2) constitute strong circumstantial evidence of conscious misbehavior or recklessness by each defendant.  *See ECA*, 553 F.3d at 198.  Plaintiff fails to plead scienter by either method.  *First*, Plaintiff alleges that Defendants had a motive to inflate Hyzon's share price to prevent Horizon from insolvency and to profit off of their stock holdings, but such generalized motives are insufficient as a matter of law.  *Second*, Plaintiff alleges that Defendants must have known or recklessly disregarded that their statements about Hyzon's customer relationships, Hiringa and HongYun were false, but Plaintiff never identifies the specific facts needed to support these inferences.

### A.    Plaintiff's Generic, Group-Pleaded Allegations of Motive Are Insufficient.

To plead scienter based on motive and opportunity, Plaintiff must allege particularized facts indicating that *each defendant* "benefitted in some concrete and personal way from the purported fraud."  *Id.* (quoting *Novak* v. *Kasaks*, 216 F.3d 300, 307-08 (2d Cir. 2000)).  Motives "generally possessed by most corporate directors and officers do not suffice."  *Kalnit* v. *Eichler*, 264 F.3d 131, 139 (2d Cir. 2001).  Plaintiff offers two theories regarding motive—both

---

[9]    At most, Plaintiff alleges that Haskopoulos (and Anderson) signed DCRB's annual and quarterly reports that incorporated by reference presentations containing allegedly false statements.  (CAC ¶¶ 91, 99, 271.)  But it is well established that merely alleging that an individual signed a public filing in their corporate role is insufficient to plead scienter as to that individual. *Lipow* v. *Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 163 (S.D.N.Y. 2015); *In re Sotheby's Holdings, Inc.*, 2000 WL 1234601, at *7 (S.D.N.Y. Aug. 31, 2000).

too generic to plead scienter.

*First*, Plaintiff suggests that some—but not all—Defendants had a motive to commit fraud because a merger would "insert much needed capital" into Horizon, thereby allowing Horizon to "avoid the existential risk of insolvency." (CAC ¶¶ 244-47.) Even assuming Horizon's business had been facing difficulties, allegations concerning "generic corporate interests such as . . . avoiding bankruptcy, or continuing to operate as a business . . . do not support motive to commit securities fraud." *Lehmann* v. *Ohr Pharm., Inc.*, 830 F. App'x 349, 352 (2d Cir. 2020); *see also In re PXRE Grp., Ltd. Sec. Litig.*, 600 F Supp. 2d 510, 532 (S.D.N.Y. 2009) ("[t]he alleged motivation of a corporation to raise money to prevent . . . [threats to] the 'survival' of a company [] is far too generalized (and generalizable)" to support scienter). Moreover, the CAC does not allege that Anderson, Haskopoulos or Tichio had *any* connection to Horizon, so there is no basis to infer that Horizon's alleged struggles would have motivated any of these defendants to commit fraud. Plaintiff's allegations are "nothing more than a pejorative characterization of [the] ordinary corporate desire[]" to see if a company could succeed in a new market. *See In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 560 (S.D.N.Y. 2004).

*Second*, Plaintiff suggests that Defendants had a motive to commit fraud because some—but not all—Defendants stood to profit from their holdings of "founders shares" and related options, which allegedly *could be* worth millions of dollars *if* sold after the end of a six-month lock-up period following completion of the Merger. (*Id.* ¶¶ 248-50.) The prospect of potentially profiting from founders shares or options also is insufficient to plead scienter. *See, e.g.*, *Adient*, 2020 WL 1644018, at *26 (describing "Founders' Grants, i.e., stock incentive awards given to certain . . . executives in connection with [a] spinoff" as "allegations of the type of corporate profit motive possessed by most corporate directors and officers") (internal quotation marks omitted).

This case is far from the paradigmatic example of motive, where defendants sell significant amounts of shares at inflated prices.  Indeed, the CAC does not allege that *any* Defendant sold *any* Hyzon shares, and in fact acknowledges that Defendants affirmatively disclosed the SEC investigation and anticipated revenue shortfall *prior to* expiration of the lock-up period.  (CAC ¶¶ 148-49, 250.)  The Second Circuit has held that these circumstances undercut an inference of scienter, as have district courts addressing similar fact patterns.  *See Rombach*, 355 F.3d at 176-77 (scienter not pleaded where plaintiffs did "not allege that defendants sold stock or profited in any way during the relevant period" and where defendant disclosed "financial problems prior to the deadline to file its financial statements"); *In re EveryWare Glob., Inc. Sec. Litig.*, 175 F. Supp. 3d 837, 860 (S.D. Ohio 2016) (rejecting scienter allegations where defendant did not sell shares or stand to benefit from options until after relevant stock drop); *Murdeshwar* v. *Search Media Holdings Ltd.*, 2011 WL 7704347 (S.D. Fla. Aug. 8, 2011) (rejecting motive allegations where company disclosed improprieties before individual defendants could sell warrants, and where no defendants were alleged to sell stock).

Moreover, the CAC concedes that Haskopoulos and Gordon did not receive any "founders shares" or any Hyzon stock or options following the Merger, rendering this motive theory inapplicable to them.  (*See* CAC ¶ 249 n.135.)[10]  And although Plaintiff asserts in vague terms that founders shares were transferred to a firm related to Anderson "and other DCRB directors," Plaintiff does not specifically allege that Tichio received any.  (*See id.* ¶ 248.)  Plaintiff's theories of motive do not support a strong inference of scienter.

---

[10]    Plaintiff attempts to salvage his motive theory as to Haskopoulos and Gordon by asserting that they benefitted from "their employment" and vague, unquantified "indirect business relationships" (CAC ¶ 249 n.135), but generic allegations of prolonged employment and an interest in a high share price are classic examples of insufficient motives. *See Kalnit*, 264 F.3d at 139-40.

B.    **Plaintiff's Speculations of Recklessness Lack Adequate Basis in Fact.**

Because Plaintiff's allegations of motive are insufficient, Plaintiff must plead facts constituting strong circumstantial evidence of conscious misbehavior or recklessness. But without a showing of motive, "the strength of the circumstantial allegations must be correspondingly greater." *ECA*, 553 F.3d at 199. Plaintiff must set forth detailed allegations "that [1] *specific* contradictory information was available to the defendants [2] *at the same time* they made their misleading statements." *PXRE*, 600 F. Supp. 2d at 536 (emphases in original). Conscious misbehavior or recklessness is "a state of mind approximating actual intent, and not merely a heightened form of negligence." *Novak*, 216 F.3d at 312 (internal quotation marks omitted). It must represent "an extreme departure from the standards of ordinary care." *S. Cherry St., LLC* v. *Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (internal quotation marks omitted).

1.    **Plaintiff Fails To Plead That Defendants Knowingly or Recklessly Misrepresented Hyzon's Business Relationships.**

Plaintiff asserts that Defendants deliberately or recklessly made false statements regarding brand-name partners to gain investor support. (CAC ¶¶ 251-52.) To support this theory, Plaintiff cites the Blue Orca Report's purported quote from an anonymous former Hyzon employee who said "I just didn't like the way it was being presented . . . Saying that they've got all of these orders and things. But a lot of them are all MoUs." (*Id.* ¶ 253.) Plaintiff concludes that given Hyzon's size and the importance of this information, "it is absurd to suggest that Defendants . . . did not know, or would not reasonably be aware of, these concerns." (*Id.*)

Plaintiff's theory depends almost entirely on crediting a second-hand recounting of purported statements by an anonymous former employee, which should be disregarded absent corroboration. *See Long Miao*, 442 F. Supp. 3d at 801. Even assuming this recounting was accurate, Plaintiff does not allege any facts suggesting that Defendants were aware of (or shared)

these views, or that Defendants recklessly disregarded facts showing that the specific statements identified in the CAC must be false. *See Jones* v. *Perez*, 550 F. App'x 24, 28 (2d Cir. 2013) (noting that "none of the confidential witnesses assert[ed] direct knowledge" of what the defendants were aware of, let alone specific contrary facts); *City of Dearborn Heights Act 345 Police & Fire R* v. *Axonyx, Inc.*, 374 F. App'x 83, 85 (2d Cir. 2010) (affirming dismissal where plaintiffs "[relied] on opinions of confidential witnesses to support their allegations, but they fail[ed] to offer any factual underpinnings for those opinions"). Plaintiff's conclusory allegations present no particularized facts regarding any individual Defendant's knowledge and are insufficient to demonstrate scienter.

The most compelling inference here is that Defendants did not know of or share the unnamed employee's purported sentiments. *See, e.g.*, *Bratusov* v. *Comscore, Inc.*, 2020 WL 3447989, at *15 (S.D.N.Y. June 24, 2020) (employee's resignation implied only that defendants disagreed with him, not that they acted with scienter). Even assuming Defendants overestimated the likelihood that negotiations or MOUs would lead to binding orders, Plaintiff has not adequately alleged that Defendants were reckless in making those estimates. *See Novak*, 216 F.3d at 309 ("[A]llegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim for securities fraud"); *In re Express Scripts Holdings Co. Sec. Litig.*, 773 F. App'x 9, 15 (2d Cir. 2019) (scienter not pleaded where "Defendants could not have known that the negotiations with [a customer] would ultimately fail"). Ultimately, Plaintiff's theory depends on the circular notion that Defendants *must have* consciously or recklessly lied about Hyzon's business partnerships because the Blue Orca Report claimed that Hyzon had lied. This is insufficient to state a claim. *Slayton*, 604 F.3d at 776. "[T]hat management's optimism about a prosperous future turned out to be unwarranted is not circumstantial evidence of conscious fraudulent behavior or recklessness." *Rothman* v. *Gregor*,

-34-

220 F.3d 81, 90 (2d Cir. 2000) (internal quotation marks omitted).

### 2.    Defendants Did Not Knowingly or Recklessly Portray Hiringa as an End User of Hyzon Vehicles.

Plaintiff's theory of scienter as to Hiringa simply rehashes the argument that Defendants' statements were misleading, and again relies largely on the Blue Orca Report's purported second-hand account from an anonymous Hiringa employee to suggest that Defendants consciously or recklessly omitted Hiringa's focus on creating refueling infrastructure and facilitating the sale of FCEVs to third parties.  (CAC ¶¶ 255-56.)

The inference that Hyzon knowingly or recklessly portrayed Hiringa as an end user of its trucks is not cogent, let alone compelling.  As detailed above, Hyzon explicitly stated that Hiringa was building a refueling network and working with "fleet partners" and "fleet operators" as early as August 2020 and again in March 2021.  If Hyzon meant to portray Hiringa as an end user of trucks, these repeated references would be quite counterintuitive.  (*Id*. ¶¶ 59, 226.)  At worst, the purported Hiringa employee and Hyzon may have had different understandings as to whether the 20-vehicle order was "binding."  But as noted above, "omissions and ambiguities count against inferring scienter."  *Tellabs*, 551 U.S. at 326.  Whether considered in isolation or holistically with other claims, the Hiringa allegations do not raise a "strong" inference of scienter.

### 3.    The CAC Lacks Specific Facts Suggesting Defendants Believed or Recklessly Disregarded That HongYun Was a "Sham" Company.

Plaintiff next alleges that Defendants made misstatements about HongYun with scienter because "due diligence into [HongYun] . . . confirm[s] this supposedly large Chinese customer of Hyzon is a fake company established to serve as a pretend counterparty to a sham agreement to pump up Hyzon's stock price."  (CAC ¶ 261.)[11]  Plaintiff bases this on the short

---

[11]    As noted above, Plaintiff's allegations regarding HongYun cannot establish scienter as to

sellers' and investigator's purported inability to confirm that HongYun was operational.  (*Id.* ¶ 262.)  Defendants allegedly "either knew or recklessly disregarded these facts, as any reasonable company would perform due diligence before announcing a deal representing nearly 74% of its sales (by number of vehicles delivered) in a single year."  (*Id.* ¶ 263.)  Plaintiff adds that Hyzon equivocated on whether HongYun was established but still announced that HongYun was accepting deliveries, which allegedly strengthens the inference of scienter.  (*Id.* ¶¶ 264-65.)

Plaintiff does not adequately allege that Defendants "knew" HongYun was a sham, as he fails to plead that even a single defendant was aware of specific information contradicting any statement at the time it was made.  *See Teamsters Loc. 445 Freight Div. Pension Fund* v. *Dynex Cap. Inc.*, 531 F.3d 190, 196 (2d Cir. 2008).  Plaintiff does not identify contrary facts, or who reviewed them and when.  On the contrary, the CAC's inclusion of the picture of a fleet of Hyzon trucks branded with the logo of HongYun's partner undercuts any notion that Defendants knew HongYun was a "sham."  (CAC ¶ 145.)

Moreover, circuit precedent squarely forecloses any argument that a failure to diligence HongYun establishes scienter:  "conditional allegations of the sort that a defendant would have learned the truth about a company's fraud if it had performed the due diligence it promised are generally insufficient to establish the requisite scienter for private securities fraud claims under the PSLRA's heightened pleading instructions."  *In re Advanced Battery Techs., Inc.*, 781 F.3d 638, 646 (2d Cir. 2015) (cleaned up).  While recklessness may be established when a defendant "failed to check information they had a duty to monitor," no such duty has been pleaded here.  *ECA*, 553 F.3d at 199.  And the Second Circuit has noted there is no generalized duty "to be aware of what is going on."  *Saltz* v. *First Frontier, L.P.*, 485 F. App'x 461, 464-65 (2d Cir. 2012).

---

Tichio or Haskopoulos, as neither had a role with Hyzon at the time of the alleged misstatements.

Again, the CAC reveals a more compelling, nonculpable inference:  that Hyzon believed HongYun was a legitimate entity, formed in the days following a Shanghai government announcement regarding a major FCEV pilot program, with significant prospects to order Hyzon vehicles for its end user partners.  (CAC ¶¶ 145-47, 264.)  Plaintiff's only basis to argue that these beliefs were reckless is his investigator's purported inability to corroborate them.  That falls far short of the specific, contradictory information needed to demonstrate that any defendant acted with "a state of mind approximating actual intent, and not merely a heightened form of negligence." *Novak*, 216 F.3d at 312.

### 4. The Edits to Investor Presentations Do Not Reflect Misstatements Knowingly or Recklessly Made.

Plaintiff claims that revisions to Legacy Hyzon's investor presentations demonstrate that Defendants knew or should have known that certain entities were improperly listed as "top tier customers" (CAC ¶ 266), but Plaintiff never alleges that any particular individual defendant had any involvement in these changes, which precludes an inference of scienter as to any of them.  *See In re UBS*, 2012 WL 4471265, at *9.  Plaintiff also acknowledges that Hyzon stated that it had entered signed agreements with certain of the potential customers that the Blue Orca Report suggested were illusory and that Hyzon continued to engage in negotiations with many others.  (*See* CAC ¶ 217.)  On these allegations, the more compelling inference is that Hyzon simply anonymized references to potential partners.  (*Id*. ¶ 138.)  Again, Plaintiff provides no specific facts to support the inference that any defendant misrepresented the status of these potential relationships with "a state of mind approximating actual intent, and not merely a heightened form of negligence." *Novak*, 216 F.3d at 312 (internal quotation marks omitted).

**5.    Neither the SEC Investigation nor the Core Operations Doctrine Support an Inference of Scienter.**

Finally, Plaintiff asserts that the existence of the SEC investigation and Defendants' knowledge of Hyzon's core operations support his scienter claims.  (CAC ¶¶ 269-74.)  While government investigations "can bolster an inference of scienter, they cannot create one where none exists."  *In re Henry Schein, Inc. Sec. Litig.*, 2019 WL 8638851, at \*22 (E.D.N.Y. Sept. 27, 2019); *Set Cap. LLC* v. *Credit Suisse Grp. AG*, 996 F.3d 64, 80 (2d Cir. 2021) (SEC investigation alone does not "independently raise[] a compelling inference of manipulative intent," instead only "supporting culpable inferences drawn from stronger allegations").  The same holds true for the core operations doctrine, which is of questionable viability.  *See, e.g.*, *Sachsenberg* v. *IRSA Inversiones y Representaciones Sociedad Anónima*, 339 F. Supp. 3d 169, 183–84 (S.D.N.Y. 2018) ("[S]ince the enactment of the PSLRA, the Second Circuit has expressed doubt as to the continued independent viability of the core operations doctrine.").

The limited value of these allegations makes sense.  An investigation is not an adjudication of liability, and "[i]t is well established that boilerplate allegations that defendants knew or should have known of fraudulent conduct based solely on their board membership or executive positions are insufficient to plead scienter."  *In re Hardinge, Inc. Sec. Litig.*, 696 F. Supp. 2d 309, 328 (W.D.N.Y. 2010) (internal quotation marks omitted); *Cox* v. *Blackberry Ltd.*, 660 F. App'x 23, 25 (2d Cir. 2016) ("[That defendants] occupied high-ranking positions . . . and had an incentive for the company to succeed is insufficient to establish scienter.").  Given the issues with the other grounds for scienter detailed above, these allegations cannot render any inference of scienter cogent or compelling.

**III.    PLAINTIFF DOES NOT PLEAD LOSS CAUSATION AS A MATTER OF LAW.**

To state a claim under Section 10(b), Plaintiff must allege a direct causal connection

-38-

between Defendants' alleged misstatements and the putative class's alleged damages.  *See Dura Pharms., Inc.* v. *Broudo*, 544 U.S. 336, 346-47 (2005).  If that connection is "attenuated," or "if the plaintiff fails to demonstrate a causal connection between the content of the alleged misstatements or omissions and the harm actually suffered,  a fraud claim will not lie." *Lentell* v. *Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005) (internal quotation marks and citation omitted).  Plaintiffs typically satisfy this requirement by alleging either (1) the issuance of a corrective disclosure that reveals a defendant's fraud; or (2) that investors suffered losses following the foreseeable materialization of a risk concealed by the defendant's fraudulent statements. *See In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010).

Plaintiff fails to adequately allege loss causation under either approach.  The three purported corrective disclosures alleged by Plaintiff—(1) the January 12, 2022 8-K disclosing the SEC investigation and Hyzon's expectation that it would record lower-than-forecasted revenues; (2) the Blue Orca Report; and (3) the Iceberg Report—all concerned either public information or risks that had been properly disclosed.  (*See id*. ¶ 278.)

First, the January 12, 2022 8-K does not constitute a corrective disclosure.  Hyzon repeatedly disclosed the risk that it might not meet its $37 million revenue target as early as the date of the first alleged misstatement.  (*See* Ex. 1 (noting "risks relating to the uncertainty of the projected financial information with respect to Hyzon, including the conversion of pre-orders into binding orders" and COVID-19 related disruptions).)  Plaintiff also does not allege that Hyzon concealed the existence of an SEC investigation at the time of any of the alleged misstatements or that Hyzon should have foreseen an investigation based on its projections and negotiations.  Even had Hyzon foreseen such an investigation, courts routinely hold that announcements of initiated legal proceedings, without more, are "insufficient to constitute a . . . disclosure for purposes of

§ 10(b)." *Meyer* v. *Greene*, 710 F.3d 1189, 1201 (11th Cir. 2013); *see also*, *e.g.*, *In re Dell, Inc. Sec. Litig.*, 591 F. Supp. 2d 877, 910 (W.D. Tex. 2008) (press release announcing an SEC investigation was not a revelation of misconduct). This makes sense: the disclosure of an investigation "simply puts investors on notice of a *potential* future disclosure of fraudulent conduct." *Loos* v. *Immersion Corp.*, 762 F.3d 880, 890 (9th Cir. 2014) (emphasis in original). Any price movement in the wake of this announcement does not suffice to plead loss causation.

Apart from anonymous statements that this Court should not credit, the short seller reports contained only public information cast in a negative light. As Blue Orca put it, it simply "conducted research and analysis based on public information in a manner that any person could have done if they had been interested in doing so." (CAC Ex. A at 20.) Where "[n]either short seller report revealed a *fact* previously undisclosed" and "only disclosed that investigators were 'unable to establish'" the truth of defendants' statements, such reports are not corrective disclosures. *In re Ideanomics, Inc. Sec. Litig.*, 2022 WL 784812, at *11 (S.D.N.Y. Mar. 15, 2022) (emphasis in original). This Circuit's precedents are clear: a "negative journalistic characterization of previously disclosed facts does not constitute a corrective disclosure of anything but the journalists' opinions." *Omnicom*, 597 F.3d at 512. Any stock drop here owes to the misleading tenor of the short sellers' negative opinions, rather than newly disclosed facts.

## IV. PLAINTIFF'S FAILURE TO ADEQUATELY PLEAD A SECTION 10(B) CLAIM NECESSITATES DISMISSAL OF THE SECTION 20(A) CLAIM.

To plead liability under Section 20(a) of the Exchange Act, a plaintiff must adequately allege a "primary violation" of another law, in this case Section 10(b). *See ATSI*, 493 F.3d at 108. Plaintiff has failed to do so, requiring dismissal of the Section 20(a) claim. *See id.*

## CONCLUSION

For the foregoing reasons, the CAC should be dismissed with prejudice.

Dated:    New York, New York
          May 20, 2022

Respectfully submitted,

Jacob M. Croke (*crokej@sullcrom.com*)
Arun Bodapati† (*bodapatia@sullcrom.com*)
Alexander Peacocke† (*peacockea@sullcrom.com*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004-2498
Telephone:    (212) 558-4000
Facsimile:    (212) 558-3588

Laura Kabler Oswell† (*oswelll@sullcrom.com*)
SULLIVAN & CROMWELL LLP
1870 Embarcadero Road
Palo Alto, CA 94303
Tel: (650) 461-5679
Fax: (650) 461-5746

*Attorneys for Defendants Hyzon Motors Inc., Erik
Anderson, Peter Haskopoulos, Craig Knight, Mark
Gordon, George Gu and Robert Tichio*

† Application for admission *pro hac vice* pending