**UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IN RE HYZON MOTORS INC. SECURITIES LITIGATION | Case No. 6:21-cv-06612-CJS-MWP |
| *This Document Relates to:* *ALL ACTIONS* | |

**LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ....................................................................................................................1

SUMMARY OF THE COMPLAINT...................................................................................4

    A.    Hyzon's Origins—A Corporate Parent with No Demand for its Technology ...............................................................................................4

    B.    Hyzon Defendants Find Their Blank Check Savior ...............................5

    C.    Hyzon's False and Misleading Representations Allow It to Go Public ......................................................................................................5

    D.    Defendants Fill Hyzon's Delivery Gap with a Previously Unannounced Deal with a Sham Chinese Purchaser, HongYun ...........7

    E.    The Truth Emerges—Publication of the Blue Orca and Iceberg Research Reports ....................................................................................8

    F.    Disclosure of an SEC Investigation and Dismal Expected Financial Performance ...............................................................................9

    G.    Lead Plaintiff's China-Based Investigator Confirms HongYun's Lack of Business Operations and Ability to Purchase Vehicles.............10

    H.    Hyzon's Financial Disclosures Further Confirm Hyzon's Fraud .........10

ARGUMENT .........................................................................................................................11

I.    THE COMPLAINT SUFFICIENTLY ALLEGES THAT DEFENDANTS MADE MATERIAL MISSTATEMENTS AND OMISSIONS.........................................11

    A.    Defendants' Statements Regarding HongYun Are Actionable .............12

    B.    Statements Regarding Hiringa Are Actionable......................................16

    C.    Statements Regarding 100% Certain and Highly Probable Orders Are Actionable ......................................................................................17

    D.    PSLRA Safe Harbor Does Not Protect Defendants' Statements...........21

    E.    The Blue Orca and Iceberg Reports' Findings Are Reliable, Have Independently Been Corroborated, And Should Be Credited...............25

II.    THE COMPLAINT ADEQUATELY ALLEGES SCIENTER ......................................27

A.    The Complaint Alleges Defendants' Conscious Misbehavior or
Recklessness ..........................................................................................28

1.    Defendants Knew or Recklessly Disregarded that HongYun
was a "Sham" Company ..............................................................28

2.    Defendants Knowingly or Recklessly Portrayed Hiringa as
a Customer with Binding Orders ................................................32

3.    Defendants Knowingly or Recklessly Misrepresented
Committed Orders.......................................................................33

4.    The SEC Investigation and Core Operations Doctrine
Supports Scienter .......................................................................35

B.    Defendants Had Motive and Opportunity to Defraud............................................36

III.    THE COMPLAINT ADEQUATELY PLEADS LOSS CAUSATION ............................38

IV.    THE COMPLAINT ESTABLISHES CONTROL PERSON LIABILITY .......................40

V.    CONCLUSION.................................................................................................1

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Alpha Capital Anstalt v. New Generation Biofuels, Inc.*,
  2014 WL 6466994 (S.D.N.Y. Nov. 18, 2014) ........................................................................28

*In re Avon Sec. Litig.*,
  2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019) ........................................................................30

*In re Banco Bradesco S.A. Sec. Litig.*,
  277 F. Supp. 3d 600 (S.D.N.Y. 2017) .............................................................................15, 25

*Bear Stearns Cos., Inc. Sec., Deriv., & ERISA Litig.*,
  763 F. Supp. 2d 423 (S.D.N.Y. 2011) ...................................................................................28

*Bos. Ret. Sys. v. Alexion Pharms., Inc.*,
  556 F. Supp. 3d 100 (D. Conn. 2021) ...................................................................................39

*CFTC v. McDonnell*,
  332 F.Supp.3d 641 (E.D.N.Y. Aug. 23, 2018) ......................................................................16

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
  2018 WL 2382600 (S.D.N.Y. May 24, 2018) ..................................................................22, 23

*Chill v. Gen. Elec. Co.*,
  101 F.3d 263 (2d Cir. 1996)....................................................................................................3

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
  875 F. Supp. 2d 359 (S.D.N.Y. 2012)..............................................................................28, 32

*City of Providence v. Aeropostale, Inc.*,
  2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013) ......................................................................22

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*,
  477 F. Supp. 3d 123 (S.D.N.Y. 2020)....................................................................................40

*Diversified Cap. Invs., Inc. v. Sprint Commc'ns, Inc.*,
  2016 WL 2988864 (N.D. Cal. May 24, 2016)........................................................................20

*Dougherty v. Esperion Therapeutics, Inc.*,
  905 F.3d 971 (6th Cir. 2018) .................................................................................................23

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005).................................................................................................................39

*Fresno Cty. Emps.' Ret. Ass'n v. comScore, Inc.*,
    268 F. Supp. 3d 526 (S.D.N.Y. 2017)....................................................................30

*Freudenberg v. E\*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010)...................................................................39

*In re Gen. Elec. Co. Sec. Litig.*,
    857 F. Supp. 2d 367 (S.D.N.Y. 2012).............................................................29, 36

*In re Hebron Tech. Sec. Litig.*,
    2021 WL 4341500 (S.D.N.Y. Sept. 22, 2021)......................................................26

*In re Hi-Crush Partners L.P. Sec. Litig.*,
    2013 WL 6233561 (Dec. 2, 2013) .......................................................................24

*Hutchins v. NBTY, Inc.*,
    2012 WL 1078823 (E.D.N.Y. Mar. 30, 2012)......................................................32

*In re Ideanomics, Inc., Sec. Litig.*,
    2022 WL 784812 (S.D.N.Y. Mar. 15, 2022) ........................................................40

*In re IMAX Sec. Litig.*,
    587 F. Supp. 2d 471 (S.D.N.Y. 2008)..................................................................29

*In re Intercept Pharms., Inc. Sec. Litig.*,
    2015 WL 915271 (S.D.N.Y. Mar. 4, 2015) ..........................................................34

*Katz v. Image Innovations Holdings, Inc.*,
    542 F. Supp. 2d 269 (S.D.N.Y. 2008)..................................................................30

*Kramer v. Time Warner, Inc.*,
    937 F.2d 767 (2d Cir. 1991)................................................................................10

*Lea v. TAL Educ. Grp.*,
    837 F. App'x 20 (2d Cir. 2020) ..........................................................................40

*Lewy v. SkyPeople Fruit Juice, Inc.*, 2012 WL 3957916
    (S.D.N.Y. Sept. 10, 2012)...................................................................................27

*Long Miao v. Fanhua*,
    442 F. Supp. 3d 774 (S.D.N.Y. 2020)..................................................................26

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
    797 F.3d 160 (2d Cir. 2015)................................................................................40

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
    513 F.3d 702 (7th Cir. 2008) ..............................................................................38

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011)............................................................................................................11

*In re MBIA, Inc., Sec. Litig.*,
  700 F. Supp. 2d 566 (S.D.N.Y. 2010)..............................................................................39

*McIntire v. China MediaExpress Holdings, Inc.*,
  927 F. Supp. 2d 105 (S.D.N.Y. 2013)..............................................................................26

*Medis Inv. Grp. v. Medis Techs., Ltd.*,
  586 F. Supp. 2d 136 (S.D.N.Y. 2008)..............................................................................35

*N.J. Carpenters Health Fund v. DLJ, Mortg. Capital, Inc.*,
  2010 WL 1473288 (S.D.N.Y. Mar. 29, 2010) ...................................................................4

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
  455 F. App'x 10 (2d Cir. 2011) ........................................................................................33

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000).......................................................................................12, 27

*In re Omnicom Grp., Inc. Sec. Litig.*,
  597 F.3d 501 (2d Cir. 2010).............................................................................................40

*Plumbers' Union Local No. 12 Pension Fund v. Swiss Reins. Co.*,
  753 F.Supp.2d 166 (S.D.N.Y. 2010)................................................................................15

*In re Romeo Power Inc. Sec. Litig.*,
  2022 WL 1806303 (S.D.N.Y. June 2, 2022) ...............................................................14, 21

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001)...................................................................................11, 12, 29

*Sec. & Exch. Comm'n v. Hurgin*,
  484 F. Supp. 3d 98 (S.D.N.Y. 2020)....................................................................17, 25, 34

*In re Silvercorp Metals, Inc. Sec. Litig.*,
  26 F. Supp. 3d 266 (S.D.N.Y. 2014).................................................................................33

*Singh v. Cigna Corp.*,
  918 F.3d 57 (2d Cir. 2019)...............................................................................................12

*Skiadas v. Acer Therapeutics Inc.*,
  2020 WL 3268495 (S.D.N.Y. June 16, 2020) ...................................................................37

*Slayton v. Am. Express Co.*,
  604 F.3d 758 (2d Cir. 2010).......................................................................................24, 25

*In re SLM Corp. Sec. Litig.*,
　740 F. Supp. 2d 542 (S.D.N.Y. 2010)................................................................38

*Spitzberg v. Houston Am. Energy Corp.*,
　758 F.3d 676 (5th Cir. 2014) ...........................................................................36

*In re Stillwater Cap. Partners Inc. Litig.*,
　858 F. Supp. 2d at 288 .....................................................................................37

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*,
　531 F.3d 190 (2d Cir. 2008)..............................................................................31

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
　551 U.S. 308 (2007)................................................................................17, 25, 27

*Thomas v. Roach*,
　165 F.3d 137 (2d Cir. 1999)........................................................................26, 27

*In re Vaxart, Inc. Sec. Litig.*,
　2021 WL 6061518 (N.D. Cal. Dec. 22, 2021)..............................................13, 16

*In re VEON Sec. Litig.*,
　2017 WL 4162342 (S.D.N.Y. Sep. 19, 2017)....................................................38

*In re Vivendi, S.A. Sec. Litig.*,
　838 F.3d at 261 ...........................................................................................38, 39

*W. Palm Beach Firefighters' Pension Fund v. Startek, Inc.*,
　2008 WL 879023 (D. Colo. March 28, 2008).....................................................23

*Wallace v. IntraLinks*,
　2013 WL 1907685 (S.D.N.Y. May 8, 2021) ......................................................33

*In re Xcel Energy, Inc.*,
　364 F. Supp. 2d 980 (D. Minn. 2005)................................................................35

*In re XL Fleet Corp. Sec. Litig.*,
　2022 WL 493629 (S.D.N.Y. Feb. 17, 2022)..................................................19, 30

## STATUTES

15 U.S.C. § 77z-2(b)(2)(D)..................................................................................................22

15 U.S.C. § 78u-5(c)(B)(i)...................................................................................................24

John Coates, SPACs, IPOs and Liability Risk under the Securities Laws (Apr. 8,
    2021), https://www.sec.gov/news/public-statement/spacs-ipos-liability-risk-
    under-securities-laws ....................................................................................................22

## OTHER AUTHORITIES

Fed. R. Civ. P. 8.................................................................................................................39

Fed. R. Civ. P. 15(a)(2)......................................................................................................40

*SPACs Proposal*, U.S. Securities and Exchange Commissioner (Mar. 30, 2022),
    available at https://www.sec.gov/news/statement/crenshaw-spac-20220330..........................36

**TABLE OF DEFINED TERMS**

| TERM | Definition |
|---|---|
| ¶¶ | Refers to paragraphs in the complaint |
| Blue Orca | Blue Orca Capital—a short seller analyst firm managed and founded by Soren Aandahl, which published a report on September 28, 2021 concerning Hyzon's purported deals and customers (*Id.* ¶ 40) |
| Complaint | The Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws (ECF No. 34) |
| DCRB | Defendant Decarbonization Plus Acquisition Corporation—a publicly traded special purpose acquisition company formed for the purpose of acquiring a private owned company (here Hyzon) and taking it public (*Id.* ¶ 23). |
| DCRB Defendants | Defendants Anderson, Haskopoulos, and Tichio |
| EV | Electric vehicle |
| Exchange Act | Securities Exchange Act of 1934 |
| HFCEV | Hydrogen-fuel-cell powered electric vehicles (*Id.* ¶ 1) |
| Hiringa | Hiringa Energy (*Id.* ¶¶ 1, 59) |
| HongYun | Shanghai Hydrogen HongYun Automotive Co., Ltd. (*Id.* ¶ 8) |
| Horizon | Horizon Fuel Cell Technologies Ltd.—Hyzon's corporate grandparent, a Singapore-based company purporting to be a world leading developer and manufacturer of various fuel cell electric energy solutions and products, from which Hyzon spun off as an independent entity (*Id.* ¶ 38) |
| Hyzon a/k/a the Company | Defendant Hyzon Motors LLC (*Id.* ¶ 1) |
| Hyzon Defendants | Defendants Knight, Gu, and Gordon |
| Iceberg Research | Activist short seller firm founded by Arnauld Vaugner, best known for its reports on one of the largest commodity trading firms in the world, which published an October 6, 2021 report on Hyzon (¶ 42) |

| IPO | Initial Public Offering (*Id*. ¶ 60) |
| --- | --- |
| Jiushuang | Jiushuang (Shanghai) New Energy Technology Co., Ltd.—the Chinese company with which Hyzon entered into two joint ventures in July 2021 to promote the commercial operation of fuel cell vehicles in the Shanghai, China market (ECF No. 52-2, at 104). |
| Market Cap | "Market cap" or "market capitalization" refers to refers to the total value of all a company's shares of stock, calculated by multiplying the price of a stock by its total number of outstanding shares (for example, a company with 2 million shares selling at $5 a share would have a market cap of $1 million) (*Id*. ¶ 4) |
| MoU | Memorandum of Understanding (*Id*. ¶ 8) |
| MTD | Defendants' Motion to Dismiss (ECF No. 49) and their accompany Memorandum in Support (ECF No. 49-1) |
| Plaintiff | Lead Plaintiff Alfred Miller |
| Preliminary Proxy Statement/ Soliciting Materials | SEC Form PRE 14A is required for all corporations that hold shareholder votes. Also known as a preliminary proxy statement, it discloses all relevant details related to the issues being put forward for a shareholder vote. Hyzon filed such statements containing several of the statements and omissions at issue with the SEC on March 17, May 14, June 4, June 12, June 16, June 21, June 30, and July 12, 2021. (*Id*. ¶ 92) |
| PSLRA | The Private Securities Litigation Reform Act |
| Riverstone | Riverstone Holdings LLP and its affiliates—private equity firm whose affiliates sponsored DCRB up through the SPAC Merger, which was managed by Defendants Haskopoulos and Tichio (¶ 27, 31) |
| SPAC or "blank check" company | A special purpose acquisition company, also known as a "SPAC" or "blank check company" for short, is a shell company listed on a public exchange established for the purpose of raising capital to finance the purchase of an unidentified private company, thus making the acquired company public without going through the traditional initial public offering process Compl. ¶ 1. |

**INTRODUCTION**

This is a federal securities class action concerning Hyzon, a "SPAC"-repackaging of a flailing hydrogen-fuel-cell business covered in a glittering new wrapper of misleading deal announcements, illusory customer contracts, and fantastical financial projections. Prior to Hyzon's SPAC IPO, Defendants represented that the Company had secured "100% certain" multi-million-dollar sale commitments, and were near-securing a number of "high probability" orders, from "blue chip Fortune 100 companies" (including Coca Cola, Ikea, and Heineken) with 2021 delivery dates. ¶¶ 74-107. Defendants' statements ultimately allowed Hyzon—a zero-revenue company peddling its corporate parent Horizon's staid hydrogen-fuel-cell technology—to go public with $626 million in hand and a $2 billion market cap valuation. ¶¶ 68-69. Thereafter, Defendants repeatedly affirmed that Hyzon was on track to achieve lofty 2021 revenue and vehicle delivery targets, including through a 500 vehicle / $250 million agreement with Chinese "logistics" company, HongYun. ¶ 115.

*Defendants' statements were false and misleading*. As revealed through analyst Blue Orca's research, and confirmed by Plaintiff's investigation thereafter: (1) HongYun was a sham Chinese entity formed three days before Hyzon's deal announcement with no ability to pay for the contracted vehicles; (2) Hyzon's second largest "customer," Hiringa—claimed by Hyzon to have signed a "binding" order for 20 vehicles to be delivered in 2021 under a larger, 1,500 vehicle supply agreement—was in fact a small "channel partner" with no obligation, intention, or capability to purchase the volume of vehicles Defendants claimed, ¶¶ 125-28; and (3) the "top tier" Fortune 100 customers and 100% certain commitments Defendants prominently featured in Hyzon' early investor presentations were fake or grossly exaggerated. ¶¶ 129-31.

*The Blue Orca Report is credible*. Defendants' stake much of their MTD on challenging the credibility of Blue Orca's report, faulting it for relying in part on interviews with an

- 1 -

anonymous former Hyzon executive and current Hiringa executive. MTD at 17-18. But Defendants ignore the myriad credible sources corroborating Blue Orca's findings and the witness statements therein. These sources include foreign regulatory filings, public records searches, WeChat, internet, and digital media searches, LinkedIn research, and Hyzon's and Horizon's public filings. ¶ 123. Further, Defendants offer no response to the numerous credible and corroborating sources incorporated throughout the Complaint. *E.g.*, ¶¶ 135-38 (Hyzon's admissions and non-denials to the Blue Orca Report); ¶ 139 (Iceberg Research report), ¶¶ 152-83 (Plaintiff's independent investigation); ECF No. 52-2 (Hyzon's audited 2021 financial results).

*Defendants' misstatements are actionable*. Equally futile are Defendants' contentions that their misrepresentations regarding (1) HongYun, (2) Hiringa, and (3) Hyzon's committed orders are not actionable or pled with particularity. *First*, Defendants' statements concerning HongYun led investors to believe that Hyzon had landed a major new customer that would generate hundreds of millions of dollars. In actuality, HongYun lacked the financial substance to purchase and immediately deploy even one new hydrogen fueled truck, let alone 500. ¶ 123. That Defendants subsequently announced "*deliveries*" through HongYun means nothing. Defendants issued these statements to keep the HongYun charade alive. Despite purportedly turning over 62 vehicles to HongYun, Hyzon awarded HongYun 2 million stock warrants for the purchase and has since recognized little to no revenue on its deliveries. This confirms HongYun was a sham.

*Second,* that Defendants never expressly referred to Hiringa as the ultimate end user of the vehicles is irrelevant. MTD at 35. Throughout the Class Period, Defendants misleadingly conveyed the impression that Hiringa was paying for, and taking title over, Hyzon HFCEVs by falsely describing Hiringa as the maker of a "binding" order of 20 vehicles to be delivered in 2021. ¶¶ 89-92. Hiringa's true status as a "channel partner" with no responsibility, plan, or

means to purchase Hyzon's trucks flatly contradicted Hyzon's claims. ¶¶ 125-28. Moreover, Defendants do not dispute the Hiringa-"facilitated" orders were far from binding, as they were subject to undisclosed preconditions, including validation trials and hydrogen infrastructure buildouts which would not occur, at the earliest, until the latter half of 2022. ¶¶ 125-28, 137.

*Finally*, Defendants contend they are immune to claims based on Hyzon's represented relationships with certain blue-chip customers, projected deliveries, and guided revenues because they warned investors elsewhere in their public filings that Hyzon's vehicle delivery projections included "non-binding MOUs" that "may not be converted into binding orders or sales." MTD at 20. But these boilerplate risk disclosures were inadequate, as they failed to warn that the name brand customer relationships with "100% certain" or "highly probable" orders were illusory, and that the delivery and revenue targets Defendants claimed they were on track to meet were based on fabricated customers and phony agreements—facts Defendants knew at the time. ¶¶ 199-218.

*Defendants acted with scienter*. Defendants dismiss the Complaint's allegations concerning their knowledge and recklessness as "nothing more than hindsight." MTD at 3. But this overlooks Defendants' admitted knowledge, their personal involvement in the vetting and negotiation of the deals in question, and their egregious refusal to "see the obvious." *See Chill v. Gen. Elec. Co.*, 101 F.3d 263, 269 (2d Cir. 1996). Further, Plaintiff's motive allegations are hardly "generic." MTD at 30-32. Each DCRB Defendant was driven to make the alleged false statements as part of their SPAC gamble—to receive hundreds of millions of dollars of Founder Shares at an extreme discount if they could persuade shareholders to approve the merger, or to lose their Founder Shares in their entirety should the merger fail. Mar. 17, 2021 Proxy Statement (ECF No. 52-3 at 3). As to the Hyzon Defendants, the Complaint details how (1) Hyzon's status gave them a motive to lie to complete the merger to receive cash necessary for Hyzon to

continue operations, ¶¶ 244-47; and (2) the Hyzon Defendants held millions in securities that would become publicly tradeable Hyzon stock following the expiration of a lock-up period. ¶¶ 248-50. As such, the Hyzon Defendants possessed tremendous incentive to keep Hyzon's stock price artificially inflated long enough for the lock-up to expire in January 2022.

*Loss causation*. Finally, Hyzon's boilerplate risk disclosures similarly do not negate Plaintiff's clear showing of loss causation. That Hyzon could potentially face the risk it might not achieve revenue targets was not a secret. However, "[t]he disclosures fail[ed] to make clear the magnitude of the risk" which Defendants knew Hyzon faced. *N.J. Carpenters Health Fund v. DLJ, Mortg. Capital, Inc*., 2010 WL 1473288, at *6 (S.D.N.Y. Mar. 29, 2010). What Defendants knew and investors did not was that: (i) Hyzon's largest customer was a fake shell entity; (ii) Hyzon's next largest customer was not really a customer, but a channel partner from which the Company would earn no revenue; and (iii) Hyzon had used phantom big-name customers to overstate orders and financial projections. Immediately after these concealed risks were revealed, Hyzon's stock declined sharply, injuring investors. Accordingly, the MTD should be denied.

## SUMMARY OF THE COMPLAINT

### A.     Hyzon's Origins—A Corporate Parent with No Demand for its Technology

Hyzon —a developer and seller of HFCEVs—was founded in January 2020, when Defendants Knight and Gu, the then-current and former CEOs of Hyzon's corporate parent Horizon, spun-off Horizon's commercial vehicle unit. ¶ 56. At the time of the spinoff, Horizon was in dire financial straits. ¶¶ 48-53. By late 2019, Horizon's fuel-cell sales and free cash flow imploded when its major customer, responsible for nearly 75% of Horizon's fuel-cell sales, defaulted. *Id.* As a result, Horizon de-registered from the Chinese stock exchange. ¶¶ 53-55. Using Horizon's dwindling reserves, Knight and Gu created Hyzon, planning to resell Horizon's commercial vehicle operations in American, European, or Oceanic markets. ¶¶ 56-57.

**B.       Hyzon Defendants Find Their Blank Check Savior**

To attract outside investment, the Hyzon Defendants developed a compelling, yet misleading, narrative about their ability to leverage Horizon's purported commercial success. ¶¶ 60-67. By February 9, 2021, their gambit had paid off. On that day, Hyzon announced it would go public by merging with DCRB in a deal valuing the repackaged hydrogen fuel cell distributor at over $2 billion—more than 10x Horizon's last reported market cap. ¶¶ 68-69.

As a SPAC, DCRB had been created by Defendants Anderson, Haskopoulos, and Tichio, who served as DCRB's CEO, CFO, and Chairman, respectively, for the sole purpose of raising investor capital to acquire an operating business. ¶¶ 26-27, 31, 65-67, 71, 93, 102-04. Through its October 2020 IPO, DCRB had raised $200 million for a prospective acquisition. ¶¶ 65-67. Thereafter, DCRB had eighteen months (i.e., until March 2022) to complete a qualifying business combination. *Id.* If DCRB failed to do so, it would have to wind up its affairs and return investors' money, and the substantial ownership interests held by Defendants Anderson, Haskopoulos, and Tichio, either personally or through investment vehicles, would become worthless. ¶ 60; *see also* Mar. 17, 2021 Proxy Statement (ECF No. 52-3, at 174-75).

**C.       Hyzon's False and Misleading Representations Allow It to Go Public**

Throughout the first half of 2021, Hyzon had no actual vehicle sales and generated no revenue. ¶¶ 4-5, 14, 109. Approval of the merger thus depended on Defendants convincing shareholders of Hyzon's promise. ¶¶ 4-5. To that end, Defendants generated enthusiasm by emphasizing Hyzon's growing back log of "contracted orders" and top tier customers, selling investors on the idea that Hyzon could generate almost $2 billion in five years. ¶¶ 73-80. In the more-near term, Defendants repeatedly claimed that Hyzon would deliver 85 vehicles and earn nearly $40 million in revenue in 2021 from its purportedly confirmed customers and orders. *Id.*

To legitimize these sales and revenue promises, Defendants included logos of several Fortune 500 companies in their investor presentations, which Hyzon claimed were top tier customers that would contribute $700 million in revenue over the next 5 years. ¶¶ 73-80. Hyzon also went so far as to include a global map of its top "customer deployments under way," falsely listing blue chip companies like Heineken, Coca Cola, and Ikea as end users who were in the last stage of finalizing multi-million-dollar purchases with 2021 deliveries. ¶¶ 74-77. Notably, these presentations projecting 85 vehicles delivered and nearly 40 million in revenue in 2021 did not include any planned sales to China-based end users – Horizon's existing market. ¶¶ 73-80.

The DCRB Defendants validated Hyzon's pitch. The DCRB Defendants told shareholders that they had done extensive due diligence on Hyzon. ¶¶ 71, 91 n.51, 93, 99 n.57, 102-04.  In recommending shareholder approval of the merger, Defendant Tichio assured investors that DCRB had vetted Hyzon's customers and its sales backlog, claiming the Company had "a sales pipeline for 2021 that [wa]s 100 percent under contract or MOU, providing real runway visibility, and its customers include some of the most recognizable global brands." ¶ 71.

Defendants further publicized massive "binding purchases" with New Zealand startup, Hiringa, which Hyzon claimed had placed a "binding order" for 20 trucks to be delivered before the end of 2021 (24% of Hyzon's 2021 projected deliveries), as part of a larger, 1,500 vehicle supply agreement. ¶¶ 89-92. These "top tier customers" and "certain orders" generated considerable enthusiasm for Hyzon, with media outlets highlighting the Company's relationship with the major brands and Hyzon's sizable deal with its "customer" Hiringa. ¶¶ 90, 93, 111-12.

In the months between the merger's February 2021 announcement and July 2021 closing, however—when several EV SPACs like Lordstown, Nikola and XL Fleet were outed for faking customer orders and exaggerating their books of business—Defendants surreptitiously removed

name-brand customers like those identified above from Hyzon's subsequent investor presentations. ¶¶ 81-87. In one instance, Hyzon's edits were so rushed that they used the logo of FrieslandCampina—a Hyzon customer that purchased only one vehicle in 2021—twice to fill the noticeable white-space gap. ¶ 97. Yet despite dropping blue chip customers that were purportedly "finalizing" or had "highly probable" 2021 purchase orders totaling more than $700 million in future revenue, Hyzon did not decrease its sales or revenue projections. ¶ 86. Instead, in its April 2021 communications, Hyzon doubled down on its claim that it would deliver 85 vehicles in 2021 and increased its 2021 revenue forecast to $55 million. ¶ 95.

On July 17, 2021, relying on Defendants' false and misleading claims, DCRB shareholders approved the $2.6 billion merger with Hyzon, raising nearly $630 million for the cash-strapped company. ¶ 106. The SPAC IPO also granted millions of dollars in "locked up" stock and stock options to insiders, including each of the DCRB Defendants and Hyzon Defendants, held personally or through their investment funds. ¶¶ 248-49; *see also* Mar. 17, 2021 Proxy Statement (ECF No. 52-3, at 15-16); Gordon Form 3 & 4 ECF No. 52-4).

### D.    Defendants Fill Hyzon's Delivery Gap with a Previously Unannounced Deal with a Sham Chinese Purchaser, HongYun

By September 2021, Hyzon had only delivered two of the 85 promised vehicles for the calendar year. ¶ 113. Desperate, Defendants made their biggest gambit yet: on September 9, 2021, they issued a press release announcing that they had signed a memorandum of understanding with a Chinese logistics company, HongYun, an entity never mentioned in Hyzon's previous deal announcements, for the sale of 500 vehicles. ¶¶ 114-16. In doing so, Hyzon represented that HongYun's "core team" had "solid operation[al] experience" in "leasing," "maintenance," and logistics, and that, under the MoU, it expected to deliver 100 vehicles (a number greater than its total 2021 projections of 85) to HongYun by the end of 2021.

- 7 -

¶ 116. On news of this mega deal, worth up to $250 million, investment analysts grew increasingly bullish, and Hyzon's stock shot up nearly 30% in a single trading day. ¶ 117-18.

Unbeknownst to investors: HongYun was a sham customer established just three days before the deal announcement. ¶¶ 123, 160. The shell company had zero paid-in capital (i.e., capital that shareholders have actually paid into a corporate bank account). ¶ 162. It had no physical office or working contact information. ¶¶ 166-69. It had no salaried employees. ¶¶ 182-85. It had no digital presence, including WeChat (a de facto prerequisite for doing business in China). ¶¶ 179-81. It had no hydrogen-fuel-cell, maintenance, or leasing operations. ¶¶ 170-78. Neither HongYun nor its individual shareholders had any business connections to hydrogen-fuel-cell end users. ¶¶ 186-88. Put simply, HongYun lacked the financial substance, infrastructure, and track record to purchase or deploy anywhere close to 100 new HFCEVs. ¶¶ 189-93.

E.      **The Truth Emerges—Publication of the Blue Orca and Iceberg Research Reports**

The truth about HongYun and Hyzon's other misrepresentations began to emerge on September 28, 2021, when Blue Orca, a short seller, published a report on Hyzon's purported deals and customers. ¶¶ 121-32. In addition to disclosing HongYun's origins, Blue Orca revealed that it had interviewed a Hiringa senior executive, who reported that the company was not a customer, but rather a "channel partner" with no binding obligations to purchase vehicles and no expectations to take delivery of any Hyzon vehicles for third-party purchasers until at least mid-2022. ¶¶ 124-28. The Report further contended that: Hyzon's dropped big-name customers (*e.g.*, Coca-Cola, Heineken) were "phantom customers;" and Hyzon's financial projections were "pure fantasy." ¶¶ 129-30. The Report supported these claims with excerpts from Blue Orca's interview with a former Hyzon senior executive who left Hyzon, in part, because of the Company's misrepresentations regarding its purportedly committed sales deals. ¶ 129.

The revelations in the Blue Orca Report caused Hyzon's shares to plummet, declining 28% in a single trading day. ¶ 133. A week later, with Hyzon's stock price still depressed, Hyzon responded to Blue Orca's purportedly "misleading and inaccurate claims." ¶ 135. But the Company's response did nothing to restore investor confidence. ¶ 140. This is because Hyzon's response made key admissions or non-denials of Blue Orca's principal conclusions. *See* ¶ 136. The Company conceded that HongYun was a newly created "special purpose entity" that was established and had entered into a MoU with Hyzon over a two-week period. *Id.* The Company also did not deny any of Blue Orca's other findings regarding HongYun's background and lack of resources. *Id.* Nor did Hyzon dispute the identity of HongYun's shareholders. *Id.* Further, Hyzon conceded that Hiringa was a channel partner, not a customer. ¶ 137.

In the following days, a second analyst, Iceberg Research, issued its own report agreeing with Blue Orca's findings. ¶ 139. Additionally, Iceberg Research revealed new information about how Hyzon exaggerated Horizon's historical sales and fuel cell superiority. This second short seller report caused Hyzon's stock to fall nearly 8% in one day. ¶ 140.

**F.    Disclosure of an SEC Investigation and Dismal Expected Financial Performance**

The truth about Hyzon's fabricated pre-merger-touted deals and phantom blue-chip customer base was fully revealed on January 12, 2022, when Hyzon issued an update on its 2021 deliveries and financial expectations. ¶ 148. The Company stated that it "anticipate[d] [its] 2021 financial results" would be "materially lower than forecast revenues and margins," even though it purportedly delivered 62 vehicles to HongYun and 87 vehicles in total for 2021 (two more than its projected target). *Id*. Hyzon also disclosed that it had received a subpoena from the SEC demanding documents and information concerning Blue Orca's claims. ¶ 149. This news caused Hyzon's stock to fall nearly 23% in a single trading day. All told, Hyzon's stock lost over $3.4 billion in shareholder value, down nearly 75% from its Class Period high. ¶¶ 16, 150-51.

G.    **Lead Plaintiff's China-Based Investigator Confirms HongYun's Lack of Business Operations and Ability to Purchase Vehicles**

Lead Plaintiff's China-based investigator uncovered additional information about HongYun's utter lack of financial substance, operating footprint, infrastructure, and track record, including that: (1) HongYun lacks any actual capital; (2) HongYun has no physical office, as confirmed by site visits, ¶¶ 166-69; (3) HongYun has only two individual shareholders, both of which lack sufficient capital and relevant business experience, ¶¶ 179-85; (4) HongYun has no salaried employees, *id.*; (5) HongYun lacks the infrastructure and operational footprint to conduct the day-to-day sales, marketing, or leasing services claimed by Defendants, ¶¶ 166-85; and (6) HongYun is not legally able, given its present lack of paid-in capital, to obtain a license to lease vehicles or to compete in public tenders for contracts with state-owned enterprises. ¶¶ 189-93. Given these facts, Plaintiff's independent investigator concluded HongYun simply could not have purchased the vehicles Hyzon claims without undisclosed Hyzon financing. ¶¶186-88. Rather, the most plausible inference is that Defendants aided HongYun and trumped-up bogus deals to plug Hyzon's significant deliveries gap and pump up Hyzon's stock. ¶ 265.

H.    **Hyzon's Financial Recent SEC Disclosures Further Confirm Hyzon's Fraud**

Hyzon's audited 2021 financial statements further support the inference HongYun is a sham. On March 23, 2022 (two days after the Complaint's filing), Hyzon reported only $5.1 million in revenue for 4Q 2021, and a total of only $6.0 million for 2021, despite its purported 62-truck delivery to HongYun. Hyzon 2021 Financial Update (ECF No. 52-5, at 1; ECF No. 52-6, at 19).[1] One week later, on March 30, 2022, the Company further conceded in its 2021 Annual Report several new and previously undisclosed facts about its 2021 vehicle deliveries, including:

---

[1] It is well within the Court's province to take judicial notice of Defendants' post-Complaint SEC filings in its sufficiency review, particularly to the extent they supplement the Defendants' prior corrective disclosures. *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).

- On November 23, 2021—two weeks after Hyzon's required 3Q21 regulatory filings, and days before Hyzon would make its first delivery to HongYun—the Company entered into a warrant agreement with a HongYun subsidiary allowing the subsidiary to purchase up to two million shares of Hyzon stock, at an exercise price of $7.75 per share (the per share closing price of Hyzon's stock that day). ***Put differently, Hyzon had secretly awarded HongYun stock options potentially worth millions for purchasing its HFCEVs.*** Hyzon 2021 Annual Report (ECF No. 52-2, at 113).

- In December 2021, Hyzon China sold and delivered 20 HFCEVs to its joint venture partner Jiushuang, for which Hyzon has only been allowed to recognize $100,000 in revenue. *Id.* at 115. ***As such, Hyzon disclosed that of its 87 deliveries in 2021 originally marketed to investors as sales to America, European, and Oceanic markets, only 5 of 87 apparently went to parties located outside of China (62 to HongYun and 20 to Jiushuang)***. Additionally, Hyzon newly disclosed that it had entered into joint ventures with Jiushuang in July 2021—around the same time Defendants persuaded shareholders to approve the SPAC Merger—a fact unknown to shareholders at the time. *Id.* at 104.

- Although Hyzon reportedly delivered 87 vehicles for a contract value of $19.6 million (nearly half of its projected ~$40 million target for 85 vehicles delivered), the Company could not recognize full contract values on delivery due to collection concerns raised by its independent auditor (KPMG). ***In other words, Hyzon's auditor forbade Hyzon from booking revenue with HongYun and Jiushuang due to Hyzon's inability to collect from the sham entity and Hyzon's self-dealing.*** *Id.* at 100.

Plaintiff intends to allege these allegations, as well as any other newly revealed fraud by Defendants, in subsequent amendments to the Complaint.

## ARGUMENT

To state a Section 10(b) claim, a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011). Here, Defendants only challenge falsity, scienter, and loss causation.

## I.    THE COMPLAINT SUFFICIENTLY ALLEGES THAT DEFENDANTS MADE MATERIAL MISSTATEMENTS AND OMISSIONS

To adequately allege the falsity of Defendants' statements and material omissions, a plaintiff need not plead "detailed evidentiary matter," *In re Scholastic Corp. Sec. Litig.*, 252 F.3d

63, 72 (2d Cir. 2001), but merely facts sufficient "to support a reasonable belief" that defendants' statements were materially false or misleading. *Novak v. Kasaks*, 216 F.3d 300, 314 n.1 (2d Cir. 2000). Whether a statement is misleading is "evaluated not only by 'literal truth,' but by 'context and manner of presentation.'" *Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019). Here, Defendants made actionable misstatements or omissions regarding: (1) HongYun; (2) Hiringa; and (3) Hyzon's illusory customers and arbitrary sales pipeline for fiscal year 2021. Defendants' arguments for dismissal fail to carry their burden for any of these categories of statements.

## A.    Defendants' Statements Regarding HongYun Are Actionable

Defendants contend that the Complaint fails to plead an actionable claim regarding HongYun on two grounds. First, they argue that the Complaint lacks particularized factual allegations showing that HongYun was a fake company incapable of making legitimate vehicle purchases. MTD at 24. Second, Defendants contend that their statements concerning HongYun's "core team" are inactionable puffery. MTD at 27-28. Both arguments rest on a myopic reading of Plaintiff's allegations, and neither has merit.

***As an initial matter***, Defendants ignore the breadth and detail of the ***many*** alleged false and misleading statements and omissions they made regarding Hyzon's purported deal with HongYun. Such statements not only misled investors regarding (1) the number of vehicles that HongYun purportedly purchased, but also, as to HongYun's (2) origins, (3) operations, (4) track record, and (5) counterparty risk (*i.e.*, its ability to pay). ¶¶ 232-42. For example, in announcing Hyzon's incredible deal with HongYun, Defendants described the three-day old purchaser as an established logistics solutions company with HFCEV-related "operation, leasing[,] and maintenance" expertise. *Id*. ¶ 115, 160. Additionally, Defendants hailed HongYun's "core team's" "solid operation experience," "master[y] (sic) the real time vehicle data management," and "deep cooperation with several large logistics groups in China." ¶ 116 (list omitted).

These representations falsely portrayed HongYun as a well-established logistics company with sufficient operating footprint, infrastructure, and track record to purchase and deploy 500 new hydrogen fueled trucks. In truth, however, HongYun was a sham, shell counterparty with no reported affiliations with any credible logistics business, ¶¶ 186-88; no paid-in capital for operations, ¶¶ 162-65; no salaried employees, ¶¶ 182-85; no physical office or working contact information, ¶¶ 166-69; and no web presence on the internet or on popular social media platforms in China, including WeChat, ¶¶ 179-81. Furthermore, HongYun's "core team"—consisting of its primary shareholder of record (a distributor of European paint supplies) and a newly installed minority shareholder—had no relevant business experience in "vehicle data management" nor business relationships with hydrogen-fuel-cell-related industries. ¶¶ 170-76. Defendants cannot credibly contest that the omission of these undisclosed facts materially misled investors. *See In re Vaxart, Inc. Sec. Litig.*, 2021 WL 6061518, at *4 (N.D. Cal. Dec. 22, 2021) (holding that vaccine developer's press releases announcing MOU partnership to manufacture and distribute one billion vaccines was misleading, where in actuality, partner organization lacked the capacity, personnel, and wherewithal to produce even one dose of vaccine).

Nor can Defendants dispute that their subsequent statements and omissions about HongYun after the Blue Orca's Report's publication are actionable. After Blue Orca put HongYun's legitimacy front and center, Defendants obfuscated on HongYun's true nature to keep the charade alive, stating that the sham entity would generate significant long-term revenue for Hyzon. ¶ 136. In their October 5, 2021 Response to Blue Orca, Defendants conceded that HongYun was formed just days before Hyzon issued its September 9, 2021 press release, but then claimed, for the first time, that HongYun was a "special purpose entity"—that is, a device used by corporations to create ostensibly independent legal entities. *Id.* As Plaintiff's

investigation confirmed, this characterization was also materially misleading, as HongYun has no official corporate backing—only two individual shareholders with limited registered capital to their names and known business connections. ¶¶ 170-76. Still, Hyzon continued to emphasize its receipt of major purchase orders from HongYun and deliveries of those vehicles, without disclosing HongYun's immense counterparty risk. ¶¶ 160-65.

Tellingly, the MTD focuses on just two subsets of Plaintiff's lengthy HongYun allegations—specifically (1) whether or not Hyzon actually delivered HFCEVs to a legitimate end purchaser through HongYun, MTD at 24, and (2) whether statements concerning HongYun's "core team" are inactionable puffery, MTD at 28—thereby disregarding the full scope of Plaintiff's claims concerning HongYun's operation, experience, **_and_** ability to pay. Defendants' motion thus fails right out of the gate. *See In re Romeo Power Inc. Sec. Litig*., 2022 WL 1806303, at *3 (S.D.N.Y. June 2, 2022) (denying entire motion to dismiss where plaintiffs had sufficiently alleged that at least one of fourteen alleged misstatements was false or misleading).

But even if Defendants' arguments were entertained, they nonetheless fail. ***First***, despite Defendants' assertion to the contrary, the fact that Hyzon issued a self-serving press release regarding a HongYun-involved delivery, in the aftermath of the Blue Orca and Iceberg Research Reports, does nothing to undermine the allegations that HongYun is a sham. As discussed above, no independent media reports corroborate HongYun's role in the purported purchase. ¶¶ 186-88. Further, Hyzon's audited 2021 financial statements refute Defendants' self-serving press release claiming to have sold vehicles through HongYun. Though Hyzon reported the delivery of 87 vehicles (67 of which were purportedly through HongYun), Hyzon's auditor did not allow Defendants to recognize revenue on the delivered vehicles' contracted value, given HongYun's inability to pay. *See* Background, Part H, *supra*, at 10. Hyzon has also since disclosed that, one

week before its delivery to HongYun, it indirectly granted the company 2 million warrants for Hyzon stock. *Id.* Accordingly, whether or not Hyzon delivered any vehicles to a Chinese end-user is beside the point if Hyzon cannot generate any economic benefit from HongYun. *See Plumbers' Union Local No. 12 Pension Fund v. Swiss Reins. Co.*, 753 F.Supp.2d 166, 180 (S.D.N.Y. 2010) ("Once a party chooses to speak, . . . it has a 'duty to be both accurate and complete.'" (quoting *Caiola v. Citibank, N.A., N.Y.*, 295 F.3d 312, 331 (2d Cir. 2002))).

**Second**, Defendants' statements regarding whether or not HongYun had any operations or any experience are representations of verifiable fact, not reputational opinion, which a reasonable investor would rely upon in making an investment decision. *See, e.g.*, *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 647 (S.D.N.Y. 2017). For a commitment the size of HongYun's (500 trucks for $250 million), investors would expect the counterparty would need to be a deep-pocketed and well-established logistics company with sufficient operating footprint, infrastructure, and track record to purchase and immediately deploy 100 of these trucks in one quarter, and the remaining 400 in 2022. ¶ 115. To give investors this impression, Defendants falsely described HongYun's business, ¶ 116 ("provid[ing] operation, leasing and maintenance service for customers across [China]"); its personnel's track record, *id.* ("the core team of the company has solid operation experience and master the real time vehicle data management"); and purported business contacts through which it could sell vehicles, *id.* ("a deep cooperation with several large logistics group in China including [list of companies]"). As demonstrated in the government records, official business databases, and in-person site visits, HongYun had no credentials or HFCEV-logistics-related track records whatsoever. ¶¶ 159-93. Thus, even if the qualitatively subjective aspects of some statements could be seen as puffery in isolation (e.g., *solid* experience), when viewed in the context of the totality of Defendants'

representations, the statements became actionable misrepresentations by heralding HongYun—

Hyzon's most material sales arrangement to date—as having any track record, experience,

location, or employees whatsoever, when it did not. *See Vaxart, Inc. Sec. Litig*., 2021 WL

6061518, at *4; *CFTC v. McDonnell*, 332 F.Supp.3d 641, 718 & 721 (E.D.N.Y. Aug. 23, 2018)

(judgment against defendant claiming to have a "track record . . . experience and expertise with

virtual currency," because a "reasonable investor would find it important to know if the firm he

had entrusted his funds to was only a one-man boiler room in Staten Island that did not have a

prestigious Wall Street address, virtual currency expertise, or multiple employees").

## B.    Statements Regarding Hiringa Are Actionable

For Plaintiff's Hiringa claims, Defendants simply contend that none of their

misstatements or omissions regarding the New Zealand start-up's "binding orders" were actually

false or misleading. MTD at 22. Again, their argument fails to recount the full factual record.

Throughout the Class Period, Defendants repeatedly held out Hiringa as a "top tier

customer" and committed direct purchaser that would receive 20 of Hyzon's 85 projected 2021

HFCEV deliveries. For example, on Hyzon's Feb. 17, 2021, Defendants announced that "Hyzon

[had been] commissioned to build and *supply Hiringa*" with HFCEVs, "the first batch of

vehicles . . . expected to enter service in New Zealand by the end of 2021," and also published a

tweet describing the deal as "an agreement for the build and supply of up to 1,500 hydrogen fuel

cell-powered trucks *to New Zealand's Hiringa Energy* by 2026." ¶¶ 89-90. Likewise, in

Hyzon's Mar. 17, 2021 Proxy Statement, Defendants similarly told investors that "*Hiringa ha[d]*

*placed* a binding order for the first 20 trucks." ¶¶ 91-92.

In each of these statements, Defendants characterized Hiringa as the purchaser of the

purported binding 20-vehicle agreement. But in truth, Hiringa was a channel partner, not a

customer, for Hyzon vehicles. ¶ 125. Indeed, a Hiringa executive confirmed: Hiringa had no

- 16 -

intention to ever pay for or take title over Hyzon's trucks, but merely act[ed] as a conduit to encourage other New Zealand heavy truck operators to purchase trucks from Hyzon, *Id.* ¶ 125-28; Hiringa had made no "binding order;" ¶ 126; and when claiming it was "100%" certain Hyzon would deliver 20 vehicles to Hiringa in 2021, Defendants knew ***Hiringa's "sales" were first subject to a testing and validation round*** to be carried out between March and June 2022 at the earliest. *Id.* ¶ 128; *see also Sec. & Exch. Comm'n v. Hurgin*, 484 F. Supp. 3d 98, 111 (S.D.N.Y. 2020) (holding that in announcing three-year deal with corporation's biggest customer, the CEO omitted material facts about the corporation's relationship with the customer, including that the corporation only had an oral agreement, which had been terminated and could negatively impact the corporation's ability to recognize revenue from the customer).

That Hyzon disclosed Hiringa's relationship to TR Group in its October 2021 response to the Blue Orca Report is irrelevant. MTD at 23. That disclosure occurred ***after their fraud had been partially revealed.*** *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007) (declining to credit Defendants' disclosure after the fraud was revealed). Likewise, Defendants scattered references to "partners" or other "fleet operators" buried in its press releases concerning Hiringa similarly fails to cure the overall misleading impression created by the full context of their misleading statements and omissions about Hiringa. MTD at 22.

**C.      Statements Regarding 100% Certain and Highly Probable Orders Are Actionable**

Defendants contend that Plaintiff's claims regarding Hyzon's purportedly committed orders and "top-tier" customer base are inactionable on sufficiency and PSLRA-safe harbor grounds (which Plaintiff addresses in Part D below). MTD at 20. For their sufficiency-styled attack, Defendants argue that the Complaint offers no factual support for the assertion that Hyzon "did not have any pre-orders and instead had non-binding [MoUs]." MTD at 20. Additionally, they assert that the Complaint pleads no facts suggesting that Hyzon improperly

counted orders. *Id.* at 21. Yet again, Defendants understate the full scope of Plaintiff's claims and the extent their misstatements and omissions materially misled investors.

Throughout the Class Period, Defendants sought to earn credibility with investors by promising a "committed sales pipeline" comprised of "100% Certain" and "High Probability . . . (70%)" orders from blue-chip Fortune 100s and municipalities, totaling nearly $40 million for 2021 alone. ¶¶ 69-70. In Company press releases, investor reports, and public statements, Defendants claimed that these logos and sales commitments reflected the rapidly accelerated demand for its product. ¶ 75. Further, they stressed that Hyzon's 2021 deliveries uniquely distinguished its business from its EV competitors and cited this committed sales pipeline as a primary driver for the Company's hefty $2 billion enterprise evaluation. ¶ 70. Defendants repeated their committed order and revenue claims directly alongside logos of purported name-brand customers like Heineken and Ikea, lending credit to their other sales claims. ¶ 75. Further, Defendants repeatedly published maps of purported 2021 customer deployments to specific "customers," which if added up, totaled nearly $40 million in sales in 2021.[2] *Id.*

As discussed above, in the months between the February 2021 SPAC-merger announcement and the July 2021 merger closure— the same time that EV SPAC Lordstown was outed for faking customer orders and exaggerating its book of business—Defendants surreptitiously began to scrub several reported "blue-chip" customers from the Company's investor materials and presentations. ¶ 8, 81-87. Without explanation or acknowledgment,

---

[2] Defendants' statements thus suggested to investors that the Company rationally formed its 2021 revenue and delivery targets using these established customers and orders. ¶ 70. These statements were materially false and misleading, however, because they failed to disclose, among other things, that Hyzon did not have the "binding" or "100% certain" 2021 orders from the blue chip, Fortune 100 companies it was featuring as top-tier customers. In addition, Hyzon materially overstated its pipeline and committed orders by exaggerating the probability of sales opportunities and customer interest.

purported customers including Heineken, Ikea, and Nestle were removed from the Company's disclosures altogether. *Id.* When Defendants edited Hyzon's April 2021 investor presentation to remove vehicle customer logos it could no longer credibly claim, the Company even used the logo for Friesland twice to disguise the fact it had removed so many name-brands. ¶ 97. And in changing its customer roster, Defendants also repeatedly failed to disclose the significant risks that made it likely it to miss its end of year target—the repeated claim Hyzon would earn ~$40 million and deliver 85 vehicles, respectively, in 2021. *Id.* ¶ 55; *see also In re XL Fleet Corp. Sec. Litig.*, 2022 WL 493629, at *5 (S.D.N.Y. Feb. 17, 2022) (finding that defendants' statements about vehicle manufacturer's exaggerated sales pipeline, revenue projections, and state of negotiation purported customers were false and actionable).

Defendants nevertheless contend that Plaintiff's case is far narrower, and that, under their shifted goal lines, Plaintiff has failed to plead an actionable claim. But their arguments do not carry the day. *First*, Defendants falsely assert that Hyzon's presentations "were clear that the logos represented '[c]ustomers [who] were at various stages of contract negotiations, not all subject to binding purchases.'" MTD at 21. But Hyzon's presentations went much further. For each logo, Hyzon gave detailed accounts of the state of negotiations. ¶¶ 75-78. For example, for Heineken (later "anonymized" as a "global brewer" headquartered in Northern Europe), Hyzon represented to investors in its presentations that it was "finalizing" a purchase order under which five HFCEVs would be delivered in 2021. ¶ 75. No such purchase order materialized. ¶¶ 14, 113. Likewise, for Ikea (later "anonymized" as a "leading retailed" headquartered in Northern Europe), Hyzon represented to investors that it was "finalizing" a contract under which two HFCEVs would be delivered in 2021. ¶ 75. Again, no vehicles were reported delivered.

While Defendants' argument might be persuasive if one or two near-finalized contracts fell through, that is not the case here. Again, out of Hyzon's many touted 100% certain and high probability customer deployments for 2021—all sourced outside of Asia, ¶ 78—Hyzon delivered on only a 1-vehicle deal. And at least one senior Hyzon executive left the company, in part, because of discomfort with how Hyzon represented its sales pipeline to the public. ¶ 130. Given these facts, Hyzon's self-serving response to the Blue Orca Report, in which it represented that it has remained in discussions with potential customers, is neither persuasive nor compelling evidence that Defendants did not embellish Hyzon's customer relations and orders. MTD at 21 (citing Hyzon's October 5, 2021 response to the Blue Orca Report as exculpatory evidence to Plaintiff's claim). When read in the context of Defendants' other statements regarding Hyzon's "committed sales pipeline" and the nature of "100% certain" and high probability orders, reasonable minds would find that the Company's statements were misleading. *See Diversified Cap. Invs., Inc. v. Sprint Commc'ns, Inc.*, 2016 WL 2988864, at \*4 (N.D. Cal. May 24, 2016) (defendant's self-serving press release cannot be credited over complaint's falsity allegations, especially where plaintiff alleged defendants were dishonest in that press release).

**Second,** despite Defendants' contentions to the contrary, MTD at 20, the Complaint also shows with particularity how Hyzon could not have the committed orders the Company proudly proclaimed. In particular, the Complaint compiles detailed reports on Hyzon's actual 2021 deliveries from Hyzon's public statements. ¶¶ 14, 113. Those reports show that by August 2021, after crediting all of Hyzon's press releases confirming future 2021 deliveries (including 20 vehicles to Hiringa, *see* Part B, *supra*, at 16), the Company was still 40 vehicles short of its 2021 commitments. Defendants would have the Court believe that the remainder of the "committed" 2021 orders Hyzon stated in its pre-merger materials magically fell apart. Further, they would

have the Court ignore the allegations that Hyzon itself surreptitiously removed order information and logos of prominent logos from its investor materials without informing investors. ¶¶ 81-97.

Additionally, the Complaint shows that, even though Hyzon exceeded its projected delivery target for 2021—62 of its 87 vehicle deliveries consisted not of purchases from Hyzon's originally represented committed customer base, but by the 11th-hour shell purchaser HongYun. As a result of this suspicious deal—for which HongYun was given 2 million warrants for its purchases—and Hyzon's self-deal for 20 vehicles with Jiushuang, Hyzon recognized less than $6.0 million in revenue for its purported 2021 sales, *see* Background, Part H, *supra* at 10, well short of the $40 million it would have earned under its originally touted customer deployment plans. *See Scholastic Corp. Sec. Litig.*, 252 F.3d at 72 ("post-class period data may be relevant to determining what a defendant knew or should have known during the class period").

If Hyzon had committed orders, totaling ~$40 million in revenue, from the name brand companies featured in its pre-merger investor materials, it would defy all business logic for the Company to eschew those orders for meager-revenue transactions with HongYun and others. Defendants argue that a non-fraudulent inference for revenue shortfall was Defendants failure to predict supply disruptions. However, Defendants' purported failure to predict supply disruptions does not provide any basis for Hyzon deceiving investors into believing they had finalized or were in advanced contract negotiations with blue chip companies, or hiding its various dealings in China. *See Romeo Power Inc. Sec. Litig.*, 2022 WL 1806303, at *5 (rejecting failure to predict supply chain disruptions as non-fraudulent inference for overstating available suppliers).

**D.     PSLRA Safe Harbor Does Not Protect Defendants' Statements**

Defendants contend that a handful of statements regarding delivery and revenue targets are inactionable as protected forward-looking statements under the PSLRA or the "bespeaks caution doctrine." MTD at 24-27. Again, they construe Plaintiff's claims too narrowly.

- 21 -

*As an initial matter*, the PSLRA's safe harbor applies only to forward-looking statements accompanied by meaningful cautionary language and made without knowledge that they are false or misleading. It does not free Defendants from liability for their numerous omissions of material fact discussed above, *City of Providence v. Aeropostale, Inc.*, 2013 WL 1197755, at *12 (S.D.N.Y. Mar. 25, 2013) (citing cases), including, for example, that Hyzon's revenue and vehicle targets were arbitrary rather than based on actual, identifiable "100% certain" or "high probability" sales opportunities, and that certain purported customers with purported 2021 delivery dates lacked the independent financial ability, interest, or infrastructure to satisfy the conditions of publicized order volumes or dates. Further, it does not apply to statements before July 17, 2021—the date the SPAC-Merger closed—because DCRB offered securities in the SPAC-Merger, and the SPAC-merger constituted an IPO. *See* 15 U.S.C. § 77z-2(b)(2)(D).[3]

*Second*, Defendants' statements about the 100% committed and high probability orders purportedly underlying their revenue projections were representations of current facts, not forward looking. *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2018 WL 2382600, at *8 (S.D.N.Y. May 24, 2018) ("[I]t is well recognized that even when an allegedly false statement has both a forward looking aspect and an aspect that encompasses a representation of present fact, the safe harbor provision of the PSLRA does not apply."). Multiple courts have held that representations of a "strong" or "healthy" pipeline can predicate a securities fraud claim if defendants fail to disclose material facts that undermine those representations. *See, e.g.*, *W. Palm Beach Firefighters' Pension Fund v. Startek, Inc.*, 2008 WL 879023, at *4, *8-*9, *12 (D. Colo.

---

[3] *See* 15 U.S.C. § 77z-2(b)(2)(D); SEC Acting Director of Corporate Finance John Coates, *SPACs, IPOs and Liability Risk under the Securities Laws* (Apr. 8, 2021), https://www.sec.gov/news/public-statement/spacs-ipos-liability-risk-under-securities-laws ("[I]t is . . . commonly understood that it is the de-SPAC [merger] – and not the initial offering by the SPAC – that is the transaction in which a private operating company . . . , engages in its [IPO].").

March 28, 2008) (statements that pipeline was "strong[]" and "healthy" were actionable where pipeline "contained few contracts with a high probability"). Accordingly, the critical inquiry is whether the veracity of statements underlying Defendants' purported revenue projections could be determined at the time such statements were made. *See Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 983 (6th Cir. 2018) (citation omitted).

Here, Hyzon's claim that it expected to complete $40 million in backlog in 100% certain and high probability orders by the end of 2021 "encompasse[d] a representation of present fact"—that is, Hyzon had a sufficient backlog of committed orders and was then actually manufacturing vehicles on the scale necessary to reach $40 million on the stated timeline. But as discussed above, this was not the case. The committed orders and "top tier customers" Hyzon touted in its presentations, as a basis for its projections, were illusory. Additionally, though Defendants had made "a conscious decision" to "shift" ~90% of Hyzon's 2021 deliveries to customers in China, "where average selling prices are approximately half of other regions," as early as August 2021, ¶¶ 142, 148, Defendants failed to fully disclose this material fact, or the full revenue implications resulting from the shift, until January 12, 2022—the last day of the Class Period when the Defendants' fraud scheme was fully revealed—and after.

***Third***, even if certain revenue or delivery target numbers themselves were forward looking, the guided numbers were not accompanied by meaningful cautionary language. "To avail themselves of safe harbor protection under the meaningful cautionary language prong, defendants must demonstrate that their cautionary language was not boilerplate and conveyed substantive information." *Slayton v. Am. Express Co*., 604 F.3d 758, 772 (2d Cir. 2010). Cautionary language is not meaningful if it fails to disclose known, material facts or states that risks may occur in the future that, in fact, have already transpired. *See id.* at 771. Defendants'

- 23 -

citation to boilerplate warnings regarding its ability "to accurately measure supply and demand for its vehicles" and "inherent[] uncertainty" are far too generic and, as discussed above, both failed to convey material facts underlying the Company's revenue and vehicle-delivery targets, and described as risks events that had already transpired (e.g. maintaining revenue projections even after Hyzon had stripped logos of "committed" or "high probability" customers from its investor presentations and shifted focus to Asia). Further, warnings regarding the ability to convert pre-orders to binding orders does nothing to cure the literal falsity that the catalog of 100% committed 2021 orders Defendants impressed on investors were never 100% committed or binding in the first place. *See In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561, at *14 (Dec. 2, 2013) (rejecting, in 10(b) context, safe harbor argument where Defendants had concealed "historical" fact in their investor materials—the falling through of a purported customer relationship underlying Defendants' business operations and projections).

*Finally*, the safe harbor does not protect forward-looking statements if the defendant had actual knowledge of falsity. *See* 15 U.S.C. § 78u-5(c)(B)(i). The Second Circuit has held that actual knowledge precludes the safe harbor if "a reasonable person would . . . deem an inference that the defendants (1) did not genuinely believe the [ ] statement, (2) actually knew that they had no reasonable basis for making the statement, or (3) were aware of undisclosed facts tending to seriously undermine the accuracy of the statement, 'cogent and at least as compelling as any opposing inference.'" *Slayton*, 604 F.3d at 775 (citing *Tellabs*, 551 U.S. at 323).

As discussed above, to attain the 2021 revenues Hyzon projected throughout the Class Period, the Company had to deliver on its purported binding orders at the ~$450k per vehicle price point Hyzon publicly communicated. *See* ¶ 72 ($37m / 85 vehicles). Hyzon's January 12, 2022 disclosure (and its publicly available 2021 Annual Report) shows that Hyzon was no longer

able to meet its earlier projected revenue targets the moment it shifted its delivery priorities to Asia for deals with lower vehicle prices. ¶ 148. Even though Hyzon knew, or should have been aware of these revenue problems as early as July 2021 (the time of the SPAC merger) when it first conceived its strategy-shift to Asia, *see* Background, Part H, *supra*, at 10, the Company did not disclose the full extent of how its Asia-strategy would impact Company revenues until January 12, 2022 (the last day of the Class Period). *see* Background, Part H, *supra*, at 10. As such, the Complaint sufficiently alleges Defendants had actual knowledge of facts—i.e., its demand-gap filling vehicles sales in Asia, with significantly lower average vehicle prices—that seriously undermined the projection. [4] Defendants' "safe harbor" arguments thus lack any merit.

**E.      The Blue Orca and Iceberg Reports' Findings Are Reliable, Have Independently Been Corroborated, And Should Be Credited**

Defendants argue that the Court should ignore Plaintiff's allegations to the extent they originally arose from the Blue Orca and Iceberg Reports, or put in Defendants' words, the "unreliable and uncorroborated claims by self-interested short sellers." MTD at 17. Defendants' argument takes two forms. Neither is persuasive.

*First*, Defendants suggest that the Reports are inherently unreliable given Blue Orca and Iceberg's profit motive.  But the argument that short-seller reports "are inherently unreliable" because the authors "hold short positions . . . has been repeatedly rejected in prior cases." *McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 124 (S.D.N.Y. 2013).

---

[4] Defendants also argue that "Statements 1B and 1C," which pertain to Hyzon's committed sales pipeline, are puffery because they provide no specifics about the pipeline beyond its bare existence. MTD at 27. But these statements must be viewed in the full context of Defendants' other statements. *See, Banco Bradesco*, 277 F. Supp. 3d at 647. Further, the representation of a specific sales pipeline figure can be materially misleading, even if the precise methodology for calculating that number is not disclosed, if defendants omit material facts that make the realization of those sales unlikely. *See, e.g.*, *SEC v. Hurgin*, 484 F. Supp. 3d 98, 105, 110-112 (S.D.N.Y. 2020). Defendants' argument thus lacks merit.

**Second,** Defendants contend that the Blue Orca Report lacks indicia of reliability because it relies on, in part, anonymous interviews with Hyzon (former) and Hiringa executives. But this position too is inconsistent with the law of this Circuit. Instead, courts routinely credit short seller reports where "the allegations in the complaint, taken as a whole, state a claim, *In re Hebron Tech. Sec. Litig.*, 2021 WL 4341500, at *13 (S.D.N.Y. Sept. 22, 2021), and, in cases where a short seller relies on anonymous sources, have sustained complaints based on "well-pled independent and particularized facts [that] corroborate those attributed to anonymous sources[.]" *Long Miao v. Fanhua*, 442 F. Supp. 3d 774, 801 (S.D.N.Y. 2020). That is the case here.

Though Blue Orca's Report cites anonymous persons for certain facts, the bulk of the Reports are based on additional, verified sources, which bolster the short sellers' credibility. These sources include filings with foreign government record databases, Hyzon's public statements and investor reports, and filings with corporate regulators—all of which have been corroborated by Plaintiff's independent investigation. ¶¶ 152-93. Defendants do not challenge these additional factual sources at all, thereby conceding their veracity at this stage. *See Thomas v. Roach*, 165 F.3d 137, 145 (2d Cir. 1999). Moreover, these same sources and Defendants' subsequent admissions corroborate the anonymous interview statements, permitting Plaintiff to rely on those statements. For example, the current Hiringa executive's statements that Hiringa is not actually a customer but a channel partner with no binding purchase order or 2021 deliveries were all confirmed by Hyzon's October 5, 2021 rebuttal to the Blue Orca Report. ¶ 139. Likewise, the former Hyzon executives' statement that Hyzon had grossly inflated projected margins is corroborated by Horizon's historic financials, industry whitepapers, and Hyzon's 2021 financial results reporting far less revenue and gross margin than expected for the 87 vehicles sold to purportedly independent purchasers. *See* Background, Part H, *supra*, at 10.

Given the extensive corroboration of the Report, including above all, by Defendants' admissions, Iceberg's Research, Plaintiff's independent investigation, and the SEC (which subpoenaed Hyzon based on the Report's veracity), the Court should give substantial weight and credibility to Blue Orca's anonymous interviews and other factual allegations. *Lewy v. SkyPeople Fruit Juice, Inc.*, 2012 WL 3957916, at *4 (S.D.N.Y. Sept. 10, 2012).

## II.    THE COMPLAINT ADEQUATELY ALLEGES SCIENTER

A plaintiff may plead scienter "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Novak*, 216 F.3d at 307. The proper analysis is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23 (emphasis in original). At the pleading stage, this inference "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences,'" but must merely be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id*. at 324. "The Second Circuit has further clarified that scienter may be demonstrated by proof that defendants 'knew facts or had access to information suggesting that their public statements were not accurate.'" *Alpha Capital Anstalt v. New Generation Biofuels, Inc.*, 2014 WL 6466994, at *10 (S.D.N.Y. Nov. 18, 2014) (quoting *In re NovaGold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 298 (S.D.N.Y. 2009)).

"[A]t the motion to dismiss stage, a tie on scienter goes to the plaintiff." *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp*., 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012). Here, the inference that Defendants acted with scienter is at least as compelling as any inference of non-fraudulent conduct.

- 27 -

A.     **The Complaint Alleges Defendants' Conscious Misbehavior or Recklessness**

1.     **Defendants Knew or Recklessly Disregarded that HongYun was a "Sham" Company**

The Complaint teems with support of Defendants' conscious misconduct with respect to their misstatements concerning HongYun. *First*, the timing and circumstances surrounding Hyzon's deal announcement with HongYun supports an inference of scienter. *See Bear Stearns Cos., Inc. Sec., Deriv., & ERISA Litig.*, 763 F. Supp. 2d 423, 517 (S.D.N.Y. 2011) (temporal proximity of certain statements combined with other circumstantial evidence can contribute to an inference of scienter). Hyzon announced its deal with HongYun on the heels of its second quarter report on August 11, 2021; and after Hyzon reaffirmed its 2021 delivery projections of 85 vehicles and elicited positive analyst coverage, its stock price skyrocketed despite having only one delivery to date. ¶ 109. Desperate to fill its delivery gap, Defendants announced that Hyzon had secured a 500-vehicle deal with HongYun that would suddenly allow Hyzon to exceed its projected delivery of 85 trucks before the end of the year. ¶ 115-17. Not surprisingly, news of the Hyzon-HongYun deal caused Hyzon's stock price to skyrocket 29% in a single trading day. ¶ 118. But as investors would later learn, Hyzon was a shell company established only three days before Hyzon announced the deal, ¶ 120, and was subsequently awarded 2 million Hyzon stock warrants in exchange for its purported purchase. *See supra* at 11. These facts strongly suggest that HongYun was brought in merely to plug the order gap and pump Hyzon's stock price. ¶ 246.

*Second*, for Hyzon, the size of the announced HongYun deal was immense, as the 100-truck-order supposedly placed in 2021 was larger than the Company's previously guided 85 total deliveries for the year, and future "committed" sales would equate to over 60% of Hyzon's 2022 delivery targets. *See, e.g., In re IMAX Sec. Litig.*, 587 F. Supp. 2d 471, 481 (S.D.N.Y. 2008)

(scienter pled where "defendants undoubtedly appreciated that theater system revenue was of singular importance to the financial well-being and market perception of the Company").

*Third*, Defendants held themselves out as knowledgeable regarding HongYun, making specific representations regarding HongYun's purported business operations, its management team's industry experience and significant customer relations. But as discussed above, Part I.A, *supra*, at 11, neither HongYun nor its shareholders had the capital, business experience, or business connections Defendants represented. Thus, the Executive Defendants either spoke on these subjects with knowledge or failed to investigate the true facts underlying their statements. *See, e.g., In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 395-96 (S.D.N.Y. 2012) (highly "improbable" that defendant who said he was familiar with company "would not inquire into whether his company was exposed to the subprime consumer borrower").

*Fourth*, Defendants' admissions concerning HongYun and failure to address the short sellers' most incriminating allegations support scienter. For example, in Hyzon's October 5, 2021 Response, Defendants did not dispute that they knew HongYun was formed three days before Hyzon announced the tentpole deal. ¶ 136. Similarly, after Blue Orca pointed out HongYun's lack of resources, Hyzon refused to give any information on HongYun's financial substance, address how HongYun would finance its vehicle purchases, or explain whether Hyzon was providing financing to HongYun either directly or by lease. ¶¶ 12, 146, 143; *see also XL Fleet*, 2022 WL 493629, at *5 (non-denial of short-seller allegations supported inference of scienter). Further, they declined to do so knowing at the time (and as early as July 2017) that the Company would fall well short of its 2021 revenue projections, and recognize meager revenues, under the celebrated HongYun deal and Hyzon's then-undisclosed sales shift to Asia.

*Fifth*, Defendants' efforts after the short seller reports to propagate the false notion that HongYun was a legitimate and unaffiliated counterparty further supports scienter. Indeed, when Defendant Knight was asked by analysts about HongYun, Knight made highly specific denials as to whether Hyzon was "faking the kind of customer opportunity and faking capabilities." *See Fresno Cty. Emps.' Ret. Ass'n v. comScore, Inc*., 268 F. Supp. 3d 526, 552 (S.D.N.Y. 2017) ("campaign by [defendants] to placate the market in reaction to the inquiries by the media, analysts, investors and the SEC . . . provides cogent support for the inference of scienter").

*Sixth*, "post-Class Period events and statements" support an inference of scienter as to what Defendants knew or should have known. *In re Avon Sec. Litig*., 2019 WL 6115349, at \*20 (S.D.N.Y. Nov. 18, 2019) (citing *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000). Although Hyzon claims to have sold and delivered 87 vehicles (above the target of 85) in FY21, the Company reported FY21 revenues of only $6 million—84% lower than the company's guided target of $37 million—in its SEC reports. *See Katz v. Image Innovations Holdings, Inc*., 542 F. Supp. 2d 269, 273 (S.D.N.Y. 2008) ("the magnitude of the alleged fraud provides some additional circumstantial evidence of scienter"). Further, Defendants disclosed in Hyzon's post-Complaint SEC filings that in 2021, in relation to Hyzon's efforts to fill its demand gap, Hyzon indirectly issued HongYun 2 million stock warrants, and in the last remaining weeks of the year, sold its joint-venture partner 20 vehicles to cover the remainder of its delivery gap.

*Finally*, the Company has disclosed ***that the Q4 and FY 2021 revenue shortfall was due in part to collection concerns raised by Hyzon's auditor, KPMG***. Background, Part H, *supra*, at 10. This is entirely consistent with the ability to pay concerns the short sellers raised about HongYun which Defendants repeatedly sought to shoot down.

Defendants fail to set forth what innocent, competing inference should be adopted instead. For instance, Defendants cite *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Cap. Inc*., 531 F.3d 190 (2d Cir. 2008), to suggest that plaintiff is pleading a "should-have-known-" or "duty to monitor"-type fraud with respect to HongYun. MTD at 36-37. There, the court found a "broad reference" to "raw data" that the company had access to be insufficient because the plaintiff did not allege what that data would have shown. *Id*. at 196. But here, in contrast to *Dynex*, Defendants represented they had direct, first-hand knowledge of HongYun's established nature, operational footprint, and customer connections. ¶ 116. And more fundamentally, the *Dynex* court's acceptance of a "competing inference" that statements were result of "careless mistakes," *id*. at 197, simply has no place in this case where after their lies about HongYun were exposed, Defendants doubled down on the fallacy that HongYun was a lucrative customer. ¶¶ 136, 143.

Defendants also argue Hyzon's press release featuring a photo of the vehicle fleet with a Baowu logo above the front windshield undercuts the notion that Defendants knew HongYun was a "sham." MTD at 36. But this ignores the Complaint's allegations, including that Defendants issued the press release in furtherance of their scheme to portray HongYun as a prized customer. ¶ 145 As explained, that Baowu had ordered a fleet of 29 Hyzon vehicles is dubious, as there was no previously known pilot test program with Baowu or tendering process, as is customary with Chinese state-owned enterprises like Baowu. *Id.* In addition, HongYun lacks the capital and licensure to pass through vehicles to Baowu. ¶¶ 161, 191. Finally, Hyzon's paltry revenues and auditor revenue recognition concerns are inconsistent with the legitimate sale of 29 vehicles to a large industrial conglomerate with an ability to pay like Baowu.

### 2.    Defendants Knowingly or Recklessly Portrayed Hiringa as a Customer with Binding Orders

Defendants used Hiringa as the first major deal Hyzon announced after the Company revealed its plans of the take-public merger, claiming that Hyzon had signed an agreement to build and supply 1,500 hydrogen powered vehicles for Hiringa, with the first batch of 20 trucks "expected to enter service" in 2021, thereby accounting for 24% of Hyzon's guided deliveries in the year (85). *See, e.g., Hutchins v. NBTY, Inc.*, 2012 WL 1078823, at \*6 (E.D.N.Y. Mar. 30, 2012) (finding strong circumstantial evidence of scienter, given defendants' failure to disclose material adverse information concerning the company's largest source of business and "the potential resulting adverse impact on costs, sales, pricing, operating leverage and profitability"). Defendants then went on to repeatedly highlight the Hiringa contract in investor presentations, press releases and YouTube promotional videos hosted by Defendant Knight, making specific statements concerning the "binding" orders Hiringa had placed and explicitly characterizing Hiringa as a "customer." *See Pontiac*, 875 F. Supp. 2d at 372 (S.D.N.Y. 2012) ("The specificity of these statements . . . is strong circumstantial evidence that [defendants] were receiving some form of specific information").

But as revealed through Blue Orca's interview with a senior Hiringa executive, Hiringa (1) is merely a channel partner for Hyzon's vehicles, (2) does not intend to pay for or take title over the trucks, but merely facilitate the sale of hydrogen trucks to third parties as an unpaid conduit, (3) has merely a right, not an obligation to buy HFCEVs under the 1,500 vehicle agreement, (4) has no capital allotted for buying trucks; and (5) was not taking any deliveries of Hyzon trucks in 2021, let alone the twenty Hyzon said was committed, and that orders from Hyzon would only be fulfilled based on testing results from an initial validation. ¶¶ 127-28. Defendants would have been aware of Hiringa's goals and its end-users' preconditions from its

- 32 -

negotiations with Hiringa and any reasonable diligence it likely conducted. *See Wallace v. IntraLinks*, 2013 WL 1907685, at \*8-\*9 (S.D.N.Y. May 8, 2021) (fact that "CEO and CFO . . . would likely remain informed about developments with a crucial part of [the company's] business" provided "additional evidence" of scienter). Defendants admitted as much in Hyzon's October 5 Response, when it conceded many of Blue Orca's allegations, and did not dispute that Hyzon would not be supplying Hiringa with 20 trucks in 2021, as previously represented. Defendants' admissions and non-denials as to Hiringa thus further support a strong inference of Defendants' scienter. *See In re Silvercorp Metals, Inc. Sec. Litig*., 26 F. Supp. 3d 266, 276 (S.D.N.Y. 2014) (defendant's "non-denial" of allegations raised in public reporting about the defendant's and company's conduct "provide a strong inference of scienter").

### 3. Defendants Knowingly or Recklessly Misrepresented Committed Orders

Many facts show Defendants' scienter when they made false and misleading statements concerning the purported committed and high probability orders. ***First***, the committed and high probability orders were key to Hyzon achieving its lofty revenue and delivery targets and intensely followed by analysts and investors. *See New Orleans Emps. Ret. Sys. v. Celestica, Inc*., 455 F. App'x 10, 14 n.3 (2d Cir. 2011) (scienter pled where fraud subject was "key to measuring . . . performance and . . . a subject about which investors and analysts often inquired").

***Second***, Defendants' repeated edits to the Company's investor presentations to remove questionably listed customers further shows that they knew, or were reckless in not knowing, that certain companies were improperly listed as "Top Tier Customers" or depicted near graphics for committed or highly probable orders. ¶¶81-87, 95-98, 266. These edits occurred when other EV SPACs like XL Fleet, Nikola, and Lordstown Motors were exposed for faking customers, exaggerating backlogs, and exaggerating revenues. ¶¶ 60, 129. Thus, Defendants knew their relationships with certain customers were so tenuous that Hyzon would be exposed to similar

liability if it did not drop customer logos. *Id.* Nevertheless, Defendants failed to alert investors to these inconspicuous changes, and relatedly refused to update Hyzon's financial projections. *See, e.g., In re Intercept Pharms., Inc. Sec. Litig.*, 2015 WL 915271, at *7 (S.D.N.Y. Mar. 4, 2015) (finding scienter where defendant "engag[ed] in the sort of selective disclosure that creates a real possibility of misleading investors.").

Defendants' argument that the Complaint never alleges which particular Defendant made the changes to the investor presentations misses the mark. MTD at 37. Defendants Tichio, Knight and Gordon published and referred to the original investor presentation during the February 9, 2021 Hyzon-DCRB Merger Call. ¶ 71. The original presentation and each of its subsequent iterations were all exhibits to, and incorporated by reference in, the Company's definitive proxy statements, published jointly by Defendants. ¶ 92. Further, the complaint details how each Defendant was centrally involved in the merger and solicitation process, and had ultimate authority over the proxy materials, including the choice to include the investor presentations, their content and how to communicate it. ¶¶ 68-112. Accordingly, the changes to the investor presentations may readily be attributed to each Defendant. *See, e.g., Hurgin*, 484 F. Supp. 3d at 112 (CEO of acquiring entity jointly made statements in proxy concerning acquired entity's backlog, even though information was made and supplied by the acquired entity).

***Finally***, that early senior Hyzon executives left the Company in part because of concerns over misrepresentations on customer contracts further supports scienter. ¶ 130. Though Defendants contend that the Complaint fails to show they were aware of these executive views, it is absurd to suggest that Defendants did not know, or would not reasonably be aware, given Hyzon's number of executive employees and the importance of the information. ¶ 273. Despite these facts, Defendants contend that the "most compelling inference here" is that they merely

"overestimated the likelihood that negotiations or MOUs would lead to binding orders"—facts they could not have predicted. MTD at 33-34. But their surreptitious deletions of big-name customers from investor presentations and complete backtracking on these entities' "binding" orders undermines any such inference. ¶ 266. Moreover, Defendants' argument disregards the most obvious scienter-related fact pled in the Complaint: because Defendants themselves were personally engaged in the due diligence of Hyzon's business and/or the actual contract negotiations with the alleged customers, they plainly knew or were deliberately reckless in making these materially false and misleading statements. ¶¶ 269-74.

**4.      The SEC Investigation and Core Operations Doctrine Supports Scienter**

The SEC's decision to investigate Hyzon further strengthens the inference of scienter, particularly given that Defendants have admitted that the investigation relates to the precise conduct alleged in the Blue Orca Report, that is, the same alleged conduct that gave rise to this case. *In re Xcel Energy, Inc.*, 364 F. Supp. 2d 980, 995 (D. Minn. 2005).

Similarly, the "core operations doctrine" permits an inference that a company and its senior executives have knowledge of information concerning the "core operations" of a business, even without specific allegations that senior management had actual knowledge of such information. *Medis Inv. Grp. v. Medis Techs., Ltd.*, 586 F. Supp. 2d 136, 145 (S.D.N.Y. 2008), *aff'd*, 328 F. App'x 754 (2d Cir. 2009). "Core operations" include matters "critical to the long term viability" of the company and events affecting a "significant source of income." *Medis*, 586 F. Supp. 2d at 146. Here, it cannot be credibly disputed that Hyzon's largest customers and the nature of its customer contracts are "core operations." Therefore, it would be "'absurd to suggest'" that Hyzon's management and co-founders were "'without knowledge'" that Hyzon's largest customer was a fake shell company, and its remaining largest customers were not really

customers at all, which inevitably would lead to Hyzon's poor financial and operational results.

*See Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d at 395 (internal citation omitted).

**B.    Defendants Had Motive and Opportunity to Defraud**

Although motive is not necessary to plead scienter, motive allegations can "meaningfully enhance the strength of the inference." *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 685 (5th Cir. 2014). Here, each Defendant had powerful incentives to commit the fraud.

***DCRB Individual Defendants' Motive***: The unique financial structure of SPACs creates a risk for conflicts of interest and misaligned incentives because the sponsor has an incentive to enter into a losing deal for SPAC investors if its alternative is to liquidate.[5] In this case, the Sponsor, Defendant Anderson's private equity firm WRG, and other DCRB parties obtained a 20% interest in DCRB, consisting of 5,643,125 Founder Shares that would convert into Class A shares if a qualifying business combination were approved. Mar. 17, 2021 Proxy Statement (ECF No. 52-3, at 3). As of July 16, 2021, the Founder Shares were valued at $56,431,250 million, including Anderson's 630,947 Founder Shares valued at $6.3 million. *Id.* at 228.[6] In addition, DCRB, Defendant Anderson's private equity firm WRG, and other DCRB parties held 6,514,500 warrants, each exercisable to purchase one share of Class A Common Stock at $11.50 per share. *Id.* at 56. These warrants had an aggregate market value of $6.5 million as of July 16, 2021 but

---

[5] *See* Commissioner Caroline A. Crenshaw, *Statement on the SPACs Proposal*, U.S. Securities and Exchange Commissioner (Mar. 30, 2022), https://www.sec.gov/news/statement/crenshaw-spac-20220330.

[6] Defendants suggest DCRB Individual Defendants Tichio and Haskopoulos lacked a financial motive to commit the alleged fraud since they did not ***personally*** receive stock in Hyzon. MTD at 32, n.10.  But the Sponsor, which received 5.64 million shares of Hyzon's stock after the close of the merger, is an affiliate of and managed by Riverstone– the same entity which Tichio served as a Partner and Managing Director and which Haskopoulos served as Managing Director, CFO, Chief Accounting Officer, and Secretary. Therefore, Tichio and Haskopoulos most certainly had an economic interest in the closing of the merger.

would become worthless if the merger were not approved. *See* 2021 Annual Report (ECF No. 52-2, at 139). Accordingly, the DCRB Defendants had a concrete and tangible motive to obtain approval of the merger with Hyzon, irrespective of the merits of the deal for DCRB's public shareholders. *See In re Stillwater Cap. Partners Inc. Litig.*, 858 F. Supp. 2d at 288 ("The desire to avoid impending liquidation was also a motivating factor for the [SPAC's] officers.").

  ***Hyzon Individual Defendants' Motive***. As warned of in DCRB's proxy statements, Hyzon's "ability to continue as a going concern depends upon whether [Hyzon] can ultimately attain profitable operations, generate sufficient cash flow to meet our obligations, and obtain additional financing as needed." Mar. 17, 2021 Proxy Statement (ECF No. 52-3, at 130). These circumstances gave the Hyzon Individual Defendants' a motive to exaggerate Hyzon's customers, committed orders and its financial prospects in order to complete the merger and receive the cash necessary for Hyzon to continue operations. While Defendants argue that this type of motive is "generic" and applicable to all corporations, the issuance of a "going concern" qualifier is a unique circumstance that can create a concrete and particularized motive to make deliberate or reckless misrepresentations. *See, e.g.*, *Skiadas v. Acer Therapeutics Inc.*, 2020 WL 3268495, at *11, 12 (S.D.N.Y. June 16, 2020) (company's "going concern" status gave defendants an "incentive to gamble" because "[a]n executive at a company that will go belly up if it fails to fundraise has different incentives from a generic corporate insider").

  Upon completion of the merger, Gu and Knight were awarded more-or-less 200,000 shares of Class A Common Hyzon stock, and over 5.7 million stock options, exercisable at $2.00 per share, in exchange for their outstanding pre-merger holdings. ¶ 249. If exercised that day, in total, these shares were worth more than $46 million. *Id.* Similarly, Defendant Knight's shares

and options, if fully exercised, were worth (net) nearly $45 million. *Id.*[7] Because of DCRB's February 8, 2021 Lock-Up Agreement, Defendants were barred from selling or otherwise transferring their stock until January 17, 2022 and had a compelling motive to keep stock prices inflated through the continuation of their fraudulent scheme. *Id.* ¶ 250*; see also In re SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 557-58 (S.D.N.Y. 2010) (plaintiffs adequately pled scienter when defendant stood to receive multi-million-dollar payment and stock options upon completion of merger if company's stock did not fall below certain trigger prices). Executive compensation also increased sharply last year, with Gu receiving total compensation of $6,357,709 versus $429,519 in 2020, and Knight's jumping to $4,640,278 from $414,415. 2021 Annual Report (ECF No. 52-2, at 130).

Finally, contrary to Defendants' contentions, MTD at 32, that the fraud was partially uncovered and Hyzon's stock price crashed before Defendants had a chance to cash in does not change the fact that they had a motive to conceal Hyzon's risks from the market. *See Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) ("[T]hat a gamble—concealing bad news in the hope that it will be overtaken by good news—fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble.").

## III.    THE COMPLAINT ADEQUATELY PLEADS LOSS CAUSATION

A "securities fraud plaintiff's burden [in pleading loss causation] is not a heavy one." *In re VEON*, 2017 WL 4162342, at *11. As the Second Circuit has explained, "a plaintiff can

---

[7] Defendants misleadingly suggest that Defendant Gordon had no motive since he personally did not receive any Hyzon stock following the merger. MTD at 32. But subsequent to the filing of the Complaint, Plaintiff learned that Gordon's investment entity, Ascent Funds SPV 1 LP, received over 10.7 million Earnout Shares in Hyzon immediately following the merger. ECF Nos. 52-4 & -8. Ascent Funds was similarly locked out from selling these shares before February 2021. *Id.* The court make take judicial notice of these SEC filings. *See supra* n.1.

establish loss causation either by showing a 'materialization of risk' or by identifying a 'corrective disclosure' that reveals the truth behind the alleged fraud." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d at 261. A court's review of a loss causation pleading is governed by Fed. R. Civ. P. 8; *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005).

Here, Defendants' fraud was partially revealed through three disclosure events that occurred on September 28, 2021, October 5, 2021, and January 12, 2022—each of which are connected to the fraud and caused Hyzon's stock price to plummet. Defendants nevertheless challenge loss causation on two grounds, both of which fail.

**_First_,** Defendants contend that the January 12, 2022 disclosure—that is, Hyzon's press release revealing the existence of an SEC investigation and Hyzon's expectation that it would record lower-than-forecasted revenues—does not suffice. MTD at 39. But announcements of government investigations regarding the subject of the misstatements alleged have long been found sufficient to plead loss causation. *Bos. Ret. Sys. v. Alexion Pharms., Inc.*, 556 F. Supp. 3d 100, 141 (D. Conn. 2021) (citing *Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Intern. N.V.*, 89 F. Supp. 3d 602, 620 (S.D.N.Y. 2015). Likewise, courts have routinely recognized that disclosures consisting of surprisingly poor financial results driven by a concealed risk adequately demonstrate loss causation. *See Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 203-04 (S.D.N.Y. 2010).

Despite Defendants' assertions to the contrary, MTD at 25-26, Hyzon's pro forma risk disclosures noting the general uncertainty of projected financial information carry little weight in the face of Defendants' ongoing assurances and reaffirmations that Hyzon's forecast was "100 percent covered" by binding orders from companies with the ability to pay. *See In re MBIA, Inc., Sec. Litig.*, 700 F. Supp. 2d 566, 582 (S.D.N.Y. 2010). Indeed, the market's reaction, dropping

23% over the two days following the announcement, speaks for itself. Similarly, Defendants' misrepresentations concerning Hyzon's customers and orders, and the various risks associated therewith, plainly increased the threat of government scrutiny against the Company. Defendants' contention that they could not have foreseen an SEC investigation is thus meritless.

Defendants' **_second_** argument, that the Blue Orca and Iceberg reports purportedly "contained only public information cast in a negative light," MTD at 40, similarly lacks merit. Much of the information in the Blue Orca and Iceberg reports, including interviews with former Hyzon senior executives and a senior Hiringa executive, was not public information, and much of the information in the Reports, including filings with multiple Chinese and Singapore regulatory entities and individuals in different languages, was not readily accessible to investors. *See Lea v. TAL Educ. Grp.*, 837 F. App'x 20, 28 (2d Cir. 2020) (finding loss causation pled adequately based on a short-seller report with similar information). Accordingly, Defendants' cited authorities—*In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501 (2d Cir. 2010) (no loss causation where price drop occurred one year after initial disclosure); *In re Ideanomics, Inc., Sec. Litig.*, 2022 WL 784812 (S.D.N.Y. Mar. 15, 2022) (no loss causation where short seller did not reveal any new facts, and simply was "unable to establish" certain facts)—are simply inapposite.

## IV.    THE COMPLAINT ESTABLISHES CONTROL PERSON LIABILITY

The Complaint alleges that the Individual Defendants are control persons. ¶¶ 321-17. Defendants' sole argument regarding Section 20(a) is that Plaintiff fails to sufficiently plead a primary securities-fraud violation. MTD at 40. But because Plaintiff adequately pleads a primary violation, he has stated a claim under Section 20(a). *See City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*, 477 F. Supp. 3d 123, 138 (S.D.N.Y. 2020).

## V.      CONCLUSION

For the reasons detailed herein, Defendants' MTD should be denied in its entirety.[8]

Dated this 19th day of July, 2022.          Respectfully submitted,

**HAGENS BERMAN SOBOL SHAPIRO LLP**

_/s/ Steven W. Berman_
Steven W. Berman (*pro hac vice*)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

Reed. R. Kathrein (*pro hac vice*)
Lucas E. Gilmore (*pro hac vice*)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
reed@hbsslaw.com
lucasg@hbsslaw.com

Raffi Melanson
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1 Faneuil Hall Sq., 5th Floor
Boston, MA 02109
Telephone: (617) 482-3700
Facsimile: (617) 482-3003
raffim@hbsslaw.com

*Lead Counsel for Lead Plaintiff Alfred Miller*

---

[8] If the Court finds that the Complaint contains deficiencies, Plaintiff respectfully requests leave to amend. *See* Fed. R. Civ. P. 15(a)(2); *see also Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015).

Brian J. Schall (*pro hac vice* forthcoming)
**THE SCHALL LAW FIRM**
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Telephone: 310-301-3335
Facsimile: 310-388-0192
brian@schallfirm.com

*Additional Counsel for Lead Plaintiff Alfred Miller*

- 2 -