# EXHIBIT B

PREM14A 1 d46419dprem14a.htm PREM14A

**Table of Contents**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

## SCHEDULE 14A

**PROXY STATEMENT PURSUANT TO SECTION 14(a) OF
THE SECURITIES EXCHANGE ACT OF 1934**

Filed by the Registrant ☒        Filed by a Party other than the Registrant ☐

Check the appropriate box:

☒ Preliminary Proxy Statement

☐ **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

☐ Definitive Proxy Statement

☐ Definitive Additional Materials

☐ Soliciting Material under §240.14a-12

# Decarbonization Plus Acquisition Corporation
**(Name of Registrant as Specified In Its Charter)**

**N/A**
**(Name of Person(s) Filing Proxy Statement, if other than the Registrant)**

Payment of Filing Fee (Check the appropriate box):

☐ No fee required.

☒ Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

    (1) Title of each class of securities to which transaction applies:

        Not Applicable

    (2) Aggregate number of securities to which transaction applies:

        Not Applicable

    (3) Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

        Not Applicable

    (4) Proposed maximum aggregate value of transaction:

        $2,072,036,810(1)

    (5) Total fee paid:

        $226,059.22(2)

☐ Fee paid previously with preliminary materials.

☐ Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

    (1) Amount Previously Paid:

    (2) Form, Schedule or Registration Statement No.:

    (3) Filing Party:

    (4) Date Filed:

(1) Our estimate of the transaction value is based on the following estimated values: 181,517,646 shares of the registrant's Class A Common Stock issued to Historical Rollover Stockholders, 20,360,005 shares issuable to holders of Hyzon Options outstanding under the Hyzon Motors Inc. 2020 Stock Incentive Plan and holders of Hyzon RSUs, 5,000,000 shares issued to the holder of the Hyzon Convertible Notes, and 326,030 shares issuable upon exercise of the Ardour Warrants.

(2) The amount is the product of $2,072,036,810 multiplied by the Securities and Exchange Commission's filing fee of $109.10 per million.

Table of Contents

Stock converted into shares of Class A Common Stock will no longer be outstanding and will cease to exist, and each holder of such Class B Common Stock will thereafter cease to have any rights with respect to such securities.

For more information about the Business Combination Agreement and the business combination and other transactions contemplated thereby, see the section entitled "Proposal No. 1—The Business Combination Proposal."

**Conditions to the Closing**

The obligations of DCRB, Merger Sub and Hyzon to consummate the business combination and related transactions are subject to the satisfaction or waiver of certain conditions, including, but not limited to (a) Written Consent (as defined below), (b) approval and adoption of the DCRB Proposals (as defined below) by DCRB stockholders, (c) the absence of any law or order that makes the business combination and related transactions illegal or otherwise prohibits the consummation of the business combination and related transactions, (d) expiration or termination under the HSR Act (the waiting period under the HSR Act is currently set to expire on March 22, 2021) and (e) listing of Class A Common Stock on Nasdaq or another exchange mutually agreed to by the parties, as of the Closing Date. In addition, the obligations of DCRB and Merger Sub to consummate the business combination and related transactions are subject to the satisfaction or waiver of certain additional conditions. including, but not limited to, (a) the representations and warranties of Hyzon shall be true and correct to the standards applicable to such representations and warranties, (b) each of the covenants of Hyzon shall be performed or complied in all material respects, (c) the absence of a Hyzon Material Adverse Effect (as defined below) and (d) the receipt of audited financial statements of Hyzon

Obligations of Hyzon to consummate the business combination and related transactions are also subject to the satisfaction or waiver of certain additional conditions, including, but not limited to, (a) the representations and warranties of DCRB and Merger Sub shall be true and correct to the standards applicable to such representations and warranties, (b) each of the covenants of DCRB and Merger Sub shall be performed or complied in all material respects and (c) the absence of a DCRB Material Adverse Effect (as defined below).

**Regulatory Matters**

Neither DCRB nor Hyzon is aware of any material regulatory approvals or actions that are required for completion of the business combination other than as required under the HSR Act. The parties have filed a premerger notification under the HSR Act. It is presently contemplated that if any additional regulatory approvals or actions are required, those approvals or actions will be sought. There can be no assurance, however, that any such additional approvals or actions will be obtained.

**Other Agreements**

***Lock-Up Agreement***

On February 8, 2021, certain stockholders of Hyzon entered into an agreement with DCRB and Hyzon (the "Lock-Up Agreement") pursuant to which they agreed, subject to certain customary exceptions, not to directly or indirectly sell, assign, encumber, pledge, hypothecate, dispose, loan or otherwise transfer, or enter into any agreement with respect to any sale, assignment, encumbrance, pledge, hypothecation, disposition, loan or other transfer, any shares of Class A Common Stock or any shares of Class A Common Stock issued or issuable upon the exercise of any warrant or other right to acquire shares of such Class A Common Stock beneficially owned or otherwise held by such stockholders ("Lock-Up Securities") for six months following the Closing Date.

For more information about the Lock-Up Agreement, see the section entitled "Proposal No. 1—The Business Combination Proposal—Related Agreements—Lock-Up Agreements."

15

Table of Contents

*Founder Warrant Agreement*

Concurrently with the execution and delivery of the Business Combination Agreement, DCRB, our Sponsor and certain other stockholders of DCRB, WRG and each of our independent directors (the "Founders Warrant Parties") entered into an agreement (the "Founders Warrant Agreement") pursuant to which they agreed that:

- The Founders Warrant Parties shall not, with respect to an aggregate of 4,885,875 private placement warrants (or shares of Class A Common Stock issued upon exercise of private placement warrants), (a)(i) sell or assign, offer to sell, contract or agree to sell, hypothecate, pledge, grant any option to purchase or otherwise dispose of, (ii) agree to dispose of, directly or indirectly, or (iii) establish or increase a "put equivalent position" or liquidation with respect to or decrease of a "call equivalent position" within the meaning of Section 16 of the Exchange Act and the rules and regulations of the SEC promulgated thereunder with respect to, in each case (i), (ii) and (iii), any security, (b) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of any security, whether any such transaction is to be settled by delivery of such securities, in cash or otherwise, or (c) publicly announce any intention to effect any transaction specified in clause (a) or (b) (the actions described in (a)-(c), a "Transfer"), until the earlier of (i) one year after the Closing and (ii) subsequent to the Closing, (x) the date on which the last sale price of the Class A Common Stock quoted on Nasdaq (or the exchange on which the shares of DCRB Class A Common Stock are then listed) equals or exceeds $11.50 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within any 30-trading day period or (y) the date on which DCRB completes a liquidation, merger, capital stock exchange, reorganization or other similar transaction that results in the holders of DCRB Class A Common Stock having the right to exchange their shares of Class A Common Stock for cash, securities or other property;

- Upon and subject to the Closing, an aggregate of 814,313 private placement warrants (the "$12.00 Warrants") shall become subject to potential forfeiture, and each Founders Warrant Party agreed not to exercise such $12.00 Warrants, unless and until a $12.00 Triggering Event (as defined below) occurs. Prior to the occurrence of a $12.00 Triggering Event, each Founders Warrant Party shall not Transfer any of the $12.00 Warrants. In the event no $12.00 Triggering Event occurs during the five-year period commencing on the one-year anniversary of the Closing (the "Warrant Earnout Period"), the $12.00 Warrants shall immediately be forfeited to DCRB for no consideration as a contribution to the capital of DCRB and immediately cancelled. "$12.00 Triggering Event" means the occurrence of a date on which the last reported sales price of one share of Class A Common Stock quoted on Nasdaq (or the exchange on which the shares of Class A Common Stock are then listed) is greater than or equal to $12.00 (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within any 30 consecutive trading day period within the Warrant Earnout Period; provided, that, if, during the Warrant Earnout Period, there is a change of control pursuant to which the holders of Class A Common Stock have the right to receive consideration implying a value of Class A Common Stock (as determined in good faith by the DCRB Board) of (i) less than $12.00 (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like), then the $12.00 Warrants shall immediately be forfeited to DCRB for no consideration and immediately cancelled; or (ii) greater than or equal to $12.00 (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like), then the $12.00 Triggering Event shall be deemed to have occurred.

- Upon and subject to the Closing, an aggregate of 814,312 private placement warrants (the "$14.00 Warrants") shall become subject to potential forfeiture, and each Founders Warrant Party agreed not to exercise such $14.00 Warrants, unless and until a $14.00 Triggering Event (as defined below) occurs. Prior to the occurrence of a $14.00 Triggering Event, each Founders Warrant Party shall not Transfer any of the $14.00 Warrants. In the event no $14.00 Triggering Event occurs during the Warrant Earnout Period, the $14.00 Warrants shall immediately be forfeited to DCRB for no consideration as a

16

**Table of Contents**

contribution to the capital of DCRB and immediately cancelled. "$14.00 Triggering Event" means the occurrence of a date on which the last reported sales price of one share of Class A Common Stock quoted on Nasdaq (or the exchange on which the shares of Class A Common Stock are then listed) is greater than or equal to $14.00 (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within any 30 consecutive trading day period within the Warrant Earnout Period; provided, that, if, during the Warrant Earnout Period, there is a change of control pursuant to which the holders of Class A Common Stock have the right to receive consideration implying a value of Class A Common Stock (as determined in good faith by the DCRB Board) (i) less than $14.00 (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like), then the $14.00 Warrants shall immediately be forfeited to DCRB for no consideration and immediately cancelled; or (ii) of greater than or equal to $14.00 (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like), then the $14.00 Triggering Event shall be deemed to have occurred.

### A&R Registration Rights Agreement

In connection with the Closing, that certain Registration Rights Agreement dated October 19, 2020 (the "IPO Registration Rights Agreement") will be amended and restated and DCRB, certain persons and entities holding securities of DCRB prior to the Closing (the "Initial Holders") and certain persons and entities receiving Class A Common Stock in connection with the business combination (the "New Holders" and together with the Initial Holders, the "Reg Rights Holders") will enter into that amended and restated IPO Registration Rights Agreement attached as an exhibit to the Business Combination Agreement (the "A&R Registration Rights Agreement"). Pursuant to the A&R Registration Rights Agreement, DCRB will agree that, within 15 business days after the Closing, DCRB will file with the SEC (at DCRB's sole cost and expense) a registration statement registering the resale of certain securities held by or issuable to the Initial Holders and certain of the New Holders (the "Initial Registration Statement"), and DCRB will use its reasonable best efforts to have the Initial Registration Statement become effective as soon as reasonably practicable after the filing thereof. Additionally, DCRB will agree that, as soon as reasonably practicable after DCRB is eligible to register the Reg Rights Holders' securities on a registration statement on Form S-3, DCRB will file with the SEC (at DCRB's sole cost and expense) a registration statement registering the resale of certain securities that were not included on the Initial Registration Statement (the "Subsequent Registration Statement") and DCRB will use its reasonable best efforts to have the Subsequent Registration Statement become effective as soon as reasonably practicable after the filing thereof. In certain circumstances, the Reg Rights Holders can demand up to three underwritten offerings in any 12 month period and will be entitled to customary piggyback registration rights. The A&R Registration Rights Agreement does not provide for the payment of any cash penalties by DCRB if it fails to satisfy any of its obligations under the A&R Registration Rights Agreement.

For more information about the A&R Registration Rights Agreement, see the section entitled "Proposal No. 1—The Business Combination Proposal—Related Agreements—A&R Registration Rights Agreement."

### Proposed Second Amended and Restated Charter

Pursuant to the terms of the Business Combination Agreement, at the Closing, we will amend and restate, effective as of the Effective Time, our Charter to, among other things, (a) increase the number of authorized shares of our Class A Common Stock from 250,000,000 shares to 400,000,000 shares, (b) increase the number of authorized shares of our Preferred Stock from 1,000,000 shares to 10,000,000 shares, (c) eliminate certain provisions in the Charter relating to an Initial Business Combination that will no longer be applicable to us following the Closing, (d) change the post-combination company's name to "Hyzon Motors Inc." and (e) make certain other changes that the DCRB Board deems appropriate for a public operating company.

17

Table of Contents

**Stockholder Communications**

The DCRB Board welcomes communications from our stockholders. Our stockholders may send communications to the DCRB Board, any committee of the DCRB Board or any other director in particular to:

**Decarbonization Plus Acquisition Corp.**
**2744 Sand Hill Road, Suite 100**
**Menlo Park, CA 94025**

Our stockholders should mark the envelope containing each communication as "Stockholder Communication with Directors" and clearly identify the intended recipient(s) of the communication. DCRB's Chief Executive Officer will review each communication received from our stockholders and will forward the communication, as expeditiously as reasonably practicable, to the addressees if: (a) the communication complies with the requirements of any applicable policy adopted by the DCRB Board relating to the subject matter of the communication; and (b) the communication falls within the scope of matters generally considered by the DCRB Board. To the extent the subject matter of a communication relates to matters that have been delegated by the DCRB Board to a committee or to an executive officer of DCRB, then DCRB's Chief Executive Officer may forward the communication to the executive officer or chairman of the committee to which the matter has been delegated. The acceptance and forwarding of communications to the members of the DCRB Board or an executive officer does not imply or create any fiduciary duty of any DCRB Board member or executive officer to the person submitting the communications.

**Code of Ethics and Committee Charters**

We have adopted a Code of Ethics applicable to our directors, officers and employees. Our Code of Ethics and our audit and compensation committee charters are available on our website, www.dcrbplus.com, under the "DCRB I" tab. In addition, a copy of the Code of Ethics will be provided without charge upon request from us in writing at 2744 Sand Hill Road, Suite 100, Menlo Park, CA 94025 or by telephone at (212) 993-0076. We intend to disclose any amendments to or waivers of certain provisions of our Code of Ethics in a Current Report on Form 8-K.

**Conflicts of Interest**

Riverstone manages several investment vehicles. A family of private equity funds in the energy and power industry that are managed by Riverstone ("Riverstone Funds") or its affiliates may compete with us for acquisition opportunities. If these funds decide to pursue any such opportunity, we may be precluded from procuring such opportunities. In addition, investment ideas generated within Riverstone may be suitable for both us and for a current or future Riverstone Fund and may be directed to such investment vehicle rather than to us. Neither Riverstone nor members of our management team who are also employed by Riverstone have any obligation to present us with any opportunity for a potential business combination of which they become aware. Riverstone and/or our management, in their capacities as officers or managing directors of Riverstone or in their other endeavors, may be required to present potential business combinations to the related entities, current or future investment vehicles, or third parties, before they present such opportunities to us.

Notwithstanding the foregoing, we may, at our option, pursue an acquisition opportunity jointly with our Sponsor, or one or more of its affiliates, which we refer to as an "Affiliated Joint Acquisition." Such entity may co-invest with us in the target business at the time of our Initial Business Combination, or we could raise additional proceeds to complete the acquisition by making a specified future issuance to any such fund or vehicle.

Each of our officers and directors presently has, and any of them in the future may have additional fiduciary or contractual obligations to other entities pursuant to which such officer or director is or will be required to present a business combination opportunity to such entity. Accordingly, if any of our officers or directors

173

Table of Contents

becomes aware of a business combination opportunity which is suitable for an entity to which he or she has then-current fiduciary or contractual obligations, he or she will honor his or her fiduciary or contractual obligations to present such opportunity to such other entity. We do not believe, however, that the fiduciary duties or contractual obligations of our officers or directors will materially affect our ability to complete our business combination. In addition, we may pursue an Affiliated Joint Acquisition opportunity with an entity to which an officer or director has a fiduciary or contractual obligation. Any such entity may co-invest with us in the target business at the time of our Initial Business Combination, or we could raise additional proceeds to complete the acquisition by issuing to such entity a class of equity or equity-linked securities. Our amended and restated certificate of incorporation provides that we renounce our interest in any corporate opportunity offered to any director or officer unless such opportunity is expressly offered to such person solely in his or her capacity as a director or officer of our company and such opportunity is one we are legally and contractually permitted to undertake and would otherwise be reasonable for us to pursue.

In addition, Riverstone or its affiliates, including our officers and directors who are affiliated with Riverstone, may sponsor or form other blank check companies similar to ours during the period in which we are seeking an Initial Business Combination, and members of our management team may participate in such blank check companies. Any such companies may present additional conflicts of interest in pursuing an acquisition target, particularly in the event there is overlap among the management teams. However, we do not believe that any such potential conflicts would materially affect our ability to complete our Initial Business Combination.

Investors and potential investors should also be aware of the following other potential conflicts of interest:

- None of our officers or directors is required to commit his or her full time to our affairs and, accordingly, may have conflicts of interest in allocating his or her time among various business activities.

- In the course of their other business activities, our officers and directors may become aware of investment and business opportunities which may be appropriate for presentation to us as well as the other entities with which they are affiliated. Our management may have conflicts of interest in determining to which entity a particular business opportunity should be presented.

- Our initial stockholders have agreed to waive their redemption rights with respect to any Founder Shares and any public shares held by them in connection with the consummation of our Initial Business Combination. Additionally, our initial stockholders have agreed to waive their redemption rights with respect to any Founder Shares held by them if we fail to consummate our Initial Business Combination by the deadline specified in our Charter. If we do not complete our Initial Business Combination within such time period, the proceeds of the sale of the private placement warrants held in the Trust Account will be used to fund the redemption of our public shares, and the private placement warrants will expire worthless. With certain limited exceptions, the Founder Shares are not transferrable, assignable or salable until the earlier of: (A) one year after the completion of our Initial Business Combination or (B) subsequent to our Initial Business Combination, (i) if the last sale price of the Class A Common Stock equals or exceeds $12.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within any 30-trading day period commencing at least 150 days after our Initial Business Combination, or (ii) the date on which we complete a liquidation, merger, capital stock exchange, reorganization or other similar transaction that results in all of our stockholders having the right to exchange their shares of common stock for cash, securities or other property. With certain limited exceptions, the private placement warrants and the Class A Common Stock underlying such warrants will not be transferable, assignable or salable until 30 days after the completion of our Initial Business Combination. Since our Sponsor and officers and directors directly or indirectly own common stock and warrants, our officers and directors may have a conflict of interest in determining whether a particular target business is an appropriate business with which to effectuate our Initial Business Combination.

174

**Table of Contents**

- Our officers and directors may have a conflict of interest with respect to evaluating a particular business combination if the retention or resignation of any such officers and directors was included by a target business as a condition to any agreement with respect to our Initial Business Combination.

- Our Sponsor, officers or directors may have a conflict of interest with respect to evaluating a business combination and financing arrangements as we may obtain loans from our Sponsor or an affiliate of our Sponsor or any of our officers or directors to finance transaction costs in connection with an intended Initial Business Combination. Up to $1,500,000 of such loans may be convertible into warrants of the post combination entity at a price of $1.00 per warrant at the option of the lender. Such warrants would be identical to the private placement warrants, including as to exercise price, exercisability and exercise period.

The conflicts described above may not be resolved in our favor.

In general, officers and directors of a corporation incorporated under the laws of the State of Delaware are required to present business opportunities to a corporation if:

- the corporation could financially undertake the opportunity;

- the opportunity is within the corporation's line of business; and

- it would not be fair to our company and its stockholders for the opportunity not to be brought to the attention of the corporation.

Accordingly, as a result of multiple business affiliations, our officers and directors may have similar legal obligations relating to presenting business opportunities meeting the above-listed criteria to multiple entities. Furthermore, our Charter provides that the doctrine of corporate opportunity will not apply with respect to any of our officers or directors in circumstances where the application of the doctrine would conflict with any fiduciary duties or contractual obligations they may have.

We are not prohibited from pursuing an Initial Business Combination with a company that is affiliated with our Sponsor, officers or directors. In the event we seek to complete our Initial Business Combination with such a company, we, or a committee of independent directors, would obtain an opinion from an independent investment banking firm which is a member of FINRA, or from an independent accounting firm, that such Initial Business Combination is fair to our company from a financial point of view.

In the event that we submit our Initial Business Combination to our public stockholders for a vote, our initial stockholders have agreed to vote any Founder Shares held by them and any public shares held by them in favor of our Initial Business Combination, and our officers and directors have also agreed to vote any public shares held by them in favor of our Initial Business Combination.

**Limitation on Liability and Indemnification of Officers and Directors**

Our Charter provides that our officers and directors will be indemnified by us to the fullest extent authorized by Delaware law, as it now exists or may in the future be amended. In addition, our Charter provides that our directors will not be personally liable for monetary damages to us or our stockholders for breaches of their fiduciary duty as directors, unless they violated their duty of loyalty to us or our stockholders, acted in bad faith, knowingly or intentionally violated the law, authorized unlawful payments of dividends, unlawful stock purchases or unlawful redemptions, or derived an improper personal benefit from their actions as directors.

We have entered into agreements with our officers and directors to provide contractual indemnification in addition to the indemnification provided for in our Charter. Our bylaws also permit us to secure insurance on behalf of any officer, director or employee for any liability arising out of his or her actions, regardless of whether Delaware law would permit such indemnification. We purchased a policy of directors' and officers' liability insurance that insures our officers and directors against the cost of defense, settlement or payment of a judgment in some circumstances and insures us against or obligations to indemnify our officers and directors.

175