**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *IN RE HYZON MOTORS INC, SECURITIES LITIGATION* | Master File No.: 21-cv-06612-CJS-MWP |
| | Dated:        September 13, 2023 |
| This Document Relates to: ALL ACTIONS. | |

**THE DCRB DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION TO DISMISS THE THIRD AMENDED AND CONSOLIDATED COMPLAINT**

VINSON & ELKINS LLP

Michael C. Holmes (*pro hac vice*)
Jeffrey Crough (*pro hac vice*)
Eugene Temchenko (*pro hac vice*)
2001 Ross Avenue, Suite 3900
Dallas, Texas 75201
Telephone:  +1.214.220.7700

Marisa Antonelli
1114 Avenue of the Americas
New York, NY  10036-7708
Telephone:  +1.212.237.0000

*Counsel for Peter Haskopoulos, Robert Tichio, Jennifer Aaker, Jane Kearns, Pierre Lapeyre, David Leuschen, Jim McDermott, Jeffrey Tepper, Michael Warren, Riverstone Investment Group LLC, Decarbonization Plus Acquisition Sponsor, LLC, and WRG DCRB Investors, LLC*

## TABLE OF CONTENTS

**Page**

I.  Preliminary Statement ............................................................................................... 1

II.  Background ................................................................................................................ 4

    A.  DCRB is formed to acquire a business focused on decarbonization. ................. 4

    B.  DCRB explores potential transactions and agrees to combine with Hyzon. ...... 5

    C.  Hyzon and DCRB make statements regarding Hyzon. ....................................... 6

    D.  DCRB issues the Proxy. ...................................................................................... 7

    E.  The Merger closes and the DCRB Board resigns. .............................................. 8

    F.  Short-sellers attack New Hyzon and Plaintiff files suit but waits nearly two years to tack on a Section 14(a) claim against the DCRB Defendants. ........................................................... 9

III.  Legal Standards........................................................................................................ 9

IV.  Argument ................................................................................................................ 10

    A.  The Section 14(a) Claim against the DCRB Defendants Fails. ........................ 10

        1.  The Section 14(a) claim is derivative but Plaintiff failed to satisfy Rule 23.1. ............ 11

        2.  The Section 14(a) claim against DCRB Defendants fails because Plaintiff did not plead the requisite mental state. ............................................................................. 12

            a.  Despite alleging a Section 14(a) claim sounding in fraud, Plaintiff failed to allege fraud with specificity per Rule 9(b). .................................................................. 13

            b.  Even if Rule 9(b) did not apply, Plaintiff failed to plead negligence. ...................... 16

        3.  WRG cannot be liable under Section 14(a) because it is not alleged to have had sufficient participation in the solicitation efforts. ................................................................. 17

        4.  There was no false statement or material omission. ...................................... 18

            a.  Projections are forward-looking statements that cannot form the basis of a Section 14(a) claim. ..................................................................................... 18

            b.  Statements about New Hyzon's sales pipeline cannot be alleged to be false based on subsequent results. ......................................................................... 19

            c.  The DCRB Defendants did not misrepresent Hyzon's relationship with Hiringa.... 20

    B.  The Section 10(b) Claims against Tichio and Haskopoulos Fail.................... 21

        1.  No statement attributable to Tichio and Haskopoulos is alleged to be false or misleading. 22

        2.  The TAC Does Not Plead a Strong Inference of Scienter. .............................. 23

    C.  Without a Predicate Violation, the Section 20(a) Claims Fail........................ 25

V.  Conclusion .............................................................................................................. 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Asay v. Pinduoduo Inc.*,
2021 WL 3871269 (2d Cir. Aug. 31, 2021)...................................................................... 25

*Atuahene v. City of Hartford*,
10 F. App'x 33 (2d Cir. 2001) ........................................................................................ 17

*Bisel v. Acasti Pharma, Inc.*,
2022 WL 4538173 (S.D.N.Y. Sept. 28, 2022)............................................................. 9, 10

*Bond Opportunity Fund v. Unilab Corp.*,
2003 WL 21058251 (S.D.N.Y. May 9, 2003), *aff'd*,
87 F. App'x 772 (2d Cir. 2004) ................................................................................. passim

*Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd*,
866 F. Supp. 2d 223 (S.D.N.Y. 2012) ........................................................................... 16

*Brookfield Asset Mgmt., Inc. v. Rosson*,
261 A.3d 1251 (Del. 2021) ....................................................................................... 11, 12

*Cohen v. Stevanovich*,
722 F. Supp. 2d 416 (S.D.N.Y. 2010) ........................................................................... 25

*El Paso Pipeline GP Co. v. Brinckerhoff*,
152 A.3d 1248 (Del. 2016) ............................................................................................ 12

*Enzo Biochem, Inc. v. Harbert Discovery Fund, LP*,
2021 WL 4443258 (S.D.N.Y. Sept. 27, 2021)................................................................ 14

*Geoffrey A. Orley Revocable Tr. U/A/D 1/26/2000 v. Genovese*,
2020 WL 611506 (S.D.N.Y. Feb. 7, 2020)..................................................................... 22

*Halebian v. Berv*,
590 F.3d 195 (2d Cir. 2009) ........................................................................................... 11

*I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*,
936 F.2d 759 (2d Cir. 1991) ............................................................................................. 4

*In re Adient plc Sec. Litig.*,
2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020) .................................................................. 15

*In re AmTrust Fin. Servs., Inc. Sec. Litig.*,
2019 WL 4257110 (S.D.N.Y. Sept. 9, 2019).................................................................. 23

*In re Axis Cap. Holdings Ltd. Sec. Litig.*,
456 F. Supp. 2d 576 (S.D.N.Y. 2006) ........................................................................... 10

*In re Bank of Am. Corp. Sec., Deriv., & ERISA Litig.*,
757 F. Supp. 2d 260 (S.D.N.Y. 2010) ........................................................................... 18

*In re Chembio Diagnostics, Inc. Sec. Litig.*,
586 F. Supp. 3d 199 (E.D.N.Y. 2022) ........................................................................... 14

*In re JP Morgan Chase Sec. Litig.*,
363 F. Supp. 2d 595 (S.D.N.Y. 2005) ................................................................................... 13

*In re Lululemon Sec. Litig.*,
14 F. Supp. 3d 553 (S.D.N.Y. 2014), *aff'd*,
604 F. App'x 62 (2d Cir. 2015) ........................................................................................... 20

*In re Marsh & Mclennan Cos., Inc. Sec. Litig.*,
501 F. Supp. 2d 452 (S.D.N.Y. 2006) ................................................................................. 15

*In re McKesson HBOC, Inc. Sec. Litig.*,
126 F. Supp. 2d 1248 (N.D. Cal. 2000) .............................................................................. 16

*In re Molycorp, Inc. Sec. Litig.*,
2015 WL 1097355 (S.D.N.Y. Mar. 12, 2015) ..................................................................... 22

*In re MultiPlan Corp. S'holders Litig.*,
268 A.3d 784 (Del. Ch. 2022) ............................................................................................. 12

*In re NYMEX S'holder Litig.*,
2009 WL 3206051 (Del. Ch. Sept. 30, 2009) ...................................................................... 11

*In re Pattern Energy Grp. Inc. Sec. Litig.*,
2021 WL 311257 (D. Del. Jan. 28, 2021).............................................................................. 17

*In re PXRE Grp., Ltd. Sec. Litig.*,
600 F. Supp. 2d 510 (S.D.N.Y. 2009) ............................................................................ 14, 24

*In re Romeo Power, Inc. Sec. Litig.*,
2022 WL 1806303 (S.D.N.Y. June 2, 2022) ..................................................................... 2, 11

*In re Supercom Inc. Sec. Litig.*,
2018 WL 4926442 (S.D.N.Y. Oct. 10, 2018).......................................................................... 24

*Janus Cap. Grp., Inc. v. First Deriv. Traders*,
564 U.S. 135 (2011)............................................................................................................. 22

*Kalnit v. Eichler*,
264 F.3d 131 (2d Cir. 2001) ................................................................................................ 24

*Karp v. First Conn. Bancorp, Inc.*,
535 F. Supp. 3d 458 (D. Md. 2021)..................................................................................... 17

*Lopez v. CTPartners Exec. Search Inc.*,
173 F. Supp. 3d 12 (S.D.N.Y. 2016) ........................................................................ 4, 18, 21

*Malin v. XL Cap. Ltd.*,
499 F. Supp. 2d 117 (D. Conn. 2007), *aff'd*,
312 F. App'x 400 (2d Cir. 2009) ........................................................................................... 4

*McIntire v. China MediaExpress Hldgs., Inc.*,
927 F. Supp. 2d 105 (S.D.N.Y. 2013) ................................................................................. 25

*Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.*,
645 F. Supp. 2d 210 (S.D.N.Y. 2009) ....................................................................... 13, 14, 22

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004) ........................................................................ 13

*Ronconi v. Larkin*,
253 F.3d 423 (9th Cir. 2001) ......................................................................... 3

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
573 F.3d 98 (2d Cir. 2009) .......................................................................... 24

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)..................................................................................... 24

*Tongue* v. *Sanofi*,
816 F.3d 199 (2d Cir. 2016) ........................................................................ 23

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.*,
845 A.2d 1031 (Del. 2004) .......................................................................... 11

*Varjabedian v. Emulex Corp.*,
2020 WL 1847708 (C.D. Cal. Feb. 25, 2020) ........................................... 17

*Woolgar v. Kingston Cos.*,
477 F. Supp. 3d 193 (S.D.N.Y. 2020) ................................................... 20, 23

**Statutes**

15 U.S.C. § 78u-4 ................................................................................... 10, 16, 23

15 U.S.C. § 78u-5 ............................................................................................ 18

**Rules**

Fed. R. Civ. P. 8............................................................................................... 17

Fed. R. Civ. P. 9................................................................................. 2, 10, 13, 16

Fed. R. Civ. P. 23.1 .................................................................................. 1, 11, 13

## I.     **PRELIMINARY STATEMENT**

For almost two years, Plaintiff has been waging this federal securities lawsuit alleging misstatements under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 regarding Hyzon Motors Inc. ("Hyzon"), a nascent developer of hydrogen-fueled vehicles formed through a July 2021 "SPAC" business combination (the "Merger") between Decarbonization Plus Acquisition Corporation ("DCRB") and Hyzon (before Merger, "Legacy Hyzon" and after Merger, "New Hyzon").  Plaintiff's Third Amended Complaint (the "TAC"), filed in June 2023, now belatedly gloms on claims under Section 14(a) of the Securities Exchange Act of 1934 against each of DCRB's directors, its sponsor, and other affiliates (collectively, the "DCRB Defendants") (only one of which had any role in managing New Hyzon) and posits that the same disclosure themes underlying Plaintiff's Section 10(b) claims also infect the proxy statement ("Proxy") and related filings soliciting stockholder approval for the Merger (collectively, the "Merger Filings"). But the Merger Filings were clear about the opportunities and risks ahead.  Although Legacy Hyzon had garnered substantial interest from potential customers, it had an untested business model in an emerging industry, it had no revenue, and its manufacturing plants were incomplete.

Plaintiff's disclosure theories—whether related to post-Merger statements or the Merger Filings—fail for the fundamental reasons explained in the Hyzon Defendants' brief (the "Hyzon Brief" or "Hyzon Br.").  The DCRB Defendants file this brief to explain why the Plaintiff's newly-minted Section 14(a) theory against them is particularly deficient, and why there is no basis for the TAC's inclusion of two peripheral DCRB Defendants in the Section 10(b) claims.

**Section 14(a) claims**:  As a threshold matter, as *In re Romeo Power, Inc. Sec. Litig.* recently held, a Section 14(a) claim is derivative where, as here, it seeks damages on the theory that a proxy misrepresented the true value of the target corporation, and should be dismissed because Plaintiff has not satisfied the demand requirements of Federal Rule of Civil Procedure

23.1. *See* 2022 WL 1806303, at *5 (S.D.N.Y. June 2, 2022). Further, notwithstanding Plaintiff's purported disclaimers, the TAC broadly accuses the DCRB Defendants of fraudulent behavior, triggering Rule 9(b) without offering the required particularized allegations of scienter or of what contrary information any DCRB Defendant received or when. Nor could Plaintiff reconcile any suggestion that the DCRB Defendants knew that Hyzon was not as represented with the DCRB Defendants' interest, as they would hold substantial equity in the post-Merger entity, giving them as strong an incentive as anyone to ensure that post-Merger Hyzon lived up to expectations. Even if the Court gave effect to the TAC's disclaimers of alleging fraud selectively as to Section 14(a) (but not Section 10(b)), the TAC likewise fails to plead facts establishing even negligence by the DCRB Defendants. Finally, as the Hyzon Brief explains more fully, Plaintiff fails to adequately allege that the Merger Filings were materially false or misleading. It was Plaintiff's burden to allege that financial projections and sales pipeline statements were false at the time they were made, and falsity cannot be inferred retrospectively simply by contrasting the Merger Filings' non-actionable forward-looking projections with disappointing actual results. And even when Plaintiff focuses on contemporaneous facts—such as statements describing Hyzon's relationship with hydrogen infrastructure partner Hiringa Energy ("Hiringa")—he misconstrues the statements and seeks to draw implausible inferences.

**Section 10(b)**: The TAC, like its predecessors, continues to include two DCRB Defendants—Robert Tichio, DCRB's Chairman, and Peter Haskopoulos, DCRB's CFO—among the Section 10(b) defendants, seeking to hold them liable for literally every statement challenged in the TAC, even after the Merger closed when they had no role at Hyzon. The few statements they allegedly made preceding the Merger (1) are duplicative of those underlying the deficient Section 14(a) claim and fail for the same reasons, or (2) are forward-looking statements or

expressions of optimism couched in cautionary language.  Moreover, the TAC lacks particularized allegations supporting a compelling inference that Tichio and Haskopoulos acted with scienter.

**Section 20**:  Because Plaintiff's primary claims fail, the Section 20 controller-liability claims also necessarily fail against the DCRB Defendants.

Finally, to the extent Plaintiff seeks to overcome the TAC's deficiencies by pointing to the Delaware Court of Chancery's recent decision denying dismissal of a breach of fiduciary duty claim related to the Merger Filings, that reliance is misplaced.  *See Malork v. Anderson, et al.*, C.A. No. 2022-0260-PAF (Del. Ch.).  For example:

- The Delaware Court premised its finding of a direct claim on allegations that individual redemption rights were impaired, in contrast to the classically derivative theory here of an acquisition overpayment.  Ex. C, Tr. at 20:6-14.

- The Delaware Court had no occasion to make findings that the defendants had acted with any requisite mental state at all.  *Id*. at 34:13-17, 37:20-38:2, 39:6-40:21;

- The Delaware Court repeatedly emphasized that its disclosure analysis included a "very close call" even under Delaware's plaintiff-friendly "reasonable conceivability" standard.  *Id.* at 23:1-18, 37:1-4, 37:20-38:4, 40:4-9 ("[T]he operative test is one of reasonable conceivability, which asks whether there is a possibility of recovery.").  By contrast, Plaintiff's claims must meet the much higher standard of pleading with particularity, and he is entitled to only the most plausible of competing inferences and must show a plausible (not merely possible) claim to relief.  *Infra* § II; *Ronconi v. Larkin*, 253 F.3d 423, 437 (9th Cir. 2001) ("The heightened pleading requirements of the [PSLRA] are an unusual deviation from the usually lenient requirements of [notice] pleading."); and

- Here, the bulk of Plaintiff's disclosure claims challenge forward-looking statements subject to

a federal statutory safe harbor and are not actionable, either because they were "(i) accompanied by meaningful cautionary language *or* … the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading."  *Lopez v. CTPartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 24-25 (S.D.N.Y. 2016).

For these reasons, the Delaware decision does not determine the sufficiency of Plaintiff's allegations under the more onerous standards of the federal securities laws.  Because the Complaint fails to state claim under those standards, as explained below, it should be dismissed.

## II.    BACKGROUND

### A.    DCRB is formed to acquire a business focused on decarbonization.

In September 2017, DCRB was formed as a special purpose acquisition company ("SPAC") to combine with a company focused on "decarbonz[ing] the [economy's] most carbon-intensive sectors."  Ex. A, Prospectus 2, 4 F-7 (Oct. 10, 2020); Ex. B, Proxy 94 (June 21, 2021).[1] DCRB was formed by its sponsor, Decarbonization Plus Acquisition Sponsor, LLC ("DCRB Sponsor"), and had 24 months following its initial public offering (the "IPO") to complete its business combination or it would unwind and return capital to investors.  Ex. A, Prospectus 23.

DCRB was overseen by a highly qualified board:  Robert Tichio (Chairman), Jim McDermott (Lead Independent Director), Erik Anderson, Dr. Jennifer Aaker, Jane Kearns, Pierre Lapeyre, Jr., David Leuschen, Jeffery Tepper, and Michael Warren (the "DCRB Board").  Ex. B, Proxy 181-85; TAC ¶¶ 36, 41, 53-59.  Anderson—the founder of investment firm WestRiver

---

[1] The Court may "examine [the registration and proxy plaintiff cites] together with the allegations contained on the face of the complaint" because those documents are "integral to the complaint." *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 762 (2d Cir. 1991). Moreover, a court can take judicial notice of "SEC filings even if the plaintiff did not specifically cite them in the complaint," considering them either "for the truth of their contents" or simply to assess the total mix of information available.  *See Malin v. XL Cap. Ltd.*, 499 F. Supp. 2d 117, 132-33 (D. Conn. 2007) (collecting authorities), *aff'd*, 312 F. App'x 400 (2d Cir. 2009).

Group—served as DCRB's CEO and formed WRG DCRB Investors, LLC ("WRG") to hold the founder shares awarded for his DCRB service.  Ex. B, Proxy v, 95, 181; TAC ¶ 50.  Peter Haskopoulos served as DCRB's CFO, Chief Accounting Officer, and Secretary.  Ex. B, Proxy 181; TAC ¶ 37.  Lapeyre, Leuschen, and Tichio were executives at Riverstone Holdings, LLC, an affiliate of both DCRB Sponsor and Riverstone Investment Group LLC, a private equity firm experienced in acquiring and managing businesses addressing climate change.  Ex. A, Prospectus 2, 96-97; TAC ¶ 49.

DCRB completed its IPO on October 22, 2020, issuing 20 million units at $10 each—which consisted of one share of DCRB Class A Common Stock and one-half of one public warrant to later purchase additional Class A shares for $11.50 per share.  Ex. B, Proxy 95, 218; TAC ¶ 99.  Following the typical SPAC structure, DCRB Sponsor, independent directors McDermott, Aaker, Tepper, and Warren, and WRG collectively held approximately 20% of DCRB's outstanding shares after its IPO in the form of "founder shares." Ex. A, Prospectus 12, 105; TAC ¶ 489.

**B.      DCRB explores potential transactions and agrees to combine with Hyzon.**

Following the IPO, as part of its robust search for targets, DCRB identified Legacy Hyzon, which, as more fully described in the Hyzon Brief, was a spin-off from Horizon Fuel Cell Technologies ("Horizon").  Ex. B, Proxy 63, 95; TAC ¶¶ 32, 80-81, 91, 104; Hyzon Br. at 4-5.  DCRB and Legacy Hyzon began discussions on October 30, 2020, and executed a confidentiality agreement on November 2, 2020.  Ex. B, Proxy 95.  Between November 2020 and February 2021, DCRB and its legal, financial, and industry advisors performed due diligence on Legacy Hyzon and negotiated a business combination.  Ex. B, Proxy 95-100.  On February 8, 2021, the DCRB Board unanimously approved the Merger, Ex. B, Proxy 13, 22, 100; TAC ¶ 106, and the Merger was publicly announced the next day.  Ex. B, Proxy 100; TAC ¶ 109.

C.      **Hyzon and DCRB make statements regarding Hyzon.**

Along with the announcement of the Merger and afterwards, DCRB made robust disclosures regarding the Merger, Legacy and New Hyzon (collectively "Hyzon"), and its industry.

On February 9, 2021, DCRB issued a press release announcing the Merger, held an investor call, and disseminated an investor presentation, which included a slide detailing Legacy Hyzon's sales pipeline.  TAC ¶ 298; Ex. D at slide 18.  For each partner discussed, the slide disclosed whether orders were under contract or at a preliminary stage (e.g., "advanced discussions," "MOU," etc.).  Ex. D at slide 18.  Updated presentations were disseminated on February 10 and February 12.  TAC ¶¶ 304, 307; *e.g.*, Ex. E.  Although Plaintiff claims that customers were "surreptitiously dropped" between the February 9 and February 12 versions, the logos of the customers were merely removed to anonymize them, as the Hyzon Brief demonstrates.  *See* TAC ¶ 309; Hyzon Br. at 6-7, 24.  In April 2021, a revised version similarly depicted anonymized customers and provided updates regarding the pipeline.  Ex. F at slide 35; Hyzon Br. at 7.

Among the relationships discussed in the sales pipeline was Hiringa, identified as Legacy Hyzon's "hydrogen infrastructure partner" in New Zealand, which had signed a contract for 20 trucks with "[p]rojected [d]elivery" in 2021 and projected purchases of 1,400+ trucks within five years.  Ex. E at slide 18; Ex. F at slide 35.  Contrary to Plaintiff's claims that DCRB and Hyzon omitted that Hiringa was a "channel-partner" rather than an "end-user" of Hyzon vehicles (TAC ¶ 129), the investor presentations and other communications clearly described the nature of the relationship, as the Hyzon Brief again explains:  Hiringa would build a hydrogen refueling network for its fleet operator partners, who would purchase Hyzon trucks.  *See* Hyzon Br. at 7-8, 25-26; Ex. E at slide 18; Ex. F at slide 35; Ex. G (Feb. 17, 2021 Press Release); Ex. B, Proxy 164; Ex. N.

The presentations also included a set of "Summary Projected Financials" for Legacy Hyzon which (among other things) projected revenues, gross margins between 30.8% and 33.6%, and

vehicle deliveries for 2021 through 2025.  Exs. D-E at slide 39; Ex. F at slide 52; TAC ¶¶ 298, 304, 307, 321.  Each presentation explained that the "projected financial information constitute[d] forward-looking information" that was "inherently uncertain" and "should not be relied upon as necessarily being indicative of future results."  Exs. D-F at slide 2.

**D.      DCRB issues the Proxy.**

DCRB also issued a series of preliminary proxy statements before issuing the final Proxy on June 21, 2021.  TAC ¶ 319.  Each version explained the background of the Merger and provided a detailed list of factors (both positive and negative) that the DCRB Board had considered in connection with the transaction.   TAC ¶ 315; Exs. I-L.  While the Proxy explained that Legacy "Hyzon ha[d] already received a limited number of orders" and that "[t]he DCRB Board considered [Legacy] Hyzon's non-binding memoranda of understanding, letters of intent and a limited number of orders with various clients, including blue-chip Fortune 100 companies," the Proxy also warned investors that Legacy Hyzon "ha[d] a limited number of current customers," that "there [wa]s no assurance as to whether [New] Hyzon's sales pipeline w[ould] result in sales and revenues," and that Legacy "Hyzon's orders each include[d] terms permitting the counterparty to cancel or suspend some or all of their obligations thereunder."  Ex. B, Proxy 26, 101, 135, 161-62.  The Proxy similarly cautioned that Legacy Hyzon had not yet completed its manufacturing facilities, had a "business model … yet to be tested," and also operated in a "market for hydrogen-powered commercial vehicles [that was] new and untested."  *Id*. at 26, 33, 36.

The Proxy also included a summary of Legacy Hyzon's internal financial projections, which had been provided to DCRB during diligence.  TAC ¶ 315; Ex. B, Proxy 104-07.  The projections were contextualized by detailed explanation of their underlying assumptions, which, consistent with the investor presentations, included "maintaining gross margins relatively

consistent at 30% to 33% from 2021 to 2025." Ex. B, Proxy 106-07; TAC ¶ 315.[2]  The projections were accompanied by extensive cautionary language, including that they (i) were only "provided in th[e] proxy statement because they were made available to DCRB and the DCRB Board in connection with their review" of the transaction, (ii) had not been updated since they were provided to the DCRB Board, (iii) represented "forward-looking statements that are inherently subject to significant uncertainties," and (iv) should not be "rel[ied] on … in making a decision regarding the [Merger]." Ex. B, Proxy 104-05.

Finally, a preliminary version of the Proxy also explained Legacy Hyzon's relationship with Hiringa.  TAC ¶ 357; Ex. I at 127.  Consistent with the investor presentations and press releases, the preliminary proxy explained that Hiringa had "placed a binding order for the first 20 trucks … and aim[ed] to deploy up to 1,500 … trucks manufactured by [Legacy] Hyzon to fleet operators in New Zealand by 2026." *Id*.  It further explained that Legacy Hyzon "expect[ed] the first shipments of four trucks to occur by the first quarter of 2022." *Id*.  The final Proxy mentioned Hiringa only once, stating "Hyzon intends to collaborate with chosen technology and project development partners such as … Hiringa in New Zealand … to ensure that affordable hydrogen is available to its fleet operator customers." Ex. B, Proxy 164.

### E.    The Merger closes and the DCRB Board resigns.

On July 15, 2021, 95% of the DCRB shares present at a special meeting voted to approve the Merger.  TAC ¶ 143; Ex. M at Ex. 99.1.  The next day the Merger closed, all members of the DCRB Board resigned except for Erik Anderson, DCRB was renamed Hyzon, and the combined entity began trading on the Nasdaq under the symbol "HYZN."  TAC ¶¶ 143-44; Ex. B, Proxy 5,

---

[2] Plaintiff complains that the use of the word "maintains" created the "misleading impression that [Legacy]] Hyzon already had gross margins at 30-33%."  TAC ¶ 317.  This argument is meritless, including because Hyzon repeatedly disclosed it had no revenues.  *See* Hyzon Br. at 25.

100.  Thereafter, the DCRB Defendants ceased to have any role in New Hyzon's management, except for Anderson's continued service as a New Hyzon director.  *See* Ex. B, Proxy 202.

**F.      Short-sellers attack New Hyzon and Plaintiff files suit but waits nearly two years to tack on a Section 14(a) claim against the DCRB Defendants.**

As described more fully in the Hyzon Brief, nearly eight months after the Merger was announced and over two months after it closed, New Hyzon came under attack in short seller reports by Blue Orca Capital (the "Blue Orca Report") and Iceberg Research.  Hyzon Br. at 10-11. In January 2022, New Hyzon also disclosed receipt of a subpoena from the U.S. Securities and Exchange Commission "related to the allegations made in the [Blue Orca Report]."  TAC ¶ 192.

Shortly after the Blue Orca Report, several purported shareholders of New Hyzon filed complaints parroting its allegations and asserting violations of Sections 10(b) and 20(a) against New Hyzon and certain individuals.  The initial Consolidated Amended Class Action Complaint filed in March 2022 asserted, *inter alia*, claims for purported violations of Section 10(b) against Tichio and Haskopoulos.[3]  ECF No. 34 ¶¶ 30-31, 302-11.  On September 16, 2022, Plaintiff again amended to add factual allegations related to subsequent events at New Hyzon.  *See* ECF Nos. 54, 55.  Over nine months later, on June 23, 2023, Plaintiff again amended and filed the TAC, introducing for the first time Section 14(a) and 20(a) claims against the DCRB Defendants.

**III.   LEGAL STANDARDS**

The TAC asserts claims under Sections 14(a), and 20(a) against each DCRB Defendant, and also under Section 10(b) against Tichio and Haskopoulos.  For each claim, "Plaintiff faces a high pleading standard" under the Private Securities Litigation Reform Act ("PSLRA").  *Bisel v. Acasti Pharma, Inc.*, 2022 WL 4538173, at *6 (S.D.N.Y. Sept. 28, 2022).  Plaintiff must "specify

---

[3] The *Malork* action was filed in the Delaware Court of Chancery on March 18, 2022.  *See Malork v. Anderson, et al.*, C.A. No. 2022-0260-PAF (Del. Ch.).  The Court of Chancery denied the defendants' motion to dismiss that action on July 17, 2023.  *See* Ex. C.

each statement alleged to have been misleading, the reason or reasons why the statement is misleading." *Id.* (Section 14(a)); *In re Axis Cap. Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 583-84 (S.D.N.Y. 2006) (Section 10(b)). The PSLRA also requires pleading "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). "The 'strong inference' requirement … mean[s] that plaintiffs are entitled to only the most plausible of competing inferences." *Bond Opportunity Fund v. Unilab Corp.*, 2003 WL 21058251, at *3 (S.D.N.Y. May 9, 2003), *aff'd*, 87 F. App'x 772 (2d Cir. 2004).

Additionally, any claim "grounded in alleged fraudulent conduct" is "subject to Federal Rule of Civil Procedure 9(b)'s heightened pleading standard for allegations of fraud." *Bisel*, 2022 WL 4538173, at *7. That heightened standard applies to negligence claims under Section 14 when "grounded in alleged fraudulent conduct" even if, as here (TAC ¶ 543), Plaintiff "disclaims any allegations of fraud." *Id.*. Rule 9(b) requires that plaintiffs "'[i] specify the statements that [they] contend[] were fraudulent, [ii] identify the speaker, [iii] state where and when the statements were made, and [iv] explain why the statements were fraudulent.'" *Id*.

## IV.   ARGUMENT[4]

### A.   The Section 14(a) Claim against the DCRB Defendants Fails.

Plaintiff's Section 14(a) claims allege that DCRB's pre-Merger Filings misled investors about Legacy Hyzon's revenue projections, sales pipeline, and relationship with Hiringa. *See* TAC ¶ 545. Those claims fail because they are derivative, Plaintiff wholly failed to plead the requisite culpable mental state, and the TAC lacks facts demonstrating the statements were false when made.

---

[4] As discussed above, the Delaware *Malork* decision, with which the DCRB Defendants respectfully disagree, does not control here given the different procedural and substantive frameworks of the claims in the two suits. Plaintiff's allegations here must be judged against the requirements of the PSLRA and the federal securities laws, including the safe harbors for forward looking statements and the applicable mental states. The *Malork* decision cannot fill in the Complaint's significant shortcomings from those requirements. *See supra* § I; Hyzon Br. at n.7.

#### 1.    The Section 14(a) claim is derivative but Plaintiff failed to satisfy Rule 23.1.

The Court should follow the recent *Romeo Power* decision, hold that the Section 14(a) claims are derivative, and dismiss the claims because Plaintiff failed to "satisfy … Rule 23.1" by making demand on the New Hyzon board or pleading demand futility. 2022 WL 1806303, at *5.

The law of Delaware, the state of incorporation of DCRB and New Hyzon, controls whether the Section 14(a) claim is direct or derivative. *Halebian v. Berv*, 590 F.3d 195, 206 (2d Cir. 2009); Ex. B, Proxy viii. Under Delaware law, courts "look to the nature of the wrong and to whom the relief should go." *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1039 (Del. 2004). The inquiry does not depend on "plaintiff's characterization of the claim." *In re NYMEX S'holder Litig.*, 2009 WL 3206051, at *9 (Del. Ch. Sept. 30, 2009). Rather, a plaintiff can only state a "direct" claim by "demonstrat[ing] that he…can prevail without showing an injury to the corporation," because harms that flow indirectly to stockholders through the corporation are derivative. *Brookfield Asset Mgmt., Inc. v. Rosson*, 261 A.3d 1251, 1263, 1266, 1268 (Del. 2021).

The *Romeo Power* ruling correctly held that a Section 14(a) claim was derivative in the exact same context. 2022 WL 1806303, at *5. There, the plaintiffs brought a Section 14(a) claim against a SPAC's directors that alleged misleading disclosures in the proxy for a de-SPAC transaction overstated the value of a company by misrepresenting the strength of its supply chain. *Id*. The Court held the claim was derivative under Delaware law because its "essence [was] that the proxy…overstated the value of [the target] and as a result, [the SPAC's] shareholders received less in value from the merger than they expected when they approved it." *Id*.

Plaintiff advances the same theory here. Plaintiff identifies his damages under Section 14(a) as "the difference between the inflated price th[e] investors paid when purchasing Hyzon securities and the true value of those securities once the inflation is removed," and alleges

-11-

that misleading proxy materials "caused [DCRB stockholders] to vote in favor of the SPAC Merger." TAC ¶¶ 551-52. In other words, Plaintiff claims that a misleading proxy caused DCRB stockholders to approve the Merger with Legacy Hyzon for more than Legacy Hyzon was actually worth, and that the value of DCRB stockholders' shares went down when that was supposedly uncovered. This is a textbook "overpayment" claim that is "exclusively derivative" under Delaware law, *Brookfield*, 261 A.3d at 1265, since the alleged conduct "harm[ed] the corporation directly" and "stockholders only derivatively so far as their stock los[t] value," *El Paso Pipeline GP Co. v. Brinckerhoff*, 152 A.3d 1248, 1261 (Del. 2016).

The Court of Chancery's holding in *Malork* that the fiduciary duty claims were direct claims did not address the Section 14(a) claim at issue in this case and therefore does not change this outcome. Ex. C, Tr. 20:6-14. Applying its earlier analysis in *In re MultiPlan Corp. S'holders Litig.*, 268 A.3d 784 (Del. Ch. 2022), the Court of Chancery explained that the claims were direct because "the plaintiffs [were] not suing because [the SPAC] did not combine [] on more favorable terms" but instead because "the Plaintiff allege[d] that the Defendants breached their fiduciary duties by … impairing the [] stockholder's [contractual] redemption right through false and misleading disclosures," and that impairment was "a harm independent of and not shared with [the SPAC]." Ex. C, Tr. 20:6-14; *MultiPlan*, 268 A.3d at 802, 804-05. Unlike claimed impairment of a contractual redemption right held by a plaintiff individually, Plaintiff here alleges damage based on the general decline in stock price allegedly due to overpayment. *See* TAC ¶¶ 551-52.

### 2. The Section 14(a) claim against DCRB Defendants fails because Plaintiff did not plead the requisite mental state.

Given the Hyzon Brief's thorough explanation that the Merger Filings were not false or misleading, the DCRB Defendants address the applicable mental state element before further explaining why the Complaint fails to adequately allege a material misstatement. Indeed, the Court

need not grapple with the alleged falsity or materiality of the challenged statements because (in addition to failing to satisfy Rule 23.1) Plaintiff failed to plead the requisite level of culpability. Because the "Section 14(a) claim[] [is] based in fraud" despite Plaintiff's disclaimers, "Plaintiff[] must," but fails to, "alleg[e] with … specificity [each defendant's] knowledge of the alleged[] fraud[]" pursuant to Rule 9(b). *Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.*, 645 F. Supp. 2d 210, 239 (S.D.N.Y. 2009). And even if the claim sounded in negligence, Plaintiff wholly failed to allege facts showing that any specific defendant acted negligently.

> a.    Despite alleging a Section 14(a) claim sounding in fraud, Plaintiff failed to allege fraud with specificity per Rule 9(b).

In tacit recognition that he cannot allege that the DCRB Defendants knowingly made misstatements, Plaintiff purports to disclaim reliance on allegations of fraud but only as to the Section 14(a) claim. TAC ¶ 543. However, a plaintiff may not plead around Rule 9(b) through such boilerplate and selective disclaimers. *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 636 (S.D.N.Y. 2005). Rule 9(b) applies regardless of disclaimers where "wording and imputations" of the allegations "are classically associated with fraud." *Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir. 2004). Thus, in *Rombach*, the Second Circuit required plaintiffs to satisfy Rule 9(b) because plaintiffs alleged "the [r]egistration statement was 'inaccurate *and* misleading;' that it contained '*untrue* statements of material facts;' and that 'materially *false* and *misleading* written statements' were issued." *Id.*

The rationale for applying Rule 9(b) in this case to the Section 14(a) claim in addition to the Section 10(b) claim is even stronger than in *Rombach*. The Section 14(a) claim is premised on the same representations concerning Legacy Hyzon's sales pipeline and business potential as the Section 10(b) fraud claims, and Plaintiff alleges—as in *Rombach*—that DCRB Defendants' representations were "false and misleading" with the same theory of falsity underlying the

Section 10(b) claims.  *E.g.*, TAC ¶¶ 10, 545-52; *see In re Chembio Diagnostics, Inc. Sec. Litig.*, 586 F. Supp. 3d 199, 225-26 (E.D.N.Y. 2022) (finding Section 11 claims to sound in fraud partly because of the "factual overlap" with Section 10(b) claims).  Further, Plaintiff contends that DCRB Defendants acted "to make millions from their equity holdings and Founder Shares" without regard to "how the post-merger company work[ed] out."  *Id.* ¶¶ 5, 87-88, 108, 124, 481-82, 487.  The TAC also alleges "Defendants could not cash out their stocks until January 17, 2020, and had a compelling motive to keep stock prices inflated through the continuation of their ***fraudulent scheme***," *Id.* ¶ 486, and that "the unique financial structure of SPACs created a risk for conflicts of interest … because the sponsor ha[d] an incentive to enter into a losing deal." *Id.* ¶ 489.  Such allegations and imputations of bad motives plainly sound in fraud.  *E.g.*, *Enzo Biochem, Inc. v. Harbert Discovery Fund, LP*, 2021 WL 4443258, at *9 (S.D.N.Y. Sept. 27, 2021).

But while the TAC attempts to attribute a fraudulent motive, it wholly fails to allege with "specificity [any DCRB Defendants'] knowledge of the alleged[] fraud[]." *SafeNet, Inc.*, 645 F. Supp. 2d at 239.  Apart from describing founder shares and identifying each DCRB Defendant, the TAC merely alleges: (1) they were DCRB's founders, stockholders, officers, directors, and/or controllers, some with prior SPAC experience, *id.* ¶¶ 48-50, 53-58, 96-98, 100-02, 108; (2) they either authorized or personally made some of the statements about Hyzon, *id.* ¶¶ 6, 111-12, 114, 288, 292, 310, 312-13, 315, 329-30, 471; and (3) that DCRB conducted due diligence on Legacy Hyzon, *id.* ¶¶ 316, 474.  There are no allegations suggesting that any DCRB Defendant received information contradicting his or her public statements about Hyzon.  Plaintiff merely presumes that the DCRB Defendants must have received undisclosed material information contradicting their public statements.  *See* TAC ¶¶ 474, 533, 556.  Fraud cannot be pleaded on such speculation. *In re PXRE Grp., Ltd. Sec. Litig.*, 600 F. Supp. 2d 510, 536 (S.D.N.Y. 2009); *In re Marsh &*

*Mclennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 483 (S.D.N.Y. 2006) (mere "allegations regarding the magnitude of the fraud or the organizational role of a defendant … are insufficient").

Nor is Plaintiff's attempt to invent a bad motive based on the DCRB Defendants' founder shares sufficient to raise a strong inference of scienter. *See* TAC ¶¶ 5, 87-88, 108, 124, 481-82, 486-787. The founder shares "convert[ed] into Class A shares" following the Merger, *see* TAC ¶ 489, giving their recipients all the more reason to enter a transaction with a company with long-term prospects of success. That the recipients did not acquire the founder shares on the open market, or that the shares would be cancelled absent a deal within 24 months, does not diminish this incentive—particularly without allegations that DCRB faced dissolution absent a combination with Legacy Hyzon. In *Bond*, for instance, the Court dismissed claims that directors knew that a proxy statement undervalued the stock being sold, finding it "extremely significant that all of the … directors sold all or most of their … shares for the same … buyout price that was paid to the public shareholders," because it would be in the directors' "informed economic self-interest" to get the best deal available. 2003 WL 21058251 at *11. The Court rejected the "[p]laintiffs' attempt to overcome this presumption by arguing that because the outside directors were allowed to purchase their shares cheaply, they could make a profit even at a low price," because that "does not negate these directors' self-interest in achieving a higher price for their shares." *Id.*

Moreover, crediting the plaintiffs' theory "would raise suspicion about directors' and officers' 'conflicts'" in each of the "very common" scenarios where they had been "given the opportunity to purchase shares at below market prices." *Id.*; *see also In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *26 (S.D.N.Y. Apr. 2, 2020) (explaining allegations regarding "Founder's Grants" were "the type of 'corporate profit' motive possessed by most corporate directors and officers"). Similarly here, Plaintiff's theory would raise an inference of fraud in every case against

-15-

SPAC defendants receiving founder shares—even though those shares convert to the same common stock as that of other stockholders.

      b.  Even if Rule 9(b) did not apply, Plaintiff failed to plead negligence.

Plaintiff cannot avoid dismissal of the Section 14(a) claims even if the Court finds that Rule 9(b) does not apply, because Plaintiff failed to plead facts at least establishing negligence.

"The Second Circuit has not opined on the [pleading standard for negligence], and what authority exists is divergent," with some courts concluding that "negligence is conduct, and not a state of mind," rendering the PSLRA's heightened pleading standard inapplicable to the negligence prong, *Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd*, 866 F. Supp. 2d 223, 240 (S.D.N.Y. 2012), while other courts treat negligence as a mental state, requiring a plaintiff "plead with particularity facts that give rise to a strong inference of negligence" as to each particular defendant, *Bond*, 2003 WL 21058251, at *4, *10. The Court should follow *Bond* and treat negligence as a mental state for securities claims, because *Bond* is most consistent with the language of the PSLRA. The PSLRA imposes heightened pleading standard for any "required state of mind"—i.e., not just for scienter—indicating that it should apply to the mental state underlying negligence as well. 15 U.S.C. § 78u-4(b)(2); *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1267 (N.D. Cal. 2000).

The TAC entirely fails to plead a strong inference of negligence as to any DCRB Defendant, as there are no particular allegations concerning their mental states at all (apart from the failed attempt to generally allege a bad motive from founder shares). *See Bond*, 2003 WL 21058251, at *4, *10. Even if the Court concluded that negligence was conduct, rather than a state of mind, the TAC's lack of detailed allegations is still fatal to the Section 14(a) claim. To plead negligence, Plaintiff needed to "allege[] what the applicable standard of care in this case would be" and plead facts demonstrating that defendants "failed to exercise reasonable care" when

authorizing a proxy containing false statements. *Karp v. First Conn. Bancorp, Inc.*, 535 F. Supp. 3d 458, 474 (D. Md. 2021). The TAC "lump[ing] all the defendants together" in a single claim and "provid[ing] no factual basis to distinguish their conduct … fail[s] to satisfy [even the] minimum [Rule 8] standard." *Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001).

Even setting aside the group pleading issue, the TAC makes no allegations indicating that the DCRB Defendants acted unreasonably. Plaintiff asserts negligence merely because the Merger Filings allegedly contained inaccurate or misleading information. *See* TAC ¶¶ 546-47. But Plaintiff has alleged no oversight in their preparation, and no facts contradicting the description of Legacy Hyzon's sales pipeline or business prospects that the DCRB Defendants should have known at the time of the Merger Filings. Absent allegations showing that any inaccuracy was the result of a specific Defendant's failure to act with ordinary care, the Court should not presume that any inaccuracy in the Proxy was the result of culpable conduct. *E.g.*, *Bond*, 2003 WL 21058251, at *10 (dismissing Section 14(a) claim where plaintiffs failed to allege "that the directors knew or should have known of the alleged flaws"); *Varjabedian v. Emulex Corp.*, 2020 WL 1847708, at *11 (C.D. Cal. Feb. 25, 2020) (similar).

### 3. *WRG cannot be liable under Section 14(a) because it is not alleged to have had sufficient participation in the solicitation efforts.*

The Section 14(a) claim against WRG should be dismissed also because WRG is not alleged to have "participated in the solicitation effort or … 'put [its] reputation[] in issue'" as part of the solicitation. *In re Pattern Energy Grp. Inc. Sec. Litig.*, 2021 WL 311257, at *17 n.13 (D. Del. Jan. 28, 2021) (dismissing Section 14(a) claim). The TAC alleges only that WRG was Defendant Anderson's affiliate, a DCRB founding stockholder, and interested in the merger because of founder's shares. *See* TAC ¶¶ 26, 36, 50-51, 100, 106, 481, 489. That WRG was tangentially connected to the solicitation—or even that its name appeared in the Proxy—"without

-17-

more, provides an insufficient basis to bring [WRG] within the ambit of Section 14(a)." *In re Bank of Am. Corp. Sec., Deriv., & ERISA Litig.*, 757 F. Supp. 2d 260, 294-95 (S.D.N.Y. 2010).

### 4.    *There was no false statement or material omission.*

Plaintiff's three categories of allegations underlying his Section 14(a) claim—(1) statements projecting revenue levels or margins for New Hyzon (TAC ¶¶ 292, 304-11, 315); (2) statements describing New Hyzon's sales pipeline and "blue chip" customers (*id.* ¶¶ 285, 288, 293, 296-97, 315, 320-21); and (3) statements describing Hiringa's relationship with Hyzon (*id.* ¶¶ 357-59)—each fail to allege an actionable misstatement or omission for multiple reasons.

### a.    Projections are forward-looking statements that cannot form the basis of a Section 14(a) claim.

Plaintiff contends that DCRB misrepresented New Hyzon's projections of up to $3.3 billion in revenue by 2025 with 30-33% gross margins, because the projections were based on "non-binding memorand[a] of understanding" and assumed New Hyzon could obtain commitments from major clients. TAC ¶¶ 113, 292-94. Plaintiff does not explain what the correct projections would have been, summarily asserting that the revenue figures were fabricated, *id.* ¶ 294, and that New Hyzon "had different margins than those in the assumptions … espoused," *id.* ¶ 317. Regardless, the challenged statements are not actionable. The statements are forward-looking, as they comprise: "Hyzon *forecasts*…", "Summary *Projected* Financials," and "gross margin" levels within "financial *projections*," and were identified as such. Ex. F at slide 2, 52; Ex. D at slide 2, 39; Ex. B, Proxy 27; 15 U.S.C. § 78u-5(i)(1)(A) & (C) (defining forward-looking statement as "a statement containing a projection of income" or "a statement of future economic performance"). Such a statement is not actionable if: "[i] [it is] accompanied by meaningful cautionary language *or* [ii] [it is] immaterial *or* [iii] the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading." *CTPartners*, 173 F. Supp. 3d at 24-25.

The third prong plainly applies, the TAC lacks well-pleaded allegations that the DCRB Defendants made any statements with actual knowledge that they were false or misleading. *Infra* § IV.A.2.  Moreover, if Plaintiff's express disclaimer of any allegations of fraud in his Section 14(a) claim (TAC ¶ 543) is credited despite his many allegations sounding in fraud (*see supra* § IV.A.2.a), the TAC itself refutes that the DCRB Defendants acted with actual knowledge of the alleged falsity. *See* TAC ¶¶ 543-52.

And even if Plaintiff had not purported to disclaim fraud and failed to plead knowledge of falsity, the first prong plainly applies, as the solicitation materials contain clear cautionary language.  Investors were expressly told that the projections—again, clearly labeled as forward-looking statements—"may be materially different than actual results," that investors should "not … rely on the projections in" deciding how to vote, and that Legacy Hyzon was "an early-stage company" with no revenue and an unproven business model, in a nascent industry. *Supra* § II.D.

    b. <u>Statements about New Hyzon's sales pipeline cannot be alleged to be false based on subsequent results.</u>

The second category of statements Plaintiff challenges consist of descriptions of Legacy Hyzon's sales pipeline.  TAC ¶¶ 285, 288, 293, 296-97, 315, 320-21.  Plaintiff presumes that customers were "lost" between the Merger's signing and closing based on anonymization of customers in later versions of the presentations, but these changes were made ***within days*** of the initial presentation and, as Plaintiff acknowledges, did not result in any  "update[] [to] revenue forecast projections," *id.* ¶ 294; *see supra* § II.C.  The far more reasonable inference is a decision to anonymize the customers in the presentation, not that customers were lost or misrepresented.

As the Hyzon Brief addresses in detail (at 23-26), Plaintiff cannot allege facts (or point to an internal document or confidential witness) directly suggesting that the sales pipeline was not as described.  Instead, Plaintiff asks the Court to infer that these descriptions must have been false

because "Hyzon never converted … any of the 'near final' orders" into binding orders. *id.* ¶ 294.[5]

But it is well-established that such allegations of fraud by hindsight are insufficient to state a claim

as a matter of law. *Bond*, 2003 WL 21058251, at *10; *Woolgar v. Kingston Cos.*, 477 F. Supp. 3d

193, 225-26 (S.D.N.Y. 2020) (statement that loss reserves were adequate not rendered false by

subsequent need to significantly increase reserves). Indeed, inferring falsity based on subsequent

results, or allowing Plaintiff to twist disclosures about "'near final' orders" into guarantees of

future binding orders (*e.g.*, TAC ¶¶ 294), is especially unwarranted in light of DCRB's robust

disclosures regarding the risks to future sales. *Supra* § II.D. The Proxy disclosed that Legacy

Hyzon "ha[d] a limited number of current customers" and a "business model [that] has yet to be

tested," and that "there [wa]s no assurance as to whether [New] Hyzon's sales pipeline w[ould]

result in sales and revenues, or that [New] Hyzon w[ould] be able to convert nonbinding letters of

intent or memoranda of understanding into orders or sales." Ex. B, Proxy 26, 135. Plaintiff cannot

allege falsity by noting New Hyzon has fallen short post-Merger. As there are no well-pleaded

allegations showing that the Merger Filings were "false or misleading ***at the time*** they were made,"

the Section 14(a) claim fails. *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 580 (S.D.N.Y.

2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015).

> c. <u>The DCRB Defendants did not misrepresent Hyzon's relationship with Hiringa.</u>

Plaintiff also alleges the DCRB Defendants misleadingly claimed that Hiringa was a

customer and end-user of Hyzon trucks, when in fact it was a "channel partner." TAC ¶¶ 357-59.

---

[5] Indeed, Plaintiff attempts to allege falsity primarily by juxtaposing statements about Legacy Hyzon's projected future performance with subsequent results. *Compare* TAC ¶¶ 288, 315, 320 (descriptions of sales pipeline), *with id.* ¶¶ 290, 316-17-323 (New Hyzon's post-Merger sales); *compare id.* ¶¶ 292, 296-98, 304, 307, 315 (forecasts about potential revenues), *with id.* ¶¶ 294-95, 399-303 (revenue New Hyzon "reported" "to date"); *compare id.* ¶¶ 8, 126, 129, 131-41 (statements about deliveries "planned" for end-of-2021), *with id.* ¶¶ 151, 165-67, 169, 181 (New Hyzon's actual deliveries).

However, as detailed above and in the Hyzon Brief, the Merger Filings explained the nature of the Hiringa partnership and its role building a hydrogen refueling network in New Zealand. *Supra* § II.D; Hyzon Br. at 25-26. The press release announcing the partnership explained that Hiringa would "build a … refueling network," and Hyzon and Hiringa planned to "roll out" vehicles "alongside [their] partners." Ex. G. The Proxy likewise disclosed that New Hyzon would "collaborate with … Hiringa … to ensure that affordable hydrogen is available to its fleet operator customers," Ex. B, Proxy 164, and a February 28 transcript filed with the SEC confirmed that Hiringa was "to develop the hydrogen … fueling network," with Hyzon partnering "to enable the match of hydrogen demand and … supply," Ex. N; TAC ¶ 128. Each public statement alone—and certainly taken as a whole conveying the same message—accurately described Hiringa's role.

Plaintiff also takes issue with the timeline of deliveries to Hiringa, complaining that New Hyzon did not deliver vehicles by end-of-2021, as initially forecasted, *see* TAC ¶ 167, but the statements he cites are non-actionable forward-looking statements. *See* TAC ¶¶ 129, 167, 357 ("Hyzon **anticipates** fulfilling [orders] … with first shipments **planned** for the second half of 2021," Hiringa "**expects** to receive … vehicles in March or April 2022," and Hyzon "**expects** the first shipments … to occur by the first quarter of 2022"). Again, Plaintiff does not and cannot "prove that [such statements were] made with actual knowledge that [they were] false or misleading," *CTPartners*, 173 F. Supp. 3d at 24-25, especially in light of his disclaimer of scienter on behalf of the DCRB Defendants. And, the Proxy specifically cautioned that Hyzon had not yet completed its manufacturing facilities and "may be unable to successfully produce its … vehicles … in appropriate volumes, at competitive costs, or at all…." Ex. B, Proxy 32.

**B.      The Section 10(b) Claims against Tichio and Haskopoulos Fail.**

The TAC includes Tichio and Haskopoulos as Section 10(b) defendants in Counts I and II, without allegations supporting either falsity or scienter.

-21-

### 1. No statement attributable to Tichio and Haskopoulos is alleged to be false or misleading.

Under Section 10(b), liability can attach only to the "maker" of a statement—that is, "the person … with ultimate authority over the statement, including its content and whether and how to communicate it." *Janus Cap. Grp., Inc. v. First Deriv. Traders*, 564 U.S. 135, 142 (2011). At a minimum, Section 10(b) requires a defendant "to have disseminated or approved … the language" at issue. *Geoffrey A. Orley Revocable Tr. U/A/D 1/26/2000 v. Genovese*, 2020 WL 611506, at *7-8 (S.D.N.Y. Feb. 7, 2020). But Plaintiff claims Haskopoulos and Tichio are liable based on "every [allegedly] false and misleading statement identified," TAC ¶ 25, which includes SOX certifications made by the Hyzon Defendants, *id.* ¶¶ 411, statements made by the Hyzon Defendants independently, *e.g., id.* ¶¶ 327, 350, 353, 380, 402, and numerous statements post-dating the Merger. Plaintiff specifically attributes only three categories of pre-Merger statements to Haskopoulos and Tichio, none of which are adequately alleged to be false or misleading.

*First*, Plaintiff alleges that Haskopoulos and Tichio approved the statements in the Merger Filings that underlie Plaintiff's Section 14(a) claim, which allegedly contain or incorporate certain allegedly false statements. This theory fails for failure to allege scienter, *infra* § IV.A.2, and because none of the statements were false or misleading, *supra* § IV.A.4; Hyzon Br. at 34-43.[6]

*Second*, the TAC quotes Tichio as stating on February 9, 2021, that Legacy Hyzon had "a sales pipeline for 2021 that is 100 percent under contract or MOU, providing real runway visibility, and its customers include some of the most recognizable global brands and the largest municipalities in the world," TAC ¶ 112, and on June 29, 2021, that Legacy Hyzon was "projecting

---

[6] No other statements are attributed to Haskopoulos, so the Section 10(b) claim against him fails for the same reasons the Section 14(a) claim fails against the other Defendants, and his simply signing SEC filings alone is insufficient to plead liability. *In re Molycorp, Inc. Sec. Litig.*, 2015 WL 1097355, at *12 (S.D.N.Y. Mar. 12, 2015); *SafeNet*, 645 F. Supp. 2d at 239.

$37 million of revenue [from] vehicles" in 2021," *id.* ¶¶ 139, 292, 329. But as with the Section 14(a) claims, falsity is not alleged because the presentations delineated binding orders from MOUs, and that these projections did not come to pass or that the MOUs did not result in binding orders is insufficient to plead falsity. *Woolgar*, 477 F. Supp. 3d at 225-26; *supra* § IV.A.4I.A.4.

*Finally*, Plaintiff appears to challenge Tichio's assertion that he and others "fe[lt] extraordinarily comfortable" with Legacy Hyzon's projections, the description of as "high probability," or assessment that Legacy Hyzon's clients may "scale their truck orders and grow the conversion of their fleets over time." TAC ¶¶ 139-40. These statements are classic opinion statements which are not actionable unless "either 'the speaker did not hold the belief [he] professed' or 'the supporting fact[s] [he] supplied were untrue.'" *Tongue* v. *Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016). Plaintiff does not allege that Tichio did not sincerely hold the belief he expressed. *See In re AmTrust Fin. Servs., Inc. Sec. Litig.*, 2019 WL 4257110, at *25-26 (S.D.N.Y. Sept. 9, 2019). At most, Plaintiff suggests that Tichio's optimism was misleading because he omitted that some of Legacy Hyzon's negotiations had not yet resulted in binding orders—a fact which was plainly and repeatedly disclosed. *See* TAC ¶ 139. And again, the Proxy disclosed that "there [wa]s no assurance as to whether [Legacy] Hyzon's sales pipeline w[ould] result in sales and revenues, or that [New] Hyzon w[ould] be able to convert non-binding letters of intent or memoranda of understanding into orders or sales." Ex. B, Proxy 26.

### 2.    *The TAC Does Not Plead a Strong Inference of Scienter.*

The Section 10(b) claims against Tichio and Haskopoulos also fail because Plaintiff does not plead a strong inference of scienter as required by the PSLRA. 15 U.S.C. § 78u-4(b)(2)(A). To establish a strong inference of scienter, the inference of fraudulent intent must be "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314

(2007). "Scienter must be separately [pleaded] and individually supportable as to each defendant and is not amenable to group pleading." *In re Supercom Inc. Sec. Litig.*, 2018 WL 4926442, at *28 (S.D.N.Y. Oct. 10, 2018).

The allegations concerning Tichio and Haskopoulos fall far short of this high bar. The TAC alleges only that Tichio and Haskopoulos (i) held roles at DCRB, *see* TAC ¶¶ 37, 41, 98, 100-01, (ii) made or authorized some of the statements at issue, *see id.* ¶¶ 6, 111-12, 288, 292, 310, 330, and (iii) had some involvement in the due diligence of Legacy Hyzon, *see id.* ¶ 474. None of these allegations identify "*specific* contradictory information [that] was available to" Tichio and Haskopoulos "*at the same time* they made … statements" about Hyzon. *PXRE Grp.*, 600 F. Supp. 2d at 536. Indeed, Plaintiff merely attempts to suggest that Tichio and Haskopoulos must have seen contrary information as part of due diligence, but such "bare assertions [that the defendants, due to their high-level positions …, had access to adverse undisclosed … information], without any further facts or details, do not adequately demonstrate defendants' knowledge of facts or access to information contradicting their public statements." *Id.* at 538.

Nor has Plaintiff alleged motive, which requires pleading a "concrete and personal benefit to the individual defendants resulting from the fraud." *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001). Plaintiff concedes that "Tichio and Haskopoulos did not personally receive Hyzon stock[] in connection with the [Meger]"; the alleged motive is an indirect one—that Tichio and Haskopoulos "had an economic interest in the merger's closing through" companies that employed them as officers, partners, or directors. TAC ¶ 487. But it is well-established that motive cannot be pleaded by reference to "goals that are 'possessed by virtually all corporate insiders,'" such as ensuring "the success of an investment." *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009). Regardless, founder shares incentivized the recipients to achieve a favorable

transaction for DCRB and did not provide a motive for fraud.  *See supra* § IV.A.2.a.

  **C.**  **Without a Predicate Violation, the Section 20(a) Claims Fail.**

 "Liability for § 20(a) violations is derivative of liability for … violations" of another section of the Exchange Act.  *McIntire v. China MediaExpress Hldgs., Inc.*, 927 F. Supp. 2d 105, 121 (S.D.N.Y. 2013).  Since the claims for primary violations of Section 10(b) and 14(a) fail, the derivative Section 20(a) Counts must be dismissed as well.  *Asay v. Pinduoduo Inc.*, 2021 WL 3871269, at *5 (2d Cir. Aug. 31, 2021).

 Lastly, even if the Court concluded that some primary violation claim survived, the Section 20(a) claim against WRG must be dismissed because Plaintiff pleaded no facts suggesting that WRG "controlled" a primary violator—indeed, WRG is not alleged to have done anything other than receive founder shares.  *Cohen v. Stevanovich*, 722 F. Supp. 2d 416, 435 (S.D.N.Y. 2010) (citation omitted); *see* TAC ¶¶ 50, 100, 106, 481, 489.

**V.**  **CONCLUSION**

 The TAC therefore should be dismissed with prejudice as to the DCRB Defendants.

Dated: September 13, 2023
     Dallas, Texas

Respectfully Submitted,

VINSON & ELKINS LLP

By: _____
Michael C. Holmes

Marisa Antonelli
1114 Avenue of the Americas
New York, NY 10036-7708
Telephone: +1.212.237.0000

Michael C. Holmes (*pro hac vice*)
Jeffrey Crough (*pro hac vice*)
Eugene Temchenko (*pro hac vice*)
2001 Ross Avenue, Suite 3900
Dallas, Texas 75201
Telephone: +1.214.220.7700

*Counsel for Peter Haskopoulos, Robert Tichio, Jennifer Aaker, Jane Kearns, Pierre Lapeyre, David Leuschen, Jim McDermott, Jeffrey Tepper, Michael Warren, Riverstone Investment Group LLC, Decarbonization Plus Acquisition Sponsor, LLC, and WRG DCRB Investors, LLC*