**UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

IN RE HYZON MOTORS INC.
SECURITIES LITIGATION

Case No. 6:21-cv-06612-CJS-MWP

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

**HYZON DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR**
**MOTION TO DISMISS THE THIRD AMENDED CONSOLIDATED**
**CLASS ACTION COMPLAINT**

Laura Kabler Oswell (*pro hac vice*)
SULLIVAN & CROMWELL LLP
550 Hamilton Avenue
Palo Alto, California  94301
Tel.: (650) 461-5600
Fax:  (650) 461-5700
oswelll@sullcrom.com

Jacob M. Croke
Christopher A. Graham (*pro hac vice*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Tel.: (212) 558-4000
Fax:  (212) 558-3588
crokej@sullcrom.com
grahamch@sullcrom.com

*Counsel for Defendants Hyzon Motors Inc.,*
*Erik Anderson, Craig Knight, Mark Gordon,*
*and George Gu*

September 13, 2023

# TABLE OF CONTENTS

*Page*

PRELIMINARY STATEMENT ...................................................................................................1

FACTUAL BACKGROUND AND PLAINTIFF'S ALLEGATIONS..........................................4

      A.      Horizon Develops Leading Fuel Cell Technology and Forms Legacy Hyzon........4

      B.      Legacy Hyzon and DCRB Announce the Merger .....................................................5

      C.      Completion of the Merger and Hyzon's Subsequent Statements ............................9

      D.      The Short Seller Reports and Hyzon's Responses...................................................10

      E.      Hyzon Announces 2021 Results ..............................................................................11

      F.      Hyzon Identifies Local Accounting and Operational Issues, Conducts an Internal Investigation, and Restates Certain Financial Reports ............................13

      G.      The Instant Action and Plaintiff's Insufficient Investigation ................................16

LEGAL STANDARD...................................................................................................................17

ARGUMENT ...............................................................................................................................18

I.      PLAINTIFF LACKS STANDING TO PURSUE SECTION 10(B) CLAIMS FOR ALLEGED MISSTATEMENTS ABOUT LEGACY HYZON......................................18

II.      PLAINTIFF DOES NOT ALLEGE ANY ACTIONABLE MISSTATEMENTS ............19

      A.      Plaintiff's Allegations Depend Largely on Unreliable and Uncorroborated Claims by Self-Interested Short Sellers ..................................................................20

      B.      Defendants' Statements Were Not Misleading.......................................................22

            1.      Hyzon Repeatedly Disclosed That Many of Its Business Relationships Involved Non-Binding Agreements, Including with Customers in China ............................................................................................................22

            2.      Defendants Accurately Disclosed the Nature of Hiringa's Orders and Its Partnerships with End-User Fleet Operators.......................................25

            3.      Plaintiff Fails to Allege Facts Supporting His Claims That HongYun Did Not Order and Receive Hyzon FCEVs or That Hyzon Misleadingly Described HongYun's Orders .................................26

            4.      Limited Revenue Timing Issues Do Not Support Plaintiff's Allegations of Fraud .....................................................................................29

C.      Many Statements Challenged by Plaintiff Are Legally Inactionable ....................30

        1.      The PSLRA Safe Harbor Protects Forward-Looking Statements Regarding Revenue and Delivery Projections ............................................30

        2.      Reasonable Investors Do Not Rely on Vague, Optimistic Puffery............32

        3.      Any Opinions Did Not Supply False Facts or Omit Material Facts Necessary to Be Disclosed...........................................................................33

III.     PLAINTIFF DOES NOT RAISE A COGENT AND COMPELLING INFERENCE THAT ANY DEFENDANT ACTED WITH SCIENTER .................................................34

      A.      Plaintiff's Speculations of Recklessness Lack Adequate Basis in Fact.................35

        1.      The Special Committee Report and Accounting Restatements Do Not Support Scienter.....................................................................................35

        2.      Plaintiff Fails To Plead That Defendants Knowingly or Recklessly Misrepresented Hyzon's Business Relationships ......................................37

        3.      Defendants Did Not Knowingly or Recklessly Portray Hiringa as an End User of Hyzon Vehicles........................................................................39

        4.      The TAC Lacks Specific Facts Suggesting Defendants Believed or Recklessly Disregarded That HongYun Was a "Sham" Company ...........39

        5.      Neither the Government Investigations Nor the Core Operations Doctrine Support an Inference of Scienter.................................................41

        6.      Management Changes Do Not Support an Inference of Scienter ..............41

      B.      Plaintiff's Generic, Group-Pleaded Allegations of Motive Are Insufficient.........42

IV.     PLAINTIFF DOES NOT PLEAD LOSS CAUSATION AS A MATTER OF LAW ......44

V.      PLAINTIFF'S REMAINING CLAIMS ALSO FAIL.........................................................46

      A.      Plaintiff Fails To State a Claim for "Scheme" Liability Pursuant to Rule 10b-5(a) and (c)..............................................................................................46

      B.      Plaintiff Fails To State a Claim Pursuant to Section 14(a) ...................................47

      C.      Failure to Adequately Plead a Section 10(b) or 14(a) Claim Necessitates Dismissal of the Section 20(a) Claim ...................................................................50

VI.     DISMISSAL SHOULD BE GRANTED WITH PREJUDICE .........................................50

- iii -

## TABLE OF AUTHORITIES

*Page(s)*

**CASES**

*Abramson* v. *Newlink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020)...................................................................................32

*In re Adient plc Sec. Litig.,*
2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020*)*..........................................................22

*In re Advanced Battery Techs., Inc.*,
781 F.3d 638 (2d Cir. 2015)...................................................................................40

*In re Alibaba Grp. Holding Ltd. Sec. Litig.*,
2023 WL 2601472 (S.D.N.Y. Mar. 22, 2023) ........................................................18

*Alpha Cap. Anstalt* v. *Schwell Wimpfheimer & Assocs. LLP*,
2018 WL 1627266 (S.D.N.Y. Mar. 30, 2018) ........................................................47

*In re AmTrust Fin. Servs., Inc. Sec. Litig.*,
2019 WL 4257110 (S.D.N.Y. Sept. 9, 2019)..........................................................34

*In re Aratana Therapeutics Inc. Sec. Litig.*,
315 F. Supp. 3d 737 (S.D.N.Y. 2018)....................................................................33

*ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007)...................................................................22, 28, 50

*In re Bank of Am. Corp. Sec. Litig.*,
757 F. Supp. 2d 260 (S.D.N.Y. 2010)....................................................................48

*In re Bausch & Lomb, Inc. Sec. Litig.*,
2003 WL 23101782 (W.D.N.Y. Mar. 28, 2003)..................................... 23-24, 31, 32

*In re Bausch & Lomb, Inc. Sec. Litig.*,
592 F. Supp. 2d 323 (W.D.N.Y. 2008) ...................................................................35

*In re BHP Billiton Ltd. Sec. Litig.*,
276 F. Supp. 3d 65 (S.D.N.Y. 2017)......................................................................31

*Bisel* v. *Acasti Pharma, Inc.*,
2022 WL 4538173 (S.D.N.Y. Sept. 28, 2022).....................................................47, 48

*Bratusov* v. *Comscore, Inc.*,
2020 WL 3447989 (S.D.N.Y. June 24, 2020) ........................................................38

*In re Bristol-Myers Squibb Co. CVR Sec. Litig.*,
   2023 WL 2308151 (S.D.N.Y. Mar. 1, 2023) .................................................................49

*C.D.T.S.* v. *UBS AG*,
   2013 WL 6576031 (S.D.N.Y. Dec. 13, 2013) ...........................................................22

*In re Canandaigua Sec. Litig.*,
   944 F. Supp. 1202 (S.D.N.Y. 1996).........................................................................29

*In re CarLotz, Inc. Sec. Litig.*,
   __ F. Supp. 3d __, 2023 WL 2744064 (S.D.N.Y. Mar. 31, 2023).....................................2, 19

*Carpenters Pension Tr. Fund of St. Louis* v. *Barclays PLC*,
   750 F.3d 227 (2d Cir. 2014)...................................................................................44

*In re Columbia Pipeline, Inc.*,
   405 F. Supp. 3d 494 (S.D.N.Y. 2019)......................................................................49

*Cox* v. *Blackberry Ltd.*,
   660 F. App'x 23 (2d Cir. 2016) ..............................................................................41

*In re Dell, Inc. Sec. Litig.*,
   591 F. Supp. 2d 877 (W.D. Tex. 2008)....................................................................45

*Dobina* v. *Weatherford Int'l Ltd.*,
   909 F. Supp. 2d 228 (S.D.N.Y. 2012)......................................................................37

*In re DraftKings Inc. Sec. Litig.*,
   2023 WL 145591 (S.D.N.Y. Jan. 10, 2023) ..............................................................21

*In re Eastman Kodak Co. Sec. Litig.*,
   632 F. Supp. 3d 169 (W.D.N.Y. 2022)..................................................................25, 47

*ECA Loc. 134 IBEW* v. *JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009).............................................................32, 34, 42, 43

*Egan* v. *TradingScreen, Inc.*,
   2011 WL 4344067 (S.D.N.Y. Sept. 12, 2011)............................................................22

*Feldman* v. *Cutaia*,
   951 A.2d 727 (Del. 2008) .....................................................................................49

*Gamm* v. *Sanderson Farms, Inc.*,
   944 F.3d 455 (2d Cir. 2019)...................................................................................27

*Gillis* v. *QRX Pharma Ltd.*,
   197 F. Supp. 3d 557 (S.D.N.Y. 2016).......................................................................42

*Glaser* v. *The9, Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011)..................................................................................42

*Goplen* v. *51job, Inc.*,
    453 F. Supp. 2d 759 (S.D.N.Y. 2006)..................................................................................43

*Gregory* v. *ProNAi Therapeutics Inc.*,
    297 F. Supp. 3d 372 (S.D.N.Y. 2018)..................................................................................33

*In re GTx, Inc. Shareholders Litig.*,
    2020 WL 3439356 (S.D.N.Y. June 23, 2020) .........................................................................48

*In re Hardinge, Inc. Sec. Litig.*,
    696 F. Supp. 2d 309 (W.D.N.Y. 2010)............................................................................28, 41

*In re Hebron Tech. Co., Ltd. Sec. Litig.*,
    2021 WL 4341500 (S.D.N.Y. Sept. 22, 2021)........................................................................20

*In re Henry Schein, Inc. Sec. Litig.*,
    2019 WL 8638851 (E.D.N.Y. Sept. 27, 2019) ...................................................................41, 45

*In re Hertz Glob. Holdings Inc.*,
    905 F.3d 106 (3d Cir. 2018)..............................................................................................36

*In re Ideanomics, Inc. Sec. Litig.*,
    2022 WL 784812 (S.D.N.Y. Mar. 15, 2022) ...........................................................................44

*Ind. Pub. Ret. Sys.* v. *SAIC, Inc.*,
    818 F.3d 85 (2d Cir. 2016)................................................................................................33

*In re Int'l Bus. Machines Corp. Sec. Litig.*,
    163 F.3d 102 (2d Cir. 1998).........................................................................................18, 32

*Janus Capital Grp., Inc.* v. *First Derivative Traders*,
    564 U.S. 135 (2011)................................................................................................ *passim*

*Jones* v. *Perez*,
    550 F. App'x 24 (2d Cir. 2013) ..........................................................................................38

*Kabrovski* v. *City of Rochester, New York*,
    149 F. Supp. 3d 413 (W.D.N.Y. 2015)...................................................................................5

*Kalnit* v. *Eichler*,
    264 F.3d 131 (2d Cir. 2001)....................................................................................36, 42, 43

*Kocourek* v. *Shrader*,
    391 F. Supp. 3d 308 (S.D.N.Y. 2019)...................................................................................24

*Kohlberg* v. *Birdsey*,
2022 WL 976809 (S.D.N.Y. Mar. 31, 2022) ................................................................19

*Lachman* v. *Revlon, Inc.*,
487 F. Supp. 3d 111 (E.D.N.Y. 2020) ........................................................................23

*Lattanzio* v. *Deloitte & Touche LLP*,
476 F.3d 147 (2d Cir. 2007) ................................................................................45, 46

*Lehmann* v. *Ohr Pharm., Inc.*,
830 F. App'x 349 (2d Cir. 2020) ..........................................................................42, 43

*In re Liberty Tax, Inc. Sec. Litig.*,
435 F. Supp. 3d 457 (E.D.N.Y. 2020) ........................................................................49

*Lipow* v. *Net1 UEPS Techs., Inc.*,
131 F. Supp. 3d 144 (S.D.N.Y. 2015) .................................................................39, 49

*Long Miao* v. *Fanhua, Inc.*,
442 F. Supp. 3d 774 (S.D.N.Y. 2020) .................................................................21, 38

*In re Longtop Fin. Techs. Ltd. Sec. Litig.*,
910 F. Supp. 2d 561 (S.D.N.Y. 2012) ........................................................................20

*Lopez* v. *CTPartners Exec. Search Inc.*,
173 F. Supp. 3d 12 (S.D.N.Y. 2016) ..........................................................................31

*Menora Mivtachim Ins. Ltd.* v. *Frutarom Indus. Ltd.*,
54 F.4th 82 (2d Cir. 2022) ........................................................................2, 18, 19

*Meyer* v. *Greene*,
710 F.3d 1189 (11th Cir. 2013) ..................................................................................45

*In re Mindbody, Inc. Sec. Litig.*,
489 F. Supp. 3d 188 (S.D.N.Y. 2020) .................................................................46, 47

*Monroe Cnty. Employees' Ret. Sys.* v. *YPF Sociedad Anonima*,
15 F. Supp. 3d 336 (S.D.N.Y. 2014) ..........................................................................50

*Novak* v. *Kasaks*,
216 F.3d 300 (2d Cir. 2000) ........................................................................35, 37, 41

*In re Omnicom Grp., Inc. Sec. Litig.*,
597 F.3d 501 (2d Cir. 2014) ................................................................................44, 46

*Parkcentral Glob. Hub Ltd.* v. *Porsche Auto. Holdings SE*,
763 F.3d 198 (2d Cir. 2014) ........................................................................................4

*Police & Fire Ret. Sys. of City of Detroit* v. *SafeNet, Inc.*,
  645 F. Supp. 2d 210 (S.D.N.Y. 2009)...................................................................20, 46, 48, 49

*In re PXRE Grp., Ltd. Sec. Litig.*,
  600 F. Supp. 2d 510 (S.D.N.Y. 2009).................................................................................35, 43

*Rombach* v. *Chang*,
  355 F.3d 164 (2d Cir. 2004)................................................................................................43, 47

*In re Romeo Power Inc. Sec. Litig.*,
  2022 WL 1806303 (S.D.N.Y. June 2, 2022) .............................................................................49

*Rothman* v. *Gregor*,
  220 F.3d 81 (2d Cir. 2000)........................................................................................................38

*Sachsenberg* v. *IRSA Inversiones y Representaciones Sociedad Anónima*,
  339 F. Supp. 3d 169 (S.D.N.Y. 2018)........................................................................................41

*Saltz* v. *First Frontier, L.P.*,
  485 F. App'x 461 (2d Cir. 2012) ...............................................................................................40

*San Leandro Emergency Med. Grp. Profit Sharing Plan* v. *Philip Morris Cos.*,
  75 F.3d 801 (2d Cir. 1996).........................................................................................................32

*In re Sanofi Sec. Litig.*,
  155 F. Supp. 3d 386 (S.D.N.Y. 2016).........................................................................................30

*Savor, Inc.* v. *FMR Corp.*,
  812 A.2d 894 (Del. 2002) ..........................................................................................................21

*SEC* v. *Falstaff Brewing Corp.*,
  629 F.2d 62 (D.C. Cir. 1980)......................................................................................................48

*Sfiraiala* v. *Deutsche Bank AG*,
  729 F. App'x 55 (2d Cir. 2018) ..................................................................................................37

*Silverman* v. *3D Total Sols., Inc.*,
  2020 WL 1285049 (S.D.N.Y. Mar. 18, 2020) ...........................................................................50

*Slayton* v. *Am. Exp. Co.*,
  604 F.3d 758 (2d Cir. 2010)..................................................................................................31, 41

*In re Sotheby's Holdings, Inc.*,
  2000 WL 1234601 (S.D.N.Y. Aug. 31, 2000)............................................................................39

*In re Synchrony Financial Sec. Litig.*,
  988 F.3d 157 (2d Cir. 2021)........................................................................................................31

*Tabor* v. *Bodisen Biotech, Inc.*,
    579 F. Supp. 2d 438 (S.D.N.Y. 2008)................................................................28

*Teamsters Loc. 445 Freight Div. Pension Fund* v. *Dynex Cap. Inc.*,
    531 F.3d 190 (2d Cir. 2008)..............................................................................40

*In re Telefonaktiebolaget LM Ericsson Sec. Litig.*,
    2023 WL 3628244 (E.D.N.Y. May 24, 2023) ...................................................36

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)......................................................................................18, 34

*Tongue* v. *Sanofi*,
    816 F.3d 199 (2d Cir. 2016)...............................................................................33

*In re Twinlab Corp. Sec. Litig.*,
    103 F. Supp. 2d 193 (E.D.N.Y. 2000) ...............................................................35

*In re UBS AG Sec. Litig.*,
    2012 WL 4471265 (S.D.N.Y. Sept. 28, 2021)...............................................37, 38

*Venkataraman* v. *Kandi Techs. Grp., Inc.*,
    2021 WL 4952260, at *3 (S.D.N.Y. Oct. 25, 2021) .........................................34

*Wanca* v. *Super Micro Computer, Inc.*,
    2018 WL 3145649 (N.D. Cal. June 27, 2018) ...................................................30

**STATUTES AND RULES**

Private Securities Litigation Reform Act of 1995 (PSLRA),
    15 U.S.C. §§ 78u-4 and 78u-5 ........................................................... *passim*

Securities Exchange Act of 1934, Sections 10(b), 14(a), and 20(a),
    15 U.S.C. §§ 78j(b), 78n(a), and 78t(a) .............................................. *passim*

17 C.F.R. § 240.10b-5.............................................................................17, 46

17 C.F.R. § 240.14a-9.....................................................................................17

Fed. R. Civ. P. 9(b) ..................................................................2, 18, 47, 48

Fed. R. Civ. P. 23.1.................................................................................48, 49

## PRELIMINARY STATEMENT

Hyzon Motors Inc. ("Hyzon") is a leading global supplier of zero-emission hydrogen fuel cell-powered commercial vehicles ("FCEVs").  Shortly after going public in July 2021, Hyzon (like many companies) was subjected to attacks from short sellers who stood to profit by causing Hyzon's share price to decline.  Lead Plaintiff Alfred Miller ("Plaintiff") parrots those attacks to accuse Hyzon and certain of its current and former executives and directors—including Erik Anderson, Mark Gordon, George Gu, and Craig Knight (collectively with Hyzon, the "Hyzon Defendants" or "Defendants")[1]—of making misleading statements regarding Hyzon's business partnerships and financial prospects.  Although subsequent FCEV orders, photographic proof of Hyzon deliveries, and an investigation by an independent committee of Hyzon's Board of Directors directly contradict the short seller claims, Plaintiff continues to rely on those now debunked short seller claims combined with speculation that certain business setbacks (*e.g.*, a shortfall in projected revenues) are evidence of underlying misconduct rather than the growing pains typical of a newly public company in a highly competitive and technologically cutting-edge industry.  Despite four opportunities to refine his claims over the span of two years, including after viewing Defendants' previous motion to dismiss, Plaintiff's third amended consolidated class action complaint (the "TAC," Dkt. 67) falls far short of the stringent pleading requirements that apply to securities class actions.  It should be dismissed with prejudice for the following reasons:

*First*, Plaintiff does not have standing to challenge many of the alleged misstatements.  Hyzon was previously known as Decarbonization Plus Acquisition Corp. ("DCRB").  DCRB acquired the privately held Hyzon Motors USA Inc. ("Legacy Hyzon"), and DCRB was then renamed Hyzon.  Controlling law "requires plaintiffs to have bought or sold the

---

[1]      The Hyzon Defendants hereby join in the motion to dismiss filed by the DCRB Defendants concurrently herewith.

security *about which* a misstatement was made in order to have standing to sue under Section 10(b)." *Menora Mivtachim Ins. Ltd*. v. *Frutarom Indus. Ltd*., 54 F.4th 82, 86 (2d Cir. 2022) (emphasis added). Because Plaintiff was a shareholder of DCRB and not Legacy Hyzon, Plaintiff cannot pursue pre-merger claims based on "alleged misstatements about [the target] because [Plaintiff] bought shares of [the acquirer], not [the target]." *Id.*; *see also In re CarLotz, Inc. Sec. Litig.*, __ F. Supp. 3d __, 2023 WL 2744064, at *3-5 (S.D.N.Y. Mar. 31, 2023).

*Second*, even if Plaintiff did have standing, the Private Securities Litigation Reform Act ("PSLRA") and Federal Rule of Civil Procedure 9(b) require plaintiffs to specify with particularity why each alleged misstatement is misleading. Plaintiff instead cribs his claims from the uncorroborated speculation of short sellers and tries to paper over the gaps in his pleading with a laundry list of unsubstantiated speculation, selective misreadings, and vague and convoluted claims of falsity. Particularly when read in context, Defendants' statements were not false or misleading: (1) Although Plaintiff emphasizes heavily that Hyzon's recent sales have fallen short of projections to claim that Hyzon must have misrepresented certain customer relationships, Hyzon repeatedly disclosed that its vehicle delivery projections included "non-binding MOUs" that "may not be converted into binding orders or sales." And Plaintiff's claim that Hyzon overstated certain business relationships because it anonymized logos and names in investor presentations is nonsensical. (2) Hyzon accurately characterized its relationship with Hiringa, which Hyzon repeatedly described as focused on developing hydrogen infrastructure and supporting "its fleet partners" in transitioning to FCEVs, and never claimed that Hiringa was the intended ultimate end user of Hyzon's vehicles. And (3) the allegation that Hyzon's customer HongYun was "fake" and a "sham"—the headline claim of the short sellers, which Plaintiff adopted—has been thoroughly debunked. The TAC includes a photograph of Hyzon trucks bearing the logo of HongYun's end

-2-

user partner, a large steel conglomerate, and Plaintiff does not dispute that a sample of the HongYun vehicles was tested and found to be fully operable during a recent site visit. Moreover, several of the alleged misstatements are inactionable because they are (a) forward-looking projections protected under the PSLRA; (b) generalized statements of optimism (or "puffery") that are immaterial as a matter of law; or (c) sincerely held opinions.

Plaintiff resorts to mischaracterizing the results of an internal investigation that Hyzon undertook to address potential revenue recognition timing and internal control issues, which Hyzon's management brought to the attention of its Board. As a result of the investigation, Hyzon voluntarily restated certain financial reports to correct revenue recognition timing in China and Europe. But the investigation's identification of a narrow issue—consistent with previous disclosures that as a new public company its financial reporting infrastructure and processes were still developing—does not support Plaintiff's allegations of widespread (or any) fraud. To the contrary, the investigation findings directly contradict Plaintiff's claims, having identified revenue timing issues but no issues related to the existence or legitimacy of Hyzon's counterparties.

*Third*, Plaintiff does not come close to meeting the PSLRA's requirement to plead allegations giving rise to a strong inference of scienter that is cogent and at least as compelling as nonculpable inferences. While Plaintiff suggests that "Defendants" knowingly or recklessly made false statements about Hyzon's customer relationships, Hiringa, and HongYun, Plaintiff's claims are based on nothing more than hindsight and the circular claim that Defendants knew their statements were false because the short sellers said they were false. As to Plaintiff's accounting allegations, Plaintiff provides no facts to support that Hyzon's financial restatements evidence knowing or reckless conduct, as opposed to a mistake reflecting the growing pains of a newly public company. Plaintiff's generic allegations of motive—purportedly to save Hyzon's parent

company (with which Anderson had no affiliation), and to profit from holdings of Hyzon shares (despite no allegation of an actual sale by any Defendant)—are the type of generic allegations that could be attributed to practically any corporate entity or officer, and are insufficient.

*Fourth*, Plaintiff fails to adequately allege that Defendants' statements caused any decline in Hyzon's share price. Hyzon repeatedly disclosed the risk that it might not achieve its revenue targets from the very day that Plaintiff alleges misstatements were first made. Hyzon also did not conceal material information regarding its business partners and customer orders—to the contrary, the short sellers admittedly relied on publicly available information to cast Hyzon's business in a false light. Recent drops in Hyzon's stock price are more properly attributed to the negative tone of the short sellers' self-serving reports, to broader market trends, and to investors' general concerns, not hidden information that was revealed.

*Finally*, in a last-ditch effort, Plaintiff has added new claims alleging "scheme" and Section 14(a) liability. These new theories suffer from the same deficiencies as Plaintiff's Section 10(b) claims, including failing to allege misstatements, culpable mental state, and loss causation.

These issues are fatal to Plaintiff's claims. Despite four opportunities to make his case, Plaintiff has failed to do so. Given foundational legal problems such as the absence of standing or actionable misstatements, it is highly unlikely that Plaintiff could remedy his claims by repleading, and the Court should dismiss the TAC with prejudice.

### FACTUAL BACKGROUND AND PLAINTIFF'S ALLEGATIONS[2]

### A.     Horizon Develops Leading Fuel Cell Technology and Forms Legacy Hyzon

Hyzon is a Rochester-based supplier of hydrogen FCEVs. (TAC ¶ 32.) Hyzon's

---

[2]     The Court need only consider well-pleaded factual allegations. *Parkcentral Glob. Hub Ltd.* v. *Porsche Auto. Holdings SE*, 763 F.3d 198, 202 (2d Cir. 2014). The Court also may consider documents incorporated by reference, or integral to and relied upon, in the complaint.

ultimate parent and majority shareholder is Horizon Fuel Cell Technologies PTE Ltd. ("Horizon"), a Singapore-based developer and manufacturer of fuel cell electric energy products co-founded by George Gu and Craig Knight in 2003. (*Id.* ¶¶ 38, 40, 60.) Horizon grew from small-scale projects to producing fuel cells for buses, light delivery trucks, and heavy-duty vehicles. (*Id.* ¶¶ 68-69.) In 2020, Horizon spun off US-based Legacy Hyzon, to commercialize Horizon's fuel cell technology in the production of FCEVs. (*Id.* ¶¶ 79-80.) Gu served as Legacy Hyzon's CEO, Knight as Chief Commercial Officer, and Mark Gordon as CFO. (*Id.* ¶¶ 38-40.)

### B.      Legacy Hyzon and DCRB Announce the Merger

On February 9, 2021, Legacy Hyzon announced that it would merge with DCRB, a special purpose acquisition company ("SPAC"), following months of due diligence and negotiations. (*Id.* ¶¶ 33, 99, 109.) DCRB went public in the fall of 2020 to raise capital to finance a business combination with a company "developing and advancing a platform that decarbonizes the most carbon-intensive sectors of the economy," including transportation. (*Id.* ¶¶ 97-98.) Erik Anderson served as DCRB's CEO. (*Id.* ¶ 36.) In the press release announcing this business combination (the "Merger"), Gu stated that the "business combination will enable us to expand deployments of our zero-emission hydrogen fuel cell powered heavy vehicles globally, and to continue leading the hydrogen transition." (Statement 1C,[3] *id.* ¶ 288.)

Legacy Hyzon and DCRB also held an investor call and published an investor

---

*Kabrovski* v. *City of Rochester, New York*, 149 F. Supp. 3d 413, 418 (W.D.N.Y. 2015). Defendants have attached as exhibits to this motion complete copies of certain documents that contain statements referenced in the TAC. (*See* Appendices 1 & 2.)

[3]      The Hyzon Defendants use these shorthand definitions to refer to the statements that Plaintiff has identified as allegedly misleading. The number refers to the exhibit where the statement may be read in its original context, and the letters differentiate each alleged misstatement within a given document. For the Court's convenience, the Hyzon Defendants have prepared a chart setting forth each statement and why it is inactionable. (*See* Appendix 1.)

presentation.  (TAC ¶¶ 112, 114.)   Among other topics, the presentation covered information regarding Legacy Hyzon's "backlog" or "pipeline," which included orders under contract, orders subject to non-binding memoranda of understanding ("MoUs" or "MOUs"), and potential orders that Legacy Hyzon considered probable based on the status of negotiations.  (*Id.* ¶¶ 115-16, 122.) The presentation stated that Legacy Hyzon had a "2021 backlog of ~$40 million under contract or MOU" (Statement 3A, TAC ¶ 297), with "80% of near-term backlog [corresponding] to customers in Europe, Asia and Australia."  (Statement 3B, *id.*)  On the call, Gordon said that Legacy Hyzon was "securing orders with customers of varying types," and "forecasts to grow from $37 million on revenue on 85 units sold in 2021."   (Statements 2B–C, *id.* ¶ 292.)   The presentation (1) identified certain "Top Tier Customers/End-Users/Partners" by name (Statement 3C, *id.* ¶ 298); (2) described the status of negotiations with actual and potential customers on a map with those customers' logos (Statement 3D, *id.*); (3) stated that Legacy Hyzon had "[c]ontracted Orders (100% Certain) from 13 private and public sector customers" (Statement 3E, *id.*); (4) used certain company logos to depict "Vehicle Customers" (Statement 3F, *id.*); and (5) summarized projected financials (Statement 3G, *id.*).  The presentation cautioned that Legacy Hyzon's arrangements with the prospective customers were "at various stages of contract negotiations, not all subject to binding purchases," and that "[s]ome sales [were] made to [third party logistics] customers [rather than] the end users depicted here (as is typical for the industry)."  (Ex. 3 at 18, 29.)

The February 9 presentation, call, and press release each included cautionary language regarding forward-looking statements.  For example, the presentation began with a dedicated disclaimer that "[t]he assumptions and estimates underlying [] projected financial information are inherently uncertain and are subject to a wide variety of significant business, economic, competitive and other risks and uncertainties."  (*Id.* at 2.)  The presentation expressly

stated that "[n]on-binding pre-orders, signed [MOUs] or heads of terms in our sales pipeline may not be converted into binding orders or sales." (*Id.* at 54.)  Similar warnings were included during the investor call and in the press release.  (Ex. 1 at 4; Ex. 2 at 1.)

Legacy Hyzon and DCRB filed updated versions of this presentation with the SEC on February 10 and 12, 2021, which were substantively unchanged, except that some logos referencing "Top Tier Customers/End-Users/Partners" were revised (Statements 4A and 5A, TAC ¶¶ 304, 307), and on the slides describing the status of negotiations, the logos were removed and names anonymized (*e.g.*, "Heineken" became "Global Brewer") (Statements 4B and 5B, *id.*; *see also id.* ¶¶ 442-43).  The updated presentations also revised the list of logos depicting "Vehicle Customers."  (Statements 4D and 5D, *id.* ¶¶ 304, 307.)  An April 29, 2021 version of the presentation anonymized additional customer logos and names, including all names related to the status of negotiations.  (Statements 12E, 12H, *id.* ¶ 321.)  The updated presentations retained the cautionary statements identified above.  (Ex. 4 at 18, 29, 54; Ex. 5 at 18, 29, 54; Ex. 12 at 35, 59.)

*Hiringa.*  On February 17, 2021, Legacy Hyzon announced that it "ha[d] signed a vehicle supply agreement" ("VSA") with New Zealand-based clean energy startup Hiringa Energy ("Hiringa"), pursuant to which Hyzon would "build and supply Hiringa with [FCEVs]." (Statement 6A, TAC ¶ 350.)  The press release noted that the companies previously had entered into a preliminary agreement to explore partnership opportunities for Hyzon to deploy FCEVs and for Hiringa to build hydrogen refueling infrastructure, and referenced Hyzon's "plans to have up to 1,500 fuel cell trucks on the road in New Zealand by 2026," with "the first batch of vehicles [] expected to enter service in New Zealand by the end of 2021." (Statements 6B–C, *id.*; Ex. 6 at 1.) The press release explicitly stated that "Hiringa will build a green hydrogen refuelling network," that Hiringa executives were "pleased leading New Zealand brands are stepping up to participate,"

and that Hyzon and Hiringa looked forward to "roll[ing] out over 1,500 heavy FCEVs by 2026[,] *alongside our partners*." (Ex. 6 at 2-3 (emphasis added).) The press release also referred to Hyzon and Hiringa's earlier agreement, which "secure[d] access for Hiringa *and its fleet partners*" to Hyzon's FCEVs. (Dkt. 34 ¶ 59.)[4] A Twitter post linking to the press release featured a photograph of a Hyzon-branded truck bearing the logos of Hiringa's end-user partners TR Group and TIL Group. (TAC ¶ 126; *see also* Ex. 20 at 3 (referring again to end user TR Group).)

DCRB further discussed the Hiringa VSA in its March 17, 2021 proxy statement. (TAC ¶ 357.) DCRB stated that "Hiringa has placed a binding order for the first 20 trucks," with the first four expected to be delivered by the Q1 2022. (Statement 11B, *id*.) DCRB explained that Hiringa would be "supported by logistics companies in New Zealand" (Statement 11C, *id*. ¶ 357) and "aim[ed] to deploy up to 1,500 fuel cell powered heavy trucks manufactured by Hyzon to fleet operators in New Zealand by 2026," and that Hyzon's vehicles would be "powered by green hydrogen supplied through Hiringa's nationwide refueling infrastructure." (Ex. 11 at 127.)

*"Fireside Chats."* As the Merger drew closer, certain Defendants also discussed Legacy Hyzon's forward-looking revenue targets and projections during "fireside chats," which were hosted by investment banks on March 10, 2021, June 16, 2021, and June 29, 2021. (Statements 10, 14, and 16; *id.* ¶¶ 313, 327, 329.) The transcripts of these fireside chats reflect cautionary language warning that such forward-looking statements were subject to "the ability of Hyzon to accurately estimate supply and demand for its vehicles," and "risks relating to the

---

[4]    Plaintiff cites Hyzon's subsequent November 2021 description of Hiringa as a "channel partner" to claim that Hyzon's earlier descriptions were false or misleading. (TAC ¶ 347.) But as described above, this description of Hiringa was fully consistent with Hyzon's previous disclosures. That includes the description of Hiringa in an August 31, 2020 press release, which Plaintiff quoted in the first amended consolidated class action complaint but deleted in full after Defendants pointed out that Plaintiff's own description of the press release referred to Hiringa's "fleet partners." (Dkt. 49 at 22, 35; Dkt. 55-3 at 40-41 (redline reflecting deletion).)

uncertainty of the projected financial information . . . including the conversion of pre-orders into binding orders." (Ex. 10 at 11; Ex. 14 at 18-19; Ex. 16 at 52-53.)

*Final Proxy Statement.*  On June 21, 2021, DCRB filed a final proxy statement. DCRB stated that, in assessing Legacy Hyzon's "Revenue Potential," the "DCRB Board considered Hyzon's non-binding [MOUs], letters of intent and a limited number of orders with various clients, including blue-chip Fortune 100 companies as well as Hyzon's rapidly growing visibility." (Statement 15A, TAC ¶ 315.)  The proxy included a "[f]orecast" of "[p]rojected revenue," which was "subject to significant uncertainties" and based on "numerous estimates and assumptions," including "Hyzon's maintaining gross margin remains relatively consistent at 30% to 33% from 2021 to 2025, through product design and other innovations to decrease the cost of materials in a FCEV." (Statement 15C, *id.*; Ex. 15 at 106.)  The proxy statement included a prominent disclaimer regarding forward-looking statements. (Ex. 15 at 27-28.)

C.    **Completion of the Merger and Hyzon's Subsequent Statements**

The Merger closed on July 16, 2021, with 95% of voting shareholders approving the transaction. (TAC ¶ 143.)  As part of the Merger, DCRB acquired Legacy Hyzon and was renamed Hyzon. (*Id.* ¶ 33.)  Anderson, Gu, Knight, and Gordon joined Hyzon's Board of Directors, with Knight serving as Hyzon's CEO and Gordon as Hyzon's CFO. (*Id.* ¶¶ 36, 38-40.)

On July 19, 2021, Hyzon published an updated investor presentation, which included an update on the status of Hyzon's pipeline "under contract or MOU," and reiterated the previous projections for 2021. (Statements 18A–B, *id.* ¶ 334.)  Like the previous presentations, it opened with a disclaimer regarding forward-looking statements, as well as incorporated the risk factors in DCRB's June 21, 2021 proxy statement. (*Id.* ¶ 144; Ex. 18 at 2-3.)

On September 9, 2021, Hyzon announced a "non-binding MoU" with Shanghai HongYun Automobile Co. Ltd. ("HongYun") to supply "up to 500" FCEVs, "subject to execution

of a definitive vehicle supply agreement." (TAC ¶ 367; Ex. 19 at 1.) Hyzon described HongYun as a Shanghai-based logistics company "focus[ed] on providing logistics solutions primarily through hydrogen-powered [FCEVs]," and as "provid[ing] operation, leasing and maintenance service for customers across the country, including one of the world's largest steelmakers." (Statement 19B, TAC ¶ 367.) The press release stated that "[a]fter Hyzon delivers the vehicles, HongYun will be responsible for the subsequent commercial arrangements with its end customers." (Ex. 19 at 1.) It also warned of "risks related to the ability to convert non-binding [MOUs] into binding orders or sales (including because of the current or prospective financial resources of the counterparties to Hyzon's non-binding [MOUs] and letters of intent)." (*Id.* at 3.)

### D.    The Short Seller Reports and Hyzon's Responses

On September 28, 2021, Blue Orca Capital ("Blue Orca"), a short selling firm, published a report regarding Hyzon. ("Blue Orca Report," TAC ¶ 159.) Blue Orca admitted that it stood "to realize significant gains if [the] price of [Hyzon's stock] declines," and claimed that: (1) HongYun was a shell entity formed three days before Hyzon announced the MOU; (2) Hiringa was Hyzon's "channel partner" rather than a "customer"; and (3) Hyzon overstated its relationship with certain "big-name customers" in early investor presentations, as evidenced by the removal of logos and names in later presentations. (*See* Ex. 31.) Blue Orca acknowledged that these statements were its "opinion," and that it relied on "conduct[ing] research and analysis based on public information" as "any person could have done." (*Id.* at 20.) In addition, Blue Orca's claims depended in significant part on anonymous sources, purportedly including a former Hyzon employee and a Hiringa employee, neither of whom was described in detail. (*Id.* at 5-7, 11.) Blue Orca disclaimed any "representation" as to the report's "accuracy . . . or completeness." (*Id.* at 20.)

On October 5, 2021, Hyzon issued a response to the Blue Orca Report. (TAC ¶ 175.) Hyzon stated that HongYun was "a special purpose entity seeking to provide third-party

clean energy logistics services to corporate customers" (Statement 20A, *id.* ¶ 372), and explained that HongYun had been established in the wake of an August 2021 announcement by the Shanghai government regarding a hydrogen FCEV pilot program (*id.*). Hyzon also explained that it "ha[d] never suggested that Hiringa [was] an end user of hydrogen trucks," but rather that Hyzon and Hiringa had partnered to develop hydrogen infrastructure and supply FCEVs, which "already has resulted in a [VSA] for 20 trucks to be delivered to TR Group Ltd., one of New Zealand's largest truck and trailer leasing and rental companies." (*Id.* ¶ 177.) Finally, Hyzon explained that "no customers or potential customers 'disappeared' from any investor presentation; rather, Hyzon anonymized certain customer and potential customer names." (Statement 20E, *id.* ¶ 337.)

The next day, Iceberg Research ("Iceberg"), another short seller that stood "to realize gains in the event that the price of [Hyzon's] securities decline[d]," published a report cursorily stating that it agreed with Blue Orca's claims. (Ex. 32 at 1, 9-10.) Iceberg also purported to offer "new information," suggesting that Horizon had spun off Hyzon to raise money. (*See id.* at 1, 4-5.) Iceberg relied primarily on public filings by a Horizon subsidiary, which Iceberg interpreted to suggest Horizon was struggling financially. (*Id.* at 3-5.)

E.    **Hyzon Announces 2021 Results**

On November 12, 2021, Hyzon issued a press release regarding its third quarter results, stating that Hyzon had "[r]eceived the first two purchase orders, for 62 trucks in total, pursuant to the terms of the previously announced MOU to supply [HongYun]." (Statement 21, TAC ¶ 377.) In a call that day, Knight stated that "[t]he end user of these trucks is a large industrial conglomerate." (Statement 22, *id.* ¶ 380.) Gordon also stated that, due to a shift in deliveries from Europe to China, revenue in 2021 was expected to be below prior projections, explaining that "as we've said in the past, the [average sales price] of vehicles in China are substantially below what they are in Europe." (Ex. 22 at 13.) On November 15, 2021, Hyzon filed its third quarter Form

10-Q, which reported revenue of $1 million.  (Statement 23A-B, TAC ¶ 341.)

On December 8, 2021, Hyzon announced it had delivered "29 fuel cell electric trucks to be used by a major steel conglomerate in China through [HongYun]."  (Statement 24A, *id.* ¶ 383.)  The press release featured a photo of the Hyzon vehicles, bearing the logo of BaoWu Steel, the world's largest steel manufacturer.  (*Id.* ¶¶ 187, 279; *see also* Ex. 24 at 1.)



On January 12, 2022, Hyzon reported that it had delivered 87 vehicles during 2021. (TAC ¶¶ 191-92)  Hyzon reiterated that it expected 2021 revenue would be lower than forecasted due in part to a shift in vehicle sales to Asia.  (*Id.* ¶ 191.)  In addition, Hyzon disclosed that it had received an SEC subpoena "for production of documents and information, including related to the allegations made in the [Blue Orca Report]."  (*Id.* ¶ 192.)[5]

On March 23, 2022, Hyzon filed a Form 8-K reporting revenue of $6.0 million for 2021.  (Statement 25, TAC ¶ 401-02.)  Although "total contract value for [] deliveries was $19.6 million" (Ex. 25 at 4), Hyzon's auditor determined that for certain customers in China, Hyzon could only recognize revenue for cash received, not the contract value as is typical, due to the customers' limited operating history.  (TAC ¶¶ 195, 200-01, 389.)  During the earnings call,

---

[5]    Hyzon subsequently reported that, in October 2022, the U.S. Attorney's Office for the Southern District of New York ("SDNY") notified Hyzon that it had opened an investigation into the same matters.  (TAC ¶ 237.)

Gordon stated, "It's a little strange," but "[o]nce [HongYun] has a longer operating history, we anticipate booking more revenues upfront." (Statements 26D–E, *id.* ¶ 402.)

On March 30, 2022, Hyzon filed its Form 10-K, which provided additional details regarding Hyzon's 2021 revenue and orders. The Form 10-K disclosed revenue was reduced by $0.2 million for stock warrants issued to HongYun, which gave HongYun the right to purchase Hyzon stock at $7.75 per share after making payments for the Hyzon vehicles it purchased. (TAC ¶ 199; Ex. 27 at 113.) The $7.75 exercise price was the price of Hyzon shares on November 23, 2021 (TAC ¶ 185) to align HongYun's interest with Hyzon's by rewarding HongYun if Hyzon's stock price increased. The Form 10-K also noted that 20 vehicles had been sold to Jiushuang (Shanghai) New Energy Technology Co. ("Jiushuang"), the parent of two entities that partnered with Hyzon to form joint ventures promoting hydrogen in China. (Ex. 27 at 104, 115.)

On April 12, 2022, Hyzon announced a new CFO would "succeed Mark Gordon," who would "assist with the transition and serve as a senior advisor." (Ex. 34 at 1; TAC ¶ 206.)

**F.      Hyzon Identifies Local Accounting and Operational Issues, Conducts an Internal Investigation, and Restates Certain Financial Reports**

On August 4, 2022, Hyzon announced that, in connection with preparing its quarterly financial results, Hyzon had identified "certain issues regarding revenue recognition timing and internal controls and procedures, primarily pertaining to its China operations." (Ex. 35; TAC ¶ 209.) Hyzon's Board "appointed a committee of independent board members to investigate" (the "Special Committee"). (Ex. 35.) Hyzon advised that, in light of the issues identified, its most recent Form 10-K and Form 10-Q "should no longer be relied upon." (*Id.*) In addition, Hyzon announced that it had "identified operational inefficiencies at" its European joint venture, and therefore had "determined to restructure its European operations" and "withdraw" its previous "financial and operational guidance." (*Id.*)

-13-

Following this series of announcements indicating that Hyzon had fallen short of its 2021 revenue projections and was struggling to execute operationally, Hyzon announced a change of its senior leadership.  On August 17, 2022, Hyzon issued a press release announcing that Hyzon's Board had appointed Parker Meeks as interim CEO, replacing Knight, who "also depart[ed] from his role as director of the Company."  (TAC ¶¶ 215-16.)  Hyzon also announced that "Gu has transitioned from his executive role with the Company to the non-executive Chairman of the Board," in which capacity he "will remain available to provide strategic counsel."  (*Id.* ¶ 216.)  On February 1, 2023, Hyzon disclosed that its Board had determined that Knight's departure should constitute a termination for cause under his employment agreement.  (*Id.* ¶ 220.)[6]

*Special Committee Disclosure.*  On March 13, 2023, Hyzon filed a Form 8-K reporting the results of the Special Committee investigation.  (*Id.* ¶¶ 221-26.)  Of the 87 vehicles reported as delivered during 2021, 62 vehicles were to HongYun, 20 to Jiushuang, and 5 to customers in Europe. (Ex. 36.)  As to China, "[d]espite [Hyzon] receiving certain documentation that was intended to serve as confirmation that the Jiushuang and Hongyun vehicles were complete . . . as of year-end 2021, the Special Committee [] found that the 20 Jiushuang vehicles and approximately 30 of the Hongyun vehicles" had not yet completed the vehicle commissioning process and therefore were not yet operable on hydrogen "at the time of delivery and as of December 31, 2021." (*Id.*)  As Hyzon later explained in its Form 10-K/A, commissioning "consists of injecting hydrogen through the fuel cell powertrain system and conducting other tests." (Ex. 38 at iii.)  Although "the assembly of [the] vehicles [in China] was complete at the time of initial delivery," "they had not undergone [this] final commissioning." (*Id.*)  However, this issue was

---

[6]    Mr. Knight does not agree that his departure can properly be classified a termination for cause.

later resolved. "As part of the Special Committee investigation, [a] forensic accounting firm conducted site visits of the 20 Jiushuang vehicles and a significant sample set of the 62 Hongyun vehicles, and confirmed that those vehicles were operable on hydrogen." (Ex. 36.)

As to Europe, "[t]he Special Committee noted that the five vehicles delivered to customers in Europe . . . needed to undergo repairs post-delivery," which led the Company to "re-evaluate[] the treatment of revenue recorded for those five vehicles." (*Id.*) The Special Committee also found that "it does not appear that an additional vehicle provided to Transport Groep Noord, a carrier providing transport for Royal FrieslandCampina N.V., in Europe in 2021 was operable on hydrogen when Hyzon issued a press release regarding this vehicle [on July 13, 2021]." (*Id.*)

The Special Committee did not find wrongdoing or knowledge of these issues by any Hyzon executive or director. (*See id.*) The Special Committee noted "Hyzon's reliance on third parties for many aspects of the sales, commissioning, and delivery process," and that "the Hyzon China operations team should have confirmed that the vehicles were commissioned and operable on hydrogen at the time of delivery." (*Id.*) "[T]he Special Committee noted that the tenor of certain communications by certain Hyzon executives was overly concentrated on meeting the Company's 2021 deliveries forecast and recognizing revenue on those deliveries; however, other communications reflected the importance of complying with the relevant accounting standards." (*Id.*) "The Special Committee proposed certain recommendations," including (i) "a written revenue recognition policy"; (ii) "a written disclosure policy"; (iii) "a commissioning and homologation policy and processes"; and (iv) "periodic general public company training for Company personnel." (*Id.*)

**Restatements.** On March 14, 2023, Hyzon filed three restatements: two amended quarterly reports on Form 10-Q/A for Q3 2021 and Q1 2022, and an amended annual report on

Form 10-K/A for 2021. (Exs. 37-39.) Based on the Special Committee investigation, Hyzon "concluded that [its] contractual performance obligation to deliver functioning [FCEVs] [in China] was not fully satisfied for revenue recognition purposes" during 2021. (Ex. 38 at iv.) For the 62 HongYun vehicles, that obligation was met in Q1 2022, and $2.5 million in revenue for delivery of the HongYun vehicles was therefore recognized in Q1 2022 rather than in Q4 2021. (Ex. 39 at 13.) For the 20 Jiushuang vehicles, delivery was completed in Q3 2022 (*id.*), although "no amounts were recognized as revenue as the consideration received was less than the amounts paid to satisfy local government VAT obligations" (Ex. 40 at 94).

Regarding Europe, based on the Special Committee's findings, Hyzon conducted an internal accounting review that found that, under certain "contracts which were assumed from [a subsidiary of Hyzon's European joint venture partner] in July 2021," "instead of manufacturing or assembling FCEVs that [Hyzon Europe] owned for sale to customers, Hyzon Europe was providing these customers with vehicle retrofit services to convert the customers' . . . vehicles to hydrogen FCEVs." (Ex. 39 at 3.) Accordingly, rather than recognize revenue for the European vehicles at the time of delivery, revenue was reallocated based on when work was performed. (*Id.*)

G.      **The Instant Action and Plaintiff's Insufficient Investigation**

On December 14, 2021, the Court consolidated several shareholder class actions and appointed Plaintiff to lead the putative class. (ECF Nos. 21, 22.) On March 21, 2022, Plaintiff filed the first amended consolidated class action complaint ("FAC") (ECF No. 34), and after Defendants moved to dismiss the FAC, Plaintiff requested and was granted leave to file the second amended complaint ("SAC"). (ECF No. 49, 54). Plaintiff filed the SAC on September 16, 2022. (ECF No. 55.) Following a stay to allow the parties to pursue mediation, Plaintiff requested and was granted leave to file a third amended complaint. (ECF No. 66.) Plaintiff filed the TAC on June 23, 2023, adding for the first time a claim under Section 14 of the Exchange Act and adding

-16-

as defendants DCRB's directors and sponsor.  (ECF No. 67.)  Count I alleges that Defendants violated Section 10(b) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder.  (TAC ¶¶ 518-27.)  Count II alleges that Defendants violated Section 10(b) and SEC Rule 10b-5(a) and (c) regarding "scheme" liability.  (*Id.* ¶¶ 528-37.)  Count IV alleges that Defendants violated Section 14(a) and SEC Rule 14a-9 promulgated thereunder.  (*Id.* ¶¶ 543-52.)  Counts III and V allege that certain defendants violated Section 20(a) of the Exchange Act based on primary violations of Section 10(b) and Section 14(a), respectively.  (*Id*. ¶¶ 538-42, 553-61.)

The TAC largely relies on allegations in the short seller reports to claim that Defendants knowingly made false statements to inflate Hyzon's stock price.  (*See id*. ¶¶ 159-71, 179.)  Plaintiff does not allege that he investigated or tried to corroborate the short sellers' claims, except that Plaintiff claims to have engaged an unidentified investigator ("Investigator C-1") to review certain of the HongYun-related allegations.  (*Id.* ¶¶ 242, 244.)  Plaintiff alleges that Investigator C-1 was unable to determine that HongYun had a web presence, registered employees, paid capital commitments, a physical office space, or apparent connections to large conglomerates.  (*Id.* ¶¶ 250-75.)  Plaintiff alleges that based on these "findings," Investigator C-1 concluded that— in his opinion—it would be difficult for HongYun to compete for contracts from large Chinese businesses like BaoWu Steel.  (*Id.* ¶¶ 254, 279-80.)  Despite the plain inconsistency of Investigator C-1's conclusions with the disclosures of deliveries to HongYun and BaoWu Steel and the Special Committee's on-site testing, Plaintiff does not indicate that Investigator C-1 has revised his opinion.  Plaintiff does not allege that Investigator C-1 reviewed any of the short sellers' other claims or any other alleged misstatements in the TAC, except those regarding HongYun.

## LEGAL STANDARD

As a threshold requirement to pursuing a claim under Section 10(b) or Rule 10b-5, a plaintiff must "have bought or sold the security about which a misstatement was made in order

to have standing to sue." *Menora Mivtachim Ins. Ltd*. v. *Frutarom Indus. Ltd*., 54 F.4th 82, 86 (2d Cir. 2022). Assuming that standing has been adequately alleged, a plaintiff must allege that a defendant (1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which the plaintiff relied; and (5) that plaintiff's reliance was the proximate cause of their injury. *In re Int'l Bus. Machines Corp. Sec. Litig.* ("*IBM*"), 163 F.3d 102, 106 (2d Cir. 1998). These claims are subject to "[e]xacting pleading requirements." *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). Under Rule 9(b), plaintiffs must "state with particularity the circumstances constituting fraud," and the PSLRA requires plaintiffs to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

## ARGUMENT

### I.  PLAINTIFF LACKS STANDING TO PURSUE SECTION 10(B) CLAIMS FOR ALLEGED MISSTATEMENTS ABOUT LEGACY HYZON.

Plaintiff cannot challenge Statements 1A–17C under Section 10(b) because these alleged misstatements were made "about" Legacy Hyzon when Plaintiff was not a shareholder of Legacy Hyzon, a privately held company pre-Merger, but rather was a shareholder in DCRB. Under Second Circuit law, the purchaser-seller rule "requires plaintiffs to have bought or sold the security *about which* a misstatement was made in order to have standing to sue under Section 10(b)." *Frutarom*, 54 F.4th at 86 (emphasis added). This bright-line rule does not vary based on the "significance or directness of the relationship between two companies." *Id.* at 88. In the merger context, shareholders of an acquirer cannot pursue claims based on "alleged misstatements about [the target] because they bought shares of [the acquirer], not [the target]." *Id.* at 86; *see also*

*In re Alibaba Grp. Holding Ltd. Sec. Litig.*, 2023 WL 2601472, at *5 (S.D.N.Y. Mar. 22, 2023).

*In re CarLotz, Inc. Securities Litigation* confirms that SPAC shareholders cannot pursue claims for alleged misstatements about a pre-merger target. __ F. Supp. 3d __, 2023 WL 2744064, at *3-5 (S.D.N.Y. Mar. 31, 2023). Like this case, *CarLotz* involved a SPAC merger in which the pre-merger target company made allegedly false statements in investor presentations. Applying *Frutarom*, the court ruled that plaintiffs lacked standing because "[a]ll of the challenged pre-merger statements . . . were made by Pre-Merger CarLotz [the SPAC target] about itself, not Acamar [the SPAC]." *Id*. at *4. Plaintiff could not "avoid this problem by equating Pre-Merger CarLotz with Post-Merger CarLotz," *id.*, and as in *Frutarom*, it did not make a difference that the target's alleged misstatements had been incorporated into the SPAC's SEC filings, Reply Mem. at 3-4, *CarLotz*, No. 1:21-cv-05906, ECF No. 74 (S.D.N.Y. Oct. 20, 2022); *Frutarom*, 54 F.4th at 84 (no standing for statements "incorporated into [the acquirer's] Form S-4 Registration Statement").

"*Frutarom* forecloses Plaintiff['s] challenge to any statements made by Pre-Merger [Hyzon] about Pre-Merger [Hyzon]." *CarLotz*, 2023 WL 2744064, at *4. Whereas Plaintiff was a shareholder of DCRB, "[a]ll of the challenged pre-merger statements . . . were made by Pre-Merger [Hyzon] about itself, not [DCRB]." *Id.* Plaintiff lacks standing to pursue those statements.

## II.    PLAINTIFF DOES NOT ALLEGE ANY ACTIONABLE MISSTATEMENTS.

Even if Plaintiff did have standing, Plaintiff does not come close to meeting the required pleading standard. At the outset, only a small fraction of the purported misstatements are alleged to have been spoken by any individual defendant. Plaintiff attributes most statements generically to "Hyzon" or "Defendants" without alleging a specific basis for the individual defendants' involvement, except for cursory references to their corporate roles. That is plainly insufficient. *Kohlberg* v. *Birdsey*, 2022 WL 976809, at *6 (S.D.N.Y. Mar. 31, 2022); *see also Janus Capital Grp., Inc.* v. *First Derivative Traders*, 564 U.S. 135, 142 (2011) (liability limited to

the "maker" of the statement with "ultimate authority").  Plaintiff never alleges that Anderson made any misstatements at all—relying solely on Anderson's signature of certain public filings as DCRB's chairman, a connection that clearly falls short (*see infra* at 39 n.16)—warranting dismissal of the claims against him on that basis alone.  *Police & Fire Ret. Sys. of City of Detroit* v. *SafeNet, Inc.*, 645 F. Supp. 2d 210, 239 (S.D.N.Y. 2009) (signature insufficient).

Plaintiff divides the alleged misstatements into four categories:  (1) "Statements Concerning 100% Committed and Highly Probable Orders"; (2) "Statements Concerning Hiringa"; (3) "Statements Concerning HongYun"; and (4) "Statements Concerning Revenue Recognition Practices and Internal Controls."   (TAC ¶¶ 284-414.)  None is sufficient to state a claim.  *First*, Plaintiff relies almost exclusively on the uncorroborated speculation of two short seller reports that this Court should not credit.  *Second*, none of the alleged misstatements is false or misleading, particularly when viewed in context.  *Finally*, many of Defendants' statements also are inactionable forward-looking projections, opinions, or puffery.

A. **Plaintiff's Allegations Depend Largely on Unreliable and Uncorroborated Claims by Self-Interested Short Sellers.**

The vast majority of Plaintiff's allegations are simply cribbed from the Blue Orca and Iceberg short seller reports.  Both short sellers acknowledged that they would profit from a decline in Hyzon's share price, giving them "an obvious motive to exaggerate the infirmities of the securities in which they speculate." *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 910 F. Supp. 2d 561, 577 (S.D.N.Y. 2012).  Given the heightened pleading standard applicable to securities fraud claims, courts do not reflexively credit claims based on short seller reports, but rather consider whether "there is a basis to view the short seller's factual allegations as reliable as opposed to fabricated based on self-interest—for example, where facts are cited that tend to substantiate these allegations or reveal the basis for the short-seller's factual assertions." *In re Hebron Tech. Co.,*

*Ltd. Sec. Litig.*, 2021 WL 4341500, at \*13 (S.D.N.Y. Sept. 22, 2021).  Courts also apply "close scrutiny where a short-seller report . . . relies on 'confidential' or anonymous sources, without corroboration."  *Long Miao* v. *Fanhua, Inc.*, 442 F. Supp. 3d 774, 801 (S.D.N.Y. 2020).

The Blue Orca Report's claims concerning Hyzon's customer relationships and Hiringa relied almost entirely on purported statements by an anonymous former Hyzon employee and an unnamed Hiringa employee.  Plaintiff does not allege that he made any effort to corroborate those purported statements, and the Blue Orca Report itself lacks sufficient corroboration.  That alone is reason enough to disregard these purported statements and dismiss all claims based on them.[7]  *Long Miao*, 442 F. Supp. at 797 (uncorroborated "statements made by anonymous—and often vaguely described—interviewees . . . cannot sustain a §10(b) claim"); *In re DraftKings Inc. Sec. Litig.*, 2023 WL 145591, at \*23 (S.D.N.Y. Jan. 10, 2023) (similar).

Moreover, Plaintiff's own allegations contradict the short sellers' claims.  While Plaintiff repeats the short sellers' allegations in claiming that HongYun purportedly is "fake," a "sham," and lacks assets to transact with Hyzon (TAC ¶¶ 158, 162, 241), following the delivery

---

[7]     The recent Delaware Court of Chancery bench ruling in a breach of fiduciary duty case against the former directors and sponsor of DCRB, which declined to dismiss breach of fiduciary duty claims regarding Hyzon's customer relationships and Hiringa under Delaware's plaintiff-friendly "reasonable conceivability" standard, should not affect this Court's analysis under the PSLRA.  Transcript, *Malork* v. *Anderson*, No. 2022-0260, Dkt. 108 (Del. Ch. July 7, 2023) (Ex. 41).  In contrast to the PSLRA, under Delaware's "minimal" standard (*id.* at 23), "even vague allegations are 'well-pleaded' if they give the opposing party notice of the claim" and "dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances," *Savor, Inc.* v. *FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002) (quotation omitted).  The Court of Chancery noted that, even under this favorable standard, similar allegations regarding Hyzon's customer relationships were "a very close call"— including because the removal of certain customer logos in investor presentations could have been "merely an effort to anonymize customers and nothing more"—and claims related to Hiringa were "reasonably conceivable" when "applying the plaintiff-friendly standard on a motion to dismiss." (Ex. 41 at 35, 38-39.)  Although that court was required to credit those allegations under the Delaware standard, this Court is under no such obligation under the heightened pleading standards of the PSLRA.

of 62 vehicles to HongYun and the Special Committee's successful testing of a sample of these vehicles (*id.* ¶ 235-36; Ex. 36), Plaintiff pivots and now also claims that the alleged misstatements include purported failures to disclose that (i) HongYun orders would have lower-than-average sale prices (¶ 379); (ii) revenue from HongYun would be accounted for across multiple quarters (*id.*); (iii) warrants to HongYun were an improper "kickback" to purchase Hyzon FCEVs (*id.* ¶ 186), an allegation that tacitly concedes HongYun is capable of purchasing Hyzon FCEVs; and (iv) HongYun was in fact the customer of Hyzon's parent Horizon (*id.* ¶ 290-91), speculation for which Plaintiff provides zero support.  Plaintiff cannot meet his pleading burden based on these inconsistent allegations.  *Egan* v. *TradingScreen, Inc.*, 2011 WL 4344067, at *6 (S.D.N.Y. Sept. 12, 2011) (dismissing "[i]n light of [] inconsistent allegations and theories").

### B.     Defendants' Statements Were Not Misleading.

Plaintiff has not adequately alleged that any statements were false or misleading. "[A]n alleged material misstatement" must have been "false *at the time it was made*."  *In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *12 (S.D.N.Y. Apr. 2, 2020) (quotation omitted). "[P]laintiffs must do more than assert in a conclusory fashion that statements were or must have been false—they must allege facts supportive of how and why this is the case."  *C.D.T.S.* v. *UBS AG*, 2013 WL 6576031, at *3 (S.D.N.Y. Dec. 13, 2013).  This requires "specific allegations," rather than speculative inferences.  *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 103 (2d Cir. 2007).  The TAC fails to meet this rigorous standard.

### 1.     Hyzon Repeatedly Disclosed That Many of Its Business Relationships Involved Non-Binding Agreements, Including with Customers in China.

Plaintiff alleges that Hyzon misrepresented its potential partnerships and sales pipeline because Hyzon (1) "did not have any 100% certain or high probability pre-orders . . . and instead, at best, had non-binding [MOUs]," (2) purportedly counted orders from entities that did

not sign agreements, did not intend or could not be expected to order vehicles, were merely intermediaries, or had not satisfied conditions precedent to confirm a sale, (3) purportedly concealed its order backlog with Chinese customers and misleadingly focused on North America, Europe, and Australia, and (4) based financial projections on an operating margin of 30-33%. (TAC ¶¶ 285, 317.)[8]  Plaintiff alleges that the following statements are false or misleading for the aforementioned reasons:  Statements 1A–5E, 8, 10, 12B–H, 14–16, 17A–18C, 20E–F, and 23C–D. Plaintiff has failed to plead that these statements were false or misleading.

*First*, contrary to Plaintiff's claim, Hyzon never represented that its pipeline was entirely comprised of "100% certain or high probability pre-orders," rather than MOUs.  In fact, Hyzon consistently disclosed that its 2021 forecast was "covered by contracts and MOUs" (*id*. ¶ 292), and that its backlog included actual and prospective orders "under contract or [MOU]" (*id*. ¶¶ 297-98).  Hyzon further warned that "[n]on-binding pre-orders [and] signed [MOUs] . . . in our sales pipeline may not be converted into binding orders or sales" (Ex. 3 at 54), and that orders included "terms permitting the counterparty to cancel or suspend some or all of their obligations" (Ex. 17 at 6).  Plaintiff fails to plead any specific facts indicating this description of Hyzon's pipeline was false other than the uncorroborated Blue Orca Report.  (TAC ¶ 285.)  *In re Bausch &*

---

[8]     Rather than explain the basis for each alleged misstatement, Plaintiff attempts to avoid the PSLRA's requirements through "puzzle pleading," and claims that, for each of four categories, the alleged misstatements were "false and misleading for the following reasons, both together and individually," and then provides a laundry list of vague or generalized reasons.  (TAC ¶¶ 285, 347, 364; *see, e.g.*, TAC ¶ 326 ("The statement(s) in the above-depicted paragraphs referred to and incorporated by reference the false and misleading materials discussed in ¶¶ 288, 292, 296, 304, & 307.").)  Courts in this Circuit routinely dismiss securities fraud complaints where "[i]nstead of explaining what aspect of each quoted statement is materially false or misleading and why, plaintiffs reproduce the same conclusory formula" intended "to cover *all* of the allegedly material misrepresentations."  *See, e.g.*, *Lachman* v. *Revlon, Inc.*, 487 F. Supp. 3d 111, 127–28 (E.D.N.Y. 2020) (quotation omitted).  This is the approach Plaintiff has followed here: rather than detail why and how each statement is misleading, Plaintiff leaves that task to this Court.  Plaintiff cannot meet the pleading standard in this manner.

*Lomb, Inc. Sec. Litig.*, 2003 WL 23101782, at \*19 (W.D.N.Y. Mar. 28, 2003) (rejecting claims where "plaintiff's characterizations . . . [had] no factual basis"). At most, Plaintiff claims that sales described in the pipeline were not realized, allegedly indicating that the original characterization of the order or projection was false. (TAC ¶¶ 239, 294, 300.) But that is a classic fraud-by-hindsight argument that courts consistently reject. *Kocourek* v. *Shrader*, 391 F. Supp. 3d 308, 328 (S.D.N.Y. 2019) (rejecting that unrealized revenue projections indicated falsity).

*Second*, Plaintiff pleads no facts supporting an inference that Hyzon was counting orders from entities that had no intention or ability to buy vehicles. Instead, Plaintiff conclusorily repeats Blue Orca's claim that the anonymization of logos in the later investor presentations demonstrate that "Hyzon was either initially misleading the market or it lost these orders between February and July." (TAC ¶ 170) But the anonymization of certain potential customers does not support the inference that customers were lost over months, particularly when anonymization occurred within days of the initial presentation. The presentations were clear that the logos represented "[c]ustomers [who] were at various stages of contract negotiations, not all subject to binding purchases" (Ex. 3 at 29), and Hyzon remained in discussions with many of those same potential customers long after the logos were anonymized. (*See* Ex. 20 at 3.) Plaintiff fails to plead particularized facts supporting his accusation, as required by the PSLRA.[9]

*Third*, Plaintiff fails to plead facts sufficient to allege that Hyzon concealed its order backlog in China and misleadingly focused on North America, Europe, and Australia. Plaintiff's allegations confirm that Hyzon regularly discussed China as part of its global distribution strategy. For example, the February 9, 2021 investor presentation highlighted a "Leading Steel Company"

---

[9]     As noted above (*see supra* at 21 n.7), the Delaware Court of Chancery found that the sufficiency of similar allegations was "a very close call" even under Delaware's lenient "reasonably conceivable" pleading standard. (Ex. 41 at 35, 38.)

located in China, consistent with the delivery of vehicles to HongYun for use by BaoWu Steel. (Ex. 3 at 18.)  The same presentation listed a "Chinese Municipality" as the top public sector sales prospect.  (*Id.* at 19; *see also* Ex. 2 at 2 ("Eighty percent of [Hyzon's] near-term sales pipeline is in Asia, Australia and Europe.").)  And Hyzon issued three press releases regarding China-based HongYun.  (TAC ¶¶ 12, 383, 467.)  Given that Hyzon is headquartered in New York, and has an active sales presence in Europe and Australia (*e.g.*, *id.* ¶¶ 32, 35), it is unsurprising that these regions were included as part of its global sales strategy.  Plaintiff fails to provide specific facts as to how these descriptions (including grouping of certain regions) purportedly were false.

*Finally*, Plaintiff attempts to claim that Hyzon falsely represented its *current* operating margin by using a 30-33% *future* operating margin in the company's projections, likely recognizing that the PSLRA precludes Plaintiff from challenging the forward-looking margin. (TAC ¶¶ 315, 317.)  But that is baseless: (i) the margin cited by Plaintiff is specifically described as "*projected* gross margin"; (ii) the same sentence states that achieving this margin is contingent on future "product design and other innovations to decrease the cost of materials in a FCEV"; and (iii) the same document showed Legacy Hyzon did not yet have revenue, and therefore left the current margin blank.  (Ex. 15 at 69-70, 106.)  No reasonable investor would rely on a reference to "maintaining" a future 30-33% margin as representative of the current margin given this context. *See In re Eastman Kodak Co. Sec. Litig.*, 632 F. Supp. 3d 169, 186  (W.D.N.Y. 2022).

### 2. Defendants Accurately Disclosed the Nature of Hiringa's Orders and Its Partnerships with End-User Fleet Operators.

Plaintiff next alleges that Hyzon's statements regarding Hiringa were misleading because Hyzon (1) represented Hiringa as an end user of FCEVs; (2) did not have binding orders from Hiringa; (3) did not identify Hiringa's end user partners; and (4) counted orders from Hiringa customers that could not plausibly order the number of trucks estimated.  (TAC ¶¶ 347, 351.)

Plaintiff alleges that the following statements are misleading for one or more of these reasons: Statements 6A–7, 9, and 11A-12A.  None of these statements are false or misleading.

*First*, Hyzon did not portray Hiringa as a vehicle end user, and consistently explained Hiringa would build a refueling network that could be used by partners who would purchase Hyzon vehicles.  Hyzon's statements explicitly noted that "Hiringa will build a green hydrogen refuelling network for vehicle fuel supply" to Hiringa's "partners."  (*See supra* at 7-8.)

*Second*, Plaintiff relies on Blue Orca's purported summary of an interview with an unnamed Hiringa employee to claim that Hyzon did not have any "binding orders" with Hiringa. (*Id.* ¶¶ 165, 318, 346.)  But even if credited, the former employee asserted only that the VSA for 1,500 trucks was not binding.  (Ex. 31 at 6.)  Hyzon has never suggested otherwise.  (*See* TAC ¶ 355 (vehicles would be built "[a]s binding orders . . . are placed").)  In fact, the unnamed Hiringa employee *confirmed* that Hiringa expected to receive four vehicles in early 2022, with sixteen more to follow (*id*. ¶ 167), which is consistent with Hyzon's statement that "Hiringa has placed a binding order for the first 20 trucks" and "Hyzon expects the first shipments of four trucks to occur by [Q1] 2022."  (*Id.* ¶ 357; *see also id.* ¶ 298 (Hiringa "Signed Contract, 20 [units]").)

*Finally*, Defendants *did* identify Hiringa's end user partners (*see supra* at 8), and Plaintiff never explains why Hiringa's partners could not plausibly order the projected number of vehicles.  Plaintiff's claims regarding Hiringa lack any basis in fact and must be dismissed.

### 3. Plaintiff Fails to Allege Facts Supporting His Claims That HongYun Did Not Order and Receive Hyzon FCEVs or That Hyzon Misleadingly Described HongYun's Orders.

Plaintiff claims that the statements regarding HongYun were false because (1) HongYun was allegedly a fake or shell company without the ability to purchase FCEVs; (2) Hyzon allegedly had only non-binding MoUs with HongYun, not binding purchase orders; (3) Hyzon allegedly counted orders from businesses that had not signed agreements or could not

plausibly be expected to order the number of vehicles suggested; (4) Hyzon allegedly did not disclose counterparty risks and implications for its revenue accounting; and (5) Hyzon allegedly should have disclosed the HongYun share warrants earlier.  (TAC ¶¶ 364, 368.)  Plaintiff alleges that the following were misstatements for one or more of these reasons:  Statements 19A–20D, 21–22, and 24A–24C.  Plaintiff fails to allege any facts indicating that these statements were false.

*First*, contrary to Plaintiff's claims (*see* TAC ¶¶ 188, 368), the Special Committee confirmed that vehicles had been delivered to HongYun, conducted on-site testing of a significant sample, and found the vehicles to be operable.  (Ex. 36.)  The fact that there was an issue with the *timing* of the recognition of revenue refutes Plaintiff's claim that the counterparty to these transactions was a "fake" or a "sham."  (*See id*; Ex. 39 at 13.)  The TAC adds the allegation that HongYun "was likely a Horizon customer handed to Hyzon," but Plaintiff provides zero support for this speculation.  (TAC ¶ 368.)  Allegations of underlying unlawful conduct that render statements false or misleading must themselves be pleaded with particularity, *Gamm* v. *Sanderson Farms, Inc.*, 944 F.3d 455, 463 (2d Cir. 2019), something Plaintiff has repeatedly failed to do.

*Second*, Plaintiff does not plead any facts supporting the claim that Hyzon did not receive binding purchase orders from and deliver trucks to HongYun.  On the contrary, Plaintiff bizarrely cites to a press release announcing Hyzon's delivery of trucks to HongYun and even includes in the TAC a photograph of Hyzon trucks emblazoned with the logo of BaoWu Steel, the world's largest steel manufacturer, but then suggests that his eyes must be deceiving him because Hyzon never "disclosed any pilot test program" with that steel manufacturer.  (*Id*. ¶¶ 185, 187-88.)

*Third*, Plaintiff fails to plead facts suggesting that HongYun's end user customers

could not plausibly order the number of trucks projected by Hyzon.[10]  The press release showing

Hyzon trucks bearing BaoWu Steel's logo seriously undermines Plaintiff's claims.  Ultimately,

Plaintiff relies only on the speculative inference that Hyzon's statements must be untrue based on

the conclusions of the short sellers and Plaintiff's "investigator."  That is insufficient.  Falsity

requires "specific allegations," rather than speculative inferences.  *See ATSI*, 493 F.3d at 103.

*Fourth*, Plaintiff claims that Hyzon's updates regarding orders from HongYun were

misleading because they purportedly did not discuss the potential impact of counterparty risk on

Hyzon's revenue.  (TAC ¶¶ 367-83, 467.)  But such an omission could not be misleading because

the challenged statements did not discuss revenue, only the number of orders.  (*Id.*); *see In re*

*Hardinge, Inc. Sec. Litig.*, 696 F. Supp. 2d 309, 321 (W.D.N.Y. 2010) (no obligation "to disclose

all information [] tangentially related to the subject matter of a statement").  Moreover, Hyzon

repeatedly disclosed counterparty risks related to its orders (*e.g.*, Ex. 17 at 6 ("orders include terms

permitting the counterparty to cancel or suspend some or all of their obligations"); *supra* Section

II.B.1), and specifically addressed counterparty risks with respect to HongYun (Ex. 20 at 2).[11]

---

[10]       Relatedly, Plaintiff suggests that statements about HongYun were misleading
because "Hyzon counted pre-orders from entities that merely operated as intermediaries for
ultimate purchasers."  (TAC ¶ 364(c).)  But Plaintiff ignores Hyzon's repeated reminders that
dealing directly with third party logistics partners rather than end users was "typical for the
industry."  (Ex. 3 at 18.)

[11]       Plaintiff also refers to Hyzon's sale of 20 vehicles to Jiushuang (Shanghai) New
Energy Technology Co., Ltd. ("Jiushuang"), the parent of a Hyzon joint venture partner.  (TAC
¶¶ 18, 200.)  Although Plaintiff suggests that Hyzon should have announced that Jiushuang
purportedly was a related party in advance of Hyzon's March 30, 2022 Form 10-K, Plaintiff does
not allege any statement that was false or misleading as a result.  Nor does Plaintiff explain how
the parent of Hyzon's joint venture partner—an entity separate from the joint venture itself over
which Hyzon is not alleged to have control—is purportedly a related party.  *Tabor* v. *Bodisen*
*Biotech, Inc.*, 579 F. Supp. 2d 438, 450-51 (S.D.N.Y. 2008) (noting in dismissing related party
claim that parties are related "if one party controls or can significantly influence the management
or operating policies of the other").

*Fifth*, Plaintiff fails to plead facts showing that Hyzon misled investors by not disclosing earlier that HongYun received Hyzon share warrants as an incentive for purchasing Hyzon vehicles. Because the challenged statements did not address revenue, Hyzon had no obligation to disclose warrants that served as a small sales incentive. *In re Canandaigua Sec. Litig.*, 944 F. Supp. 1202, 1209 (S.D.N.Y. 1996) (non-disclosure of discount was not actionable).[12]

### 4. Limited Revenue Timing Issues Do Not Support Plaintiff's Allegations of Fraud.

Regarding the restated financial reports, Hyzon acknowledges that the original reports reflected incorrect timing for the recognition of certain revenue (although Plaintiff has not alleged scienter or loss causation, as described in Sections III and IV below). But Plaintiff's attempt to misconstrue the restatements to support his allegations regarding Hyzon's customer relationships (TAC ¶¶ 239, 285)—which center on investor presentations made from February to July 2021, five to ten months before the restated deliveries—is baseless.

Likewise, there is no basis for Plaintiff's claim that the description of Hyzon's business as "*focused primarily* on assembling and supplying battery-electric vehicles and [FCEVs]" was allegedly misleading because it did not account for retrofitting work on 5 vehicles in Europe. (Statement 23D, TAC ¶ 396-97 (emphasis added).) There is no dispute that the 82 vehicles Hyzon delivered in China—94% of 87 total vehicles delivered—qualified as traditional "assembl[y] and supply[]." Regardless of whether the 5 vehicles in Europe were "assembl[y] and supply[]," the description was accurate as to the "primar[]y" "focus[]" of Hyzon's business.

Finally, Plaintiff is incorrect that Knight and Gordon's certifications pursuant to the

---

[12]    Moreover, contrary to Plaintiff's portrayal, the value of the warrants was minimal. The warrants were valued at $0.2 million based on GAAP. (Ex. 27 at 113.) Plaintiff attempts to inflate the value of the warrants by hypothesizing their sale at a share price of $10.40 (TAC ¶ 186), well over the $7.75 share price at the time the warrants issued and more than ten times the share price as of June 23, 2023 (Ex. 33).

Sarbanes-Oxley Act ("SOX") were necessarily false in light of Hyzon's restatements.  (Statements 27C, 27E–F, *id.* ¶¶ 393, 411-12.)  SOX certifications "contain[] important qualifying language; that is, the declarants only certified the financial reporting to the extent of his or her knowledge on the date of execution."  *Wanca* v. *Super Micro Computer, Inc.*, 2018 WL 3145649, at \*6 (N.D. Cal. June 27, 2018).  "[F]alsity of the statement is entirely dependent on what [the certifier] knew, not on what was objectively true at the time of the statement."  *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 402 (S.D.N.Y. 2016).  Because Plaintiff has not pled any facts indicating that Knight or Gordon knew the certifications to be false when made, Plaintiff has failed to plead falsity.[13]

### C.    Many Statements Challenged by Plaintiff Are Legally Inactionable.

Many of Defendants' statements also are indistinguishable from statements that the Supreme Court and Second Circuit have held are not actionable as a matter of law, including (1) forward-looking projections, which are protected under the PSLRA absent certain exceptions inapplicable here; (2) "puffery," vague optimism that is immaterial as a matter of law; and (3) sincerely held opinions that neither embed inaccurate facts nor omit material information.

#### 1.    The PSLRA Safe Harbor Protects Forward-Looking Statements Regarding Revenue and Delivery Projections.

The TAC challenges several forward-looking statements, which are protected by the PSLRA's safe harbor.  *See* 15 U.S.C. § 78u-5(c).  "A forward-looking statement is not actionable if it [1] 'is identified and accompanied by meaningful cautionary language' *or* [2] 'the

---

[13]    In addition, contrary to Plaintiff's claim that Knight and Gordon's certifications in Hyzon's 2021 Form 10-K were false because they failed to disclose internal control weaknesses (TAC ¶ 412), the same Form 10-K included multiple disclosures that Hyzon "[Hyzon] ha[d] identified a material weakness in [its] internal control over financial reporting." (Ex. 27 at 32, 46-47, 118-19.)  These disclosures were expressly incorporated into Knight and Gordon's certifications. (*Id.* at Exs. 31.1 ¶ 5(a) & 31.2 ¶ 5(a).)

plaintiff fails to prove that it was made with actual knowledge that it was false or misleading.'" *Lopez* v. *CTPartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 25 (S.D.N.Y. 2016) (quoting *Slayton* v. *Am. Exp. Co.*, 604 F.3d 758, 766 (2d Cir. 2010)).[14]

Statements 1C, 1E, 2A–C, 3G, 4E, 5E, 12G, 14, 15C, 16, 18B, and 26C–F concern Hyzon's "projection of revenues" and predictions of "future economic performance," which are explicitly covered by the PSLRA's safe harbor. 15 U.S.C. § 78u-5(i)(1). As described above, these allegedly false statements were accompanied by cautionary language, and are inactionable for that reason alone. (*See supra* at 6-9; *e.g.*, Ex. 1 at 4; Ex. 18 at 2-3); *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 84 (S.D.N.Y. 2017) (safe harbor applied where "presentation was accompanied by a disclaimer").

Moreover, Plaintiff does not allege with particularity that Defendants (1) did not genuinely believe these statements; (2) knew that they had no reasonable basis for such statements; or (3) were aware of undisclosed facts tending to seriously undermine the accuracy of the statements. *See Slayton*, 604 F.3d at 775. In particular, Plaintiff does not address Hyzon's explanation that revenues were lower than forecast primarily because of the shift in vehicle sales to Asia, where prices were approximately half of those in other markets. (TAC ¶ 191.) Nor does Plaintiff provide a reason to doubt that Hyzon anticipated revenue for its orders would be booked at the time of delivery in keeping with standard practice, particularly where the end user was the world's largest steel company. (TAC ¶ 390 (recognizing that "[t]he collectability assessment . . . is partly [] forward-looking").) The TAC's claims lack the specificity required to infer that Defendants knew any of these projections were false. *See, e.g.*, *In re Synchrony Financial Sec.*

---

[14] Even if a particular forward-looking statement is excluded from the safe harbor's protections, the "bespeaks caution" doctrine protects that statement if accompanied by cautionary language pertaining to the risk realized. *See Bausch & Lomb*, 2003 WL 23101782, at *2.

*Litig.*, 988 F.3d 157, 172 (2d Cir. 2021) ("[E]conomic prognostication, though faulty, does not, without more, amount to fraud.").

Statements 1A, 2A, 6B, 6C, 9, 12B, 19A, 20B–D, and 24B are projections regarding Hyzon's delivery targets.  The PSLRA exempts from liability statements like these, which concern "the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer."  15 U.S.C. § 78u-5(i)(1)(B).  Many of these statements specifically noted that Hyzon's delivery targets were predicated on executing further binding orders and cautioned that issues like the global supply chain disruptions and pandemic could significantly impact delivery targets and timing.  *See, e.g.*, Statements 9, 19A; *supra* at 6-9; *Bausch & Lomb*, 2003 WL 23101782, at *18 (bespeaks caution doctrine protected statements that were subject to risks including "successful execution of marketing strategies").  Again, Plaintiff has "not alleged circumstances to show that the defendants lacked a reasonable basis for their optimistic, but qualified, predictions as to the company's future performance."  *San Leandro Emergency Med. Grp. Profit Sharing Plan* v. *Philip Morris Cos.*, 75 F.3d 801, 813 (2d Cir. 1996). Plaintiff's failure to allege actual knowledge of falsity renders these statements inactionable.

### 2.    Reasonable Investors Do Not Rely on Vague, Optimistic Puffery.

"Puffery," statements "too general to cause a reasonable investor to rely upon them," *ECA Loc. 134 IBEW* v. *JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009), are "not sufficiently material, as a matter of law, to support a claim for securities fraud," *IBM*, 163 F.3d at 109; *Abramson* v. *Newlink Genetics Corp.*, 965 F.3d 165, 173 (2d Cir. 2020) ("Generic, indefinite statements of corporate optimism typically are not actionable.").

Statements 1B, 1C, 1E, 2A, 2B, and 23C—for example, that Hyzon's "committed sales pipeline is proof that the world is truly recognizing the need to develop innovative solutions to mitigate climate change" and that the "business combination will enable [Hyzon] to expand

-32-

deployments of [FCEVs] globally, and to continue leading the hydrogen transition"—are classic puffery. These statements provide no specifics about Hyzon's pipeline. Simply claiming that these statements were false "does not cure their generality, which is what prevents them from rising to the level of materiality required to form the basis for assessing a potential investment." *Ind. Pub. Ret. Sys.* v. *SAIC, Inc.*, 818 F.3d 85, 97-98 (2d Cir. 2016); *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 757 (S.D.N.Y. 2018) (statement that Aratana had "made remarkable progress towards . . . advancing our expanding pipeline towards commercialization" was puffery). References to Hyzon's role as a "leader" and to "the world" recognizing the need to mitigate climate change likewise are too vague to be legally actionable. *See, e.g.*, *Gregory* v. *ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 399 (S.D.N.Y. 2018).

Statements 19C and 19D, that "[t]he core team of [HongYun] has solid operation experience and master the real time vehicle data management," and that HongYun was "leveraging its rich end user resources in logistics industry," also are far too generic for a reasonable investor to rely on. The Second Circuit has held that statements regarding "operational excellence" are inactionable. *SAIC*, 818 F.3d at 97; *see also Gregory*, 297 F. Supp. 3d at 399.

### 3. Any Opinions Did Not Supply False Facts or Omit Material Facts Necessary to Be Disclosed.

Statements 1E, 16, and 26C–E—for example, that "[w]e still feel extraordinarily comfortable" with Legacy Hyzon's forward-looking projections, that recording HongYun revenue over time is "strange accounting treatment," and that we "anticipate" more favorable treatment in the future—are classic forms of opinion. Opinions may be misleading only under two circumstances, neither of which applies here: (1) "the speaker did not hold the belief [he] professed or the supporting fact[s] [he] supplied were untrue"; or (2) "the speaker omits information whose omission makes the statement misleading to a reasonable investor." *Tongue* v. *Sanofi*, 816 F.3d

199, 210 (2d Cir. 2016) (quotation omitted).  Plaintiff does not allege that Knight and Gordon did not sincerely hold the beliefs they expressed.  *In re AmTrust Fin. Servs., Inc. Sec. Litig.*, 2019 WL 4257110, at *25-26 (S.D.N.Y. Sept. 9, 2019) (plaintiff must plead facts suggesting the defendant actually "reached a conclusion different from the one stated").  Nor does Plaintiff identify specific additional information that an investor would need so as not to be misled, particularly in the context of the other information disclosed.  Each opinion is therefore inactionable.

## III.   PLAINTIFF DOES NOT RAISE A COGENT AND COMPELLING INFERENCE THAT ANY DEFENDANT ACTED WITH SCIENTER.

The PSLRA requires plaintiffs to "state with particularity facts giving rise to a strong inference" of scienter.  15 U.S.C. § 78u-4(b)(2)(A).  That inference "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *ECA*, 553 F.3d at 198.  This standard requires the Court to "engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged."  *Tellabs*, 551 U.S. at 314.  If a "plausible, nonculpable explanation[]" is more likely than fraud, then the plaintiff has failed to plead scienter.  *Id.* at 324.

Plaintiff must plead "a factual basis for scienter for each defendant," *Venkataraman* v. *Kandi Techs. Grp., Inc.*, 2021 WL 4952260, at *3 (S.D.N.Y. Oct. 25, 2021) (quotation omitted), requiring particularized facts that (1) constitute strong circumstantial evidence of conscious misbehavior or recklessness; or (2) show a specific motive and opportunity to commit fraud, *ECA*, 553 F.3d at 198.  Plaintiff fails to plead scienter by either method.  *First*, Plaintiff fails to identify specific facts indicating that Defendants must have known or recklessly disregarded that their statements about Hyzon's customer relationships, Hiringa, HongYun, and revenue recognition

were false.  *Second*, Plaintiff's generic allegations of motive are insufficient as a matter of law.[15]

### A.     Plaintiff's Speculations of Recklessness Lack Adequate Basis in Fact.

To meet the PSLRA's stringent pleading requirement, Plaintiff must plead facts constituting strong circumstantial evidence of conscious misbehavior or recklessness.  Plaintiff must allege with detail "that [1] *specific* contradictory information was available to the defendants [2] *at the same time* they made their misleading statements."  *In re PXRE Grp., Ltd. Sec. Litig.*, 600 F. Supp. 2d 510, 536 (S.D.N.Y. 2009) (emphases in original).  Conscious misbehavior or recklessness is "a state of mind approximating actual intent, and not merely a heightened form of negligence."  *Novak* v. *Kasaks*, 216 F.3d 300, 312 (2d Cir. 2000) (quotation omitted).

### 1.     The Special Committee Report and Accounting Restatements Do Not Support Scienter.

Having failed entirely on the three prior attempts to find a basis to plead scienter, Plaintiff in the TAC leans heavily on the Special Committee investigation and related restatements to attempt to satisfy the high standard for pleading scienter under the PSLRA.  (TAC ¶¶ 416-21.) Neither, however, support a compelling inference of fraud.

It is well established that "violations of GAAP, even ones that lead to restatement of financials, do not suffice to raise a strong inference of scienter without particularized allegations of fraudulent intent."  *In re Bausch & Lomb, Inc. Sec. Litig.*, 592 F. Supp. 2d 323, 345 (W.D.N.Y. 2008); *see also In re Twinlab Corp. Sec. Litig.*, 103 F. Supp. 2d 193, 207 (E.D.N.Y. 2000). Notably, Plaintiff does not even attempt to plead facts alleging scienter specific to the accounting restatements: the TAC is devoid of specific facts supporting that any alleged misstatements related

---

[15]     Importantly, the Delaware decision denying dismissal of breach of fiduciary duty claims made no findings that any alleged misstatements were made with ***any*** mental state—let alone a mental state that would satisfy the PSLRA's stringent requirements. (*See* Ex. 41 at 34:13-17, 37:20-38:2, 39:6-40:21.)

to Hyzon's accounting were made knowingly or recklessly. (*See* TAC ¶¶ 415-89.)

The Special Committee report provides no basis for alleging scienter against any Defendant. The report does not assign blame to any director or manager. To the contrary, the Special Committee's observation of "Hyzon's reliance on third parties for many aspects of the sales, commissioning, and delivery process," and its conclusion that "the Hyzon China operations team should have confirmed that the vehicles were commissioned and operable on hydrogen," indicate that the delivery process occurred at a distance from Hyzon's senior management. (Ex. 36.) Plaintiff claims that the Special Committee's note regarding "[t]he tenor" of certain communications evidences a motive to "distinguish Hyzon from its competitors" and "keep the post-merger stock price high." (TAC ¶ 419.) But this statement, which also noted "communications reflected the importance of complying with the relevant accounting standards" (Ex. 36), is ambiguous at best. In any event, this type of generic business motive cannot support an inference of scienter, as described in Section III.B. *Kalnit* v. *Eichler*, 264 F.3d 131, 139-40 (2d Cir. 2001). Similarly, the Special Committee's recommendations for process improvements such as a "new revenue recognition policy," a "commissioning and homologation . . . policy," and "general public company training" (TAC ¶ 420) do not plead a compelling inference of knowing wrongdoing. *In re Telefonaktiebolaget LM Ericsson Sec. Litig.*, 2023 WL 3628244, at *17 (E.D.N.Y. May 24, 2023) (recommended compliance "enhancements" did not imply scienter).

Finally, in light of Hyzon's repeated prior disclosures that as a new public company it was working to resolve internal control issues and build its financial reporting capacity, the more likely explanation is the inherent challenges in managing a newly public company in a nascent industry. *See In re Hertz Glob. Holdings Inc.*, 905 F.3d 106, 117 (3d Cir. 2018) (restatements "are more plausibly interpreted as admissions of mismanagement, not of affirmative misconduct");

-36-

*Dobina* v. *Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 251 (S.D.N.Y. 2012). And even if there were an indication of intentional wrongdoing, there is no basis to conclude that knowledge of local-level problems in China and Europe was attributable to the company or individual defendants. *Sfiraiala* v. *Deutsche Bank Aktiengesellschaft*, 729 F. App'x 55, 58 (2d Cir. 2018) (improper transfers from Russia and "serious compliance deficiencies" worldwide were insufficient to indicate individual knowledge). Plaintiff fails to provide specific facts showing otherwise.

> **2.      Plaintiff Fails To Plead That Defendants Knowingly or Recklessly Misrepresented Hyzon's Business Relationships.**

Plaintiff asserts that Defendants deliberately or recklessly made false statements regarding brand-name partners to gain investor support. (TAC ¶¶ 435-37.) But none of Plaintiff's allegations show that senior members of Hyzon's management made such statements, even if false, with "a state of mind approximating actual intent, and not merely a heightened form of negligence." *Novak*, 216 F.3d at 312 (quotation omitted).

*First*, Plaintiff claims that revisions to Legacy Hyzon's investor presentations demonstrate that Defendants "knew . . . or were reckless in not knowing" that certain entities were improperly listed as "top tier customers" (TAC ¶ 439), but Plaintiff never alleges that any particular individual defendant had any involvement in these changes, let alone that an individual defendant made any allegedly false statement knowingly. That precludes an inference of scienter as to any individual defendant. *In re UBS AG Sec. Litig.*, 2012 WL 4471265 at *9 (S.D.N.Y. Sept. 28, 2021). Plaintiff also acknowledges that Hyzon stated that it had entered signed agreements with certain potential customers that Blue Orca suggested were illusory and continued to negotiate with many others. (*See* TAC ¶ 337.) The more compelling inference from these allegations is that Hyzon simply anonymized references to potential partners. (*Id.* ¶ 178.)

*Second*, Plaintiff refers to a July 13, 2021 press release regarding the Transport

Groep Noord truck, which the Special Committee determined was not operable on hydrogen at the time of the press release. (*Id.* ¶ 438.) But in addition to Plaintiff's failure to plead that Hyzon's senior management was aware that this truck was not operable on hydrogen at the time, there is no basis to infer scienter as to unrelated investor presentations issued months earlier.

*Third*, Plaintiff cites the Blue Orca Report's purported quote from an anonymous former Hyzon employee who said "I just didn't like the way it was being presented . . . Saying that they've got all of these orders and things. But a lot of them are all MoUs." (TAC ¶ 448.) Plaintiff concludes that "it is absurd to suggest that Defendants . . . did not know, or would not reasonably be aware of, these concerns." (*Id.*) But even if the anonymous employee's statement were credited, which it should not be, *Long Miao*, 442 F. Supp. 3d at 801, Plaintiff does not allege any specific facts suggesting that Defendants were aware of (or shared) these views, or that Defendants recklessly disregarded facts showing that the alleged misstatements must be false. *Jones* v. *Perez*, 550 F. App'x 24, 28 (2d Cir. 2013) (noting that "none of the confidential witnesses assert[ed] direct knowledge" of what the defendants were aware of, let alone specific contrary facts). The most compelling inference here is that Defendants did not know of or share the unnamed employee's purported sentiments. *Bratusov* v. *Comscore, Inc.*, 2020 WL 3447989, at *14 (S.D.N.Y. June 24, 2020). Even assuming Defendants overestimated the likelihood that negotiations or MOUs would lead to binding orders—"that management's optimism about a prosperous future turned out to be unwarranted is not circumstantial evidence of conscious fraudulent behavior or recklessness." *Rothman* v. *Gregor*, 220 F.3d 81, 90 (2d Cir. 2000) (quotation omitted). Ultimately, Plaintiff's theory depends on the circular notion that Defendants must have consciously or recklessly lied about Hyzon's business partnerships because the Blue Orca Report claimed that Hyzon had lied. Plaintiff fails to present particularized facts regarding

any individual Defendant's knowledge.[16]   That is insufficient.

### 3.   Defendants Did Not Knowingly or Recklessly Portray Hiringa as an End User of Hyzon Vehicles.

Plaintiff's theory of scienter as to Hiringa simply rehashes the argument that Defendants' statements were misleading, and again relies largely on the Blue Orca Report's purported second-hand account from an anonymous Hiringa employee to suggest that Defendants consciously or recklessly omitted Hiringa's focus on creating refueling infrastructure and facilitating the sale of FCEVs to third parties.  (TAC ¶¶ 453-57.)

The inference that Hyzon knowingly or recklessly portrayed Hiringa as an end user of its trucks is not cogent, let alone compelling.  As detailed above, Hyzon explicitly stated that Hiringa was building a refueling network and working with "fleet partners" and "fleet operators" as early as August 2020 and again in March 2021.  (*See supra* at 7-8.)  If Hyzon intended to portray Hiringa as an end user of trucks, these repeated references would be quite counterintuitive.  The Hiringa allegations do not raise a "strong" inference of scienter.

### 4.   The TAC Lacks Specific Facts Suggesting Defendants Believed or Recklessly Disregarded That HongYun Was a "Sham" Company.

Plaintiff alleges that Defendants made misstatements about HongYun with scienter because "due diligence . . . confirm[s]" that HongYun "was established to serve as a counterparty to sham transactions."  (TAC ¶ 459.)  Plaintiff bases this on the short sellers' and unnamed investigator's purported inability to confirm that HongYun was operational.  (*Id.* ¶ 460.)  Defendants allegedly "either knew or recklessly disregarded these facts, as any reasonable

---

[16]   At most, Plaintiff alleges that Anderson signed DCRB's SEC filings that incorporated by reference presentations containing allegedly false statements.  (TAC ¶¶ 325, 547.)  But it is well established that alleging that a corporate director signed a public filing is insufficient to plead scienter.  *Lipow* v. *Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 153, 163 (S.D.N.Y. 2015); *In re Sotheby's Holdings, Inc.*, 2000 WL 1234601, at *7 (S.D.N.Y. Aug. 31, 2000).

company would perform due diligence before announcing [such] a deal." (*Id*. ¶ 461.)  Plaintiff adds that Hyzon equivocated on whether HongYun was established but still announced that HongYun was accepting deliveries, allegedly supporting an inference of scienter.  (*Id*. ¶¶ 462-68.)

Plaintiff does not adequately allege that Defendants "knew" HongYun was a sham, as he fails to plead that even a single defendant was aware of specific information contradicting any statement at the time it was made.  *Teamsters Loc. 445 Freight Div. Pension Fund* v. *Dynex Cap. Inc.*, 531 F.3d 190, 196-97 (2d Cir. 2008).  Plaintiff does not identify contrary facts, or who reviewed them and when.  On the contrary, the picture of Hyzon trucks with the logo of HongYun's partner, as well as the results of the Special Committee investigation and restatements confirming that vehicles were delivered to HongYun, undercuts any notion that Defendants knew HongYun was a "sham."  (TAC ¶ 187; Ex. 36.)

Moreover, circuit precedent forecloses any argument that a failure to diligence HongYun establishes scienter:  "allegations of the sort that a defendant would have learned the truth about a company's fraud if it had performed the due diligence it promised are generally insufficient to establish the requisite scienter." *In re Advanced Battery Techs., Inc.*, 781 F.3d 638, 646 (2d Cir. 2015) (cleaned up).  The Second Circuit has noted there is no generalized duty "to be aware of what is going on." *Saltz* v. *First Frontier, L.P.*, 485 F. App'x 461, 464-65 (2d Cir. 2012).

Again, the TAC reveals a more compelling, nonculpable inference: that Hyzon believed HongYun was a legitimate entity, formed in the days following a Shanghai government announcement regarding a major FCEV pilot program, with significant prospects to order Hyzon vehicles for its end user partners—a belief that by all indications appears to be correct.  (TAC ¶¶ 187-90, 463-65.)  Plaintiff's only basis to argue that these beliefs were reckless is his investigator's purported inability to corroborate them.  That falls far short of the specific, contradictory

information needed to show that any defendant acted with "a state of mind approximating actual intent, and not merely a heightened form of negligence," *Novak*, 216 F.3d at 312, particularly in the context of photographic evidence confirming deliveries to HongYun (TAC ¶ 187).

### 5. Neither the Government Investigations Nor the Core Operations Doctrine Support an Inference of Scienter.

Plaintiff asserts that the existence of the SEC and SDNY investigations and Defendants' knowledge of Hyzon's core operations support his scienter claims. (TAC ¶¶ 429-33, 469-74.) While investigations "can bolster an inference of scienter, they cannot create one where none exists." *In re Henry Schein, Inc. Sec. Litig.*, 2019 WL 8638851, at *22 (E.D.N.Y. Sept. 27, 2019); *Slayton*, 604 F.3d at 777. The same holds true for the core operations doctrine, which is at best "a supplementary, but not an independent, means to plead scienter" and of questionable viability following the PSLRA. *See, e.g.*, *Sachsenberg* v. *IRSA Inversiones y Representaciones Sociedad Anónima*, 339 F. Supp. 3d 169, 183-84 (S.D.N.Y. 2018).

The limited value of these allegations makes sense. An investigation is not an adjudication of liability, and "[i]t is well established that boilerplate allegations that defendants knew or should have known of fraudulent conduct based solely on their board membership or executive positions are insufficient to plead scienter." *In re Hardinge, Inc. Sec. Litig.*, 696 F. Supp. 2d 309, 328 (W.D.N.Y. 2010) (quotation omitted); *see also Cox* v. *Blackberry Ltd.*, 660 F. App'x 23, 25 (2d Cir. 2016) (similar). Given the issues with the other grounds for scienter detailed above, these allegations cannot render any inference of scienter cogent or compelling.

### 6. Management Changes Do Not Support an Inference of Scienter.

Finally, Plaintiff points to Knight and Gordon's departures and Gu's transition to a non-executive board role to attempt to show scienter. But "[c]ourts . . . have consistently held that an officer's resignation, without more, is insufficient to support a strong inference of scienter."

-41-

*Gillis* v. *QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 605 (S.D.N.Y. 2016).  As Plaintiff acknowledges, these departures occurred following a series of negative business announcements, including missed earnings forecasts, operational issues in Europe, and a prolonged slide in Hyzon's stock price.  In this context, a leadership change was the natural outcome, and Plaintiff does not to refute that conclusion, only repeating speculation from news articles and opining on the reason for the deletion of Knight's social media profile (TAC ¶¶ 426-27).  Gordon continued to work for Hyzon as a consultant (Ex. 34 at 1) and Gu remained as Hyzon's Chairman, a circumstance that is inconsistent with a determination of wrongdoing.  And while Plaintiff repeatedly refers to the later determination that Knight's termination should retroactively be made for cause, Plaintiff provides no basis to connect that decision to the alleged fraud, rather than the myriad other potential reasons for such a determination.  In short, plaintiff has failed to plead "independent facts [that] indicate that the [departures] [were] somehow tied to the fraud alleged." *Glaser* v. *The9, Ltd.*, 772 F. Supp. 2d 573, 598 (S.D.N.Y. 2011).

**B.     Plaintiff's Generic, Group-Pleaded Allegations of Motive Are Insufficient.**

To plead scienter based on motive and opportunity, Plaintiff must allege specific facts indicating that *each defendant* "benefitted in some concrete and personal way from the purported fraud." *Id.* at 586 (quoting *ECA*, 553 F.3d at 198).  Motives "generally possessed by most corporate directors and officers do not suffice." *Kalnit*, 264 F.3d at 139.  Plaintiff offers two theories regarding motive—both too generic to plead scienter.

*First*, Plaintiff suggests that some—but not all—Defendants had a motive to commit fraud because a merger would "[i]nsert[] [m]uch [n]eeded [c]apital" into Horizon, thereby allowing Horizon to "avoid the existential risk of insolvency."  (TAC ¶¶ 476-79.)  Even assuming Horizon's business had been facing difficulties, allegations concerning "generic corporate interests such as . . . avoiding bankruptcy, or continuing to operate as a business . . . do not support motive

-42-

to commit securities fraud." *Lehmann* v. *Ohr Pharm., Inc.*, 830 F. App'x 349, 352 (2d Cir. 2020); *see also PXRE*, 600 F. Supp. 2d at 532. Moreover, the TAC does not allege that Anderson had *any* connection to Horizon, so Horizon's alleged struggles would in no way motivate him.

*Second*, Plaintiff suggests that Defendants had a motive to commit fraud because some—but not all—Defendants stood to profit in the future from their holdings of Hyzon shares or options, including "founders shares." (*Id.* ¶¶ 480-88.) The prospect of potentially profiting from shares or options also is insufficient to plead scienter. *See, e.g.*, *ECA*, 553 F.3d at 198 ("the desire to keep stock prices high to increase officer compensation, do[es] not constitute 'motive'"); *Goplen* v. *51job, Inc.*, 453 F. Supp. 2d 759, 772 (S.D.N.Y. 2006) (no motive despite ownership of millions of shares). This case is far from the paradigmatic example of motive, where defendants sell significant amounts of shares at inflated prices. Indeed, the TAC does not allege that *any* Defendant sold *any* Hyzon shares, and in fact acknowledges that Defendants affirmatively disclosed the SEC investigation and anticipated revenue shortfall *prior to* expiration of the lock-up period. (TAC ¶¶ 191-92, 486.) These circumstances undercut an inference of scienter. *See, e.g.*, *Rombach*, 355 F.3d at 176-77 (scienter not pled where plaintiffs did "not allege that defendants sold stock or profited in any way during the relevant period" and defendant disclosed "problems prior to the deadline to file its financial statements").

Moreover, the TAC concedes that Gordon did not receive any "founders shares" or any Hyzon stock or options following the Merger. (*See* TAC ¶ 483.) Plaintiff attempts to salvage his motive theory by asserting that Gordon benefitted through business with related firms (*id.*), but as above, these generic allegations of a high share price are a classic example of insufficient motives. *See Kalnit*, 264 F.3d at 139-40. Plaintiff's theories of motive do not support a strong inference of scienter required by the PSLRA.

-43-

**IV.     PLAINTIFF DOES NOT PLEAD LOSS CAUSATION AS A MATTER OF LAW.**

To state a Section 10(b) claim, Plaintiff must allege a direct causal connection between the alleged misstatements and damages. *Carpenters Pension Tr. Fund of St. Louis* v. *Barclays PLC*, 750 F.3d 227, 232-33 (2d Cir. 2014). Plaintiffs typically satisfy this requirement by alleging either (1) a corrective disclosure that revealed a defendant's fraud; or (2) that investors suffered losses following the foreseeable materialization of a risk concealed by the defendant's fraudulent statements. *Id.* Plaintiff fails to adequately allege loss causation under either approach. Apparently recognizing that the Special Committee disclosure and the restatements in March 2023 did not significantly impact Hyzon's share price, Plaintiff alleges seven earlier events between September 2021 and August 2022 as purported corrective disclosures. (TAC ¶ 493.) But each event concerned either public information or risks that had been properly disclosed:

(a) Blue Orca Report and (b) Iceberg Report: Blue Orca "conducted research and analysis based on public information in a manner that any person could have done." (Ex. 31 at 20.) This Circuit's precedents are clear: a "negative journalistic characterization of previously disclosed facts does not constitute a corrective disclosure of anything but the journalists' opinions." *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2014). Because "[n]either short seller report revealed a *fact* previously undisclosed" and "only disclosed that investigators were 'unable to establish'" the truth of defendants' statements, such reports are not corrective disclosures. *In re Ideanomics, Inc. Sec. Litig.*, 2022 WL 784812, at *11 (S.D.N.Y. Mar. 15, 2022) (dismissing for failure to plead loss causation). Any stock drop here owes to the negative tenor of the short sellers' opinions, not newly disclosed facts.

(c) January 12, 2022 Form 8-K: Hyzon's report of financial results below its previous forecast does not constitute a corrective disclosure, since "[m]ere failure to meet earnings forecasts is insufficient to establish loss causation," and Hyzon's disclosure did not "reveal[] or

-44-

specifically correct[] any prior fraud or misrepresentation." *In re Dell, Inc. Sec. Litig.*, 591 F. Supp. 2d 877, 909 (W.D. Tex. 2008) (quotation omitted); *see also Henry Schein*, 2019 WL 8638851, at *25. Nor is disclosure of the SEC investigation a corrective disclosure, since "the announcement of an investigation reveals just that—an investigation—and nothing more." *Meyer* v. *Greene*, 710 F.3d 1189, 1201 (11th Cir. 2013); *see also*, *e.g.*, *Dell*, 591 F. Supp. at 910.

(d) March 23, 2022 Earnings Call and March 30, 2022 Form 10-K and (e) May 6, 2022 Form 8-K: As described above, disappointing earnings reports are not corrective disclosures, since Hyzon's earnings reports did not disclose any facts regarding the alleged fraud. Nor has Plaintiff pled plausible facts demonstrating a loss was caused by the disclosure of the HongYun share warrants, since the warrants have value only if Hyzon's share price rises above $7.75, a scenario inconsistent with Plaintiff's own allegations. Finally, because Plaintiff fails to link the Jiushuang sale to a false or misleading statement (*see supra* at 28 n.11), Plaintiff cannot show "a sufficient connection between [the] misstatements and the losses suffered." *Lattanzio* v. *Deloitte & Touche LLP*, 476 F.3d 147, 157 (2d Cir. 2007).

(f) August 4, 2022 Form 8-K: The announcement of an ongoing internal investigation was not a corrective disclosure, nor was the accompanying identification of potential revenue recognition timing or internal control issues being investigated. *Meyer*, 710 F.3d at 1201. As a newly public company, Hyzon had repeatedly disclosed "material weakness in our internal control over financial reporting." (Ex. 15 at 41, 52; *see also* Ex. 23 at 37-39 (same); Ex. 11 at 41-42 (similar).) Notwithstanding Plaintiff's attempt to mischaracterize the August 4, 2022 announcement as having disclosed widespread fraud, the announcement bore no connection to alleged misstatements concerning Hyzon's customer relationships, Hiringa, or HongYun's legitimacy as a customer. (Ex. 35.) Plaintiff's own allegations indicate that the decline in Hyzon's

share price resulted from concerns related to Hyzon's business operations, not from fraud. (TAC ¶ 211 ("could slow down the growth story of Hyzon"), ¶ 212 ("management has yet to prove its ability to produce vehicles at volume")). That again is not "a sufficient connection between [the] misstatements and the losses suffered." *Lattanzio*, 476 F.3d at 157.

(g) <u>August 17, 2022 Press Releases</u>:    Hyzon's leadership transition was unsurprising given lower-than-projected revenue and other reported business issues, and "would not alert investors to any improprieties so as to allege loss causation." *SafeNet*, 645 F. Supp. 2d at 229; *Omnicom*, 597 F.3d at 514 (reaction to resignation "is far too tenuously connected" to alleged fraud "to support liability"). [17]    That Hyzon was not in compliance with Nasdaq listing requirements due to delayed filing of its Form 10-Q was not a corrective disclosure because Hyzon had previously announced that such non-compliance would occur pending the Special Committee investigation, and because it did not correct any prior alleged misstatement. (Ex. 35.)

## V.    PLAINTIFF'S REMAINING CLAIMS ALSO FAIL.

In a last-ditch effort, the TAC adds new theories of "scheme" liability and Section 14(a) liability based on the same alleged misstatements that are the basis for Plaintiff's Section 10(b) claims. But these claims, as well as Plaintiff's Section 20(a) claim, also fail.

### A.    Plaintiff Fails To State a Claim for "Scheme" Liability Pursuant to Rule 10b-5(a) and (c).

To state a scheme liability claim, Plaintiff must plead: "(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance." *In re Mindbody, Inc. Sec. Litig.*, 489 F. Supp. 3d 188, 216 (S.D.N.Y. 2020). Plaintiff cannot end-run the shortcomings of his Rule 10b-5(b) allegations by

---

[17]    The announcement that Knight's termination was retroactively made for cause did not occur until nearly six months later, on February 1, 2023.

repackaging them as a scheme liability claim, and "must prove that [] [D]efendant[s] committed an inherently deceptive or manipulative act that is independent from any alleged misstatement or omission." *Kodak*, 632 F. Supp. 3d at 190-91. Plaintiff has not done so, as to Hyzon or any of the individual defendants, and instead alleges a "scheme" that is founded on the same allegations of "false pretense" addressed above, including "listing phantom customers in investor materials," "announcing deals with sham counterparties," and "falsely reporting deliveries." (TAC ¶ 531-32); *Mindbody*, 489 F. Supp. 3d at 217 (dismissing scheme liability claim "because it is indistinguishable from the misstatements and omissions alleged under [Section 10(b)]").

Even if Plaintiff had alleged a separate deceptive act, his scheme liability claim would fail for the same reasons that his misstatement claims fail. "[T]he alleged making of false statements and omissions was a key part of the claimed scheme," and the lack of actionable misstatements therefore "is also fatal to Plaintiffs' scheme liability claim." *Kodak*, 632 F. Supp. 3d at 190. Moreover, for the same reasons described above, Plaintiff has pled neither scienter nor loss causation, let alone loss causation based on a deceptive act that was communicated to the public and on which Plaintiff relied. *Alpha Cap. Anstalt* v. *Schwell Wimpfheimer & Assocs. LLP*, 2018 WL 1627266, at *12 (S.D.N.Y. Mar. 30, 2018).

## B. Plaintiff Fails To State a Claim Pursuant to Section 14(a).

Plaintiff's Section 14(a) claim, which Plaintiff asserts as an additional basis for liability with respect to Statements 1A–5E, 10, 11A–12H, and 14–15C, fares no better. "Plaintiff faces a high pleading standard." *Bisel* v. *Acasti Pharma, Inc.*, 2022 WL 4538173, at *6 (S.D.N.Y. Sept. 28, 2022). Not only must Plaintiff meet the pleading standards of the PLSRA, *id.*, but because Plaintiff's allegations sound in fraud, he must meet the heightened pleading standard of Rule 9(b). *See id.* at *7; *Rombach* v. *Chang*, 355 F.3d 164, 172 (2d Cir. 2004) (where "the wording and imputations of the complaint are classically associated with fraud" Rule 9(b) applies).

Rule 9(b) applies to "Section 14(a) claims grounded in alleged fraudulent conduct . . . even if [the allegations] disclaim reliance on a fraud theory," as Plaintiff attempts to do here (TAC ¶ 543). *Bisel*, 2022 WL 4538173, at *7 (quoting *SafeNet*, 645 F. Supp. 2d at 239).

Plaintiff's Section 14(a) claim fails for at least five reasons. Plaintiff has not shown: (1) that Gu, Knight, or Gordon solicited or allowed their named to be used to solicit a proxy, except for isolated statements; (2) a misrepresentation or omission; (3) loss causation; (4) negligence; or (5) a presuit demand or demand futility as required by Rule 23.1.[18]

*First*, Plaintiff "must allege a substantial connection between the use of [each defendant's] name and the solicitation." *Mehedi*, 2023 WL 3592098, at *15 (quotation omitted). "[T]he simple appearance of one's name in a proxy statement does not trigger liability for any misstatement appearing therein." *SEC* v. *Falstaff Brewing Corp.*, 629 F.2d 62, 68 (D.C. Cir. 1980). Except for the limited number of statements where Gu, Knight, or Gordon is specifically identified as the speaker (*see* Appendix 1), "the allegations do not show a substantial and plausible connection to the solicitation process sufficient to subject [defendant] to liability under Section 14(a)." *In re Bank of Am. Corp. Sec. Litig.*, 757 F. Supp. 2d 260, 295 (S.D.N.Y. 2010).

*Second*, the allegedly false proxy statements concern Hyzon's customer relationships, order forecasts, and Hiringa. Each of the alleged misstatements is inactionable for the same reasons described above: (i) the statements are not false or misleading, (ii) many of the statements are forward-looking statements, and (iii) certain statements are inactionable puffery or opinion. (*See supra* at 32-33); *In re GTx, Inc. Shareholders Litig.*, 2020 WL 3439356, at *2-3 (S.D.N.Y. June 23, 2020) (dismissing Section 14(a) claim for failure to plead misrepresentation or

---

18      The deficiencies of Plaintiff's Section 14(a) claim are addressed in greater detail in the brief of the DCRB Defendants. As noted above (*supra* at 1 n.1), the Hyzon Defendants join in those arguments.

omission); *In re Bristol-Myers Squibb Co. CVR Sec. Litig.*, 2023 WL 2308151, at \*7-9 (S.D.N.Y. Mar. 1, 2023) (Section 14(a) incorporates PSLRA's safe harbor for forward-looking statements).

*Third*, for the same reasons described *supra* at 44-46, the "failure to sufficiently allege loss causation provides an independently sufficient grounds for the dismissal of their . . . 14(a) claims." *In re Liberty Tax, Inc. Sec. Litig.*, 435 F. Supp. 3d 457, 472 (E.D.N.Y. 2020).

*Fourth*, Plaintiff's generic allegations of negligence are wholly insufficient to meet his burden under Section 9(b). Plaintiff merely points to the individual Defendants' corporate roles, and alleges that given their general knowledge of the business, these are topics with which they should have been familiar. (TAC ¶¶ 547, 549.) But "[c]ourts in this Circuit have long held that accusations founded on nothing more than a defendant's corporate position are entitled to no weight." *Lipow*, 131 F. Supp. 3d at 163; *see also In re Columbia Pipeline, Inc.*, 405 F. Supp. 3d 494, 513 (S.D.N.Y. 2019) (generalized allegations that directors should have known of fraud were insufficient to allege a Section 14(a) violation). Likewise, Plaintiff cannot meet his burden "by simply alleging that [Anderson] had the requisite state of mind because [he] signed certain documents." *SafeNet*, 645 F. Supp. 2d at 239.

*Finally*, Plaintiff has not made a presuit demand or pled demand futility, as required for derivative claims under Rule 23.1. For the reasons described in the concurrently filed memorandum of the DCRB Defendants, in which the Hyzon Defendants join, Plaintiff's Section 14(a) claim is derivative and should be dismissed.[19] *Romeo Power*, 2022 WL 1806303, at \*5.

---

[19] In the Delaware action (*see supra* at 21 n.7), the court found that the claims were direct because the complaint alleged that the defendants impaired DCRB shareholders' redemption rights. (Ex. 41 at 20.) Unlike in that case, the "essence" of Plaintiff's claims here is "that the proxy statements overstated the value of [Hyzon] and as a result, [DCRB] shareholders received less in value from the merger than they expected when they approved it." *In re Romeo Power Inc. Sec. Litig.*, 2022 WL 1806303, at \*5 (S.D.N.Y. June 2, 2022); TAC ¶ 552. That is a classic derivative overpayment claim. *Feldman* v. *Cutaia*, 951 A.2d 727, 733 (Del. 2008).

C.   **Failure to Adequately Plead a Section 10(b) or 14(a) Claim Necessitates Dismissal of the Section 20(a) Claim.**

To plead liability under Section 20(a) of the Exchange Act, a plaintiff must adequately allege (i) a "primary violation" of another law, in this case Section 10(b) or Section 14(a), (ii) "control of the primary violator by the defendant," and (iii) that a controlling person was "a culpable participant." *ATSI*, 493 F.3d at 108.  For the reasons described above, Plaintiff has failed to plead a primary violation or culpable participation by any individual defendant, necessitating dismissal of the Section 20(a) claim. *See id.*[20]

## VI.   DISMISSAL SHOULD BE GRANTED WITH PREJUDICE.

Plaintiff has had four opportunities over the course of nearly two years to perfect his claims, including two opportunities after reviewing the arguments in Defendants' previous motion to dismiss.  Where the previous motion to dismiss "pointed out the defects in the original complaint," as here, "leave to amend should be denied." *Silverman* v. *3D Total Sols., Inc.*, 2020 WL 1285049, at *10 (S.D.N.Y. Mar. 18, 2020).  Moreover, Plaintiff's "failure to identify any actionable misrepresentation or omissions" and Plaintiff's lack of standing to pursue alleged misstatements about Legacy Hyzon "[are] not curable through amendment," which "would be futile." *Monroe Cnty. Employees' Ret. Sys.* v. *YPF Sociedad Anonima*, 15 F. Supp. 3d 336, 351, 358 (S.D.N.Y. 2014).  Each of these is an independently sufficient basis to deny Plaintiff leave to amend.  The Court need not, and should not, entertain a fifth complaint.  For this reason, and for the reasons above, the TAC should be dismissed with prejudice.

---

[20]   In addition, Plaintiff fails to allege that Anderson controlled any violation by Legacy Hyzon, or that Gordon, Gu, or Knight controlled DCRB, each a separate legal entity, prior to the closing of the merger.  Nor could any individual defendant be liable as control person before or after his tenure.  Further, as to any primary violation by Hyzon, Plaintiff cannot allege control person liability against Anderson based solely on his role as an outside director.

Dated:    Palo Alto, California
          September 13, 2023

Respectfully submitted,

 /s/ Laura Kabler Oswell
Laura Kabler Oswell (*pro hac vice*)
SULLIVAN & CROMWELL LLP
550 Hamilton Avenue
Palo Alto, California  94301
Tel.:  (650) 461-5600
Fax:  (650) 461-5700
oswelll@sullcrom.com

Jacob M. Croke
Christopher A. Graham (*pro hac vice*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Tel.:  (212) 558-4000
Fax:  (212) 558-3588
crokej@sullcrom.com
grahamch@sullcrom.com

*Counsel for Defendants Hyzon Motors Inc.,*
*Erik Anderson, Craig Knight, Mark Gordon,*
*and George Gu*