# Exhibit 41

1

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

JOHN E. MALORK, Individually and      :
on Behalf of All Others Similarly     :
Situated,                             :
                                      :
                 Plaintiff,           :
                                      :
        v.                            : Civil Action
                                      : No. 2022-0260-PAF
ERIK ANDERSON, JENNIFER AAKER,        :
JANE KEARNS, PIERRE LAPEYRE, JR.,     :
DAVID LEUSCHEN, ROBERT TICHIO, JIM    :
MCDERMOTT, JEFFREY TEPPER, MICHAEL    :
WARREN, RIVERSTONE INVESTMENT         :
GROUP LLC, WRG DCRB INVESTORS,        :
LLC, and DECARBONIZATION PLUS         :
ACQUISITION SPONSOR, LLC,             :
                                      :
                 Defendants.          :

                      - - -

                Chancery Court Chambers
                Leonard L. Williams Justice Center
                500 North King Street
                Wilmington, Delaware
                Monday, July 17, 2023
                3:15 p.m.

                      - - -

BEFORE:  HON. PAUL A. FIORAVANTI, JR., Vice Chancellor

                      - - -


   TELEPHONIC BENCH RULING ON DEFENDANTS' MOTION TO
                     DISMISS

------------------------------------------------------------

                CHANCERY COURT REPORTERS
        Leonard L. Williams Justice Center
        500 North King Street - Suite 11400
            Wilmington, Delaware 19801
                 (302) 255-0532

2

APPEARANCES:

        DAVID M. SBORZ, ESQ.
        ANDREW J. PEACH, ESQ.
        JACOB JEIFCA, ESQ.
        Andrews & Springer LLC
                -and-
        RANDALL J. BARON, ESQ.
        ERIK W. LUEDEKE, ESQ.
        of the California Bar
        Robbins Geller Rudman & Dowd LLP
                -and-
        GREGORY E. DEL GAIZO, ESQ.
        MARIO D. VALDOVINOS, ESQ.
        of the California Bar
        Robbins LLP
          for Plaintiff


        JAMES M. YOCH, JR., ESQ.
        Young Conaway Stargatt & Taylor, LLP
                -and-
        MICHAEL C. HOLMES, ESQ.
        WILL STRIPLING, ESQ.
        of the Texas Bar
        Vinson & Elkins LLP
          for Defendants


                            - - -

3

THE COURT:  Good afternoon.  Vice Chancellor joining.  Who did he have on the line?

ATTORNEY SBORZ:  Good afternoon, Your Honor.  This is David Sborz from Andrews & Springer on behalf plaintiff Malork.  From my office is Andrew Peach and Jacob Jeifa.  From Robbins Geller Rudman & Dowd is Randall Baron and Eric Luedeke.  And from Robbins LLP is Greg Del Gaizo and Mario Valdovinos.

THE COURT:  Welcome.

ATTORNEY YOCH:  Good afternoon, Your Honor.  James Yoch, Young Conaway Stargatt & Taylor, on behalf of defendants.  And also with me on the line are Michael Holmes and Will Stripling from Vinson & Elkins, also on behalf of defendants.

THE COURT:  Welcome.

Counsel, thank you for getting on the line.  Given what I have on my docket, I am going to give you a bench ruling on the motion to dismiss.  If you would kindly put your phones on mute, I will deliver my bench ruling.

The facts of the case that I am going to describe are derived from the complaint and the documents integral thereto.  This action arises out of a de-SPAC transaction between Decarbonization Plus

4

Acquisition Corporation, which I refer to as "Decarb" or the "Company," now known as Hyzon Motors Inc., which I will refer to as "Legacy Hyzon."  Riverstone Investment Group LLC, or "Riverstone," a Delaware limited liability company, founded Decarb.  Riverstone also founded Decarbonization Plus Acquisition Sponsor, LLC, or the "Sponsor."

As is typical in the special purpose acquisition company context, the Sponsor purchased from Decarb Class B Founder Shares for $25,000.  The Founder Shares gave the Sponsor the right to obtain 20 percent of the equity of the SPAC if a de-SPAC transaction occurred.  Decarb's directors did not all have the same number of Founder Shares.  At a $10 per share valuation, Decarb's directors with the least number of Founder Shares stood to gain $221,300 in value if a de-SPAC transaction occurred.  Decarb's directors with the greatest number of Founder Shares stood to gain $45,917,080.

Riverstone is, among other things, a serial SPAC creator and has launched at least seven blank check companies under the "Decarbonization" or "Silver Run" banners since 2015.  Defendants David Leuschen and Pierre Lapeyre founded Riverstone after

5

leaving Goldman Sachs.  Defendants Eric Anderson and Robert Tichio, two other Goldman Sachs alumni, were also founding members of Riverstone.  Riverstone is focused on investments in the clean energy space and leverages its strong ties with Goldman Sachs to source talent and investment opportunities.  In or around August 2020, Goldman is alleged to have owned a 12 percent interest in Riverstone and, accordingly, held rights to a proportionate share of Riverstone profits.  Riverstone maintains a stable of directors which it places onto the boards of its blank check companies.

Legacy Hyzon was a privately held company engaged in the design, development, and manufacture of hydrogen fuel cell-powered commercial vehicles.  Legacy Hyzon was originally a new business line of its parent corporation, Horizon Fuel Cell Technologies, a Chinese company focused on the production of hydrogen fuel cells.  According to the complaint, by late 2019, Horizon was experiencing financial and operational difficulties due to losing a customer that accounted for nearly 75 percent of Horizon's fuel cell sales.  Horizon turned to the U.S. capital markets looking to raise capital.  In 2020,

6

Horizon established U.S. operations by launching an engineering development center in Rochester, New York.

In August 2020, Legacy Hyzon retained Goldman Sachs as its financial advisor in connection with exploring alternatives for raising capital. Legacy Hyzon's capital raising effort focused on finding a SPAC with which to merge.

By October 13, 2020, Legacy Hyzon was in the process of executing nondisclosure agreements with various SPACs and exploring potential business combinations with them.

On October 22nd, 2020, Decarb conducted an initial public offering without any business operations of its own with the sole purpose of entering into a combination with an operating company in the clean energy space. Through its IPO, Decarb issued 20 million units at $10 per share, which raised $200 million in gross proceeds. Each unit consisted of one share of Decarb Class A stock and one half of one warrant. Decarb's registration statement stated that in October 2020, the Sponsor would transfer an aggregate of 10,064,329 Founder Shares to its independent director nominees and an affiliate of its chief executive officer at the original purchase

7

price of the Founder Shares.

Decarb's nine-person board of directors consisted of what Decarb called its five independent directors and four, by implication, nonindependent directors.  The so-called independent directors were Jennifer Aaker, Jane Kearns, Jim McDermott, Jeff Tepper, and Michael Warren.  According to Decarb, these directors were independent from the Sponsor and Riverstone.  The nonindependent directors were Eric Anderson, Pierre Lapeyre, David Leuschen, and Robert Tichio.  Every director, save one, however, received Founder Shares.  Additionally, Riverstone had previously appointed every Decarb director to boards of several other Riverstone portfolio SPACs.

On October 30, 2020, Defendants Anderson and Tichio met with Goldman Sachs bankers regarding a possible transaction between Decarb and Hyzon.

On November 13, 2020, after hiring Vinson & Elkins and meeting with Hyzon management and reviewing various Legacy Hyzon sales pitches made by Goldman Sachs, Decarb began undertaking legal due diligence of Hyzon with Legacy Hyzon's bankers at Goldman Sachs.  Throughout November and December 2020,

8

Decarb conducted due diligence and negotiated with Horizon regarding the potential business combination with Legacy Hyzon.  These negotiations culminated in a de-SPAC transaction, the final terms of which contemplated a total enterprise value of Legacy Hyzon of $1.983 billion with equity consideration in the form of Decarb's Class A common stock and $350 million in private investment in public equity, or PIPE, financing.

During the week of January 4, 2021, Decarb engaged Citigroup Global Markets and Credit Suisse Securities (USA) LLC as its financial advisor and equity capital markets advisor respectfully.  Both Citi and Credit Suisse were involved in Decarb's IPO. When Citi and Credit Suisse undertook the IPO for Decarb, they agreed that 60 percent of their $11 million in investment banking fees would be placed in a trust and that they would forfeit any rights or claims to those fees upon liquidation of a SPAC.  This meant that if Decarb did not conduct a de-SPAC within its investment window, Credit Suisse and Citi would lose out on 60 percent of their compensation from the IPO.

During the week of January 10, 2021,

9

Decarb also engaged Goldman Sachs and Morgan Stanley to serve as placement agents for the PIPE financing.

On February 8, 2021, Decarb's board unanimously approved the Merger. On the morning of February 9, 2021, Decarb and Legacy Hyzon announced the Merger and related financing transactions, which I refer to as the "Transactions." The Merger valued the post-transaction company at more than $2 billion. In addition, the pre-Merger Legacy Hyzon owners were estimated to own 73 percent of the post-Merger company. Decarb Class A stockholders would own 8.9 percent of the post-Merger company. The Sponsor, the independent directors, and WRG DCRB Investors, LLC, or "WRG," an affiliate of Defendant Anderson, would own 2.2 percent of the post-Merger company. The PIPE investors would own 15.9 percent of the post-Merger company.

The Merger required the affirmative vote of a majority of the Decarb stock entitled to vote and actually cast at a special meeting of stockholders. The Company set the record date for the meeting at June 1, 2021; issued its definitive proxy statement on June 21, 2021; and held the meeting on July 15, 2021. Decarb Class A stockholders had until

10

July 13, 2021, to exercise the redemption rights.

As is typical with SPACs, once a merger target has been identified, Class A stockholders had the right, in connection with their investment in pre-Merger Decarb, either to take possession of the stock in the newly formed company Decarb eventually acquired or to seek a redemption of the *pro rata* share of the trust assets; i.e., $10 in cash initially paid for their shares plus interest. That's referred to as the "Redemption Rights."  The board recommended that Decarb stockholders vote in favor of the merger and not to redeem their stock.

The Merger Proxy recommended that Decarb stockholders vote in favor of the merger based on, among other things, that the transaction was purportedly the product of arm's-length negotiations, the fact that Decarb's board comprised a majority of so-called independent directors, and the strength of the board's due diligence.  The Merger Proxy did not provide an independent, third-party opinion as to whether the Merger was fair to Decarb's public Class A stockholders.  The Merger Proxy did, however, include financial projections that showed jumps in expected 2023 and 2024 truck deployment, which represented a

11

reversal of Legacy Hyzon's historical downward trend in actual sales volumes.

In connection with seeking stockholder approval, the Defendants conducted a series of investor presentations, including one on February 9, 2021.  In a PowerPoint slide deck accompanying this presentation, the Defendants represented that Legacy Hyzon said it expected to increase its deliveries from 85 trucks during FY21 to 9,260 by FY25.  Concomitantly, Legacy Hyzon expected to grow its revenues from an estimated $37 million in 2021 to nearly $3.3 billion in 2025.

The presentation also included a slide titled "Customer Deployments Underway and Demand is Accelerating Rapidly."  This slide contained a map with a dozen or so black dots centered on various known population centers around the world.  Adjacent to the dots were the logos of various blue-chip customers, such as Coca-Cola and Ikea.  Accompanying each customer logo was a text box that detailed the projected delivery date, the status of the order, and a five-year projection of the number of units and revenues that Legacy Hyzon expected to deliver to generate from that customer.

12

The slide broke down Legacy Hyzon's order pipeline into two buckets.  The first bucket was "Contracted Orders."  The slide represented that Contracted Orders are 100 percent certain.  The second bucket of orders was "High Probability Orders," which the slide represented to be 70 percent certain.

Among the customers touted on this slide was a New Zealand company, Hiringa.  The projected delivery date to Hiringa was 2021 for the first 20 trucks.  The slide represented that the status of that order was a signed contract for the 20 trucks, generating approximately $10 million.  The slide stated that Legacy Hyzon's five-year projected units were 1,400 to Hiringa and a corresponding $500 million in projected revenue.  As a "Signed Contract," it appears that the slide represented that the Hiringa order for 20 trucks was 100 percent certain.

Defendants made another investor presentation on April 29, 2021, and again disclosed the accompanying slide deck in a filing with the SEC. One slide highlighted that Legacy Hyzon had announced a "vehicle supply agreement to supply trucks to New Zealand-based Hiringa Energy, first deliveries

13

expected by [end of year] 2021."  This supply agreement was presented under the heading titled "commercial."  On that same slide, several other deals were announced under a heading titled "partnerships." On another slide, Hiringa was listed as among Legacy Hyzon's "Vehicle Customers."

The April 29, 2021, presentation included the same map slide from the February 9 slide deck, which superimposed Legacy Hyzon's customer information.  The April 29, 2021, presentation, however, removed the customer logos from that side.

On July 15, 2021, the Company stockholders approved the Merger.

On September 28, 2021, Blue Orca Capital, a short seller, published a highly critical report of Legacy Hyzon's fundamentals.  The report alleged that Legacy Hyzon was a "repackaging of a failing Chinese parent company which has been trying to sell the same hydrogen fuel cell without much success for 17 years" and whose major customers are "fake."

Among the most prominent issues highlighted by the report was that Hiringa was not in fact a customer of the company and, rather, a "channel

14

partner" assisting Legacy Hyzon in marketing vehicles to a real end-user customer in New Zealand.  According to the report, it was not Hiringa's business model to purchase trucks, nor was it ever capable of purchasing trucks on the scale indicated by Legacy Hyzon's investor presentations.

The report also alleged that Legacy Hyzon generally had massively inflated expected sales and specifically misrepresented its relationships with the blue-chip companies identified in the investor presentations.  The report also alleged that Legacy Hyzon's projected gross margins of 33.6 percent were radically overstated and that Legacy Hyzon could, at best, expect to see gross margins between 5 and 15 percent.

On October 6, 2021, Iceberg Research, a company that identifies earnings misrepresentations and accounting irregularities in financial statements issued by public companies, published its first report on Hyzon.  Among other things, this report stated that Legacy Hyzon's parent, Horizon, saw its 2019 sales surge due to one customer that was now in financial trouble and that this was not disclosed by Legacy Hyzon.  The Iceberg report also raised the specter

15

that Legacy Hyzon's Chinese parent would plunder the cash raised by Legacy Hyzon's de-SPAC and raised several issues with Legacy Hyzon's claims regarding its technology.

On November 16, 2021, Iceberg Research published its second report.  The second report noted that Hyzon had ended the third quarter of 2021 with the sale of only two trucks and that no other vehicles at that point had seemed to have been delivered. Given that this report was made 45 days before the end of the year, it is alleged that it was virtually impossible for Hyzon to deliver on the formally "100% Certain" contracted orders.

On January 12, 2022, Decarb disclosed that the SEC had opened a formal investigation into the company's disclosures related to the issues raised in the Blue Orca report.

In the wake of the Blue Orca report, the Iceberg Research reports, and the SEC investigation, the market price of Decarb stock has declined, trading below $3 per share by July 5, 2022. Today, it trades below $2 per share.

On March 18, 2022, Plaintiff brought this action.  On August 2, 2022, the Plaintiff amended

16

the complaint.  The complaint alleges two causes of action.  The first cause of action is styled as a direct *Multiplan* claim against the Director Defendants.  This *Multiplan* claim alleges the Director Defendants breached their fiduciary duties of care and loyalty and the subsumed obligations to act in good faith and make full disclosure by making false and misleading disclosures with the disloyal desire to serve their personal interests.  This allegation centers on pleading that the enormous returns which the holders of the Founders Shares expected to receive if the Company completed any deal, as opposed to the best deal, caused the Director Defendants to make misleading disclosures to stockholders to drive down redemptions and to increase the likelihood that the deal would go through.

The second cause of action is styled as a direct claim for breach of fiduciary duty against Decarb's controlling stockholders.  These so-called "Controller Defendants" include Riverstone, the Sponsor, and WRG.  They are alleged to be controllers via their control of the Founder Shares, which held the power to elect and remove members of the board. The complaint alleges that the Controller Defendants

breached their fiduciary duties to Decarb stockholders by agreeing to and entering into the Merger without ensuring that it was entirely fair to Decarb stockholders.  The second cause of action further generally alleges that the Controller Defendants breached their fiduciary duties of care and loyalty.

On August 15, 2022, the Defendants moved to dismiss.  In light of Vice Chancellor Will's decision in the *Gig3* case, on January 11 of this year, I asked the parties for supplemental briefing on the effect of that case on the instant action.  On January 24, 2023, the Plaintiff moved to supplement the complaint.  On March 2, the Court heard oral argument on the motion to supplement.  And that same day, the Court denied the motion.

A little more than a month later, on April 21, the Court heard argument on the motion to dismiss.  The Court took that under advisement, and this is the bench ruling adjudicating that motion.

For the reasons that follow, I am denying the defendants' motion to dismiss.

The Defendants make several procedural arguments as to why this Court should dismiss Plaintiff's complaint in addition to the more

18

substantive arguments.  I address the procedural arguments first.

First, the Defendants, citing Court of Chancery Rule 23.1, argue that the Plaintiff's claims are derivative claims that cannot be maintained because the Plaintiff has not made a demand on the board or alleged with particularity why demand would be futile.

In the *Tooley* case, the Delaware Supreme Court announced a test to distinguish a direct claim from a derivative claim.  The test asks two questions:  First, who suffered the alleged harm, the corporation or the suing stockholders?  Second, who would receive the benefit of any recovery or other remedy, the corporation or the stockholders?

In the *Multiplan* case, Vice Chancellor Will addressed the *Tooley* test in the SPAC context. There, the plaintiff stockholders alleged that the company's fiduciaries induced the stockholders to approve an unfavorable de-SPAC transaction because of the non-ratable benefit the company's fiduciaries received as a result of their founder shares.  The *Multiplan* defendants argued that the plaintiffs' claims were derivative overpayment claims for breach

of fiduciary duty.  Vice Chancellor Will held that the claims were direct claims under the *Tooley* test.  The Court held that the complaint centered on the allegation that the board impaired the public stockholders' informed exercise of their redemption right.

Answering the first *Tooley* question, the Court concluded that the alleged harm did not run to the company because the company had no such redemption right and the funds held in trust did not belong to the company until the stockholders opted not to redeem their shares but to invest in the post-merger combined entity.  Thus, the stockholders suffered a harm independent of and not shared with the company.

Turning to the second *Tooley* question, the Court held that any recovery would flow to the SPAC stockholders directly because the harm was based on their individual redemption right.  Summarizing her reasoning, Vice Chancellor Will stated:

"At bottom, the plaintiffs are not suing because [the SPAC] did not merge with [the target] on more favorable terms.  They are suing because the defendants, purportedly for self-serving

20

purposes, induced Class A stockholders to forgo the opportunity to convert their [shares in the SPAC] into a guaranteed $10.04 per share in favor of investing in [the target]. That Claim is direct." That's at page 804 of the *Multiplan* decision.

The same logic that applied in *Multiplan* and subsequently in the *Gig3* case and Chancellor McCormick's recent bench ruling in *XL Fleet* applies here. Here, the Plaintiff alleges that the Defendants breached their fiduciary duties by, for self-interested purposes, impairing the Decarb stockholder's redemption right through false or misleading disclosures. At bottom, as discussed, this claim is direct.

Defendants also argue that Plaintiff's claims are holder claims and, therefore, are claims not suitable for a class action. A holder claim is a cause of action by persons wrongfully induced to hold stock instead of selling it. That's from the *Citicorp* case, 140 A.3d 1125 at page 1132 from the Delaware Supreme Court in 2016.

Holder claims generally cannot be asserted as class claims because "individual questions of law or fact, particularly as to the element of

justifiable reliance, will inevitably predominate over common questions of law or fact."  That's from the *CBS* case 2020 WL 268779 at *20 from this Court on January 27, 2021.

In *Gig3*, Vice Chancellor Will considered a similar argument under similar factual circumstances and held that the plaintiff in that case did not assert a holder claim.  First, the Court held that the requirement that stockholders decide whether to request that their cash be returned to them from the trust or to invest in the proposed business combination was an investment decision comparable to those that the Delaware Supreme Court has recognized as a call for stockholder action.  Accordingly, the claim was not based on inaction, rather a call to action similar to purchasing and tendering stock or making an appraisal decision.

The Court also noted that the reasons which prevent holder claims from being pursued on behalf of a class were not present in the claims presented in *Gig3* by that plaintiff because holder claims are grounded in common law fraud and negligent misrepresentation, which requires proof of reliance.

The Court noted that the redemption

22

right there, "though individual in nature, created a 'collective action problem' for stockholders such that it would be 'impractical, if not impossible, for each stockholder to ask and have answered by the corporation its own set of questions regarding the decision presented for consideration.'  Stockholders must choose to redeem or invest based upon the disclosures provided by the SPAC.  '[A] reasonable inference can be drawn that the stockholder relied upon the disclosure and that, assuming it is "material," any harm flowing from the stockholder's action proximately resulted from such reliance.'  Individual proof of reliance is unnecessary."  That's at pages 711-712 of *Gig3*.

The same logic as applied in *Gig3* applies here.  Decarb's stockholders were asked to make this investment decision to either redeem their shares or invest in the proposed business combination.  Plaintiff's claims are predicated on this business decision, making the holder claim line of cases inapposite.  Moreover, like in *Gig3*, a reasonable inference can be drawn that stockholders relied upon the public disclosures made by Decarb and its representatives.

23

Next I move to the Defendants' Rule 12(b)(6) arguments.  The standard under Rule 12(b)(6) is well-established Delaware law.  The pleading standards for purposes of a 12(b)(6) motion are minimal, and the operative test is one of reasonable conceivability, which asks whether there is a possibility of recovery.

Specifically, "(i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof."  That is from the *Savor* case, 812 A.2d page 894 at pages 896-97 from the Delaware Supreme Court in 2002.

Starting with the Plaintiff's fiduciary duty claims, the directors and officers of Delaware corporations owe duties of care and loyalty to the corporation and its stockholders as residual claimants.  That's from *Multiplan*, at pages 799-800.

When a corporation seeks stockholder

24

action, the duties of loyalty and care manifest themselves contextually in a duty to disclose fully and fairly all material information within the board's control.  Where, as here, a plaintiff alleges that fiduciaries were incentivized to push through a value-destroying deal and use inadequate disclosures to secure stockholder approval, the duty of loyalty claims are intertwined with allegations of misleading disclosures.  That's also from *Multiplan*, at 799-800.

Consistent with Vice Chancellor Will's reasoning in *Multiplan*, *Gig2*, and *Gig3*, as well as Chancellor McCormick's bench ruling in *XL Fleet*, at the pleadings stage, I will consider the claims under a singular theory of fiduciary breach.

First, this Court must determine what standard of review applies.  The standard of review is the test that a court applies when evaluating whether directors have met the standard of conduct.  That's from the *Trados* case at page 35.

"Delaware has three tiers of review for evaluating director decision-making: the business judgment rule, enhanced scrutiny, and entire fairness."  That's from *Reis v. Hazelett*, 28 A.3d 442 at page 457 from this Court in 2011.

25

The business judgment rule is a differential, rebuttable presumption that in making a business decision, the board of directors "acted on an informed basis, in good faith and in the honest belief that the action was taken in the best interests of the company."  That's from *Aronson*, 473 A.2d at 811, citing Section 141(a) of the DGCL.

When a court finds that the business judgment rule applies, the business decisions of disinterested directors will not be disturbed if they can be attributed to any rational business purpose. That's from *Sinclair v. Levien*, 280 A.2d 717 at page 720 from the Delaware Supreme Court in 1971.

The business judgment rule is inapplicable, however, where at least half the board is interested or not independent.  That's from *Multiplan* at 809.

The business judgment rule is also inapplicable if the plaintiff presents facts supporting a reasonable inference that the transaction involved a controlling stockholder engaged in a conflicted transaction.  If the business judgment rule is rebutted, Delaware's most searching review, entire fairness, will apply.  All of that is also from

26

*Multiplan*.

Here, entire fairness applies because the de-SPAC transaction was a conflicted controller transaction.

The parties do not dispute that the Controller Defendants were controllers of Decarb, with the exception of WRG. In cases when the determination of whether control exists turns on disputed facts, it is impossible to determine whether a large blockholder is a controlling stockholder until an evidentiary hearing is held. That's In re *Cysive* at page 551.

The Plaintiff has pleaded enough here to make it reasonably conceivable that WRG, together with the other alleged Controller Defendants, controlled Decarb. WRG and the Sponsor allegedly had entered into a voting agreement whereby WRG agreed to vote its shares in favor of the Merger. Further, WRG was owned by Decarb's CEO at the time of its IPO and the Merger, making it reasonably conceivable that WRG could have exercised managerial control that would make it no differently situated than if it had majority control. I do note that this is somewhat of a close call, but given the factual nature of this question, I find it appropriate to allow discovery

27

into whether WRG was in fact a controller.

Defendants argue that Plaintiff has not pleaded facts establishing that any Controller Defendant was conflicted.  Defendants contend that no conflicted transaction occurred because the controller neither stood on his side of the deal nor competed with the common stockholders for consideration.

The Plaintiff disagrees, arguing that the Controller Defendants were conflicted with respect to the transaction because they held a financial interest in consummating a bad deal over no deal at all.  The Controller Defendants' $25,000 in Founder Shares and $6.5 million in warrants to purchase Decarb shares at $11.50 would be worthless if Decarb liquidated.

As of the record date, the closing price of Decarb common stock was $10 per share.  That price implied a market value of approximately $56.4 million for the Founder Shares.  Although the Controller Defendants expected to receive the same post-de-SPAC Class A shares held by Decarb's Class A stockholders, the return on the Controller Defendants' investment of this deal was 2,255x.  This astronomical return stands in stark contrast with the return a

28

Decarb Class A stockholder stood to receive if they decided to invest in the post-de-SPAC company.

Further, even though the Controller Defendants' stock could not be sold until one year after the Merger or the stock exceeded certain prices for a sustained period of time, the Controller Defendants could still expect to see an outsized return on their per-share investment given that they paid approximately two-tenths of one cent per share.

Moreover, even though the Controller Defendants' warrants would only be valuable if Decarb's stock post de-SPAC was greater than $11.50 per share, which would align Controller Defendants' incentives post-de-SPAC with Decarb's Class A stockholders generally, it does not align their incentives with Decarb's Class A stockholders during the time that the Controller Defendants were alleged to have violated their fiduciary duties, the pre-de-SPAC disclosure period. During this period, the warrants further skewed the Controller Defendants toward preferring any deal over the best deal because the warrants were sure to be worth nothing if no deal went through and probabilistically worth something even if a bad deal went through.

29

Vice Chancellor Will and Chancellor McCormick addressed similar conflicts for SPAC sponsors in *Multiplan*, *Gig2*, *Gig3*, and *XL Fleet*. Those cases all discuss the conflicts within the SPAC structure.

The same issues present themselves here. It's reasonably conceivable that the Controller Defendants preferred a value-decreasing acquisition to liquidation because it could achieve substantial upside even on a bad deal. Meanwhile, the public stockholders would only be interested in a merger if it rendered their shares worth more than the redemption value. This difference of perspectives created a conflict of interest between the stockholders and the Controller Defendants. Thus, the Plaintiff has adequately asserted claims subject to the entire fairness standard.

Plaintiff alleges that half or more of the board was not independent and disinterested. The difference for a defendant being subjected to entire fairness under the conflicted board theory is that *Corwin* cleansing is potentially available. Because the plaintiffs have alleged a viable conflicted controller theory, however, I need not analyze here

30

whether the majority of the board was conflicted, although there seems to be a very strong argument that they were, which I will address later.

Having concluded that entire fairness applies, I turn now to whether it is reasonably conceivable that the Defendants breached their fiduciary duties.  Entire fairness comprises two parts: fair dealing and fair price.  Although fair dealing and fair price are typically analyzed individually at first, entire fairness is a unitary test.  All aspects of entire fairness will be examined as a whole.  At the pleadings stage, the factual intensity of the entire fairness test typically precludes the Court from granting a motion to dismiss under Rule 12(b)(6).

In *Weinberger*, 457 A.2d 701 at pages 710-711 from the Delaware Supreme Court in 1983, the Court explained that the duty of disclosure falls within the fair dealing element of entire fairness. There, because material information was withheld from the minority stockholders under the circumstances amounting to a breach of fiduciary duty, the Court concluded that the merger did not meet the test of entire fairness.

31

Plaintiff here alleges that both the Director Defendants and the Controller Defendants disloyally caused the proxy to omit or misstate material facts necessary for an informed stockholder vote. An omitted fact is material where there is a substantial likelihood that a reasonable stockholder would consider it important in deciding how to vote. That is from the *TSC v. Northway* case from the U.S. Supreme Court in 1976. To be material, an omitted fact must significantly alter the total mix of information. That's also from *TSC*.

Further, when the board "travels down the road of partial disclosure," the board has an obligation to provide stockholders with "an accurate, full, and fair characterization of [] historic[al] events." That is from the *Arnold* case from the Delaware Supreme Court in 1994.

Plaintiff alleges three primary misstatements or omissions made by the Defendants in connection with the de-SPAC which allegedly impaired Decarb's stockholders' ability to make an informed decision as to whether they wanted to redeem their shares or invest in the post-de-SPAC entity. Plaintiff alleges that the Defendants made

32

misstatements regarding (1) sales to Hiringa; (2) projections of sales to blue-chip customers; and (3) Legacy Hyzon's projected gross margins and cash projections.  I address each in turn.

The Plaintiff alleges that Defendants' disclosures relating to Hiringa were materially misleading because they created the impression that Hiringa was an end customer of Legacy Hyzon when in fact Hiringa was a middle person who merely helped Legacy Hyzon distribute its products.

In the February 2021 investor presentation, Decarb represented that Hiringa had signed a contract with Hyzon that contemplated the delivery of 20 of Hyzon's trucks.  That's Exhibit 5 at 15.  Those trucks were projected to be delivered in 2021, and the transaction was to generate around $10 million in revenue.  The presentation indicated that negotiations for this transaction were at the "signed agreement" stage and that "contracted orders" were "100% Certain."  Thus, Decarb represented that it was 100 percent certain that Hyzon would deliver to Hiringa 20 trucks and that this transaction would create revenue of approximately $10 million.

Defendants argue that these statements

33

that make Hiringa look like an end customer of Legacy Hyzon's products are undercut by a set of press releases issued by Legacy Hyzon and Hiringa.  Legacy Hyzon and Hiringa issued two relevant press releases about Legacy Hyzon's and Hiringa's evolving relationship.

On August 31, 2021, Legacy Hyzon and Hiringa issued a press release stating that they had signed a "Heads of Agreement that secures access for Hiringa and its fleet partners to the supply of zero emission Heavy Goods Vehicles ...."  This agreement supports Hiringa and its Partners' strategy to roll out over 1,500 FCEVs by 2026 ...."  The language of this press release does make Hiringa look like a middle person and not an end customer because it describes Hiringa as a "fleet partner" and not a customer.

On February 17, 2021, however, Legacy Hyzon and Hiringa issued a press release that made Hiringa look more like a customer.  The second press release formally announced a new Hiringa contract, stating that "the two companies ha[d] signed a vehicle supply agreement, with Hyzon commissioned to build and supply Hiringa with zero emission Heavy Goods

34

Vehicles, (HGV)" with "the first batch of [twenty] vehicles ... expected to enter service in New Zealand by the end of 2021."

The release further stated that "Hyzon plans to have up to 1,500 fuel cell trucks on the road in New Zealand by 2026 as part of the agreement with Hiringa."  The release went on to say:  "The vehicle supply agreement builds on the signing of a Heads of Agreement between the two companies in August 2020 ...."  This press release states that Hiringa had been "commissioned to build and supply Hiringa with zero emission" HGVs.

These press releases were, at best, inartfully drafted.  They were not so clear as to put reasonable Decarb investors on notice that Hiringa was not an end customer, but rather a fleet partner middle person.

Decarb's investor presentations also contained statements that made it seem like Hiringa was an end customer, not a fleet partner.

In the February 2021 investor presentation, a slide highlighted that Legacy Hyzon had announced a "vehicle supply agreement to supply trucks to New Zealand-based Hiringa Energy; first

35

deliveries expected by [year-end] 2021." This supply agreement was presented under a heading titled "commercial." On the same slide, several other deals were announced under a heading titled "partnerships." It's reasonably conceivable that this would lead a reasonable investor to believe that Hiringa was a customer, not a partner. On a different slide, Hiringa was listed as among Legacy Hyzon's "Vehicle Customers."

Further, in an April 2021 investor presentation, Decarb represented that Hiringa was "a Vehicle Customer." This further supports the conclusion that Decarb's characterization of Hiringa was materially misleading and would likely cause misapprehension in a reasonable investor.

Looking at Legacy Hyzon's disclosures regarding Hiringa, and applying the plaintiff-friendly standard on a motion to dismiss, it is reasonably conceivable that Defendants communicated materially misleading disclosures regarding Hiringa and Legacy Hyzon's relationship. This contract was Legacy Hyzon's second largest. It is a reasonable conclusion that the details of this relationship were material and that the alleged misrepresentations would have

36

altered the total mix of information available to Decarb's stockholders. Decarb's stockholders were conceivably led to believe that Hiringa was an end customer and not a would-be distributor. Knowing the number of end customers affects an investor's understanding of a company's revenue prospects and thereby affects an investor's valuation of the company. The misstatements and omissions that led to this reasonably conceivable misapprehension were therefore material.

Moreover, in the end, the entity that ordered the 20 trucks was TR Group Ltd., not Hiringa. The announcement of this did not occur until November 4, 2021. Thus, it is reasonably conceivable that in February and April 2021, Hiringa and Hyzon had not entered into a signed contract that was 100 percent certain.

Additionally, the complaint alleges that the "orders were far from binding, as they were subject to undisclosed preconditions, including validation trials and hydrogen infrastructure buildouts that would not occur, at the earliest, until the latter half of 2022." This indicates that the trucks would not be deliverable by the end of 2021.

In sum, I am persuaded that there is a reasonable conceivability that Decarb's communications regarding Hiringa were materially misleading and evidence unfair dealing.

In the February 2021 investor presentation, Decarb presented a slide that appeared to represent that Hyzon had several blue-chip customers around the world. In the April 2021 investor presentation, Decarb presented the same slide without any of the blue-chip customer names or logos. The Plaintiffs allege that the presence of the blue-chip logos in the February presentation misleadingly created the impression that Legacy Hyzon had relationships with these customers at the stages indicated in the February presentation when, in fact, Legacy Hyzon did not have relationships with these customers. The Defendants argue that the removal of the blue-chip customer logos was done merely to anonymize the presentation.

At the motion to dismiss stage, drawing all reasonable inferences in favor of the plaintiff, I find that it is reasonably conceivable that presenting a slide with the blue-chip company names and logos indicating that Hyzon has contractual

38

or business relations with those companies when they allegedly do not is a material misstatement.

This one is a very close call for me, I admit. Knowing whether a company has contractual relationships with important customers is information that would alter the total mix of information available to an investor because that information informs the investor's expectation of how much revenue the company will generate and the value of the company.

Moreover, the inclusion of these blue-chip logos confers, by association, the blue-chip companies' credibility onto Legacy Hyzon. A reasonable investor would conclude that the blue-chip companies are working with Legacy Hyzon and it must mean that Legacy Hyzon is a reputable and reliable company. If Legacy Hyzon did not have these relationships it purported to have with these blue-chip customers, then the inclusion of the blue-chip logos in the February investor presentation would be a material misstatement because the inclusion of the blue-chip companies would not create a full and fair characterization of Legacy Hyzon's customer pipeline and would unjustifiably impart the blue-chip

39

companies' credibility onto Legacy Hyzon.

At a later stage, discovery may very well show that the difference in the slides was merely an effort to anonymize customers and nothing more. But that must await further developments in the case.

Legacy Hyzon told investors in presentations that it would turn cash flow positive as early as 2023, generate annual EBITDA of $505 million by 2025, and do so by achieving gross profit margins on electric vehicles of 23 percent in 2021 and as high as 33.6 percent by 2025. A former executive of Legacy Hyzon, however, reportedly told Blue Orca that Legacy Hyzon's retrofitting model of production would in fact yield no more than 5 to 10 percent gross margins. As a result, according to Blue Orca, "If we apply industry average gross margins of 15% to Legacy Hyzon's projected revenues, the Company will not turn cash positive in the next five years. The picture looks even more dire if we apply a more appropriate gross margin assumption of 5-10%, which the former Legacy Hyzon executive we interviewed says is more realistic."

The Defendants attack this allegation of a misstatement as being too vague because it is

40

based on an anonymous tip.  Plaintiffs counter that the allegations are supported by the industry figures that are publicly available.

If the Plaintiff based its allegations here solely on an anonymous tip and nothing more, the Defendants would have a much stronger argument.  But the presence of the industry numbers assuages, at least at the pleadings stage, any concern that the allegations are completely made up.  If the Company's profit margins were intentionally overstated, that would be a material misstatement because it would change the mix of information regarding how valuable the company is, something about which a reasonable stockholder would consider important in deciding whether to redeem or ride along with Legacy Hyzon's business in the Merger.  Accordingly, I find that the Plaintiff has adequately alleged a material misstatement regarding Legacy Hyzon's gross margins.  At this stage, the Plaintiff has stated a claim for breach of fiduciary duty based on materially misleading disclosures and omissions.

Next I turn to exculpation.  The Defendants raise the fact that Decarb's charter contains an exculpatory provision that eliminates

41

director liability for breaches of the duty of care as a defense to the Plaintiff's claims.  As a result of this provision, the Plaintiff must plead a non-exculpated claim for breach of the duty of loyalty to reach the individual Director Defendants.  This means the Plaintiff must plead facts supporting a rational inference that the directors operated with the personal interest that conflicted with the interests of the stockholders or that they acted to advance the self-interest of an interested party to whom they were beholden.  The Plaintiffs allege that each member of the board approved the acquisition while laboring under conflicts and caused Decarb to issue misleading statements regarding the Merger.

In *Gig3*, the Court found that directors who held founder shares and who were intertwined with a serial SPAC sponsor's empire were conflicted as a result of the differential returns the directors could expect from their founder shares and were not independent from the similarly conflicted serial SPAC sponsor because it was reasonably conceivable at the pleadings stage that they expected to be considered for directorships in the serial SPAC sponsor's future endeavors.

42

The same pleading stage conclusion is warranted here based upon the well-pleaded allegations in the complaint. Every Decarb director had Founder Shares, save one. Further, every Decarb director was or had been a director at several of Riverstone's other SPACs. The director with the smallest amount of Founder Shares could expect those Founder Shares to be worth greater than $200,000 upon a de-SPAC. Although there's not a whole lot in the complaint regarding whether this would be material to the directors, it is reasonable to conclude at this stage that this would be a material amount of money. But even for directors whose Founder Shares weren't worth just over $220,000, there are other allegations to support the claims that they were materially interested and unable to invoke exculpation at this stage.

The complaint alleges sufficient entanglement between the directors and Riverstone such that, like *Gig3*, the directors would likely expect to be considered for directorships at Riverstone entities, and as a result, it is reasonably conceivable that they are not independent from Decarb's conflicted Sponsor. The complaint alleges that all of the directors have served on other SPACs

43

created by Riverstone under the "Decarbonization" banner.

Accordingly, under the test articulated in *Cornerstone*, the Plaintiffs have adequately alleged that each of the board members was either self-interested in the Merger or acted in a manner that advanced the Sponsor's interests to the public stockholders' detriment.

Thus, the Director Defendants' motion to dismiss based on exculpation under the certificate is denied.  Therefore, for the foregoing reasons, the motion to dismiss is denied.

Counsel, that is my ruling on the motion to dismiss.  I am not asking for reargument, but if there are any questions, I'm happy to entertain them now.  And let me first turn to counsel for the plaintiff.

ATTORNEY SBORZ:  Your Honor, for Plaintiff Malork, no questions.

THE COURT:  For the defendants.

ATTORNEY HOLMES:  Your Honor, this is Michael Holmes.  We don't have any questions.

THE COURT:  Thank you, Counsel.  I appreciate you getting on the line.

44

                    With that, the Court stands in recess.
Have a good day.

                    (Proceedings concluded at 4:04 p.m.)

                              - - -

45

CERTIFICATE

I, DENNEL NIEZGODA, Official Court Reporter for the Court of Chancery for the State of Delaware, Registered Merit Reporter, Certified Realtime Reporter, do hereby certify that the foregoing pages numbered 3 through 44 contain a true and correct transcription of the rulings as stenographically reported by me at the hearing in the above cause before the Vice Chancellor of the State of Delaware, on the date therein indicated, except as revised by the Vice Chancellor.

IN WITNESS WHEREOF I hereunto set my hand at Wilmington, this 19th day of July, 2023.


                    /s/ Dennel Niezgoda
                    -----------------------------
                    Dennel Niezgoda
                    Official Court Reporter
                    Registered Merit Reporter
                    Certified Realtime Reporter