# EXHIBIT C

DEFM14A 1 d924103ddefm14a.htm DEFM14A

**Table of Contents**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

## SCHEDULE 14A

**PROXY STATEMENT PURSUANT TO SECTION 14(a) OF
THE SECURITIES EXCHANGE ACT OF 1934**

Filed by the Registrant ☒                Filed by a Party other than the Registrant ☐

Check the appropriate box:

☐    Preliminary Proxy Statement

☐    **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

☒    Definitive Proxy Statement

☐    Definitive Additional Materials

☐    Soliciting Material under §240.14a-12

# Decarbonization Plus Acquisition Corporation

**(Name of Registrant as Specified In Its Charter)**

**N/A**
**(Name of Person(s) Filing Proxy Statement, if other than the Registrant)**

Payment of Filing Fee (Check the appropriate box):

☐    No fee required.

☐    Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

    (1)    Title of each class of securities to which transaction applies:

    (2)    Aggregate number of securities to which transaction applies:

    (3)    Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

    (4)    Proposed maximum aggregate value of transaction:

    (5)    Total fee paid:

☒    Fee paid previously with preliminary materials.

☐    Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

    (1)    Amount Previously Paid:

    (2)    Form, Schedule or Registration Statement No.:

    (3)    Filing Party:

    (4)    Date Filed:

Table of Contents

**SUMMARY TERM SHEET**

This Summary Term Sheet, together with the sections entitled "Questions and Answers About the Proposals for DCRB Stockholders" and "Summary of the Proxy Statement," summarizes certain information contained in this proxy statement, but does not contain all of the information that is important to you. You should read carefully this entire proxy statement, including the attached annexes, for a more complete understanding of the matters to be considered at the special meeting.

- DCRB is a blank check company incorporated as a Delaware corporation for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses. For more information about DCRB, see the section entitled "Information About DCRB."

- There are currently 22,572,502 shares of DCRB's Class A Common Stock and 5,643,125 shares of DCRB's Class B Common Stock issued and outstanding. In addition, there are currently 17,800,751 warrants of DCRB outstanding, consisting of 11,286,251 public warrants and 6,514,500 private placement warrants. Each whole warrant entitles the holder to purchase one whole share of Class A Common Stock for $11.50 per share. The warrants will become exercisable on the later of 30 days after the completion of an Initial Business Combination or 12 months from the closing of our Initial Public Offering and will expire five years after the completion of an Initial Business Combination or earlier upon redemption or liquidation. Once the warrants become exercisable, DCRB may redeem warrants in certain circumstances. See the section entitled "Description of Securities—Warrants."

- Hyzon, a Delaware corporation, is a hydrogen mobility company headquartered in Rochester, New York, founded for the purpose of designing, developing and manufacturing both standalone and integrated hydrogen fuel cells and systems as well as purpose-designed hydrogen-powered commercial vehicles. For more information about Hyzon, see the sections entitled "Information About Hyzon" and "Management's Discussion and Analysis of Financial Condition and Results of Operations of Hyzon."

- On February 8, 2021, we and our wholly owned subsidiary, Merger Sub, entered into the Business Combination Agreement with Hyzon. A copy of the Business Combination Agreement is attached to this proxy statement as *Annex A*.

- Pursuant to the Business Combination Agreement, and subject to the terms and conditions contained therein, Merger Sub will merge with and into Hyzon, with Hyzon surviving the merger as a wholly owned subsidiary of New Hyzon. For more information about the Business Combination Agreement and the business combination, see the section entitled "Proposal No. 1—The Business Combination Proposal."

- At the Closing, shares of Class A Common Stock will be issued to the Historical Rollover Stockholders (including the holder of Ascent Options) in the business combination in exchange for all outstanding shares of Hyzon Common Stock. The number of shares of Class A Common Stock that will be issued to the Historical Rollover Stockholders in the business combination will be adjusted downward if the aggregate amount of Company Transaction Costs is in excess of the Company Transaction Costs Cap. Conversely, the number of shares of Class A Common Stock that will be issued to the Historical Rollover Stockholders in the business combination will be adjusted upward if the aggregate amount of DCRB Transaction Costs is in excess of the DCRB Transaction Costs Cap. Assuming that neither of the foregoing adjustments occur, 180,426,406 shares of Class A Common Stock will be issued to the Historical Rollover Stockholders (including the holder of Ascent Options) in the business combination in exchange for all outstanding shares of Hyzon Common Stock. It is also anticipated that we will reserve for issuance up to 21,858,629 shares of Class A Common Stock in respect of New Hyzon options and restricted stock units issued in exchange for outstanding pre-merger Hyzon Options and Hyzon RSUs and in respect of New Hyzon warrants issued in exchange for outstanding pre-merger Hyzon Warrants. It is further anticipated that we will issue up to 5,025,108 shares of Class A Common Stock to the holder of the Hyzon Convertible Notes, and 326,103 warrants pursuant to the Ardour Subscription Agreement. Additionally, during the Earnout Period, we may issue to Eligible DCRB

viii

Table of Contents

for outstanding pre-merger Hyzon Options, Hyzon RSUs and Hyzon Warrants, of 202,285,035 shares of Class A Common Stock, (b) the issuance and sale of 35,500,000 shares of Class A Common Stock in the PIPE Financing and (c) the issuance of up to 5,025,108 Conversion Shares (Proposal No. 4).

- *The 2021 Plan Proposal*—To consider and vote upon a proposal to approve and adopt the 2021 Plan and material terms thereunder (Proposal No. 5). A copy of the 2021 Plan is attached to this proxy statement as *Annex C*.

- *The Director Election Proposal*—To consider and vote upon a proposal to elect three directors to serve until the 2022 annual meeting of stockholders, three directors to serve until the 2023 annual meeting of stockholders and three directors to serve until the 2024 annual meeting of stockholders, and until their respective successors are duly elected and qualified, subject to such directors' earlier death, resignation, retirement, disqualification or removal (Proposal No. 6).

- *The Adjournment Proposal*—To consider and vote upon a proposal to approve the adjournment of the special meeting to a later date or dates, if necessary or appropriate, to permit further solicitation and vote of proxies in the event that there are insufficient votes for, or otherwise in connection with, the approval of the Business Combination Proposal, the Charter Proposals, the Nasdaq Proposal, the 2021 Plan Proposal or the Director Election Proposal (Proposal No. 7).

**Q: Are the Proposals conditioned on one another?**

A: We may not consummate the business combination unless the Business Combination Proposal, the Charter Proposals and the Nasdaq Proposal are approved at the special meeting. The Charter Proposals, the 2021 Plan Proposal and the Director Election Proposal are conditioned on the approval of the Business Combination Proposal and the Nasdaq Proposal. The Adjournment Proposal is not conditioned on the approval of any other Proposal set forth in this proxy statement.

**Q: What will happen in the business combination?**

A: On February 8, 2021, DCRB and Merger Sub entered into the Business Combination Agreement with Hyzon. Pursuant to the Business Combination Agreement, and subject to the terms and conditions contained therein, Merger Sub will merge with and into Hyzon, with Hyzon surviving the merger. After giving effect to the merger, Hyzon will become a wholly owned subsidiary of New Hyzon. At the Closing, 202,285,035 shares of Class A Common Stock will be issued to the Historical Rollover Stockholders in the business combination in exchange for all outstanding shares of Hyzon Common Stock, or reserved for issuance in respect of New Hyzon options and restricted stock units issued in exchange for outstanding pre-merger Hyzon Options, Hyzon RSUs and New Hyzon warrants issued in exchange for outstanding pre-merger Hyzon Warrants. For more information about the Business Combination Agreement and the business combination, see the section entitled "Proposal No. 1—The Business Combination Proposal."

**Q: How were the transaction structure and consideration for the business combination determined?**

Following the closing of the IPO, DCRB representatives commenced a robust search for businesses or assets to acquire for the purpose of consummating DCRB's initial business combination. On October 30, 2020, Robert Tichio, a member of the DCRB Board, and Erik Anderson, our chief executive officer and a member of the DCRB Board, participated in a video conference with representatives of Goldman Sachs & Co. LLC regarding a possible transaction between DCRB and Hyzon. Hyzon had engaged Goldman Sachs as its financial advisor on or about August 18, 2020 in connection with exploring alternatives for raising capital. On November 2, 2020, DCRB and Hyzon executed a non-disclosure agreement that did not contain a standstill provision to facilitate more in-depth discussions between the parties regarding a possible business combination. After further discussions, negotiations and the performance of extensive due diligence, on January 8, 2021, DCRB and Hyzon executed a non-binding letter of intent. Please see the section entitled "Proposal No. 1—The Business Combination Proposal—Background of the Business Combination" for additional information.

2

Table of Contents

**Q:** **Did the DCRB Board obtain a third-party valuation or fairness opinion in determining whether or not to proceed with the business combination?**

**A:** No. The DCRB Board did not obtain a third-party valuation or fairness opinion in connection with its determination to approve the business combination. DCRB's officers and directors have substantial experience in evaluating the operating and financial merits of companies from a wide range of industries and concluded that their experience and backgrounds, together with the experience and sector expertise of DCRB's advisors, enabled them to make the necessary analyses and determinations regarding the business combination. In addition, DCRB's officers, directors and advisors have substantial experience with mergers and acquisitions. Accordingly, investors will be relying solely on the judgment of the DCRB Board in valuing Hyzon and assuming the risk that the DCRB Board may not have properly valued the business.

**Q:** **What happens if I sell my shares of Class A Common Stock before the special meeting?**

**A:** The record date for the special meeting is earlier than the date that the business combination is expected to be completed. If you transfer your shares of Class A Common Stock after the record date, but before the special meeting, unless the transferee obtains from you a proxy to vote those shares, you will retain your right to vote at the special meeting. However, you will not be able to seek redemption of your shares of Class A Common Stock because you will no longer be able to deliver them for cancellation upon consummation of the business combination in accordance with the provisions described in this proxy statement. If you transfer your shares of Class A Common Stock prior to the record date, you will have no right to vote those shares at the special meeting or seek redemption of those shares.

**Q:** **How has the announcement of the business combination affected the trading price of DCRB's units, Class A Common Stock and warrants?**

**A:** On February 8, 2021, the last trading date before the public announcement of the business combination, DCRB's public units, Class A Common Stock and public warrants closed at $20.29, $17.76 and $5.32, respectively. On June 18, 2021 the trading date immediately prior to the date of this proxy statement, DCRB's public units, Class A Common Stock and warrants closed at $11.56, $10.46 and $2.30, respectively.

**Q:** **Following the business combination, will DCRB's securities continue to trade on a stock exchange?**

**A:** Yes. We anticipate that, following the business combination, our Class A Common Stock and public warrants will continue trading on Nasdaq under the new symbols "HYZN" and "HYZNW," respectively. Our units will automatically separate into the component securities upon consummation of the business combination and, as a result, will no longer trade as separate securities following the business combination.

**Q:** **What vote is required to approve the Proposals presented at the special meeting?**

**A:** Approval of each of the Business Combination Proposal, the Nasdaq Proposal, the 2021 Plan Proposal and the Adjournment Proposal requires the affirmative vote (online or by proxy) of the holders of a majority of the outstanding shares of Class A Common Stock and Class B Common Stock entitled to vote and actually cast thereon, voting as a single class. Approval of the Charter Proposals requires the affirmative vote (online or by proxy) of the holders of a majority of the outstanding shares of Class A Common Stock and Class B Common Stock entitled to vote thereon at the special meeting, voting as a single class.

Approval of the Director Election Proposal requires the affirmative vote (online or by proxy) of a plurality of the votes cast by holders of our Class A Common Stock and Class B Common Stock at the special meeting and entitled to vote thereon, voting as a single class. This means that the nine director nominees will be elected if they receive more affirmative votes than any other nominee for the same position.

5

Table of Contents

## SUMMARY OF THE PROXY STATEMENT

*This summary highlights selected information from this proxy statement and does not contain all of the information that is important to you. To better understand the business combination and the proposals to be considered at the special meeting, you should read this entire proxy statement carefully, including the annexes. See also the section entitled "Where You Can Find Additional Information."*

### Parties to the Business Combination

**Decarbonization Plus Acquisition Corporation**

DCRB is a Delaware corporation formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination involving DCRB and one or more businesses. Upon the Closing, we intend to change our name from "Decarbonization Plus Acquisition Corporation" to "Hyzon Motors Inc."

Our Class A Common Stock, public warrants, and units, consisting of one share of Class A Common Stock and one-half of one warrant, are traded on Nasdaq under the ticker symbols "DCRB," "DCRBW" and "DCRBU," respectively. We intend to apply to continue the listing of our Class A Common Stock and warrants on Nasdaq under the symbols "HYZN" and "HYZNW," respectively, upon the Closing. The units will automatically separate into the component securities upon consummation of the business combination and, as a result, will no longer trade as a separate security.

The mailing address of our principal executive office is 2744 Sand Hill Road, Suite 100, Menlo Park, California 94025, and our telephone number is (212) 993-0076.

**Hyzon Motors Inc.**

Hyzon is a hydrogen mobility company founded for the purpose of designing, developing and manufacturing hydrogen-powered commercial vehicles and fuel cell systems, and providing complete hydrogen mobility solutions, from hydrogen supply to fuel cell lifecycle management and vehicle leasing. Headquartered in Rochester, New York, with operations in Europe, Singapore, Australia and China, Hyzon aims to accelerate the energy transition toward hydrogen through the development of hydrogen solutions.

The mailing address of Hyzon's principal executive office is 475 Quaker Meeting House Road, Honeoye Falls, New York 14472, and its telephone number is (585) 484-9337.

For more information about Hyzon, see the sections entitled "*Management's Discussion and Analysis of Financial Condition and Results of Operations of Hyzon*" and "*Information About Hyzon*."

### The Business Combination

On February 8, 2021, we entered into the Business Combination Agreement with Merger Sub and Hyzon. Pursuant to the Business Combination Agreement, and subject to the terms and conditions contained therein, Merger Sub will merge with and into Hyzon, with Hyzon surviving the merger. After giving effect to the merger, Hyzon will become a wholly owned subsidiary of New Hyzon.

Immediately prior to the Effective Time, all outstanding principal and accrued and unpaid interest on the Hyzon Convertible Notes as of such time will be automatically converted into a number of shares of Hyzon

13

**Table of Contents**

The following diagram illustrates the structure of New Hyzon immediately following the consummation of the business combination. The interests set forth below (a) assume (i) that no public stockholders elect to have their public shares redeemed, (ii) that there are no other issuances of equity interests of DCRB or Hyzon and (iii) that there are no exercises of Hyzon Options or Hyzon Warrants and (b) do not take into account (i) DCRB warrants that will remain outstanding following the business combination and may be exercised at a later date or (ii) the Earnout Shares. As a result of the business combination, the economic and voting interests of our public stockholders will decrease. If these assumptions are not correct, then the percent of ownership set forth in the diagram below would change.



1    Reflects indirect ownership of Hyzon Motors Inc.

We anticipate that, upon the Closing, the ownership of New Hyzon will be as follows:

- the Historical Rollover Stockholders will own 180,426,406 shares of our Class A Common Stock, which will constitute 72.4% of our outstanding Class A Common Stock;

- the public stockholders will own 22,572,502 shares of our Class A Common Stock, which will constitute 9.0% of our outstanding Class A Common Stock;

- the New PIPE Investors will own 35,500,000 shares of our Class A Common Stock, which will constitute 14.3% of our outstanding Class A Common Stock;

- the holders of the Hyzon Convertible Notes will own 5,025,108 shares of our Class A Common Stock, which will constitute 2.0% of our outstanding Class A Common Stock; and

- the initial stockholders will own 5,643,125 shares of our Class A Common Stock, which will constitute 2.3% of our outstanding Class A Common Stock.

The number of shares and the interests set forth above (a) assume (i) that no public stockholders elect to have their public shares redeemed, (ii) that there are no other issuances of equity interests of DCRB or Hyzon and (iii) that there are no exercises of Hyzon Options or Hyzon Warrants and (b) do not take into account (i) DCRB warrants that will remain outstanding following the business combination and may be exercised at a later date or (ii) the Earnout Shares. As a result of the business combination, the economic and voting interests of our public stockholders will decrease.

The ownership percentages with respect to New Hyzon set forth above do not take into account warrants to purchase Class A Common Stock that will remain outstanding immediately following the business combination, but do include the Founder Shares, which will convert into Class A Common Stock upon an Initial Business Combination. If the facts are different than these assumptions, the percentage ownership retained by DCRB's existing stockholders in New Hyzon following the business combination will be

22

Table of Contents

**Risk Factors**

In evaluating the proposals set forth in this proxy statement, you should carefully read this proxy statement, including the annexes, and especially consider the factors discussed in the section entitled "Risk Factors." Some of the risks related to Hyzon's business and industry and the business combination are summarized below.

*Risks Related to Hyzon's Business, Operations and Industry*

- Hyzon's business model has yet to be tested and Hyzon may fail to commercialize its strategic plans.

- Hyzon has a limited number of current customers, and there is no assurance as to whether Hyzon's sales pipeline will result in sales and revenues, or that Hyzon will be able to convert non-binding letters of intent or memoranda of understanding into orders or sales (including because of the current or prospective financial resources of the counterparties to Hyzon's non-binding memoranda of understanding and letters of intent), or that Hyzon will be able to identify additional potential customers and convert them to paying customers.

- Hyzon also faces and will continue to face significant competition in all aspects of its business and operations, and many of its current and future competitors have or will have significantly more resources than Hyzon, and may outcompete Hyzon for customers, employees, and suppliers.

- To date, Hyzon has produced only technology validation units, and there is no assurance that Hyzon will be able to establish and operate facilities capable of producing its hydrogen fuel cell systems or assemble its hydrogen-powered commercial vehicles in appropriate volumes and at competitive costs or at all.

- There is no assurance that there will be or that Hyzon will be able to supply hydrogen at prices or with an emissions profile that allow Hyzon's hydrogen-powered commercial vehicles to be competitive with commercial vehicles powered by other energy sources.

- Hyzon also depends on third parties, including on its parent company Horizon, for supply of key inputs and components.

- Hyzon depends on Horizon as a single source supplier for its fuel cell systems.

- Such suppliers, including Horizon, may be unable to deliver the inputs and components necessary for Hyzon to produce its hydrogen-powered commercial vehicles or hydrogen fuel cell systems at prices, volumes, and specifications acceptable to Hyzon.

- Hyzon may also be unable to protect, defend, maintain or enforce intellectual property on which Hyzon depends, and the failure to do so could enable Hyzon's competitors to offer similar products using Hyzon's technology and may impact Hyzon's ability to continue offering its products and services that incorporate such intellectual property.

Any of the above could have a material adverse effect on Hyzon's business.

26

Table of Contents

## CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS

This proxy statement contains forward-looking statements within the meaning of Section 27A of the Securities Act, and Section 21E of the Exchange Act. We have based these forward-looking statements on our current expectations and projections about future events. All statements, other than statements of present or historical fact included in this proxy statement, regarding the proposed business combination, DCRB's ability to consummate the business combination, the benefits of the transaction, the post-combination company's future financial performance following the business combination and the post-combination company's strategy, expansion plans, future operations, future operating results, estimated revenues, losses, projected costs, prospects, plans and objectives of management are forward-looking statements. In some cases, you can identify forward-looking statements by terminology such as "may," "should," "could," "would," "expect," "plan," "anticipate," "intend," "believe," "estimate," "continue," "project" or the negative of such terms or other similar expressions. These forward-looking statements are subject to known and unknown risks, uncertainties and assumptions about us that may cause our actual results, levels of activity, performance or achievements to be materially different from any future results, levels of activity, performance or achievements expressed or implied by such forward-looking statements. Except as otherwise required by applicable law, DCRB disclaims any duty to update any forward-looking statements, all of which are expressly qualified by the statements in this section, to reflect events or circumstances after the date of this proxy statement. DCRB cautions you that these forward-looking statements are subject to numerous risks and uncertainties, most of which are difficult to predict and many of which are beyond the control of DCRB.

In addition, DCRB cautions you that the forward-looking statements regarding DCRB and the post-combination company, which are contained in this proxy statement, are subject to the following factors:

- the occurrence of any event, change or other circumstances that could delay the business combination or give rise to the termination of the Business Combination Agreement and the other agreements related to the business combination (including catastrophic events, acts of terrorism, the outbreak of war, the novel coronavirus pandemic ("COVID-19") and other public health events), as well as management's response to any of the foregoing;

- the outcome of any legal proceedings that may be instituted against DCRB, Hyzon, their affiliates or their respective directors and officers following announcement of the business combination;

- the inability to complete the business combination due to the failure to obtain approval of the stockholders of DCRB, regulatory approvals, or satisfy the other conditions to closing in the Business Combination Agreement;

- the risk that DCRB may not be able to obtain the financing necessary to consummate the business combination;

- the risk that the proposed business combination disrupts current plans and operations of Hyzon or DCRB as a result of the announcement and consummation of the business combination;

- DCRB's ability to realize the anticipated benefits of the business combination, which may be affected by, among other things, competition, the pace and depth of hydrogen vehicle adoption generally, and the ability of New Hyzon to accurately estimate supply and demand for its vehicles, and to grow and manage growth profitably following the business combination;

- risks relating to the uncertainty of the projected financial information with respect to Hyzon, including the conversion of Hyzon's non-binding memoranda of understanding and letters of intent into orders;

- costs related to the business combination;

- New Hyzon's success in retaining or recruiting, or changes required in, its officers, key employees or directors following the business combination;

27

Table of Contents

- the possibility of third-party claims against DCRB's Trust Account;

- the amount of redemption requests by DCRB's stockholders;

- changes in applicable laws or regulations, including vehicle safety regulations applicable to hydrogen-powered vehicles, governmental incentives and fuel and energy price;

- the ability of Hyzon to execute its business model, including market acceptance of its planned products and services;

- the possibility that COVID-19 may hinder DCRB's ability to consummate the business combination;

- the possibility that COVID-19 may adversely affect the results of operations, financial position and cash flows of DCRB or the post-combination company; and

- the possibility that DCRB or the post-combination company may be adversely affected by other economic, business or competitive factors.

Should one or more of the risks or uncertainties described in this proxy statement, or should underlying assumptions prove incorrect, actual results and plans could differ materially from those expressed in any forward-looking statements. Additional information concerning these and other factors that may impact the operations and projections discussed herein can be found in the section entitled "Risk Factors" in DCRB's final prospectus for its Initial Public Offering, which was filed with the SEC on October 21, 2020, and in DCRB's periodic filings with the SEC, including its Annual Report on Form 10-K for the fiscal year ended December 31, 2020. DCRB's SEC filings are available publicly on the SEC's website at *www.sec.gov*.

28

Table of Contents

## RISK FACTORS

The following risk factors will apply to our business and operations following the completion of the business combination. These risk factors are not exhaustive, and investors are encouraged to perform their own investigation with respect to the business, financial condition and prospects of Hyzon and our business, financial condition and prospects following the completion of the business combination. You should carefully consider the following risk factors in addition to the other information included in this proxy statement, including matters addressed in the section entitled "Cautionary Note Regarding Forward-Looking Statements." We may face additional risks and uncertainties that are not presently known to us, or that we currently deem immaterial, which may also impair our business or financial condition. The following discussion should be read in conjunction with the financial statements of Hyzon and notes to the financial statements included herein.

**Risks Related to Hyzon**

*Risks Related to Hyzon's Business, Operations and Industry*

*Hyzon's business model has yet to be tested and any failure to commercialize its strategic plans would have a material adverse effect on its operating results and business, harm Hyzon's reputation and could result in substantial liabilities that exceed its resources.*

The estimated costs and timelines that Hyzon has developed in planning for full scale commercial production are subject to the risks and uncertainties inherent in transitioning from a start-up company focused on proof-of-concept activities to the design and large-scale integration, assembly, and manufacture of hydrogen-powered commercial vehicles, and, secondarily, the large-scale integration and manufacture of hydrogen fuel cell systems. Hyzon may not be able to accurately estimate the demand for its hydrogen-powered commercial vehicles or hydrogen fuel cell systems, which could result in a variety of inefficiencies in its business and hinder its ability to generate revenue. If Hyzon fails to accurately predict supply and demand for its products, and other integration, assembly and manufacturing requirements, it could incur additional costs or experience delays. In addition, there can be no assurance that Hyzon's estimates related to the costs and timing necessary to complete design and engineering of its facilities will prove accurate. The likelihood of Hyzon's success must be considered in light of these risks, expenses, complications, delays and the competitive environment in which it operates. Therefore, there can be no assurances that Hyzon's business plan will prove successful.

Hyzon will continue to encounter risks and difficulties frequently experienced by early-stage companies, including scaling up its infrastructure and headcount, and may encounter unforeseen expenses, difficulties or delays in connection with pursuing its growth plans. In addition, as a result of the capital-intensive nature of Hyzon's business, Hyzon can be expected to continue sustaining substantial operating expenses without generating sufficient revenues to cover expenditures. Any investment in Hyzon is therefore highly speculative and could result in the loss of your entire investment.

*Hyzon may need to raise additional funds, and these funds may not be available on terms favorable to Hyzon or Hyzon's stockholders or at all when needed.*

The manufacture, integration, assembly and sale of hydrogen-powered commercial vehicles and hydrogen fuel cell systems are capital intensive businesses. Hyzon's business plan to manufacture, integrate, assemble, sell and service hydrogen-powered commercial vehicles and hydrogen fuel cell systems is expected to require continued capital investment to fund operations, continue research and development and improve facilities. There can be no assurance that Hyzon will have access to the capital it needs on favorable terms when required or at all. If Hyzon cannot raise additional funds when Hyzon needs them, Hyzon's financial condition, business, prospects, and results of operations could be materially adversely affected. Hyzon may raise funds through the issuance of debt securities or through loan arrangements, the terms of which could require significant interest payments, contain covenants that restrict Hyzon's business, or other unfavorable terms. Hyzon may also raise funds through the sale of additional equity securities, which could dilute Hyzon's stockholders.

29

Table of Contents

***Hyzon is only permitted to operate in the European market through its joint venture with Holthausen Clean Technology Investments B.V.***

On December 30, 2020, Hyzon formed Hyzon Motors Europe B.V. ("Hyzon Europe"), a joint venture with Holthausen Clean Technology Investments B.V. ("Holthausen"), for the primary purpose of supplying hydrogen-powered trucks to the European Union and nearby markets such as the United Kingdom, Nordic countries and Switzerland. Hyzon owns 50.5% of the equity interests of Hyzon Europe. Pursuant to the Joint Venture Agreement, dated as of December 30, 2020 (the "JV Agreement"), by and among Hyzon, Holthausen and Hyzon Europe, neither Hyzon nor Holthausen may have an interest in, be engaged in, or be concerned with, or approach any person with a view to obtaining an interest or being engaged in or concerned with, any business involving the development or production of, or the trading in, any products developed, produced or traded by, or the provision of services developed or provided by Hyzon Europe or any of its subsidiaries, other than passive investments representing no more than 1% ownership in such business. As a result, following the business combination, New Hyzon must develop, produce and sell hydrogen-powered trucks in Europe through the Hyzon Europe joint venture and is thereby limited in its ability to conduct certain operations in Europe outside of Hyzon Europe. If Hyzon's arrangements with Hyzon Europe are considered unenforceable or otherwise impermissible by courts or other government bodies, Hyzon may also be subject to fines, liability or other sanctions by courts or other government bodies.

***Hyzon may be unable to successfully produce its hydrogen-powered commercial vehicles or its hydrogen fuel cell systems in appropriate volumes, at competitive costs, or at all, which may adversely affect Hyzon's business, prospects, financial condition and operating results.***

Hyzon has not yet completed its facilities in Rochester, New York, where Hyzon intends to manufacture hydrogen fuel cell systems, or its facilities in Groningen, the Netherlands, where Hyzon intends to assemble its hydrogen-powered commercial vehicles. There is no assurance that Hyzon will be able to complete its facilities in Rochester or Groningen, or that Hyzon will be able to either manufacture its hydrogen fuel cell systems in Rochester or assemble its hydrogen-powered commercial vehicles in Groningen at costs, volumes, and specifications acceptable to Hyzon. These facilities may also require permits for construction or operation, and Hyzon may not be able to obtain these permits on conditions acceptable to Hyzon. Hyzon will depend on the supply of hydrogen fuel cell systems solely from Horizon until its manufacturing facilities in Rochester are operational, and will continue to rely on Horizon thereafter for supply of hydrogen fuel cell systems for deliveries in China. Hyzon also relies on third parties for the production of glider kits, chassis and other commercial vehicle components, and, in the United States, for the assembly of its hydrogen-powered commercial vehicles. Both Hyzon's facilities and the facilities of its suppliers, assemblers and other partners may be harmed or rendered inoperable by natural or man-made disasters, including earthquakes, flooding, fire and power outages, or by health epidemics, such as the recent COVID-19 pandemic, and related governmental responses, which may render it difficult or impossible for Hyzon to produce its products for some period of time. Any alternative suppliers and partners may either not exist or if they do exist may be unwilling or unable to supply Hyzon. The inability to produce Hyzon's products or the backlog that may develop if Hyzon's facilities or the facilities of its suppliers are rendered inoperable for even a short period of time may result in the loss of customers or harm Hyzon's reputation. Although Hyzon maintains insurance for damage to its property and the disruption of its business, this insurance may not be sufficient to cover all of Hyzon's potential losses and may not continue to be available to Hyzon on acceptable terms, if at all.

***Hyzon, its partners and its suppliers may rely on complex machinery for production of Hyzon's hydrogen-powered commercial vehicles and fuel cell systems, which involves a significant degree of risk and uncertainty in terms of operational performance and costs.***

Hyzon, its partners and suppliers may rely on complex machinery for the manufacture, integration and assembly of Hyzon's hydrogen-powered commercial vehicles and fuel cell systems. Such complex machinery may involve a significant degree of uncertainty and risk in terms of operational performance and costs. Hyzon's

32

Table of Contents

provided by issued patent claims is often difficult to determine. As a result, Hyzon cannot be certain that the patent applications that it files will issue, or that its issued patents will afford protection against competitors with similar technology. In addition, even if all of Hyzon's patent claims are allowed and cover their intended scope, Hyzon's competitors may circumvent or design around Hyzon's issued patents, which may adversely affect Hyzon's business, prospects, financial condition and operating results.

### Risks Related to the Hydrogen Fuel Cell Industry

***Hyzon's hydrogen vehicles compete for market share with vehicles powered by other technologies that may prove to be more attractive to customers. Decreases in the price of gasoline and natural gas and the availability of alternative powered vehicles could delay or prevent transition to hydrogen vehicles.***

Hyzon's hydrogen vehicles compete for market share with vehicles fueled by alternative energy sources. If alternative energy powered vehicles are available and the prices of alternative sources are lower than energy sources used by Hyzon's products, offer greater efficiencies, greater reliability or otherwise benefit from other factors resulting in overall lower total cost of ownership, this could decrease incentives to transition to hydrogen vehicles, adversely impact sales of Hyzon's products and affect the commercial success of its vehicles or make its vehicles uncompetitive or obsolete. Fuel prices, including volatility in the cost of diesel or a prolonged period of low gasoline and natural gas costs, could decrease incentives to transition to hydrogen vehicles. Moreover, there is no guarantee that commercial customers will prefer hydrogen vehicles over other zero emissions or near zero emissions vehicles, such as electric vehicles; to the extent that other zero emissions or near zero emissions vehicles have lower total costs of ownership or better sustainability profiles, it may adversely impact sales of Hyzon's products or the commercial success of its vehicles.

***Hyzon's products use flammable fuels and some generate high voltages, which could subject Hyzon's business to product safety, product liability, other claims, product recalls, or negative publicity.***

High-voltage electricity poses potential shock hazards, and hydrogen is a flammable gas and therefore a potentially dangerous fuel. Any accidents involving or linked to, defects in design or manufacturing of, or any negative publicity surrounding hydrogen-powered vehicles, including those produced by Hyzon, or the production, transportation or use of hydrogen generally could materially impede Hyzon's business. If any of Hyzon's products are or are alleged to be defective in design or manufacturing or experience other failures, including with respect to the safety of hydrogen or the efficiency and performance of hydrogen fuel cells, Hyzon may be compelled to undertake product recalls or take other actions, which could adversely affect Hyzon's business, prospects, operating results, reputation and financial condition. Insufficient warranty reserves to cover future warranty claims could adversely affect Hyzon's business, prospects, financial condition and operating results. In addition, Hyzon may be held responsible for damages beyond the scope of Hyzon's insurance coverage.

### Risks Related to Litigation and Regulations

***Hyzon operates in a highly regulated industry. The failure to comply with laws or regulations could subject Hyzon to significant regulatory risk, and changing laws and regulations and changing enforcement policies and priorities could adversely affect Hyzon's business, prospects, financial condition and operating results.***

The motor vehicle manufacturing and hydrogen industries are highly regulated in most countries, and if Hyzon fails to comply with national, federal, state and local laws, rules, regulations and guidance, including those related to hydrogen-powered vehicle safety and direct sales to customers, Hyzon's business could be adversely affected. Hyzon will be subject to licensing and operational requirements that could result in substantial compliance costs, and Hyzon's business would be adversely affected if Hyzon's licenses are impaired. Litigation, regulatory actions and compliance issues, including in respect of antitrust and competition laws as applied to Hyzon's relationships with Horizon and Hyzon Europe, could subject Hyzon to revocation of licenses, significant fines, penalties, judgments, remediation costs, negative publicity and reputational harm, and

40

Table of Contents

requirements resulting in increased expenses. Hyzon's operations and products are also subject to numerous stringent environmental laws and regulations, including those governing the generation, use, handling, storage, or disposal of hazardous substances and wastes. These laws may require Hyzon or others in Hyzon's value chain to obtain permits and comply with various restrictions and obligations that may have material effects on Hyzon's operations. If key permits and approvals cannot be obtained on acceptable terms, or if other operational requirements cannot be met in a manner satisfactory for Hyzon's operations or on a timeline that meets Hyzon's commercial obligations, it may adversely impact Hyzon's business. In addition, laws, regulations and rules relating to privacy, information security, and data protection could increase Hyzon's costs, affect or limit how Hyzon collects and uses personal information, and adversely affect Hyzon's business opportunities. The ongoing costs of complying with such laws, regulations and rules could be significant.

Additionally, all of these laws and regulations may be subject to change or changes in enforcement policies or priorities, including from changes that may result from changes in the political landscape. Future legislation and regulations, changes to existing laws and regulations, or interpretations thereof, or changes in enforcement policies or priorities, could require significant management attention and cause additional expenditures, restrictions, and delays in connection with Hyzon's operations as well as other future projects.

***Hyzon depends on global customers and suppliers, and adverse changes in governmental policy or trade regimes could significantly impact the competitiveness of Hyzon's products.***

Hyzon sources components from suppliers and sells its products around the world, including sourcing hydrogen fuel cell systems from Horizon in China. There is significant uncertainty about the future relationship between the U.S. and various other countries, particularly China, with respect to trade policies, treaties, government regulations, tariffs, customs regulations, price or exchange controls, or preferences in foreign nations of domestically manufactured products. Changes in such government policy, including any changes to existing trade agreements, international trade relations between countries in which Hyzon or its suppliers or partners have business operations or Hyzon's target markets, regulatory requirements, or the availability of tax and other governmental incentives, including those promoting fuel efficiency and alternate forms of energy, may have an adverse effect on Hyzon. A trade war, other governmental action related to tariffs or international trade agreements, changes in U.S. social, political, regulatory and economic conditions or in laws and policies governing foreign trade, manufacturing, development or investment in the territories and countries where Hyzon sell its products, sources its supplies or currently operates or may in the future operate, and any resulting negative sentiments towards the U.S. as a result of such changes, may have an adverse effect on Hyzon's business, financial condition or results of operations.

### Other Risks

***As a private company, Hyzon has not been required to document and test its internal controls over financial reporting nor has management been required to certify the effectiveness of its internal controls and its auditors have not been required to opine on the effectiveness of its internal control over financial reporting. Failure to maintain adequate financial, information technology and management processes and controls could result in material weaknesses and errors in Hyzon's financial reporting, which could adversely affect Hyzon's business.***

As a private company, Hyzon has not been subject to the SEC's internal control reporting requirements. Following the business combination, the Company will become subject to the SEC's internal control over financial reporting requirements and will become subject to the auditor attestation requirements in the year in which it is deemed to be a large accelerated filer, which would occur once the market value of its common equity held by non-affiliates exceeds $700 million as of the end of the prior fiscal year's second fiscal quarter, or otherwise loses its "emerging growth company" status. As a result, Hyzon expects that its independent registered public accounting firm will be required to formally attest to the effectiveness of its internal controls over financial reporting commencing with the New Hyzon's Annual Report on Form 10-K for the year ended

41

Table of Contents

December 31, 2022. Hyzon may not be able to complete its evaluation, testing and any required remediation in a timely fashion. In addition, Hyzon's current controls and any new controls that it develops may become inadequate because of poor design, inadequate enforcement, and changes in its business, including increased complexity resulting from expansion. Any failure to implement and maintain effective internal controls over financial reporting could adversely affect the results of assessments by its independent registered public accounting firm and their attestation reports.

### Hyzon will incur increased costs as a result of operating as a public company, and its management will devote substantial time to new compliance initiatives.

If Hyzon completes the business combination and becomes a public company, it will incur significant legal, accounting and other expenses that it did not incur as a private company. As a public company, Hyzon will be subject to the reporting requirements of the Exchange Act, the Sarbanes-Oxley Act, the Dodd-Frank Wall Street Reform and Consumer Protection Act, as well as rules adopted, and to be adopted, by the SEC and the Nasdaq. Hyzon's management and other personnel will need to devote a substantial amount of time to these compliance initiatives. Moreover, Hyzon expects these rules and regulations to substantially increase its legal and financial compliance costs and to make some activities more time-consuming and costly. Hyzon cannot predict or estimate the amount or timing of additional costs it may incur to respond to these requirements. The impact of these requirements could also make it more difficult for Hyzon to attract and retain qualified persons to serve on its board of directors, its board committees or as executive officers.

### Hyzon's management has limited experience in operating a public company.

Hyzon's executive officers have limited experience in the management of a publicly traded company. Hyzon's management team may not successfully or effectively manage its transition to a public company that will be subject to significant regulatory oversight and reporting obligations under federal securities laws. Their limited experience in dealing with the increasingly complex laws pertaining to public companies could be a significant disadvantage in that it is likely that an increasing amount of their time may be devoted to these activities which will result in less time being devoted to the management and growth of the post-combination company. Hyzon may not have adequate personnel with the appropriate level of knowledge, experience and training in the accounting policies, practices or internal control over financial reporting required of public companies in the United States Hyzon is in the process of upgrading its finance and accounting systems to an enterprise system suitable for a public company, and a delay could impact its ability or prevent it from timely reporting its operating results, timely filing required reports with the SEC and complying with Section 404 of the Sarbanes-Oxley Act. The development and implementation of the standards and controls necessary for Hyzon to achieve the level of accounting standards required of a public company in the United States may require costs greater than expected. It is possible that Hyzon will be required to expand its employee base and hire additional employees to support its operations as a public company which will increase its operating costs in future periods.

### Hyzon faces risks related to health epidemics, including the ongoing COVID-19 pandemic, which could have a material adverse effect on its business and results of operations.

Hyzon's business and results of operations are expected to be adversely affected by the COVID-19 pandemic and related governmental responses, which has caused a material adverse effect on the level of economic activity around the world, including in the markets Hyzon serves. The governmental responses being implemented to contain the outbreak of COVID-19 or its impact, including travel restrictions, the shutdown of businesses and quarantines, among others, may limit Hyzon's ability to meet with potential customers or affect the ability of Hyzon's personnel, suppliers, and partners to operate in the ordinary course. The extent to which the COVID-19 pandemic impacts Hyzon will depend on future developments, which are highly uncertain and cannot be predicted, including new information which may emerge concerning the severity of COVID-19 and the actions to contain or otherwise address the effects of COVID-19, among others. If the overall economy is impacted for an extended period, Hyzon's results of operations, financial position and cash flows may be materially adversely affected.

42

Table of Contents

***We may amend the terms of the warrants in a manner that may be adverse to holders of public warrants with the approval by the holders of at least 50% of the then-outstanding public warrants (or, if applicable, 65% of the then-outstanding public warrants and 65% of the then-outstanding private placement warrants, voting as separate classes). As a result, the exercise price of the warrants could be increased, the exercise period could be shortened and the number of shares of our Class A Common Stock purchasable upon exercise of a warrant could be decreased, all without a holder's approval.***

Our warrants were issued in registered form under a warrant agreement between Continental Stock Transfer & Trust Company, as warrant agent, and us. The warrant agreement provides that the terms of the warrants may be amended without the consent of any holder to cure any ambiguity or correct any defective provision, but requires the approval by the holders of at least 50% of the then-outstanding public warrants to make any change that adversely affects the interests of the registered holders of public warrants. Accordingly, we may amend the terms of the public warrants in a manner adverse to a holder if holders of at least 50% of the then-outstanding public warrants (or, if applicable, 65% of the then-outstanding public warrants and 65% of the then-outstanding private placement warrants, voting as separate classes) approve of such amendment. Although our ability to amend the terms of the public warrants with the consent of at least 50% of the then-outstanding public warrants (or, if applicable, 65% of the then-outstanding public warrants and 65% of the then-outstanding private placement warrants, voting as separate classes) is unlimited, examples of such amendments could be amendments to, among other things, increase the exercise price of the warrants, convert the warrants into cash or stock (at a ratio different than initially provided), shorten the exercise period or decrease the number of shares of our Class A Common Stock purchasable upon exercise of a warrant.

***We may redeem unexpired warrants prior to their exercise at a time that is disadvantageous to warrantholders, thereby making their warrants worthless.***

We have the ability to redeem outstanding warrants at any time after they become exercisable and prior to their expiration, at a price of $0.01 per warrant, provided that the last reported sales price of our Class A Common Stock equals or exceeds $18.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within a 30 trading-day period ending on the third trading day prior to the date on which we give proper notice of such redemption and provided certain other conditions are met. If and when the warrants become redeemable by us, we may exercise our redemption right even if we are unable to register or qualify the underlying securities for sale under all applicable state securities laws. Redemption of the outstanding warrants could force you (a) to exercise your warrants and pay the exercise price therefor at a time when it may be disadvantageous for you to do so, (b) to sell your warrants at the then-current market price when you might otherwise wish to hold your warrants or (c) to accept the nominal redemption price which, at the time the outstanding warrants are called for redemption, is likely to be substantially less than the market value of your warrants. None of the private placement warrants will be redeemable by us so long as they are held by our Sponsor, independent directors, WRG or any of their permitted transferees.

***Because certain of our shares of Class A Common Stock and warrants currently trade as units consisting of one share of Class A Common Stock and one-half of one warrant, the units may be worth less than units of other blank check companies.***

Each unit contains one-half of one warrant. Pursuant to the warrant agreement, no fractional warrants will be issued upon separation of the units, and only whole warrants will trade. This is different from other blank check companies similar to ours whose units include one share of common stock and one warrant to purchase one whole share. We have established the components of the units in this way in order to reduce the dilutive effect of the warrants upon completion of an Initial Business Combination since the warrants will be exercisable in the aggregate for one-half of the number of shares compared to units that each contain a whole warrant to purchase one share, thus making us, we believe, a more attractive merger partner for target businesses. Nevertheless, this unit structure may cause our units to be worth less than if they included a warrant to purchase one whole share.

51

Table of Contents

***Our warrants are accounted for as liabilities and the changes in value of our warrants could have a material effect on our financial results.***

On April 12, 2021, the Acting Director of the Division of Corporation Finance and Acting Chief Accountant of the SEC together issued a statement regarding the accounting and reporting considerations for warrants issued by special purpose acquisition companies entitled "Staff Statement on Accounting and Reporting Considerations for Warrants Issued by Special Purpose Acquisition Companies ("SPACs") (the "SEC Statement"), which focused on certain settlement terms and provisions related to certain tender offers following a business combination, which terms are similar to those contained in the warrant agreement governing our warrants. As a result of the SEC Statement, we reevaluated the accounting treatment of our 11,286,251 public warrants and 6,514,500 private placement warrants, and determined to classify the warrants as derivative liabilities measured at fair value, with changes in fair value each period reported in earnings.

As a result, included on our balance sheet as of December 31, 2020 contained elsewhere in this proxy statement are derivative liabilities related to embedded features contained within our warrants. ASC 815 provides for the remeasurement of the fair value of such derivatives at each balance sheet date, with a resulting non-cash gain or loss related to the change in the fair value being recognized in earnings in the statement of operations. As a result of the recurring fair value measurement, our financial statements and results of operations may fluctuate quarterly, based on factors which are outside of our control. Due to the recurring fair value measurement, we expect that we will recognize non-cash gains or losses on our warrants each reporting period and that the amount of such gains or losses could be material.

***We have identified a material weakness in our internal control over financial reporting as of December 31, 2020. If we are unable to develop and maintain an effective system of internal control over financial reporting, we may not be able to accurately report our financial results in a timely manner, which may adversely affect investor confidence in us and materially and adversely affect our business and operating results.***

Following the issuance of the SEC Statement, after consultation with our independent registered public accounting firm, our management and the audit committee of the DCRB Board (the "Audit Committee") we concluded that, in light of the SEC Statement, it was appropriate to restate our previously issued audited financial statements as of and for the period ended December 31, 2020 and our previously issued audited balance sheet dated as of October 22, 2020 (the "Restatement"). See "Our warrants are accounted for as liabilities and the changes in value of our warrants could have a material effect on our financial results." As part of such process, we identified a material weakness in our internal controls over financial reporting.

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis.

Effective internal controls are necessary for us to provide reliable financial reports and prevent fraud. We continue to evaluate steps to remediate the material weakness. These remediation measures may be time consuming and costly and there is no assurance that these initiatives will ultimately have the intended effects.

If we identify any new material weaknesses in the future, any such newly identified material weakness could limit our ability to prevent or detect a misstatement of our accounts or disclosures that could result in a material misstatement of our annual or interim financial statements. In such case, we may be unable to maintain compliance with securities law requirements regarding timely filing of periodic reports in addition to applicable stock exchange listing requirements, investors may lose confidence in our financial reporting and our stock price may decline as a result. We cannot assure you that the measures we have taken to date, or any measures we may take in the future, will be sufficient to avoid potential future material weaknesses.

52

Table of Contents

***Nasdaq may delist our securities from trading on its exchange, which could limit investors' ability to make transactions in our securities and subject us to additional trading restrictions.***

We cannot assure you that our securities will continue to be listed on Nasdaq after the business combination. In connection with the business combination, we will be required to demonstrate compliance with Nasdaq's initial listing requirements, which are more rigorous than Nasdaq's continued listing requirements, in order to continue to maintain the listing of our securities on Nasdaq. For instance, our stock price would generally be required to be at least $4.00 per share and our stockholders' equity would generally be required to be at least $5.0 million. We cannot assure you that we will be able to meet those initial listing requirements at that time. Our continued eligibility for listing may depend on, among other things, the number of our shares that are redeemed.

If Nasdaq delists our securities from trading on its exchange and we are not able to list our securities on another national securities exchange, we expect our securities could be quoted on an over-the-counter market. If this were to occur, we could face significant material adverse consequences, including:

- potential termination of the Business Combination Agreement if our securities are not listed on another national exchange mutually agreed to by Hyzon

- a limited availability of market quotations for our securities;

- reduced liquidity for our securities;

- a determination that our Class A Common Stock is a "penny stock" which will require brokers trading in our Class A Common Stock to adhere to more stringent rules and possibly result in a reduced level of trading activity in the secondary trading market for our securities;

- a limited amount of news and analyst coverage; and

- a decreased ability to issue additional securities or obtain additional financing in the future.

The National Securities Markets Improvement Act of 1996, which is a federal statute, prevents or preempts the states from regulating the sale of certain securities, which are referred to as "covered securities." Because our units, Class A Common Stock and public warrants are listed on Nasdaq, our units, Class A Common Stock and public warrants qualify as covered securities. Although the states are preempted from regulating the sale of our securities, the federal statute does allow the states to investigate companies if there is a suspicion of fraud, and, if there is a finding of fraudulent activity, then the states can regulate or bar the sale of covered securities in a particular case. While we are not aware of a state having used these powers to prohibit or restrict the sale of securities issued by blank check companies, other than the state of Idaho, certain state securities regulators view blank check companies unfavorably and might use these powers, or threaten to use these powers, to hinder the sale of securities of blank check companies in their states. Further, if we were no longer listed on Nasdaq, our securities would not be covered securities and we would be subject to regulation in each state in which we offer our securities.

***The DCRB Board did not obtain a third-party valuation or fairness opinion in determining whether or not to proceed with the business combination.***

The DCRB Board did not obtain a third-party valuation or fairness opinion in connection with its determination to approve the business combination. DCRB's officers and directors have substantial experience in evaluating the operating and financial merits of companies from a wide range of industries and concluded that their experience and backgrounds, together with the experience and sector expertise of DCRB's advisors, enabled them to make the necessary analyses and determinations regarding the business combination. Accordingly, investors will be relying solely on the judgment of the DCRB Board in valuing Hyzon and assuming the risk that the DCRB Board may not have properly valued the business. The lack of a third-party valuation or fairness opinion may also lead an increased number of stockholders to vote against the proposed business combination or demand redemption of their shares for cash, which could potentially impact DCRB's ability to consummate the business combination.

53

Table of Contents

## UNAUDITED PRO FORMA CONDENSED COMBINED FINANCIAL INFORMATION

### Introduction

The following unaudited pro forma condensed combined financial statements of DCRB present the combination of the financial information of Hyzon and DCRB, adjusted to give effect to the business combination and consummation of the PIPE Financing (collectively, the "Transactions"). The following unaudited pro forma condensed combined financial information has been prepared in accordance with Article 11 of Regulation S-X. In May 2020, the SEC adopted Release No. 33-10786 "Amendments to Financial Disclosures about Acquired and Disposed Businesses." Release No. 33-10786 was effective on January 1, 2021; therefore, the unaudited pro forma condensed combined financial information herein is presented in accordance therewith.

DCRB is a blank check company incorporated in Delaware on September 7, 2017. DCRB was formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses. As of March 31, 2021, there was approximately $225.7 million held in the Trust Account.

Hyzon is headquartered in Rochester, New York, and was incorporated in the State of Delaware on January 21, 2020 as a wholly owned subsidiary of Horizon, a Singapore-based fuel cell company. Horizon is a privately-held fuel cell technology company focused on developing and manufacturing hydrogen fuel cell stacks and systems for a variety of mobility and non-mobility applications, including for vehicles, backup power generation, and educational programs. Horizon has operations primarily in China, Korea, Japan, Singapore, and the Czech Republic.

To our knowledge and as determined in accordance with Rule 13d-3 under the Exchange Act, the following persons are the direct beneficial owners of 5% or more of the outstanding shares of Horizon stock: George Gu, Hyzon's Executive Chairman (17.56%), P.N. Generations LLP (10.65%), Liu Chengang (8.14%), DPCV1 Limited (7.49%) and Taras Wankewycz (6.78%), and Craig Knight, the Chief Executive Officer of Hyzon, is the direct beneficial owner of approximately 2.2% shares of Horizon stock, in each case, based on 682,810 shares of stock outstanding as of the date hereof.

Hyzon was formed to focus on accelerating the energy transition through the manufacturing and supply of hydrogen fuel cell-powered commercial vehicles across the North American, European, and Australasian regions. Since its inception, Hyzon has devoted substantially all of its efforts in building the infrastructure to support the future production of hydrogen fuel cell trucks and buses and supply of hydrogen fuel cell systems for mobility applications, recruiting management and technical staff, and raising capital. Hyzon has not yet generated any revenue. Hyzon's rights in intellectual property relating to its core fuel cell technology is subject to the Horizon IP Agreement between Hyzon and JS Horizon, which is part of the Horizon group of companies, described further in the section titled "*Intellectual Property.*"

The following unaudited pro forma condensed combined balance sheet as of March 31, 2021 combines the historical unaudited condensed consolidated balance sheet of Hyzon with the historical unaudited condensed consolidated balance sheet of DCRB on a pro forma basis as if the Transactions had been consummated on March 31, 2021. The unaudited pro forma condensed combined statement of operations for the three months ended March 31, 2021 combines the historical unaudited condensed consolidated statement of operations of Hyzon for the three months ended March 31, 2021 and the historical unaudited condensed consolidated statement of operations of DCRB for the three months ended March 31, 2021, giving effect to the Transactions as if they had been consummated on January 21, 2020 (inception). The unaudited pro forma condensed combined statement of operations for the year ended December 31, 2020 combines the historical audited statement of

63

Table of Contents

**UNAUDITED PRO FORMA CONDENSED COMBINED BALANCE SHEET**
**AS OF MARCH 31, 2021**
*(in thousands, except share and per share amounts)*

| | DCRB (Historical) (US GAAP) | Hyzon (Historical) (US GAAP) | Combined | Pro Forma Adjustments (Assuming No Redemptions) | As of 31-Mar-21 Pro Forma Combined (Assuming No Redemptions) | Additional Pro Forma Adjustments (Assuming Maximum Redemptions) | As of 31-Mar-21 Pro Forma Combined (Assuming Maximum Redemptions) |
|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | |
| Cash | $ — | 47,773 | $ 47,773 | $ 225,731**(A)** (7,900)**(B)** (18,732)**(B)** (14,200)**(B)(C)** 355,000**(C)** (5,703)**(B)** | $ 581,969 | $ (180,731)**(L)** | $ 401,238 |
| Cash held in trust account | 225,731 | | 225,731 | (225,731)**(A)** | — | | — |
| Prepaid expenses and other current assets | 917 | 8,647 | 9,564 | | 9,564 | | 9,564 |
| **Total current assets** | **$ 226,648** | **$ 56,420** | **$ 283,068** | **$ 308,465** | **$ 591,532** | **$ (180,731)** | **$ 410,801** |
| Property and equipment—net | | 4,313 | 4,313 | | 4,313 | | 4,313 |
| Right-Of-use assets | | 1,507 | 1,507 | | 1,507 | | 1,507 |
| Deferred transaction costs | | 3,465 | 3,465 | (3,465)**(B)** | — | | — |
| Other assets | | 736 | 736 | | 736 | | 736 |
| **Total assets** | **$ 226,648** | **$ 66,441** | **$ 293,089** | **$ 305,000** | **$ 598,088** | **$ (180,731)** | **$ 417,357** |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | | | | |
| Accounts payable | | 591 | 591 | | 591 | | 591 |
| Accrued professional fees and other current liabilities | 3,544 | 3,622 | 7,166 | (3,544)**(B)** | 3,622 | | 3,622 |
| Related party payables | 1,984 | 11,371 | 13,355 | (1,984)**(B)** | 11,371 | | 11,371 |
| Current portion of operating lease liability | | 434 | 434 | | 434 | | 434 |
| Accrued expenses and other current liabilities | 175 | | 175 | (175)**(B)** | — | | — |
| Deferred revenue | | 2,905 | 2,905 | | 2,905 | | 2,905 |
| **Total current liabilities** | **5,703** | **18,923** | **24,626** | **(5,703)** | **18,923** | **—** | **18,923** |
| Lease liability, net of current portion | | 1,257 | 1,257 | | 1,257 | | 1,257 |
| Deferred underwriting fee payable | 7,900 | | 7,900 | (7,900)**(B)** | — | | — |
| Convertible debt, net | | 49,441 | 49,441 | 559**(I)** )**(I)** (50,000 | — | — | — |
| Earnout liability | | | | 179,186**(K)** | 179,186 | | 179,186 |
| Warrant liabilities | 33,939 | — | 33,939 | (21,105)**(H)** | 12,834 | — | 12,834 |
| **Total liabilities** | **$ 47,542** | **$ 69,621** | **$ 117,163** | **$ 95,036** | **$ 212,199** | **$ —** | **$ 212,199** |
| **Commitments and Contingences** | | | | | | | |
| Common stock subject to possible redemption | 174,106 | | 174,106 | (174,106)**(D)** | — | | — |
| **Stockholders' Equity** | | | | | | | |
| Common Stock | | 94 | 94 | (94)**(E)** | — | | — |
| Class A Common Stock | 1 | | 1 | 2**(D)** 18**(E)** 4**(C)** 1**(I)** 1**(F)** | 25 | (2)**(L)** | 23 |
| Class B Common Stock | 1 | | 1 | (1)**(F)** | (0) | | (0) |
| Additional paid in capital | 27,953 | 19,522 | 47,475 | 174,104**(D)** 354,996**(C)** 76**(E)** (22,954)**(G)** (14,200)**(B)(C)** (3,465)**(B)** (10,868)**(B)** 21,105**(H)** 16,599**(J)** 50,000**(I)** (179,186)**(K)** | 433,682 | (180,729)**(L)** | 252,953 |
| Retained earnings (deficit) | (22,954) | (22,418) | (45,372) | (7,864)**(B)** 22,954**(G)** (16,599)**(J)** (559)**(I)** | (47,440) | | (47,440) |
| Accumulated other comprehensive gain | | (54) | (54) | | (54) | | (54) |
| Non-Controlling Interest | | (324) | (324) | | (324) | | (324) |
| **Total Stockholders' Equity** | **$ 5,000** | **$ (3,180)** | **$ 1,820** | **$ 209,963** | **$ 385,889** | **$ (180,731)** | **$ 205,158** |
| **Total Liabilities, Convertible Preferred Stock and Stockholders' Equity** | **$ 226,648** | **$ 66,441** | **$ 293,089** | **$ 305,000** | **$ 598,088** | **$ (180,731)** | **$ 417,357** |

68

Table of Contents

**UNAUDITED PRO FORMA CONDENSED COMBINED STATEMENT OF OPERATIONS
FOR THE PERIOD ENDED DECEMBER 31, 2020**

(in thousands, except share and per share data)

| | DCRB (Historical, As Restated) (US GAAP) | Hyzon (Historical) (US GAAP) | Combined | Pro Forma Adjustments (Assuming No Redemptions) | Pro Forma Combined (Assuming No Redemptions) | Additional Pro Forma Adjustments (Assuming Maximum Redemptions) | Pro Forma Combined (Assuming Maximum Redemptions) |
|---|---|---|---|---|---|---|---|
| | For the Period Ended December 31, 2020 | | | | For the Period Ended 31-Dec-20 | | For the Period Ended 31-Dec-20 |
| Revenue | $ — | $ — | $ — | $ — | $ — | $ — | $ — |
| Cost of sales | — | — | — | — | — | — | — |
| **Gross Margin** | — | — | — | — | — | — | — |
| Operating costs | — | — | — | — | — | — | — |
| Research and development | — | 1,446 | 1,446 | 212 **(EE)** | 1,658 | — | 1,658 |
| Selling, general, and administrative | 5,480 | 12,785 | 18,265 | 7,864 **(CC)** (24) **(DD)** 17,265 **(EE)** | 43,371 | — | 43,371 — |
| **Total operating expenses** | **5,480** | **14,231** | **19,711** | **25,318** | **45,029** | **—** | **45,029** |
| **Loss from operations** | **(5,480)** | **(14,231)** | **(19,711)** | **(25,318)** | **(45,029)** | **—** | **(45,029)** |
| Expensed offering costs | (655) | | (655) | | (655) | | (655) |
| Interest (expense) | — | (37) | (37) | (559) **(GG)** | (596) | — | (596) |
| Loss on consolidation of variable interst entity | — | (100) | (100) | | (100) | — | (100) |
| Foreign currency loss, net | | (8) | (8) | | (8) | | (8) |
| Interest Income | 3 | — | 3 | (3) **(BB)** | — | — | — |
| Change in fair value of warrant liabilities | (15,491) | | (15,491) | 9,368 **(FF)** | (6,123) | | (6,123) |
| **Income (loss) before income taxes** | **(21,623)** | **(14,376)** | **(35,999)** | **(16,512)** | **(52,511)** | **—** | **(52,511)** |
| Provision for income taxes | — | — | — | — **(AA)** | — | — | — |
| **Net Income (loss)** | **$ (21,623)** | **$ (14,376)** | **$ (35,999)** | **$ (16,512)** | **$ (52,511)** | **$ —** | **$ (52,511)** |
| Net Income (loss) attributable to noncontrolling interest | | $ (105) | $ (105) | $ — | $ (105) | $ — | $ (105) |
| **Net Income (loss) attributable to Hyzon Motors, Inc** | | **$ (14,271)** | **$ (35,894)** | **$ (16,512)** | **$ (52,406)** | **$ —** | **$ (52,406)** |
| Basic and diluted net loss per common share | $ (4.22) | $ (0.17) | | | $ (0.21) | | $ (0.23) |
| Weighted average shares outstanding, basic and diluted | 5,123,002 | 86,145,594 | | | 249,152,191 | | 231,079,635 |

69

[Table of Contents](#)

**UNAUDITED PRO FORMA CONDENSED COMBINED STATEMENT OF OPERATIONS**
**FOR THE THREE MONTHS ENDED MARCH 31, 2021**
**(in thousands, except share and per share data)**

| | DCRB (Historical) (US GAAP) | Hyzon (Historical) (US GAAP) | Combined | Pro Forma Adjustments (Assuming No Redemptions) | Pro Forma Combined (Assuming No Redemptions) | Pro Forma Adjustments (Assuming Maximum Redemptions) | Pro Forma Combined (Assuming Maximum Redemptions) |
|---|---|---|---|---|---|---|---|
| Revenue | $ — | $ — | $ — | $ — | $ — | $ — | $ — |
| Cost of sales | — | — | — | — | — | — | — |
| **Gross Margin** | — | — | — | — | — | — | — |
| Operating costs | | | | | | — | — |
| Research and development | | 627 | 627 | 3 **(EE)** | 630 | — | 630 |
| Selling, general, and administrative | 776 | 3,146 | 3,922 | (30)**(DD)** 217**(EE)** | 4,109 | — | 4,109 |
| **Total operating expenses** | **776** | **3,773** | **4,549** | **189** | **4,739** | **—** | **4,739** |
| **Loss from operations** | **(776)** | **(3,773)** | **(4,549)** | **(189)** | **(4,739)** | **—** | **(4,739)** |
| Interest (expense) | — | (4,590) | (4,590) | | (4,590) | — | (4,590) |
| Loss on consolidation of variable interest entity | — | | — | | — | — | — |
| Foreign currency loss, net | | (28) | (28) | | (28) | — | (28) |
| Change in fair value of warrant liabilities | (339) | | (339) | 339**(FF)** | 0 | — | 0 |
| Interest Income | 3 | 2 | 5 | (5)**(BB)** | — | — | — |
| **Income (loss) before income taxes** | **(1,111)** | **(8,389)** | **(9,500)** | **144** | **(9,356)** | **—** | **(9,356)** |
| Provision for income taxes | — | — | — | — **(AA)** | — | — | — |
| **Net Income (loss)** | **$ (1,111)** | **$ (8,389)** | **$ (9,500)** | **$ 144** | **$ (9,356)** | **$ —** | **$ (9,356)** |
| Net Income (loss) attributable to noncontrolling interest | | $ (242) | $ (242) | $ — | $ (242) | $ — | $ (242) |
| **Net Income (loss) attributable to Hyzon Motors, Inc** | | **$ (8,147)** | **$ (9,258)** | **$ 144** | **$ (9,114)** | **$ —** | **$ (9,114)** |
| Basic and diluted net loss per common share | $ (0.20) | $ (0.09) | | | $ (0.04) | | $ (0.04) |
| Weighted average shares outstanding, basic and diluted | 5,643,125 | 93,793,115 | | | 249,152,191 | | 231,079,635 |

70

Table of Contents

**NOTES TO UNAUDITED PRO FORMA CONDENSED COMBINED FINANCIAL INFORMATION**

**1.  Basis of Presentation**

Under both the no redemption and the maximum redemption scenarios, the business combination will be accounted for as a reverse recapitalization, with no goodwill or other intangible assets recorded, in accordance with GAAP. Under this method of accounting, DCRB will be treated as the "acquired" company for financial reporting purposes. Accordingly, for accounting purposes, the business combination will be treated as the equivalent of Hyzon issuing stock for the net assets of DCRB, accompanied by a recapitalization. The net assets of DCRB will be stated at historical cost, with no goodwill or other intangible assets recorded.

The unaudited pro forma condensed combined balance sheet as of March 31, 2021 assumes that the Transactions occurred on March 31, 2021. The unaudited pro forma condensed combined statement of operations for the three months ended March 31, 2021 and the period from January 21, 2020 (inception) through December 31, 2020 present pro forma effect to the Transactions as if they had been completed on January 21, 2020.

The unaudited pro forma condensed combined balance sheet as of March 31, 2021 has been prepared using, and should be read in conjunction with, the following:

- DCRB's unaudited condensed consolidated balance sheet as of March 31, 2021 and the related notes included elsewhere in this proxy statement; and

- Hyzon's unaudited condensed consolidated balance sheet as of March 31, 2021 and the related notes included elsewhere in this proxy statement.

The unaudited pro forma condensed combined statement of operations for the three months ended March 31, 2021 has been prepared using, and should be read in conjunction with, the following:

- DCRB's unaudited condensed consolidated statement of operations for the three months ended March 31, 2021 and the related notes included elsewhere in this proxy statement; and

- Hyzon's unaudited condensed consolidated statement of operations for the three months ended March 31, 2021 and the related notes included elsewhere in this proxy statement.

The unaudited pro forma condensed combined statement of operations for the period from January 21, 2020 (inception) through December 31, 2020 has been prepared using, and should be read in conjunction with, the following:

- DCRB's audited consolidated statement of operations for the period ended December 31, 2020, as restated, and the related notes included elsewhere in this proxy statement; and

- Hyzon's audited consolidated statement of operations for the period from January 21, 2020 (inception) through December 31, 2020 and the related notes included elsewhere in this proxy statement.

Management has made significant estimates and assumptions in its determination of the unaudited pro forma adjustments. As the unaudited pro forma condensed combined financial information has been prepared based on these preliminary estimates, the final amounts recorded may differ materially from the information presented.

The unaudited pro forma condensed combined financial information does not give effect to any anticipated synergies, operating efficiencies, tax savings, or cost savings that may be associated with the business combination.

The unaudited pro forma adjustments reflecting the consummation of the Transactions are based on certain currently available information and certain assumptions and methodologies that DCRB believes are reasonable

71

Table of Contents

shares of our Class A Common Stock from 250,000,000 shares to 400,000,000 shares, (b) increase the number of authorized shares of our Preferred Stock from 1,000,000 shares to 10,000,000 shares, (c) eliminate certain provisions in the Charter relating to an Initial Business Combination that will no longer be applicable to us following the Closing, (d) change the post-combination company's name to "Hyzon Motors Inc." and (e) make certain other changes that the DCRB Board deems appropriate for a public operating company, including amendments to the exclusive forum provisions.

**PIPE Financing**

In connection with the execution of the Business Combination Agreement, on February 8, 2021, we entered into separate Subscription Agreements with a number of Subscribers, pursuant to which the Subscribers agreed to purchase, and we agreed to sell to the Subscribers, an aggregate of 35,500,000 PIPE Shares for a purchase price of $10.00 per share and an aggregate purchase price of $355,000,000, in a private placement. The PIPE Shares do not include the Conversion Shares that will convert from the Hyzon Convertible Notes, pursuant to their terms, at a price of $9.00 per share (based on 90% of the price per PIPE Share) in connection with the PIPE Financing.

The closing of the sale of the PIPE Shares pursuant to the Subscription Agreements is contingent upon, among other customary closing conditions, the concurrent consummation of the business combination. The purpose of the PIPE Financing is to raise additional capital for use by the combined company following the Closing.

Pursuant to the Subscription Agreements, we agreed that, within 15 calendar days after the consummation of the business combination, we will file the PIPE Resale Registration Statement with the SEC (at our sole cost and expense), and we will use our reasonable efforts to have the PIPE Resale Registration Statement declared effective as soon as practicable after the filing thereof.

**Ardour Subscription Agreement**

In connection with the execution of the Business Combination Agreement, on February 8, 2021, we entered into the Ardour Subscription Agreement with ACP Mgmt Corp., Ardour and Hyzon, pursuant to which ACP Mgmt Corp. agreed, in full satisfaction of Ardour Capital Investment LLC's right to receive a warrant to purchase shares of Hyzon Common Stock for its services as a financial advisor to Hyzon, to purchase, and we agreed to sell to ACP Mgmt Corp., such number of warrants exercisable for one share of DCRB Class A Common Stock at an exercise price of $2.20, subject to the terms of the Ardour Warrant Agreement, to be entered into by and between us and Continental Stock Transfer & Trust Company in connection with Closing, equal to (x) 184,000 multiplied by (y) the Exchange Ratio. Such warrants will be governed by and exercisable subject to the terms and conditions of the Ardour Warrant Agreement.

## Background of the Business Combination

DCRB is a Delaware corporation formed on September 7, 2017 for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses. Our business strategy is to identify, acquire and, after the initial business combination, build a company whose principal effort is developing and advancing a platform that decarbonizes the most carbon-intensive sectors, including the energy and agriculture, industrials, transportation and commercial and residential sectors. DCRB's goal is to build a focused business with multiple competitive advantages that have the potential to improve the target business's overall value proposition. The ultimate goal of this business strategy is to maximize stockholder value. The proposed business combination was the result of an extensive search for a potential transaction utilizing the vast network and industry experience of DCRB's management team, our Sponsor and its affiliates. The terms of the business combination were the result of extensive negotiations between representatives of DCRB and Hyzon management. The following is a brief description of the background of these negotiations, the business combination and related transactions.

94

Table of Contents

On October 22, 2020, DCRB completed its IPO of 20,000,000 public units, with each unit consisting of one share of Class A Common Stock and one-half of one public warrant, raising gross proceeds of approximately $200.0 million. Simultaneously with the closing of the IPO, DCRB completed the private sale of 6,000,000 private placement warrants to our Sponsor, our independent directors and WRG, generating gross proceeds of approximately $6.0 million.

In connection with the IPO, the underwriters were granted an option to purchase up to an additional 3,000,000 units. On November 9, 2020, the underwriters partially exercised this over-allotment option and, on November 12, 2020, the underwriters purchased 2,572,502 over-allotment units (the "Over-allotment Units"), generating gross proceeds of $25,725,020. Simultaneously with the closing of the sale of the Over-allotment Units, DCRB completed the private sale of an additional 514,500 private placement warrants to our Sponsor, our independent directors and WRG, generating gross proceeds of approximately $514,500.

Following the closing of the IPO, DCRB representatives commenced a robust search for businesses or assets to acquire for the purpose of consummating DCRB's initial business combination. Between October 23, 2020 and February 9, 2021, we reviewed potential acquisition alternatives, explored options with the underwriters from the IPO, and contacted or were contacted by 20 individuals and entities with respect to more than 20 business combination opportunities. As part of this process, DCRB representatives considered over fifteen potential acquisition targets in a wide variety of industry sectors, including targets that were engaged in businesses involving energy sustainability or utilizing technologies that would make a positive impact on the environment. DCRB entered into 22 non-disclosure or confidentiality agreements with potential business combination targets; however, none of the confidentiality agreements included a standstill agreement that would prevent DCRB from making an offer for the counterparty, or would prevent any party from making an offer for DCRB. In several cases, DCRB presented term sheets or illustrative transaction structures (or similar documentation) describing the structure or principal terms of a potential business combination.

As part of its acquisition strategy, DCRB did not focus its efforts pursuing potential transactions in competitive or auction situations, but instead focused on bilateral discussions with the key decision makers of the potential targets regarding a potential transaction.

Between October 13, 2020 and November 30, 2020, Hyzon executed non-disclosure agreements with ten other special purpose acquisition companies ("SPACs") interested in exploring a potential business combination with Hyzon, which strategic alternative Hyzon management had first discussed the possibility of pursuing in summer 2020. Following execution of such non-disclosure agreements, those SPACs were provided with Hyzon's management presentation. Four SPACs were also given access to the electronic data room containing information about Hyzon's business.

On October 30, 2020, Robert Tichio and Erik Anderson participated in a video conference with representatives of Goldman Sachs & Co. LLC ("Goldman Sachs"), regarding a possible transaction between DCRB and Hyzon. Hyzon had engaged Goldman Sachs as its financial advisor on or about August 18, 2020 in connection with exploring alternatives for raising capital.

On November 2, 2020, DCRB and Hyzon executed a non-disclosure agreement that did not contain a standstill provision to facilitate more in-depth discussions between the parties regarding a possible business combination. Also on November 2, 2020, Hyzon granted DCRB access to its electronic data room containing information relating to Hyzon for DCRB's due diligence review.

Also on November 2, 2020, DCRB contacted and retained Vinson & Elkins L.L.P. ("Vinson & Elkins") to advise DCRB on a possible business combination with Hyzon. Vinson & Elkins assisted DCRB in drafting a non-binding letter of intent and binding exclusivity agreement.

On November 4, 2020, DCRB received and reviewed Hyzon's management presentation, including an overview of Hyzon's business and financial model, comparison against peer companies and information

95

Table of Contents

regarding Hyzon's potential customers, existing and planned facility developments, products and technologies. That same day, Robert Tichio and Erik Anderson had a call with Craig Knight, the Chief Executive Officer of Hyzon and George Gu, the Executive Chairman of Hyzon, expressing their interest in advancing diligence to assess Hyzon and its prospects. Members of Hyzon management provided an overview of Hyzon's business and current operations, and responded to initial due diligence questions raised by DCRB management, including with respect to technology, business development, organizational structure and capital spending plans.

On November 5, 2020, DCRB received and reviewed Hyzon's management presentation, including an overview of Hyzon's business and financial model, comparison against peer companies and information regarding Hyzon's contracted customer orders, domestic and international facilities, products and technologies and current operations.

On November 13, 2020, Mr. Tichio participated in a call with representatives of Goldman Sachs regarding DCRB's key areas of focus for business and legal due diligence of Hyzon. Over the next few days, Goldman Sachs provided DCRB with responses to certain diligence questions raised by Mr. Tichio.

On November 25, 2020, representatives of Goldman Sachs called Mr. Tichio to discuss DCRB's interest in pursuing a potential business combination with Hyzon. Mr. Tichio advised that DCRB continued to be interested in the possibility of a business combination with Hyzon.

On November 30, 2020, Hyzon engaged Goldman Sachs as its financial advisor in connection with the possible sale of all or a portion of Hyzon. That same week, Hyzon also discontinued discussions with the other SPACs.

On December 5, 2020, DCRB shared a draft of the non-binding letter of intent and binding exclusivity agreement with Hyzon. The draft non-binding letter of intent provided for a total enterprise value of Hyzon of $1.983 billion, with equity consideration in the form of Class A Common Stock and a $350 million PIPE Financing. The binding exclusivity agreement provided for the termination of any existing discussions by Hyzon with respect to any potential transactions similar to the proposed business combination and to exclusive negotiations with DCRB until January 29, 2021.

On December 7, 2020, Goldman Sachs delivered comments on the draft non-binding letter of intent and binding exclusivity agreement on behalf of Hyzon. The comments to the draft non-binding letter of intent provided for a total enterprise value of Hyzon of $2.0 billion; added an earnout for the Hyzon stockholders of up to 18 million additional shares of Class A Common Stock if the trading price of the Class A Common Stock exceeded certain thresholds ($18 and $20 per share) during the five year-period after Closing; and provided that the Sponsor would agree to subject the private placement warrants to an earnout arrangement whereby 75% of the private placement warrants would be subject to a lock-up arrangement, 12.5% of the private placement warrants would be subject to forfeiture and not exercisable until the Class A Common Stock exceeded $12 for a period of time after the Closing and 12.5% of the private placement warrants would be subject to forfeiture and not exercisable until the Class A Common Stock exceeded $14 for a period of time after the Closing. Hyzon's draft non-binding letter of intent also provided that the fees payable in respect of the transaction would be capped at an amount to be determined, with deviations from such budget by either party resulting in appropriate adjustments to the purchase price, and that the definitive transaction documentation would include customary closing conditions, including a minimum cash condition. Hyzon's proposed revisions also provided that DCRB would not enter into a letter of intent with any other party with respect to any potential transaction similar to the proposed business combination until January 29, 2021, the expiration date of the exclusivity period, and that Hyzon would be permitted to conduct a private placement during the exclusivity period.

On December 7, 2020, Vinson & Elkins delivered revised drafts of the non-binding letter of intent and binding exclusivity agreement to Sullivan & Cromwell LLP ("Sullivan & Cromwell"), outside legal counsel to Hyzon, on behalf of DCRB that accepted Hyzon's comments with certain clarifying changes. Throughout the

96

Table of Contents

day, Vinson & Elkins and Sullivan & Cromwell negotiated the binding exclusivity agreement, including adding a requirement that Hyzon notify DCRB within 48 hours if it or any of its affiliates entered into a letter of intent with respect to a private placement that is not in furtherance of the business combination with DCRB and that DCRB would thereafter be permitted to terminate the exclusivity agreement in its sole discretion. Later in the day on December 7, 2020, DCRB and Hyzon executed the binding exclusivity agreement.

From December 7, 2020 to February 8, 2021, DCRB's representatives and advisors performed extensive due diligence investigation of the materials included in the electronic data room, including a review of Hyzon's material contracts and facilities, and intellectual property, financial, tax, legal insurance and accounting due diligence.

On December 8, 2020, representatives of DCRB, Hyzon, Goldman Sachs, Vinson & Elkins and Sullivan & Cromwell participated in a kick-off meeting to discuss timing and process of a business combination and the PIPE Financing.

On December 9, 2020, representatives of Vinson & Elkins and Sullivan & Cromwell participated in a conference call to discuss initial drafts of transaction documents, certain deal points and diligence matters.

During the week of December 14, 2020, DCRB engaged a number of third-party advisors, in addition to Vinson & Elkins, to assist with various aspects of commercial, financial and legal diligence, including an advisor to assist in the evaluation of the overall electrified vehicle market and the addressable market of Hyzon's vehicles more specifically, and an advisor to assist in the quality of the fuel cell technology that would be commercialized by Hyzon in the transportation market.

On December 17, 2020, Vinson & Elkins delivered a draft term sheet regarding proposed intellectual property arrangements as between Hyzon and JS Horizon and its affiliates, as well as an issues list concerning the then-existing intellectual property arrangements as between Hyzon and JS Horizon. The draft term sheet proposed that JS Horizon and its affiliates would assign to Hyzon all of their right, title and interest in all intellectual property that JS Horizon and its affiliates owned as of the date of transfer, subject to a license granted by Hyzon back to JS Horizon to use such assigned intellectual property rights within Asia, Africa and South America in use cases other than mobility products.

On December 21, 2020, Sullivan & Cromwell delivered comments on the intellectual property term sheet to Vinson & Elkins. The comments clarified that, as of such time, Hyzon already exclusively owned, and would continue to exclusively own, certain patent applications relating to vehicles and fuel cell technologies. The comments also counter-proposed a new agreement whereby other existing intellectual property developed by JS Horizon would be owned jointly by Hyzon and JS Horizon, subject to exclusive licenses and covenants perpetually restricting each party's exploitation of such jointly-owned intellectual property within exclusive fields of use for the jointly-owned IP rights based on industry (mobility products vs. non-mobility products) as well as geography (Asia, South America and Africa vs. rest of world).

On December 22, 2020, Vinson & Elkins delivered a draft letter of intent for the business combination based on the terms included in the draft non-binding letter of intent delivered by DCRB on December 7, 2020. Vinson & Elkins and Sullivan & Cromwell continued to exchange drafts of the letter of intent and to negotiate key terms, including a cap on fees payable in respect of the business combination, certain governance matters in respect of the combined company and a lock-up agreement for certain Hyzon shareholders.

On December 23, 2020, Vinson & Elkins delivered a revised draft of the intellectual property term sheet to Sullivan & Cromwell. The revised draft clarified the exclusive fields as well as the treatment of improvements to jointly-owned intellectual property.

On December 24, 2020, Vinson & Elkins delivered initial drafts of the Business Combination Agreement, amended and restated registration rights agreement and form of subscription agreement to Sullivan & Cromwell.

97

Table of Contents

On January 3, 2021, Sullivan & Cromwell delivered an initial draft of the intellectual property agreement between Hyzon and JS Horizon to Vinson & Elkins. During the week of January 4, DCRB, Hyzon, JS Horizon, Vinson & Elkins and Sullivan & Cromwell exchanged drafts of the intellectual property agreement and participated in conference calls regarding the same to resolve various issues, focusing principally on the scope of the parties' exclusive fields and restrictions on use (including with respect to improvements to existing intellectual property). On January 12, 2021, Hyzon and JS Horizon executed the intellectual property agreement.

During the week of January 4, 2021, DCRB engaged Citigroup Global Markets Inc. ("Citi") as its financial advisor and Credit Suisse Securities (USA) LLC ("Credit Suisse") as its financial advisor and equity capital markets advisor, respectively, in connection with the business combination to assist the DCRB Board with advice on the transaction structure, negotiation strategy, valuation analyses, financial terms and other financial matters. In determining to engage Citi and Credit Suisse, DCRB considered Citi and Credit Suisse's knowledge and experience with respect to similar transactions, special purpose acquisition companies in general and the fact that Citi and Credit Suisse had previously acted as underwriters of DCRB's IPO.

Due to the progression of the discussions with Hyzon from October 30, 2020, to January 5, 2021, as well as the DCRB Board's conclusion that a transaction with Hyzon would present the most attractive opportunity for DCRB, the DCRB Board ultimately determined at a meeting of the DCRB Board held on January 7, 2021, that the business combination with Hyzon was the most attractive potential transaction for DCRB. The decision to ultimately pursue the business combination with Hyzon over the other potential targets was generally the result of, but not limited to, one or more of the following factors:

- the other potential acquisitions did not fully meet the investment criteria of DCRB, which included, among other things, candidates that are at an inflection point, exhibit a need for capital to achieve the company's growth strategy and would benefit from DCRB management's transactional, financial, managerial and investment experience;

- the determination of DCRB's management and our Sponsor that Hyzon was of superior quality to the other potential acquisitions after taking into consideration the following:

  - Hyzon's value to investors being a differentiated, pure-play, independent hydrogen mobility company with an exclusive focus on hydrogen in the commercial vehicle market;

  - Hyzon's non-binding memoranda of understanding, letters of intent and limited number of firm orders with various clients, including blue-chip Fortune 100 companies as well as Hyzon's rapidly growing visibility and potential near-term customers in Europe, Asia and Australia; and

  - Hyzon's expected capability to produce its own fuel cells once production and manufacturing facilities are established, with a proven fuel cell technology that has superior competitive performance compared to electric alternatives and a management team with valuable fuel cell and automotive sector experience; and

- a difference in valuation expectations between DCRB and the senior executives or stockholders of the other potential targets.

On January 8, 2021, DCRB and Hyzon executed the letter of intent for the business combination.

On January 8, 2021, Sullivan & Cromwell delivered a revised draft of the Business Combination Agreement to Vinson & Elkins. Throughout the following four weeks, Vinson & Elkins and Sullivan & Cromwell exchanged several drafts of the Business Combination Agreement to resolve issues raised by DCRB and Hyzon, which focused principally on certain representations, warranties and covenants by Hyzon related to intellectual property, environmental and employment matters, including a revised draft that was delivered by Vinson & Elkins to Sullivan & Cromwell on January 15, 2021, and further revised draft delivered by Sullivan & Cromwell to Vinson & Elkins on January 25, 2021.

98

Table of Contents

During the week of January 10, 2021, DCRB also engaged Goldman Sachs and Morgan Stanley & Co. LLC ("Morgan Stanley") to serve as placement agents for the PIPE Financing. Goldman Sachs did not provide any advice to DCRB, including, but not limited to, regarding the valuation of Hyzon or the terms of the business combination. In addition, DCRB and Hyzon each signed a consent letter with Goldman Sachs acknowledging Goldman Sachs' roles as financial advisor to Hyzon in connection with the business combination and as co-placement agent to DCRB in connection with the PIPE Financing and waiving any potential conflicts in connection with such dual roles.

Between December 20, 2020 and January 11, 2021, Hyzon and Korea Zinc negotiated the Hyzon Convertible Notes, pursuant to which the holders of the Hyzon Convertible Notes will receive up to 5,000,000 shares of Class A Common Stock at $9 per share upon the closing of the business combination.

Representatives of DCRB and Hyzon and their advisors prepared an investor presentation, relating to Hyzon and its business, which included certain management projections for Hyzon, as well as a pro forma capitalization table of the post-combination company as of the Closing. The investor presentation was made available on January 14, 2021 to investors interested in participating in the PIPE Financing.

Beginning on January 15, 2021 and over the next four weeks, Goldman Sachs and Morgan Stanley facilitated telephonic and video conferences with a number of prospective investors in the PIPE Financing. A number of the prospective investors participated in discussions with DCRB and Hyzon representatives and were provided the investor presentation as well as access to an electronic data room containing supporting information. A draft of a subscription agreement prepared by Vinson & Elkins was shared with prospective investors and representatives of Vinson & Elkins and Sullivan & Cromwell addressed and negotiated comments to the subscription agreement from the various interested investors.

On January 19, 2021, Vinson & Elkins delivered initial drafts of the lock-up agreement and founder warrant agreement, and over the next three weeks Vinson & Elkins and Sullivan & Cromwell exchanged drafts of these documents and the other exhibits and ancillary documents to the Business Combination Agreement.

During the week of January 25, 2021, DCRB engaged Alvarium MB (UK) Limited ("Alvarium") as an equity capital markets advisor in connection with the PIPE Financing to assist DCRB with developing materials for distribution to potential investors and coordinating marketing and distribution of the PIPE Shares to investors. In determining to engage Alvarium, DCRB considered Alvarium's knowledge and experience with respect to similar transactions and special purpose acquisition companies and private investment in public equity fundraising in connection thereof in general.

On January 29, 2021, the binding exclusivity agreement between DCRB and Hyzon terminated pursuant to its terms.

On February 2, 2021, Goldman Sachs delivered a proposal on behalf of Hyzon regarding an additional earnout for the Hyzon stockholders and DCRB stockholders. As part of the negotiation of this proposal, DCRB indicated to representatives of Goldman Sachs that DCRB would receive a loan from the Sponsor prior to Closing to fund certain working capital and transaction expenses of DCRB, $1.5 million of which would be repaid to the Sponsor in additional private placement warrants.

Following the January 29, 2021 expiration of the binding exclusivity agreement between DCRB and Hyzon, and in light of the ongoing negotiations over Hyzon's proposal regarding an additional earnout, DCRB continued discussions with other potential business combination targets, and on February 4, 2021, DCRB delivered a non-binding letter of intent to explore negotiations with another potential business combination target. Due to the benefits expected to be provided by the Hyzon business combination, the advanced stage of negotiations with Hyzon, and the other reasons discussed below, the DCRB Board ultimately reaffirmed its decision to pursue the business combination with Hyzon over the other potential targets.

99

Table of Contents

Over that week, representatives of Vinson & Elkins and Sullivan & Cromwell, DCRB and Hyzon negotiated outstanding issues in the Business Combination Agreement, and agreed (i) to revisions to the representations made by Hyzon relating to environmental and intellectual property disclosures, including a representation with respect to Hyzon's good faith projections for its commercialization timeline, (ii) not to include consummation of the PIPE Financing as a condition to the Closing, (iii) that generally actions in the ordinary course of business as part of Hyzon's prosecution and maintenance of its intellectual property portfolio between the period between signing and closing would not require DCRB consent, (iv) that Hyzon would be required to deliver audited financial statements of Hyzon within 30 days of the date of the Business Combination Agreement, (v) that Hyzon RSUs would be treated similarly to Hyzon Options in the merger and (vi) Hyzon's stockholders would receive an additional 5.25 million shares of Class A Common Stock if the price of the Class A Common Stock exceeds $35 for a period of time during the five years after Closing, and in no event would the shares be delivered prior to the one-year anniversary of Closing.

On February 8, 2021, Vinson & Elkins and Sullivan & Cromwell finalized the draft of the Business Combination Agreement.

That same day, the DCRB Board held a special meeting by video conference. Also in attendance were members of DCRB management, and representatives of the Sponsor, Vinson & Elkins and other advisors. During this meeting, an advisor engaged to evaluate the overall electrified vehicle market and the addressable market of Hyzon's vehicles provided to the DCRB Board an overview of its due diligence process and their analysis of Hyzon. Vinson & Elkins provided to the DCRB Board a review of fiduciary duties under Delaware law in the context of consideration of the proposed business combination transaction. Vinson & Elkins also reviewed with the DCRB Board the scope of the due diligence review and the terms of the business combination, including the Business Combination Agreement, the form of subscription agreements and the other definitive agreements, copies of all of which were provided to the DCRB Board in advance of the meeting. After considerable review of the information presented to the DCRB Board, the DCRB Board unanimously approved the Business Combination Agreement and the other transaction documents related thereto and the PIPE Financing by written consent.

Also on February 8, 2021, the Hyzon board of directors unanimously approved the Business Combination Agreement and the transactions contemplated thereby.

Later that evening, the parties executed the Business Combination Agreement, and the investors subscribing to purchase PIPE Shares in connection with the PIPE Financing executed the subscription agreements. Under the PIPE Financing, certain investors agreed to purchase, at the Closing, $355 million of Class A Common Stock at $10.00 per share and Korea Zinc Co., Ltd. and Sewon Co., Ltd. agreed to convert $45 million aggregate principal amount of Hyzon Convertible Notes at $9.00 per share.

Before the market opened on February 9, 2021, DCRB and Hyzon announced the business combination together with the execution of the Business Combination Agreement along with the subscription agreements.

### DCRB Board's Consideration of and Reasons for Approving the Business Combination

The DCRB Board considered a wide variety of factors in connection with its evaluation of the business combination. In light of the complexity of those factors, the DCRB Board, as a whole, did not consider it practicable to, nor did it attempt to, quantify or otherwise assign relative weights to the specific factors it took into account in reaching its decision. The DCRB Board viewed its decision as being based on all of the information available and the factors presented to and considered by it. In addition, individual members of the DCRB Board may have given different weight to different factors. This explanation of the reasons for the DCRB Board's approval of the business combination, and all other information presented in this section, is forward-looking in nature and, therefore, should be read in light of the factors discussed in the section entitled "Cautionary Note Regarding Forward-Looking Statements."

100

**Table of Contents**

Before reaching its decision, the DCRB Board reviewed the results of the due diligence conducted by DCRB's management and DCRB's advisors, which included:

- meetings and calls with Hyzon management and advisors regarding business model, operations and forecasts;

- research on comparable public companies, including Fuel Cell Energy, Power Cell, Plug Power, Ballard, ITM Power, Nel, Nikola, Luminar, Innoviz, Velodyne, Romeo Power Technology and Tesla;

- research on comparable transactions;

- study of analyst reports and market trends in the electric vehicle and hydrogen fuel cell industries;

- review of material contracts;

- review of intellectual property matters;

- review of commercial, financial, tax, legal and accounting due diligence;

- consultation with Hyzon's management and DCRB's legal and financial advisors and industry experts, including its advisor that assisted in evaluating the overall electrified vehicle market and of the addressable market for Hyzon's vehicles, and its advisor that assisted in evaluating the quality of Hyzon's fuel cell technology;

- financial and valuation analysis of Hyzon and the business combination;

- financial projections prepared by Hyzon's management team; and

- the financial statements of Hyzon.

In approving the business combination, the DCRB Board determined not to obtain a fairness opinion. The officers and directors of DCRB have substantial experience in evaluating the operating and financial merits of companies from a wide range of industries and concluded that their experience and background enabled them to make the necessary analyses and determinations regarding the business combination.

The factors considered by the DCRB Board include, but were not limited to, the following:

- *Competitive and Innovative Design*. The DCRB Board considered Hyzon's innovative and competitive hydrogen fuel cell design and the potential applications of Hyzon's hydrogen fuel cells across multiple industries.

- *Value to Equity Investors*. The DCRB Board considered Hyzon's value to investors, determining that Hyzon is the only pure-play, independent hydrogen mobility company targeting the commercial vehicle and heavy duty transportation segments.

- *Revenue Potential.* The DCRB Board considered Hyzon's non-binding memoranda of understanding, letters of intent and a limited number of orders with various clients, including blue-chip Fortune 100 companies as well as Hyzon's rapidly growing visibility. While Hyzon's revenues are currently rooted in sales to customers with existing and secured hydrogen production or supply, hydrogen infrastructure investments could prove opportunistic, with recurring revenue potential.

- *Global Scale*. The DCRB Board considered Hyzon's existing global footprint, with approximately 150,000 square feet of facilities in New York and the Netherlands as well as Hyzon's near-term backlog to customers in Europe, Asia and Australia.

- *Development Capability*. The DCRB Board considered Hyzon's capability to produce its own fuel cells once production and manufacturing facilities are established, with a proven fuel cell technology that has superior competitive performance as compared to electric alternatives and a management team with valuable fuel cell and automotive sector experience.

101

Table of Contents

- *Due Diligence*. The results of DCRB's due diligence investigation of Hyzon conducted by DCRB's management team and its financial and legal advisors.

- *Terms of the Business Combination Agreement*. The DCRB Board reviewed the financial and other terms of the Business Combination Agreement and determined that they were the product of arm's-length negotiations among the parties.

- *Independent Director Role*. The DCRB Board is comprised of a majority of independent directors who are not affiliated with our Sponsor and its affiliates. DCRB's independent directors took an active role in guiding DCRB management as DCRB evaluated and negotiated the proposed terms of the business combination. Following an active and detailed evaluation, the DCRB Board's independent directors unanimously approved, as members of the DCRB Board, the Business Combination Agreement and the business combination.

- *Stockholder Approval*. The DCRB Board considered the fact that, in connection with the business combination, DCRB stockholders have the option to (i) remain stockholders of the combined company, (ii) sell their shares on the open market or (iii) redeem their shares for the per share amount held in the Trust Account pursuant to the terms of our Charter.

- *Other Alternatives*. The DCRB Board believes, after a thorough review of other business combination opportunities reasonably available to DCRB, that the business combination represents the best potential business combination for DCRB and the most attractive opportunity for DCRB based upon the process utilized to evaluate and assess other potential business combination targets. The DCRB Board believes that such process has not presented a better alternative.

In addition, the DCRB Board determined that the business combination satisfies the investment criteria that the DCRB Board identified in connection with the IPO. For more information, see the section entitled "Proposal No. 1—The Business Combination Proposal—Background of the Business Combination."

In the course of its deliberations, the DCRB Board also considered a variety of uncertainties, risks and other potentially negative factors relevant to the business combination, including the following:

- *Developmental Stage Company Risk.* The risk that Hyzon is an early-stage company, with limited operating history. As Hyzon scales from limited production of units deployed for technology validation to production for operational fleet validation to, ultimately, volume production and sales to support full fleet conversions, it is difficult, if not impossible, to forecast Hyzon's future results, and Hyzon has limited insight into trends that may emerge and affect Hyzon's business.

- *Business Plan Risk*. The risk that Hyzon may be unable to execute on its business model, which would have a material adverse effect on Hyzon's operating results and business, would harm Hyzon's reputation and could result in substantial liabilities that exceed its resources.

- *Customer Risk.* The risk that Hyzon may not be able to convert non-binding orders, letters of intent or memoranda of understanding into orders or sales.

- *Financing Risk.* The risk that Hyzon may be unable to achieve sufficient sales or otherwise raise the necessary capital to implement its business plan and strategy. If Hyzon needs to raise additional funds, the risk that these funds may not be available on terms favorable to Hyzon or Hyzon's stockholders, or at all when needed.

- *Competitive Risk*. The risk that Hyzon faces significant competition and that its competitors have or may have significantly more resources.

- *Supplier Risk*. The risk that until Hyzon completes its hydrogen fuel cell production facilities, which may be delayed or not occur at all, Hyzon is and expects to be dependent on Horizon as a single source supplier of its hydrogen fuel cell systems, and the inability of Horizon to deliver such fuel cell systems for Hyzon's commercial vehicles at prices, volumes, and specifications acceptable to Hyzon could have

102

Table of Contents

a material adverse effect on Hyzon's business, prospects, financial condition and operating results. Also the risk that Hyzon could experience delays if its component supply and assembly partners do not meet agreed upon timelines or experience capacity constraints.

- *Intellectual Property Risk*. The risk that Hyzon may not have adequate intellectual property rights to carry out its business, may need to defend itself against patent, copyright, trademark, trade secret or other intellectual property infringement or misappropriation claims, and may need to enforce its intellectual property rights from unauthorized use by third parties.

- *Regulatory Risk*. The risks that are associated with Hyzon operating in the highly-regulated motor vehicle manufacturing and hydrogen industries. Failure to comply with regulations or laws could subject Hyzon to significant regulatory risk, including the risk of litigation, regulatory actions and compliance issues that could subject Hyzon to significant fines, penalties, judgments, remediation costs, negative publicity and requirements resulting in increased expenses.

- *Public Company Risk*. The risks that are associated with being a publicly traded company that is in its early, developmental stage.

- *Benefits May Not Be Achieved Risk*. The risk that the potential benefits of the business combination may not be fully achieved or may not be achieved within the expected timeframe.

- *Redemption Risk*. The risk that a significant number of DCRB stockholders elect to redeem their shares prior to the consummation of the business combination and pursuant to DCRB's existing Charter, which would potentially make the business combination more difficult to complete or reduce the amount of cash available to the combined company to execute its business plan following the Closing.

- *Stockholder Vote Risk*. The risk that DCRB's stockholders may fail to provide the votes necessary to effect the business combination.

- *Litigation Risk*. The risk of the possibility of litigation challenging the business combination or that an adverse judgment granting permanent injunctive relief could indefinitely enjoin consummation of the business combination.

- *Closing Risk*. The risk that the closing might not occur in a timely manner or that the closing might not occur at all, despite DCRB's efforts.

- *Closing Conditions Risk*. The risk that completion of the business combination is conditioned on the satisfaction of certain closing conditions that are not within DCRB's control.

- *Minority Position*. The risk that DCRB's stockholders will hold a minority position in the combined company.

- *No Third-Party Valuation Risk*. The risk that DCRB did not obtain a third-party valuation or fairness opinion in connection with the business combination.

- *Fees, Expenses and Time Risk*. The risk of incurring significant fees and expenses associated with completing the business combination and the substantial time and effort of management required to complete the business combination.

- *Other Risks*. Various other risk factors associated with Hyzon's business, as described in the section entitled "Risk Factors."

In addition to considering the factors described above, the DCRB Board also considered that the officers and directors of DCRB may have interests in the business combination as individuals that are in addition to, and that may be different from, the interests of DCRB's stockholders. DCRB's independent directors reviewed and considered these interests during the negotiation of the business combination and in evaluating and unanimously approving, as members of the DCRB Board, the Business Combination Agreement and the business combination. For more information, see the section entitled "Proposal No. 1—The Business Combination Proposal—Interests of Certain Persons in the Business Combination."

103

Table of Contents

The DCRB Board concluded that the potential benefits that it expects DCRB and its stockholders to achieve as a result of the business combination outweigh the potentially negative factors associated with the business combination. Accordingly, the DCRB Board, based on its consideration of the specific factors listed above, unanimously (a) determined that the business combination and the other transactions contemplated by the Business Combination Agreement are fair to, and in the best interests of, DCRB's stockholders, (b) approved, adopted and declared advisable the Business Combination Agreement and the transactions contemplated thereby and (c) recommended that the stockholders of DCRB approve each of the Proposals.

The above discussion of the material factors considered by the DCRB Board is not intended to be exhaustive but does set forth the principal factors considered by the DCRB Board.

## Unaudited Prospective Financial Information

Hyzon provided DCRB with its internally prepared forecasts for each of the years in the five-year period ending December 31, 2025. DCRB management reviewed the forecasts and presented key elements of the forecasts to the DCRB Board as part of the DCRB Board's review and subsequent approval of the business combination. Hyzon and DCRB do not, as a matter of general practice, publicly disclose long-term forecasts or internal projections of future performance, revenue, financial condition or other results. However, in connection with the proposed business combination, management of DCRB used the financial forecasts set forth below as part of its comprehensive analysis. The forecasts were prepared solely for internal use and not with a view toward public disclosure, the published guidelines of the SEC regarding projections or the guidelines established by the American Institute of Certified Public Accountants for preparation and presentation of prospective financial information. However, in the view of Hyzon's management, the forecasts were prepared on a reasonable basis, reflect the best currently available estimates and judgments, and present, to the best of management's knowledge and belief, the expected course of action and the expected future financial performance of Hyzon.

The forecasts include EBITDA and EBITDA Margin, which are non-GAAP financial measures. Due to the forward-looking nature of these projections, specific quantifications of the amounts that would be required to reconcile such projections to GAAP measures are not available, and DCRB's management believes that it is not feasible to provide accurate forecasted non-GAAP reconciliations. Non-GAAP financial measures should not be considered in isolation from, or as a substitute for, financial information presented in compliance with GAAP, and non-GAAP financial measures as used by DCRB's management may not be comparable to similarly titled measures used by other companies.

The inclusion of financial projections in this proxy statement should not be regarded as an indication that DCRB, Hyzon, their respective directors, officers, advisors or other representatives considered, or now considers, such financial projections necessarily to be predictive of actual future results or to support or fail to support your decision whether to vote for or against the Business Combination Proposal. The financial projections are not fact and should not be relied upon as being necessarily indicative of future results, and readers of this proxy statement, including investors or stockholders, are cautioned not to place undue reliance on this information. You are cautioned not to rely on the projections in making a decision regarding the business combination, as the projections may be materially different than actual results. We will not refer back to the financial projections in our future periodic reports filed under the Exchange Act.

The financial projections reflect numerous estimates and assumptions with respect to general business, economic, regulatory, market and financial conditions and other future events, as well as matters specific to Hyzon's business, all of which are difficult to predict and many of which are beyond Hyzon's and DCRB's control. The financial projections are forward-looking statements that are inherently subject to significant uncertainties and contingencies, many of which are beyond Hyzon's and DCRB's control. The various risks and uncertainties include those set forth in the sections entitled "Risk Factors," "Management's Discussion and Analysis of Financial Condition and Results of Operations of Hyzon" and "Cautionary Note Regarding Forward-Looking Statements." As a result, there can be no assurance that the projected results will be realized or that

104

Table of Contents

actual results will not be significantly higher or lower than projected. Since the financial projections cover multiple years, such information by its nature becomes less reliable with each successive year. These financial projections are subjective in many respects and thus are susceptible to multiple interpretations and periodic revisions based on actual experience and business developments.

Furthermore, the financial projections do not take into account any circumstances or events occurring after the date they were prepared. Nonetheless, a summary of the financial projections is provided in this proxy statement because they were made available to DCRB and the DCRB Board in connection with their review of the proposed business combination.

The projections were prepared by, and are the responsibility of, Hyzon and DCRB management. KPMG LLP, Hyzon's independent registered public accounting firm, and WithumSmith+Brown, PC, DCRB's independent registered public accounting firm, have not examined, compiled or otherwise applied procedures with respect to the accompanying prospective financial information presented herein and, accordingly, express no opinion or any other form of assurance on it or its achievability, and assume no responsibility for, and disclaim any association with, the prospective financial information. The KPMG LLP report included in this proxy statement relates to historical financial information of Hyzon. It does not extend to the projections and should not be read as if it does.

The key elements of the forecasts provided by management of DCRB to the DCRB Board are summarized in the tables below:

**Key Financial Metrics:**

| | Forecast | | | | |
| | Year Ended December 31, | | | | |
| | 2021E | 2022E | 2023E | 2024E | 2025E |
| | | | (dollars in millions) | | |
| EBITDA[1] | ($ 73) | ($ 25) | $ 87 | $ 326 | $ 505 |
| EBITDA Margin[2] | NM | NM | 8.9% | 14.5% | 15.4% |

(1)    Hyzon defines EBITDA as net loss before interest income or expense, income tax expense or benefit, and depreciation and amortization. EBITDA is not a financial measure prepared in accordance with GAAP and should not be considered a substitute for net loss prepared in accordance with GAAP.

(2)    Hyzon defines EBITDA Margin as EBITDA, divided by total revenue, for the period presented. EBITDA Margin is not a financial measure prepared in accordance with GAAP and should not be considered a substitute for operating margin prepared in accordance with GAAP.

**Key Non-Financial Metrics:**

| | Forecast | | | | |
| | Year Ended December 31, | | | | |
| | 2021E | 2022E | 2023E | 2024E | 2025E |
| Medium and Heavy Duty Trucks Deployed | 74 | 623 | 3,360 | 6,800 | 9,260 |
| Buses Deployed | 11 | 35 | 68 | 340 | 600 |
| Class 3 Truck / Van | 0 | 0 | 840 | 4,435 | 7,235 |
| Total Vehicles Deployed | 85 | 658 | 4,268 | 11,535 | 17,095 |

Projected revenue is based on a variety of operational assumptions, including the number of Hyzon vehicles deployed.

105

Table of Contents

Other key assumptions impacting projections include projected gross margin per vehicle, other operating expenses, general and administrative expenses, research and development expenses, and capital expenditures, among others. Hyzon's revenue forecasts are based on its management's assessment of the potential market demand for its hydrogen fuel cell vehicles and systems, including the increasing acceptance of such vehicles and systems. The projections also reflect continued investment in research and development to address these anticipated market opportunities and assumes that Hyzon is able to obtain additional financing to fund such research and development. While general and administrative expenses are expected to increase in absolute dollars as Hyzon grows, such expenses are expected to represent a smaller percentage of revenue as Hyzon scales, contributing to improvements in EBITDA Margin over time.

The financial projections reflect numerous estimates and assumptions with respect to general business, economic, regulatory, market and financial conditions and other future events, as well as matters specific to Hyzon's business, all of which are difficult to predict and many of which are beyond Hyzon's and DCRB's control. The financial projections reflected the following key management assumptions:

- Worldwide commercial FCEV compound annual sales growth of 34% from 2020 to 2030, reaching total market value of approximately $20 billion from 230,000 vehicles sold, based in part on the expectation that governments will continue to implement legislation that incentivizes or requires the transportation industry to transition to lower GHG emitting vehicles, thereby stimulating demand for Hyzon's products by commercial vehicle operators that comprise Hyzon's target market.

- Hyzon's achieving a market share of over 28% of all commercial FCEV unit sales by 2025. The share of industry sales is expected to grow at an accelerated rate during the period as Hyzon ramps up volumes in the medium duty, heavy duty and bus segments and in 2023 begins selling vehicles in the class 3 truck/van segment. Hyzon estimates its average annual growth rate of vehicle sales volume will be more than 270% from 2021 to 2025, compared to worldwide commercial FCEV average annual unit growth rate of more than 20%.

- The total cost of ownership, on a per mile basis, for hydrogen-powered commercial vehicles will decline by approximately 17% from 2021 to 2025, based on numerous estimates and factors outside of Hyzon's control, such as the price for hydrogen being $4.00 per kilogram in the near term and $3.00 in the medium term, annual miles driven, interest rates and financing costs, maintenance costs and sales taxes along with region in which the vehicle is operated, taxes and vehicle model and customer option or design specification. Furthermore, the total cost of ownership today is above that of a comparable diesel powered vehicle. Hyzon is anticipating the total cost of ownership for its hydrogen-powered commercial vehicles will fall below that of an equivalent diesel powered engine in the near term, and become even more favorable with government subsidies of approximately 17 cents per mile in the case of California and 23 cents per mile in Europe. Included in these estimates are assumptions that maintenance costs will be higher for diesel engines than hydrogen-powered vehicles and the price of diesel will be consistent with current prices (e.g., $4.00 per gallon in California and $6.34 per gallon in Europe in May 2021). For more information regarding total cost of ownership and maintenance costs of hydrogen-powered commercial vehicles, see the section entitled "Information About Hyzon — *Benefits of Hydrogen*."

- A decline in the sales price for Hyzon's medium and heavy duty commercial vehicle by approximately 30% from 2021 to 2025, from $570,000 to $400,000, on a blended basis for all models.

- Hyzon's maintaining gross margin remains relatively consistent at 30% to 33% from 2021 to 2025, through product design and other innovations to decrease the cost of materials in a FCEV.

- Increases in total overhead costs from approximately $22 million in 2021 to over $360 million in 2025 as Hyzon scales to support the company's growth. As a result, Hyzon assumes these costs as a percentage of revenue will decrease from almost 60% in 2021 to approximately 11% in 2025. The largest component of overhead expenditures are for personnel and benefit costs of more than $215 million in 2025, followed by almost $60 million in depreciation and amortization, approximately

106

Table of Contents

$55 million in research and development, over $25 million in marketing expenditures and approximately $5 million in operating expense for facilities. Estimates are made by Hyzon management with respect to mix of personnel hired, wage rates, benefit costs, facilities costs and geography associated with each.

• Hyzon's substantial investment in product development will decline over time, with 2021 estimated to represent the largest single year of associated operating expense at approximately $60 million. The upfront expenditures are planned to support the development and eventual launch of vehicle offerings in the heavy duty, medium duty, light duty and bus segments of the commercial vehicle industry. Hyzon anticipates operating expenses for product development to be over $20 million in each of 2022 and 2023, declining to zero thereafter.

• Capitalized product development expenditures of more than $18 million in 2021, almost $85 million in 2022, and averaging approximately $40 million in 2023, 2024 and 2025. Hyzon has made assumptions regarding product development costs that will be capitalized or expensed based upon reasonable expectations of the nature of such costs and current understanding of the application of current relevant accounting rules.

• Capital expenditures will rise substantially over the period forecasted, due to significant planned investments in Hyzon's facilities to achieve scaled production and expand its operations around the world. Hyzon anticipates investments of almost $45 million in 2021 rising to nearly $115 million in 2023 and before normalizing at approximately 3% of revenue and averaging approximately $77 million in 2024 and 2025. The costs for such investments are estimated throughout the period and are based on Hyzon's assumptions as to where and when such expenditures will be incurred based upon its current experience, projected space requirements and without benefit or hindrance from local or national governments.

• Hyzon pursues a strategy of investing in infrastructure to support hydrogen production and delivery, which is anticipated to produce revenue from the sale of hydrogen, vehicle service and leasing of approximately 2% of total revenue in 2025. Hyzon management's assumptions regarding revenue, costs and capital expenditures include additional assumptions about the price paid by the customer for hydrogen, lease acceptance rate, availability of real estate that meet the needs for such infrastructure, along with estimates of the local costs associated with the investments and ongoing operating expenses.

• Hyzon's projected financial information is estimated in U.S. Dollars and assumes no future change in foreign exchange rates.

## Satisfaction of 80% Test

It is a requirement under our Charter and Nasdaq listing requirements that the business or assets acquired in an Initial Business Combination have a fair market value equal to at least 80% of the balance of the funds in the Trust Account (excluding the deferred underwriting discounts and commissions and taxes payable on the income earned on the Trust Account) at the time of the execution of a definitive agreement for an Initial Business Combination. In connection with its evaluation and approval of the business combination, the DCRB Board determined that the fair market value of Hyzon exceeded $1.5 billion, based on, among other things, comparable company EBITDA multiples and revenue multiples.

## Interests of Certain Persons in the Business Combination

In considering the recommendation of the DCRB Board to vote in favor of the business combination, stockholders should be aware that, aside from their interests as stockholders, our Sponsor and certain of our directors and officers have interests in the business combination that are different from, or in addition to, those of other stockholders generally. Our directors were aware of and considered these interests, among other matters, in evaluating the business combination, and in recommending to stockholders that they approve the business combination. Stockholders should take these interests into account in deciding whether to approve the business combination. These interests include, among other things:

107

Table of Contents

any, between the amount realized on a sale or other taxable disposition of that share and the participant's tax basis in that share will be long-term capital gain or loss. If, however, a participant disposes of a share acquired upon exercise of an ISO before the end of the required holding period, which is referred to as a disqualifying disposition, the participant generally will recognize ordinary income in the year of the disqualifying disposition equal to the excess, if any, of the fair market value of the share on the date of exercise of the stock option over the exercise price. However, if the sales proceeds are less than the fair market value of the share on the date of exercise of the stock option, the amount of ordinary income recognized by the participant will not exceed the gain, if any, realized on the sale. If the amount realized on a disqualifying disposition exceeds the fair market value of the share on the date of exercise of the stock option, that excess will be short-term or long-term capital gain, depending on whether the holding period for the share exceeds one year. For purposes of the alternative minimum tax, the amount by which the fair market value of a share of stock acquired upon exercise of an ISO exceeds the exercise price of the stock option generally will be an adjustment included in the participant's alternative minimum taxable income for the year in which the stock option is exercised. If, however, there is a disqualifying disposition of the share in the year in which the stock option is exercised, there will be no adjustment for alternative minimum tax purposes with respect to that share. In computing alternative minimum taxable income, the tax basis of a share acquired upon exercise of an ISO is increased by the amount of the adjustment taken into account with respect to that share for alternative minimum tax purposes in the year the stock option is exercised. New Hyzon is not allowed a tax deduction with respect to the grant or exercise of an ISO or the disposition of a share acquired upon exercise of an ISO after the required holding period. If there is a disqualifying disposition of a share, however, New Hyzon will generally be entitled to a tax deduction equal to the taxable ordinary income realized by the participant, subject to the requirement of reasonableness, and provided that either the employee includes that amount in income or New Hyzon timely satisfies its reporting requirements with respect to that amount.

*Restricted Stock Awards*. Generally, the recipient of a restricted stock award will recognize ordinary income at the time the stock is received equal to the excess, if any, of the fair market value of the stock received over any amount paid by the recipient in exchange for the stock. If, however, the stock is not vested when it is received (for example, if the employee is required to work for a period of time in order to have the right to sell the stock), the recipient generally will not recognize income until the stock becomes vested, at which time the recipient will recognize ordinary income equal to the excess, if any, of the fair market value of the stock on the date it becomes vested over any amount paid by the recipient in exchange for the stock. A recipient may, however, file an election with the IRS, within 30 days following his or her receipt of the stock award, to recognize ordinary income, as of the date the recipient receives the award, equal to the excess, if any, of the fair market value of the stock on the date the award is granted over any amount paid by the recipient for the stock. The recipient's basis for the determination of gain or loss upon the subsequent disposition of shares acquired from a restricted stock award will be the amount paid for such shares plus any ordinary income recognized either when the stock is received or when the stock becomes vested. Subject to the requirement of reasonableness and the satisfaction of a tax reporting obligation, New Hyzon will generally be entitled to a tax deduction equal to the taxable ordinary income realized by the recipient of the restricted stock award.

*Restricted Stock Unit Awards*. Generally, the recipient of a restricted stock unit award structured to comply with the requirements of Section 409A of the Code or an exception to Section 409A of the Code will recognize ordinary income at the time the stock is delivered equal to the excess, if any, of the fair market value of the stock received over any amount paid by the recipient in exchange for the stock. To comply with the requirements of Section 409A of the Code, the stock subject to a restricted stock unit award may generally only be delivered upon one of the following events: a fixed calendar date (or dates), separation from service, death, disability or a change in control. If delivery occurs on another date, unless the restricted stock unit award otherwise complies with or qualifies for an exception to the requirements of Section 409A of the Code (including delivery upon achievement of a performance goal), in addition to the tax treatment described above, the recipient will owe an additional 20% federal tax and interest on any taxes owed. The recipient's basis for the determination of gain or loss upon the subsequent disposition of shares acquired from a restricted stock unit award will be the amount paid for such shares plus any ordinary income recognized when the stock is delivered. Subject to the requirement of

130

Table of Contents

independence as the necessary hydrogen can be produced locally at or proximate to the central base and dispensed at optimally-configured hydrogen refueling stations. Hyzon's fuel cell technologies are also compatible with light commercial vehicles among other applications. Hyzon plans to expand its range of products and hydrogen solutions if the transportation sector increasingly adopts hydrogen power and investments are made in hydrogen production and related infrastructure in accordance with Hyzon's expectations.

To date, Hyzon has received orders for Hyzon-branded commercial vehicles and coach buses in an aggregate value of approximately $18,276 thousand from companies around the world, including Fortescue Metals Group Ltd., and Hyzon's counterparties have paid $1,800 thousand in deposits in respect of such orders. Hyzon also has an order valued at $1,470 thousand to integrate a hydrogen fuel cell system built around its next generation fuel cell stacks into aircraft, in respect of which Hyzon's counterparty has paid a deposit of $700 thousand. Hyzon's orders each include terms permitting the counterparty to cancel or suspend some or all of their obligations thereunder without cause, with little or no prior notice and without penalty or early termination payments. However, Hyzon currently expects that these orders will be fulfilled and has determined that each contract with a customer exists in accordance with ASC 606-10-25-1. The transaction price associated with the subset of these contracts entered into prior to December 31, 2020 has accordingly been disclosed as a remaining performance obligation pursuant to ASC 606-10-50-13 through 50-15 (refer to Note 3: Revenues, within the Notes to Hyzon's Consolidated Financial Statements).

### The Business Combination

On February 8, 2021, Hyzon entered into the Business Combination Agreement with DCRB and Merger Sub pursuant to which Merger Sub will merge with and into Hyzon, with Hyzon surviving the merger as a wholly owned subsidiary of DCRB. Following the closing of the business combination, the post-combination company will be named Hyzon Motors Inc., and will be listed on Nasdaq and trade under the symbols "HYZN" and "HYZNW." The business combination is anticipated to generate gross proceeds of up to approximately $580,700 thousand of cash, assuming no redemptions by DCRB's public stockholders. This includes an aggregate of $355,000 thousand of anticipated proceeds from the PIPE Financing at $10.00 per PIPE Share. Hyzon's cash on hand after giving effect to these transactions, including any transaction costs and expenses, is expected to be used for general corporate purposes, including developing infrastructure and supply chain, acquiring and leasing equipment for manufacturing, and investing in research and development.

### COVID-19 Pandemic

The COVID-19 pandemic is currently impacting countries, communities, supply chains, and the global financial markets. Governments have imposed laws requiring social distancing, travel restrictions, shutdowns of businesses and quarantines, among others, and these laws may limit Hyzon's ability to meet with potential customers or partners, or affect the ability of Hyzon's personnel, suppliers, partners and customers to operate in the ordinary course. Depending on the severity and longevity of the COVID-19 pandemic, which is highly uncertain and cannot be predicted, these factors, in turn, may materially adversely affect Hyzon's operations, financial position and cash flows.

### Key Trends and Uncertainties

Hyzon believes that its performance and future success depend on several factors that present significant opportunities for Hyzon but also pose risks and challenges, including those discussed below and in the section entitled "Risk Factors — Risks Related to Hyzon."

*Commercial Launch of Hyzon-branded commercial vehicles and other hydrogen solutions*

Hyzon currently has no revenues, and Hyzon's business model has yet to be tested. Hyzon's ability to create a sustainable business may be adversely affected by its current financial condition, access to equity and debt

135

**Table of Contents**

**Liquidity and Capital Resources**

As of March 31, 2021, Hyzon had $47,773 thousand in unrestricted cash, positive working capital of $37,497 thousand, and an accumulated deficit of $(22,418) thousand. Our ability to continue as a going concern depends upon whether we can ultimately attain profitable operations, generate sufficient cash flow to meet our obligations, and obtain additional financing as needed.

*Debt*

As of March 31, 2021 Hyzon had net convertible debt of $49,441 thousand, which includes the note face value of $45,000 thousand, the fair value of the bifurcated embedded derivative associated with the automatic conversion triggered by the business combination with DCRB of $4,500 thousand, and net of deferred issuance costs of $59 thousand. The notes mature on February 1, 2023 and will automatically convert to common stock upon the closing of the business combination or another similar qualified financing at a ratio based on 90% of the price per share paid by external investors in the business combination or another similar qualified financing.

*Cash Flows*

***Cash Flows for the Three Months Ended March 31, 2021 and for the Period from January 21, 2020 (Inception) through March 31, 2020***

**Cash Flows from Operating Activities**

Net cash used in operating activities was $(9,470) thousand for the three months ended March 31, 2021, as compared to zero for the period ended March 31, 2020. The cash flows used in operating activities for the three months ended March 31, 2021 was driven by Hyzon recording a net loss of $(8,389) thousand, offset by noncash expenses of $4,919, and then reduced by changes in operating assets and liabilities of ($6,000) thousand. There were no meaningful operating activities in the period ended March 31, 2020.

**Cash Flows from Investing Activities**

Net cash used in investing activities was $(4,073) thousand for the three months ended March 31, 2021, as compared to zero for the period ended March 31, 2020. The cash flows used in investing activities for the three months ended March 31, 2021 were related primarily to capital expenditures related to acquiring a facility near Rochester, NY to begin production of hydrogen fuel cell systems and assembly of hydrogen storage systems. There were no similar purchases in the prior period ended March 31, 2020.

**Cash Flows from Financing Activities**

Net cash provided by financing activities was $44,603 thousand for the three months ended March 31, 2021, as compared to zero for the period ended March 31, 2020. The cash flows provided by financing activities for the three months ended March 31, 2021was due primarily to the proceeds received from issuance of convertible debt. There were no similar financing activities in the period ended March 31, 2020.

Hyzon continues to seek additional financing to advance its business plans. However, Hyzon's management cannot give assurances that Hyzon will be successful even if Hyzon obtains additional financing. Should Hyzon not be successful in its business plan or be unable to obtain sufficient financing, Hyzon could need to curtail certain operating activities.

***Cash Flows for the Period from January 21, 2020 (Inception) through December 31, 2020***

**Cash Flows from Operating Activities**

For the period from January 21, 2020 (date of inception) through December 31, 2020, net cash used in Hyzon's operating activities was $(1,177) thousand. The cash flows used in operating activities was driven by

140

Table of Contents

*Heavy-Duty Trucks*



Based on their estimated specifications, Hyzon expects that its heavy-duty trucks will have a GVM of up to 50 metric tonnes, which is expected to include an onboard hydrogen mass of 45 kilograms and the option to upgrade to a hydrogen mass of 70 kilograms. The cabin of Hyzon's heavy-duty trucks is expected to be air suspended and to open using electric tilt. Hyzon's heavy-duty trucks are expected to have a Hyzon fuel cell system with power up to 240 kW and fuel economy of eleven kilometers per kilogram of hydrogen while loaded. Hyzon expects that the 240 kW fuel cell system will allow its heavy-duty trucks to run at 100% of operating requirements on hydrogen without draining the batteries.

*City and Coach Buses*

Hyzon is developing city and coach buses with safety features including forward collision warning, advanced emergency braking systems and lane departure warnings. Hyzon also expects that its city bus will include remote vehicle monitoring. As with Hyzon's other commercial vehicle offerings, detailed specifications can be tailored to a customer's individual requirements.

*City Bus*



Based on estimated specifications, Hyzon expects that its city bus will seat 35 passengers and accommodate 35 standing passengers and will have a Curb Weight (unladen mass) of 13.5 metric tonnes. Hyzon expects that its first generation city buses will have integrated fuel cell stacks with power of up to 100 kW continuous (90 kW

160

Table of Contents

peak). Hyzon's city bus is expected to feature 2x120 kW continuous power electric motors and 100 kWh battery, with a system voltage of 460V. Designed to be low-rise and low-entry, Hyzon's first generation city buses are expected to have a driving range of 500 kilometers. The fuel cell system is expected to be supplied by a 40 kilogram hydrogen storage system located in the roof of the bus for safety, so that, in the case of tank damage, hydrogen can vent rapidly away from the vehicle. The hydrogen storage system is expected to have a working pressure of 350 bar with a worldwide standard receptacle for refueling.

*Coach Bus*



Based on estimated specifications, Hyzon expects that its coach buses will seat up to 57 passengers and have a Curb Weight of 18 metric tonnes. Hyzon's coach buses are expected to feature a 120kW fuel cell, a Dana TM4 power electric motor (115 kW continuous (230 kW peak)) that provides smooth acceleration and superior control, as well as a 100 kWh battery that provides power when the vehicle is idle, or the fuel tank is empty. Designed for long-range passenger transport with comfort in mind, passengers and drivers can enjoy a smooth drive without the disruption of engine vibration. Fuel cell coaches are at least 60% quieter than comparable diesel vehicles, especially at idle. Hyzon's coach buses are expected to have a normal driving range of up to 300 kilometers and an onboard hydrogen mass of 26 kilograms in 8 x 140 liter tanks.

*Timeline*

In Europe, Hyzon commenced assembling commercial vehicles in its Winschoten facility in February 2021, and most current European and Australia/New Zealand commercial vehicle sales are expected to be fulfilled by the Winschoten facility, with first deliveries targeted for the second quarter of 2021.

In the United States, Hyzon commercial vehicle assembly is targeted to begin in Fontaine Modification Company's plant by the fourth quarter of 2021. Hyzon has not yet commenced vehicle sales in the United States and, as was the case in Europe, it expects initial orders to be small volume validation orders, enabling North American customers to assess the suitability of Hyzon fuel cell powered vehicles for their needs, Hyzon expects deployments of series production Hyzon vehicles to commence before the end of 2022.

*Existing Customers*

Hyzon has already received a limited number of orders in an aggregate value of approximately $18.2 million[1] for Hyzon-branded trucks, sleepers and buses to Australia, New Zealand and the Netherlands, and

---

[1] This figure was derived by converting order amounts in euros to US dollars at a rate of 1.19 USD/EUR as of March 17, 2021.

161

Table of Contents

is in advanced discussions for delivery of Hyzon-branded trucks to France and Germany, before the end of 2021. Hyzon's existing customers which have placed orders include leaders in the transportation and logistics and mining sectors, as well as companies committed to reducing the overall environmental impact and fuel costs of their owned and operated trucking fleets. Hyzon's orders each include terms permitting the counterparty to cancel or suspend some or all of their obligations thereunder without cause, with little or no prior notice and without penalty or early termination payments. However, Hyzon currently expects that these orders will be fulfilled and has determined that each contract with a customer exists in accordance with ASC 606-10-25-1. The transaction price associated with the subset of these contracts entered into prior to December 31, 2020 has accordingly been disclosed as a remaining performance obligation pursuant to ASC 606-10-50-13 through 50-15 (refer to Note 3: Revenues, within the Notes to Hyzon's Consolidated Financial Statements).

Hyzon has also entered into non-binding memoranda of understanding and letters of intent with various companies and municipalities predominantly in Europe, Asia and Australia, which indicate interest in over 3,000 Hyzon-branded commercial vehicles, and in some cases Hyzon has deployed demonstration units to customers. Such non-binding memoranda of understanding and letters of intent signal significant potential fleet demand, but Hyzon has not yet converted these non-binding, memoranda of understanding or letters of intent into orders or sales. Hyzon has no assurances that such potential customers will convert into orders or sales, including because of the current or future financial position and the level of demand for the products and services of such potential customers. Hyzon may also be unable to identify or secure additional customers. For more information about these risks, please see the section entitled "Risk Factors."

### Hyzon's SuperH2Truck™

Hyzon is also in the early-stages of designing the SuperH2Truck, a purpose-built hydrogen-powered truck that is expected to enter production by 2025. Hyzon's SuperH2Trucks are intended to be based on a Hyzon-produced fuel cell-optimized high-strength steel chassis and feature an integrated Hyzon-designed fuel cell stack. By developing the SuperH2Truck in-house that is specifically designed for fuel cells, not internal combustion engines, Hyzon hopes to increase fuel storage, freight capacity, strength and power while reducing aerodynamic drag, rolling resistance, and, crucially, weight. Through its ongoing R&D efforts both on a standalone basis and in coordination with partners, Hyzon aims to develop next generation fuel cell and vehicle technologies, including technologies that are currently under development, such as a humidifier and an air compressor designed for a 200 kW to 300 kW fuel cell system, high power and high safety battery back, and a high efficiency multi- motor independent drive system. By blending together these enhanced features with the benefits of hydrogen fuels, Hyzon believes it can provide a compelling suite of benefits to both fleet operators and their drivers.

### Integrating Hyzon's Hydrogen Fuel Cell Systems

In addition to developing its range of Hyzon-branded commercial vehicles, Hyzon also integrates and configures hydrogen fuel cell systems into existing commercial vehicles as well as maritime and aircraft applications for customers using their private labels based on the individual requirements of customers.

### Heavy-Duty Commercial Vehicles

Hyzon currently integrates fuel cell systems in the United States and Europe for new hydrogen-powered commercial vehicles using automotive parts sourced from third-party OEMs and other vendors and assembles hydrogen storage systems for commercial vehicles using externally sourced parts. Although Hyzon expects that its current market of heavy-transport operators within the commercial vehicle sector will continue to be its main target market in the near to medium term, Hyzon's fuel cell technologies are also compatible with Class 3 through Class 6 commercial vehicles. As such, Hyzon anticipates expanding into light and medium commercial vehicle applications as the market for hydrogen-powered vehicles develops and matures, and as hydrogen supply becomes more prevalent, and importantly, more economical.

### City and Coach Buses

Hyzon's fuel cell systems are well suited for both city bus and regional coach applications.

162

Table of Contents

For city buses, Hyzon's fuel cells are designed to be compatible with the 40- and 60-foot (12 and 18 meter) low-floor city bus models that are used in urban areas around the globe. Due to the fast refueling offered by hydrogen-powered buses, Hyzon expects cities and municipalities to be able to replace diesel bus fleets with a near-zero emissions equivalent with minimal impact on operating routes and depot facilities.

In the regional coach market, many coach bus operators seek at least a 200-mile (320 km) driving range, and, currently, Hyzon believes that only hydrogen fuel cells can achieve that range with near-zero emissions.

In both markets, Hyzon believes that its buses will offer superior performance compared to diesel buses and provide improved passenger amenity through near-zero emissions, elimination of diesel smells and quieter operations.

Hyzon expects to perform coach assembly in the United States and Europe to complement existing assembly efforts in Asia (through multiple third-party OEMs) and is currently evaluating possible timelines with respect to beginning assembly activities in those regions.

Hyzon has already received an order from Fortescue Metals Group Ltd. in Australia for the delivery of ten coach buses in 2021. Hyzon has also entered into a non-binding memorandum of understanding with Goldi Mobility Kft to collaborate on developing hydrogen fuel cell electric buses in Hungary. Phase I of this initiative involves designing and building a prototype 60-foot (18 meter) bus, which is in process; Phase II would consist of the procurement of 12 initial buses in Hungary and other European nations.

*Fuel Cell Systems for Rail, Maritime and Aviation Applications*

Hyzon also believes that its fuel cell systems have the ability to meet customer requirements for rail, maritime and aviation applications. Indeed, Hyzon is already in the process of designing and developing high-powered density fuel cell systems for small electric aircraft usage and anticipates delivering such a fuel cell system to an end-customer by the end of 2021.

Hyzon has also had discussions with manufacturers of intercity, standard and high speed passenger trains to design and integrate Hyzon's hydrogen fuel cells into passenger trains. In addition, a number of ocean-going vessel manufacturers have expressed an interest in validating Hyzon's technology for their vessels. To date these applications have not resulted in orders.

**Hydrogen Fuel Cell System Production and Supply**

Hyzon expects that its first fuel cells will be manufactured at the facility in Rochester, New York, by the end of 2021 and that production of hydrogen fuel cell advanced materials (such as MEAs) in Illinois will also begin by the end of 2021. Following these initial milestones, Hyzon expects to distribute its fuel cell systems to facilities in Europe for assembly into hydrogen-powered vehicles by the end of the first quarter of 2022. Hyzon currently sources hydrogen fuel cells and fuel cell stacks and systems from Horizon and anticipates continuing to rely on Horizon as a fuel cell supplier at least until Hyzon's manufacturing plants are operational. Hyzon may continue to source hydrogen fuel cells and fuel cell stacks from Horizon for the Chinese market, even after Hyzon's manufacturing of fuel cells commences, as it may be more economical to source from Horizon's factory in China than ship Hyzon's U.S.-made fuel cells to China. Hyzon also plans to engage in the production of other electrification components for fuel cell vehicles by 2025.

Once production of the fuel cell systems commences, Hyzon intends to (1) deploy the systems in the assembly of Hyzon-branded commercial vehicles and the integration into other applications described above and (2) sell such fuel cells on a standalone basis to select partners for mobility applications in certain geographies.

163

Table of Contents

*Complete Hydrogen Solutions*

Although a significant portion of Hyzon's current customers are fleet operators that use a back-to-base model with pre-existing access to hydrogen, Hyzon is developing a complete hydrogen solution that is intended to serve customers who do not currently have access to hydrogen. This solution is expected to include hydrogen production, compression, and storage.

To develop this complete hydrogen solution, Hyzon intends to collaborate with chosen technology and project development partners such as its existing partners RavenSR in the United States, Hiringa in New Zealand, and Global NRG Ltd. in Australia, to ensure that affordable hydrogen is available to its fleet operator customers. In addition, Hyzon has entered into a strategic alliance with Viva Energy to provide near-zero-emission vehicles coupled with hydrogen refueling stations to customers in Australia. Hyzon believes that it has the potential to realize recurring revenue from certain hydrogen supply partnership agreements as hydrogen production hubs are commissioned.

In addition, Hyzon Zero Carbon, Inc. ("Hyzon Zero Carbon"), a wholly-owned subsidiary of Hyzon has developed an alliance, which aims to facilitate the establishment of hydrogen hubs around the world starting from back-to-base or base-to-base logistics hubs. Hydrogen can be produced from local renewable sources such as municipal waste, renewable natural gas, bio-methanol, solar or wind, not only to refuel the vehicles but also to provide peak power backup power to the electricity grid, thereby increasing grid resilience.

The alliance is planned to facilitate ecosystems for commercializing fuel cell vehicles, and collaborators may include energy companies, green hydrogen production companies, hydrogen equipment companies, financing companies, insurance companies, corporate customers and after-sales service companies, among others. Hyzon and its partners plan to announce multiple green hydrogen hubs in the United States, Australia, New Zealand and Europe before the end of 2021, with the first announcement expected before the end of March 2021.

Through Hyzon Zero Carbon, Hyzon also intends to provide fuel cell lifecycle management service and hydrogen supply to fuel cell commercial vehicles.

*Financing Solutions*

Hyzon Zero Carbon also intends to provide vehicle leasing solutions. Hyzon is working to establish a financing program in Australia in partnership with Bank of America Australia, which is expected to enable fleet operators to lease a vehicle and pay one monthly fee and receive:

- The Zero Emission Vehicle;

- Scheduled Preventative Maintenance; and

- Hydrogen Supply.

Hyzon expects to launch its Hyzon Zero Carbon financing program by the end of 2021. If successful, Hyzon intends to expand the financing program to other markets by partnering with other financial institutions.

The application of new technology and the development and delivery of competitive hydrogen vehicles, including the release of new high-volume models, is expected to enable rapid growth for Hyzon around the world and to contribute to the acceptance of commercial hydrogen fuel cell vehicles and the affordable transition of the transportation sector onto hydrogen energy.

**Facilities**

*Manufacturing and Assembly*

Hyzon acquired a 78,000 sq. foot building near Rochester, New York to begin production of hydrogen fuel cell systems. Once online, the Rochester facility is expected to distribute fuel cells to Hyzon's assembly partners

164

Table of Contents

*Erik Anderson* has served as our Chief Executive Officer since September 21, 2020 and has served as a member of the DCRB Board since October 22, 2020. Mr. Anderson has served as the chief executive officer of Decarbonization Plus Acquisition Corporation III since February 11, 2021 and will become a member of its board of directors following its initial public offering. Mr. Anderson has served as the chief executive officer of Decarbonization Plus Acquisition Corporation II since January 14, 2021 and a member of its board of directors since February 2021. Mr. Anderson founded WRG, a collaboration of leading investment firms providing integrated capital solutions to the global innovation economy, in 2002 and has served as chief executive officer of WRG since its inception. In 2018, Mr. Anderson became executive chairman of Singularity University, a company that offers executive educational programs, a business incubator and innovation consultancy service. Mr. Anderson is also the executive chairman of Topgolf Entertainment Group, a global sports and entertainment company. Mr. Anderson has received numerous honors, including the Ernst & Young Entrepreneur of the Year Award. In 2018 and 2017, Mr. Anderson was honored by Goldman Sachs as one of their Top 100 Most Intriguing Entrepreneurs. In 2019 and 2018, Mr. Anderson was ranked by Golf Inc.as the No. 3 most powerful person in the golf industry after being ranked No. 8 in 2017. Mr. Anderson is Vice-Chairman of ONEHOPE, a cause-centric consumer brand and technology company, and is the founder of America's Foundation for Chess, currently serving 160,000 children in the United States with its First Move curriculum. Mr. Anderson serves on the Board of Play Magnus, an interactive chess app. In 2019, Mr. Anderson became a member of the board of Pro.com, a leader in the home improvement experience industry. His investment experience includes being partner at Frazier Healthcare Partners, chief executive officer of Matthew G Norton Co. and vice president at Goldman, Sachs & Co. Mr. Anderson was recognized early in his career as one of the top "40 under 40" young achievers and emerging leaders by Seattle's Puget Sound Business Journal. Mr. Anderson holds a master's and bachelor's degree in Industrial Engineering from Stanford University and a bachelor's degree (Cum Laude) in Management Engineering from Claremont McKenna College.

*Peter Haskopoulos* has served as our Chief Financial Officer, Chief Accounting Officer and Secretary since August 2020. Mr. Haskopoulos has served as the chief financial officer, chief accounting officer and secretary of Decarbonization Plus Acquisition Corporation III since February 2021. Mr. Haskopoulous has served as the chief financial officer, chief accounting officer and secretary of Decarbonization Plus Acquisition Corporation II since December 2020. Mr. Haskopoulos is a managing director of Riverstone and serves as Riverstone's chief financial officer. Prior to joining Riverstone in 2007, Mr. Haskopoulos served in several financial roles within Thomson Reuters Corporation (NYSE: TRI), most recently as the director of finance. Previously, he was a manager with Ernst & Young, where he worked with both public and private companies. Mr. Haskopoulos started his career at Arthur Andersen. Mr. Haskopoulos earned his M.B.A. and undergraduate degree from Rutgers University and is a certified public accountant.

*Dr. Jennifer Aaker* has served as a member of the DCRB Board since October 22, 2020. Dr. Aaker has served as a member of the board of directors of Decarbonization Plus Acquisition Corporation II since February 2021. Dr. Aaker has been the General Atlantic Professor at Stanford Graduate School of Business since 2001 and serves as the Coulter Family Faculty Fellow at Stanford Graduate School of Business. A behavioral scientist and author, Dr. Aaker is widely published in leading scientific journals and her work has been featured in The Economist, The New York Times, The Wall Street Journal, The Washington Post, BusinessWeek, Forbes, NPR, CBS MoneyWatch, Inc., and Science. Dr. Aaker is the coauthor of several books including the award-winning book, The Dragonfly Effect, which has been translated into over ten languages, as well as Power of Story, which drew on behavioral science to provide a hands-on tool putting The Dragonfly Effect model to work. Her professional areas of focus include artificial intelligence, digitization and brand value. Dr. Aaker currently serves on the board of directors of Codexis Inc. and on the board of directors and audit committee of the Stephen and Ayesha Curry Eat. Learn. Play. Foundation. Ms. Aaker served on the boards of Corporate Visions, Inc. from 2011 to 2016, California Casualty Insurance from 2009 to 2015, and Accompany from 2014 to 2018. She is the recipient of the Distinguished Scientific Achievement Award, Stanford Distinguished Teaching Award, Citibank Best Teacher Award, George Robbins Best Teacher Award, Robert Jaedicke Silver Apple Award, and the MBA Professor of the Year Award. Dr. Aaker completed her PhD degrees at Stanford University, and holds a BA from UC Berkeley.

181

Table of Contents

We believe that Dr. Aaker's expertise in behavioral science, artificial intelligence, digitization and brand value and significant experience on numerous boards of directors bring important and valuable skills to our board of directors.

*Jane Kearns* has served as a member of the DCRB Board since October 22, 2020. Ms. Kearns has served as a member of the board of directors of Decarbonization Plus Acquisition Corporation II since February 2021. Ms. Kearns is Vice President, Growth Services (since May 2019), and Senior Advisor, Cleantech (since October 2012), at MaRS Discovery District. MaRS is a launchpad for startups, a platform for researchers and a home to innovators, supporting over 1,200 Canadian science and technology companies tackling society's greatest challenges in four core categories: cleantech, health, fintech and enterprise software. Ms. Kearns co-founded, grew and profitably sold a renewable energy company, and leverages over 20 years of experience in venture capital, cleantech and sustainability to help build businesses that matter. Ms. Kearns is a co-founder of the CanadaCleantech Alliance, sits on the board of Clear Blue Technologies International (TSXV: CBLU), is an advisory board member for StandUp Ventures and Amplify Ventures, and is a member of the Expert Panel on Clean Growth for the Canadian Institute for Climate Choices. She holds an MBA from Columbia University.

We believe that Ms. Kearns's leadership in sustainable innovation and extensive experience growing successful companies at the intersection of business and sustainability bring important and valuable skills to our board of directors.

*Pierre Lapeyre, Jr.* has served as a member of the DCRB Board since October 22, 2020. Mr. Lapeyre has served as a member of the board of directors of Decarbonization Plus Acquisition Corporation II since February 2021. Mr. Lapeyre is the co-founder and senior managing director of Riverstone Holdings LLC. Mr. Lapeyre was a managing director of Goldman Sachs in its Global Energy & Power Group. Mr. Lapeyre joined Goldman Sachs in 1986 and spent his 14-year investment banking career focused on energy and power, and leading client coverage and execution of a wide variety of M&A, IPO, strategic advisory and capital markets financings for clients across all sectors of the industry. Mr. Lapeyre received his B.S. in Finance/Economics from the University of Kentucky and his M.B.A. from the University of North Carolina at Chapel Hill. Mr. Lapeyre serves on the boards of directors or equivalent bodies of a number of public and private Riverstone portfolio companies and their affiliates. In addition to his duties at Riverstone, Mr. Lapeyre serves on the Executive Committee of the Board of Visitors of the MD Anderson Cancer Center and is a Trustee and Treasurer of The Convent of the Sacred Heart.

We believe that Mr. Lapeyre's considerable energy and power private equity and investment banking experience bring important and valuable skills to our board of directors.

*David Leuschen* has served as a member of the DCRB Board since October 22, 2020. Mr. Leuschen has served as a member of the board of directors of Decarbonization Plus Acquisition Corporation II since February 2021. Mr. Leuschen is the co-founder and senior managing director of Riverstone Holdings LLC. Prior to Riverstone, Mr. Leuschen was a partner and managing director at Goldman Sachs and founder and head of the Goldman Sachs Global Energy and Power Group. Mr. Leuschen was responsible for building the Goldman Sachs energy and power investment banking practice into one of the leading franchises in the global energy and power industry. Mr. Leuschen additionally served as chairman of the Goldman Sachs Energy Investment Committee, where he was responsible for screening potential direct investments by Goldman Sachs in the energy and power industry. In addition to his board roles at various Riverstone portfolio companies and investment vehicles, Mr. Leuschen has served as a director of Cambridge Energy Research Associates, Cross Timbers Oil Company (predecessor to XTO Energy) and J. Aron Resources. He is also president and sole owner of Switchback Ranch LLC and on the Advisory Board of Big Sky Investment Holdings LLC. David serves on a number of nonprofit boards of directors, including as a Trustee of United States Olympic Committee Foundation, a Director of Conservation International, a Director of the Peterson Institute for International Economics, a Founding Member of the Peterson Institute's Economic Leadership Council, a Director of the Wyoming Stock Growers Association and a Director of the Montana Land Reliance. Mr. Leuschen received his A.B. from Dartmouth and his M.B.A. from Dartmouth's Amos Tuck School of Business.

182

Table of Contents

We believe that Mr. Leuschen's considerable energy and power private equity and investment banking experience, as well as his experience on the boards of various Riverstone portfolio companies and investment vehicles, bring important and valuable skills to our board of directors.

*Robert Tichio* has served as a member of the DCRB Board since August 2020 and served as our chief executive until September 2020. Mr. Tichio has served as a member of the board of directors of Decarbonization Plus Acquisition Corporation III since February 2021 and temporarily served as its chief executive officer in February 2021. Mr. Tichio has served as a member of the board of directors of Decarbonization Plus Acquisition Corporation II since December 2020 and served as its chief executive officer from December 2020 to January 2021. Mr. Tichio is a partner and managing director of Riverstone Holdings LLC. Mr. Tichio joined the firm in 2006 and has been focused on the firm's Private Equity business. Prior to joining Riverstone, Mr. Tichio was in the Principal Investment Area (PIA) of Goldman Sachs, which manages the firm's private corporate equity investments. Mr. Tichio began his career at J.P. Morgan in the Mergers & Acquisition Group, where he concentrated on assignments that included public company combinations, asset sales, takeover defenses, and leveraged buyouts. Mr. Tichio received his A.B. from Dartmouth College as a Phi Beta Kappa graduate, and later received his M.B.A. with Distinction from Harvard Business School. Mr. Tichio serves on a number of nonprofit and Riverstone portfolio company boards.

We believe that Mr. Tichio's considerable investment experience, as well as his experience on the boards of Riverstone portfolio companies, bring important and valuable skills to our board of directors.

*Jim McDermott* has served as the lead independent director of the DCRB Board since October 22, 2020. Mr. McDermott has served as a member of the board of directors of Decarbonization Plus Acquisition Corporation II since February 2021. Mr. McDermott is the founder and chief executive officer of Rusheen Capital Management, a private equity firm that invests in growth-stage companies in the carbon capture and utilization, low-carbon energy and water sustainability sectors. As an investor and entrepreneur, Mr. McDermott has founded, run and invested in over 35 businesses over a 25 year career and has built an extensive professional network in the low-carbon energy, water and sustainability sectors. From 1996 to 2003, Mr. McDermott founded and ran Stamps.com (STMP:NASDAQ), Archive.com (sold to Cyclone Commerce) and Spoke.com. From 2003 to 2017, Mr. McDermott co-founded and served as Managing Partner of US Renewables Group, a private investment firm, where he raised and invested approximately $1 billion into clean energy businesses. Mr. McDermott was founder and board member of NanoH2O, is the founder and executive chairman of Fulcrum BioEnergy, investor and board observer of Moleaer, a board member of Carbon Engineering and the chief executive officer of 1PointFive. For five years, Mr. McDermott has been a board member of the Los Angeles Cleantech Incubator. Mr. McDermott holds a MBA from UCLA, and a BA in Philosophy from Colorado College.

We believe Mr. McDermott's extensive investment and leadership experience brings important and valuable skills to our board of directors.

*Jeffrey Tepper* has served as a member of the DCRB Board since October 22, 2020. Mr. Tepper has served as a member of the board of directors of Decarbonization Plus Acquisition Corporation II since February 2021. Mr. Tepper is founder of JHT Advisors LLC, a mergers and acquisitions ("M&A") advisory and investment firm. From 1990 to 2013, Mr. Tepper served in a variety of senior management and operating roles at the investment bank Gleacher & Company, Inc. and its predecessors and affiliates ("Gleacher"). Mr. Tepper was head of investment banking and a member of Gleacher's Management Committee. Mr. Tepper is also Gleacher's former chief operating officer overseeing operations, compliance, technology and financial reporting. In 2001, Mr. Tepper co-founded Gleacher's asset management activities and served as president. Gleacher managed over $1 billion of institutional capital in the mezzanine capital and hedge fund areas. Mr. Tepper served on the investment committees of Gleacher Mezzanine and Gleacher Fund Advisors. Between 1987 and 1990, Mr. Tepper was employed by Morgan Stanley & Co. as a financial analyst in the M&A and merchant banking departments. Mr. Tepper served as a director of Silver Run I from its inception in November 2015 until the

183

Table of Contents

completion of its acquisition of Centennial in October 2016 and has served as a director of Centennial Resource Development, Inc. (NASDAQ: CDEV) since October 2016. Mr. Tepper is a former director of Alta Mesa Resources, Inc. (NASDAQ: AMR) and its predecessor, Silver Run II, between March 2017 and June 2020. Mr. Tepper received a Master of Business Administration from Columbia Business School and a Bachelor of Science in Economics from The Wharton School of the University of Pennsylvania with concentrations in finance and accounting.

We believe Mr. Tepper's extensive M&A experience, including service on the boards of directors of two blank check companies, brings important and valuable skills to our board of directors.

*Michael Warren* has served as a member of the DCRB Board since November 18, 2020. Mr. Warren has served as a member of the board of directors of Decarbonization Plus Acquisition Corporation II since February 2021. Mr. Warren is the Managing Director of Albright Stonebridge Group ("ASG"). Mr. Warren served as ASG's Managing Principal from 2013 to 2017 and as Principal from 2009 to 2013. Prior to ASG, Mr. Warren served as the Chief Operating Officer and Chief Financial Officer of Stonebridge International from 2004 to 2009, where he managed operations, business development, finance, and personnel portfolios. Mr. Warren served in various capacities in the Obama Administration, including as senior advisor in the White House Presidential Personnel Office and as co-lead for the Treasury and Federal Reserve agency review teams of the Obama-Biden Presidential Transition. Mr. Warren serves on the board of Brookfield Property Partners, the Board of Trustees and the risk & audit committees at Commonfund, the Board of Directors of Walker & Dunlop, Inc, and the Board of Directors of MAXIMUS. He serves as a Trustee of Yale University and is a member of the Yale Corporation Investment Committee. Mr. Warren formerly served as a Trustee of the District of Columbia Retirement Board and as a member of the Board of Directors of the United States Overseas Private Investment Corporation. Mr. Warren received degrees from Yale University and Oxford University where he was a Rhodes Scholar.

We believe Mr. Warren is well qualified to serve as a director due to his familiarity with strategic planning, investment, financial expertise, operations and government programs gained through his service on other boards, his current and prior positions in private industry and government.

**Number and Terms of Office of Officers and Directors**

DCRB has nine directors. The DCRB Board is divided into three classes with only one class of directors being elected in each year and each class (except for those directors appointed prior to DCRB's first annual meeting of stockholders) serving a three-year term. The term of office of the first class of directors, consisting of Dr. Jennifer Aaker, Jane Kearns and Michael Warren, will expire at our first annual meeting of stockholders. The term of office of the second class of directors, consisting of Erik Anderson, Jim McDermott and Jeffrey Tepper, will expire at the second annual meeting of stockholders. The term of office of the third class of directors, consisting of Pierre Lapeyre, Jr., David Leuschen and Robert Tichio, will expire at the third annual meeting of stockholders.

Holders of our Founder Shares will have the right to elect all of our directors prior to the consummation of our Initial Business Combination and holders of our public shares will not have the right to vote on the election of directors during such time.

Approval of our Initial Business Combination will require the affirmative vote of a majority of the DCRB Board, which must include a majority of our independent directors and a majority of the non-independent directors nominated by our Sponsor.

DCRB's officers are appointed by the DCRB Board and serve at the discretion of the DCRB Board, rather than for specific terms of office. The DCRB Board is authorized to appoint persons to the offices set forth in DCRB's bylaws as it deems appropriate. DCRB's bylaws provide that DCRB's officers may consist of a Chairman of the Board, Chief Executive Officer, Presidents, Chief Financial Officer, Vice Presidents, Secretary, Assistant Secretaries and such other officers as may be determined by the board of directors.

184

Table of Contents

**Board Leadership Structure and Role in Risk Oversight**

Robert Tichio serves as the Chairman of the DCRB Board. The Chief Executive Officer, who is also a director, is responsible for leading our management and operations. The DCRB Board believes that the current leadership structure is efficient for a company of our size, and promotes good corporate governance. However, the DCRB Board will continue to evaluate its leadership structure and may change it if, in the opinion of the DCRB Board, a change is required by the needs of our business and operations.

The DCRB Board is actively involved in overseeing our risk assessment and monitoring processes. The DCRB Board focuses on our general risk management strategy and ensures that appropriate risk mitigation strategies are implemented by management. Further, operational and strategic presentations by management to the DCRB Board include consideration of the challenges and risks of our businesses, and the DCRB Board and management actively engage in discussion on these topics. In addition, each of the DCRB Board's committees considers risk within its area of responsibility.

**Director Independence**

Nasdaq listing standards require that a majority of the DCRB Board be independent. An "independent director" is defined generally as a person other than an officer or employee of the company or its subsidiaries or any other individual having a relationship which in the opinion of the company's board of directors, would interfere with the director's exercise of independent judgement in carrying out the responsibilities of a director. The DCRB Board has determined that Dr. Jennifer Aaker, Jane Kearns, Jim McDermott, Jeffrey H. Tepper and Michael Warren are "independent directors" as defined in the Nasdaq listing standards and applicable SEC rules. Our independent directors will have regularly scheduled meetings at which only independent directors are present.

**Committees of the DCRB Board**

The DCRB Board has two standing committees: an audit committee and a compensation committee. Subject to phase-in rules and a limited exception, the rules of Nasdaq and Rule 10A-3 under the Exchange Act require that the audit committee of a listed company be comprised solely of independent directors, and the rules of Nasdaq require that the compensation committee of a listed company be comprised solely of independent directors.

*Audit Committee*

The DCRB Board has established an audit committee of the board of directors. Jim McDermott, Jeffrey Tepper and Robert Tichio serve as members of our audit committee. Under the Nasdaq listing standards and applicable SEC rules, we are required to have at least three members of the audit committee, all of whom must be independent, subject to the exception described below. Jim McDermott and Jeffrey Tepper are independent. Because we listed our securities on Nasdaq in connection with the IPO, we have one year from the effective date of our registration statement to have our audit committee be comprised solely of independent members. We intend to identify one additional independent director to serve on our audit committee within one year of the effective date of our registration statement, at which time Robert Tichio will resign from the committee. We expect such additional director to enter into a letter agreement substantially similar to the letter agreement signed by our Sponsor, officers and directors included as an exhibit to our registration statement.

Jeffrey Tepper serves as chair of the audit committee. All of the members of the audit committee are financially literate, and the DCRB Board has determined that Jeffrey Tepper qualifies as an "audit committee financial expert" as defined in applicable SEC rules.

185

Table of Contents

## MANAGEMENT AFTER THE BUSINESS COMBINATION

**Executive Officers and Directors After the Business Combination**

Upon the consummation of the business combination, the business and affairs of New Hyzon will be managed by or under the direction of the New Hyzon Board. DCRB and Hyzon are currently evaluating potential director nominees and executive officer appointments, but the following table sets forth the name, age and position of each of the expected directors if the Director Election Proposal is approved by DCRB's stockholders at the special meeting, and the expected executive officers of New Hyzon upon consummation of the business combination.

| Name | Age | Position |
| --- | --- | --- |
| *Executive Officers* | | |
| George Gu | 50 | Executive Chairman |
| Craig Knight | 52 | Director and Chief Executive Officer |
| Adam Kroll | 46 | Chief Financial Officer |
| Gary Robb | 48 | Chief Technology Officer |
| John Zavoli | 61 | General Counsel & Chief Legal Officer |
| Parker Meeks | 40 | Chief Strategy Officer |
| Max Holthausen | 22 | Managing Director of Hyzon Europe |
| *Non-Employee Directors* | | |
| Erik Anderson[2] | 62 | Director |
| Ivy Brown[1] | 58 | Director |
| Dennis Edwards[2][3] | 50 | Director |
| Mark Gordon | 50 | Director |
| Viktor Meng[2][3] | 46 | Director |
| Ki Deok (KD) Park[1] | 52 | Director |
| Elaine Wong[1][3] | 45 | Director |

(1)  Member of the audit committee, effective upon the consummation of the business combination.
(2)  Member of the compensation committee, effective upon the consummation of the business combination.
(3)  Member of the nominating and corporate governance committee, effective upon the consummation of the business combination.

**Executive Officers**

*George Gu*. Upon the consummation of the business combination, Mr. Gu will serve as Executive Chairman and a member of the New Hyzon Board. Mr. Gu has served as Executive Chairman of Hyzon August 2020. Prior to that, Mr. Gu served as Chief Executive Officer of Hyzon from January 2020 when he co-founded the company until August 2020. Mr. Gu co-founded Hyzon's parent company Horizon, a leading international fuel cell producer, in 2003 and has served as Horizon's Chairman since August 2019. Prior to that, Mr. Gu served as Horizon's Chief Executive Officer from the company's formation until August 2019. Mr. Gu served as the Chairman of Horizon Educational Group, an affiliate of Horizon focused on fuel cell education, from August 2019 to February 2021. From June 1999 to October 2003, Mr. Gu was the Digital Ventures Manager at Eastman Chemical Company, a specialty materials company primarily in the chemical industry, where he was responsible for clean technology and e-commerce. Mr. Gu holds an M.B.A. from the University of North Carolina (Chapel Hill) and a B.S. degree in Finance from Fudan University.

We believe Mr. Gu is qualified to serve on the New Hyzon Board due to his operational experience as Hyzon's Executive Chairman and as a member of Hyzon's board of directors, his historical knowledge of Hyzon and its strategic objectives as one of its co-founders, business leadership experience in the hydrogen mobility sector and his experience serving on the board of directors of a hydrogen-focused company.

202

**Table of Contents**

**FOR THE SPECIAL MEETING OF STOCKHOLDERS OF**

**Decarbonization Plus Acquisition Corporation**

**THIS PROXY IS SOLICITED ON BEHALF OF THE BOARD OF DIRECTORS**

**P R O X Y** The undersigned hereby appoints Erik Anderson and Peter Haskopoulos (the "Proxies"), and each of them independently, with full power of substitution, as proxies to vote all of the shares of Class A Common Stock or Class B Common Stock of Decarbonization Plus Acquisition Corporation (the "Company" or "DCRB") that the undersigned is entitled to vote (the "Shares") at the special meeting of stockholders of the Company to be held on July 15, 2021 at 10:00 a.m., Eastern time, via live webcast at https://www.cstproxy.com/decarbonizationplusacquisition/sm2021 and at any adjournment or postponement thereof. Such Shares shall be voted as indicated with respect to the proposals listed on the reverse side hereof and, unless such authority is withheld on the reverse side hereof, in the Proxies' discretion on such other matters as may properly come before the special meeting or any adjournment or postponement thereof.

**C** The undersigned acknowledges receipt of the enclosed proxy statement and revokes all prior proxies for said meeting.

**A R D** **THE SHARES REPRESENTED BY THIS PROXY WHEN PROPERLY EXECUTED WILL BE VOTED IN THE MANNER DIRECTED HEREIN BY THE UNDERSIGNED STOCKHOLDER(S). IF NO SPECIFIC DIRECTION IS GIVEN AS TO THE PROPOSALS ON THE REVERSE SIDE, THIS PROXY WILL BE VOTED "FOR" PROPOSAL NOS. 1, 2, 3, 4, 5 AND 7 AND "FOR ALL NOMINEES" ON PROPOSAL NO. 6. PLEASE MARK, SIGN, DATE AND RETURN THE PROXY CARD PROMPTLY.**

**(Continued and to be marked, dated and signed on the reverse side)**

Table of Contents



Please mark vote as indicated in this example

**DECARBONIZATION PLUS ACQUISITION CORPORATION—THE BOARD OF DIRECTORS RECOMMENDS A VOTE "FOR" PROPOSAL NOS. 1, 2, 3, 4, 5 AND 7 AND "FOR ALL NOMINEES" ON PROPOSAL NO. 6.**

(1) **The Business Combination Proposal**—To consider and vote upon a proposal to (a) approve and adopt the Business Combination Agreement and Plan of Reorganization, dated as of February 8, 2021 (the "Business Combination Agreement"), among Decarbonization Plus Acquisition Corporation ("DCRB"), DCRB Merger Sub Inc., a Delaware corporation and a wholly owned subsidiary of DCRB ("Merger Sub"), and Hyzon Motors Inc., a Delaware corporation ("Hyzon"), pursuant to which Merger Sub will merge with and into Hyzon, with Hyzon surviving the merger as a wholly owned subsidiary of DCRB and (b) approve such merger and the other transactions contemplated by the Business Combination Agreement (the "business combination" and such proposal, the "Business Combination Proposal").

FOR ☐  AGAINST ☐  ABSTAIN ☐

(2) **The Authorized Share Charter Proposal**—To consider and vote upon a proposal to (a) increase the number of authorized shares of DCRB's Class A Common Stock, par value $0.0001 per share (the "Class A Common Stock"), from 250,000,000 shares to 400,000,000 shares and (b) increase the number of authorized shares of DCRB's Preferred Stock, par value $0.0001 per share, from 1,000,000 shares to 10,000,000 shares. The Authorized Share Charter Proposal is conditioned on the approval of the Business Combination Proposal and the Nasdaq Proposal.

FOR ☐  AGAINST ☐  ABSTAIN ☐

(3) **The Additional Charter Proposal**—To consider and vote upon a proposal to eliminate provisions in DCRB's amended and restated certificate of incorporation relating to DCRB's initial business combination that will no longer be applicable to DCRB following the closing of the business combination (the "Closing"), change the post-combination company's name to "Hyzon Motors Inc." and make certain other changes that the board of directors of DCRB deems appropriate for a public operating company (the "Additional Charter Proposal" and, together with the Authorized Share Charter Proposal, the "Charter Proposals"). The Additional Charter Proposal is conditioned on the approval of the Business Combination Proposal and the Nasdaq Proposal.

FOR ☐  AGAINST ☐  ABSTAIN ☐

(4) **The Nasdaq Proposal**—To consider and vote upon a proposal to approve, for purposes of complying with applicable listing rules of the Nasdaq Capital Market ("Nasdaq"), (a) the issuance (or reservation for issuance in respect of certain options issued in exchange for outstanding pre-merger Hyzon options, Hyzon RSUs, and Hyzon Warrants) of 202,285,035 shares of Class A Common Stock, (b) the issuance and sale of 35,500,000 shares of Class A Common Stock in the private offering of securities to certain investors in connection with the business combination, and (c) the issuance of up to 5,025,108 Conversion Shares in connection with the business combination (the "Nasdaq Proposal").

FOR ☐  AGAINST ☐  ABSTAIN ☐

(5) **The 2021 Plan Proposal**—To consider and vote upon a proposal to approve and adopt the New Hyzon 2021 Equity Incentive Plan (the "2021 Plan") and material terms thereunder (the "2021 Plan Proposal"). The 2021 Plan Proposal is conditioned on the approval of the Business Combination Proposal and the Nasdaq Proposal.

FOR ☐  AGAINST ☐  ABSTAIN ☐

(6) **The Director Election Proposal**—To consider and vote upon a proposal to elect three directors to serve until the 2022 annual meeting of stockholders, three directors to serve until the 2023 annual meeting of stockholders and three directors to serve until the 2024 annual meeting of stockholders, and until their respective successors are duly elected and qualified, subject to such directors' earlier death, resignation, retirement, disqualification or removal (the "Director Election Proposal"). The Director Election Proposal is conditioned on the approval of the Business Combination Proposal and the Nasdaq Proposal.

**Nominees:**

|  | FOR ALL NOMINEES | WITHHOLD VOTE FOR ALL NOMINEES | FOR ALL NOMINEES EXCEPT* |
|---|---|---|---|
|  | ☐ | ☐ | ☐ |

01 Erik Anderson,
02 Ivy Brown
03 Dennis Edwards
04 Mark Gordon
05 George Gu
06 Craig Knight
07 Viktor Meng
08 KD Park
09 Elaine Wong

Instruction: To withhold authority to vote for any individual nominee, mark "FOR ALL NOMINEES EXCEPT" and write the number of the nominee(s) on the line below:

_____

(7) **The Adjournment Proposal**—To consider and vote upon a proposal to approve the adjournment of the special meeting to a later date or dates, if necessary or appropriate, to permit further solicitation and vote of proxies in the event that there are insufficient votes for, or otherwise in connection with, the approval of the Business Combination Proposal, the Charter Proposals, the Nasdaq Proposal, the 2021 Plan Proposal, or the Director Election Proposal (the "Adjournment Proposal").

FOR ☐  AGAINST ☐  ABSTAIN ☐