**UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IN RE HYZON MOTORS INC. SECURITIES LITIGATION | Case No. 6:21-cv-06612-CJS-MWP |
| *This Document Relates to:*<br>*ALL ACTIONS* |  |

### LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS'
<u>MOTIONS TO DISMISS THE THIRD AMENDED CONSOLIDATED COMPLAINT</u>

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ........................................................................................ 1

SUMMARY OF DEFENDANTS' MISCONDUCT ........................................................... 4

    A.     Hyzon and DCRB partner up to sell investors on Horizon's staid HFCEV business.................................................................................................. 4

    B.     Defendants misrepresent Hyzon's relationships with blue-chip customers to persuade investors to vote yes for the merger. ................................ 5

    C.     Misinformed shareholders vote to approve the de-SPAC Merger.......................... 8

    D.     Defendants concoct sham transactions through shell entity HongYun.................................................................................................... 9

    E.     Short seller analysts investigate Hyzon's claims, interview witnesses, and publish findings on Hyzon's sham transactions. .......................... 10

    F.     Undeterred, Hyzon doubles down on misstatements, falsely claiming it sold 5 HFCEVs in Europe and 82 HFCEVs in China in 2021................................................................................................................. 11

    G.     Hyzon maintains false books, records, and SEC reports to inflate revenues. .............................................................................................. 12

    H.     Hyzon's Board creates a Special Committee to investigate wrongdoing, disavows prior financial statements, and terminates Knight and Gu................................................................................................... 13

    I.     Hyzon publishes the Committee's summary findings, conceding Hyzon falsely reported deliveries and attributing failures to "certain Hyzon executives."................................................................................ 14

    J.     Hyzon issues restated financial reports for prior quarters confirming the Special Committee's findings of misconduct and improper revenue recognition. ............................................................................ 15

    K.     Defendants Hyzon and Knight consent to entry of judgment against them. ...................................................................................................... 17

    L.     The Delaware Chancery Court sustains breach-of-fiduciary duty claims against the former directors of DCRB arising from Hyzon's customer relationships. ...................................................................................... 18

APPLICABLE LEGAL STANDARDS ............................................................................... 19

    A.    Motion to dismiss under Rule 12(b)(6) .................................................. 19

    B.    Securities fraud in violation of Section 10(b) and SEC Rule 10b-5 ..................... 20

    C.    Heightened pleading under the Public Securities Litigation Reform
          Act of 1995 ..................................................................................... 20

    D.    Misleading Soliciting Materials in violation of Section 14(a) and
          SEC Rule 14a-9(a) ............................................................................ 21

ARGUMENT ..................................................................................................................... 22

    A.    The Hyzon and DCRB Defendants made materially false
          statements and omissions to investors in violation of Section 10(b)
          of the Exchange Act and SEC Rule 10b-5(b). ........................................ 22

          1.    Defendants' statements were false or misleading. .................................... 22

          2.    Defendants' statements are actionable and garner no
               protection as forward-looking, puffery, or opinion speech ....................... 33

          3.    Defendants Hyzon, Knight, Gu, Tichio, Gordon, Anderson,
               and Haskopoulos acted with scienter. .................................................. 38

           4.    Defendants' misconduct is well documented by Hyzon's
               disclosures, short seller analysts, plaintiff's independent
               investigation, and the SEC. ................................................................ 50

          5.    Lead Plaintiff has statutory standing to bring Section 10(b)
               claims for pre-merger statements. ......................................................... 52

          6.    Loss causation is adequately plead, as Defendants'
               misconduct directly caused investors to suffer significant
               losses once risks materialized. ............................................................. 56

    B.    The Hyzon and DCRB Defendants employed deceptive schemes
          and engaged in fraudulent acts in violation of Section 10(b) and
          SEC Rule 10b-5(a) & (c). ................................................................... 59

    C.    All Defendants prepared, reviewed, or disseminated false and
          misleading Soliciting Materials in violation of Section 14(a) of the
          Exchange Act and Rule 14a-9 ............................................................. 62

          1.    Defendants misstate the pleading standard for Section 14(a)
               claims. ............................................................................................ 62

2.    The Soliciting Materials contained untrue statements of material fact and omitted material information. ...................................... 64

3.    The Complaint sufficiently pleads each Defendant's negligence. .............................................................................. 65

4.    The Complaint's Section 14(a) claims are based on Defendants' deprivation of investors' redemption rights and are thus "direct," not derivative. ............................................................. 67

D.    Defendants are liable as control persons under Section 20(a). ............................ 68

CONCLUSION ................................................................................................................. 70

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*In re Adaptive Broadband Sec. Litig.*,
 2002 WL 989478 (N.D. Cal. Apr. 2, 2002) ...............................................................47

*Alpha Capital Anstalt v. New Generation Biofuels, Inc.*,
 2014 WL 6466994 (S.D.N.Y. Nov. 18, 2014) ...........................................................39

*Am. Builders & Contractors Supply Co. v. Macaluso Enters., Ltd.*,
 2022 WL 1809401 (W.D.N.Y. June 2, 2022) (Siragusa, J.) .....................................19

*In re Am. Italian Pasta Co. Sec. Litig.*,
 2006 WL 1715168 (W.D. Mo. June 19, 2006) ..........................................................46

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009) ..................................................................................................19

*In re Avon Sec. Litig.*,
 2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019) ...........................................................44

*In re Banco Bradesco S.A. Sec. Litig.*,
 277 F. Supp. 3d 600 (S.D.N.Y. 2017)........................................................................36

*In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA)*
 *Litig.*,
 757 F. Supp. 2d 260 (S.D.N.Y. 2010)........................................................................65

*Berson v. Applied Signal Tech., Inc.*,
 527 F.3d 982 (9th Cir. 2008) ....................................................................................29

*Bhandari v. Bittner*,
 2004 WL 2284582 (W.D.N.Y. Oct. 5, 2004) ............................................................19

*Bos. Ret. Sys. v. Alexion Pharms., Inc.*,
 556 F. Supp. 3d 100 (D. Conn. 2021)........................................................................57

*Bricklayers & Masons Loc. Union No. 5 Ohio Pension Fund v. Transocean Ltd.*,
 866 F. Supp. 2d 223 (S.D.N.Y. 2012)........................................................................62

*Camelot Event Driven Fund v. Alta Mesa Res., Inc.*,
 2021 WL 1416025 (S.D. Tex. Apr. 14, 2021) ..........................................................56

*In re CarLotz, Inc. Sec. Litig.*,
 2023 WL 2744064 (S.D.N.Y. Mar. 31, 2023) ..........................................................56

*Chevron Corp. v. Donziger*,
  325 F. Supp. 3d 371 (S.D.N.Y. 2018)................................................................33, 61

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
  2018 WL 2382600 (S.D.N.Y. May 24, 2018) ........................................................33

*In re China Mobile Games & Entm't Grp., Ltd Sec. Litig.*,
  2016 WL 922711 (S.D.N.Y. Mar. 7, 2016) ............................................................57

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
  450 F. Supp. 3d 379 (S.D.N.Y. 2020)....................................................................41

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*,
  477 F. Supp. 3d 123 (S.D.N.Y. 2020)....................................................................69

*Commodity Futures Trading Comm'n v. McDonnell*,
  332 F. Supp. 3d 641 (E.D.N.Y. 2018) ..............................................................24, 37

*In re Complete Mgmt. Sec. Litig.*,
  153 F. Supp. 2d 314 (S.D.N.Y. 2001).....................................................................45

*Delman v. GigAcquisitions3, LLC*,
  288 A.3d 692 (Del. Ch. 2023).................................................................................68

*In re DNTW Chartered Accts. Sec. Litig.*,
  172 F. Supp. 3d 675 (S.D.N.Y)...............................................................................19

*Dobina v. Weatherford Int'l Ltd.*,
  909 F. Supp. 2d 228 (S.D.N.Y. 2012).....................................................................32

*DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*,
  323 F. Supp. 3d 393 (S.D.N.Y. 2018).....................................................................26

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005)................................................................................................56

*Enzo Biochem, Inc. v. Harbert Discovery Fund, LP*,
  2021 WL 4443258 ...................................................................................................63

*In re Fannie Mae 2008 Sec. Litig.*,
  891 F. Supp. 2d 458 (S.D.N.Y. 2012)................................................................22, 23

*Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*,
  268 F. Supp. 3d 526 (S.D.N.Y. 2017)............................................................ *passim*

*Freudenberg v. E\*Trade Fin. Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010).....................................................................56

*Ga. Firefighters' Pension Fund v. Anadarko Petro. Corp.*,
  514 F. Supp. 942 (S.D. Tex. 2021) .........................................................................60

*Garcia–Garcia v. City of New York*,
  2013 WL 3832730 (S.D.N.Y. July 22, 2013) ...........................................................................19

*Global Network Commc'ns, Inc. v. City of New York*,
  458 F.3d 150 (2d Cir. 2006) ...................................................................................................19

*Gormley v. Magicjack Vocaltec Ltd.*,
  220 F. Supp. 3d 510 (S.D.N.Y. 2016) ....................................................................................56

*Greenapple v. Detroit Edison Co.*,
  618 F.2d 198 (2d Cir. 1980) ...................................................................................................27

*In re Hain Celestial Grp., Inc. Sec. Litig.*,
  20 F.4th 131 (2d Cir. 2021) ...................................................................................................22

*Hall v. The Children's Place Retail Stores, Inc.*,
  580 F. Supp. 2d 212 (S.D.N.Y. 2008) ....................................................................................32

*In re Hi-Crush Partners L.P. Sec. Litig.*,
  2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013) ...........................................................................35

*In re IMAX Sec. Litig.*,
  587 F. Supp. 2d 471 (S.D.N.Y. 2008) ....................................................................................44

*Indus. Tech. Ventures LP v. Pleasant T. Rowland Revocable Tr.*,
  688 F. Supp. 2d 229 (W.D.N.Y. 2010) ...................................................................................19

*In re Intercept Pharms., Inc. Sec. Litig.*,
  2015 WL 915271 (S.D.N.Y. Mar. 4, 2015) ...........................................................................42

*Janus Cap. Grp., Inc. v. First Derivative Traders*,
  564 U.S. 135 (2011) .................................................................................................................54

*John Wiley & Sons, Inc. v. DRK Photo*,
  998 F. Supp. 2d 262 (S.D.N.Y. 2014) ....................................................................................40

*In re JPMorgan Chase & Co. Sec. Litig.*,
  2007 WL 4531794 (N.D. Ill. Dec. 18, 2007) .........................................................................67

*Kalin v. Xanboo, Inc.*,
  526 F.Supp.2d 392 (S.D.N.Y.2007) .......................................................................................69

*Lea v. TAL Educ. Grp.*,
  837 F. App'x 20 (2d Cir. 2020) ..............................................................................................57

*List v. Fashion Park, Inc.*,
  340 F.2d 457 (2d Cir. 1965) ...................................................................................................43

*Lorenzo v. Sec. & Exch. Comm'n*,
  139 S. Ct. 1094 (2019) .......................................................................................................20, 59

*Lormand v. US Unwired, Inc.*,
565 F.3d 228 (5th Cir. 2009) ...........................................................................21

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
513 F.3d 702 (7th Cir. 2008) ......................................................................34, 50

*Malork v. Anderson et al.*,
No. 2022-0260-PAF (Del. Chanc. Ct. July 19, 2023)...................................... *passim*

*McIntosh v. Katapult Holdings, Inc.*,
2023 WL 5049044 (S.D.N.Y. Aug. 8, 2023)...........................................................63

*McMahan & Co. v. Wherehouse Ent., Inc.*,
900 F.2d 576 (2d Cir. 1990).......................................................................27, 29

*Mehedi v. View, Inc.*,
2023 WL 3592098 (N.D. Cal. May 22, 2023) ........................................................68

*Mendell v. Greenberg*,
927 F.2d 667 (2d Cir. 1991).............................................................................64

*In re Mercator Software Inc. Sec. Litig.*,
161 F. Supp. 2d 143 (D. Conn. 2001).................................................................48

*Michaels Bldg. Co. v. Ameritrust Co., N.A.*,
848 F.2d 674 (6th Cir.1988) .............................................................................19

*In re MicroStrategy, Inc. Sec. Litig.*,
115 F. Supp. 2d 620 (E.D. Va. 2000) .............................................................38, 46

*Miller v. City of Ithaca*,
2019 WL 1470249 (N.D.N.Y. Apr. 3, 2019) ........................................................54

*In re Mindbody, Inc. Sec. Litig.*,
489 F. Supp. 3d 188 (S.D.N.Y. 2020)...................................................................65

*Moshell v. Sasol Ltd.*,
481 F. Supp. 3d 280 (S.D.N.Y. 2020)...................................................................40

*In re MultiPlan Corp. S'holders Litig.*,
268 A.3d 784 (Del. Ch. 2022)............................................................................68

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000)..............................................................................39

*Nunes v. NBCUniversal Media, LLC*,
643 F. Supp. 3d 403 (S.D.N.Y. 2022)...................................................................37

*In re NYSE Specialists Sec. Litig.*,
503 F.3d 89 (2d Cir. 2007)...........................................................................53, 56

*Okada v. Whitehead*,
  2015 WL 13544356 (C.D. Cal. Nov. 19, 2015)................................................................25

*In re Petrobras Sec. Litig.*,
  116 F. Supp. 3d 368 (S.D.N.Y. 2015)............................................................................35

*In re Quality Sys., Inc. Sec. Litig.*,
  865 F.3d 1130 (9th Cir. 2017) ...............................................................................34, 36

*In re Refco, Inc. Sec. Litig.*,
  503 F. Supp. 2d 611 (S.D.N.Y. 2007)......................................................................47, 64

*City of Pontiac Gen. Ret. Sys. v. Lockheed Martin Corp.*,
  875 F. Supp. 2d 359 (S.D.N.Y. 2012)............................................................................38

*Romeo Power Inc. Sec. Litig.*,
  2022 WL 1806303 (S.D.N.Y. June 2, 2022) ..............................................................56, 68

*SEC v. CKB168 Holdings, Ltd.*,
  210 F. Supp. 3d 421 (E.D.N.Y. 2016) ...........................................................................59

*SEC v. Hurgin*,
  484 F. Supp. 3d 98 (S.D.N.Y. 2020)..............................................................................65

*SEC v. Lek Sec. Corp.*,
  276 F. Supp. 3d 49 (S.D.N.Y. 2017)..............................................................................69

*Skiadas v. Acer Therapeutics Inc.*,
  2020 WL 3268495 (S.D.N.Y. June 16, 2020) ..................................................................50

*Slayton v. Am. Express Co.*,
  604 F.3d 758 (2d Cir. 2010)..................................................................................34, 35

*In re Supercom Inc. Sec. Litig.*,
  2018 WL 4926442 (S.D.N.Y. Oct. 10, 2018) ..................................................................36

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)..........................................................................................21, 38

*Tolbert v. Queens Coll.*,
  242 F.3d 58 (2d Cir. 2001)....................................................................................37, 69

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.*,
  845 A.2d 1031 (Del. 2004) ........................................................................................68

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
  625 F. Supp. 3d 164 (S.D.N.Y. 2022)............................................................................54

*United Paperworkers Int'l Union v. Int'l Paper Co.*,
  985 F.2d 1190 (2d Cir. 1993)..................................................................................22, 27

*Vanleeuwen v. Keyuan Petrochemicals, Inc.*,
    2014 WL 3891351 (S.D.N.Y. Aug. 8, 2014)......................................................................19, 20, 70

*In re VEON Ltd. Sec. Litig*,
    2017 WL 4162342 (S.D.N.Y. Sept. 19, 2017)........................................................................56

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016)..............................................................................................34, 56

*Wilson v. Great Am. Indus., Inc.*,
    855 F.2d 987 (2d Cir. 1988)........................................................................................21, 63, 67

*In re WorldCom, Inc. Sec. Litig.*,
    2003 WL21488087 (S.D.N.Y. June 25, 2003) ....................................................................47

*In re WorldCom, Inc. Sec. Litig.*,
    294 F. Supp. 2d 392 (S.D.N.Y. 2003)..................................................................................45

*In re XL Fleet Corp. Sec. Litig.*,
    2022 WL 493629 (S.D.N.Y. Feb. 17, 2022).....................................................................28, 43

*Yoshikawa v. Exxon Mobil Corp.*,
    2023 WL 5489054 (N.D. Tex. Aug. 24, 2023)......................................................................60

## STATUTES

15 U.S.C. § 77z-2(b)(2)(D)...................................................................................................33

15 U.S.C. § 77z-I(1)..............................................................................................................33

15 U.S.C. § 78j(b) .................................................................................................................20

15 U.S.C. § 78n(a) ................................................................................................................21

15 U.S.C. § 78u-4(b)..............................................................................................................21

15 U.S.C. § 78u-4(b)(1) .........................................................................................................62

15 U.S.C. § 78u-4(b)(2) .........................................................................................................62

Exchange Act Section 10(b) ....................................................................................... *passim*

Exchange Act Section 14(a)........................................................................................ *passim*

PSLRA ........................................................................................................................ *passim*

## OTHER AUTHORITIES

17 CFR § 240.14a-9(a) ................................................................................................21, 61, 62

17 CFR § 240.10b-5...................................................................................................20, 52, 53, 60

17 CFR § 240.10b-5(a)&(c)................................................................................................53, 58, 60

17 CFR § 240.10b-5(b) ...............................................................................................22, 52, 54, 58

17 CFR § 240.10b-5(c) ..............................................................................................................59

Accounting Principles Board Opinion No. 20 ...........................................................................45

Fed. R. Civ. P. 8 ................................................................................................................. *passim*

Fed. R. Civ. P. 9(b) ......................................................................................................19, 63, 64

Fed. R. Civ. P. 12(b) ......................................................................................................... *passim*

Fed. R. Civ. P. 15(a)(2)..............................................................................................................70

Fed. R. Civ. P. 15(a)(3)..............................................................................................................20

John Coates, *SPACs, IPOs and Liability Risk under the Securities Laws* (Apr. 8,
    2021), https://www.sec.gov/news/public-statement/spacs-ipos-liability-risk-
    under-securities-laws ....................................................................................................33

**TABLE OF DEFINED TERMS**

| Term | Definition |
|---|---|
| ¶¶ | Refers to paragraphs in the Third Amended Consolidated Class Action Complaint ("Complaint") (Dkt. No. 67) filed on June 23, 2023 |
| T.# | Refers to Table [#] in the Complaint |
| Blue Orca | Blue Orca Capital—a short seller analyst firm founded and managed by known investor activist Soren Aandahl, which published a report on September 28, 2021 concerning Hyzon's purported deals and customers |
| Class Period | The period from February 9, 2021 to August 17, 2022, inclusive |
| DCRB | Defendant Decarbonization Plus Acquisition Corporation—a publicly traded special purpose acquisition company formed for the purpose of acquiring a private owned company (here Hyzon) and taking it public |
| DCRB Control Defendants | Defendants Riverstone, Sponsor, and WRG, by virtue of their controlling stock ownership interests, along with Defendants Anderson, Lapeyre, Leuschen, and Tichio, by virtue of their ties to those entities |
| DCRB Directors | Defendants Anderson, Aaker, Kearns, Lapeyre, Leuschen, Tichio, McDermott, Tepper, and Warren in their capacities as DCRB Directors. Also referred to herein as "DCRB Director Defendants." |
| DCRB Defendants | Defendants Anderson, Haskopoulos, and Tichio |
| DCRB MTD Br. | Memorandum of Law in Support of Defendants Haskopoulos, Tichio, Aaker, Kearns, Lapeyre, Lesuchen, McDermott, Tepper, Warren, Riverstone, Sponsor, and WRG's September 13, 2023 Motion to Dismiss (Dkt. No. 90) |
| Ex. | Documents attached to the concurrently filed Declaration of Lucas E. Gilmore |
| Exchange Act | Securities Exchange Act of 1934 |
| Founder Defendants | Defendants Knight and Gu |
| HFCEV | Hydrogen-fuel-cell powered electric vehicle |
| Hiringa | Hiringa Energy |
| HongYun | Shanghai Hydrogen HongYun Automotive Co., Ltd. |
| Horizon | Horizon Fuel Cell Technologies Ltd.—Hyzon's corporate grandparent, a Singapore-based company purporting to be a world leading developer and manufacturer of various fuel cell electric energy solutions and products, from which Hyzon spun off as an independent entity |
| Hyzon a/k/a Company | Defendant Hyzon Motors LLC (including its agents) and, following the July 16, 2021 de-SPAC Merger, both DCRB and "Legacy Hyzon" |

| Hyzon Defendants | Defendants Knight, Gu, and Gordon |
|---|---|
| Hyzon MTD Br. | Memorandum of Law in Support of Defendants Hyzon, Anderson, Knight, Gordon, and Gu's September 13, 2023 Motion to Dismiss (Dkt. No. 93) |
| Individual Defendants | Defendants Knight, Gu, Gordon, Anderson, Haskopoulos, and Tichio |
| Iceberg Research | Activist short seller firm founded by Arnauld Vaugner, best known for its reports on one of the largest commodity trading firms in the world, which published an October 6, 2021 report on Hyzon |
| IPO | Initial public offering |
| Jiushuang | Jiushuang (Shanghai) New Energy Technology Co., Ltd.—the Chinese company with which Hyzon entered into two joint ventures in July 2021 to promote the commercial operation of fuel cell vehicles in the Shanghai, China market—facts not disclosed until March 30, 2022 |
| Lead Plaintiff | Lead Plaintiff Alfred Miller |
| *Malork* Action | Refers to the breach-of-fiduciary action filed by DCRB shareholders in Delaware Court of Chancery against DCRB, its corporate backers, and its former directors. *See Malork v. Anderson et al.*, No. 2022-0260-PAF (Del. Chanc. Ct. July 19, 2023). |
| Merger Sub | DCRB Merger Sub Inc.—DCRB's directly owned subsidiary created to merge with Hyzon for purposes of taking Hyzon public through DCRB |
| MoU | Memorandum of Understanding |
| Proxy Statement | Refers to publicly filed statements securities issuers must furnish shareholders before they can seek consent or authorization for a specific corporate action (e.g., approval for a merger). These statements are filed on SEC Form Schedule 14A and must disclose all relevant details related to the issues being put forward for a shareholder vote. *See* 17 C.F.R. § 240.14a-101. They can take the form of a "preliminary" statement or a "definitive" statement." |
| PSLRA | The Private Securities Litigation Reform Act |
| Riverstone | Riverstone Holdings LLP and its affiliates—private equity firm whose affiliates sponsored DCRB up through the de-SPAC Merger, which was managed by Defendants Haskopoulos and Tichio |
| SEC | U.S. Securities and Exchange Commission |
| SEC Compl. | Refer to the complaint filed in *SEC v. Hyzon Motors, Inc. et al.*, No. 6:23-cv-06553 (W.D.N.Y.) (Sept. 26, 2023). |
| Section 10(b) Defendants | Refers to Defendants Hyzon, Knight, Gu, Gordon, Anderson, Haskopoulos, and Tichio |

| Soliciting Materials | Refers to communications sent to shareholders regarding an issue up for a shareholder vote and can include materials sent before a securities issuer furnishes a formal proxy statement. *See* 17 C.F.R. § 240.14a-12. When Soliciting Materials are sent before a formal proxy statement issues, they are filed with the SEC on Form 8-K. |
|---|---|
| SPAC or "blank check" company | Refers to a shell company listed on a public exchange established for the purpose of raising capital to finance the purchase of an unidentified private company, thus making the acquired company public without going through the traditional initial public offering process |
| de-SPAC Merger | Refers to the business combination between DCRB's directly owned subsidiary, Merger Sub, and Hyzon which closed on June 16, 2021. Upon completion of the de-SPAC Merger, DCRB renamed itself as Hyzon Motors, and Hyzon became the only business of the post-merger entity. This process is also referred to herein as a de-SPAC Merger. |
| Special Committee | The independent committee appointed by Hyzon's Board of Directors to investigate "revenue recognition timing issues" with the Company's operations in China, "operational inefficiencies" with its European operations, and general "governance and compliance issues." The Special Committee completed its preliminary findings in January 2023, and sent a Statement of its summary findings to the Board on March 10, 2023. |
| Statement | Refers to the Special Committee's summary of its investigation which was sent to Hyzon's Board on March 10, 2023. |
| Sponsor | Refers to Decarbonization Plus Acquisition Sponsor, LLC—an entity founded by Riverstone for purposes of the de-SPAC Merger |
| WRG | Refers to WRG DCRB Investors, LLC, an affiliate of Defendant Anderson |

**EXHIBITS**

A.     SEC Complaint, *SEC v. Hyzon Motors, Inc. et al*., No. 6:23-cv-06553 (W.D.N.Y. Sept. 26, 2023).

B.     Press Release, SEC, "SEC Charges Hydrogen Vehicle Co. Hyzon Motors and Two Former Executives for Misleading Investors" (Sept. 27, 2023) (press release).

C.     DCRB June 21, 2021 Proxy Statement

D.     Form 4, Statement of Changes in Beneficial Ownership for Craig Knight (Nov. 23, 2021)

E.     List of [Proposed] Supplemental Allegations

F.     [Proposed] Fourth Amended Complaint

**PRELIMINARY STATEMENT**

This case against Hyzon Motors, Inc. ("Hyzon"), its officers, directors, and take-public sponsors concerns one of the most egregious securities frauds to have emerged from the special purpose acquisition company ("SPAC")[1] stock boom of 2020 to 2021.

Throughout the Class Period, Defendants misrepresented Hyzon's relationships with Fortune 100 companies, faked deliveries and deals, and inflated the Company's financials—all to convince investors that Hyzon, a SPAC-repackaging of its corporate parent's failed business, would emerge as a leader in the fuel cell electric vehicle industry. Initially, Defendants sought to persuade shareholders of Defendant Decarbonization Plus Acquisition Corporation ("DCRB") to approve a de-SPAC Merger with Hyzon. The merger—approved by DCRB shareholders after Defendants' five-month false and misleading media campaign—enriched insiders and injected Hyzon with $600 million in much needed capital. To keep the post-merger stock inflated, DCRB's executives (doing business as Hyzon) doubled down on the previous misstatements and went so far as to issue false reports about megadeals, confirmed deliveries, and revenues, all so it would appear as if Hyzon had made good on its order and revenue promises. Through a series of compounding corrective disclosures, the Company later admitted its senior management engaged in wrongdoing, fired the same key executives for cause, restated its fraudulent financials, and copped to a $25 million SEC fine. Hyzon investors, in turn, suffered billions of dollars in losses.

Having already lost one motion to dismiss in a related Delaware Chancery Court action (and agreeing to consent judgments with the SEC),[2] Defendants cannot defend their brazen fraud on the actual pleading record. Instead, their motions advance new sets of facts recasting the Company's fraud-induced death spiral as mere "growing pains typical of a newly public company"

---

[1]   A "special purpose acquisition company" or "SPAC" refers to a shell company established on a public exchange for the purpose of merging with a private company, bringing it public without a traditional initial public offering, and operating under the acquired company's brand. ¶¶ 85-90.

[2]   *See* Telephonic Bench Ruling on Defendants' Motion to Dismiss ("Oral Ruling"), *Malork v. Anderson et al.*, No. 2022-0260-PAF (Del. Chanc. Ct. July 17, 2023) ("*Malork* Action"); *SEC v. Hyzon Motors, Inc. et al.*, No. 6:23-cv-06553 (W.D.N.Y. Sept. 27, 2023).

exacerbated by short sellers and litigious investors.[3] In this alternative universe, the Hyzon Defendants challenge the Section 10(b) elements of statutory standing, falsity, scienter, and loss causation. The DCRB Defendants, in turn, push this Court to adopt incorrect legal standards for Section 14(a). The Court should reject Defendants' attempts to rewrite the Complaint and history.

*First*, Lead Plaintiff has statutory standing to challenge under Section 10(b) every alleged misstatement made before the de-SPAC Merger closed. *Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.* reiterates that a Section 10(b) cause of action is available to any plaintiffs who "bought or sold the securities about which the misstatements were made."[4] Defendants' misstatements clear this condition. Defendants made or disseminated false statements in DCRB's proxies and other Soliciting Materials for the express purpose of influencing DCRB shareholders' decisions about DCRB securities. Because DCRB had no business operations, there was nothing Defendants could ask shareholders to do other than to vote for the merger and to not exercise their redemption rights.

*Second,* the Complaint sufficiently pleads falsity for all Counts. Indeed, the *Malork* Court found the very same statements and omissions alleged here regarding Hyzon's sales to purported "customer" Hiringa, purported orders from blue-chip "customers," and "30%-33%" gross margins were "materially misleading" at the motion-to-dismiss stage.[5] Defendants offer no cogent reason why this Court should reach a different conclusion. The disclosed results of Hyzon's internal investigation and subsequent restatements further confirm the falsity of Defendants' misstatements and omissions concerning HongYun and Hyzon's reported financial performance. *See* ¶¶ 221-26.

*Third*, the Complaint adequately alleges that the Section 10(b) Defendants acted with scienter—an element required by only Section 10(b). The Court need not look any further than the published summary of Hyzon's internal investigation and the termination of Hyzon's founder, CEO, and CFO. After Hyzon's Board-appointed Special Committee previewed the magnitude of

---

[3]   Hyzon Defs.' Mot. to Dismiss. Mem at 1 (Doc. No. 93) ("Hyzon MTD Br.").

[4]   54 F.4th 82, 88 (2d Cir. 2022) (internal citations omitted).

[5]   *See Malork* Oral Ruling at 35, 37-38 (Dkt. No. 94-41).

Hyzon's false, reports of deliveries and sales, ¶¶ 222-25, the Committee did not write off the misconduct as innocent mistakes by middle management or as byproducts of short seller reports. Instead, it noted "the tenor of certain communications by certain Hyzon executives"—here, Defendants Knight (CEO and CCO), Gordon (CFO), and Gu (Chairman)—"was overly concentrated on meeting the Company's 2021 deliveries forecast and recognizing revenue on those deliveries." ¶ 225. Defendants dismiss these allegations as nothing more than hindsight. But they overlook the Section 10(b) Defendants' personal roles in touting Hyzon's customer and order claims and vetting the phantom deals in question. *E.g.*, ¶¶ 111, 125-26, 130. They cast aside that Hyzon's Board ousted Knight (for cause), Gordon, and Gu for the misconduct alleged herein. ¶¶ 215-17. And they disregard the compelling motive evidence against them, including the millions of dollars of Founder Shares Defendants stood to gain from the de-SPAC Merger's approval, ¶ 481; Hyzon's cash-strapped status, ¶¶ 476-79; and their tremendous financial incentives to keep Hyzon's stock price inflated until the lock-up period on their securities expired. ¶¶ 484-86.

*Fourth*, the Complaint adequately pleads loss causation by demonstrating how each alleged disclosure event either revealed the information Defendants misrepresented and omitted, or constituted a materialization of the risk concealed by Defendants' misconduct. Immediately after these concealed risks were revealed, Hyzon's stock declined sharply, injuring investors.

*Finally*, Defendants have no answer to Lead Plaintiff's newly added Section 14(a) claims challenging the false and misleading Soliciting Materials. ¶¶ 543-52. Nor could they. These powerful claims require a mere negligence showing and need only meet Rule 8's notice pleading standard—elements and standards that the Complaint readily meets.

Accordingly, the Court should deny the Hyzon Defendants (Dkt. No. 89) and the DCRB Defendants' (Dkt. No. 92) motions to dismiss in their entirety.[6]

---

[6] Lead Plaintiff refers to the memoranda filed in support of these motions as "Hyzon MTD Br." and "DCRB MTD Br.," respectively. And "¶" refer to paragraphs alleged in the Complaint.

## SUMMARY OF DEFENDANTS' MISCONDUCT

This case concerns Hyzon, a publicly traded assembler of hydrogen fuel-cell electric vehicles ("HFCEVs"). Defendants Knight and Gu founded Hyzon in an attempt to revive their Chinese company's ("Horizon") failed EV enterprise. ¶¶ 67-78. Throughout the Class Period, Defendants from Hyzon and its blank-check backer, DCRB, exaggerated or negligently touted Hyzon's business dealings with Fortune 100 customers and its ability to generate revenues from those relationships. ¶¶ 109-42. To substantiate these promises, Hyzon executives falsely reported it had assembled, delivered, and sold 87 HFCEVs in 2021 for $6 million in recognized revenue. ¶ 195. These statements falsely suggested that meaningful sales and revenues were real or imminent. ¶¶ 284, 363. In truth, Hyzon touted deals with shell companies from which it was unlikely to collect payments, faked deliveries knowing its vehicles did not operate on hydrogen, and falsely recognized revenues. ¶¶ 142-201. Put simply, Hyzon's touted deals were all shams.

### A.    Hyzon and DCRB partner up to sell investors on Horizon's staid HFCEV business.

In January 2020, Defendants Knight and Gu filed paperwork establishing Hyzon as a spin-off and spiritual successor of Horizon's defunct HFCEV commercial vehicle subsidiary. ¶ 80. Knight and Gu's plan to rebuild Hyzon was simple: Hyzon would gain access to massive amounts of investment capital by going public via a process known as a de-SPAC Merger. ¶¶ 81-83. To succeed, Defendants needed to persuade shareholders of a blank check, special purpose acquisition company ("SPAC") to approve the acquisition of Hyzon. *See* ¶¶ 85-90 (describing SPAC process).

By November 2020, Hyzon started negotiations with Defendant DCRB. ¶ 104. At that time, DCRB lacked any business operations of its own. ¶ 98. It instead aimed to use the nearly $200 million raised from its October 22, 2020, IPO to invest into an acquisition target. ¶¶ 98-99. As a result of the IPO, DCRB had until March 2022 to complete a qualifying business combination. ¶ 103. If it failed to do so, it would have to wind up its affairs and return investors' money. *Id.* In that case, the substantial ownership interests its managers—Defendants Anderson, Haskopoulos, and Tichio—held, either personally or through investment vehicles, would become worthless. *Id.*

Over the course of three months, DCRB (i) "reviewed Hyzon's management presentation, including an overview of Hyzon's business and financial model, comparison against peer companies and information regarding Hyzon's potential customers"; (ii) asked questions of Hyzon; and (iii) "performed extensive due diligence investigation of the materials included in the electronic data room, including a review of Hyzon's material contracts and facilities, and intellectual property, financial, tax, legal, insurance, and accounting due diligence. ¶ 104.

By January 7, 2021, DCRB's Board chose to pursue Hyzon over other potential merger targets. ¶ 105. It chose Hyzon due in part to "Hyzon's non-binding memoranda of understanding, letters of intent and limited number of firm orders with various clients, including blue-chip Fortune 100 companies as well as Hyzon's rapidly growing visibility and potential near-term customers in Europe, Asia and Australia." *Id*. One month later, DCRB's Board[7]—poised to realize enormous returns from their Founder Shares—unanimously approved the conceived merger. ¶ 106.

Final approval, however, required the affirmative vote of a majority of the DCRB stockholders present at the special meeting. ¶ 107. If shareholders chose to reject the acquisition, shareholders could instead seek a redemption of their pro rata share of their DCRB assets, that is, the $10 in cash initially paid for each of their shares, plus interest ("redemption rights"). ¶ 98.

**B.      Defendants misrepresent Hyzon's relationships with blue-chip customers to persuade investors to vote yes for the merger.**

The Class Period begins on February 9, 2021. ¶ 109. That day, Hyzon and DCRB announced their agreement for a business combination that if approved by shareholders would result in Hyzon going public under DCRB's NASDAQ listing. *Id.* To persuade DCRB shareholders to approve the proposed $2.7 billion merger, Defendants stressed in the announcing press release that "Hyzon's technology [was] already commercialized with [an] existing global footprint, and [Hyzon's] sales pipeline with blue-chip Fortune 100s and municipalities." ¶ 111.

In merger solicitations issued that same day, Defendants also went out of their way to

---

[7]   DCRB's Directors were Defendants Anderson, Aaker, Kearns, Lapeyre, Leuschen, Tichio, McDermott, Tepper, and Warren. ¶¶ 53-59.

highlight Hyzon's deals-in-place and 2021 delivery schedule. ¶¶ 111-22. As just one example, in a conference call with investors announcing the merger, Defendant Tichio, DCRB's Chairman, claimed that: "[t]he Company has a sales pipeline for 2021 that is 100 percent under contract or MOU, providing real runway visibility, and its customers include some of the most recognizable global brands and the largest municipalities in the world." ¶ 112. On that same call, Defendant Gordon, then Hyzon's CFO, elaborated that the sales pipeline noted by Tichio—"$37 million on revenue on 85 units sold in 2021"—was "100 percent covered by contracts and MOUs." ¶ 113.

In tandem with Defendant Tichio's investor call statements, Defendants disseminated an investor presentation, made in preparation for the shareholder vote on the proposed merger. ¶¶ 114-22. This presentation misleadingly portrayed the status of Hyzon's relationships with purported customers. *Id.* On Slide 5, Defendants falsely claimed that Hyzon had a "2021 backlog of ~$40 million under contract or [Memorandum of Understanding] from blue-chip Fortune 100s and municipalities." ¶ 115. Slide 5 also listed logos of "Top Tier Customers/End Users/Partners," which purportedly included blue-chip brands like Heineken, Ikea, and Coca-Cola. *Id.*

In making these claims, Defendants published a global map of its top "customer deployments under way." ¶ 116. This map again affirmed that recognizable brands like Heineken and Ikea were end users finalizing multi-million-dollar purchases with 2021 deliveries. *Id.* In total, the map displayed logos and order statuses of 14 entities—12 of which Defendants claimed had 2021 delivery dates generating nearly $40 million. *Id.* This included Hiringa, a New Zealand startup which Defendants stressed in subsequent press releases, SEC filings, merger solicitations to investors, and social media posts had "placed a binding order" for 20 trucks to be delivered before the end of 2021, as part of a 1,500-vehicle supply agreement. ¶¶ 126-29.

Immediately next to the global deployment map, Hyzon reaffirmed its order pipeline broke down into two buckets. ¶ 116. The first bucket was "100% certain" contracted orders "[f]rom 13 private and public sector customers." *Id.* The second bucket consisted of "high probability orders," that is, at least "70%+" certain. *Id.* Under contracted orders, the slide indicated "$~40mm under

contract or MOU for 2021 revenue forecast." *Id.* The slide further relayed that "contracted and high probability revenue of >$150mm fully covers 2022 revenue forecast." *Id.* None of these materials hinted at 2021 orders, 100% certain or otherwise, from private Chinese entities. ¶ 119.

These press-release, investor-call, and investor-presentation statements—all filed by DCRB as Soliciting Materials for the de-SPAC Merger on the SEC's website—misleadingly suggested that Hyzon had deep-pocketed customers, a committed sales pipeline, and had formed revenue and delivery targets for the post-merger company using the "100% certain" orders Defendants touted. ¶ 284. In truth, Hyzon had virtually none of the committed customers with 2021 orders that Defendants proclaimed. The non-existent orders included:

- Heineken—which Defendants described as "finalizing" a $2 million purchase order for 5 HFCEVs to be delivered in 2021, ¶ 117—had informed Hyzon by February 4, 2021 that it could not accept an offer for deliveries in 2021.[8] Defendants nevertheless included Heineken in the February 9 investor presentation and continued to state that the "Global Brewer" was finalizing an order in subsequent versions of the presentation released in February, April, and July 2021. ¶¶ 321, 334.

- Ikea—which Defendants stated was "finalizing" a $1 million "contract" for 2 HFCEVs to be delivered in 2021, ¶ 118—never indicated it intended to purchase HFCEVs from Hyzon and, by June 2021, specifically told Hyzon that it would not be moving forward with any purchases.[9] Defendants nevertheless included Ikea's near-"final" order in the February, April, and July 2021 presentations. ¶¶ 321, 334.

- And Hiringa—which Defendants repeatedly held out as a direct customer with a "binding order" for 20 HFCEVs, *see* ¶ 129—was a small "channel partner" with no obligation, intention, or capability to purchase any HFCEVs, *see* ¶ 163-65. And as later revealed by an interview with a senior Hiringa executive, "Hiringa stated point blank that no deliveries would be taken in 2021, and the first validation trucks would be delivered for testing in March or April 2022, at the earliest." ¶¶ 166-67.

From February to July 2021, Defendants surreptitiously revised the investor presentations multiple times. ¶¶ 439-47. Despite the opportunity to clear the air, Defendants continued to tout

---

[8]   *See* Ex. A, SEC Compl. ¶ 22(a), *SEC v. Hyzon Motors, Inc. et al.*, No. 6:23-cv-06553 (W.D.N.Y.). (Dkt. No. 1) ("SEC Compl."); *see also* Ex. B, SEC, "SEC Charges Hydrogen Vehicle Co. Hyzon Motors and Two Former Executives for Misleading Investors" (Sept. 27, 2023) (press release).

[9]   *See* SEC Compl. ¶ 22(d).

sham "100% certain" and "high probability" orders like those identified above. *Id.*

## C.   Misinformed shareholders vote to approve the de-SPAC Merger.

By July 2021, Hyzon had made virtually zero progress towards its promise to deliver 85 HFCEVs for 2021 and to generate nearly $40 million in revenue. ¶ 151. Still, the Hyzon and DCRB Defendants pushed investors to vote yes for the de-SPAC Merger on the back of Hyzon's purported sales, customer base, and DCRB's extensive due diligence into such claims. ¶¶ 152, 315.

On June 21, 2021, DCRB filed a final proxy statement, ¶ 315, outlining the reasons why the "DCRB Board recommend[ed] that DCRB shareholders" approve the de-SPAC Merger, rather than exercise their redemption rights.[10] The DCRB Board emphasized its recommendation rested, in part, on "Revenue Potential. The DCRB Board considered Hyzon's non-binding memoranda of understanding, letters of intent and a limited number of orders with various clients, including blue-chip Fortune 100 companies as well as Hyzon's rapidly growing visibility." *Id.* The DCRB Board also cited the "results of DCRB's due diligence investigation of Hyzon conducted by DCRB's management team"—Defendants Anderson, Tichio, and Haskopoulos ("DCRB Defendants").[11]

One week later, on June 29, 2021, Defendant Tichio provided copies of Defendants' misleading investor presentation to a fireside chat audience. ¶ 139. Tichio then relayed: "[I]f you take a look at 2021, the company is you know projecting $37 million of revenue [from] vehicles that will actually roll off its lot this year. That is what we had communicated back in February. We still feel extraordinarily comfortable with that assessment, in that … the company has already demonstrated publicly through … its actual vehicles that were that that (sic) are on the road that are functioning and that are all regaining fantastic commercial traction right now." *Id.* Concerning Hyzon's backlog, Tichio also represented that the espoused deals and projections rested on "two sorts of buckets which is contracted ordered 100% certainty ... from public and private sector customers ... [and] high probability orders, and those are companies that have many times express

---

[10]   *See* Ex. C, June 21, 2021 Proxy Statement at 3, 100-02 (Dkt. No. 95-3) ("June 21, 2021 Proxy").
[11]   June 21, 2021 Proxy at 102.

indications to scale their truck orders and grow the conversion of their fleets over time ...." ¶ 140.

Finally, on July 13, 2021—two days before the special DCRB shareholder meeting—Hyzon falsely declared it had delivered its first HFCEV and posted a misleading video to social media. ¶ 142. These releases gave the false impression that the celebrated vehicle ran on hydrogen. In truth, "[w]hen Hyzon recorded the video of the FCEV milk truck, it was not connected to an operational hydrogen fuel cell and was powered solely by an electric battery that allowed it to travel only a limited distance. Hyzon had not even installed a critical component on the FCEV that was required to power the FCEV with a hydrogen fuel cell." [12] *See also* ¶ 224.

The above-described full-court media press misleadingly assured DCRB shareholders that Defendants' customer claims, sales pipeline, and 2021 guidance was based in reality. ¶ 142. As a result, on July 15, 2021, DCRB shareholders resoundingly approved the de-SPAC Merger with 95% voting in favor instead of exercising their redemption rights. ¶ 143. The next day, DCRB took on the Hyzon moniker and changed its NASDAQ stock symbol to "HYZN." ¶ 33. Defendants Anderson, Gu, Knight, and Gordon joined Hyzon's Board. ¶¶ 36-40. And the six-month lockup prohibiting Defendants from selling shares began to count down. ¶ 486.

**D.      Defendants concoct sham transactions through shell entity HongYun.**

On July 19, 2021, the first trading day after the merger completed, DCRB d/b/a Hyzon posted an updated version of the pre-merger investor presentations. ¶ 144. This new version contained slides mirroring the same customer logos, deployment maps, and financial projections included in earlier iterations. *Id*. Among other things, the presentation continued to falsely list Heineken a/k/a "Global Brewer" and Ikea a/k/a "Leading Retailer" as finalizing purchases for 2021 deliveries. ¶ 334. It also showed Hiringa as receiving 20 HFCEVs in 2021, and Royal Friesland as receiving a working HFCEV. *Id.* Defendants Knight and Gordon would repeat these claims through August 2021, including on Hyzon's inaugural earnings call, during which they confirmed the Company "remain[ed] on track" to deliver 85 HFCEVs by the end of 2021. ¶ 147.

---

[12]    SEC Compl. ¶ 29.

But with only four months left in the year, the precarious gap between Hyzon's committed deliveries and customers and its actual state of affairs was becoming increasingly evident. ¶ 151. Desperate to fill this gap, on September 9, 2021, Hyzon announced it had signed a 500-vehicle MOU with unknown "logistics company"—Shanghai Hydrogen HongYun Automotive Co., Ltd. ("HongYun"). ¶¶ 152-53. Among other things, the press release highlighted HongYun's provision of "operation, leasing and maintenance service[s]" and the "solid operation experience" of its core management team. ¶ 154. In this context, Hyzon claimed it expected a "initial order of 100 vehicles … before the end of 2021," with the remaining 400 to "be ordered in 2022." ¶ 153.

On news of this mega deal, investment analysts grew increasingly bullish. ¶¶ 155-56. Hyzon's stock shot up nearly 30% in a single day. ¶ 157. But the enthusiasm would be short lived.

**E.    Short seller analysts investigate Hyzon's claims, interview witnesses, and publish findings on Hyzon's sham transactions.**

On September 28, 2021, activist short seller firm Blue Orca Capital published a Report finding Hyzon had misrepresented or omitted material information about its major customers. ¶ 159. Based on its foreign regulatory research, Blue Orca uncovered HongYun was a Chinese shell entity formed three days before Hyzon's megadeal announcement, with no corporate backers and zero paid-in capital. ¶ 162. Blue Orca also learned that Hiringa, was "not really a customer" with binding orders. ¶¶ 164-67. As confirmed by a senior Hiringa executive interviewed by Blue Orca, Hiringa was a channel partner with a purchasing framework subject to validation testing. *Id.* Blue Orca also found that Hyzon's overstated orders and projections rested on "phantom customers" like Coca-Cola and Heineken. ¶¶ 168-69. Blue Orca's CIO, Soren Aandahl, publicly defended the Report and his underlying investigation in media interviews the same day. ¶ 171.

On these revelations, Hyzon shares plummeted, declining 28% in a single trading day, ¶ 172. Defendants publicly responded to the Report on October 5, 2021. ¶¶ 175-78. But their failure to deny or refute Blue Orca's principal allegations failed to extinguish market concerns. *Id.* To the contrary, Hyzon's response conceded HongYun was a shell entity. *See* ¶ 176 (characterizing

HongYun as a "special purpose entity"). The response also failed to point to any 100% certain, binding agreements with any Fortune 100 companies or household brands. ¶ 178 (listing purported signed agreements, none of which were Fortune 100 companies or big brands).

The next day, October 6, 2021, a second activist short seller, Iceberg Research, issued its own report corroborating Blue Orca's findings and exposing additional corporate-governance deficiencies at Hyzon. ¶ 179. Hyzon's stock fell nearly 8% by the end of the trading day. ¶ 180.

**F.    Undeterred, Hyzon doubles down on misstatements, falsely claiming it sold 5 HFCEVs in Europe and 82 HFCEVs in China in 2021.**

On November 12, 2021, Hyzon released its financial results for the third quarter of 2021. ¶ 181. Therein, Hyzon falsely reported it earned $962,000 in revenue from vehicles delivered to two European municipalities. *Id*. These sales were material to investors, as they represented Hyzon's first recognizable revenues. *See* ¶¶ 183, 437. With this positive development, Defendant Knight "again reaffirm[ed]" in an earnings call "[Hyzon's] guidance of expecting to ship 85 vehicles by the end of 2021."[13] ¶ 183. In truth, the vehicles at issue were not Hyzon made; instead, Hyzon retrofitted two vehicles already owned by the customers with hydrogen technology. ¶ 224. These vehicles needed extensive post-delivery repairs. *Id.* And when Hyzon restated its revenue after the fraud was disclosed, the Company recognized only $89 thousand for these services. ¶ 228.

A month later, on December 8, 2021, Hyzon misleadingly announced it had delivered 29 HFCEVs through HongYun, with "further orders for 33 more trucks confirmed." ¶ 187. The public would later learn that nearly half of these vehicles could not operate on hydrogen at the time of delivery or by the end of the year. ¶ 223. Moreover, the SEC recently disclosed that Hyzon made arrangements with customers to deliver the HFCEVs shortly before the end of 2021 so Hyzon

---

[13]    According to the SEC, behind the scenes, Knight took further actions to inflate Hyzon's stock price. Specifically, Knight pledged over 200 thousand of his Hyzon shares to secure a $1.5 million loan from a friend. Knight then used the loan proceeds to purchase 166,000 shares of Hyzon stock in the open market on November 22, 2021. At Knight's request, the loan did not reference the stock pledge, and the pledge was not registered with a brokerage or third party. Knight hid the pledge because he knew it violated his six-month Lock-Up Agreement. *See* SEC Compl. ¶ 66-68.

could meet its public guidance.[14] Under this arrangement, the customers then agreed to return the vehicles after the year-end to complete work necessary to enable hydrogen operability.[15]

Despite this chicanery, Hyzon misleadingly told the market on January 12, 2022, that it had "deliver[ed] of 87 fuel cell powered heavy-duty vehicles in 2021 under commercial sales agreements." ¶ 191. Nearly every one of those deliveries were infected with fraud. *See* ¶ 234 T.4.

**G.    Hyzon maintains false books, records, and SEC reports to inflate revenues.**

From January 12, 2022 through May 1, 2023, the Section 10(b) Defendants issued a series of cascading disclosures that shed light on, or were a materialization of the risk of, Defendants' misleading statements and conduct. ¶¶ 191-239. Yet even while disclosing true aspects of Hyzon's 2021 deliveries, Defendants continued to overstate their 2021 revenue and delivery results.

Beginning on January 12, 2022, Defendants provided their first update on Hyzon's total deliveries and revenues for 2021. ¶ 191. They disclosed that, despite purportedly exceeding Hyzon's 85-vehicle delivery target, the Company "anticipate[d] the 2021 financial results" would be "materially lower than forecast revenues and margins." *Id*. Hyzon misleadingly attributed this result to "lower average selling price per vehicle due to product mix and multi-year revenue recognition for the majority of sales." *Id*. Hyzon did not disclose other contributing factors, including that (i) it did not own any of the vehicles it purportedly delivered to Europe, (ii) revenues were impacted by a secret warrant agreement to HongYun, undisclosed related-party transactions, and collectability concerns; and (iii) most of the vehicles Hyzon reported as delivered in 2021 required post-delivery repairs or did not actually operate on hydrogen. *See* ¶¶ 221-34.

Additionally, Hyzon announced that it had received an SEC subpoena "for production of documents and information, including [those] related to the allegations made in the report issued by Blue Orca Capital." ¶ 192. These dual updates shattered analysts' confidence, ¶ 193, and caused Hyzon's stock price to tumble nearly 23% over two trading days, ¶ 194.

---

[14]    *See* SEC Compl. ¶ 46 (alleging fraud based on the SEC's 18-month investigation into Hyzon).

[15]    *Id.*

Two months later, on March 23, 2022, Defendants clarified the extent to which Hyzon experienced "materially lower than forecast revenues and margins." ¶¶ 191, 195. In a news release, they reported that, even though Hyzon purportedly exceeded its 2021 vehicle delivery guidance with 87 HFCEVs delivered, the total contract value for these deliveries was only $19.6 million. *Id.* Defendants claimed $13.6 million of those revenues would be collected over five years. *Id.* Given concerns about Hyzon's ability to collect future installment payments from entities like HongYun with "limited operating history," ¶ 201, Hyzon's auditor allowed Hyzon to report only $5.1 million in revenue for the fourth quarter of 2021 and only $6.0 million in revenue for all of 2021. ¶ 195.

On an earnings call held that day, Defendant Knight tried to assuage investor concerns, claiming "it's a short term issue, whether we recognize the revenue next year or the year after, frankly, it's not a huge deal." ¶ 197. But even these diminished revenue representations inflated Hyzon's true 2021 revenues (negative $80,000). ¶ 232 (discussing restated financials conceding revenue recognition misconduct). Defendants nevertheless reiterated their false delivery and recognized revenue figures in Hyzon's annual financial statements filed with the SEC one week later on March 30, 2022. ¶¶ 198-203. On this news, several market analysts downgraded their valuations of Hyzon, explaining the Company's recent disclosures reflected a lack of demand for Hyzon's technology in American, European, and Oceanic markets. ¶¶ 204-05.

Two weeks later, Hyzon's Board replaced Defendant Gordon with an outside CFO, Samuel Chong. ¶ 206. Under Chong's oversight, Hyzon reported no vehicle sales and no outstanding payments from purported Chinese customers in its quarterly report for the first quarter of 2022. ¶ 207. On this news, Hyzon's stock price dropped by approximately 11% over a single day. *Id.*

**H.    Hyzon's Board creates a Special Committee to investigate wrongdoing, disavows prior financial statements, and terminates Knight and Gu.**

Throughout the summer of 2022, Hyzon, now under a new CFO, went silent, issuing no news as to its financial condition, deals made, or sales prospects whatsoever. ¶ 208. Investors patiently waited until August—when Hyzon was required to file its next quarterly report—for an

update as to Hyzon's condition. *Id.* Their patience was greeted with bombshell news.

First, on August 4, 2022, Hyzon announced a Board-appointed Special Committee had launched "an independent investigation to address" operational inefficiencies and "revenue-recognition-timing issues in China," which "Company management brought to the attention of the Board." ¶¶ 209, 19. Hyzon declared that, as a result, it would not be releasing its second quarter report by required deadlines, and all "financial statements and guidance previously issued by the company" could "no longer be relied upon." *Id.* The market reacted harshly to these revelations, causing Hyzon's stock to free fall by 38% over a single day. ¶¶ 210-13.

Two weeks later, on August 17, 2022, the other shoe dropped. After markets closed, Hyzon disclosed its Board "had appointed Parker Meeks … as President and Interim Chief Executive Officer, effective immediately," to replace Founder Defendant Knight. ¶ 215. Media outlets tied Knight's ouster to the Boards' investigation into financial irregularities. ¶ 217. On January 17, 2023, after receiving the Special Committee's findings, Hyzon's Board retroactively deemed Knight's termination as "for cause." ¶ 220 (disclosing news to the public on February 1, 2023).

Additionally, Hyzon announced on August 17 that the Board had terminated Founder Defendant Gu as Executive Chairman of Hyzon's Board. ¶ 216. While Gu would remain on the Board as a Director, given his ownership interest in Hyzon and Hyzon's parent company Horizon, the Board made clear Gu had been stripped of all executive responsibilities at Hyzon. *Id*.

On this news, Hyzon's stock dropped 13% over the course of two trading days. ¶ 218.

## I.    Hyzon publishes the Committee's summary findings, conceding Hyzon falsely reported deliveries and attributing failures to "certain Hyzon executives."

On March 13, 2023, Hyzon disclosed it had received a Statement from the Special Committee summarizing the results of its investigation. ¶ 221. It relayed the following to investors:

For "trucks delivered to China," the Special Committee found that "20 Jiushuang vehicles and approximately 30 of the HongYun vehicles were not operable on hydrogen (that is, not commissioned) at the time of delivery and as of December 31, 2021." ¶ 223. The Special

Committee admitted Hyzon should have confirmed these vehicles "were not operable on hydrogen at the time of delivery." *Id.* It further noted Hyzon "should have had a more formal set of processes and controls to ensure commission was completed prior to delivery." *Id.* As such, 50 of the 82 HFCEVs Hyzon reported as delivered to China by year-end 2021 were sham deliveries. *Id.*

For "trucks delivered to Europe," the Special Committee found that all five vehicles needed to undergo repairs post-delivery. "Based on information provided … by the Special Committee, the Company re-evaluated the treatment of revenue recorded for those five vehicles." ¶ 224. Additionally, the Special Committee revealed that Hyzon's first announced delivery—that is, the HFCEV provided for Royal Friesland, in July 2021—was not "operable on hydrogen when Hyzon issued a press release regarding this vehicle in July 2021." *Id.* As such, "Hyzon did not recognize any revenue in connection with the provision of this vehicle." *Id.*

"[T]he Special Committee noted that the tenor of certain communications by certain Hyzon executives was overly concentrated on meeting the Company's 2021 deliveries forecast and recognizing revenue on those deliveries." ¶ 225. This tenor was contrary to Defendants' prior communications to investors—including in its SEC filings—which "reflected the importance of complying with the relevant accounting standards." *Id.* To ensure this wrongful conduct would not occur again, the Committee recommended, among other things, "the Company implement a written disclosure policy regarding the preparation, approval, and release of disclosures regarding financial information and delivery of vehicles and consider establishing a disclosure committee." ¶ 226. To date, the Special Committee's full findings have not been publicly released. *Id.*

**J.      Hyzon issues restated financial reports for prior quarters confirming the Special Committee's findings of misconduct and improper revenue recognition.**

The following day, March 14, 2023, Hyzon began releasing restated financial reports for the third quarter of 2021, the full fiscal year of 2021, and the first quarter of 2022 with the SEC. ¶ 227. These restated reports divulged further findings by the Special Committee.

**For European operations**: Hyzon conceded that "instead of manufacturing or assembling

FCEVs that it owned for sale to customers, Hyzon Europe was providing these customers with vehicle retrofit services to convert the customers' internal combustion engine ("ICE") powered vehicles to hydrogen FCEVs." ¶ 228. Consequently, "the Company did not appropriately analyze and record revenue and related balances associated with these arrangements." *Id*. And instead of earning $1 million in revenue, as previously reported, Hyzon could recognize only a mere fraction—$89 thousand dollars (9%) for services done on the 5 HFCEVs purportedly "delivered" to European customers in 2021. *Id.* Hyzon also amended its definition of revenue in its SEC filing to disclose retrofitting services as a source of revenue in addition to product sales. ¶ 234.

**For Chinese operations:** Hyzon conceded "it incorrectly recorded revenue and cost of revenue … as the Company did not meet all relevant revenue recognition requirements under U.S. GAAP related to these vehicles." ¶ 233. "For 62 FCEVs [ordered by HongYun], while control of such FCEVs was transferred to the customer prior to December 31, 2021, the Company's obligation to deliver functioning FCEVs was not fully satisfied for revenue recognition purposes as of December 31, 2021." *Id.* This was because nearly half were not operable on hydrogen on that date. *Id.* "For the other 20 FCEVs [ordered by a Hyzon related party, Jiushuang], the Company concluded it incorrectly recorded revenue in the fourth quarter of 2021, as it had not yet transferred control of the FCEVs to the customer, nor fully satisfied the obligation to deliver fully functioning FCEVs until the third quarter of 2022." ¶ 233. And for both deals, the Company incorrectly recorded taxes receivable, $1.8 million in total, as recognized revenue. *Id.*

**For actual revenues:** Despite originally recognizing $6 million in revenues for 2021, Hyzon actually earned *negative revenue of $80 thousand for the entire fiscal year*. ¶ 232. This consisted of "$0.1 million of revenue from retrofit services performed by Hyzon Europe, offset by the recognition of $(0.2) million of contra revenue associated with the issuance of [purchase incentive] warrants to a customer [HongYun] for FCEV deliveries in China." *Id*. As displayed below, under proper accounting standards, the Company earned *zero revenue from Chinese entities in 2021*. *Id.*

- 16 -

**T.1 – 2021 HFCEV Deliveries and Revenues (Actual vs. Reported)**

| End-User | Reported Deliveries | Actual Deliveries | Reported Revenue | Actual Revenue |
|---|---|---|---|---|
| Royal Friesland[16] (EU) | 1 | **0** | $450 thousand | **$0** |
| Other EU Entities[17] | 4 | **0** | $1.9 million | **$0.08 million** |
| HongYun[18] (CN) | 62 | **0** | $2.2 million | **($0.15 million)** |
| Jiushuang[19] (CN) | 20 | **0** | $0.1 million | **$0** |
| **Total** | **87** | **0\*** | **$6.0M** | **($0.08 million)** |

As of the date of the Third Amended Complaint:

- Hyzon has recognized no additional revenue for its purported $19.6 million sale of 62 HFCEVs to HongYun beyond the $2.5 million recognized in its restated 1Q22 report (originally reported as 2021 revenues in Hyzon's first 2021 Annual Report), ¶ 236.

- Hyzon has recognized zero revenue whatsoever for the 20 HFCEVs delivered to related-party entity Jiushuang in in 3Q22 (originally claimed as delivered in 4Q21). *Id.*

- Hyzon recognized no revenues in 2022 for any sales of HFCEVs made that year. *Id.*

- Hyzon generated zero sales of Hyzon-made HFCEV goods to any customer identified in its public statements, investor presentations, and Soliciting Materials. *Id.*

- Hyzon has transferred ownership of its Chinese subsidiary to its corporate parent. *Id*.

**K.     Defendants Hyzon and Knight consent to entry of judgment against them.**

On September 26, 2023—two weeks after Defendants filed the instant motions to dismiss—the SEC initiated an enforcement action in this District against Hyzon, Knight, and the head of Hyzon Europe, after an 18-month-long investigation into the same false statements and conduct at issue in this case.[20]

---

[16]   Sole vehicle Hyzon reported as delivered was not operable on hydrogen; powered by battery.

[17]   Consists of the Municipality of Groningen; the Municipality of Rotterdam; and JuVe (MPREIS). (i) Vehicles upgraded through undisclosed retrofitting services; (ii) vehicles already owned by end-users; (iii) vehicles required post-delivery repairs.

[18]   (i) Half of vehicles not operable on hydrogen by year-end; (ii) revenue recognition issues; (iii) undisclosed purchasing incentives provided via warrant agreement; (iv) customers agreed to accept vehicles and then return after year-end so Hyzon could meet forecast; (v) taxes not withheld.

[19]   (i) Vehicles not operable on hydrogen by year-end; (ii) vehicles not transferred until 3Q22.

[20]   *See* SEC Compl. ¶ 1.

In the face of the SEC's allegations, Defendants Hyzon and Knight have agreed to consent judgments under which Hyzon will pay a civil penalty of $25 million, and Defendant Knight will pay a $100k civil penalty. Entry of these consent judgments remain pending. Nevertheless, the consent judgments explicitly prevent Hyzon and Knight from arguing that damages in any related investor action should be reduced by the penalty extracted by the SEC.

**L.    The Delaware Chancery Court sustains breach-of-fiduciary duty claims against the former directors of DCRB arising from Hyzon's customer relationships.**

In addition to Lead Plaintiff and the SEC's actions, DCRB shareholders have filed a breach-of-fiduciary action in Delaware Court of Chancery against DCRB, its corporate backers, and its former directors ("*Malork* Action"). The *Malork* plaintiffs allege DCRB's directors and controllers made materially false and misleading statements about "Hyzon's true business metrics and financial prospects in connection with the Merger … [which] deprived the [shareholders] of their right to a fully informed decision whether to redeem their shares and induced stockholders to vote to approve the Merger to their detriment and the substantial benefit of Defendants."[21] These false statements included the same investor presentations and proxy statements at issue here.

On July 17, 2023, the Delaware Chancery Court sustained all aspects of the *Malork* plaintiffs' claims.[22] Among other things, it found: (i) the shareholders' claims were "direct," not derivative, because they had alleged an impairment of their redemption rights;[23] (ii) Riverstone, WRG, and DCRB's directors all were sufficiently pled as "controllers" of DCRB;[24] (iii) defendants' statements regarding sales to Hiringa, order to blue-chip customers, and projected revenues were all plausibly false or misleading;[25] and (iv) the anonymous information cited in the Blue Orca Report was sufficiently credible as it was corroborated by extrinsic information.[26]

---

[21]    Compl. ¶ 4, *Malork v. Anderson et al.*, No. 2022-0260-PAF (Del. Chanc. Ct. Mar. 18, 2022).

[22]    *See Malork* Oral Ruling at 10-14, 17.

[23]    *Id.* at 18-20; *see also* DCRB MTD Br. at 11-12 (arguing Section 14(a) claims here are derivative).

[24]    *Id.* at 26-27.

[25]    *Id.* at 31-40.

[26]    *Id.* at 40.

**APPLICABLE LEGAL STANDARDS**

**A.    Motion to dismiss under Rule 12(b)(6)**

"The purpose of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) 'is to test ... the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits.'"[27] To survive such a motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[28] When a legal claim sounds in fraud, Rule 9(b) requires that the complaint "state with particularity the circumstances constituting fraud or mistake."[29] This standard "does not require omniscience,"[30] and "is relaxed when the plaintiff is not likely to have access to more specific information until after discovery because the information is exclusively within defendant's knowledge."[31]

In ruling on the motion to dismiss, "a district court must accept the allegations contained in the complaint as true and draw all reasonable inferences in favor of the nonmoving party."[32] Additionally, the Court may take judicial notice of the fact that the SEC has civilly charged Defendants Hyzon and Knight with violations of Section 10(b) and 14(a) of the Exchange Act.[33]

In its review, the Court should also consider the newly disclosed factual material alleged in the SEC's complaint.[34] This case has remained in the pleading stages for over eighteen months

---

[27]    *Am. Builders & Contractors Supply Co. v. Macaluso Enters., Ltd.*, 2022 WL 1809401, at *1 (W.D.N.Y. June 2, 2022) (Siragusa, J.) (quoting *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006)).

[28]    *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007)).

[29]    *See* Fed. R. Civ. P 9.

[30]    *Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 680 (6th Cir. 1988).

[31]    *Bhandari v. Bittner*, 2004 WL 2284582, at *2 (W.D.N.Y. Oct. 5, 2004) (citing *Nugent v. Searle Pharm., Inc.*, 1987 WL 15328, *1 (W.D.N.Y. Aug. 5, 1987)).

[32]    *Indus. Tech. Ventures LP v. Pleasant T. Rowland Revocable Tr.*, 688 F. Supp. 2d 229, 236 (W.D.N.Y. 2010) (Siragusa, J.).

[33]    *See Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006); *Garcia–Garcia v. City of New York*, 2013 WL 3832730 (S.D.N.Y. July 22, 2013).

[34]    *See, e.g.*, *In re DNTW Chartered Accts. Sec. Litig.*, 172 F. Supp. 3d 675, 690 (S.D.N.Y.) ("[T]his Court recognizes that Plaintiffs can make use of [SEC findings] in attempting to plead scienter."), *aff'd sub nom.* 666 F. App'x 78 (2d Cir. 2016); *Vanleeuwen v. Keyuan Petrochemicals, Inc.*, 2014 WL 3891351, at *4 (S.D.N.Y. Aug. 8, 2014) ("'[T]here is nothing improper about utilizing

due to, in part, new admissions and claim-corroborating disclosures that have emerged after Lead Plaintiff has filed his pleadings. Lead Plaintiff has already amended the complaint three times to include previously undisclosed factual material. And Lead Plaintiff is prepared to formally amend his complaint again to include the corroborating allegations of misconduct uncovered by the SEC's investigation.[35] To do so now, however, would needlessly waste party and judicial resources by formally restarting the motion-to-dismiss process anew, rather than just having Defendants address these limited, new allegations (of which Defendants were already aware) in their reply briefs.[36]

**B.    Securities fraud in violation of Section 10(b) and SEC Rule 10b-5**

Section 10(b) of the Exchange Act empowers the SEC to prescribe rules and regulations to protect the public from manipulative and deceptive securities practices.[37] Rule 10b-5, implementing Section 10(b), makes it unlawful:

(a)    To employ any device, scheme, or artifice to defraud,

(b)    To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c)    To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

While these provisions cover different types of acts, both the Supreme Court and the SEC "have long recognized considerable overlap among the subsections of [Rule 10b-5].[38]

**C.    Heightened pleading under the Public Securities Litigation Reform Act of 1995**

The PSLRA heightens the normal pleading requirements for securities claims in two ways:

*First*, if plaintiffs allege the defendant made false or misleading statements or omissions,

---

information contained in an SEC complaint as evidence to support private claims under the PSLRA.'" (quoting *In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d 458, 471 (S.D.N.Y. 2012)).

[35]   The extent of these limited supplemental allegations is identified in Dkt. Nos. 95-5 (list of allegations) and 95-6 (mock fourth amended complaint).

[36]   *See* Fed. R. Civ. P. 15(a)(3).

[37]   15 U.S.C. § 78j(b).

[38]   *Lorenzo v. Sec. & Exch. Comm'n*, 139 S. Ct. 1094, 1102 (2019).

"the complaint shall specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading."[39] This applies to Section 10(b) and Section 14(a) claims.

*Second*, where the plaintiff must prove the "defendant acted with a particular state of mind, the complaint shall … state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."[40] This requirement is the only aspect of the PSLRA that "alters the usual contours of a Rule 12(b)(6) ruling" by requiring courts to "take into account plausible inferences opposing as well as supporting a strong inference of scienter."[41] This second pleading requirement applies to Section 10(b)'s scienter element, but not Section 14(a), as Section 14(a) requires only negligent conduct, which does not constitute a particular state of mind.[42]

## D.    Misleading Soliciting Materials in violation of Section 14(a) and SEC Rule 14a-9(a)

Under Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder, it is unlawful "to solicit ... any proxy or consent or authorization in respect of any security,"[43] "containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading ...."[44] "Under Rule 14a-9, plaintiffs need not demonstrate that the [misstatements] resulted from knowing conduct undertaken … with an intent to deceive."[45] "Liability can be imposed for negligently drafting a proxy statement."[46] "A fact is material for purposes of Rule 14a-9 'if there is a substantial

---

[39] *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007) (internal citation and quotation marks omitted) (quoting 15 U.S.C. § 78u-4(b)).

[40] 15 U.S.C. § 78u-4(b).

[41] *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 239 (5th Cir. 2009).

[42] *See Argument*, Parts C.1 and C.3, *infra* (discussing negligence standard under Section 14).

[43] 15 U.S.C. § 78n(a). This extends to solicitations made before furnishing a proxy statement. *See id.* § 240.14a–12. The Complaint refers to these pre-proxy statements at "Soliciting Materials."

[44] 17 C.F.R. § 240.14a–9(a).

[45] *Wilson v. Great Am. Indus., Inc.,* 855 F.2d 987, 995 (2d Cir. 1988) (citation omitted)).

[46] *Id.* at 1301 n.20.

likelihood that a reasonable shareholder would consider it important in deciding how to vote.'"[47]

## ARGUMENT

**A.    The Hyzon and DCRB Defendants made materially false statements and omissions to investors in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5(b).**

Rule 10b-5(b) concerns fraudulent statements and omissions. To establish a violation, a plaintiff must plead: a material misrepresentation or omission; scienter; a connection with the purchase or sale of a security; reliance on the misrepresentation or omission; economic loss; and a causal connection between the misrepresentation or omission and the loss.[48] Of these elements, Defendants attack four: falsity, scienter, statutory standing, and loss causation. Additionally, Defendants assert that, despite this Rule 12(b) posture, this Court must discount any allegations from external sources. As discussed below, none of these arguments reasonably engages with the crux of Lead Plaintiff's case. Lead Plaintiff's Rule 10b-5(b) claims should all be sustained.

### 1.    Defendants' statements were false or misleading.

Throughout the Class Period, Defendants made, disseminated, or approved four types of false or misleading statements. These statements concerned Hyzon's two largest customers, (a) HongYun and (b) Hiringa; (c) Hyzon's near-term pipeline of probable, deep-pocketed customers and revenues, and (d) Hyzon's actual, recognizable revenues. One court,[49] as well as the SEC, have found these statements to be materially misleading. This court should follow suit.[50]

---

[47]    *United Paperworkers Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190, 1198 (2d Cir. 1993) (quoting *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1090 (1991) (internal citations omitted)).

[48]    *In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 136 (2d Cir. 2021) (citations omitted).

[49]    *See Malork* Oral Ruling at 40 (concerning only pre-merger statements, no HongYun).

[50]    As an initial matter, Defendants suggest the Complaint fails to identify the "maker" of each alleged misstatement. *See* Hyzon MTD Br. at 19; DCRB MTD Br. at 22). They are mistaken. Section 8 of the Complaint pleads the primary "maker" of each alleged misstatement, ¶¶ 282-414, typically the corporate entities DCRB and Hyzon. And for those statements in which there are additional, individual makers, the Complaint supplies the factual material necessary to explain that individual maker's involvement and ultimate authority over the statement, whether via (i) their oversight position, (ii) their explicit ratification, (iii) their necessary signature, or (iv) attribution via quotation. *E.g.*, ¶ 288 (joint press release with quotes provided and approved by Defendants Knight, Tichio, Anderson, and Gu); ¶ 292 (conference call where Knight, Gordon, and Tichio jointly presented to investors); *see also See*, *In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d

a.    Defendants reported sham deals with HongYun with fake 2021 deliveries.

From September 2021 to March 2022, Defendants Hyzon, Knight, and Gordon—desperate to meet their delivery targets—issued a series of false or misleading statements about HongYun's origins, operations, track record, and counterparty risk. *See* ¶¶ 363-85 (identifying misstatements). Defendants falsely portrayed HongYun as a well-established logistics company with an operating footprint, infrastructure, and track record sufficient to generate Hyzon up to $250 million in revenue. ¶¶ 153-54, 367. After Blue Orca put HongYun's legitimacy front and center, Defendants reaffirmed on HongYun's ability to pay for vehicles while simultaneously hiding material information about HongYun's true corporate nature and the real terms of its reported purchases.[51] This culminated with Defendants falsely reporting Hyzon had successfully delivered 62 HFCEVs to HongYun by the end of 2021, which would purportedly generate meaningful, recognizable revenues for the Company in 2021 and thereafter. ¶¶ 187, 198-201, 344, 383, 401-02, 409-10.

In truth, HongYun had no corporate parents, deep-pocketed owners, experienced employees, or legitimate business operations to enable the "special purpose entity" to independently purchase and make payments on the vehicle deals Hyzon touted. *See* ¶¶ 240-81. Instead, Hyzon rushed its 62-vehicle deliveries to HongYun, even though many were not operable on hydrogen, just so Hyzon could tell shareholders it met its 2021 delivery goal.[52] ¶ 223. Hyzon then falsely recognized revenue in 2021 on HongYun sales, despite not completing its obligations,

---

458, 473 (S.D.N.Y. 2012), *aff'd*, 525 F. App'x 16 (2d Cir. 2013) (summary order) ("In the post-*Janus* world, an executive may be held accountable where the executive had ultimate authority over the company's statement; signed the company's statement; ratified and approved the company's statement; or where the statement is attributed to the executive."). The Hyzon Defendants' chart located at Appendix 1 to their brief, though flawed, acknowledges as much.

[51] *See, e.g.*, ¶¶ 176, 372 (Hyzon claiming HongYun was a "special purpose entity"); ¶¶ 377, 380 (Hyzon reporting HongYun order for 62 HFCEVs); ¶ 183 (Hyzon reaffirming it would meet its guidance of "shipp[ing] 85 vehicles by the end of 2021" on the back of HongYun deliveries); ¶¶ 185-86 (Hyzon failing to disclose secret purchasing incentives, revenue-recognition problems, and low vehicle prices making prior-announced 2021 revenue projections impossible to meet).

[52] *See also Summary of Defendants' Misconduct*, Part F, *supra* (discussing how, per the SEC, Hyzon delivered the vehicles before the year end under an arrangement with customers that they would return the vehicles thereafter so Hyzon could complete necessary work).

in violation of GAAP, again to maintain the illusion that Hyzon's deal announcements were credible. ¶¶ 223, 235. Hyzon's restated financials, showing in aggregate $2.3 million in revenue from Hyzon's reported 62-vehicle delivery to HongYun—a value of $40k per unit price on vehicles normally retailing at $475k—speaks for itself. ¶ 235. Further, as of the date of the Complaint, Hyzon has recognized no additional revenues for HongYun whatsoever.[53] ¶ 236.

In this context, Defendants assert the Complaint fails to establish that their HongYun statements were false or misleading. In advancing this argument, Defendants cherry-pick three of Lead Plaintiff's many alleged theories of falsity as to HongYun. They then try to attack these cherrypicked theories on factual grounds.[54] Still, all three of these challenges fail.

First, Defendants contend that, even though "there was an issue with the timing of the recognition of revenue," the Special Committee found that vehicles delivered to HongYun were eventually operable on hydrogen by the time of its forensic audit in late 2022.[55] Putting their fatal admissions of false revenue reports and faked delivery dates aside, ¶ 223, Defendants argue these deliveries "refute" the allegations that HongYun was a shell company without the ability to purchase HFCEVs.[56] Defendants in no way attempt to contest any of the detailed allegations about HongYun's ability to pay, including its lack of paid-in capital, lack of employees, lack of digital or physical infrastructure, and lack of experience.[57] ¶¶ 240-81. They also ignore the undisputed fact that to date, Hyzon has not received any installment payments from its purportedly legitimate

---

[53] These representations and omissions about HongYun sales were material to investors, as they revived investors' faith in Hyzon's ability to generate significant revenues, deliver EVs ahead of its competitors, and meet its 2021 sales forecast. ¶ 363. Indeed, Hyzon would not have achieved its 85-HFCEV delivery forecast for 2021, first announced in February 2021 and reiterated throughout the Class Period, without recognizing the 62 sales to HongYun. ¶¶ 151 T.2; 234 T.4.

[54] *See* Hyzon MTD Br. at 26-28.

[55] *See* Hyzon MTD Br. at 27.

[56] *Id.*

[57] *See Commodity Futures Trading Comm'n v. McDonnell,* 332 F. Supp. 3d 641, 718-721 (E.D.N.Y. 2018) (entering judgment against defendant claiming to have a "track record . . . experience and expertise with virtual currency," because a "reasonable investor would find it important to know if the firm he had entrusted his funds to was only a one-man boiler room in Staten Island that did not have a prestigious Wall Street address, virtual currency expertise, or multiple employees").

customer beyond the meager downpayment recognized as revenue by Hyzon in 1Q22.[58] ¶ 236.

Second, Defendants cite Hyzon's December 8, 2021 press release reporting a delivery of vehicles to HongYun as evidence HongYun had binding purchase orders with deep-pocketed purchasers like Baowu.[59] They ignore Hyzon fraudulently issued this press release, featuring a picture of the purported deliveries, when the vehicles at issue did not operate on hydrogen at the time of delivery or by the year end. The fraudulent nature of this press release undermines any evidentiary value supporting Hyzon's narrative.[60] Moreover, the fact that "the world's largest steel manufacturer," which Defendants suggest was the counterparty to the transaction, has not made any further installment payments for this "binding order" further rebuffs Defendants' attempts to defend the purported legitimacy of their HongYun-facilitated deliveries. ¶¶ 236-38.

Third, Defendants contend their HongYun statements were not misleading because they discussed only the number of orders, not revenues, and had no obligation to disclose purchase discounts incentivizing such orders.[61] But the argument ignores that Defendants inextricably linked Hyzon's delivery and revenue targets. Both before and after the SPAC Merger, Defendants repeatedly claimed Hyzon would sell 85 vehicles (its only product) in 2021, which in turn would generate approximately $37 million in total 2021 revenues for the single product company. *E.g.*, ¶ 334 (July 19, 2021 investor presentation). This math made sense only if Hyzon sold 85 vehicles at or near their $475k sticker price. ¶ 17. As late as November 2021, Defendants reaffirmed Hyzon would meet the guidance while announcing Hyzon's 62-vehicle order with HongYun, representing

---

[58] Defendants also argue that the Complaint does not support the allegation that Hyzon's corporate parents played some hand in the HongYun deal. The Complaint notes that, in their customer deployment map, Defendants repeatedly stated there were 70 vehicles "delivered to date by other OEMs with Horizon fuel cells" next to text for a "leading steel company" based in China. *E.g.*, ¶ 116 F.11, ¶¶ 119, 334. These pre-Hyzon sales reasonably suggest Horizon's historic steel-company customer was the same as HongYun's steel manufacturing counterparty. Indeed, Hyzon concedes as much in its motion to dismiss. *See* Hyzon MTD Br. at 24-25. The SEC also notes that Hyzon's corporate parents oversaw Hyzon China's operations with HongYun. SEC Compl. ¶ 49.

[59] *See* Hyzon MTD Br. at 27-28.

[60] *See, e.g.*, *Okada v. Whitehead*, 2015 WL 13544356, at *2 (C.D. Cal. Nov. 19, 2015).

[61] *See* Hyzon MTD Br. at 28-29 (citing *In re Canandaigua Sec. Litig.*, 944 F. Supp. 1202, 1209 (S.D.N.Y. 1996) (dismissing claim based on discounts untethered to price or revenue statements).

70%+ of that guidance. ¶ 183. (Defendants did not disclose until January 2022 that these vehicles were sold at "lower average selling price[s]." ¶ 192.) Defendants then rushed deliveries of vehicles not operable on hydrogen to HongYun so Hyzon could report revenue in 2021. ¶¶ 223, 225.

In discussing Hyzon's 2021 financials during the March 23, 2022 earnings call, Defendants discussed how HongYun's orders (and only those) impacted total 2021 revenues.[62] ¶ 197. Their statements put the *sources* of their revenue (both projected and actual) at issue. They thus had a duty to disclose specific risks and improprieties affecting the true number of that revenue.[63]

### b.    Defendants misleadingly suggested Hiringa had binding orders.

Hyzon repeatedly held out Hiringa as a "100% certain" direct "vehicle customer" with a "signed contract" for 20 of Hyzon's 85 projected 2021 HFCEV deliveries. *E.g.*, ¶¶ 53, 133-34; *see also* ¶¶ 350-60 (identifying statements). On February 17, 2021, for example, Hyzon announced it had been "commissioned to build and supply Hiringa" with HFCEVs, "the first batch of vehicles ... expected to enter service in New Zealand by the end of 2021." ¶ 350. Similarly, on March 17, 2021, DCRB published a preliminary proxy statement relaying "Hiringa ha[d] placed a binding order for the first 20 trucks." ¶ 129 n.67. These statements misleadingly suggested Hiringa was the ultimate end-user of the HFCEVs. In reality, it was a mere channel partner assisting other end users. ¶¶ 166-67. Hiringa had no intent to use Hyzon's HFCEVs itself. *Id.* Additionally, the orders were far from binding, as they were subject to undisclosed preconditions, including validation trials and hydrogen infrastructure buildouts that would not occur, at the earliest, until the latter half of 2022. *Id.* Accordingly, the trucks could not have been delivered by the end of 2021. *Id.*

Defendants assert they never "portray[ed] Hiringa as a vehicle end user."[64] As the Delaware Chancery found, the plain language of Defendants' statements suggests otherwise.[65]

---

[62]   *See also* Hyzon 4Q21 Earnings Call Transcript at 6, 10-11 (Mar. 23, 2022) (Dkt. No. 94-26).

[63]   *See DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 442 (S.D.N.Y. 2018) *(*"[S]tatements that put the source of the revenue at issue may be actionable if they fail to disclose the impropriety of the source.").

[64]   Hyzon MTD Br. at 26.

[65]   *Malork* Oral Ruling at 32-36 (rejecting argument DCRB adequately disclosed Hiringa was a

Indeed, Defendants' pre- and post-merger presentations identified Hiringa as having a "signed contract" and placed it in sections for "vehicle customers," not "partnerships." *See* ¶¶ 304, 321, 334.

Defendants confusingly contend Hiringa's 20-vehicle order was binding,[66] even though they do not contest that the order had undisclosed preconditions. *See also* ¶¶ 166-67, 352.

Last, Defendants argue they adequately disclosed Hiringa's channel partner role by publishing "a photograph [on Twitter, not in an investor presentation, proxy material, or SEC filing,] of a Hyzon-branded truck bearing the logos of Hiringa's end-user partners."[67] But "[s]ome statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors. For that reason, the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers.[68] The inscrutable logos Defendants reference, requiring extreme magnification to even discern, feature no explanation of their significance to the product. Just as a reasonable investor would easily miss these messages hidden in plain sight, this Court too can quickly reject the entirety of Defendants' strained arguments as to Hiringa.[69]

> c.     Defendants exaggerated Hyzon's customer relationships and 2021 sales pipeline to make Hyzon appear capable of generating 2021 revenues.

Defendants similarly contend their statements regarding Hyzon's "committed sales pipeline" were not false or misleading because they repeatedly disclosed that many of its business relationships involved non-binding agreements.[70] Again, Defendants' arguments ignore the crux of the Complaint's allegations, which focus on Defendants' representations about binding orders.

---

middleman, even while a pre-Class Period press release (Aug. 2020) possibly suggested this).

66   Hyzon MTD Br. at 26.

67   *See* Hyzon MTD Br. at 8.

68   *McMahan & Co. v. Wherehouse Ent., Inc*., 900 F.2d 576, 579 (2d Cir. 1990)*; see also Int'l Paper Co.*, 985 F.2d at 1199 ("buried " disclosures are inadequate).

69   *See Greenapple v. Detroit Edison Co*., 618 F.2d 198, 205 (2d Cir. 1980) (finding presentation methods that obscure or distort significance of material facts can render information misleading).

70   *See* Hyzon MTD Br. at 22-25.

As alleged: throughout the Class Period, Defendants sought to earn credibility with investors by promising a 2021 sales pipeline comprised of 85 "100% Certain" and "High Probability ... (70%)" vehicle orders from blue-chip Fortune 100s and municipalities, generating nearly $37 million in 2021 revenues. *See* ¶¶ 248-345. To support these claims, Defendants presented customer deployment maps listing a "near-term pipeline" with several blue-chip logos as "100 certain" or "high probability" customers alongside the status of their purported orders. *E.g.*, ¶¶ 115-18. The logos with 2021 orders—which when added up, totaled nearly $40 million in revenue—created the misimpression Hyzon had customer relationships at the stages indicated. ¶¶ 284, 323. Defendants repeated these claims after the merger, including in Hyzon's July 19, 2021 investor presentation. ¶ 334. To date, Hyzon has recognized zero revenue from deliveries of Hyzon-owned vehicles to any touted customers, blue-chip or otherwise. ¶ 236.

Defendants contend their statements were not misleading because "Hyzon never represented that its pipeline was entirely comprised of '100% certain or high probability pre-orders,' rather than MOUs."[71] But on June 29, 2021, that is exactly what Tichio told the market about Hyzon's near term pipeline.[72] Moreover, Hyzon continued to claim that certain blue-chip logos were customers with potential 2021 orders well after those customers shut Hyzon down,[73] and Hyzon stripped those logos from other parts of its presentations, ¶ 439. [74] In *In re XL Fleet Corp. Sec. Litig.,* the district court found similar conduct to be misleading.[75] And unlike other logos listed in Hyzon's customer deployment map, descriptions of deals with logos like Heineken,

---

[71]  Hyzon MTD Br. at 23.

[72]  ¶ 140 (Tichio: "[There are] two sorts of buckets which is contracted ordered 100% certainty … [and] high probability orders.").

[73]  *Summary of Defendants' Misconduct*, Part B, *supra*; SEC Compl., ¶ 22.

[74]  *Summary of Defendants' Misconduct*, Part B, *supra*; SEC Compl., ¶ 22.

[75]  *See In re XL Fleet Corp. Sec. Litig.*, 2022 WL 493629, at *4 (S.D.N.Y. Feb. 17, 2022) (finding statements about vehicle manufacturer's exaggerated sales pipeline, revenue projections, and state of negotiation purported customers were false and actionable where employees recorded "sales opportunities without a reasonable basis, record inflated percentage likelihoods of sales[,] and maintain pre-existing entries in the records after customers indicated that they would not order").

Coca Cola, and Ikea were described in terms of contracts and purchasing orders, not MOUs. ¶¶ 116-18. Hyzon's presentations both before and after the merger thus unjustifiably used blue-chip companies' credibility to bolster investor confidence in its sales pipeline.[76] Subsequent "anonymized" versions of this presentation did nothing to strip the otherwise false and misleading suggestion that these blue-chip companies were near finalizing purchasing orders for 2021. ¶ 133.

Defendants also assert they were transparent about orders in China contributing to Hyzon's 2021 order backlog and distribution strategy.[77] As evidence, Defendants cite their February 9, 2021 investor presentation, which highlights *past* sales by *Horizon* to a leading steel conglomerate in China. [78] This presentation identifies no future orders to any private customers in China despite Hyzon's *liberal* criteria for inclusion. ¶ 116 F.11. Though the presentation notes Horizon as having an unfulfilled, non-binding MOU with a Chinese municipality, Defendants miss the point.

"[O]nce [D]efendants chose to tout the company's backlog, they were bound to do so in a manner that wouldn't mislead investors as to what the backlog consisted of."[79] Defendants' public statements, including their investor presentations, overwhelmingly focused on customers located in North America, European, and Oceanic regions.[80] Their revenue projections also rested on the higher average selling prices in these markets. *See* ¶ 17. Defendants' statements thus created the false impression that Hyzon's near-term backlog primarily derived from blue-chip customers from

---

[76]  *See Malork* Oral Ruling at 38-39 ("If Legacy Hyzon did not have these relationships it purported to have with these blue-chip customers, then the inclusion of the blue-chip logos in the February investor presentation would be a material misstatement because the inclusion of the blue-chip companies would not create a full and fair characterization of Legacy Hyzon's customer pipeline and would unjustifiably impart the blue-chip companies' credibility onto Legacy Hyzon.").

[77]  *See* Hyzon MTD Br. at 24-25.

[78]  *Id.*

[79]  *Wherehouse Ent.*, 900 F.2d at 579 ("statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors"); *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008).

[80]  *E.g.*, ¶ 81 (noting Hyzon's website stated it was established to focus on "the manufacturing and supply of hydrogen fuel cell-powered commercial vehicles across the North American, European, and Australasian regions"); ¶ 111 (Knight: "Deliveries of Hyzon fuel cell powered heavy trucks to customers in Europe and North America will occur this year, well ahead of our competitors …."); ¶¶ 115-22 (showing customer slides from initial PowerPoint presentation to investors).

those regions. Indeed, analysts found the "the value-add for Hyzon [wa]s in the [purported] non-China-based business." ¶ 204. But in reality, over 94% of Hyzon's 2021 purported orders went to the lower-margin Chinese market. ¶ 222. This number increases to 100% if excluding undisclosed retrofit services performed on vehicles already owned by third parties. ¶¶ 222-24.

Third, Defendants argue they did not falsely represent Hyzon had a then-present operating margin of 30-33%.[81] In proxy statements, Defendants relayed that their projections assumed "Hyzon's *maintaining* gross margin *remains* relatively consistent at 30% to 33% from 2021 to 2025, through product design and other innovations to decrease the cost of materials in a FCEV." ¶ 315 (emphasis added). The words "maintaining" and "remains," in contrast to "achieves," naturally suggests Hyzon already had gross margins at 30-33% at the time of the proxy. ¶ 317.

Defendants nevertheless construe their margin statement as purely aspirational. Acknowledging a 30% margin to be impossible at the time, they argue that the second clause about decreasing material costs contradicts the notion Hyzon was operating at 30% margins.[82] But in doing so, they ignore two key facts. First, Hyzon already had a historic base for calculating product margins from its time operating within its parent company, Horizon. Second, immediately preceding the assumption Hyzon would maintain 30-33% gross margins, Hyzon also assumed it would be able to decrease sales prices for vehicles over the course of four years.[83] When reading these assumptions collectively, investors reasonably construed Hyzon as saying (i) Hyzon would lower prices on vehicles over time; (ii) Hyzon would decrease costs of materials over time; and (iii) on balance, "Hyzon's *maintaining* gross margin [would] remain[] relatively consistent at 30% to 33% from 2021 to 2025," ¶ 315 (emphasis added). As Defendants concede, this representation about present margins—nearly twice the industry average—was false and misleading, particularly

---

[81]  *See* Hyzon MTD Br. at 25.

[82]  *See* Hyzon MTD Br. at 25.

[83]  *See* June 21, 2021 Proxy at 106; ¶ 331 (Hyzon claiming it reduced costs of $50,000 per vehicle).

given the nature of Hyzon's now-disclosed retrofitting operations in Europe.[84]

> d.  Defendants concede Hyzon reported false financial metrics.

During the Class Period, Defendants represented Hyzon's "consolidated financial statements and related disclosures"—including revenue and cash-on-hand—had "been prepared in accordance with accounting principles generally accepted in the United States of America pursuant to [SEC] requirements and rules." ¶ 407. The Special Committee noted Hyzon's "communications reflected the importance of complying with the relevant accounting standards." ¶ 436.

In this context, Defendants attempt to chip away at Lead Plaintiff's revenue claims at the edges. First, Defendants argue their statement that Hyzon "focused primarily on *assembling* and supplying" HFCEVs, ¶ 396 (emphasis added), was not false or misleading because Hyzon's sales to Chinese customers qualified as traditional assembly and supply.[85] In doing so, however, they do not address that Hyzon made this statement in its November 15, 2021 report for 3Q21, in which the Company only recognized revenues and sales from European operations, which were later disclosed to be retrofitting services, not the assembly of goods. ¶ 228. Moreover, Defendants ignore Hyzon has had zero deliveries of assembled goods to non-China customers, even though Hyzon advertised itself as "focus[ed] on the manufacturing and supply of hydrogen fuel cell-powered commercial vehicles across the North American, European, and Australasian regions," ¶ 81, and suggested the bulk of its deep-pocketed customers originated from these areas.[86]

Defendants also contend Knight and Gordon's Sarbanes-Oxley ("SOX") certifications, attesting to the accuracy of Hyzon's financial reporting and the disclosure of fraud, *see* ¶¶ 411-12, were not "necessarily false in light of Hyzon's restatements" because Lead Plaintiff "has not pled any facts indicating that Knight or Gordon knew the certifications to be false when made."[87]

---

[84] *See also* Blue Orca Report at 15-18 (Dkt. No. 94-31) (discussing how margin claim was fantasy).

[85] *See* Hyzon MTD Br. at 29 (quoting ¶ 396).

[86] *See, e.g.*, ¶ 111 ("Deliveries of Hyzon fuel cell powered heavy trucks to customers in Europe and North America will occur this year …"); ¶¶ 115-19 (investor presentation listing logos and map).

[87] Hyzon MTD Br. at 30. The certification states in relevant parts: "Based on my knowledge, this report does not contain *any untrue statement of a material fact* or omit to state a material fact

As discussed further in Part B, *infra*, Knight and Gordon, as CEO and CFO, signed their SOX certifications knowing Hyzon had failed to implement effective internal controls necessary to ensure its regional headquarters were following U.S. accounting and financial reporting standards. ¶¶ 182 n.126, 407. They knew Hyzon's accounting and finance employees in the United States lacked sufficient visibility into the operations and processes related to the sales of products and services to ensure revenue was recognized in conformance with U.S. standards. ¶¶ 182 n.126, 407. They knowingly or recklessly let these oversight problems persist, rather than remediate them, until Gordon was replaced by an outside CFO. *See* ¶¶ 206-08; 413-14. With respect to China, Knight and Gu knew about, or recklessly disregarded, customers' "limited operating history" and the terms of their contracts. ¶ 201. And pursuant to an undisclosed agreement, Knight had Hyzon's parent company oversee most of Hyzon China's operations, including accounting and sales.[88]

Knight and Gordon thus knew or recklessly disregarded that they lacked sufficient control over Hyzon China's operations to ensure that 94% of Hyzon's 2021 sales were properly reported, and did not specifically disclose this material weakness. Further, Knight and Gordon allowed Hyzon to recognize as revenue value-added-tax payments. ¶¶ 404, 410. For these and other offenses, Hyzon's Board terminated Knight for cause. *See* ¶ 220. Accordingly, Knight and Gordon's knowledge or reckless disregard of contrary facts is not in serious dispute.[89]

Defendants do not contest the falsity of any other aspect of their revenue-related

---

necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading … Based on my knowledge, the financial statements, and other financial information included in this report, *fairly present in all material respects the financial condition*, results of operations and cash flows of the registrant as of, and for, the periods presented in this report." *E.g.*, Hyzon 2021 Annual Report, Dkt. No. 94-27 at 29 (emphasis added).

[88] *See* SEC Compl. ¶ 49.

[89] *See Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 246 (S.D.N.Y. 2012) (finding plausible inference that defendant lacked a reasonable basis for his SOX certification where company admitted "inadequate staffing and technical expertise" and "ineffective review and approval practices"); *Hall v. The Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 234 (S.D.N.Y. 2008) (finding defendant "knew, or was at the very least reckless in not knowing, that the financial statements were based upon incorrect [metrics] and faulty internal control processes").

statements. ¶¶ 318-414. New arguments raised in a reply should be deemed forfeited or waived.[90]

### 2.    Defendants' statements are actionable and garner no protection as forward-looking, puffery, or opinion speech.

Unable to defend their misstatements as true, Defendants shift gears to assert that "many" of their statements are legally protected as (1) forward-looking, (2) puffery, or (3) sincerely held opinions. As discussed below, these purportedly protected statements are all in fact actionable.

### a.    "Forward-looking" projections misrepresented the present state of affairs.

Defendants contend that statements concerning Hyzon's projected revenues and delivery targets are protected by the PSLRA's safe harbor provisions.[91] The PSLRA's safe harbor, however, applies only to statements that are (i) forward-looking (ii) accompanied by meaningful cautionary language and (iii) made without knowledge that they are false or misleading.[92] Further, the safe harbor does not apply to any statements before the July 17, 2021 merger because the merger constituted an IPO through which DCRB offered securities.[93] The statements identified by Defendants do not fall within the safe harbor's narrow bounds.

First, Defendants' statements about Hyzon's projected 2021 revenues—which Defendants claimed rested on a backlog of  "100% certain orders" from specific near-term customers—encompassed representations of present facts about Hyzon's sales pipeline.[94] *E.g.*, ¶ 116. Through these statements, Defendants represented Hyzon already had a backlog of committed orders and

---

[90]    *Chevron Corp. v. Donziger*, 325 F. Supp. 3d 371, 379 n.21 (S.D.N.Y. 2018) ("It is well established, of course, that arguments first raised in reply briefs are forfeited or waived.").

[91]    *See* Hyzon MTD Br. at 30-32.

[92]    *See* 15 U.S.C. § 77z-(c)(1).

[93]    *See* 15 U.S.C. § 77z-2(b)(2)(D) (excluding "forward-looking statement[s] in connection with an offering of securities by a blank check company"); SEC Acting Director of Corporate Finance John Coates, *SPACs, IPOs and Liability Risk under the Securities Laws* (Apr. 8, 2021), https://www.sec.gov/news/public-statement/spacs-ipos-liability-risk-under-securities-laws  ("[I]t is ... commonly understood that it is the de-SPAC [merger]—and not the initial offering by the SPAC—that is the transaction in which a private operating company …. engages in its [IPO].").

[94]    *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2018 WL 2382600, at *8 (S.D.N.Y. May 24, 2018) ("[I]t is well recognized that even when an allegedly false statement has both a forward-looking aspect and an aspect that encompasses a representation of present fact, the safe harbor provision of the PSLRA does not apply.").

could manufacture vehicles on the scale necessary to reach its $40 million sales target on the stated timeline.[95] *Id.* But Defendants did not disclose material, known facts about lost or non-existent customers that undermined their representations. For example, Defendants did not disclose that their apparent "near-term pipeline"—depicted through their recycled global customer deployment map—included purported customers like Heineken and Hiringa, which had informed Hyzon they would not be taking orders in 2021. ¶¶ 168, 177. Further, Defendants did not disclose the full revenue impact of their "conscious decision" to shift nearly all 2021 deliveries to China, "where average selling prices are approximately half of other regions," until *after* the year-end. ¶ 191.

These concrete descriptions of the present pipeline, coupled with Defendants' omissions, falsely reassured investors that the number of, type of, and revenue expected from prospective sales remained unchanged, or was even growing, compared to past projections.[96] Whether Defendants' projections would come to pass is of no issue. (They did not.) Defendants "affirmatively create[d] an impression of a state of affairs that differ[ed] in a material way from the one that [they knew or recklessly disregarded] actually exist[ed]" behind the scenes at Hyzon.[97]

Defendants also failed to accompany their guidance with meaningful cautionary language and disclosures of material risks that were already transpiring.[98] Despite their claim to the contrary, generalized warnings regarding the ability to convert pre-orders to binding orders did nothing to cure the specific falsity that the catalog of 100% committed orders were never 100% committed

---

[95]   *See In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 246 (2d Cir. 2016) ("there is nothing prospective about the representation that Vivendi entered 2001 with a 'very strong balance sheet'").

[96]   *See* ¶ 142 (July 13, 2021 update: "Orders and non-binding MoUs have increased to represent up to $83M, up more than 50% from $55M as of April 29, 2021, and over 100% from February 12, 2021"); ¶ 225 (Special Committee: "the tenor of certain communications … overly concentrated on meeting the Company's 2021 deliveries forecast and recognizing revenue on those deliveries.").

[97]   *See In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1144 (9th Cir. 2017) (internal citation omitted) (holding statements that sales pipeline was "very robust," "build[ing] to record levels," and "keeps growing" were not forward-looking because they "provided a concrete description of the past and present state of the pipeline" and "reassured investors during the class period that the number and type of prospective sales in the pipeline was unchanged, or even growing, compared to previous quarters"); *Tellabs*, 513 F.3d at 705 ("[S]aying that sales are 'still going strong' does not entitle … a safe harbor with regard to the statement's representation concerning current sales.")

[98]   *See Slayton v. Am. Express Co.*, 604 F.3d 758, 772 (2d Cir. 2010).

or binding in the first place.[99] In particular, warnings that prospective customers were "at various stages of contract negotiations," ¶ 120, or that non-binding pre-orders may not be converted, did not obviate the fact Defendants falsely listed entities like Heineken and Ikea as near finalizing purchase 2021 orders when those entities never indicated they intended to purchase HFCEVs.[100]

Finally, the safe harbor does not protect any statements to the extent "a reasonable person would …. deem an inference that the defendants (1) did not genuinely believe the [] statement, (2) actually knew that they had no reasonable basis for making the statement, or (3) were aware of undisclosed facts tending to seriously undermine the accuracy of the statement, 'cogent and at least as compelling as any opposing inference.'"[101] As discussed throughout, to attain the $37 million in revenues Hyzon repeatedly projected for 2021, the Company had to maintain an average sales price around $450k per vehicle on its projected 85 deliveries. ¶ 17. This figure became impossible to meet the moment Hyzon learned Hiringa would not be taking HFCEVs until 2Q22, lost other blue-chip logos as potential 2021 customers, and first conceived its strategy shift to Asia. ¶ 151. Nevertheless, Defendants continued to push their false guidance claims. *E.g.*, ¶¶ 142, 147. As such, Defendants' delivery and revenue statements enjoy no safe harbor protections whatsoever.

> b.    Detailed lists of customers and revenue-sources are not puffery.

Defendants argue that three of their alleged misstatements are inactionable as puffery.[102] "Whether a representation is 'mere puffery,'" however, "depends, in part, on the context in which it is made."[103] Even if some statements, "viewed in isolation, may be mere puffery, nonetheless, when ... the statements were made repeatedly in an effort to reassure the investing public about the

---

[99]    *See* Hyzon MTD Br. at 31; *In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561, at *14 (S.D.N.Y. Dec. 2, 2013) (rejecting, in Section 10(b) context, safe harbor argument where defendants had concealed a "historical" fact in their investor materials—the falling through of a purported customer relationship underlying Defendants' business operations and projections).

[100]   *See* ¶ 133, SEC Compl. ¶¶ 19-23.

[101]   *Slayton*, 604 F.3d at 775 (citing *Tellabs*, 551 U.S. at 323).

[102]   *See* Hyzon MTD at 32-33.

[103]   *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015).

Company's integrity, a reasonable investor could rely on them as reflective of the true state of affairs at the Company."[104] Such is the case here.

First, Defendants contend that isolated quotations made by Defendants' Knight and Gu on February 9, 2021 about Hyzon's "committed sales pipeline" were far too general to be material to investors.[105] Knight and Gu repeatedly referenced Hyzon's "committed sales pipeline" the same day DCRB and Hyzon announced their merger plans and released an investment presentation describing Hyzon's purported customer base. ¶¶ 109-23. In this context, statements about Hyzon's pipeline constituted explicit references to Hyzon's detailed lists of customers and near-term deployments. These statements thus communicated Hyzon could generate revenue, despite lacking a significant sales history, because it was purportedly finalizing contracts with well-known customers in its concrete pipeline, ¶ 286. Defendants do not contend that any other statements falsely suggesting blue-chip customers were finalizing contracts is puffery. For the same reasons, Knight and Gu's pipeline statements are not puffery.[106]

Second, Defendants assert that statements about Hyzon's North American, European, and Australasian geographic focus, ¶ 341, are too general, but develop no argument as to this point.[107] Regardless, analyst commentary confirms non-China-based business was its "value-add" and thus material to investing decisions. ¶ 204. Defendants have no response.

Finally, Defendants' statements regarding whether or not HongYun had any operations or any experience are verifiable factual representations, not reputational opinion, which a reasonable investor would rely upon in making an investment decision.[108] Even if qualitatively subjective

---

[104] *Id.*

[105] *See* Hyzon MTD Br. at 32-33 (referencing ¶¶ 288 & 292).

[106] *See Quality Sys.*, 865 F.3d at 1144 (holding statements were not generic statements of optimism where they represented that the company's sales pipeline was "very robust," "deep," "build[ing] to record levels," and "keeps growing," because they "provided a concrete description of the past and present state of the pipeline"); *In re Supercom Inc. Sec. Litig.*, 2018 WL 4926442, at *24 (S.D.N.Y. Oct. 10, 2018).

[107] *See* Hyzon MTD Br. at 33.

[108] *See, e.g.*, *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 647 (S.D.N.Y. 2017).

aspects of these statements could be seen as puffery in isolation (e.g., *solid* experience), when viewed in the total context of Defendants' representations, the statements became actionable by falsely heralding HongYun—Hyzon's most material sales arrangement—as having any objectively verifiable track record, experience, or employees whatsoever, when it had none.[109]

### c. Defendants' purported opinions had no reasonable basis in fact.

Defendants contend that three of their alleged misstatements constitute opinions which are inactionable as a matter of law.[110] Defendants develop no argument as to any of these three misstatements. Instead, they perfunctorily assert these misstatements constitute opinions, and that Lead Plaintiff failed to plead the circumstances under which opinions are inactionable. Defendants' argument is thus waived.[111] But even if not waived, their argument lacks merit.

Defendant Gu's February 9, 2021 press release statements to investors regarding "municipalities and Fortune 100 companies" embracing hydrogen does not constitute pure opinion, as it intentionally echoed other statements in the press release relaying the purported fact that Hyzon had a "sales pipeline with bluechip Fortune 100s and municipalities." ¶ 288. Defendants do not contest that the latter statement is actionable. Gu's is similarly liable.[112]

Defendant Tichio's June 29, 2021 fireside chat statements that he felt "extraordinarily comfortable" with Hyzon's $37 million revenue goal for 2021 given vehicles were gaining "commercial traction" was misleading, as at the time, Hyzon had been informed by customers listed in its investor presentations  were not taking in 2021 deliveries. Hyzon was thus losing the very customers it suggested its projections were based on, undermining Tichio' s belief in his

---

[109] *See McDonnell*, 332 F. Supp. 3d at 718 & 721 (judgment against defendant claiming to have a "track record . . . experience and expertise with virtual currency," because a "reasonable investor would find it important to know if the firm he had entrusted his funds to was only a one-man boiler room in Staten Island that did not have a prestigious Wall Street address, virtual currency expertise, or multiple employees"); ¶¶ 240-81.

[110] *See* Hyzon MTD Br. at 33-34.

[111] *Tolbert v. Queens Coll.*, 242 F.3d 58, 75 (2d Cir. 2001).

[112] *Nunes v. NBCUniversal Media, LLC*, 643 F. Supp. 3d 403, 414 (S.D.N.Y. 2022) ("when a 'statement of opinion implies that it is based upon facts which justify the opinion but are unknown to those reading or hearing it, it is a "mixed opinion" and is actionable'" (internal citation omitted)).

statements. ¶ 112. Tichio, an agent of DCRB and Hyzon, omitted this material information.

Finally, Defendant Knight and Gordon's March 23, 2022 statements downplaying auditors' revenue treatment for HongYun and anticipating future payments were also false or misleading. As alleged, by that point, Hyzon had determined "it was not probable that it would collect substantially all of the consideration it was entitled to from future payments." ¶ 405.

### 3. Defendants Hyzon, Knight, Gu, Tichio, Gordon, Anderson, and Haskopoulos acted with scienter.

Scienter is "a mental state embracing intent to deceive, manipulate, or defraud."[113] In assessing whether scienter is sufficiently pled, the proper analysis is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."[114] At the pleading stage, this "need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the 'most plausible of competing inferences,'" but must merely be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged."[115] "If the totality of the circumstances alleged raises a 'strong inference' of the requisite state of mind, it is immaterial whether plaintiffs satisfy their burden by 'pleading motive and opportunity, conscious misbehavior, recklessness, or by impressing upon the Court a novel legal theory.'"[116] "[A] tie on scienter goes to the plaintiff."[117]

From the start, Defendants' motions throw-away this holistic framework. Defendants instead argue that certain facts, scrutinized in isolation, fail to show they deceived shareholders with the requisite state of mind.[118] They also contend that their plans to repackage Horizon's failed HFCEV business, and keep Hyzon's stock price inflated until they could cash out their locked up

---

[113] *Tellabs*, 551 U.S. at 319 (quoting in *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976)).

[114] *Id*. at 322-23.

[115] *Id.* at 324.

[116] *In re MicroStrategy, Inc. Sec. Litig*., 115 F. Supp. 2d 620, 631 (E.D. Va. 2000) (quoting *In re Health Mgmt., Inc. Sec. Litig.*, 970 F. Supp. 192, 201 (E.D.N.Y. 1997)).

[117] *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012).

[118] *See* Hyzon MTD Br. at 35-42 (individually attacking seven factors demonstrating scienter).

stocks, are far too generic corporate interests to motivate their alleged securities fraud.[119] As discussed below, the Complaint meets, if not exceeds, the requirements for pleading a strong inference scienter—that is, either (a) "'strong circumstantial evidence of conscious misbehavior or recklessness'" and (b) "both motive and opportunity to commit the fraud.'"[120].

> a.    The Complaint pleads strong circumstantial evidence that these Defendants acted knowingly or recklessly.

A plaintiff sufficiently pleads conscious misbehavior or recklessness where they can show defendants' "knowledge of facts or access to information contradicting their public statements," or that "defendants failed to review or failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud."[121]

Here, the Complaint is replete with examples showing Defendants knew, or readily had access, to facts contradicting their public statements about HongYun, Hiringa, customer commitments, and revenues at the time they were made. Indeed, Hyzon itself has effectively conceded at least two Defendants'—Hyzon co-founders Knight and Gu's—culpability in the alleged fraud scheme. Defendants would have this Court stand inches from the canvas, so as to only question the individual brushstrokes. They refuse to take a few steps back to see, without any ambiguity at all, the full portrait depicting their knowing or reckless misconduct.

> (1)    The Special Committee's summary findings concede misconduct.

The Special Committee's findings provide a cogent starting point for Defendants' scienter. After the Hyzon Defendants repeatedly denied allegations of fake customers and exaggerated orders, the Special Committee quickly uncovered that most of the hydrogen trucks Defendants

---

[119]    *See id.* at 42-43.

[120]    *Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 550 (S.D.N.Y. 2017) (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007)).

[121]    *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000); *see also Alpha Capital Anstalt v. New Generation Biofuels, Inc.*, 2014 WL 6466994, at *10 (S.D.N.Y. Nov. 18, 2014) ("The Second Circuit has further clarified that scienter may be demonstrated by proof that defendants 'knew facts or had access to information suggesting that their public statements were not accurate; or [ ] failed to check information they had a duty to monitor.'") (quoting *In re NovaGold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 298 (S.D.N.Y. 2009)).

reported as "delivered" in 2021 did not operate on hydrogen or had to undergo significant repairs postdelivery, which led to a significant overstatement in revenue.[122] *See* ¶¶ 223-24.

Despite these admissions, Defendants contend the "Special Committee report provides no basis for alleging scienter."[123] As an initial matter, Hyzon has never released the full Special Commitee report; it has only produced a one-page disclosure of the Special Committee's summary findings. ¶ 221. It is thus improper for Defendants to suggest that the full report makes or does not make any specific findings.[124]

Though the summary findings do not call out any specific Defendants by name, both the disclosure and the Board's cotemporaneous conduct suggests Hyzon's executive's culpability. Significantly, the Special Committee did not claim Defendants' misrepresentations resulted from issues flowing from the bottom-up. Instead, it identified as a causal factor "the tenor of certain communications by certain Hyzon executives was overly concentrated on meeting the company's 2021 deliveries forecast and recognizing revenue on those deliveries."[125] Defendants Knight, Gordon, Gu, and Tichio all publicly espoused the false narrative about Hyzon's 2021 deliveries and revenues. *E.g.*, ¶¶ 111-12, 139, 141, 198, 402. Hyzon's Board discovered these issues only after replacing Gordon with an outside CFO. ¶ 208. The Board ousted Knight and Gu within two weeks of announcing the independent investigation. ¶ 215. And days after receiving the Special Committee's preliminary report, the Board retroactively terminated Knight for cause. ¶ 220.

Given these facts, Defendants' competing inference—that Hyzon was a new company working to resolve internal control issues by independent actors[126]—does not pass the smell test. The above-alleged misconduct was committed around the same time, by unrelated employees at

---

[122]   *See comScore*, 268 F. Supp. 3d at 551 (Board's admission of "wrongful conduct" contributed to strong inference of scienter).

[123]   *See* Hyzon MTD Br. at 36.

[124]   *See John Wiley & Sons, Inc. v. DRK Photo*, 998 F. Supp. 2d 262, 269 n.4 (S.D.N.Y. 2014).

[125]   *See Moshell v. Sasol Ltd.*, 481 F. Supp. 3d 280, 286 (S.D.N.Y. 2020) (independent review attributing misreporting to executive misconduct supports scienter).

[126]   Hyzon MTD Br. at 36-37.

distinct subsidiaries, located on two separate continents. ¶¶ 223-24. The misconduct involved Hyzon's only product and only two manufacturing facilities. *Id.* The goal of this misconduct was to substantiate Defendants' promises to investors about 2021 deliveries and revenues. ¶ 225. The only common link was Hyzon's management.[127] To remediate this misconduct, Hyzon specifically identified "appoint[ing] a new Chief Executive Officer and Interim Financial Officer" as actions already taken.[128] ¶ 421. Further, the Company planned to adopt "a written disclosure policy regarding the preparation, approval and release of disclosures regarding financial information and the delivery of vehicles," possibly through a disclosure committee, to prevent new management from being able to make similarly misleading statements or engage in deceptive conduct for Hyzon's benefit . ¶ 420. All signs point to Hyzon and these Individual Defendants' culpability.[129]

(2)   Surreptitious edits to investor presentations, which "anonymized"<br>customers but left on non-existent deals, supports scienter.

Defendants' surreptitious edits to DCRB and Hyzon's investor presentations further suggest they acted with scienter. During the Class Period, Defendants had their employees edit these presentations at least four times to remove purported customer logos from slides displaying purported customers and a near-term global deployment map. ¶¶ 439-47. In doing so, however, they left on details about purported deals, even when customers indicated to Defendant Knight and others they would not be making purchasers in the near or medium term.[130] Defendants also continued to list deals for anonymized customers, which Hyzon no longer identified as a customer

---

[127]  *See* note 58, *supra* (noting how Hyzon's corporate parents—controlled by and previously managed by Defendants Knight and Gu—oversaw Hyzon China's operations); ¶ 38 (noting how Knight served as Hyzon's chief commercial officer before being appointed CEO in August 2021).

[128]  *See comScore*, 268 F. Supp. 3d at 542, 551 (audit committee's recommended remedial plan directed at executive defendants supported scienter).

[129]  Courts in this Circuit "will impute corporate scienter even if the corporation's agent making a misrepresentation did not individually have the requisite knowledge of the falsity of that statement if a sufficiently senior director or officer of the corporation with some oversight over the public-facing misrepresentation had such knowledge and did not intervene." *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 424 (S.D.N.Y. 2020) (citing *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177 (2d Cir. 2015)).

[130]  *See* ¶ 133, SEC Compl. ¶¶ 19-23.

in other parts. *Id.* Defendants incorporated these false and misleading slides into presentations released after the merger, which falsely claimed on the global deployment map that Hyzon had completed its delivery to Royal Friesland, when the vehicle did not operate on hydrogen. ¶ 334.

Defendants contend that the Complaint fails to show that any particular individual had any involvement in these changes.[131] They forget their investment presentations were misleading from the start, as several purported customers had never expressed an intent to purchase HFCEVs.[132] Defendants also provided information about customer relationships to the presentation drafters, in addition to reviewing and approving these presentations before they were released to the public and filed with the SEC. ¶ 549. With respect to Knight, as chief commercial officer and later chief executive officer, he was responsible for, and was the primary source of information on, the advancement of Hyzon's customer contacts alongside its limited sales and operational employees. *See* ¶ 38. In these roles and as a co-founder of Hyzon, Knight directly interacted with several of Hyzon's purported or inherited customers, including Coca-Cola. But he showed no concern as to whether Hyzon's selective disclosures would mislead investors.[133] Gordon and Tichio similarly disseminated copies of these materials and elaborated on the claims therein. ¶¶ 112, 139.

Nothing in the record indicates Knight kept deal information close or otherwise stymied updates to Defendants from Hyzon's broader management team. To the contrary, a former Hyzon executive told Blue Orca they were concerned about Hyzon's tactics. ¶ 169. Both the Hyzon and DCRB Defendants also had access to Hyzon's limited orders and MOUs showing the true state of Hyzon's dealings. ¶ 105. This held true to Hiringa. It is reasonable to assume Hyzon's deal documents reflected the undisputed facts that Hiringa was a channel partner, its "binding orders"

---

[131]  *See* Hyzon MTD Br. at 37-39.

[132]  *See Summary of Defendants' Misconduct*, Part B, *supra* (noting how Heineken had informed Hyzon by February 4, 2021 it would not be making orders and how Coca-Cola had only entertained an introductory meeting with Hyzon, far from the advanced discussions Hyzon claimed).

[133]  *See, e.g., In re Intercept Pharms., Inc. Sec. Litig.*, 2015 WL 915271, at *7 (S.D.N.Y. Mar. 4, 2015) (finding scienter where defendant "engag[ed] in the sort of selective disclosure that creates a real possibility of misleading investors.").

were conditioned on validation testing and commercial hydrogen infrastructure buildouts, and Hiringa would not be receiving any vehicles until at least early 2022.[134] ¶¶ 454-55.

The allegations that DCRB's three managers, Anderson, Tichio, and Haskopoulos, were substantially involved in conducting DCRB's extensive due diligence into Hyzon's projections and orders, *see* ¶¶ 104-05, further "supports a finding of conscious misbehavior or recklessness" when the DCRB Defendants made, disseminated, or approved the false or misleading statements at issue.[135] This is particularly so for Tichio, who, as the public spokesperson for DCRB, frequently appeared alongside the Hyzon Defendants to substantiate their false 2021 targets. *E.g.*, ¶ 139.

(3)    Repeated reports of sham deliveries support scienter.

Throughout the Class Period, Defendants knowingly or recklessly reported as successes sham transactions and deliveries to substantiate, albeit under false pretenses, Defendants' revenue and delivery projections. As the Complaint recounts, Defendants employed such tactics from the beginning—parading to investors reports and videos of Hyzon's first successful delivery three days before the de-SPAC merger vote, even though the vehicle did not operate on hydrogen. ¶ 224. Defendants would go on to make false reports for the entirety of its purported 2021 orders. The five vehicles Hyzon purportedly delivered to Europe in truth were retrofit services of vehicles owned by customers and required post-delivery repairs. *Id.* Likewise, the bulk of Hyzon's purported deliveries to its Chinese customers—82 in total—did not operate on hydrogen when delivered. ¶ 223. Hyzon nevertheless arranged the deliveries under agreements where customers would return the vehicles, after the year-end, so work could be completed.[136] Twenty of the vehicles, purportedly purchased by a Hyzon joint-venture partner, were not transferred until 3Q22.

---

[134] For Hiringa, Defendants contend that if they had an intent to deceive, they would not have described Hiringa as "aim[ing] to deploy up to 1,500 [HFCEVs] to fleet operators" in its proxy statements. Hyzon MTD Br. at 39. This reference is ambiguous when read with the preceding text that "Hiringa ha[d] placed a binding order" for 20 vehicles. ¶ 357. Further, it is well settled that "half-truths"—literally true statements creating a materially misleading impression—can support claims for securities fraud. *See List v. Fashion Park, Inc.*, 340 F.2d 457, 462 (2d Cir. 1965).

[135] *See In re XL Fleet Corp. Sec. Litig.*, 2022 WL 493629, at *6 (S.D.N.Y. Feb. 17, 2022).

[136] *See* SEC Compl. ¶ 46.

¶ 233. Moreover, these companies limited operating histories presented material risks to payment collectability. ¶¶ 195-97. This did not stop defendants from trying to recognize revenues for these flawed deliveries in 2021. ¶¶ 198-202. Defendants went so far to create false records to justify their claims to independent auditors.[137]

In this context, Defendants contend the Complaint fails to show they knew HongYun's transactions were shams. The Complaint sets forth in detail HongYun's true identity as a shell entity established three days before Hyzon's announcement with zero paid-in capital, no physical or digital infrastructure, and no track record to deploy anywhere close to 100 HFCEVs. ¶¶ 240-81. Hyzon has never disputed these facts. Indeed, after Blue Orca published its Report on Hyzon, the Company implicitly conceded it was aware of HongYun's lack of operational history when announcing the MOU. ¶ 176. Defendants tried to explain the problem away, claiming HongYun was a "special purpose entity."[138] And even if they were not at the time of the MOU, Defendants were certainly put on notice of HongYun's alleged illegitimacy after the Blue Orca Report issued.

Rather than withdraw, Defendants continued to affirmatively hold out HongYun as effectuating legitimate transactions and defended HongYun's origins in response to media scrutiny.[139] Defendants did so because HongYun's purported orders for 62 HFCEVS were central to substantiating the myth Hyzon would meet its 2021 delivery and revenue targets.[140] The consequences of their fraud are apparent from Hyzon's restated financial reports.[141] Absent the above-described sham reported deliveries: Hyzon earned negative revenue in 2021, not $6.0

---

[137]   *See* SEC Compl. ¶¶ 61-62.

[138]   *XL Fleet*, 2022 WL 493629, at \*5 (non-denial of short-seller allegations supported scienter).

[139]   *See comScore*, 268 F. Supp. 3d at 552 ("campaign by [defendants] to placate the market in reaction to the inquiries by the media, analysts, investors and the SEC . . . provides cogent support for the inference of scienter").

[140]   *See, e.g., In re IMAX Sec. Litig.*, 587 F. Supp. 2d 471, 481 (S.D.N.Y. 2008) (scienter pled where "defendants undoubtedly appreciated that theater system revenue was of singular importance to the financial well-being and market perception of the Company").

[141]   *In re Avon Sec. Litig.*, 2019 WL 6115349, at \*20 (S.D.N.Y. Nov. 18, 2019) (finding "post-Class Period events and statements" supported an inference) (citing *Rothman v. Gregor,* 220 F.3d 81, 92 (2d Cir. 2000).

million as originally claimed. Hyzon recognized in 2022 only $2.9 million in revenue from HongYun's initial payments. And to date, Hyzon has received no additional revenues towards its purported $19.6 million contract with HongYun or from its other purported Chinese customers.

> (4)     Defendants' GAAP violations and improper bookkeeping to support 2021 projections support a strong inference of scienter.

Following the de-SPAC-Merger, Defendants Hyzon, Knight, Gordon, Gu, and Anderson violated generally accepted accounting principles ("GAAP") by, among other things, falsely reporting revenues and deliveries on HFCEVs that were not owned by Hyzon, not operable on hydrogen, or not transferred to the customer within the applicable reporting period. ¶¶ 230-34. They also falsely reported value-added tax receivables as revenues. ¶ 233. To sustain these false reports, Hyzon improperly recorded in its books and records the purported sales transactions described above. *See* ¶ 197. In truth, Hyzon did not earn $6.0 million in 2021 from 87 vehicle deliveries; it completed zero orders of Hyzon-owned vehicles and made negative revenue due to warrants granted to HongYun.[142] ¶ 234 T.4. Hyzon conceded these violations in its restated financial reports.[143] ¶¶ 229-34.

Defendants argue their GAAP violations "do not suffice to raise a strong inference of scienter without particularized allegations of fraudulent intent."[144] While GAAP violations alone do not ordinarily constitute scienter, they nevertheless have "significant inferential weight in the scienter calculus."[145] This is particularly true where GAAP violations were part and parcel of

---

[142]    *See In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 403 (S.D.N.Y. 2003) ("The size of WorldCom's restatement alone demonstrates that the Audit Committee Defendants either knew of the accounting irregularities or recklessly disregarded information which would have led them to discover the fraud.").

[143]    *See also* Statement of Financial Accounting Standards No. 16, Prior Period Adjustments (noting restatements are only permitted to correct material accounting errors or irregularities that existed at the time the financial statements were prepared); Accounting Principles Board Opinion No. 20, Accounting Changes (same).

[144]    *See* Hyzon MTD Br. at 35 (quoting *In re Bausch & Lomb, Inc. Sec. Litig.*, 592 F. Supp. 2d 323, 345 (W.D.N.Y. 2008)).

[145]    *In re Micro Strategy Sec. Litig.*, 115 F. Supp. 2d 620, 635 (E.D. Va. 2000); *see also In re Complete Mgmt. Sec. Litig.*, 153 F. Supp. 2d 314, 334 (S.D.N.Y. 2001) (GAAP violations "may be one of

Defendants' scheme, as they enabled Hyzon to falsely claim it had met the 2021 deliveries forecast and revenue goals that "certain Hyzon executives" (Knight and Gordon) "overly concentrated on" in the "tenor of certain communications." ¶ 225 (quoting Special Committee Report).

Defendants Knight and Gordon, Hyzon's CEO and CFO, were well aware of the requirements for reporting revenue. As put in Hyzon's stated policy for recognizing revenue:

> The Company recognizes revenue when it satisfies a performance obligation by transferring control of product or service to a customer .... On standard vehicle sales contracts, revenues are recognized at a point in time when customers obtain control of the vehicle, that is when transfer of title and risks and rewards of ownership of goods have passed and when obligation to pay is considered certain. ¶ 391.

Additionally, GAAP accounting standard ASC 606-10-25-1 sets forth detailed instructions on under what conditions a company may recognize revenue, particularly where the collectability of installment-based-payment terms is concerned. *See* ¶¶ 389-90.

During their respective tenures, Knight and Gordon controlled and signed Hyzon's financial reports, which referenced, explained, and purported to have applied these standards.[146] Hyzon's auditors enforced these provisions against Hyzon while working with Knight and Gordon to finalize Hyzon's financial reports. *See* ¶ 200. Knight and Gordon also certified that all internal deficiencies had been disclosed.[147] ¶¶ 411-412. The simplicity of these provisions—particularly that one cannot claim revenue on undelivered or incomplete vehicles—corroborates scienter.[148] Further, Hyzon identified "appoint[ing a] new Chief Executive Officer" as a remedial step taken

---

several red flags'" that support an inference of scienter").

[146] Defendants Anderson and Gu also reviewed, signed, and approved for dissemination the false financial reports relayed in Hyzon's 2021 Annual Report.

[147] *See In re Am. Italian Pasta Co. Sec. Litig.*, 2006 WL 1715168 at *5 (W.D. Mo. June 19, 2006) (by signing SOX certifications, defendants attested they were "either aware of the improper accounting, [were] reckless with regard to the public reports of [defendant's] finances, or had not conducted any review and did not act in accordance with the certifications.")

[148] *See In re Microstrategy*, 115 F. Supp. 2d at 638 (finding that "if the GAAP rules and ... accounting policies Defendants are alleged to have violated are relatively simple, it is more likely that the Defendants were aware of the violations and consciously or intentionally implemented or supported them, or were reckless in this regard.").

to address the above-described GAAP violations. ¶ 234. The Company also committed to provide "periodic training for Company personnel, including on potential topics such as the responsibilities of a public company, the core values of the Company's accounting and finance function, and best practices to implement those values," ¶ 234, presumably to catch future fraud by executives.

That Defendants violated GAAP and improperly accounted for vehicle deliveries prior to the end of the fiscal year further supports a strong inference of scienter. Had Defendants not been intentionally or recklessly accelerating revenues, but instead committed administrative errors, they would have likely continued the misreporting in subsequent quarters. Instead, Defendants allowed deliveries and revenues from two separate Hyzon subsidiaries—located on two separate continents—to be misreported in a way that salvaged the false and misleading customer and revenue claims made by Hyzon, Knight, Gordon, and Tichio in the United States. *See* ¶ 225. Hyzon's Board then halted all financial reporting and commenced a nearly six-month long investigation to root out accounting issues shortly after installing an outside CFO. ¶¶ 209, 221.

Defendants' accounting misconduct was clear cut and easily detectable.[149]

> (5) Cascading terminations of executives supports a strong inference of scienter.

The timing of key executive terminations and resignations puts any scienter doubts to rest. Hyzon's Board-appointed Special Committee commenced its independent investigation into the fraud alleged herein within months of replacing Defendant Gordon with an outsider CFO. ¶¶ 206-09. Within two weeks of establishing the Special Committee and receiving SEC subpoenas, ¶ 430, Hyzon's Board immediately ousted Founder Defendant Knight without a permanent replacement and stripped Founder Defendant Gu of all executive responsibilities. ¶ 216. Media outlets directly tied Knight to the SEC's investigation into Hyzon's "financial quagmire." ¶ 217. And days after the Special Committee released its preliminary findings to the Board, the Board deemed it

---

[149] *See In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 657-58 (S.D.N.Y. 2007); *In re WorldCom, Inc. Sec. Litig.*, 2003 WL21488087, at *7 (S.D.N.Y. June 25, 2003).

necessary to recharacterize Defendant Knight's ouster as a "termination for cause."[150]

Defendants contend these terminations do not give rise to an inference of scienter, as they followed a series of negative business announcements, including missed earnings forecast and a slide in Hyon's stock.[151] In Defendants' view, "a leadership change was the natural outcome."[152] In doing so, they ignore that: (i) these negative business announcements all stemmed from their false and misleading portrayal of Hyzon's state of affairs; (ii) Hyzon's downturn began when Blue Orca put the spotlight on Defendants' false claims; and (iii) Defendants' financial reports and disclosures thereafter corroborated, and shed further light on, how deep the fraud went. Defendants offer no explanation as to why the Board retroactively deemed Knight terminated for cause after receiving the Special Committee's findings other than knowing or reckless misconduct, or why it was necessary to remove Gu as Chairman if only because of day-to-day mismanagement.

That Gu and Gordon remain associated with Hyzon is not surprising. Gu—the founder, chairman, and controlling shareholder of Hyzon's parent companies, and Hyzon's largest individual shareholder—continues to exercise incredible power over Hyzon via his paternal positions and intellectual property rights. *See* ¶¶ 40, 60, 94. Likewise, Gordon—Hyzon's second largest individual shareholder—sits as a director of one Hyzon's largest partners, Raven SR. ¶ 483. Given their significant power over Hyzon's viability, it is more surprising that the Company deemed it necessary to take action against Gu and Gordon rather than let them sit in their positions.

(6)    Government investigations and core operations bolster scienter.

Defendants acknowledge that the SEC and SDNY investigations against them, as well as

---

[150]    *See also e.g., In re Adaptive Broadband Sec. Litig.,* 2002 WL 989478, at \*14 (N.D. Cal. Apr. 2, 2002) (denying motion to dismiss where CEO and CFO resignations, coupled with second CFO's reassignment near time of restatement and internal investigation were highly suspicious "add[ed] one more piece to the scienter puzzle"); *In re Mercator Software Inc. Sec. Litig.*, 161 F. Supp. 2d 143, 150 (D. Conn. 2001) (firing of vice president of finance and resignation of CFO on the same day as financial restatement was announced supported finding of scienter).

[151]    *See* Hyzon MTD Br. at 41-42.

[152]    *Id.*

the Complaint's well pled allegations of their sophistication, bolster an inference of scienter.[153] As such, Plaintiffs simply note that nearly two weeks after Defendants filed the instant motions, the SEC also initiated an enforcement action in this Court against Hyzon and Knight. The SEC presumably did so after engaging in extensive fact finding, including a review of evidence produced by defendants and other witnesses. It is thus reasonable to infer there is evidence in Defendants' possession, custody, or control evidencing Defendants' scienter.

b.    Powerful incentives motivated Defendants' alleged fraud.

Although not necessary to establish scienter, Defendants had powerful motives to commit fraud. For the DCRB Defendants, the unique financial structure of DCRB's SPAC structure created a perverse incentive for the SPAC officers to enter into a losing deal for investors. The SPAC Sponsor, Defendant Anderson's private equity firm WRG, and other DCRB parties obtained a 20% interest in DCRB, consisting of 5,643,125 Founder Shares that would convert into Class A shares if any qualifying business combination were approved. ¶ 489. On July 16, 2021, these shares were valued at $56.4 million, including Anderson's 630,947 Founder Shares valued at $6.3 million.[154] *Id.* Thus, even in a "bad" deal for public SPAC investors (that is, where the post-transaction company's stock traded at less than $10 per share), completion of a business transaction would yield massive windfalls to holders of Founder Shares. Additionally, DCRB, WRG, and other DCRB parties held 6,514,500 warrants worth $6.5 million as of July 16, 2021 that would become worthless if the merger was not approved. *Id.*

Likewise, as to the Hyzon Defendants' motive, Hyzon's ability to continue was an ongoing concern depending upon whether Hyzon could ultimately break free from Horizon's failed track record, attain profitable operations, generate sufficient cash flow to meet obligations, and obtain

---

[153]    *See* Hyzon MTD Br. at 41.

[154]    Additionally, WRG is an affiliate of and managed by Riverstone—the same entity which Tichio served as a Partner and Managing Director and which Haskopoulos served as Managing Director, CFO, Chief Accounting Officer, and Secretary.

financing as needed. ¶¶ 478-79.[155] These circumstances unduly incentivized the Hyzon Defendants to exaggerate Hyzon's customers, committed orders, and financial prospects to complete the merger and receive the cash necessary for Hyzon's continued operation.[156]

The Hyzon Defendants also stood to benefit from the fraud personally. Upon completion of the merger, Gu and Knight were awarded ~200,000 shares of Class A Common Hyzon stock, and over 5.7 million stock options, exercisable at $2.00 per share. ¶ 484. If exercised that day, in total, these shares were worth more than $46 million. *Id.* The de-SPAC Merger supersized the Hyzon Defendants' executive compensation. In 2021, Gu received total compensation of $6,357,709 versus $429,519 in 2020, and Knight's jumped to $4,640,278 from $414,415. ¶ 488. Gordon's projects received more than 9.6 million shares of Hyzon common stock worth approximately $93 million on the day the merger completed, in addition to receiving over 1.1 million "Earnout Shares" whose issuance were contingent on Hyzon's stock reaching certain price tiers. ¶ 483.

Because of DCRB's Lock-Up Agreement, Defendants were barred from selling their stock until January 2022, and thus had a compelling motive to keep stock prices inflated after completion of the merger. ¶ 486. That the fraud was partially uncovered and Hyzon's stock price crashed before Defendants had a chance to cash in does not change the fact they had motive to defraud.[157]

### 4. Defendants' misconduct is well documented by Hyzon's disclosures, short seller analysts, plaintiff's independent investigation, and the SEC.

Defendants contend that this Court should discount the "vast majority" of the Complaint's allegations because they purportedly depend on "unreliable and uncorroborated claims by self-interested short sellers."[158] In doing so, Defendants fail to identify a single factual matter that relies solely on uncorroborated sources, anonymous or otherwise. Further, Defendants disregard the fact

---

[155] *See also* June 21, 2021 Proxy at 140 (describing conditions for Hyzon's continued operations).

[156] *See, e.g., Skiadas v. Acer Therapeutics Inc.*, 2020 WL 3268495, at *11-12 (S.D.N.Y. June 16, 2020) (company's "going concern" status provided motive to defraud).

[157] *See Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 710 (7th Cir. 2008).

[158] Hyzon MTD Br. at 20-21.

their own statements and disclosures acknowledge, if not explicitly concede, that their past statements about committed orders, customer relations, and projections were plainly false.[159]

As just one example, Defendants myopically assert that this Court can disregard claims concerning Hiringa because they are based, in part, on Blue Orca's interviews with an unnamed Hiringa executive.[160] But Defendants ignore Hyzon itself conceded in its response to Blue Orca that Hiringa was in fact a channel partner, not an end user with binding orders. ¶ 177. Hyzon also conceded that, despite prior claims about 2021 deliveries, it would not supply trucks to Hiringa's partners until "the first half of 2022." *Id.* As such, Hyzon's own disclosures corroborate the very anonymous statements they seek to attack, including that Hiringa would not take any Hyzon deliveries until receiving four validation HFECVs in March or April 2022, at the earliest. ¶ 166.

The same is true about Blue Orca's conclusion that "Hyzon announced a bogus deal with a fake looking Chinese customer to pump its stock price." ¶ 162. On October 5, 2021, Hyzon confessed that HongYun was a "special purpose vehicle" established days before Hyzon announced the critical MOU. ¶ 176. Lead Plaintiff's China-based investigator, Investigator C-1, independently verified Blue Orca's findings that HongYun had no paid in capital, no official phone number, email, WeChat or website, and no registered corporate owners. *See* ¶¶ 240-81. Hyzon has since collected but a fraction of the revenues it claimed it would receive from a legitimate transaction. ¶¶ 235-36. And Hyzon's Special Committee Statement and restated quarterly reports concede the Company falsely reported deliveries to HongYun, even though the HFCEVs did not operate on hydrogen. ¶¶ 223-25. This was all so Defendants could say they met their projections.[161]

Defendants' premise—that a "vast majority" of the Complaint rests on short seller allegations—is false.[162] From September 2021 through March 2023, Hyzon issued a series of

---

[159] *E.g.*, ¶¶ 221-26 (discussing Special Committee summary findings); ¶¶ 227-34 (restated reports).

[160] Hyzon MTD Br. at 21.

[161] *See also* SEC Compl. ¶ 46 (alleging scheme where Hyzon delivered HFCEVs shortly before the end of 2021 so it could meet its public guidance and where customers would then return the vehicles to Hyzon so that the Company could complete its work).

[162] *See* Hyzon MTD Br. at 20.

cascading disclosures acknowledging and correcting for its prior false and misleading conduct. ¶¶ 176-239. Lead Plaintiff's claims mostly rest on the flood of new information revealed through these disclosure events and Lead Plaintiff's own investigation. That the Blue Orca Report precipitated these events does not otherwise undermine the probative value these disclosures bear.

### 5.       Lead Plaintiff has statutory standing to bring Section 10(b) for pre-merger statements.

Defendants argue that Lead Plaintiff lacks statutory standing to assert Section 10(b) claims against Hyzon for any statements made before the July 16, 2021 de-SPAC Merger.[163] In their view, the Second Circuit's decision in *Frutarom* bars investors from bringing Section 10(b) claims unless the issuer makes misstatements about itself. Defendants accordingly contend that, under *Frutarom*, Lead Plaintiff and the purported class—all shareholders of DCRB securities prior to the merger— cannot bring Section 10(b) claims based on any statements pre-dating the July 16, 2021 de-SPAC Merger. Defendants are mistaken.

In *Frutarom*, the plaintiffs—investors who bought shares of International Flavors & Fragrances, Inc. ("IFF") after it had announced plans to acquire Frutarom Industries Ltd.—brought Section 10(b) claims against IFF and Frutarom for materially misleading statements Frutarom made before the merger announcement about its compliance with anti-bribery laws. The district court dismissed the complaint on multiple grounds. As to IFF, the district court found that its statements about its growth projections, Frutarom's financial performance, and Frutarom's management were not actionable as the statements did "not even remotely come close to implicating Frutarom's specific [purported bribery] operations in Russia and China."[164] As for Frutarom, the court held that plaintiffs "lack[ed] statutory standing under Section 10(b) to bring

---

[163]   *See* Hyzon MTD Br. at 18. Defendants do not assert Lead Plaintiff lacks statutory standing to bring any other claims against Hyzon, including under Section 14(a). Their standing argument thus has no impact on the parties, discovery, or damages in this case. Additionally, because Defendants repeated their false statements about customer relationships, Hiringa, and revenues after the Class Period, ¶ 334, their standing argument, if successful, does not alter the scope of claims in this case.

[164]   2021 WL 1199035 at *15-19; *see also id.* at *19-20 (finding underlying bribery claims not pled with particularity); *id.* at *24-29 (finding IFF's scienter not sufficiently pled).

claims" based on false statements Frutarom made about itself prior to the IFF-Frutarom merger."[165]

On appeal, the plaintiffs challenged only the dismissal of their Rule 10b-5(b) claims against Frutarom on statutory standing grounds, not the dismissal of claims against IFF.[166] The plaintiff argued there was "a sufficiently 'direct relationship' between Frutarom's misstatements about itself and the price of IFF's shares" that they could bring claims against legacy Frutarom.[167] The Court of Appeals ultimately rejected this functional (over-formal) inquiry.[168] It held that under the "purchaser-seller rule," "standing to bring a [Section 10(b)] claim is limited to the purchasers or sellers of *securities about which a misstatement was made*."[169] And since Frutarom "made material misstatements about itself" and its historic aversion to bribery—rather than about IFF securities (e.g., post-merger financials)—plaintiffs, as IFF shareholders, could not bring Section 10(b) misstatement claims against Frutarom for the pre-merger misstatements at issue.[170]

Contrary to Defendants' suggestions, the Court of Appeals was not presented with the question, and thus did not hold, that the purchaser-seller rule bars Section 10(b) claims against an acquirer-issuer for any of its pre-merger statements. In years prior, the Second Circuit rejected such a broad sweeping construction of the purchaser-seller rule.[171] Likewise, in *Frutarom*, the

---

[165] 2021 WL 1199035 at *15-19.

[166] 54 F.4th at 85.

[167] *Id.*

[168] *Id.*

[169] 54 F.4th at 84 (citing *Blue Chip Stamps v. Manor Drug Store*s, 421 U.S. 723, 730 (1975)) (emphasis added). Notably, the Second Circuit's holding intentionally focuses on misstatements affecting *securities*, not misstatements about the issuing company. Originally, the Second Circuit's opinion required "plaintiffs to have bought or sold the security of *the issuer* about which a misstatement was made." *See Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*, Case No. 21-1076, Dkt No. 121-1 (2d Cir. Sept. 30, 2022) ("Original Opinion") at 8 (emphasis added). After Securities law professors explained that the original rule formulation would have unintended consequences, including exempting "securities of SPACs," the Second Circuit issued a revised opinion replacing the issuer-focused language with language focusing on the security. *See* Securities Law Scholars Amicus Brief, Case No. 21-1076, Dkt No. 140 (2d Cir. Oct. 26, 2022).

[170] *Id.* at 88-89.

[171] *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 102 (2d Cir. 2007) ("*Nortel* should not be read to hold that "an action under Rule 10b–5 for false statements about a security purchased by the plaintiff lies only against the issuer of the security, or that only statements about a security issuer are actionable.").

court repeatedly made clear that its holding extending only to cases in which a non-issuer was exclusively making misrepresentations "about itself."[172] As such, there can be no question that Lead Plaintiff thus has statutory standing to pursue claims against issuer DCRB.[173]

Nor did the *Frutarom* Court opine that the statutory-standing requirements it discussed barred Rule 10b-5(a)&(c) scheme liability claim against non-issuers. As noted by the district court in *In re Turquoise Hill Resources Ltd. Sec. Litig.*, such a reading would reduce recent Supreme Court cases on "scheme" liability to mere "nullities".

> If it were true that investors do not have standing to bring claims under Rule 10b–5 against a non-issuer company whose stock they did not purchase or sell, except in a few limited circumstances, then the Supreme Court's key holdings in cases such as *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 131 S. Ct. 2296, 180 L.Ed.2d 166 (2011) and *Stoneridge Investment Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 128 S. Ct. 761, 169 L.Ed.2d 627 (2008)—…which concern when a third-party may be liable under Rule 10b–5 to another company's shareholders, would largely be nullities. The Supreme Court, in those cases, could have instead held that Plaintiffs would not have standing to bring Rule 10b–5 claims against the third parties.[174]

If the *Frutarom* Court intended to disrupt these Supreme Court holdings, it could easily have said so—and surely would have said so.[175] To the contrary, the court clarified its decision did not preclude stock purchasers from suing entities other than the "makers" of misstatements—including "underwriters, brokers, bankers, and non-issuer sellers"—for their fraudulent acts or conduct under Rule 10b-5.[176] Accordingly, Lead Plaintiff may pursue scheme liability claims against all Defendants for all pre-merger deceptive acts and conduct committed to push shareholders to approve the SPAC merger.

Finally, *Frutarom* still allows private plaintiffs "to sue entities other than the issuer of a

---

[172]   2021 WL 1199035, at *30–31 (S.D.N.Y. Mar. 30, 2021).

[173]   *See Malork* Oral Ruling at 35 (finding DCRB was a maker of investor presentations statements); DCRB MTD Br. at 6-7 (conceding DCRB made statements about Hyzon and issued the proxies).

[174]   *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 199 (S.D.N.Y. 2022).

[175]   *Miller v. City of Ithaca*, 2019 WL 1470249, at *2 (N.D.N.Y. Apr. 3, 2019).

[176]   *Frutarom*, 54 F.4th at 88.

security if those entities made material misstatements about the security, as long as the plaintiffs purchased or sold the securities *about which* the misstatements were made."[177] Although the Second Circuit did not provide express instructions on how to determine what security a statement is "about," the *Frutarom* Court considered at least two formal factors for these Rule 10b-5(b) type claims: (i) who the alleged statement is addressed to and (ii) what investment decision the statement seeks to influence. In *Frutarom*, the statements plaintiffs challenged were historic statements addressed to only Frutarom's pre-merger public shareholders—predominantly investors on Frutarom's foreign stock exchanges.[178] Additionally, Frutarom's statements sought to influence the investment decisions of only its shareholders—the only set of shareholders needed to approve the merger under the merger agreement. Thus, prior to the merger, when Frutarom issued reports, the statements therein were naturally about itself.

Here, the pre-merger statements at issue—contained in investor presentations, proxy statements, and other soliciting materials filed with the SEC by DCRB—where targeted at, and intended to persuade, the investment decisions of only DCRB shareholders.[179] Proxy statements, for example, were addressed to "Stockholders of Decarbonization Plus Acquisition Corporation" for the purpose of advising them to vote for the de-SPAC merger at "the special meeting of stockholders of Decarbonization Plus Acquisition Corporation."[180] Just like DCRB's proxies, investment presentations also began with "important information for investors and shareholders,"[181] which Hyzon—a private company controlled by its corporate parents—lacked entirely. There is no dispute that, after DCRB announced the proposed merger, its blank check securities related to only one substantive matter: the commercialization of Hyzon's HFCEVs. And there was nothing DCRB could ask shareholders to do other than buy shares, vote, and not redeem.

---

[177] *Id.* at 88 (emphasis added).

[178] *See* 2021 WL 1199035, at *2 (S.D.N.Y. Mar. 30, 2021).

[179] *See* Compl. at vii (explaining that under SEC regulations, a soliciting material means any communications sent to shareholders regarding an issue up for a shareholder vote).

[180] *E.g.,* June 21, 2021 Proxy at 2.

[181] *See, e.g.*, Feb. 9, 2021 Investor Presentation at 3 (Dkt. No. 94-3).

Defendants' cited authorities do not hold otherwise and are distinguished on their facts. In *CarLotz*, for example, the plaintiffs conceded that all of the challenged pre-merger statements were made by pre-merger CarLotz and no other company.[182] Here, in contrast, DCRB and its executives made several of the challenged pre-merger statements on their own, or at the very least were joint makers of statements.[183] Just like in other SPAC cases sustained around the country,[184] Lead Plaintiff has statutory standing to pursue Section 10(b) claims against both Hyzon and DCRB.[185]

**6.    Loss causation is adequately plead, as Defendants' misconduct directly caused investors to suffer significant losses once risks materialized.**

"Loss causation ... is the proximate causal link between the alleged misconduct and the plaintiff's economic harm."[186] A "securities fraud plaintiff's burden [in pleading loss causation] is not a heavy one."[187] As the Second Circuit has explained, "a plaintiff can establish loss causation either by showing a 'materialization of risk' or by identifying a 'corrective disclosure' that reveals the truth behind the alleged fraud."[188] The corrective disclosures or materializations alleged need not be a "'mirror image' tantamount to a confession of fraud."[189] Loss causation pleading is governed by Rule 8.[190]

Here, Defendants' fraud was partially revealed through seven disclosure events, each of which disclosed new facts about Defendants' misconduct or otherwise constituted a foreseeable materialization of their misconduct. The misconduct revealed through these disclosure events

---

[182]   *In re CarLotz, Inc. Sec. Litig.*, 2023 WL 2744064 at *4 (S.D.N.Y. Mar. 31, 2023).

[183]   *See, e.g., In re NYSE.*, 503 F.3d at 102 (finding that one set of statements gave plaintiffs standing to sue regarding every security that traded on the New York Stock Exchange). *Frutarom* did not disturb precedent holding misstatements can be about or relate to multiple companies' securities.

[184]   *E.g., Romeo Power Inc. Sec. Litig.*, 2022 WL 1806303, at *2 (S.D.N.Y. June 2, 2022); *Camelot Event Driven Fund v. Alta Mesa Res., Inc.*, 2021 WL 1416025, at *3 (S.D. Tex. Apr. 14, 2021).

[185]   If the Court disagrees and finds that *Frutarom* bars Section 10(b) claims based on either DCRB or Hyzon's pre-merger statements, Lead Plaintiff, understanding this Court is bound by *Frutarom*, contends *Frutarom* was wrongly decided as applied to SPAC and scheme-based cases.

[186]   *Gormley v. Magicjack Vocaltec Ltd.*, 220 F. Supp. 3d 510, 517 (S.D.N.Y. 2016).

[187]   *In re VEON Ltd. Sec. Litig*, 2017 WL 4162342, at *11 (S.D.N.Y. Sept. 19, 2017).

[188]   *In re Vivendi*, 838 F.3d at 261.

[189]   *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 202 (S.D.N.Y. 2010).

[190]   *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005).

caused Hyzon's stock price to plummet. Defendants nevertheless attempt to challenge each loss event as a last-ditch effort to defeat Lead Plaintiff's Section 10(b) claims.[191]

**Blue Orca Report (Sept. 30, 2021).** On September 28, 2021, Blue Orca issued a Report finding that Hyzon's publicly touted orders and customer base was false and misleading. In its aftermath, Hyzon's stock fell $28.0%. ¶ 493(a). Defendants contend the Report is not a corrective disclosure on the false premise it contained no new information. As discussed above, the Report relied on foreign language regulatory research and non-public witness interviews, which revealed undisclosed facts about HongYun and Hiringa purchasing ability, and Blue Orca's findings have since been corroborated by Hyzon's own disclosures.[192] The magnitude of the resulting price drop refutes the conclusory claim the market simply reacted to a negative journalistic opinion.[193]

**Iceberg Research Report (Oct. 6, 2021).** In the wake of Iceberg's corroborative investigation into Horizon's downfall, Hyzon's stock fell 8.0%. ¶ 493(b). Defendants' repeat the same arguments raised against Blue Orca. Their arguments fail for the same reasons.

**2021 Financial Update and News About SEC Subpoena (Jan. 12, 2022).** On this date, Hyzon informed investors that its 2021 results would be "materially lower than forecast" and that it had received an SEC subpoena relating to Blue Orca's allegations. ¶ 493(c). Defendants beg the Court to view these events without context—as nothing more than a poor quarter and a baseless investigation. But "announcements of government investigations regarding the subject of the misstatements alleged" have long been found "sufficient to plead loss causation."[194] Likewise, courts routinely recognized that disclosures consisting of surprisingly poor financial results driven

---

[191]   *See* Hyzon MTD Br. at 44-46.

[192]   *See Argument*, Part A.4.

[193]   *See Lea v. TAL Educ. Grp.*, 837 F. App'x 20, 28 (2d Cir. 2020) (finding loss causation pled adequately based on a short-seller report with similar information); *In re China Mobile Games & Entm't Grp., Ltd Sec. Litig.*, 2016 WL 922711, at *9 n.12 (S.D.N.Y. Mar. 7, 2016) (finding loss causation pled where "[t]he [short seller] report contains information that was not readily accessible, including [information from] … financial filings in Chinese.").

[194]   *Bos. Ret. Sys. v. Alexion Pharms., Inc.*, 556 F. Supp. 3d 100, 141 (D. Conn. 2021) (citing *Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Intern. N.V.*, 89 F. Supp. 3d 602, 620 (S.D.N.Y. 2015)).

by a concealed risk adequately demonstrate loss causation.[195] Indeed, behind the scenes, Hyzon fraudulently hid the extent to which it failed to satisfy any performance obligations.[196] And Defendants Hyzon and Knight have since agreed to consent judgments with the SEC.[197]

**2021 Annual Report (Mar. 30, 2022)**. This bombshell report revealed, among other things, Hyzon's grant of warrants to HongYun, that Hyzon's lack of non-China business, and auditor concerns about the collectability of revenues from Hyzon's unestablished Chinese purchasers. ¶¶ 198-204. Individually and holistically, this disclosed information revealed aspects of Defendants' fraud scheme and previewed further disclosures and restatements to come. On this news, Hyzon's stock fell 17.0%, ¶ 493(d), even though Hyzon depressed market expectations on January 12 and March 23 that its financial results would be materially lower than forecast, ¶ 195.

**1Q22 Report (May 6, 2022).** This quarterly report began the first of many revealing that, despite Hyzon's backlog claims, it had no orders in the pipeline and no revenues from past or future deals. ¶ 207. On this news, Hyzon's stock dropped nearly 11%. ¶ 493(f). Defendants do not meaningfully develop any argument as to this disclosure event and may not do so in their reply.

**Special Committee Investigation Launch (Aug. 4, 2022).** On news of the Special Committee's investigation into the problems alleged herein, the disavowal of all prior guidance, and no future reports in the new future, Hyzon's stock price dropped 38%. ¶ 493(g). Defendants conclusorily assert this news bore no connection to their misstatements about Hyzon's customer relationships, Hiringa, or HongYun. Their position is divorced from the pleading record. The Special Committee's summary findings concede Hyzon falsely reported performance obligations as satisfied. ¶ 223. Defendants, as perpetrators of the fraud, cannot blame analysts for not knowing what had not yet been disclosed. Nor can they seriously dispute in a Rule 12(b) posture that the announced investigation materialized from the risks posed by their underlying misconduct.

---

[195] *See E\*Trade*, 712 F. Supp. 2d at 203-04.

[196] *See Argument*, Part B (summarizing defendants' deceptive acts and conduct).

[197] *See Background*, Part K.

**Founder terminations (Aug. 17, 2022).** Defendants claim the termination of Hyzon's founders two weeks after the announcement of the Special Committee investigation is not a loss causation event because their terminations were unsurprising given lower-than-projected revenues. They ignore that several media outlets reported Knight's ouster and Gu's demotion as being directly tied to the irregularities described in the August 4, 2022 press release, ¶ 217, that Knight's termination was retroactively deemed for cause, ¶ 220; and that Gu was ousted despite having little connection to Hyzon's day-to-day affairs, ¶ 40 (alleging Gu's transition from CEO to Chairman).

Under Rules 8 and 12(b), Defendants are not entitled to deference for a competing inference. Plaintiffs have sufficiently pled loss causation for each alleged disclosure event.

**B.      The Hyzon and DCRB Defendants employed deceptive schemes and engaged in fraudulent acts in violation of Section 10(b) and SEC Rule 10b-5(a) & (c).**

In contrast to Rule 10b-5(b)'s linear focus on misstatements, Rules 10b-5(a) and (c), by their broad terms, "capture a wide range of conduct," schemes, and acts.[198] For shorthand, securities litigants commonly refer to such claims as "scheme liability."

Scheme liability requires showing that "[d]efendants ... participated in an illegitimate, sham or inherently deceptive transaction where [their] conduct or role ha[d] the purpose and effect of creating a false appearance."[199] Accordingly, to state a claim, a plaintiff must allege that a defendant "(1) committed a deceptive or manipulative act, (2) with scienter, that (3) the act affected the market for securities or was otherwise in connection with their purchase of sale, and (4) that the defendant's actions caused the plaintiff's injuries."[200]

Here, Defendants erroneously contend Lead Plaintiff's scheme liability claims simply rehash the same alleged misrepresentations and omissions alleged in Lead Plaintiff's Rule 10b-5(b) claims.[201] In their view, Lead Plaintiff's misstatement claims and scheme claims rise and fall

---

[198]   *Lorenzo*, 139 S. Ct. at 1101.

[199]   *SEC v. CKB168 Holdings, Ltd.*, 210 F. Supp. 3d 421, 445 (E.D.N.Y. 2016) (citation and internal quotation marks omitted).

[200]   *Id.* (citation and internal quotation marks omitted).

[201]   *See* Hyzon MTD Br. at 46-47.

together. Operating under this myopic assumption, they assert no new or independent arguments as to why Lead Plaintiff has failed to plead a scheme liability claim. They fail to appreciate the extent of their deceptive or manipulative conduct beyond their misstatements and omissions.

**Prior to the de-SPAC Merger**, Defendants employed an aggressive media strategy that exaggerated Hyzon's operational ability, purported customer bases, and purported committed sales for the purpose of convincing DCRB shareholders to vote in favor of the de-SPAC Merger, instead of exercising their redemption rights. ¶¶ 109-42. In furtherance of this pre-merger scheme, Defendants surreptitiously edited the investment presentations shown to DCRB shareholders, removing logos of blue-chip customers, but leaving on those customer's purported deals, even where customers like Heineken had indicated they would not be making purchases.[202] *See* ¶ 443.

On top of their sham media blitz and their surreptitious edits, Defendants created farcical posts to support their false claims about being able to manufacture and deliver hydrogen-operable vehicles. *E.g.*, ¶ 124. Indeed, two days before the June 15, 2021 shareholder vote, Defendants announced Hyzon had made its first HFCEV delivery, ¶ 142 n.78, and simultaneously posted a video on social media showing this vehicle in operation. As the Special Committee Report later disclosed, this vehicle did not run on hydrogen. ¶ 224. To allow the vehicle to travel for purposes of the video, a Hyzon executive rigged the purported HFCEV to run on an electric battery. At that time, Hyzon had not even installed a critical component required to power the vehicle with a hydrogen fuel cell.[203] The falsification of customer deployment maps and videos of Hyzon vehicles to bolster Hyzon's public image going into the SPAC merger constitutes actionable conduct separate from and beyond Defendants' unlawful misstatements and omissions.[204]

---

[202] *See Ga. Firefighters' Pension Fund v. Anadarko Petro. Corp.*, 514 F. Supp. 942, 954 (S.D. Tex. 2021) (sustaining Rule 10b-5(c) claim where defendants "direct[ed] employees to use outdated, misleading maps that made [the project] seem more commercially viable tha[n] it really was").

[203] *See also* SEC Compl. ¶ 29.

[204] *See Yoshikawa v. Exxon Mobil Corp.*, 2023 WL 5489054, at *9 (N.D. Tex. Aug. 24, 2023) (finding scheme where mid-level executive instructed her team to manipulate internal valuations of ExxonMobil's Permian assets in order to support CEO's public pledges to investors).

**Following the de-SPAC Merger**, Defendants continued to engage in fraudulent conduct to prove their operational ability, keep inflated the value of their locked up stocks, and support their impossible pledges to shareholders. To cite the most egregious examples: To fill Hyzon's delivery gap, in September 2021, Defendants entered into an MOU and touted purported deals through a newly formed shell entity, HongYun, which in truth lacked the expertise or capital to independently fulfill such transactions.[205] *E.g.*, ¶ 368. In November 2021, as Hyzon's stock continued to stagnate in Blue Orca's wake, Defendant Knight unlawfully pledged nearly 225,000 of his Hyzon shares to secure a loan and used the $1.5 million in proceeds in an unsuccessful attempt to inflate Hyzon's stock price.[206] To incentivize HongYun to make purchases towards Hyzon's 2021 delivery goal, in November 2021, Hyzon secretly granted a HongYun subsidiary warrants for Hyzon stock that would vest as HongYun made payments. ¶ 186. So that Hyzon could claim it made good on its 2021 delivery guidance, Hyzon arranged to deliver non-functioning vehicles before the end of the year in an arrangement where the customers agreed to return the vehicles after year-end to complete necessary work.[207] To substantiate the misleading reports underlying Defendants public claims, Hyzon created false books and records, and improperly claimed as revenue tax payments totaling $1.8 million. ¶ 404.

These examples all constitute actionable deceptive or manipulative conduct that violates Rule 10b-5(a) & (c). Defendants' failure to address their conduct-based fraud is fatal to their motions to dismiss. They cannot argue for the first time in their reply that the above-described conduct cannot sustain a scheme liability claim.[208] And for the reasons described above,[209] their

---

[205] *See also* note 58, *supra* (explaining how Defendants likely used HongYun to disguise and portray a Horizon customer as a new, deep pocketed purchaser to fill Hyzon's delivery gap).

[206] *See* SEC Compl. ¶¶ 66-68; Knight Form 4 Statement of Changes in Beneficial Ownership (Nov. 23, 2021) (recording Knight's purchase of 166,000 shares of Hyzon securities for a total price of about $1.4 million), https://www.secform4.com/filings/1716583/0000899243-21-045701.htm.

[207] *See* SEC Compl. ¶ 46.

[208] *Donziger*, 325 F. Supp. 3d at 379 n.21 ("It is well established, of course, that arguments first raised in reply briefs are forfeited or waived.").

[209] *See Argument*, Part A.2 (scienter); Part 6 (loss causation).

arguments as to scienter and loss causation (elements common to all Rule 10b-5 claims) simply lack merit. The Court should thus deny Defendants' motions as to scheme liability.

**C.     All Defendants prepared, reviewed, or disseminated false and misleading Soliciting Materials in violation of Section 14(a) of the Exchange Act and Rule 14a-9.**

In Count IV, Lead Plaintiff addresses a separate set of conduct than that at issue in Counts I, II, and III (Section 10(b) securities fraud counts against Hyzon and DCRB's management). Count IV charges primarily pre-merger DCRB, its directors, and its controllers for negligently preparing, approving, or disseminating false and misleading Soliciting Materials, which failed to disclose material facts that were necessary to render the statements therein about Hyzon's purported customers and revenue sources no longer misleading.[210] ¶ 545. These Soliciting Materials were essential links in persuading shareholders to vote for the consummation of Hyzon's July 16, 2021 merger. ¶ *Id.* The falsehoods therein thus deprived investors of their right to be presented with accurate Soliciting Materials before choosing between approving the merger or exercising their redemption rights. ¶ 551.

Applying an (1) incorrect pleading standard, Defendants contend that Lead Plaintiff's allegations fall short because they (2) lack facts showing the statements were false when made; (3) fail to plead Defendants' negligent conduct; and (4) the charges are derivative instead of direct.

**1.     Defendants misstate the pleading standard for Section 14(a) claims.**

Under the PSLRA, a plaintiff who alleges that a defendant "made an untrue statement of a material fact" must satisfy the following heightened pleading standard:

> [T]he complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.[211]

Here, all agree this provision applies to lawsuits brought under Section 14(a) and Rule 14a-9.[212]

---

[210]    *See also* ¶ 549 (distinguishing Defendants Knight, Gu, Gordon, and Tichio's role and conduct in the preparation, approval, and dissemination of the misleading Soliciting Materials).

[211]    15 U.S.C. § 78u-4(b)(1).

[212]    *See Bricklayers & Masons Loc. Union No. 5 Ohio Pension Fund v. Transocean Ltd.,* 866 F. Supp.

Defendants err, however, in arguing that the PSLRA's heightened pleading standard for state of mind also applies to Section 14(a) claims.[213] Their reliance on two outlier decisions from over twenty years ago speaks volume of their position. "The better reasoned" and more recent cases from this Circuit have routinely held that this standard does not apply to suits brought under Section 14(a).[214] This is because scienter is not an element of Section 14(a).[215] Section 14(a) only requires negligence.[216] And "negligence is not a state of mind; it is a failure, whether conscious or even unavoidable …, to come up to the specified standard of care."[217] This Court should find the same—the heightened state-of-mind pleading standard does not apply to Section 14(a).[218]

In a similar vein, Defendants also contend that the heightened pleading standards for fraud under Rule 9(b) should apply to Lead Plaintiff's Section 14(a) negligence claims.[219] Not so. Section 14(a) claims, which do not sound in fraud, are only subject to the notice pleading standard of Rule 8.[220] Here, the Complaint is structured to draw a "clear distinction" between the fraud and

---

2d 223, 239 (S.D.N.Y. 2012) (applying § 78u-4(b)(1) to Section 14(a) lawsuit).

[213] *See* DCRB MTD Br. at 16 (citing *Bond Opportunity Fund v. Unilab Corp.*, 2003 WL 21058251, at *4 (S.D.N.Y. May 9, 2003)); *Applicable Legal Standards*, Part C, *supra* (discussing standard).

[214] *comScore*, 268 F. Supp. 3d at 559; s*ee, also e.g., McIntosh v. Katapult Holdings, Inc*., 2023 WL 5049044, at *5 (S.D.N.Y. Aug. 8, 2023) ("Plaintiffs point out, correctly, that the PSLRA's heightened pleading standard for a defendant's state of mind, 15 U.S.C. § 78u-4(b)(2), does not apply to suits brought under Section 14(a).").

[215] *See Wilson*, 855 F.2d at 995 ("Under Rule 14a-9, plaintiffs need not demonstrate that the omissions and misrepresentations resulted from knowing conduct undertaken by the director defendants with an intent to deceive.").

[216] *Id.*

[217] *Enzo Biochem, Inc. v. Harbert Discovery Fund, LP*, 2021 WL 4443258, at *8 (S.D.N.Y. Sept. 27, 2021 (quoting *Beck v. Dobrowski*, 559 F.3d 680, 682 (7th Cir. 2009)).

[218] Defendants also fault Lead Plaintiff for not alleging the applicable standard of care. *See* DCRB MTD Br. at 16-17. But courts in this Circuit hold that Section 14(a) requires proof only that Defendants issued a misleading proxy solicitation, which Plaintiff has done here; not particularized allegations of the standard of care and Defendants' breach of that duty. *See comScore*, 268 F. Supp. 3d at 560; *Wilson*, 855 F.2d at 995.

[219] *See* DCRB MTD Br. at 10; Hyzon MTD Br. at 47.

[220] *comScore*, 268 F. Supp. 3d at 558 (notice pleading applied where plaintiffs "went beyond 'nominal efforts' to distinguish their fraud allegations from their strict liability and negligence allegations under ... Section 14(a)")

non-fraud claims and defendants.[221] And as in *comScore*, the Complaint specifies that the Section 14(a) claims, based solely in negligence, disclaims any allegations that "could be construed as alleging or sounding in fraud or intentional or reckless misconduct."[222] *See* ¶ 543. That Plaintiffs base the Section 10(b) and Section 14(a) claims on certain common documents "does not take away plaintiffs' right to plead in the alternative that defendants violated provisions requiring only negligence."[223] "In similar circumstances, courts have consistently held that ... Section 14(a) are subject to notice pleading where, as here, the division between the claims is clear."[224]

Regardless, Defendants' argument for a more particularized pleading standard is a non-starter. The Complaint specifies the Soliciting Materials alleged to be misleading, the speaker for each of those statements, where and when the statements were made, the reasons why each statement were false and misleading, and the facts on which that belief was formed. *E.g.*, ¶¶ 288, 292, 296, 304, 307, 313, 315, 320, 327, and 357. Rule 9(b) requires nothing more.

### 2. The Soliciting Materials contained untrue statements of material fact and omitted material information.

"A proxy statement [and other Soliciting Materials] should honestly, openly and candidly state all the material facts, making no concealment of the purposes for the proposals it advocates. Unlike poker where a player must conceal his unexposed cards, the object of a proxy statement is to put all one's cards on the table face-up."[225] Section 14(a) is satisfied "[o]nly when the proxy statement fully and fairly furnishes all the objective material facts" to allow a reasonably prudent investor "to make an informed investment decision ...."[226]

Despite this mandate, Defendants prepared, approved, or disseminated Soliciting Materials

---

[221] *See* ¶¶ 36-59 (distinguishing Executive Defendants Knight, Gu, Gordon, Anderson, Tichio, and Haskopoulos—the participants in the alleged Section 10(b) misconduct—from the other Section 14(a) defendants, such as DCRB's controlling entities and non-Hyzon-affiliated directors).

[222] *comScore*, 268 F. Supp. 3d at 558.

[223] *See Refco*, 503 F. Supp. 2d at 632-33.

[224] *comScore*, 268 F. Supp. 3d at 558 (collecting cases).

[225] *Mendell v. Greenberg*, 927 F.2d 667, 670 (2d Cir. 1991), *amended*, 938 F.2d 1528 (2d Cir. 1990).

[226] *comScore*, 268 F. Supp. 3d at 561.

containing three types of materially untrue and misleading statements which impaired DCRB's shareholders' ability to make an informed decision as to whether to redeem their shares or invest in post-de-SPAC Hyzon. These statements describing (i) Hyzon's relationship sales to Hiringa; (ii) Hyzon's relationship with and sales to "blue chip customers"; and (iii) Hyzon's historical gross margins, were false and material for the same reasons discussed in Part A.1, *supra*.[227]

### 3. The Complaint sufficiently pleads each Defendant's negligence.

Defendants contend the Complaint falls short of pleading negligence because, in their view, Lead Plaintiff alleges "no oversight in [the Soliciting Materials] preparation, and no facts contradicting the description of … Hyzon's sales pipeline or business prospects that the DCRB Defendants should have known at the time of the Merger Filings."[228] Defendants underestimate their culpable participation in pushing the misleading Soliciting Materials at issue.

To establish negligence for purposes of Section 14(a), plaintiffs need only allege that a defendant "knew or in the exercise of due diligence should have known that the Proxy Statement contained false or misleading statements or omissions."[229] It is not necessary that the defendant "personally made allegedly misleading statements or personally prepared the proxy materials."[230] "[W]hen individuals listed in a proxy statement 'hav[e] put their reputations in issue, [they] cannot divorce themselves from improper actions taken in the proxy battle by the participants acting under the banner of their names."[231] Such is the case here.

Just as in *Hurgin*, the Hyzon and DCRB Defendants put their reputation on the line to solicit shareholder approval for the July 16, 2021 merger. For DCRB's Defendants and Directors, the proxy materials listed each director's extensive professional backgrounds to lend credit to the

---

[227] *See In re Mindbody, Inc. Sec. Litig.*, 489 F. Supp. 3d 188, 217 (S.D.N.Y. 2020) ("Materiality for purposes of Section 14(a) is indistinguishable from the Section 10(b) standard.").

[228] *See* DCRB MTD Br. at 17.

[229] *See SEC v. Hurgin*, 484 F. Supp. 3d 98, 117 (S.D.N.Y. 2020) (internal quotation marks omitted).

[230] *Id.*

[231] *Id.* (quoting *In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 757 F. Supp. 2d 260, 294 (S.D.N.Y. 2010)).

Board's recommendation that shareholders vote for the proposed merger.[232] The proxy statements also set forth their involvement in the merger process. The DCRB Board:

- "reviewed the results of the due diligence conducted by DCRB's management and DCRB's advisors, which included: … meetings and calls with Hyzon management and advisors regarding business model, operations and forecasts … [and] review of material contracts";[233]

- "determined not to obtain a fairness opinion" in favor of self-relying on their members' substantial experience investing in companies;[234] and

- favored the proposed merger due to, among other things, their consideration of "Hyzon's non-binding memoranda of understanding, letters of intent and a limited number of orders with various clients, including blue-chip Fortune 100 companies as well as Hyzon's rapidly growing visibility."[235]

Yet despite reviewing Hyzon's MOUs and limited orders, Defendants allowed soliciting materials to issue in DCRB and Hyzon's name which contained the false and misleading claims discussed throughout. For example, Defendants allowed DCRB and Hyzon to suggest for months that Hiringa was an end user with 2021 deliveries, even though the terms of the Hiringa agreement plausibly suggested otherwise.[236] Likewise, Defendants let flourish the exaggerated claim that Hyzon had binding orders, or were near finalizing orders, with blue-chip Fortune 100s, when no such probable prospects existed,[237] and the contracts inherited by Hyzon Europe (established July 2020, ¶ 84) were retrofit services, not for Hyzon-owned vehicles. These investment presentations, deal announcements, and margin projections were not obscure publications; they were the cornerstone of DCRB and Hyzon's joint strategy to garner shareholder approval for the merger.

---

[232] June 21, 2021 Proxy at 181-84.

[233] *Id.* at 101.

[234] *Id.*

[235] *Id.* For the Hyzon Defendants, the Soliciting Materials listed their respective backgrounds as well to assure shareholders of the talent they would bring to the post-merger entity. These Defendants, as well as DCRB Chairman Tichio, frequently marketed the merger's prospects to investors.

[236] *See Argument*, Part A.1.b (discussing how Hiringa was a channel partner whose receipt of vehicles was subject to validation trials that would not begin until mid-2022).

[237] *See Argument*, Part A.1.c (discussing how DCRB and Hyzon falsely claimed that blue-chip logos like Heineken and Ikea were near-term customers for months, when those logos informed Hyzon as early as January and February 2021 that they would not be making orders in 2021 or at all).

At best, Defendants negligently failed to monitor or inquire into the status of the very orders and customers DCRB and Hyzon repeatedly touted as reasons to vote for the merger at any point after the February 9, 2021 merger announcement.[238] And "[a]s a matter of law, the preparation of [Soliciting Materials] by corporate insiders containing materially false or misleading statements or omitting a material fact is sufficient to satisfy the ... negligence standard."[239]

### 4. The Complaint's Section 14(a) claims are based on Defendants' deprivation of investors' redemption rights and are thus "direct," not derivative.

Despite DCRB's assertions to the contrary, Lead Plaintiff's Section 14(a) claim is not derivative. In short, Defendants mischaracterize Lead Plaintiff as asserting an "overpayment" claim—that is, a misleading proxy caused DCRB stockholders to approve the de-SPAC Merger for more than Hyzon was actually worth, and that the value of DCRB stockholders' shares went down when that was supposedly uncovered."[240] But nowhere does the Complaint allege DCRB overpaid for Hyzon or should have obtained more favorable terms.

The Complaint alleges that, because of Defendants' materially false Soliciting Materials, Lead Plaintiff and the Class Members that were entitled to vote on the de-SPAC Merger were denied the opportunity to make a fully informed decisions on whether to vote no on the merger and whether to exercise their redemption rights. ¶ 551. Without having been advised of material facts, Lead Plaintiff and the Class were damaged as a direct and proximate result of the untrue statements and omissions set forth herein. ¶ 552. When the truth was disclosed, the value of their Hyzon securities decreased significantly. *Id*.

The alleged harm does not run to the corporation because DCRB had no such redemption

---

[238] *See In re JPMorgan Chase & Co. Sec. Litig.*, 2007 WL 4531794, at \*8 (N.D. Ill. Dec. 18, 2007) (finding negligence pled where defendants, "as directors, had the opportunity and obligation to monitor and inquire into the details of ... negotiations" underlying material omission from proxy).

[239] *Wilson*, 855 F.2d at 995; *comScore*, 268 F. Supp. at 526, 560. Defendants contend their motive for making or disseminating false or misleading Soliciting Materials—the vast profits they stood to gain from their Founder Shares, ¶ 106—are far too generic. *See* DCRB MTD Br. at 15. Negligence is not a state-of-mind requiring compelling proof of knowledge or motive—i.e., scienter evidence.

[240] *See* DCRB MTD Br. at 11-12.

rights and the funds held in trust did not belong to DCRB *until* shareholders opted to invest their unredeemed shares in post-merger Hyzon. Shareholders thus suffered a harm independent of, and not shared with, DCRB. And any recovery on this claim would flow to shareholders directly because the harm arises from their deprived individual redemption and voting right.[241]

Applying the *Tooley* test,[242] the Delaware Chancery Courts have consistently found breach of fiduciary duty claims premised on the same impairing of SPAC stockholder's redemption right to be direct in nature (not derivative).[243] This includes the ongoing DCRB shareholder action against Hyzon.[244] Likewise, in *Mehedi*, a federal district court recently held a nearly identical Section 14(a) claim stemming from a de-SPAC Merger and pleading that a false and misleading proxy denied shareholders the opportunity to make a fully informed decision in voting alleged a direct claim, reasoning "given Lead Plaintiff's theory of the damage under the Section 14(a) claim, the damages are not derivative, and [he] was not required to plead demand futility."[245]

## D.     Defendants are liable as control persons under Section 20(a).

Only one Defendant, WRG, meaningfully develops a challenge to their liability as a control

---

[241]   *See Bank of Am.*, 757 F. Supp. 2d at 292 ("[A] corporation's stock may decrease because the corporation was damaged by an action that would not have been approved by fully-informed shareholders. But the value of that corporation's shares also may decrease once a corrective disclosure issues. That decrease is not necessarily co-extensive with injury to the corporation.").

[242]   *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004) (to determine whether a claim is direct or derivative in nature, Delaware courts apply two-pronged test, which considers "(1) who suffered the alleged harm" and "(2) who would receive the benefit of any recovery or other remedy.").

[243]   *See*, e.g., *In re MultiPlan Corp. S'holders Litig.*, 268 A.3d 784, 805 (Del. Ch. 2022) (claims were direct because "the plaintiffs [were] not suing because [the SPAC] did not combine [] on more favorable terms" but instead because "the Plaintiff allege[d] that the Defendants breached their fiduciary duties by … impairing the [] stockholder's [contractual] redemption right through false and misleading disclosures," and that impairment was "a harm independent of and not shared with [the SPAC]."); *Delman v. GigAcquisitions3, LLC*, 288 A.3d 692, 710 (Del. Ch. 2023).

[244]   *See Malork* Oral Ruling at 20.

[245]   *See Mehedi v. View, Inc.*, 2023 WL 3592098, at *15 (N.D. Cal. May 22, 2023). Defendants' reliance on *Romeo Power* is flawed. There, the plaintiffs did "not dispute ... the[ir] claim as based on the theory that … the proxy statement overstated the value of Romeo." *Romeo Power*, 2022 WL 1806303, at *5. That is inapposite to Lead Plaintiff's claim here,

person. [246] The wholly owned affiliate (owned by DCRB's CEO, Defendant Anderson) contends the Section 14(a) and Section 20 claims against it must be dismissed because it is not alleged to have done anything wrong other than receive Founder Shares.[247] It is mistaken.

WRG was a wholly owned affiliate of DCRB's CEO Anderson created for the purpose of holding Founder Shares for the benefit of Anderson. ¶ 50. The Complaint details how WRG, together with Riverstone and Sponsor (other artificial entities that Defendants Anderson, Lapeyre, Leuschen, and Tichio established and controlled) controlled primary violator DCRB by virtue of their holding of the Founder Shares.[248] ¶ 100. The Founder Shares gave the DCRB Control Defendants, including WRG, the power to elect and remove members of the Board, ensuring their control over the Proxy. *Id*. DCRB's registration acknowledged as much:

> Our initial stockholders [that is, the Sponsor, the "independent director nominees," and WRG] will control the election of our board of directors until consummation of our initial business combination and will hold a substantial interest in us. As a result, they will elect all of our directors prior to our initial business combination and may exert a substantial influence on actions requiring a stockholder vote, potentially in a manner that you do not support.

*Id.* Given its ability to appoint directors, and the fact DCRB deemed Anderson and WRG as essentially being one in the same, ¶ 99 n.44, WRG was able to "exercise[] managerial control that would make it no differently situated than if it had majority control."[249] On these same facts, the

---

[246] *See Tolbert v. Queens Coll*., 242 F. 3d 58, 75 (2d Cir. 2001) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."). Accordingly, the other Defendants' control-person liability thus rises and falls with their defenses against Lead Plaintiff's Section 10(b) and Section 14(a) claims. *See City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*, 477 F. Supp. 3d 123, 138 (S.D.N.Y. 2020).

[247] DCRB MTD Br. at 25.

[248] *Kalin v. Xanboo, Inc*., 526 F. Supp. 2d 392, 405 (S.D.N.Y.2007) ("[C]ourts have regularly based findings of control person liability on allegations of substantial stock ownership and common principals."); *SEC v. Lek Sec. Corp*., 276 F. Supp. 3d 49, 63 (S.D.N.Y. 2017) ("Control over a primary violator may be established by showing that the defendant possessed 'the power to direct or cause the direction of the management and policies of the primary violators, whether through the ownership of voting securities, by contract, or otherwise.'"). (quoting *In re Lehman Bros. Mortg.–Backed Sec. Litig.*, 650 F.3d 167, 185 (2d Cir. 2011))

[249] *Malork* Oral Ruling at 26.

Chancery Court found WRG controlled DCRB and its actions, including issuance of the June 21, 2021 Proxy.[250] Defendants provide no explanation why this Court should not hold the same.

## CONCLUSION

For these reasons, Defendants' motions to dismiss should be denied. As this this the first instance the Court has reviewed this securities fraud complaint, if any claims are dismissed, Lead Plaintiff respectfully requests leave to file an amended complaint, *see* Fed. R. Civ. P. 15(a)(2), which, among other things, incorporates the SEC's recently filed fraud allegations and corrects any technical deficiencies.[251]

---

[250] *Id.*

[251] *See supra* at 19; *Vanleeuwen v. Keyuan Petrochemicals, Inc.*, 2014 WL 3891351, at *4 (S.D.N.Y. Aug. 8, 2014) ("'[T]here is nothing improper about utilizing information contained in an SEC complaint as evidence to support private claims under the PSLRA.'" (quoting *In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d 458, 471 (S.D.N.Y.2012)).

Dated this 25th day of October, 2023

Respectfully submitted,

**HAGENS BERMAN SOBOL SHAPIRO LLP**

*/s/ Steve W. Berman*
Steve W. Berman (*pro hac vice*)
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com

Reed. R. Kathrein (*pro hac vice*)
Lucas E. Gilmore (*pro hac vice*)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
reed@hbsslaw.com
lucasg@hbsslaw.com

Raffi Melanson
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1 Faneuil Hall Sq., 5th Floor
Boston, MA 02109
Telephone: (617) 482-3700
Facsimile:  (617) 482-3003
raffim@hbsslaw.com

*Lead Counsel for Lead Plaintiff Alfred Miller*

Brian J. Schall (*pro hac vice* forthcoming)
**THE SCHALL LAW FIRM**
2049 Century Park East, Suite 246
Los Angeles, CA 90067
Telephone: (310) 301-3335
Facsimile:  (310) 388-0192
brian@schallfirm.com

*Additional Counsel for Lead Plaintiff Alfred Miller*

**CERTIFICATE OF SERVICE**

The undersigned, an attorney, hereby certifies that on October 25, 2023 a true and correct copy of the foregoing was electronically filed by CM/ECF, which caused notice to be sent to all counsel of record.

/s/ *Steve W. Berman*
STEVE W. BERMAN