# EXHIBIT 1

**EFiled:  Mar 18 2022 03:58PM EDT**
**Transaction ID 67407294**
**Case No. 2022-0260-**

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| JOHN E. MALORK, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ERIK ANDERSON, JENNIFER AAKER, JANE KEARNS, PIERRE LAPEYRE, JR., DAVID LEUSCHEN, ROBERT TICHIO, JIM McDERMOTT, JEFFREY TEPPER, MICHAEL WARREN, RIVERSTONE INVESTMENT GROUP LLC, WRG DCRB INVESTORS, LLC and DECARBONIZATION PLUS ACQUISITION SPONSOR, LLC,<br><br>Defendants. | C.A. No. 2022-____-___ |

## VERIFIED CLASS ACTION COMPLAINT

Plaintiff John E. Malork ("Plaintiff"), based on his own knowledge, and on information and belief, including the investigation of counsel and the review of publicly available information, as to all other matters, alleges as follows:

## NATURE OF THE ACTION

1.     This is a stockholder class action brought by Plaintiff on behalf of himself and all other similarly situated investors in Decarbonization Plus Acquisition Corporation ("Decarb" or the "Company"), now known as Hyzon Motors Inc. ("Hyzon"), who were entitled to redeem their shares of Company stock in connection with the Company's acquisition of and merger with, a formerly privately

held company also called Hyzon (the "Merger"). Plaintiff asserts breaches of fiduciary duties in connection with the Merger by the following individuals and entities (collectively, "Defendants," and each a "Defendant"): (a) Decarb directors Erik Anderson (then-Chief Executive Officer ("CEO")), Jennifer Aaker, Jane Kearns, Pierre Lapeyre, Jr., David Leuschen, Robert Tichio (former CEO), Jim McDermott, Jeffrey Tepper, and Michael Warren in their capacities as members of Decarb's Board of Directors (the "Board") and/or as Decarb officers; and (b) Riverstone Investment Group LLC ("Riverstone"), which founded Decarb and defendant Decarbonization Plus Acquisition Sponsor, LLC (the "Sponsor"), and WRG DCRB Investors, LLC ("WRG"), an affiliate of Defendant Anderson, in their capacities as Decarb's controlling stockholders.

2.      Hyzon as it exists today is the product of the July 2021 Merger between Decarb – then a publicly traded special purpose acquisition company ("SPAC") – and Hyzon, then a privately held company engaged in the design, development, and manufacture of hydrogen fuel cell powered commercial vehicles. Prior to the Merger, Decarb lacked any business operations of its own. Instead, its sole purpose was to seek out and combine with an operating company or business. Decarb conducted an initial public stock offering ("IPO") of 20 million shares of Class A common stock at $10 per share on October 22, 2020, raising $200 million in gross proceeds. Pursuant to the SPAC's terms, Decarb had two years after the IPO, or

- 2 -

until October 22, 2022, to identify a merger target and complete the acquisition or face returning the initial $10 per share investment, plus interest, to its investors.

3. Critically, once a merger target had been identified, putative class members had the right, in connection with their investment in pre-Merger Decarb, either to take possession of the stock in any newly formed company Decarb eventually acquired or to seek a redemption of their pro rata share of trust assets (*i.e.*, $10 in cash initially paid for their shares, plus interest) ("Redemption Rights").

4. This action is brought on behalf of the former holders of the Decarb SPAC common stock whose Redemption Rights were unlawfully impaired due to Defendants' misstatements and omissions about Hyzon's true business metrics and financial prospects in connection with the Merger. These materially false and misleading statements deprived the Class (defined herein) of their right to a fully informed decision whether to redeem their shares and induced stockholders to vote to approve the Merger to their detriment and the substantial benefit of Defendants.

5. As further detailed herein, in structuring Decarb, Defendant Anderson (through his control of WRG), along with Defendants Lapeyre, Leuschen, and Tichio (in their capacities as co-founders, partners, and/or managing directors of Riverstone, which controlled Decarb and the Sponsor) behaved disloyally and in service of their own financial interests. These Defendants used the full panoply of tools that gave the Board strong (indeed, overriding) incentives to get a deal – any

- 3 -

deal – done.  These Defendants pushed the Merger without regard to whether it was truly in the best interest of the SPAC's outside investors (*i.e.*, without regard to whether the target private company was actually a solid investment) and without providing full and complete disclosure to investors.  Among other things:

- The Sponsor (for the benefit of Riverstone), WRG (for the benefit of Anderson), and the non-executive directors of the Company received "founder shares" ("Founder Shares") giving them the right to obtain 20% of the equity of the SPAC for nominal consideration, provided an acquisition was completed.  At the time of the Merger, the Founder Shares were worth approximately $56.4 million, but would expire worthless if no deal were completed.

- Sponsor gave the purportedly independent non-executive directors of the Company (each of whom was selected by and had extensive professional and financial ties to Defendants Anderson, Lapeyre, Leuschen, and Tichio) a large number of Founder Shares, the value of which were also conditioned on a deal – any deal – closing.

- Thus, even in a "bad" deal for public SPAC investors (*i.e.*, where the post-transaction company's stock trades at less than $10 per share), completion of a business transaction would yield massive windfalls to holders of the Founder Shares.

- Defendants' disclosures regarding the Merger lacked the rigor of the usual IPO disclosures, yet were critical to outside investors' informed exercise of their Redemption Rights.

- The massive windfalls available to WRG (and thus Anderson), the Sponsor (and thus Riverstone), and the Board contingent from the Merger closing – separate from any benefit to stockholders – created a clear conflict of interest with respect to any proposed deal, thus warranting entire fairness review of any deal.

6.    As a result of these conflicts of interests, Defendants issued materially false and misleading statements in support of the Merger, which were designed to

- 4 -

discourage stockholders from exercising their Redemption Rights. Instead, Defendants encouraged stockholders to approve the Merger, claiming that strong consumer demand for hydrogen fuel vehicles warranted entry into the Merger and the acquisition of Hyzon. In reality: (a) many of Hyzon's customers were illusory; (b) Hiringa, supposedly one of Hyzon's largest customers, was only a distributor, not a customer; (c) Hyzon's financial projections were grossly inflated and lacked a reasonable factual basis; and (d) Hyzon was unable to meet a material portion of the vehicle deliverables it had promised in 2021.

7.    Most notably, the Founder Shares cost the Sponsor just $25,000 yet were worth *$56.4 million* upon the Merger's closing, representing an increase on its investment of *more than 2,255x*.

8.    For purposes of this action, "[t]he entire fairness standard of review applies due to inherent conflicts between the SPAC's fiduciaries and public stockholders" in connection to the Merger, which resulted in a "value-decreasing transaction."[1] Here, the process leading to the Merger fails any entire fairness review for multiple reasons, including:

9.    First, the Board did not bother retaining its own, independent financial advisor to assess the fairness of the merger consideration and negotiate the Merger,

---

[1]    *In re MultiPlan Corp. S'holders Litig.*, 2022 WL 24060, at *2 (Del. Ch. Jan. 3, 2022).

- 5 -

but instead shared a financial advisor with the Company's acquisition target, Hyzon. That conflicted financial advisor was Goldman Sachs & Co. ("Goldman Sachs"). This is not a coincidence. Defendant Anderson had previously served as a Goldman Sachs vice president, and Defendants Lapeyre, Leuschen, and Tichio were also Goldman Sachs alumni. Defendants have expressly acknowledged the "conflicts in connection with such dual roles." At the tail end of the Merger process, the Board brought on additional financial advisors. It was too little too late. The purported due diligence and deal negotiations were largely complete. The new bankers themselves had been paid millions of dollars for services to Riverstone, which had just underwritten Decarb's IPO, and expected to receive additional millions for further investment banking work from the Company following the Merger. As a result, these financial advisors lacked any ability to act impartially and appear to have been belatedly added to rubberstamp a largely completed deal process.

10. Second, while the Board had a duty to diligently review Hyzon's operations before agreeing to buy the company, it either failed in that duty or it and its conflicted financial advisor ignored and concealed basic facts making clear the acquisition would be detrimental to Decarb stockholders. For instance, minimal due diligence would have revealed that Hyzon's fuel cell technology unit sales – the very technology that was supposed to make Hyzon profitable following the Merger – had declined by 81% since 2019. Moreover, Hyzon's financial projections were grossly

- 6 -

inflated due to its gross margin estimates being overstated by upwards of 600%. Similarly, just days after announcing the proposed Merger, on February 17, 2021, Hyzon announced a purportedly valuable new agreement with New Zealand infrastructure startup Hiringa to "purchase" 1,500 trucks by 2026, making Hiringa one of Hyzon's largest purported "customers." In reality Hiringa was not a "customer" at all, but merely a "channel partner" contracted to assist Hyzon in eventually marketing vehicles to end customers in New Zealand. Hiringa was in fact just a small startup operating out of a house in New Zealand with neither the capability nor the then-current intent to purchase Hyzon trucks. A modicum of financial due diligence would have uncovered these basic facts – but none was conducted.

11. Third, Defendants' statements regarding the Merger were affirmatively false and misleading. For example, in soliciting Decarb investors to support the Merger rather than redeem their pre-deal shares, the Board repeatedly highlighted the "***extensive due diligence***" it supposedly had performed. However, the Board had simply accepted its conflicted financial advisors' projections for Hyzon at face value, rather than disclose the target's true financial picture.

12. Less than 10% of the Company's outside investors redeemed their shares before the Merger closed on July 16, 2021.

13.    Investors who believed the Board's disclosures and put their faith in the Board's purported due diligence and loyalty received a rude – but prompt – awakening.  Just two months after the Merger closed, a market research report by Blue Orca Capital (the "Blue Orca Report" or "Report") publicly disclosed – *for the first time* – both the issues with Hyzon's purported customers and the truth about its business metrics and financial prospects.  Thereafter, on January 12, 2022, Hyzon disclosed that the enforcement staff at the U.S. Securities and Exchange Commission ("SEC") had opened a formal investigation into the Company's disclosures related to issues raised in the Blue Orca Report.

14.    The result has been a financial catastrophe for stockholders who failed to redeem their Decarb stock.  Following the publication of the Blue Orca Report and the announcement of the SEC investigation, the market price of Decarb Class A stock plummeted.  Indeed, the market price of those shares – which had traded in a tight range around $10 (and actually represented $10 per share, plus interest, of cash) before the Merger – traded below $4 per share by January 24, 2022.  In other words, a pool of approximately $200 million of cash pre-deal was devalued to approximately $80 million, reflecting the destruction of roughly $120 million of stockholder value.

15.    In sum, the entire fairness standard applies to this deeply conflicted Merger.  In light of the conflict-laden structure of this SPAC and the manner in

which the Sponsor and the Board acted with respect to those conflicts and the deal process in general, the Merger cannot meet the test of entire fairness.

16.    Accordingly, the Court should award monetary damages to the Class or, in the alternative, for public stockholders who purchased Decarb stock and were entitled to redeem their shares and continue to hold such stock, equitably reopen the redemption window to allow them to exchange their Decarb Class A shares for $10 per share, plus interest.

## PARTIES AND RELEVANT NON-PARTIES

17.    Plaintiff John E. Malork has consistently held, and has been the beneficial owner of, Decarb stock at all relevant times, including prior to the July 13, 2021 redemption deadline, and was entitled to redeem his shares.

18.    Defendant Erik Anderson had served as Decarb's CEO since September 21, 2020 and as a Board member since October 22, 2020.  He also served as the CEO and a director at a number of other SPACs created by Riverstone under the "Decarbonization Plus" banner.  He currently serves as a member of the post-Merger company's board of directors.  Defendant Anderson founded West River Group in 2002 and has served as its CEO since its inception.  West River Group, in turn, created controlling shareholder Defendant WRG to house Defendant Anderson's Founder Shares in connection with the SPAC transaction.  Previously,

Defendant Anderson served as a vice president at Goldman Sachs, Decarb's conflicted financial advisor.

19.     Non-Party Peter Haskopoulos had served as Decarb's Chief Financial Officer ("CFO"), Chief Accounting Officer, and Secretary since August 2020. Previously, he served as the CFO, Chief Accounting Officer, and Secretary at a number of other SPACs created by Riverstone under the "Decarbonization Plus" banner.  Haskopoulos was also a managing director and the CFO of Riverstone.

20.     Defendant Jennifer Aaker served as a member of the Board prior to the Merger.  She also served a director of at least one other SPAC created by Riverstone under the "Decarbonization Plus" banner.

21.     Defendant Jane Kearns served as a member of the Board prior to the Merger.  She also served as a director of at least one other SPAC created by Riverstone under the "Decarbonization Plus" banner.

22.     Defendant Pierre Lapeyre, Jr. served as a member of the Board prior to the Merger.  He also served as a director of at least one other SPAC created by Riverstone under the "Decarbonization Plus" banner.  Defendant Lapeyre is the co-founder and a senior managing director of Riverstone, and he serves on the boards of directors or equivalent bodies of a number of public and private Riverstone portfolio companies and their affiliates.  Defendant Lapeyre was also a managing partner of the conflicted financial advisor Goldman Sachs' Global Energy & Power

Group, having joined Goldman Sachs in 1986 and having spent his 14-year investment banking career there focused on energy and power.

23.    Defendant David Leuschen served as a member of the Board prior to the Merger.  He also served as a director of at least one other SPAC created by Riverstone under the "Decarbonization Plus" banner.  Defendant Leuschen is the co-founder and a senior managing director of Riverstone, and he serves on the boards of several Riverstone portfolio companies and investment vehicles.  Defendant Leuschen also previously served as a partner and managing director at the conflicted financial advisor Goldman Sachs.  There, Defendant Leuschen also served as the founder and head of Goldman Sachs' Global Energy & Power Group, where he is credited with having advanced the Goldman Sachs energy and power investment banking practice, and as chairman of the Goldman Sachs Energy Investment Committee, where he is credited with having screened potential direct investments by Goldman Sachs in the energy and power industry.

24.    Defendant Robert Tichio served as a Board member prior to the Merger and as Decarb's CEO until September 2020.  He has also previously served as a director at a number of other SPACs created by Riverstone under the "Decarbonization Plus" banner, and had served at least temporarily as their CEOs. Defendant Tichio was also a director and a managing partner at Riverstone, and also served on the boards of directors at a number of Riverstone portfolio companies.

- 11 -

Previously, Defendant Tichio served as a banker at Goldman Sachs in the Principal Investment Area, which manages the firm's private corporate equity investments.

25.    Defendant Jim McDermott served as the lead "independent" director of the Board prior to the Merger.  He also served as a director of at least one other SPAC created by Riverstone under the "Decarbonization Plus" banner.

26.    Defendant Jeffrey Tepper served as a Board member prior to the Merger.  He also served as a director of at least one other SPAC created by Riverstone under the "Decarbonization Plus" banner.  Defendant Tepper previously served as a director of Silver Run I (from its inception in November 2015 until the completion of its de-SPAC in October 2016) and Silver Run II (between March 2017 and its de-SPAC in June 2020).

27.    Defendant Michael Warren served as a member of the Board prior to the Merger.  He also served as a director of at least one other SPAC created by Riverstone under the "Decarbonization Plus" banner.

28.    Defendant Riverstone is a Delaware limited liability company that founded and thus controlled both Decarb and the Sponsor.  Along with the directors of Decarb and WGN, through its ownership of the Sponsor, Riverstone was a controlling shareholder of Decarb.  Riverstone acted through Defendants Lapeyre and Leuschen, its co-founders and senior managing directors, who jointly shared beneficial ownership of the Class B common Founder Shares held directly by the

Sponsor, and Defendant Tichio, one of Riverstone's managing directors.  In addition to its series of Decarbonization SPACs, Riverstone carried out two previous SPAC transactions (Silver Run I and Silver Run II).  Riverstone raised approximately $1 billion in March 2017 for what eventually became Alta Mesa Resources (previously known as Silver Run II), which later went bankrupt in 2020.  Riverstone also acquired an oil and natural gas company called Centennial Resource Development in October 2016 as part of its first SPAC, Silver Run I.

29.    Defendant Sponsor is a Delaware limited liability company and affiliate of Riverstone that served as Decarb's sponsor and purchased and held Riverstone's Class B Founder Shares.  As set forth in ¶¶56-60 and 72 below, several Board members received membership interests in the Sponsor and, in turn, a portion of the Founder Shares, which gave them the opportunity to make millions of dollars as long as they approved a transaction in which Decarb acquired another business.

30.    Defendant WGR is an affiliate of Defendant Anderson, created by the West River Group where Anderson serves as CEO, that purchased and held Founder Shares for the benefit of Defendant Anderson.

31.    Defendants Anderson, Aaker, Kearns, Lapeyre, Leuschen, Tichio, McDermott, Tepper, and Warren are sometimes collectively referred to herein as the "Director Defendants."  Defendants Riverstone, Sponsor, and WGR, by virtue of their controlling stock ownership interests, along with Defendants Anderson,

- 13 -

Lepeyre, Leuschen, and Tichio, by virtue of their ties to those entities and the conflicted advisor Goldman Sachs, are sometimes collectively referred to herein as the "Controller Defendants."

32.   Non-Party Decarbonization Plus Acquisition Corporation (defined above as "Decarb" or the "Company") f/k/a Silver Run Acquisition Corporation III is a blank check company formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization, or similar business combination.  On or around October 22, 2020, Decarb closed its $200 million IPO. On July 16, 2021 (the "Closing Date"), Decarb merged with Hyzon, with Decarb remaining as the surviving entity.  Hyzon – and following the Merger, Decarb – is engaged in the design, development, and manufacture of hydrogen fuel cell powered commercial vehicles.  Prior to the Merger, the Company's shares traded on the Nasdaq under the ticker symbol "DCRB."  The post-Merger company's shares trade on the Nasdaq under the ticker symbol "HYZN."

33.   Non-Party Goldman Sachs is a multinational investment bank and financial services company headquartered in New York City.  Goldman Sachs is referred to herein as conflicted because it simultaneously served as the financial advisor to both Hyzon – the seller – and Decarb – the buyer – in the Merger.

## SUBSTANTIVE ALLEGATIONS

### I.      Structure of SPAC Transactions

34.      SPACs, also known as "blank-check companies," are publicly traded shell corporations that undertake no business operations of their own, but are instead created to merge with privately held operating businesses.  SPACs typically raise funds through an IPO in which they issue and sell "units," comprised of both shares and warrants to purchase shares.  SPACs typically have a two-year deadline to identify a target company or business to acquire.  Once a SPAC identifies a target and the target agrees to the terms of a merger or acquisition, the parties effect a business combination through a reverse merger – often referred to as the "de-SPAC" transaction – that must be approved by the SPAC's stockholders.

35.      This transactional structure serves as a back door to an IPO for the target company.  The target company reverse mergers with a subsidiary of the SPAC, which has already been publicly listed, and then serves as the SPAC's operating subsidiary going forward.  The SPAC, which is the surviving entity, then assumes the identity of the target company, changing its name and applicable security listings. In theory, this structure allows the target company to bypass the time and expense of a traditional public listing and avoid regulatory scrutiny and traditional gatekeepers, such as the underwriters who would perform due diligence in a firm commitment offering.

- 15 -

36.    In addition, while the traditional IPO process permits the market to set the price at which an already operating company or business is valued and sold in an IPO, the SPAC process reverses the usual order of events.  With a SPAC, investors first purchase shares of an empty-shell publicly traded company, permitting them the "opportunity" to have their shares converted into shares of an-as-yet unidentified operating business that will be selected by SPAC management. Essentially, stockholders who invest in SPACs are investing in the skill, experience, reputation, faithfulness, and diligence of SPAC managers, who are entrusted with finding suitable acquisition targets.  Stockholders rely on SPAC managers to identify and vet targets and to negotiate a fair and reasonable price for any acquisitions.

37.    Most SPACs have the same basic terms and legal structure.  A SPAC will raise funds from public investors through an IPO, and then hold those funds in "trust" for those investors while the SPAC seeks an acquisition target.  The SPAC will then have a "completion window" – generally two years – to identify and execute a business combination.  If the SPAC fails to do so during the completion window, then it must return the funds in trust to its public stockholders and the SPAC dissolves.

38.    SPAC stockholders are granted voting rights to approve or reject the business combination proposed by the management team.  Thus, when the management team identifies a target, a proxy statement must be distributed to all

SPAC stockholders, which includes the target company's complete audited financials and the terms of the proposed business combination. In anticipation of the stockholder vote, each SPAC stockholder has three options: (a) to approve the transaction by voting in favor of it; (b) to elect to sell their shares in the open market; or (c) to vote against the transaction and redeem their shares for a pro-rata share of the trust account. To this end, SPAC stockholders depend on management to provide complete and accurate information about any contemplated transactions.

39.     If a merger or acquisition is accomplished within the allocated time frame, stockholders and management of the SPAC can profit through their ownership of the common stock and any related securities. (Ordinarily, SPAC IPOs include "units" consisting of both stock and out-of-the-money warrants.) However, if an acquisition is not completed within the time period specified when the SPAC is organized, then the SPAC automatically dissolves and the money held in trust is returned to investors. No salaries, finder's fees, or other cash compensation are paid to the founders and/or management team if they fail to consummate a successful business combination. Accordingly, the founders and management team of a SPAC, who typically own approximately 20% of the company through founders' shares and invest significant resources in the formation of the company and identifying acquisition targets, are highly incentivized to get a qualifying transaction approved within the operating deadline. Furthermore, SPAC management is heavily

- 17 -

incentivized to reduce the stockholder redemption rate because redemptions deplete available cash to fund a business acquisition and ongoing business operations following the merger, reducing the value of the contingent stock management receives in the blank check IPO and threatening the business acquisition altogether.

40.    Indeed, leaders in the finance industry have opined that SPAC management teams have an incentive to spend the money they have raised so they can collect fees and pay themselves in salary and stock options at the company they purchase.  For example, Ben Dell, managing partner of investment firm Kimmeridge Energy, recently stated that "SPACs are the most egregious example in the industry of executive misalignment with investors."  In addition to the reward of paying themselves a handsome salary, SPAC management teams are incentivized to receive a return on the significant time and financial resources they expended up front to set up the investment vehicle and pursue an acquisition target.

41.    Additional inherent conflicts abound, since the founders control the SPACs' investment and financing decisions with little, if any, oversight.  For instance, founders often allow themselves and select investors to participate in additional investments – at especially favorable terms – in their SPAC acquisitions through private warrant placements and investment in public equity, or "PIPE" financings.  When a SPAC conducts an acquisition using this form of PIPE financing, the SPAC managers dilute the existing SPAC investors by selecting their

preferred investors – whether they are existing SPAC investors or not – who will acquire cheap post-deal equity by providing the financing for a PIPE deal.

42.     Another example of the conflict inherent in the current SPAC structure is where founders richly compensate affiliated entities to provide consulting or advisory services to their SPACs.  Despite standing to receive a windfall through their own Founder Shares (and ultimately receiving tens of millions of dollars in equity based on completing the Merger), the Controller Defendants opportunistically caused Decarb to pay millions of dollars in advisory fees to Goldman Sachs, with which they each had extensive history and dealings.  *See* ¶¶18-28, 45.  Defendants used Goldman because a majority of the Board had their own multi-million-dollar windfalls riding on closing the deal no matter the cost to Decarb stockholders.

43.     An important check on the potential for misconduct by the directors, officers, and controllers of SPACs, however, is their fiduciary duties to stockholders. After all, Delaware blank check corporations are still Delaware corporations, governed by the State's statutory and common law.  Accordingly, if a SPAC choses to incorporate in Delaware, then its fiduciaries are bound by non-waivable duties of loyalty, good faith, and care.

44.     Defendants enjoyed all the powers and opportunities bestowed upon them by the conflict-laden SPAC structure.  But they used those powers and opportunities to serve their own interests at the expense of the interests of the Class.

- 19 -

Where, as here, there are "inherent conflicts between the SPAC's fiduciaries and public stockholders," then "[t]he entire fairness standard of review applies."[2] The Merger, the product of an unfair process at an unfair price, fails that standard. Defendants breached their duties of loyalty, good faith, and care in effecting and approving the unfair Merger.

## II.    Background to the Hyzon Merger

45.    Defendant Riverstone was founded by investment bankers Defendants Leuschen and Lapeyre after they "left Goldman Sachs Group Inc. and hung a shingle in 2000, just in time for the shale boom."[3] At Riverstone, Defendants Leuschen and Lapeyre teamed up with former Goldman Sachs alumni Defendants Anderson and Tichio, and Non-Party Haskopoulos. Riverstone is one of the country's most prolific "clean energy" SPAC sponsors, having launched at least seven blank check companies under the "Decarbonization" and/or "Silver Run" banners since 2015.[4]

---

[2]    *See MultiPlan*, 2022 WL 24060, at *2.

[3]    *See* Ryan Dezember & Amrith Ramkumar, *Riverstone SPACs Bet Renewable Energy Will Pay Off This Time*, Wall St. J., Aug. 26, 2021; and ¶¶18-28 above.

[4]    *Id.*; *see also* Cromwell Schubarth, *Private equity firm's Menlo Park SPAC raises $350M in an IPO*, Silicon Valley Bus. J., Feb. 5, 2021 ("Riverstone's Decarbonization Plus companies are its fourth and fifth SPACs. Its three previous ones predated last year's gold rush. And instead of being focused on reducing carbon use, they aimed to benefit from it in the form of fossil fuel extraction."); Decarbonization Plus Acquisition Corporation's final Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934 filed with the SEC on Form DEFM14A on June 21, 2021 ("Merger Proxy") at 73.

These SPACs have raised more than $3.3 billion dollars from public investors.[5]  This action relates to Riverstone's last Silver Run SPAC, which was renamed under the "Decarbonization" SPAC banner mid-play.[6]

46.    According to *The Wall Street Journal*, "[t]he crowd of investors going green has made clean-energy businesses with meager sales but rosy forecasts popular targets for blank-check companies."[7]  As a result, "[t]here have been 70 SPAC deals tied to renewable energy or sustainability announced since March

---

[5]    *Id*.; *see also* Olivia Pulsinelli, *Former EOG CEO's new 'blank check' company to acquire controlling stake in E&P co.*, Hous. Bus. J., July 26, 2016 (Riverstone sponsored de-SPAC Centennial Resource Development Corp. raised $450 million in 2016); Ryan Dezember & Maureen Farrell, *Riverstone, Retired Energy Executive Raise $1 Billion to Shop in Oil Patch*, Wall St. J., Mar. 25, 2017 (Riverstone sponsored de-SPAC Anadarko Petroleum Corp. raises $1 billion); Ryan Dezember & Amrith Ramkumar, *Riverstone SPACs Bet Renewable Energy Will Pay Off This Time*, Wall St. J., Aug. 26, 2021 (noting that Riverstone sponsored de-SPACs Hyzon Motors Corp., Tritium Holdings Pty Ltd., and Solid Power Inc. SPACs, respectively, raised $200 million in October 2020, $350 million in February, 2021, and $350 million in March 2021; and that "[t]he latest Riverstone SPAC, Decarbonization Plus Acquisition Corp. IV, raised about $315 million in a stock offering this month and is looking for a business to take public"); Merger Proxy at 73 (noting Riverstone sponsored the Vista SPAC raising $650 million in March 2017, which was used to acquire Pampa Energía S.A. and Pluspetrol Resources Corporation).

[6]    *Id*.; *see also* Merger Proxy at F-6.

[7]    *See* Ryan Dezember & Amrith Ramkumar, *Riverstone SPACs Bet Renewable Energy Will Pay Off This Time*, Wall St. J., Aug. 26, 2021.

2020," and "[t]hey collectively value the companies at more than $170 billion, including debt but excluding cash holdings."[8]

47. In 2017, the Sponsor incorporated Silver Run Acquisition Corporation III under the laws of Delaware. On August 18, 2020, the Sponsor changed the name of the Company to Decarbonization Plus Acquisition Corporation. This would have been the last of Riverstone's Silver Run SPACs but was instead the first of its Decarbonization SPACs. Defendant Tichio then served as the Company's CEO and sole director. Non-Party Haskopoulos served as the Company's CFO, Chief Accounting Officer, and Secretary, roles he would also serve at Riverstone and in other Riverstone-sponsored SPACs.

48. In his managerial role, Defendant Tichio was responsible for sourcing, negotiating, and executing a business combination for Decarb. Both he and CFO Haskopoulos hailed from Goldman Sachs and had extensive past professional and business dealings with Defendants Lapeyre and Leuschen, who had since founded Riverstone, and with Defendant Anderson, who had since gone on to found and lead West River Group, a collaboration of investment firms focused on startups.

49. On August 19, 2020, the Company submitted to the SEC a confidential, preliminary Registration Statement on Form S-1. Decarb disclosed that in its

---

[8]     *Id.*

- 22 -

anticipated IPO, the Company sought to issue and sell 40 million units for $10 each, raising an estimated $400 million in proceeds.  Each unit would consist of one share of Decarb Class A common stock and one-half of one warrant to purchase one share of Decarb Class A common stock.  That filing further noted that former Goldman Sachs alumni Defendants Anderson, Lapeyre, and Leuschen would be added to the Board upon completion of the IPO, with Defendant Anderson coming in as the new CEO of Decarb.  That filing further noted that Defendants McDermott and Tepper were also joining the Board upon completion of the IPO, with Defendant Tepper also having served as a member of the board of previous Riverstone-sponsored SPACs Silver Run I and Silver Run II.  That filing emphasized the Sponsor's experience serving as a manager of clean energy SPACs, stating in pertinent part:

> Riverstone is one of ***the most experienced private equity investors globally within renewable energy***, with over 15 years of dedicated investment experience to renewables.  Since inception, Riverstone has committed over $5.2 billion of capital to 14 renewable power platform investments across subsectors including power generation, transmission & distribution, services and supply chain. Riverstone has owned or developed nearly 14 gigawatts of generation capacity and has developed over 110 projects in 14 countries.  Further, Riverstone has raised significant funds for decarbonization and renewables platforms following the emergence of the coronavirus and its impact on the global economy and financial markets.  In 2020, Riverstone raised $1 billion of equity for the recapitalization of Enviva Holdings, the world's largest producer of sustainable wood pellets, and completed a $6.1 billion take-private of Pattern Energy Group, one of the world's largest companies dedicated to carbon-free electricity

- 23 -

through the development of utility scale wind and solar power facilities.[9]

50.    On September 22, 2020, Decarb filed with the SEC an amendment to the Registration Statement, which stated that Defendants Aaker, Kearns, and Warren also would be added to the Board upon completion of the IPO.  The amendment stated that the Sponsor "Riverstone [was] one of the most experienced private equity investors globally within renewable energy."  The amendment also stated that the IPO would be reduced to 34.5 million units at $10, raising an estimated $345 million in proceeds.  A September 30, 2020 amendment further lowered the expected IPO proceeds to $300 million, and an October 13, 2020 amendment again lowered the anticipated proceeds to just $200 million.

51.    The SEC declared the Registration Statement effective on October 19, 2020.  On or about October 22, 2020, Decarb completed its IPO, issuing and selling 20 million units at $10 each and raising $200 million in proceeds.  Each unit consisted of one share of Decarb Class A stock and one-half of one warrant. The amended Registration Statement stated that [the] number of Founder Shares issued in 2017 had been "determined based on the expectation that [the] founder

---

[9]    Emphasis added.

shares would represent 20% of the outstanding shares after" the IPO, which the Sponsor "acquired" for the nominal payment of $25,000 or ~$0.002 per share.[10]

52.    The Registration Statement further stated that "[i]n October 2020, our sponsor will transfer an aggregate of 1,064,329 founder shares to our independent director nominees and an affiliate of our chief executive officer at their original purchase price." Thus, Defendants Aaker, Kearns, McDermott, Tepper, Warren, and Anderson were indifferent as to value of Hyzon as they stood to earn millions upon the closing of the Merger.

53.    The Registration Statement defined Defendants Aaker, Kearns, McDermott, and Tepper as the "independent directors" of Decarb.  It also defined Defendants Anderson and WRG as essentially being one in the same.  *See* IPO Prospectus at 98, 104-05.  As a result, the Sponsor (and its beneficial owners Defendants Lapeyre and Leuschen), and ***each*** of the other Defendants (except Defendant Tichio) would take the founders shares at the same nominal price Riverstone had paid for them in 2017.

54.    The Registration Statement further stated that simultaneously with the completion of the SPAC IPO, the Sponsor (and thus Riverstone and its owners Lapeyre and Leuschen), the "independent director nominees," and WRG had

---

[10]    *See* Decarbonization Plus Acquisition Corporation IPO Prospectus filed with the SEC on Form 424b on October 21, 2020 ("IPO Prospectus") at 12.

committed to purchase six million private placement warrants at $1 per warrant (which warrants were convertible to Decarb Class A stock at $11.50 per share).

55.    Decarb went public with a completion window of approximately two years, keyed off its October 21, 2020 IPO date.  Thus, the Company had to complete a business combination by October 22, 2022, or the Founder Shares would be forfeited, the private placement warrants would be worthless, the IPO proceeds held in trust would be returned to the public stockholders, and Decarb would be dissolved.

### III.    Riverstone Packs the Board with Loyalists and Ensures Their Fealty with a Windfall of Founder Shares

56.    Riverstone, beneficially owned by Defendants Lapeyre and Leuschen and with Defendant Tichio serving as a managing partner; the then-four "independent director nominees"; and Defendant Anderson, by virtue of his ownership of WRG, which controlled Decarb through the Sponsor, held voting control over the Company.  The Registration Statement acknowledged as much, stating in pertinent part:

> Our initial stockholders [*i.e.* the Sponsor, the "independent director nominees," and WRG] will control the election of our board of directors until consummation of our initial business combination and will hold a substantial interest in us.  As a result, they will elect all of our directors prior to our initial business combination and may exert a substantial influence on actions requiring a stockholder vote, potentially in a manner that you do not support.

57.    Defendants Lapeyre and Leuschen, as the beneficial owners of Riverstone, joined by Riverstone general partner Defendant Tichio, then serving as

- 26 -

the CEO and sole director of Decarb prior to the IPO, initially appointed themselves and Defendants Anderson, Aaker, and Kearns to the Board, with Anderson assuming the role of CEO. These Defendants later added Defendants McDermott and Tepper, and, after the IPO, Defendant Warren, to the Board, with McDermott assuming the lead independent director role. As the controller of a majority of Decarb Class B shares through the Sponsor, Defendants Lapeyre, Leuschen, and Tichio could remove any director at any time. Prior to an initial business combination, only holders of Class B common stock were entitled to vote on the election of directors, ensuring these Defendants' absolute control over the Board. Furthermore, each of their chosen directors had deep professional and/or financial ties to these controlling stockholders, further ensuring the directors' fealty.

58.    At the time of Merger approval: (a) Defendants Lapeyre and Leuschen were the co-founders, senior managing partners, and beneficial owners of Riverstone; (b) Defendant Tichio – Decarb's CEO and lone director at the time of the IPO – was a partner and managing director of Riverstone; (c) Non-Party Haskopoulos – Decarb's CFO at the time of the IPO – was a managing director and the CFO of Riverstone; (c) Defendants Anderson (former Goldman VP), Lapeyre (former managing director of Goldman's Global Energy & Power Group), Leuschen (former partner and managing director of Goldman and founder and head of its Global Energy & Power Group), and Tichio (former Goldman banker in the

- 27 -

Principal Investment Area) were alumni of the conflicted financial advisor chosen for the Merger, Goldman Sachs; (d) Defendants Anderson (CEO/director of Decarbonization Acquisition Corps. ("DCRB") I, II, and III), Aaker (director of DCRBs I and II), Kearns (director DCRBs I and II), Lapeyre (director of DCRBs I and II), Leuschen (director of DCRBs I and II), Tichio (former CEO and then-present director of DCRBs I, II, and III), McDermott (director of DCRBs I and II), Tepper (director of Silver Run I and II and DCRBs I and II), and Warren (director of DCRBs I and II) each had been nominated to or seated on multiple boards of Riverstone-sponsored SPACs; (e) Riverstone (*i.e.*, Lapeyre/Leuschen/Tichio) essentially gifted each of the "independent director nominees" – Aaker, Kearns, McDermott, Tepper, and Warren – and Anderson/WRG in his capacity as CEO of Decarb, Founder Shares worth ***millions of dollars*** for nominal consideration contingent on Decarb completing an acquisition; and (f) Riverstone (*i.e.*, Lapeyre/Leuschen/Tichio) allowed each of the "independent director nominees" – Aaker, Kearns, McDermott, Tepper, and Warrenan – and Anderson/WRG in his capacity as CEO of Decarb, to buy a portion of Riverstone's $6 million in private placement warrants. These numerous conflicts of interest are summarized in the table below:

- 28 -

| Decarb Officer/Director | Director at Other Sponsor SPACSs | | | | | Founder Shares | Private Placement Warrants | Riverstone Affiliation | Goldman Affiliation |
|---|---|---|---|---|---|---|---|---|---|
| | I | II | III | IV | V | | | | |
| Anderson | | | ✓ | ✓ | ✓ | 630,947 | ✓ | | Former VP |
| Haskopoulos | | | ✓ | ✓ | ✓ | ~ | | Mang. Dir. and CFO | |
| Aaker | | | ✓ | ✓ | | 22,130 | ✓ | | |
| Kearns | | | ✓ | ✓ | | 22,130 | ✓ | | |
| Lapeyre | | | ✓ | ✓ | | 4,591,708 | ✓ | Co-Founder and Managing Director | Former Managing Director |
| Leuschen | | | ✓ | ✓ | | 4,591,708 | ✓ | Co-Founder and Managing Director | Former Managing Director |
| Tichio | | | ✓ | ✓ | ✓ | ~ | | Managing Director | Former Banker |
| McDermott | | | ✓ | ✓ | | 331,950 | ✓ | | |
| Tepper | ✓ | ✓ | ✓ | ✓ | | 22,130 | ✓ | | |
| Warren | | | ✓ | ✓ | | 22,130 | ✓ | | |

- 29 -

59.    Importantly, by appointing Defendants Anderson, Aaker, Kearns, McDermott, Tepper, and Warren to the boards of directors of Riverstone's other SPACs, Defendants Lapeyre, Leuschen, and Tichio (via their control of Riverstone) provided them with the opportunity to receive additional Founder Shares and warrants in those SPACs.  Thus, consummation of the Merger did not provide an isolated, one-time multi-million-dollar payday for these directors.  Rather, *each* "Riverstone" SPAC business combination presented an ongoing, multi-million-dollar opportunity for them, and the prospect of plum appointments in connection with future Riverstone SPACs.

60.    In short, these strong personal financial incentives for a majority of the Board members – potentially amounting to tens of millions of dollars – eliminated their ability to act independently and "say no" to any deal pushed by Defendants Lapeyre, Leuschen, and Tichio via Riverstone and the Sponsor.

## IV.    Decarb Merges with Hyzon

61.    Nominally headquartered in Rochester, New York prior to the Merger, Hyzon was a supplier of zero-emissions hydrogen fuel cell powered commercial vehicles, including heavy duty trucks, buses, and coaches.  Hyzon, originally a new business line of Horizon Fuel Cell Technologies ("Horizon"), had been founded and operated out of China for 17 years (since 2003).  According to a Hyzon website:

> Hyzon was known as the Heavy Vehicle Business Unit (HVBU)
> of Horizon and was responsible for the development of fuel cell systems

- 30 -

and the delivery of about 500 fuel cell-powered commercial vehicles during 2019 and 2020, leveraging the deep and extensive experience bolstered within the group.[11]

The Hyzon website also states that it first established its U.S. operations when it "[l]aunch[ed] [its] engineering development centre in Rochester, NY" in 2020.[12] Hyzon's website further represents that New Zealand-based Hiringa "sign[ed] [an] agreement" and "order[ed] . . . up to 1[,]500 trucks" from Hyzon in 2020.[13] Hyzon publicly announced the Hiringa order in February 2021.

62.    During the summer of 2020, Hyzon's management determined to seek out a publicly traded SPAC to merge with in order to allow Hyzon stock to be publicly traded. On or about August 18, 2020, Hyzon retained Goldman Sachs as its financial advisor for this endeavor. By October 13, 2020, Hyzon was in the process of executing non-disclosure agreements with various SPACs and "exploring a potential business combination" with them.[14]

63.    On October 30, 2020, Defendants Anderson and Tichio met with Goldman Sachs' bankers "regarding a possible transaction between [Decarb] and

---

11    *See* https://hyzonmotors.com/about/#overview (last visited Mar. 8, 2022).

12    *Id.*

13    *Id.*

14    *See* Merger Proxy at 95.

- 31 -

Hyzon."[15]   After hiring Vinson & Elkins LLP, meeting with Hyzon management, and reviewing various Hyzon sales pitches made by Goldman Sachs, Decarb began undertaking its "legal due diligence of Hyzon" with Hyzon's bankers at Goldman Sachs, beginning on November 13, 2020.[16]

64.   Throughout late November 2020, Defendant Tichio continued negotiating with Goldman Sachs over the due diligence and deal terms for a possible merger with Hyzon.[17]   Despite the obvious conflict of interest, on November 30, 2020, Decarb itself engaged Goldman Sachs "as its financial advisor in connection with the possible sale of all or a portion of Hyzon," and "[t]hat same week, Hyzon also discontinued with the [ten] other SPACs" it had been speaking with since early October 2020.[18]   Throughout December 2020 and January 2021, Goldman Sachs – working as an advisor for both Decarb and Hyzon – completed the rest of the due diligence while negotiating the final terms of the de-SPAC transaction on behalf of

---

[15]     *Id*.

[16]     *Id*. at 96.

[17]     *Id*.

[18]     *Id*. at 95-96.

both sides.[19]   Various extraneous agreements – such as an intellectual property agreement – were executed.[20]

65.    Finally, Decarb claims that:

During the week of January 4, 2021, [i]t engaged Citigroup Global Markets Inc. ("Citi") as its financial advisor and Credit Suisse Securities (USA) LLC ("Credit Suisse") as its financial advisor and equity capital markets advisor, respectively, in connection with the business combination to assist the [Decarb] Board with advice on the transaction structure, negotiation strategy, valuation analyses, financial terms and other financial matters."[21]

The Decarb Board claims this engagement was appropriate because those two firms had just jointly handled its IPO in October 2020.

66.    Even if Citi and Credit Suisse were independent financial advisors, merely adding additional investment banking firms at the 11th hour as the terms of a deal are being finalized does not erase the taint of conflict when the seller's investment bankers had been allowed to negotiate deal terms and handle due diligence for months.

67.    But neither Citi, Credit Suisse, nor Goldman were independent financial advisors.  Many of Decarb's Board members were Goldman Sachs alumni themselves and various Decarb entities had completed billions of dollars in

---

[19]    *Id*. at 97-98.

[20]    *Id*.

[21]    *Id*. at 98.

transactions with all three investment banks in the recent past and could anticipate continuing to do so in the future.  Those deals included, but were not limited to: (a) Citi and Credit Suisse serving as the sole joint book-running managers of DCRB II's, DCRB IV's, and DCRB V's IPOs; (b) Citi serving as a financial advisor to DCRB II in its de-SPAC transaction; (c) Goldman Sachs being one of the anchors in a $1.1 billion Riverstone single-asset process undertaken in July 2020[22]; (d) Goldman Sachs acquiring a 12% stake in Riverstone for $500 million in 2017[23]; (e) Riverstone being a member of a consortium of private equity firms including Goldman Sachs that completed the $27.5 billion acquisition of Kinder Morgan, one of the largest pipeline operators in the United States, in 2006[24]; (f) Riverstone and Goldman Sachs jointly purchasing a Lucid Energy Group subsidiary in January 2018 for $1.6 billion[25]; and (g) Goldman Sachs alone having backed a new Riverstone $5

---

[22]     *See* Chris Witkowsky, *Goldman one of several anchors in $1.1 bn Riverstone single-asset process*, Buyouts Insider, July 22, 2020.

[23]     *See* Rabia Arif, *Goldman Sachs fund to acquire 12% of Riverstone Holdings for $500 M*, S&P Global Market Intelligence, May 4, 2017.

[24]     *See* Jad Mouawad, *Kinder Morgan Agrees to an Improved Buyout Offer Led by Its Chairman*, N.Y. Times, Aug. 29, 2006.

[25]     *See* Lucid Energy Group press release, *Lucid Energy Group Agrees to Sell Delaware Basin Subsidiary to Riverstone Holdings LLC and Goldman Sachs Merchant Banking Division for $1.6 Billion*, Jan. 8, 2018.

billion "make-or-break" fund in August 2018.[26]  Citi and Credit Suisse jointly received **$11 million** in the Decarb IPO alone.

68.    On the morning of February 9, 2021, Decarb and Hyzon announced the Merger and related financing transactions (together, the "Transactions").  The prior day, February 8, 2021, the Board unanimously approved the Merger.

69.    Under the terms of the Merger, following a series of transactions, Hyzon would become a wholly owned subsidiary of Decarb, as depicted in the chart below from the Merger Proxy:



70.    The Merger valued the post-transaction Company at "more than $2 billion."[27]  In addition, the pre-Merger Hyzon owners were estimated to own 73% of the post-Merger company.  By contrast, Decarb Class A stockholders would own only 8.9% of the post-Merger company, and the Sponsor, the "independent director

---

[26]    *See* Joshua Franklin & David French, *Exclusive: Goldman-backed Riverstone readies for make-or-break fundraising*, Reuters, Aug. 30, 2018.

[27]    *See* Ed Ludlow & Gillian Tan, *Fuel Cell Startup Hyzon Valued at Over $2 Billion in SPAC Merger*, Bloomberg, Feb. 9, 2021.

nominees," and Anderson/WRG, would own 2.2% of the post-Merger company. The PIPE investors would own 15.9% of the post-Merger company.

71.     Approval of the Merger by Decarb stockholders required the affirmative vote of a majority of the stockholders present at the special meeting. The Company set the record date for the meeting as June 1, 2021, issued its definitive proxy statement on June 21, 2021, and held the meeting on July 15, 2021.

72.     As of the record date, the closing price of Decarb common stock was $10 per share. That price implied a market value of approximately $56.4 million for the Class B Founder Shares, which had been purchased a few months prior for a mere $25,000 (*i.e.*, the value of the Founder Shares increased *2,255x*). At this valuation, members of the Board were poised to realize enormous returns on their investments in the event the Merger closed, as illustrated by the table below:

| Director | Founder Shares[28] | Implied Value at $10 per share |
|---|---|---|
| Anderson | 630,947 | $6,309,470 |
| Aaker | 22,130 | $221,300 |
| Kearns | 22,130 | $221,300 |
| Lapeyre | 4,591,708 | $45,917,080 |
| Leuschen | 4,591,708 | $45,917,080 |
| McDermott | 331,950 | $3,319,500 |

---

[28]     *See* Merger Proxy at 228.

- 36 -

| Director | Founder Shares[28] | Implied Value at $10 per share |
|---|---|---|
| Tepper | 22,130 | $221,300 |
| Warren | 22,130 | $221,300 |

73.     The Merger Proxy touted the Board's purported reasons for recommending the Merger, including:

- "*Competitive and Innovative* [hydrogen fuel cell] *Design*";

- "*Value to Equity Investors*";

- "*Revenue Potential*";

- "*Global Scale*";

- "*Development Capability*";

- "*Due Diligence*";

- "*Terms of Business Combination Agreement*" being "the product of ***arm's-length negotiations*** among the parties";

- "*Independent Director Role*" and the Decarb Board being "comprised of a ***majority of independent directors who are not affiliated with our Sponsor and its affiliates***"; and

- Investors having the "***option to . . . redeem their shares***" rather than "remain stockholders of the combined company" or "sell their shares."[29]

74.     The Merger Proxy repeatedly represented that the Board reached these conclusions only after conducting "***extensive due diligence***." According to the

---

[29]     *Id.* at 101-02 (emphasis added).

Merger Proxy, this "*extensive due diligence*" consisted of the Decarb Board's review of the "*extensive due diligence*" conducted largely by its conflicted financial advisor Goldman Sachs, who had been busy simultaneously selling Hyzon to Decarb and negotiating good financial terms for Hyzon in those ongoing negotiations. Among other things this "*extensive due diligence*" included:

- meetings and calls with Hyzon management and advisors regarding *business model, operations and forecasts*;

- research on comparable public companies . . . ;

- research on comparable transactions;

- study of analyst reports and market trends in the electric vehicle and hydrogen fuel cell industries;

- *review of material contracts*;

- review of intellectual property matters;

- review of *commercial, financial*, tax, legal and *accounting* due diligence;

- consultation with Hyzon's management and DCRB's legal and financial advisors and industry experts, including its advisor that assisted in evaluating the overall electrified vehicle market and of the addressable market for Hyzon's vehicles, and its advisor that assisted in evaluating the quality of Hyzon's fuel cell technology;

- *financial and valuation analysis of Hyzon and the business combination*;

- *financial projections prepared by Hyzon's management team*; and

- the *financial statements of Hyzon*.[30]

75. Notably, the Merger Proxy did not provide an independent, third-party opinion as to whether the Merger was fair, from a financial perspective, to Decarb public Class A stockholders. It claimed that the "officers and directors [of Decarb have *substantial experience in evaluating the operating and financial merits of companies* from a wide range of industries and concluded that their experience and backgrounds . . . enabled them to make the necessary analyses and determinations regarding the business combination."[31]

76. Instead, Decarb presented its own financial analyses to support the Board's recommendation of the Merger. The valuation analyses adopted the projections below, which show sudden jumps in expected 2023 and 2024 trucks deployed, EBITDA, and EBITDA margin, despite Horizon/Hyzon having suffered a stark downward trend in actual sales volumes since 2019 and despite the gross margin forecasts being twice the average for other electric vehicle manufacturers:

---

[30]    *Id*. at 101 (emphasis added).

[31]    *Id*. at 53 (emphasis added).

**Key Financial Metrics:**

| | | | Forecast | | |
| | | | Year Ended December 31, | | |
| | 2021E | 2022E | 2023E | 2024E | 2025E |
| | | | (dollars in millions) | | |
| EBITDA[1] | ($ 73) | ($ 25) | $ 87 | $ 326 | $ 505 |
| EBITDA Margin[2] | NM | NM | 8.9% | 14.5% | 15.4% |

**Key Non-Financial Metrics:**

| | | | Forecast | | |
| | | | Year Ended December 31, | | |
| | 2021E | 2022E | 2023E | 2024E | 2025E |
| Medium and Heavy Duty Trucks Deployed | 74 | 623 | 3,360 | 6,800 | 9,260 |
| Buses Deployed | 11 | 35 | 68 | 340 | 600 |
| Class 3 Truck / Van | 0 | 0 | 840 | 4,435 | 7,235 |
| Total Vehicles Deployed | 85 | 658 | 4,268 | 11,535 | 17,095 |

77.    However, as noted above, the Board affirmatively represented its *"extensive due diligence"* of Hyzon and its *"substantial experience in evaluating the operating and financial merits of companies,"* and these representations specifically assured Decarb's public stockholders that these projections were reasonable.

78.    After having received these disclosures, on July 15, 2021, Company stockholders approved the Merger.

## V.    The Blue Orca Research Report and Resulting SEC Investigation

79.    The rosy characterization of Hyzon portrayed by Decarb management was short-lived.

80.    Just two months after the deal closed, on September 28, 2021, research firm Blue Orca Capital published its Report via its Twitter account characterizing Hyzon as "a zero-revenue hydrogen EV SPAC which we liken to a *Chinese Lordstown Motors*." In the Report, Blue Orca Capital exposed Hyzon as "just a

repackaging of a flailing Chinese parent company which has been trying to sell the same hydrogen fuel cells without much success for 17 years" and whose "supposed major customers" are "fake." The Blue Orca Report highlighted facts that were either omitted or misleadingly characterized in the Merger Proxy and Defendants' other public representations concerning the Merger. Among other things, Blue Orca reported that:

- An important Hyzon "customer" was not, in fact, a customer of the Company. Hyzon had been touting the strength of one of its purportedly largest customers, New Zealand infrastructure startup Hiringa, which had supposedly signed an agreement to "acquire" 1,500 trucks by 2026. A former senior Hiringa executive, however, revealed that Hiringa was not actually a customer of Hyzon, but a mere "channel partner" assisting Hyzon in marketing vehicles to real end customers in New Zealand. Indeed, Hiringa was just a small startup operating out of a house in New Zealand with neither the capability nor the then-current intention to purchase any trucks from Hyzon.

- Hyzon had massively inflated expected sales. Hyzon had been representing to investors that it expected to deliver the first 20 trucks to Hiringa by the end of 2021, accounting for 24% of guided deliveries that year, and claiming that the orders were "100% certain." A Hiringa executive, however, told Blue Orca that it would not take any deliveries of Hyzon trucks in 2021 and only expected to receive the first four validation vehicles in March or April 2022, at the earliest.

- Hyzon had fabricated its business, operations, and financial prospects. In its initial investor presentations, Hyzon had claimed to have customer contracts with a bevy of big blue chip companies worth upwards of $700 million. These purported customers, however, were later unceremoniously stricken from those investor presentations as multiple other electric vehicle SPACs – including XL Fleet, Nikola, and Lordstown Motors – were exposed for faking customer orders, exaggerating their backlog, and exaggerating future revenues. Yet, despite these massive purported customer orders being stricken, Hyzon

- 41 -

failed to correspondingly reduce its already exaggerated financial projections.

- Several early senior Hyzon executives had left the Company in large part over their concerns that Hyzon had been misrepresenting its customer contracts.

- Hyzon was just a SPAC repackaging of its flailing Chinese parent Horizon, which had delisted from the Chinese OTC market at an enterprise value of only $190 million, which for 17 years had failed to gain meaningful traction with the very same fuel cell technology Hyzon was promising to make profitable, and which technology had experienced dramatic sales declines since 2019. Blue Orca provided the following chart illustrating this point:



*Horizon* **Fuel Cells Sold by** *Horizon (Parent) 2019-2021*

- Hyzon told investors in presentations that it would turn cash flow positive as early as 2023, generate annual EBITDA of $505 million by 2025, and do so by achieving gross profit margins on electric vehicles of 32% in 2021 and as high as 33.6% by 2025. A former executive from Hyzon, however, told Blue Orca that Hyzon's retrofitting model of production would in fact yield no more than 5% to 10% gross margins. As a result, according to Blue Orca: "If we apply industry average gross margins of 15% to Hyzon's projected revenues, the Company will not turn cash positive in the next five years. The picture looks even more dire if we apply a more appropriate gross margin assumption of 5-10%, which the former Hyzon executive we interviewed says is more realistic."

- Despite Hyzon's technology supposedly being world class and the foundation for its hockey-stick-like future revenue growth projections, since 2020 two of Hyzon's former Chief Technology Officers had

resigned in quick succession, showing little faith in Hyzon and its technological prospects despite having obvious financial incentives to remain.

81.    On January 12, 2022, Decarb disclosed that the SEC had opened a formal investigation into the Company's disclosures related to the issues raised in the Blue Orca Report.  The SEC served a subpoena on Decarb seeking various documents and information.  That investigation remains ongoing.

82.    In the wake of the Blue Orca Report and the SEC investigation, the market price of Decarb stock has declined precipitously, trading below $4 per share by January 24, 2021, or *60% below* the IPO price of $10 per share and *60% below* the record date price of $10 per share.

83.    Further bolstering the allegations of the Blue Orca Report, in January 2021 Decarb disclosed that it anticipated its 2021 financial results would reflect a lower average selling price per vehicle due to product mix and lower multi-year revenue recognition for the majority of sales, which the Company says will result in materially lower-than-previously-forecast revenues and margins.  Indeed, after the Merger closed, during Decarb's third quarter 2021 earnings conference call on November 12, 2021, it disclosed that it had suddenly shifted its deployment focus to Asia, where average selling prices are approximately half that of other regions.

## VI.    The Merger Was Unfair to Unaffiliated Holders of Class A Stock

### A.    The Merger Process Suffered from a Myriad of Conflicts of Interest

84.    For at least three reasons, Decarb's fiduciaries were hopelessly conflicted when sourcing, negotiating, and executing the Merger.

85.    First, due to their economic interests in Class B Founder Shares, the Director Defendants were incentivized to get a deal done – any deal at all – even if it was not in the best interests of the public Class A stockholders.  As described above at ¶¶47-51, the Sponsor initially contributed $25,000 to the Company in exchange for the Founder Shares – *i.e.*, approximately $0.002 per share.  Thus, even if the post-Merger company's stock price fell well below Decarb's $10 per share IPO price (which it has), holders of Class B shares were still poised to realize proceeds in the hundreds of millions of dollars.

86.    Second, the Director Defendants were beholden to Riverstone – and its owners and operators, Defendants Lapeyre, Leuschen, and Tichio – who controlled Decarb.  Riverstone controlled all of the Founder Shares through the Sponsor, placed each of the Director Defendants on the Board, and had the power to remove any of them at any time.  The Director Defendants had deep ties to Riverstone, both professional and financial.  Indeed, Riverstone repeatedly placed these same Director Defendants on boards of other SPACs founded under Silver Run and the "Decarbonization Plus" banner, providing them opportunities to realize significant

- 44 -

profits from ownership of additional Founder Shares in other SPACs. Riverstone appointed Defendant Anderson CEO and allowed his WSG entity to participate heavily in the Founder Shares. Given all of these ties, the Director Defendants could not act independently from Riverstone and entirely lacked the incentive or practical ability to "say no" to any deal proposed by Defendants Lapeyre, Leuschen, and Tichio.

87. Third, in order to force the deal through no matter the consequences for Decarb stockholders, the Director Defendants failed to obtain an unbiased third-party valuation of Hyzon or a fairness opinion and hired a completely conflicted financial advisor – Goldman Sachs – that was simultaneously marketing Hyzon's *bona fides* to Decarb and negotiating sales terms for Hyzon as its financial advisor. Given the extensive personal and professional ties between Goldman Sachs and several of the Director Defendants, as detailed herein, Goldman served as a rubber stamp for any deal desired by Riverstone. That the Board brought in Citi and Credit Suisse at the 11th hour as additional financial advisors – when the due diligence was largely complete and the deal terms had been largely negotiated – provided cold comfort. Citi and Credit Suisse both had recently received $11 million in fees for underwriting Decarb's IPO and could reasonably anticipate receiving millions more in investment banking fees from Riverstone in the future.

- 45 -

88.    In short, no disinterested party was effectively watching out for the unaffiliated holders of Decarb's Class A common stock.

### B.    Decarb Class A Stockholders Did Not Have a Fully Informed Opportunity to Elect Whether to Redeem Their Stock

89.    The Merger was not fair to holders of Class A stock.  After the market learned the facts presented in the Blue Orca Report, the price of Decarb Class A stock plummeted and remains well below the $10 per share IPO and record date price.  By January 2022, the price of Decarb Class A stock had fallen below $4 per share, more than *60% below* the redemption price.

90.    Crucially, the Merger Proxy and other public disclosures by Decarb insiders contained material omissions or were materially misleading, such that Class A stockholders were not provided with all material information necessary to decide whether to redeem their shares ahead of the Merger.  In particular, the disclosures were grossly deficient for at least the following reasons:

91.    First, although Defendants had been touting the strength of one of Hyzon's purportedly largest customers at the time of Merger, Hiringa, who had supposedly signed an agreement to "acquire" 1,500 trucks by 2026, was not in fact a customer of Hyzon but a would-be distributor.  Hiringa had neither the capability nor the then-current intent to purchase trucks from Hyzon.  These facts rendered Hyzon's projections materially false and misleading.

- 46 -

92. Second, because the 20 trucks Hyzon claimed would be sold to Hiringa by the end of 2021, accounting for 24% of guided deliveries that year, were not in fact slated to be delivered in 2021, Hyzon's 2021 projections provided in the Merger Proxy were materially false and misleading.

93. Third, Hyzon removed a bevy of big blue chip companies accounting for an estimated $700 million in sales without correspondingly lowering its financial guidance. As a result, the lofty financial projections the Company was providing were materially false and misleading and lacked a reasonable factual basis.

94. Fourth, the Board should have discovered in its "***extensive due diligence***" and disclosed that several early senior Hyzon executives left the Company in large part over their concerns with how Hyzon had been misrepresenting its customer contracts. The failure to disclose these facts to investors rendered statements regarding the Board's purported due diligence activities materially false and misleading.

95. Fifth, that Horizon/Hyzon had been experiencing a dramatic sales decline since 2019 was a material known trend that the Company should have disclosed to investors in compliance with the federal securities laws. That trend is irreconcilable with Defendants' representations that the fuel cell technology Hyzon had planned to market was as valuable as represented.

96.     Sixth, Defendants claimed Hyzon could obtain profit margins of more than 33% by 2025 – when its business model would in fact afford profit margins of 5% to 10% *at best*.  Defendants also claimed that Hyzon would turn cash flow positive as early as 2023 or generate annual EBITDA of $505 million by 2025 – again, when its business models did not support such projections.  As a result, Hyzon's financial projections provided in the Merger Proxy were materially false and misleading.  A fairness opinion, an unbiased third-party valuation, and/or unconflicted financial advisors could have confirmed these adverse facts.

97.     Seventh, meaningful due diligence would have at least called into question why two of Hyzon's Chief Technology Officers – who would have been the key officers in charge of its technology – had resigned since just 2020 in quick succession.  These departures, which occurred despite the obvious financial incentives to stay, indicated that the executives had little faith in Hyzon and its technological prospects, and should have been disclosed to investors.

98.     As a result of these material omissions and/or misleading statements, Class A stockholders were not provided with all material information to decide whether to redeem their stock.  And those who did not redeem their stock have suffered substantial damages as a result.

**CLASS ACTION ALLEGATIONS**

99.    Plaintiff, a stockholder in the Company, brings this action individually and as a class action pursuant to Rule 23 on behalf of himself and all holders of Decarb common stock (the "Class") who held such stock prior to the July 13, 2021 redemption deadline and were entitled to elect to redeem their shares but did not (except the Defendants herein, and any person, firm, trust, corporation, or other entity related to or affiliated with any of the Defendants) and who were injured by Defendants' breaches of fiduciary duties and other violations of law.

100.    This action is properly maintainable as a class action.

101.    A class action is superior to other available methods of fair and efficient adjudication of this controversy.

102.    The Class is so numerous that joinder of all members is impracticable. The number of Class members is believed to be in the thousands, and they are likely scattered across the United States.  Moreover, damages suffered by individual Class members may be small, making it overly expensive and burdensome for individual Class members to pursue redress on their own.

103.    There are questions of law and fact that are common to all Class members and that predominate over any questions affecting only individuals, including, without limitation:

- 49 -

(a)    whether Defendants breached their fiduciary duties to Plaintiff and the Class;

(b)    whether the Controller Defendants controlled Decarb;

(c)    whether "entire fairness" is the applicable standard of review;

(d)    which party or parties bear(s) the burden of proof;

(e)    the existence and extent of any injury to the Class or Plaintiff caused by any breach;

(f)    the availability and propriety of equitable re-opening of the redemption period; and

(g)    the proper measure of the Class's damages.

104.    Plaintiff's claims and defenses are typical of the claims and defenses of other Class members, and Plaintiff has no interests antagonistic or adverse to the interests of other Class members.  Plaintiff will fairly and adequately protect the interests of the Class.

105.    Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.

106.    Defendants have acted in a manner that affects Plaintiff and all members of the Class alike, thereby making appropriate injunctive relief and/or corresponding declaratory relief with respect to the Class as a whole.

107.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants; or adjudications with respect to individual members of the Class would, as a practical matter, be dispositive of the interest of other members or substantially impair or impede their ability to protect their interests.

## FIRST CAUSE OF ACTION

### DIRECT CLAIM FOR BREACH OF FIDUCIARY DUTY AGAINST THE DIRECTOR DEFENDANTS

108.    Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

109.    As directors of Decarb, the Director Defendants owed Plaintiff and the Class the utmost fiduciary duties of care and loyalty, which subsume an obligation to act in good faith, with candor, and to make accurate and complete material disclosures to Decarb stockholders.

110.    These duties required the Director Defendants to place the interests of Decarb stockholders above their personal interests and the interests of the Controller Defendants.

111.    Through the events and actions described herein, the Director Defendants breached their fiduciary duties to Plaintiff and the Class by prioritizing

- 51 -

their own personal, financial, and/or reputational interests and approving the Merger, which was unfair to Decarb Class A stockholders.

112. The Director Defendants also breached their duty of candor by issuing the false and misleading Merger Proxy.

113. As a result, Plaintiff and the Class were harmed when, deceived by the false and misleading disclosures and the Director Defendants' approval of the Merger, they did not exercise their Redemption Rights prior to the Merger.

114. In addition, members of the Class approved the acquisition of Hyzon based on false and misleading information.

115. Plaintiff and the Class suffered damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

### DIRECT CLAIM FOR BREACH OF FIDUCIARY DUTY
### AGAINST THE CONTROLLER DEFENDANTS

116. Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

117. The Controller Defendants were Decarb's controlling stockholders. Specifically, the Controller Defendants controlled all of the Class B Founder Shares, elected (and could remove at any time) the other members of the Board, had deep personal and financial ties to the members of the Board they selected (including by granting them material financial interests in the Class B Founder Shares and by

- 52 -

appointing them to other boards of directors of SPACs created under the Silver Run or Decarbonization banners), and held officer roles at Decarb.

118.    The Controller Defendants owed Plaintiff and the Class fiduciary duties of care and loyalty, which include an obligation to act in good faith, with candor, and to provide complete and accurate material disclosures to Decarb stockholders.

119.    At all relevant times, the Controller Defendants had the power to control, influence, and cause – and actually did control, influence, and cause – the Company to enter into the Merger.

120.    The Merger was unfair, reflecting an unfair price and unfair process.

121.    Through the events and actions described herein, the Controller Defendants breached their fiduciary duties to Plaintiff and the Class by agreeing to and entering into the Merger without ensuring that it was entirely fair to Plaintiff and the Class.

122.    As a result, Plaintiff and the Class were harmed when, deceived by the false and misleading disclosures and the Board's approval of the Merger, they did not exercise their Redemption Rights prior to the Merger.

123.    In addition, members of the Class approved the acquisition of Hyzon based on false and misleading information.

124.    Plaintiff and the Class suffered damages in an amount to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment and relief in his favor and in favor of the Class, and against Defendants, as follows:

A.    Declaring that this Action is properly maintainable as a class action;

B.    Finding the Director Defendants liable for breaching their fiduciary duties owed to Plaintiff and the Class;

C.    Finding the Controller Defendants liable for breaching their fiduciary duties, in their capacity as Decarb's controlling stockholders, owed to Plaintiff and the Class;

D.    Certifying the proposed Class;

E.    Awarding Plaintiff and the other members of the Class damages in an amount to be proven at trial, together with interest thereon;

F.    With respect to Class members who had the right to seek redemption and still hold their shares, equitably re-opening the redemption window to allow them to redeem their shares at the prior redemption price, as per the terms of the Company's foundational documents;

G.    In the alternative, rescinding the Merger and returning the capital raised in Decarb's IPO to the Company's public stockholders, as well as all other rescissory damages;

- 54 -

H.      Awarding Plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

I.       Awarding Plaintiff and the Class such other relief as this Court deems just and equitable.

ANDREWS & SPRINGER LLC

*Of Counsel:*

Samuel H. Rudman
Mary K. Blasy
ROBBINS GELLER RUDMAN
  & DOWD LLP
58 South Service Road, Suite 200
Melville, NY  11747
(631) 367-7100

Travis E. Downs III
Benny C. Goodman III
Erik W. Luedeke
Brian E. Cochran
ROBBINS GELLER RUDMAN
  & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
(619) 231-1058

Brian J. Robbins
Gregory E. Del Gaizo
ROBBINS LLP
5040 Shoreham Place
San Diego, CA  92122
(619) 525-3990

Dated:  March 18, 2022

 */s/ David M. Sborz*
Peter B. Andrews (#4623)
Craig J. Springer (#5529)
David M. Sborz (#6203)
Andrew J. Peach (#5789)
Jackson E. Warren (#6957)
4001 Kennett Pike, Suite 250
Wilmington, DE  19807
(302) 504-4957

*Counsel for Plaintiff*

- 55 -

**EFiled:  Mar 18 2022 03:58PM EDT**
**Transaction ID 67407294**
**Case No. 2022-0260-**

## UNSWORN DECLARATION AND VERIFICATION OF JOHN E. MALORK PURSUANT TO 10 *DEL. C.* §3927 IN SUPPORT OF VERIFIED CLASS ACTION COMPLAINT

Pursuant to 10 *Del. C.* §3927 and Delaware Court of Chancery Standing Order No. 9, entered on January 28, 2022, I do hereby state as follows:

1.    I, John E. Malork, plaintiff in the above-captioned action, am a holder of Decarbonization Plus Acquisition Corporation ("Decarb" or the "Company"), now known as Hyzon Motors, Inc., common stock and have owned Decarb shares during all relevant times alleged in the Verified Class Action Complaint (the "Complaint"). I am a resident of California and am of full legal age. I make this unsworn declaration and verification in support of the Complaint filed in the above-captioned case.

2.    I make this unsworn declaration under penalty of perjury.

3.    I have read the Complaint and consulted with counsel.

4.    The facts alleged in the Complaint are true and correct to the best of my knowledge, information, and belief.

5.    In accordance with Delaware Court of Chancery Rules 23(aa) and 23.1(b), neither I, nor anyone else affiliated with me, has received, been promised or offered, and will not accept any form of compensation, directly or indirectly, for prosecuting or serving as a representative party in this action except for: (i) such damages or other relief as the Court may award me as a member of the class; (ii) such

fees, costs, or other payments as the Court expressly approves to be paid to me; or

(iii) reimbursement, paid by my attorneys, of actual and reasonable out-of-pocket

expenditures incurred directly in connection with the prosecution of this action.

I declare under penalty of perjury under the laws of Delaware that the

foregoing is true and correct.

Executed on this 18 day of March, 2022.

By: _____
John E. Malork

2

**EFiled:  Mar 18 2022 03:58PM EDT**
**Transaction ID 67407294**
**Case No. 2022-0260-**

SUPPLEMENTAL INFORMATION PURSUANT TO RULE 3(A)
OF THE RULES OF THE COURT OF CHANCERY

The information contained herein is for the use by the Court for statistical and administrative purposes only. Nothing stated herein shall be deemed an admission by or binding upon any party.

1. Caption of Case:

JOHN MALORK, Individually and on Behalf of All Others Similarly Situated, Plaintiffs, v. ERIK ANDERSON, JENNIFER AAKER, JANE KEARNS, PIERRE LAPEYRE, JR., DAVID LEUSCHEN, JIM MCDERMOTT, JEFFREY TEPPER, ROBERT TICHIO, MICHAEL WARREN, RIVERSTONE INVESTMENT GROUP LLC, WRG DCRB INVESTORS, LLC, AND DECARBONIZATION PLUS ACQUISITION SPONSOR, LLC, Defendants.

2. Date Filed:  March 18, 2022

3. Name and address of counsel for plaintiff(s):

Peter B. Andrews (#4623), Craig J. Springer (#5529), David M. Sborz (#6203),
Andrew J. Peach (#5789), and Jackson E. Warren (#6957), ANDREWS & SPRINGER LLC,
4001 Kennett Pike, Suite 250, Wilmington, Delaware 19807

4. Short statement and nature of claim asserted:

Stockholder class action asserting breach of fiduciary duty claims.

5. Substantive field of law involved (check one):

| | | |
|---|---|---|
| ____ Administrative law | ____ Labor law | ____ Trusts, Wills and Estates |
| ____ Commercial law | ____ Real Property | ____ Consent trust petitions |
| ____ Constitutional law | ____ 348 Deed Restriction | ____ Partition |
| _X_ Corporation law | ____ Zoning | ____ Rapid Arbitration (Rule 96, 97) |
| ____ Trade Secrets/trade mark/or other intellectual property | | ____ Other |

6. Related cases, including any Register of Wills matters (this requires copies of all documents in this matter to be filed with the Register of Wills):

N/A

7. Basis of court's jurisdiction (including the citation of any statute(s) conferring jurisdiction):

10 *Del. C.* § 341; 6 *Del. C.* § 18-105; 10 *Del. C.* § 3114

8. If the complaint seeks preliminary equitable relief, state the specific preliminary relief sought.

9. If the complaint seeks a TRO, summary proceedings, a Preliminary Injunction, or Expedited Proceedings, check here ____.  (If #9 is checked, a Motion to Expedite must accompany the transaction.)

10. If the complaint is one that in the opinion of counsel should not be assigned to a Master in the first instance, check here and attach a statement of good cause.  _X_

*/s/ David M. Sborz*
David M. Sborz (#6203)

## STATEMENT OF GOOD CAUSE

I am a partner of Andrews & Springer LLC, and a member in good standing of the Bar of the State of Delaware. With my firm, I am counsel to Plaintiff in this action. We respectfully submit that this action is inappropriate for submission to a Master in the first instance, as the case involves complex issues under Delaware law.

ANDREWS & SPRINGER LLC

/s/ David M. Sborz
Peter B. Andrews (#4623)
Craig J. Springer (#5529)
David M. Sborz (#6203)
Andrew J. Peach (#5789)
Jackson E. Warren (#6957)
4001 Kennett Pike, Suite 250
Wilmington, DE 19807
(302) 504-4957

Dated:  March 18, 2022



**EFiled: Mar 18 2022 03:58PM EDT**
**Transaction ID 67407294**
**Case No. 2022-0260**

4001 Kennett Pi
Suite 250
Wilmington, DE
302 504 4957
www.andrewsspringer.com

March 18, 2022

**VIA FILE & SERVE*XPRESS***

Register in Chancery
Court of Chancery, State of Delaware
Leonard L. Williams Justice Center
500 North King Street, Suite 11600
Wilmington, Delaware 19801

      **Re:**    ***Malork v. Anderson, et al.*, C.A. No. 2022-____-___**

Dear Register in Chancery:

Please issue summonses to defendants Erik Anderson, Jennifer Aaker, Jane
Kearns, Pierre Lapeyre, Jr., David Leuschen, Jim McDermott, Jeffrey Tepper,
Robert Tichio, Michael Warren,  Riverstone Investment Group LLC, WRG DCRB
Investors, LLC, and Decarbonization Plus Acquisition Sponsor, LLC, to be served
by Parcels, Inc. as special process server pursuant to Court of Chancery Rule 4(c),
as follows:

      **Pursuant to 10 *Del. C.* § 3114**:

Erik Anderson
c/o Hyzon Motors, Inc.
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, Delaware 19808

Register in Chancery
March 18, 2022
Page 2



Jennifer Aaker
c/o Hyzon Motors, Inc.
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, Delaware 19808

Jane Kearns
c/o Hyzon Motors, Inc.
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, Delaware 19808

Pierre Lapeyre, Jr.
c/o Hyzon Motors, Inc.
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, Delaware 19808

David Leuschen
c/o Hyzon Motors, Inc.
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, Delaware 19808

Jim McDermott
c/o Hyzon Motors, Inc.
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, Delaware 19808

Jeffrey Tepper
c/o Hyzon Motors, Inc.
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, Delaware 19808

Register in Chancery
March 18, 2022
Page 3



ANDREWS & SPRINGER LLC
ATTORNEYS

Robert Tichio
c/o Hyzon Motors, Inc.
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, Delaware 19808

Michael Warren
c/o Hyzon Motors, Inc.
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, Delaware 19808

**Pursuant to 6 _Del. C._ § 18-105**:

Riverstone Investment Group LLC
c/o Corporation Trust Company
1209 N. Orange Street
Wilmington, Delaware 19801

WRB DCRB Investors, LLC
c/o Resident Agents Inc.
8 The Green, Suite R
Dover, Delaware 19901

Decarbonization Plus Acquisition Sponsor, LLC
c/o The Corporation Trust Company
1209 N. Orange Street
Wilmington, Delaware 19801

Please contact my paralegal, Dara Cupingood, at

dcupingood@andrewsspringer.com if you have any questions.

Register in Chancery
March 18, 2022
Page 4



Respectfully,

*/s/ David M. Sborz*

David M. Sborz (#6203)

Words: 286

DMS/djc