# EXHIBIT 2

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | |
|---|---|
| JOHN E. MALORK, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ERIK ANDERSON, JENNIFER AAKER, JANE KEARNS, PIERRE LAPEYRE, JR., DAVID LEUSCHEN, ROBERT TICHIO, JIM McDERMOTT, JEFFREY TEPPER, MICHAEL WARREN, RIVERSTONE INVESTMENT GROUP LLC, WRG DCRB INVESTORS, LLC and DECARBONIZATION PLUS ACQUISITION SPONSOR, LLC,<br><br>Defendants. | C.A. No. 2022-0260-LWW |

**VERIFIED FIRST AMENDED CLASS ACTION COMPLAINT**

Plaintiff John E. Malork ("Plaintiff"), based on his own knowledge, and on information and belief, including the investigation of counsel and the review of publicly available information, as to all other matters, alleges as follows:

**NATURE OF THE ACTION**

1.    This is a stockholder class action brought by Plaintiff on behalf of himself and all other similarly situated investors in Decarbonization Plus Acquisition Corporation ("Decarb" or the "Company"), now known as Hyzon Motors Inc. ("Hyzon"), who were entitled to redeem their shares of Company stock in connection with the Company's acquisition of and merger with, a formerly privately

held company also called Hyzon (the "Merger"). Plaintiff asserts breaches of fiduciary duties in connection with the Merger by the following individuals and entities (collectively, "Defendants," and each a "Defendant"): (a) Decarb directors Erik Anderson (then-Chief Executive Officer ("CEO")), Jennifer Aaker, Jane Kearns, Pierre Lapeyre, Jr., David Leuschen, Robert Tichio (former CEO), Jim McDermott, Jeffrey Tepper, and Michael Warren in their capacities as members of Decarb's Board of Directors (the "Board") and/or as Decarb officers; and (b) Riverstone Investment Group LLC ("Riverstone"), which founded Decarb and defendant Decarbonization Plus Acquisition Sponsor, LLC (the "Sponsor"), and WRG DCRB Investors, LLC ("WRG"), an affiliate of Defendant Anderson, in their capacities as Decarb's controlling stockholders (the "Controller Defendants").

2.      Hyzon as it exists today is the product of the July 2021 Merger between Decarb—then a publicly traded, special purpose acquisition company ("SPAC")—and "Legacy Hyzon," then a privately held company engaged in the design, development, and manufacture of hydrogen fuel cell powered commercial vehicles. Prior to the Merger, Decarb lacked any business operations of its own. Instead, its sole purpose was to seek out and combine with an operating company or business. Decarb conducted an initial public stock offering ("IPO") of 20 million shares of Class A common stock at $10 per share on October 22, 2020, raising $200 million in gross proceeds. Pursuant to the SPAC's terms, Decarb had two years after the

- 2 -

IPO, or until October 22, 2022, to identify a merger target and complete the acquisition or face returning the initial $10 per share investment, plus interest, to its investors.

3.    Critically, once a merger target had been identified, putative class members had the right, in connection with their investment in pre-Merger Decarb, either to take possession of the stock in any newly formed company Decarb eventually acquired _or_ to seek a redemption of their pro rata share of trust assets (*i.e.*, $10 in cash initially paid for their shares, plus interest) ("Redemption Rights").

4.    This action is brought on behalf of the former holders of the Decarb SPAC common stock whose Redemption Rights were unlawfully impaired due to Defendants' misstatements and omissions about Legacy Hyzon's true business metrics and financial prospects in connection with the Merger. These materially false and misleading statements deprived the Class (defined herein) of their right to a fully informed decision whether to redeem their shares and induced stockholders to vote to approve the Merger to their detriment and the substantial benefit of Defendants.

5.    As further detailed herein, in structuring Decarb, Defendant Anderson (through his control of WRG), along with Defendants Lapeyre, Leuschen, and Tichio (in their capacities as co-founders, partners, and/or managing directors of Riverstone, which controlled Decarb and the Sponsor) behaved disloyally and in

service of their own financial interests.  These Defendants used the full panoply of tools that gave the Board strong (indeed, overriding) incentives to get a deal—any deal—done.  These Defendants pushed the Merger through without regard to whether it was truly in the best interest of the SPAC's outside investors and without providing full and complete disclosure to investors, thus negating their rights to the full and uncompromised exercise of their right to redemption.  Among other things:

- The Sponsor (for the benefit of Riverstone), WRG (for the benefit of Anderson), and the executive directors of the Company received "founder shares" ("Founder Shares") giving them the right to obtain 20% of the equity of the SPAC for nominal consideration, provided an acquisition was completed.  At the time of the Merger, the Founder Shares were worth approximately $56.4 million, but would expire worthless if no deal were completed.

- The Sponsor gave the purportedly independent non-executive directors of the Company (each of whom was selected by and had extensive professional and financial ties to Defendants Riverstone, Anderson, Lapeyre, Leuschen, and Tichio) a large number of Founder Shares, the value of which were also conditioned on a deal—any deal—closing.

- Thus, even in a "bad" deal for public SPAC investors (*i.e.*, where the post-transaction company's stock trades at less than $10 per share), completion of a business transaction would yield massive windfalls to holders of the Founder Shares—including each of the purportedly "independent" non-executive members of the Decarb Board.

- Defendants' disclosures in the Merger Proxy (described below) regarding the Merger lacked the rigor of the usual IPO disclosures, yet were critical to outside investors' informed exercise of their Redemption Rights.  Critically, in addition to delivering a materially misleading description of the Merger target's business metrics and financial prospects and overstating the deficient due diligence completed in connection with the target's selection, the Merger Proxy provided shareholders with the ***only*** directives as to exercising their

- 4 -

Redemption Rights and expressly directed that shareholders rely solely upon the Merger Proxy and related SEC filings in making that decision whether to redeem, and conduct no independent research of their own.[1]

- The massive windfalls available to WRG (and thus Anderson), the Sponsor (and thus Riverstone), and the members of the Decarb Board contingent upon the Merger closing—separate from any benefit to stockholders—created a clear conflict of interest with respect to any proposed deal, thus warranting entire fairness review of any deal.

6.      As a result of these conflicts of interest, Defendants issued materially false and misleading statements in support of the Merger in the Merger Proxy and related SEC filings, which were designed to discourage stockholders from exercising their Redemption Rights.  Instead, Defendants encouraged stockholders to approve the Merger and to forgo their Redemption Rights, claiming that strong consumer demand for hydrogen fuel vehicles and Legacy Hyzon's long list of customers with signed orders—many for delivery during 2021—warranted entry into the Merger and the acquisition of Legacy Hyzon.  In reality: (a) many of Legacy Hyzon's customers were illusory; (b) Hiringa, supposedly one of Legacy Hyzon's largest customers, which had purportedly signed a "100% Certain," "Signed Contract" for

---

[1]    Such "related SEC filings" include the SEC filings made by Legacy Hyzon between February 9, 2021, when the de-SPAC transaction was first announced, and the July 13, 2021 deadline for Decarb stockholders to exercise their Redemption Rights, including but not limited to the slides used in connection with the February 9, 2021 Investor Presentation, which were filed with the SEC on Form 8-K on February 9, 2021 (the "February 2021 Investor Presentation Slides"), and the April 29, 2021 Investor Presentation, which were filed with the SEC on Form 8-K on April 29, 2021 (the "April 2021 Investor Presentation Slides").

20 vehicles to be delivered before the end of 2021, was only a distributor, not a customer, with no obligation, intention, or capability to purchase the volume of vehicles Legacy Hyzon claimed were "100% Certain"; (c) Legacy Hyzon's financial projections were grossly inflated and lacked a reasonable factual basis; (d) Legacy Hyzon was unable to meet a material portion of the vehicle deliverables it had promised in 2021; (e) undisclosed financial problems related to Legacy Hyzon's former parent, which would remain its controlling stockholder and continue to be its largest supplier, left Legacy Hyzon exposed to being exploited; (f) Legacy Hyzon had exaggerated its "superior fuel cell technology"; and (g) there was a crippling deficit in Legacy Hyzon's business model: buyers would be disinclined to purchase vehicles from Legacy Hyzon, which had only been retrofitting vehicles made by others, once they found out that it was Legacy Hyzon and not the vehicles' official equipment manufacturers ("OEMs") that would be responsible for warranting the vehicles being sold by Legacy Hyzon.

7.    Most notably, the Founder Shares cost the Sponsor just $25,000 yet were worth *$56.4 million* upon the Merger's closing, representing an increase on its investment of *more than 2,255x*.

8.    For purposes of this action, "[t]he entire fairness standard of review applies due to inherent conflicts between the SPAC's fiduciaries and public stockholders" in connection to the Merger, which resulted in a "value-decreasing

transaction."[2] Here, the process leading to the Merger fails any entire fairness review for multiple reasons, including:

9.    First, prior to negotiating the substantial terms of the Merger and conducting the purported "due diligence," the Decarb Board never bothered retaining its own, independent investment bankers to assess the fairness of the merger consideration and negotiate the Merger, but instead shared clearly conflicted investment bankers with the Company's acquisition target, Legacy Hyzon.  That conflicted investment banking firm was Goldman Sachs & Co. ("Goldman Sachs"), which served both as target Legacy Hyzon's financial advisor in the Merger and as the co-placement agent for Decarb in selling the PIPE financing required to complete the Merger.[3]  This was not a coincidence as the Board and the Controller Defendants have decades of extensive professional and financial ties to Goldman Sachs. Defendant Anderson had previously served as a Goldman Sachs vice president, and Defendants Lapeyre, Leuschen, and Tichio were also Goldman Sachs alumni. Indeed, these Riverstone executives had such strong business ties to Goldman Sachs that in 2017 Goldman Sachs had purchased a 12% stake in Defendant Riverstone.

---

[2]    *In re MultiPlan Corp. S'holders Litig.*, 268 A.3d 784, 792 (Del. Ch. 2022).

[3]    The "PIPE Financing" was the issuance and private offering of 35.5 million shares of the Class A common stock of the combined company for $10.00 each to certain investors in connection with completing the Merger, raising $355 million to be used by the combined company for general corporate purposes.

Only after Legacy Hyzon had hired Goldman Sachs to find an acquirer did the controlling stockholders of Decarb hire Goldman Sachs to serve as its co-placement agent for the PIPE shares required to complete the Merger. Defendants have expressly acknowledged the "conflicts in connection with such dual roles" and explicitly required that Decarb and Legacy Hyzon sign dual letters "waiving any potential conflicts in connection with such dual roles."[4]

10. At the tail end of the Merger process, the Decarb Board claims to have brought on its own independent financial advisors. But it was too little too late. The purported due diligence and deal negotiations were then largely complete. Critically, the new investment bankers—Citigroup Global Markets Inc. ("Citi") and Credit Suisse Securities (USA) LLC ("Credit Suisse")—had themselves just been promised millions of dollars in contingent investment banking fees for underwriting Decarb's IPO, a full 60% of which fees would be forfeited if Decarb did not complete the Merger. Thus Credit Suisse and Citi had their own interests in seeing the Merger completed. As detailed herein, these new conflicted advisors also had very reasonable expectations of receiving millions of dollars more in investment banking fees for doing further work for the Company and Riverstone following the

---

[4] *See* Decarbonization Plus Acquisition Corporation's final Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934 filed with the SEC on Form DEFM14A on June 21, 2021 ("Merger Proxy") at 99.

Merger, including in the additional SPACs then being undertaken by Riverstone. As a result, these new purported financial advisors lacked any ability to act impartially and appear to have only been belatedly added to rubberstamp a largely completed and highly conflicted deal process.

11.    Second, while the Board had a duty to diligently review Legacy Hyzon's operations before agreeing to buy the company, it either failed in that duty or it and its conflicted financial advisors ignored and concealed basic facts making clear the acquisition would be detrimental to Decarb stockholders. For instance, minimal due diligence would have revealed that Legacy Hyzon's fuel cell technology unit sales—the very technology that was supposed to make Hyzon profitable following the Merger—had declined by 81% since 2019. If revealed during the purported due diligence, this material information should have been disclosed in the Merger Proxy, but it was not. Similarly, as demonstrated by industry data, the financial statements of Legacy Hyzon's former parent, and statements by industry executives, including a confidential witness identified by a stock research firm as a "former Hyzon executive," Legacy Hyzon's financial projections in the Merger Proxy were grossly inflated because its gross margin estimates were overstated by upwards of 600%. Similarly, just days after announcing the proposed Merger, on February 17, 2021, Legacy Hyzon announced a purportedly valuable signed contract with New Zealand infrastructure startup Hiringa to "purchase" 1,500

- 9 -

trucks by 2026, including 20 trucks by 2021, making Hiringa one of Legacy Hyzon's largest purported "customers." Those 20 trucks reflected 24% of the 85 vehicles the Merger Proxy consistently stated Legacy Hyzon was on track to sell during 2021. The February 2021 and April 2021 Investor Presentation Slides emphasized the Hiringa deal was a "100% [c]ertain" "[s]igned [c]ontract." In reality though, Hiringa was not a "customer" at all, but merely a "channel partner" contracted to assist Legacy Hyzon in eventually marketing vehicles to end customers in New Zealand. Hiringa was in fact then just a small startup operating out of a house in New Zealand with neither the capability nor the then-current intent to purchase Hyzon trucks. A modicum of financial due diligence would have uncovered these basic facts—but no meaningful due diligence was conducted—or the findings were concealed.

12.    Third, Defendants' statements regarding the Merger were affirmatively false and misleading. For example, in soliciting Decarb investors to support the Merger rather than redeem their pre-deal shares, the Board repeatedly highlighted the "***extensive due diligence***" it supposedly had performed. However, the Board had simply accepted its conflicted financial advisors' projections for Hyzon at face value, rather than disclose the target's true financial picture.

13.    Less than 10% of the Company's outside investors redeemed their shares before the Merger closed on July 16, 2021.

- 10 -

14.     Investors who believed the Board's disclosures and put their faith in the Board's purported due diligence and loyalty received a rude—but prompt—awakening.  Just two months after the Merger closed, a market research report by Blue Orca Capital (the "Blue Orca Report") publicly disclosed for the first time both the fallacy of Hyzon's claimed customers and the truth about its business metrics and inflated financial prospects.[5]  The findings of the Blue Orca Report were then independently researched and confirmed by a second research firm, Iceberg Research, which published its own reports in October and November 2021.[6]  The Iceberg Research Reports revealed additional facts that had been concealed by Defendants in connection with obtaining shareholder approval of the Merger and dissuading Decarb shareholders from exercising their Redemption Rights. Specifically, the 1st Iceberg Research Report raised additional unknown issues relating to Legacy Hyzon's governance, challenged the published strength of its fuel cell technology and revealed weaknesses in its business model related to Legacy Hyzon (not the OEMs) being responsible to fulfill customer warranty obligations. The 2nd Iceberg Research Report, published after Hyzon reported its third quarter

---

[5]   *See* Blue Orca Capital, *Blue Orca is Short Hyzon Motors Inc.*, Sept. 28, 2021 (*see* Exhibit 1).

[6]   *See* Iceberg Research, *Hyzon Motors Inc: Trouble at the Parentco*, Oct. 6, 2021 ("1st Iceberg Research Report") and *Horizon Unleashes a Load of Hot Air with its 3Q21 Results*, Nov. 16, 2021 ("2nd Iceberg Research Report") (*see* Exhibits 2-3).

- 11 -

2021 financial results, emphasized that it was nearly impossible for Legacy Hyzon to complete the vehicle sales and financial projections contained in the Merger Proxy. While the Blue Orca and Iceberg Research Reports were published after the Merger, they address material issues of fact in existence and known prior to the Merger.

15.    Thereafter, on January 12, 2022, Hyzon disclosed that the enforcement staff at the SEC had opened a formal investigation into the Company's disclosures related to issues raised in the Blue Orca Report and that the Company had badly missed the 2021 sales and financial targets it had claimed to be "100% [c]ertain" it would meet in connection with obtaining shareholder approval of the Merger and dissuading shareholders from exercising their Redemption Rights. Upon information and belief as of the filing of this Complaint, that SEC investigation appears to remain ongoing. And Hyzon has since reported its actual 2021 revenues, which came in at just $6 million, less than 17% of the $37 million in 2021 revenues relayed in the Merger Proxy and the Investor Presentations employed by Defendants to obtain shareholder approval of the Merger and to dissuade shareholders from exercising their Redemption Rights.

16.    The result has been a financial catastrophe for the public stockholders who failed to redeem their Decarb shares. Following the publication of the Blue Orca and Iceberg Reports, the announcement of the SEC investigation and Hyzon's

disclosure of its fledgling sales, the market price of Decarb Class A stock plummeted. Indeed, the market price of those shares—which had traded in a tight range around $10 (and actually represented $10 per share, plus interest, of cash) before the Merger—traded below $3 per share by July 5, 2022. In other words, a pool of approximately $200 million of cash pre-deal was devalued to approximately $70 million, reflecting the destruction of roughly $130 million of stockholder value.

17.    In sum, the entire fairness standard applies to this deeply conflicted Merger. In light of the conflict-laden structure of this SPAC and the manner in which the Sponsor and the Board acted with respect to those conflicts and the deal process in general, the Merger cannot meet the test of entire fairness.

18.    Accordingly, the Court should award monetary damages to the Class or, in the alternative, for public stockholders who purchased Decarb stock and were entitled to redeem their shares and continue to hold such stock, equitably reopen the redemption window to allow them to exchange their Decarb Class A shares for $10 per share, plus interest.

## PARTIES AND RELEVANT NON-PARTIES

19.    Plaintiff John E. Malork has consistently held, and has been the beneficial owner of, Decarb stock at all relevant times, including prior to the July 13, 2021 redemption deadline, and was entitled to redeem his shares.

- 13 -

20.     Defendant Erik Anderson had served as Decarb's CEO since September 21, 2020 and as a Board member since October 22, 2020.  He has also served as the CEO and a director at a number of other SPACs created by Riverstone under the "Decarbonization Plus" banner.  He currently serves as a member of the post-Merger company's board of directors.  Defendant Anderson founded West River Group in 2002 and has served as its CEO since its inception.  West River Group, in turn, created controlling shareholder Defendant WRG to house Defendant Anderson's Founder Shares in connection with the SPAC transaction.  Previously, Defendant Anderson served as a vice president at Goldman Sachs, the conflicted investment banker.

21.     Defendant Jennifer Aaker served as a member of the Board prior to the Merger.  She has also served a director of several other SPACs created by Riverstone under the "Decarbonization Plus" banner.

22.     Defendant Jane Kearns served as a member of the Board prior to the Merger.  She has also served as a director of several other SPAC created by Riverstone under the "Decarbonization Plus" banner.

23.     Defendant Pierre Lapeyre, Jr. served as a member of the Board prior to the Merger.  He has also served as a director of several other SPACs created by Riverstone under the "Decarbonization Plus" banner.  Defendant Lapeyre is the co-founder and a senior managing director of Riverstone, and he serves on the boards

of directors or equivalent bodies of a number of public and private Riverstone portfolio companies and their affiliates, including Centennial Resource Development, Inc. f/k/a Silver Run Acquisition Corporation ("Silver Run") where he, along with Defendants Leuschen, Tepper, and Tichio, have served as directors since 2016. Defendant Lapeyre was also a managing partner of the conflicted investment banker Goldman Sachs' Global Energy & Power Group, having joined Goldman Sachs in 1986 and having spent his 14-year investment banking career there focused on energy and power.

24. Defendant David Leuschen served as a member of the Board prior to the Merger. He has also served as a director of several other SPACs created by Riverstone under the "Decarbonization Plus" banner. Defendant Leuschen is the co-founder and a senior managing director of Riverstone, and he serves on the boards of several Riverstone portfolio companies and investment vehicles, including Silver Run where he, along with Defendants Lapeyre, Tepper, and Tichio, has served as a director since 2016. Defendant Leuschen also previously served as a partner and managing director at the conflicted investment banker Goldman Sachs. There, Defendant Leuschen also served as the founder and head of Goldman Sachs' Global Energy & Power Group, where he is credited with having advanced the Goldman Sachs energy and power investment banking practice, and as chairman of the Goldman Sachs Energy Investment Committee, where he is credited with having

- 15 -

screened potential direct investments by Goldman Sachs in the energy and power industry.

25.    Defendant Robert Tichio served as a Board member prior to the Merger and as Decarb's CEO until September 2020.  He has also previously served as a director at several other SPACs created by Riverstone under the "Decarbonization Plus" banner, and had served at least temporarily as their CEOs.  Defendant Tichio was also a director and a managing partner at Riverstone, and also served on the boards of directors at a number of Riverstone portfolio companies, including Silver Run, where he, along with Defendants Lapeyre, Leuschen, and Tepper, has served as a director since 2016.  Previously, Defendant Tichio served as a banker at the conflicted investment banker Goldman Sachs in the Principal Investment Area, which manages the firm's private corporate equity investments.

26.    Defendant Jim McDermott purportedly served as the lead "independent" director of the Board prior to the Merger.  He also served as a director of several other SPACs created by Riverstone under the "Decarbonization Plus" banner.

27.    Defendant Jeffrey Tepper served as a Board member prior to the Merger.  He also served as a director of several other SPACs created by Riverstone under the "Decarbonization Plus" banner.  Defendant Tepper previously served as a director of Riverstone portfolio companies Silver Run I (from its inception in

November 2015 until the completion of its de-SPAC in October 2016) and Silver Run II (between March 2017 and its de-SPAC in June 2020).

28.    Defendant Michael Warren served as a member of the Board prior to the Merger.  He also served as a director of several other SPACs created by Riverstone under the "Decarbonization Plus" banner.

29.    Defendant Riverstone is a Delaware limited liability company that founded, and thus controlled, both Decarb and the Sponsor.  In 2017, Goldman Sachs purchased a 12% interest in Riverstone.  Along with the directors of Decarb and WRG, through its ownership of the Sponsor, Riverstone was a controlling shareholder of Decarb.  Riverstone acted through Defendants Lapeyre and Leuschen, its co-founders and senior managing directors, who jointly shared beneficial ownership of the Class B common Founder Shares held directly by the Sponsor, and Defendant Tichio, one of Riverstone's managing directors.  In addition to its series of Decarbonization SPACs, Riverstone carried out two previous SPAC transactions (Silver Run I and Silver Run II).  Riverstone raised approximately $1 billion in March 2017 for what eventually became Alta Mesa Resources (previously known as Silver Run II), which later went bankrupt in 2020.  Riverstone also acquired an oil and natural gas company called Centennial Resource Development in October 2016 as part of its first SPAC, Silver Run I.

- 17 -

30.     Defendant Sponsor is a Delaware limited liability company and affiliate of Riverstone that served as Decarb's sponsor and purchased and held Riverstone's Class B Founder Shares.  As set forth in ¶¶55-56, 62-63 and 82 below, several Board members received membership interests in the Sponsor and, in turn, a portion of the Founder Shares, which gave them the opportunity to make millions of dollars as long as they approved a transaction in which Decarb acquired another business.

31.     Defendant WRG is an affiliate of Defendant Anderson, created by the West River Group where Anderson serves as CEO, that purchased and held Founder Shares for the benefit of Defendant Anderson.

32.     Defendants Anderson, Aaker, Kearns, Lapeyre, Leuschen, Tichio, McDermott, Tepper, and Warren are sometimes collectively referred to herein as the "Director Defendants."  Defendants Riverstone, Sponsor, and WRG, by virtue of their controlling stock ownership interests, along with Defendants Anderson, Lapeyre, Leuschen, and Tichio, by virtue of their ties to those entities and the conflicted investment banker Goldman Sachs, are sometimes collectively referred to herein as the "Controller Defendants."

33.     Non-Party Peter Haskopoulos had served as Decarb's Chief Financial Officer ("CFO"), Chief Accounting Officer, and Secretary since August 2020. Previously, he served as the CFO, Chief Accounting Officer, and Secretary at a

- 18 -

number of other SPACs created by Riverstone under the "Decarbonization Plus" banner. Haskopoulos was also a managing director and the CFO of Riverstone.

34.    Non-Party Decarbonization Plus Acquisition Corporation (defined above as "Decarb" or the "Company"), f/k/a Silver Run Acquisition Corporation III, is a blank check company formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization, or similar business combination. On or around October 22, 2020, Decarb closed its $200 million IPO. On July 16, 2021 (the "Closing Date"), Decarb merged with Legacy Hyzon, with Decarb remaining as the surviving entity. Legacy Hyzon—and following the Merger, Decarb—is engaged in the design, development, and manufacture of hydrogen fuel cell powered commercial vehicles. Prior to the Merger, the Company's shares traded on the Nasdaq under the ticker symbol "DCRB." The post-Merger company's shares trade on the Nasdaq under the ticker symbol "HYZN."

35.    Non-Party Goldman Sachs is a multinational investment bank and financial services company headquartered in New York City. In 2017, Goldman Sachs purchased a 12% stake in Defendant Riverstone. In connection with the Merger Goldman Sachs is conflicted because it simultaneously served as the financial advisor to Legacy Hyzon—the seller—and as an investment banker and co-placement agent to Decarb—the buyer—in the Merger, and because of its financial investment in Riverstone. As detailed herein in ¶¶20-35, and 62, the

Controller Defendants also have extensive professional and financial ties to Goldman Sachs and it has a reasonable expectation of receiving millions of dollars in future fees for work done for the Controller Defendants.

36.     Non-Parties Citi and Credit Suisse are multinational investment banks and financial services companies with their U.S. headquarters in New York City. They served as underwriters to Decarb in its October 2020 IPO and were promised $11 million in investment banking fees, 60% of which was contingent upon a timely business combination being completed by Decarb.  Citi and Credit Suisse were brought on as additional advisors to Decarb in the final throes of the Merger negotiations and rubber stamped their approval of it.  As detailed herein in ¶¶20-36, 45, 48-59, 62, 68, 71-76, and 122 the Controller Defendants also have extensive financial ties to Citi and Credit Suisse and Citi and Credit Suisse have a reasonable expectation of receiving millions of dollars in future fees for work done for the Controller Defendants.

## SUBSTANTIVE ALLEGATIONS

### I.     Structure of SPAC Transactions

37.     SPACs, also known as "blank-check companies," are publicly traded shell corporations that undertake no business operations of their own, but are instead created to merge with privately held operating businesses.  SPACs typically raise funds through an IPO in which they issue and sell "units," comprised of both shares

and warrants to purchase shares. SPACs typically have a two-year deadline to identify a target company or business to acquire. Once a SPAC identifies a target and the target agrees to the terms of a merger or acquisition, the parties effect a business combination through a reverse merger—often referred to as the "de-SPAC" transaction—that must be approved by the SPAC's stockholders.

38. This transactional structure serves as a back door to an IPO for the target company. The target company reverse merges with a subsidiary of the SPAC, which has already been publicly listed, and then serves as the SPAC's operating subsidiary going forward. The SPAC, which is the surviving entity, then assumes the identity of the target company, changing its name and applicable security listings. In theory, this structure allows the target company to bypass the time and expense of a traditional public listing and avoid regulatory scrutiny and traditional gatekeepers, such as underwriters who would perform due diligence in a firm commitment offering.

39. In addition, while the traditional IPO process permits the market to set the price at which an already operating company or business is valued and sold in an IPO, the SPAC process reverses the usual order of events. With a SPAC, investors first purchase shares of an empty-shell publicly traded company, permitting them the "opportunity" to have their shares converted into shares of an-as-yet unidentified operating business that will be selected by SPAC management.

Essentially, stockholders who invest in SPACs are investing in the skill, experience, reputation, faithfulness, and diligence of SPAC managers, who are entrusted with finding suitable acquisition targets. Stockholders rely on SPAC managers to identify and vet targets and to negotiate a fair and reasonable price for any acquisitions.

40. Most SPACs have the same basic terms and legal structure. A SPAC will raise funds from public investors through an IPO, and then hold those funds in "trust" for those investors while the SPAC seeks an acquisition target. The SPAC will then have a "completion window"—generally two years—to identify and execute a business combination. If the SPAC fails to do so during the completion window, then it must return the funds in trust to its public stockholders and the SPAC dissolves.

41. SPAC stockholders are granted both voting rights to approve or reject the business combination proposed by the management team and their Redemption Rights. Thus, when the management team identifies a target, a proxy statement must be distributed to all SPAC stockholders, which includes the target company's complete audited financials and the terms of the proposed business combination. Upon review of the merger proxy (and related SEC filings), in addition to casting their vote in favor of or against the proposed transaction, each SPAC stockholder has three options: (a) to continue holding their SPAC shares until they convert into shares of the combined company; (b) to elect to sell their SPAC shares in the open

market; or (c) to redeem their SPAC shares for a pro-rata share of the trust account. To this end, SPAC stockholders depend on management to provide complete and accurate information about any contemplated transactions in the Merger Proxy and in related SEC filings.  Critically, the merger proxies provide the only instructions SPAC shareholders receive as to exercising their Redemption Rights and the merger proxies explicitly direct that the SPAC shareholders rely only upon statements made in the merger proxy and related SEC filings in making their decisions.

42.    If a merger or acquisition is accomplished within the allocated time frame, stockholders and management of the SPAC can profit through their ownership of the common stock and any related securities.  (Ordinarily, SPAC IPOs include "units" consisting of both stock and out-of-the-money warrants.)  However, if an acquisition is not completed within the time period specified when the SPAC is organized, then the SPAC automatically dissolves and the money held in trust is returned to investors.  No salaries, finder's fees, or other cash compensation are paid to the founders and/or management team if they fail to consummate a successful business combination.  Accordingly, the founders and management team of a SPAC, who typically own approximately 20% of the company through founders' shares and invest significant resources in the formation of the company and identifying acquisition targets, are highly incentivized to get a qualifying transaction approved within the operating deadline.    Furthermore, SPAC management is heavily

- 23 -

incentivized to reduce the stockholder redemption rate because redemptions deplete available cash to fund a business acquisition and ongoing business operations following the merger, reducing the value of the contingent stock management receives in the blank check IPO and threatening the business acquisition altogether.

43.    Indeed, leaders in the finance industry have opined that SPAC management teams have an incentive to spend the money they have raised so they can collect fees and pay themselves in salary and stock options at the company they purchase.  For example, Ben Dell, managing partner of investment firm Kimmeridge Energy, recently stated that "SPACs are the most egregious example in the industry of executive misalignment with investors."  In addition to the reward of paying themselves a handsome salary, SPAC management teams are incentivized to receive a return on the significant time and financial resources they expended up front to set up the investment vehicle and pursue an acquisition target.

44.    Additional inherent conflicts abound, since the founders control the SPACs' investment and financing decisions with little, if any, oversight.  For instance, founders often allow themselves and select investors to participate in additional investments—at especially favorable terms—in their SPAC acquisitions through private warrant placements and investment in public equity, or "PIPE" financings.  When a SPAC conducts an acquisition using this form of PIPE financing, the SPAC managers dilute the existing SPAC investors by selecting their

preferred investors—whether they are existing SPAC investors or not—who will acquire cheap post-deal equity by providing the financing for a PIPE deal.

45.     Another example of the conflict inherent in the current SPAC structure is where founders richly compensate affiliated persons and entities to provide consulting or advisory services to their SPACs, or to serve on the boards of their other SPACS.  Despite standing to receive a windfall through their own Founder Shares (and ultimately receiving tens of millions of dollars in equity based on completing the Merger), the Controller Defendants opportunistically caused Decarb to pay millions of dollars in investment banking fees to Goldman Sachs, Citi, and Credit Suisse, with which they each had extensive history and dealings.  *See* ¶¶20-36, 45, 48-59, 62, 68, 71-76, and 122.  Defendants used Goldman Sachs, Citi, and Credit Suisse because a majority of the Board had their own multi-million-dollar windfalls riding on closing the deal no matter the cost to Decarb stockholders.  Citi and Credit Suisse would also forfeit 60% of the fees they had earned underwriting Decarb's IPO if a timely business combination was not completed.  Each of the purportedly "independent" outside directors on the Decarb Board was also then engaged in other SPAC transactions with Riverstone where they served on the boards of those SPACs.  These "independent" outside directors expected to share millions of dollars more in profits on founders shares they were receiving in connection with completing those SPAC business transactions, giving even the

purported outside directors on the Decarb Board incentive to approve Decarb's Merger with Legacy Hyzon.

46.    An important check on the potential for misconduct by the directors, officers, and controllers of SPACs, however, is their fiduciary duties to stockholders. After all, Delaware blank check corporations are still Delaware corporations, governed by the State's statutory and common law.  Accordingly, if a SPAC choses to incorporate in Delaware, then its fiduciaries are bound by non-waivable duties of loyalty, good faith, and care.

47.    Defendants enjoyed all the powers and opportunities bestowed upon them by the conflict-laden SPAC structure.  But they used those powers and opportunities to serve their own interests at the expense of the interests of the Class. Where, as here, there are "inherent conflicts between the SPAC's fiduciaries and public stockholders," then "[t]he entire fairness standard of review applies."[7]  The Merger, the product of an unfair process at an unfair price, fails that standard. Defendants breached their duties of loyalty, good faith, and care in effecting and approving the unfair Merger.

---

[7]    *See MultiPlan*, 268 A.3d at 792.

## II.      Background to the Hyzon Merger

48.     Defendant Riverstone was founded by investment banker Defendants Leuschen and Lapeyre after they "left Goldman Sachs Group Inc. and hung a shingle in 2000, just in time for the shale boom."[8]  At Riverstone, Defendants Leuschen and Lapeyre teamed up with former Goldman Sachs alumni Defendants Anderson and Tichio, and Non-Party Haskopoulos.  Riverstone is one of the country's most prolific "clean energy" SPAC sponsors, having launched at least seven blank check companies under the "Decarbonization" and/or "Silver Run" banners since 2015.[9] Goldman Sachs was so involved in Riverstone's SPAC transactions that it took a 12% ownership stake in Riverstone in 2017 giving it a proportional cut of Riverstone's management fees and profits.[10]  According to a *Wall Street Journal* account, Goldman Sachs' investment in Riverstone was "a reunion of sorts for

---

[8]   *See* Ryan Dezember & Amrith Ramkumar, *Riverstone SPACs Bet Renewable Energy Will Pay Off This Time*, Wall St. J., Aug. 26, 2021; and ¶¶18-28 above.

[9]   *Id.*; *see also* Cromwell Schubarth, *Private equity firm's Menlo Park SPAC raises $350M in an IPO*, Silicon Valley Bus. J., Feb. 5, 2021 ("Riverstone's Decarbonization Plus companies are its fourth and fifth SPACs.  Its three previous ones predated last year's gold rush.  And instead of being focused on reducing carbon use, they aimed to benefit from it in the form of fossil fuel extraction."); Merger Proxy at 73.

[10]   *See* Ryan Dezember, *Goldman Fund Agrees to Buy 12% of Riverstone Holdings – Roughly $500 million deal would value the energy investment firm at more than $4 billion*, Wall St. J., May 4, 2017 ("The deal would value Riverstone at more than $4 billion and give the Goldman fund a proportional cut of the firm's management fees and profits.").

- 27 -

Riverstone's founders, David Leuschen and Pierre Lapeyre Jr., who worked as high-ranking energy bankers at Goldman, arranging oil company mergers and stock sales before leaving to start the investment firm in 2000," adding that Defendants "Leuschen and Lapeyre have frequently tapped their Goldman connections to recruit deal makers and find investment opportunities" and that "Riverstone's investment committee includes 14 people who have Goldman on their résumés." The Riverstone SPACs have since raised more than $3.3 billion dollars from public investors.[11] This action relates to Riverstone's last Silver Run SPAC, which was renamed under the "Decarbonization" SPAC banner mid-play.[12]

---

[11] *Id*.; *see also* Olivia Pulsinelli, *Former EOG CEO's new 'blank check' company to acquire controlling stake in E&P co*., Hous. Bus. J., July 26, 2016 (Riverstone sponsored de-SPAC Centennial Resource Development Corp. raised $450 million in 2016); Ryan Dezember & Maureen Farrell, *Riverstone, Retired Energy Executive Raise $1 Billion to Shop in Oil Patch*, Wall St. J., Mar. 25, 2017 (Riverstone sponsored de-SPAC Anadarko Petroleum Corp. raises $1 billion); Ryan Dezember & Amrith Ramkumar, *Riverstone SPACs Bet Renewable Energy Will Pay Off This Time*, Wall St. J., Aug. 26, 2021 (noting that Riverstone sponsored de-SPACs Hyzon Motors Corp., Tritium Holdings Pty Ltd., and Solid Power Inc. SPACs, respectively, raised $200 million in October 2020, $350 million in February, 2021, and $350 million in March 2021; and that "[t]he latest Riverstone SPAC, Decarbonization Plus Acquisition Corp. IV, raised about $315 million in a stock offering this month and is looking for a business to take public"); Merger Proxy at 73 (noting Riverstone sponsored the Vista SPAC raising $650 million in March 2017, which was used to acquire Pampa Energía S.A. and Pluspetrol Resources Corporation).

[12] *Id*.; *see also* Merger Proxy at F-6.

49.     According to *The Wall Street Journal*, "[t]he crowd of investors going green has made clean-energy businesses with meager sales but rosy forecasts popular targets for blank-check companies."[13]  As a result, "[t]here have been 70 SPAC deals tied to renewable energy or sustainability announced since March 2020," and "[t]hey collectively value the companies at more than $170 billion, including debt but excluding cash holdings."[14]

50.     In 2017, the same year that Goldman Sachs took a 12% ownership stake in Riverstone, the Sponsor incorporated Silver Run Acquisition Corporation III under the laws of Delaware.  On August 18, 2020, the Sponsor changed the name of the Company to Decarbonization Plus Acquisition Corporation.  This would have been the last of Riverstone's Silver Run SPACs but was instead the first of its Decarbonization SPACs.  Defendant Tichio then served as the Company's CEO and sole director.  Non-Party Haskopoulos then served as the Company's CFO, Chief Accounting Officer, and Secretary, roles he would also serve at Riverstone and in other Riverstone-sponsored SPACs.

51.     In his managerial role, Defendant Tichio was responsible for sourcing, negotiating, and executing a business combination for Decarb.  Both he and CFO

---

[13]  *See* Ryan Dezember & Amrith Ramkumar, *Riverstone SPACs Bet Renewable Energy Will Pay Off This Time*, Wall St. J., Aug. 26, 2021.

[14]  *Id.*

Haskopoulos hailed from Goldman Sachs and had extensive past professional and business dealings with Defendants Lapeyre and Leuschen, who had since founded Riverstone, and with Defendant Anderson, who had since gone on to found and lead West River Group, a collaboration of investment firms focused on startups.

52.    On August 19, 2020, the Company submitted to the SEC a confidential, preliminary Registration Statement on Form S-1.  Decarb disclosed that in its anticipated IPO, the Company sought to issue and sell 40 million units for $10 each, raising an estimated $400 million in proceeds.  Each unit would consist of one share of Decarb Class A common stock and one-half of one warrant to purchase one share of Decarb Class A common stock.  That filing further noted that former Goldman Sachs alumni Defendants Anderson, Lapeyre, and Leuschen would be added to the Board upon completion of the IPO, with Defendant Anderson coming in as the new CEO of Decarb.  That filing further noted that Defendants McDermott and Tepper were also joining the Board upon completion of the IPO, with Defendant Tepper also having served as a member of the board of previous Riverstone-sponsored SPACs Silver Run I and Silver Run II.  That filing emphasized the Sponsor's experience serving as a manager of clean energy SPACs, stating in pertinent part:

> Riverstone is one of ***the most experienced private equity investors globally within renewable energy***, with over 15 years of dedicated investment experience to renewables.  Since inception, Riverstone has committed over $5.2 billion of capital to 14 renewable power platform investments across subsectors including power generation, transmission & distribution, services and supply chain.

Riverstone has owned or developed nearly 14 gigawatts of generation capacity and has developed over 110 projects in 14 countries. Further, Riverstone has raised significant funds for decarbonization and renewables platforms following the emergence of the coronavirus and its impact on the global economy and financial markets. In 2020, Riverstone raised $1 billion of equity for the recapitalization of Enviva Holdings, the world's largest producer of sustainable wood pellets, and completed a $6.1 billion take-private of Pattern Energy Group, one of the world's largest companies dedicated to carbon-free electricity through the development of utility scale wind and solar power facilities.[15]

53.    On September 22, 2020, Decarb filed with the SEC an amendment to the Registration Statement, which stated that Defendants Aaker, Kearns, and Warren also would be added to the Board upon completion of the IPO. The amendment stated that the Sponsor "Riverstone [was] one of the most experienced private equity investors globally within renewable energy." The amendment also stated that the IPO would be reduced to 34.5 million units at $10, raising an estimated $345 million in proceeds. A September 30, 2020 amendment further lowered the expected IPO proceeds to $300 million, and an October 13, 2020 amendment again lowered the anticipated proceeds to just $200 million.

54.    The SEC declared the Registration Statement effective on October 19, 2020. On or about October 22, 2020, Decarb completed its IPO, issuing and selling 20 million units at $10 each and raising $200 million in proceeds. Each

---

[15]  Emphasis added.

unit consisted of one share of Decarb Class A stock and one-half of one warrant. The amended Registration Statement stated that the number of Founder Shares issued in 2017 had been "determined based on the expectation that [the] founder shares would represent 20% of the outstanding shares after" the IPO, which the Sponsor "acquired" for the nominal payment of $25,000 or ~$0.002 per share.[16]

55.     The Registration Statement further stated that "[i]n October 2020, our sponsor will transfer an aggregate of 1,064,329 founder shares to our independent director nominees and an affiliate of our chief executive officer at their original purchase price." Thus, Defendants Aaker, Kearns, McDermott, Tepper, Warren, and Anderson were indifferent as to value of Hyzon as they collectively stood to earn millions upon the closing of the Merger. Defendants Aaker, Kearns, McDermott, Tepper, Warren, and Anderson were also contemporaneously serving as members of several other boards of other Riverstone SPACs and collectively stood to earn millions more upon the completion of those SPAC transactions.

56.     The Registration Statement defined Defendants Aaker, Kearns, McDermott, Tepper, and Warren as the "independent directors" of Decarb— conceding by negative implication, Defendants Anderson, Lapeyre, Leuschen, and Tichio were not independent. The Registration Statement also defined Defendants

---

[16]   *See* Decarbonization Plus Acquisition Corporation IPO Prospectus filed with the SEC on Form 424b on October 21, 2020 ("IPO Prospectus") at 12.

Anderson and WRG as essentially being one in the same.[17]  As a result, the Sponsor (and its beneficial owners Defendants Lapeyre and Leuschen), and *each* of the other Defendants (except Defendant Tichio) would take the founders shares at the same nominal price Riverstone had paid for them in 2017.

57.    The Registration Statement further stated that simultaneously with the completion of the SPAC IPO, the Sponsor (and thus Riverstone and its owners Lapeyre and Leuschen), the "independent director nominees," and WRG had committed to purchase six million private placement warrants at $1 per warrant (which were convertible to Decarb Class A stock at $11.50 per share).

58.    Decarb went public with a completion window of approximately two years, keyed off its October 21, 2020 IPO date.  Thus, the Company had to complete a business combination by October 22, 2022, or the Founder Shares would be forfeited, the private placement warrants would be worthless, the IPO proceeds held in trust would be returned to the public stockholders, and Decarb would be dissolved. Moreover, since 60% of IPO underwriters Citi and Credit Suisse's $11 million in fees were contingent upon Decarb completing a business combination, Citi and Credit Suisse also faced millions of dollars in fees held in a trust account being returned to the public stockholders of Decarb.

_____

[17] *See* IPO Prospectus at 98, 104-05.

59.    As to the Redemption Rights of Decarb shareholders, the IPO Registration Statement stated in pertinent part as follows:

*We will provide our stockholders with the opportunity to redeem all or a portion of their shares of our Class A common stock upon the completion of our initial business combination.*

\*    \*    \*

At the time of your investment in us, you will not be provided with an opportunity to evaluate the specific merits or risks of one or more target businesses*. Since our board of directors may complete a business combination without seeking stockholder approval, public stockholders may not have the right or opportunity to vote on the business combination, unless we seek such stockholder vote*. Accordingly, if we do not seek stockholder approval, your only opportunity to affect the investment decision regarding a potential business combination may be limited to exercising your redemption rights within the period of time . . . .

## III.    Riverstone Packs the Board with Loyalists and Ensures Their Fealty with a Windfall of Founder Shares

60.    Riverstone, beneficially owned by Defendants Lapeyre and Leuschen and with Defendant Tichio serving as a managing partner; the then-four "independent director nominees"; and Defendant Anderson, by virtue of his ownership of WRG, which controlled Decarb through the Sponsor, held voting control over the Company.  The Registration Statement acknowledged as much, stating in pertinent part:

Our initial stockholders [*i.e.* the Sponsor, the "independent director nominees," and WRG] will control the election of our board of directors until consummation of our initial business combination and will hold a substantial interest in us.  As a result, they will elect all of our directors prior to our initial business combination and may exert a

- 34 -

substantial influence on actions requiring a stockholder vote, potentially in a manner that you do not support.

61.     Defendants Lapeyre and Leuschen, as the beneficial owners of Riverstone, joined by Riverstone general partner Defendant Tichio, then serving as the CEO and sole director of Decarb prior to the IPO, initially appointed themselves and Defendants Anderson, Aaker, and Kearns to the Board, with Anderson assuming the role of CEO.  These Defendants later added Defendants McDermott and Tepper, and, after the IPO, Defendant Warren, to the Board, with McDermott assuming the lead independent director role.  As the controller of a majority of Decarb Class B shares through the Sponsor, Defendants Lapeyre, Leuschen, and Tichio could remove any director at any time.  Prior to an initial business combination, only holders of Class B common stock were entitled to vote on the election of directors, ensuring these Defendants' absolute control over the Board.  Furthermore, each of their chosen directors had deep professional and/or financial ties to these controlling stockholders, further ensuring the directors' fealty.

62.     At the time of Merger approval: (a) Defendants Lapeyre and Leuschen were the co-founders, senior managing partners, and beneficial owners of Riverstone; (b) Defendant Tichio—Decarb's CEO and lone director at the time of the IPO—was a partner and managing director of Riverstone; (c) Non-Party Haskopoulos—Decarb's CFO at the time of the IPO—was a managing director and the CFO of Riverstone and served as CFO at Decarb and Decarbonization

- 35 -

Acquisition Corps. ("DCRB") II, III, IV, and V; (c) Defendants Anderson (former Goldman Sachs VP), Lapeyre (former managing director of Goldman Sachs' Global Energy & Power Group), Leuschen (former partner and managing director of Goldman Sachs and founder and head of its Global Energy & Power Group), and Tichio (former Goldman Sachs banker in the Principal Investment Area) were alumni of the conflicted investment banker, Goldman Sachs, which then owned a 12% stake in Riverstone and was serving as the financial advisor to Legacy Hyzon and as an investment banker to Decarb; (d) Defendants Anderson (CEO/director of DCRBs I, II, III, IV, and V), Aaker (director of DCRBs I, II, III, IV, and V), Kearns (director DCRBs I, II, III, IV, and V), Lapeyre (director of DCRBs I, II, III, IV, and V), Leuschen (director of DCRBs I, II, III, IV, and V), Tichio (current/former CEO and then-present director of DCRBs I, II, III, IV, and V), McDermott (director of DCRBs I, II, III, IV, and V), Tepper (director of Silver Run I and II and DCRBs I, II, III, IV, and V), and Warren (director of DCRBs I, II, and III) each had been nominated to or seated on multiple boards of Riverstone-sponsored SPACs[18]; (e)

---

[18]  A total of five SPACs have shared the DCRB name thus far, and three of those SPACs have completed business combinations as of the filing of this Complaint. DCRB I (Decarb) completed the business combination with Hyzon at issue here. DCRB II completed a business combination with Tritium Holdings Pty Ltd. on January 13, 2022.  DCRB III completed a business combination with Solid Power Operating, Inc. on December 8, 2021.  DCRB IV completed its IPO on August 13, 2021, but has not completed a business combination or announced a likely target.

Riverstone (*i.e.*, Lapeyre/Leuschen/Tichio) essentially gifted each of the "independent director nominees"—Aaker, Kearns, McDermott, Tepper, and Warren—and Anderson/WRG in his capacity as CEO of Decarb, Founder Shares worth ***millions of dollars*** for nominal consideration contingent on Decarb completing an acquisition; and (f) Riverstone (*i.e.*, Lapeyre/Leuschen/Tichio) allowed each of the "independent director nominees"—Aaker, Kearns, McDermott, Tepper, and Warren—and Anderson/WRG in his capacity as CEO of Decarb, to buy a portion of Riverstone's $6 million in private placement warrants. These numerous conflicts of interest are summarized in the table below:

| Decarb Officer/Director | Director at Sponsor SPACs | | | | | Decarb Private Placement Warrants | Decarb Founder Shares | Riverstone Affiliation | Goldman Affiliation |
|---|---|---|---|---|---|---|---|---|---|
| | I | II | III | IV | V | | | | |
| Anderson | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | 630,947 | | Former VP |
| Haskopoulos (as CFO only) | ✓ | ✓ | ✓ | ✓ | ✓ | | ~ | Managing Director and CFO | |
| Aaker | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | 22,130 | | |

---

DCRB V has filed several registration statements, most recently on January 21, 2022, in anticipation of conducting an IPO.

| Decarb Officer/Director | Director at Sponsor SPACs | | | | | Decarb Private Placement Warrants | Decarb Founder Shares | Riverstone Affiliation | Goldman Affiliation |
|---|---|---|---|---|---|---|---|---|---|
| | I | II | III | IV | V | | | | |
| Kearns | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | 22,130 | | |
| Lapeyre | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | 4,591,708 | Co-Founder and Managing Director | Former Managing Director |
| Leuschen | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | 4,591,708 | Co-Founder and Managing Director | Former Managing Director |
| Tichio | ✓ | ✓ | ✓ | ✓ | ✓ | | ~ | Managing Director | Former Banker |
| McDermott | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | 331,950 | | |
| Tepper | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | 22,130 | | |
| Warren | ✓ | ✓ | ✓ | ✓ | | ✓ | 22,130 | | |

63.     Importantly, by appointing Defendants Anderson, Aaker, Kearns, McDermott, Tepper, and Warren to the boards of directors of Riverstone's other SPACs, Defendants Lapeyre, Leuschen, and Tichio (via their control of Riverstone) provided them with the opportunity to receive additional founder shares and warrants in those SPACs.  Indeed, while the Hyzon de-SPAC transaction would

reward the holders of its Class B Founder Shares with shares worth $56.4 million in the open market, this was not the only de-SPAC from which these parties were collectively profiting. These Board members, along with the Controller Defendants, collectively received much more in connection with serving on SPAC boards for Riverstone. As emphasized in an August 25, 2021 *Wall Street Journal* report, Riverstone is a prolific SPAC creator and "[b]etween Hyzon and the announced mergers with Tritium and Solid Power, Riverstone ***and other members of the SPAC team*** are in line for about ***$240 million in paper gains through ultracheap shares and other perks they get for sponsoring the SPACs***, according to New York University Law School professor Michael Ohlrogge, who studies SPACs."[19] Indeed, based on their receipt of founders shares in the five DCRB SPACs being valued at an estimated $10 per share as of the date of any eventual business combination, the purported outside "independent directors" on the Decarb Board, i.e. Defendants Aaker, Kearns, McDermott, Tepper, and Warren, all were poised to gain millions of dollars in payoffs:

| Director | DCRB SPAC | Founder Shares | Implied Value at $10 Per Share | Total Potential Payoff |
|---|---|---|---|---|
| **Aaker** | I (Decarb) | 22,130 | $221,300 | |

---

[19] *See* Ryan Dezember and Amrith Ramjuma, *Riverstone SPACs Bet Renewable Energy Will Pay Off This Time*, Wall St. J., Aug. 26, 2021.

| Director | DCRB SPAC | Founder Shares | Implied Value at $10 Per Share | Total Potential Payoff |
|---|---|---|---|---|
| | II | 40,000 | $400,000 | |
| | III | 40,000 | $400,000 | |
| | IV | 41,551 | $415,510 | |
| | V | TBD | TBD | |
| | | | | *$1,436,810+* |
| **Kearns** | I (Decarb) | 22,130 | $221,300 | |
| | II | 40,000 | $400,000 | |
| | III | 40,000 | $400,000 | |
| | IV | 41,551 | $415,510 | |
| | V | TBD | TBD | |
| | | | | *$1,436,810+* |
| **McDermott** | I (Decarb) | 331,950 | $3,319,500 | |
| | II | 240,000 | $2,400,000 | |
| | III | 240,000 | $2,400,000 | |
| | IV | 83,102 | $831,020 | |
| | V | TBD | TBD | |
| | | | | *$8,950,520+* |
| **Tepper** | I (Decarb) | 22,130 | $221,300 | |
| | II | 40,000 | $400,000 | |
| | III | 40,000 | $400,000 | |

| Director | DCRB SPAC | Founder Shares | Implied Value at $10 Per Share | Total Potential Payoff |
|---|---|---|---|---|
| | IV | 41,551 | $415,510 | |
| | V | TBD | TBD | |
| | | | | *$1,436,810+* |
| **Warren**[20] | I (Decarb) | 22,130 | $221,300 | |
| | II | 40,000 | $400,000 | |
| | III | 40,000 | $400,000 | |
| | IV | 41,551 | $415,510 | |
| | | | | *$1,436,810+* |

64.    Thus, consummation of the Merger did not provide an isolated, one-time multi-million-dollar payday for these directors.  Rather, ***each*** Riverstone SPAC business combination presents an ongoing, multi-million-dollar opportunity for them, and the prospect of plum appointments in connection with future Riverstone SPACs.

65.    And the relationships these senior executives and directors shared with one another in connection with the many DCRB SPACs were not the only close

---

[20]  Though having initially agreed to serve as a director, Defendant Warren appears to have resigned from DCRBs II and III in April 2021 and from DCRB IV on an undisclosed date and to have forfeited his founders shares in those three SPACs.

professional and financial ties these Defendants shared.  There were more, including but not limited to:

- **Singularity Education Group:** a California-based executive educational provider, business incubator, and innovation consultancy service where Defendant Anderson has served as the Executive Chairman since 2018 and Defendant Kearns has served as a member of the faculty since February 2019;

- **Centennial Resource Development, Inc. f/k/a Silver Run Acquisition Corporation:** a Colorado-based oil and natural gas company launched and 31% owned by Defendant Riverstone upon whose board Defendants Lapeyre, Leuschen, Tepper, and Tichio have served since October 2016;

- **Alta Mesa Resources, Inc. f/k/a Silver Run Acquisition Corporation II**: a Texas-based oil exploration and production company launched by Riverstone that went through bankruptcy proceedings in 2020 and upon whose board Defendants Lapeyre, Leuschen, and Tepper served as directors until 2020;

- **Riverstone Energy Limited:** a closed-end investment company launched and operated by Riverstone that invests in the global energy industry and where Defendants Lapeyre and Leuschen served on the board between 2013 and 2020; and

- **Envira Inc.:** a Maryland-based company that develops, constructs, acquires, owns, and operates wood pellet production plants and where Defendants Lapeyre and Leuschen have served as directors since January 2022 and had both previously served as general partner directors since March 2021.

66.     Indeed, the preliminary proxy statements Hyzon filed with the SEC in the lead up to the Merger vote in July 2021 expressly conceded that Defendants Anderson, Lapeyre, Leuschen, and Tichio were not "independent directors." Yet, Defendants Aaker, Kearns, McDermott, Tepper, and Warren were also conflicted, given their obvious financial income in the outcome of the Hyzon de-SPAC

transaction and their long history of profiting off their business relationships with Riverstone and their participation in the other DCRB SPAC transactions.

67.    In short, these strong personal financial incentives for each of the Decarb Board members—adding up to millions of dollars—eliminated these Board members' ability to act independently and to "say no" to any deal pushed by Defendants Anderson, Lapeyre, Leuschen, and Tichio via Riverstone and the Sponsor.  The IPO Registration Statement essentially admitted as much, stating in pertinent part as follows:

> Since our sponsor, officers and directors will lose their entire investment in us if our business combination is not completed, *a conflict of interest may arise in determining whether a particular business combination target is appropriate for our initial business combination*.[21]

However, it is clearly one thing to admit a conflict of interest *could later arise* in selecting a viable merger target; it is an entirely separate thing to: (i) conceal known problems with a SPAC merger target's business metrics and financial prospects—or fail to conduct due diligence to unearth them—in order to ensure shareholder approval of a merger and to dissuade SPAC shareholders from exercising their Redemption Rights; and (ii) to violate the solemn, non-waivable fiduciary duties of

---

[21]   IPO Prospectus at 45.

loyalty, good faith, and due care that directors of Delaware corporations, governed by the State's statutory and common law, are bound by.

68.     Yet it is clear that is what Riverstone demanded of these directors here. As the following portions of an August 26, 2021 *Wall Street Journal* expose elucidate, the band of conflicted Decarb directors has helped Riverstone launch and sell its series of SPAC transactions and each director has profited thereby to the tune of millions of dollars while the investors in the Riverstone SPACs often fell flat:

> Riverstone is best known for its energy-focused private-equity funds. For its green efforts, the firm is using special-purpose acquisition companies, or SPACs. These are blank-check companies that raise cash from stock-market investors, merge with private companies and take them public. SPACs have raised a record of roughly $120 billion from investors this year and invested heavily in clean-energy businesses.

> So far, Riverstone has done four clean-energy SPACs. The firm's first one took hydrogen fuel-cell truck company Hyzon Motors Inc. public. Companies making electric- and fuel-cell-powered vehicles were among the hottest SPAC investments earlier this year but have tumbled recently. Hyzon shares are down by more than half from their peak.

> Other Riverstone SPACs announced deals for electric-vehicle battery-charging company Tritium Holdings Pty Ltd. and solid-state battery firm Solid Power Inc., which is backed by Ford Motor Co. and BMW AG. Those deals have yet to close, but Riverstone's pace of deal making is among the fastest in the SPAC market.

> The latest Riverstone SPAC, Decarbonization Plus Acquisition Corp. IV raised about $315 million in a stock offering this month and is looking for a business to take public.

*     *     *

In securities filings affiliated with its green SPACs, Riverstone touts two decades of experience investing in clean energy. ***There is no mention in the filings of how those funds performed.***

Riverstone's first renewable-energy fund raised $685 million in 2006 from investors including the California Public Employees' Retirement System. ***That fund lost roughly 90%***. "You'd think a monkey couldn't have lost that much money," Riverstone co-founder David Leuschen told a conference of oil investors in 2016.

The firm's second fund raised $3.4 billion in 2008 and ***barely broke even after fees***, according to public pension disclosures. Riverstone created the fund after investors asked it to, Mr. Leuschen said. "Nobody would call me a great believer in the renewable business," he said, "but I think it's got actually quite a bright future."

*   *   *

***Riverstone's record with SPACs is uneven.*** The firm helped revive the SPAC process in 2016 after years of drought following the financial crisis. Riverstone launched a SPAC to stake former EOG Resources Inc. Chief Executive Mark Papa in the West Texas oil fields. The shares doubled in value.

Investors then gave a billion dollars to Riverstone and former Anadarko Petroleum Corp. CEO James Hackett to try for SPAC gold again. That SPAC bought drilling fields and pipelines in an Oklahoma field that were supposed to be the next big thing. Production was weak and oil prices slumped amid a supply glut.



Annual revenue projections made by companies going public through Riverstone SPACs

■ Hyzon  ■ Tritium

Note: Solid Power projects annual sales less than $35 million each year through 2025.
Source: The companies

- 45 -

Oil-and-gas investments across Riverstone's portfolio sputtered. ***When their value fell, Riverstone executives faced the prospect of returning more than $300 million in paper profits that they had taken when deals looked like winners.*** ***<u>Riverstone later sold a 12% stake in itself to Goldman Sachs</u>***.

***Shares of the firm's SPAC venture in West Texas plunged. The Oklahoma venture filed for bankruptcy protection in 2019 and was liquidated.*** A third shale SPAC never sold shares until Riverstone renamed it Decarbonization Plus Acquisition Corp. and it went public last October.

That SPAC in February said it would merge with Hyzon, which projected 2021 sales of $37 million but said that by 2025 revenue would top $3 billion as hydrogen fuel becomes more viable.

Hyzon's shares have since tumbled as enthusiasm for transportation startups has cooled. ***Still, Riverstone and its SPAC partners remain in the green: Their incentive package for creating the SPAC is worth about $56 million, almost $50 million above its roughly $6.5 million cost.***[22]

## IV. Decarb Merges with Legacy Hyzon

69. At the time of the Merger, Legacy Hyzon was barely a year-old stand-alone company. It opened its headquarters in Honeoyo Falls, New York at the former General Motors facility that had closed in 2012. Legacy Hyzon was then a purported supplier of zero-emissions hydrogen fuel cell powered commercial vehicles, including heavy duty trucks, buses, and coaches. U.S. investors were told

---

[22] *See* Ryan Dezember and Amrith Ramkumar, *Riverstone SPACs Bet Renewable Energy Will Pay Off This Time – Investors have given the oil financier more than $1 billion for blank-check firms in spite of its clean-energy past*, Wall St. J., Aug. 26, 2021 (emphasis added).

that Legacy Hyzon, originally a new business line of its parent corporation, Horizon

Fuel Cell Technologies ("Horizon"), had been founded and successfully operated

out of China for 17 years (since 2003). According to Hyzon's website:

> Hyzon was known as the Heavy Vehicle Business Unit (HVBU) of Horizon and was ***responsible for the development of fuel cell systems and the delivery of about 500 fuel cell-powered commercial vehicles during 2019 and 2020, leveraging the deep and extensive experience bolstered within the group***.[23]

70.    What was not disclosed to U.S. investors was that the lion's share of

Horizon's 2019 sales had been to a single now defunct customer, and that at the time

of the spinoff of Legacy Hyzon from its Chinese parent Horizon, Horizon was in

dire financial straits due to the lack of sales of those fuel cells. By late 2019,

Horizon's fuel-cell sales and free cash flow had imploded when its major customer,

responsible for nearly 75% of Horizon's fuel-cell sales, defaulted. As a result, the

market value of the Horizon operating subsidiary responsible for sales of Horizon's

fuel cell systems had evaporated and that operating subsidiary had de-registered

from the Chinese stock exchange. Seeking to raise public capital to develop Legacy

Hyzon's business without having to reveal its financial collapse to investors, Legacy

Hyzon looked to the US capital markets, then awash with EV vehicle company

SPAC investment opportunities. The Hyzon website states that it first established

---

[23] *See* https://hyzonmotors.com/about/#overview (last visited Mar. 8, 2022).

its U.S. operations when it "[l]aunch[ed] [its] engineering development centre in Rochester, NY" in 2020.

71.    On or about August 18, 2020, Legacy Hyzon purportedly retained Goldman Sachs as its financial advisor "in connection with exploring alternatives for raising capital."  Not coincidentally, Goldman Sachs then owned a 12% interest in Riverstone and rights to proportionate share of Riverstone's profits.[24]  By the summer of 2020, Legacy Hyzon's management had apparently determined to seek out a publicly traded SPAC to merge with in order to allow Legacy Hyzon stock to be publicly traded.  By October 13, 2020, Legacy Hyzon was in the process of executing non-disclosure agreements with various SPACs and "exploring a potential business combination" with them.[25]

72.    On October 30, 2020, Defendants Anderson and Tichio met with Goldman Sachs' bankers "regarding a possible transaction between [Decarb] and Hyzon."[26]    After hiring Vinson & Elkins LLP, meeting with Legacy Hyzon management, and reviewing various Legacy Hyzon sales pitches made by Goldman

---

[24]  *See* Ryan Dezember and Amrith Ramkumar, *Riverstone SPACs Bet Renewable Energy Will Pay Off This Time – Investors have given the oil financier more than $1 billion for blank-check firms in spite of its clean-energy past*, Wall St. J., Aug. 26, 2021.

[25]  *See* Merger Proxy at 95.

[26]  *Id*.

Sachs, Decarb began undertaking its "legal due diligence of Hyzon" with Legacy Hyzon's bankers at Goldman Sachs, beginning on November 13, 2020.[27] Notably, due to its 12% ownership stake in Riverstone, Goldman Sachs stood to receive a proportional profit in Riverstone's profits in the deal.

73.    Throughout late November 2020, Defendant Tichio continued negotiating with Goldman Sachs over the due diligence and deal terms for a possible merger with Legacy Hyzon.[28] In the Merger Proxy, Legacy Hyzon claims to have formally engaged Goldman Sachs "as its financial advisor in connection with the possible sale of all or a portion of Hyzon" on November 30, 2020, and states "[t]hat same week, Hyzon also discontinued discussions with the [ten] other SPACs" it had been speaking with since early October 2020.[29] Throughout December 2020 and January 2021, the parties completed the rest of the due diligence while negotiating the final terms of the de-SPAC transaction, including determining "a total enterprise value of Hyzon of $1.983 billion, with equity consideration in the form of Class A Common Stock and a $350 million PIPE Financing."[30] Various extraneous

---

[27]  *Id*. at 96.

[28]  *Id*.

[29]  *Id*. at 95-96.

[30]  *Id*. at 96-98.

agreements—such as an intellectual property agreement—were also executed.[31] According to the Merger Proxy, "[d]uring the week of December 14, 2020, [Decarb] engaged a number of third-party advisors . . . to assist with various aspects of commercial, financial and legal diligence, including . . . an advisor to assist in the quality of the fuel cell technology that would be commercialized by Hyzon in the transportation market." The Merger Proxy contained no description of who those "third-party advisors" were, what their qualifications were, how they were being compensated or what they were asked to opine upon, and based on what has since been revealed about the fuel cell technology in particular, it is clear their due diligence was ineffective. This is not surprising since Goldman Sachs shared such a close relationship with Riverstone and the Controller Defendants, all of whom were attempting to shove this transaction through.

74. The Merger Proxy then states that:

> During the week of January 4, 2021, [Decarb] engaged Citigroup Global Markets Inc. ("Citi") as its financial advisor and Credit Suisse Securities (USA) LLC ("Credit Suisse") as its financial advisor and equity capital markets advisor, respectively, in connection with the business combination to assist the [Decarb] Board with advice on the transaction structure, negotiation strategy, valuation analyses, financial terms and other financial matters . . . .[32]

---

[31] *Id*.

[32] *Id*. at 98.

Because Citi and Credit Suisse had just served as underwriters in the Decarb IPO, however, they too were conflicted in serving as advisors to Decarb in the de-SPAC transaction.  When Citi and Credit Suisse undertook the IPO for Decarb, they agreed that 60% of their $11 million in investment banking fees would be placed in a trust and that: "(i) they [would] forfeit any rights or claims to [those fees], including any accrued interest thereon, then in the trust account upon liquidation, and (ii) that the [fees would] be distributed on a pro rata basis . . . to the public stockholders" of Decarb.  Although the Decarb SPAC still had until October 2022 to complete a business combination, it had taken many months to decide upon Legacy Hyzon and to negotiate a proposed business combination.  Neither Citi nor Credit Suisse were likely to reject that combination.  If Citi and Credit Suisse suddenly rejected the proposed transaction, it would reflect poorly on Riverstone's claimed keen ability to identify and acquire worthwhile targets—the bread and butter of Riverstone's business.  Nor were Citi or Credit Suisse inclined to replicate their efforts at the eleventh hour with a different target after the due diligence was largely complete and the terms of the deal had essentially been finalized.  In short, Citi and Credit Suisse had no real choice but to rubber stamp this proposed Merger due to their own financial conflicts.

75.    Making matters worse, according to the Merger Proxy, "[d]uring the week of January 10, 2021, [Decarb] also engaged Goldman Sachs and Morgan

- 51 -

Stanley & Co. LLC ('Morgan Stanley') to serve as placement agents for the PIPE Financing."[33]  Though the Merger Proxy claims "Goldman Sachs did not provide any advice to" Decarb regarding the "valuation of Hyzon or the terms of the business combination," nonetheless, in recognition of the clear conflict this retention presented, the Merger Proxy states that "[Decarb] and Hyzon each signed a consent letter with Goldman Sachs acknowledging Goldman Sachs' roles as financial advisor to Hyzon in connection with the business combination and as co-placement agent to DCRB in connection with the PIPE Financing and waiving any potential conflicts in connection with such dual roles."  But executing a "waiver" does not erase the taint of conflict when Legacy Hyzon's, the seller's, investment bankers were also angling to get investment banking work from the buyer, Decarb.  Goldman Sachs would ultimately get that work and also serve as investment bankers for Decarb, the buyer, as the placement agent for Decarb in selling the PIPE Financing required to complete the Merger.  This conflict was compounded because Goldman Sachs owned a 12% stake in the sponsor of the SPAC, Riverstone, giving Goldman Sachs a proportional stake in Riverstone's profits.

76.    Indeed, neither Citi, Credit Suisse, nor Goldman Sachs were independent investment bankers or financial advisors.  Many of Decarb's Board

---

[33] *Id*. at 99.

members were Goldman Sachs alumni themselves and various Decarb entities had completed billions of dollars in transactions with all three investment banks in the recent past and could anticipate continuing to do so in the future.  Those deals included, but were not limited to: (a) Citi and Credit Suisse serving as the sole joint book-running managers of DCRB II's, DCRB IV's, and DCRB V's IPOs; (b) Citi serving as a financial advisor to DCRB II in its de-SPAC transaction; (c) Goldman Sachs being one of the anchors in a $1.1 billion Riverstone single-asset process undertaken in July 2020[34]; (d) Goldman Sachs acquiring a 12% stake in Riverstone for $500 million in 2017[35]; (e) Riverstone being a member of a consortium of private equity firms including Goldman Sachs that completed the $27.5 billion acquisition of Kinder Morgan, one of the largest pipeline operators in the United States, in 2006[36]; (f) Goldman Sachs owning a 12% interest in Riverstone, giving it a proportionate cut of Riverstone's profits; (g) Riverstone and Goldman Sachs jointly

---

[34]  *See* Chris Witkowsky, *Goldman one of several anchors in $1.1 bn Riverstone single-asset process*, Buyouts Insider, July 22, 2020.

[35]  *See* Rabia Arif, *Goldman Sachs fund to acquire 12% of Riverstone Holdings for $500 M*, S&P Global Market Intelligence, May 4, 2017.

[36]  *See* Jad Mouawad, *Kinder Morgan Agrees to an Improved Buyout Offer Led by Its Chairman*, N.Y. Times, Aug. 29, 2006.

purchasing a Lucid Energy Group subsidiary in January 2018 for $1.6 billion[37]; and (h) Goldman Sachs alone having backed a new Riverstone $5 billion "make-or-break" fund in August 2018.[38] Critically, Citi and Credit Suisse had jointly received ***$11 million*** in investment banking fees from the Decarb IPO alone—the receipt of 60% of which was contingent upon completing the Merger.

77.   On the morning of February 9, 2021, Decarb and Legacy Hyzon announced the Merger and related financing transactions (together, the "Transactions").  The prior day, February 8, 2021, the Board unanimously approved the Merger.

78.   Under the terms of the Merger, following a series of transactions, Legacy Hyzon would become a wholly owned subsidiary of Decarb, as depicted in the chart below from the Merger Proxy:

---

[37] *See* Lucid Energy Group press release, *Lucid Energy Group Agrees to Sell Delaware Basin Subsidiary to Riverstone Holdings LLC and Goldman Sachs Merchant Banking Division for $1.6 Billion*, Jan. 8, 2018.

[38] *See* Joshua Franklin & David French, *Exclusive: Goldman-backed Riverstone readies for make-or-break fundraising*, Reuters, Aug. 30, 2018.



79.    The Merger valued the post-transaction Company at "more than $2 billion."[39]  In addition, the pre-Merger Legacy Hyzon owners were estimated to own 73% of the post-Merger company.  By contrast, Decarb Class A stockholders would own only 8.9% of the post-Merger company, and the Sponsor, the "independent director nominees," and Anderson/WRG, would own 2.2% of the post-Merger company.  The PIPE investors would own 15.9% of the post-Merger company.

80.    Approval of the Merger by Decarb stockholders required the affirmative vote of a majority of the stockholders present at the special meeting.  The Company set the record date for the meeting as June 1, 2021, issued its definitive proxy statement on June 21, 2021, and held the meeting on July 15, 2021.  Decarb stockholders had until July 13, 2021 to exercise their Redemption Rights.  Inviting stockholders to exercise their Redemption Rights, directly after spelling out that the

---

[39]  *See* Ed Ludlow & Gillian Tan, *Fuel Cell Startup Hyzon Valued at Over $2 Billion in SPAC Merger*, Bloomberg, Feb. 9, 2021.

Board recommended shareholders vote in favor of the Merger with Hyzon, the letter to Decarb shareholders signed by Defendant Anderson in the Merger Proxy stated in pertinent part: "Pursuant to our Charter, *we are providing the holders* of shares of Class A Common Stock originally sold as part of the units issued in our initial public offering (the 'IPO' and such holders, the 'public stockholders') *with the opportunity to redeem*, upon the Closing, shares of Class A Common Stock then held by them . . . ."  The Merger Proxy went on to instruct that:

> In order to exercise your redemption rights, you must (a) if you hold your shares of Class A Common Stock through units, elect to separate your units into the underlying public shares and public warrants prior to exercising your redemption rights with respect to the public shares, and (b) prior to 5:00 p.m., Eastern time, on July 13, 2021 (two business days before the special meeting), tender your shares physically or electronically and submit a request in writing that we redeem your public shares for cash to Continental Stock Transfer & Trust Company, our transfer agent . . . .

81.    As to "WHERE YOU CAN FIND ADDITIONAL INFORMATION," the Merger Proxy stated in pertinent part that Decarb "files reports, proxy statements and other information with the SEC as required by the Exchange Act."  The Merger Proxy warned that shareholders should rely only upon the information provided in the Merger Proxy and related SEC filings, stating that Decarb "has not authorized anyone to give any information or make any representation about the business combination, [Decarb] or Hyzon that is different from, or in addition to, that

- 56 -

contained in this proxy statement," and "[t]herefore, if anyone does give you information of this sort, you should not rely on it."

82.    As of the record date, the closing price of Decarb common stock was $10 per share.  That price implied a market value of approximately $56.4 million for the Class B Founder Shares, which had been purchased a few months prior for a mere $25,000 (*i.e.*, the value of the Founder Shares increased **2,255x**).  At this valuation, members of the Decarb Board were poised to realize enormous returns on their investments in the event the Merger closed, as illustrated by the table below:

| Director | Founder Shares[40] | Implied Value at $10 per share |
|---|---|---|
| Anderson | 630,947 | $6,309,470 |
| Aaker | 22,130 | $221,300 |
| Kearns | 22,130 | $221,300 |
| Lapeyre | 4,591,708 | $45,917,080 |
| Leuschen | 4,591,708 | $45,917,080 |
| McDermott | 331,950 | $3,319,500 |
| Tepper | 22,130 | $221,300 |
| Warren | 22,130 | $221,300 |

83.    The Merger Proxy touted the Board's purported reasons for recommending the Merger, including:

---

[40]    *See* Merger Proxy at 228.

- "*Competitive and Innovative* [hydrogen fuel cell] *Design*";

- "*Value to Equity Investors*";

- "*Revenue Potential*";

- "*Global Scale*";

- "*Development Capability*";

- "*Due Diligence*";

- "*Terms of Business Combination Agreement*" being "the product of **arm's-length negotiations** among the parties";

- "*Independent Director Role*" and the Decarb Board being "comprised of a **majority of independent directors who are not affiliated with our Sponsor and its affiliates**"; and

- Investors having the "**option to . . . redeem their shares**" rather than "remain stockholders of the combined company" or "sell their shares."[41]

84.     The Merger Proxy repeatedly represented that the Board reached these conclusions only after conducting "**extensive due diligence**."  According to the Merger Proxy, this "**extensive due diligence**" consisted of the Decarb Board's review of the "**extensive due diligence**" provided to it by Legacy Hyzon.  Among other things this "**extensive due diligence**" included:

- meetings and calls with Hyzon management and advisors regarding **business model, operations and forecasts**;

- research on comparable public companies . . . ;

---

[41]  *Id*. at 101-02 (emphasis added).

- 58 -

- research on comparable transactions;

- study of analyst reports and market trends in the electric vehicle and hydrogen fuel cell industries;

- *review of material contracts*;

- review of intellectual property matters;

- review of *commercial, financial*, tax, legal and *accounting* due diligence;

- consultation with Hyzon's management and DCRB's legal and financial advisors and industry experts, including its advisor that assisted in evaluating the overall electrified vehicle market and of the addressable market for Hyzon's vehicles, and its advisor that assisted in evaluating the quality of Hyzon's fuel cell technology;

- *financial and valuation analysis of Hyzon and the business combination*;

- *financial projections prepared by Hyzon's management team*; and

- the *financial statements of Hyzon*.[42]

85.     Notably, the Merger Proxy did not provide an independent, third-party opinion as to whether the Merger was fair, from a financial perspective, to Decarb public Class A stockholders. It claimed that the "officers and directors [of Decarb] have *substantial experience in evaluating the operating and financial merits of companies* from a wide range of industries and concluded that their experience and backgrounds . . . enabled them to make the necessary analyses and determinations

---

[42]  *Id*. at 101 (emphasis added).

- 59 -

regarding the business combination."[43]   It claimed that Citi and Credit Suisse had provided Decarb with financial advisory services at the last minute, but provided no independent, third-party opinion as to whether the Merger was fair, from a financial perspective, to Decarb public Class A stockholders.

86.    Instead, Decarb presented its own financial analyses to support the Board's recommendation of the Merger.   The valuation analyses adopted the projections below, which show sudden jumps in expected 2023 and 2024 trucks deployed, EBITDA, and EBITDA margin, despite Horizon/Legacy Hyzon having suffered a stark downward trend in actual sales volumes since 2019 and despite the gross margin forecasts being twice the average for other electric vehicle manufacturers:

**Key Financial Metrics:**

| | Forecast Year Ended December 31, | | | | |
| --- | --- | --- | --- | --- | --- |
| | 2021E | 2022E | 2023E (dollars in millions) | 2024E | 2025E |
| EBITDA[1] | ($ 73) | ($ 25) | $ 87 | $ 326 | $ 505 |
| EBITDA Margin[2] | NM | NM | 8.9% | 14.5% | 15.4% |

**Key Non-Financial Metrics:**

| | Forecast Year Ended December 31, | | | | |
| --- | --- | --- | --- | --- | --- |
| | 2021E | 2022E | 2023E | 2024E | 2025E |
| Medium and Heavy Duty Trucks Deployed | 74 | 623 | 3,360 | 6,800 | 9,260 |
| Buses Deployed | 11 | 35 | 68 | 340 | 600 |
| Class 3 Truck / Van | 0 | 0 | 840 | 4,435 | 7,235 |
| Total Vehicles Deployed | 85 | 658 | 4,268 | 11,535 | 17,095 |

---

[43]   *Id*. at 53 (emphasis added).

87.    However, as noted above, the Board affirmatively represented its "***extensive due diligence***" of Hyzon and its "***substantial experience in evaluating the operating and financial merits of companies***," and these representations specifically assured Decarb's public stockholders that these projections were reasonable.

88.    In connection with seeking shareholder approval of the Merger—and dissuading the existing public shareholders of Decarb from seeking redemption—Defendants also conducted a series of Investor Presentations, including one on February 9, 2021, using PowerPoint slides. In one slide, Legacy Hyzon said it then expected to increase its deliveries from 85 during FY21 to 9,260 by FY25 and to concomitantly exponentially grow its revenues from an estimated $37 million in 2021 to nearly $3.3 billion by 2025:



89.     Even though the parties had not yet formally announced the Hiringa deal, another slide in the February 9, 2021 Investor Presentation entitled "***Customer Deployments Underway. . . .***" referred to the Hiringa sale as a "Signed Contract," emphasizing that Legacy Hyzon's "Contracted Orders" were all "100% Certain," and stated that the first twenty vehicles would ship in 2021, contributing an estimated $10 million in revenues for Hyzon for 2021—or more than 25% of the $37 million forecast for 2021:



90.     Days later, on February 17, 2021, Legacy Hyzon and Hiringa issued a press release formally announcing the Hiringa contract, stating that "the two companies ha[d] signed a ***vehicle supply agreement***," with "the first batch of [twenty] vehicles . . . ***expected to enter service in New Zealand by the end of 2021***." The release further stated that "Hyzon plans to have up to 1,500 fuel cell trucks on the road in New Zealand by 2026 as part of the agreement with Hiringa."

91.     Defendants made another investor presentation on April 29, 2021 and again filed those slides with the SEC.  One slide highlighted that Legacy Hyzon had announced a "***vehicle supply agreement*** to supply trucks ***to New England-based Hiringa*** Energy; ***first deliveries expected by [end of year] 2021***," notably presenting that as a commercial achievement and not one of its partnerships:



92.     Elsewhere, 15 specific "Vehicle ***Customers***" of Legacy Hyzon were displayed, with Hiringa appearing prominently at the top of that list:



93.    In each of these statements, Defendants characterized Hiringa as the purchaser of the purportedly binding 20-vehicle agreement being delivered in 2021, as well as the additional 1400-1500 vehicles being delivered over the following five-year period.

94.    More generally, Defendants' use of these purported customer maps and charts in the February 2021 and April 2021 Investor Presentations was also materially misleading in that Legacy Hyzon had no viable agreements with or commitments from many of the blue-chip, "top tier customers" it touted on these charts.  The use of these top-tier customer logos and sales commitments more than implied a rapidly accelerating demand for Legacy Hyzon's product—indeed, the customer charts were titled: "Customer Deployments Underway and Demand is Accelerating Rapidly."  Defendants repeated these committed order and revenue claims directly alongside logos of purported name brand customers like Coca Cola, Heineken, Nestle, and Ikea, lending credit to their other sales claims.  Further, Defendants repeatedly published maps of purported 2021 customer deployments to specific "customers," which if added up, totaled nearly $40 million in sales in 2021: February 9, 2021 "Customer" Map:

Case 6:21-cv-06612-MAV-MJP   Document 116-2   Filed 06/30/25   Page 67 of 254



95.     Yet then, in the months between the February 2021 Merger announcement and the July 2021 Redemption deadline—during the same time period that EV SPAC Lordstown was outed for faking customer orders and exaggerating its own book of business—Defendants began surreptitiously scrubbing several reported "blue-chip" customer names and logos from the presentations. Without explanation or acknowledgment, purported top-tier customers, including Coca Cola, Heineken, Ikea, and Nestle were removed altogether.  Yet even when Defendants presented an anonymized customer chart on April 29, 2021, the details of many of these same "customers" appeared to remain, even though their names and logos had been formally removed.  For example, the details for the purported

- 66 -

Heineken deal remain prominently displayed in the same spot on the map now referred to as a "Global Brewer":

April 29, 2021 "Customer" Chart:



96.    Throughout the February 2021 to July 2021 time period, Defendants claimed that Legacy Hyzon was involved in advanced negotiation—if not already entered into binding contract—with a number of top-tier brand customers in order to convince shareholders that there was serious, growing demand for its fuel cell offerings.  Although Defendants appear to have been spooked and removed some of the purported brand name "customer" names and logos from certain of their presentations, they never disclosed the loss of *any* of those customers.  They never reduced the projections for Legacy Hyzon's 2021 deliverables or financial results,

- 67 -

or the five-year projections for Legacy Hyzon's deliverables or financial results. Notably, these top- tier, brand-purported companies are not the only "customers" that failed to produce a single sale for Legacy Hyzon—almost every "customer" failed to materialize.

97.   After having received these disclosures, on July 15, 2021, Company stockholders approved the Merger.

## V.   The Blue Orca and Iceberg Research Reports and Resulting SEC Investigation and Senior Executive Departures

98.   The rosy characterization of Legacy Hyzon portrayed by Defendants was short-lived.

99.   Just two months after the deal closed, on September 28, 2021, research firm Blue Orca Capital published its Report via its Twitter account characterizing Legacy Hyzon as "a zero-revenue hydrogen EV SPAC which we liken to a *Chinese Lordstown Motors*."  In the Report, Blue Orca Capital exposed Legacy Hyzon as "just a repackaging of a flailing Chinese parent company which has been trying to sell the same hydrogen fuel cells without much success for 17 years" and whose "supposed major customers" are "fake."  The Blue Orca Report highlighted facts that were either omitted or misleadingly characterized in the Merger Proxy and Defendants' other public representations concerning the Merger.  Among other things, Blue Orca reported that:

- An important Legacy Hyzon "customer"—indeed its second largest— was not, in fact, even a customer of the Company. Legacy Hyzon had been touting the strength of one of its purportedly largest customers, New Zealand infrastructure startup Hiringa, which had supposedly signed an agreement in February 2021 to "acquire" 1,500 trucks by 2026, including 20 by 2021. A former senior Hiringa executive, however, had revealed to Blue Orca that Hiringa was not actually a customer of Legacy Hyzon, but a mere "channel partner" assisting Legacy Hyzon in marketing vehicles to real end customers in New Zealand. Indeed, in reality Hiringa was then just a small startup operating out of a house in New Zealand with neither the capability nor the then-current intention to purchase any vehicles from Legacy Hyzon.

- Legacy Hyzon had massively inflated expected sales. Legacy Hyzon had been representing to investors that it expected to deliver the first 20 trucks to Hiringa by the end of 2021, accounting for 24% of guided deliveries that year and 25% of guided revenues, and claiming that the orders were "100% certain." A Hiringa executive, however, told Blue Orca that it would not take any deliveries of Legacy Hyzon trucks in 2021 and only expected to receive the first four validation vehicles in March or April 2022, at the earliest.

- Legacy Hyzon had fabricated its business, operations, and financial prospects. In its initial Investor Presentations, Legacy Hyzon had claimed to have customer contracts with a bevy of big blue-chip companies worth upwards of $700 million. These purported customers, however, were later unceremoniously stricken from those Investor Presentations as multiple other electric vehicle SPACs—including XL Fleet, Nikola, and Lordstown Motors—were exposed for faking customer orders, exaggerating their backlog, and exaggerating future revenues. Yet, despite these massive purported customer orders being stricken, Legacy Hyzon failed to correspondingly reduce its already exaggerated financial projections.

- Several early senior Legacy Hyzon executives had reportedly left the Company in large part over their concerns that Legacy Hyzon had been misrepresenting its customer contracts like other the other EV SPACs. A "former Senior Legacy Hyzon Executive" is quoted as stating that "he and other early senior Legacy Hyzon executives, all of whom left the Company, became uncomfortable with how Legacy Hyzon was

- 69 -

presenting customer orders to investors." He continued: "They were going out, kind of selling it as really what it wasn't at the time. *A bit like unfortunately what Nikola was doing*."

- Legacy Hyzon was just a SPAC "repackaging" of its "flailing Chinese parent Horizon," which had delisted from the Chinese OTC market at an enterprise value of only $190 million, which for 17 years had failed to gain meaningful traction with the very same fuel cell technology Legacy Hyzon was promising to make profitable, and which technology had experienced dramatic sales declines since 2019.[44] Blue Orca provided the following chart illustrating this point, which it stated was based on Legacy Hyzon's July 2021 Investor Presentation, Jiangsu Horizon's 2019 Annual Report, and an Orange Group Article:



*Horizon* Fuel Cells Sold by *Horizon (Parent) 2019-2021*

- Legacy Hyzon told investors in presentations that it would turn cash flow positive as early as 2023, generate annual EBITDA of $505 million by 2025, and do so by achieving gross profit margins on electric vehicles of 32% in 2021 and as high as 33.6% by 2025. A former executive from Legacy Hyzon, however, reportedly told Blue Orca that Legacy Hyzon's retrofitting model of production would in fact yield no more than 5% to 10% gross margins. As a result, according to Blue Orca: "If we apply industry average gross margins of 15% to Legacy Hyzon's projected revenues, the Company will not turn cash positive in the next five years. The picture looks even more dire if we apply a more appropriate gross margin assumption of 5-10%, which the former Legacy Hyzon executive we interviewed says is more realistic."

---

[44] To be sure, the Blue Orca Report references the sales and financial filings of Jiangsu Horizon, an operating subsidiary of Hyzon's former parent Horizon.

- Despite Legacy Hyzon's technology supposedly being world class and the foundation for its hockey-stick-like future revenue growth projections, since 2020, two of Legacy Hyzon's former Chief Technology Officers, Ian Thompson and Gary Robb, had unexpectedly resigned in quick succession with little time on the job, showing little faith in Legacy Hyzon and its technological prospects despite having obvious financial incentives to remain.

100.   Regarding "customer" Hiringa's purchase of 20 trucks during 2021, the Blue Orca Report quoted a Hiringa executive disputing that Hiringa was ever a customer of Legacy Hyzon or that Hiringa had ever committed to purchase anything from Legacy Hyzon, and stating that Hiringa would not even begin to validate the first couple vehicles until mid-2022:

> To channel check Hyzon's claims, we spoke with a senior Hiringa executive. Although they remain interested in the project, **Hiringa explained to us that they are not actually a customer**, but a "**channel partner**" for Hyzon's vehicles. Hiringa does not intend to pay for or take title over the trucks, but merely facilitate the sale of hydrogen trucks to third parties.
>
> > *"We're effectively a channel partner model if you like."*
> >
> > ***"Our business model is not to buy the trucks. We do the refueling…. we're effectively an unpaid market channel"***
> >
> > *"There's no point in us being the middleman. So [the end customer] will physically pay for the trucks and they will physically take title."*
> >
> > - Hiringa Executive
>
> This is not a matter of semantics. According to Hiringa, it has no current intention (or funds) to purchase 1,500 trucks from Hyzon, but merely to act as a conduit to encourage other New Zealand heavy truck operators to purchase trucks from Hyzon.

This makes more sense, as Hiringa does not have anywhere near the financial resources to pay for 1,500 trucks, being a company **with less than 20 employees according to LinkedIn and supposedly operating out of a house in New Zealand**. Rather than purchasing 1,500 trucks, Hiringa plans to build fuel stations with the hope of facilitating future purchases from end customers.

Hiringa also informed us that the **1,500-truck agreement claimed by Hyzon in its investor presentations is not a binding order**, and that it merely represents a right, not an obligation, to buy.

*"That's a right to buy, not an obligation to buy."*

*"At the end of the day it's not binding. That's not a binding purchase. It's a purchasing framework."*

- Hiringa Executive

\*      \*      \*

Yet Hiringa's executive said that **Hiringa will not take any deliveries of Hyzon trucks in 2021 and expects to receive the first four validation vehicles in March or April 2022, at the earliest**.

*Hiringa: "Realistically with the supply chains, I think they will be arriving in March or April [2022]. There's also some work to do in quarter one in the Netherlands before they ship."*

*Blue Orca: "So you don't actually expect trucks this year? You expect them in the first quarter of 2022?"*

*Hiringa: "…March through May, if you like, or April through June [2022] is when we are going to be doing validation in New Zealand… it's not [a] full commercial operation."*

*Blue Orca: "So you don't expect any trucks to be delivered from Hyzon until at least March or April next year. And those are the four validation units?"*

*Hiringa: "Yep, yep."*

- Hiringa Executive

- 72 -

This directly contradicts Hyzon's claims to investors. According to Hyzon's disclosures, Hiringa will account for 24% of the Company's deliveries in 2021, making it the key to whether Hyzon meets its revenue and delivery guidance for this year. But Hiringa told us point blank that no deliveries would be taken in 2021, and the first validation trucks would be delivered in March or April 2022, at the earliest.

Furthermore, Hiringa told us that the remaining 16 trucks ordered from Hyzon would be fulfilled based on testing results of the initial four validation vehicles, which they expect to carry out between March and June 2022 at the earliest.

We asked Hiringa if there was any possibility that they might bring forward the order for the 16 trucks, but Hiringa told us that they do not want to take delivery until they build the commercial hydrogen fuel station infrastructure in New Zealand—which Hiringa indicated would not be until the second half of 2022.

> *"We don't have the [commercial] stations until the second half of the [2022] calendar year. So, we don't want to hold [on to] 16 trucks…"*

> - Hiringa Executive

Our call with Hiringa suggests that the 1,500-truck deal was more hype than reality. Based on our conversation, we do not think that Hiringa has the obligation, the intention, or the capability to purchase the trucks Hyzon claimed in its announcement.[45]

101.   Notably, in its October 5, 2021 response to the Blue Orca Report, Hyzon never disputed that Hiringa was not a "customer" of Legacy Hyzon or that Hiringa was not taking delivery of any of the 20 vehicles during 2021.[46]   Instead,

---

[45] Blue Orca Report at 5-7 (emphasis added).

[46] *See* Hyzon Motors Issues Statement Strongly Rejecting Misleading and Inaccurate     Short     Seller     Report,     Oct.     5,     2021, https://investors.hyzonmotors.com/news/news-details/2021/Hyzon-Motors-issues-

- 73 -

Hyzon claimed that it never said that Hiringa would be "an end user" of the vehicles and that Hyzon still saw "significant potential in the New Zealand market through its partnership with Hiringa, which already has resulted in a Vehicle Supply Agreement for 20 trucks to be delivered to TR Group Ltd., one of New Zealand's largest truck and trailer leasing and rental companies." Hyzon also claimed that it "plans to start supplying trucks to TR Group Ltd. in the first half of 2022."

102. But TR Group Ltd. appears to have put out its own press release announcing that "TR Group has ordered 20 x Hyzon Hydrogen Fuel Cell Trucks" on November 5, 2021, well outside of the timeframe described in the Merger Proxy and the Investor Presentations.[47] The TR Group Ltd. press release stated that "[t]he

_____

statement-strongly-rejecting-misleading-and-inaccurate-short-seller-report/default.aspx (last visited July 31, 2022).

[47] *See* TR Group Orders 20 Hydrogen Fuel Cell (HFC) Electric Trucks, Nov. 5, 2021, https://www.trgroup.co.nz/blog/posts/2021/november/tr-group-orders-20-hydrogen-fuel-cell-hfc-electric-trucks/ (last visited July 31, 2022). On November 4, 2021, the New Zealand Energy Efficiency & Conservation Authority ("EECA") – the government agency apparently funding the endeavor – issued its own release stating that the "EECA welcomed the *news today* that . . . TR Group *has ordered* 20 heavy hydrogen fuel cell trucks for delivery to New Zealand next year, with $4 million in co-funding from the COVID Response and Recovery Fund (CRRF) and an additional $2 million in co-funding from EECA." *See also* Hydrogen-Powered Heavy Freight Trucks to Hit New Zealand Roads, Nov. 4, 2021, https://www.eeca.govt.nz/about/news-and-corporate/news/hydrogen-powered-heavy-freight-trucks-to-hit-new-zealand-roads/ (last visited July 31, 2022). Notably, TR Group Ltd. had issued a July 20, 2020 press release stating that it had signed a memorandum of understanding with Hiringa to offer heavy fuel cell electric trucks in New Zealand at some point, but there was no certainty as to when or how many. TR Group Ltd. instead simply stated that it "hope[d] that this partnership be

- 74 -

first units will be in New Zealand in mid-2022 for performance testing with the balance arriving towards the end of the year." Even if Hyzon's belated explanation was accepted at face value, it constitutes an admission that the Hiringa-"facilitated" orders were far from binding, as they were subject to undisclosed preconditions, including validation trials and hydrogen infrastructure buildouts that would not occur, at the earliest, until the latter half of 2022.

103. Addressing the claim that Legacy Hyzon was "Just a Repackaging of Its Chinese Parent Company, a 17-Year-Old Business Recently Valued as a Microcap" and the 81% decline in parent Horizon's fuel cell sales since 2019, Hyzon's October 5, 2021 rebuttal again minced words, countering that the Blue Orca Report improperly conflated Horizon and one of its operating subsidiaries, Jiangsu Horizon. But Hyzon failed to address Blue Orca's statements about the actual decline in market capitalization in the shares listed on the OTC exchange in China. As clarified in the 1st Iceberg Research Report, one of Horizon's operating subsidiaries had been listed and delisted and that the same operating subsidiary was responsible for most of Horizon's fuel cell sales.

---

fruitful. . . ." *See* Fuel Cell Partnership with Hiringa Energy, July 20, 2020, https://www.trgroup.co.nz/blog/posts/2020/july/fuel-cell-partnership-with-hiringa-energy/ (last visited July 31, 2022).

104.    Responding to the post-2019 decline in fuel cell sales from the Blue Orca Report, Hyzon's October 5, 2021 rebuttal quips that "[a]lthough not relevant to Hyzon's future business," "Hyzon understands that Jiangsu Horizon shipped more than 26 megawatts of fuel cells in 2019 and more than 36 megawatts of fuel cells in 2020."   Once again, Hyzon dodged the issue—Blue Orca's simple calculation, supported by citations to documentary evidence, that Horizon had sold fuel cell battery systems installed in 400 vehicles during 2019, 100 vehicles during 2020, and 38 vehicles during the first half of 2021.  Hyzon's rebuttal instead references the shipment of "megawatts of fuel cells."

105.  Hyzon's October 5, 2021 rebuttal also addressed the Blue Orca Report's statements that Legacy Hyzon's margins in the Merger Proxy and in the February 2021 Investor Presentation were overstated.  Among other things, the Blue Orca Report cited as evidence of the overstated margins industry participants, a white paper and a former Legacy Hyzon executive, which showed that Legacy Hyzon could not generate any free cash flow over the following five years,  Hyzon's October 5, 2021 rebuttal once again avoided the factual issues and instead claimed that Legacy Hyzon's statements were aspirational (i.e., "Hyzon management has long articulated its view of being at the vanguard of an industry in its nascency that it believes will develop substantially beyond its current size, enabling Hyzon to capture a robust profitability profile on the back of its technology.").  What Hyzon

- 76 -

did not do is contest the specific discrepancies identified by the Blue Orca Report. Hyzon did not contest that the 32% margins provided were nearly twice the industry average and impossible for a company that is retrofitting vehicles made by other companies. Nor did the Blue Orca Report contest the statement by a "former Hyzon senior executive" that "Hyzon would likely generate gross margins of 5-10% on its vehicle sales at best." And the rebuttal ignored the fact that the much lower anticipated margins made it impossible for Legacy Hyzon to generate free cash flows over the following five years—or Hyzon simply chalked that up to more aspirational speech.

106. On October 6, 2021, Iceberg Research published its first report. Iceberg Research expressly stated that it had conducted its own research in reviewing the Blue Orca Report, that it agreed with each of Blue Orca's key findings, and that its own Report "contains new information on Legacy Hyzon." The 1st Iceberg Research Report revealed that Legacy Hyzon's "parent Horizon Fuel Cell Technologies Pte Ltd ('Horizon') saw its 2019 sales surge, thanks to one customer," that "this client was in financial trouble by the end of the year," and that "[t]his was never disclosed" by Legacy Hyzon. It further stated that "Hyzon's corporate governance puts its minority shareholders at risk" because "Horizon holds the largest block of Hyzon shares, and controls both management and the board of the two entities." The 1st Iceberg Research Report emphasized that Horizon was not only

- 77 -

Hyzon's majority shareholder, then holding 63% of its shares, but that it was also "Hyzon's key source of hydrogen fuel cells under a supply agreement signed in January 2021."  According to Iceberg Research, "[a]lmost all Horizon's sales come from its Chinese subsidiary Jiangsu Qingneng New Energy Technologies Co., Ltd," and "Qingneng's financials show most of the 2019 spike was due to one customer, Shanghai SunLong Bus Co., Ltd."  As to that "one customer," the 1st Iceberg Research Report stated:

> ***Qingneng and Horizon never disclosed that SunLong was and is still in financial distress.*** SunLong's parent company Shenzhen-listed Tunghsu Optoelectronic Technology defaulted on three bonds (RMB 4.7bn or ~$666m) towards the end of 2019, despite reporting a $2.6bn cash stack at the end of September. The filings of both Qingneng and Beijing SinoHytec (北京亿华通科技股份有限公司), a much larger fuel cell peer and also a SunLong supplier, show SunLong's struggles continued in 2020.
>
> Qingneng's free cash flow plunged to negative RMB49.7m ($7m) for the 1H20 period. The drop was mainly due to sales, which fell 36% YoY to RMB 16m ($2.4m), and poor collections on its SunLong receivables. We estimate that Qingneng collected just RMB 1m of its end-2019 SunLong receivables (RMB 56.5m or $8m).
>
> Yet, just 5% of the SunLong receivables were recognised as bad debts at the end of June 2020. Qingneng chose to sweep this problem under the carpet. By contrast, SinoHytec recognised SunLong's problems and impaired 28% of its SunLong receivables in the 1H20 period, up from 16% at the end of 2019.

107.  The 1st Iceberg Research Report further warned that "[t]he same Horizon that did not disclose its customer default now has extensive control of Hyzon through its 63%-shareholding" and that "[t]his may create the risk that

Horizon gets access to the ~$500m cash pile Hyzon raised through the July 2021 SPAC merger, by charging Hyzon exorbitant prices to support its fuel cell business, to the detriment of minority shareholders," a process it referred to as "'拆东补西' or 'pulling down the east wall to repair the west wall.'"

108.    The 1st Iceberg Research Report also lamented that in the Merger Proxy, "Hyzon boasts of its superior fuel cell technology" but that "[w]e believe these claims are exaggerated."   According to the 1st Iceberg Research Report, "Hyzon boasts of its technical superiority, in particular, its G3 Titan fuel cells lead the world on volumetric power density ('VPD' of 5.48-6.08) and gravimetric power density (GPD of 5.03-5.54)," citing a slide from the same February 2021 Investor Presentation.  According to Iceberg Research, the "[d]ata assessed by third-party TUV Rheinland" cited in that  investor presentation "was from 'short stack testing' and merely points to the '…potential of using full power fuel cells up to 500hp (370kW) for heavy mobility applications . . . .'"  Instead, according to Iceberg Research, "Hyzon's existing product — the 150 kW G2 fuel cell — underperforms most peers.  Its GPD of just 2.31 kW/kg is much lower than Ballard's 140 kW FCgen – HSP  at 4.7 kW/kg."

109.    The 1st Iceberg Research Report further stated that "we think customers will be reluctant to buy trucks whose warranties are covered by Hyzon, not by

original equipment manufacturers ('OEMs')."    The Report goes on to detail in relevant part as follows:

> ***Reliable warranties are crucial to industrial clients that intensively use their vehicles***. Hyzon does not build trucks. It converts OEM's internal combustion engine vehicles (e.g., DAF) to hydrogen-fueled trucks through its 50.5%-owned joint venture — Hyzon Motors Europe BV — with Netherlands-based Holthausen Clean Technology Investments BV.
>
> ***We were informed by a Holthausen representative that Hyzon, not the OEM, will cover the warranty.*** Hyzon's clients will then have to trust that Holthausen and Hyzon are able to service the warranty. Holthausen is run by a father and son team, Carl and Max Holthausen. According to a March 2021 report by Dutch newspaper Het Financieele Dagblad, the Holthausens first experimented with hydrogen as a fuel about 10 years ago, first as a generator, followed by a boat, a remote-controlled car, a drone, then finally a "Hesla", a hydrogen-powered Tesla Model S.
>
> ***We expect many industrial customers will be reluctant to buy Hyzon's vehicles when established OEMs such as Toyota, Hino, and General Motors are lining up to launch their own hydrogen trucks***. The likes of Daimler Trucks began testing its Mercedes-Benz GenH2 prototype truck in May this year while South Korea's Hyundai plans to roll out 1,600 fuel cell trucks by 2025.

110.    On November 16, 2021, another shoe fell.    Iceberg Research published the 2nd Iceberg Research Report.    Notably, Legacy Hyzon stated at the time of Merger that it was on track to deliver 85 vehicles during 2021, garnering it some $37 million in revenues.[48]    However, as the 2nd Iceberg Research Report noted, "Hyzon ended the third quarter [ended September 30, 2021] with the sale of only two trucks

---

[48]    *See* February 2021 Investor Presentation at 39 and Merger Proxy at 105.

recorded at the start of August," and "[n]o other vehicle seems to have been delivered since then and we are 45 days from the end of the year."  In short, it was virtually impossible for Hyzon to deliver on one of the "Contracted Orders" Legacy Hyzon had claimed in the February 2021 Investor Presentation to be "100% Certain."

111.   On January 12, 2022, Decarb disclosed that the SEC had opened a formal investigation into the Company's disclosures related to the issues raised in the Blue Orca Report.  The SEC served a subpoena on Decarb seeking various documents and information.  Upon information and belief, that investigation remains ongoing.

112.   In the wake of the Blue Orca Report, the Iceberg Research Reports and the SEC investigation, the market price of Decarb stock has declined precipitously, trading below $3 per share by July 5, 2022, or **70% below** the IPO price of $10 per share and **70% below** the record date price of $10 per share.

113.   Further bolstering the charges made in the Blue Orca and Iceberg Research Reports, in January 2022 Decarb disclosed that it anticipated its 2021 financial results would reflect a much lower average selling price ("ASP") per vehicle due to product mix and lower multi-year revenue recognition for the majority of sales, which the Company said would result in materially lower-than-previously-forecast revenues and margins.  Indeed, after the Merger closed, during Hyzon's third quarter 2021 earnings conference call on November 12, 2021, it disclosed that

- 81 -

it had suddenly shifted its deployment focus to Asia, where ASPs are approximately half that of other regions. Stock research analysts at D.A. Davidson & Company would report that during a "management meeting" they hosted with Hyzon in January 2022, Hyzon disclosed that contrary to the Merger Proxy's claims that its own New York and Illinois fuel cell production facilities would be fully operational by the end of 2021, neither facility was yet operational, leaving Hyzon indefinitely reliant upon its former parent, now controlling shareholder and sole supplier of its key fuel-cell components, Horizon, and emphasizing that Hyzon's margins would remain low as a result.[49] In short, this demonstrates that the Merger Proxy misrepresented Hyzon's ability to operate independently from its former parent and the adverse impact that would have on its financial results.

114. On February 15, 2022, stock research analysts with Morgan Stanley, which served as the co-placment agent with Goldman Sachs for PIPE financing in connection with the Merger, issued an initiation report on Hyzon stock. Morgan

---

[49] *Compare* Merger Proxy at 163 ("Hyzon expects that its first fuel cells will be manufactured at the facility in Rochester, New York, by the end of 2021 and that production . . . in Illinois will also begin by the end of 2021.") and D.A. Davidson & Company, *4Q:21 Preview: Steady Global Expansion Continues*, Mar. 17, 2022 ("**The build-outs in Chicago and Rochester.** We hosted management meetings in January with investors, where HYZN provided some additional color on its US facility build-outs. The bottom line is that delays continue, but HYZN is lucky that it is able to obtain key fuel-cell components from former parent company Horizon. In the near-term, however, margins may be challenged.").

Stanley confirmed that the lofty margin projections Defendants provided in the Merger Proxy were materially false and misleading in that Legacy Hyzon, which was not an OEM, could never achieve them, stating in pertinent part: "Our FY25 EBITDA margin estimate of 0.2% is *~1500bps below* management's FY25 EBITDA margin target (*which is in line with best in class mature OEMs & suppliers*)."[50]

115. Morgan Stanley also warned that the Hyzon fuel cell "durability/power density claims" in the Merger Proxy "*remain unproven*," stating in pertinent part that:

> While HYZN's power density claims would undoubtedly place the company well ahead of BEV and FCEV peers, the company's limited operating history and relatively limited level of accumulated real-world miles *prevent a more fulsome confirmation of the company's technology claims*. With the company also continuing to source fuel cell systems from Horizon in the near-term, reliability and quality will remain two key variables as the company ramps its domestic manufacturing capabilities in the United States.
>
> *Fuel cells for HYZN trucks that are currently in production are being sourced from Horizon and are the G2 model*. Though Horizon has sold over 500 systems and 27MW of fuel cell capacity in 2019 including 10 units of its 150kW (2nd gen/G2) stacks, the majority of these systems (350) were used in light-duty truck applications that were deployed in 2019. Roughly 15% have also been used in some heavy truck (70) and city bus applications (5).[51]

---

[50] *See* Morgan Stanley & Co. LLC, *Fueling the Future of Hydrogen; Initiate at EW, $7PT*, Feb. 15, 2022 at 2.

[51] *Id.* at 46-47.

116.    On March 30, 2022, Hyzon filed its 2021 Annual Financial Report with the SEC on Form 10-K disclosing that while it had reported having sold 87 trucks during 2021, all but five of those vehicles had been sold in China.  It further disclosed that on November 23, 2021, the Company had entered into a stock warrant agreement with one of its large Chinese customers to purchase up to two million shares of Hyzon stock, at an exercise price of $7.75 per share (the per share closing price of Hyzon's stock that day), revealing that Hyzon had awarded that purported customer stock options potentially worth millions of dollars in exchange for purchasing its vehicles.  It also disclosed that in December 2021, Hyzon sold 20 vehicles to another joint venture partner in China.  In sum, while Hyzon reported delivery of 87 vehicles during 2021 for a contract value of just $19.6 million—less than half of its projected $37 million target for 85 vehicles being sold during 2021— Hyzon's independent outside auditors would not permit it to recognize the full contract values on delivery of those vehicles due to collection concerns raised by its auditor.  Accordingly, Hyzon reported only $6 million in sales for 2021.

117.    The 2021 10-K further disclosed that in response to the revelations about Hyzon's true business metrics and financial prospects, "certain of the Company's potential suppliers and partners indicated that they were suspending negotiations with [Hyzon] concerning supplying [Hyzon] with key components necessary to produce [its] vehicles." Hyzon explained that the "negative publicity"

had "adversely affected [its] brand and reputation," which "makes it more difficult for [it] to attract and retain employees, partners and customers, reduces confidence in [its] products and services." As a result of those difficulties, it further explained, "customers, potential customers, partners and potential partners have failed to award [it] additional business or cancelled or sought to cancel existing contracts or otherwise, directed or may direct future business to [its] competitors. . . ."

118.   On April 12, 2022, less than two months after the SEC investigation was announced, the *Wall Street Journal* published a report that Hyzon CFO Mark Gordon was resigning following the announcement of the SEC investigation into the Blue Orca Report's claims that "some orders for Hyzon vehicles weren't real." The *Wall Street Journal* report noted that rather than the $37 million in fiscal 2021 revenues that Hyzon had stated it was on track to report in Merger Proxy—in connection with its effort to encourage shareholders to vote in favor of the Merger and to dissuade them from exercising their Redemption Rights—Hyzon had only reported $6 million in revenues for fiscal 2021.[52]   The *Wall Street Journal* report further noted that the Company only "expects to deliver 300 to 400 vehicles this year" (2022), which is upwards of 50% less than the 658 vehicles the Company had said in the Merger Proxy it was on track to deliver during 2022.

---

[52] *See* Mark Maurer, Hyzon Motors Recruits New CFO Months After SEC Subpoena, Wall St. J., April 12, 2022.

## VI. The Merger Was Unfair to Unaffiliated Holders of Class A Stock

### A. The Merger Process Suffered from a Myriad of Conflicts of Interest

119. For at least three reasons, Decarb's fiduciaries were hopelessly conflicted when sourcing, negotiating, and executing the Merger.

120. First, due to their economic interests in Class B Founder Shares, the Director Defendants were incentivized to get a deal done—any deal at all—even if it was not in the best interests of the public Class A stockholders. As described above at ¶54, the Sponsor initially contributed $25,000 to the Company in exchange for the Founder Shares—*i.e.*, approximately $0.002 per share. Thus, even if the post-Merger company's stock price fell well below Decarb's $10 per share IPO price (which it has), holders of Class B shares were still poised to realize proceeds in the hundreds of millions of dollars.

121. Second, the Director Defendants were beholden to Riverstone—and its owners and operators, Defendants Lapeyre, Leuschen, and Tichio—who controlled Decarb. Riverstone controlled all of the Founder Shares through the Sponsor, placed each of the Director Defendants on the Board, and had the power to remove any of them at any time. The Director Defendants each had had deep ties to Riverstone, both professional and financial. Indeed, Riverstone repeatedly placed these same Director Defendants on boards of other SPACs founded under Silver Run and the "Decarbonization Plus" banner, providing them opportunities to realize significant

profits from ownership of additional Founder Shares in other SPACs.  Riverstone appointed Defendant Anderson CEO and allowed his WRG entity to participate heavily in the Founder Shares.  Given all of these ties, the Director Defendants could not act independently from Riverstone and entirely lacked the incentive or practical ability to "say no" to any deal proposed by Defendants Lapeyre, Leuschen, and Tichio.

122.    Third, in order to force the deal through no matter the consequences for Decarb stockholders, the Director Defendants failed to obtain an unbiased third-party valuation of Hyzon or a fairness opinion and instead hired a completely conflicted investment banker, Goldman Sachs, that was simultaneously marketing Hyzon's *bona fides* to Decarb and serving as an investment banker and placement agent to Decarb.  Goldman Sachs then also owned a 12% interest in Riverstone.  Given the extensive personal and professional ties between Goldman Sachs, Riverstone and several of the Director Defendants, as detailed herein, Goldman Sachs was conflicted.  Likewise, due to their still contingent interest in 60% of the investment banking fees Citi and Credit Suisse had been promised in connection with the Decarb IPO, Citi and Credit Suisse were conflicted and served as a mere rubber stamp for any deal now desired by Riverstone.  And that the Board brought in Citi and Credit Suisse at the eleventh hour as additional purported independent financial advisors—when the due diligence was largely complete and the deal terms

had been largely negotiated—provided cold comfort.  Moreover, Citi and Credit Suisse had both recently earned $11 million in fees for underwriting Decarb's IPO and could then reasonably anticipate receiving millions of dollars more in investment banking fees from Riverstone in the future.

123.   In short, no disinterested party was effectively watching out for the unaffiliated holders of Decarb's Class A common stock.

**B.   Decarb Class A Stockholders Did Not Have a Fully Informed Opportunity to Elect Whether to Redeem Their Stock**

124.   The Merger was not fair to holders of Class A stock.  After the market learned the facts presented in the Blue Orca and Iceberg Research Reports, the price of Decarb Class A stock plummeted and remains well below the $10 per share IPO and record date price.  By July 2022, the price of Decarb Class A stock had fallen below $3 per share, more than *70% below* the redemption price.

125.   Crucially, the Merger Proxy and other public disclosures by Decarb insiders contained material omissions or were materially misleading, such that Class A stockholders were not provided with all material information necessary to decide whether to redeem their shares ahead of the Merger.  In particular, the disclosures were grossly deficient for at least the following reasons:

126.   First, although Defendants had been touting the strength of one of Legacy Hyzon's purportedly largest customers at the time of Merger, Hiringa, who had supposedly signed a binding agreement to "acquire" 1,500 trucks by 2026,

including 20 trucks by 2021, Hiringa was not in fact a customer of Legacy Hyzon but a would-be distributor.  Hiringa had neither the capability nor the then-current intent to purchase trucks from Legacy Hyzon.  These facts rendered Legacy Hyzon's projections materially false and misleading.

127.   Second, because the 20 trucks Legacy Hyzon claimed would be sold to Hiringa by the end of 2021, accounting for 24% of guided deliveries that year, were not in fact slated to be delivered in 2021, Legacy Hyzon's 2021 projections provided in the Merger Proxy were materially false and misleading.

128.   Third, in the lead up to completing the Merger, Legacy Hyzon removed a bevy of big blue chip companies accounting for an estimated $700 million in sales without correspondingly lowering its financial guidance.  As a result, the lofty financial projections the Company was providing were materially false and misleading and lacked a reasonable factual basis.  The removal of these brand-named customer orders previously identified as "100% certain" or "highly probable" demonstrates those orders were illusory, and that the delivery and revenue targets Defendants claimed they were on track to meet were based on illusory customers.

129.   Fourth, the Board should have discovered in its "***extensive due diligence***" and disclosed that several early senior Legacy Hyzon executives left the Company in large part over their concerns with how Legacy Hyzon had been misrepresenting its customer contracts.  The failure to disclose these facts to

investors rendered statements regarding the Board's purported due diligence activities materially false and misleading.

130. Fifth, that the business of Legacy Hyzon, while still part of Horizon, had been experiencing a dramatic sales decline since 2019 was a material known trend that the Company should have disclosed to investors. That trend is irreconcilable with Defendants' representations that the fuel cell technology Legacy Hyzon had planned to market was as valuable as represented.

131. Sixth, Defendants claimed Legacy Hyzon could obtain profit margins of more than 33% by 2025—when its business model would in fact afford profit margins of 5% to 10% *at best*. Defendants also claimed that Legacy Hyzon would turn cash flow positive as early as 2023 or generate annual EBITDA of $505 million by 2025—again, when its business models did not support such projections. As a result, Legacy Hyzon's financial projections provided in the Merger Proxy were materially false and misleading. A fairness opinion, an unbiased third-party valuation, and/or unconflicted financial advisors could have confirmed these adverse facts.

132. Seventh, meaningful due diligence would have at least called into question why two of Legacy Hyzon's Chief Technology Officers—who would have been the key officers in charge of its technology—had resigned since just 2020 in quick succession. These departures, which occurred despite the obvious financial

- 90 -

incentives to stay, indicated that the executives had little faith in Legacy Hyzon and its technological prospects, and should have been disclosed to investors.

133.   Eighth, Defendants boasted of Legacy Hyzon's technical superiority in its fuel cells but those claims were exaggerated.  In reality, the data cited by Defendants was from short stack testing and merely points to the potential of using full power fuel cells.  Instead, Legacy Hyzon's existing product underperforms most peers.

134.   Ninth, because Legacy Hyzon—not the OEMs producing the retrofitted vehicles Legacy Hyzon was selling—was responsible for the warranties, many would-be purchasers of Legacy Hyzon's fuel cell vehicles were unlikely to make purchases from Legacy Hyzon.

135.   As a result of these material omissions and/or misleading statements, Class A stockholders were not provided with all material information to decide whether to redeem their stock.  And those who did not redeem their stock have suffered substantial damages as a result.

## CLASS ACTION ALLEGATIONS

136.   Plaintiff, a stockholder in the Company, brings this action individually and as a class action pursuant to Court of Chancery Rule 23 on behalf of himself and all holders of Decarb common stock (the "Class") who held such stock prior to the July 13, 2021 redemption deadline and were entitled to elect to redeem their shares

- 91 -

but did not (except the Defendants herein, and any person, firm, trust, corporation, or other entity related to or affiliated with any of the Defendants) and who were injured by Defendants' breaches of fiduciary duties and other violations of law.

137. This action is properly maintainable as a class action.

138. A class action is superior to other available methods of fair and efficient adjudication of this controversy.

139. The Class is so numerous that joinder of all members is impracticable. The number of Class members is believed to be in the thousands, and they are likely scattered across the United States.  Moreover, damages suffered by individual Class members may be small, making it overly expensive and burdensome for individual Class members to pursue redress on their own.

140. There are questions of law and fact that are common to all Class members and that predominate over any questions affecting only individuals, including, without limitation:

(a) whether Defendants breached their fiduciary duties to Plaintiff and the Class;

(b) whether the Controller Defendants controlled Decarb;

(c) whether "entire fairness" is the applicable standard of review;

(d) which party or parties bear(s) the burden of proof;

(e)    the existence and extent of any injury to the Class or Plaintiff caused by any breach;

(f)    the availability and propriety of equitable re-opening of the redemption period; and

(g)    the proper measure of the Class's damages.

141.    Plaintiff's claims and defenses are typical of the claims and defenses of other Class members, and Plaintiff has no interests antagonistic or adverse to the interests of other Class members.  Plaintiff will fairly and adequately protect the interests of the Class.

142.    Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.

143.    Defendants have acted in a manner that affects Plaintiff and all members of the Class alike, thereby making appropriate injunctive relief and/or corresponding declaratory relief with respect to the Class as a whole.

144.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants; or adjudications with respect to individual members of the Class would, as a practical matter, be dispositive of the interest of other members or substantially impair or impede their ability to protect their interests.

## FIRST CAUSE OF ACTION

### DIRECT CLAIM FOR BREACH OF FIDUCIARY DUTY
### AGAINST THE DIRECTOR DEFENDANTS

145.   Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

146.   As directors of Decarb, the Director Defendants owed Plaintiff and the Class the utmost fiduciary duties of care and loyalty, which subsume an obligation to act in good faith, with candor, and to make accurate and complete material disclosures to Decarb stockholders.

147.   These duties required the Director Defendants to place the interests of Decarb stockholders above their personal interests and the interests of the Controller Defendants.

148.   Through the events and actions described herein, the Director Defendants breached their fiduciary duties to Plaintiff and the Class by prioritizing their own personal, financial, and/or reputational interests and approving the Merger, which was unfair to Decarb Class A stockholders.

149.   The Director Defendants also breached their duty of candor by issuing the false and misleading Merger Proxy.

150.   As a result, Plaintiff and the Class were harmed when, deceived by the false and misleading disclosures and the Director Defendants' approval of the Merger, they did not exercise their Redemption Rights prior to the Merger.

151.   In addition, members of the Class approved the acquisition of Hyzon based on false and misleading information.

152.   Plaintiff and the Class suffered damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

### DIRECT CLAIM FOR BREACH OF FIDUCIARY DUTY
### AGAINST THE CONTROLLER DEFENDANTS

153.   Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

154.   The Controller Defendants were Decarb's controlling stockholders. Specifically, the Controller Defendants controlled all of the Class B Founder Shares, elected (and could remove at any time) the other members of the Board, had deep personal and financial ties to the members of the Board they selected (including by granting them material financial interests in the Class B Founder Shares and by appointing them to other boards of directors of SPACs created under the Silver Run or Decarbonization banners), and held officer roles at Decarb.

155.   The Controller Defendants owed Plaintiff and the Class fiduciary duties of care and loyalty, which include an obligation to act in good faith, with candor, and to provide complete and accurate material disclosures to Decarb stockholders.

156.   At all relevant times, the Controller Defendants had the power to control, influence, and cause—and actually did control, influence, and cause—the Company to enter into the Merger.

157.   The Merger was unfair, reflecting an unfair price and unfair process.

158.   Through the events and actions described herein, the Controller Defendants breached their fiduciary duties to Plaintiff and the Class by agreeing to and entering into the Merger without ensuring that it was entirely fair to Plaintiff and the Class.

159.   As a result, Plaintiff and the Class were harmed when, deceived by the false and misleading disclosures and the Board's approval of the Merger, they did not exercise their Redemption Rights prior to the Merger.

160.   In addition, members of the Class approved the acquisition of Hyzon based on false and misleading information.

161.   Plaintiff and the Class suffered damages in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment and relief in his favor and in favor of the Class, and against Defendants, as follows:

A.     Declaring that this Action is properly maintainable as a class action;

B.      Finding the Director Defendants liable for breaching their fiduciary duties owed to Plaintiff and the Class;

C.      Finding the Controller Defendants liable for breaching their fiduciary duties, in their capacity as Decarb's controlling stockholders, owed to Plaintiff and the Class;

D.      Certifying the proposed Class;

E.      Awarding Plaintiff and the other members of the Class damages in an amount to be proven at trial, together with interest thereon;

F.      With respect to Class members who had the right to seek redemption and still hold their shares, equitably re-opening the redemption window to allow them to redeem their shares at the prior redemption price, as per the terms of the Company's foundational documents;

G.      In the alternative, rescinding the Merger and returning the capital raised in Decarb's IPO to the Company's public stockholders, as well as all other rescissory damages;

H.      Awarding Plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

I.      Awarding Plaintiff and the Class such other relief as this Court deems just and equitable.

ANDREWS & SPRINGER LLC

*Of Counsel*:

*/s/ David M. Sborz*

Peter B. Andrews (#4623)

Samuel H. Rudman (*PHV* forthcoming)
Mary K. Blasy (*PHV* forthcoming)
ROBBINS GELLER RUDMAN
 & DOWD LLP
58 South Service Road, Suite 200
Melville, NY 11747
(631) 367-7100

Craig J. Springer (#5529)
David M. Sborz (#6203)
Andrew J. Peach (#5789)
Jackson E. Warren (#6957)
4001 Kennett Pike, Suite 250
Wilmington, DE  19807
(302) 504-4957

*Counsel for Plaintiff*

Randall J. Baron
Travis E. Downs III (*PHV* forthcoming)
Benny C. Goodman III
Erik W. Luedeke
Brian E. Cochran (*PHV* forthcoming)
ROBBINS GELLER RUDMAN
 & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
(619) 231-1058

Brian J. Robbins (*PHV* forthcoming)
Gregory E. Del Gaizo
ROBBINS LLP
5040 Shoreham Place
San Diego, CA 92122
(619) 525-3990

Dated: August 1, 2022

- 98 -

# EXHIBIT 1



*THIS RESEARCH REPORT EXPRESSES SOLELY OUR OPINIONS. We are short sellers. We are biased. So are long investors. So is Hyzon. So are the banks that raised money for the Company. If you are invested (either long or short) in Hyzon, so are you. Just because we are biased does not mean that we are wrong. Use BOC Texas, LLC's research opinions at your own risk. This report and its contents are not intended to be and do not constitute or contain any financial product advice. Investors should seek their own financial, legal and tax advice in respect of any decision regarding any securities discussed herein. You should do your own research and due diligence before making any investment decisions, including with respect to the securities discussed herein. We have a short interest in Hyzon's stock and therefore stand to realize significant gains in the event that the price of such instrument declines. Please refer to our full disclaimer located on the last page of this report*

## COMPANY: Hyzon Motors Inc. │ NASDAQ: HYZN
## INDUSTRY: Hydrogen Fuel Cell Electric Vehicle SPAC

**PRICE (AS OF CLOSE 9/27/2021)**
## USD 9.21

**MARKET CAP**
## USD 2.3 BILLION

We are short Hyzon Motors Inc ("Hyzon" or the "Company") (NASDAQ: HYZN), a zero-revenue hydrogen EV SPAC which we liken to a *Chinese Lordstown Motors*. In our opinion, Hyzon's supposed major customers are a fake-looking Chinese shell company incorporated three days before the deal announcement and a tiny New Zealand startup which told us they are not really a customer.

Hyzon is just a repackaging of a flailing Chinese parent company which has been trying to sell the same hydrogen fuel cells without much success for 17 years. The parent entity was delisted from the Chinese OTC exchange in early 2021 at an enterprise value of sub $200 million. Hyzon is just a worse version of this same business in SPAC form, yet trades at 10x the valuation. We think Chinese investors obviously knew best.

Notably for a zero revenue SPAC banking on the future value of its technology to save its business, **two of Hyzon's chief technology officers have resigned in the past 15 months. The Company is only 20 months old.** Ultimately, we think Hyzon's parent has taken advantage of the general suspension of disbelief in financial markets to enrich insiders by repackaging an old technology in a fig leaf of misleading deal announcements and illusory customer contracts.

1. **Hyzon's Largest Customer is a Fake-Looking Chinese Shell Entity Formed 3 Days Before Deal Announced**. We think Hyzon's largest customer looks fake. On September 9, 2021, Hyzon's stock shot up 29% on a pre-market announcement that it secured a major new deal for 500 trucks (including 100 orders in 2021) from a new Chinese customer, Shanghai HongYun. Yet Chinese government records show that Shanghai HongYun was **established only three days before Hyzon announced the deal** and has **no paid in capital**. It has no WeChat account or website. The supposedly major customer appears to be just an empty shell entity. In our opinion, such evidence suggests that Hyzon announced a major order with a fake looking Chinese customer just to pump its stock price.

2. **Channel Checks Reveal Next Largest Customer Not Really a Customer**. Hyzon claims that a New Zealand infrastructure startup named Hiringa supposedly signed an agreement to order 1,500 trucks by 2026, purportedly making it Hyzon's next largest customer. Yet when we channel checked these claims with Hiringa, its executive **clarified that Hiringa was not actually a customer, but a "channel partner"** assisting Hyzon in marketing vehicles to real end customers in New Zealand. Hiringa is a small startup operating out of a house in New Zealand which wants to raise money to build hydrogen fuel stations. Based on our conversation, Hiringa has neither the capability nor the current intention to purchase trucks from Hyzon.

   - **Significant 2021 Delivery and Guidance Miss**. According to Hyzon, Hiringa will account for 24% of the Company's projected deliveries in 2021. Yet Hiringa **stated point blank that no deliveries would be taken in 2021**, and the first validation trucks would be delivered for testing in *March or April 2022*, at the earliest. Hiringa supposedly accounts for 24% of Hyzon's projected 2021 deliveries, so we expect a major guidance miss. We think it is highly misleading for Hyzon to continually reaffirm delivery and revenue guidance and characterize such revenues as "100% certain" when Hiringa admits that it will not take any deliveries this year.

3. **Phantom Big-Name Customers Suggest Overstated Orders and Financial Projections**. In its much hyped initial investor presentation filed in February 2021, Hyzon generated considerable buzz around its SPAC by claiming that big household names - including **Coca Cola, Ikea, and Heineken** - were already "top tier customers" and "partners." Yet in the following months, after other EV SPACs like Lordstown Motors got into trouble for fabricating customer contracts, Hyzon quietly dropped these household names from its investor decks. In the four months between February 2021 and July 2021, nearly all of Hyzon's previously named blue chip customers disappeared from its disclosures altogether. In aggregate, Hyzon dropped customers supposedly accounting for $700 million in future orders from its subsequent decks. Remarkably however, despite apparently losing many of its most prominent customers, Hyzon's financial projections remained unchanged. We think it's highly misleading for Hyzon to have apparently lost most of its blue-chip customers without substantially revising future revenue projections downward.

- **Former Executives Left in Part Because of Concerns over Misrepresentations on Customer Contracts**. We spoke with one former senior executive who left the Company after only a few months.  He said he "didn't like the way [customer contracts] were being presented" and compared Hyzon "**a bit like unfortunately what Nikola was doing**… *I was very uncomfortable with that*."  In our opinion, such accounts corroborate the other evidence showing that Hyzon is likely overstating customer relationships or misrepresenting its contracts.

4.  **Hyzon is Just a Repackaging of Its Chinese Parent Company, a 17-year-old Business Recently Valued as a Microcap**. Hyzon is just a repackaging of its parent company, *Horizon*, a Chinese hydrogen fuel cell business that recently delisted from the Chinese OTC market in March 2021 at an enterprise value of just $190 million.  *Horizon* has been trying to sell its fuel cell technology for years, without meaningful success.  Chinese filings published by *Jiangsu Horizon* suggest that its **fuel cell unit sales have declined by 81% since 2019**.  By the time Hyzon's parent delisted, *Horizon* struggled with minimal (and declining) sales and a microcap valuation, making it absurd that Hyzon garnered a 10x valuation on the notion that it has some preferential "access" to the same fuel cell technology.

5.  **Hyzon's Projections are Fantasy: Parent's Financials and Former Executives Suggest Hyzon May Earn 5-10% Gross Margins, at Best**.  Without any current revenue, Hyzon's share price is contingent on its projected 32% gross margins on future vehicle sales.  This is pure fantasy.  To put Hyzon's projected gross margins in perspective, a 32% projected gross margin is nearly the twice the industry average for established vehicle manufacturers. The leading EV brand, Tesla, reports a gross margin of 22%.  Hyzon doesn't make vehicles, nor does it plan to.  It pays other companies to retrofit vehicles with fuel cells purchased from its parent company.  A former Hyzon senior executive projected that Hyzon would likely generate **gross margins of 5-10% on vehicle sales at best.** Even when Hyzon starts making fuel cells itself, which will not be for some time, its parent's Chinese financials show that fuel cell manufacturing is only a small fraction of the EV production value chain.  At either industry average margins (likely too generous) or a more realistic 5-10% gross margin, we don't think Hyzon will generate any positive EBITDA or free cash flow in the next five years.

6.  **Two CTO Resignations in 15 Months**.  Hyzon is a zero revenue SPAC whose stock price is contingent on the value of its yet undeveloped vehicle technology to generate future revenues.  Yet **two of Hyzon's CTOs have resigned in the past 15 months**, even though Hyzon was only formed 20 months ago.  The first CTO resigned after just five months at Hyzon.  The second, Gary Robb, just resigned (September 2021). If Hyzon's technology is supposedly world class, and the foundation for its hockey stick like future revenue growth, we question why the critical officers in charge of such technology apparently have such little faith in either the Company or the technology (or both) that they stepped down, despite the obvious financial incentives to remain at the SPAC.

Ultimately, we think Hyzon's parent has taken advantage of the general suspension of disbelief in financial markets to enrich insiders by repackaging an old technology in a fig leaf of misleading deal announcements and illusory customer contracts.  In our opinion, it is akin to a *Chinese Lordstown Motors*.

1.   **Hyzon's Largest Customer is a Fake-Looking Chinese Shell Entity Formed 3 Days Before Deal Announced**.

We think Hyzon's largest customer looks fake.  On September 9, 2021, Hyzon's stock shot up 29% largely on the strength of a pre-market announcement by the Company that it had secured a major new vehicle deal.

Hyzon announced that it had signed a Memorandum of Understanding ("MoU") with a new Chinese customer, Shanghai Hydrogen HongYun Automotive Co., Ltd. ("Shanghai HongYun"), for the sale of 500 trucks.  In the announcement, Hyzon claimed that the customer expects to order 100 of these trucks in 2021, with the remaining 400 trucks to be ordered in 2022.  This makes Shanghai HongYun by far one of Hyzon's largest near-term customers.

| # of Vehicles | FY2021 | FY2022 |
|---|---|---|
| Shanghai HongYun | 100 | 400 |
| Company Delivery Guidance as of July 2021 | 85 | 658 |

*Source: Hyzon Disclosures*

To put the size of the order in context, the 100-truck-order supposedly placed in 2021 is larger than the Company's previously guided total deliveries for the year.  The market duly reacted, causing Hyzon's stock to rip as high as 29% on the day.

If authentic, Hyzon's deal with Shanghai HongYun is worth as much as $250 million.[1]  For a commitment of that size, we would typically expect the counterparty to be a deep-pocketed and well-established logistics company with sufficient operating footprint, infrastructure and track record to purchase and deploy 500 new hydrogen fueled trucks.

But when we looked up Shanghai HongYun on China's National Enterprise Credit Information Publicity System, we found that Shanghai HongYun was **established only three days before Hyzon announced the deal**.

*Source: National Enterprise Credit Information Publicity System*

The Chinese corporate registry also shows that Shanghai HongYun has **no paid in capital**.

*Source: National Enterprise Credit Information Publicity System*

With no paid in capital, the customer appears to be merely an empty shell company.  Shanghai HongYun does not yet have an official phone number, email, WeChat or website that we could find.[2]

---

[1] Based on Hyzon's own disclosure of truck prices: Hyzon Investor Presentation July 2021, p23
[2] For those unfamiliar, almost all legitimate Chinese businesses with an operating footprint have a WeChat account.



*Source: https://www.qcc.com/firm/e18cbf89a85f34fdb18d89c09197c675.html*

Hyzon cannot claim that HongYun is the subsidiary of a larger corporation because its two sole shareholders are individuals.



*Source: https://www.qcc.com/firm/e18cbf89a85f34fdb18d89c09197c675.html*

We checked all the companies associated with Kou Jian, the 95% owner and legal representative of HongYun, and Zhong Dequan, the 5% owner of HongYun. All the companies appear to be small. Many of them have no active website or WeChat account and had no more than 5 employees as of 2020.

| Associated Company | Business Description | Connections | Paid In Capital (RMB M) | 2020 Reported Employee Count | Active Website/ WeChat Account |
|---|---|---|---|---|---|
| Shanghai Lanzhou Industrial | Agent for German Natural Clay Paint VOLVOX | Kou Jian is the legal rep and 96% owner | 5 | 1 | Yes |
| Shanghai Yujing Hongcheng Investment Management Consulting | Bookkeeping | Kou Jian is the legal rep and 80% owner | 0.5 | 5 | None |
| Shanghai Muya International Cargo Freight Agent | International Cargo Freight Agent | Kou Jian is the 20% owner | 5 | 2 | None |
| Shanghai Haoliang Furniture | Selling Furniture | Kou Jian is the 5% owner | 0.1 | 1 | None |
| Shanghai Xiangben Precision Machinery | General equipment manufacturing | Zhong Dequan is the legal rep and 70% owner | 0.1 | 0 | None |

*Source: qcc.com*

As we will discuss in the next section, interviews with other purported customers indicate that Hyzon is far behind its vehicle delivery claims to investors and will likely miss guidance both in 2021 and going forward by a wide margin. We suspect that given these and other setbacks, Hyzon was desperate.

This likely explains why Hyzon announced a major order with a Chinese customer formed **just three days before the announcement**, with no paid in capital and no operating footprint, website or WeChat account.  In our opinion, such evidence suggests that Hyzon announced a bogus deal with a fake looking Chinese customer to pump its stock price.

4

**2.   Channel Checks Reveal Next Largest Customer Not Really a Customer; Significant 2021 Delivery and Guidance Miss**

Hyzon's next largest customer is a tiny New Zealand startup who told us they are not really a customer. Based on our conversation, we do not think that Hiringa has the obligation, the intention, or the capability to purchase the trucks Hyzon claimed in its announcement.

Hiringa has long been a key customer in Hyzon's SPAC narrative. At the height of SPAC mania in February 2021, Hyzon announced that it had signed an agreement to build and supply 1,500 hydrogen powered vehicles for Hiringa, with the first batch of 20 trucks "expected to enter service" in 2021.[3]

ROCHESTER, N.Y., Feb. 17, 2021 /PRNewswire/ -- Hyzon Motors Inc. ("Hyzon") and New Zealand's Hiringa Energy ("Hiringa") are pleased to announce the two companies have signed a vehicle supply agreement, with Hyzon commissioned to build and supply Hiringa with zero emission Heavy Goods Vehicles (HGV).
The hydrogen fuel cell-powered trucks, to be assembled at Hyzon's facility in Winschoten, The Netherlands, will be manufactured in full compliance with local New Zealand requirements and the first batch of vehicles are expected to enter service in New Zealand by the end of 2021. Hyzon plans to have up to 1,500 fuel cell trucks on the road in New Zealand by 2026 as part of the agreement with Hiringa.

*Source: [Hyzon Press Release](#)*

Hyzon also highlighted the Hiringa contract in a YouTube promotional video by its CEO Craig Knight in March 2021.



*Source: [https://youtu.be/ZbVH7nRcegg?t=164](#)*

To channel check Hyzon's claims, we spoke with a senior Hiringa executive. Although they remain interested in the project, **Hiringa explained to us that they are not actually a customer**, but a "**channel partner**" for Hyzon's vehicles. Hiringa does not intend to pay for or take title over the trucks, but merely facilitate the sale of hydrogen trucks to third parties.

> *"We're effectively a channel partner model if you like."*

> ***"Our business model is not to buy the trucks. We do the refueling…. we're effectively an unpaid market channel"***

> *"There's no point in us being the middleman. So [the end customer] will physically pay for the trucks and they will physically take title."*

>                                                                   - Hiringa Executive

---

[3] *[Hyzon Investor Presentation February 2021, p18](#)*

**5**

This is not a matter of semantics. According to Hiringa, it has no current intention (or funds) to purchase 1,500 trucks from Hyzon, but merely to act as a conduit to encourage other New Zealand heavy truck operators to purchase trucks from Hyzon.

This makes more sense, as Hiringa does not have anywhere near the financial resources to pay for 1,500 trucks, being a company **with less than 20 employees according to LinkedIn and supposedly operating out of a house in New Zealand**.[4] Rather than purchasing 1,500 trucks, Hiringa plans to build fuel stations with the hope of facilitating future purchases from end customers.

Hiringa also informed us that the **1,500-truck agreement claimed by Hyzon in its investor presentations is not a binding order,** and that it merely represents a right, not an obligation, to buy.

> *"That's a right to buy, not an obligation to buy."*

> *"At the end of the day it's not binding. That's not a binding purchase. It's a purchasing framework."*

> *- Hiringa Executive*

- **Significant 2021 Delivery and Guidance Miss**

Furthermore, Hiringa directly contradicted Hyzon's claims regarding its near-term deliveries.

When Hyzon announced the Hiringa contract, it stated that it expected to deliver the first 20 trucks by the end of 2021, accounting for 24% of its guided deliveries in the year. As recently as August, Hyzon reaffirmed this guidance, projecting 85 truck deliveries and $37 million in revenues in 2021.

| ($USD MILLIONS) | 2021E | 2022E | 2023E | 2024E | 2025E |
|---|---|---|---|---|---|
| **VOLUMES** | | | | | |
| **VEHICLE DELIVERY VOLUMES** | | | | | |
| HEAVY TRUCK (36T-50T) | 74 | 513 | 2,638 | 5,660 | 7,400 |
| MEDIUM TRUCK (12T) | 0 | 110 | 722 | 1,140 | 1,860 |
| CITY BUS (12M) | 11 | 35 | 68 | 340 | 600 |
| CLASS 3 TRUCK / VAN | 0 | 0 | 840 | 4,435 | 7,235 |
| **TOTAL** | **85** | **658** | **4,268** | **11,535** | **17,095** |
| **INCOME STATEMENT** | | | | | |
| VEHICLE REVENUE | 35 | 190 | 948 | 2,176 | 3,129 |
| FUEL CELL REVENUE | 2 | 6 | 17 | 43 | 105 |
| HYZON ZERO CARBON REVENUE | 0 | 1 | 7 | 24 | 52 |
| **TOTAL REVENUE** | **$37** | **$198** | **$972** | **$2,242** | **$3,286** |
| % GROWTH | nm | 412% | 392% | 131% | 47% |

*Source: Hyzon Investor Presentation July 2021*

In its investor presentation, Hyzon insisted that these 2021 orders are "100% certain." Not probable, but "100% certain."

---

[4] According to Hiringa, the small amount of capital that they have raised to date is ringfenced for building hydrogen infrastructure projects i.e. refueling stations, and not for buying trucks.

**6**



*Source: [Hyzon Investor Presentation February 2021](Hyzon Investor Presentation February 2021)*

Yet Hiringa's executive said that **Hiringa will not take any deliveries of Hyzon trucks in 2021 and expects to receive the first four validation vehicles in March or April 2022, at the earliest**.

> *Hiringa: "Realistically with the supply chains, I think they will be arriving in March or April [2022]. There's also some work to do in quarter one in the Netherlands before they ship."*
>
> *Blue Orca: "So you don't actually expect trucks this year? You expect them in the first quarter of 2022?"*
>
> *Hiringa: "...March through May, if you like, or April through June [2022] is when we are going to be doing validation in New Zealand... it's not [a] full commercial operation."*
>
> *Blue Orca: "So you don't expect any trucks to be delivered from Hyzon until at least March or April next year. And those are the four validation units?"*
>
> *Hiringa: "Yep, yep."*
>
> - Hiringa Executive

This directly contradicts Hyzon's claims to investors. According to Hyzon's disclosures, Hiringa will account for 24% of the Company's deliveries in 2021, making it the key to whether Hyzon meets its revenue and delivery guidance for this year. But Hiringa told us point blank that no deliveries would be taken in 2021, and the first validation trucks would be delivered in *March or April 2022*, at the earliest.

Furthermore, Hiringa told us that the remaining 16 trucks ordered from Hyzon would be fulfilled based on testing results of the initial four validation vehicles, which they expect to carry out between March and June 2022 at the earliest.

We asked Hiringa if there was any possibility that they might bring forward the order for the 16 trucks, but Hiringa told us that they do not want to take delivery until they build the commercial hydrogen fuel station infrastructure in New Zealand – which Hiringa indicated would not be until the second half of 2022.

> *"We don't have the [commercial] stations until the second half of the [2022] calendar year. So, we don't want to hold [on to] 16 trucks..."*
>
> - Hiringa Executive

Our call with Hiringa suggests that the 1,500-truck deal was more hype than reality. Based on our conversation, we do not think that Hiringa has the obligation, the intention, or the capability to purchase the trucks Hyzon claimed in its announcement.

Ultimately, we think Hyzon continues to mislead investors by reaffirming 2021 guidance when its purportedly major customer is not actually a customer and states point blank that they will not be taking any vehicle deliveries this year.

**7**

Hyzon Motors Inc. | NASDAQ: HYZN                                                www.blueorcacapital.com

### 3. Phantom Big-Name Customers Suggest Overstated Orders and Financial Projections

In its much hyped initial investor presentation filed in February 2021, Hyzon generated considerable buzz around its SPAC with a deck that included a number of big household names listed as "top tier customers," including Coca Cola, Nestle, Ikea, and Heineken.



*Source: Hyzon Investor Presentation February 2021*

For example, the February deck showed that Hyzon was **finalizing** purchase orders with the likes of **Heineken** and **Ikea** for vehicles to be delivered in 2021. Hyzon also projected **hundreds of millions in revenues from Coca-Cola** in the next five years.



*Source: Hyzon Investor Presentation February 2021*

These names generated considerable enthusiasm, and Hyzon's stock price predictably exploded with investor interest. Yet like many other rotten EV SPACs (e.g. Lordstown Motors), these name brand customer relationships appear to have been largely illusory.

Two months later, Hyzon's April investor presentation showed a very different customer list with most of the notable name brands missing.

Spot the difference:

 

*Source: Hyzon February 2021 Investor Presentation , Hyzon April 2021 Investor Presentation*

**Coca Cola. Gone. Heineken. Gone. Ikea. Gone.**

In the four months between February 2021 and July 2021, nearly all of Hyzon's previously named blue chip customers disappeared from its disclosures altogether. Amusingly, Hyzon was apparently so desperate to fill the gap left by the omission of its blue-chip customers that it included the logo of *Friesland Campina* twice in the latter deck.

In total, Hyzon dropped blue chip customers with orders worth $700 million in future orders from its subsequent investor presentations.

| Company Name | SEC, February 2021 | Company, July 2021 | 5-y Revenue Projection (Units) | 5-y Revenue Projection (USD M) |
|---|---|---|---|---|
| TotalEnergies | ✔ | ✔ | 500+ | 200+ |
| Nestle ✖ | ✔ | ✖ | | |
| Edeka | ✔ | ✔ | 500+ | 200+ |
| Coca-Cola ✖ | ✔ | ✖ | 500+ | 200+ |
| Ikea ✖ | ✔ | ✖ | 500+ | 200+ |
| Heineken ✖ | ✔ | ✖ | 500+ | 200+ |
| FrieslandCampina | | ✔ | 200+ | 80+ |
| Fortescue Metals | ✔ | ✔ | 100+ | 60+ |
| Air Products & Chemicals ✖ | ✔ | ✖ | 50+ | 20+ |
| Viva Energy Australia | | ✔ | | |
| Korea Zinc | ✔ | ✔ | 30 | 15+ |
| PSA International ✖ | ✔ | ✖ | 300 | 80+ |
| Southern California Gas ✖ | ✔ | ✖ | | |
| State of Berlin | ✔ | ✔ | | |
| Port de Barcelona | ✔ | ✔ | | |
| Port of Antwerp | ✔ | ✔ | | |
| Municipality of Groningen | | ✔ | | |
| Neom | ✔ | ✔ | 250 | 100 |
| Centurion | | ✔ | 50+ | 20+ |
| Russell Logistics | | ✔ | 200 | 80+ |
| Hiringa Energy | | ✔ | 1,400+ | 500+ |
| Infinite Blue Energy | | ✔ | | |

*Source: Hyzon Investor Presentations [Feb-21](), [Jul-21]()*

Hyzon achieved early credibility in a crowded field of zero revenue EV SPACs in part by promoting orders from name brand customers, yet without a word it has dropped almost all of these supposed customers from mention in its subsequent investor presentations.

We suspect that Hyzon removed these customers from its disclosures because either the customers backed out of their orders with Hyzon, or the orders were so tenuous to begin with that representing these customers to investors would be misleading to the market.

Between the top of SPAC mania in February and the lukewarm market conditions in July, multiple EV SPACs were exposed for faking customer orders, exaggerating their backlog and exaggerating future revenues, including [XL Fleet, Nikola,]() and [Lordstown Motors](). Perhaps Hyzon, or more likely their lawyers, got religion and realized they had similarly exaggerated customer commitments in their early SPAC presentations to investors.

Remarkably, despite dropping its largest customers, which collectively accounted for at least $700 million in supposed future revenue, Hyzon's financial projections have remained unchanged since February.

| USD M | February 2021 | April 2021 | July 2021 |
|---|---|---|---|
| Backlog under contracts or MoUs | 40 | 55 | 83 |
| Contracted and high probability revenue (70%) | 150 | 150 | 150 |
| Near Term Forecasted Revenue (2021-2022) | 235 | 235 | 235 |
| Five Year Forecasted Revenue (2021-2025) | 6,735 | 6,735 | 6,735 |

*Source: Hyzon Investor Presentations: Feb-21, Apr-21, Jul-21*

This makes little sense. If Hyzon ever had credible orders with these blue-chip clients, then why did it drop them from its investor disclosures? And conversely, if Hyzon has lost the previously announced contracts or the discussions have ground to a halt, then the loss or likely loss of almost $700 million in orders from such critical customers should surely impact its projected revenues going forward.

- **Former Executives Left in Part Because of Concerns over Misrepresentations on Customer Contracts**.

Hyzon's apparent misrepresentation of its key customers at the time of its SPAC is consistent with the comments of one of its former senior executives with whom we spoke. The former executive indicated that he and other early senior Hyzon executives, all of whom left the Company, became uncomfortable with how Hyzon was presenting customer orders to investors.

> *"I just didn't like the way it was being presented. A lot of the stuff that they are saying is open to interpretation how you read that. Saying that they've got all of these orders and things. But a lot of them are **all MoUs which as you know in the business mean basically nothing.***
>
> *They were going out, kind of selling it as really what it wasn't at the time. **A bit like unfortunately what Nikola was doing**. It's kind of a lot of hype, and getting money through that hype from people who don't really understand*
>
> *You know it's great to show all these pictures of renderings of trucks and orders that you may have, but these orders, most of them… 90% of them are MoUs so there's no binding contract, and if you look from when they've announced those [contracts], still none of those have been built or delivered.*
>
> *The only three vehicles they have is what's on their website. These are all prototype vehicles. They're not production vehicles of any type. They've basically been hand built at the facilities. These are the things that I think, if you're going to announce that, say that. Be honest about it.*
>
> ***I was very uncomfortable with that**. A lot of these, if you look at their website, they've loaded lots of them on there of signed meetings they had. All these are MoUs that they've signed. **None of them are binding in any way whatsoever**."*

> - Former Senior Hyzon Executive

SPACs are notorious for fabricating customer contracts or presenting mere discussions as binding orders. Either Hyzon was initially misleading investors about the contracts with major customers or something changed causing it to remove them from its disclosures. In our opinion, Hyzon was either initially misleading the market or it lost these orders between February and July. Either way, we cannot see a scenario in which Hyzon's revenue projections could remain unchanged.

**4.  Hyzon is Just a Repackaging of Its Chinese Parent Company, a 17-Year-Old Business Recently Valued as a Microcap**

There is a misconception in the market, perpetuated by the Company, that Hyzon has a unique first mover advantage because it has access to the allegedly valuable "fuel cell expertise" of its parent company, *Horizon*.

*Horizon* is described by the sell side as a "Singapore-based" company which has "delivered hundreds of fuel cells to date" – purportedly differentiating Hyzon from its competitors which are yet to deliver a meaningful number of vehicles.

**Number of Fuel Cell Commercial Vehicles Delivered and Projected to be Delivered by 2023**

|  | Horizon / HYZON | NIKOLA | HYUNDAI | TOYOTA | KENWORTH | HONDA / ISUZU | DAIMLER |
|---|---|---|---|---|---|---|---|
| FUEL CELL COMMERCIAL VEHICLES DELIVERED BY END OF 2020 | ~500[1] | 0 | 10s | 10s | 0 | 0 | 0 |
| FUEL CELL COMMERCIAL VEHICLES TO BE DEPLOYED BY END OF 2023 | 5,000[2] | 2,000 | 2,000 | No public info | No public info | No public info | No public info |

*Source: Hyzon Investor Presentation February, p31*

The reality, in our opinion, is that Hyzon is simply a SPAC repackaging of a flailing Chinese parent which delisted from the Chinese OTC market at an enterprise value of only $190 million, and which for 17 years had failed to gain meaningful traction with its fuel cell technology.

Between June 2018 and March 2021, Hyzon's parent, *Jiangsu Horizon* ("*Horizon*") was listed on the National Equities Exchange and Quotations (NEEQ), the over-the-counter exchange for Chinese small and medium-sized enterprises. During this time, it was required to file its audited financials and interim/annual reports with Chinese regulators.

Despite Hyzon's attempts to conceal its Chinese origins, *Horizon's* employees and fuel cell manufacturing facilities are located in China.  In March 2021, *Horizon* de-registered from the Chinese stock exchange.  Two months prior, in January 2021 – which we should note was the peak of EV stock market mania – stock options issued to *Horizon's* employees valued *Horizon's* business at a paltry $190 million.[5]

---

[5] This valuation was in line with Jiangsu Horizon's external investment round in August 2020 which valued *Horizon's* equity at $200 million.

**_Horizon_ Enterprise Value as of January 2021**

| | RMB M | USD M |
|---|---|---|
| Total Shares Outstanding (m) | 36.1 | 36.1 |
| Share Price (RMB, USD) | 36.04 | 5.54 |
| Equity Value | 1,300 | 200 |
| (-) Cash and Equivalents | (60) | (9) |
| (-) Equity Investments | (3) | (0) |
| **Enterprise Value** | 1,237 | **190** |

_Source: http://www.neeq.com.cn/disclosure/2021/2021-01-26/1611654052_860439.pdf_

_FX rate assumed at 6.50 RMB/USD_

It is no wonder Hyzon kept quiet about this to investors. Hyzon is basically the same business as _Horizon_ yet trades at **10x** the enterprise value of the Chinese parent company, which developed and manufactures the fuel cells supposedly underpinning the value proposition of the SPAC.

Nor do the parent's fuel cells appear to be much in demand. Public filings by _Horizon_ during its time as a public company also indicate that its sales volumes have fallen dramatically since 2019. In its public filings, _Horizon_ (parent) stated that in 2019, it installed its fuel cell battery systems in approximately 400 vehicles.

The company completed the delivery of nearly 400 fuel cell systems for vehicles in 2019

公司于 2019 年完成近 400 台车用燃料电池系统的交货，其中搭载公司 VL II 代 60kW 燃料电池系统的 8 吨物流车已完成超过 300 台装车，搭载公司 95kW 燃料电池系统的 42 吨牵引车及已完成上牌并投入示范运行，为公司进一步拓展商业化的大功率车用燃料电池市场打下了坚实的基础。在海外市场，借助公司 Horizon Fuel Cell 的品牌知名度，公司已陆续承接了韩国燃料电池轨道列车等项目，并正在推进美国、欧洲、澳大利亚、新西兰等地客户燃料电池重卡及客车商业化项目。

_Source: Jiangsu Horizon's 2019 Annual Report_

_Horizon_ delisted before it was required to publish its 2020 annual report, but based on Hyzon's SPAC disclosures, _Horizon_ only sold approximately 100 fuel cells in 2020, representing a 75% decline in unit sales year-on-year.[6]

More recently, an article by a Chinese energy focused research organization _the Orange Group,_ stated that _Horizon_ had sold a total of 538 fuel cells as of June 2021 – implying that _Horizon_ sold a further 38 fuel cells in the first half of 2021.

As of June 2021, a total of 369 hydrogen fuel cell systems provided by Jiangsu Horizon have been licensed in China.

截止2021年6月，搭配清能股份提供的氢燃料电池系统在国内累计实现上牌共计369台，市场主要分布在上海、武汉、苏州、南通，布局巩固和拓展国内市场。同时，清能股份在新加坡、美国、澳大利亚、荷兰、香港等地设有多家子公司和办事处，布局国际市场。

此外，清能股份还向第三方燃料电池系统企业销售电堆，截止2021年6月已完成169台配套车辆上牌，即搭载清能股份系统及电堆的车辆总计上牌量为538套。

In addition, Horizon also sell fuel cell stacks to third-party fuel cell system companies. As of June 2021, 169 vehicles have been licensed, that is, the total number of licensed vehicles equipped with Horizon's fuel cell system and stacks is 538 sets.

_Source: https://www.shangyexinzhi.com/article/4198728.html_

---

[6] _Horizon_ disclosed to Chinese investors that it sold 400 fuel cells in 2019. In its SPAC presentation, Hyzon stated that its parent _Horizon_ had sold a total of 500 fuel cells by the end of 2020, indicating that _Horizon_ sold approximately 100 fuel cells in 2020.

***Horizon* Fuel Cells Sold by *Horizon (Parent) 2019-2021***



Source: *Hyzon July 2021 Investor Presentation, Jiangsu Horizon's 2019 Annual Report, Orange Group Article*
*Note: 81% decline is based on annualized adjustment for 2021.*

If Horizon's fuel cells were so valuable, why has it only sold 538 units in the past 17 years, and why does it appear that unit sales have declined 81% since 2019?

Hyzon's attempt to conjure a track record for itself by equating fuel cell sales by its parent to fully fledged vehicle deliveries is also absurd. Producing fuel cells is in no way akin to producing electric vehicles. In 2019 alone there were more than 70,000 hydrogen fuel cells sold globally.[7] Hyzon's parent, *Horizon* has no discernable first mover advantage in this field. It is not even a significant player measured by market share.

Hyzon pitches itself as an asset-light American manufacturer of hydrogen fuel cells. Yet this same fuel cell technology is owned and manufactured by its parent company in China which has not managed to gain traction selling this technology in more than 17 years of trying. The parent's unit sales are in decline, which in our view, speaks volumes about the lack of demand for its technology. Chinese investors valued the fuel cell business at less than $200 million in January 2021, and likely knew far better.

---

[7] https://www.edisongroup.com/wp-content/uploads/2020/12/Edison-Hydrogen-report-v10.pdf, page 16

5. **Hyzon's Projections are Fantasy: Parent's Financials and Former Executives Suggest Hyzon May Earn 5-10% Gross Margins, at Best**.

An interview with a former Hyzon executive and the financials of Hyzon's Chinese parent suggest that Hyzon's projected financials are likely a fantasy.

Without any current revenue, Hyzon's valuation relies entirely on its self-serving financial projections. Hyzon forecasts in its SPAC presentations that it will turn cash flow positive as early as 2023. By 2025, Hyzon tells investors that it will generate annual EBITDA of $505 million.

One of the key drivers of these future financials is Hyzon's projected gross margins. Hyzon forecasts that its gross profit margins on electric vehicles will be 32% in 2021 and reach as high as 33.6% by 2025.

| ($USD MILLIONS) | 2021E | 2022E | 2023E | 2024E | 2025E |
|---|---|---|---|---|---|
| TOTAL GROSS PROFIT | $12 | $62 | $299 | $735 | $1,106 |
| GROSS MARGIN % | 32.0% | 31.5% | 30.8% | 32.8% | 33.6% |

*Source: Hyzon July 2021 Investor Presentation*

We think Hyzon's projected margins are grossly inflated. **We spoke to a former executive from Hyzon who indicated that Hyzon's retrofitting model of production would yield no more than 5-10% gross margins**.

> *"[The margins are] quite small, because you're paying out a lot to everyone else. You're buying the truck from someone. You're buying the fuel cell. The only thing you're getting paid for is basically the fitting of [the fuel cell] into the system.*
>
> ***I wouldn't have thought it would be more than five to ten percent [gross margins] max. And ten percent would be doing really well.***
>
> ***There's a lot of cash going out***. *It's not like Mercedes or Volvo or DAF. They're building their trucks, their own chassis, their own engines, their own bodies. It's not the same as that where you've got a lot of vertical integration in which the money is staying inside the Company. A lot of it is going out. It's going out to Horizon. It's going out to DAF or wherever they're buying the trucks from. You're having to buy the motors. You're buying the controllers. The fuel system for the hydrogen fuel tanks. All that system is all being bought in. So basically, what you're making is what you can make on top of all that."*

- Former Senior Hyzon Executive

Hyzon purchases ready-made trucks from third-party manufacturers, and then retrofits these trucks with its parent's fuel cells. Hyzon even outsources the retrofitting to third parties.[8] Hyzon's former executive was confident that this business model would yield, at best, 5-10% gross margins.

Similarly, the senior executive we spoke to at Hyzon's channel partner, Hiringa, stated that the economics of the trucks were so stretched that it was simply not possible to accommodate a commission charge on top.

> *"We contemplated doing that [charging commissions]. But the models to get this going can't take extra ticket clippings."*

- Senior Hiringa Executive

---

[8] In Europe, this retrofitting process is carried out by Hyzon's joint venture partner – *Holthausen* – a small retrofitting workshop run by a father and a son in the Netherlands. In the US, Hyzon plans to outsource the retrofitting process altogether to *Fontaine Modification* – a third party provider of vehicle assembly services.

To put it in perspective, a 32% gross margin is nearly twice the industry average for vehicle manufacturers. The leading EV brand, Tesla, reports a gross margin of 22%.



**Hyzon vs. Established Vehicle Manufacturers: LTM Gross Margin (%)**

*Source: Capital IQ, Hyzon Investor Presentation*

For context, a 2020 whitepaper jointly written by Deloitte and Ballard Power Systems stated gross margins for hydrogen vehicle manufacturers (FCEV) of 14%. Even these self-serving industry projections, drafted to justify lofty public valuations, only project half the gross margins for FCEV companies as Hyzon's SPAC projections.

Even in the fictitious world of EV SPACs, Hyzon's claimed future margins look egregious. Notorious SPAC trash Nikola and XL Fleet only projected gross margins for 2021 of 23-25%.



**Hyzon vs. EV SPAC Trash: 2021E Gross Margin (%)**

*Source: Hyzon Investor Presentation, Nikola, XL Fleet, Canoo, Lordstown*

Yet even compared with the most absurd SPAC projections, Hyzon's claims appear fantasy. Many of these competitors have established brands, unique IP, and huge economies of scale. In this context, Hyzon's projected margins appear to be a fantasy.

The financials of Hyzon's parent company corroborate this view. Hyzon does not currently manufacture fuel cells. It buys them from its Chinese parent company. Hyzon's plan is to license the technology to produce hydrogen fuel cells at its facility in Rochester, NY, which will not be ready until the latter half of 2022, at the earliest.

Even when Hyzon starts producing its own fuel cells, its parent's financials suggest that its projected margins are unlikely to materialize. *Horizon*'s Chinese filings reported a gross profit of USD 21,000 per fuel cell sold.

**16**

（三）合并利润表

| 项目 | 附注 | 2019 年 |
|---|---|---|
| 一、营业总收入  Sales Revenue | | 202,039,500.11 |
| 其中：营业收入 | 五、25 | 202,039,500.11 |
| 利息收入 | | |
| 已赚保费 | | |
| 手续费及佣金收入 | | |
| 二、营业总成本 | | 193,366,812.87 |
| 其中：营业成本  Cost of Goods Sold | 五、25 | 142,924,740.76 |

*Source: [Jiangsu Horizon's 2019 Annual Report](#)*

| Jiangsu Horizon | RMB | USD |
|---|---|---|
| Sales Revene | 202,039,500 | 29,242,521 |
| COGS | (142,924,741) | (20,686,448) |
| Gross Profit | 59,114,759 | 8,556,072 |
| Fuel Cell Units Sold | 400 | 400 |
| **Gross Profit Per Fuel Cell System** | **147,787** | **21,390** |

*Source: [Jiangsu Horizon's 2019 Annual Report.](#)*

According to Hyzon's projections, it expects to sell its vehicles for USD 411,765 per truck on average. So even if it can capture the same gross profit as its parent from "just the fuel cells," that equates to a gross margin of just 5% on the overall sales price of the vehicle.

| | 2021E |
|---|---|
| Total Vehicle Revenue (USD) | 35,000,000 |
| Vehicle Volume | 85 |
| Price per truck (USD) | 411,765 |
| Gross Profit Per Fuel Cell System (USD) | 21,390 |
| **Gross Margin** | **5%** |

*Source: [Hyzon July 2021 Investor Presentation](#), Blue Orca Calculation*

The point is that Hyzon is projecting 30% margins on vehicles. But based on its parent's financials, we calculate that the "just the fuel cells" model will likely produce only 5% gross margins because the value of the fuel cell to the overall production process is limited.

If we apply industry average gross margins of 15% to Hyzon's projected revenues, the Company will not turn cash positive in the next five years. The picture looks even more dire if we apply a more appropriate gross margin assumption of 5-10%, which the former Hyzon executive we interviewed says is more realistic.

**At Gross Margins Below 15% Hyzon Will Generate Negative EBITDA in 2025**

| EBITDA Sensitivity to Gross Margin (USDm) | | | | | | |
|---|---|---|---|---|---|---|
| | | | | Year | | |
| | | 2021E | 2022E | 2023E | 2024E | 2025E |
| | 5% | (83) | (77) | (163) | (297) | (437) |
| | 10% | (81) | (67) | (115) | (185) | (272) |
| Gross | 15% | (79) | (57) | (66) | (73) | (108) |
| Margin | 20% | (78) | (47) | (18) | 39 | 56 |
| | 25% | (76) | (38) | 31 | 152 | 221 |
| | 30% | (74) | (28) | 80 | 264 | 385 |

| Free Cash Flow Sensitivity to Gross Margin (USDm) | | | | | | |
|---|---|---|---|---|---|---|
| | | | | Year | | |
| | | 2021E | 2022E | 2023E | 2024E | 2025E |
| | 5% | (146) | (255) | (324) | (399) | (563) |
| | 10% | (144) | (245) | (276) | (287) | (398) |
| Gross | 15% | (142) | (235) | (227) | (175) | (234) |
| Margin | 20% | (141) | (225) | (179) | (63) | (70) |
| | 25% | (139) | (216) | (130) | 50 | 95 |
| | 30% | (137) | (206) | (81) | 162 | 259 |

*Source: Hyzon Projections, Blue Orca Calculation*

*Note Hyzon guides 31.5% - 33.6% gross margins between 2021-2025. Assumes other operating costs and Capex in line with Company estimates. Free Cash Flow calculated as EBITDA less guided Capex.*

We think Hyzon will be lucky to generate 5-10% gross margins, given its limited value in the production chain. But even near industry standard gross margins (15%), Hyzon will not generate positive EBITDA for the next five years. The sensitivity analysis on cash flows is even more dire, showing, in our opinion, that Hyzon is unlikely to generate free cash flows at any point in the foreseeable future.

**6.    Two CTO Resignations In 15 Months**

Hyzon's stock price is contingent on the value of its technology to generate future revenues.  We view it is as a significant red flag that **two of Hyzon's CTOs have resigned in the past 15 months**, even though Hyzon was only formed in January 2020.

On September 2, 2021, Hyzon announced that its Chief Technology Officer, Gary Robb, resigned after just 15 months in the role. The announcement should concern investors because as with other early-stage companies, Hyzon's valuation and future success rests largely on its product execution for which the CTO is responsible.

Hyzon claimed that Gary Robb retired. But we spoke to a former Hyzon executive who expressed skepticism about this narrative given Robb's relatively young age.

*"You know, they say he's retiring but … it's kind of young to be retiring."*

- Former Hyzon Executive

Undisclosed to investors, Gary Robb is actually Hyzon's second Chief Technology Officer to resign since Hyzon's inception in January 2020.  Hyzon's first CTO – Ian Thompson – lasted just five months in the role before resigning in June 2020.



**Chief Technology Officer**
Hyzon Motors · Full-time
Feb 2020 – Jun 2020 · 5 mos
Michigan, United States

Lead and direct Vehicle development, Prototype, Pilot and Production Facilities
Lead and direct Full Vehicle Compliance and type approval for Global markets

*Source: https://www.linkedin.com/in/ian-thompson-271b8621/*

That makes two CTO resignations for Hyzon in 15 months, even though the Company was only formed in January 2020.

| CTO | Start Date | End Date | Tenure |
|---|---|---|---|
| Ian Thompson | Feb-20 | Jun-20 | 5 mos |
| Gary Robb | Jun-20 | Sep-21 | 1 yr 3 mos |
| Shinichi Hirano | Sep-21 | Present | 1 mos |

*Source: https://www.linkedin.com/in/ian-thompson-271b8621/, Hyzon Press Release*

If Hyzon's technology is supposedly world class, and the foundation for its hockey-stick-like future revenue growth, we question why the critical officers in charge of such technology apparently have such little faith in either the Company or the technology (or both) that they both stepped down so abruptly and after so little time at Hyzon, despite the obvious financial incentives to remain.

Ultimately, we think Hyzon's parent has taken advantage of the general suspension of disbelief in financial markets to enrich insiders by repackaging an old technology in a fig leaf of misleading deal announcements and illusory customer contracts.

**DISCLAIMER**

*We are short sellers. We are biased. So are long investors. So is Hyzon. So are the banks that raised money for the Company. If you are invested (either long or short) in Hyzon, so are you. Just because we are biased does not mean that we are wrong. We, like everyone else, are entitled to our opinions and to the right to express such opinions in a public forum. We believe that the publication of our opinions about the public companies we research is in the public interest.*

*You are reading a short-biased opinion piece. Obviously, we will make money if the price of Hyzon stock declines. This report and all statements contained herein are solely the opinion of BOC Texas, LLC, a Texas limited liability company, and are not statements of fact. Our opinions are held in good faith, and we have based them upon publicly available evidence, which we set out in our research report to support our opinions. We conducted research and analysis based on public information in a manner that any person could have done if they had been interested in doing so. You can publicly access any piece of evidence cited in this report or that we relied on to write this report. Think critically about our report and do your own homework before making any investment decisions. We are prepared to support everything we say, if necessary, in a court of law.*

*As of the publication date of this report, BOC Texas, LLC (a Texas limited liability company) (possibly along with or through our members, partners, affiliates, employees, and/or consultants) along with our clients and/or investors has a direct or indirect short position in the stock (and/or possibly other options or instruments) of the company covered herein, and therefore stands to realize significant gains if the price of such instrument declines. Use BOC Texas, LLC's research at your own risk. You should do your own research and due diligence before making any investment decision with respect to the securities covered herein. The opinions expressed in this report are not investment advice nor should they be construed as investment advice or any recommendation of any kind.*

*This report and its contents are not intended to be and do not constitute or contain any financial product advice as defined in the Australian Corporations Act 2001 (Cth). Because this document has been prepared without consideration of any specific clients investment objectives, financial situation or needs, no information in this report should be construed as recommending or suggesting an investment strategy. Investors should seek their own financial, legal and tax advice in respect of any decision regarding any securities discussed herein. At this time, because of ambiguity in Australian law, this report is not available to Australian residents. Australian residents are encouraged to contact their lawmakers to clarify the ambiguity under Australian financial licensing requirements.*

*Following publication of this report, we intend to continue transacting in the securities covered therein, and we may be long, short, or neutral at any time hereafter regardless of our initial opinion. This is not an offer to sell or a solicitation of an offer to buy any security, nor shall any security be offered or sold to any person, in any jurisdiction in which such offer would be unlawful under the securities laws of such jurisdiction. To the best of our ability and belief, all information contained herein is accurate and reliable, and has been obtained from public sources we believe to be accurate and reliable, and who are not insiders or connected persons of the stock covered herein or who may otherwise owe any fiduciary duty or duty of confidentiality to the issuer. As is evident by the contents of our research and analysis, we expend considerable time and attention in an effort to ensure that our research analysis and written materials are complete and accurate. We strive for accuracy and completeness to support our opinions, and we have a good-faith belief in everything we write, however, all such information is presented "as is," without warranty of any kind– whether express or implied.*

*If you are in the United Kingdom, you confirm that you are subscribing and/or accessing BOC Texas, LLC research and materials on behalf of: (A) a high net worth entity (e.g., a company with net assets of GBP 5 million or a high value trust) falling within Article 49 of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005 (the "FPO"); or (B) an investment professional (e.g., a financial institution, government or local authority, or international organization) falling within Article 19 of the FPO.*

*This report should only be considered in its entirety. Each section should be read in the context of the entire report, and no section, paragraph, sentence or phrase is intended to stand alone or to be interpreted in isolation without reference to the rest of the report. The section headings contained in this report are for reference purposes only and may only be considered in conjunction with the detailed statements of opinion in their respective sections.*

*BOC Texas, LLC makes no representation, express or implied, as to the accuracy, timeliness, or completeness of any such information or with regard to the results to be obtained from its use. All expressions of opinion are subject to change without notice, and BOC Texas, LLC does not undertake a duty to update or supplement this report or any of the information contained herein. By downloading and opening this report you knowingly and independently agree: (i) that any dispute arising from your use of this report or viewing the material herein shall be governed by the laws of the State of Texas, without regard to any conflict of law provisions; (ii) to submit to the personal and exclusive jurisdiction of the superior courts located within the State of Texas and waive your right to any other jurisdiction or applicable law, given that BOC Texas, LLC is a Texas limited liability company that operates in Texas; and (iii) that regardless of any statute or law to the contrary, any claim or cause of action arising out of or related to use of this website or the material herein must be filed within one (1) year after such claim or cause of action arose or be forever barred. The failure of BOC Texas, LLC to exercise or enforce any right or provision of this disclaimer shall not constitute a waiver of this right or provision. If any provision of this disclaimer is found by a court of competent jurisdiction to be invalid, the parties nevertheless agree that the court should endeavor to give effect to the parties' intentions as reflected in the provision and rule that the other provisions of this disclaimer remain in full force and effect, in particular as to this governing law and jurisdiction provision.*

20

# EXHIBIT 2

Case 6:21-cv-06612-MAV-MJP    Document 116-2    Filed 06/30/25    Page 122 of 254



# ICEBERG RESEAR CH

ABOUT          CONTACT US

## Revealing financial manipulation and accounting frauds

# HYZON MOTORS INC: TROUBLE AT THE PARENTCO

October 6, 2021 · *by* Iceberg Research · *in Uncategorized* · *10 Comments*

FOLLOW US ON TWITTER

*Please refer to our disclaimer at the bottom of the report.*

Blue Orca Capital published a short report on Nasdaq-listed Hyzon Motors Inc. on 28 September 2021. Having conducted our own research, we agree with its key findings. Hyzon issued a rebuttal to the report on 5 October 2021 that failed to address these issues.

This report contains new information on Hyzon. Its parent Horizon Fuel Cell Technologies Pte Ltd ("Horizon") saw its 2019 sales surge, thanks to one customer. But this client was in

financial trouble by the end of the year. This was never disclosed. Hyzon's corporate governance puts its minority shareholders at risk. Horizon holds the largest block of Hyzon shares, and controls both management and the board of the two entities.

Adding to these concerns is Horizon's unenviable track record with spin-offs. The first two have not gone well. Hyzon is its third and is likely to suffer the same fate.

Hyzon boasts of its superior fuel cell technology. We believe these claims are exaggerated. Furthermore, we think customers will be reluctant to buy trucks whose warranties are covered by Hyzon, not by original equipment manufacturers ("OEMs").

We are short Hyzon Motors.

## Horizon's Surge in 2019 Sales Was With a Major Client in Financial Distress

The bull case for Hyzon is largely supported by the fuel cell technology and expertise of its 63%-shareholder, Singapore-based Horizon, also Hyzon's key source of hydrogen fuel cells under a supply agreement signed in January 2021.

Singapore filings show the Horizon group reported $28.9m revenue in 2019 (see below), up 540% from $4.5m in 2018, which suggests Horizon is growing fast in the nascent market for hydrogen fuel cells.

*Source: Horizon Fuel Cell filings*

---

**Tweets** by
**@IcebergResear**

 **Iceberg Research**
@IcebergResear

It's plain fraud. There is no other w
to define it.ft.com/content/11549c…


**Selling to yourself: the priva...**
Private equity groups are incr…
ft.com

Jun 21, 20

Iceberg Research Retweeted

**Joe Weisenthal**
@TheStalwart

To what degree did crypto contribu
to elevated inflation, by juicing buyi
power of token holders, contributin
to semiconductor tightness, pulling
labor from elsewhere, all the while
contributing nothing productive for
the supply side?

Jun 13, 20

 **Iceberg Research**
@IcebergResear

Replying to @IcebergResear

Shares are issued with a 3%
discount. No restriction on selling,
meaning shares will likely be sold
immediately, diluting existing
shareholders. Tumim was involved
a similar financing for Nikola. 2/2

Jun 7, 20

Embed          View on Twitter

Case 6:21-cv-06612-MAV-MJP    Document 116-2    Filed 06/30/25    Page 124 of 254

We found that almost all Horizon's sales come from its Chinese subsidiary Jiangsu Qingneng New Energy Technologies Co., Ltd — 江苏清能新能源技术股份有限公司 ("Qingneng"). Qingneng was listed on China's OTC exchange — National Equities Exchange and Quotations (NEEQ) market — between June 2018 and March 2021. Qingneng's financials show most of the 2019 spike was due to one customer, Shanghai SunLong Bus Co., Ltd (上海申龙客车有限公司), which accounted for 74% (RMB 150m) of Qingneng's sales and 85% (RMB 56.5m) of trade receivables at the end of 2019.

**Qingneng's disclosure of its largest customers by sales in 2019**

| 序号 | 客户 | 销售金额 | 年度销售占比% | 是否存在关联关系 |
|---|---|---|---|---|
| 1 | 上海申龙客车有限公司 | 150,000,000.00 | 74.24% | 否 |
| 2 | 南通亿能能源科技有限公司 | 18,390,605.52 | 9.10% | 否 |
| 3 | Horizon Fuel Cell Europe s.r.o. | 8,361,567.27 | 4.14% | 否 |
| 4 | 上海杰宁新能源科技有限公司 | 4,601,769.91 | 2.28% | 否 |
| 5 | Horizon Fuel Cell Americas Inc. | 3,953,594.78 | 1.96% | 否 |
| | 合计 | 185,307,537.48 | 91.72% | - |

(3) 主要客户情况 — 单位：元

*Source: Jiangsu Qingneng 2019 financial statements*

Qingneng and Horizon never disclosed that SunLong was and is still in financial distress. SunLong's parent company Shenzhen-listed Tunghsu Optoelectronic Technology defaulted on three bonds (RMB 4.7bn or ~$666m) towards the end of 2019, despite reporting a $2.6bn cash stack at the end of September. The filings of both Qingneng and Beijing SinoHytec (北京亿华通科技股份有限公司), a much larger fuel cell peer and also a SunLong supplier, show SunLong's struggles continued in 2020.

Qingneng's free cash flow plunged to negative RMB49.7m ($7m) for the 1H20 period. The drop was mainly due to sales, which fell 36% YoY to RMB 16m ($2.4m), and poor collections on its SunLong receivables. We estimate that Qingneng collected just

RMB 1m of its end-2019 SunLong receivables (RMB 56.5m or $8m).

Yet, just 5% of the SunLong receivables were recognised as bad debts at the end of June 2020. Qingneng chose to sweep this problem under the carpet. By contrast, SinoHytec recognised SunLong's problems and impaired 28% of its SunLong receivables in the 1H20 period, up from 16% at the end of 2019.

| Comparison of revenue and balances with SunLong - RMB million | | | | |
|---|---|---|---|---|
| Company | Qingneng | | Beijing SinoHytec | |
| Period | 2019 | 1H20 | 2019 | 1H20 |
| Revenue with SunLong | 150 | - | 350 | - |
| Trade receivables with SunLong | 56.5 | 55.5 | 297.17 | 292.54 |
| Allowance for bad debts - SunLon | 2.83 | 2.78 | 46.73 | 80.68 |
| Allowance as % of trade receivables | 5.00% | 5.00% | 15.70% | 27.60% |

Source: Qingneng and Beijing SinoHytec financial statements

## Hyzon's Corporate Governance Put Its Minority Shareholders at Risk

The same Horizon that did not disclose its customer default now has extensive control of Hyzon through its 63%-shareholding. Both entities share common directors i.e., Chairman George Gu (顾志军) and CEO Craig Knight. The remaining shareholder base is fragmented with each owning less than 5%. Horizon is the only fuel cell supplier for Hyzon.

This may create the risk that Horizon gets access to the ~$500m cash pile Hyzon raised through the July 2021 SPAC merger, by charging Hyzon exorbitant prices to support its fuel cell business, to the detriment of minority shareholders. Hyzon will have to pay a subsidiary of Horizon at least $10m [Pg 7] by the end of this year to licence intellectual property. We call this '拆东补西' or 'pulling down the east wall to repair the west wall'.

As per the prospectus, the 155.6m Hyzon shares held by Horizon are subject to a six-month lock-up, meaning Horizon can sell its shares from January 2022.

**History of Disappointing Spinoffs**

Horizon's website shows Hyzon is its third spin-off. The first two have remained small without any meaningful growth, despite being around for at least 10 years. We believe the same will happen with Hyzon.

- Horizon Fuel Cell Europe s.r.o. (HFCE)

Czech Republic-based HFCE was Horizon's first spin-off. The company was incorporated in 2011 to develop, produce, and sell hydrogen-themed science experiment kits for students. HFCE's products are sold through its website and on Amazon. The company boasts of 50,000 customers in 150 countries, according to its website, but Czech filings show total profits from 2011-2019 were a measly CZK 11.1m ($0.5m).

- HES Energy Systems

Horizon started HES Energy in 2009, first as a hydrogen aerial mobility lab, then a move into drone development in 2017. The company was acquired in 2015 by H3 Dynamics, another Singapore-based company, as part of an MBO led by Horizon and Hyzon's strategic advisor Taras Wankewycz.

The Singapore-incorporated company's total operating losses were negative SGD 2.4m ($1.8m) over the 2018-2020 period. About SGD 1.3m (~$1m) was burnt on operations (see below).

HES Energy's 2018-2020 financials

*Source: HES Energy filings*

**Exaggerated Technical Claims**

Hyzon boasts of its technical superiority, in particular, its G3 Titan fuel cells lead the world on volumetric power density ("VPD" of 5.48-6.08) and gravimetric power density (GPD of 5.03-5.54), according to its investor presentation.

**Hyzon's comparison of its fuel cell with competitors**

*Source: Hyzon investor presentation*

However, the G3 Titan is compared to fuel cells that are already in the market. The G3 Titan is still under development and will only be launched in 2022 [Pg 33 of July 2021 Investor Presentation]. Data assessed by third-party TUV Rheinland was from 'short stack testing' and merely points to the '…potential of using full power fuel cells up to 500hp (370kW) for heavy mobility applications…'.

Hyzon's existing product — the 150 kW G2 fuel cell — underperforms most peers. Its GPD of just 2.31 kW/kg is much lower than Ballard's 140 kW FCgen – HSP at 4.7 kW/kg.

**Product brochure for G2 fuel cell**

7/18/22, 7:19 PM
Case 6:21-cv-06612-MAV-MJP    Document 116-2    Filed 06/30/25    Page 128 of 254
Hyzon Motors Inc: Trouble at the ParentCo | Iceberg Research

Source: Jiangsu Qingneng *website*

## The Warranty Issue

Reliable warranties are crucial to industrial clients that intensively use their vehicles. Hyzon does not build trucks. It converts OEM's internal combustion engine vehicles (e.g., DAF) to hydrogen-fueled trucks through its 50.5%-owned joint venture — Hyzon Motors Europe BV — with Netherlands-based Holthausen Clean Technology Investments BV.

We were informed by a Holthausen representative that Hyzon, not the OEM, will cover the warranty. Hyzon's clients will then have to trust that Holthausen and Hyzon are able to service the warranty. Holthausen is run by a father and son team, Carl and Max Holthausen. According to a March 2021 report by Dutch newspaper Het Financieele Dagblad, the Holthausens first experimented with hydrogen as a fuel about 10 years ago, first as a generator, followed by a boat, a remote controlled car, a drone, then finally a "Hesla", a hydrogen-powered Tesla Model S.

We expect many industrial customers will be reluctant to buy Hyzon's vehicles when established OEMs such as Toyota, Hino, and General Motors are lining up to launch their own hydrogen trucks. The likes of Daimler Trucks began testing its Mercedes-Benz GenH2 prototype truck in May this year while South Korea's Hyundai plans to roll out 1,600 fuel cell trucks by 2025.

## Disclaimer

*Our research and reports express our opinions, which we have based upon generally available public information, field research, inferences and deductions through our due diligence and analytical process. To the best of our ability and belief, all information*

*contained herein is accurate and reliable, and has been obtained from public sources we believe to be accurate and reliable, and who are not insiders or connected persons of the stock covered herein or who may otherwise owe any fiduciary duty or duty of confidentiality to the issuer. We strive for accuracy and completeness to support our opinions, and we have a good faith belief in everything we write, however, all such information is presented "as is," without warranty of any kind – whether express or implied. Iceberg Research ("Iceberg") makes no representation, express or implied, as to the accuracy, timeliness, or completeness of any such information or with regard to the results to be obtained from its use. You agree that the use of Iceberg's research is at your own risk. In no event will Iceberg be liable for any direct or indirect trading losses caused by any information available on this report. Think critically about our opinions and do your own research and analysis before making any investment decisions. You should seek the advice of a security professional regarding your stock transactions.*

*You should assume that as of the publication date of our reports and research, Iceberg may have a short position in the securities (and/or options, swaps, and other derivatives related to the stock) covered herein, and therefore may stand to realize gains in the event that the price of the covered securities declines. We may continue transacting in the securities of the company covered in this report, and we may buy, sell, cover or otherwise change the form or substance of our position in the issuer regardless of our initial views set out herein.*

*This is not an offer to sell or a solicitation of an offer to buy any security, nor shall Iceberg offer, sell or buy any security to or from any person through this site or reports on this site. Iceberg is not registered as an investment advisor in any jurisdiction. You agree to do your own research and due diligence before making any investment decision with respect to securities discussed herein. You represent to Iceberg that you have sufficient investment sophistication to critically assess the information, analysis and opinions in this report.*

*We are entitled to our opinions and to the right to express such opinions in a public forum. We believe that the publication of our opinions about public companies that we research is in the public interest. This report and all statements contained herein are the opinion of Iceberg and are not statements of fact. You can publicly access any piece of evidence cited in this report or that we relied on to write this report. All expressions of opinion are subject*

*to change without notice, and Iceberg does not undertake to update or supplement any reports or any of the information, analysis and opinion contained in them.*

*You agree that use of Iceberg's research is at your own risk. In no event will you hold Iceberg or any affiliated party liable for any direct or indirect trading losses caused by any information on this site. You further agree to do your own research and due diligence before making any investment decision with respect to securities covered herein. You represent to Iceberg that you have sufficient investment sophistication to critically assess the information, analysis and opinion on Iceberg's site and in this report. You further agree that you will not communicate the contents of this report to any other person unless that person has agreed to be bound by these same terms of service.*

*By downloading, opening and/or reading this report you knowingly and independently agree: (i) to abide by the terms of service of our website, which are hereby fully incorporated herein, (ii) that any dispute arising from your use of this report or viewing the material herein shall be governed by the laws of the State of New York, United States, without regard to any conflict of law provisions; (iii) to submit to the personal and exclusive jurisdiction of the superior courts located within the State of New York and waive your right to any other jurisdiction or applicable law; and (iv) that regardless of any statute or law to the contrary, any claim or cause of action arising out of or related to use of this website or the material herein must be filed within one (1) year after such claim or cause of action arose or be forever barred. The failure of Iceberg to exercise or enforce any right or provision of this disclaimer shall not constitute a waiver of this right or provision. If any provision of this disclaimer is found by a court of competent jurisdiction to be invalid, the parties nevertheless agree that the court should endeavor to give effect to the parties' intentions as reflected in the provision and rule that the other provisions of this disclaimer remain in full force and effect, in particular as to this governing law and jurisdiction provision.*

## 10 comments

 *Craig* · October 6, 2021 - 5:00 pm · *Reply→*

Would you please explain why you have deliberately left out the vehicles already on road and in use in Europe?

Thanks

 Like

 Iceberg Research · October 7, 2021 - 9:51 pm · *Reply*→

1) First, there is no such thing as an "Hyzon truck" as the company likes to promote itself. These trucks are built by OEMs, and retrofitted with fuel cells and hydrogen tanks by Hyzon. There are countless companies that can do that.

2) These vehicles are used under pilot programs

3) This report is not about the mechanics of a truck. It's about the ability of Hyzon to generate future cash flows for its shareholders to support its current valuation.

4) Horizon has hidden lots of key information. This is most likely the reason by the way why this new company (Hyzon) was created. If the SPAC had been with Horizon, it would have been much tougher to hide the elements we found.

5) Saying that Hyzon is independent from Horizon is naive considering its corporate governance and 63% ownership.

 Like

*Craig* · October 8, 2021 - 6:53 am ·



It is no secret that they use OEM trucks?

The possibility to return on invest is the technology being out into use, test programs, alterations and final market implementation and then sales, this is a normal business development! Have you ever run a development company? Or just analysis bits of info?

Again no mention of their trucks on the roads!

If you are a short then that explains it all.

 Like



Iceberg Research · October 8, 2021 - 10:40 am · *Reply*→

Your "development company" for which you obviously work should not be worth $1.6b. We will see in six months how it goes. You should be cautious considering our track record.

 Like



*Craig* · October 8, 2021 - 10:44 am · *Reply*→

I do not work for this company, although I have run various companies in a different field.

It's just a shame that you work with only shreds of info, claiming that others doing that is wrong, and have

obviously no experience in building and running a

company. Your objective is clear.

This is my last remark.

Thank you

★ Like



Iceberg Research · October 8, 2021 - 10:58 am · *Reply→*

If you ran companies as you claimed, you should know

that when a customer accounting for 74% of the sales is

defaulting, that is a bloody big issue. The minority

shareholders of Hyzon will appreciate being left in the

dark on that.

★ Like



*Craig* · October 8, 2021 - 11:35 am · *Reply→*

Same old, same old bye bye

★ Like



*Andre Toh* · October 8, 2021 - 12:39 pm · *Reply→*

Some work with shreds of info… some hide info… right

Craig..

★ Like



*Jason* · October 8, 2021 - 2:05 pm · *Reply→*

I think all of these concerns are valid. Only time will tell

on where Hyzon and Horizons motives are. If they dump

shares after the lockup expires or if they stay on course

7/18/22, 7:19 PM
Case 6:21-cv-06612-MAV-MJP   Document 116-2   Filed 06/30/25   Page 134 of 254
Hyzon Motors Inc.: Trouble at the ParentCo | Iceberg Research

and build a company that will compete in the hydrogen transport sector.

I was hoping that Hyzon wouldn't be retrofitting trucks at all and focus more on selling their fuel cells, Eaxels, storage tanks and other tech/IP to legacy companies. Kind of like Cummins. If the G3 Titan really is the best in class and well ahead of peers, well, there certainly is value in that.

 Like



*Nik Patel* · October 9, 2021 - 12:42 pm · *Reply*→

Thanks for putting this report together. At a minimum it certainly leaves many unanswered questions by Hyzon mgmt /board. A point by point rebuttal would be helpful but I suspect we will not get that anytime soon.

It does appear that if Hyzon was intensely diligenced by a private market investor , it would be valued as a true development stage concept company that would be raising early stage series A/B capital at what I suspect is a much lower valuation.

The likely greatest concern I see is that Hyzon is competing against large multinational incumbent auto OEMs that have invested billions into hydrogen fuel cell technologies and have extraordinary capital and resource commitments to these efforts whereas Hyzons

roster of engineering and technical talent is likely far far less and thus probability of success is low

I agree with Iceberg that having a handful of retrofit trucks on the road is something anyone with a mechanics garage can accomplish. This feels more like Nikola than Hyundai . The hope for the long holders Hyzon must be that they are able to wisely invest in R&D the capital raised by the SPAC transaction and "figure it out" over the next 5 years vs likely having an already established and successful R&D program on the cusp of mass manufacturing capabilities. This is the classic "Theranos" conundrum of early stage startups, they sell a bright future but highly uncertain if they have the ability to get there

★ Like

# Leave a Reply

Enter your comment here...

← Diginex's ($EQOS) inconsistent data point to massive trading volume manipulation

Hyzon Unleashes a Load of Hot Air with its 3Q21 Results →

Blog at WordPress.com.

# EXHIBIT 3



# ICEBERG RESEARCH

ABOUT          CONTACT US

## Revealing financial manipulation and accounting frauds

# HYZON UNLEASHES A LOAD OF HOT AIR WITH ITS 3Q21 RESULTS

FOLLOW US ON TWITTER

November 16, 2021 · *by* Iceberg Research · *in* Uncategorized · *Leave a comment*

*Please refer to our disclaimer at the bottom of the report.*

**Clear as mud HongYun raises serious questions on Hyzon's 85 trucks sales guidance**

Hyzon ended the third quarter with the sale of only two trucks recorded at the start of August. No other vehicle seems to have been delivered since then and we are 45 days from the end of the

year. Still, Hyzon maintains it will sell 85 trucks in 2021. This has reinvigorated its share price.

Sell-side analysts on Hyzon's 12 November earnings call scratched their heads over where the remaining 83 deliveries would go. These vehicles were supposed to be delivered in Europe, initially. But Hyzon declared the company made a *'conscious decision to shift the mix of delivery locations from predominantly European to predominantly Asian customers, in China, specifically.'*

Meanwhile the now infamous Shanghai Hydrogen HongYun Automotive Co., Ltd (上海氢力鸿运汽车有限公司) has ordered 62 trucks. We believe that HongYun was brought in to plug the order gap. As a reminder, this HongYun was set up three days before Hyzon announced a major deal for 500 trucks. HongYun had no paid in capital, no WeChat account, and no website. Hyzon was unable to give any reassuring information on this customer's financial substance in its weak rebuttal on 5 October.

How HongYun will finance its purchase remains a mystery. We strongly doubt Hyzon will meet its sales guidance unless it provides HongYun with financing (directly or via leases).

A mysterious "large industrial conglomerate" is supposed to be the "end-user" of these 62 trucks, not HongYun. It is strange that a conglomerate would plunge headlong into using so many trucks without any pilot tests.

Hyzon is incentivised to keep the HongYun charade alive till the lock-up for 170m shares expires on January 17th next year, in our view. Its guidance shows HongYun is essential for 2022 sales as well. Hyzon has forecast 600-700 vehicle deliveries in 2022,

**Tweets** by
@IcebergResear

 **Iceberg Research**
@IcebergResear

It's plain fraud. There is no other w
to define it.ft.com/content/11549c…

**Selling to yourself: the priva...**
Private equity groups are incr…
ft.com

Jun 21, 2C

Iceberg Research Retweeted

 **Joe Weisenthal**
@TheStalwart

To what degree did crypto contribu
to elevated inflation, by juicing buyi
power of token holders, contributin
to semiconductor tightness, pulling
labor from elsewhere, all the while
contributing nothing productive for
the supply side?

Jun 13, 2C

 **Iceberg Research**
@IcebergResear

Replying to @IcebergResear

Shares are issued with a 3%
discount. No restriction on selling,
meaning shares will likely be sold
immediately, diluting existing
shareholders. Tumim was involved
a similar financing for Nikola. 2/2

Jun 7, 2C

Embed      View on Twitter

of which HongYun would be responsible for 400 (~60%) under the MoU signed on 9 September.

We contacted Hyzon to ask about counterparty risk with HongYun, and whether any financing will be provided. We have not received any answer. All of our questions are detailed below:

- How many trucks does Hyzon expect to deliver to HongYun in 4Q21?

- Will HongYun buy or lease these trucks?

- How did Hyzon assess HongYun's counterparty risk i.e., its ability to pay Hyzon? Does HongYun have financial substance? This customer was set up just three days before Hyzon's 9 September announcement.

- Will Hyzon finance HongYun's order?

- What is the name of the "large industrial conglomerate" that would use HongYun's trucks?

We will share our findings on Hyzon's guidance with the SEC.

We also believe many investors have misunderstood Hyzon's business model as we explained in our first report. The company likes to portray itself as a truck manufacturer. Hyzon simply retrofits OEM trucks with fuel cells and hydrogen tanks by hand, before its logo is slapped on at the end. The company is sandwiched between truck OEMs and its parentco Horizon (whose main client defaulted), which means margins will be squeezed on both ends.

## Hyzon tried to hide the link between CFO Mark Gordon and hub partner Raven

Hyzon wants to promote hydrogen production in the US to boost the adoption of fuel cell trucks. Creating the infrastructure is one of the industry's biggest challenges. To this end, Hyzon will spend $150m to help Raven build hydrogen production hubs [Pg 38 of the July investor presentation] over the next four years. This represents 30% of the ~$500m Hyzon raised through the SPAC merger.

Raven comes across as a serious partner because of the plan to build up to 250 hubs. CFO Mark Gordon — a former employee of Goldman Sachs — was ecstatic about the Raven investment during the call: he stated the 'appetite to debt finance these hubs is extreme…'.

But who is Raven? The California-incorporated company has just nine employees as shown on LinkedIn. Its key investor and offtaker will be Hyzon that has almost no revenue. This means the likelihood of getting project finance is very low.

Raven, while presented as independent from Hyzon, is connected through CFO Mark Gordon. Gordon is the CIO of private equity firm Ascent Hydrogen — a Raven investor. That may explain his enthusiasm.

**Raven is one of Ascent's portfolio companies**

□

*Source: Ascent Hydrogen Fund portfolio page*

Hyzon and Ascent have gone to great lengths to hide this connection. Ascent's website, before October's short reports, clearly showed Gordon as its CIO and Hyzon chairman George Gu as its advisor.

**Page showing Ascent's team**

☐

*Source: Ascent Hydrogen Fund leadership* page *– accessed on 24 August 2021*

The same webpage is now down, a sign that once again, Hyzon has hidden the true nature of its partnerships to hype its business prospects.

**Same Ascent team page about three months later**



*Source: Ascent Hydrogen Fund* website

## Hydrogen trucks are already threatened by battery-electric trucks

The typical case for hydrogen trucks argues that battery-electric trucks (BEVs) require large batteries and are therefore too heavy for long distances. But this assumption is now challenged with advances in battery technology against hydrogen's inefficiencies. Case in point: Volkswagen's Scania, despite having hydrogen fuel cell trucks (FCEVs) in operations, announced earlier this year they would stop developing FCEVs to focus on battery-electric trucks. According to Scania, "The rapid development of electric solutions for heavy duty vehicles includes the fast advancement of battery technology in respect of energy storage capacity per kg. Charging time, charging cycles and economics per kg are improving rapidly."

In other words, hydrogen is fast becoming a non-starter, even for large trucks. The structural flaws of the hydrogen solution are

Case 6:21-cv-06612-MAV-MJP    Document 116-2    Filed 06/30/25    Page 143 of 254

well documented. They are the reasons why hydrogen cars have lost the competition against BEV cars.

1. Hydrogen is massively inefficient compared to battery-powered alternatives. A Transport & Environment study shows BEVs use 73% of original electricity for propulsion versus just 22% for FCEVs. This means FCEVs need 3x as much power to drive the same distance as a BEV, which translates to higher costs.

*Source: Transport & Environment*

2. BEV infrastructure is far easier to build compared to FCEVs which require new hydrogen production hubs and dedicated fuelling stations. Hyzon's CEO Craig Knight acknowledges this issue and told investors that customers need infrastructure before they commit: *'Yeah, timing is definitely a factor. We're not seeing customers lose faith, but we are seeing some deliveries delayed for a few different reasons, we've had some customers scenarios where — where the hydrogen infrastructure rollout is a little delayed. So, therefore, there's not really much point delivering vehicles without hydrogen being available.'*

The confluence of hydrogen's poor energy efficiency, constant improvements in battery energy density, and high infrastructure costs, will translate to uncompetitive price points for hydrogen,

and see customers turn their backs on FCEVs. ARK Investment holds a similar view.

Just recently, Tesla announced it will deploy the first Megacharger station — a more powerful version of its Supercharger network — to support its future Tesla Semi electric trucks that were projected to travel 400 miles after just 30 minutes of charging. This is an ominous sign for hydrogen truck makers. The Supercharger network has been a key driver of the EV maker's success, and just like they did for cars, Tesla has the means to fund the roll-out of this network. Hyzon is fighting against the odds and its chances for success will fade with time.

---

*Disclaimer*

*Our research and reports express our opinions, which we have based upon generally available public information, field research, inferences and deductions through our due diligence and analytical process. To the best of our ability and belief, all information contained herein is accurate and reliable, and has been obtained from public sources we believe to be accurate and reliable, and who are not insiders or connected persons of the stock covered herein or who may otherwise owe any fiduciary duty or duty of confidentiality to the issuer. We strive for accuracy and completeness to support our opinions, and we have a good faith belief in everything we write, however, all such information is presented "as is," without warranty of any kind – whether express or implied. Iceberg Research ("Iceberg") makes no representation, express or implied, as to the accuracy, timeliness, or completeness of any such information or with regard to the results to be obtained from its use. You agree that the use of Iceberg's research is at your own risk. In no event will Iceberg be liable for any direct or indirect trading losses caused by any information available on this report. Think critically about our opinions and do your own*

*research and analysis before making any investment decisions. You should seek the advice of a security professional regarding your stock transactions.*

*You should assume that as of the publication date of our reports and research, Iceberg may have a short position in the securities (and/or options, swaps, and other derivatives related to the stock) covered herein, and therefore may stand to realize gains in the event that the price of the covered securities declines. We may continue transacting in the securities of the company covered in this report, and we may buy, sell, cover or otherwise change the form or substance of our position in the issuer regardless of our initial views set out herein.*

*This is not an offer to sell or a solicitation of an offer to buy any security, nor shall Iceberg offer, sell or buy any security to or from any person through this site or reports on this site. Iceberg is not registered as an investment advisor in any jurisdiction. You agree to do your own research and due diligence before making any investment decision with respect to securities discussed herein. You represent to Iceberg that you have sufficient investment sophistication to critically assess the information, analysis and opinions in this report.*

*We are entitled to our opinions and to the right to express such opinions in a public forum. We believe that the publication of our opinions about public companies that we research is in the public interest. This report and all statements contained herein are the opinion of Iceberg and are not statements of fact. You can publicly access any piece of evidence cited in this report or that we relied on to write this report. All expressions of opinion are subject to change without notice, and Iceberg does not undertake to update or supplement any reports or any of the information, analysis and opinion contained in them.*

*You agree that use of Iceberg's research is at your own risk. In no event will you hold Iceberg or any affiliated party liable for any direct or indirect trading losses caused by any information on this site. You further agree to do your own research and due diligence before making any investment decision with respect to securities covered herein. You represent to Iceberg that you have sufficient investment sophistication to critically assess the information, analysis and opinion on Iceberg's site and in this report. You further agree that you will not communicate the contents of this report to any other person unless that person has agreed to be bound by these same terms of service.*

*By downloading, opening and/or reading this report you knowingly and independently agree: (i) to abide by the terms of service of our website, which are hereby fully incorporated herein, (ii) that any dispute arising from your use of this report or viewing the material herein shall be governed by the laws of the State of New York, United States, without regard to any conflict of law provisions; (iii) to submit to the personal and exclusive jurisdiction of the superior courts located within the State of New York and waive your right to any other jurisdiction or applicable law; and (iv) that regardless of any statute or law to the contrary, any claim or cause of action arising out of or related to use of this website or the material herein must be filed within one (1) year after such claim or cause of action arose or be forever barred. The failure of Iceberg to exercise or enforce any right or provision of this disclaimer shall not constitute a waiver of this right or provision. If any provision of this disclaimer is found by a court of competent jurisdiction to be invalid, the parties nevertheless agree that the court should endeavor to give effect to the parties' intentions as reflected in the provision and rule that the other provisions of this disclaimer remain in full force and effect, in particular as to this governing law and jurisdiction provision.*

## Leave a Reply

Enter your comment here...

← Hyzon Motors Inc: Trouble at the ParentCo

Lilium NV – The Losing Horse in the eVTOL Race →

Blog at WordPress.com.

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| JOHN E. MALORK, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ERIK ANDERSON, JENNIFER AAKER, JANE KEARNS, PIERRE LAPEYRE, JR., DAVID LEUSCHEN, ROBERT TICHIO, JIM McDERMOTT, JEFFREY TEPPER, MICHAEL WARREN, RIVERSTONE INVESTMENT GROUP LLC, WRG DCRB INVESTORS, LLC and DECARBONIZATION PLUS ACQUISITION SPONSOR, LLC,<br><br>Defendants. | C.A. No. 2022-0260-LWW |

**EXHIBIT A TO VERIFIED FIRST AMENDED
CLASS ACTION COMPLAINT**

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

JOHN E. MALORK, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

v.

ERIK ANDERSON, JENNIFER AAKER, JANE KEARNS, PIERRE LAPEYRE, JR., DAVID LEUSCHEN, ROBERT TICHIO, JIM McDERMOTT, JEFFREY TEPPER, MICHAEL WARREN, RIVERSTONE INVESTMENT GROUP LLC, WRG DCRB INVESTORS, LLC and DECARBONIZATION PLUS ACQUISITION SPONSOR, LLC,

Defendants.

C.A. No. 2022-————-———-0260-LWW

## VERIFIED FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiff John E. Malork ("Plaintiff"), based on his own knowledge, and on information and belief, including the investigation of counsel and the review of publicly available information, as to all other matters, alleges as follows:

## NATURE OF THE ACTION

1. This is a stockholder class action brought by Plaintiff on behalf of himself and all other similarly situated investors in Decarbonization Plus Acquisition Corporation ("Decarb" or the "Company"), now known as Hyzon Motors Inc. ("Hyzon"), who were entitled to redeem their shares of Company stock in connection with the Company's acquisition of and merger with, a formerly privately

- 2 -

held company also called Hyzon (the "Merger"). Plaintiff asserts breaches of fiduciary duties in connection with the Merger by the following individuals and entities (collectively, "Defendants," and each a "Defendant"): (a) Decarb directors Erik Anderson (then-Chief Executive Officer ("CEO")), Jennifer Aaker, Jane Kearns, Pierre Lapeyre, Jr., David Leuschen, Robert Tichio (former CEO), Jim McDermott, Jeffrey Tepper, and Michael Warren in their capacities as members of Decarb's Board of Directors (the "Board") and/or as Decarb officers; and (b) Riverstone Investment Group LLC ("Riverstone"), which founded Decarb and defendant Decarbonization Plus Acquisition Sponsor, LLC (the "Sponsor"), and WRG DCRB Investors, LLC ("WRG"), an affiliate of Defendant Anderson, in their capacities as Decarb's controlling stockholders. (the "Controller Defendants").

2.      Hyzon as it exists today is the product of the July 2021 Merger between Decarb——then a publicly traded, special purpose acquisition company ("SPAC")—")—and "Legacy Hyzon,," then a privately held company engaged in the design, development, and manufacture of hydrogen fuel cell powered commercial vehicles. Prior to the Merger, Decarb lacked any business operations of its own. Instead, its sole purpose was to seek out and combine with an operating company or business. Decarb conducted an initial public stock offering ("IPO") of 20 million shares of Class A common stock at $10 per share on October 22, 2020, raising $200 million in gross proceeds. Pursuant to the SPAC's terms, Decarb had two years after the

- 3 -

IPO, or until October 22, 2022, to identify a merger target and complete the acquisition or face returning the initial $10 per share investment, plus interest, to its investors.

3.      Critically, once a merger target had been identified, putative class members had the right, in connection with their investment in pre-Merger Decarb, either to take possession of the stock in any newly formed company Decarb eventually acquired **_or_** to seek a redemption of their pro rata share of trust assets (*i.e.*, $10 in cash initially paid for their shares, plus interest) ("Redemption Rights").

4.      This action is brought on behalf of the former holders of the Decarb SPAC common stock whose Redemption Rights were unlawfully impaired due to Defendants' misstatements and omissions about Legacy Hyzon's true business metrics and financial prospects in connection with the Merger.  These materially false and misleading statements deprived the Class (defined herein) of their right to a fully informed decision whether to redeem their shares and induced stockholders to vote to approve the Merger to their detriment and the substantial benefit of Defendants.

5.      As further detailed herein, in structuring Decarb, Defendant Anderson (through his control of WRG), along with Defendants Lapeyre, Leuschen, and Tichio (in their capacities as co-founders, partners, and/or managing directors of Riverstone, which controlled Decarb and the Sponsor) behaved disloyally and in

- 4 -

service of their own financial interests.  These Defendants used the full panoply of tools that gave the Board strong (indeed, overriding) incentives to get a deal——any deal——done.  These Defendants pushed the Merger through without regard to whether it was truly in the best interest of the SPAC's outside investors (*i.e., without regard to whether the target private company was actually a solid investment)* and without providing full and complete disclosure to investors, thus negating their rights to the full and uncompromised exercise of their right to redemption.  Among other things:

- The Sponsor (for the benefit of Riverstone), WRG (for the benefit of Anderson), and the non-executive directors of the Company received "founder shares" ("Founder Shares") giving them the right to obtain 20% of the equity of the SPAC for nominal consideration, provided an acquisition was completed.  At the time of the Merger, the Founder Shares were worth approximately $56.4 million, but would expire worthless if no deal were completed.

- The Sponsor gave the purportedly independent non-executive directors of the Company (each of whom was selected by and had extensive professional and financial ties to Defendants Riverstone, Anderson, Lapeyre, Leuschen, and Tichio) a large number of Founder Shares, the value of which were also conditioned on a deal——any deal—— closing.

- Thus, even in a "bad" deal for public SPAC investors (*i.e.*, where the post-transaction company's stock trades at less than $10 per share), completion of a business transaction would yield massive windfalls to holders of the Founder Shares—including each of the purportedly "independent" non-executive members of the Decarb Board.

- Defendants' disclosures in the Merger Proxy (described below) regarding the Merger lacked the rigor of the usual IPO disclosures, yet were critical to outside investors' informed exercise of their

- 5 -

Redemption Rights.  Critically, in addition to delivering a materially misleading description of the Merger target's business metrics and financial prospects and overstating the deficient due diligence completed in connection with the target's selection, the Merger Proxy provided shareholders with the ***only*** directives as to exercising their Redemption Rights and expressly directed that shareholders rely solely upon the Merger Proxy and related SEC filings in making that decision whether to redeem, and conduct no independent research of their own.[1]

- The massive windfalls available to WRG (and thus Anderson), the Sponsor (and thus Riverstone), and the members of the Decarb Board contingent fromupon the Merger closing——separate from any benefit to stockholders——created a clear conflict of interest with respect to any proposed deal, thus warranting entire fairness review of any deal.

6.    As a result of these conflicts of interestsinterest, Defendants issued materially false and misleading statements in support of the Merger in the Merger Proxy and related SEC filings, which were designed to discourage stockholders from exercising their Redemption Rights.  Instead, Defendants encouraged stockholders to approve the Merger and to forgo their Redemption Rights, claiming that strong consumer demand for hydrogen fuel vehicles and Legacy Hyzon's long list of customers with signed orders—many for delivery during 2021—warranted entry

---

[1]  Such "related SEC filings" include the SEC filings made by Legacy Hyzon between February 9, 2021, when the de-SPAC transaction was first announced, and the July 13, 2021 deadline for Decarb stockholders to exercise their Redemption Rights, including but not limited to the slides used in connection with the February 9, 2021 Investor Presentation, which were filed with the SEC on Form 8-K on February 9, 2021 (the "February 2021 Investor Presentation Slides"), and the April 29, 2021 Investor Presentation, which were filed with the SEC on Form 8-K on April 29, 2021 (the "April 2021 Investor Presentation Slides").

into the Merger and the acquisition of Legacy Hyzon.  In reality: (a) many of Legacy Hyzon's customers were illusory; (b) Hiringa, supposedly one of Legacy Hyzon's largest customers, which had purportedly signed a "100% Certain," "Signed Contract" for 20 vehicles to be delivered before the end of 2021, was only a distributor, not a customer; (e), with no obligation, intention, or capability to purchase the volume of vehicles Legacy Hyzon claimed were "100% Certain"; (c) Legacy Hyzon's financial projections were grossly inflated and lacked a reasonable factual basis; and (d) Legacy Hyzon was unable to meet a material portion of the vehicle deliverables it had promised in 2021; (e) undisclosed financial problems related to Legacy Hyzon's former parent, which would remain its controlling stockholder and continue to be its largest supplier, left Legacy Hyzon exposed to being exploited; (f) Legacy Hyzon had exaggerated its "superior fuel cell technology"; and (g) there was a crippling deficit in Legacy Hyzon's business model: buyers would be disinclined to purchase vehicles from Legacy Hyzon, which had only been retrofitting vehicles made by others, once they found out that it was Legacy Hyzon and not the vehicles' official equipment manufacturers ("OEMs") that would be responsible for warranting the vehicles being sold by Legacy Hyzon.

7.    Most notably, the Founder Shares cost the Sponsor just $25,000 yet were worth *$56.4 million* upon the Merger's closing, representing an increase on its investment of *more than 2,255x*.

- 7 -

8.      For purposes of this action, "[t]he entire fairness standard of review applies due to inherent conflicts between the SPAC's fiduciaries and public stockholders" in connection to the Merger, which resulted in a "value-decreasing transaction."[2] Here, the process leading to the Merger fails any entire fairness review for multiple reasons, including:

9.      First, prior to negotiating the substantial terms of the Merger and conducting the purported "due diligence," the Decarb Board did not bothernever bothered retaining its own, independent financial advisor investment bankers to assess the fairness of the merger consideration and negotiate the Merger, but instead shared a financial advisorclearly conflicted investment bankers with the Company's acquisition target, Legacy Hyzon.   That conflicted financial advisorinvestment banking firm was Goldman Sachs & Co. ("Goldman Sachs"). This is not "), which served both as target Legacy Hyzon's financial advisor in the Merger and as the co-placement agent for Decarb in selling the PIPE financing required to complete the Merger.[3] This was not a coincidence. as the Board and the Controller Defendants

---

[2] *In re MultiPlan Corp. S'holders Litig.*, 2022 WL 24060, at *2268 A.3d 784, 792 (Del. Ch. Jan. 3, 2022).

[3] The "PIPE Financing" was the issuance and private offering of 35.5 million shares of the Class A common stock of the combined company for $10.00 each to certain investors in connection with completing the Merger, raising $355 million to be used by the combined company for general corporate purposes.

have decades of extensive professional and financial ties to Goldman Sachs. Defendant Anderson had previously served as a Goldman Sachs vice president, and Defendants Lapeyre, Leuschen, and Tichio were also Goldman Sachs alumni. Indeed, these Riverstone executives had such strong business ties to Goldman Sachs that in 2017 Goldman Sachs had purchased a 12% stake in Defendant Riverstone. Only after Legacy Hyzon had hired Goldman Sachs to find an acquirer did the controlling stockholders of Decarb hire Goldman Sachs to serve as its co-placement agent for the PIPE shares required to complete the Merger. Defendants have expressly acknowledged the "conflicts in connection with such dual roles." and explicitly required that Decarb and Legacy Hyzon sign dual letters "waiving any potential conflicts in connection with such dual roles."[4]

9.10. At the tail end of the Merger process, the Decarb Board claims to have brought on additional its own independent financial advisors. ItBut it was too little too late. The purported due diligence and deal negotiations were then largely complete. TheCritically, the new bankersinvestment bankers—Citigroup Global Markets Inc. ("Citi") and Credit Suisse Securities (USA) LLC ("Credit Suisse")— had themselves hadjust been paidpromised millions of dollars for services to

---

[4] *See* Decarbonization Plus Acquisition Corporation's final Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934 filed with the SEC on Form DEFM14A on June 21, 2021 ("Merger Proxy") at 99.

- 9 -

~~Riverstone, which had just underwritten~~in contingent investment banking fees for underwriting Decarb's IPO, ~~and expected to receive additional~~a full 60% of which fees would be forfeited if Decarb did not complete the Merger.  Thus Credit Suisse and Citi had their own interests in seeing the Merger completed.  As detailed herein, these new conflicted advisors also had very reasonable expectations of receiving millions ~~for~~ of dollars more in investment banking fees for doing further ~~investment banking~~ work ~~from~~for the Company and Riverstone following the Merger~~.~~, including in the additional SPACs then being undertaken by Riverstone.  As a result, these new purported financial advisors lacked any ability to act impartially and appear to have only been belatedly added to rubberstamp a largely completed and highly conflicted deal process.

~~10.~~11. Second, while the Board had a duty to diligently review Legacy Hyzon's operations before agreeing to buy the company, it either failed in that duty or it and its conflicted financial ~~advisor~~advisors ignored and concealed basic facts making clear the acquisition would be detrimental to Decarb stockholders.  For instance, minimal due diligence would have revealed that Legacy Hyzon's fuel cell technology unit sales——the very technology that was supposed to make Hyzon profitable following the Merger——had declined by 81% since 2019.  ~~Moreover,~~If revealed during the purported due diligence, this material information should have been disclosed in the Merger Proxy, but it was not.  Similarly, as demonstrated by

industry data, the financial statements of Legacy Hyzon's former parent, and statements by industry executives, including a confidential witness identified by a stock research firm as a "former Hyzon executive," Legacy Hyzon's financial projections in the Merger Proxy were grossly inflated due tobecause its gross margin estimates beingwere overstated by upwards of 600%.  Similarly, just days after announcing the proposed Merger, on February 17, 2021, Legacy Hyzon announced a purportedly valuable new agreementsigned contract with New Zealand infrastructure startup Hiringa to "purchase" 1,500 trucks by 2026, including 20 trucks by 2021, making Hiringa one of Legacy Hyzon's largest purported "customers."  Those 20 trucks reflected 24% of the 85 vehicles the Merger Proxy consistently stated Legacy Hyzon was on track to sell during 2021.  The February 2021 and April 2021 Investor Presentation Slides emphasized the Hiringa deal was a "100% [c]ertain" "[s]igned [c]ontract."  In reality though, Hiringa was not a "customer" at all, but merely a "channel partner" contracted to assist Legacy Hyzon in eventually marketing vehicles to end customers in New Zealand.  Hiringa was in fact then just a small startup operating out of a house in New Zealand with neither the capability nor the then-current intent to purchase Hyzon trucks.  A modicum of financial due diligence would have uncovered these basic facts——but noneno meaningful due diligence was conducted—or the findings were concealed.

- 11 -

11.12. Third, Defendants' statements regarding the Merger were affirmatively false and misleading. For example, in soliciting Decarb investors to support the Merger rather than redeem their pre-deal shares, the Board repeatedly highlighted the "***extensive due diligence***" it supposedly had performed. However, the Board had simply accepted its conflicted financial advisors' projections for Hyzon at face value, rather than disclose the target's true financial picture.

12.13. Less than 10% of the Company's outside investors redeemed their shares before the Merger closed on July 16, 2021.

13.14. Investors who believed the Board's disclosures and put their faith in the Board's purported due diligence and loyalty received a rude but prompt awakening. Just two months after the Merger closed, a market research report by Blue Orca Capital (the "Blue Orca Report" or "Report") publicly disclosed for the first time both the issues withfallacy of Hyzon's purportedclaimed customers and the truth about its business metrics and inflated financial prospects. Thereafter, on January 12, 2022, Hyzon disclosed that the enforcement staff at the U.S. Securities and Exchange Commission ("SEC") had opened a formal investigation into the Company's disclosures related to issues raised in [5] The findings of the Blue Orca Report. were then independently researched and confirmed by a second research

___

[5] *See* Blue Orca Capital, *Blue Orca is Short Hyzon Motors Inc.*, Sept. 28, 2021 (*see* Exhibit 1).

firm, Iceberg Research, which published its own reports in October and November 2021.[6] The Iceberg Research Reports revealed additional facts that had been concealed by Defendants in connection with obtaining shareholder approval of the Merger and dissuading Decarb shareholders from exercising their Redemption Rights. Specifically, the 1st Iceberg Research Report raised additional unknown issues relating to Legacy Hyzon's governance, challenged the published strength of its fuel cell technology and revealed weaknesses in its business model related to Legacy Hyzon (not the OEMs) being responsible to fulfill customer warranty obligations. The 2nd Iceberg Research Report, published after Hyzon reported its third quarter 2021 financial results, emphasized that it was nearly impossible for Legacy Hyzon to complete the vehicle sales and financial projections contained in the Merger Proxy. While the Blue Orca and Iceberg Research Reports were published after the Merger, they address material issues of fact in existence and known prior to the Merger.

15. Thereafter, on January 12, 2022, Hyzon disclosed that the enforcement staff at the SEC had opened a formal investigation into the Company's disclosures related to issues raised in the Blue Orca Report and that the Company had badly

---

[6] *See* Iceberg Research, *Hyzon Motors Inc: Trouble at the Parentco*, Oct. 6, 2021 ("1st Iceberg Research Report") and *Horizon Unleashes a Load of Hot Air with its 3Q21 Results*, Nov. 16, 2021 ("2nd Iceberg Research Report") (*see* Exhibits 2-3).

missed the 2021 sales and financial targets it had claimed to be "100% [c]ertain" it would meet in connection with obtaining shareholder approval of the Merger and dissuading shareholders from exercising their Redemption Rights.   Upon information and belief as of the filing of this Complaint, that SEC investigation appears to remain ongoing.  And Hyzon has since reported its actual 2021 revenues, which came in at just $6 million, less than 17% of the $37 million in 2021 revenues relayed in the Merger Proxy and the Investor Presentations employed by Defendants to obtain shareholder approval of the Merger and to dissuade shareholders from exercising their Redemption Rights.

14.16. The result has been a financial catastrophe for the public stockholders who failed to redeem their Decarb stockshares.  Following the publication of the Blue Orca Report and Iceberg Reports, the announcement of the SEC investigation and Hyzon's disclosure of its fledgling sales, the market price of Decarb Class A stock plummeted.  Indeed, the market price of those shares——which had traded in a tight range around $10 (and actually represented $10 per share, plus interest, of cash) before the Merger——traded below $43 per share by January 24July 5, 2022.  In other words, a pool of approximately $200 million of cash pre-deal was devalued to approximately $8070 million, reflecting the destruction of roughly $120130 million of stockholder value.

15.17. In sum, the entire fairness standard applies to this deeply conflicted Merger. In light of the conflict-laden structure of this SPAC and the manner in which the Sponsor and the Board acted with respect to those conflicts and the deal process in general, the Merger cannot meet the test of entire fairness.

16.18. Accordingly, the Court should award monetary damages to the Class or, in the alternative, for public stockholders who purchased Decarb stock and were entitled to redeem their shares and continue to hold such stock, equitably reopen the redemption window to allow them to exchange their Decarb Class A shares for $10 per share, plus interest.

## PARTIES AND RELEVANT NON-PARTIES

17.19. Plaintiff John E. Malork has consistently held, and has been the beneficial owner of, Decarb stock at all relevant times, including prior to the July 13, 2021 redemption deadline, and was entitled to redeem his shares.

18.20. Defendant Erik Anderson had served as Decarb's CEO since September 21, 2020 and as a Board member since October 22, 2020. He has also served as the CEO and a director at a number of other SPACs created by Riverstone under the "Decarbonization Plus" banner. He currently serves as a member of the post-Merger company's board of directors. Defendant Anderson founded West River Group in 2002 and has served as its CEO since its inception. West River Group, in turn, created controlling shareholder Defendant WRG to house Defendant

- 15 -

Anderson's Founder Shares in connection with the SPAC transaction. Previously, Defendant Anderson served as a vice president at Goldman Sachs, ~~Decarb's~~the conflicted ~~financial advisor~~investment banker.

~~19.~~1. ~~Non-Party Peter Haskopoulos had served as Decarb's Chief Financial Officer ("CFO"), Chief Accounting Officer, and Secretary since August 2020. Previously, he served as the CFO, Chief Accounting Officer, and Secretary at a number of other SPACs created by Riverstone under the "Decarbonization Plus" banner. Haskopoulos was also a managing director and the CFO of Riverstone.~~

~~20.~~21.Defendant Jennifer Aaker served as a member of the Board prior to the Merger. She has also served a director of ~~at least one~~several other ~~SPACS~~SPACs created by Riverstone under the "Decarbonization Plus" banner.

~~21.~~22.Defendant Jane Kearns served as a member of the Board prior to the Merger. She has also served as a director of ~~at least one~~several other SPAC created by Riverstone under the "Decarbonization Plus" banner.

~~22.~~23.Defendant Pierre Lapeyre, Jr. served as a member of the Board prior to the Merger. He has also served as a director of ~~at least one~~several other ~~SPAC~~SPACs created by Riverstone under the "Decarbonization Plus" banner. Defendant Lapeyre is the co-founder and a senior managing director of Riverstone, and he serves on the boards of directors or equivalent bodies of a number of public and private Riverstone

portfolio companies and their affiliates., including Centennial Resource Development, Inc. f/k/a Silver Run Acquisition Corporation ("Silver Run") where he, along with Defendants Leuschen, Tepper, and Tichio, have served as directors since 2016. Defendant Lapeyre was also a managing partner of the conflicted financial advisorinvestment banker Goldman Sachs' Global Energy & Power Group, having joined Goldman Sachs in 1986 and having spent his 14-year investment banking career there focused on energy and power.

23.24. Defendant David Leuschen served as a member of the Board prior to the Merger. He has also served as a director of at least oneseveral other SPACSPACs created by Riverstone under the "Decarbonization Plus" banner. Defendant Leuschen is the co-founder and a senior managing director of Riverstone, and he serves on the boards of several Riverstone portfolio companies and investment vehicles., including Silver Run where he, along with Defendants Lapeyre, Tepper, and Tichio, has served as a director since 2016. Defendant Leuschen also previously served as a partner and managing director at the conflicted financial advisorinvestment banker Goldman Sachs. There, Defendant Leuschen also served as the founder and head of Goldman Sachs' Global Energy & Power Group, where he is credited with having advanced the Goldman Sachs energy and power investment banking practice, and as chairman of the Goldman Sachs Energy

Investment Committee, where he is credited with having screened potential direct investments by Goldman Sachs in the energy and power industry.

24.25. Defendant Robert Tichio served as a Board member prior to the Merger and as Decarb's CEO until September 2020. He has also previously served as a director at a number ofseveral other SPACs created by Riverstone under the "Decarbonization Plus" banner, and had served at least temporarily as their CEOs. Defendant Tichio was also a director and a managing partner at Riverstone, and also served on the boards of directors at a number of Riverstone portfolio companies., including Silver Run, where he, along with Defendants Lapeyre, Leuschen, and Tepper, has served as a director since 2016. Previously, Defendant Tichio served as a banker at the conflicted investment banker Goldman Sachs in the Principal Investment Area, which manages the firm's private corporate equity investments.

25.26. Defendant Jim McDermott purportedly served as the lead "independent" director of the Board prior to the Merger. He also served as a director of at least oneseveral other SPACSPACs created by Riverstone under the "Decarbonization Plus" banner.

26.27. Defendant Jeffrey Tepper served as a Board member prior to the Merger. He also served as a director of at least oneseveral other SPACSPACs created by Riverstone under the "Decarbonization Plus" banner. Defendant Tepper previously served as a director of Riverstone portfolio companies Silver Run I (from

- 18 -

its inception in November 2015 until the completion of its de-SPAC in October 2016) and Silver Run II (between March 2017 and its de-SPAC in June 2020).

27.28. Defendant Michael Warren served as a member of the Board prior to the Merger. He also served as a director of at least oneseveral other SPACSPACs created by Riverstone under the "Decarbonization Plus" banner.

28.29. Defendant Riverstone is a Delaware limited liability company that founded, and thus controlled, both Decarb and the Sponsor. In 2017, Goldman Sachs purchased a 12% interest in Riverstone. Along with the directors of Decarb and WGNWRG, through its ownership of the Sponsor, Riverstone was a controlling shareholder of Decarb. Riverstone acted through Defendants Lapeyre and Leuschen, its co-founders and senior managing directors, who jointly shared beneficial ownership of the Class B common Founder Shares held directly by the Sponsor, and Defendant Tichio, one of Riverstone's managing directors. In addition to its series of Decarbonization SPACs, Riverstone carried out two previous SPAC transactions (Silver Run I and Silver Run II). Riverstone raised approximately $1 billion in March 2017 for what eventually became Alta Mesa Resources (previously known as Silver Run II), which later went bankrupt in 2020. Riverstone also acquired an oil and natural gas company called Centennial Resource Development in October 2016 as part of its first SPAC, Silver Run I.

- 19 -

29.30. Defendant Sponsor is a Delaware limited liability company and affiliate of Riverstone that served as Decarb's sponsor and purchased and held Riverstone's Class B Founder Shares. As set forth in ¶¶55-56 60, 62-63 and 7282 below, several Board members received membership interests in the Sponsor and, in turn, a portion of the Founder Shares, which gave them the opportunity to make millions of dollars as long as they approved a transaction in which Decarb acquired another business.

30.31. Defendant WGRWRG is an affiliate of Defendant Anderson, created by the West River Group where Anderson serves as CEO, that purchased and held Founder Shares for the benefit of Defendant Anderson.

31.32. Defendants Anderson, Aaker, Kearns, Lapeyre, Leuschen, Tichio, McDermott, Tepper, and Warren are sometimes collectively referred to herein as the "Director Defendants." Defendants Riverstone, Sponsor, and WGRWRG, by virtue of their controlling stock ownership interests, along with Defendants Anderson, LepeyreLapeyre, Leuschen, and Tichio, by virtue of their ties to those entities and the conflicted advisorinvestment banker Goldman Sachs, are sometimes collectively referred to herein as the "Controller Defendants."

33. Non-Party Peter Haskopoulos had served as Decarb's Chief Financial Officer ("CFO"), Chief Accounting Officer, and Secretary since August 2020. Previously, he served as the CFO, Chief Accounting Officer, and Secretary at a

number of other SPACs created by Riverstone under the "Decarbonization Plus" banner. Haskopoulos was also a managing director and the CFO of Riverstone.

32.34. Non-Party Decarbonization Plus Acquisition Corporation (defined above as "Decarb" or the "Company")"), f/k/a Silver Run Acquisition Corporation III, is a blank check company formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization, or similar business combination. On or around October 22, 2020, Decarb closed its $200 million IPO. On July 16, 2021 (the "Closing Date"), Decarb merged with Legacy Hyzon, with Decarb remaining as the surviving entity. Legacy Hyzon and following the Merger, Decarb is engaged in the design, development, and manufacture of hydrogen fuel cell powered commercial vehicles. Prior to the Merger, the Company's shares traded on the Nasdaq under the ticker symbol "DCRB." The post-Merger company's shares trade on the Nasdaq under the ticker symbol "HYZN."

33.35. Non-Party Goldman Sachs is a multinational investment bank and financial services company headquartered in New York City. In 2017, Goldman Sachs purchased a 12% stake in Defendant Riverstone. In connection with the Merger Goldman Sachs is referred to herein as conflicted because it simultaneously served as the financial advisor to bothLegacy Hyzon the seller and as an investment banker and co-placement agent to Decarb the buyer in the Merger in the Merger, and because of its financial investment in Riverstone. As

detailed herein in ¶¶20-35, and 62, the Controller Defendants also have extensive professional and financial ties to Goldman Sachs and it has a reasonable expectation of receiving millions of dollars in future fees for work done for the Controller Defendants.

36.    Non-Parties Citi and Credit Suisse are multinational investment banks and financial services companies with their U.S. headquarters in New York City. They served as underwriters to Decarb in its October 2020 IPO and were promised $11 million in investment banking fees, 60% of which was contingent upon a timely business combination being completed by Decarb.  Citi and Credit Suisse were brought on as additional advisors to Decarb in the final throes of the Merger negotiations and rubber stamped their approval of it.  As detailed herein in ¶¶20-36, 45, 48-59, 62, 68, 71-76, and 122 the Controller Defendants also have extensive financial ties to Citi and Credit Suisse and Citi and Credit Suisse have a reasonable expectation of receiving millions of dollars in future fees for work done for the Controller Defendants.

<u>**SUBSTANTIVE ALLEGATIONS**</u>

**I.    Structure of SPAC Transactions**

34.37.SPACs, also known as "blank-check companies," are publicly traded shell corporations that undertake no business operations of their own, but are instead created to merge with privately held operating businesses.  SPACs typically raise

funds through an IPO in which they issue and sell "units," comprised of both shares and warrants to purchase shares.  SPACs typically have a two-year deadline to identify a target company or business to acquire.  Once a SPAC identifies a target and the target agrees to the terms of a merger or acquisition, the parties effect a business combination through a reverse merger——often referred to as the "de-SPAC" transaction——that must be approved by the SPAC's stockholders.

35.38.This transactional structure serves as a back door to an IPO for the target company.  The target company reverse mergersmerges with a subsidiary of the SPAC, which has already been publicly listed, and then serves as the SPAC's operating subsidiary going forward.  The SPAC, which is the surviving entity, then assumes the identity of the target company, changing its name and applicable security listings.  In theory, this structure allows the target company to bypass the time and expense of a traditional public listing and avoid regulatory scrutiny and traditional gatekeepers, such as the underwriters who would perform due diligence in a firm commitment offering.

36.39.In addition, while the traditional IPO process permits the market to set the price at which an already operating company or business is valued and sold in an IPO, the SPAC process reverses the usual order of events.  With a SPAC, investors first purchase shares of an empty-shell publicly traded company, permitting them the "opportunity" to have their shares converted into shares of an-

as-yet unidentified operating business that will be selected by SPAC management. Essentially, stockholders who invest in SPACs are investing in the skill, experience, reputation, faithfulness, and diligence of SPAC managers, who are entrusted with finding suitable acquisition targets. Stockholders rely on SPAC managers to identify and vet targets and to negotiate a fair and reasonable price for any acquisitions.

37.40. Most SPACs have the same basic terms and legal structure. A SPAC will raise funds from public investors through an IPO, and then hold those funds in "trust" for those investors while the SPAC seeks an acquisition target. The SPAC will then have a "completion window"—"—generally two years——to identify and execute a business combination. If the SPAC fails to do so during the completion window, then it must return the funds in trust to its public stockholders and the SPAC dissolves.

38.41. SPAC stockholders are granted both voting rights to approve or reject the business combination proposed by the management team and their Redemption Rights. Thus, when the management team identifies a target, a proxy statement must be distributed to all SPAC stockholders, which includes the target company's complete audited financials and the terms of the proposed business combination. In anticipationUpon review of the stockholder merger proxy (and related SEC filings), in addition to casting their vote in favor of or against the proposed transaction, each SPAC stockholder has three options: (a) to approve the transaction by voting in favor

- 24 -

~~of it~~continue holding their SPAC shares until they convert into shares of the combined company; (b) to elect to sell their SPAC shares in the open market; or (c) to ~~vote against the transaction and~~ redeem their SPAC shares for a pro-rata share of the trust account. To this end, SPAC stockholders depend on management to provide complete and accurate information about any contemplated transactions~~.~~ in the Merger Proxy and in related SEC filings. Critically, the merger proxies provide the only instructions SPAC shareholders receive as to exercising their Redemption Rights and the merger proxies explicitly direct that the SPAC shareholders rely only upon statements made in the merger proxy and related SEC filings in making their decisions.

~~39.~~42. If a merger or acquisition is accomplished within the allocated time frame, stockholders and management of the SPAC can profit through their ownership of the common stock and any related securities. (Ordinarily, SPAC IPOs include "units" consisting of both stock and out-of-the-money warrants.) However, if an acquisition is not completed within the time period specified when the SPAC is organized, then the SPAC automatically dissolves and the money held in trust is returned to investors. No salaries, finder's fees, or other cash compensation are paid to the founders and/or management team if they fail to consummate a successful business combination. Accordingly, the founders and management team of a SPAC, who typically own approximately 20% of the company through founders' shares and

invest significant resources in the formation of the company and identifying acquisition targets, are highly incentivized to get a qualifying transaction approved within the operating deadline.   Furthermore, SPAC management is heavily incentivized to reduce the stockholder redemption rate because redemptions deplete available cash to fund a business acquisition and ongoing business operations following the merger, reducing the value of the contingent stock management receives in the blank check IPO and threatening the business acquisition altogether.

40.43. Indeed, leaders in the finance industry have opined that SPAC management teams have an incentive to spend the money they have raised so they can collect fees and pay themselves in salary and stock options at the company they purchase.  For example, Ben Dell, managing partner of investment firm Kimmeridge Energy, recently stated that "SPACs are the most egregious example in the industry of executive misalignment with investors."  In addition to the reward of paying themselves a handsome salary, SPAC management teams are incentivized to receive a return on the significant time and financial resources they expended up front to set up the investment vehicle and pursue an acquisition target.

41.44. Additional inherent conflicts abound, since the founders control the SPACs' investment and financing decisions with little, if any, oversight.  For instance, founders often allow themselves and select investors to participate in additional investments——at especially favorable terms——in their SPAC

- 26 -

acquisitions through private warrant placements and investment in public equity, or "PIPE" financings.  When a SPAC conducts an acquisition using this form of PIPE financing, the SPAC managers dilute the existing SPAC investors by selecting their preferred investors——whether they are existing SPAC investors or not——who will acquire cheap post-deal equity by providing the financing for a PIPE deal.

42.45. Another example of the conflict inherent in the current SPAC structure is where founders richly compensate affiliated persons and entities to provide consulting or advisory services to their SPACs, or to serve on the boards of their other SPACS.  Despite standing to receive a windfall through their own Founder Shares (and ultimately receiving tens of millions of dollars in equity based on completing the Merger), the Controller Defendants opportunistically caused Decarb to pay millions of dollars in advisory investment banking fees to Goldman Sachs, Citi, and Credit Suisse, with which they each had extensive history and dealings. *See ¶¶18-2820-36*, 45., 48-59, 62, 68, 71-76, and 122.  Defendants used Goldman Sachs, Citi, and Credit Suisse because a majority of the Board had their own multi-million-dollar windfalls riding on closing the deal no matter the cost to Decarb stockholders.  Citi and Credit Suisse would also forfeit 60% of the fees they had earned underwriting Decarb's IPO if a timely business combination was not completed.  Each of the purportedly "independent" outside directors on the Decarb Board was also then engaged in other SPAC transactions with Riverstone where they

served on the boards of those SPACs. These "independent" outside directors expected to share millions of dollars more in profits on founders shares they were receiving in connection with completing those SPAC business transactions, giving even the purported outside directors on the Decarb Board incentive to approve Decarb's Merger with Legacy Hyzon.

43.46. An important check on the potential for misconduct by the directors, officers, and controllers of SPACs, however, is their fiduciary duties to stockholders. After all, Delaware blank check corporations are still Delaware corporations, governed by the State's statutory and common law. Accordingly, if a SPAC choses to incorporate in Delaware, then its fiduciaries are bound by non-waivable duties of loyalty, good faith, and care.

44.47. Defendants enjoyed all the powers and opportunities bestowed upon them by the conflict-laden SPAC structure. But they used those powers and opportunities to serve their own interests at the expense of the interests of the Class. Where, as here, there are "inherent conflicts between the SPAC's fiduciaries and public stockholders," then "[t]he entire fairness standard of review applies."[7] The Merger, the product of an unfair process at an unfair price, fails that standard.

---

[7] *See MultiPlan*, 2022 WL 24060, 268 A.3d at *2 792.

Defendants breached their duties of loyalty, good faith, and care in effecting and approving the unfair Merger.

## II.    Background to the Hyzon Merger

45.48. Defendant Riverstone was founded by investment bankersbanker Defendants Leuschen and Lapeyre after they "left Goldman Sachs Group Inc. and hung a shingle in 2000, just in time for the shale boom."[8]  At Riverstone, Defendants Leuschen and Lapeyre teamed up with former Goldman Sachs alumni Defendants Anderson and Tichio, and Non-Party Haskopoulos.  Riverstone is one of the country's most prolific "clean energy" SPAC sponsors, having launched at least seven blank check companies under the "Decarbonization" and/or "Silver Run" banners since 2015.[9]  These SPACs haveGoldman Sachs was so involved in Riverstone's SPAC transactions that it took a 12% ownership stake in Riverstone in

---

[8]    *See* Ryan Dezember & Amrith Ramkumar, *Riverstone SPACs Bet Renewable Energy Will Pay Off This Time*, Wall St. J., Aug. 26, 2021; and ¶¶18-28 above.

[9]    *Id.*; *see also* Cromwell Schubarth, *Private equity firm's Menlo Park SPAC raises $350M in an IPO*, Silicon Valley Bus. J., Feb. 5, 2021 ("Riverstone's Decarbonization Plus companies are its fourth and fifth SPACs.  Its three previous ones predated last year's gold rush.  And instead of being focused on reducing carbon use, they aimed to benefit from it in the form of fossil fuel extraction."); Decarbonization Plus Acquisition Corporation's final Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934 filed with the SEC on Form DEFM14A on June 21, 2021 ("Merger Proxy") at 73.Merger Proxy at 73.

- 29 -

2017 giving it a proportional cut of Riverstone's management fees and profits.[10]

According to a *Wall Street Journal* account, Goldman Sachs' investment in Riverstone was "a reunion of sorts for Riverstone's founders, David Leuschen and Pierre Lapeyre Jr., who worked as high-ranking energy bankers at Goldman, arranging oil company mergers and stock sales before leaving to start the investment firm in 2000," adding that Defendants "Leuschen and Lapeyre have frequently tapped their Goldman connections to recruit deal makers and find investment opportunities" and that "Riverstone's investment committee includes 14 people who have Goldman on their résumés."  The Riverstone SPACs have since raised more than $3.3 billion dollars from public investors.[11]  This action relates to Riverstone's

---

[10]  *See* Ryan Dezember, *Goldman Fund Agrees to Buy 12% of Riverstone Holdings – Roughly $500 million deal would value the energy investment firm at more than $4 billion*, Wall St. J., May 4, 2017 ("The deal would value Riverstone at more than $4 billion and give the Goldman fund a proportional cut of the firm's management fees and profits.").

[11]  *Id*.; *see also* Olivia Pulsinelli, *Former EOG CEO's new 'blank check' company to acquire controlling stake in E&P co.*, Hous. Bus. J., July 26, 2016 (Riverstone sponsored de-SPAC Centennial Resource Development Corp. raised $450 million in 2016); Ryan Dezember & Maureen Farrell, *Riverstone, Retired Energy Executive Raise $1 Billion to Shop in Oil Patch*, Wall St. J., Mar. 25, 2017 (Riverstone sponsored de-SPAC Anadarko Petroleum Corp. raises $1 billion); Ryan Dezember & Amrith Ramkumar, *Riverstone SPACs Bet Renewable Energy Will Pay Off This Time*, Wall St. J., Aug. 26, 2021 (noting that Riverstone sponsored de-SPACs Hyzon Motors Corp., Tritium Holdings Pty Ltd., and Solid Power Inc. SPACs, respectively, raised $200 million in October 2020, $350 million in February, 2021, and $350 million in March 2021; and that "[t]he latest Riverstone SPAC, Decarbonization Plus Acquisition Corp. IV, raised about $315 million in a stock offering this month and

last Silver Run SPAC, which was renamed under the "Decarbonization" SPAC banner mid-play.[12]

46.49. According to *The Wall Street Journal*, "[t]he crowd of investors going green has made clean-energy businesses with meager sales but rosy forecasts popular targets for blank-check companies."[13]  As a result, "[t]here have been 70 SPAC deals tied to renewable energy or sustainability announced since March 2020," and "[t]hey collectively value the companies at more than $170 billion, including debt but excluding cash holdings."[14]

47.50. In 2017 In 2017, the same year that Goldman Sachs took a 12% ownership stake in Riverstone, the Sponsor incorporated Silver Run Acquisition Corporation III under the laws of Delaware.  On August 18, 2020, the Sponsor changed the name of the Company to Decarbonization Plus Acquisition Corporation. This would have been the last of Riverstone's Silver Run SPACs but was instead the first of its Decarbonization SPACs.  Defendant Tichio then served as the Company's

---

is looking for a business to take public"); Merger Proxy at 73 (noting Riverstone sponsored the Vista SPAC raising $650 million in March 2017, which was used to acquire Pampa Energía S.A. and Pluspetrol Resources Corporation).

[12]  *Id.*; *see also* Merger Proxy at F-6.

[13]  *See* Ryan Dezember & Amrith Ramkumar, *Riverstone SPACs Bet Renewable Energy Will Pay Off This Time*, Wall St. J., Aug. 26, 2021.

[14]  *Id.*

- 31 -

CEO and sole director.  Non-Party Haskopoulos then served as the Company's CFO, Chief Accounting Officer, and Secretary, roles he would also serve at Riverstone and in other Riverstone-sponsored SPACs.

48.51. In his managerial role, Defendant Tichio was responsible for sourcing, negotiating, and executing a business combination for Decarb.  Both he and CFO Haskopoulos hailed from Goldman Sachs and had extensive past professional and business dealings with Defendants Lapeyre and Leuschen, who had since founded Riverstone, and with Defendant Anderson, who had since gone on to found and lead West River Group, a collaboration of investment firms focused on startups.

49.52. On August 19, 2020, the Company submitted to the SEC a confidential, preliminary Registration Statement on Form S-1.  Decarb disclosed that in its anticipated IPO, the Company sought to issue and sell 40 million units for $10 each, raising an estimated $400 million in proceeds.  Each unit would consist of one share of Decarb Class A common stock and one-half of one warrant to purchase one share of Decarb Class A common stock.  That filing further noted that former Goldman Sachs alumni Defendants Anderson, Lapeyre, and Leuschen would be added to the Board upon completion of the IPO, with Defendant Anderson coming in as the new CEO of Decarb.  That filing further noted that Defendants McDermott and Tepper were also joining the Board upon completion of the IPO, with Defendant Tepper also having served as a member of the board of previous Riverstone-sponsored

- 32 -

SPACs Silver Run I and Silver Run II. That filing emphasized the Sponsor's experience serving as a manager of clean energy SPACs, stating in pertinent part:

> Riverstone is one of **the most experienced private equity investors globally within renewable energy**, with over 15 years of dedicated investment experience to renewables. Since inception, Riverstone has committed over $5.2 billion of capital to 14 renewable power platform investments across subsectors including power generation, transmission & distribution, services and supply chain. Riverstone has owned or developed nearly 14 gigawatts of generation capacity and has developed over 110 projects in 14 countries. Further, Riverstone has raised significant funds for decarbonization and renewables platforms following the emergence of the coronavirus and its impact on the global economy and financial markets. In 2020, Riverstone raised $1 billion of equity for the recapitalization of Enviva Holdings, the world's largest producer of sustainable wood pellets, and completed a $6.1 billion take-private of Pattern Energy Group, one of the world's largest companies dedicated to carbon-free electricity through the development of utility scale wind and solar power facilities.[15]

50.53. On September 22, 2020, Decarb filed with the SEC an amendment to the Registration Statement, which stated that Defendants Aaker, Kearns, and Warren also would be added to the Board upon completion of the IPO. The amendment stated that the Sponsor "Riverstone [was] one of the most experienced private equity investors globally within renewable energy." The amendment also stated that the IPO would be reduced to 34.5 million units at $10, raising an estimated $345 million in proceeds. A September 30, 2020 amendment further lowered the expected IPO

---

[15] Emphasis added.

proceeds to $300 million, and an October 13, 2020 amendment again lowered the anticipated proceeds to just $200 million.

51.54. The SEC declared the Registration Statement effective on October 19, 2020. On or about October 22, 2020, Decarb completed its IPO, issuing and selling 20 million units at $10 each and raising $200 million in proceeds. Each unit consisted of one share of Decarb Class A stock and one-half of one warrant. The amended Registration Statement stated that [the] number of Founder Shares issued in 2017 had been "determined based on the expectation that [the] founder shares would represent 20% of the outstanding shares after" the IPO, which the Sponsor "acquired" for the nominal payment of $25,000 or ~$0.002 per share.[16]

52.55. The Registration Statement further stated that "[i]n October 2020, our sponsor will transfer an aggregate of 1,064,329 founder shares to our independent director nominees and an affiliate of our chief executive officer at their original purchase price." Thus, Defendants Aaker, Kearns, McDermott, Tepper, Warren, and Anderson were indifferent as to value of Hyzon as they collectively stood to earn millions upon the closing of the Merger. Defendants Aaker, Kearns, McDermott, Tepper, Warren, and Anderson were also contemporaneously serving as members

---

[16] *See* Decarbonization Plus Acquisition Corporation IPO Prospectus filed with the SEC on Form 424b on October 21, 2020 ("IPO Prospectus") at 12.

of several other boards of other Riverstone SPACs and collectively stood to earn millions more upon the completion of those SPAC transactions.

53.56. The Registration Statement defined Defendants Aaker, Kearns, McDermott, and Tepper, and Warren as the "independent directors" of Decarb. It conceding by negative implication, Defendants Anderson, Lapeyre, Leuschen, and Tichio were not independent. The Registration Statement also defined Defendants Anderson and WRG as essentially being one in the same. See IPO Prospectus at 98, 104-05.[17] As a result, the Sponsor (and its beneficial owners Defendants Lapeyre and Leuschen), and *each* of the other Defendants (except Defendant Tichio) would take the founders shares at the same nominal price Riverstone had paid for them in 2017.

54.57. The Registration Statement further stated that simultaneously with the completion of the SPAC IPO, the Sponsor (and thus Riverstone and its owners Lapeyre and Leuschen), the "independent director nominees," and WRG had committed to purchase six million private placement warrants at $1 per warrant (which warrants were convertible to Decarb Class A stock at $11.50 per share).

55.58. Decarb went public with a completion window of approximately two years, keyed off its October 21, 2020 IPO date. Thus, the Company had to complete

---

[17] *See* IPO Prospectus at 98, 104-05.

a business combination by October 22, 2022, or the Founder Shares would be forfeited, the private placement warrants would be worthless, the IPO proceeds held in trust would be returned to the public stockholders, and Decarb would be dissolved. Moreover, since 60% of IPO underwriters Citi and Credit Suisse's $11 million in fees were contingent upon Decarb completing a business combination, Citi and Credit Suisse also faced millions of dollars in fees held in a trust account being returned to the public stockholders of Decarb.

59.     As to the Redemption Rights of Decarb shareholders, the IPO Registration Statement stated in pertinent part as follows:

> *We will provide our stockholders with the opportunity to redeem all or a portion of their shares of our Class A common stock upon the completion of our initial business combination*.

> \*        \*        \*

> At the time of your investment in us, you will not be provided with an opportunity to evaluate the specific merits or risks of one or more target businesses*. Since our board of directors may complete a business combination without seeking stockholder approval, public stockholders may not have the right or opportunity to vote on the business combination, unless we seek such stockholder vote*. Accordingly, if we do not seek stockholder approval, your only opportunity to affect the investment decision regarding a potential business combination may be limited to exercising your redemption rights within the period of time . . . .

## III.    Riverstone Packs the Board with Loyalists and Ensures Their Fealty with a Windfall of Founder Shares

~~56.~~60. Riverstone, beneficially owned by Defendants Lapeyre and Leuschen and with Defendant Tichio serving as a managing partner; the then-four

- 36 -

"independent director nominees"; and Defendant Anderson, by virtue of his ownership of WRG, which controlled Decarb through the Sponsor, held voting control over the Company. The Registration Statement acknowledged as much, stating in pertinent part:

> Our initial stockholders [*i.e.* the Sponsor, the "independent director nominees," and WRG] will control the election of our board of directors until consummation of our initial business combination and will hold a substantial interest in us. As a result, they will elect all of our directors prior to our initial business combination and may exert a substantial influence on actions requiring a stockholder vote, potentially in a manner that you do not support.

57.61.Defendants Lapeyre and Leuschen, as the beneficial owners of Riverstone, joined by Riverstone general partner Defendant Tichio, then serving as the CEO and sole director of Decarb prior to the IPO, initially appointed themselves and Defendants Anderson, Aaker, and Kearns to the Board, with Anderson assuming the role of CEO. These Defendants later added Defendants McDermott and Tepper, and, after the IPO, Defendant Warren, to the Board, with McDermott assuming the lead independent director role. As the controller of a majority of Decarb Class B shares through the Sponsor, Defendants Lapeyre, Leuschen, and Tichio could remove any director at any time. Prior to an initial business combination, only holders of Class B common stock were entitled to vote on the election of directors, ensuring these Defendants' absolute control over the Board. Furthermore, each of

- 37 -

their chosen directors had deep professional and/or financial ties to these controlling stockholders, further ensuring the directors' fealty.

58.62. At the time of Merger approval: (a) Defendants Lapeyre and Leuschen were the co-founders, senior managing partners, and beneficial owners of Riverstone; (b) Defendant Tichio——Decarb's CEO and lone director at the time of the IPO——was a partner and managing director of Riverstone; (c) Non-Party Haskopoulos——Decarb's CFO at the time of the IPO——was a managing director and the CFO of Riverstone and served as CFO at Decarb and Decarbonization Acquisition Corps. ("DCRB") II, III, IV, and V; (c) Defendants Anderson (former Goldman Sachs VP), Lapeyre (former managing director of Goldman'sGoldman Sachs' Global Energy & Power Group), Leuschen (former partner and managing director of Goldman Sachs and founder and head of its Global Energy & Power Group), and Tichio (former Goldman Sachs banker in the Principal Investment Area) were alumni of the conflicted investment banker, Goldman Sachs, which then owned a 12% stake in Riverstone and was serving as the financial advisor chosen for the Merger, Goldman Sachsto Legacy Hyzon and as an investment banker to Decarb; (d) Defendants Anderson (CEO/director of Decarbonization Acquisition Corps. ("DCRB") IDCRBs I, II, III, IV, and IIIV), Aaker (director of DCRBs I, II, III, IV, and IIV), Kearns (director DCRBs I, II, III, IV, and IIV), Lapeyre (director of DCRBs I, II, III, IV, and IIV), Leuschen (director of DCRBs I, II, III, IV, and IIV),

Tichio (current/former CEO and then-present director of DCRBs I, II, III, IV, and IIIV), McDermott (director of DCRBs I, II, III, IV, and IIV), Tepper (director of Silver Run I and II and DCRBs I, II, III, IV, and IIV), and Warren (director of DCRBs I, II, and IIIII) each had been nominated to or seated on multiple boards of Riverstone-sponsored SPACs[18]; (e) Riverstone (*i.e.*, Lapeyre/Leuschen/Tichio) essentially gifted each of the "independent director nominees"—"—Aaker, Kearns, McDermott, Tepper, and Warren——and Anderson/WRG in his capacity as CEO of Decarb,— Founder Shares worth ***millions of dollars*** for nominal consideration contingent on Decarb completing an acquisition; and (f) Riverstone (*i.e.*,—— Lapeyre/Leuschen/Tichio) allowed each of the "independent director nominees"— "—Aaker, Kearns, McDermott, Tepper, and Warrenan Warren—and Anderson/WRG in his capacity as CEO of Decarb, to buy a portion of Riverstone's $6 million in private placement warrants.  These numerous conflicts of interest are summarized in the table below:

---

[18]  A total of five SPACs have shared the DCRB name thus far, and three of those SPACs have completed business combinations as of the filing of this Complaint. DCRB I (Decarb) completed the business combination with Hyzon at issue here. DCRB II completed a business combination with Tritium Holdings Pty Ltd. on January 13, 2022.  DCRB III completed a business combination with Solid Power Operating, Inc. on December 8, 2021.  DCRB IV completed its IPO on August 13, 2021, but has not completed a business combination or announced a likely target. DCRB V has filed several registration statements, most recently on January 21, 2022, in anticipation of conducting an IPO.

| Decarb Officer/Director | Director at ~~Other~~ Sponsor ~~SPACSs~~ SPACs | | | | | Decarb Private Placement Warrants ~~Founder Shares~~ | Decarb Founder Shares~~Private Placement Warrants~~ | Riverstone Affiliation | Goldman Affiliation |
|---|---|---|---|---|---|---|---|---|---|
| | I | II | III | IV | V | | | | |
| Anderson | ✓ | ✓ | ✓ | ✓ | ✓ | ✓~~630,947~~ | 630,947 ~~✓~~ | | Former VP |
| Haskopoulos (as CFO only) | ✓ | ✓ | ✓ | ✓ | ✓ | ~ | ~ | ~~Mang. Dir.~~Managing Director and CFO | |
| Aaker | ✓ | ✓ | ✓ | ✓ | ✓ | ✓~~22,130~~ | 22,130 ~~✓~~ | | |
| Kearns | ✓ | ✓ | ✓ | ✓ | ✓ | ✓~~22,130~~ | 22,130 ~~✓~~ | | |
| Lapeyre | ✓ | ✓ | ✓ | ✓ | ✓ | ✓~~4,591,708~~ | 4,591,708 ~~✓~~ | Co-Founder and Managing Director | Former Managing Director |
| Leuschen | ✓ | ✓ | ✓ | ✓ | ✓ | ✓~~4,591,708~~ | 4,591,708 ~~✓~~ | Co-Founder and Managing Director | Former Managing Director |
| Tichio | ✓ | ✓ | ✓ | ✓ | ✓ | ~ | ~ | Managing Director | Former Banker |
| McDermott | ✓ | ✓ | ✓ | ✓ | ✓ | ✓~~331,950~~ | 331,950 ~~✓~~ | | |

- 40 -

| Decarb Officer/Director | Director at ~~Other~~ Sponsor ~~SPACSs~~ SPACs | | | | | Decarb Private Placement Warrants ~~Founder Shares~~ | Decarb Founder Shares ~~Private Placement Warrants~~ | Riverstone Affiliation | Goldman Affiliation |
|---|---|---|---|---|---|---|---|---|---|
| | I | II | III | IV | V | | | | |
| Tepper | ✓ | ✓ | ✓ | ✓ | ✓ | ✓~~22,130~~ | 22,130 ✓ | | |
| Warren | ✓ | ✓ | ✓ | ✓✓ | | ✓~~22,130~~ | 22,130 ✓ | | |

63.   Importantly, by appointing Defendants Anderson, Aaker, Kearns, McDermott, Tepper, and Warren to the boards of directors of Riverstone's other SPACs, Defendants Lapeyre, Leuschen, and Tichio (via their control of Riverstone) provided them with the opportunity to receive additional ~~Founder Shares and warrants in those SPACs.~~ founder shares and warrants in those SPACs.  Indeed, while the Hyzon de-SPAC transaction would reward the holders of its Class B Founder Shares with shares worth $56.4 million in the open market, this was not the only de-SPAC from which these parties were collectively profiting.  These Board members, along with the Controller Defendants, collectively received much more in connection with serving on SPAC boards for Riverstone.  As emphasized in an August 25, 2021 *Wall Street Journal* report, Riverstone is a prolific SPAC creator

- 41 -

and "[b]etween Hyzon and the announced mergers with Tritium and Solid Power, Riverstone *and other members of the SPAC team* are in line for about *$240 million in paper gains through ultracheap shares and other perks they get for sponsoring the SPACs*, according to New York University Law School professor Michael Ohlrogge, who studies SPACs."[19]  Indeed, based on their receipt of founders shares in the five DCRB SPACs being valued at an estimated $10 per share as of the date of any eventual business combination, the purported outside "independent directors" on the Decarb Board, i.e. Defendants Aaker, Kearns, McDermott, Tepper, and Warren, all were poised to gain millions of dollars in payoffs:

| Director | DCRB SPAC | Founder Shares | Implied Value at $10 Per Share | Total Potential Payoff |
|---|---|---|---|---|
| **Aaker** | I (Decarb) | 22,130 | $221,300 | |
| | II | 40,000 | $400,000 | |
| | III | 40,000 | $400,000 | |
| | IV | 41,551 | $415,510 | |
| | V | TBD | TBD | |
| | | | | *$1,436,810*+ |
| **Kearns** | I (Decarb) | 22,130 | $221,300 | |
| | II | 40,000 | $400,000 | |

---

[19] *See* Ryan Dezember and Amrith Ramjuma, *Riverstone SPACs Bet Renewable Energy Will Pay Off This Time*, Wall St. J., Aug. 26, 2021.

- 42 -

| Director | DCRB SPAC | Founder Shares | Implied Value at $10 Per Share | Total Potential Payoff |
|---|---|---|---|---|
| | III | 40,000 | $400,000 | |
| | IV | 41,551 | $415,510 | |
| | V | TBD | TBD | |
| | | | | *$1,436,810+* |
| **McDermott** | I (Decarb) | 331,950 | $3,319,500 | |
| | II | 240,000 | $2,400,000 | |
| | III | 240,000 | $2,400,000 | |
| | IV | 83,102 | $831,020 | |
| | V | TBD | TBD | |
| | | | | *$8,950,520+* |
| **Tepper** | I (Decarb) | 22,130 | $221,300 | |
| | II | 40,000 | $400,000 | |
| | III | 40,000 | $400,000 | |
| | IV | 41,551 | $415,510 | |
| | V | TBD | TBD | |
| | | | | *$1,436,810+* |
| **Warren**[20] | I (Decarb) | 22,130 | $221,300 | |

---

[20] Though having initially agreed to serve as a director, Defendant Warren appears to have resigned from DCRBs II and III in April 2021 and from DCRB IV on an undisclosed date and to have forfeited his founders shares in those three SPACs.

- 43 -

| Director | DCRB SPAC | Founder Shares | Implied Value at $10 Per Share | Total Potential Payoff |
|---|---|---|---|---|
| | II | 40,000 | $400,000 | |
| | III | 40,000 | $400,000 | |
| | IV | 41,551 | $415,510 | |
| | | | | *$1,436,810+* |

59.64. Thus, consummation of the Merger did not provide an isolated, one-time multi-million-dollar payday for these directors. Rather, *each* "Riverstone" SPAC business combination presentedpresents an ongoing, multi-million-dollar opportunity for them, and the prospect of plum appointments in connection with future Riverstone SPACs.

65. And the relationships these senior executives and directors shared with one another in connection with the many DCRB SPACs were not the only close professional and financial ties these Defendants shared. There were more, including but not limited to:

- **Singularity Education Group:** a California-based executive educational provider, business incubator, and innovation consultancy service where Defendant Anderson has served as the Executive Chairman since 2018 and Defendant Kearns has served as a member of the faculty since February 2019;

- **Centennial Resource Development, Inc. f/k/a Silver Run Acquisition Corporation:** a Colorado-based oil and natural gas company launched and 31% owned by Defendant Riverstone upon whose board Defendants Lapeyre, Leuschen, Tepper, and Tichio have served since October 2016;

- 44 -

- **Alta Mesa Resources, Inc. f/k/a Silver Run Acquisition Corporation II**: a Texas-based oil exploration and production company launched by Riverstone that went through bankruptcy proceedings in 2020 and upon whose board Defendants Lapeyre, Leuschen, and Tepper served as directors until 2020;

- **Riverstone Energy Limited:** a closed-end investment company launched and operated by Riverstone that invests in the global energy industry and where Defendants Lapeyre and Leuschen served on the board between 2013 and 2020; and

- **Envira Inc.:** a Maryland-based company that develops, constructs, acquires, owns, and operates wood pellet production plants and where Defendants Lapeyre and Leuschen have served as directors since January 2022 and had both previously served as general partner directors since March 2021.

66. Indeed, the preliminary proxy statements Hyzon filed with the SEC in the lead up to the Merger vote in July 2021 expressly conceded that Defendants Anderson, Lapeyre, Leuschen, and Tichio were not "independent directors." Yet, Defendants Aaker, Kearns, McDermott, Tepper, and Warren were also conflicted, given their obvious financial income in the outcome of the Hyzon de-SPAC transaction and their long history of profiting off their business relationships with Riverstone and their participation in the other DCRB SPAC transactions.

60.67. In short, these strong personal financial incentives for a majority each of the Decarb Board members — potentially amounting to tens of — adding up to millions of dollars — eliminated their these Board members' ability to act independently and to "say no" to any deal pushed by Defendants Anderson, Lapeyre,

- 45 -

Leuschen, and Tichio via Riverstone and the Sponsor.  The IPO Registration Statement essentially admitted as much, stating in pertinent part as follows:

> Since our sponsor, officers and directors will lose their entire investment in us if our business combination is not completed, *a conflict of interest may arise in determining whether a particular business combination target is appropriate for our initial business combination*.[21]

However, it is clearly one thing to admit a conflict of interest *could later arise* in selecting a viable merger target; it is an entirely separate thing to: (i) conceal known problems with a SPAC merger target's business metrics and financial prospects—or fail to conduct due diligence to unearth them—in order to ensure shareholder approval of a merger and to dissuade SPAC shareholders from exercising their Redemption Rights; and (ii) to violate the solemn, non-waivable fiduciary duties of loyalty, good faith, and due care that directors of Delaware corporations, governed by the State's statutory and common law, are bound by.

68.    Yet it is clear that is what Riverstone demanded of these directors here. As the following portions of an August 26, 2021 *Wall Street Journal* expose elucidate, the band of conflicted Decarb directors has helped Riverstone launch and sell its series of SPAC transactions and each director has profited thereby to the tune of millions of dollars while the investors in the Riverstone SPACs often fell flat:

---

[21]  IPO Prospectus at 45.

Riverstone is best known for its energy-focused private-equity funds. For its green efforts, the firm is using special-purpose acquisition companies, or SPACs. These are blank-check companies that raise cash from stock-market investors, merge with private companies and take them public. SPACs have raised a record of roughly $120 billion from investors this year and invested heavily in clean-energy businesses.

So far, Riverstone has done four clean-energy SPACs. The firm's first one took hydrogen fuel-cell truck company Hyzon Motors Inc. public. Companies making electric- and fuel-cell-powered vehicles were among the hottest SPAC investments earlier this year but have tumbled recently. Hyzon shares are down by more than half from their peak.

Other Riverstone SPACs announced deals for electric-vehicle battery-charging company Tritium Holdings Pty Ltd. and solid-state battery firm Solid Power Inc., which is backed by Ford Motor Co. and BMW AG. Those deals have yet to close, but Riverstone's pace of deal making is among the fastest in the SPAC market.

The latest Riverstone SPAC, Decarbonization Plus Acquisition Corp. IV raised about $315 million in a stock offering this month and is looking for a business to take public.

\*    \*    \*

In securities filings affiliated with its green SPACs, Riverstone touts two decades of experience investing in clean energy. ***There is no mention in the filings of how those funds performed.***

Riverstone's first renewable-energy fund raised $685 million in 2006 from investors including the California Public Employees' Retirement System. ***That fund lost roughly 90%***. "You'd think a monkey couldn't have lost that much money," Riverstone co-founder David Leuschen told a conference of oil investors in 2016.

The firm's second fund raised $3.4 billion in 2008 and ***barely broke even after fees***, according to public pension disclosures. Riverstone created the fund after investors asked it to, Mr. Leuschen said. "Nobody would call me a great believer in the renewable business," he said, "but I think it's got actually quite a bright future."

- 47 -

*    *    *

*Riverstone's record with SPACs is uneven.* The firm helped revive the SPAC process in 2016 after years of drought following the financial crisis. Riverstone launched a SPAC to stake former EOG Resources Inc. Chief Executive Mark Papa in the West Texas oil fields. The shares doubled in value.

Investors then gave a billion dollars to Riverstone and former Anadarko Petroleum Corp. CEO James Hackett to try for SPAC gold again. That SPAC bought drilling fields and pipelines in an Oklahoma field that were supposed to be the next big thing. Production was weak and oil prices slumped amid a supply glut.



Oil-and-gas investments across Riverstone's portfolio sputtered. *When their value fell, Riverstone executives faced the prospect of returning more than $300 million in paper profits that they had taken when deals looked like winners. Riverstone later sold a 12% stake in itself to Goldman Sachs.*

*Shares of the firm's SPAC venture in West Texas plunged. The Oklahoma venture filed for bankruptcy protection in 2019 and was liquidated.* A third shale SPAC never sold shares until Riverstone renamed it Decarbonization Plus Acquisition Corp. and it went public last October.

That SPAC in February said it would merge with Hyzon, which projected 2021 sales of $37 million but said that by 2025 revenue would top $3 billion as hydrogen fuel becomes more viable.

- 48 -

*Hyzon's shares have since tumbled as enthusiasm for transportation startups has cooled. **Still, Riverstone and its SPAC partners remain in the green: Their incentive package for creating the SPAC is worth about $56 million, almost $50 million above its roughly $6.5 million cost.**[22]*

## IV.    Decarb Merges with Legacy Hyzon

~~61.~~69. ~~Nominally headquartered in Rochester, New York prior to the Merger, Hyzon was a~~At the time of the Merger, Legacy Hyzon was barely a year-old stand-alone company.  It opened its headquarters in Honeoyo Falls, New York at the former General Motors facility that had closed in 2012.  Legacy Hyzon was then a purported supplier of zero-emissions hydrogen fuel cell powered commercial vehicles, including heavy duty trucks, buses, and coaches.  U.S. investors were told that Legacy Hyzon, originally a new business line of its parent corporation, Horizon Fuel Cell Technologies ("Horizon"), had been founded and successfully operated out of China for 17 years (since 2003).  According to ~~a Hyzon~~Hyzon's website:

> Hyzon was known as the Heavy Vehicle Business Unit (HVBU) of Horizon and was **responsible for the development of fuel cell systems and the delivery of about 500 fuel cell-powered commercial vehicles during 2019 and 2020, leveraging the deep and extensive experience bolstered within the group**.[23]

---

[22]  *See* Ryan Dezember and Amrith Ramkumar, *Riverstone SPACs Bet Renewable Energy Will Pay Off This Time – Investors have given the oil financier more than $1 billion for blank-check firms in spite of its clean-energy past*, Wall St. J., Aug. 26, 2021 (emphasis added).

[23]  *See* https://hyzonmotors.com/about/#overview (last visited Mar. 8, 2022).

70.   What was not disclosed to U.S. investors was that the lion's share of Horizon's 2019 sales had been to a single now defunct customer, and that at the time of the spinoff of Legacy Hyzon from its Chinese parent Horizon, Horizon was in dire financial straits due to the lack of sales of those fuel cells.  By late 2019, Horizon's fuel-cell sales and free cash flow had imploded when its major customer, responsible for nearly 75% of Horizon's fuel-cell sales, defaulted.  As a result, the market value of the Horizon operating subsidiary responsible for sales of Horizon's fuel cell systems had evaporated and that operating subsidiary had de-registered from the Chinese stock exchange.  Seeking to raise public capital to develop Legacy Hyzon's business without having to reveal its financial collapse to investors, Legacy Hyzon looked to the US capital markets, then awash with EV vehicle company SPAC investment opportunities.   The Hyzon website ~~also~~ states that it first established its U.S. operations when it "[l]aunch[ed] [its] engineering development centre in Rochester, NY" in 2020.[24]  ~~Hyzon's website further represents that New Zealand-based Hiringa "sign[ed] [an] agreement" and "order[ed] . . . up to 1[,]500 trucks" from Hyzon in~~

---

[24]  ~~Id.~~

On or about August 18, 2020.<del>[25]  Hyzon publicly announced the Hiringa order</del>,
Legacy Hyzon purportedly retained Goldman Sachs as its financial advisor "in
<del>February 2021.</del>

<del>62.</del>71.<del>During</del>connection with exploring alternatives for raising capital."  Not
coincidentally, Goldman Sachs then owned a 12% interest in Riverstone and rights
to proportionate share of Riverstone's profits.[26]  By the summer of 2020, Legacy
Hyzon's management had apparently determined to seek out a publicly traded SPAC
to merge with in order to allow Legacy Hyzon stock to be publicly traded.  <del>On or
about August 18, 2020, Hyzon retained Goldman Sachs as its financial advisor for
this endeavor.  By </del>By October 13, 2020, Legacy Hyzon was in the process of
executing non-disclosure agreements with various SPACs and "exploring a potential
business combination" with them.[27]

<del>63.</del>72.On October 30, 2020, Defendants Anderson and Tichio met with
Goldman Sachs' bankers "regarding a possible transaction between [Decarb] and

---

[25]  <del>Id.</del>

[26]  *See* Ryan Dezember and Amrith Ramkumar, *Riverstone SPACs Bet Renewable
Energy Will Pay Off This Time – Investors have given the oil financier more than $1
billion for blank-check firms in spite of its clean-energy past*, Wall St. J., Aug. 26,
2021.

[27]  *See* Merger Proxy at 95.

Hyzon."[28]    After hiring Vinson & Elkins LLP, meeting with Legacy Hyzon management, and reviewing various Legacy Hyzon sales pitches made by Goldman Sachs, Decarb began undertaking its "legal due diligence of Hyzon" with Legacy Hyzon's bankers at Goldman Sachs, beginning on November 13, 2020.[29] Notably, due to its 12% ownership stake in Riverstone, Goldman Sachs stood to receive a proportional profit in Riverstone's profits in the deal.

64.73. Throughout late November 2020, Defendant Tichio continued negotiating with Goldman Sachs over the due diligence and deal terms for a possible merger with Legacy Hyzon.[30]    DespiteIn the obvious conflict of interest, on November 30, 2020, Decarb itselfMerger Proxy, Legacy Hyzon claims to have formally engaged Goldman Sachs "as its financial advisor in connection with the possible sale of all or a portion of Hyzon,"" on November 30, 2020, and states "[t]hat same week, Hyzon also discontinued discussions with the [ten] other SPACs" it had been speaking with since early October 2020.[31]  Throughout December 2020 and January 2021, Goldman Sachs—working as an advisor for both Decarb and Hyzon—the parties completed the rest of the due diligence while negotiating the final terms

---

[28]  *Id.*

[29]  *Id.* at 96.

[30]  *Id.*

[31]  *Id.* at 95-96.

of the de-SPAC transaction ~~on behalf of both sides.[32]    Various extraneous agreements    such as an intellectual property agreement    were executed.[33]~~, including determining "a total enterprise value of Hyzon of $1.983 billion, with equity consideration in the form of Class A Common Stock and a $350 million PIPE Financing."[34]    Various extraneous agreements—such as an intellectual property agreement—were also executed.[35]    According to the Merger Proxy, "[d]uring the week of December 14, 2020, [Decarb] engaged a number of third-party advisors . . . to assist with various aspects of commercial, financial and legal diligence, including . . . an advisor to assist in the quality of the fuel cell technology that would be commercialized by Hyzon in the transportation market." The Merger Proxy contained no description of who those "third-party advisors" were, what their qualifications were, how they were being compensated or what they were asked to opine upon, and based on what has since been revealed about the fuel cell technology in particular, it is clear their due diligence was ineffective.    This is not surprising since Goldman Sachs shared such a close relationship with Riverstone and the

---

[32]  ~~*Id.* at 97-98.~~

[33]  ~~*Id.*~~

[34]  *Id.* at 96-98.

[35]  *Id.*

- 53 -

Controller Defendants, all of whom were attempting to shove this transaction through.

65.74. Finally, Decarb claimsThe Merger Proxy then states that:

> During the week of January 4, 2021, [i]tDecarb] engaged Citigroup Global Markets Inc. ("Citi") as its financial advisor and Credit Suisse Securities (USA) LLC ("Credit Suisse") as its financial advisor and equity capital markets advisor, respectively, in connection with the business combination to assist the [Decarb] Board with advice on the transaction structure, negotiation strategy, valuation analyses, financial terms and other financial matters." . . . .[36]

The Decarb Board claims this engagement was appropriate because those two firms had just jointly handled its IPO in October 2020.

66.    Even if Citi and Credit Suisse were independent financial advisors, merely adding additional investment banking firms at the 11th hour as the terms of a deal are being finalized does not erase the taint of conflict when the seller's investment bankers had been allowed to negotiate deal terms and handle due diligence for months.

ButBecause Citi and Credit Suisse had just served as underwriters in the Decarb IPO, however, they too were conflicted in serving as advisors to Decarb in the de-SPAC transaction. When Citi and Credit Suisse undertook the IPO for Decarb, they agreed that 60% of their $11 million in investment banking fees would be placed in a trust

---

[36]  *Id*. at 98.

and that: "(i) they [would] forfeit any rights or claims to [those fees], including any accrued interest thereon, then in the trust account upon liquidation, and (ii) that the [fees would] be distributed on a pro rata basis . . . to the public stockholders" of Decarb.  Although the Decarb SPAC still had until October 2022 to complete a business combination, it had taken many months to decide upon Legacy Hyzon and to negotiate a proposed business combination.  Neither Citi nor Credit Suisse were likely to reject that combination.  If Citi and Credit Suisse suddenly rejected the proposed transaction, it would reflect poorly on Riverstone's claimed keen ability to identify and acquire worthwhile targets—the bread and butter of Riverstone's business.  Nor were Citi or Credit Suisse inclined to replicate their efforts at the eleventh hour with a different target after the due diligence was largely complete and the terms of the deal had essentially been finalized.  In short, Citi and Credit Suisse had no real choice but to rubber stamp this proposed Merger due to their own financial conflicts.

75.    Making matters worse, according to the Merger Proxy, "[d]uring the week of January 10, 2021, [Decarb] also engaged Goldman Sachs and Morgan Stanley & Co. LLC ('Morgan Stanley') to serve as placement agents for the PIPE Financing."[37]  Though the Merger Proxy claims "Goldman Sachs did not provide

---

[37] *Id.* at 99.

any advice to" Decarb regarding the "valuation of Hyzon or the terms of the business combination," nonetheless, in recognition of the clear conflict this retention presented, the Merger Proxy states that "[Decarb] and Hyzon each signed a consent letter with Goldman Sachs acknowledging Goldman Sachs' roles as financial advisor to Hyzon in connection with the business combination and as co-placement agent to DCRB in connection with the PIPE Financing and waiving any potential conflicts in connection with such dual roles."  But executing a "waiver" does not erase the taint of conflict when Legacy Hyzon's, the seller's, investment bankers were also angling to get investment banking work from the buyer, Decarb.  Goldman Sachs would ultimately get that work and also serve as investment bankers for Decarb, the buyer, as the placement agent for Decarb in selling the PIPE Financing required to complete the Merger.  This conflict was compounded because Goldman Sachs owned a 12% stake in the sponsor of the SPAC, Riverstone, giving Goldman Sachs a proportional stake in Riverstone's profits.

67.76. Indeed, neither Citi, Credit Suisse, nor Goldman Sachs were independent investment bankers or financial advisors.  Many of Decarb's Board members were Goldman Sachs alumni themselves and various Decarb entities had completed billions of dollars in transactions with all three investment banks in the recent past and could anticipate continuing to do so in the future.  Those deals included, but were not limited to: (a) Citi and Credit Suisse serving as the sole joint

book-running managers of DCRB II's, DCRB IV's, and DCRB V's IPOs; (b) Citi serving as a financial advisor to DCRB II in its de-SPAC transaction; (c) Goldman Sachs being one of the anchors in a $1.1 billion Riverstone single-asset process undertaken in July 2020[38]; (d) Goldman Sachs acquiring a 12% stake in Riverstone for $500 million in 2017[39]; (e) Riverstone being a member of a consortium of private equity firms including Goldman Sachs that completed the $27.5 billion acquisition of Kinder Morgan, one of the largest pipeline operators in the United States, in 2006[40]; (f) Goldman Sachs owning a 12% interest in Riverstone, giving it a proportionate cut of Riverstone's profits; (g) Riverstone and Goldman Sachs jointly purchasing a Lucid Energy Group subsidiary in January 2018 for $1.6 billion[41]; and (gh) Goldman Sachs alone having backed a new Riverstone $5 billion "make-or-break" fund in August 2018.[42] Critically, Citi and Credit Suisse had jointly received

---

[38] *See* Chris Witkowsky, *Goldman one of several anchors in $1.1 bn Riverstone single-asset process*, Buyouts Insider, July 22, 2020.

[39] *See* Rabia Arif, *Goldman Sachs fund to acquire 12% of Riverstone Holdings for $500 M*, S&P Global Market Intelligence, May 4, 2017.

[40] *See* Jad Mouawad, *Kinder Morgan Agrees to an Improved Buyout Offer Led by Its Chairman*, N.Y. Times, Aug. 29, 2006.

[41] *See* Lucid Energy Group press release, *Lucid Energy Group Agrees to Sell Delaware Basin Subsidiary to Riverstone Holdings LLC and Goldman Sachs Merchant Banking Division for $1.6 Billion*, Jan. 8, 2018.

[42] *See* Joshua Franklin & David French, *Exclusive: Goldman-backed Riverstone readies for make-or-break fundraising*, Reuters, Aug. 30, 2018.

***$11 million*** in <u>investment banking fees from</u> the Decarb IPO alone<u>—the receipt of</u>

<u>60% of which was contingent upon completing the Merger</u>.

~~68.~~77.On the morning of February 9, 2021, Decarb and <u>Legacy</u> Hyzon

announced the Merger and related financing transactions (together, the

"Transactions").  The prior day, February 8, 2021, the Board unanimously approved

the Merger.

~~69.~~78.Under the terms of the Merger, following a series of transactions,

<u>Legacy</u> Hyzon would become a wholly owned subsidiary of Decarb, as depicted in

the chart below from the Merger Proxy:



~~70.~~79.The Merger valued the post-transaction Company at "more than

$2 billion."[43]  In addition, the pre-Merger <u>Legacy</u> Hyzon owners were estimated to

own 73% of the post-Merger company.  By contrast, Decarb Class A stockholders

would own only 8.9% of the post-Merger company, and the Sponsor, the

---

[43]  *See* Ed Ludlow & Gillian Tan, *Fuel Cell Startup Hyzon Valued at Over $2 Billion in SPAC Merger*, Bloomberg, Feb. 9, 2021.

"independent director nominees," and Anderson/WRG, would own 2.2% of the post-Merger company.   The PIPE investors would own 15.9% of the post-Merger company.

71.80.Approval of the Merger by Decarb stockholders required the affirmative vote of a majority of the stockholders present at the special meeting.  The Company set the record date for the meeting as June 1, 2021, issued its definitive proxy statement on June 21, 2021, and held the meeting on July 15, 2021.  Decarb stockholders had until July 13, 2021 to exercise their Redemption Rights.  Inviting stockholders to exercise their Redemption Rights, directly after spelling out that the Board recommended shareholders vote in favor of the Merger with Hyzon, the letter to Decarb shareholders signed by Defendant Anderson in the Merger Proxy stated in pertinent part: "Pursuant to our Charter, *we are providing the holders* of shares of Class A Common Stock originally sold as part of the units issued in our initial public offering (the 'IPO' and such holders, the 'public stockholders') *with the opportunity to redeem*, upon the Closing, shares of Class A Common Stock then held by them . . . ."  The Merger Proxy went on to instruct that:

> In order to exercise your redemption rights, you must (a) if you hold your shares of Class A Common Stock through units, elect to separate your units into the underlying public shares and public warrants prior to exercising your redemption rights with respect to the public shares, and (b) prior to 5:00 p.m., Eastern time, on July 13, 2021 (two business days before the special meeting), tender your shares physically or electronically and submit a request in writing that we redeem your

public shares for cash to Continental Stock Transfer & Trust Company, our transfer agent . . . .

81.     As to "WHERE YOU CAN FIND ADDITIONAL INFORMATION," the Merger Proxy stated in pertinent part that Decarb "files reports, proxy statements and other information with the SEC as required by the Exchange Act."  The Merger Proxy warned that shareholders should rely only upon the information provided in the Merger Proxy and related SEC filings, stating that Decarb "has not authorized anyone to give any information or make any representation about the business combination, [Decarb] or Hyzon that is different from, or in addition to, that contained in this proxy statement," and "[t]herefore, if anyone does give you information of this sort, you should not rely on it."

72.82. As of the record date, the closing price of Decarb common stock was $10 per share.  That price implied a market value of approximately $56.4 million for the Class B Founder Shares, which had been purchased a few months prior for a mere $25,000 (*i.e.*, the value of the Founder Shares increased *2,255x*).  At this valuation, members of the Decarb Board were poised to realize enormous returns on their investments in the event the Merger closed, as illustrated by the table below:

| Director | Founder Shares[44] | Implied Value at $10 per share |
|---|---|---|
| Anderson | 630,947 | $6,309,470 |
| Aaker | 22,130 | $221,300 |
| Kearns | 22,130 | $221,300 |
| Lapeyre | 4,591,708 | $45,917,080 |
| Leuschen | 4,591,708 | $45,917,080 |
| McDermott | 331,950 | $3,319,500 |
| Tepper | 22,130 | $221,300 |
| Warren | 22,130 | $221,300 |

73.83. The Merger Proxy touted the Board's purported reasons for recommending the Merger, including:

- "*Competitive and Innovative* [hydrogen fuel cell] *Design*";

- "*Value to Equity Investors*";

- "*Revenue Potential*";

- "*Global Scale*";

- "*Development Capability*";

- "*Due Diligence*";

- "*Terms of Business Combination Agreement*" being "the product of **arm's-length negotiations** among the parties";

---

[44] *See* Merger Proxy at 228.

- 61 -

- *"Independent Director Role"* and the Decarb Board being "comprised of a **majority of independent directors who are not affiliated with our Sponsor and its affiliates**"; and

- Investors having the "**option to . . . redeem their shares**" rather than "remain stockholders of the combined company" or "sell their shares."[45]

74.84. The Merger Proxy repeatedly represented that the Board reached these conclusions only after conducting "**extensive due diligence**." According to the Merger Proxy, this "**extensive due diligence**" consisted of the Decarb Board's review of the "**extensive due diligence**" conducted largely by its conflicted financial advisor Goldman Sachs, who had been busy simultaneously selling Hyzon to Decarb and negotiating good financial terms for Hyzon in those ongoing negotiations.provided to it by Legacy Hyzon. Among other things this "**extensive due diligence**" included:

- meetings and calls with Hyzon management and advisors regarding **business model, operations and forecasts**;

- research on comparable public companies . . . ;

- research on comparable transactions;

- study of analyst reports and market trends in the electric vehicle and hydrogen fuel cell industries;

- **review of material contracts**;

- review of intellectual property matters;

---

[45] *Id*. at 101-02 (emphasis added).

- 62 -

- review of *commercial, financial*, tax, legal and *accounting* due diligence;

- consultation with Hyzon's management and DCRB's legal and financial advisors and industry experts, including its advisor that assisted in evaluating the overall electrified vehicle market and of the addressable market for Hyzon's vehicles, and its advisor that assisted in evaluating the quality of Hyzon's fuel cell technology;

- *financial and valuation analysis of Hyzon and the business combination*;

- *financial projections prepared by Hyzon's management team*; and

- the *financial statements of Hyzon*.[46]

75.85. Notably, the Merger Proxy did not provide an independent, third-party opinion as to whether the Merger was fair, from a financial perspective, to Decarb public Class A stockholders.  It claimed that the "officers and directors [of Decarb] have *substantial experience in evaluating the operating and financial merits of companies* from a wide range of industries and concluded that their experience and backgrounds . . . enabled them to make the necessary analyses and determinations regarding the business combination."[47]  It claimed that Citi and Credit Suisse had provided Decarb with financial advisory services at the last minute, but provided no

---

[46]  *Id*. at 101 (emphasis added).

[47]  *Id*. at 53 (emphasis added).

independent, third-party opinion as to whether the Merger was fair, from a financial perspective, to Decarb public Class A stockholders.

76.86. Instead, Decarb presented its own financial analyses to support the Board's recommendation of the Merger. The valuation analyses adopted the projections below, which show sudden jumps in expected 2023 and 2024 trucks deployed, EBITDA, and EBITDA margin, despite Horizon/Legacy Hyzon having suffered a stark downward trend in actual sales volumes since 2019 and despite the gross margin forecasts being twice the average for other electric vehicle manufacturers:

**Key Financial Metrics:**

|  | Forecast Year Ended December 31, | | | | |
|---|---|---|---|---|---|
|  | 2021E | 2022E | 2023E (dollars in millions) | 2024E | 2025E |
| EBITDA[1] | ($ 73) | ($ 25) | $ 87 | $ 326 | $ 505 |
| EBITDA Margin[2] | NM | NM | 8.9% | 14.5% | 15.4% |

**Key Financial Metrics:**

|  | Forecast Year Ended December 31, (dollars in millions) | | | | |
|  | 2021E | 2022E | 2023E | 2024E | 2025E |
|---|---|---|---|---|---|
| EBITDA(1) | ($ 73) | ($ 25) | $ 87 | $ 326 | $ 505 |
| EBITDA Margin(2) | NM | NM | 8.9% | 14.5% | 15.4% |

**Key Non-Financial Metrics:**

|  | Forecast Year Ended December 31, | | | | |
|  | 2021E | 2022E | 2023E | 2024E | 2025E |
|---|---|---|---|---|---|
| Medium and Heavy Duty Trucks Deployed | 74 | 623 | 3,360 | 6,800 | 9,260 |
| Buses Deployed | 11 | 35 | 68 | 340 | 600 |
| Class 3 Truck / Van | 0 | 0 | 840 | 4,435 | 7,235 |
| Total Vehicles Deployed | 85 | 658 | 4,268 | 11,535 | 17,095 |

77.87. However, as noted above, the Board affirmatively represented its "*extensive due diligence*" of Hyzon and its "*substantial experience in evaluating the operating and financial merits of companies*," and these representations specifically assured Decarb's public stockholders that these projections were reasonable.

88.    In connection with seeking shareholder approval of the Merger—and dissuading the existing public shareholders of Decarb from seeking redemption—Defendants also conducted a series of Investor Presentations, including one on February 9, 2021, using PowerPoint slides. In one slide, Legacy Hyzon said it then expected to increase its deliveries from 85 during FY21 to 9,260 by FY25 and to concomitantly exponentially grow its revenues from an estimated $37 million in 2021 to nearly $3.3 billion by 2025:



89.     Even though the parties had not yet formally announced the Hiringa deal, another slide in the February 9, 2021 Investor Presentation entitled "**_Customer_** **_Deployments Underway. . . ._**" referred to the Hiringa sale as a "Signed Contract," emphasizing that Legacy Hyzon's "Contracted Orders" were all "100% Certain," and stated that the first twenty vehicles would ship in 2021, contributing an estimated $10 million in revenues for Hyzon for 2021—or more than 25% of the $37 million forecast for 2021:



90.    Days later, on February 17, 2021, Legacy Hyzon and Hiringa issued a press release formally announcing the Hiringa contract, stating that "the two companies ha[d] signed a *vehicle supply agreement*," with "the first batch of [twenty] vehicles . . . *expected to enter service in New Zealand by the end of 2021*." The release further stated that "Hyzon plans to have up to 1,500 fuel cell trucks on the road in New Zealand by 2026 as part of the agreement with Hiringa."

91.    Defendants made another investor presentation on April 29, 2021 and again filed those slides with the SEC.  One slide highlighted that Legacy Hyzon had announced a "*vehicle supply agreement* to supply trucks *to New England-based Hiringa* Energy; *first deliveries expected by [end of year] 2021*," notably presenting that as a commercial achievement and not one of its partnerships:



92.    Elsewhere, 15 specific "Vehicle *Customers*" of Legacy Hyzon were displayed, with Hiringa appearing prominently at the top of that list:



93.    In each of these statements, Defendants characterized Hiringa as the purchaser of the purportedly binding 20-vehicle agreement being delivered in 2021, as well as the additional 1400-1500 vehicles being delivered over the following five-year period.

94.    More generally, Defendants' use of these purported customer maps and charts in the February 2021 and April 2021 Investor Presentations was also materially misleading in that Legacy Hyzon had no viable agreements with or commitments from many of the blue-chip, "top tier customers" it touted on these charts.  The use of these top-tier customer logos and sales commitments more than implied a rapidly accelerating demand for Legacy Hyzon's product—indeed, the customer charts were titled: "Customer Deployments Underway and Demand is Accelerating Rapidly."  Defendants repeated these committed order and revenue claims directly alongside logos of purported name brand customers like Coca Cola, Heineken, Nestle, and Ikea, lending credit to their other sales claims.  Further, Defendants repeatedly published maps of purported 2021 customer deployments to specific "customers," which if added up, totaled nearly $40 million in sales in 2021: February 9, 2021 "Customer" Map:



95.    Yet then, in the months between the February 2021 Merger announcement and the July 2021 Redemption deadline—during the same time period that EV SPAC Lordstown was outed for faking customer orders and exaggerating its own book of business—Defendants began surreptitiously scrubbing several reported "blue-chip" customer names and logos from the presentations. Without explanation or acknowledgment, purported top-tier customers, including Coca Cola, Heineken, Ikea, and Nestle were removed altogether. Yet even when Defendants presented an anonymized customer chart on April 29, 2021, the details of many of these same "customers" appeared to remain, even though their names and logos had been formally removed. For example, the details for the purported

Heineken deal remain prominently displayed in the same spot on the map now referred to as a "Global Brewer":

April 29, 2021 "Customer" Chart:



96.    Throughout the February 2021 to July 2021 time period, Defendants claimed that Legacy Hyzon was involved in advanced negotiation—if not already entered into binding contract—with a number of top-tier brand customers in order to convince shareholders that there was serious, growing demand for its fuel cell offerings. Although Defendants appear to have been spooked and removed some of the purported brand name "customer" names and logos from certain of their presentations, they never disclosed the loss of *any* of those customers. They never reduced the projections for Legacy Hyzon's 2021 deliverables or financial results,

or the five-year projections for Legacy Hyzon's deliverables or financial results. Notably, these top- tier, brand-purported companies are not the only "customers" that failed to produce a single sale for Legacy Hyzon—almost every "customer" failed to materialize.

78.97.After having received these disclosures, on July 15, 2021, Company stockholders approved the Merger.

**V.    The Blue Orca and Iceberg Research ReportReports and Resulting SEC Investigation and Senior Executive Departures**

79.98.The rosy characterization of Legacy Hyzon portrayed by Decarb managementDefendants was short-lived.

80.99.Just two months after the deal closed, on September 28, 2021, research firm Blue Orca Capital published its Report via its Twitter account characterizing Legacy Hyzon as "a zero-revenue hydrogen EV SPAC which we liken to a *Chinese Lordstown Motors*."  In the Report, Blue Orca Capital exposed Legacy Hyzon as "just a repackaging of a flailing Chinese parent company which has been trying to sell the same hydrogen fuel cells without much success for 17 years" and whose "supposed major customers" are "fake."  The Blue Orca Report highlighted facts that were either omitted or misleadingly characterized in the Merger Proxy and Defendants' other public representations concerning the Merger.  Among other things, Blue Orca reported that:

- 72 -

- An important Legacy Hyzon "customer""—indeed its second largest— was not, in fact, even a customer of the Company. Legacy Hyzon had been touting the strength of one of its purportedly largest customers, New Zealand infrastructure startup Hiringa, which had supposedly signed an agreement in February 2021 to "acquire" 1,500 trucks by 2026., including 20 by 2021. A former senior Hiringa executive, however, had revealed to Blue Orca that Hiringa was not actually a customer of Legacy Hyzon, but a mere "channel partner" assisting Legacy Hyzon in marketing vehicles to real end customers in New Zealand. Indeed, in reality Hiringa was then just a small startup operating out of a house in New Zealand with neither the capability nor the then-current intention to purchase any trucksvehicles from Legacy Hyzon.

- Legacy Hyzon had massively inflated expected sales. Legacy Hyzon had been representing to investors that it expected to deliver the first 20 trucks to Hiringa by the end of 2021, accounting for 24% of guided deliveries that year and 25% of guided revenues, and claiming that the orders were "100% certain." A Hiringa executive, however, told Blue Orca that it would not take any deliveries of Legacy Hyzon trucks in 2021 and only expected to receive the first four validation vehicles in March or April 2022, at the earliest.

- Legacy Hyzon had fabricated its business, operations, and financial prospects. In its initial investor presentations,Investor Presentations, Legacy Hyzon had claimed to have customer contracts with a bevy of big blue--chip companies worth upwards of $700 million. These purported customers, however, were later unceremoniously stricken from those investor presentationsInvestor Presentations as multiple other electric vehicle SPACs——including XL Fleet, Nikola, and Lordstown Motors——were exposed for faking customer orders, exaggerating their backlog, and exaggerating future revenues. Yet, despite these massive purported customer orders being stricken, Legacy Hyzon failed to correspondingly reduce its already exaggerated financial projections.

- Several early senior Legacy Hyzon executives had reportedly left the Company in large part over their concerns that Legacy Hyzon had been misrepresenting its customer contracts. like other the other EV SPACs. A "former Senior Legacy Hyzon Executive" is quoted as stating that

"he and other early senior Legacy Hyzon executives, all of whom left the Company, became uncomfortable with how Legacy Hyzon was presenting customer orders to investors." He continued: "They were going out, kind of selling it as really what it wasn't at the time. *A bit like unfortunately what Nikola was doing*."

- Legacy Hyzon was just a SPAC "repackaging" of its "flailing Chinese parent Horizon," which had delisted from the Chinese OTC market at an enterprise value of only $190 million, which for 17 years had failed to gain meaningful traction with the very same fuel cell technology Legacy Hyzon was promising to make profitable, and which technology had experienced dramatic sales declines since 2019.[48] Blue Orca provided the following chart illustrating this point, which it stated was based on Legacy Hyzon's July 2021 Investor Presentation, Jiangsu Horizon's 2019 Annual Report, and an Orange Group Article:



**Horizon Fuel Cells Sold by Horizon (Parent) 2019-2021**

- Legacy Hyzon told investors in presentations that it would turn cash flow positive as early as 2023, generate annual EBITDA of $505 million by 2025, and do so by achieving gross profit margins on electric vehicles of 32% in 2021 and as high as 33.6% by 2025. A former executive from Legacy Hyzon, however, reportedly told Blue Orca that Legacy Hyzon's retrofitting model of production would in fact yield no more than 5% to 10% gross margins. As a result, according to Blue Orca: "If we apply industry average gross margins of 15% to Legacy Hyzon's projected revenues, the Company will not turn cash positive in the next five years. The picture looks even more dire if we apply a

---

[48] To be sure, the Blue Orca Report references the sales and financial filings of Jiangsu Horizon, an operating subsidiary of Hyzon's former parent Horizon.

more appropriate gross margin assumption of 5-10%, which the former Legacy Hyzon executive we interviewed says is more realistic."

- Despite Legacy Hyzon's technology supposedly being world class and the foundation for its hockey-stick-like future revenue growth projections, since 2020, two of Legacy Hyzon's former Chief Technology Officers, Ian Thompson and Gary Robb, had unexpectedly resigned in quick succession with little time on the job, showing little faith in Legacy Hyzon and its technological prospects despite having obvious financial incentives to remain.

100.    Regarding "customer" Hiringa's purchase of 20 trucks during 2021, the Blue Orca Report quoted a Hiringa executive disputing that Hiringa was ever a customer of Legacy Hyzon or that Hiringa had ever committed to purchase anything from Legacy Hyzon, and stating that Hiringa would not even begin to validate the first couple vehicles until mid-2022:

To channel check Hyzon's claims, we spoke with a senior Hiringa executive. Although they remain interested in the project, **Hiringa explained to us that they are not actually a customer**, but a "**channel partner**" for Hyzon's vehicles. Hiringa does not intend to pay for or take title over the trucks, but merely facilitate the sale of hydrogen trucks to third parties.

*"We're effectively a channel partner model if you like."*

*"**Our business model is not to buy the trucks. We do the refueling…. we're effectively an unpaid market channel**"*

*"There's no point in us being the middleman. So [the end customer] will physically pay for the trucks and they will physically take title."*

- Hiringa Executive

This is not a matter of semantics. According to Hiringa, it has no current intention (or funds) to purchase 1,500 trucks from Hyzon, but

merely to act as a conduit to encourage other New Zealand heavy truck operators to purchase trucks from Hyzon.

This makes more sense, as Hiringa does not have anywhere near the financial resources to pay for 1,500 trucks, being a company **with less than 20 employees according to LinkedIn and supposedly operating out of a house in New Zealand**. Rather than purchasing 1,500 trucks, Hiringa plans to build fuel stations with the hope of facilitating future purchases from end customers.

Hiringa also informed us that the **1,500-truck agreement claimed by Hyzon in its investor presentations is not a binding order**, and that it merely represents a right, not an obligation, to buy.

*"That's a right to buy, not an obligation to buy."*

*"At the end of the day it's not binding. That's not a binding purchase. It's a purchasing framework."*

- Hiringa Executive

\*    \*    \*

Yet Hiringa's executive said that **Hiringa will not take any deliveries of Hyzon trucks in 2021 and expects to receive the first four validation vehicles in March or April 2022, at the earliest**.

*Hiringa: "Realistically with the supply chains, I think they will be arriving in March or April [2022]. There's also some work to do in quarter one in the Netherlands before they ship."*

*Blue Orca: "So you don't actually expect trucks this year? You expect them in the first quarter of 2022?"*

*Hiringa: "...March through May, if you like, or April through June [2022] is when we are going to be doing validation in New Zealand... it's not [a] full commercial operation."*

*Blue Orca: "So you don't expect any trucks to be delivered from Hyzon until at least March or April next year. And those are the four validation units?"*

*Hiringa: "Yep, yep."*

- 76 -

- Hiringa Executive

This directly contradicts Hyzon's claims to investors. According to Hyzon's disclosures, Hiringa will account for 24% of the Company's deliveries in 2021, making it the key to whether Hyzon meets its revenue and delivery guidance for this year. But Hiringa told us point blank that no deliveries would be taken in 2021, and the first validation trucks would be delivered in March or April 2022, at the earliest.

Furthermore, Hiringa told us that the remaining 16 trucks ordered from Hyzon would be fulfilled based on testing results of the initial four validation vehicles, which they expect to carry out between March and June 2022 at the earliest.

We asked Hiringa if there was any possibility that they might bring forward the order for the 16 trucks, but Hiringa told us that they do not want to take delivery until they build the commercial hydrogen fuel station infrastructure in New Zealand—which Hiringa indicated would not be until the second half of 2022.

*"We don't have the [commercial] stations until the second half of the [2022] calendar year. So, we don't want to hold [on to] 16 trucks…"*

- Hiringa Executive

Our call with Hiringa suggests that the 1,500-truck deal was more hype than reality. Based on our conversation, we do not think that Hiringa has the obligation, the intention, or the capability to purchase the trucks Hyzon claimed in its announcement.[49]

101.  Notably, in its October 5, 2021 response to the Blue Orca Report, Hyzon never disputed that Hiringa was not a "customer" of Legacy Hyzon or that

---

[49] Blue Orca Report at 5-7 (emphasis added).

- 77 -

Hiringa was not taking delivery of any of the 20 vehicles during 2021.[50]  Instead, Hyzon claimed that it never said that Hiringa would be "an end user" of the vehicles and that Hyzon still saw "significant potential in the New Zealand market through its partnership with Hiringa, which already has resulted in a Vehicle Supply Agreement for 20 trucks to be delivered to TR Group Ltd., one of New Zealand's largest truck and trailer leasing and rental companies." Hyzon also claimed that it "plans to start supplying trucks to TR Group Ltd. in the first half of 2022."

102.  But TR Group Ltd. appears to have put out its own press release announcing that "TR Group has ordered 20 x Hyzon Hydrogen Fuel Cell Trucks" on November 5, 2021, well outside of the timeframe described in the Merger Proxy and the Investor Presentations.[51]  The TR Group Ltd. press release stated that "[t]he

---

[50] *See* Hyzon Motors Issues Statement Strongly Rejecting Misleading and Inaccurate Short Seller Report, Oct. 5, 2021, https://investors.hyzonmotors.com/news/news-details/2021/Hyzon-Motors-issues-statement-strongly-rejecting-misleading-and-inaccurate-short-seller-report/default.aspx (last visited July 31, 2022).

[51] *See* TR Group Orders 20 Hydrogen Fuel Cell (HFC) Electric Trucks, Nov. 5, 2021, https://www.trgroup.co.nz/blog/posts/2021/november/tr-group-orders-20-hydrogen-fuel-cell-hfc-electric-trucks/ (last visited July 31, 2022).  On November 4, 2021, the New Zealand Energy Efficiency & Conservation Authority ("EECA") – the government agency apparently funding the endeavor – issued its own release stating that the "EECA welcomed the *news today* that . . . TR Group *has ordered* 20 heavy hydrogen fuel cell trucks for delivery to New Zealand next year, with $4 million in co-funding from the COVID Response and Recovery Fund (CRRF) and an additional $2 million in co-funding from EECA." *See also* Hydrogen-Powered Heavy Freight Trucks to Hit New Zealand Roads, Nov. 4, 2021,

- 78 -

first units will be in New Zealand in mid-2022 for performance testing with the balance arriving towards the end of the year." Even if Hyzon's belated explanation was accepted at face value, it constitutes an admission that the Hiringa-"facilitated" orders were far from binding, as they were subject to undisclosed preconditions, including validation trials and hydrogen infrastructure buildouts that would not occur, at the earliest, until the latter half of 2022.

103.    Addressing the claim that Legacy Hyzon was "Just a Repackaging of Its Chinese Parent Company, a 17-Year-Old Business Recently Valued as a Microcap" and the 81% decline in parent Horizon's fuel cell sales since 2019, Hyzon's October 5, 2021 rebuttal again minced words, countering that the Blue Orca Report improperly conflated Horizon and one of its operating subsidiaries, Jiangsu Horizon. But Hyzon failed to address Blue Orca's statements about the actual decline in market capitalization in the shares listed on the OTC exchange in China. As clarified in the 1st Iceberg Research Report, one of Horizon's operating

---

https://www.eeca.govt.nz/about/news-and-corporate/news/hydrogen-powered-heavy-freight-trucks-to-hit-new-zealand-roads/ (last visited July 31, 2022). Notably, TR Group Ltd. had issued a July 20, 2020 press release stating that it had signed a memorandum of understanding with Hiringa to offer heavy fuel cell electric trucks in New Zealand at some point, but there was no certainty as to when or how many. TR Group Ltd. instead simply stated that it "hope[d] that this partnership be fruitful. . . ." *See* Fuel Cell Partnership with Hiringa Energy, July 20, 2020, https://www.trgroup.co.nz/blog/posts/2020/july/fuel-cell-partnership-with-hiringa-energy/ (last visited July 31, 2022).

subsidiaries had been listed and delisted and that the same operating subsidiary was responsible for most of Horizon's fuel cell sales.

104.    Responding to the post-2019 decline in fuel cell sales from the Blue Orca Report, Hyzon's October 5, 2021 rebuttal quips that "[a]lthough not relevant to Hyzon's future business," "Hyzon understands that Jiangsu Horizon shipped more than 26 megawatts of fuel cells in 2019 and more than 36 megawatts of fuel cells in 2020."  Once again, Hyzon dodged the issue—Blue Orca's simple calculation, supported by citations to documentary evidence, that Horizon had sold fuel cell battery systems installed in 400 vehicles during 2019, 100 vehicles during 2020, and 38 vehicles during the first half of 2021.  Hyzon's rebuttal instead references the shipment of "megawatts of fuel cells."

105.  Hyzon's October 5, 2021 rebuttal also addressed the Blue Orca Report's statements that Legacy Hyzon's margins in the Merger Proxy and in the February 2021 Investor Presentation were overstated.  Among other things, the Blue Orca Report cited as evidence of the overstated margins industry participants, a white paper and a former Legacy Hyzon executive, which showed that Legacy Hyzon could not generate any free cash flow over the following five years,  Hyzon's October 5, 2021 rebuttal once again avoided the factual issues and instead claimed that Legacy Hyzon's statements were aspirational (i.e., "Hyzon management has long articulated its view of being at the vanguard of an industry in its nascency that

it believes will develop substantially beyond its current size, enabling Hyzon to capture a robust profitability profile on the back of its technology."). What Hyzon did not do is contest the specific discrepancies identified by the Blue Orca Report. Hyzon did not contest that the 32% margins provided were nearly twice the industry average and impossible for a company that is retrofitting vehicles made by other companies. Nor did the Blue Orca Report contest the statement by a "former Hyzon senior executive" that "Hyzon would likely generate gross margins of 5-10% on its vehicle sales at best." And the rebuttal ignored the fact that the much lower anticipated margins made it impossible for Legacy Hyzon to generate free cash flows over the following five years—or Hyzon simply chalked that up to more aspirational speech.

106.    On October 6, 2021, Iceberg Research published its first report. Iceberg Research expressly stated that it had conducted its own research in reviewing the Blue Orca Report, that it agreed with each of Blue Orca's key findings, and that its own Report "contains new information on Legacy Hyzon." The 1st Iceberg Research Report revealed that Legacy Hyzon's "parent Horizon Fuel Cell Technologies Pte Ltd ('Horizon') saw its 2019 sales surge, thanks to one customer," that "this client was in financial trouble by the end of the year," and that "[t]his was never disclosed" by Legacy Hyzon. It further stated that "Hyzon's corporate governance puts its minority shareholders at risk" because "Horizon holds the largest

- 81 -

block of Hyzon shares, and controls both management and the board of the two entities."  The 1st Iceberg Research Report emphasized that Horizon was not only Hyzon's majority shareholder, then holding 63% of its shares, but that it was also "Hyzon's key source of hydrogen fuel cells under a supply agreement signed in January 2021."  According to Iceberg Research, "[a]lmost all Horizon's sales come from its Chinese subsidiary Jiangsu Qingneng New Energy Technologies Co., Ltd.," and "Qingneng's financials show most of the 2019 spike was due to one customer, Shanghai SunLong Bus Co., Ltd."  As to that "one customer," the 1st Iceberg Research Report stated:

> ***Qingneng and Horizon never disclosed that SunLong was and is still in financial distress.*** SunLong's parent company Shenzhen-listed Tunghsu Optoelectronic Technology defaulted on three bonds (RMB 4.7bn or ~$666m) towards the end of 2019, despite reporting a $2.6bn cash stack at the end of September. The filings of both Qingneng and Beijing SinoHytec (北京亿华通科技股份有限公司), a much larger fuel cell peer and also a SunLong supplier, show SunLong's struggles continued in 2020.
>
> Qingneng's free cash flow plunged to negative RMB49.7m ($7m) for the 1H20 period. The drop was mainly due to sales, which fell 36% YoY to RMB 16m ($2.4m), and poor collections on its SunLong receivables. We estimate that Qingneng collected just RMB 1m of its end-2019 SunLong receivables (RMB 56.5m or $8m).
>
> Yet, just 5% of the SunLong receivables were recognised as bad debts at the end of June 2020. Qingneng chose to sweep this problem under the carpet. By contrast, SinoHytec recognised SunLong's problems and impaired 28% of its SunLong receivables in the 1H20 period, up from 16% at the end of 2019.

107.    The 1st Iceberg Research Report further warned that "[t]he same Horizon that did not disclose its customer default now has extensive control of Hyzon through its 63%-shareholding" and that "[t]his may create the risk that Horizon gets access to the ~$500m cash pile Hyzon raised through the July 2021 SPAC merger, by charging Hyzon exorbitant prices to support its fuel cell business, to the detriment of minority shareholders," a process it referred to as "'拆东补西' or 'pulling down the east wall to repair the west wall.'"

108.    The 1st Iceberg Research Report also lamented that in the Merger Proxy, "Hyzon boasts of its superior fuel cell technology" but that "[w]e believe these claims are exaggerated."  According to the 1st Iceberg Research Report, "Hyzon boasts of its technical superiority, in particular, its G3 Titan fuel cells lead the world on volumetric power density ('VPD' of 5.48-6.08) and gravimetric power density (GPD of 5.03-5.54)," citing a slide from the same February 2021 Investor Presentation.  According to Iceberg Research, the "[d]ata assessed by third-party TUV Rheinland" cited in that  investor presentation "was from 'short stack testing' and merely points to the '…potential of using full power fuel cells up to 500hp (370kW) for heavy mobility applications . . . .'"  Instead, according to Iceberg Research, "Hyzon's existing product — the 150 kW G2 fuel cell — underperforms most peers.  Its GPD of just 2.31 kW/kg is much lower than Ballard's 140 kW FCgen – HSP  at 4.7 kW/kg."

109.   The 1st Iceberg Research Report further stated that "we think customers will be reluctant to buy trucks whose warranties are covered by Hyzon, not by original equipment manufacturers ('OEMs')."   The Report goes on to detail in relevant part as follows:

> *Reliable warranties are crucial to industrial clients that intensively use their vehicles*. Hyzon does not build trucks. It converts OEM's internal combustion engine vehicles (e.g., DAF) to hydrogen-fueled trucks through its 50.5%-owned joint venture — Hyzon Motors Europe BV — with Netherlands-based Holthausen Clean Technology Investments BV.
>
> *We were informed by a Holthausen representative that Hyzon, not the OEM, will cover the warranty.* Hyzon's clients will then have to trust that Holthausen and Hyzon are able to service the warranty. Holthausen is run by a father and son team, Carl and Max Holthausen. According to a March 2021 report by Dutch newspaper Het Financieele Dagblad, the Holthausens first experimented with hydrogen as a fuel about 10 years ago, first as a generator, followed by a boat, a remote-controlled car, a drone, then finally a "Hesla", a hydrogen-powered Tesla Model S.
>
> *We expect many industrial customers will be reluctant to buy Hyzon's vehicles when established OEMs such as Toyota, Hino, and General Motors are lining up to launch their own hydrogen trucks*. The likes of Daimler Trucks began testing its Mercedes-Benz GenH2 prototype truck in May this year while South Korea's Hyundai plans to roll out 1,600 fuel cell trucks by 2025.

110.   On November 16, 2021, another shoe fell.  Iceberg Research published the 2nd Iceberg Research Report.  Notably, Legacy Hyzon stated at the time of Merger that it was on track to deliver 85 vehicles during 2021, garnering it some $37

- 84 -

million in revenues.[52]  However, as the 2nd Iceberg Research Report noted, "Hyzon ended the third quarter [ended September 30, 2021] with the sale of only two trucks recorded at the start of August," and "[n]o other vehicle seems to have been delivered since then and we are 45 days from the end of the year."  In short, it was virtually impossible for Hyzon to deliver on one of the "Contracted Orders" Legacy Hyzon had claimed in the February 2021 Investor Presentation to be "100% Certain."

81.111.    On January 12, 2022, Decarb disclosed that the SEC had opened a formal investigation into the Company's disclosures related to the issues raised in the Blue Orca Report.  The SEC served a subpoena on Decarb seeking various documents and information.  ThatUpon information and belief, that investigation remains ongoing.

82.112.    In the wake of the Blue Orca Report, the Iceberg Research Reports and the SEC investigation, the market price of Decarb stock has declined precipitously, trading below $43 per share by January 24, 2021July 5, 2022, or 6070% below the IPO price of $10 per share and 6070% below the record date price of $10 per share.

83.113.    Further bolstering the allegations of charges made in the Blue Orca Reportand Iceberg Research Reports, in January 20212022 Decarb disclosed

---

[52]  *See* February 2021 Investor Presentation at 39 and Merger Proxy at 105.

that it anticipated its 2021 financial results would reflect a much lower average selling price ("ASP") per vehicle due to product mix and lower multi-year revenue recognition for the majority of sales, which the Company ~~says will~~said would result in materially lower-than-previously-forecast revenues and margins. Indeed, after the Merger closed, during ~~Decarb's~~Hyzon's third quarter 2021 earnings conference call on November 12, 2021, it disclosed that it had suddenly shifted its deployment focus to Asia, where ~~average selling prices are approximately half that of other regions.~~ASPs are approximately half that of other regions. Stock research analysts at D.A. Davidson & Company would report that during a "management meeting" they hosted with Hyzon in January 2022, Hyzon disclosed that contrary to the Merger Proxy's claims that its own New York and Illinois fuel cell production facilities would be fully operational by the end of 2021, neither facility was yet operational, leaving Hyzon indefinitely reliant upon its former parent, now controlling shareholder and sole supplier of its key fuel-cell components, Horizon, and emphasizing that Hyzon's margins would remain low as a result.[53] In short, this

---

[53] *Compare* Merger Proxy at 163 ("Hyzon expects that its first fuel cells will be manufactured at the facility in Rochester, New York, by the end of 2021 and that production . . . in Illinois will also begin by the end of 2021.") and D.A. Davidson & Company, *4Q:21 Preview: Steady Global Expansion Continues*, Mar. 17, 2022 ("**The build-outs in Chicago and Rochester.** We hosted management meetings in January with investors, where HYZN provided some additional color on its US facility build-outs. The bottom line is that delays continue, but HYZN is lucky that

demonstrates that the Merger Proxy misrepresented Hyzon's ability to operate independently from its former parent and the adverse impact that would have on its financial results.

114.   On February 15, 2022, stock research analysts with Morgan Stanley, which served as the co-placment agent with Goldman Sachs for PIPE financing in connection with the Merger, issued an initiation report on Hyzon stock.  Morgan Stanley confirmed that the lofty margin projections Defendants provided in the Merger Proxy were materially false and misleading in that Legacy Hyzon, which was not an OEM, could never achieve them, stating in pertinent part: "Our FY25 EBITDA margin estimate of 0.2% is *~1500bps below* management's FY25 EBITDA margin target (*which is in line with best in class mature OEMs & suppliers*)."[54]

115.   Morgan Stanley also warned that the Hyzon fuel cell "durability/power density claims" in the Merger Proxy "*remain unproven*," stating in pertinent part that:

> While HYZN's power density claims would undoubtedly place the company well ahead of BEV and FCEV peers, the company's limited operating history and relatively limited level of accumulated real-world miles *prevent a more fulsome confirmation of the company's technology claims*. With the company also continuing to

it is able to obtain key fuel-cell components from former parent company Horizon. In the near-term, however, margins may be challenged.").

[54]   *See* Morgan Stanley & Co. LLC, *Fueling the Future of Hydrogen; Initiate at EW, $7PT*, Feb. 15, 2022 at 2.

source fuel cell systems from Horizon in the near-term, reliability and quality will remain two key variables as the company ramps its domestic manufacturing capabilities in the United States.

*Fuel cells for HYZN trucks that are currently in production are being sourced from Horizon and are the G2 model*. Though Horizon has sold over 500 systems and 27MW of fuel cell capacity in 2019 including 10 units of its 150kW (2nd gen/G2) stacks, the majority of these systems (350) were used in light-duty truck applications that were deployed in 2019. Roughly 15% have also been used in some heavy truck (70) and city bus applications (5).[55]

116.   On March 30, 2022, Hyzon filed its 2021 Annual Financial Report with the SEC on Form 10-K disclosing that while it had reported having sold 87 trucks during 2021, all but five of those vehicles had been sold in China.  It further disclosed that on November 23, 2021, the Company had entered into a stock warrant agreement with one of its large Chinese customers to purchase up to two million shares of Hyzon stock, at an exercise price of $7.75 per share (the per share closing price of Hyzon's stock that day), revealing that Hyzon had awarded that purported customer stock options potentially worth millions of dollars in exchange for purchasing its vehicles.  It also disclosed that in December 2021, Hyzon sold 20 vehicles to another joint venture partner in China.  In sum, while Hyzon reported delivery of 87 vehicles during 2021 for a contract value of just $19.6 million—less than half of its projected $37 million target for 85 vehicles being sold during 2021—

---

[55] *Id.* at 46-47.

Hyzon's independent outside auditors would not permit it to recognize the full contract values on delivery of those vehicles due to collection concerns raised by its auditor. Accordingly, Hyzon reported only $6 million in sales for 2021.

117. The 2021 10-K further disclosed that in response to the revelations about Hyzon's true business metrics and financial prospects, "certain of the Company's potential suppliers and partners indicated that they were suspending negotiations with [Hyzon] concerning supplying [Hyzon] with key components necessary to produce [its] vehicles." Hyzon explained that the "negative publicity" had "adversely affected [its] brand and reputation," which "makes it more difficult for [it] to attract and retain employees, partners and customers, reduces confidence in [its] products and services." As a result of those difficulties, it further explained, "customers, potential customers, partners and potential partners have failed to award [it] additional business or cancelled or sought to cancel existing contracts or otherwise, directed or may direct future business to [its] competitors. . . ."

118. On April 12, 2022, less than two months after the SEC investigation was announced, the *Wall Street Journal* published a report that Hyzon CFO Mark Gordon was resigning following the announcement of the SEC investigation into the Blue Orca Report's claims that "some orders for Hyzon vehicles weren't real." The *Wall Street Journal* report noted that rather than the $37 million in fiscal 2021 revenues that Hyzon had stated it was on track to report in Merger Proxy—in

connection with its effort to encourage shareholders to vote in favor of the Merger and to dissuade them from exercising their Redemption Rights—Hyzon had only reported $6 million in revenues for fiscal 2021.[56]  The *Wall Street Journal* report further noted that the Company only "expects to deliver 300 to 400 vehicles this year" (2022), which is upwards of 50% less than the 658 vehicles the Company had said in the Merger Proxy it was on track to deliver during 2022.

## VI.    The Merger Was Unfair to Unaffiliated Holders of Class A Stock

### A.    The Merger Process Suffered from a Myriad of Conflicts of Interest

84.119.    For at least three reasons, Decarb's fiduciaries were hopelessly conflicted when sourcing, negotiating, and executing the Merger.

85.120.    First, due to their economic interests in Class B Founder Shares, the Director Defendants were incentivized to get a deal done—any deal at all—even if it was not in the best interests of the public Class A stockholders.  As described above at ¶¶47-51¶54, the Sponsor initially contributed $25,000 to the Company in exchange for the Founder Shares—i.e., approximately $0.002 per share.  Thus, even if the post-Merger company's stock price fell well below Decarb's $10 per share IPO price (which it has), holders of Class B shares were still poised to realize proceeds in the hundreds of millions of dollars.

---

[56] *See* Mark Maurer, Hyzon Motors Recruits New CFO Months After SEC Subpoena, Wall St. J., April 12, 2022.

86.121.    Second, the Director Defendants were beholden to Riverstone——and its owners and operators, Defendants Lapeyre, Leuschen, and Tichio——who controlled Decarb.  Riverstone controlled all of the Founder Shares through the Sponsor, placed each of the Director Defendants on the Board, and had the power to remove any of them at any time.  The Director Defendants each had had deep ties to Riverstone, both professional and financial.  Indeed, Riverstone repeatedly placed these same Director Defendants on boards of other SPACs founded under Silver Run and the "Decarbonization Plus" banner, providing them opportunities to realize significant profits from ownership of additional Founder Shares in other SPACs. Riverstone appointed Defendant Anderson CEO and allowed his WSGWRG entity to participate heavily in the Founder Shares.  Given all of these ties, the Director Defendants could not act independently from Riverstone and entirely lacked the incentive or practical ability to "say no" to any deal proposed by Defendants Lapeyre, Leuschen, and Tichio.

87.122.    Third, in order to force the deal through no matter the consequences for Decarb stockholders, the Director Defendants failed to obtain an unbiased third-party valuation of Hyzon or a fairness opinion and instead hired a completely conflicted financial advisor investment banker, Goldman Sachs—, that was simultaneously marketing Hyzon's *bona fides* to Decarb and negotiating sales terms for Hyzonserving as its financial advisor. an investment banker and placement

agent to Decarb.  Goldman Sachs then also owned a 12% interest in Riverstone. Given the extensive personal and professional ties between Goldman Sachs, Riverstone and several of the Director Defendants, as detailed herein, Goldman Sachs was conflicted.  Likewise, due to their still contingent interest in 60% of the investment banking fees Citi and Credit Suisse had been promised in connection with the Decarb IPO, Citi and Credit Suisse were conflicted and served as a mere rubber stamp for any deal now desired by Riverstone.  ThatAnd that the Board brought in Citi and Credit Suisse at the 11theleventh hour as additional purported independent financial advisors——when the due diligence was largely complete and the deal terms had been largely negotiated——provided cold comfort.  Moreover, Citi and Credit Suisse had both had recently receivedearned $11 million in fees for underwriting Decarb's IPO and could then reasonably anticipate receiving millions of dollars more in investment banking fees from Riverstone in the future.

88.123.    In short, no disinterested party was effectively watching out for the unaffiliated holders of Decarb's Class A common stock.

## B.    Decarb Class A Stockholders Did Not Have a Fully Informed Opportunity to Elect Whether to Redeem Their Stock

89.124.    The Merger was not fair to holders of Class A stock.  After the market learned the facts presented in the Blue Orca Reportand Iceberg Research Reports, the price of Decarb Class A stock plummeted and remains well below the $10 per share IPO and record date price.  By JanuaryJuly 2022, the price of Decarb

Class A stock had fallen below $43 per share, more than *6070% below* the redemption price.

125. Crucially, the Merger Proxy and other public disclosures by Decarb insiders contained material omissions or were materially misleading, such that Class A stockholders were not provided with all material information necessary to decide whether to redeem their shares ahead of the Merger. In particular, the disclosures were grossly deficient for at least the following reasons:

126. First, although Defendants had been touting the strength of one of Legacy Hyzon's purportedly largest customers at the time of Merger, Hiringa, who had supposedly signed a binding agreement to "acquire" 1,500 trucks by 2026, including 20 trucks by 2021, Hiringa was not in fact a customer of Legacy Hyzon but a would-be distributor. Hiringa had neither the capability nor the then-current intent to purchase trucks from Legacy Hyzon. These facts rendered Legacy Hyzon's projections materially false and misleading.

127. Second, because the 20 trucks Legacy Hyzon claimed would be sold to Hiringa by the end of 2021, accounting for 24% of guided deliveries that year, were not in fact slated to be delivered in 2021, Legacy Hyzon's 2021 projections provided in the Merger Proxy were materially false and misleading.

128. Third, in the lead up to completing the Merger, Legacy Hyzon removed a bevy of big blue chip companies accounting for an estimated $700

million in sales without correspondingly lowering its financial guidance.  As a result, the lofty financial projections the Company was providing were materially false and misleading and lacked a reasonable factual basis.  The removal of these brand-named customer orders previously identified as "100% certain" or "highly probable" demonstrates those orders were illusory, and that the delivery and revenue targets Defendants claimed they were on track to meet were based on illusory customers.

94.129.    Fourth, the Board should have discovered in its "*extensive due diligence*" and disclosed that several early senior Legacy Hyzon executives left the Company in large part over their concerns with how Legacy Hyzon had been misrepresenting its customer contracts.  The failure to disclose these facts to investors rendered statements regarding the Board's purported due diligence activities materially false and misleading.

95.130.    Fifth, that the business of Legacy Hyzon, while still part of Horizon/Hyzon, had been experiencing a dramatic sales decline since 2019 was a material known trend that the Company should have disclosed to investors in compliance with the federal securities laws..  That trend is irreconcilable with Defendants' representations that the fuel cell technology Legacy Hyzon had planned to market was as valuable as represented.

96.131.    Sixth, Defendants claimed Legacy Hyzon could obtain profit margins of more than 33% by 2025——when its business model would in fact afford

profit margins of 5% to 10% ***at best***.  Defendants also claimed that Legacy Hyzon would turn cash flow positive as early as 2023 or generate annual EBITDA of $505 million by 2025——again, when its business models did not support such projections.  As a result, Legacy Hyzon's financial projections provided in the Merger Proxy were materially false and misleading.  A fairness opinion, an unbiased third-party valuation, and/or unconflicted financial advisors could have confirmed these adverse facts.

97.132.    Seventh, meaningful due diligence would have at least called into question why two of Legacy Hyzon's Chief Technology Officers——who would have been the key officers in charge of its technology——had resigned since just 2020 in quick succession.  These departures, which occurred despite the obvious financial incentives to stay, indicated that the executives had little faith in Legacy Hyzon and its technological prospects, and should have been disclosed to investors.

133.   Eighth, Defendants boasted of Legacy Hyzon's technical superiority in its fuel cells but those claims were exaggerated.  In reality, the data cited by Defendants was from short stack testing and merely points to the potential of using full power fuel cells.  Instead, Legacy Hyzon's existing product underperforms most peers.

134.   Ninth, because Legacy Hyzon—not the OEMs producing the retrofitted vehicles Legacy Hyzon was selling—was responsible for the warranties, many

would-be purchasers of Legacy Hyzon's fuel cell vehicles were unlikely to make purchases from Legacy Hyzon.

98.135.    As a result of these material omissions and/or misleading statements, Class A stockholders were not provided with all material information to decide whether to redeem their stock.  And those who did not redeem their stock have suffered substantial damages as a result.

## CLASS ACTION ALLEGATIONS

99.136.    Plaintiff, a stockholder in the Company, brings this action individually and as a class action pursuant to Court of Chancery Rule 23 on behalf of himself and all holders of Decarb common stock (the "Class") who held such stock prior to the July 13, 2021 redemption deadline and were entitled to elect to redeem their shares but did not (except the Defendants herein, and any person, firm, trust, corporation, or other entity related to or affiliated with any of the Defendants) and who were injured by Defendants' breaches of fiduciary duties and other violations of law.

100.137.    This action is properly maintainable as a class action.

101.138.    A class action is superior to other available methods of fair and efficient adjudication of this controversy.

102.139.    The Class is so numerous that joinder of all members is impracticable.  The number of Class members is believed to be in the thousands, and

- 96 -

they are likely scattered across the United States.  Moreover, damages suffered by individual Class members may be small, making it overly expensive and burdensome for individual Class members to pursue redress on their own.

103.140.    There are questions of law and fact that are common to all Class members and that predominate over any questions affecting only individuals, including, without limitation:

(a)    whether Defendants breached their fiduciary duties to Plaintiff and the Class;

(b)    whether the Controller Defendants controlled Decarb;

(c)    whether "entire fairness" is the applicable standard of review;

(d)    which party or parties bear(s) the burden of proof;

(e)    the existence and extent of any injury to the Class or Plaintiff caused by any breach;

(f)    the availability and propriety of equitable re-opening of the redemption period; and

(g)    the proper measure of the Class's damages.

104.141.    Plaintiff's claims and defenses are typical of the claims and defenses of other Class members, and Plaintiff has no interests antagonistic or adverse to the interests of other Class members.  Plaintiff will fairly and adequately protect the interests of the Class.

- 97 -

105.142.    Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.

106.143.    Defendants have acted in a manner that affects Plaintiff and all members of the Class alike, thereby making appropriate injunctive relief and/or corresponding declaratory relief with respect to the Class as a whole.

107.144.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants; or adjudications with respect to individual members of the Class would, as a practical matter, be dispositive of the interest of other members or substantially impair or impede their ability to protect their interests.

**FIRST CAUSE OF ACTION**

**DIRECT CLAIM FOR BREACH OF FIDUCIARY DUTY
AGAINST THE DIRECTOR DEFENDANTS**

108.145.    Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

109.146.    As directors of Decarb, the Director Defendants owed Plaintiff and the Class the utmost fiduciary duties of care and loyalty, which subsume an obligation to act in good faith, with candor, and to make accurate and complete material disclosures to Decarb stockholders.

- 98 -

110.147.    These duties required the Director Defendants to place the interests of Decarb stockholders above their personal interests and the interests of the Controller Defendants.

111.148.    Through the events and actions described herein, the Director Defendants breached their fiduciary duties to Plaintiff and the Class by prioritizing their own personal, financial, and/or reputational interests and approving the Merger, which was unfair to Decarb Class A stockholders.

112.149.    The Director Defendants also breached their duty of candor by issuing the false and misleading Merger Proxy.

113.150.    As a result, Plaintiff and the Class were harmed when, deceived by the false and misleading disclosures and the Director Defendants' approval of the Merger, they did not exercise their Redemption Rights prior to the Merger.

114.151.    In addition, members of the Class approved the acquisition of Hyzon based on false and misleading information.

115.152.    Plaintiff and the Class suffered damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

### DIRECT CLAIM FOR BREACH OF FIDUCIARY DUTY
### AGAINST THE CONTROLLER DEFENDANTS

116.153.    Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

117.154.	The Controller Defendants were Decarb's controlling stockholders.  Specifically, the Controller Defendants controlled all of the Class B Founder Shares, elected (and could remove at any time) the other members of the Board, had deep personal and financial ties to the members of the Board they selected (including by granting them material financial interests in the Class B Founder Shares and by appointing them to other boards of directors of SPACs created under the Silver Run or Decarbonization banners), and held officer roles at Decarb.

118.155.	The Controller Defendants owed Plaintiff and the Class fiduciary duties of care and loyalty, which include an obligation to act in good faith, with candor, and to provide complete and accurate material disclosures to Decarb stockholders.

119.156.	At all relevant times, the Controller Defendants had the power to control, influence, and cause——and actually did control, influence, and cause—— the Company to enter into the Merger.

120.157.	The Merger was unfair, reflecting an unfair price and unfair process.

121.158.	Through the events and actions described herein, the Controller Defendants breached their fiduciary duties to Plaintiff and the Class by agreeing to

- 100 -

and entering into the Merger without ensuring that it was entirely fair to Plaintiff and the Class.

122.159.    As a result, Plaintiff and the Class were harmed when, deceived by the false and misleading disclosures and the Board's approval of the Merger, they did not exercise their Redemption Rights prior to the Merger.

123.160.    In addition, members of the Class approved the acquisition of Hyzon based on false and misleading information.

124.161.    Plaintiff and the Class suffered damages in an amount to be determined at trial.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment and relief in his favor and in favor of the Class, and against Defendants, as follows:

A.    Declaring that this Action is properly maintainable as a class action;

B.    Finding the Director Defendants liable for breaching their fiduciary duties owed to Plaintiff and the Class;

C.    Finding the Controller Defendants liable for breaching their fiduciary duties, in their capacity as Decarb's controlling stockholders, owed to Plaintiff and the Class;

D.    Certifying the proposed Class;

E.    Awarding Plaintiff and the other members of the Class damages in an amount to be proven at trial, together with interest thereon;

F.    With respect to Class members who had the right to seek redemption and still hold their shares, equitably re-opening the redemption window to allow them to redeem their shares at the prior redemption price, as per the terms of the Company's foundational documents;

G.    In the alternative, rescinding the Merger and returning the capital raised in Decarb's IPO to the Company's public stockholders, as well as all other rescissory damages;

H.    Awarding Plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

I.    Awarding Plaintiff and the Class such other relief as this Court deems just and equitable.

ANDREWS & SPRINGER LLC

-/s/ David M. Sborz

*Of Counsel*:

Samuel H. Rudman *(PHV* forthcoming)
Mary K. Blasy *(PHV* forthcoming)
ROBBINS GELLER RUDMAN
 & DOWD LLP
58 South Service Road, Suite 200
Melville, NY -11747
(631) 367-7100

Randall J. Baron
Travis E. Downs III *(PHV* forthcoming)
Benny C. Goodman III
Erik W. Luedeke
Brian E. Cochran *(PHV* forthcoming)
ROBBINS GELLER RUDMAN
 & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA -92101
(619) 231-1058

Brian J. Robbins *(PHV* forthcoming)
Gregory E. Del Gaizo
ROBBINS LLP
5040 Shoreham Place
San Diego, CA -92122
(619) 525-3990

~~Dated:  March 18, 2022~~

Dated: August 1, 2022

Peter B. Andrews (#4623)
Craig J. Springer (#5529)
David M. Sborz (#6203)
Andrew J. Peach (#5789)
Jackson E. Warren (#6957)
4001 Kennett Pike, Suite 250
Wilmington, DE  19807
(302) 504-4957

*Counsel for Plaintiff*

- 103 -

## UNSWORN DECLARATION AND VERIFICATION OF
## JOHN E. MALORK PURSUANT TO 10 *DEL. C.* §3927 IN SUPPORT
## OF VERIFIED FIRST AMENDED CLASS ACTION COMPLAINT

Pursuant to 10 *Del. C.* §3927 and Delaware Court of Chancery Standing Order No. 9, entered on January 28, 2022, I do hereby state as follows:

1.      I, John E. Malork, plaintiff in the above-captioned action, am a holder of Decarbonization Plus Acquisition Corporation ("Decarb" or the "Company"), now known as Hyzon Motors, Inc., common stock and have owned Decarb shares during all relevant times alleged in the Verified Class Action Complaint (the "Complaint"). I am a resident of California and am of full legal age. I make this unsworn declaration and verification in support of the Complaint filed in the above-captioned case.

2.      I make this unsworn declaration under penalty of perjury.

3.      I have read the Complaint and consulted with counsel.

4.      The facts alleged in the Complaint are true and correct to the best of my knowledge, information, and belief.

5.      In accordance with Delaware Court of Chancery Rules 23(aa) and 23.1(b), neither I, nor anyone else affiliated with me, has received, been promised or offered, and will not accept any form of compensation, directly or indirectly, for prosecuting or serving as a representative party in this action except for: (i) such damages or other relief as the Court may award me as a member of the class; (ii) such

fees, costs, or other payments as the Court expressly approves to be paid to me; or (iii) reimbursement, paid by my attorneys, of actual and reasonable out-of-pocket expenditures incurred directly in connection with the prosecution of this action.

I declare under penalty of perjury under the laws of Delaware that the foregoing is true and correct.

Executed on this _31_ day of July, 2022.

By: _____
John E. Malork

2

## CERTIFICATE OF SERVICE

I hereby certify that, on August 1, 2022, I caused a true and correct copy of the foregoing *Verified First Amended Class Action Complaint* to be served upon the following counsel of record via File & Serve*Xpress*:

> Rolin P. Bissell
> James M. Yoch, Jr.
> Kevin P. Rickert
> YOUNG CONAWAY STARGATT
>   & TAYLOR, LLP
> Rodney Square
> 1000 North King Street
> Wilmington, DE 19801

>        */s/ David M. Sborz*
>        David M. Sborz (#6203)



EFiled: Aug 02 2022 12:10PM EDT
Transaction ID 67890502
Case No. 2022-0260-PAF



4001 Kennett I
Suite 250
Wilmington, D
302 504 4957
www.andrewsspringer.com

August 2, 2022

**VIA FILE & SERVE*EXPRESS* AND HAND DELIVERY**

The Honorable Paul A. Fioravanti, Jr.
Court of Chancery
Leonard L. Williams Justice Center
500 North King Street
Wilmington, Delaware 19801

  **Re: *Malork v. Anderson, et al.*, C.A. No. 2022-0260-PAF**

Dear Vice Chancellor Fioravanti:

  Enclosed please find two (2) courtesy copies of plaintiff's *Verified First Amended Class Action Complaint* and Exhibit A thereto (Rule 15(aa) Redline Comparison), which were filed with the Court on today's date.

  Counsel are available at the Court's convenience should the Court have any questions.

      Respectfully,

      */s/ David M. Sborz*

      David M. Sborz (#6203)
      Words: 45

The Honorable Paul A. Fioravanti, Jr.
August 2, 2022
Page 2



cc:    Register in Chancery (via File & Serve*Xpress*)
        Rolin P. Bissell (via File & Serve*Xpress*)
        James M. Yoch, Jr. (via File & Serve*Xpress*)
        Kevin P. Rickert (via File & Serve*Xpress*)