# EXHIBIT 4

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

JOHN E. MALORK, Individually and on Behalf of All Others Similarly Situated,

        Plaintiff,

v.

ERIK ANDERSON, JENNIFER AAKER, JANE KEARNS, PIERRE LAPEYRE, JR., DAVID LEUSCHEN, ROBERT TICHIO, JIM McDERMOTT, JEFFREY TEPPER, MICHAEL WARREN, RIVERSTONE INVESTMENT GROUP LLC, WRG DCRB INVESTORS, LLC and DECARBONIZATION PLUS ACQUISITION SPONSOR, LLC,

        Defendants.

C.A. No. 2022-0260-PAF

## DEFENDANTS' ANSWER TO PLAINTIFF'S VERIFIED FIRST AMENDED CLASS ACTION COMPLAINT

Defendants Erik Anderson, Jennifer Aaker, Jane Kearns, Pierre Lapeyre, Jr., David Leuschen, Robert Tichio, Jim McDermott, Jeffrey Tepper, Michael Warren, Riverstone Investment Group, LLC, WRG DCRB Investors, LLC, and Decarbonization Plus Acquisition Sponsor, LLC, (collectively, "Defendants") by and through their undersigned counsel, respond to the Verified First Amended Class Action Complaint (the "Complaint") filed by John E. Malork ("Plaintiff") as follows.

Unless expressly admitted, all allegations of the Complaint (including all footnotes, headings, and bulleted lists) are denied. Defendants deny all allegations suggesting that they acted improperly in any respect. Specifically, Defendants deny all allegations suggesting the existence of conflicts of interest in the merger between Decarbonization Plus Acquisition Corporation ("DCRB") and Hyzon Motors Inc. ("Hyzon") completed in July 2021 (the "Merger"). Defendants further deny all allegations that the Merger was in any way unfair to holders of DCRB stock. Defendants further deny all allegations that the redemption rights of any holder of DCRB stock were "impaired" in connection with the Merger. Defendants further deny the existence of any false or misleading disclosure made in connection with the Merger or Hyzon.

Defendants respectfully refer the Court to DCRB's October 21, 2020 Prospectus (the "Prospectus"), the June 21, 2021 Definitive Proxy Statement (the "Proxy") and to the other publicly available documents referred to by Plaintiff for a complete and accurate description of the contents of those documents and for a complete and accurate description of DCRB and the Merger. Defendants deny all allegations to the extent they conflict with the Prospectus or the Proxy.

To the extent that Defendants use terms defined in the Complaint herein, such use is not an acknowledgement or admission of any characterization that Plaintiff seeks to associate with any such defined term.

For their answers to each specific paragraph of the Complaint, Defendants state as follows:

## NATURE OF THE ACTION

1.    This is a stockholder class action brought by Plaintiff on behalf of himself and all other similarly situated investors in Decarbonization Plus Acquisition Corporation ("Decarb" or the "Company"), now known as Hyzon Motors Inc. ("Hyzon"), who were entitled to redeem their shares of Company stock in connection with the Company's acquisition of and merger with, a formerly privately held company also called Hyzon (the "Merger"). Plaintiff asserts breaches of fiduciary duties in connection with the Merger by the following individuals and entities (collectively, "Defendants," and each a "Defendant"): (a) Decarb directors Erik Anderson (then-Chief Executive Officer ("CEO")), Jennifer Aaker, Jane Kearns, Pierre Lapeyre, Jr., David Leuschen, Robert Tichio (former CEO), Jim McDermott, Jeffrey Tepper, and Michael Warren in their capacities as members of Decarb's Board of Directors (the "Board") and/or as Decarb officers; and (b) Riverstone Investment Group LLC ("Riverstone"), which founded Decarb and defendant Decarbonization Plus Acquisition Sponsor, LLC (the "Sponsor"), and WRG DCRB Investors, LLC ("WRG"), an affiliate of Defendant Anderson, in their capacities as Decarb's controlling stockholders (the "Controller Defendants").

**Answer**: Paragraph 1 purports to describe this action and states conclusions of law, to which no response is required.  To the extent a response is required, Defendants admit that Plaintiff purports to describe the claims asserted by Plaintiff in the Complaint and the putative class Plaintiff purports to represent.  Defendants deny the remaining allegations in Paragraph 1.

2.    Hyzon as it exists today is the product of the July 2021 Merger between Decarb—then a publicly traded, special purpose acquisition company ("SPAC")—and "Legacy Hyzon," then a privately held company engaged in the design, development, and manufacture of hydrogen fuel cell powered commercial vehicles. Prior to the Merger, Decarb lacked any business operations of its own. Instead, its sole purpose was to seek out and combine with an operating company or business. Decarb conducted an initial public stock offering ("IPO") of 20 million shares of

3

Class A common stock at $10 per share on October 22, 2020, raising $200 million in gross proceeds. Pursuant to the SPAC's terms, Decarb had two years after the IPO, or until October 22, 2022, to identify a merger target and complete the acquisition or face returning the initial $10 per share investment, plus interest, to its investors.

**Answer**: Defendants admit that Hyzon is the product of the Merger completed in July 2021.  Defendants respectfully refer the Court to the Prospectus and Proxy for a complete and accurate description of DCRB, DCRB's initial public offering (the "IPO"), and its objective of identifying an appropriate acquisition candidate. Defendants deny the allegations in Paragraph 2 to the extent that they are inconsistent with the Prospectus and Proxy.

3.    Critically, once a merger target had been identified, putative class members had the right, in connection with their investment in pre-Merger Decarb, either to take possession of the stock in any newly formed company Decarb eventually acquired **or** to seek a redemption of their pro rata share of trust assets (*i.e.*, $10 in cash initially paid for their shares, plus interest) ("Redemption Rights").

**Answer**: Paragraph 3 purports to describe the "redemption rights" of DCRB stockholders.  Defendants respectfully refer the Court to the Prospectus and Proxy for a complete and accurate description of DCRB stockholders' redemption rights. Defendants deny the allegations in Paragraph 3 to the extent that they are inconsistent with the Prospectus and Proxy.

4.    This action is brought on behalf of the former holders of the Decarb SPAC common stock whose Redemption Rights were unlawfully impaired due to Defendants' misstatements and omissions about Legacy Hyzon's true business metrics and financial prospects in connection with the Merger. These materially false and misleading statements deprived the Class (defined herein) of their right to a fully

informed decision whether to redeem their shares and induced stockholders to vote to approve the Merger to their detriment and the substantial benefit of Defendants.

**Answer**: Defendants deny the allegations in Paragraph 4.

5.      As further detailed herein, in structuring Decarb, Defendant Anderson (through his control of WRG), along with Defendants Lapeyre, Leuschen, and Tichio (in their capacities as co-founders, partners, and/or managing directors of Riverstone, which controlled Decarb and the Sponsor) behaved disloyally and in service of their own financial interests. These Defendants used the full panoply of tools that gave the Board strong (indeed, overriding) incentives to get a deal—any deal—done. These Defendants pushed the Merger through without regard to whether it was truly in the best interest of the SPAC's outside investors and without providing full and complete disclosure to investors, thus negating their rights to the full and uncompromised exercise of their right to redemption. Among other things:

- The Sponsor (for the benefit of Riverstone), WRG (for the benefit of Anderson), and the executive directors of the Company received "founder shares" ("Founder Shares") giving them the right to obtain 20% of the equity of the SPAC for nominal consideration, provided an acquisition was completed. At the time of the Merger, the Founder Shares were worth approximately $56.4 million, but would expire worthless if no deal were completed.

- The Sponsor gave the purportedly independent non-executive directors of the Company (each of whom was selected by and had extensive professional and financial ties to Defendants Riverstone, Anderson, Lapeyre, Leuschen, and Tichio) a large number of Founder Shares, the value of which were also conditioned on a deal—any deal—closing.

- Thus, even in a "bad" deal for public SPAC investors (*i.e.*, where the post-transaction company's stock trades at less than $10 per share), completion of a business transaction would yield massive windfalls to holders of the Founder Shares—including each of the purportedly "independent" non-executive members of the Decarb Board.

- Defendants' disclosures in the Merger Proxy (described below) regarding the Merger lacked the rigor of the usual IPO disclosures, yet were critical to outside investors' informed exercise of their Redemption Rights. Critically, in addition to delivering a materially misleading description of the Merger target's business metrics and

5

financial prospects and overstating the deficient due diligence completed in connection with the target's selection, the Merger Proxy provided shareholders with the only directives as to exercising their Redemption Rights and expressly directed that shareholders rely solely upon the Merger Proxy and related SEC filings in making that decision whether to redeem, and conduct no independent research of their own.[1]

- The massive windfalls available to WRG (and thus Anderson), the Sponsor (and thus Riverstone), and the members of the Decarb Board contingent upon the Merger closing—separate from any benefit to stockholders—created a clear conflict of interest with respect to any proposed deal, thus warranting entire fairness review of any deal.

**Answer**: Defendants deny the allegations in Paragraph 5 and respectfully refer the Court to the Proxy for a complete and accurate description of the Merger and its terms.

6. As a result of these conflicts of interest, Defendants issued materially false and misleading statements in support of the Merger in the Merger Proxy and related SEC filings, which were designed to discourage stockholders from exercising their Redemption Rights. Instead, Defendants encouraged stockholders to approve the Merger and to forgo their Redemption Rights, claiming that strong consumer demand for hydrogen fuel vehicles and Legacy Hyzon's long list of customers with signed orders—many for delivery during 2021—warranted entry into the Merger and the acquisition of Legacy Hyzon. In reality: (a) many of Legacy Hyzon's customers were illusory; (b) Hiringa, supposedly one of Legacy Hyzon's largest customers, which had purportedly signed a "100% Certain," "Signed Contract" for 20 vehicles to be delivered before the end of 2021, was only a distributor, not a customer, with no obligation, intention, or capability to purchase the volume of

---

[1] Such "related SEC filings" include the SEC filings made by Legacy Hyzon between February 9, 2021, when the de-SPAC transaction was first announced, and the July 13, 2021 deadline for Decarb stockholders to exercise their Redemption Rights, including but not limited to the slides used in connection with the February 9, 2021 Investor Presentation, which were filed with the SEC on Form 8-K on February 9, 2021 (the "February 2021 Investor Presentation Slides"), and the April 29, 2021 Investor Presentation, which were filed with the SEC on Form 8-K on April 29, 2021 (the "April 2021 Investor Presentation Slides").

vehicles Legacy Hyzon claimed were "100% Certain"; (c) Legacy Hyzon's financial projections were grossly inflated and lacked a reasonable factual basis; (d) Legacy Hyzon was unable to meet a material portion of the vehicle deliverables it had promised in 2021; (e) undisclosed financial problems related to Legacy Hyzon's former parent, which would remain its controlling stockholder and continue to be its largest supplier, left Legacy Hyzon exposed to being exploited; (f) Legacy Hyzon had exaggerated its "superior fuel cell technology"; and (g) there was a crippling deficit in Legacy Hyzon's business model: buyers would be disinclined to purchase vehicles from Legacy Hyzon, which had only been retrofitting vehicles made by others, once they found out that it was Legacy Hyzon and not the vehicles' official equipment manufacturers ("OEMs") that would be responsible for warranting the vehicles being sold by Legacy Hyzon.

**Answer**: Defendants deny the allegations in Paragraph 6 and respectfully refer the Court to the Proxy for a complete and accurate description of the Merger and Hyzon's business.

7.    Most notably, the Founder Shares cost the Sponsor just $25,000 yet were worth ***$56.4 million*** upon the Merger's closing, representing an increase on its investment of ***more than 2,255x***.

**Answer**: Defendants admit that the Sponsor initially contributed $25,000 to DCRB in exchange for founder shares.  Otherwise, Defendants deny the allegations in Paragraph 7.

8.    For purposes of this action, "[t]he entire fairness standard of review applies due to inherent conflicts between the SPAC's fiduciaries and public stockholders" in connection to the Merger, which resulted in a "value-decreasing transaction."[2] Here, the process leading to the Merger fails any entire fairness review for multiple reasons, including:

---

[2] *In re MultiPlan Corp. S'holders Litig.*, 268 A.3d 784, 792 (Del. Ch. 2022).

**Answer**: Paragraph 8 contains Plaintiff's conclusions of law and fact to which no response is required.  To the extent further response is required, Defendants deny the allegations in Paragraph 8.

9.      First, prior to negotiating the substantial terms of the Merger and conducting the purported "due diligence," the Decarb Board never bothered retaining its own, independent investment bankers to assess the fairness of the merger consideration and negotiate the Merger, but instead shared clearly conflicted investment bankers with the Company's acquisition target, Legacy Hyzon. That conflicted investment banking firm was Goldman Sachs & Co. ("Goldman Sachs"), which served both as target Legacy Hyzon's financial advisor in the Merger and as the co-placement agent for Decarb in selling the PIPE financing required to complete the Merger.[3] This was not a coincidence as the Board and the Controller Defendants have decades of extensive professional and financial ties to Goldman Sachs. Defendant Anderson had previously served as a Goldman Sachs vice president, and Defendants Lapeyre, Leuschen, and Tichio were also Goldman Sachs alumni. Indeed, these Riverstone executives had such strong business ties to Goldman Sachs that in 2017 Goldman Sachs had purchased a 12% stake in Defendant Riverstone. Only after Legacy Hyzon had hired Goldman Sachs to find an acquirer did the controlling stockholders of Decarb hire Goldman Sachs to serve as its co-placement agent for the PIPE shares required to complete the Merger. Defendants have expressly acknowledged the "conflicts in connection with such dual roles" and explicitly required that Decarb and Legacy Hyzon sign dual letters "waiving any potential conflicts in connection with such dual roles."[4]

**Answer**: Defendants admit that Goldman Sachs & Co. LLC ("Goldman Sachs") served as Legacy Hyzon's financial advisor in the Merger and as the co-

---

[3] The "PIPE Financing" was the issuance and private offering of 35.5 million shares of the Class A common stock of the combined company for $10.00 each to certain investors in connection with completing the Merger, raising $355 million to be used by the combined company for general corporate purposes.

[4] *See* Decarbonization Plus Acquisition Corporation's final Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934 filed with the SEC on Form DEFM14A on June 21, 2021 ("Merger Proxy") at 99.

8

placement agent in the PIPE financing completed in connection with the Merger. Defendants further admit that funds affiliated with Petershill Partners PLC purchased an approximately 12% interest in Riverstone in 2017. Defendants also admit that Defendants Anderson, Lapeyre, Leuschen, and Tichio were previously affiliated with the Goldman Sachs organization. Defendants admit that the quoted language in Paragraph 9 appears in the Proxy. Defendants respectfully refer the Court to the Proxy for a complete and accurate description of its contents. With regard to the footnote that accompanies paragraph 9, Defendants admit that, in connection with the Merger, DCRB entered into separate Subscription Agreements with a number of subscribers pursuant to which the subscribers agreed to purchase an aggregate of 35,500,000 PIPE shares for a purchase price of $10.00 per share and an aggregate purchase price of $355,000,000. Otherwise, Defendants deny the allegations in Paragraph 9.

10. At the tail end of the Merger process, the Decarb Board claims to have brought on its own independent financial advisors. But it was too little too late. The purported due diligence and deal negotiations were then largely complete. Critically, the new investment bankers—Citigroup Global Markets Inc. ("Citi") and Credit Suisse Securities (USA) LLC ("Credit Suisse")—had themselves just been promised millions of dollars in contingent investment banking fees for underwriting Decarb's IPO, a full 60% of which fees would be forfeited if Decarb did not complete the Merger. Thus Credit Suisse and Citi had their own interests in seeing the Merger completed. As detailed herein, these new conflicted advisors also had very reasonable expectations of receiving millions of dollars more in investment banking fees for doing further work for the Company and Riverstone following the Merger, including in the additional SPACs then being undertaken by Riverstone. As a result, these new purported financial advisors lacked any ability to act impartially and

9

appear to have only been belatedly added to rubberstamp a largely completed and highly conflicted deal process.

**Answer**: Defendants admit that DCRB retained Citigroup Global Markets Inc. ("Citi") and Credit Suisse Securities (USA) LLC ("Credit Suisse") to serve as underwriters with respect to the IPO and as financial advisors with respect to the Merger.  Paragraph 10 purports to describe the work and fees of Citi and Credit Suisse in connection with the IPO and the Merger.  Defendants respectfully refer the Court to the Prospectus and the Proxy for a complete and accurate description of the work of Citi and Credit Suisse and the compensation provided to them in connection therewith.  Otherwise, Defendants deny the allegations in Paragraph 10.

11.     Second, while the Board had a duty to diligently review Legacy Hyzon's operations before agreeing to buy the company, it either failed in that duty or it and its conflicted financial advisors ignored and concealed basic facts making clear the acquisition would be detrimental to Decarb stockholders. For instance, minimal due diligence would have revealed that Legacy Hyzon's fuel cell technology unit sales—the very technology that was supposed to make Hyzon profitable following the Merger—had declined by 81% since 2019. If revealed during the purported due diligence, this material information should have been disclosed in the Merger Proxy, but it was not. Similarly, as demonstrated by industry data, the financial statements of Legacy Hyzon's former parent, and statements by industry executives, including a confidential witness identified by a stock research firm as a "former Hyzon executive," Legacy Hyzon's financial projections in the Merger Proxy were grossly inflated because its gross margin estimates were overstated by upwards of 600%. Similarly, just days after announcing the proposed Merger, on February 17, 2021, Legacy Hyzon announced a purportedly valuable signed contract with New Zealand infrastructure startup Hiringa to "purchase" 1,500 trucks by 2026, including 20 trucks by 2021, making Hiringa one of Legacy Hyzon's largest purported "customers." Those 20 trucks reflected 24% of the 85 vehicles the Merger Proxy consistently stated Legacy Hyzon was on track to sell during 2021. The February 2021 and April 2021 Investor Presentation Slides emphasized the Hiringa deal was a "100% [c]ertain" "[s]igned [c]ontract." In reality though, Hiringa

10

was not a "customer" at all, but merely a "channel partner" contracted to assist Legacy Hyzon in eventually marketing vehicles to end customers in New Zealand. Hiringa was in fact then just a small startup operating out of a house in New Zealand with neither the capability nor the then-current intent to purchase Hyzon trucks. A modicum of financial due diligence would have uncovered these basic facts—but no meaningful due diligence was conducted—or the findings were concealed.

**Answer**: Defendants lack knowledge or information sufficient to form a belief as to views allegedly reported to Blue Orca Capital by unidentified "industry executives" including the "confidential witness" referenced in Paragraph 11 and, therefore, deny the related allegations on that basis. Otherwise, Defendants deny the allegations in Paragraph 11.

12.    Third, Defendants' statements regarding the Merger were affirmatively false and misleading. For example, in soliciting Decarb investors to support the Merger rather than redeem their pre-deal shares, the Board repeatedly highlighted the "***extensive due diligence***" it supposedly had performed. However, the Board had simply accepted its conflicted financial advisors' projections for Hyzon at face value, rather than disclose the target's true financial picture.

**Answer**: Defendants admit that the quoted language contained in Paragraph 12 appears in the Proxy. Defendants respectfully refer the Court to the Proxy for a complete and accurate description of its contents. Otherwise, Defendants deny the allegations in Paragraph 12.

13.    Less than 10% of the Company's outside investors redeemed their shares before the Merger closed on July 16, 2021.

**Answer**: Defendants admit the allegations in Paragraph 13.

14.    Investors who believed the Board's disclosures and put their faith in the Board's purported due diligence and loyalty received a rude—but prompt—awakening. Just two months after the Merger closed, a market research report by Blue Orca Capital (the "Blue Orca Report") publicly disclosed for the first time both

11

the fallacy of Hyzon's claimed customers and the truth about its business metrics and inflated financial prospects.[5] The findings of the Blue Orca Report were then independently researched and confirmed by a second research firm, Iceberg Research, which published its own reports in October and November 2021.[6]  The Iceberg Research Reports revealed additional facts that had been concealed by Defendants in connection with obtaining shareholder approval of the Merger and dissuading Decarb shareholders from exercising their Redemption Rights. Specifically, the 1st Iceberg Research Report raised additional unknown issues relating to Legacy Hyzon's governance, challenged the published strength of its fuel cell technology and revealed weaknesses in its business model related to Legacy Hyzon (not the OEMs) being responsible to fulfill customer warranty obligations. The 2nd Iceberg Research Report, published after Hyzon reported its third quarter 2021 financial results, emphasized that it was nearly impossible for Legacy Hyzon to complete the vehicle sales and financial projections contained in the Merger Proxy. While the Blue Orca and Iceberg Research Reports were published after the Merger, they address material issues of fact in existence and known prior to the Merger.

**Answer**: Defendants admit that, on September 28, 2021, Blue Orca Capital published a report regarding Hyzon.  Defendants further admit that Iceberg Research published reports regarding Hyzon on October 6, 2021 and November 16, 2021. Without accepting the accuracy of material contained in the Reports, Defendants respectfully refer the Court to the Blue Orca and Iceberg Research Reports for a complete and accurate description of their contents.  Otherwise, the Defendants deny the allegations in Paragraph 14.

15.    Thereafter, on January 12, 2022, Hyzon disclosed that the enforcement staff at the SEC had opened a formal investigation into the Company's disclosures

[5] *See* Blue Orca Capital, *Blue Orca is Short Hyzon Motors Inc.*, Sept. 28, 2021 (*see* Exhibit 1).

[6] *See* Iceberg Research, *Hyzon Motors Inc: Trouble at the Parentco*, Oct. 6, 2021 ("1st Iceberg Research Report") and *Horizon Unleashes a Load of Hot Air with its 3Q21 Results*, Nov. 16, 2021 ("2nd Iceberg Research Report") (*see* Exhibits 2-3).

12

related to issues raised in the Blue Orca Report and that the Company had badly missed the 2021 sales and financial targets it had claimed to be "100% [c]ertain" it would meet in connection with obtaining shareholder approval of the Merger and dissuading shareholders from exercising their Redemption Rights. Upon information and belief as of the filing of this Complaint, that SEC investigation appears to remain ongoing. And Hyzon has since reported its actual 2021 revenues, which came in at just $6 million, less than 17% of the $37 million in 2021 revenues relayed in the Merger Proxy and the Investor Presentations employed by Defendants to obtain shareholder approval of the Merger and to dissuade shareholders from exercising their Redemption Rights.

**Answer**: Defendants admit that Hyzon reported revenues of approximately $6 million in 2021.  Defendants further admit that, on January 12, 2022, Hyzon disclosed that it had received a subpoena from the SEC.  Defendants respectfully refer the Court to Hyzon's January 12, 2022 disclosure for a complete and accurate description of its contents and to the updates regarding the subpoena provided by Hyzon in its Form 10-Q, Form 10-K, and other reports periodically filed by Hyzon with the SEC, including any future updates that Hyzon may provide.  Otherwise, Defendants deny the allegations in Paragraph 15.

16.    The result has been a financial catastrophe for the public stockholders who failed to redeem their Decarb shares. Following the publication of the Blue Orca and Iceberg Reports, the announcement of the SEC investigation and Hyzon's disclosure of its fledgling sales, the market price of Decarb Class A stock plummeted. Indeed, the market price of those shares—which had traded in a tight range around $10 (and actually represented $10 per share, plus interest, of cash) before the Merger—traded below $3 per share by July 5, 2022. In other words, a pool of approximately $200 million of cash pre-deal was devalued to approximately $70 million, reflecting the destruction of roughly $130 million of stockholder value.

13

**Answer**: Paragraph 16 purports to summarize the trading price of Hyzon stock. That information is publicly available and speaks for itself. Otherwise, Defendants deny the allegations in Paragraph 16.

17. In sum, the entire fairness standard applies to this deeply conflicted Merger. In light of the conflict-laden structure of this SPAC and the manner in which the Sponsor and the Board acted with respect to those conflicts and the deal process in general, the Merger cannot meet the test of entire fairness.

**Answer**: Paragraph 17 contains Plaintiff's conclusions of law and fact to which no response is required. To the extent further response is required, Defendants deny the allegations in Paragraph 17.

18. Accordingly, the Court should award monetary damages to the Class or, in the alternative, for public stockholders who purchased Decarb stock and were entitled to redeem their shares and continue to hold such stock, equitably reopen the redemption window to allow them to exchange their Decarb Class A shares for $10 per share, plus interest.

**Answer**: Paragraph 18 contains Plaintiff's conclusions of law and fact to which no response is required. To the extent further response is required, Defendants deny the allegations in Paragraph 18.

## PARTIES AND RELEVANT NON-PARTIES

19. Plaintiff John E. Malork has consistently held, and has been the beneficial owner of, Decarb stock at all relevant times, including prior to the July 13, 2021 redemption deadline, and was entitled to redeem his shares.

**Answer**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 19 and therefore deny them on that basis.

14

20.    Defendant Erik Anderson had served as Decarb's CEO since September 21, 2020 and as a Board member since October 22, 2020. He has also served as the CEO and a director at a number of other SPACs created by Riverstone under the "Decarbonization Plus" banner. He currently serves as a member of the post-Merger company's board of directors. Defendant Anderson founded West River Group in 2002 and has served as its CEO since its inception. West River Group, in turn, created controlling shareholder Defendant WRG to house Defendant Anderson's Founder Shares in connection with the SPAC transaction. Previously, Defendant Anderson served as a vice president at Goldman Sachs, the conflicted investment banker.

**Answer**: Defendants admit that Defendant Anderson served as a director and as CEO of DCRB. Defendants further admit that Defendant Anderson served as a director of Decarb II, III, and IV and as CEO of Decarb II, III, IV, and V. Defendants further admit that Defendant Anderson currently serves on Hyzon's board of directors. Defendants further admit that Defendant Anderson founded West River Group in 2002 and has served as its CEO since its inception. Defendants further admit that Defendant WRG was created to hold Defendant Anderson's founder shares. Defendants further admit that Defendant Anderson was previously affiliated with the Goldman Sachs organization. Otherwise, Defendants deny the allegations in Paragraph 20.

21.    Defendant Jennifer Aaker served as a member of the Board prior to the Merger. She has also served a director of several other SPACs created by Riverstone under the "Decarbonization Plus" banner.

**Answer**: Defendants admit that Defendant Aaker served as a member of the DCRB Board prior to the Merger and that she served as a director on the boards of Decarb II, III, and IV.

15

22.     Defendant Jane Kearns served as a member of the Board prior to the Merger. She has also served as a director of several other SPAC created by Riverstone under the "Decarbonization Plus" banner.

**Answer**: Defendants admit that Defendant Kearns served as a member of the DCRB Board prior to the Merger and that she served as a director on the boards of Decarb II, III, and IV.

23.     Defendant Pierre Lapeyre, Jr. served as a member of the Board prior to the Merger. He has also served as a director of several other SPACs created by Riverstone under the "Decarbonization Plus" banner. Defendant Lapeyre is the co¬founder and a senior managing director of Riverstone, and he serves on the boards of directors or equivalent bodies of a number of public and private Riverstone portfolio companies and their affiliates, including Centennial Resource Development, Inc. f/k/a Silver Run Acquisition Corporation ("Silver Run") where he, along with Defendants Leuschen, Tepper, and Tichio, have served as directors since 2016. Defendant Lapeyre was also a managing partner of the conflicted investment banker Goldman Sachs' Global Energy & Power Group, having joined Goldman Sachs in 1986 and having spent his 14-year investment banking career there focused on energy and power.

**Answer**: Defendants admit that Defendant Lapeyre served as a member of the DCRB Board prior to the Merger and that he served as a director on the boards of Decarb II, III, and IV.  Defendants further admit that Defendant Lapeyre is a co-founder and senior managing director of Riverstone.  Defendants further admit that Defendant Lapeyre served as a director of Centennial Resource Development, Inc. f/k/a Silver Run Acquisition Corporation from 2016 until he resigned that position on September 1, 2022.  Defendants admit that Lapeyre was previously affiliated with the Goldman Sachs organization.  Otherwise, Defendants deny the allegations in Paragraph 23.

16

24.     Defendant David Leuschen served as a member of the Board prior to the Merger. He has also served as a director of several other SPACs created by Riverstone under the "Decarbonization Plus" banner. Defendant Leuschen is the co¬founder and a senior managing director of Riverstone, and he serves on the boards of several Riverstone portfolio companies and investment vehicles, including Silver Run where he, along with Defendants Lapeyre, Tepper, and Tichio, has served as a director since 2016. Defendant Leuschen also previously served as a partner and managing director at the conflicted investment banker Goldman Sachs. There, Defendant Leuschen also served as the founder and head of Goldman Sachs' Global Energy & Power Group, where he is credited with having advanced the Goldman Sachs energy and power investment banking practice, and as chairman of the Goldman Sachs Energy Investment Committee, where he is credited with having screened potential direct investments by Goldman Sachs in the energy and power industry.

**Answer**: Defendants admit that Defendant Leuschen served as a member of the DCRB Board prior to the Merger and that he served as a director on the boards of Decarb II, III, and IV. Defendants further admit that Defendant Leuschen is a co-founder and senior managing director of Riverstone.  Defendants further admit that Defendant Leuschen served as a director of Centennial Resource Development, Inc. f/k/a Silver Run Acquisition Corporation from 2016 until he resigned that position on September 1, 2022.  Defendants admit that Leuschen was previously affiliated with the Goldman Sachs organization.  Otherwise, Defendants deny the allegations of Paragraph 24.

25.     Defendant Robert Tichio served as a Board member prior to the Merger and as Decarb's CEO until September 2020. He has also previously served as a director at several other SPACs created by Riverstone under the "Decarbonization Plus" banner, and had served at least temporarily as their CEOs. Defendant Tichio was also a director and a managing partner at Riverstone, and also served on the boards of directors at a number of Riverstone portfolio companies, including Silver Run, where he, along with Defendants Lapeyre, Leuschen, and Tepper, has served

17

as a director since 2016. Previously, Defendant Tichio served as a banker at the conflicted investment banker Goldman Sachs in the Principal Investment Area, which manages the firm's private corporate equity investments.

**Answer**: Defendants admit that Defendant Tichio served as a member of the DCRB Board prior to the Merger and that he served as a director on the boards of Decarb II, III, IV, and V.    Defendants further admit that Defendant Tichio is a partner at Riverstone.  Defendants further admit that Defendant Tichio served as a director of Centennial Resource Development, Inc., f/k/a Silver Run Acquisition Corporation, and now known as Permian Resources, since 2016.  Defendants admit that Tichio was previously affiliated with the Goldman Sachs organization. Otherwise, Defendants deny the allegations in Paragraph 25.

26.    Defendant Jim McDermott purportedly served as the lead "independent" director of the Board prior to the Merger. He also served as a director of several other SPACs created by Riverstone under the "Decarbonization Plus" banner.

**Answer**: Defendants admit that Defendant McDermott served as the lead independent director of DCRB and that he served as a director on the boards of Decarb II, III, and IV.

27.    Defendant Jeffrey Tepper served as a Board member prior to the Merger. He also served as a director of several other SPACs created by Riverstone under the "Decarbonization Plus" banner. Defendant Tepper previously served as a director of Riverstone portfolio companies Silver Run I (from its inception in November 2015 until the completion of its de-SPAC in October 2016) and Silver Run II (between March 2017 and its de-SPAC in June 2020).

**Answer**: Defendants admit that Defendant Tepper served as a member of the DCRB Board prior to the Merger and that he served as a director on the boards of

18

Decarb II, III, and IV. Defendants further admit that Defendant Tepper served as a director of Silver Run I and Silver Run II. Otherwise, Defendants deny the allegations in Paragraph 27.

28.    Defendant Michael Warren served as a member of the Board prior to the Merger. He also served as a director of several other SPACs created by Riverstone under the "Decarbonization Plus" banner.

**Answer**: Defendants admit that Defendant Warren served as a member of the DCRB Board prior to the Merger and that he served as a director on the boards of Decarb II and III until April 2021.

29.    Defendant Riverstone is a Delaware limited liability company that founded, and thus controlled, both Decarb and the Sponsor. In 2017, Goldman Sachs purchased a 12% interest in Riverstone. Along with the directors of Decarb and WRG, through its ownership of the Sponsor, Riverstone was a controlling shareholder of Decarb. Riverstone acted through Defendants Lapeyre and Leuschen, its co-founders and senior managing directors, who jointly shared beneficial ownership of the Class B common Founder Shares held directly by the Sponsor, and Defendant Tichio, one of Riverstone's managing directors. In addition to its series of Decarbonization SPACs, Riverstone carried out two previous SPAC transactions (Silver Run I and Silver Run II). Riverstone raised approximately $1 billion in March 2017 for what eventually became Alta Mesa Resources (previously known as Silver Run II), which later went bankrupt in 2020. Riverstone also acquired an oil and natural gas company called Centennial Resource Development in October 2016 as part of its first SPAC, Silver Run I.

**Answer**: Defendants admit that Riverstone is a Delaware limited liability company. Defendants further admit that funds affiliated with Petershill Partners PLC purchased an approximately 12% interest in Riverstone in 2017. Defendants further admit that Riverstone or its affiliates were involved in two previous SPAC transactions involving Centennial Resource Development and Alta Mesa Resources.

19

Defendants further admit that Alta Mesa Resources filed for bankruptcy in 2019. Plaintiff's allegation in the first sentence of Paragraph 29 that Riverstone "controlled" both DCRB and Sponsor are legal conclusions to which no response is required. Otherwise, Defendants deny the allegations in Paragraph 29.

30.    Defendant Sponsor is a Delaware limited liability company and affiliate of Riverstone that served as Decarb's sponsor and purchased and held Riverstone's Class B Founder Shares. As set forth in ¶¶55-56, 62-63 and 82 below, several Board members received membership interests in the Sponsor and, in turn, a portion of the Founder Shares, which gave them the opportunity to make millions of dollars as long as they approved a transaction in which Decarb acquired another business.

**Answer**: Defendants admit that Defendant Sponsor was a Delaware limited liability company, affiliate of Riverstone, and served as DCRB's sponsor. Otherwise, Defendants deny the allegations in Paragraph 30.

31.    Defendant WRG is an affiliate of Defendant Anderson, created by the West River Group where Anderson serves as CEO, that purchased and held Founder Shares for the benefit of Defendant Anderson.

**Answer**: Defendants admit the allegations in Paragraph 31.

32.    Defendants Anderson, Aaker, Kearns, Lapeyre, Leuschen, Tichio, McDermott, Tepper, and Warren are sometimes collectively referred to herein as the "Director Defendants." Defendants Riverstone, Sponsor, and WRG, by virtue of their controlling stock ownership interests, along with Defendants Anderson, Lapeyre, Leuschen, and Tichio, by virtue of their ties to those entities and the conflicted investment banker Goldman Sachs, are sometimes collectively referred to herein as the "Controller Defendants."

**Answer**: Defendants admit that Defendants Anderson, Aaker, Kearns, Lapeyre, Leuschen, Tichio, McDermott, Tepper, and Warren served as directors of DCRB.  Paragraph 32 otherwise contains Plaintiff's conclusions of law and fact to

20

which no response is required.  To the extent further response is required, Defendants deny the allegations in Paragraph 32.

33.     Non-Party Peter Haskopoulos had served as Decarb's Chief Financial Officer ("CFO"), Chief Accounting Officer, and Secretary since August 2020. Previously, he served as the CFO, Chief Accounting Officer, and Secretary at a number of other SPACs created by Riverstone under the "Decarbonization Plus" banner. Haskopoulos was also a managing director and the CFO of Riverstone.

**Answer**: Defendants admit that Non-Party Peter Haskopoulos served as the Chief Financial Offer, Chief Accounting Offer, and Secretary of Decarb I, II, III, IV, and V.  Defendants further admit the Non-Party Peter Haskopoulos previously served as a Managing Partner and Chief Financial Officer for Riverstone.

34.     Non-Party Decarbonization Plus Acquisition Corporation (defined above as "Decarb" or the "Company"), f/k/a Silver Run Acquisition Corporation III, is a blank check company formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization, or similar business combination. On or around October 22, 2020, Decarb closed its $200 million IPO. On July 16, 2021 (the "Closing Date"), Decarb merged with Legacy Hyzon, with Decarb remaining as the surviving entity. Legacy Hyzon—and following the Merger, Decarb—is engaged in the design, development, and manufacture of hydrogen fuel cell powered commercial vehicles. Prior to the Merger, the Company's shares traded on the Nasdaq under the ticker symbol "DCRB." The post¬Merger company's shares trade on the Nasdaq under the ticker symbol "HYZN."

**Answer**: Defendants respectfully refer the Court to the Prospectus and Proxy for a complete and accurate description of DCRB, its IPO, and the Merger.  To the extent further response is required, Defendants admit the allegations in Paragraph 34.

21

35.    Non-Party Goldman Sachs is a multinational investment bank and financial services company headquartered in New York City. In 2017, Goldman Sachs purchased a 12% stake in Defendant Riverstone. In connection with the Merger Goldman Sachs is conflicted because it simultaneously served as the financial advisor to Legacy Hyzon—the seller—and as an investment banker and co-placement agent to Decarb—the buyer—in the Merger, and because of its financial investment in Riverstone. As detailed herein in ^20-35, and 62, the Controller Defendants also have extensive professional and financial ties to Goldman Sachs and it has a reasonable expectation of receiving millions of dollars in future fees for work done for the Controller Defendants.

**Answer**: Defendants admit that Goldman Sachs served as financial advisor to Legacy Hyzon with respect to the Merger.  Defendants further admit that Goldman Sachs served as co-placement agent for the PIPE financing completed in connection with the Merger.  Defendants further admit that funds affiliated with Petershill Partners PLC purchased an approximately 12% stake in Riverstone in 2017.  Paragraph 35 purports to describe Goldman Sachs' work for Legacy Hyzon and DCRB.  Defendants respectfully refer the Court to the Prospectus and Proxy for a complete and accurate description of the Goldman Sachs' work.  Otherwise, Defendants deny the allegations in Paragraph 35.

36.    Non-Parties Citi and Credit Suisse are multinational investment banks and financial services companies with their U.S. headquarters in New York City. They served as underwriters to Decarb in its October 2020 IPO and were promised $11 million in investment banking fees, 60% of which was contingent upon a timely business combination being completed by Decarb. Citi and Credit Suisse were brought on as additional advisors to Decarb in the final throes of the Merger negotiations and rubber stamped their approval of it. As detailed herein in ^20-36, 45, 48-59, 62, 68, 71-76, and 122 the Controller Defendants also have extensive financial ties to Citi and Credit Suisse and Citi and Credit Suisse have a reasonable expectation of receiving millions of dollars in future fees for work done for the Controller Defendants.

**Answer**: Defendants admit that Citi and Credit Suisse served as underwriters for DCRB's IPO and as DCRB's financial advisors with respect to the Merger. Paragraph 36 purports to describe Citi's and Credit Suisse's work and fees in connection with the IPO and the Merger. Defendants respectfully refer the Court to the Prospectus and the Proxy for a complete and accurate description of Citi's and Credit Suisse's work and the compensation provided to them in connection therewith. Otherwise, Defendants deny the allegations in Paragraph 36.

## SUBSTANTIVE ALLEGATIONS

### I.    Structure of SPAC Transactions

37.    SPACs, also known as "blank-check companies," are publicly traded shell corporations that undertake no business operations of their own, but are instead created to merge with privately held operating businesses. SPACs typically raise funds through an IPO in which they issue and sell "units," comprised of both shares and warrants to purchase shares. SPACs typically have a two-year deadline to identify a target company or business to acquire. Once a SPAC identifies a target and the target agrees to the terms of a merger or acquisition, the parties effect a business combination through a reverse merger—often referred to as the "de-SPAC" transaction—that must be approved by the SPAC's stockholders.

**Answer**: The allegations in Paragraph 37 contain Plaintiff's purported characteristics of SPACs generally, to which no response is required. To the extent a response is required, Defendants admit on information and belief that SPACs often raise funds through an IPO, often have a set timeframe in which to identify and execute a business combination, and often once a SPAC identifies a target and agrees to the terms of the merger or acquisition, the parties may effect a business combination that must be approved by the SPAC's shareholders. Defendants

23

respectfully refer the Court to the Prospectus and Proxy for a complete and accurate description of DCRB, the SPAC structure and process, and the Merger.

38.     This transactional structure serves as a back door to an IPO for the target company. The target company reverse merges with a subsidiary of the SPAC, which has already been publicly listed, and then serves as the SPAC's operating subsidiary going forward. The SPAC, which is the surviving entity, then assumes the identity of the target company, changing its name and applicable security listings. In theory, this structure allows the target company to bypass the time and expense of a traditional public listing and avoid regulatory scrutiny and traditional gatekeepers, such as underwriters who would perform due diligence in a firm commitment offering.

**Answer**: The allegations in Paragraph 38 contain Plaintiff's purported characteristics of SPACs generally, to which no response is required.   To the extent a response is required, Defendants admit on information and belief that SPACs often change their name and applicable security listing based on the target company. Defendants otherwise deny the allegations in Paragraph 38.  Defendants respectfully refer the Court to the Prospectus and Proxy for a complete and accurate description of DCRB, the SPAC structure and process, and the Merger.

39.     In addition, while the traditional IPO process permits the market to set the price at which an already operating company or business is valued and sold in an IPO, the SPAC process reverses the usual order of events. With a SPAC, investors first purchase shares of an empty-shell publicly traded company, permitting them the "opportunity" to have their shares converted into shares of an- as-yet unidentified operating business that will be selected by SPAC management. Essentially, stockholders who invest in SPACs are investing in the skill, experience, reputation, faithfulness, and diligence of SPAC managers, who are entrusted with finding suitable acquisition targets. Stockholders rely on SPAC managers to identify and vet targets and to negotiate a fair and reasonable price for any acquisitions.

24

**Answer**: The allegations in Paragraph 39 contain Plaintiff's purported characteristics of SPACs generally, to which no response is required.  To the extent a response is required, Defendants admit on information and belief that investors in SPACs often first purchase stock in a publicly traded company without business operations and then may have the opportunity to convert that stock into equity in the post SPAC-target merger company.  Defendants respectfully refer the Court to the Prospectus and Proxy for a complete and accurate description of DCRB, the SPAC structure and process, and the Merger.

40.    Most SPACs have the same basic terms and legal structure. A SPAC will raise funds from public investors through an IPO, and then hold those funds in "trust" for those investors while the SPAC seeks an acquisition target. The SPAC will then have a "completion window"—generally two years—to identify and execute a business combination. If the SPAC fails to do so during the completion window, then it must return the funds in trust to its public stockholders and the SPAC dissolves.

**Answer**: The allegations in Paragraph 40 contain Plaintiff's purported characteristics of SPACs generally, to which no response is required.  To the extent a response is required, Defendants admit on information and belief that SPACs often raise funds from public investors, those funds are often held in trust while the SPAC seeks an acquisition target, and that SPACs often have a set timeframe in which to identify and execute a business combination or otherwise will return funds held in trust to public investors.  Defendants respectfully refer the Court to the Prospectus

25

and Proxy for a complete and accurate description of DCRB, the SPAC structure and process, and the Merger.

41.    SPAC stockholders are granted both voting rights to approve or reject the business combination proposed by the management team and their Redemption Rights. Thus, when the management team identifies a target, a proxy statement must be distributed to all SPAC stockholders, which includes the target company's complete audited financials and the terms of the proposed business combination. Upon review of the merger proxy (and related SEC filings), in addition to casting their vote in favor of or against the proposed transaction, each SPAC stockholder has three options: (a) to continue holding their SPAC shares until they convert into shares of the combined company; (b) to elect to sell their SPAC shares in the open market; or (c) to redeem their SPAC shares for a pro-rata share of the trust account. To this end, SPAC stockholders depend on management to provide complete and accurate information about any contemplated transactions in the Merger Proxy and in related SEC filings. Critically, the merger proxies provide the only instructions SPAC shareholders receive as to exercising their Redemption Rights and the merger proxies explicitly direct that the SPAC shareholders rely only upon statements made in the merger proxy and related SEC filings in making their decisions.

**Answer**: The allegations in Paragraph 41 contain Plaintiff's purported characteristics of SPACs generally, to which no response is required.   To the extent a response is required, Defendants admit on information and belief that SPACs often disseminate proxy statements in connection with a proposed business combination and that SPAC stockholders are often granted both voting rights to approve or reject the business combination proposed by the SPAC as well as redemption rights. Defendants also admit on information and belief that SPAC stockholders often have the option to continue holding their SPAC shares until they convert into shares of the combined company, elect to sell their SPAC shares in the open market, or redeem their shares for a pro-rata share of the trust account.  Defendants respectfully refer

the Court to the Prospectus and Proxy for a complete and accurate description of

DCRB, the SPAC structure and process, and the Merger.

42.    If a merger or acquisition is accomplished within the allocated time frame, stockholders and management of the SPAC can profit through their ownership of the common stock and any related securities. (Ordinarily, SPAC IPOs include "units" consisting of both stock and out-of-the-money warrants.) However, if an acquisition is not completed within the time period specified when the SPAC is organized, then the SPAC automatically dissolves and the money held in trust is returned to investors. No salaries, finder's fees, or other cash compensation are paid to the founders and/or management team if they fail to consummate a successful business combination. Accordingly, the founders and management team of a SPAC, who typically own approximately 20% of the company through founders' shares and invest significant resources in the formation of the company and identifying acquisition targets, are highly incentivized to get a qualifying transaction approved within the operating deadline. Furthermore, SPAC management is heavily incentivized to reduce the stockholder redemption rate because redemptions deplete available cash to fund a business acquisition and ongoing business operations following the merger, reducing the value of the contingent stock management receives in the blank check IPO and threatening the business acquisition altogether.

**Answer**: The allegations in Paragraph 42 contain Plaintiff's purported

characteristics of SPACs generally, to which no response is required.  To the extent

a response is required, Defendants admit on information and belief that all

stockholders of a SPAC may profit through their ownership of stock if a merger or

acquisition is accomplished in a certain time frame; whereas if a merger or

acquisition is not accomplished in the time frame, the SPAC often dissolves and

returns funds back to the investors and the founder shares expire.   Defendants

respectfully refer the Court to the Prospectus and Proxy for a complete and accurate

description of DCRB, the SPAC structure and process, and the Merger. Otherwise, Defendants deny the allegations in Paragraph 42.

43. Indeed, leaders in the finance industry have opined that SPAC management teams have an incentive to spend the money they have raised so they can collect fees and pay themselves in salary and stock options at the company they purchase. For example, Ben Dell, managing partner of investment firm Kimmeridge Energy, recently stated that "SPACs are the most egregious example in the industry of executive misalignment with investors." In addition to the reward of paying themselves a handsome salary, SPAC management teams are incentivized to receive a return on the significant time and financial resources they expended up front to set up the investment vehicle and pursue an acquisition target.

**Answer**: With respect to the portion of Paragraph 43 that refers to unidentified "leaders in the finance industry," Defendants lack information and knowledge as to which individuals those allegations refer to and therefore deny that portion of Paragraph 43 on that basis. With respect to the portion of Paragraph 43 that purports to attribute a statement to Ben Dell, it does not identify the time, date, or location at which the alleged statement was made. Defendants therefore lack information and knowledge as to the existence and content of the alleged statement and therefore deny that portion of Paragraph 43 on that basis. Defendants deny the remaining allegations in Paragraph 43.

44. Additional inherent conflicts abound, since the founders control the SPACs' investment and financing decisions with little, if any, oversight. For instance, founders often allow themselves and select investors to participate in additional investments—at especially favorable terms—in their SPAC acquisitions through private warrant placements and investment in public equity, or "PIPE" financings. When a SPAC conducts an acquisition using this form of PIPE financing, the SPAC managers dilute the existing SPAC investors by selecting their preferred

28

investors—whether they are existing SPAC investors or not—who will acquire cheap post-deal equity by providing the financing for a PIPE deal.

**Answer**: Defendants respectfully refer the Court to the Prospectus and Proxy for a complete and accurate description of DCRB, the SPAC structure and process, and the Merger. Defendants deny the allegations in Paragraph 44.

45.     Another example of the conflict inherent in the current SPAC structure is where founders richly compensate affiliated persons and entities to provide consulting or advisory services to their SPACs, or to serve on the boards of their other SPACS. Despite standing to receive a windfall through their own Founder Shares (and ultimately receiving tens of millions of dollars in equity based on completing the Merger), the Controller Defendants opportunistically caused Decarb to pay millions of dollars in investment banking fees to Goldman Sachs, Citi, and Credit Suisse, with which they each had extensive history and dealings. See ^20- 36, 45, 48-59, 62, 68, 71-76, and 122. Defendants used Goldman Sachs, Citi, and Credit Suisse because a majority of the Board had their own multi-million-dollar windfalls riding on closing the deal no matter the cost to Decarb stockholders. Citi and Credit Suisse would also forfeit 60% of the fees they had earned underwriting Decarb's IPO if a timely business combination was not completed. Each of the purportedly "independent" outside directors on the Decarb Board was also then engaged in other SPAC transactions with Riverstone where they served on the boards of those SPACs. These "independent" outside directors expected to share millions of dollars more in profits on founders shares they were receiving in connection with completing those SPAC business transactions, giving even the purported outside directors on the Decarb Board incentive to approve Decarb's Merger with Legacy Hyzon.

**Answer**: Paragraph 45 purports to describe DCRB's underwriters and financial advisors and their work and fees in connection with the IPO and the Merger. Defendants respectfully refer the Court to the Prospectus and Proxy for a complete and accurate description of DCRB, the SPAC structure and process, and the Merger. Defendants admit that the Defendants directors served on other Decarb

29

SPAC boards, as detailed in Defendants' responses to paragraphs 20 through 28 herein.  Otherwise, Defendants deny the allegations in Paragraph 45.

46.    An important check on the potential for misconduct by the directors, officers, and controllers of SPACs, however, is their fiduciary duties to stockholders. After all, Delaware blank check corporations are still Delaware corporations, governed by the State's statutory and common law. Accordingly, if a SPAC choses to incorporate in Delaware, then its fiduciaries are bound by non-waivable duties of loyalty, good faith, and care.

**Answer**: Paragraph 46 contains Plaintiff's conclusions of law to which no response is required.

47.    Defendants enjoyed all the powers and opportunities bestowed upon them by the conflict-laden SPAC structure. But they used those powers and opportunities to serve their own interests at the expense of the interests of the Class. Where, as here, there are "inherent conflicts between the SPAC's fiduciaries and public stockholders," then "[t]he entire fairness standard of review applies."[7]  The Merger, the product of an unfair process at an unfair price, fails that standard. Defendants breached their duties of loyalty, good faith, and care in effecting and approving the unfair Merger.

**Answer**: Paragraph 47 contains Plaintiff's conclusions of law and fact to which no response is required.  To the extent further response is required, Defendants deny the allegations in Paragraph 47.

## II.    Background to the Hyzon Merger

48.    Defendant Riverstone was founded by investment banker Defendants Leuschen and Lapeyre after they "left Goldman Sachs Group Inc. and hung a shingle in 2000, just in time for the shale boom."[8]  At Riverstone, Defendants Leuschen and Lapeyre teamed up with former Goldman Sachs alumni Defendants Anderson and Tichio, and Non-Party Haskopoulos. Riverstone is one of the country's most prolific

---

[7] *See MultiPlan*, 268 A.3d at 792.

[8] *See* Ryan Dezember & Amrith Ramkumar, *Riverstone SPACs Bet Renewable Energy Will Pay Off This Time*, Wall St. J., Aug. 26, 2021; and W8-28 above.

"clean energy" SPAC sponsors, having launched at least seven blank check companies under the "Decarbonization" and/or "Silver Run" banners since 2015.[9] Goldman Sachs was so involved in Riverstone's SPAC transactions that it took a 12% ownership stake in Riverstone in 2017 giving it a proportional cut of Riverstone's management fees and profits.[10]  According to a *Wall Street Journal* account, Goldman Sachs' investment in Riverstone was "a reunion of sorts for Riverstone's founders, David Leuschen and Pierre Lapeyre Jr., who worked as high-ranking energy bankers at Goldman, arranging oil company mergers and stock sales before leaving to start the investment firm in 2000," adding that Defendants "Leuschen and Lapeyre have frequently tapped their Goldman connections to recruit deal makers and find investment opportunities" and that "Riverstone's investment committee includes 14 people who have Goldman on their resumes." The Riverstone SPACs have since raised more than $3.3 billion dollars from public investors.[11]  This

---

[9] *Id.*; *see also* Cromwell Schubarth, *Private equity firm's Menlo Park SPAC raises $350M in an IPO*, Silicon Valley Bus. J., Feb. 5, 2021 ("Riverstone's Decarbonization Plus companies are its fourth and fifth SPACs. Its three previous ones predated last year's gold rush. And instead of being focused on reducing carbon use, they aimed to benefit from it in the form of fossil fuel extraction."); Merger Proxy at 73.

[10] *See* Ryan Dezember, *Goldman Fund Agrees to Buy 12% of Riverstone Holdings - Roughly $500 million deal would value the energy investment firm at more than $4 billion*, Wall St. J., May 4, 2017 ("The deal would value Riverstone at more than $4 billion and give the Goldman fund a proportional cut of the firm's management fees and profits.").

[11] *Id.*; *see also* Olivia Pulsinelli, *Former EOG CEO's new 'blank check' company to acquire controlling stake in E&P co.*, Hous. Bus. J., July 26, 2016 (Riverstone sponsored de-SPAC Centennial Resource Development Corp. raised $450 million in 2016); Ryan Dezember & Maureen Farrell, *Riverstone, Retired Energy Executive Raise $1 Billion to Shop in Oil Patch*, Wall St. J., Mar. 25, 2017 (Riverstone sponsored de-SPAC Anadarko Petroleum Corp. raises $1 billion); Ryan Dezember & Amrith Ramkumar, *Riverstone SPACs Bet Renewable Energy Will Pay Off This Time*, Wall St. J., Aug. 26, 2021 (noting that Riverstone sponsored de-SPACs Hyzon Motors Corp., Tritium Holdings Pty Ltd., and Solid Power Inc. SPACs, respectively, raised $200 million in October 2020, $350 million in February, 2021, and $350 million in March 2021; and that "[t]he latest Riverstone SPAC, Decarbonization Plus Acquisition Corp. IV, raised about $315 million in a stock offering this month and is looking for a business to take public"); Merger Proxy at 73 (noting Riverstone sponsored the Vista SPAC raising $650 million in March 2017, which was used to acquire Pampa Energ^a S.A. and Pluspetrol Resources Corporation).

action relates to Riverstone's last Silver Run SPAC, which was renamed under the "Decarbonization" SPAC banner mid-play.[12]

**Answer**: Defendants admit that Defendants Leuschen and Lapeyre founded Riverstone in 2000.  Defendants admit  that Leuschen and Lapeyre had previously been affiliated with the Goldman Sachs organization.  Defendants further admit that funds affiliated with Petershill Partners PLC acquired an approximately 12% ownership stake in Riverstone in 2017.  Defendants further admit that affiliates of Riverstone have sponsored at least seven SPACs since 2015.  Defendants admit that a Wall Street Journal article was published  on August 26, 2021 and that the quoted language contained in Paragraph 48 appeared in that article. Without accepting the accuracy of material contained in that article, Defendants respectfully refer the Court to the article for a complete statement of the article's contents.   Otherwise, Defendants deny the allegations in Paragraph 48.

49.     According to *The Wall Street Journal*, "[t]he crowd of investors going green has made clean-energy businesses with meager sales but rosy forecasts popular targets for blank-check companies."[13]  As a result, "[t]here have been 70 SPAC deals tied to renewable energy or sustainability announced since March 2020," and "[t]hey collectively value the companies at more than $170 billion, including debt but excluding cash holdings."[14]

---

[12] *Id*.; *see also* Merger Proxy at F-6.

[13] *See* Ryan Dezember & Amrith Ramkumar, *Riverstone SPACs Bet Renewable Energy Will Pay Off This Time*, Wall St. J., Aug. 26, 2021.

[14] *Id*.

**Answer**: Defendants admit that a Wall Street Journal article was published on August 26, 2021 and that the quoted language contained in Paragraph 49 appeared in that article. Without accepting the accuracy of material contained in that article, Defendants respectfully refer the Court to the article for a complete statement of the article's contents.

50.    In 2017, the same year that Goldman Sachs took a 12% ownership stake in Riverstone, the Sponsor incorporated Silver Run Acquisition Corporation III under the laws of Delaware. On August 18, 2020, the Sponsor changed the name of the Company to Decarbonization Plus Acquisition Corporation. This would have been the last of Riverstone's Silver Run SPACs but was instead the first of its Decarbonization SPACs. Defendant Tichio then served as the Company's CEO and sole director. Non-Party Haskopoulos then served as the Company's CFO, Chief Accounting Officer, and Secretary, roles he would also serve at Riverstone and in other Riverstone-sponsored SPACs.

**Answer**: Defendants admit that funds affiliated with Petershill Partners PLC acquired an approximately 12% ownership stake in Riverstone in 2017.  Otherwise, Defendants admit the allegations in Paragraph 50.

51.    In his managerial role, Defendant Tichio was responsible for sourcing, negotiating, and executing a business combination for Decarb. Both he and CFO Haskopoulos hailed from Goldman Sachs and had extensive past professional and business dealings with Defendants Lapeyre and Leuschen, who had since founded Riverstone, and with Defendant Anderson, who had since gone on to found and lead West River Group, a collaboration of investment firms focused on startups.

**Answer**:    Defendants    admit    that    Defendant    Tichio's    managerial responsibilities at DCRB included assistance with sourcing, negotiating, and executing a business combination for DCRB.  Defendants further admit that Tichio and Haskopoulos were previously affiliated with the Goldman Sachs organization.

33

Defendants further admit that Tichio and Haskopoulos had professional and business dealings with Defendants Lapeyre and Leuschen, given their work together at Riverstone. Defendants further admit that Defendant Anderson founded and serves as CEO of West River Group. Otherwise, Defendants deny the allegations in Paragraph 51.

52.     On August 19, 2020, the Company submitted to the SEC a confidential, preliminary Registration Statement on Form S-1. Decarb disclosed that in its anticipated IPO, the Company sought to issue and sell 40 million units for $10 each, raising an estimated $400 million in proceeds. Each unit would consist of one share of Decarb Class A common stock and one-half of one warrant to purchase one share of Decarb Class A common stock. That filing further noted that former Goldman Sachs alumni Defendants Anderson, Lapeyre, and Leuschen would be added to the Board upon completion of the IPO, with Defendant Anderson coming in as the new CEO of Decarb. That filing further noted that Defendants McDermott and Tepper were also joining the Board upon completion of the IPO, with Defendant Tepper also having served as a member of the board of previous Riverstone-sponsored SPACs Silver Run I and Silver Run II. That filing emphasized the Sponsor's experience serving as a manager of clean energy SPACs, stating in pertinent part:

> Riverstone is one of *the most experienced private equity investors globally within renewable energy*, with over 15 years of dedicated investment experience to renewables. Since inception, Riverstone has committed over $5.2 billion of capital to 14 renewable power platform investments across subsectors including power generation, transmission & distribution, services and supply chain. Riverstone has owned or developed nearly 14 gigawatts of generation capacity and has developed over 110 projects in 14 countries. Further, Riverstone has raised significant funds for decarbonization and renewables platforms following the emergence of the coronavirus and its impact on the global economy and financial markets. In 2020, Riverstone raised $1 billion of equity for the recapitalization of Enviva Holdings, the world's largest producer of sustainable wood pellets, and completed a $6.1 billion take-private of Pattern Energy Group, one of the world's largest companies dedicated to carbon-free electricity

through the development of utility scale wind and solar power facilities.[15]

**Answer**: Defendants admit that the quoted language in Paragraph 52 appears (without Plaintiff's added emphasis) in the August 19, 2020 Form S-1 that DCRB filed with the SEC.  Defendants further admit that the S-1 disclosed that Defendants Anderson, Lapeyre, and Leuschen would be added to the Board and that Defendant Anderson would be the CEO of DCRB.  Otherwise, Defendants respectfully refer the Court to the S-1 for a complete and accurate description of its contents. Defendants deny the allegations in Paragraph 52 to the extent that they are inconsistent with the Form S-1.

53.    On September 22, 2020, Decarb filed with the SEC an amendment to the Registration Statement, which stated that Defendants Aaker, Kearns, and Warren also would be added to the Board upon completion of the IPO. The amendment stated that the Sponsor "Riverstone [was] one of the most experienced private equity investors globally within renewable energy." The amendment also stated that the IPO would be reduced to 34.5 million units at $10, raising an estimated $345 million in proceeds. A September 30, 2020 amendment further lowered the expected IPO proceeds to $300 million, and an October 13, 2020 amendment again lowered the anticipated proceeds to just $200 million.

**Answer**: Defendants admit that the quoted language contained in Paragraph 53 appears in a September 22, 2020 amendment to the Prospectus that DCRB filed with the SEC. Otherwise, Paragraph 53 purports to characterize DCRB's expected issuance of IPO units as stated in the September 22, 2020, September 30, 2022, and

---

[15] Emphasis added.

October 13, 2020 amendments to the Prospectus.  Defendants respectfully refer the

Court to those documents for a complete and accurate description of their contents.

Defendants deny the allegations in Paragraph 53 to the extent that they are

inconsistent with those filings or the Prospectus.

54.    The SEC declared the Registration Statement effective on October 19, 2020. On or about October 22, 2020, Decarb completed its IPO, issuing and selling 20 million units at $10 each and raising $200 million in proceeds. Each unit consisted of one share of Decarb Class A stock and one-half of one warrant. The amended Registration Statement stated that the number of Founder Shares issued in 2017 had been "determined based on the expectation that [the] founder shares would represent 20% of the outstanding shares after" the IPO, which the Sponsor "acquired" for the nominal payment of $25,000 or ~$0.002 per share.[16]

**Answer**: Defendants admit the first three sentences of Paragraph 54.

Defendants further admit that the quoted language in Paragraph 54 appears in the

amended Prospectus.  Defendants respectfully refer the Court to the Prospectus for

a complete and accurate description of DCRB's IPO and the allocation of founder

shares in connection therewith.  Defendants deny the allegations in Paragraph 54 to

the extent that they are inconsistent with the Prospectus.

55.    The Registration Statement further stated that "[i]n October 2020, our sponsor will transfer an aggregate of 1,064,329 founder shares to our independent director nominees and an affiliate of our chief executive officer at their original purchase price." Thus, Defendants Aaker, Kearns, McDermott, Tepper, Warren, and Anderson were indifferent as to value of Hyzon as they collectively stood to earn millions upon the closing of the Merger. Defendants Aaker, Kearns, McDermott, Tepper, Warren, and Anderson were also contemporaneously serving as members

---

[16] *See* Decarbonization Plus Acquisition Corporation IPO Prospectus filed with the SEC on Form 424b on October 21, 2020 ("IPO Prospectus") at 12.

of several other boards of other Riverstone SPACs and collectively stood to earn millions more upon the completion of those SPAC transactions.

**Answer**: Defendants admit that the quoted language contained in the first sentence of Paragraph 55 appears in the Prospectus. Defendants respectfully refer the Court to the Prospectus for a complete and accurate description of its contents. Defendants also admit that Defendants Aaker, Kearns, McDermott, Tepper, and Anderson contemporaneously served on the board of directors of Decarb II, III, and IV. Defendant Warren did not serve on the board of Decarb IV, but did contemporaneously serve on the board of directors of Decarb II and III for a limited time, resigning from those boards in April 2021. Otherwise, Defendants deny the allegations contained in Paragraph 55.

56. The Registration Statement defined Defendants Aaker, Kearns, McDermott, Tepper, and Warren as the "independent directors" of Decarb— conceding by negative implication, Defendants Anderson, Lapeyre, Leuschen, and Tichio were not independent. The Registration Statement also defined Defendants Anderson and WRG as essentially being one in the same.[17] As a result, the Sponsor (and its beneficial owners Defendants Lapeyre and Leuschen), and each of the other Defendants (except Defendant Tichio) would take the founders shares at the same nominal price Riverstone had paid for them in 2017.

**Answer**: Defendants respectfully refer the Court to the Prospectus for a complete and accurate description of DCRB's directors and the allocation of founder shares. Defendants deny the allegations in Paragraph 56 to the extent that they are inconsistent with the Prospectus.

---

[17] *See* IPO Prospectus at 98, 104-05.

57.    The Registration Statement further stated that simultaneously with the completion of the SPAC IPO, the Sponsor (and thus Riverstone and its owners Lapeyre and Leuschen), the "independent director nominees," and WRG had committed to purchase six million private placement warrants at $1 per warrant (which were convertible to Decarb Class A stock at $11.50 per share).

**Answer**: Defendants respectfully refer the Court to the Prospectus for a complete and accurate description of DCRB, its initial public offering, and the amount and price of private placement warrants purchased by Sponsor, DCRB directors, and WRG in connection therewith.  Defendants deny the allegations in Paragraph 57 to the extent that they are inconsistent with the Prospectus.

58.    Decarb went public with a completion window of approximately two years, keyed off its October 21, 2020 IPO date. Thus, the Company had to complete a business combination by October 22, 2022, or the Founder Shares would be forfeited, the private placement warrants would be worthless, the IPO proceeds held in trust would be returned to the public stockholders, and Decarb would be dissolved. Moreover, since 60% of IPO underwriters Citi and Credit Suisse's $11 million in fees were contingent upon Decarb completing a business combination, Citi and Credit Suisse also faced millions of dollars in fees held in a trust account being returned to the public stockholders of Decarb.

**Answer**: Defendants respectfully refer the Court to the Prospectus for a complete and accurate description of DCRB, its initial public offering, the founder shares and private placement warrants, and the compensation provided to the underwriters in connection with the IPO.  Defendants deny the allegations in Paragraph 58 to the extent that they are inconsistent with the Prospectus.

59.    As to the Redemption Rights of Decarb shareholders, the IPO Registration Statement stated in pertinent part as follows:

38

> *We will provide our stockholders with the opportunity to redeem all or a portion of their shares of our Class A common stock upon the completion of our initial business combination.*

*    *    *

> At the time of your investment in us, you will not be provided with an opportunity to evaluate the specific merits or risks of one or more target businesses. *Since our board of directors may complete a business combination without seeking stockholder approval, public stockholders may not have the right or opportunity to vote on the business combination, unless we seek such stockholder vote.* Accordingly, if we do not seek stockholder approval, your only opportunity to affect the investment decision regarding a potential business combination may be limited to exercising your redemption rights within the period of time . . . .

**Answer**: Defendants admit that the quoted language in Paragraph 59 appears (without Plaintiff's added emphasis) in the Prospectus. Defendants respectfully refer the Court to the Prospectus for a complete and accurate description of its contents. Defendants deny the allegations in Paragraph 59 to the extent that they are inconsistent with the Prospectus.

III.    **Riverstone Packs the Board with Loyalists and Ensures Their Fealty with a Windfall of Founder Shares**

60.    Riverstone, beneficially owned by Defendants Lapeyre and Leuschen and with Defendant Tichio serving as a managing partner; the then-four "independent director nominees"; and Defendant Anderson, by virtue of his ownership of WRG, which controlled Decarb through the Sponsor, held voting control over the Company. The Registration Statement acknowledged as much, stating in pertinent part:

> Our initial stockholders [*i.e.* the Sponsor, the "independent director nominees," and WRG] will control the election of our board of directors until consummation of our initial business combination and will hold a substantial interest in us. As a result, they will elect all of our directors prior to our initial

39

business combination and may exert a substantial influence on actions requiring a stockholder vote, potentially in a manner that you do not support.

**Answer:** Defendants admit that the block-quoted language in Paragraph 60 appears (without Plaintiff's alterations) in the Prospectus. Defendants respectfully refer the Court to the Prospectus for a complete and accurate description of its contents. To the extent that Paragraph 60 contains Plaintiff's characterization of the contents of the Prospectus, Defendants deny the allegations in Paragraph 60.

61. Defendants Lapeyre and Leuschen, as the beneficial owners of Riverstone, joined by Riverstone general partner Defendant Tichio, then serving as the CEO and sole director of Decarb prior to the IPO, initially appointed themselves and Defendants Anderson, Aaker, and Kearns to the Board, with Anderson assuming the role of CEO. These Defendants later added Defendants McDermott and Tepper, and, after the IPO, Defendant Warren, to the Board, with McDermott assuming the lead independent director role. As the controller of a majority of Decarb Class B shares through the Sponsor, Defendants Lapeyre, Leuschen, and Tichio could remove any director at any time. Prior to an initial business combination, only holders of Class B common stock were entitled to vote on the election of directors, ensuring these Defendants' absolute control over the Board. Furthermore, each of their chosen directors had deep professional and/or financial ties to these controlling stockholders, further ensuring the directors' fealty.

**Answer**: Defendants respectfully refer the Court to the Prospectus for a complete and accurate description of the officers and directors of DCRB. To the extent the allegations in Paragraph 61 are inconsistent with the Prospectus, Defendants deny the allegations in Paragraph 61.

62. At the time of Merger approval: (a) Defendants Lapeyre and Leuschen were the co-founders, senior managing partners, and beneficial owners of Riverstone; (b) Defendant Tichio—Decarb's CEO and lone director at the time of the IPO—was a partner and managing director of Riverstone; (c) Non-Party Haskopoulos—Decarb's CFO at the time of the IPO—was a managing director and

40

the CFO of Riverstone and served as CFO at Decarb and Decarbonization Acquisition Corps. ("DCRB") II, III, IV, and V; (c) Defendants Anderson (former Goldman Sachs VP), Lapeyre (former managing director of Goldman Sachs' Global Energy & Power Group), Leuschen (former partner and managing director of Goldman Sachs and founder and head of its Global Energy & Power Group), and Tichio (former Goldman Sachs banker in the Principal Investment Area) were alumni of the conflicted investment banker, Goldman Sachs, which then owned a 12% stake in Riverstone and was serving as the financial advisor to Legacy Hyzon and as an investment banker to Decarb; (d) Defendants Anderson (CEO/director of DCRBs I, II, III, IV, and V), Aaker (director of DCRBs I, II, III, IV, and V), Kearns (director DCRBs I, II, III, IV, and V), Lapeyre (director of DCRBs I, II, III, IV, and V), Leuschen (director of DCRBs I, II, III, IV, and V), Tichio (current/former CEO and then-present director of DCRBs I, II, III, IV, and V), McDermott (director of DCRBs I, II, III, IV, and V), Tepper (director of Silver Run I and II and DCRBs I, II, III, IV, and V), and Warren (director of DCRBs I, II, and III) each had been nominated to or seated on multiple boards of Riverstone-sponsored SPACs[18]; (e) Riverstone (*i.e.*, Lapeyre/Leuschen/Tichio) essentially gifted each of the "independent director nominees"—Aaker, Kearns, McDermott, Tepper, and Warren—and Anderson/WRG in his capacity as CEO of Decarb, Founder Shares worth ***millions of dollars*** for nominal consideration contingent on Decarb completing an acquisition; and (f) Riverstone (*i.e.*, Lapeyre/Leuschen/Tichio) allowed each of the "independent director nominees"—Aaker, Kearns, McDermott, Tepper, and Warren—and Anderson/WRG in his capacity as CEO of Decarb, to buy a portion of Riverstone's $6 million in private placement warrants. These numerous conflicts of interest are summarized in the table below:

---

[18] A total of five SPACs have shared the DCRB name thus far, and three of those SPACs have completed business combinations as of the filing of this Complaint. DCRB I (Decarb) completed the business combination with Hyzon at issue here. DCRB II completed a business combination with Tritium Holdings Pty Ltd. On January 13, 2022. DCRB III completed a business combination with Solid Power Operating, Inc. on December 8, 2021. DCRB IV completed its IPO on August 13, 2021, but has not completed a business combination or announced a likely target. DCRB V has filed several registration statements, most recently on January 21, 2022, in anticipation of conducting an IPO.

| Decarb Officer/Director | Director at Sponsor SPACs | | | | | Decarb Private Placement Warrants | Decarb Founder Shares | Riverstone Affiliation | Goldman Affiliation |
|---|---|---|---|---|---|---|---|---|---|
| | I | II | III | IV | V | | | | |
| Anderson | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | 630,947 | | Former VP |
| Haskopoulos (as CFO only) | ✓ | ✓ | ✓ | ✓ | ✓ | | ~ | Managing Director and CFO | |
| Aaker | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | 22,130 | | |
| Kearns | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | 22,130 | | |
| Lapeyre | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | 4,591,708 | Co-Founder and Managing Director | Former Managing Director |
| Leuschen | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | 4,591,708 | Co-Founder and Managing Director | Former Managing Director |
| Tichio | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ~ | Former Managing Director | Former Banker |
| McDermott | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | 331,950 | | |
| Tepper | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | 22,130 | | |
| Warren | ✓ | ✓ | ✓ | ✓ | | ✓ | 22,130 | | |

**Answer**: Defendants respectfully refer the Court to the Proxy for a complete and accurate description of DCRB's officers and directors and of the founders

shares.  With respect to the footnote that accompanies Paragraph 62, Defendants

admit that DCRB I completed a business combination with Hyzon.  Defendants

further admit that DCRB II completed a business combination with Tritum Holdings

Pty Ltd. on January 13, 2022.  Defendants further admit that DCRB III completed a

business combination with Solid Power Operating Inc. on December 8, 2021.

Defendants further admit that DCRB IV completed its IPO on August 13, 2021.

Otherwise, Defendants deny the allegations in footnote 18 and Paragraph 62.

63.    Importantly, by appointing Defendants Anderson, Aaker, Kearns, McDermott, Tepper, and Warren to the boards of directors of Riverstone's other SPACs, Defendants Lapeyre, Leuschen, and Tichio (via their control of Riverstone) provided them with the opportunity to receive additional founder shares and warrants in those SPACs. Indeed, while the Hyzon de-SPAC transaction would reward the holders of its Class B Founder Shares with shares worth $56.4 million in the open market, this was not the only de-SPAC from which these parties were collectively profiting. These Board members, along with the Controller Defendants, collectively received much more in connection with serving on SPAC boards for Riverstone. As emphasized in an August 25, 2021 Wall Street Journal report, Riverstone is a prolific SPAC creator and "[b]etween Hyzon and the announced mergers with Tritium and Solid Power, Riverstone ***and other members of the SPAC team*** are in line for about ***$240 million in paper gains through ultracheap shares and other perks they get for sponsoring the SPACs***, according to New York University Law School professor Michael Ohlrogge, who studies SPACs."[19]  Indeed, based on their receipt of founders shares in the five DCRB SPACs being valued at an estimated $10 per share as of the date of any eventual business combination, the purported outside "independent directors" on the Decarb Board, i.e. Defendants Aaker, Kearns, McDermott, Tepper, and Warren, all were poised to gain millions of dollars in payoffs:

---

[19] *See* Ryan Dezember and Amrith Ramjuma, *Riverstone SPACs Bet Renewable Energy Will Pay Off This Time*, Wall St. J., Aug. 26, 2021.

| Director | DCRB SPAC | Founder Shares | Implied Value at $10 Per Share | Total Potential Payoff |
|---|---|---|---|---|
| Aaker | I (Decarb) | 22,130 | $221,300 | |
| | II | 40,000 | $400,000 | |
| | III | 40,000 | $400,000 | |
| | IV | 41,551 | $415,510 | |
| | V | TBD | TBD | |
| | | | | $1,436,810+ |
| Kearns | I (Decarb) | 22,130 | $221,300 | |
| | II | 40,000 | $400,000 | |
| | III | 40,000 | $400,000 | |
| | IV | 41,551 | $415,510 | |
| | V | TBD | TBD | |
| | | | | $1,436,810+ |
| McDermott | I (Decarb) | 331,950 | $3,319,500 | |
| | II | 240,000 | $2,400,000 | |
| | III | 240,000 | $2,400,000 | |
| | IV | 83,102 | $831,020 | |
| | V | TBD | TBD | |
| | | | | $8,950,520+ |
| Tepper | I (Decarb) | 22,130 | $221,300 | |
| | II | 40,000 | $400,000 | |
| | III | 40,000 | $400,000 | |
| | IV | 41,551 | $415,510 | |
| | V | TBD | TBD | |
| | | | | $1,436,810+ |
| Warren[20] | I (Decarb) | 22,130 | $221,300 | |

[20] Though having initially agreed to serve as a director, Defendant Warren appears

44

| Director | DCRB SPAC | Founder Shares | Implied Value at $10 Per Share | Total Potential Payoff |
|---|---|---|---|---|
| | II | 40,000 | $400,000 | |
| | III | 40,000 | $400,000 | |
| | IV | 41,551 | $415,510 | |
| | | | | **$1,436,810+** |

**Answer**: Defendants admit that a Wall Street Journal article was published on August 26, 2021 and that the quoted language contained in Paragraph 63 appeared in that article. Without accepting the accuracy of material contained in that article, Defendants respectfully refer the Court to the article for a complete statement of the article's contents. Paragraph 63 also purports to characterize the allocation of founder shares and warrants. Defendants respectfully refer the Court to the Prospectus and Proxy for a complete and accurate description of the founder shares and warrants. Otherwise, Defendants deny the allegations contained in Paragraph 63.

64. Thus, consummation of the Merger did not provide an isolated, one-time multi-million-dollar payday for these directors. Rather, *each* Riverstone SPAC business combination presents an ongoing, multi-million-dollar opportunity for them, and the prospect of plum appointments in connection with future Riverstone SPACs.

**Answer**: Defendants deny the allegations in Paragraph 64.

65. And the relationships these senior executives and directors shared with one another in connection with the many DCRB SPACs were not the only close

___

to have resigned from DCRBs II and III in April 2021 and from DCRB IV on an undisclosed date and to have forfeited his founders shares in those three SPACs.

45

professional and financial ties these Defendants shared. There were more, including but not limited to:

- **Singularity Education Group:** a California-based executive educational provider, business incubator, and innovation consultancy service where Defendant Anderson has served as the Executive Chairman since 2018 and Defendant Kearns has served as a member of the faculty since February 2019;

- **Centennial Resource Development, Inc. f/k/a Silver Run Acquisition Corporation:** a Colorado-based oil and natural gas company launched and 31% owned by Defendant Riverstone upon whose board Defendants Lapeyre, Leuschen, Tepper, and Tichio have served since October 2016;

- **Alta Mesa Resources, Inc. f/k/a Silver Run Acquisition Corporation II:** a Texas-based oil exploration and production company launched by Riverstone that went through bankruptcy proceedings in 2020 and upon whose board Defendants Lapeyre, Leuschen, and Tepper served as directors until 2020;

- **Riverstone Energy Limited:** a closed-end investment company launched and operated by Riverstone that invests in the global energy industry and where Defendants Lapeyre and Leuschen served on the board between 2013 and 2020; and

- **Envira Inc.:** a Maryland-based company that develops, constructs, acquires, owns, and operates wood pellet production plants and where Defendants Lapeyre and Leuschen have served as directors since January 2022 and had both previously served as general partner directors since March 2021.

**Answer**: Defendants admit that Defendant Anderson serves on the board of Singularity Group, but is no longer Executive Chairman. Defendants further admit the Defendant Kearns serves as a faculty member/expert at Singularity Group.

Defendants admit that Riverstone or its affiliates at one point owned approximately 31% of Centennial Resources Development, Inc. However, in

46

August 2022, Centennial merged with Colgate Energy Partners II LLC and became Permian Resources Corporation. Defendants further admit that Lapeyre, Leuschen, Tichio, and Tepper served on the board of Centennial until September 1, 2022. Only Defendants Tichio and Tepper continued to serve on the board of Permian Resources after that date.

Defendants admit that Silver Run Acquisition Corporation II merged with Alta Mesa Resources, Inc. in 2018. Defendants further admit that Defendants Lapeyre, Leuschen, and Tepper served on the Alta Mesa board until 2019 when Alta Mesa filed for bankruptcy.

Defendants admit that Defendants Lapeyre and Leuschen have served as directors of Enviva, Inc. (rather than "Envira Inc.") since January 2022. Defendants further admit that Defendant Lapeyre served as a member of the board of Enviva's general partner from March 2021 until Enviva was converted to a c-corporation in January 2022. Defendants further admit that Defendant Leuschen served as a member of the board of Enviva's general partner from April 2021 until Enviva was converted to a C-corporation in January 2022. Defendants deny the remaining allegations contained in Paragraph 65, including any and all allegations to the extent they suggest the existence of any conflicts of interest.

66.    Indeed, the preliminary proxy statements Hyzon filed with the SEC in the lead up to the Merger vote in July 2021 expressly conceded that Defendants Anderson, Lapeyre, Leuschen, and Tichio were not "independent directors." Yet, Defendants Aaker, Kearns, McDermott, Tepper, and Warren were also conflicted,

47

given their obvious financial income in the outcome of the Hyzon de-SPAC transaction and their long history of profiting off their business relationships with Riverstone and their participation in the other DCRB SPAC transactions.

**Answer**: Paragraph 66 purports to characterize preliminary versions of the

Proxy.  Defendants respectfully refer the Court to the preliminary proxy filings for

a complete and accurate description of their contents.  Otherwise, Defendants deny

the allegations contained in Paragraph 66.

67.    In short, these strong personal financial incentives for each of the Decarb Board members—adding up to millions of dollars—eliminated these Board members' ability to act independently and to "say no" to any deal pushed by Defendants Anderson, Lapeyre, Leuschen, and Tichio via Riverstone and the Sponsor. The IPO Registration Statement essentially admitted as much, stating in pertinent part as follows:

> Since our sponsor, officers and directors will lose their entire investment in us if our business combination is not completed, ***a conflict of interest may arise in determining whether a particular business combination target is appropriate for our initial business combination***.[21]

However, it is clearly one thing to admit a conflict of interest could later arise in selecting a viable merger target; it is an entirely separate thing to: (i) conceal known problems with a SPAC merger target's business metrics and financial prospects—or fail to conduct due diligence to unearth them—in order to ensure shareholder approval of a merger and to dissuade SPAC shareholders from exercising their Redemption Rights; and (ii) to violate the solemn, non-waivable fiduciary duties of loyalty, good faith, and due care that directors of Delaware corporations, governed by the State's statutory and common law, are bound by.

---

[21] IPO Prospectus at 45.

**Answer**: Defendants admit that the block-quoted language contained in Paragraph 67 appears (without Plaintiff's added emphasis) in the Prospectus. Otherwise, Defendants deny the allegations in Paragraph 67.

68.    Yet it is clear that is what Riverstone demanded of these directors here. As the following portions of an August 26, 2021 *Wall Street Journal* expose elucidate, the band of conflicted Decarb directors has helped Riverstone launch and sell its series of SPAC transactions and each director has profited thereby to the tune of millions of dollars while the investors in the Riverstone SPACs often fell flat:

Riverstone is best known for its energy-focused private-equity funds. For its green efforts, the firm is using special-purpose acquisition companies, or SPACs. These are blank-check companies that raise cash from stock-market investors, merge with private companies and take them public. SPACs have raised a record of roughly $120 billion from investors this year and invested heavily in clean-energy businesses.

So far, Riverstone has done four clean-energy SPACs. The firm's first one took hydrogen fuel-cell truck company Hyzon Motors Inc. public. Companies making electric- and fuel-cell-powered vehicles were among the hottest SPAC investments earlier this year but have tumbled recently. Hyzon shares are down by more than half from their peak.

Other Riverstone SPACs announced deals for electric-vehicle battery-charging company Tritium Holdings Pty Ltd. and solid-state battery firm Solid Power Inc., which is backed by Ford Motor Co. and BMW AG. Those deals have yet to close, but Riverstone's pace of deal making is among the fastest in the SPAC market.

The latest Riverstone SPAC, Decarbonization Plus Acquisition Corp. IV raised about $315 million in a stock offering this month and is looking for a business to take public.

\*      \*      \*

In securities filings affiliated with its green SPACs, Riverstone touts two decades of experience investing in clean energy. ***There is no mention in the filings of how those funds performed.***

49

Riverstone's first renewable-energy fund raised $685 million in 2006 from investors including the California Public Employees' Retirement System. ***That fund lost roughly 90%.*** "You'd think a monkey couldn't have lost that much money," Riverstone co-founder David Leuschen told a conference of oil investors in 2016.

The firm's second fund raised $3.4 billion in 2008 and ***barely broke even after fees***, according to public pension disclosures. Riverstone created the fund after investors asked it to, Mr. Leuschen said. "Nobody would call me a great believer in the renewable business," he said, "but I think it's got actually quite a bright future."

*   *   *

***Riverstone's record with SPACs is uneven.*** The firm helped revive the SPAC process in 2016 after years of drought following the financial crisis. Riverstone launched a SPAC to stake former EOG Resources Inc. Chief Executive Mark Papa in the West Texas oil fields. The shares doubled in value.

Investors then gave a billion dollars to Riverstone and former Anadarko Petroleum Corp. CEO James Hackett to try for SPAC gold again. That SPAC bought drilling fields and pipelines in an Oklahoma field that were supposed to be the next big thing. Production was weak and oil prices slumped amid a supply glut.



Annual revenue projections made by companies going public through Riverstone SPACs

Note: Solid Power projects annual sales less than $35 million each year through 2025.
Source: The companies

Oil-and-gas investments across Riverstone's portfolio sputtered. ***When their value fell, Riverstone executives faced the prospect of returning more than $300 million in paper profits that they had taken***

50

*when deals looked like winners. <u>Riverstone later sold a 12% stake in itself to Goldman Sachs.</u>*

*Shares of the firm's SPAC venture in West Texas plunged. The Oklahoma venture filed for bankruptcy protection in 2019 and was liquidated.* A third shale SPAC never sold shares until Riverstone renamed it Decarbonization Plus Acquisition Corp. and it went public last October.

That SPAC in February said it would merge with Hyzon, which projected 2021 sales of $37 million but said that by 2025 revenue would top $3 billion as hydrogen fuel becomes more viable.

Hyzon's shares have since tumbled as enthusiasm for transportation startups has cooled. *Still, Riverstone and its SPAC partners remain in the green: Their incentive package for creating the SPAC is worth about $56 million, almost $50 million above its roughly $6.5 million cost.[22]*

**Answer**: Defendants admit that a Wall Street Journal article was published on August 26, 2021 and that the quoted language contained in Paragraph 68 appeared in that article. Without accepting the accuracy of material contained in that article, Defendants respectfully refer the Court to the article for a complete and accurate description of the article's contents. Otherwise, Defendants deny the allegations contained in Paragraph 68.

**IV.    Decarb Merges with Legacy Hyzon**

69.    At the time of the Merger, Legacy Hyzon was barely a year-old stand-alone company. It opened its headquarters in Honeoyo Falls, New York at the

---

[22] See Ryan Dezember and Amrith Ramkumar, Riverstone SPACs Bet Renewable Energy Will Pay Off This Time – Investors have given the oil financier more than $1 billion for blank-check firms in spite of its clean-energy past, Wall St. J., Aug. 26, 2021 (emphasis added).

51

former General Motors facility that had closed in 2012. Legacy Hyzon was then a purported supplier of zero-emissions hydrogen fuel cell powered commercial vehicles, including heavy duty trucks, buses, and coaches. U.S. investors were told that Legacy Hyzon, originally a new business line of its parent corporation, Horizon Fuel Cell Technologies ("Horizon"), had been founded and successfully operated out of China for 17 years (since 2003). According to Hyzon's website:

> Hyzon was known as the Heavy Vehicle Business Unit (HVBU) of Horizon and was ***responsible for the development of fuel cell systems and the delivery of about 500 fuel cell-powered commercial vehicles during 2019 and 2020, leveraging the deep and extensive experience bolstered within the group.***[23]

**Answer**: Defendants admit that Hyzon was incorporated on January 21, 2020 as an indirect subsidiary of Horizon Fuel Cell Technologies.  Defendants further admit that Legacy Hyzon was headquartered in Honeoye Falls, New York and that it established a test center in a former General Motors facility.  Defendants further admit that Legacy Hyzon's business included the supply of zero-emissions hydrogen fuel cell powered commercial vehicles, including heavy duty trucks, buses, and coaches.  Paragraph 69 further includes a quotation attributed to Hyzon's website. The quotation does not appear at the URL address cited in the Complaint, and Defendants therefore lack information and knowledge as to the existence and content of the alleged statement and deny allegations concerning it on that basis.  Otherwise, Defendants deny the allegations contained in Paragraph 69.

70.     What was not disclosed to U.S. investors was that the lion's share of Horizon's 2019 sales had been to a single now defunct customer, and that at the time of the spinoff of Legacy Hyzon from its Chinese parent Horizon, Horizon was in

---

[23] *See* https://hyzonmotors.com/about/#overview (last visited Mar. 8, 2022).

dire financial straits due to the lack of sales of those fuel cells. By late 2019, Horizon's fuel-cell sales and free cash flow had imploded when its major customer, responsible for nearly 75% of Horizon's fuel-cell sales, defaulted. As a result, the market value of the Horizon operating subsidiary responsible for sales of Horizon's fuel cell systems had evaporated and that operating subsidiary had de-registered from the Chinese stock exchange. Seeking to raise public capital to develop Legacy Hyzon's business without having to reveal its financial collapse to investors, Legacy Hyzon looked to the US capital markets, then awash with EV vehicle company SPAC investment opportunities. The Hyzon website states that it first established its U.S. operations when it "[l]aunch[ed] [its] engineering development centre in Rochester, NY" in 2020.

**Answer**: With respect to the portion of Paragraph 70 that purports to attribute a statement to "[t]he Hyzon website" without providing a URL link or otherwise identifying the location at which the alleged statement was made, Defendants are unable to locate the alleged statement and, therefore, lack information and knowledge as to the existence and content of the alleged statement and therefore deny that portion of Paragraph 70 on that basis. Defendants deny the remaining allegations contained in Paragraph 70, including any and all allegations to the extent they suggest the existence of any false or misleading statement or material omission made by Defendants.

71.    On or about August 18, 2020, Legacy Hyzon purportedly retained Goldman Sachs as its financial advisor "in connection with exploring alternatives for raising capital." Not coincidentally, Goldman Sachs then owned a 12% interest in Riverstone and rights to proportionate share of Riverstone's profits.[24] By the summer of 2020, Legacy Hyzon's management had apparently determined to seek

---

[24] *See* Ryan Dezember and Amrith Ramkumar, *Riverstone SPACs Bet Renewable Energy Will Pay Off This Time – Investors have given the oil financier more than $1 billion for blank-check firms in spite of its clean-energy past*, Wall St. J., Aug. 26, 2021.

out a publicly traded SPAC to merge with in order to allow Legacy Hyzon stock to be publicly traded. By October 13, 2020, Legacy Hyzon was in the process of executing non-disclosure agreements with various SPACs and "exploring a potential business combination" with them.[25]

**Answer**: Defendants admit on information and belief that Legacy Hyzon was exploring a potential business combination and had executed non-disclosure agreements with various SPACs by October 13, 2020.  Defendants further admit that Hyzon retained Goldman Sachs as its financial advisor.  Defendants further admit that funds affiliated with Petershill Partners PLC held an approximately 12% ownership stake in Riverstone.  With regard to Paragraph 71's allegations regarding what Legacy Hyzon management's "apparently determined" in the summer of 2020, Defendants lack information and knowledge regarding such determinations and deny the allegations on that basis.  Otherwise, Defendants deny the allegations in Paragraph 71.

72.    On October 30, 2020, Defendants Anderson and Tichio met with Goldman Sachs' bankers "regarding a possible transaction between [Decarb] and Hyzon."[26] After hiring Vinson & Elkins LLP, meeting with Legacy Hyzon management, and reviewing various Legacy Hyzon sales pitches made by Goldman Sachs, Decarb began undertaking its "legal due diligence of Hyzon" with Legacy Hyzon's bankers at Goldman Sachs, beginning on November 13, 2020.[27] Notably, due to its 12% ownership stake in Riverstone, Goldman Sachs stood to receive a proportional profit in Riverstone's profits in the deal.

---

[25] *See* Merger Proxy at 95.
[26] *Id.*
[27] *Id.* at 96

54

**Answer**: Defendants admit that the quoted language in Paragraph 72 appears in the Proxy.  Defendants respectfully refer the Court to the Proxy for a complete and accurate description of the background of the Merger.  Defendants deny the allegations in Paragraph 72 to the extent they conflict with the Proxy.  Otherwise, Defendants deny the allegations in Paragraph 72.

73.    Throughout late November 2020, Defendant Tichio continued negotiating with Goldman Sachs over the due diligence and deal terms for a possible merger with Legacy Hyzon.[28] In the Merger Proxy, Legacy Hyzon claims to have formally engaged Goldman Sachs "as its financial advisor in connection with the possible sale of all or a portion of Hyzon" on November 30, 2020, and states "[t]hat same week, Hyzon also discontinued discussions with the [ten] other SPACs" it had been speaking with since early October 2020.[29] Throughout December 2020 and January 2021, the parties completed the rest of the due diligence while negotiating the final terms of the de-SPAC transaction, including determining "a total enterprise value of Hyzon of $1.983 billion, with equity consideration in the form of Class A Common Stock and a $350 million PIPE Financing."[30] Various extraneous agreements—such as an intellectual property agreement—were also executed.[31] According to the Merger Proxy, "[d]uring the week of December 14, 2020, [Decarb] engaged a number of third-party advisors . . . to assist with various aspects of commercial, financial and legal diligence, including . . . an advisor to assist in the quality of the fuel cell technology that would be commercialized by Hyzon in the transportation market." The Merger Proxy contained no description of who those "third-party advisors" were, what their qualifications were, how they were being compensated or what they were asked to opine upon, and based on what has since been revealed about the fuel cell technology in particular, it is clear their due diligence was ineffective. This is not surprising since Goldman Sachs shared such a close relationship with Riverstone and the Controller Defendants, all of whom were attempting to shove this transaction through.

---

[28] *Id.*
[29] *Id.* at 95-96
[30] *Id.* at 96-98.
[31] *Id.*

**Answer**:  Defendants admit that the quoted language in Paragraph 73 appears in the Proxy.  Defendants respectfully refer the Court to the Proxy for a complete and accurate description of the background of the Merger.  Defendants deny the allegations in Paragraph 73 to the extent they conflict with the Proxy.  To the extent that Paragraph 73 otherwise contains Plaintiff's characterization of the Proxy's contents, Defendants deny the allegations in Paragraph 73.

74.    The Merger Proxy then states that:

> During the week of January 4, 2021, [Decarb] engaged Citigroup Global Markets Inc. ("Citi") as its financial advisor and Credit Suisse Securities (USA) LLC ("Credit Suisse") as its financial advisor and equity capital markets advisor, respectively, in connection with the business combination to assist the [Decarb] Board with advice on the transaction structure, negotiation strategy, valuation analyses, financial terms and other financial matters . . . .[32]

Because Citi and Credit Suisse had just served as underwriters in the Decarb IPO, however, they too were conflicted in serving as advisors to Decarb in the de-SPAC transaction. When Citi and Credit Suisse undertook the IPO for Decarb, they agreed that 60% of their $11 million in investment banking fees would be placed in a trust and that: "(i) they [would] forfeit any rights or claims to [those fees], including any accrued interest thereon, then in the trust account upon liquidation, and (ii) that the [fees would] be distributed on a pro rata basis . . . to the public stockholders" of Decarb. Although the Decarb SPAC still had until October 2022 to complete a business combination, it had taken many months to decide upon Legacy Hyzon and to negotiate a proposed business combination. Neither Citi nor Credit Suisse were likely to reject that combination. If Citi and Credit Suisse suddenly rejected the proposed transaction, it would reflect poorly on Riverstone's claimed keen ability to identify and acquire worthwhile targets—the bread and butter of Riverstone's business. Nor were Citi or Credit Suisse inclined to replicate their efforts at the eleventh hour with a different target after the due diligence was largely complete and the terms of the deal had essentially been finalized. In short, Citi and Credit Suisse

---

[32] *Id.*

had no real choice but to rubber stamp this proposed Merger due to their own financial conflicts.

**Answer**: Defendants admit that the quoted language contained in Paragraph 74 appears in the Proxy. Defendants respectfully refer the Court to the Proxy for a complete and accurate description of its content. Otherwise, Defendants deny the allegations in Paragraph 74.

75.    Making matters worse, according to the Merger Proxy, "[d]uring the week of January 10, 2021, [Decarb] also engaged Goldman Sachs and Morgan Stanley & Co. LLC ('Morgan Stanley') to serve as placement agents for the PIPE Financing."[33] Though the Merger Proxy claims "Goldman Sachs did not provide any advice to" Decarb regarding the "valuation of Hyzon or the terms of the business combination," nonetheless, in recognition of the clear conflict this retention presented, the Merger Proxy states that "[Decarb] and Hyzon each signed a consent letter with Goldman Sachs acknowledging Goldman Sachs' roles as financial advisor to Hyzon in connection with the business combination and as co-placement agent to DCRB in connection with the PIPE Financing and waiving any potential conflicts in connection with such dual roles." But executing a "waiver" does not erase the taint of conflict when Legacy Hyzon's, the seller's, investment bankers were also angling to get investment banking work from the buyer, Decarb. Goldman Sachs would ultimately get that work and also serve as investment bankers for Decarb, the buyer, as the placement agent for Decarb in selling the PIPE Financing required to complete the Merger. This conflict was compounded because Goldman Sachs owned a 12% stake in the sponsor of the SPAC, Riverstone, giving Goldman Sachs a proportional stake in Riverstone's profits.

**Answer**: Defendants admit that the quoted language appears in the Proxy. Defendants respectfully refer the Court to the Proxy for a complete and accurate description of the PIPE financing and the advisors that assisted with that financing. Otherwise, Defendants deny the allegations in Paragraph 75.

---

[33] *Id.* at 99.

57

76.    Indeed, neither Citi, Credit Suisse, nor Goldman Sachs were independent investment bankers or financial advisors. Many of Decarb's Board members were Goldman Sachs alumni themselves and various Decarb entities had completed billions of dollars in transactions with all three investment banks in the recent past and could anticipate continuing to do so in the future. Those deals included, but were not limited to: (a) Citi and Credit Suisse serving as the sole joint book-running managers of DCRB II's, DCRB IV's, and DCRB V's IPOs; (b) Citi serving as a financial advisor to DCRB II in its de-SPAC transaction; (c) Goldman Sachs being one of the anchors in a $1.1 billion Riverstone single-asset process undertaken in July 2020[34]; (d) Goldman Sachs acquiring a 12% stake in Riverstone for $500 million in 2017[35]; (e) Riverstone being a member of a consortium of private equity firms including Goldman Sachs that completed the $27.5 billion acquisition of Kinder Morgan, one of the largest pipeline operators in the United States, in 2006[36]; (f) Goldman Sachs owning a 12% interest in Riverstone, giving it a proportionate cut of Riverstone's profits; (g) Riverstone and Goldman Sachs jointly purchasing a Lucid Energy Group subsidiary in January 2018 for $1.6 billion[37]; and (h) Goldman Sachs alone having backed a new Riverstone $5 billion "make-or-break" fund in August 2018.[38] Critically, Citi and Credit Suisse had jointly received ***$11 million*** in investment banking fees from the Decarb IPO alone—the receipt of 60% of which was contingent upon completing the Merger.

**Answer**:  Defendants admit that for Decarb II, Credit Suisse served as an underwriter for the IPO, Credit Suisse and Citi served as placement agents for PIPE financing, and Citi served as a financial advisor.  Defendants further admit that for

---

[34] *See* Chris Witkowsky, *Goldman one of several anchors in $1.1 bn Riverstone single-asset process*, Buyouts Insider, July 22, 2020.

[35] *See* Rabia Arif, *Goldman Sachs fund to acquire 12% of Riverstone Holdings for $500 M*, S&P Global Market Intelligence, May 4, 2017.

[36] *See* Jad Mouawad, *Kinder Morgan Agrees to an Improved Buyout Offer Led by Its Chairman*, N.Y. Times, Aug. 29, 2006.

[37] *See* Lucid Energy Group press release, *Lucid Energy Group Agrees to Sell Delaware Basin Subsidiary to Riverstone Holdings LLC and Goldman Sachs Merchant Banking Division for $1.6 Billion*, Jan. 8, 2018.

[38] *See* Joshua Franklin & David French, *Exclusive: Goldman-backed Riverstone readies for make-or-break fundraising*, Reuters, Aug. 30, 2018.

58

Decarb IV, Credit Suisse and Citi were underwriters for the IPO and Citi served as a PIPE placement agent. Defendants further admit that for Decarb V, Credit Suisse and Citi served as underwriters for the IPO. Defendants further admit that a Goldman Sachs-affiliated investment vehicle was an investor in a July 2020 transaction involving Riverstone. Defendants further admit that funds affiliated with Petershill Partners PLC acquired an approximately 12% interest in Riverstone in 2017. Defendants further admit that Riverstone was member of a consortium of investors, including affiliates of Goldman Sachs, that completed an investment in Kinder Morgan, Inc. in 2006. Defendants further admit that affiliates of Riverstone and affiliates of Goldman Sachs Merchant Banking Division purchased a Lucid Energy subsidiary in January 2018 for $1.6 billion. Otherwise, Defendants deny the allegations contained in Paragraph 76.

77. On the morning of February 9, 2021, Decarb and Legacy Hyzon announced the Merger and related financing transactions (together, the "Transactions"). The prior day, February 8, 2021, the Board unanimously approved the Merger.

**Answer**: Defendants admit the allegations in Paragraph 77.

78. Under the terms of the Merger, following a series of transactions, Legacy Hyzon would become a wholly owned subsidiary of Decarb, as depicted in the chart below from the Merger Proxy:

59

**Answer**: Defendants admit that the chart contained in Paragraph 78 appears in the Proxy and illustrates the post-Merger ownership of Hyzon subject to a number of assumptions described in the Proxy. Defendants respectfully refer the Court to the Proxy for a complete and accurate description of its contents.

79.    The Merger valued the post-transaction Company at "more than $2 billion."[39] In addition, the pre-Merger Legacy Hyzon owners were estimated to own 73% of the post-Merger company. By contrast, Decarb Class A stockholders would own only 8.9% of the post-Merger company, and the Sponsor, the "independent director nominees," and Anderson/WRG, would own 2.2% of the postMerger company. The PIPE investors would own 15.9% of the post-Merger company.

**Answer**: Defendants admit that the quoted language in the first sentence of Paragraph 79 appears in the Bloomberg article cited by Plaintiff in footnote 39. Defendants respectfully refer the Court to this article for a complete and accurate description of its contents. Defendants further admit that the ownership percentages contained in Paragraph 79 are included in the chart contained in Paragraph 78, which appears in the Proxy and illustrates the post-Merger ownership of Hyzon subject to

---

[39] *See* Ed Ludlow & Gillian Tan, *Fuel Cell Startup Hyzon Valued at Over $2 Billion in SPAC Merger*, Bloomberg, Feb. 9, 2021.

a number of assumptions.  Defendants respectfully refer the Court to the Proxy for

a complete and accurate description of its contents and the assumptions related to

the pro forma ownership percentages.

80.    Approval of the Merger by Decarb stockholders required the affirmative vote of a majority of the stockholders present at the special meeting. The Company set the record date for the meeting as June 1, 2021, issued its definitive proxy statement on June 21, 2021, and held the meeting on July 15, 2021. Decarb stockholders had until July 13, 2021 to exercise their Redemption Rights. Inviting stockholders to exercise their Redemption Rights, directly after spelling out that the Board recommended shareholders vote in favor of the Merger with Hyzon, the letter to Decarb shareholders signed by Defendant Anderson in the Merger Proxy stated in pertinent part: "Pursuant to our Charter, *we are providing the holders* of shares of Class A Common Stock originally sold as part of the units issued in our initial public offering (the 'IPO' and such holders, the 'public stockholders') *with the opportunity to redeem*, upon the Closing, shares of Class A Common Stock then held by them . . . ." The Merger Proxy went on to instruct that:

> In order to exercise your redemption rights, you must (a) if you hold your shares of Class A Common Stock through units, elect to separate your units into the underlying public shares and public warrants prior to exercising your redemption rights with respect to the public shares, and (b) prior to 5:00 p.m., Eastern time, on July 13, 2021 (two business days before the special meeting), tender your shares physically or electronically and submit a request in writing that we redeem your public shares for cash to Continental Stock Transfer & Trust Company, our transfer agent . . . .

**Answer**:    Defendants admit that approval of the Merger required the

affirmative vote of a majority of the DCRB stockholders present at a special meeting.

Defendants further admit that the record date was June 1, 2021, that the definitive

proxy was issued on June 21, 2021, and that DCRB stockholders had until July 13,

2021 to exercise their redemption rights.  Defendants admit that the quoted language

in Paragraph 80 appears (without Plaintiff's added emphasis) in the Proxy.

Defendants respectfully refer the Court to the Proxy for a complete and accurate

description of its contents.   To the extent that Paragraph 80 otherwise contains

Plaintiff's characterization of the Proxy's contents, Defendants deny the allegations

in Paragraph 80.

81.   As to "WHERE YOU CAN FIND ADDITIONAL INFORMATION," the Merger Proxy stated in pertinent part that Decarb "files reports, proxy statements and other information with the SEC as required by the Exchange Act." The Merger Proxy warned that shareholders should rely only upon the information provided in the Merger Proxy and related SEC filings, stating that Decarb "has not authorized anyone to give any information or make any representation about the business combination, [Decarb] or Hyzon that is different from, or in addition to, that contained in this proxy statement," and "[t]herefore, if anyone does give you information of this sort, you should not rely on it."

**Answer**:  Defendants admit that the quoted language in Paragraph 81 appears

in the Proxy.   Defendants respectfully refer the Court to the Proxy for a complete

and accurate description of its contents.  To the extent that Paragraph 81 otherwise

contains Plaintiff's characterization of the Proxy's contents, Defendants deny the

allegations in Paragraph 81.

82.   As of the record date, the closing price of Decarb common stock was $10 per share. That price implied a market value of approximately $56.4 million for the Class B Founder Shares, which had been purchased a few months prior for a mere $25,000 (*i.e.*, the value of the Founder Shares increased 2,255x). At this valuation, members of the Decarb Board were poised to realize enormous returns on their investments in the event the Merger closed, as illustrated by the table below:

| **Director** | **Founder shares**[40] | **Implied Value at** |
|---|---|---|

---

[40] *See* Merger Proxy at 228.

|  |  | **$10 per share** |
|---|---|---|
| Anderson | 630,947 | $6,309,470 |
| Aaker | 22,130 | $221,300 |
| Kearns | 22,130 | $221,300 |
| Lapeyre | 4,591,708 | $45,917,080 |
| Leuschen | 4,591,708 | $45,917,080 |
| McDermott | 331,950 | $3,319,500 |
| Tepper | 22,130 | $221,300 |
| Warren | 22,130 | $221,300 |

**Answer**: Paragraph 82 purports to summarize the trading price of DCRB common stock. That information is publicly available and speaks for itself. Otherwise, Defendants deny the allegations in Paragraph 82.

83. The Merger Proxy touted the Board's purported reasons for recommending the Merger, including:

- "*Competitive and Innovative [hydrogen fuel cell] Design*";

- "*Value to Equity Investors*";

- "*Revenue Potential*";

- "*Global Scale*";

- "*Development Capability*";

- "*Due Diligence*";

- "*Terms of Business Combination Agreement*" being "the product of ***arm's-length negotiations*** among the parties";

63

- "*Independent Director Role*" and the Decarb Board being "comprised of a ***majority of independent directors who are not affiliated with our Sponsor and its affiliates***"; and

- Investors having the "***option to . . . redeem their shares***" rather than "remain stockholders of the combined company" or "sell their shares."[41]

**Answer**:  Defendants admit that the quoted language contained in each bullet point in Paragraph 83 appears in the Proxy.  Defendants respectfully refer the Court to the Proxy for a complete and accurate description of its contents and the Board's reasons for the Merger.  To the extent that Paragraph 83 otherwise contains Plaintiff's characterization of the Proxy's contents, Defendants deny the allegations in Paragraph 83.

84.    The Merger Proxy repeatedly represented that the Board reached these conclusions only after conducting "***extensive due diligence***." According to the Merger Proxy, this "extensive due diligence" consisted of the Decarb Board's review of the "***extensive due diligence***" provided to it by Legacy Hyzon. Among other things this "***extensive due diligence***" included:

- meetings and calls with Hyzon management and advisors regarding ***business model, operations and forecasts***;

- research on comparable public companies . . . ;

- research on comparable transactions;

- study of analyst reports and market trends in the electric vehicle and hydrogen fuel cell industries;

- ***review of material contracts***;

- review of intellectual property matters;

---

[41] *Id.* at 101-02 (emphasis added).

- review of *commercial, financial*, tax, legal and *accounting* due diligence;

- consultation with Hyzon's management and DCRB's legal and financial advisors and industry experts, including its advisor that assisted in evaluating the overall electrified vehicle market and of the addressable market for Hyzon's vehicles, and its advisor that assisted in evaluating the quality of Hyzon's fuel cell technology;

- *financial and valuation analysis of Hyzon and the business combination*;

- *financial projections prepared by Hyzon's management team*; and

- the *financial statements of Hyzon*.[42]

**Answer**:    Defendants admit that the quoted language and the language contained in each bullet point in Paragraph 84 appear (without Plaintiff's added emphasis) in the Proxy. Defendants respectfully refer the Court to the Proxy for a complete and accurate description of its contents and of the diligence performed in connection with the Merger. To the extent that Paragraph 84 otherwise contains Plaintiff's characterization of the Proxy's contents, Defendants deny the allegations in Paragraph 84.

85.    Notably, the Merger Proxy did not provide an independent, third-party opinion as to whether the Merger was fair, from a financial perspective, to Decarb public Class A stockholders. It claimed that the "officers and directors [of Decarb] have *substantial experience in evaluating the operating and financial merits of companies* from a wide range of industries and concluded that their experience and backgrounds . . . enabled them to make the necessary analyses and determinations regarding the business combination."[43] It claimed that Citi and Credit Suisse had provided Decarb with financial advisory services at the last minute, but provided no

---

[42] *Id.* at 101 (emphasis added).
[43] *Id.* at 53 (emphasis added).

65

independent, third-party opinion as to whether the Merger was fair, from a financial perspective, to Decarb public Class A stockholders.

**Answer**: Defendants admit that the quoted language in Paragraph 85 appears in the Proxy. Defendants respectfully refer the Court to the Proxy for a complete and accurate description of its contents and the work performed to analyze the fairness, in financial terms, of the Merger. To the extent that Paragraph 85 otherwise contains Plaintiff's characterization of the Proxy's contents, Defendants deny the allegations in Paragraph 85.

86.   Instead, Decarb presented its own financial analyses to support the Board's recommendation of the Merger. The valuation analyses adopted the projections below, which show sudden jumps in expected 2023 and 2024 trucks deployed, EBITDA, and EBITDA margin, despite Horizon/Legacy Hyzon having suffered a stark downward trend in actual sales volumes since 2019 and despite the gross margin forecasts being twice the average for other electric vehicle manufacturers:

**Key Financial Metrics:**

| | Forecast Year Ended December 31, | | | | |
| --- | --- | --- | --- | --- | --- |
| | 2021E | 2022E | 2023E | 2024E | 2025E |
| | | | (dollars in millions) | | |
| EBITDA[1] | ($ 73) | ($ 25) | $ 87 | $ 326 | $ 505 |
| EBITDA Margin[2] | NM | NM | 8.9% | 14.5% | 15.4% |

**Key Non-Financial Metrics:**

| | Forecast Year Ended December 31, | | | | |
| --- | --- | --- | --- | --- | --- |
| | 2021E | 2022E | 2023E | 2024E | 2025E |
| Medium and Heavy Duty Trucks Deployed | 74 | 623 | 3,360 | 6,800 | 9,260 |
| Buses Deployed | 11 | 35 | 68 | 340 | 600 |
| Class 3 Truck / Van | 0 | 0 | 840 | 4,435 | 7,235 |
| Total Vehicles Deployed | 85 | 658 | 4,268 | 11,535 | 17,095 |

**Answer**: Defendants admit that the tables contained in Paragraph 86 appear in the Proxy. Defendants respectfully refer the Court to the Proxy for a complete and accurate description of its contents and financial analyses, including its clear

disclosure that "Hyzon provided DCRB with its internally prepared forecasts" which were contained in the tables.  Defendants specifically deny that DCRB "presented its own financial analyses" in these tables.  To the extent that Paragraph 86 otherwise contains Plaintiff's characterization of the Proxy's contents, Defendants deny the allegations in Paragraph 86.

87.    However, as noted above, the Board affirmatively represented its "***extensive due diligence***" of Hyzon and its "***substantial experience in evaluating the operating and financial merits of companies,***" and these representations specifically assured Decarb's public stockholders that these projections were reasonable.

**Answer**:   Defendants admit that the quoted language and the language contained in each bullet point in Paragraph 87 appear (without Plaintiff's added emphasis) in the Proxy.  Defendants respectfully refer the Court to the Proxy for a complete and accurate description of its contents.  To the extent that Paragraph 87 otherwise contains Plaintiff's characterization of the Proxy's contents, Defendants deny the allegations in Paragraph 87.

88.    In connection with seeking shareholder approval of the Merger—and dissuading the existing public shareholders of Decarb from seeking redemption—Defendants also conducted a series of Investor Presentations, including one on February 9, 2021, using PowerPoint slides. In one slide, Legacy Hyzon said it then expected to increase its deliveries from 85 during FY21 to 9,260 by FY25 and to concomitantly exponentially grow its revenues from an estimated $37 million in 2021 to nearly $3.3 billion by 2025:



**Answer**: Defendants admit that the slide referenced in Paragraph 88 appears in a February 9, 2021 investor presentation. Defendants respectfully refer the Court to the investor presentation for a complete and accurate description of its contents. To the extent that Paragraph 88 otherwise contains Plaintiff's characterization of the investor presentation's contents, including that Defendants sought to "dissuad[e] the existing public shareholders of Decarb from seeking redemption," Defendants deny the allegations in Paragraph 88.

89.     Even though the parties had not yet formally announced the Hiringa deal, another slide in the February 9, 2021 Investor Presentation entitled "***Customer Deployments Underway. . . .***" referred to the Hiringa sale as a "Signed Contract," emphasizing that Legacy Hyzon's "Contracted Orders" were all "100% Certain," and stated that the first twenty vehicles would ship in 2021, contributing an estimated $10 million in revenues for Hyzon for 2021—or more than 25% of the $37 million forecast for 2021:



**Answer**:  Defendants admit that the quoted language and slide referenced in

Paragraph 89 appear (without Plaintiff's added emphasis) in a February 9, 2021

investor presentation.   Defendants respectfully refer the Court to the investor

presentation for a complete and accurate description of its contents.  To the extent

that Paragraph 89 otherwise contains Plaintiff's characterization of the investor

presentation's contents, Defendants deny the allegations in Paragraph 89.

90.     Days later, on February 17, 2021, Legacy Hyzon and Hiringa issued a press release formally announcing the Hiringa contract, stating that "the two

companies ha[d] signed a *vehicle supply agreement*," with "the first batch of [twenty] vehicles . . . *expected to enter service in New Zealand by the end of 2021*." The release further stated that "Hyzon plans to have up to 1,500 fuel cell trucks on the road in New Zealand by 2026 as part of the agreement with Hiringa."

**Answer**: Defendants admit that, on February 17, 2021, Legacy Hyzon and Hiringa issued a joint press release. Defendants admit that the quoted language in Paragraph 90 appears (without Plaintiff's added emphasis) in the press release. Defendants respectfully refer the Court to the February 17, 2021 press release for a complete and accurate description of its contents. To the extent that the allegations suggest the existence of any false or misleading statement made by Defendants, Defendants deny any and all such allegations.

91. Defendants made another investor presentation on April 29, 2021 and again filed those slides with the SEC. One slide highlighted that Legacy Hyzon had announced a "*vehicle supply agreement* to supply trucks to *New England-based Hiringa* Energy; *first deliveries expected by [end of year] 2021*," notably presenting that as a commercial achievement and not one of its partnerships:

70



**Answer**: Defendants admit that DCRB filed a presentation with the SEC on April 29, 2021. Defendants further admit that the quoted language and slide referenced in Paragraph 91 appears (without Plaintiff's added emphasis) in the investor presentation. Defendants respectfully refer the Court to the investor presentation for a complete and accurate description of its contents. To the extent that Paragraph 91 otherwise contains Plaintiff's characterization of the Presentation's contents, Defendants deny the allegations in Paragraph 91.

92.    Elsewhere, 15 specific "Vehicle *Customers*" of Legacy Hyzon were displayed, with Hiringa appearing prominently at the top of that list:

71



**Answer**: Defendants admit that the quoted language and slide referenced in

Paragraph 92 appears (without Plaintiff's emphasis) in the April 29, 2021

Presentation. Defendants respectfully refer the Court to the investor presentation for

a complete and accurate description of its contents. To the extent that Paragraph 92

otherwise contains Plaintiff's characterization of the investor presentation's

contents, Defendants deny the allegations in Paragraph 92.

93.    In each of these statements, Defendants characterized Hiringa as the purchaser of the purportedly binding 20-vehicle agreement being delivered in 2021, as well as the additional 1400-1500 vehicles being delivered over the following fiveyear period.

**Answer**: Paragraph 93 purports to characterize certain statements made in

various investor presentations and press releases. Defendants respectfully refer the

Court to those documents for a complete and accurate description of their contents.

Otherwise, Defendants deny the allegations in Paragraph 93.

94.     More generally, Defendants' use of these purported customer maps and charts in the February 2021 and April 2021 Investor Presentations was also materially misleading in that Legacy Hyzon had no viable agreements with or commitments from many of the blue-chip, "top tier customers" it touted on these charts. The use of these top-tier customer logos and sales commitments more than implied a rapidly accelerating demand for Legacy Hyzon's product—indeed, the customer charts were titled: "Customer Deployments Underway and Demand is Accelerating Rapidly." Defendants repeated these committed order and revenue claims directly alongside logos of purported name brand customers like Coca Cola, Heineken, Nestle, and Ikea, lending credit to their other sales claims. Further, Defendants repeatedly published maps of purported 2021 customer deployments to specific "customers," which if added up, totaled nearly $40 million in sales in 2021:

February 9, 2021 "Customer" Map:



**Answer**:  Paragraph 94 purports to characterize certain statements made in various investor presentations and press releases.  Defendants respectfully refer the

Court to those documents for a complete and accurate description of their contents.

Otherwise, Defendants deny the allegations in Paragraph 94.

95.    Yet then, in the months between the February 2021 Merger announcement and the July 2021 Redemption deadline—during the same time period that EV SPAC Lordstown was outed for faking customer orders and exaggerating its own book of business—Defendants began surreptitiously scrubbing several reported "blue-chip" customer names and logos from the presentations. Without explanation or acknowledgment, purported top-tier customers, including Coca Cola, Heineken, Ikea, and Nestle were removed altogether. Yet even when Defendants presented an anonymized customer chart on April 29, 2021, the details of many of these same "customers" appeared to remain, even though their names and logos had been formally removed. For example, the details for the purported Heineken deal remain prominently displayed in the same spot on the map now referred to as a "Global Brewer":

April 29, 2021 "Customer" Chart:



**Answer**:  Defendants admit that DCRB filed a presentation with the SEC on April 29, 2021.  Defendants also admit that the slide referenced in Paragraph 95

74

appears in that presentation. Otherwise, Defendants deny the allegations in Paragraph 95.

96. Throughout the February 2021 to July 2021 time period, Defendants claimed that Legacy Hyzon was involved in advanced negotiation—if not already entered into binding contract—with a number of top-tier brand customers in order to convince shareholders that there was serious, growing demand for its fuel cell offerings. Although Defendants appear to have been spooked and removed some of the purported brand name "customer" names and logos from certain of their presentations, they never disclosed the loss of *any* of those customers. They never reduced the projections for Legacy Hyzon's 2021 deliverables or financial results, or the five-year projections for Legacy Hyzon's deliverables or financial results. Notably, these top- tier, brand-purported companies are not the only "customers" that failed to produce a single sale for Legacy Hyzon—almost every "customer" failed to materialize.

**Answer**: Defendants deny the allegations in Paragraph 96.

97. After having received these disclosures, on July 15, 2021, Company stockholders approved the Merger.

**Answer**: Defendants admit that, on July 15, 2021, DCRB stockholders approved the Merger. Otherwise, Defendants deny the allegations in Paragraph 97.

V. **The Blue Orca and Iceberg Research Reports and Resulting SEC Investigation and Senior Executive Departures**

98. The rosy characterization of Legacy Hyzon portrayed by Defendants was short-lived.

**Answer**: Defendants deny the allegations in Paragraph 98.

99. Just two months after the deal closed, on September 28, 2021, research firm Blue Orca Capital published its Report via its Twitter account characterizing Legacy Hyzon as "a zero-revenue hydrogen EV SPAC which we liken to a *Chinese Lordstown Motors*." In the Report, Blue Orca Capital exposed Legacy Hyzon as "just a repackaging of a flailing Chinese parent company which has been trying to sell the same hydrogen fuel cells without much success for 17 years" and whose "supposed major customers" are "fake." The Blue Orca Report highlighted facts that

were either omitted or misleadingly characterized in the Merger Proxy and Defendants' other public representations concerning the Merger. Among other things, Blue Orca reported that:

- An important Legacy Hyzon "customer"—indeed its second largest— was not, in fact, even a customer of the Company. Legacy Hyzon had been touting the strength of one of its purportedly largest customers, New Zealand infrastructure startup Hiringa, which had supposedly signed an agreement in February 2021 to "acquire" 1,500 trucks by 2026, including 20 by 2021. A former senior Hiringa executive, however, had revealed to Blue Orca that Hiringa was not actually a customer of Legacy Hyzon, but a mere "channel partner" assisting Legacy Hyzon in marketing vehicles to real end customers in New Zealand. Indeed, in reality Hiringa was then just a small startup operating out of a house in New Zealand with neither the capability nor the then-current intention to purchase any vehicles from Legacy Hyzon.

- Legacy Hyzon had massively inflated expected sales. Legacy Hyzon had been representing to investors that it expected to deliver the first 20 trucks to Hiringa by the end of 2021, accounting for 24% of guided deliveries that year and 25% of guided revenues, and claiming that the orders were "100% certain." A Hiringa executive, however, told Blue Orca that it would not take any deliveries of Legacy Hyzon trucks in 2021 and only expected to receive the first four validation vehicles in March or April 2022, at the earliest.

- Legacy Hyzon had fabricated its business, operations, and financial prospects. In its initial Investor Presentations, Legacy Hyzon had claimed to have customer contracts with a bevy of big blue-chip companies worth upwards of $700 million. These purported customers, however, were later unceremoniously stricken from those Investor Presentations as multiple other electric vehicle SPACs—including XL Fleet, Nikola, and Lordstown Motors—were exposed for faking customer orders, exaggerating their backlog, and exaggerating future revenues. Yet, despite these massive purported customer orders being stricken, Legacy Hyzon failed to correspondingly reduce its already exaggerated financial projections.

- Several early senior Legacy Hyzon executives had reportedly left the Company in large part over their concerns that Legacy Hyzon had been misrepresenting its customer contracts like other the other EV SPACs.

76

A "former Senior Legacy Hyzon Executive" is quoted as stating that "he and other early senior Legacy Hyzon executives, all of whom left the Company, became uncomfortable with how Legacy Hyzon was presenting customer orders to investors." He continued: "They were going out, kind of selling it as really what it wasn't at the time. *A bit like unfortunately what Nikola was doing*."

- Legacy Hyzon was just a SPAC "repackaging" of its "flailing Chinese parent Horizon," which had delisted from the Chinese OTC market at an enterprise value of only $190 million, which for 17 years had failed to gain meaningful traction with the very same fuel cell technology Legacy Hyzon was promising to make profitable, and which technology had experienced dramatic sales declines since 2019.[44] Blue Orca provided the following chart illustrating this point, which it stated was based on Legacy Hyzon's July 2021 Investor Presentation, Jiangsu Horizon's 2019 Annual Report, and an Orange Group Article:



*Horizon* Fuel Cells Sold by *Horizon (Parent) 2019-2021*

- Legacy Hyzon told investors in presentations that it would turn cash flow positive as early as 2023, generate annual EBITDA of $505 million by 2025, and do so by achieving gross profit margins on electric vehicles of 32% in 2021 and as high as 33.6% by 2025. A former executive from Legacy Hyzon, however, reportedly told Blue Orca that Legacy Hyzon's retrofitting model of production would in fact yield no more than 5% to 10% gross margins. As a result, according to Blue Orca: "If we apply industry average gross margins of 15% to Legacy Hyzon's projected revenues, the Company will not turn cash positive

---

[44] To be sure, the Blue Orca Report references the sales and financial filings of Jiangsu Horizon, an operating subsidiary of Hyzon's former parent Horizon.

in the next five years. The picture looks even more dire if we apply a more appropriate gross margin assumption of 5-10%, which the former Legacy Hyzon executive we interviewed says is more realistic."44 To be sure, the Blue Orca Report references the sales and financial filings of Jiangsu Horizon, an operating subsidiary of Hyzon's former parent Horizon.

- Despite Legacy Hyzon's technology supposedly being world class and the foundation for its hockey-stick-like future revenue growth projections, since 2020, two of Legacy Hyzon's former Chief Technology Officers, Ian Thompson and Gary Robb, had unexpectedly resigned in quick succession with little time on the job, showing little faith in Legacy Hyzon and its technological prospects despite having obvious financial incentives to remain.

**Answer**:  Defendants admit that, on September 28, 2021, Blue Orca Capital published a report regarding Hyzon.  Defendants further admit that the language quoted in Paragraph 99 and included in the bullet point list appears (without Plaintiff's emphasis) in the Blue Orca Report.  Without accepting the accuracy of material contained in the Report, Defendants respectfully refer the Court to the Report for a complete and accurate description of its contents.  Otherwise, Defendants deny the allegations contained in Paragraph 99.

100.   Regarding "customer" Hiringa's purchase of 20 trucks during 2021, the Blue Orca Report quoted a Hiringa executive disputing that Hiringa was ever a customer of Legacy Hyzon or that Hiringa had ever committed to purchase anything from Legacy Hyzon, and stating that Hiringa would not even begin to validate the first couple vehicles until mid-2022:

> To channel check Hyzon's claims, we spoke with a senior Hiringa executive. Although they remain interested in the project, **Hiringa explained to us that they are not actually a customer**, but a "**channel partner**" for Hyzon's vehicles. Hiringa does not intend to

78

pay for or take title over the trucks, but merely facilitate the sale of hydrogen trucks to third parties.

> *"We're effectively a channel partner model if you like."*

> ***"Our business model is not to buy the trucks. We do the refueling…. we're effectively an unpaid market channel"***

> *"There's no point in us being the middleman. So [the end customer] will physically pay for the trucks and they will physically take title."*

> - Hiringa Executive

This is not a matter of semantics. According to Hiringa, it has no current intention (or funds) to purchase 1,500 trucks from Hyzon, but merely to act as a conduit to encourage other New Zealand heavy truck operators to purchase trucks from Hyzon.

This makes more sense, as Hiringa does not have anywhere near the financial resources to pay for 1,500 trucks, being a company **with less than 20 employees according to LinkedIn and supposedly operating out of a house in New Zealand**. Rather than purchasing 1,500 trucks, Hiringa plans to build fuel stations with the hope of facilitating future purchases from end customers.

Hiringa also informed us that the **1,500-truck agreement claimed by Hyzon in its investor presentations is not a binding order**, and that it merely represents a right, not an obligation, to buy.

> *"That's a right to buy, not an obligation to buy."*

> *"At the end of the day it's not binding. That's not a binding purchase. It's a purchasing framework."*

> - Hiringa Executive

*    *    *

Yet Hiringa's executive said that **Hiringa will not take any deliveries of Hyzon trucks in 2021 and expects to receive the first four validation vehicles in March or April 2022, at the earliest**.

79

*Hiringa: "Realistically with the supply chains, I think they will be arriving in March or April [2022]. There's also some work to do in quarter one in the Netherlands before they ship."*

*Blue Orca: "So you don't actually expect trucks this year? You expect them in the first quarter of 2022?"*

*Hiringa: "...March through May, if you like, or April through June [2022] is when we are going to be doing validation in New Zealand... it's not [a] full commercial operation."*

*Blue Orca: "So you don't expect any trucks to be delivered from Hyzon until at least March or April next year. And those are the four validation units?"*

*Hiringa: "Yep, yep."*

- Hiringa Executive

This directly contradicts Hyzon's claims to investors. According to Hyzon's disclosures, Hiringa will account for 24% of the Company's deliveries in 2021, making it the key to whether Hyzon meets its revenue and delivery guidance for this year. But Hiringa told us point blank that no deliveries would be taken in 2021, and the first validation trucks would be delivered in March or April 2022, at the earliest.

Furthermore, Hiringa told us that the remaining 16 trucks ordered from Hyzon would be fulfilled based on testing results of the initial four validation vehicles, which they expect to carry out between March and June 2022 at the earliest.

We asked Hiringa if there was any possibility that they might bring forward the order for the 16 trucks, but Hiringa told us that they do not want to take delivery until they build the commercial hydrogen fuel station infrastructure in New Zealand—which Hiringa indicated would not be until the second half of 2022.

*"We don't have the [commercial] stations until the second half of the [2022] calendar year. So, we don't want to hold [on to] 16 trucks..."*

- Hiringa Executive

80

> Our call with Hiringa suggests that the 1,500-truck deal was more hype than reality. Based on our conversation, we do not think that Hiringa has the obligation, the intention, or the capability to purchase the trucks Hyzon claimed in its announcement.[45]

**Answer**:    Defendants admit that the language quoted in Paragraph 100 appears (without Plaintiff's emphasis) in the Blue Orca Report.    Without accepting the accuracy of material contained in the Report, Defendants respectfully refer the Court to the Report for a complete and accurate description of its contents. Otherwise, Defendants deny the allegations contained in Paragraph 100.

101.    Notably, in its October 5, 2021 response to the Blue Orca Report, Hyzon never disputed that Hiringa was not a "customer" of Legacy Hyzon or that Hiringa was not taking delivery of any of the 20 vehicles during 2021.[46] Instead, Hyzon claimed that it never said that Hiringa would be "an end user" of the vehicles and that Hyzon still saw "significant potential in the New Zealand market through its partnership with Hiringa, which already has resulted in a Vehicle Supply Agreement for 20 trucks to be delivered to TR Group Ltd., one of New Zealand's largest truck and trailer leasing and rental companies." Hyzon also claimed that it "plans to start supplying trucks to TR Group Ltd. in the first half of 2022."

**Answer**:    Defendants admit that, on October 5, 2021, Hyzon released a statement responding to the Blue Orca Report.  Defendants further admit that the quoted language in Paragraph 101 appears in Hyzon's October 5, 2021 statement. Defendants respectfully refer the Court to Hyzon's response for a complete and

---

[45] Blue Orca Report at 5-7 (emphasis added).

[46] *See* Hyzon Motors Issues Statement Strongly Rejecting Misleading and Inaccurate Short Seller Report, Oct. 5, 2021, https://investors.hyzonmotors.com/news/news-details/2021/Hyzon-Motors-issues-statement-strongly-rejecting-misleading-and-inaccurate-short-sellerreport/default.aspx (last visited July 31, 2022).

81

accurate description of its contents.  To the extent that Paragraph 101 otherwise contains Plaintiff's characterization of the response, Defendants deny the allegations in Paragraph 101.

102.  But TR Group Ltd. appears to have put out its own press release announcing that "TR Group has ordered 20 x Hyzon Hydrogen Fuel Cell Trucks" on November 5, 2021, well outside of the timeframe described in the Merger Proxy and the Investor Presentations.[47] The TR Group Ltd. press release stated that "[t]he first units will be in New Zealand in mid-2022 for performance testing with the balance arriving towards the end of the year." Even if Hyzon's belated explanation was accepted at face value, it constitutes an admission that the Hiringa-"facilitated" orders were far from binding, as they were subject to undisclosed preconditions, including validation trials and hydrogen infrastructure buildouts that would not occur, at the earliest, until the latter half of 2022.

---

[47] *See* TR Group Orders 20 Hydrogen Fuel Cell (HFC) Electric Trucks, Nov. 5, 2021, https://www.trgroup.co.nz/blog/posts/2021/november/tr-group-orders-20-hydrogen-fuel-cell-hfc-electric-trucks/ (last visited July 31, 2022). On November 4, 2021, the New Zealand Energy Efficiency & Conservation Authority ("EECA") – the government agency apparently funding the endeavor – issued its own release stating that the "EECA welcomed the *news today* that . . . TR Group *has ordered* 20 heavy hydrogen fuel cell trucks for delivery to New Zealand next year, with $4 million in co-funding from the COVID Response and Recovery Fund (CRRF) and an additional $2 million in co-funding from EECA." See also Hydrogen-Powered Heavy Freight Trucks to Hit New Zealand Roads, Nov. 4, 2021, https://www.eeca.govt.nz/about/news-and-corporate/news/hydrogen-poweredheavy-freight-trucks-to-hit-new-zealand-roads/ (last visited July 31, 2022). Notably, TR Group Ltd. had issued a July 20, 2020 press release stating that it had signed a memorandum of understanding with Hiringa to offer heavy fuel cell electric trucks in New Zealand at some point, but there was no certainty as to when or how many. TR Group Ltd. instead simply stated that it "hope[d] that this partnership be fruitful. . . ." *See* Fuel Cell Partnership with Hiringa Energy, July 20, 2020, https://www.trgroup.co.nz/blog/posts/2020/july/fuel-cell-partnership-with-hiringaenergy/ (last visited July 31, 2022).

**Answer**:  Defendants admit that, on November 5, 2021, TR Group Ltd. issued a press release. Defendants further admit that the quoted language in Paragraph 102 appears in TR Group Ltd.'s November 5, 2021 press release.   Defendants respectfully refer the Court to the press release for a complete and accurate description of its contents.  Otherwise, Defendants deny the allegations in Paragraph 102.

103.   Addressing the claim that Legacy Hyzon was "Just a Repackaging of Its Chinese Parent Company, a 17-Year-Old Business Recently Valued as a Microcap" and the 81% decline in parent Horizon's fuel cell sales since 2019, Hyzon's October 5, 2021 rebuttal again minced words, countering that the Blue Orca Report improperly conflated Horizon and one of its operating subsidiaries, Jiangsu Horizon. But Hyzon failed to address Blue Orca's statements about the actual decline in market capitalization in the shares listed on the OTC exchange in China. As clarified in the 1st Iceberg Research Report, one of Horizon's operating subsidiaries had been listed and delisted and that the same operating subsidiary was responsible for most of Horizon's fuel cell sales.

**Answer**:  Defendants admit that, on October 5, 2021, Hyzon released a statement responding to the Blue Orca Report.  Defendants respectfully refer the Court to Hyzon's response for a complete and accurate description of its contents. To the extent that Paragraph 103 otherwise contains Plaintiff's characterization of the response, Defendants deny the allegations in Paragraph 103.

104.   Responding to the post-2019 decline in fuel cell sales from the Blue Orca Report, Hyzon's October 5, 2021 rebuttal quips that "[a]lthough not relevant to Hyzon's future business," "Hyzon understands that Jiangsu Horizon shipped more than 26 megawatts of fuel cells in 2019 and more than 36 megawatts of fuel cells in 2020." Once again, Hyzon dodged the issue—Blue Orca's simple calculation, supported by citations to documentary evidence, that Horizon had sold fuel cell battery systems installed in 400 vehicles during 2019, 100 vehicles during 2020, and

38 vehicles during the first half of 2021. Hyzon's rebuttal instead references the shipment of "megawatts of fuel cells."

**Answer**:   Defendants admit that, on October 5, 2021, Hyzon released a statement responding to the Blue Orca Report.   Defendants further admit that the quoted language in Paragraph 104 appears in Hyzon's October 5, 2021 statement. Defendants respectfully refer the Court to Hyzon's response for a complete and accurate description of its contents.   To the extent that Paragraph 104 otherwise contains Plaintiff's characterization of the response, Defendants deny the allegations in Paragraph 104.

105.   Hyzon's October 5, 2021 rebuttal also addressed the Blue Orca Report's statements that Legacy Hyzon's margins in the Merger Proxy and in the February 2021 Investor Presentation were overstated. Among other things, the Blue Orca Report cited as evidence of the overstated margins industry participants, a white paper and a former Legacy Hyzon executive, which showed that Legacy Hyzon could not generate any free cash flow over the following five years, Hyzon's October 5, 2021 rebuttal once again avoided the factual issues and instead claimed that Legacy Hyzon's statements were aspirational (i.e., "Hyzon management has long articulated its view of being at the vanguard of an industry in its nascency that it believes will develop substantially beyond its current size, enabling Hyzon to capture a robust profitability profile on the back of its technology."). What Hyzon did not do is contest the specific discrepancies identified by the Blue Orca Report. Hyzon did not contest that the 32% margins provided were nearly twice the industry average and impossible for a company that is retrofitting vehicles made by other companies. Nor did the Blue Orca Report contest the statement by a "former Hyzon senior executive" that "Hyzon would likely generate gross margins of 5-10% on its vehicle sales at best." And the rebuttal ignored the fact that the much lower anticipated margins made it impossible for Legacy Hyzon to generate free cash flows over the following five years—or Hyzon simply chalked that up to more aspirational speech.

84

**Answer**:    Defendants admit that, on October 5, 2021, Hyzon released a statement responding to the Blue Orca Report.    Defendants further admit that the first quote in Paragraph 105 appears in Hyzon's October 5, 2021 statement. Defendants respectfully refer the Court to Hyzon's response for a complete and accurate description of its contents.  Defendants further admit that the second and third quotes in Paragraph 105 appear in the Blue Orca Report.    Without accepting the accuracy of material contained in the Report, Defendants respectfully refer the Court to the Report for a complete and accurate description of its contents.  To the extent that Paragraph 105 otherwise contains Plaintiff's characterization of Hyzon's response, Defendants deny the allegations in Paragraph 105.

106.    On October 6, 2021, Iceberg Research published its first report. Iceberg Research expressly stated that it had conducted its own research in reviewing the Blue Orca Report, that it agreed with each of Blue Orca's key findings, and that its own Report "contains new information on Legacy Hyzon." The 1st Iceberg Research Report revealed that Legacy Hyzon's "parent Horizon Fuel Cell Technologies Pte Ltd ('Horizon') saw its 2019 sales surge, thanks to one customer," that "this client was in financial trouble by the end of the year," and that "[t]his was never disclosed" by Legacy Hyzon. It further stated that "Hyzon's corporate governance puts its minority shareholders at risk" because "Horizon holds the largest block of Hyzon shares, and controls both management and the board of the two entities." The 1st Iceberg Research Report emphasized that Horizon was not only Hyzon's majority shareholder, then holding 63% of its shares, but that it was also "Hyzon's key source of hydrogen fuel cells under a supply agreement signed in January 2021." According to Iceberg Research, "[a]lmost all Horizon's sales come from its Chinese subsidiary Jiangsu Qingneng New Energy Technologies Co., Ltd," and "Qingneng's financials show most of the 2019 spike was due to one customer, Shanghai SunLong Bus Co., Ltd." As to that "one customer," the 1st Iceberg Research Report stated:

> ***Qingneng and Horizon never disclosed that SunLong was and is still in financial distress.*** SunLong's parent company Shenzhenlisted

85

Tunghsu Optoelectronic Technology defaulted on three bonds (RMB 4.7bn or ~$666m) towards the end of 2019, despite reporting a $2.6bn cash stack at the end of September. The filings of both Qingneng and Beijing SinoHytec (北京亿华通科技股份有限公司), a much larger fuel cell peer and also a SunLong supplier, show SunLong's struggles continued in 2020.

Qingneng's free cash flow plunged to negative RMB49.7m ($7m) for the 1H20 period. The drop was mainly due to sales, which fell 36% YoY to RMB 16m ($2.4m), and poor collections on its SunLong receivables. We estimate that Qingneng collected just RMB 1m of its end-2019 SunLong receivables (RMB 56.5m or $8m).

Yet, just 5% of the SunLong receivables were recognised as bad debts at the end of June 2020. Qingneng chose to sweep this problem under the carpet. By contrast, SinoHytec recognised SunLong's problems and impaired 28% of its SunLong receivables in the 1H20 period, up from 16% at the end of 2019.

**Answer**: Defendants admit that, on October 6, 2021, Iceberg Research published a report regarding Hyzon. Defendants further admit that the language quoted and block quoted in Paragraph 106 appears (without Plaintiff's emphasis) in the 1st Iceberg Report. Without accepting the accuracy of material contained in the Report, Defendants respectfully refer the Court to the Report for a complete and accurate description of its contents. Otherwise, Defendants deny the allegations contained in Paragraph 106.

107. The 1st Iceberg Research Report further warned that "[t]he same Horizon that did not disclose its customer default now has extensive control of Hyzon through its 63%-shareholding" and that "[t]his may create the risk that Horizon gets access to the ~$500m cash pile Hyzon raised through the July 2021 SPAC merger, by charging Hyzon exorbitant prices to support its fuel cell business, to the detriment of minority shareholders," a process it referred to as "'拆东补西' or 'pulling down the east wall to repair the west wall.'"

**Answer**: Defendants admit that the quoted language in Paragraph 107 appears in the 1st Iceberg Report. Without accepting the accuracy of material contained in the Report, Defendants respectfully refer the Court to the Report for a complete and accurate description of its contents. Otherwise, Defendants deny the allegations contained in Paragraph 107.

108. The 1st Iceberg Research Report also lamented that in the Merger Proxy, "Hyzon boasts of its superior fuel cell technology" but that "[w]e believe these claims are exaggerated." According to the 1st Iceberg Research Report, "Hyzon boasts of its technical superiority, in particular, its G3 Titan fuel cells lead the world on volumetric power density ('VPD' of 5.48-6.08) and gravimetric power density (GPD of 5.03-5.54)," citing a slide from the same February 2021 Investor Presentation. According to Iceberg Research, the "[d]ata assessed by third-party TUV Rheinland" cited in that investor presentation "was from 'short stack testing' and merely points to the '…potential of using full power fuel cells up to 500hp (370kW) for heavy mobility applications . . . .'" Instead, according to Iceberg Research, "Hyzon's existing product — the 150 kW G2 fuel cell — underperforms most peers. Its GPD of just 2.31 kW/kg is much lower than Ballard's 140 kW Fcgen – HSP at 4.7 kW/kg."

**Answer**: Defendants admit that the quoted language in Paragraph 108 appears in the 1st Iceberg Report. Without accepting the accuracy of material contained in the Report, Defendants respectfully refer the Court to the Report for a complete and accurate description of its contents. Otherwise, Defendants deny the allegations contained in Paragraph 108.

109. The 1st Iceberg Research Report further stated that "we think customers will be reluctant to buy trucks whose warranties are covered by Hyzon, not by original equipment manufacturers ('OEMs')." The Report goes on to detail in relevant part as follows:

87

*Reliable warranties are crucial to industrial clients that intensively use their vehicles.* Hyzon does not build trucks. It converts OEM's internal combustion engine vehicles (e.g., DAF) to hydrogenfueled trucks through its 50.5%-owned joint venture — Hyzon Motors Europe BV — with Netherlands-based Holthausen Clean Technology Investments BV.

*We were informed by a Holthausen representative that Hyzon, not the OEM, will cover the warranty.* Hyzon's clients will then have to trust that Holthausen and Hyzon are able to service the warranty. Holthausen is run by a father and son team, Carl and Max Holthausen. According to a March 2021 report by Dutch newspaper Het Financieele Dagblad, the Holthausens first experimented with hydrogen as a fuel about 10 years ago, first as a generator, followed by a boat, a remotecontrolled car, a drone, then finally a "Hesla", a hydrogen-powered Tesla Model S.

*We expect many industrial customers will be reluctant to buy Hyzon's vehicles when established OEMs such as Toyota, Hino, and General Motors are lining up to launch their own hydrogen trucks.* The likes of Daimler Trucks began testing its Mercedes-Benz GenH2 prototype truck in May this year while South Korea's Hyundai plans to roll out 1,600 fuel cell trucks by 2025.

**Answer**:   Defendants admit that the quoted language in Paragraph 109 appears (without Plaintiff's emphasis) in the 1st Iceberg Report.  Without accepting the accuracy of material contained in the Report, Defendants respectfully refer the Court to the Report for a complete and accurate description of its contents. Otherwise, Defendants deny the allegations contained in Paragraph 109.

110.   On November 16, 2021, another shoe fell. Iceberg Research published the 2nd Iceberg Research Report. Notably, Legacy Hyzon stated at the time of Merger that it was on track to deliver 85 vehicles during 2021, garnering it some $37 million in revenues.[48] However, as the 2nd Iceberg Research Report noted, "Hyzon ended the third quarter [ended September 30, 2021] with the sale of only two trucks

---

[48] *See* February 2021 Investor Presentation at 39 and Merger Proxy at 105.

88

recorded at the start of August," and "[n]o other vehicle seems to have been delivered since then and we are 45 days from the end of the year." In short, it was virtually impossible for Hyzon to deliver on one of the "Contracted Orders" Legacy Hyzon had claimed in the February 2021 Investor Presentation to be "100% Certain."

**Answer**: Defendants admit that, on November 16, 2021, Iceberg Research published a second report regarding Hyzon. Defendants further admit that the language quoted in Paragraph 110 appears in the 2nd Iceberg Report. Without accepting the accuracy of material contained in the Report, Defendants respectfully refer the Court to the Report for a complete and accurate description of its contents. Otherwise, Defendants deny the allegations contained in Paragraph 110.

111. On January 12, 2022, Decarb disclosed that the SEC had opened a formal investigation into the Company's disclosures related to the issues raised in the Blue Orca Report. The SEC served a subpoena on Decarb seeking various documents and information. Upon information and belief, that investigation remains ongoing.

**Answer**: Defendants admit that, on January 12, 2022, Hyzon (not DCRB) disclosed that it had received a subpoena from the SEC for the production of documents and information, including materials related to the allegations made in the report issued by Blue Orca Capital. Defendants respectfully refer the Court to Hyzon's January 12, 2022 disclosure for a complete and accurate description of its contents and to the updates regarding the subpoena provided by Hyzon in its Form 10-Q, Form 10-K, and other reports periodically filed by Hyzon with the SEC, including any future updates that Hyzon may provide. Otherwise, Defendants deny the allegations in Paragraph 111.

89

112.  In the wake of the Blue Orca Report, the Iceberg Research Reports and the SEC investigation, the market price of Decarb stock has declined precipitously, trading below $3 per share by July 5, 2022, or **70% below** the IPO price of $10 per share and **70% below** the record date price of $10 per share.

**Answer**:  Paragraph 112 purports to summarize the trading price of Hyzon stock.  That information is publicly available and speaks for itself.  Otherwise, Defendants deny the allegations in Paragraph 112.

113.  Further bolstering the charges made in the Blue Orca and Iceberg Research Reports, in January 2022 Decarb disclosed that it anticipated its 2021 financial results would reflect a much lower average selling price ("ASP") per vehicle due to product mix and lower multi-year revenue recognition for the majority of sales, which the Company said would result in materially lower-than-previouslyforecast revenues and margins. Indeed, after the Merger closed, during Hyzon's third quarter 2021 earnings conference call on November 12, 2021, it disclosed that it had suddenly shifted its deployment focus to Asia, where ASPs are approximately half that of other regions. Stock research analysts at D.A. Davidson & Company would report that during a "management meeting" they hosted with Hyzon in January 2022, Hyzon disclosed that contrary to the Merger Proxy's claims that its own New York and Illinois fuel cell production facilities would be fully operational by the end of 2021, neither facility was yet operational, leaving Hyzon indefinitely reliant upon its former parent, now controlling shareholder and sole supplier of its key fuel-cell components, Horizon, and emphasizing that Hyzon's margins would remain low as a result.[49] In short, this demonstrates that the Merger Proxy misrepresented Hyzon's ability to operate independently from its former parent and the adverse impact that would have on its financial results.

---

[49] *Compare* Merger Proxy at 163 ("Hyzon expects that its first fuel cells will be manufactured at the facility in Rochester, New York, by the end of 2021 and that production . . . in Illinois will also begin by the end of 2021.") and D.A. Davidson & Company, *4Q:21 Preview: Steady Global Expansion Continues*, Mar. 17, 2022 ("**The build-outs in Chicago and Rochester.** We hosted management meetings in January with investors, where HYZN provided some additional color on its US facility build-outs. The bottom line is that delays continue, but HYZN is lucky that it is able to obtain key fuel-cell components from former parent company Horizon. In the near-term, however, margins may be challenged.").

**Answer**:  Paragraph 113 purports to reference Hyzon's January 12, 2022 Form 8-K.  Defendants respectfully refer the Court to the Form 8-K filing for a complete and accurate description of its contents.  To the extent that Paragraph 113 otherwise contains Plaintiff's characterization of the Form 8-K's contents, Defendants deny that the allegations fully and accurately represent the contents of the 8-K.  Plaintiff also purports to reference a report from "stock research analysts at D.A. Davidson and Company."  Defendants admit that D.A. Davidson & Company published a report regarding Hyzon and that the quoted language appears in the report.  With regard to the footnote that accompanies Paragraph 113, Defendants admit that the quoted language in the first parenthetical appears in the Proxy.  Defendants respectfully refer the Court to the Proxy for a complete and accurate description of its contents.  With regard to the second parenthetical in footnote 49, Defendants admit that the quoted language appears in the D.A. Davidson & Company report.  Otherwise, Defendants deny the allegations in footnote 49 and Paragraph 113.

114.  On February 15, 2022, stock research analysts with Morgan Stanley, which served as the co-placment agent with Goldman Sachs for PIPE financing in connection with the Merger, issued an initiation report on Hyzon stock. Morgan Stanley confirmed that the lofty margin projections Defendants provided in the Merger Proxy were materially false and misleading in that Legacy Hyzon, which was not an OEM, could never achieve them, stating in pertinent part: "Our FY25

EBITDA margin estimate of 0.2% is *~**1500bps below*** management's FY25 EBITDA margin target (***which is in line with best in class mature OEMs & suppliers***)."[50]

**Answer**:  Defendants admit that Morgan Stanley published a report regarding Hyzon on February 15, 2022.  Defendants further admit that the quoted language (without Plaintiff's added emphasis) appears in the Morgan Stanley report. Otherwise, Defendants deny the allegations in Paragraph 114.

115.   Morgan Stanley also warned that the Hyzon fuel cell "durability/power density claims" in the Merger Proxy "***remain unproven***," stating in pertinent part that:

> While HYZN's power density claims would undoubtedly place the company well ahead of BEV and FCEV peers, the company's limited operating history and relatively limited level of accumulated real-world miles ***prevent a more fulsome confirmation of the company's technology claims***. With the company also continuing to source fuel cell systems from Horizon in the near-term, reliability and quality will remain two key variables as the company ramps its domestic manufacturing capabilities in the United States.
>
> ***Fuel cells for HYZN trucks that are currently in production are being sourced from Horizon and are the G2 model.*** Though Horizon has sold over 500 systems and 27MW of fuel cell capacity in 2019 including 10 units of its 150kW (2nd gen/G2) stacks, the majority of these systems (350) were used in light-duty truck applications that were deployed in 2019. Roughly 15% have also been used in some heavy truck (70) and city bus applications (5).[51]

**Answer**:  Defendants admit that the quoted and block-quoted language in Paragraph 115 appears (without Plaintiff's added emphasis) in the February 15, 2022

---

[50] *See* Morgan Stanley & Co. LLC, *Fueling the Future of Hydrogen; Initiate at EW, $7PT*, Feb. 15, 2022 at 2.

[51] *Id.* at 46-47.

Morgan Stanley report.  Otherwise, Defendants deny the allegations in Paragraph 115.

116.   On March 30, 2022, Hyzon filed its 2021 Annual Financial Report with the SEC on Form 10-K disclosing that while it had reported having sold 87 trucks during 2021, all but five of those vehicles had been sold in China. It further disclosed that on November 23, 2021, the Company had entered into a stock warrant agreement with one of its large Chinese customers to purchase up to two million shares of Hyzon stock, at an exercise price of $7.75 per share (the per share closing price of Hyzon's stock that day), revealing that Hyzon had awarded that purported customer stock options potentially worth millions of dollars in exchange for purchasing its vehicles. It also disclosed that in December 2021, Hyzon sold 20 vehicles to another joint venture partner in China. In sum, while Hyzon reported delivery of 87 vehicles during 2021 for a contract value of just $19.6 million—less than half of its projected $37 million target for 85 vehicles being sold during 2021—Hyzon's independent outside auditors would not permit it to recognize the full contract values on delivery of those vehicles due to collection concerns raised by its auditor. Accordingly, Hyzon reported only $6 million in sales for 2021.

**Answer**:  Defendants admit that, on March 30, 2022, Hyzon filed its 2021 Annual Financial Report with the SEC on Form 10-K.  Defendants respectfully refer the Court to the Form 10-K filing for a complete and accurate description of its contents and of Hyzon's performance in 2021.  Otherwise, Defendants deny the allegations in Paragraph 116.

117.   The 2021 10-K further disclosed that in response to the revelations about Hyzon's true business metrics and financial prospects, "certain of the Company's potential suppliers and partners indicated that they were suspending negotiations with [Hyzon] concerning supplying [Hyzon] with key components necessary to produce [its] vehicles." Hyzon explained that the "negative publicity" had "adversely affected [its] brand and reputation," which "makes it more difficult for [it] to attract and retain employees, partners and customers, reduces confidence in [its] products and services." As a result of those difficulties, it further explained, "customers, potential customers, partners and potential partners have failed to award

[it] additional business or cancelled or sought to cancel existing contracts or otherwise, directed or may direct future business to [its] competitors. . . ."

**Answer**:  Defendants admit that the quoted language in Paragraph 117 appeared in Hyzon's 2021 Form 10-K.  Defendants respectfully refer the Court to the Form 10-K filing for a complete and accurate description of its contents and of Hyzon's performance in 2021.  Otherwise, Defendants deny the allegations in Paragraph 117.

118.  On April 12, 2022, less than two months after the SEC investigation was announced, the *Wall Street Journal* published a report that Hyzon CFO Mark Gordon was resigning following the announcement of the SEC investigation into the Blue Orca Report's claims that "some orders for Hyzon vehicles weren't real." The *Wall Street Journal* report noted that rather than the $37 million in fiscal 2021 revenues that Hyzon had stated it was on track to report in Merger Proxy—in connection with its effort to encourage shareholders to vote in favor of the Merger and to dissuade them from exercising their Redemption Rights—Hyzon had only reported $6 million in revenues for fiscal 2021.[52] The *Wall Street Journal* report further noted that the Company only "expects to deliver 300 to 400 vehicles this year" (2022), which is upwards of 50% less than the 658 vehicles the Company had said in the Merger Proxy it was on track to deliver during 2022.

**Answer**:  Defendants admit that a Wall Street Journal article was published on August 26, 2021 and that the quoted language contained in Paragraph 118 appeared in that article. Without accepting the accuracy of material contained in that article, Defendants respectfully refer the Court to the article for a complete statement

---

[52] *See* Mark Maurer, Hyzon Motors Recruits New CFO Months After SEC Subpoena, Wall St. J., April 12, 2022.

of the article's contents.  Otherwise, Defendants deny the allegations contained in

Paragraph 118.

## VI.    The Merger Was Unfair to Unaffiliated Holders of Class A Stock

### A.    The Merger Process Suffered from a Myriad of Conflicts of Interest

119.    For at least three reasons, Decarb's fiduciaries were hopelessly conflicted when sourcing, negotiating, and executing the Merger.

**Answer**:  Defendants deny the allegations in Paragraph 119.

120.    First, due to their economic interests in Class B Founder Shares, the Director Defendants were incentivized to get a deal done—any deal at all—even if it was not in the best interests of the public Class A stockholders. As described above at ¶54, the Sponsor initially contributed $25,000 to the Company in exchange for the Founder Shares—i.e., approximately $0.002 per share. Thus, even if the post-Merger company's stock price fell well below Decarb's $10 per share IPO price (which it has), holders of Class B shares were still poised to realize proceeds in the hundreds of millions of dollars.

**Answer**:  Defendants admit that the Sponsor initially contributed $25,000 to

DCRB in exchange for founder shares in DCRB.  Otherwise, Defendants deny the

allegations in Paragraph 120.

121.    Second, the Director Defendants were beholden to Riverstone—and its owners and operators, Defendants Lapeyre, Leuschen, and Tichio—who controlled Decarb. Riverstone controlled all of the Founder Shares through the Sponsor, placed each of the Director Defendants on the Board, and had the power to remove any of them at any time. The Director Defendants each had had deep ties to Riverstone, both professional and financial. Indeed, Riverstone repeatedly placed these same Director Defendants on boards of other SPACs founded under Silver Run and the "Decarbonization Plus" banner, providing them opportunities to realize significant profits from ownership of additional Founder Shares in other SPACs. Riverstone appointed Defendant Anderson CEO and allowed his WRG entity to participate heavily in the Founder Shares. Given all of these ties, the Director Defendants could not act independently from Riverstone and entirely lacked the incentive or practical

95

ability to "say no" to any deal proposed by Defendants Lapeyre, Leuschen, and Tichio.

**Answer**: Defendants deny the allegations in Paragraph 121.

122. Third, in order to force the deal through no matter the consequences for Decarb stockholders, the Director Defendants failed to obtain an unbiased thirdparty valuation of Hyzon or a fairness opinion and instead hired a completely conflicted investment banker, Goldman Sachs, that was simultaneously marketing Hyzon's *bona fides* to Decarb and serving as an investment banker and placement agent to Decarb. Goldman Sachs then also owned a 12% interest in Riverstone. Given the extensive personal and professional ties between Goldman Sachs, Riverstone and several of the Director Defendants, as detailed herein, Goldman Sachs was conflicted. Likewise, due to their still contingent interest in 60% of the investment banking fees Citi and Credit Suisse had been promised in connection with the Decarb IPO, Citi and Credit Suisse were conflicted and served as a mere rubber stamp for any deal now desired by Riverstone. And that the Board brought in Citi and Credit Suisse at the eleventh hour as additional purported independent financial advisors—when the due diligence was largely complete and the deal terms had been largely negotiated—provided cold comfort. Moreover, Citi and Credit Suisse had both recently earned $11 million in fees for underwriting Decarb's IPO and could then reasonably anticipate receiving millions of dollars more in investment banking fees from Riverstone in the future.

**Answer**: Defendants deny the allegations in Paragraph 122.

123. In short, no disinterested party was effectively watching out for the unaffiliated holders of Decarb's Class A common stock.

**Answer**: Defendants deny the allegations in Paragraph 123.

## B.    Decarb Class A Stockholders Did Not Have a Fully Informed Opportunity to Elect Whether to Redeem Their Stock

124. The Merger was not fair to holders of Class A stock. After the market learned the facts presented in the Blue Orca and Iceberg Research Reports, the price of Decarb Class A stock plummeted and remains well below the $10 per share IPO and record date price. By July 2022, the price of Decarb Class A stock had fallen below $3 per share, more than ***70% below*** the redemption price.

96

**Answer**:  Paragraph 124 purports to summarize the trading price of Hyzon stock.  That information is publicly available and speaks for itself.  Otherwise, Defendants deny the allegations in Paragraph 124.

125.    Crucially, the Merger Proxy and other public disclosures by Decarb insiders contained material omissions or were materially misleading, such that Class A stockholders were not provided with all material information necessary to decide whether to redeem their shares ahead of the Merger. In particular, the disclosures were grossly deficient for at least the following reasons:

**Answer**:  Defendants deny the allegations in Paragraph 125.

126.    First, although Defendants had been touting the strength of one of Legacy Hyzon's purportedly largest customers at the time of Merger, Hiringa, who had supposedly signed a binding agreement to "acquire" 1,500 trucks by 2026, including 20 trucks by 2021, Hiringa was not in fact a customer of Legacy Hyzon but a would-be distributor. Hiringa had neither the capability nor the then-current intent to purchase trucks from Legacy Hyzon. These facts rendered Legacy Hyzon's projections materially false and misleading.

**Answer**:  Defendants deny the allegations in Paragraph 126.

127.    Second, because the 20 trucks Legacy Hyzon claimed would be sold to Hiringa by the end of 2021, accounting for 24% of guided deliveries that year, were not in fact slated to be delivered in 2021, Legacy Hyzon's 2021 projections provided in the Merger Proxy were materially false and misleading.

**Answer**:  Defendants deny the allegations in Paragraph 127.

128.    Third, in the lead up to completing the Merger, Legacy Hyzon removed a bevy of big blue chip companies accounting for an estimated $700 million in sales without correspondingly lowering its financial guidance. As a result, the lofty financial projections the Company was providing were materially false and misleading and lacked a reasonable factual basis. The removal of these brand-named customer orders previously identified as "100% certain" or "highly probable" demonstrates those orders were illusory, and that the delivery and revenue targets Defendants claimed they were on track to meet were based on illusory customers.

**Answer**:  Defendants deny the allegations in Paragraph 128.

129.    Fourth, the Board should have discovered in its "*extensive due diligence*" and disclosed that several early senior Legacy Hyzon executives left the Company in large part over their concerns with how Legacy Hyzon had been misrepresenting its customer contracts. The failure to disclose these facts to investors rendered statements regarding the Board's purported due diligence activities materially false and misleading.

**Answer**:  Defendants deny the allegations in Paragraph 129.

130.    Fifth, that the business of Legacy Hyzon, while still part of Horizon, had been experiencing a dramatic sales decline since 2019 was a material known trend that the Company should have disclosed to investors. That trend is irreconcilable with Defendants' representations that the fuel cell technology Legacy Hyzon had planned to market was as valuable as represented.

**Answer**:  Defendants deny the allegations in Paragraph 130.

131.    Sixth, Defendants claimed Legacy Hyzon could obtain profit margins of more than 33% by 2025—when its business model would in fact afford profit margins of 5% to 10% at best. Defendants also claimed that Legacy Hyzon would turn cash flow positive as early as 2023 or generate annual EBITDA of $505 million by 2025—again, when its business models did not support such projections. As a result, Legacy Hyzon's financial projections provided in the Merger Proxy were materially false and misleading. A fairness opinion, an unbiased third-party valuation, and/or unconflicted financial advisors could have confirmed these adverse facts.

**Answer**:  Defendants deny the allegations in Paragraph 131.

132.    Seventh, meaningful due diligence would have at least called into question why two of Legacy Hyzon's Chief Technology Officers—who would have been the key officers in charge of its technology—had resigned since just 2020 in quick succession. These departures, which occurred despite the obvious financial incentives to stay, indicated that the executives had little faith in Legacy Hyzon and its technological prospects, and should have been disclosed to investors

**Answer**:  Defendants deny the allegations in Paragraph 132.

133.    Eighth, Defendants boasted of Legacy Hyzon's technical superiority in its fuel cells but those claims were exaggerated. In reality, the data cited by Defendants was from short stack testing and merely points to the potential of using

98

full power fuel cells. Instead, Legacy Hyzon's existing product underperforms most peers.

**Answer**: Defendants deny the allegations in Paragraph 133.

134.    Ninth, because Legacy Hyzon—not the OEMs producing the retrofitted vehicles Legacy Hyzon was selling—was responsible for the warranties, many would-be purchasers of Legacy Hyzon's fuel cell vehicles were unlikely to make purchases from Legacy Hyzon.

**Answer**: Defendants deny the allegations in Paragraph 134.

135.    As a result of these material omissions and/or misleading statements, Class A stockholders were not provided with all material information to decide whether to redeem their stock. And those who did not redeem their stock have suffered substantial damages as a result.

**Answer**: Defendants deny the allegations in Paragraph 135.

## CLASS ACTION ALLEGATIONS

136.    Plaintiff, a stockholder in the Company, brings this action individually and as a class action pursuant to Court of Chancery Rule 23 on behalf of himself and all holders of Decarb common stock (the "Class") who held such stock prior to the July 13, 2021 redemption deadline and were entitled to elect to redeem their shares but did not (except the Defendants herein, and any person, firm, trust, corporation, or other entity related to or affiliated with any of the Defendants) and who were injured by Defendants' breaches of fiduciary duties and other violations of law.

**Answer**: Paragraph 136 contains Plaintiff's conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 136.

137.    This action is properly maintainable as a class action.

**Answer**: Paragraph 137 contains Plaintiff's conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 137.

138.  A class action is superior to other available methods of fair and efficient adjudication of this controversy.

**Answer**: Paragraph 138 contains Plaintiff's conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 138.

139.  The Class is so numerous that joinder of all members is impracticable. The number of Class members is believed to be in the thousands, and they are likely scattered across the United States. Moreover, damages suffered by individual Class members may be small, making it overly expensive and burdensome for individual Class members to pursue redress on their own.

**Answer**: Paragraph 139 contains Plaintiff's conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 139.

140.  There are questions of law and fact that are common to all Class members and that predominate over any questions affecting only individuals, including, without limitation:

    (a)    whether Defendants breached their fiduciary duties to Plaintiff and the Class;

    (b)    whether the Controller Defendants controlled Decarb;

    (c)    whether "entire fairness" is the applicable standard of review;

    (d)    which party or parties bear(s) the burden of proof;

100

(e)    the existence and extent of any injury to the Class or Plaintiff caused by any breach;

(f)    the availability and propriety of equitable re-opening of the redemption period; and

(g)    the proper measure of the Class's damages.

**Answer**:  Paragraph 140 contains Plaintiff's conclusions of law to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 140.

141.    Plaintiff's claims and defenses are typical of the claims and defenses of other Class members, and Plaintiff has no interests antagonistic or adverse to the interests of other Class members. Plaintiff will fairly and adequately protect the interests of the Class.

**Answer**:  Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 141.  Further, Paragraph 141 contains Plaintiff's conclusions of law to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 141.

142.    Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.

**Answer**:  Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 142.  Further, Paragraph 142 contains Plaintiff's conclusions of law to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 142.

143.   Defendants have acted in a manner that affects Plaintiff and all members of the Class alike, thereby making appropriate injunctive relief and/or corresponding declaratory relief with respect to the Class as a whole.

**Answer**: Paragraph 143 contains Plaintiff's conclusions of law to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 143.

144.   The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants; or adjudications with respect to individual members of the Class would, as a practical matter, be dispositive of the interest of other members or substantially impair or impede their ability to protect their interests.

**Answer**: Paragraph 144 contains Plaintiff's conclusions of law to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 144.

## FIRST CAUSE OF ACTION

### DIRECT CLAIM FOR BREACH OF FIDUCIARY DUTY
### AGAINST THE DIRECTOR DEFENDANTS

145.   Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

**Answer**: Defendants repeat and reallege their preceding responses as if set forth fully herein.

146.   As directors of Decarb, the Director Defendants owed Plaintiff and the Class the utmost fiduciary duties of care and loyalty, which subsume an obligation to act in good faith, with candor, and to make accurate and complete material disclosures to Decarb stockholders.

**Answer**: Paragraph 146 contains Plaintiff's conclusions of law to which no response is required.

147.   These duties required the Director Defendants to place the interests of Decarb stockholders above their personal interests and the interests of the Controller Defendants.

**Answer**: Paragraph 147 contains Plaintiff's conclusions of law to which no response is required.

148.   Through the events and actions described herein, the Director Defendants breached their fiduciary duties to Plaintiff and the Class by prioritizing their own personal, financial, and/or reputational interests and approving the Merger, which was unfair to Decarb Class A stockholders.

**Answer**: Paragraph 148 contains Plaintiff's conclusions of fact and law to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 148.

149.   The Director Defendants also breached their duty of candor by issuing the false and misleading Merger Proxy.

**Answer**: Paragraph 149 contains Plaintiff's conclusions of fact and law to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 149.

150.   As a result, Plaintiff and the Class were harmed when, deceived by the false and misleading disclosures and the Director Defendants' approval of the Merger, they did not exercise their Redemption Rights prior to the Merger.

**Answer**: Paragraph 150 contains Plaintiff's conclusions of fact and law to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 150.

151.  In addition, members of the Class approved the acquisition of Hyzon based on false and misleading information.

**Answer**:  Paragraph 151 contains Plaintiff's conclusions of fact and law to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 151.

152.  Plaintiff and the Class suffered damages in an amount to be determined at trial.

**Answer**:  Paragraph 152 contains Plaintiff's conclusions of fact and law to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 152.

## SECOND CAUSE OF ACTION

### DIRECT CLAIM FOR BREACH OF FIDUCIARY DUTY
### AGAINST THE CONTROLLER DEFENDANTS

153.  Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

**Answer**:  Defendants repeat and reallege their preceding responses as if set forth fully herein.

154.  The Controller Defendants were Decarb's controlling stockholders. Specifically, the Controller Defendants controlled all of the Class B Founder Shares, elected (and could remove at any time) the other members of the Board, had deep personal and financial ties to the members of the Board they selected (including by granting them material financial interests in the Class B Founder Shares and by appointing them to other boards of directors of SPACs created under the Silver Run or Decarbonization banners), and held officer roles at Decarb.

**Answer**: Paragraph 154 contains Plaintiff's conclusions of fact and law to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 154.

155. The Controller Defendants owed Plaintiff and the Class fiduciary duties of care and loyalty, which include an obligation to act in good faith, with candor, and to provide complete and accurate material disclosures to Decarb stockholders.

**Answer**: Paragraph 155 contains Plaintiff's conclusions of law to which no response is required.

156. At all relevant times, the Controller Defendants had the power to control, influence, and cause—and actually did control, influence, and cause—the Company to enter into the Merger.

**Answer**: Paragraph 156 contains Plaintiff's conclusions of fact and law to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 156.

157. The Merger was unfair, reflecting an unfair price and unfair process.

**Answer**: Paragraph 157 contains Plaintiff's conclusions of fact and law to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 157.

158. Through the events and actions described herein, the Controller Defendants breached their fiduciary duties to Plaintiff and the Class by agreeing to and entering into the Merger without ensuring that it was entirely fair to Plaintiff and the Class.

**Answer**: Paragraph 158 contains Plaintiff's conclusions of fact and law to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 158.

159.   As a result, Plaintiff and the Class were harmed when, deceived by the false and misleading disclosures and the Board's approval of the Merger, they did not exercise their Redemption Rights prior to the Merger.

**Answer**: Paragraph 159 contains Plaintiff's conclusions of fact and law to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 159.

160.   In addition, members of the Class approved the acquisition of Hyzon based on false and misleading information.

**Answer**: Paragraph 160 contains Plaintiff's conclusions of fact and law to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 160.

161.   Plaintiff and the Class suffered damages in an amount to be determined at trial.

**Answer**: Paragraph 161 contains Plaintiff's conclusions of fact and law to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 161.

## DEFENDANTS' AFFIRMATIVE DEFENSES

Without assuming the burden of proof or persuasion where such burden properly rests with Plaintiff and the members of the putative class, and without waiving and hereby expressly reserving their right to assert any defenses at such time

and to such extent as discovery and factual developments establish a basis therefore, Defendants assert the defenses and affirmative defenses below with respect to the causes of action alleged in the Complaint.  Defendants expressly reserve the right: (a) to amend or supplement this Answer, their defenses and affirmative defenses, and all other pleadings; and (b) to (i) assert any and all additional defenses and affirmative defenses under any applicable law if discovery shows that such defenses would be appropriate, and (ii) assert any cross-claims, counterclaims, and third-party claims when and if they become appropriate in this case.

## FIRST AFFIRMATIVE DEFENSE

The Complaint fails to state a claim upon which relief can be granted against any Defendant, in whole or in part.

## SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by Section 8.1 of DCRB's Amended and Restated Certificate of Incorporation and by Delaware law, including 8 *Del. C.* § 102(b)(7).

## THIRD AFFIRMATIVE DEFENSE

Plaintiff's claims fail, in whole or in part, due to the application of the business judgment rule.

## FOURTH AFFIRMATIVE DEFENSE

107

The Merger was entirely fair, as to both process and price, to the DCRB stockholders and to the Company.

## FIFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are, in whole or in part, derivative and therefore barred for failure to abide by the requirements of Delaware Court of Chancery Rule 23.1.

## SIXTH AFFIRMATIVE DEFENSE

Defendants' conduct did not cause any damages to Plaintiff or the putative class.

## SEVENTH AFFIRMATIVE DEFENSE

Plaintiff cannot satisfy the requirements for certification of the putative class under Delaware Court of Chancery Rule 23, including because, among other things, individual issues of reliance will predominate.

## EIGHTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because the Merger was overwhelmingly approved by an uncoerced and fully-informed vote of DCRB's stockholders.

## NINTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred or precluded, in whole or in part, by 8 Del. C. § 141(e) because the Defendants relied in good faith upon the records of DCRB and upon information, opinions, reports or statements presented by DCRB's officers or

employees and by advisors that the Defendants reasonably believed were within such advisors' professional or expert competence and who had been selected with reasonable care by or on behalf of DCRB.

## TENTH AFFIRMATIVE DEFENSE

Plaintiff's claims, in whole or in part, fail under the doctrine of estoppel, including because Plaintiff and other members of the putative class voted in favor of the Merger and elected not to redeem their shares.

## ELEVENTH AFFIRMATIVE DEFENSE

The Complaint fails to identify any material undisclosed information or any misstatement of material fact made or authorized by the Defendants in connection with the Merger.

## PRAYER FOR RELIEF

WHEREFORE, Defendants respectfully request that the Court enter judgment in favor of Defendants and against Plaintiff, that Plaintiff be denied any and all relief, and that the Court grant Defendants such other and further relief as may be just and appropriate.

OF COUNSEL:
Michael C. Holmes
Jeffrey Crough
Will Stripling
VINSON & ELKINS LLP
2001 Ross Avenue
Suite 3900
Dallas, Texas 75201
(214) 220-7700

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

*/s/ James M. Yoch, Jr.*
Rolin P. Bissell (#4478)
James M. Yoch, Jr. (#5251)
Kevin P. Rickert (#6513)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
(302) 571-6600

*Counsel for Defendants Erik Anderson, Jennifer Aaker, Jane Kearns, Pierre Lapeyre, Jr., David Leuschen, Robert Tichio, Jim McDermott, Jeffrey Tepper, Michael Warren, Riverstone Investment Group, LLC, WRG DCRB Investors, LLC, and Decarbonization Plus Acquisition Sponsor, LLC*

Dated: September 8, 2023

110

# CERTIFICATE OF SERVICE

I, Kevin P. Rickert, Esquire, hereby certify that on September 8, 2023,

a copy of the foregoing document was served on the following counsel in the

manner indicated below:

## BY FILE & SERVEXPRESS

Peter B. Andrews, Esq.
Craig J. Springer, Esq.
David M. Sborz, Esq.
Andrew J. Peach, Esq.
Jackson E. Warren, Esq.
ANDREWS & SPRINGER LLC
4001 Kennett Pike, Suite 250
Wilmington, DE 19807

/s/ Kevin P. Rickert
Kevin P. Rickert (No. 6513)