UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE:    HYZON MOTORS INC.<br>SECURITIES LITIGATION | DECISION AND ORDER<br>21-CV-6612-MAV |

## INTRODUCTION

Defendant Hyzon Inc. f/k/a Decarbonization Plus Acquisition Corporation ("Hyzon" or the "Company") is the product of a merger between two companies – Hyzon Motors Inc. ("Legacy Hyzon"), and Decarbonization Plus Acquisition Corporation ("DCRB") – that was announced in February 2021 and consummated in July 2021. Despite an optimistic outlook prior to the merger, Hyzon failed to generate the sales or revenue it had forecast for its hydrogen fuel cell technology in the commercial vehicle markets. Consequently, by August 2022 the company's share price had fallen dramatically. According to the parties, Hyzon is presently in the midst of "assignment for the benefit of creditor" proceedings that, if successful, would involve liquidation of the company's assets for distribution to its creditors.

Lead Plaintiff Alfred Miller, who alleges he lost more than $3 million due to the decline in the company's share price, now brings the present putative class action pursuant to the Securities Exchange Act of 1934 ("Exchange Act") on behalf of himself and (a) all persons or entities who purchased securities of Hyzon during the period from February 9, 2021 to August 17, 2022, inclusive ("Class Period"), as well as (b) all former shareholders of DCRB who held DCRB securities as of June 1, 2021, were entitled to vote with respect to the merger with Legacy Hyzon, and were damaged

thereby. Plaintiff claims that Defendants violated Sections 10(b), 14(a), and 20(a) of the Exchange Act and their implementing regulations by making materially false and misleading statements in the press, on investor calls, and in proxy solicitation materials to shareholders, and carrying out a common plan, scheme, or unlawful course of conduct to deceive the investing public. ECF No. 1 at ¶¶ 518–61.

The matter is presently before the Court on motions to dismiss filed by the "Hyzon Defendants" and the "DCRB Defendants," respectively. ECF Nos. 93, 97. For the reasons that follow, Defendants' respective motions to dismiss are each granted in part, and denied in part. The Court finds that Plaintiff lacks standing to challenge pre-merger statements by Legacy Hyzon and its executives, and that Plaintiff's claims for scheme liability under Rule 10b-5(a) and (c), and proxy misstatements under Section 14(a), must be dismissed. However, Plaintiff's Rule 10b-5(b) claim regarding several post-merger statements by Hyzon and its executives survives the motions, as does the corresponding Section 20(a) claim.

## FACTUAL BACKGROUND

The facts below are taken from the third amended complaint ("TAC"). For the purposes of resolving the instant motions, the Court accepts all factual allegations as true and draws all reasonable inferences in favor of Plaintiff. *See Trs. of Upstate New York Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016).

## I. Pre-Class Period: Prior to February 9, 2021

Prior to founding Legacy Hyzon, Defendants Craig Knight and George Gu were

2

C-level executives at Horizon Fuel Cell Technologies ("Horizon"), a Singapore-based fuel cell manufacturer that announced in 2019 the commencement of volume production of fuel stacks for commercial vehicles. TAC at ¶¶ 68–69. Although the first year of production gave reason for optimism, Horizon's sales began to decline and it was forced by early 2021 to de-register from the Chinese stock exchange it was listed on. *Id.* at ¶ 78. As the Horizon business began its slide, Knight and Gu founded Legacy Hyzon in January 2020, incorporating in Delaware with headquarters located in Honeoye Falls, New York. *Id.* at ¶¶ 32, 80. As Legacy Hyzon's website stated, its "establishment as a standalone entity [from Horizon] was to focus on accelerating the energy transition through the manufacturing and supply of hydrogen fuel cell-powered commercial vehicles across the North American, European, and Australasian regions." *Id.* at ¶ 82.

In March 2020, the company announced plans to start an integration facility in Honeoye Falls by midyear. *Id.* at ¶ 83. In July 2020, Legacy Hyzon announced that it had co-founded a European subsidiary and opened a European headquarters in Groningen, Netherlands. *Id.* at ¶ 84. The following month, Legacy Hyzon announced that it had entered into an agreement to supply hydrogen fuel cell-powered coaches to an iron ore mining operation in western Australia. *Id.* Around the same time, Legacy Hyzon retained Goldman Sachs as its financial advisor to attract "massive capital influxes." *Id.* at ¶ 91.

3

Also in August 2020, a group of investors organized Decarbonization Plus Acquisition Corporation ("DCRB") as a special purpose acquisition company ("SPAC"), and filed a Registration Statement with the Securities and Exchange Commission. *Id.* at ¶¶ 96–97. As Plaintiff explains it, a SPAC

> [I]s a company established for the purpose of raising capital to finance the purchase of another "target" company. As part of the SPAC process, a SPAC first lists itself on a stock exchange and raises proceeds through an initial public offering. The listed SPAC then identifies a target investment company, normally an unlisted private company, to execute a reverse takeover (often referred to as a "de-SPAC" transaction), thereby bringing the private company public. The SPAC, which is the surviving entity, then assumes the identity of the target company, changing its name and applicable security listings.

*Id.* at ¶ 86. DCRB sought to raise up to $345 million through an IPO to fund the acquisition of a target company "whose principal effort was developing and advancing a platform that decarbonizes carbon intensive sectors of the economy." *Id.* at ¶ 98. In October 2020, the SEC declared DCRB's registration statement effective and DCRB raised approximately $200 million through an initial public offering. *Id.* at ¶ 99.

By that time, Legacy Hyzon was in the process of exploring a potential business combination with various SPACs. *Id.* at ¶ 91. In November 2020, DCRB and Legacy Hyzon executed a non-disclosure agreement, and DCRB reviewed Legacy Hyzon's management presentation – including an overview of Legacy Hyzon's business and financial model – and received access to Legacy Hyzon's "electronic data room" for due diligence research. *Id.* at ¶¶ 91, 104. Beginning in December 2020, DCRB's representatives and advisors performed extensive due diligence on Legacy Hyzon,

4

and by January 7, 2021 the DCRB Board of Directors determined to pursue a business combination with Legacy Hyzon. *Id.* at ¶ 105. On January 8, 2021, DCRB and Legacy Hyzon executed a nonbinding letter of intent. *Id.* On February 8, 2021, the DCRB board of directors unanimously approved a merger with Legacy Hyzon, and called for a special meeting of shareholders to vote on the merger. *Id.* at ¶¶ 106–07.

## II. The Class Period: February 9, 2021 to August 17, 2022

On February 9, 2021, Legacy Hyzon announced that it had agreed to a merger with DCRB that, if approved by DCRB's shareholders, would take Legacy Hyzon public and list it on the Nasdaq. *Id.* at ¶ 109. With this and other media appearances, Legacy Hyzon "thus began an aggressive media blitz in the United States, Australia, and other locations in an effort to persuade shareholders to approve the [Legacy Hyzon-DCRB merger] and to garner investor interest." *Id.* at ¶ 125. As will be detailed further below, the statements made by several Defendants throughout this so-called "media blitz" are at issue in this case.

On July 15, 2021, the Legacy Hyzon-DCRB merger was approved and the combination occurred on July 16, with DCRB changing its name to Hyzon Motors Inc. ("Hyzon"). *Id.* at ¶ 143. On July 19, Hyzon's Class A common stock began trading on the Nasdaq. *Id.* at ¶ 144. In August, despite having delivered only two vehicles to customers up to that point, Hyzon affirmed that its sales target for the 2021 year was to deliver 85 vehicles. *Id.* at ¶ 146.

5

By the beginning of September 2021, the company had only half of the orders it needed to hit its sales target for the year. *Id.* at ¶ 151. Then, on September 9, Hyzon announced that it had secured a major new deal with Chinese company Shanghai HongYun ("HongYun") "for the purchase of 500 hydrogen-powered electric trucks," with 100 trucks to be ordered by the end of 2021. *Id.* at ¶ 153. This announcement caused stock prices to "soar." *Id.* at ¶ 156.

Less than a month later, however, the legitimacy of Hyzon's deal with HongYun and the nature of its relationship with another alleged customer (Hiringa) were being questioned in research reports by third party "short-seller activist investment firms" Blue Orca Capital and Iceberg Research. *Id.* at ¶¶ 159–84. In early October 2021, Hyzon issued a strongly-worded response rejecting the conclusions of the short-seller firms. *Id.* at ¶¶ 175–78.

On January 12, 2022, Hyzon issued a press release claiming it had delivered 87 fuel cell powered heavy duty vehicles in 2021 under commercial sales agreements, but noted that the 2021 financial results would be "materially lower than forecast revenues and margins." *Id.* at ¶ 191. The company also acknowledged in an SEC filing for investors that the SEC had subpoenaed the company for the production of documents and information related to the allegations in the research reports questioning whether the HongYun deal was a sham. *Id.* On this news, Hyzon's stock price dropped to a new low by January 21, 2022. Hyzon's 2021 Annual Report, released on March 30, 2022, revealed "shockingly low revenue numbers." *Id.* at ¶ 198.

6

The first quarter 2022 financial results, announced on May 6, 2022, were no better. *Id.* at ¶ 207. Hyzon reported no vehicle sales for the first quarter, and would not recognize any revenue for vehicles that quarter on past contracts. *Id.* By August 4, 2022, days before the deadline for second quarter financial filings with the SEC, Hyzon announced it would not be able to release its filings on time due to "identified operational inefficiencies" and "revenue-recognition-timing issues in China." *Id.* at ¶ 209. The company disclosed that a board-appointed special committee was conducting an independent investigation to address the revenue recognition problems, and also that "financial statements and guidance previously issued by the company [could] no longer be relied upon . . . ." *Id.* at ¶ 209. Hyzon's stock price continued to tumble. *Id.* at ¶ 210.

On August 4, 2022, Hyzon filed another report with the SEC. TAC at ¶ 417. Rather than the customary performance report, this filing reported that:

> In connection with the preparation of the Company's financial results for the period ended June 30, 2022, the Company's Board of Directors appointed a committee of independent board members to investigate, with the assistance of independent outside counsel and other advisors, certain issues regarding revenue recognition timing and internal controls and procedures, primarily pertaining to its China operations, that were brought to the attention of the Board by Company management. The revenue recognition timing issues being investigated include the recognition of revenue for the year ended December 31, 2021. Due to the ongoing investigation, the Company will be unable to file its Form 10-Q for the quarter ended June 30, 2022 by August 15, 2022, the due date for filing, and does not have an anticipated filing date at this time. The Company will file a Notification of Late Filing on Form 12b-25 (the "Notification") on or before August 16, 2022.

ECF No. 94-35 at 3. The filing also indicated that Hyzon's Annual Report for the year ended December 31, 2021, and Quarterly Report for the quarter ending March 31, 2022 "should no longer be relied upon . . . ." *Id.*

On August 17, 2022, Hyzon released a statement indicating that Knight had been removed as CEO, and that Gu would move to a non-Executive position on the Board. TAC at ¶ 220. Knight's termination as CEO was later deemed by the company to be "for cause." *Id.*

In March 2023, Hyzon filed a report disclosing the results of the investigation into the revenue recognition issues. As relevant to Plaintiff's allegations, the report stated:

> <u>Trucks Delivered to China</u>: Despite the Company receiving certain documentation that was intended to serve as confirmation that the Jiushuang and Hongyun vehicles were complete and conformed to certain operational standards as of year-end 2021, the Special Committee investigation found that the 20 Jiushuang vehicles and approximately 30 of the Hongyun vehicles were not operable on hydrogen (i.e., not commissioned) at the time of delivery and as of December 31, 2021.
>
> The Special Committee noted that, at a minimum, the Hyzon China operations team should have confirmed that the vehicles were commissioned and operable on hydrogen at the time of delivery. The Special Committee further noted that - considering Hyzon's reliance on third parties for many aspects of the sales, commissioning, and delivery process - Hyzon should have had a more formal set of processes and controls to ensure commissioning was completed prior to delivery.
>
> As part of the Special Committee investigation, the forensic accounting firm conducted site visits of the 20 Jiushuang vehicles and a significant sample set of the 62 Hongyun vehicles, and confirmed that those vehicles were [eventually upgraded to become] operable on hydrogen.

8

Trucks Delivered to Europe: The Special Committee noted that the five vehicles delivered to customers in Europe for which revenue was recognized in 2021 needed to undergo repairs post-delivery. Based on information provided to the Company by the Special Committee, the Company reevaluated the treatment of revenue recorded for those five vehicles.

ECF No. 94-36 at 3. In short, although the Special Committee confirmed that vehicles were delivered to HongYun as reported, and that they were ultimately operable by hydrogen, the revenue from these vehicles should not have been recognized in 2021 because most of them were not operable by hydrogen at the time of delivery.

Consequently, Hyzon filed amended financial reports for the quarter ending September 30, 2021; the annual period ending December 31, 2021; and the quarter ending March 31, 2022. Correction of the error in the report for the quarter ending September 30, 2021 "decrease[d] Revenue by $0.9 million . . . ." ECF No. 94-37 at 8. In addition to correcting revenue, the amended quarterly report also revealed that "instead of manufacturing or assembling [fuel cell electric vehicles] that it owned for sale to customers, Hyzon Europe was providing these customers with vehicle retrofit services to convert the customers' internal combustion engine . . . powered vehicles to hydrogen FCEVs." *Id.* at 5. Correction of the errors in the Annual Report for 2021 decreased revenue by $4.0 million for the China transactions, and $2.1 million for the European transactions. ECF No. 94-38 at 16–17. However, the corrections increased revenue by $2.5 million for the quarter ending March 31, 2022 as the vehicles delivered in December 2021 were finally able to be operated on hydrogen. ECF No. 94-39 at 10.

9

## PROCEDURAL HISTORY

This case involves the consolidated claims of several other cases filed in this Court against Defendants that were filed toward the end of 2021 or early 2022. ECF No. 21. After several different plaintiffs filed motions for appointment as lead plaintiff, Plaintiff Alfred Miller was appointed without objection. ECF No. 20, 22.

On November 4, 2023, the parties submitted a joint motion to stay the briefing schedule regarding Defendants' anticipated motion to dismiss the Second Amended Complaint to allow the parties to explore whether the asserted claims could be resolved without further Court intervention. ECF No. 58. The motion was granted, but the parties' efforts did not result in a settlement, and the parties therefore agreed to an amended briefing schedule involving a third amended complaint and motions to dismiss from two sets of defendants. ECF No. 65.

On June 23, 2023, Plaintiff filed his third amended complaint ("TAC," ECF No. 67) alleging five causes of action under the Securities and Exchange Act of 1934 ("Exchange Act"). These causes of action include: (I.) violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) for making false or misleading statements; (II.) violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) for a scheme to defraud investors ("scheme liability"); (III.) "control person" liability under Section 20(a) of the Exchange Act for the Section 10(b) violations alleged in Counts I and II; (IV.) violations of Section 14(a) of the Exchange Act and Rule 14a-9 for misleading

10

proxy statements; and (V.) "control person" liability under Section 20(a) of the Exchange Act for the Section 14(a) violations alleged in Count IV. TAC at ¶ 518–61.

The TAC names multiple Defendants in the action, and the Defendants have organized themselves into two primary groups[1] and submitted two separate motions to dismiss. Both the Hyzon Defendants and the DCRB Defendants filed their respective motions to dismiss on September 13, 2023. ECF Nos. 89, 92.

The "Hyzon Defendants" have submitted papers focused primarily on alleged deficiencies in the Section 10(b) and Section 20(a) claims in Counts I, II, and III. ECF No. 89. The Hyzon Defendants include the following parties:

- Hyzon Inc. ("Hyzon"), formerly known as Decarbonization Plus Acquisition Corporation ("DCRB") (TAC at ¶¶ 32–35);

- Erik Anderson, a director on Hyzon's Board of Directors, who served as President and Chief Executive Officer ("CEO") of DCRB until the July 2021 merger (*Id.* at ¶¶ 36);

- Craig Knight, the co-founder and Chief Commercial Officer of Legacy Hyzon until the July 2021 merger, then CEO of Hyzon from the merger until August 17, 2022 (*Id.* at ¶ 38);

- Mark Gordon, Legacy Hyzon's Chief Financial Officer ("CFO") from August 2020 until the July 2021 merger, then Hyzon's CFO from the merger until August 12, 2022 (*Id.* at ¶ 39);

- George Gu, co-founder and CEO of Legacy Hyzon until the July 2021 merger, then Executive Chairman of Hyzon's Board of Directors from the merger until August 17, 2022 (*Id.* at ¶ 40).

---

[1] The Court notes that these two groups are not precisely aligned with the causes of action that Plaintiff alleges. In particular, although the Section 10(b) violations issues were briefed by the "Hyzon Defendants," Plaintiff's Section 10(b) allegations also implicate two "DCRB Defendants": Peter Haskopoulos and Robert Tichio. *See* ECF No. 90 at 7. To the extent that the DCRB Defendants' briefing does not fully address the allegations against Haskopolous and Tichio, the DCRB Defendants have indicated that they join in the Hyzon Defendants' arguments. ECF No. 97 at 13–15.

The "DCRB Defendants" have submitted papers focused primarily on alleged deficiencies in the Section 14 and Section 20(a) claims in Counts IV and V. The DCRB Defendants include the following parties, who or which are identified in the TAC as holding their respective positions only until the July 2021 merger:

- Peter Haskopoulous, DCRB's CFO (*Id.* at ¶ 37);

- Robert Tichio, the Chairman of DCRB's Board of Directors (*Id.* at ¶ 41);

- Jennifer Aaker, a member of DCRB's Board of Directors (*Id.* at ¶ 53);

- Jane Kearns, a member of DCRB's Board of Directors (*Id.* at ¶ 54);

- Pierre Lapeyre, Jr., a member of DCRB's Board of Directors (*Id.* at ¶ 55);

- David Leushen, a member of DCRB's Board of Directors (*Id.* at ¶ 56);

- Jim McDermott, the lead "independent" member of DCRB's Board of Directors (*Id.* at ¶ 57);

- Jeffrey Tepper, a member of DCRB's Board of Directors (*Id.* at ¶ 58);

- Michael Warren, a member of DCRB's Board of Directors (*Id.* at ¶ 59);

- Decarbonization Plus Acquisition Sponsor, LLC ("DCRB Sponsor"), a limited liability company that served as DCRB's sponsor and purchased and held the Founder Shares for the de-SPAC process (*Id.* at ¶ 49);

- Riverstone Investment Group LLC, a limited liability company that founded and controlled DCRB and DCRB Sponsor (*Id.* at ¶ 48);

- WRG DRB Investors, LLC, an affiliate of Defendant Anderson's, which purchased and held Founder Shares for the benefit of Anderson (*Id.* at ¶ 49).

## LEGAL STANDARD

The purpose of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "is to test . . . the formal sufficiency of the plaintiff's statement of a claim for

relief without resolving a contest regarding its substantive merits." *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006) (emphasis omitted). An action must be dismissed under Rule 12(b)(6) "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief . . . ." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007). To survive a motion to dismiss under Rule 12(b)(6), on the other hand, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Where a plaintiff's factual allegations are "merely consistent with" a defendant's liability, those allegations "stop[ ] short of the line between possibility and plausibility of entitlement to relief." *Id.* (quoting *Twombly*, 550 U.S. at 557). Moreover, "[c]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to defeat a motion to dismiss." *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 398 (2d Cir. 2006) (citation and internal quotation marks omitted).

Plaintiffs asserting securities fraud claims, such as here, must meet the heightened pleading standards of Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). Rule 9(b) requires a plaintiff to plead "the circumstances constituting

13

fraud . . . with particularity." Fed. R. Civ. P. 9(b). The PSLRA requires a plaintiff to plead each misleading statement, the reasons why the statement is misleading, and, for allegations made upon information and belief, state with particularity all facts on which the belief is formed. 15 U.S.C. § 78u-4(b)(1). Further, in "an action for money damages requiring proof of a particular state of mind, 'the complaint shall, with respect to each act or omission . . ., state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Noto v. 22nd Century Grp., Inc.*, 650 F. Supp. 3d 33, 43 (W.D.N.Y. 2023) (citing 15 U.S.C. § 78u-4(b)(2); *ATSI Commc'ns*, 493 F.3d at 99).

It is well-settled that a court reviewing the sufficiency of a claim to survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6) may consider documents that are incorporated by reference into the complaint, as well as documents that – even if not incorporated by reference – are "integral" to the complaint. *Chambers*, 282 F.3d at 152–54. Indeed, where documents are incorporated by reference into a complaint, "the underlying documents rather than the Plaintiff's description of them govern on a motion to dismiss under Rule 12(b)(6)." *Rimu Cap. Ltd. v. Ader*, No. 23-CV-05065 (LJL), 2025 WL 1268342, at *15 (S.D.N.Y. May 1, 2025) (internal quotation marks and citation omitted). Accordingly, in considering the alleged misstatements and wrongdoing by Defendants, the Court considers not only Plaintiff's complaint, but also the exhibits submitted by Defendants, which consist of extended portions of the documents in which the alleged misstatements were made. *See* ECF Nos. 94-1 to 94-

41. The Court also considers the DCRB and Hyzon electronic filings referenced in the TAC that are available on the Securities and Exchange Commission's "EDGAR" database at https://www.sec.gov/edgar/. *See, e.g.,* ECF No. 67 at ¶ 97 n. 43.

## DISCUSSION

### I. Standing for Section 10(b) Claims

Both the Hyzon and the DCRB Defendants maintain that Plaintiff lacks standing to pursue claims under Section 10(b) of the Exchange Act for alleged misstatements about Legacy Hyzon under the Second Circuit's decision in *Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*, 54 F.4th 82 (2d Cir. 2022) ("*Frutarom*"). ECF No. 93 at 18–19. In response, Plaintiff indicates that the Hyzon and DCRB Defendants' reading of *Frutarom* is too broad, and suggests that the instant case is distinguishable in that any statements made by the Defendants about Legacy Hyzon sought to influence an investment decision in DCRB. ECF No. 96 at 54–56.

The Court is not persuaded by Plaintiff's position as it relates to Legacy Hyzon, Knight, Gu, and Gordon, and finds that Plaintiff lacks standing to pursue claims against pre-merger statements made by those Defendants. Plaintiff does have standing, however, to pursue claims against Defendants Anderson, Tichio, and Haskopoulos, who had the authority to speak on behalf of DCRB.

### A. The Purchaser-Seller Rule

Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) makes it unlawful for any person, directly or indirectly,

[T]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

Acting under the authority granted it by Section 10(b), the Securities and Exchange Commission ("SEC") promulgated Rule 10b-5 (17 C.F.R. § 240.10b-5), which reads as follows:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

a) To employ any device, scheme, or artifice to defraud,

b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. 240.10b-5.

In *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975), the Supreme Court reiterated its earlier rulings that Rule 10b-5 provided a private right of action. *Blue Chip Stamps*, 421 U.S. at 730 (citing *Superintendent of Insurance v. Bankers Life & Cas. Co.*, 404 U.S. 6, 13 n. 9 (1971); *Affiliated Ute Citizens v. United States*,

406 U.S. 128, 150–154 (1972)). In addition, the Court made clear that under the so-called "purchaser-seller rule" this private right of action was limited to purchasers and sellers of the security or securities at issue in the case. *Id.* at 730–749 (explaining why it was adopting the purchaser-seller rule as first set forth in *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2d Cir. 1952)). Courts have had many occasions to discuss and apply the purchaser-seller rule since the *Blue Chip Stamps* decision, including the Second Circuit recently in *Frutarom*.

The *Frutarom* action grew out of a merger between International Flavors & Fragrances, Inc. ("IFF") and Frutarom Industries Ltd. ("Frutarom"), through which Frutarom became a wholly owned subsidiary of IFF. *Frutarom*, 54 F.4th at 84. Prior to the merger, executives at Frutarom denied accusations that the company routinely bribed key employees at customer companies and customs officials in Eastern Europe, and affirmed its compliance with anti-bribery laws. *Id.* Following the merger, however, the truth emerged: prior to the merger, Frutarom executives had "made improper payments to representatives of a number of customers" in Russia and Ukraine. *Id.* at 85. As a result, IFF's shares dropped by 16%. *Id.* The *Frutarom* plaintiffs filed suit, arguing that as shareholders in IFF, they had standing under the purchaser-seller rule to bring an action under Section 10(b) and Rule 10b-5(b) for misstatements made by Frutarom executives "because there was a sufficiently 'direct relationship' between Frutarom's misstatements about itself and the price of IFF's shares." *Id.* at 86.

17

In rejecting plaintiffs' argument, the Second Circuit reiterated the reasons the Supreme Court discussed in *Blue Chip Stamps* for adopting the purchaser-seller rule. *Frutarom*, 54 F.4th at 85–86. The *Frutarom* court pointed out that the Supreme Court observed that the text of the Exchange Act itself supported the rule, that courts across the country had almost uniformly accepted the rule, and that there was a "danger of vexatious litigation which could result from a widely expanded class of plaintiffs under Rule 10b-5." *Id.* at 86 (quoting *Blue Chip Stamps*, 421 U.S. at 740). The *Frutarom* court then expanded upon its objections to the *Frutarom* plaintiffs' reasoning, explaining that judicially-created private rights of action such as that in Rule 10b-5 should be construed narrowly, and the adoption of a "direct relationship" test for standing would erode the effectiveness of the purchaser-seller rule.

More importantly, the *Frutarom* court answered a question which the Second Circuit had "left for another day" in *Ontario Pub. Serv. Emps. Union Pension Tr. Fund v. Nortel Networks Corp.*, 369 F.3d 27, 34 (2d Cir. 2004). Specifically, the *Frutarom* court held that "purchasers of a security of an acquiring company do not have standing under Section 10(b) to sue the target company for alleged misstatements the target company made about itself prior to the merger between two companies." *Frutarom* 54 F.4th at 88. Thus, the Second Circuit concluded that "Section 10(b) standing does not depend on the significance or directness of the relationship between two companies. Rather, the question is whether the plaintiff bought or sold the securities about which the misstatements were made." *Id.* at 88.

18

*Frutarom*'s reasoning has been applied by district courts in this Circuit in the SPAC context to deny standing in circumstances similar to the present action. For example, in *In re CarLotz, Inc. Sec. Litig.*, No. 21-CV-5906 (AS), 2024 WL 1348749 (S.D.N.Y. Mar. 29, 2024), the district court considered whether shareholders of a SPAC could bring a Section 10(b) action against the target company on the basis of pre-merger statements, and concluded that the *Frutarom* "holding does not leave open the possibility that the acquiring company's shareholders might have statutory standing to sue for a misstatement 'about' the target company . . . ." *In re CarLotz, Inc. Sec. Litig.*, 2024 WL 1348749, at *6.

Similarly, the district court in *Kusnier v. Virgin Galactic Holdings, Inc.*, No. 21CV3070ARRTAM, 2023 WL 8750398 (E.D.N.Y. Dec. 19, 2023) found that shareholders of a SPAC did not have standing to challenge pre-merger statements by the target company because "[r]ead as a whole . . . . *Frutarom* concluded that pre-merger statements by an acquisition target 'about itself' are not 'about' the securities of the acquiring company, and as such, purchasers of those securities do not have standing under the purchaser-seller rule." *Kusnier*, 2024 WL 1348749 at *8.

So, too, the district court in *Genesee Cnty Employees' Ret. Sys. v. DocGo Inc.*, No. 23 CIV. 9476 (KPF), 2025 WL 951251, at *17 (S.D.N.Y. Mar. 28, 2025), declined to consider claims against the target company's CEO for pre-merger statements because "[a]pplying the reasoning of [*Frutarom*] to this case, purchasers of a security from [a SPAC] do not have standing to sue for comments made by [the target

company's CEO] while he was the president of [the target company], an entirely separate entity."

**B. Application of the Rule to Legacy Hyzon and its Representatives**

After review of the parties' arguments and the relevant case law, the Court agrees with the district courts in *In re CarLotz*, *Kusnier*, and *DocGo Inc.* that the Second Circuit's decision in *Frutarom* compels the conclusion that Plaintiff lacks standing to challenge the pre-merger statements of Legacy Hyzon itself, and the Defendants who spoke on behalf of Legacy Hyzon (Gu, Knight, and Gordon).

First, the Court disagrees with Plaintiff's argument that Legacy Hyzon's alleged intent to influence an investment decision in DCRB renders the instant case distinguishable from *Frutarom*. ECF No. 96 at 54–56. Regardless of the intent of the statements, the subject of Legacy Hyzon's alleged statements – i.e., the company "about which" the statements were made – was Legacy Hyzon itself. *See Kusnier*, 2024 WL 1348749 at *8. A listing of the alleged pre-merger statements by the Hyzon Defendants is instructive.

Plaintiff challenges the following statements from a joint press release issued on February 9, 2021 to announce the potential business combination (ECF No. 94-1), each of which concerns Legacy Hyzon's technology, product offerings, or sales pipeline:

- Unattributed: "Hyzon's technology already commercialized with existing global footprint and sales pipeline with blue-chip Fortune 100s and municipalities[.]" (*Id.* at 2)

20

- By Knight: "Deliveries of Hyzon fuel cell powered heavy trucks to customers in Europe and North America will occur this year, well ahead of our competitors, and our committed sales pipeline is proof that the world is truly recognizing the need to develop innovative solutions to mitigate climate change and accelerate efforts to move the world economy down the path to net-zero emissions." (*Id.* at 2)

- By Gu: "This business combination will enable us to expand deployments of our zero-emission hydrogen fuel cell powered heavy vehicles globally, and to continue leading the hydrogen transition. We are incredibly excited about the dynamic mobility category as municipalities and Fortune 100 companies are rapidly embracing hydrogen as the essential pathway to a net-zero economy." (*Id.* at 3)

Plaintiff challenges the following statements from a call with investors on February 9, 2021 (transcript at ECF No. 94-2), each of which concerns Legacy Hyzon's sales pipeline or revenue forecasts:

- By Gordon: "Our success is not built on the outcomes of one or two trials in a location with peculiar characteristics; we're securing orders with customers of varying types, with varying criteria for long-term scaling up within their systems." (*Id.* at 7)

- By Gordon: "Hyzon forecasts to grow from $37 million on revenue on 85 units sold in 2021 . . . . Our 2021 forecast is 100 percent covered by contracts and MOUs . . . ." (*Id.* at 9)

Plaintiff challenges the following elements from the presentation distributed to potential investors on February 9, 2021 (ECF No. 94-3), each of which concerns Legacy Hyzon's sales contracts, "near-term pipeline," and projected revenues:

- Unattributed: "2021 backlog of ~$40 million under contract or MOU from blue-chip Fortune 100s . . . ." (*Id.* at 6)

- Unattributed: "80% of near-term backlog to customers in Europe, Asia, and Australia . . . ." (*Id.* at 6)

- Unattributed: Several slides with graphics and projections identifying specific customers and potential customers that involved "top tier customers / end

21

users / partners," "vehicles ordered and near-term pipeline," "vehicle customers," and "summary projected financials," respectively. (*Id.* at 6, 9, 15, 23)

Plaintiff challenges multiple elements from presentations which were based on the February 9, 2021 presentation, but edited before filing with the SEC as "Soliciting Materials" on February 10, 2021, and then again on February 12, 2021 (ECF Nos. 94-4, 94-5). The statements challenged in each of these presentations also concern Legacy Hyzon's sales contracts, "near-term pipeline," and revenue projections.

Plaintiff challenges statements made by Legacy Hyzon both in a press release and through Twitter on February 17, 2021 regarding its relationship with Hiringa (ECF Nos. 94-6 and 94-7), which concerns Legacy Hyzon's customer commitments, production capability, and sales pipeline:

- Unattributed: "Hyzon Inc. ('Hyzon') and New Zealand's Hiringa Energy ('Hiringa') are pleased to announce the two companies have signed a vehicle supply agreement, with Hyzon commissioned to build and supply Hiringa with zero emission Heavy Goods Vehicles (HGV)." (ECF No. 94-6 at 2)

- Unattributed: "[T]he first batch of vehicles are expected to enter service in New Zealand by the end of 2021." (*Id.*)

- Unattributed: "Hyzon plans to have up to 1,500 fuel cell trucks on the road in New Zealand by 2026 . . . ." (*Id.*)

- Unattributed: "We're excited to announce we have signed an agreement for the build and supply of up to 1,500 hydrogen fuel cell-powered trucks to New Zealand's Hiringa Energy by 2026." (ECF No. 94-7 at 2)

Plaintiff challenges the following statement made in a press release entitled "Hydrogen Now™ Event to Showcase Virtual Ride Along in a Zero-Emission, Hydrogen Fuel Cell Powered Truck at Hyzon's Production-Ready Groningen

Facility," (ECF No. 94-9) which was issued on March 8, 2021, and concerns Legacy Hyzon's anticipated production schedule:

- Unattributed: "As binding orders for those trucks [from the Hiringa agreement] are placed, Hyzon anticipates fulfilling them from the Groningen facility, with first shipments planned for the second half of 2021." (*Id.* at 3)

Plaintiff challenges the following statement made at the "Cowen Mobility Disruption Virtual Summit" on March 10, 2021 (transcript at ECF No. 94-10), which concerns Legacy Hyzon's customer commitments and sales pipeline:

- By Knight: "[W]e now have more customer commitments than we have 2021 revenue forecasts, so we're feeling quite confident about our 2021 outlook. [C]ustomer commitments are documented orders, tender wins, that sort of thing, and the high probability orders . . . are really those scenarios where you've been told you've been selected as the vendor but you haven't yet got the contract in place . . . ." (*Id.* at 6)

Plaintiff challenges the following elements from the presentation entitled "Analyst Day Presentation" and dated "April 2021" (ECF No. 94-12), each of which concerns Legacy Hyzon's sales contracts, "near-term pipeline" or backlog, projected revenues, and customer list:

- Unattributed: "2021 backlog of ~$55 million under contract or MOU . . . ." (*Id.* at 8)

- Unattributed: "80% of near-term backlog to customers in Europe, Asia, and Australia . . . ." (*Id.* at 8)

- Unattributed: Several slides with graphics and projections identifying specific customers and potential customers that involved "expanding top tier customers / end users / partners," "vehicles ordered and near-term pipeline," "summary projected financials," and "vehicle customers," respectively. (*Id.* at 8, 19, 28, 29)

Plaintiff challenges the following statement made at the "Bernstein Fireside Chat" which took place on June 16, 2021 (transcript at ECF No. 94-14), which concerns Legacy Hyzon's ability to hit the targets in its revenue and production projections:

- By Knight: "I'd like to remain a little conservative on this but providing there are no more nasty surprises in supply chains and those kind of things, we'll definitely hit this year's targets." (*Id.* at 5)

Lastly, Plaintiff challenges the following statements from "Hyzon's Business Update," issued on July 13, 2021 (ECF No. 94-17), which concern Legacy Hyzon's orders and non-binding MOUs, as well as its operating costs:

- Unattributed: "Orders and non-binding MoUs have increased to represent up to $83M, up more than 50% from $55M as of April 29, 2021, and over 100% from February 12, 2021." (*Id.* at 2)

- Unattributed: "The growing list of orders and non-binding MOUs comes from the rapidly developing European market as well as Australia . . . ." (*Id.* at 2)

- Unattributed: "Simultaneously, Hyzon has successfully reduced costs in excess of $50,000 per vehicle for manufacturing components and sub-systems . . . ." (*Id.* at 3)

To the extent that each of the foregoing statements relates exclusively to Legacy Hyzon – the target company – and its sales pipeline, customer base, revenue projections, technology, or operational efficiency, and that Plaintiff is not a shareholder in the company "about which" the statements were made, *Frutarom* compels the conclusion that Plaintiff lacks standing to challenge any statements attributable to Legacy Hyzon or its executives. As the Supreme Court, the Second Circuit, and the district courts who have considered the matter have held, this result

24

is consistent with the text and legislative history of the Exchange Act, and protects against an "endless case-by-case erosion" of the purchaser-seller limitation on vexatious litigation. *See, e.g., Kusnier,* 2023 WL 8750398, at \*8–10 (discussing *Frutarom* and *Blue Chip Stamps*).

Therefore, Plaintiff's Rule 10b-5 challenges to each of the foregoing pre-merger statements by Legacy Hyzon and individual defendants Knight, Gordon, and Gu, are dismissed with prejudice. As will be discussed further below, this finding does not extend to statements attributable to DCRB executives.

## C. Application of the Rule to DCRB and its Executives

The Court finds that Plaintiff does have standing to pursue its Rule 10b-5 claims against DCRB executives Tichio, Anderson, and Haskopolous for their pre-merger statements. As discussed above, *Frutarom* held that "purchasers of a security of an acquiring company do not have standing under Section 10(b) to sue the target company for alleged misstatements *the target company made about itself* prior to the merger between the two companies." *Frutarom,* 54 F.4th at 88 (emphasis added). With respect to pre-merger statements by DCRB executives, the Court is not faced with misstatements the target company made about itself prior to the merger. Rather, the Court is faced with alleged misstatements about the attractiveness of a merger target and the benefits to the acquiring company of a potential business combination by the executives of the company of which Plaintiff purchased securities, which falls squarely within the litigation permitted by the purchaser-seller rule. *See, e.g.,*

25

*Frutarom*, 54 F. 4th at 88 ("the question is whether the plaintiff bought or sold the securities about which the misstatements were made").

Accordingly, the Rule 10b-5 claims involving pre-merger statements made by DCRB executives will be considered further below.

## II. Exchange Act Section 10(b) and Rule10b-5(b) (Count I)

Plaintiff's first claim alleges violations of the Exchange Act Section 10(b) (15 U.S.C. § 78j(b)) and Rule 10b-5(b) (17 C.F.R. § 240.10b-5(b)) against Defendants Hyzon, Knight, Gu, Gordon, Anderson, Tichio, and Haskopolous. To state a claim under Rule 10b-5(b), a plaintiff must plead six elements: (1) a misstatement or omission of material fact; (2) scienter; (3) a connection with the purchase or sale of securities; (4) reliance; (5) economic loss; and (6) loss causation. *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 98 (2d Cir. 2021) (citation omitted).

The Hyzon Defendants raise a multitude of issues with Plaintiff's claim under Rule 10b-5(b). They argue that Plaintiff has not identified any actionable misstatements because the allegations are variously (A.) based on uncorroborated speculation of two short-sellers; (B.) not misleading; and, (C.) not legally actionable because they are opinion, puffery, or protected under the PSLRA as forward-looking statements. Further, the Hyzon Defendants contend that Plaintiff has failed to argue a cogent, compelling inference of scienter, both generally and with respect to each Defendant, and that he has insufficiently pled the element of loss causation.

In response, Plaintiff maintains that he has adequately pled that Defendants' statements were false or misleading, and that these allegations are corroborated not only by the short-seller reports, but also by Hyzon's own disclosures, Plaintiff's own investigation, and the SEC; that Defendants' statements are actionable and not protected as forward-looking statements, puffery, or opinion; and that he has adequately pled both scienter and loss causation.

## A. The Pre-Merger Statements at Issue

The universe of pre-merger statements at issue – i.e., statements attributable to the DCRB Defendants – is limited. To begin with, there are two statements directly attributed to Defendant Robert Tichio, the Chairman of DCRB's Board of Directors prior to the merger:

- *February 9, investor call* (ECF No. 94-2 at 3): "The Company has a sales pipeline for 2021 that is 100 percent under contract or MOU, providing real runway visibility, and its customers include some of the most recognizable global brands and the largest municipalities in the world."

- *June 29, 2021, fireside chat* (ECF No. 94-16 at 6): "[I]f you take a look at 2021 the company is you know projecting $37 million of revenue vehicles that will actually roll off its lot this year that's what we had communicated in back in February, we still feel extraordinarily comfortable with that assessment . . . ."

In addition, Defendant Peter Haskopolous, DCRB's pre-merger CFO, signed the SEC filing for the solicitation materials including all of the challenged February 9, 2021 statements from the press release, the investor call, and the investor presentation. ECF Nos. 94-1 to 94-3. Haskopolous and DCRB's pre-merger CEO, Erik Anderson, also signed DCRB's 2020 Annual Report filed on March 1, 2021, and

DCRB's Quarterly Report for the First Quarter of 2021 filed on May 24, 2021. The challenged statements in those documents all relate to the statements made on February 9, 2021. TAC at ¶¶ 310, 325; ECF Nos. 94-8, 94-13. *See also In re Smith Barney Transfer Agent Litigation*, 884 F. Supp. 2d 152, 163–64 (S.D.N.Y. 2012) (discussing *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011)) ("[S]ignatories of misleading documents 'made' the statements in those documents, and so face liability under Rule 10b–5(b).").

### B. The Post-Merger Statements at Issue

As to the post-merger statements at issue, within days of DCRB's acquisition of Legacy Hyzon, the Company posted an updated version of its investor presentation on its website. TAC at ¶ 334; ECF No. 94-18. Plaintiff challenges as false and misleading the "deployment map," which was similar to the pre-merger investor presentation from April 2021 and identifies "contracted orders" and "high probability orders" adding up to revenue of greater than $150 million (ECF No. 94-18 at 13), as well as statements asserting "$55M of revenue under contract or MOU already," with "~75% of sales into Asia & Australia, ~ 25% into Europe" (*Id.* at 19). Plaintiff also takes issue with information in the presentation's "Summary Projected Financials" indicating that the company expected to deliver 85 vehicles in 2021 and earn total revenue of $37 million. *Id.* at 22.

On September 9, 2021, Hyzon announced a major deal with HongYun for the purchase of 500 hydrogen-powered electric vehicles. TAC at ¶ 153. Plaintiff contends

that HongYun is a "sham counterparty," and challenges the following statements in

Hyzon's September 9, 2021 announcement:

- Unattributed: "Under the non-binding MoU, the initial order of 100 vehicles is expected before the end of 2021 while the other 400 vehicles will be ordered in 2022." (ECF No. 94-19 at 2)

- Unattributed: "[HongYun] provides operation, leasing and maintenance service for customers across [China], including one of the world's largest steelmakers. After Hyzon delivers the vehicles, HongYun will be responsible for the subsequent commercial arrangements with its end customers." (*Id.*)

- Unattributed: "The core team of the company has solid operation experience and master the real time vehicle data management . . . . At present, the company is focusing on the operation of hydrogen-powered heavy duty trucks by leveraging its rich end user resources in logistics industry." (*Id.* at 3)

On September 28, 2021, short-seller activist investment firm Blue Orca

Capital released a report indicating that its research revealed HongYun was "a fake-

looking Chinese shell entity formed 3 days before the deal [with Hyzon] was

announced." TAC at ¶ 161. In early October 2021, Hyzon released a response which

included several statements that Plaintiff now challenges:

- Unattributed: "Hyzon is excited about its partnership with Shanghai Hydrogen HongYun Automotive Co., Ltd. ('Shanghai HongYun'), which is a special purpose entity seeking to provide third-party clean energy logistics services to corporate customers." (ECF 94-20 at 4).

- Unattributed: "As Hyzon announced on September 9, 2021, Hyzon and Shanghai HongYun entered into a nonbinding memorandum of understanding ("MoU") under which the parties would negotiate definitive vehicle supply agreements pursuant to which Shanghai HongYun is expected to order 100 trucks in 2021 and an additional 400 trucks in 2022 . . . . Consistent with the terms of the MoU, Hyzon expects that Shanghai HongYun will be able to leverage its existing relationships to enter into long-term logistics service agreements with end users for Hyzon's hydrogen-powered vehicles. Hyzon expects to receive binding purchase orders from Shanghai HongYun for these

29

vehicles, which Hyzon anticipates will include upfront deposits and installment payments." *Id.*

- Unattributed: "Contrary to the short-seller's claims, no customers or potential customers 'disappeared' from any investor presentation . . . . Hyzon continues to engage in active discussions with a majority of the companies that the short seller report misleadingly claims 'disappeared' from its investor presentations." *Id.*

- Unattributed: "The core team of the company has solid operation experience and master the real time vehicle data management . . . . At present, the company is focusing on the operation of hydrogen-powered heavy duty trucks by leveraging its rich end user resources in [the] logistics industry." (*Id.*)

On November 12, 2021, Hyzon issued a press release announcing its "Third Quarter 2021 Financial and Operational Results" (ECF No. 94-21). Plaintiff challenges the following statement from that press release:

- Unattributed: "[Hyzon] [r]eceived the first two purchase orders, for 62 trucks in total, pursuant to terms of the previously announced MOU to supply Shanghai Hydrogen Hongyun Automotive." (ECF No. 94-21 at 2)

Hyzon also held an "earnings call" on November 12, 2021 to discuss its press release and third quarter results (ECF No. 94-22). Plaintiff challenges the following statements from that report:

- Knight: "Today, we are again reaffirming our guidance of expecting to ship 85 vehicles by the end of 2021." (ECF No. 94-22 at 4)

- Knight: "As a result of that global footprint and our deep historical relationships within Asia, when global supply chain challenges worsened, especially in the last few months, we were able to make a conscious decision to shift the mix of delivery locations from predominantly European to predominantly Asian customers, in China specifically." (*Id.*)

- Knight: "During the third quarter, Hyzon delivered two vehicles to customers in Europe, one to the municipality of Groningen, one to the municipality of Rotterdam, both in the Netherlands. In earlier communications, Hyzon had flagged several government agencies in Europe as early adopters in validating

30

fuel cell trucks for their needs, and we highlighted that the commercial sector was following closely behind. These first two deliveries are not trials. They were deliveries of vehicles to be used by these customers in real-world everyday applications. This resulted in Hyzon's first vehicle revenues, which totaled $1 million in the third quarter." (*Id.* at 5)

▪ Knight: "Hyzon has received the first two purchase orders from Shanghai Hydrogen HongYun Automotive in China for a total of 62 trucks. The end user of these trucks is a large industrial conglomerate." (*Id.*)

On November 15, 2021, Hyzon released its first quarterly report as a post-SPAC-merger public company, for the period ending September 30, 2021. Plaintiff challenges the following statements from that report:

▪ Unattributed: "Hyzon focuses on accelerating decarbonization starting with mobility through the manufacturing and supply of hydrogen fuel cell-powered vehicles across the North American, European, and Australasian regions." (ECF No. 94-23 at 4)

▪ Unattributed: "We recognized $1.0 million in sales of fuel cell vehicles for the three months ended September 30, 2021." (*Id.* at 8)

▪ Unattributed: "Our commercial vehicle business is focused primarily on assembling and supplying battery-electric vehicles and fuel cell electric vehicles . . . ." (*Id.* at 12)

On December 8, 2021, Hyzon issued a press release announcing delivery of 29 hydrogen fuel cell electric heavy duty trucks to reduce carbon emissions in the steel industry (ECF No. 94-24). Plaintiff challenges the following statements:

▪ Unattributed: "Hyzon Inc. . . . today announced the delivery of 29 fuel cell electric trucks to be used by a major steel conglomerate in China through [HongYun] . . . ." (ECF No. 94-24 at 2)

▪ Unattributed: "HongYun plans to provide operation, leasing and maintenance services for industrial and municipal customers in targeted locations in China . . . ." (*Id.*)

31

- Unattributed: "Hong[Y]un has further orders for 33 more trucks confirmed with Hyzon." (*Id.*)

On March 23, 2022, Hyzon filed a report with the SEC regarding its performance in the fourth quarter of 2021, published a news release and earnings presentation, and held an earnings call (ECF Nos. 94-25, 94-26). Plaintiff challenges the following statements:

- Unattributed, SEC Form 8-K: "For the fourth quarter ending December 31, 2021, the Company reported revenue of $5.1 million . . . . For the twelve months ended December 31, 2021, the Company reported total revenue of $6.0 million." (ECF 94-25 at 6)

- Gordon, earnings call: "Full year revenues were $6 million. Total operating expenses were $107 million. We took the full charge to the cost of sales for vehicles sold in China, which was only partially offset by the collected revenues for those sales in 2021. We expect another large portion of cash for the vehicles delivered in China during 2021 to be collected in 2022. Once this customer has a longer operating history, we anticipate booking more revenues upfront." (ECF No. 94-26 at 6)

- Gordon, earnings call: "I think it's important to think through how we will be receiving revenues for the trucks delivered this year with no cost over the next few years and the bulk of those revenues for the trucks delivered last year will come in 2022, so that will effectively be pure margin. It's a little strange accounting treatment, but what we're waiting for is for HongYun to have more operating history and we plan to re-evaluate this method of accounting for the revenues in the fourth quarter of this year, at which point we hope that we'll be able to account for the revenues more normally." (*Id.* at 9)

- Knight, earnings call: "So it's a short term issue, whether we recognize the revenue next year or the year after, frankly, it's not a huge deal . . . . [A]t the end of the day, it's a very minor pain point." (*Id.* at 12)

On March 30, 2022, Hyzon filed its 2021 Annual Report with the SEC (ECF No. 94-27), in which it reported 2021 revenue of $6.0 million. TAC at ¶ 407. The filing was signed by Defendants Knight, Gordon, Gu, and Anderson. *Id.* Plaintiff challenges

the following statements:

- Unattributed: "[O]ur management has performed additional analyses, reconciliations, and other post-closing procedures and has concluded that, notwithstanding the material weakness in our internal control over financial reporting, the consolidated financial statements for the periods covered by and included in this Annual Report on Form 10-K fairly present, in all material respects, our financial position, results of operations and cash flows for the periods presented in conformity with U.S. GAAP." (ECF No. 94-27 at 26)

On May 6, 2022, Hyzon issued a press release and investor presentation announcing its financial results for the first quarter of 2022. TAC at ¶ 413. That same day, Hyzon also held an earnings call to discuss its results and introduce its new CFO, Samuel Chong. *Id.*; ECF No. 94-29 at 4–5. Plaintiff maintains that the following statements from the first quarter 2022 performance reports were materially false and misleading statements about Hyzon's reported revenue and cash flow because it reflected improperly recognized revenue under GAAP principles:

- Unattributed: "For the first quarter ended March 31, 2022, the Company reported revenue of $0.4 million,." (ECF No. 94-28 at 6)

- Samuel Chong, new CFO: "First quarter revenues were $356,000 from the sale of fuel cell systems." (ECF No. 94-29 at 5)

## C. Application

As indicated above, a claim under Section 10(b) and Rule 10b-5(b) must plead the following elements: (1) a misstatement or omission of material fact; (2) scienter; (3) a connection with the purchase or sale of securities; (4) reliance; (5) economic loss; and (6) loss causation. *Plumber & Steamfitters Loc. 773 Pension Fund*, 11 F.4th at 98 (citation omitted). The Hyzon Defendants test Plaintiff's complaint on three elements: whether the statements were misstatements, scienter, and loss causation.

### i. Non-actionable Misstatements

Courts in this circuit have held that to qualify as a "misstatement" under Section 10(b) and Rule 10b-5, a statement must be both (1) false and (2) material. *In re Telefonaktiebolaget LM Ericsson Sec. Litig.*, 675 F. Supp. 3d 273, 285–86 (E.D.N.Y. 2023) (citing *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014)), *aff'd sub nom. Bos. Ret. Sys. v. Telefonaktiebolaget LM Ericsson*, No. 23-940-CV, 2024 WL 4023842 (2d Cir. Sept. 3, 2024). The Hyzon Defendants maintain that Plaintiff has failed to show the challenged statements were actionable because he has not sufficiently alleged either that the statements were false, or that they were material. The Court agrees with respect to Plaintiff's challenge of the investor presentations published both in February 2021 and again shortly after the merger in July 2021, the references to the February presentation in the 2020 Annual Report and 2021 Q1 Quarterly Report, Tichio's February and June 2021 statements, and Hyzon's response to the short-seller reports in October 2021.

"The veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers." *Operating Loc. 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92 (2d Cir. 2010). Some literally accurate statements can, "through their context and manner of presentation, [become] devices which mislead investors." *Id.* (quoting *McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990)).

A misstatement is material if "there is a substantial likelihood that a

34

reasonable person would consider it important in deciding whether to buy or sell shares of stock," and, in the view of a reasonable investor, the misstatement has "significantly altered the 'total mix' of information made available." *Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019). "Certain categories of statements are immaterial as a matter of law, such as 'puffery,' opinions, and forward-looking statements accompanied by adequate cautionary language." *In re Citigroup Sec. Litig.*, 20-CV-9132 (LAP), 2023 WL 2632258, at *11 (S.D.N.Y. Mar. 24, 2023). Similarly, "'[r]osy predictions,' or statements that are loosely optimistic regarding a company's well-being, have been found to be too vague and general to be actionable." *In re Lululemon*, 14 F. Supp. 3d at 572 (citations omitted).

Here, the challenged February 9, 2021 investor presentation attributable to Anderson, Haskopolous, and DCRB contains two "Disclaimer" slides at the very beginning. ECF No. 94-3 at 3–4. Most significantly, the disclaimer makes clear that the presentation includes "forward-looking statements . . . provided for illustrative purposes only and are not intended to serve as, and must not be relied on by any investor as, a guarantee, an assurance, a prediction or a definitive statement of fact or probability." *Id.* at 3. *See also* 15 U.S.C. § 77z-2(i)(1) (defining "forward looking statements"). Additionally, each of the slides that Plaintiff challenges – as well as Tichio's challenged February 9 statement – includes qualifying language indicating that the projected sales pipeline includes both contracts and MOUs. *See, e.g.,* ECF No. 94-3 at 6 ("~$40 million under contract or MOU"), 9 (specifying both the stage of

negotiation and that the company logos are "representative" of end users, not necessarily actual Hyzon customers, who may be third party suppliers to the end user), 15 ("not all [listed logos] subject to binding purchases").

Likewise, Hyzon's investor presentation released post-merger in July 2021 contains two "Disclaimer" slides at the very beginning. ECF No. 94-18 at 3–4. In this presentation, the disclaimer is even clearer: it states that the presentation includes projected, forward-looking financial information relying upon "a wide variety of significant business, economic, competitive and other risks and uncertainties that could cause actual results to differ materially" from the projections in the presentation. *Id.* at 3. *See also* 15 U.S.C. § 77z-2(i)(1) (defining "forward looking statements"). Moreover, the "Customer Deployment" map clearly distinguishes between "contracted orders" and "high probability orders," and the stage of discussions (from "advanced discussions" to "memorandum of understanding" to "signed contract") of each customer. ECF No. 94-18 at 18. It is also apparent from the presentation that the projected $55 million in revenue was based on a mix both of contracts and non-binding memoranda of understanding ("MOU"), and that its "robust pipeline" consisted of future orders also under non-binding MOUs. *Id.* at 19.

In short, Plaintiff has failed to demonstrate that the statements in the challenged investor presentations are either false or material. He has failed to demonstrate that they were false because the various disclaimers throughout the documents make clear that the projected revenue is not based completely on binding

36

orders. Further, they are not material because they contain only "simple economic projections, expressions of optimism, and other puffery" that are insufficient to constitute material misstatements. *In re Lululemon*, 14 F. Supp. 3d at 572 (citing *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004); *Novak v. Kasaks*, 216 F.3d 300, 313 (2d Cir. 2000)). Consequently, Plaintiff has failed to demonstrate that the foregoing statements, as well as the references to the February 9, 2021 statements in DCRB's 2020 Annual Report (ECF No. 94-8) and Q1 2021 Quarterly Report (ECF No. 94-13), are actionable misstatements.

Likewise, Hyzon's statement in October 2021 that "no customers or potential customers 'disappeared' from any investor presentation" (ECF No. 94-20 at 4) was not a material misstatement because it did not "significantly alter[ ] the 'total mix' of information made available." *Singh*, 918 F.3d at 63. As indicated above, the presentations made clear that many of the customers or potential customers listed not direct customers but an end user of a third party supplier, and that others were not yet contractually bound to purchase from Hyzon. As the company noted in its October 2021 statement, "[l]ike any innovative company in a nascent industry, Hyzon continues to pursue a wide range of potential opportunities, any one of which may or may not ultimately result in a commitment to purchase vehicles from Hyzon." *Id.*

Finally, the Court finds that Tichio's June 29, 2021 statement that DCRB "feel[s] extraordinarily comfortable" with the projection of $37 million of revenue vehicles to be produced in 2021 is not an actionable misstatement. Tichio's statement

was a "'rosy prediction" that was too "loosely optimistic regarding a company's well-being" to be actionable. *In re Lululemon*, 14 F. Supp. 3d at 572 (citations omitted).

*ii. Actionable Misstatements*

On the other hand, Plaintiff has adequately alleged that the remainder of the post-merger statements identified above, are actionable misstatements. First, Plaintiff has adequately alleged that they are false, in that they alter the total mix of information such that a reasonable investor could be misled.

To begin with, whether or not HongYun is truly a "sham counterparty" as both Blue Orca Capital[2] and Plaintiff allege, Defendants' September 2021 communications could have misled potential investors into believing Hyzon had formed a partnership with a well-established company with solid end user relationships that would generate significant sales and revenue for Hyzon. That the company was not well-established with solid end user relationships was made clear by Defendants Knight's and Gordon's comments on their March 2022 earnings call, which recognized that they would have to give "strange accounting treatment" to HongYun until it had "more operating history." ECF No. 94-25 at 9.

Similarly, Hyzon's statements on November 15, 2021 regarding an emphasis on "manufacturing and supply of hydrogen full cell-powered vehicles," and as being

---

[2] The Court notes that while there is no *per se* rule in the Second Circuit regarding the treatment of "short seller" reports as a source of factual allegations in a complaint, most courts in the Circuit to have addressed the matter have found that "to the extent that open-market securities fraud complaints use as the source for adverse factual allegations about a public issuer a report by a short seller—an entity with an economic interest in driving down the company's stock price—these allegations must be considered with caution." *In re DraftKings Inc. Sec. Litig.*, 650 F. Supp. 3d 120, 154 (S.D.N.Y. 2023) (collecting cases).

"focused primarily on assembling and supplying battery-electric vehicles and fuel cell electric vehicles" (ECF No. 94-23 at 4, 12) could have misled investors into believing the European contracts later revealed to be service and retro-fitting contracts (ECF No. 94-37 at 5) were more promising signs of operational effectiveness than perhaps they really were. That is, an investor could reasonably have believed from these statements that the near-term production capacity for new vehicles was much higher than it truly was.

The same is true of the 2021 Annual Report released in March 2022, and Hyzon's, Gordon's, and Knight's comments during the earnings call following the release. Reference, for example, to the "trucks delivered last year" (ECF No. 94-26 at 9) suggested completed product, whereas the company's subsequent investigation revealed that at the time of their delivery, approximately 50 of the 82 vehicles delivered to China were not operable on hydrogen as of December 31, 2021, and the 5 vehicles delivered in Europe for which revenue was recognized in 2021 needed to undergo repairs post-delivery. ECF No. 94-36 at 3. Thus, the misstatements could have led the reasonable investor to greater optimism than was perhaps merited.

### iii. Scienter

The PSLRA requires plaintiffs to plead the element of scienter – a defendant's "intention to deceive, manipulate, or defraud" – by stating with particularity facts giving rise to the "strong inference" of the required state of mind. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313 (2007). A "strong" inference is more than

merely plausible or reasonable, "it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 314.

A plaintiff can plead scienter by alleging facts that either "(1) show[ ] that the defendants had both motive and opportunity to commit the fraud or (2) constitute[e] strong circumstantial evidence of conscious misbehavior or recklessness." *In re Telefonaktiebolaget LM Ericsson Sec. Litig.*, 675 F. Supp. 3d at 286–87 (quoting *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184-85 (2d Cir. 2014)). To show scienter in the corporate context, a plaintiff must plead facts raising "a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Jackson v. Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020).

The Hyzon Defendants' argument that Plaintiff has failed to plead scienter is unconvincing. Here, the TAC alleges facts that, if true, constitute strong circumstantial evidence of conscious misbehavior or recklessness as to at least Knight and Gordon, and consequently Hyzon itself. Although Hyzon's internal investigation found that the vehicles it delivered in China in 2021 were hydrogen operable by 2023, Knight's and Gordon's failure to report the operational difficulties in March 2022 created the impression of greater delivery capabilities than the company had actually demonstrated. Had investors timely known of the delays Hyzon was experiencing in producing hydrogen-operable vehicles, they could have withheld investment on the basis that projections of future delivery capabilities were overly-optimistic. The

40

scienter of Knight and Gordon is imputed to Hyzon. *In re Romeo Power Inc. Sec. Litig.*, No. 21 CIV. 3362 (LGS), 2022 WL 1806303, at *5 (S.D.N.Y. June 2, 2022).

### iv. Loss Causation

Loss causation is "the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *In Re Shanda Games Ltd. Sec. Litig.*, 128 F.4th 26, 57 (2d Cir. 2025) (citation omitted). "Plaintiffs must allege not only the but-for causation of their losses but also the proximate causation, or that the fraud 'concealed something from the market that, when disclosed,' would foreseeably and 'negatively affect[ ] the value of the security.'" *Abramson v. NewLink Genetics Corp.*, 965 F.3d 165, 179 (2d Cir. 2020) (quoting *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 173 (2d Cir. 2005)). If the relationship between the loss and the information concealed or misstated by the defendant is "sufficiently direct, loss causation is established, but if the connection is attenuated, or if the plaintiff fails to demonstrate a causal connection between the content of the alleged misstatements or omissions and the harm actually suffered, a fraud claim will not lie." *In re Paysafe f/k/a Foley Trasimene Acquisition Corp. II Sec. Litig.*, No. 21-CV-10611 (ER), 2025 WL 1003322, at *33 (S.D.N.Y. Mar. 31, 2025) (quoting *In re Bristol Myers Squibb Co. Securities Litigation*, 586 F. Supp. 2d 148, 163 (S.D.N.Y. 2008)).

Plaintiff here plausibly alleges that "[a]s Defendants' materially false, misleading, and incomplete statements . . . were disclosed, the price of Hyzon's securities fell, as the prior inflation came out of the Company's stock price." TAC at

¶ 493. Specifically, Plaintiff alleges that the day of the Blue Orca short-seller report alleging HongYun was a sham company, Hyzon's stock price, which started the date at $9.21 per share, fell by 28%; that following news in January 2022 that Hyzon's deliveries and financial expectations would be "materially lower than forecast revenues and margins" the stock price fell by 23%; that following the release of the 2021 Annual Report the stock price fell by 17%; that following the release of Hyzon's financial report for the quarter ending March 31, 2022, the stock price fell by 11%; that after Hyzon announced on August 4, 2022 that it would not release its report for the quarter ending June 30, 2022, the share price dropped 48%; and that on August 17, 2022 when Hyzon announced that Knight had been removed as CEO and Gu demoted from Executive Chairman, the stock price fell a further 30%, ending at a mere $1.99 per share. *Id.*

Plaintiff need not demonstrate on a motion to dismiss that the corrective disclosure was the only possible cause for decline in the stock price. *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 233 (2d Cir. 2014). That "is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss." *See Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003). *See also In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 763 F.Supp. 2d 423, 507 (S.D.N.Y. 2011) ("[A]t the motion to dismiss stage, the [complaint] need not rule out all competing theories for the drop in . . .

stock price; that is an issue to be determined by the trier of fact on a fully developed record."). Accordingly, the Court finds Plaintiff has sufficiently pled loss causation.

### v. Summary

In sum, Plaintiff lacks standing to challenge premerger statements made by Legacy Hyzon and its executives. Further, Plaintiff's Rule 10b-5(b) claims regarding the February 2021 and July 2021 investor presentations, as well as against Defendants Tichio, Anderson, and Haskopolous, are without merit. However, with respect to the Rule 10b-5(b) challenges to the remaining post-merger statements, Plaintiff has adequately alleged the elements of material misstatement, scienter, and loss causation, and those challenges survive Defendants' motions to dismiss.

## III. Count II: Claims under Rule 10b-5(a) and (c)

Plaintiff's second claim alleges violations of Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5(a) and (c) (17 C.F.R. § 240.10b-5(a) and (c)), commonly known as "scheme liability." Defendants maintain that this claim should be dismissed because it is merely an attempt by Plaintiff to "end run" the short-comings of his allegations in support of his Rule 10b-5(b) claim and fails to allege a separate deceptive act as required by caselaw. *In re Eastman Kodak Co. Sec. Litig.*, 632 F. Supp. 3d 169, 191 (W.D.N.Y. 2022) (citing, *inter* alia, *Sec. & Exch. Comm'n v. Rio Tinto plc*, 41 F.4th 47, 53 (2d Cir. 2022) (misstatements and omissions alone cannot form the basis for a scheme liability claim)). Further, Defendants maintain that even if Plaintiff did allege an independent fraudulent act, his scheme liability

claim would fail for the same reasons as his alleged misstatements and omissions alleged in Count I.

In response, Plaintiff elaborates on the extent of Defendants' alleged deceptive or manipulative conduct beyond their misstatements and omissions. In particular, Plaintiff points in the pre-merger context[3] to a "sham media blitz," "surreptitious edits" to investor presentations, "farcical posts" to support false claims about their capacity to deliver hydrogen-operable vehicles, and the "falsification of customer deployment maps and videos." Post-merger, Plaintiff points to Defendants' MOU with "newly formed shell entity Hong Yun" and the "secret" grant of HongYun warrants, Knight's use of shares for collateral on a loan to fund an additional purchase to boost share price, and falsified books.

## A. Legal Principles

To adequately allege "scheme liability," the plaintiff must show: (1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud in connection with the purchase or sale of a security, (3) with scienter, and (4) reliance. *In re Mindbody, Inc. Sec. Litig.*, 489 F. Supp. 3d 188, 216 (S.D.N.Y. 2020). Unlike claims under Rule 10b-5(b), scheme liability claims do not require the defendant to make a misstatement or omission; they require only deceptive conduct. *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank*

---

[3] Plaintiff also advanced an argument regarding the inapplicability of the Second Circuit's holding in *Frutarom* to scheme liability claims under Rule 10b-5(a) and (c). However, it is not necessary for the Court to weigh in on that issue to adequately address Plaintiff's claim here.

*A/S*, 11 F.4th 90, 105 (2d Cir. 2021) (citing *Lorenzo v. SEC*, 139 S. Ct. 1094, 1098 (2019)).

"Courts have not allowed subsections (a) and (c) of Rule 10b-5 to be used as a 'back door into liability for those who help others make a false statement or omission in violation of subsection (b) of Rule 10b-5.'" *SEC v. Kelly*, 817 F. Supp. 2d 340, 343 (S.D.N.Y. 2011) (quoting *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 503 (S.D.N.Y. 2005)). Thus, where "the core misconduct alleged is in fact a misstatement, it [is] improper to impose primary liability . . . by designating the alleged fraud a 'manipulative device' rather than a 'misstatement.'" *SEC v. KPMG LLP*, 412 F. Supp. 2d 349, 377–78 (S.D.N.Y. 2006). Rather, "[s]cheme liability under subsections (a) and (c) of Rule 10b-5 hinges on the performance of an inherently deceptive act that is distinct from an alleged misstatement." *Kelly*, 817 F. Supp. 2d at 344

## B. Application to the Hyzon Defendants

The Court agrees with Defendants that Plaintiff has failed to adequately plead a claim for "scheme liability" separate from the claim for the alleged misstatements discussed above.

The case of *SEC v. Lee*, 720 F. Supp. 2d 305 (S.D.N.Y. 2010), provides a paradigmatic example of "scheme liability," and highlights why the present matter does not involve scheme liability. In *Lee*, the SEC's claim for scheme liability under Rule 10b-5(a) and (c) was premised on alleged "u-turning" of commodity prices between brokerage houses: one broker would send his price to a second broker, which

45

would then report that price back to the first as a purportedly "independent" quote. *Lee*, 720 F. Supp. 2d at 334. This conduct was inherently deceptive when performed, independent of whether the defendant made any misstatement or omission. *See also SEC v. First Jersey Sec. Inc.*, 101 F.3d 1450, 1471–72 (2d Cir. 1996) (affirming scheme liability where the defendant broker defrauded customer investors into paying prices that included excessive markups from market value).

Notwithstanding Plaintiff's claim that HongYun is a sham counter-party, there are no factual allegations in the third amended complaint to demonstrate "inherently deceptive" practices independent of the alleged misstatements that Defendants made. The crux of Plaintiff's scheme liability claim is that Defendants misled investors through the information provided regarding the state of their sales pipeline (including with HongYun), and their ability to fulfill customer orders. The very report from Hyzon's investigating committee that Plaintiff relies upon to discredit many of Defendants' statements in fact undermines Plaintiff's claim of independent inherently deceptive behavior. The report found no "sham" transactions or falsified numbers. Rather, it found accounting practices that were insufficient to reflect the reality of the work performed, but nevertheless confirmed the ultimate delivery of products – even 60+ vehicles to the allegedly "sham counterparty." *See supra*, p. 8–9 (excerpting the findings from the report by the special committee).

At oral argument, the parties discussed a later action by the Securities and Exchange Commission against Hyzon and several of the same individuals identified

46

here that concluded in several consent decrees. *See Securities and Exchange Commission v. Hyzon Motors Inc. et al*, No. 23-CV-6553-FPG (W.D.N.Y.). Plaintiff maintains that the SEC filings in this case, as well as the admissions in the consent decrees, add significant detail to their scheme liability claim. However, those allegations are not presently before the Court.

As will be discussed later, Plaintiff will be granted leave to move to amend his complaint and provide further explanation to the Court. For the purposes of the present motions, however, Plaintiff's claims for scheme liability under Rule 10b-5(a) and (c) are dismissed without prejudice.

## IV. Count IV: Claims under Section 14(a)

In his fourth claim, Plaintiff maintains that Defendants violated Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)) and Rule 14a-9 (17 C.F.R. § 240.14a-9) by preparing, reviewing, and/or disseminating false and misleading proxy statements and other soliciting materials which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. *See* Rule 14a-9.

Defendants argue that this claim must be dismissed because it is a "derivative" claim for the benefit of the corporation as a whole and Plaintiff has failed to allege that he has satisfied the "demand" requirement of Federal Rule of Civil Procedure 23.1. Further, Defendant argues that even if the Court were to find that it is a "direct" claim for the benefit of the shareholder(s) bringing suit, the claim should still be

dismissed because Plaintiff has failed to satisfy the heightened pleading standards for fraud, and failed to demonstrate false statements in the proxy or solicitation materials. Defendants also contend that Plaintiff has wholly failed to allege that WPG DRB Investors, LLC was in any way involved in the alleged misconduct and should be dismissed.

In response, Plaintiff argues that his claim is a "direct" claim because the essence of his claim is not that the company lost money due to a bad deal, but that the harm caused to shareholders by the misstatements and omissions from the proxy statements and solicitation materials was that it prevented them from exercising their redemption rights on their shares, a right separate and apart from harm to the corporation. Plaintiff also argues that Defendants have misstated the pleading standard for Rule 14a-9 claims, that he has adequately demonstrated the proxy and solicitation materials contained false statements, and that the complaint sufficiently pleads Defendants' negligence. With respect to WRG, Plaintiff maintains that it was a controlling party – controlling primary violator DCRB – and therefore liable under Section 20.

The Court need not decide in the present case whether Plaintiff's claims are merely "derivative," or whether his allegations include "direct" claims, as well. As discussed further below, even if Plaintiff does have standing to proceed, the challenged proxy statements are protected by the "bespeaks caution doctrine," and Plaintiff's claims under Section 14(a) must be dismissed.

**A. Section 14(a) and Rule 14a-9 Standards**

"The purpose of [Section] 14(a) [of the Exchange Act] is to prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitation." *J. I. Case Co. v. Borak*, 377 U.S. 426, 431 (1964). Rule 14a-9 helps to achieve that purpose by prohibiting any written or oral communication to solicit proxies which contains:

> any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

17 C.F.R. § 240.14a-9(a). Thus, Rule 14a-9 operates to "ensure disclosures by corporate management in order to enable the shareholders to make an informed choice." *In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 757 F. Supp. 2d 260, 305 (S.D.N.Y. 2010) (citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448 (1976)).

To adequately state a claim under Rule 14a-9, a plaintiff must allege that: "(1) a proxy statement contained a material misrepresentation or omission, which (2) caused plaintiffs' injury, and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction." *Bond Opportunity Fund v. Unilab Corp.*, 87 F. App'x 772, 773 (2d Cir. 2004). A misrepresentation or an omitted fact is material if

there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. *Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1090 (1991) (citations omitted). Put another way, a fact is material if there is a substantial likelihood that its disclosure "would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *TSC Indus., Inc.*, 426 U.S. at 449.

Unlike claims under Section 10(a), "[t]here is no requirement in the Second Circuit that plaintiffs allege fraud in order to state a cause of action pursuant to Section 14(a)." *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 636 (S.D.N.Y. 2005) (citing *Gerstle v. Gamble–Skogmo, Inc.*, 478 F.2d 1281, 1301 n. 20 (2d Cir. 1973)). Nevertheless, "[w]hen plaintiffs assert Section 14(a) claims grounded in alleged fraudulent conduct, they are subject to heightened pleading requirements . . . even if they disclaim reliance on a fraud theory." *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d at 636 (citing *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)).

## B. The Relevant Proxy Statement and Soliciting Materials

Plaintiff alleges that Defendants Hyzon, Knight, Gu, Gordon and all DCRB Defendants "prepared, reviewed, and/or disseminated false and misleading Proxy Statements and other Soliciting Materials (collectively, 'Soliciting Materials') which failed to disclose facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." TAC at ¶ 545. Each of the following statements were filed with the SEC as either "soliciting materials" or

proxy statements.

Plaintiff challenges Hyzon's February 9, 2021 press release announcing the business combination agreement, which was also filed with the SEC as "Soliciting Material" pursuant to Rule 14a-12. Plaintiff notes the release stressed "Hyzon's existing global footprint, and sales pipeline with blue-chip Fortune 100s and municipalities." TAC at ¶ 288. The release quotes Knight as stating, "Deliveries of Hyzon fuel cell powered heavy trucks to customers in Europe and North America will occur this year, well ahead of our competitors, and our committed sales pipeline is proof that the world is truly recognizing the need to develop innovative solutions to mitigate climate change and accelerate efforts to move the world economy down the path to net-zero emissions." It also quotes Gu as saying, "This business combination will enable us to expand deployments of our zero-emission hydrogen fuel cell powered heavy vehicles globally, and to continue leading the hydrogen transition. We are incredibly excited about the dynamic mobility category as municipalities and Fortune 100 companies are rapidly embracing hydrogen as the essential pathway to a net-zero economy" *Id.*

Plaintiff challenges the following statements from a call with investors on February 9, 2021 (transcript at ECF No. 94-2):

- By Tichio: "The Company has a sales pipeline for 2021 that is 100 percent under contract or MOU, providing real runway visibility, and its customers include some of the most recognizable global brands and the largest municipalities in the world." (*Id.* at 3)

- By Gordon: "Our success is not built on the outcomes of one or two trials in a location with peculiar characteristics; we're securing orders with customers of

51

varying types, with varying criteria for long-term scaling up within their systems." (*Id.* at 7)

- By Gordon: "Hyzon forecasts to grow from $37 million on revenue on 85 units sold in 2021 . . . . Our 2021 forecast is 100 percent covered by contracts and MOUs . . . ." (*Id.* at 9)

Plaintiff challenges the following elements from the presentation distributed to potential investors on February 9, 2021 (ECF No. 94-3):

- Unattributed: "2021 backlog of ~$40 million under contract or MOU from blue-chip Fortune 100s . . . ." (*Id.* at 6)

- Unattributed: "80% of near-term backlog to customers in Europe, Asia, and Australia . . . ." (*Id.* at 6)

- Unattributed: Several slides with graphics and projections identifying specific customers and potential customers that involved "top tier customers / end users / partners," "vehicles ordered and near-term pipeline," "vehicle customers," and "summary projected financials," respectively. (*Id.* at 6, 9, 15, 23)

Plaintiff challenges multiple elements from presentations which were based on the February 9, 2021 presentation, but edited before filing with the SEC as "Soliciting Materials" on February 10, 2021, and then again on February 12, 2021 (ECF Nos. 94-4, 94-5).

Plaintiff challenges the following statement made at the "Cowen Mobility Disruption Virtual Summit" on March 10, 2021 (ECF No. 94-10), the transcript of which was filed as Soliciting Materials under Rule 14a-12 with the SEC:

- By Knight: "[W]e now have more customer commitments than we have 2021 revenue forecasts, so we're feeling quite confident about our 2021 outlook. [C]ustomer commitments are documented orders, tender wins, that sort of thing, and the high probability orders . . . are really those scenarios where you've been told you've been selected as the vendor but you haven't yet got the contract in place . . . ." (*Id.* at 6)

52

On March 17, 2021, the DCRB Defendants filed their Preliminary Proxy Statement with the SEC, which they updated on May 14, June 4, and June 16, 2021. TAC at ¶ 315. Plaintiff challenges the following statements regarding the DCRB Board's considertions in evaluating a potential merger with Legacy Hyzon:

- *"Revenue Potential.* The DCRB Board considered Hyzon's non-binding memoranda of understanding, letters of intent and a limited number of orders with various clients, including blue-chip Fortune 100 companies as well as Hyzon's rapidly growing visibility." (ECF No. 94-11)

- "Hyzon's maintaining gross margin remains relatively consistent at 30% to 33% from 2021 to 2025, through product design and other innovations to decrease the cost of materials in a FCEV." (*Id.*)

- "Hyzon's commercial vehicle business will initially be focused on manufacturing and supplying heavy-duty (Class 8) trucks, medium-duty (Class 6) trucks and 40- and 60-foot (12 and 18-meter) city and coach buses to commercial vehicle operators . . . . Hyzon has already received a limited number of orders in an aggregate value of approximately $18.2 million for Hyzon-branded trucks, sleepers and buses to Australia, New Zealand and the Netherlands, and is in advanced discussions for delivery of Hyzon-branded trucks to France and Germany, before the end of 2021 . . . . Hyzon has also entered into non-binding memoranda of understanding and letters of intent with various companies and municipalities predominantly in Europe, Asia and Australia, which indicate interest in over 3,000 Hyzon-branded commercial vehicles, and in some cases Hyzon has deployed demonstration units to customers." (*Id.*)

Plaintiff challenges the following elements from the presentation entitled "Analyst Day Presentation" and dated "April 2021" (ECF No. 94-12), which was filed with the SEC as a Soliciting Material pursuant to Rule 14a-12. TAC at ¶ 320.

- Unattributed: "2021 backlog of ~$55 million under contract or MOU . . . ." (*Id.* at 8)

- Unattributed: "80% of near-term backlog to customers in Europe, Asia, and Australia . . . ." (*Id.* at 8)

53

- Unattributed: Several slides with graphics and projections identifying specific customers and potential customers that involved "expanding top tier customers / end users / partners," "vehicles ordered and near-term pipeline," "summary projected financials," and "vehicle customers," respectively. (*Id.* at 8, 19, 28, 29)

Plaintiff challenges the following statement made at the "Bernstein Fireside Chat" which took place on June 16, 2021 (ECF No. 94-14), the transcript of which was filed with the SEC as a Soliciting Material pursuant to Rule 14a-12. TAC at ¶ 327.

- By Knight: "I'd like to remain a little conservative on this but providing there are no more nasty surprises in supply chains and those kind of things, we'll definitely hit this year's targets." (*Id.* at 5)

**C. Application**

In the present case, the challenged proxy statements and soliciting materials are protected by the "bespeaks caution doctrine." Under this doctrine, a "forward-looking statement accompanied by sufficient cautionary language is not actionable because no reasonable investor could have found the statement materially misleading." *Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 141 (2d Cir. 2010) ("IPERS I"). The questions thus become: (1) whether challenged statements were forward-looking statements, and (2) if so, whether they were accompanied by sufficient cautionary language. *In re Lottery.com, Inc. Sec. Litig.*, 715 F. Supp. 3d 506, 538 (S.D.N.Y. 2024).

Plaintiff's assertions that the challenged statements are statements of present fact, rather than forward looking, ignore the context of the proxy and the timing of the shareholder vote. It is axiomatic that "forward-looking" statements are

54

statements whose truth cannot be ascertained until some time after the time they are made. *In Re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th 408, 428 (2d Cir. 2023) (quoting *In re Bear Stearns Cos. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d at 493). Here, the challenged statements were forward-looking statements because they were predictions made throughout 2021 about how Legacy Hyzon would perform through the merger and how the combined company would perform beyond. That is, while the materials indicated that some revenue was based on contracts, it was clear from the presentations that a large share of projected revenue was based on non-binding memoranda of understanding that would have to be converted in the future. Because these statements "project[ed] results in the future," they are forward-looking. *Slayton v. Am. Express Co.*, 604 F.3d 758, 769 (2d Cir. 2010).

The Court also finds that the challenged statements were accompanied by sufficient cautionary language. Generally, cautionary language must "not [be] boilerplate" and must "convey[ ] substantive information." *Slayton*, 604 F.3d at 772. Here, the DCRB Defendants provided sufficiently substantive and particular cautionary language in their Proxy statement issued on March 17, 2021, and which Plaintiffs admit was updated on May 14, June 4, and June 16, 2021 as realities became clearer. This language clearly identifies specific risks to the Hyzon business, some of which Hyzon was ultimately unable to avoid and which form the very basis of this action.

The proxy includes discussion of multiple highly-specific risk factors spanning more than a dozen pages, the most relevant of which are quoted below (bold lettering in the original):[4]

> **Hyzon has a limited operating history as a stand-alone company making it difficult to evaluate Hyzon's future business prospects, which may increase the risk of your investment.**
>
> Hyzon faces significant risks and difficulties as an early-stage company. Hyzon has a limited operating history, which increases the risk to your investment . . . . Hyzon intends to derive a majority of its revenues initially from the sale or lease of its hydrogen fuel cell heavy commercial vehicles, deliveries of which are not expected to begin until the second quarter of 2021 in Europe, and the fourth quarter of 2021 in North America, and may occur later or not at all. In addition, Hyzon has engaged in limited marketing activities to date, so there can be no assurance that customers will embrace Hyzon's commercial vehicles in significant numbers.
>
> It is difficult to predict Hyzon's future revenues or appropriately budget for its expenses. In the event that actual results differ from Hyzon's estimates or Hyzon adjusts its estimates in future periods, Hyzon's operating results and financial position could be materially affected. The projected financial information appearing elsewhere in this proxy statement has been prepared by Hyzon's management and reflects current estimates of future performance. The projected results depend on the successful implementation of Hyzon management's growth strategies and are based on assumptions and events over which Hyzon has only partial or no control. The assumptions underlying such projected information require the exercise of judgment, and the projections are subject to uncertainty due to the effects of economic, business, competitive, regulatory, legislative, political and other changes.
>
> . . . .

---

[4] Because Hyzon did not submit the complete version of the proxy statement, the Court quotes from the full proxy statement for March 17, 2021 posted by the SEC on Edgar and available at https://www.sec.gov/Archives/edgar/data/1716583/000119312521084245/d46419dprem14a.htm#toc46 419_6. These statements were checked against the statements in the June 16 proxy statement to confirm there were no significant changes.

**Hyzon has a limited number of current customers and pending orders, and there is no assurance that non-binding memoranda of understanding and letters of intent will be converted into binding orders or sales.**

To date, Hyzon has engaged in limited marketing activities and currently has limited binding contracts. Hyzon's non-binding memoranda of understanding and letters of intent with potential customers do not represent assured sales and may not be converted into binding orders or sales. In particular, Hyzon cannot be assured that the counterparties to such memoranda of understanding and letters of intent have or will have the financial capacity to make such binding orders or that such counterparties' demand for Hyzon's products will remain. For example, Hyzon has entered into non-binding letters of intent with a trucking and rail logistics operator, a leader in specialty metals, and a hydrogen electric flight company. However, Hyzon has not received any deposits from the counterparties to its non-binding memoranda of understanding and letters of intent, and these counterparties have no obligation to make purchases. Further, these counterparties may not perform as expected and may therefore not have the means or market demand to convert the non-binding memoranda of understanding or letters of intent into binding orders . . . .

Even if Hyzon were able to obtain binding orders, customers may limit their volume of purchases initially as they assess Hyzon's commercial vehicles and hydrogen fuel cell systems and whether to make a broader transition to hydrogen-powered solutions. This may be a long process, which will depend on the safety, reliability, efficiency and quality of Hyzon's products, as well as the support and service that Hyzon offers . . . . As a result, there is significant uncertainty regarding demand for Hyzon's products and the pace and levels of growth that Hyzon will be able to achieve.

. . . .

**Hyzon, its partners and its suppliers may rely on complex machinery for production of Hyzon's hydrogen-powered commercial vehicles and fuel cell systems, which involves a significant degree of risk and uncertainty in terms of operational performance and costs.**

57

Hyzon, its partners and suppliers may rely on complex machinery for the manufacture, integration and assembly of Hyzon's hydrogen-powered commercial vehicles and fuel cell systems. Such complex machinery may involve a significant degree of uncertainty and risk in terms of operational performance and costs . . . .

. . . .

**As a private company, Hyzon has not been required to document and test its internal controls over financial reporting nor has management been required to certify the effectiveness of its internal controls and its auditors have not been required to opine on the effectiveness of its internal control over financial reporting. Failure to maintain adequate financial, information technology and management processes and controls could result in material weaknesses and errors in Hyzon's financial reporting, which could adversely affect Hyzon's business.**

As a private company, Hyzon has not been subject to the SEC's internal control reporting requirements. Following the business combination, the Company will become subject to the SEC's internal control over financial reporting requirements and will become subject to the auditor attestation requirements in the year in which it is deemed to be a large accelerated filer . . . . As a result, Hyzon expects that its independent registered public accounting firm will be required to formally attest to the effectiveness of its internal controls over financial reporting commencing with the New Hyzon's Annual Report on Form 10-K for the year ended December 31, 2022. Hyzon may not be able to complete its evaluation, testing and any required remediation in a timely fashion. In addition, Hyzon's current controls and any new controls that it develops may become inadequate because of poor design, inadequate enforcement, and changes in its business, including increased complexity resulting from expansion. Any failure to implement and maintain effective internal controls over financial reporting could adversely affect the results of assessments by its independent registered public accounting firm and their attestation reports.

**Hyzon's management has limited experience in operating a public company.**

Hyzon's executive officers have limited experience in the management of a publicly traded company. Hyzon's management team may not

58

successfully or effectively manage its transition to a public company that will be subject to significant regulatory oversight and reporting obligations under federal securities laws. Their limited experience in dealing with the increasingly complex laws pertaining to public companies could be a significant disadvantage in that it is likely that an increasing amount of their time may be devoted to these activities which will result in less time being devoted to the management and growth of the post-combination company. Hyzon may not have adequate personnel with the appropriate level of knowledge, experience and training in the accounting policies, practices or internal control over financial reporting required of public companies in the United States . . . . The development and implementation of the standards and controls necessary for Hyzon to achieve the level of accounting standards required of a public company in the United States may require costs greater than expected. It is possible that Hyzon will be required to expand its employee base and hire additional employees to support its operations as a public company which will increase its operating costs in future periods.

Proxy Statement, 29–61.

These "Risk Factors" in the DCRB Defendants' proxy statement proved to be remarkably prescient. As discussed above, Hyzon experienced difficulties converting non-binding MOUs and letters of intent to actual purchase orders; the complexity of the product offerings led to deliveries that required additional repair and upgrade post-delivery to operability by hydrogen; Legacy Hyzon's inexperience with public accounting standards and practices led to inaccurate reporting and negative adjustments to their revenue; and their CEO, CFO, and Executive Chairman had difficulty adjusting to the difference between a private and public company, and were ultimately removed from leadership.

In short, the statements challenged in Plaintiff's Section 14(a) claims were forward-looking statements, and the cautionary language sufficiently warned

potential investors about the risks inherent in the merger. Accordingly, Plaintiff's Section 14(a) claims must be dismissed.

## V. Counts III and V: Claims under Section 20(a)

Plaintiff's third and fifth causes of action allege control person liability under Exchange Act Section 20(a) against Defendants for the violations alleged in Counts I, II, and IV. This section establishes derivative joint and several liability, subject to a good faith exception, for "[e]very person who, directly or indirectly, controls any person liable under any provision of [the Exchange Act]." 15 U.S.C. § 78t(a). To state a claim, a complaint must allege (1) "a primary violation by the controlled person"; (2) "control of the primary violator by the targeted defendant"; and (3) "that the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person." *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996) (internal quotation marks and alterations omitted). Further, "[w]hile a party cannot be held liable for both a primary violation and as a control person, alternative theories of liability are permissible at the pleading stage." *In re Am. Intern. Grp., Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 534–535 (S.D.N.Y. 2010).

Both sets of Defendants point out that Section 20(a) claims are derivative of primary violations of distinct code sections, and maintain that Plaintiff's Section 20(a) claims must be dismissed because Plaintiff has failed to establish predicate violations of either Section 10(b) in Counts I and II, or Section 14(a) in Count IV. As discussed above, however, although Plaintiff's Section 14(a) claims are dismissed, the

Court finds that some of Plaintiff's Section 10(b) claims are sufficiently pled to survive Defendants' motion to dismiss.

Because Defendants' sole argument regarding Plaintiff's Section 20(a) claims is that there is no predicate violation, the Section 20(a) claims survive with respect to the Section 10(b) claims that will be permitted to proceed. *In Romeo Power Inc. Securities Litigation*, 2022 WL 1806303 at *5. Plaintiff cannot, however, maintain his Section 20(a) claims related to the Section 14(a) claims, or those Section 10(b) allegations which the Court has dismissed. *Kleinman v. Elan Corp.*, 706 F.3d 145, 156 n. 14 (2d Cir. 2013) (finding that it was "correct" for the district court to dismiss Section 20(a) claims where there was no predicate violation of the Exchange Act).

## VI. Leave to Amend

Plaintiffs who must satisfy the heightened pleading requirements of Rule 9(b) are generally allowed "at least one opportunity to plead fraud with greater specificity." *ATSI Commc'ns, Inc.*, 493 F.3d at 108. Leave to amend should generally be denied, however, "in instances of futility, undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice to the non-moving party." *In re Garrett Motion Inc. Sec. Litig.*, No. 20 CIV. 7992 (JPC), 2022 WL 976269, at *18 (S.D.N.Y. Mar. 31, 2022) (citing *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 126 (2d Cir. 2008).

Here, the Court considers Plaintiff's third amended complaint, submitted more than two years into the case, after significant discovery and settlement discussions

61

with Defendants, which Plaintiff indicated led to an even greater understanding of the events alleged. ECF No. 65. Given that history, the Court is reluctant to allow Plaintiff a further opportunity to amend his complaint.

However, the Court recognizes, as discussed at oral argument, that an SEC action has been litigated against many of these Defendants during the pendency of this action, which resulted in multiple consent decrees and various potentially relevant findings and admissions. *See Securities and Exchange Commission v. Hyzon Motors Inc. et al.*, Case No. 23-cv-06553-FPG (W.D.N.Y.). Accordingly, the Court will grant Plaintiff leave to *move* to amend his complaint to incorporate any further details that emerged in the SEC action. To be clear, the Court does not here grant Plaintiff leave to amend. The Court grants Plaintiff leave to move to amend, in order to provide additional briefing to the Court on proposed amendments in light of the case cited above.

## CONCLUSION

For the foregoing reasons, it is hereby,

ORDERED that Plaintiff's Section 10(b) claims for material misstatements under Rule 10b-5(b) are dismissed with respect to the Hyzon Defendants' pre-merger statements and all statements by Defendants Anderson, Haskopolous, and Tichio; and it is further

ORDERED that Plaintiff's Section 10(b) claims for scheme liability under Rule 10b-5(a) and (c) are dismissed; and it is further

ORDERED that Plaintiff's Section 14(a) claims are dismissed; and it is further

ORDERED that Plaintiff's Section 20(a) claims for control liability are dismissed only with respect to the Section 10(b) and Section 14(a) claims that are dismissed; and it is further

ORDERED that Defendants answer Plaintiff's remaining claims within 30 days from the date of this order.

SO ORDERED.

Dated:      July 14, 2025
            Rochester, New York

ENTER:

_____
HON. MEREDITH A. VACCA
United States District Judge

63