# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *IN RE HYZON MOTORS INC. SECURITIES LITIGATION* <br><br> This Document Relates to: <br> ALL ACTIONS. | Master File No. 6:21-cv-06612-~~CJS~~MAV MWP <br><br> <u>CLASS ACTION</u> <br><br> ~~THIRD~~**[PROPOSED] FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br><br> <u>**JURY TRIAL DEMANDED**</u> |

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ...................................................................................................... 3

       A.     Brief Summary of the Facts ......................................................................... 4

       B.     The Claims Asserted in this Complaint ...................................................... 14

II.    JURISDICTION AND VENUE ............................................................................... 15

III.   PARTIES ................................................................................................................. 16

       A.     Lead Plaintiff .............................................................................................. 16

       B.     Hyzon f/k/a DCRB ..................................................................................... 17

       C.     Executive Defendants ................................................................................. 18

       D.     DCRB Control Defendants ......................................................................... 22

       E.     DCRB Director Defendants ........................................................................ 23

       F.     Other Relevant Persons and Entities .......................................................... 25

IV.    THE ORIGINS OF HYZON AND DCRB ............................................................... 28

       A.     Hyzon: A Repackaging of a Financially Flailing Chinese EV Company ... 28

       B.     Take Two: Horizon Spins Off Hyzon to Rebrand Its EV Enterprise and
              Attract More Lucrative Investments from U.S. Capital Markets ............... 34

       C.     SPACs: A Short Primer ............................................................................... 37

       D.     Hyzon Positions Itself to Attract SPAC Suitors ......................................... 39

       E.     DCRB: Origin and Formation ..................................................................... 41

       F.     Merger Countdown Begins: DCRB's Due Diligence on Hyzon ............... 44

V.     DEFENDANTS' MISCONDUCT ........................................................................... 47

       A.     Hyzon Hypes Purported Big-Name Customers, Contracts, and MOUs
              in High Revenue Areas to Support its $2.7 Billion Valuation and Lofty
              Projections .................................................................................................. 47

       B.     Defendants' Emphasize Major Vehicle Supply Agreement with Hiringa .. 56

       C.     Defendants Double Down on Revenue Projections and 2021 Deliveries
              Despite Dropping Committed Customers and Growing Supply Chain
              Concerns ..................................................................................................... 62

D.    Defendants Persuade Shareholders to Approve the Merger on the Back of Committed Orders, Top-Tier Customer, and Projected Revenue Claims ................................................................................................ 68

E.    Hyzon's Gaping Sales and Deliveries Gap .................................... 73

F.    Hyzon Announces Blockbuster Deal with Fantastical Purchaser HongYun ............................................................................................ 74

G.    The Truth Starts to Emerge: Short Seller Blue Orca Exposes Hyzon's Fraudulent Conduct with a Detailed Investigative Report ......................... 77

H.    Hyzon's Telling Admissions in Response to Blue Orca's Revelations ...... 88

I.    Iceberg Research Releases a Separate Investigative Report ....................... 90

J.    Hyzon Doubles Down: Declares It Consciously Pivoted to the Asian Market to Meet Its 2021 Goals .......................................................... 92

K.    Hyzon Touts China as Its Prized Market for 2021 ...................................... 95

L.    The Façade Starts to Crumble: Hyzon Previews its Poor 2021 Financial Results and Disclose Receipt of SEC Subpoena ......................................... 99

M.    Hyzon Discloses Its True Sales and Revenue Numbers for 2021 Included Related Party Transactions and Undisclosed Purchase Incentives .................................................................................... 101

N.    Hyzon Terminates Top Executives, Launches Independent Investigation, and Disavows All Prior Financial Guidance ....................... 109

VI.    HYZON'S POST-CLASS PERIOD DISCLOSURES REVEAL THE EXTENT OF DEFENDANTS' DECEPTION ................................................................ 118

A.    Hyzon Retroactively Determines Knight Was Terminated for Cause ...... 119

B.    Hyzon Discloses Special Investigation's Summary Findings: False Sales, Inoperable Vehicles, and Improperly Reported Revenue ............... 119

C.    Hyzon Releases Restated Financials for 3Q21 ......................................... 121

D.    Hyzon Releases Restated Financials for FY2021 ..................................... 123

E.    Hyzon Releases Restated Financials for 1Q22 ......................................... 129

F.    Hyzon Late-Files Remaining Outstanding Financials for the Rest of 2022 ............................................................................................ 129

VII.    LEAD PLAINTIFF'S INDEPENDENT INVESTIGATION CONFIRMING FACTS CONSISTENT WITH BLUE ORCA AND ICEBERG'S FINDINGS .. 131

A.    Retained Investigation Firm, Its Experience Investigating Chinese Companies, and Its Extensive Investigation of HongYun ....................... 132

B.     HongYun Was in Fact Incorporated 3 Days Before Deal Announcement.................................................................................. 134

C.     Confirmed: HongYun Has No Paid-In Capital ............................................ 136

D.     Confirmed: HongYun Has No Real Operations............................................ 138

E.     HongYun Has No Corporate Owners, Only Individual Owners with Shallow Pockets and Business Experience ................................................... 140

F.     No Corporate Parents, One Suspicious Subsidiary ..................................... 143

G.     No Website Plus No Employees Equals No Ability to Conduct Business....................................................................................................... 144

H.     No Hydrogen Experience or "Deep Connections" to Large Chinese Conglomerates............................................................................................. 147

I.     No Ability To Negotiate Supply Agreements for HFCEVs or To Participate in Government-Sanctioned RFPs (Not At Least Without Outside Aid) .................................................................................................. 148

VIII.  MATERIALLY FALSE AND MISLEADING STATEMENTS REGARDING HYZON'S PURPOTED CUSTOMERS AND VEHICLE SALES...................... 151

A.     Statements Concerning 100% Committed and Highly Probable Orders .. 153

B.     Statements Concerning Hiringa ................................................................. 183

C.     Statements Concerning HongYun............................................................... 189

D.     Materially False and Misleading Statements Concerning Revenue Recognition Practices and Internal Controls............................................... 199

IX.   ADDITIONAL ALLEGATIONS OF SCIENTER ............................................. 213

A.     The Special Committee's Findings and Hyzon's Subsequent Disclosures .................................................................................................. 213

B.     Cascading Terminations of Hyzon's Founders and C-Suite Officers ....... 216

C.     SEC and SDNY Investigations Support the Inference of Scienter ........... 218

D.     Scienter as to Hyzon's Purported Committed Orders ............................... 220

E.     Scienter as to Hyzon's Characterization of Its Relationship with Hiringa........................................................................................................ 229

F.     Scienter as to Horizon's Purported Sales and Deliveries to China ........... 231

G.     Defendants' Imputed Knowledge about Hyzon's Core Operations.......... 236

H.     Motive and Circumstantial Evidence of Scienter...................................... 239

X.      LOSS CAUSATION ...........................................................................................245

        A.      Corrective Disclosures ........................................................................245

        B.      Materialization of Risks .....................................................................251

XI.     NO SAFE HARBOR ..........................................................................................253

XII.    CLASS ACTION ALLEGATIONS ...................................................................254

XIII.   CLAIMS BROUGHT PURSUANT TO THE EXCHANGE ACT ....................258

XIV.    PRAYER FOR RELIEF .....................................................................................272

XV.     DEMAND FOR TRIAL BY JURY ...................................................................272

I.      NATURE OF THE ACTION .................................................................................4

II.     SUMMARY OF AMENDMENTS AND LIVE CLAIMS .................................19

III.    JURISDICTION AND VENUE ...........................................................................26

IV.     PARTIES .............................................................................................................27

        A.      Lead Plaintiff .......................................................................................27

        B.      Hyzon f/k/a DCRB ...............................................................................28

        C.      Hyzon Executive Defendants ...............................................................29

        D.      DCRB Executive Defendants ................................................................33

        E.      DCRB Control Defendants ...................................................................36

        F.      DCRB Director Defendants ..................................................................37

        G.      Other Relevant Persons and Entities ...................................................38

V.      THE ORIGINS OF HYZON AND DCRB ..........................................................42

        A.      Hyzon: A Repackaging of a Financially Flailing Chinese EV Company ... 42

        B.      Take Two: Horizon Spins Off Hyzon to Rebrand Its EV Enterprise and
                Attract More Lucrative Investments from U.S. Capital Markets ...............48

        C.      SPACs: A Short Primer .........................................................................51

        D.      Hyzon Positions Itself to Attract SPAC Suitors ...................................53

        E.      DCRB: Origin and Formation ..............................................................55

        F.      Merger Countdown Begins: DCRB's Due Diligence on Hyzon ...............58

VI.     DEFENDANTS' MISCONDUCT .......................................................................61

A.      Hyzon Hypes Purported Big-Name Customers, Contracts, and MOUs in High Revenue Areas to Support Its $2.7 Billion Valuation and Lofty Projections ................................................................................... 61

B.      Defendants' Emphasize Major Vehicle Supply Agreement with Hiringa .. 74

C.      Defendants Double Down on Revenue Projections and 2021 Deliveries Despite Dropping Committed Customers and Growing Supply Chain Concerns ............................................................................................ 80

D.      Defendants Persuade Shareholders to Approve the Merger on the Back of Committed-Orders, Top-Tier-Customer, and Projected-Revenue Claims ................................................................................................. 87

E.      Hyzon Announces Blockbuster Deal with Fantastical Purchaser HongYun ............................................................................................ 93

F.      The Truth Starts to Emerge: Short Seller Blue Orca Exposes Hyzon's Fraudulent Conduct with a Detailed Investigative Report ....................... 97

G.      Hyzon's Telling Admissions in Response to Blue Orca's Revelations .... 108

H.      Iceberg Research Releases a Separate Investigative Report ................... 111

I.      Hyzon Doubles Down: Declares It Consciously Pivoted to the Asian Market to Meet Its 2021 Goals ............................................................ 113

J.      Hyzon Touts China as Its Prized Market for 2021 ............................... 118

K.      The Façade Starts to Crumble: Hyzon Previews Its Poor 2021 Financial Results and Disclose Receipt of SEC Subpoena .................................. 122

L.      Hyzon Discloses Its True Sales and Revenue Numbers for 2021 Included Related Party Transactions and Undisclosed Purchase Incentives ......................................................................................... 124

M.      Hyzon Terminates Top Executives, Launches Independent Investigation, and Disavows All Prior Financial Guidance ................... 132

VII.   HYZON AND THE SEC 'S POST-CLASS PERIOD DISCLOSURES REVEAL THE EXTENT OF DEFENDANTS' DECEPTION ........................................... 142

A.      Hyzon Retroactively Determines Knight Was Terminated for Cause ...... 143

B.      Hyzon Discloses Special Investigation's Summary Findings: False Sales, Inoperable Vehicles, and Improperly Reported Revenue .............. 143

C.      Hyzon Releases Restated Financials for 3Q21 ..................................... 145

D.      Hyzon Releases Restated Financials for FY2021 ................................. 147

E.      Hyzon Releases Restated Financials for 1Q22 ..................................... 153

F.      Hyzon Late-Files Remaining Outstanding Financials for the Rest of 2022 ......................................................................................... 153

G.      The SEC Files a Complaint and Consent Judgment Against Hyzon ........ 155

VIII.  LEAD PLAINTIFF'S INDEPENDENT INVESTIGATION CONFIRMING FACTS CONSISTENT WITH BLUE ORCA AND ICEBERG'S FINDINGS .. 157

A.      Retained Investigation Firm, Its Experience Investigating Chinese Companies, and Its Extensive Investigation of HongYun ........................ 157

B.      HongYun Was in Fact Incorporated 3 Days Before Deal Announcement .................................................................................. 159

C.      Confirmed: HongYun Has No Paid-In Capital ....................................... 162

D.      Confirmed: HongYun Has No Real Operations ...................................... 164

E.      HongYun Has No Corporate Owners, Only Individual Owners with Shallow Pockets and Business Experience ............................................. 166

F.      No Corporate Parents, One Suspicious Subsidiary .................................. 169

G.      No Website Plus No Employees Equals No Ability to Conduct Business ........................................................................................... 170

H.      No Hydrogen Experience or "Deep Connections" to Large Chinese Conglomerates .................................................................................. 173

I.      No Ability To Negotiate Supply Agreements for HFCEVs or To Participate in Government-Sanctioned RFPs (Not At Least Without Outside Aid) ..................................................................................... 174

IX.    MATERIALLY FALSE AND MISLEADING STATEMENTS REGARDING HYZON'S PURPOTED CUSTOMERS AND VEHICLE SALES ..................... 178

A.      [Revised] Statements About the Present-State of Relationships with Key Customers/ Suppliers and 100% Committed/Highly Probable Orders ............................................................................................. 179

B.      [Removed] Statements Concerning Hiringa ........................................... 232

C.      Statements Concerning HongYun ......................................................... 238

D.      Materially False and Misleading Statements Concerning Revenue Recognition Practices and Internal Controls ........................................... 249

X.     ADDITIONAL ALLEGATIONS OF SCIENTER ......................................... 263

A.      The Special Committee's Findings and Hyzon's Subsequent Disclosures ....................................................................................... 263

B.      Cascading Terminations of Hyzon's Founders and C-Suite Officers ....... 266

C.     SEC and SDNY Investigations Support the Inference of Scienter ........... 269

D.     Scienter as to Hyzon's Purported Committed Orders .............................. 270

E.     Scienter as to Hyzon's Characterization of Its Relationship with Hiringa [Removed].................................................................................... 281

F.     Scienter as to Horizon's Purported Sales and Deliveries to China ........... 283

G.     Defendants' Imputed Knowledge About Hyzon's Core Operations......... 288

H.     Motive and Circumstantial Evidence of Scienter................................... 291

XI.     LOSS CAUSATION ....................................................................................... 297

A.     Corrective Disclosures ........................................................................ 297

B.     Materialization of Risks ...................................................................... 303

XII.    NO SAFE HARBOR........................................................................................ 305

XIII.   CLASS ACTION ALLEGATIONS................................................................... 306

XIV.   CLAIMS BROUGHT PURSUANT TO THE EXCHANGE ACT ...................... 310

COUNT I:    VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5(B) AGAINST DEFENDANTS HYZON, KNIGHT, GU, GORDON, ANDERSON, TICHIO, AND HASKOPOULOS.................................................. 310

COUNT II:    VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5(A) AND (C) AGAINST DEFENDANTS HYZON, KNIGHT, GU, AND GORDON.................................................................................. 312

COUNT III:    VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT AGAINST DEFENDANTS KNIGHT, GU, GORDON, ANDERSON, HASKOPOULOS, AND TICHIO ARISING FROM PRIMARY VIOLATIONS OF SECTION 10(B).................................................................................... 315

COUNT IV: VIOLATIONS OF SECTION 14 OF THE EXCHANGE ACT AND RULE 14A-9 AGAINST DEFENDANTS HYZON, RIVERSTONE, SPONSOR, WRG, KNIGHT, GU, GORDON, HASKOPOULOS, ANDERSON, AAKER, KEARNS, LAPEYRE, LEUSCHEN, TICHIO, MCDERMOTT, TEPPER, AND WARREN .................................................................................................................... 316

COUNT V:    VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT AGAINST ALL DEFENDANTS EXCEPT DCRB/HYZON   ARISING FROM PRIMARY VIOLATIONS OF SECTION 14(A)................................................ 322

XV.    PRAYER FOR RELIEF ................................................................................... 325

XVI.   DEMAND FOR TRIAL BY JURY .................................................................... 325

**TABLE OF DEFINED TERMS**

| TERM | Definition |
|---|---|
| ¶¶ | Refers to paragraphs in this pleading, the ~~Third~~Fourth Amended Consolidated Class Action Complaint ~~("TAC"), which revises and supplements the Second Amended Consolidated Class Action Complaint ("SAC") (Dkt. No. 55) filed on September 16, 2022 and the First Amended Consolidated Class Action Complaint ("FAC") (Dkt. No. 34) filed on March 11, 2022~~(4AC) |
| T.# | Refers to Table [#] |
| F.# | Refers to Figure [#] |
| Blue Orca | Blue Orca Capital—a short seller analyst firm founded and managed by known investor activist Soren Aandahl, which published a report on September 28, 2021 concerning Hyzon's purported deals and customers |
| Class Period | The period from February 9, 2021 to August 17, 2022, inclusive |
| Co-Founder Defendants | Defendants Knight and Gu |
| DCRB | Defendant Decarbonization Plus Acquisition Corporation—a publicly traded special purpose acquisition company formed for the purpose of acquiring a private owned company (here Hyzon) and taking it public |
| DCRB Control Defendants | Defendants Riverstone, Sponsor, and WRG, by virtue of their controlling stock ownership interests, along with Defendants Anderson, Lapeyre, Leuschen, and Tichio, by virtue of their ties to those entities |
| DCRB Directors | Defendants Anderson, Aaker, Kearns, Lapeyre, Leuschen, Tichio, McDermott, Tepper, and Warren in their capacities as DCRB Directors. Also referred to herein as "DCRB Director Defendants." |
| DCRB Defendants | The Defendants ~~Anderson,~~affiliated with DCRB, including the DCRB Control Defendants, DCRB's Directors, and Defendant Haskopoulos~~, and Tichio~~. |
| EV | Electric vehicle |
| Exchange Act | Securities Exchange Act of 1934 |
| ~~Founder Defendants~~ | ~~Defendants Knight and Gu~~ |
| HFCEV | Hydrogen-fuel-cell powered electric vehicle |

| Hiringa | Hiringa Energy |
|---|---|
| HongYun | Shanghai Hydrogen HongYun Automotive Co., Ltd. |
| Horizon | Horizon Fuel Cell Technologies Ltd.—Hyzon's corporate grandparent, a Singapore-based company purporting to be a world leading developer and manufacturer of various fuel cell electric energy solutions and products, from which Hyzon spun off as an independent entity |
| Hyzon a/k/a Company | Defendant Hyzon Motors LLC (including its agents) and, following the July 16, 2021 SPAC Merger, both DCRB and "Legacy Hyzon" |
| Hyzon Defendants | Defendants Knight, Gu, and Gordon |
| Individual Defendants | Defendants Knight, Gu, Gordon, Anderson, Haskopoulos, and Tichio |
| Iceberg Research | Activist short seller firm founded by Arnauld Vaugner, best known for its reports on one of the largest commodity trading firms in the world, which published an October 6, 2021 report on Hyzon |
| IPO | Initial Public Offering |
| Jiushuang | Jiushuang (Shanghai) New Energy Technology Co., Ltd.—the Chinese company with which Hyzon entered into two joint ventures in July 2021 to promote the commercial operation of fuel cell vehicles in the Shanghai, China market—facts not disclosed until March 30, 2022 |
| Lead Plaintiff | Lead Plaintiff Alfred Miller |
| Market Cap | Refers to market capitalization—that is, the total value of all a company's shares of stock, calculated by multiplying the price of a stock by its total number of outstanding shares (for example, a company with 2 million shares selling at $5 a share would have a market cap of $10 million) |
| Merger Sub | DCRB Merger Sub Inc.—DCRB's directly owned subsidiary created to merge with Hyzon for purposes of taking Hyzon public through DCRB |
| MoU | Memorandum of Understanding |
| Proxy Statement | Refers to publicly filed statements securities issuers must furnish shareholders before they can seek consent or authorization for a specific corporate action (e.g., approval for a merger). These statements are filed on SEC Form Schedule 14A and must disclose all relevant details related to the issues being put forward for a shareholder vote. *See* 17 C.F.R. § 240.14a-101. They can take the form of a "preliminary" statement or a "definitive" statement." |

| | |
|---|---|
| PSLRA | The Private Securities Litigation Reform Act |
| Riverstone | Riverstone Holdings LLP and its affiliates—private equity firm whose affiliates sponsored DCRB up through the SPAC Merger, which was managed by Defendants Haskopoulos and Tichio |
| SEC | U.S. Securities and Exchange Commission |
| Section 10(b) Defendants | Refers to Defendants Hyzon, Knight, Gu, Gordon, Anderson, Haskopoulos, and Tichio |
| Soliciting Materials | Refers to communications sent to shareholders regarding an issue up for a shareholder vote and can include materials sent before a securities issuer furnishes a formal proxy statement. *See* 17 C.F.R. § 240.14a-12. When Soliciting Materials are sent before a formal proxy statement issues, they are filed with the SEC on Form 8-K. |
| SPAC or "blank check" company | Refers to a shell company listed on a public exchange established for the purpose of raising capital to finance the purchase of an unidentified private company, thus making the acquired company public without going through the traditional initial public offering process |
| SPAC Merger | Refers to the business combination between DCRB's directly owned subsidiary, Merger Sub, and Hyzon which closed on June 16, 2021. Upon completion of the SPAC Merger, DCRB renamed itself as Hyzon Motors, and Hyzon became the only business of the post-merger entity. This process is also referred to herein as a de-SPAC merger. |
| Special Committee | The independent committee ("Special Committee") appointed by Hyzon's Board of Directors to investigate "revenue recognition timing issues" with the Company's operations in China, "operational inefficiencies" with its European operations, and general "governance and compliance issues." The Special Committee completed its preliminary findings in January 2023, and sent a Statement of its findings to the Board on March 10, 2023. |
| Statement | Refers to the Special Committee's summary of its investigation which was sent to Hyzon on March 10, 2023. |
| Sponsor | Refers to Decarbonization Plus Acquisition Sponsor, LLC—an entity founded by Riverstone for purposes of the SPAC Merger |
| WRG | Refers to WRG DCRB Investors, LLC, an affiliate of Defendant Anderson |

Lead Plaintiff Alfred Miller, by and through his undersigned counsel, respectfully submit this ~~Third~~Fourth Amended Consolidated Complaint ("~~TAC~~4AC") alleging claims pursuant to Sections 10(b), 14, and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 and 14a-9 promulgated thereunder.[1] Lead Plaintiff brings these claims on behalf of himself and (a) all persons or entities who purchased Hyzon Motors Inc. f/k/a Decarbonization Plus Acquisition Corporation's ("Hyzon" or the "Company") securities during the period from February 9, 2021 to August 17, 2022, inclusive ("Class Period"), as well as (b) all former shareholders of Decarbonization Plus Acquisition Corporation ("DCRB") who held DCRB securities as of June 1, 2021, were entitled to vote with respect to the SPAC Merger, and were damaged thereby. These groups are collectively referred to as the "Class." Excluded from the Class are Defendants, their families, and their affiliates.

Lead Plaintiff alleges the following information about himself based on his personal knowledge. All other allegations in this Complaint are based upon the ongoing investigation undertaken by Lead Plaintiff's counsel, including their review and analysis of: (i) the Company's public filings with the SEC; (ii) research reports from securities and financial analysts; (iii) the Company's press releases and reports; (iv) the Company's website and marketing materials; (v) media reports concerning the Company and other facts related to this action; (vi) price and volume data for Company securities; (vii) consultation with investigators; (viii) allegations made in any public government

---

[1] ~~See June 20, 2023 Letter Order (Dkt. No. 66) (granting Lead Plaintiff Alfred Miller leave to amend the Second Consolidated Amended Complaint ("SAC") to file Third Consolidated Amended Complaint ("TAC")).~~

- 2 -

enforcement proceedings, and (ix) additional data concerning the Company and industry as identified herein.

- 3 -

## I.      INTRODUCTION

## I.    NATURE OF THE ACTION

1.    This securities law case concerns ~~the fall of~~ Hyzon ~~from a hot SPAC stock poised to lead the emerging~~ Motors, Inc. ("Hyzon")—a now defunct hydrogen-fuel- cell-~~powered~~ electric- vehicle ("HFCEV") ~~industry into a frozen corporate vessel facing investigations by the Department of Justice and the SEC.~~

2.    ~~From Hyzon's inception, Defendants billed Hyzon as a fast-growing electric vehicle ("EV")~~ company. ~~Defendants consistently touted Hyzon's already commercialized technology, its existing global footprint, and its burgeoning sales pipeline with blue-chip Fortune 100 customers. Defendants also created the impression that Hyzon already had multi-million-dollar deals and would generate millions in revenues after delivering 85+ HFCEVs in 2021. These representations allowed Hyzon to go public and be listed on NASDAQ in July 2021 with a $2.1 billion market cap valuation and over $626 million cash in hand.~~

3.    ~~But less than one year after going public, the Company effectively admitted that its purported Blue-Chip customers, mega-supply deals, revenue, and vehicle deliveries were all a sham. Through a series of partial disclosures, Hyzon confessed it had improperly recognized nearly 100% of its reported revenues for fiscal year 2021. Moreover, it conceded that the majority of HFCEVs it purportedly delivered in 2021 did not operate on hydrogen, needed significant repairs, or were not Hyzon's own fuel cell trucks.~~

4.    ~~Following these revelations, Hyzon's stock lost nearly 90% of its value; its senior officers and directors including its founders, Defendant Knight (CEO) and Defendant Gu (Executive Chairman) ("Founder Defendants") were unceremoniously ousted from the Company; and its investors were saddled with billions of dollars in losses.~~

- 4 -

A.    **Brief Summary of the Facts**

1.    ~~Hyzon is a~~ based in Rochester, NY ~~based, HFCEV manufacturer founded by~~ which, leading up to a July 2021 shareholder vote to take Hyzon public, exaggerated the status of its business dealings with brand name companies and suppliers and then, after the merger, lied about the number of HFCEVs it had actually manufactured, delivered, and sold to hide the emerging reality that there was never any real demand for Hyzon's vehicles.

~~5.~~2.    The pipe dream of Hyzon began in 2020 when Co-Founder Defendants Craig Knight and George Gu ~~in an attempt~~decided to revive ~~their failed Chinese enterprise ("Horizon"), whose EV business~~ a financially imploded ~~at the end of 2020. Defendants'~~Chinese HFCEV business in the United States. The plan ~~to rebuild Hyzon~~ was simple: Defendants would have Hyzon go public and gain access to massive amounts of investment cash via a special process known as a de-SPAC merger. To succeed, ~~Hyzon~~they needed to persuade investors of a blank check, special purpose acquisition company ("SPAC~~) here,~~") with no business of its own—Defendant Decarbonization Plus Acquisition Corporation ("DCRB")—to approve the ~~acquisition of Hyzon. If successful, Hyzon would gain access to the massive amounts of investment cash it needed to relaunch its operations. Moreover, the directors and executives behind the acquisition stood to make millions from their equity holdings and Founder Shares~~merger.

3.    To persuade DCRB's shareholders to approve the proposed merger, ~~Defendants emphasized~~ officers and directors of Hyzon and DCRB falsely suggested to potential investors in press releases, ~~investor presentations,~~ media appearances, and ~~other Soliciting Materials Hyzon's growing backlog of deep-pocketed purchasers and the expected deliveries and revenues "committed"~~investor presentations that:

- 5 -

- Hyzon was in "advanced discussions" with, was "finalizing" purchase orders with, or had "100% certain," contracted orders from blue-chip, Fortune 100 companies,

- "Key relationships ha[d] already been formed" with specific chassis manufacturers and vehicle customers, and

- Through its touted customers and imminent sales, Hyzon would generate. As just one example, in a conference call with investors announcing the merger, Defendant Tichio, the Chairman of DCRB, claimed that: "The Company [Hyzon] has a sales pipeline millions in revenue after delivering 85+ HFCEVs in 2021.

6. DCRB filed materials containing these false statements with the SEC for 2021 that is 100 percent under contract or MOU, providing real runway visibility, and its customers include some of the most recognizable global brands and the largest municipalities in the world."² all potential investors to read. Additionally, DCRB's Board told investors it had "performed extensive due diligence" into Hyzon and had decided to pursue a de-SPAC merger with Hyzon due, in part, to Hyzon's touted business dealings with "blue-chip Fortune 100 companies."

7. Defendants repeatedly told investors Hyzon had secured, or was near securing, "100% certain" multi-million-dollar sale commitments from "blue-chip Fortune 100s and municipalities."³ Defendants also claimed "deliveries of Hyzon fuel cell powered heavy trucks to customers in Europe and North America will occur this year [2021], well

---

² Full transcript filed with the SEC as a Soliciting Material pursuant to Rule 14a-12, and is available at https://www.sec.gov/Archives/edgar/data/1716583/00011931252103 3234/d109364dex992.htm.

³ Media Release, "Hyzon Motors, the Leading Hydrogen Fuel Cell Heavy Vehicle Company, Announces Business Combination …" (Feb. 9, 2021), https://www.sec.gov/ Archives/edgar/data/1716583/00011931252103234/d109364dex991.htm

ahead of our competitors."[4] In making these claims, Defendants published a global map of its top "customer deployments under way," which listed recognizable brands like Heineken and Ikea as end users in the last stage of finalizing multi-million-dollar purchases with 2021 deliveries.

**F.1 – Customer Deployment Map Featured in Feb. 9, 2021 Investor Presentation[5]**



8. Defendants also frequently highlighted New Zealand startup Hiringa Energy's ("Hiringa") "binding order" for 20 trucks to be delivered before the end of 2021,

---

[4] *Id.*

[5] Press Release, Hyzon, "Accelerating the Hydrogen Transition; Investor Presentation," at 18 (Feb. 9, 2021), https://www.sec.gov/Archives/edgar/data/1716583/00011931 2521033234/d109364dex993.htm.

as part of a 1,500-vehicle supply agreement.[6] In reality, Hyzon had virtually none of the 100% certain sales nor committed, deep pocketed customers it was claiming.

9. On the back of these orders and customer claims, Defendants claimed Hyzon would deliver 85 vehicles and generate at least $37 million in revenue in 2021. Moreover, on July 12, 2021, just three days before shareholders were to vote on whether to approve the de-SPAC merger or exercise their cash out Redemption Rights, Hyzon issued a press release claiming it made its very first HFCEV delivery. (As revealed this year, this vehicle was not operable on hydrogen when Hyzon issued the release.)

10. Relying on Defendants' false and misleading claims in the merger Proxy Statements and Soliciting Materials, DCRB's shareholders approved the merger with Hyzon on July 15, 2021, raising $630 million for Hyzon. The completed business combination ("SPAC Merger") also granted millions of dollars in "locked up" stock and stock options, which Defendants held personally or through their investment funds.

11. False and empty promises, however, could only get Hyzon so far. By September, Hyzon had made virtually zero progress towards its promise to deliver 85 HFCEVs for 2021 and generate approximately $37 million in revenue. Still, Defendant Knight reaffirmed Hyzon's revenue target and that "the shipment of at least 85 vehicles [was] not a great risk." This reaffirmation quelled analysts' doubts, at least for the moment.

---

[6] Press Release, Hyzon, "Hydrogen Now™" Event to Showcase Virtual Ride Along in a Zero-Emission, Hydrogen Fuel Cell Powered Truck at Hyzon's Production-Ready Groningen Facility" (Mar. 8, 2021), https://www.hyzonmotors.com/in-the-news/hyzon-motors-announces-hydrogen-now-event-to-showcase-virtual-ride-along-in-a-zero-emission-hydrogen-fuel-cell-powered-truck-at-hyzons-production-ready-groningen-facility (emphasis added).

4.     These statements about Hyzon's customer and supplier relationships with well-known entities and its handful of committed orders with 2021 deliveries were material to investors, especially those evaluating whether to vote for the July 2021 de-SPAC merger, because they (i) suggested Hyzon was capable of generating revenue, despite lacking a significant sales history, because it was purportedly finalizing contract terms with well-known customers who, given their nature, could make several large orders for Hyzon vehicles (rather than one-off or trial purchases) and (ii) despite lacking a significant manufacturing history, Hyzon had established supplier relationships that would enable it to manufacture the HFCEVs needed to fulfill the orders purportedly being finalized.

5.     These statements, however, were false and misleading. As revealed by the SEC (and others): although Hyzon had solicited transactions with blue-chip, Fortune 100 companies like Heineken, Ikea, Air Products, and Coca-Cola, none of these companies had indicated they would purchase HFCEVs from Hyzon at the time Defendants disseminated these statements. To the contrary, several of these purported customers had informed Hyzon in early 2021 that they had selected different HFCEV suppliers or would otherwise not be making purchases. But Defendants did not remove these companies from subsequent versions of investor presentations they disseminated, and instead continued to list them as being in "advanced discussions" or "finalizing POs." Hyzon also kept a version of these presentations on its website up through at least the summer of 2022. Similarly, though Hyzon claimed "key relationships ha[d] already been formed" with two, HFCEV chassis suppliers, neither had reached the point of negotiating any supply relationship with Hyzon.

6.     On July 15, 2021, DCRB investors—not knowing that Hyzon had exaggerated the extent of its then-present dealings with blue-chip, deep-pocketed brands

- 9 -

and had falsely stated key relationships had already been formed with chassis suppliers—voted to take Hyzon public instead of exercising their cash-out, Redemption Rights. As such, Hyzon started trading on the National Association of Securities Dealers Automated Quotations ("Nasdaq") with a $2.1 billion market cap valuation and over $626 million cash in hand. Thereafter, Hyzon reaffirmed its pre-merger statements, including that it would deliver 85 HFCEVs before the end of 2021, in an attempt to keep the Company's stock price high—even though the customers it advertised were not in fact buying HFCEVs.

12.7.    Desperate to fill its orderthe gap between its real and exaggerated orders, on September 9, 2021, Hyzon announced it had signed a memorandum of understanding ("MOU") with a HFCEV logistics company based in China—Shanghai Hydrogen HongYun Automotive Co., Ltd. ("HongYun")—which would singularly purchase "100 vehicles … before the end of 2021" and another 400 to "be ordered in 2022."[7] On news of this $250 million mega dealpartnership with a purportedly well-established company, investment analysts grew increasingly bullish, and Hyzon's stock shot up nearly 30% in a single trading day. But like Hyzon's claims regarding blue-chip customers and orders, the claims regarding the HongYun transaction were all a sham.

13.    Though Hyzon represented HongYun as having "solid operation[al] experience" in "leasing," "maintenance," and "logistics,"[8] in truth, it was really a shell

---

[7]    Press Release, Hyzon, "Hyzon Motors to supply up to 500 hydrogen fuel cell electric vehicles to Shanghai logistics company," (Sept. 9, 2021), https://hyzonmotors.com/hyzon-motors-to-supply-up-to-500-hydrogen-fuel-cell-electric-vehicles-to-shanghai-logistics-company/.9, 2021), https://investors.hyzonfuelcell.com/news/news-details/2021/Hyzon-Motors-to-supply-up-to-500-hydrogen-fuel-cell-electric-vehicles-to-Shanghai-logistics-company/default.aspx.

[8]    Id.

- 10 -

company established three days before Hyzon's big announcement. HongYun had zero paid-in capital, no physical or digital infrastructure, and no track record to deploy anywhere close to 100 HFCEVs. And to make the deal work, Hyzon would secretly compensate a HongYun subsidiary with stock options worth millions for purchasing HFCEVs.

14.    Defendants' façade began to crack on September 28, 2021, when credible activist short seller Blue Orca Capital ("Blue Orca") published a Report on Hyzon's purported deals and customers   later corroborated by Lead Plaintiff's international independent investigation. Rather than come clean, Hyzon obscured the truth and doubled down on their prior misrepresentations, reaffirming as late as November 2021 that Hyzon would deliver 85 vehicles by the year's end.

15.    But by January 2022, Hyzon could no longer hide the truth. And investors would slowly discover over the course of nearly 18 months that nearly every one of Hyzon's celebrated deliveries in 2021 were nothing but a sham.

16.    The cascading partial disclosures confessing the extent of Hyzon's misconduct started on January 12, 2022. That day, Hyzon announced that, despite purportedly delivering 87 vehicles in 2021, its anticipated 2021 financial results would be "materially lower than forecast revenues and margins."[9] Moreover, Hyzon noted it had received an SEC subpoena concerning the allegations asserted in the Blue Orca Report.

17.    Two months later, on March 23, 2022, Hyzon made known what "materially lower" revenues actually meant by announcing its audited 2021 financial results. In short,

---

[9]   Press Release, Hyzon, "Hyzon Motors provides update on 2021 deliveries and financial expectations" (Jan. 12, 2022), *available at* https://www.sec.gov/Archives/edgar/data/1716583/000119312522007235/d277686dex991.htm

- 11 -

Hyzon revealed it would be recognizing *only $6.0 million* for its delivery of 87 HFCEVs. By comparison, Hyzon's HFCEVs, normally priced at $475k per vehicle, were expected to generate more than $41 million in revenue. When questioned, Defendant Knight again obfuscated on details about Hyzon's delivery mix and characterized Hyzon's revenue recognition issues as "a short term issue" and "a very minor pain point."[10] It would soon become clear though, that this was not a "short term" issue, and even the unusually low $6.0 million in revenue reported for 2021 was materially overstated.

18.    On March 30, 2022, Defendants filed Hyzon's 2021 Annual Report, which, in addition to repeating Hyzon's $6.0 million revenue figure, disclosed additional information about how Hyzon plugged its demand gap. Among other things, it revealed:

8.    Over the next 18 months, however, investors gradually learned that Hyzon's reported relationships with blue-chip customers and its reported deliveries in 2021 were inaccurate or (in some instances) a sham. Among other things, Hyzon admitted that:

- Hyzon's very first delivery, announced on July 13, 2021, just three days before shareholders would vote on Hyzon's de-SPAC merger, was a sham, as the vehicle did not operate on hydrogen fuel cells;

- In November 2021, Hyzon had secretly entered into a warrant agreement with a HongYun subsidiary, which awarded HongYun stock options potentially worth millions for purchasing its HFCEVs;

- In December 2021, Hyzon filled its delivery gap by delivering 20 HFCEVs to a previously undisclosed, China-based joint venture

---

[10]  Hyzon FY2021 Earnings Call (Mar. 23, 2021), Full transcript available at https://seekingalpha.com/article/4497327-hyzon-motors-inc-hyzn-ceo-craig-knight-on-q4-2021-results-earnings-call-transcript.

partner ("Jiushuang"), for which Hyzon's auditor allowed Hyzon at the time to recognize only $100,000 in revenue, ¶ 179; and

- Although Hyzon ~~reportedly~~had initially reported it had delivered 87 vehicles for a contract value of $19.6 million (nearly half of its projected ~$40 million target for ~~85 vehicles delivered~~2021), its independent auditor forbade the Company from recognizing the full contract value due to Hyzon's likely inability to collect from ~~Hyzon's Chinese special purpose entities~~HongYun or purported end users.

~~Not surprisingly, investors would later learn that these disclosures materially overstated the state of affairs at Hyzon and omitted other material information about these deals. Still, on this incomplete record, securities analysts downgraded Hyzon, with one analyst noting that while "[d]omestic China sales seem[ed] like business as usual for the parent company Horizon, ... the value-add for Hyzon [wa]s in the non-China-based business ...."[11]~~

~~19.    On August 4, 2022, the brunt of Hyzon's true state of affairs hit investors full force in the form of three major disclosures: Hyzon would not be reporting its second quarter results due to "identified operational inefficiencies" and "revenue recognition timing issues in China" which were "brought to the attention of the Board."[12] Hyzon's Board had appointed a Special Committee to "conduct[] an independent investigation to address" revenue recognition, corporate governance, and compliance problems. And the "financial statements and guidance previously issued by the company [could] no longer be~~

---

~~[11]  Jed Dorsheimer, "Hyzon Motors: Downgrading to HOLD until non-China-based sales signal a ramp; PT to $6" CONACCORD GENUITY, (Apr. 5, 2022)~~

~~[12]  "Statement from Hyzon Motors" (Aug. 4, 2022), https://www.hyzonmotors.com/in-the-news/hyzon-motors-media-statement.~~

- 13 -

relied upon."[13] Two weeks later, on August 17, 2022, Hyzon further announced the Board had terminated Founder Defendants Knight and Gu effective immediately.

20.    Following these disclosures, Hyzon's price fell from a Class Period high of $16.99 to $1.99 at the close of trading on August 19, 2022. Investors lost billions of dollars.

21.    The fallout nevertheless continued over the next several months. On February 1, 2023, following the completion of the Special Committee's preliminary investigative findings, Hyzon disclosed, "after a review of additional information, … [Defendant CEO] Knight's departure should constitute *a termination for cause* …."[14]

22.    And on March 13, 2023, Hyzon released the results of Hyzon's Board-appointed Special Committee's Investigation,[15] together with its restated financial reports for 3Q20, 4Q20, FY20, and 1Q22. These findings quell any doubt as to falsity or (for Lead Plaintiff's Section 10(b) claims) Defendants' scienter:

- *Hyzon's first delivery was a sham.* On July 13, 2021, just three days before shareholders would vote on Hyzon's de-SPAC merger, Hyzon announced it had delivered its very first hydrogen fuel cell electric vehicle ("HFCEV"). The Special Committee found that this HFCEV was not operable on hydrogen when Hyzon issued its press release. And though Hyzon initially reported earning nearly $475k in revenue

---

[13] *Id.*

[14] Hyzon Form 8-K/A (Feb. 1, 2023), https://www.sec.gov/Archives/edgar/data/1716583/000171658323000013/hyzn-20220818.htm (emphasis added).

[15] Special Committee Disclosure (Mar. 13, 2023) ("Statement"), https://www.sec.gov/Archives/edgar/data/1716583/000171658323000040/hyzn-20230313.htm.

from this single delivery, Hyzon, in fact, "did not recognize any revenue in connection with the provision of this vehicle."

- *Hyzon earned negative revenue from China in 2021, and nearly half of the HFCEVs it rushed to delivery did not operate on hydrogen.* In 2021, Hyzon claimed it delivered 62 HFCEVs to HongYun. Nearly half of these HFCEVs, however, were not operable on hydrogen (*i.e.*, not commissioned) at the time of delivery or at the end of the year. Additionally, though Hyzon initially claimed $3.7 million in revenue from this transaction in its 2021 SEC filings, under generally accepted accounting principles ("GAAP") *Hyzon actually earned negative revenue* after accounting for previously undisclosed, equity-based rebates. Though Hyzon has since recognized some revenue for this purportedly legitimate transaction, it has, as of the date of this filing, received only one payment. Moreover, the one-time payment it did receive totaled nearly $40 thousand per vehicle. For comparison, the average gas-powered truck costs between $100,000 to $200,000.

- *Hyzon did not fully complete 20 of its reportedly confirmed deliveries until 3Q22.* For 2021, Hyzon also claimed it delivered 20 HFCEVs to a related party, Jiushuang. In truth, none of these vehicles were operable on hydrogen at the end of the year. And Hyzon failed to "transfer[] control of the FCEVs to the customer, nor fully satisf[y] the obligation to deliver fully functioning FCEVs until the third

quarter of 2022."[16] To date, the Company has recognized zero revenue from this transaction using GAAP.

- *Hyzon secretly retrofitted vehicles in Europe.* For 2021, Hyzon claimed it delivered five HFCEVs to customers in Europe. The Special Committee found that all five of these HFCEVs involved retrofitting services in which Hyzon merely converted gas-powered vehicles already owned by customers on service contracts. This undisclosed activity went against Hyzon's announced business plan of manufacturing HFCEVs. Each of these HFCEVs "needed to undergo repairs post-delivery."[17] And though Hyzon initially reported earning $2.2 million in revenue from these deliveries, Hyzon in fact earned only $80k in revenue for these services.

- Because the above-mentioned issues infected every one of Hyzon's 2021 sales, *Hyzon falsely claimed it delivered 87 vehicles in 2021 and improperly recognized revenue on every 2021 delivery it previously touted*. As reported in Hyzon's restated financials, *Hyzon actually earned negative $80k in revenue in 2021* (totaling the $80k service revenues from Europe offset by the purchase-incentive warrants granted to HongYun). Not one cent of revenues originated from any blue-chip or Fortune 100 companies touted by Hyzon in its

---

[16] *Id.*

[17] *Id.*

- 16 -

early Soliciting Materials. Not one cent came from the product sales.

And not one cent came from sham Chinese deliveries.

23. Neither Hyzon nor the Special Committee attributed the misconduct summarized above to an innocent mistake. Instead, the Special Committee noted "*the tenor of certain communications by certain Hyzon executives was overly concentrated on meeting the Company's 2021 deliveries forecast and recognizing revenue on those deliveries*."[18]

- As of the date of this filing, Hyzon's shares trade at a penny stock level, hovering just over $0.80, giving Hyzon a current market capitalization of under $200 million—a stunning 95% decline in shareholder value from its Class Period high. Given the Company's allegedly fragile financial condition and the absence of a robust, liquid market for investors to dispose of their remaining Hyzon securitiesThe majority of HFCEVs Hyzon claimed it had delivered in 2021 did not operate on hydrogen in 2021, needed significant repairs to operate that were made after 2021, or were not Hyzon's own trucks.

- Despite originally claiming to have earned $6 million in revenue in 2021, *Hyzon had actually earned negative $80,000 in revenue for the fiscal year* after factoring out Hyzon's fraudulent conduct.

9. Following these revelations, Hyzon's stock lost nearly 90% of its value; its senior officers and directors—including its founders, Defendant Knight (CEO) and Defendant Gu (Executive Chairman) ("Co-Founder Defendants")—were unceremoniously ousted from the Company; and its investors were saddled with millions of dollars in losses.

---

[18] *Id.* (emphasis added).

- 17 -

10.     Several months later, while motion-to-dismiss briefs were pending before the Court, the SEC filed a complaint and consent judgment against Hyzon. These filings further revealed, among other things, that Hyzon had (i) misrepresented its relationships with blue-chip customers before the merger and (ii) conspired with customers to engineer farce deliveries of trucks before the end of 2021, all so Hyzon could claim it met its guidance.

24.11.  Today, Hyzon has been delisted from Nasdaq and is currently in dissolution proceedings. Accordingly, this Action likely represents investors' onlylast opportunity to seek recompense for the Hyzon Defendants' fraud and the DCRB Defendants' deceptionnegligence.

**F.2 -   Hyzon Stock Throughout Class Period (Feb. 9, 2022 to Aug. 17, 2022)**



**B.II.**    ~~THE~~SUMMARY OF AMENDMENTS AND LIVE **CLAIMS** ~~ASSERTED IN THIS COMPLAINT~~

25.    ~~Lead Plaintiff asserts two sets of claims in this Complaint. First, Lead Plaintiff asserts fraud claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934. These claims are asserted against Defendants Hyzon (f/k/a DCRB), Knight, Gu, Gordon, Anderson, Haskopoulos, and Tichio ("Section 10(b) Defendants") – all of whom made, issued, or disseminated materially false and misleading statements that caused the price of Hyzon securities to be artificially inflated during the Class Period ("Count I"). Each of these Defendants engaged in an act, practice, course of business, and/or scheme that defrauded or deceived investors ("Count II"). And each of these Defendants (except for Hyzon) were control persons with respect to such material misstatements and omissions. These claims are predicated on every false and misleading statement identified in Part VIII, *infra*, and are brought on behalf of all persons or entities who purchased Hyzon securities during the Class Period.~~

26.    ~~Additionally, Lead Plaintiff brings a second set of claims regarding the negligent making of false and misleading statements in Proxy Statements and other Soliciting Materials pursuant to Sections 14(a) and 20(a) of the Exchange Act. These claims are brought on behalf of holders (excluding Defendants and their affiliates) of Hyzon securities as of the record date for voting on the SPAC Merger. And they are brought against Defendants Hyzon (f/k/a DCRB), Riverstone Holdings LLP ("Riverstone"), Decarbonization Plus Acquisition Sponsor, LLC ("Sponsor"), WestRiver Group ("WRG"), Knight, Gu, Gordon, Tichio, Anderson, Haskopoulos, Aaker, Kearns, Lapeyre, David, McDermott, Tepper, and Warren, all of whom made material misstatements and omissions~~

in soliciting the approval of DCRB shareholders for the SPAC Merger (Count IV),[19] and/or (with the exception of Hyzon) were control persons with respect to such material misstatements and omissions ("Count V"). These claims are predicated solely on the statements made in the Proxy Statements and Soliciting Materials discussed in Part VIII, *supra* ¶¶ 288, 292, 296, 304, 307, 313, 315, 320, 327, and 357.

12.     On July 25, 2025, the Court issued an Order granting in part and denying in part Defendant's motion to dismiss the prior version of this complaint ("MTD Order"). As part of its ruling, the Court found, among other things, that:

- *Section 10(b) Standing for Pre-merger False Statements.* One the one hand, Lead Plaintiff lacked standing to assert any Section 10(b) claims for any misstatements Hyzon or DCRB made about Hyzon before it went public on July 15, 2021 because of the judicially-created purchaser-seller rule. *See* MTD Order at 15-25. But on the other hand, Plaintiff did have standing to pursue Section 10b-5 claims against DCRB and its executives for their limited pre-merger statements, including their statements about Hyzon's relationships with global brands/blue-chip customers. *Id.* at 25.

- *Pre-merger Statements re: Hyzon's projected sales pipeline.* These statements, particularly those about Hyzon's 2021 targets, were not actionable under Section 10(b) (via SEC Rule 10b-5(b) promulgated thereunder) or Section 14(a) as they were forward looking and accompanied by disclaimers which the Court found sufficiently disclosed the uncertainty of future sales. *See id.* at 33-37, 54-60.

---

[19] As noted in Count IV below, for purposes of Lead Plaintiff's Section 14 claim alone, Lead Plaintiff does not additionally allege that Defendants' actions sounded in fraud. Further, all allegations that Defendants acted negligently are pled in the alternative, as an alternative fact pattern to any claim that Defendants acted knowingly or recklessly.

- *Post-merger Statements re: HongYun and Post-Merger Deliveries.* Lead Plaintiff had adequately alleged Section 10(b) and Rule 10b-5(b) claims against Defendants Hyzon, Knight, and Gordon for the bulk of Hyzon's post-merger statements regarding HongYun and Hyzon's 2021 deliveries and revenues. *Id.*

- *Scheme Liability.* On the then-present record—which did not include the information revealed by the SEC's complaint and consent judgments—the Third Amended Complaint had failed to plead inherently deceptive practices independent of Defendants' alleged misstatements, thus negating a scheme liability claim. *Id.*

In reaching these rulings, the Court recognized that during the pendency of the motion-to-dismiss briefing, the SEC had published a complaint and consent judgments against Hyzon which contained "various potentially relevant findings and admissions." *Id.* at 52. It thus granted Plaintiff leave to move to amend. *Id.*

13. Consistent with the Court's Order, Lead Plaintiff has amended his complaint to formally bring the new information revealed by the SEC's complaint and consent judgments into the pleading record. In short, these new allegations include that:

- From January through July 2021, in advance of two key capital-raising events, Hyzon exaggerated the status of its business dealings with its potential customers and suppliers, including well-known companies like Heineken, Air Products, Ikea, and Coca-Cola, to create the false appearance that significant sales transactions were imminent. Although Hyzon had solicited transactions with these companies, none had indicated they would purchase FCEVs from Hyzon. In February 2021, when certain customers demanded the removal of their names and logos from investor presentations, Hyzon replaced customer names and logos with generic descriptions of each company. But *Hyzon kept the names, logos, and the generic*

- 21 -

*descriptions of these companies on its investor presentations well after they had told Hyzon that they would not be purchasing vehicles*. Additionally, these presentations falsely stated "key relationships have already been formed" with two suppliers when "Hyzon and these purported suppliers had not even reached the point of negotiating any supply relationship." *See* SEC Compl. ¶¶ 18-27.

• On July 13, 2021, shortly before the capital-raising events, Hyzon falsely claimed that it had delivered its first FCEV—a milk truck to be used by a European dairy company – and posted a misleading video to social media that gave the false impression that it ran on hydrogen when, in fact, it did not. *See id.* ¶¶ 28-29.

• Though in documents filed with the SEC from November 2021 through March 2022, Hyzon stated that its Chinese subsidiaries had sold and delivered 82 HFCEVs in 2021, in reality, Hyzon had not completed the vehicles prior to shipment. Instead, *a Hyzon China employee arranged to deliver HFCEVs shortly before the end of 2021 so that Hyzon could meet its public guidance, with the agreed-to understanding that the customer would return the vehicles after year-end so Hyzon could complete the work needed to let the vehicle run on hydrogen power*. *See id.* ¶¶ 45-46.

• Hyzon Europe's managing director falsified, or caused to be falsified, Hyzon's books, records, and accounts concerning the five purported FCEV sales made by Hyzon Europe in 2021. *See id.* ¶ 64.

• Hyzon's CEO, Craig Knight, had improperly pledged 226,415 shares of his Hyzon stock to secure a $1.5 million loan from his friend's company so that he could purchase more Hyzon shares and attempt to inflate Hyzon's stock price. *See id.* ¶¶ 65-68.

14.    Lead Plaintiff respectfully submits that, with these new allegations, the Fourth Amended Class Action Complaint cures deficiencies identified by the Court's MTD Order for three aspects of this case (not including related control-person claims).

15.    ***Section 14 Claims against Hyzon and Knight***. Relying on the SEC's investigative findings, the Complaint now shows the extent to which the pre-merger investor presentations (and other related Soliciting Materials) misrepresented the then-***present***-state of Hyzon's relationships with touted blue-chip brands and suppliers. These Soliciting Materials represented that at the time of their respective publications, Hyzon was "[f]inalizing" purchase orders or contracts with Heineken, Ikea, and Air Products. In truth, though Hyzon had solicited transactions with these companies, none had indicated they would purchase HFCEVs with Hyzon. Indeed, by at least February 4, 2021, Heineken had informed Hyzon it would not be purchasing Hyzon HFCEVs in 2021 because there we not included in the annual budget. By March 2021, Air Products told Hyzon it had selected a different supplier. And by June 2021, Ikea had decided to not make purchases. The Materials also claimed Hyzon was in "advanced discussions" with Coca-Cola, when Hyzon had only introductory meetings. Further, they claimed "key relationships ha[d] already been formed" with two suppliers when "Hyzon and these purported suppliers had not even reached the point of negotiating any supply relationship." As alleged, Hyzon, through Knight, provided the then-present information about Hyzon's customer relationships to the individuals who drafted the presentations, and Knight also made edits to, reviewed, and approved the relationship statements before they were filed with the SEC.[20]

---

[20]  These and other newly revealed false statements have been added in Section IX (Materially False and Misleading Statements), *infra*.

16.    *Section 14 Claims against DCRB, its CFO Haskopoulos, and the other members of DCRB Board* ("**DCRB Defendants**"). With these new allegations, the Complaint similarly clarifies the extent to which the DCRB Defendants negligently disseminated Soliciting Materials that misrepresented the present-state of Hyzon's relationships with blue-chip customers and suppliers. As alleged by the SEC, during the same period DCRB claims it "performed extensive due diligence" of Hyzon's materials, at least one blue-chip customer highlighted in the disseminated investor presentations—Heineken—had informed Hyzon that it would not be purchasing vehicles. Further, the presentations claimed "key relationships ha[d] already been formed" with four HFCEV chassis suppliers, even though at least two of these suppliers had not reached the point of negotiating any supply relationship. DCRB negligently disseminated these statements in February despite its purported due diligence or because it otherwise failed to do reasonable diligence into statements it was disseminating for a capital raising event. DCRB's re-publication of these false statements in future presentations (and other Soliciting Materials) was also negligent. This is because DCRB failed to conduct ongoing diligence or failed to inquire as to the reason for changes to the presentations, particularly for the February 10 and 12 presentations, given the unusual timing of the changes and the sudden anonymization of potential customer identities. Defendant Tichio's public comments about Hyzon's customers in June 2021 also triggered duties to self-educate before speaking.

17.    *Scheme Liability against Hyzon and Knight.* These new allegations show that, beginning in February 2021, Hyzon and Knight engaged in a series of acts, practices, and/or a course of business which operated as a fraud or deceit, distinct from the alleged

- 24 -

individual misstatements themselves, for the purpose of propping up Hyzon's representations and stock price. Among other things:

- Hyzon and Knight engaged in a fraudulent/deceptive course of business by (i) using misleading investor presentations and (ii) continuously claiming Hyzon had existing key relationships with blue-chip customers and suppliers which had either rejected Hyzon or never proceeded to negotiation stages. These actions created the false appearance that significant sales transactions and deliveries were imminent, incentivizing investors to vote for the SPAC merger.

- In July 2021, Hyzon recorded a deceptive video showing Hyzon's first HFCEV sale in operation (when in reality, it did not run on hydrogen, it ran on an electric battery). This was both a deceptive act and in furtherance of the fraudulent/deceptive scheme or course of business.

- As another fraudulent/deceptive act also in furtherance of a fraud scheme: the Head of Hyzon Europe (who was also an executive officer and management team member of Hyzon) signed a false document so Hyzon could recognize revenue for purported sales in Europe .

- In furtherance of a fraud scheme or fraudulent/deceptive act: in November 2021, Knight improperly pledged his Hyzon stock to secure a $1.5 million loan from a friend's company, despite a six-month lock-up agreement prohibiting from doing do so, with the goal of secretly purchasing more Hyzon shares on the public market to inflate and/or maintain Hyzon's stock price, at least until the lock up period on Hyzon's Founder Shares expired.

- In November 2021, Hyzon secretly entered into a warrant agreement with a HongYun subsidiary, which awarded HongYun stock options potentially worth millions for purchasing Hyzon HFCEVs. Hyzon

then relied on discounted deliveries to HongYun to create the false appearance that Hyzon had met its delivery and revenue guidance.

- In furtherance of a fraud scheme or fraudulent/deceptive course of business: Hyzon's China subsidiary staged vehicle deliveries near the end of 2021 so Hyzon could say it met guidance and recognize revenue, with the understanding that customers would then return the HFCEVs for necessary repairs after the year's end.

18.     Finally, Lead Plaintiff notes that in filing this Fourth Amended Complaint, he has sought to remove content that he believes is no longer pertinent, given the Court's MTD Order, while preserving his ability to appeal rulings on any false statement or claim which he believes the MTD Order wrongly decided. To streamline future litigation, in Section IX of this pleading, which identifies each false statement, Lead Plaintiff has denoted with the annotation "[Preserved]" each false statement that he is preserving for appeal, but that Defendants' and the Court need not address in future briefing or orders assessing whether the "struck" statement independently gives rise to an actionable claim. He has also demarked as "[Revised]" any false statement that he believes is actionable given the new facts he has learned from the SEC Complaint.

## II.III.  JURISDICTION AND VENUE

27.19. The claims asserted herein arise under and pursuant to the Securities Exchange Act of 1934 and certain rules promulgated by the U.S. Securities and Exchange Commission. Specifically, this Complaint asserts claims under: (1) Section 10(b) of the Exchange Act ("§10(b)") and Rule 10b-5 promulgated thereunder by the SEC, *see* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5; (2) Section 14(a) of the Exchange Act ("§14(a)")

and Rule 14a-9 promulgated thereunder by the SEC, *see* 15 U.S.C. § 78n; 17 C.F.R. §240.14a-9; and (3) Section 20(a) of the Exchange Act ("§20(a)"), *see* 15 U.S.C. § 78t(a)).

28.20. The Court has jurisdiction over this action's subject matter under Section 27 of the Exchange Act, *see* 15 U.S.C. § 78aa (exclusive jurisdiction over Exchange Act violations), and 28 U.S.C. § 1331 (federal question jurisdiction).

29.21. Venue is proper in this District under Section 27 of the Exchange Act, *see* 15 U.S.C. § 78v, and 28 U.S.C. § 1391(b)&(d). At all relevant times, Hyzon conducted business and maintained its headquarters, located at 475 Quaker Meeting House Road, Honeoye Falls, NY 14472, in this District. Additionally, many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred, in substantial part, in this District.

30.22. In connection with the acts alleged herein, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of national securities exchanges.

## III.IV. PARTIES

### A.    Lead Plaintiff

31.23. Lead Plaintiff Alfred Miller, M.D. is a retired physician who currently resides in San Antonio, Texas. As set forth in the certification filed with this Court (Dkt. No. 12-1), Dr. Miller personally purchased Hyzon securities at artificially inflated prices during the Class Period (prior to the SPAC Merger), retained those shares during the Class

Period, and suffered substantial losses upon the revelation of the corrective disclosures alleged herein.

**B.    Hyzon f/k/a DCRB**

32.24. Defendant Hyzon Motors Inc. ("Hyzon") f/k/a Decarbonization Plus Acquisition Corporation ("DCRB") is a holding company for the Hyzon business, which purports, prior to its dissolution, purported to be a leading global supplier of zero-emission, hydrogen-fuel-cell-powered heavy vehicles for the commercial vehicle market and, in particular, back-to-base vehicle fleet operations. Organized under Delaware law and headquartered at 475 Quaker Meeting House Road, Honeoye Falls, NY 14472, the Company operatesoperated in offices around the world, including in the United States, the Netherlands, Singapore, Australia, and (during the Class Period) China.

33.25. On July 16, 2021, (i) DCRB—a publicly traded special purpose acquisition company formed for the purpose of acquiring a privately owned company and taking it public, (ii) DCRB Merger Sub Inc. ("Merger Sub")—DCRB's directly owned subsidiary, and (iii) the pre-merger entity Hyzon Motors Inc. ("Legacy Hyzon") consummated a business combination to take Hyzon public (the "SPAC Merger"). Upon completion of the SPAC Merger:

(a)    DCRB renamed itself as Hyzon Motors, Inc.;

(b)    Legacy Hyzon was renamed Hyzon Motors USA Inc. (referred to herein as "Hyzon USA"); and

(c)    Hyzon USA became the wholly owned subsidiary and the only business of the post-merger DCRB d/b/a Hyzon.

- 28 -

As such, explanations of Hyzon's conduct herein include conduct of DCRB by way of its agent and subsidiary Hyzon USA. Moreover, certain of the claims alleged herein are based on the conduct of Legacy Hyzon, Merger Sub, and/or pre-merger DCRB. Because any liability of those entities survived the SPAC Merger and Hyzon's name change, Hyzon remains liable for such conduct.

34.26. Prior to the SPAC Merger, DCRB issued securities which traded on the National Association of Securities Dealers Automated Quotations ("Nasdaq")Nasdaq under the ticker symbols "DCRBU" for Units, "DCRB" for common stock, and "DCRBW" for warrants. Since the completion of the SPAC Merger, Hyzon's stock has traded on the Nasdaq under the ticker symbol "HYZN." As of August 17, 2022, Hyzon had approximately 247.9 million shares of commons stock outstanding, owned by at least hundreds or thousands of investors.

35.27. As part of its business operations, Hyzon has founded or acquired wholly owned subsidiaries, including Hyzon Automobile Technology (Shanghai) Co., Ltd. (an R&D office based in China); Hyzon Motors Australia PTY LTD (based in Australia); Hyzon Motors Europe B.V. (based in the Netherlands); Hyzon Motors Pte. Ltd. (based in Singapore); and Hyzon Motors Innovation GmbH (based in Germany). On May 31, 2023, Hyzon announced it had transferred ownership of its wholly owned Guangdong China subsidiary to its parent companies as part of an exit from the China truck market.

**C.    Hyzon Executive Defendants**

~~C.~~A.    ~~Executive Defendants~~

~~36.~~1.    ~~Defendant Erik Anderson ("Anderson") is a Director of Hyzon's Board of Directors who previously served as the President and Chief Executive Officer of DCRB~~

- 29 -

throughout the Class Period until the July 2021 SPAC Merger. Prior to the Class Period, Defendant Anderson founded WestRiver Group ("WRG"), an investment firm purporting to provide integrated capital solutions to the global innovation economy. He has served as Chief Executive Officer of WRG since its inception in 2002. During the Class Period, Anderson signed off on several of the false and misleading statements alleged herein, including those listed in Proxy Statements and Hyzon's Annual Report.

37.   Defendant Peter Haskopoulos ("Haskopoulos") served as DCRB's Chief Financial Officer ("CFO"), Chief Accounting Officer ("CAO"), and Secretary throughout the Class Period until the July 2021 SPAC Merger. According to his social media profiles, he has served in similar roles for related SPACs. In addition, he has served as the CFO of Riverstone Holdings LLC, a multinational private equity firm that founded and thus controlled DCRB and DCRB's Sponsor, Decarbonization Plus Acquisition Sponsor, LLC ("Sponsor"). During the Class Period, Anderson signed off on several of the false and misleading statements alleged herein, including those listed in Soliciting Materials containing as attachments Defendants' false and misleading investor presentations.

38.28.  Defendant Craig Knight ("Knight") is the former Chief Commercial Officer and co-founder of Hyzon USA and, as of the filing of this TACComplaint, the former Chief Executive Officer of Hyzon, a position he held from August 2021 until his termination for cause in August 2022. Before co-founding Hyzon, Knight served as the Chief Commercial Officer and, thereafter, the Chief Executive Officer, of Hyzon's corporate grandparent, Horizon, for which Knight was a founding shareholder. In those roles, Knight directly oversaw Hyzon's business strategy and sales efforts, often serving as the Company's face in investor communications and media appearances. On August 17, 2022, Hyzon

announced that its Board had terminated Knight as CEO and as a director of the Company, effective immediately. Upon information and belief, these terminations related to the misconduct alleged herein. Specifically, on February 1, 2023, Hyzon announced that its Board of Directors had determined Knight's terminations should retroactively be deemed for cause—a decision reached days after receiving the Special Committee's preliminary findings into the misconduct alleged herein.

39.29.  Defendant Mark Gordon ("Gordon") served as the Company's CFO from the July 2021 merger up through April 12, 2022 and served as Hyzon Motors USA's CFO from August 2020 until the July 2021 merger. Defendant Gordon is also a former member of the Company's Board of Directors. In those roles, Gordon made, issued, disseminated, or joined in the making, issuing, or dissemination of several of the false and misleading statements alleged herein.

40.30.  Defendant George Gu ("Gu") is the former Executive Chairman of Hyzon's Board of Directors. He was also the former Chief Executive Officer of Hyzon, a position he served in from January 2020, when he co-founded Hyzon USA, until August 2021. Before co-founding Hyzon, Gu co-founded Hyzon's parent company, Horizon, in 2003 and served as its Chief Executive Officer until August 2019, when he transitioned to the role of Chairman of Horizon's Board of Directors. In January 2020, Gu, along with Defendant Knight, co-founded Hyzon as a standalone entity from Horizon. In those roles, Gu directly oversaw Hyzon's business strategy and sales efforts. On August 17, 2022, Hyzon's Board of Directors announced that it had terminated Gu from his then-current role as Executive Chairman of Hyzon's Board and transitioned him to a non-executive role. Hyzon's website

- 31 -

still lists Gu as the Chairman of Hyzon's Board. Gu also identifies as a beneficial owner of the Hyzon securities owned by Hyzon's majority shareholder—its corporate parents.

41.1. ~~Defendant Robert Tichio ("Tichio") is the Chairman of DCRB's Board of Directors, as well as a partner and managing director of Riverstone. He has also previously served as a director at a number of other SPACs created by Riverstone under the "Decarbonization Plus" banner and had served at least temporarily as their CEOs. Defendant Tichio was also a director and a managing partner at Riverstone and served on the boards of directors at a number of Riverstone portfolio companies. During the Class Period, he directly participated in the selling of the SPAC Merger to investors, making multiple public statements along with Hyzon's senior management regarding the veracity and magnitude of Hyzon's committed orders, revenue forecasts, and business operations.~~

42.31. Throughout the Class Period, Defendants ~~Anderson, Haskopoulos,~~ Knight, Gordon, and Gu~~, and Tichio are collectively referred to herein as the "Individual Defendants."~~:

43. ~~Each of the Individual Defendants:~~

    (a)    directly participated in the management of the Company;

    (b)    ~~was~~were directly involved in the day-to-day operations of the Company at the highest levels;

    (c)    ~~was~~were privy to confidential proprietary information concerning the Company and its business and operations;

    (d)    ~~was~~were directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein in the Company's public statements and its filings with the SEC;

    (e)    ~~was~~were directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)    ~~was~~were aware of, recklessly disregarded, or were negligent of the fact that the false and misleading statements discussed herein were being issued concerning the Company; and/or

(g)    approved or ratified these statements in violation of the federal securities laws.

44.    ~~Because of their respective positions of control and authority, their respective abilities to exercise power and influence over the Company's conduct, and their respective access to material inside information about Hyzon during the Class Period, the Individual Defendants were each a controlling person of Hyzon (and its pre-merger entities) within the meaning of Section 20(a) of the Exchange Act.~~

32.    ~~The Company is liable for the acts of the Individual Defendants and its~~Hyzon is liable for the acts of Defendants Knight, Gordon, and Gu and its other employees under the doctrine of respondeat superior and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

33.    The scienter of these Defendants and other employees and agents of the Company is similarly imputed to the Company under respondeat superior and agency principles.

**D.    DCRB Executive Defendants**

34.    Defendant Erik Anderson ("Anderson") is a Director of Hyzon's Board of Directors who previously served as the President and Chief Executive Officer of DCRB throughout the Class Period until the July 2021 SPAC Merger. Prior to the Class Period, Defendant Anderson founded WestRiver Group ("WRG"), an investment firm purporting to provide integrated capital solutions to the global innovation economy. He has served as

Chief Executive Officer of WRG since its inception in 2002. During the Class Period, Anderson signed off on several of the false and misleading statements alleged herein, including those listed in Proxy Statements and Hyzon's Annual Report.

35.    Defendant Peter Haskopoulos ("Haskopoulos") served as DCRB's Chief Financial Officer ("CFO"), Chief Accounting Officer ("CAO"), and Secretary throughout the Class Period until the July 2021 SPAC Merger. According to his social media profiles, he has served in similar roles for related SPACs. In addition, he has served as the CFO of Riverstone Holdings LLC, a multinational private equity firm that founded and thus controlled DCRB and DCRB's Sponsor, Decarbonization Plus Acquisition Sponsor, LLC ("Sponsor"). During the Class Period, Haskopoulos signed off on several of the false and misleading statements alleged herein, including those listed in Soliciting Materials containing as attachments Defendants' false and misleading investor presentations.

36.    Defendant Robert Tichio ("Tichio") is the Chairman of DCRB's Board of Directors, as well as a partner and managing director of Riverstone. He has also previously served as a director at a number of other SPACs created by Riverstone under the "Decarbonization Plus" banner and had served at least temporarily as their CEOs. Defendant Tichio was also a director and a managing partner at Riverstone and served on the boards of directors at a number of Riverstone portfolio companies. During the Class Period, he directly participated in the selling of the SPAC Merger to investors, making multiple public statements along with Hyzon's senior management regarding the veracity and magnitude of Hyzon's committed orders, revenue forecasts, and business operations.

37.    Throughout the Class Period, Defendants Anderson, Haskopoulos, and Tichio:

- 34 -

(a)    directly participated in the management of the Company;

(b)    were directly involved in the day-to-day operations of the Company at the highest levels;

(c)    were privy to confidential proprietary information concerning the Company and its business and operations;

(d)    were directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein in the Company's public statements and its filings with the SEC;

(e)    were directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)    were aware of, recklessly disregarded, or were negligent of the fact that the false and misleading statements discussed herein were being issued concerning the Company; and/or

(g)    approved or ratified these statements in violation of the federal securities laws.

45.38. DCRB is liable for the acts of Defendants Anderson, Haskopoulos, and Tichio and its other employees under the doctrine of respondeat superior and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

46.39. The scienter of the Individualthese Defendants and other employees and agents of the CompanyDCRB is similarly imputed to the CompanyDCRB under respondeat superior and agency principles.

47.    Herein, "Defendants" refers to the Company and the Individual Defendants collectively, in the context of Lead Plaintiff's Section 10(b) claims. The term additionally refers to the DCRB Director Defendants and the DCRB Control Defendants in the context of Lead Plaintiff's Section 14 and related Section 20(a) claim.

## ~~D.~~E.    DCRB Control Defendants

~~48.~~40.  Defendant Riverstone Investment Group LLC ("Riverstone") is a Delaware limited liability company that founded and thus controlled both DCRB and the Sponsor. Along with the directors of DCRB and WGN, through its ownership of the Sponsor, Riverstone was a controlling shareholder of DCRB. Riverstone acted through Defendants Lapeyre and Leuschen, its co-founders and senior managing directors, who jointly shared beneficial ownership of the Class B common Founder Shares held directly by the Sponsor, and Defendant Tichio, one of Riverstone's managing directors. In addition to its series of Decarbonization SPACs, Riverstone carried out two previous SPAC transactions.

~~49.~~41.  Defendant Decarbonization Plus Acquisition Sponsor, LLC ("Sponsor") is a Delaware limited liability company and an affiliate of Riverstone that served as DCRB's sponsor and purchased and held Riverstone's Class B Founder Shares. As part of DCRB's formation, several Board members received membership interests in the Sponsor and, in turn, a portion of the Founder Shares, which gave them the opportunity to make millions of dollars as long as they approved a transaction in which DCRB acquired another business.

~~50.~~42. Defendant WRG DCRB Investors, LLC ("WRG") is an affiliate of Defendant Anderson, created by the West River Group where Anderson serves as CEO, that purchased and held Founder Shares for the benefit of Defendant Anderson.

~~51.~~43. "DCRB Control Defendants," as used herein, refers to Defendants Riverstone, Sponsor, and WRG, by virtue of their controlling stock ownership interests, along with Defendants Anderson, Lapeyre, Leuschen, and Tichio, by virtue of their ties to those entities.

## E.F.    DCRB Director Defendants

52.44. In addition to Defendants Anderson and Tichio, the DCRB Director Defendants consist of the following persons.

53.45.  Defendant Jennifer Aaker served as a member of the Board prior to the SPAC Merger. She also served a director of at least one other SPAC created by Riverstone under the "Decarbonization Plus" banner.

54.46.  Defendant Jane Kearns served as a member of the Board prior to the SPAC Merger. She also served as a director of at least one other SPAC created by Riverstone under the "Decarbonization Plus" banner.

55.47.  Defendant Pierre Lapeyre, Jr. served as a member of the Board prior to the SPAC Merger. He also served as a director of at least one other SPAC created by Riverstone under the "Decarbonization Plus" banner. Defendant Lapeyre is the co-founder and a senior managing director of Riverstone, and he serves on the boards of directors or equivalent bodies of several public and private Riverstone portfolio companies and their affiliates. Defendant Lapeyre was also a managing partner of the conflicted financial advisor Goldman Sachs' Global Energy & Power Group.

56.48.  Defendant David Leuschen served as a member of the Board prior to the SPAC Merger. He also served as a director of at least one other SPAC created by Riverstone under the "Decarbonization Plus" banner. Defendant Leuschen is the cofounder and a senior managing director of Riverstone, and he serves on the boards of several Riverstone portfolio companies and investment vehicles. Defendant Leuschen also previously served as a partner and managing director at the conflicted financial advisor Goldman Sachs. There, Defendant Leuschen also served as the founder and head of

Goldman Sachs' Global Energy & Power Group, where he is credited with having advanced the Goldman Sachs energy and power investment banking practice, and as chairman of the Goldman Sachs Energy Investment Committee, where he is credited with having screened potential direct investments by Goldman Sachs in the energy and power industry.

57.49.  Defendant Jim McDermott served as the lead "independent" director of the Board prior to the SPAC Merger. He also served as a director of at least one other SPAC created by Riverstone under the "Decarbonization Plus" banner.

58.50.  Defendant Jeffrey Tepper served as a Board member prior to the SPAC Merger. He also served as a director of at least one other SPAC created by Riverstone under the "Decarbonization Plus" banner. Defendant Tepper previously served as a director of two other SPACs.

59.51.  Defendant Michael Warren served as a member of the Board prior to the SPAC Merger. He also served as a director of at least one other SPAC created by Riverstone under the "Decarbonization Plus" banner.

## F.G.    Other Relevant Persons and Entities

## 1.    Hyzon's Parent Company

60.52.  Horizon Fuel Cell Technologies ("Horizon"), Hyzon's corporate grandparent, is a Singapore-based company purporting to be a world leading developer and manufacturer of various fuel-cell electric energy solutions and products. Before Horizon spun off Hyzon into a standalone subsidiary, Hyzon operated as Horizon's Heavy Vehicle Business Unit and, from 2019 to 2020, was responsible for the development of fuel cell systems for Horizon's fuel-cell powered commercial vehicles. As of the date of this

amended complaint, Horizon maintains majority control of Hyzon through its subsidiaries, controlling nearly 63% of Hyzon's shares.

61.53.  Hymas Pte. Ltd. ("Hymas") is a Singapore-based company that is majority but indirectly owned by Horizon and is the direct corporate parent of Hyzon.

**2.      Relevant Hyzon Subsidiaries**

54.      Hyzon Motors Europe B.V. is based and organized in the Netherlands. Hyzon Europe markets FCEVs in Europe. From March 2020 until December 2022, Hyzon Europe was a joint venture between Hyzon and HCT's parent company. Hyzon owned the majority interest in Hyzon Europe. In December 2022, Hyzon purchased the minority interest of Hyzon Europe that HCT's parent company owned. Hyzon Europe is now a wholly owned subsidiary of Hyzon.

55.      Max C.B. Holthausen is a citizen and resident of the Netherlands. Holthausen is the CEO of Holthausen Clean Technology B.V. ("HCT"), which he founded with his father. In March 2020, HCT's parent company formed a joint venture with Hyzon called Hyzon Motors Europe B.V. ("Hyzon Europe"). Holthausen served as the managing director of Hyzon Europe from March 2020 until December 2022. In its SEC filings and investor presentations, Hyzon identified Holthausen as a named executive officer and management team member of Hyzon from at least January through July 2021.

56.      Hyzon Motors Technology (Shanghai) Co., Ltd. ("Hyzon China") is based and organized in China. Hyzon China is a wholly owned subsidiary of Hyzon. Hyzon China sold its equity interest in the FCEV manufacturing component of its business in December 2022. Hyzon's parent company, Horizon, oversaw most of Hyzon China's operations, including the accounting and sales functions, pursuant to an agreement with Hyzon China.

2.3.    **Short Seller Activist Investment Firms**

62.57.  With regulators stymied, activist short seller firms have been, and continue to be, important adjuncts to ferreting out fraud in companies originating in or operating from foreign nations, including Singapore and China. Short sellers do the on-the-ground legwork in foreign nations—staking out foreign factories, for instance—to show that these companies have so little activity that they could not possibly be doing the types or magnitudes of business that they claim. With respect to this action, not one, but two separate short seller activist firms—Blue Orca and Iceberg Research—issued reports that brought the fraud scheme at issue in this action to light.

63.58.  Established in 2018, Blue Orca Capital ("Blue Orca") describes itself as a Texas-based "activist investment firm" managed and founded by Soren Aandahl. Aandahl is a former director of Glaucus Research Group and CIO of Glaucus Investments, which conducts investigative research on public companies in Asia-Pacific, Europe, and North America. Blue Orca publishes its research while taking publicly disclosed short positions that reflect their research. The firm has exposed accounting problems and fraud at several companies, primarily in China but also in other countries in Asia, Europe, and North America. Soren Aandahl appears frequently as a commentator on *Bloomberg Television* and *CNBC.* And unlike other short sellers, such as those who anonymously post on crowd sourced online resources, like SeekingAlpha.com, Blue Orca and Soren Aandahl publish their analyses in their names and defend their conclusions in public media.

64.59.  In May 2018, for example, shortly after Aandahl established Blue Orca, the firm issued a report claiming that Samsonite International SA, the world's largest luggage maker, had questionable accounting practices and poor corporate governance. In particular,

the report alleged that Samsonite concealed slowing growth through debt-fueled acquisitions and had used accounting methods to massage earnings and inflate profit margins. The report further accused Samsonite's CEO of falsely claiming to have a doctorate degree in business administration on his resume, despite never completing the program. The firm disclosed that, in light of these claims, it had taken a short position on Samsonite. Eight days later, Samsonite's CEO stepped down from his role, citing personal reasons. In addition to Samsonite, both Blue Orca and Aandahl have issued reports and public commentary concerning allegedly false and misleading statements and omissions by other corporate entities, at least two of which remain the subject matter of active securities fraud class actions filed in federal court. *See Gloster v. Standard Lithium Ltd. et al.*, No. 1:22-cv-507 (E.D.N.Y.); *In re MINISO Grp. Holding Ltd. Sec. Litig.*, No. 1:22-cv-09864-ER (S.D.N.Y.).

65.60. Like Blue Orca, Iceberg Research is an activist short seller firm that "identifies substantial earnings misrepresentation[s] and accounting irregularities in financial statements issued by public companies[,] ... locate[s] these notes in financial documentation," and then publishes its findings "to provide a complete picture for investors."[21] Established in 2015 by Arnauld Vaugner, the firm is best known for its reports on Noble Group, once one of the largest commodity trading firms in the world. Starting in 2015, Iceberg Research began posting reports accusing Noble of substantially overvaluing its assets and camouflaging its debt through financial engineering in a similar manner to the now notorious Enron. Iceberg supported these claims by citing accounting inaccuracies

---

[21]  "About," ICEBERG-RESEARCH.COM, https://iceberg-research.com/about/.

in Noble's public filings. Noble eventually fell apart after Iceberg's series of reports, losing nearly 99% of its stock value until the company was liquidated in November 2018.

66.61.  Beyond Noble, Iceberg Research has reported wrongdoings by other companies, including Tutor Perini, an American construction firm alleged to have overvalued its stocks in its financial report, and Tibet Water Resources, a Chinese company that allegedly reported brewery activities that did not exist. The firm's research has also been mentioned in various publications, including the Financial Times, the Wall Street Journal, Reuters, Quartz, South China Morning Post, and Business Times.

## IV. V.  THE ORIGINS OF HYZON AND DCRB

### A.    Hyzon: A Repackaging of a Financially Flailing Chinese EV Company

67.62.  Since its inception, Hyzon has painted itself as a new and vital innovator in the inevitable, zero-emissions frontier. But very little about Hyzon's operations or technology is new or innovative. In truth, Hyzon operates as a second life for Horizon's failed attempts to commercially market its fuel-cell technology for nearly twenty years through Chinese subsidiaries. By reorganizing and rebranding Horizon's electric vehicle operation as Hyzon, Defendants aimed to jettison their economically tarnished reputation and hopefully begin anew. But like most enterprises built on a flawed foundation, Hyzon was pre-destined to repeat Horizon's economic flailing again.

68.63.  Accordingly, Hyzon's business story must begin with the story of its corporate grandparent, Horizon, the Singapore-based fuel-cell manufacturer formerly managed by Founder Defendants Knight and Gu. In its first few years, Horizon focused on the commercialization of small-scale hydrogen-fuel-cell powered projects. In 2004, for

example, Horizon launched its first proton-exchange membrane ("PEM") fuel cell stack as an alternative to other fuel-cell technologies. That same year, Horizon also began to develop, produce, and ship hydrogen-themed science experiment kits for students.

69.64. As research and development progressed, Horizon shifted its trajectory to scaling up the size of its fuel cells for larger, power consuming equipment and applications. In 2015, Horizon began to develop fuel cells for transportation applications and general hydrogen-electric-based mobility. In 2018, Horizon successfully manufactured hydrogen fuel cells to power mid-sized buses and light delivery trucks. And in 2019, Horizon announced the commencement of volume production of its "high-performance" VLS-II series fuel stacks for commercial vehicles, with an initial focus on heavy duty trucks.

70.65. As part of these commercialization efforts, Horizon's vehicle operations increasingly centered on China, where it established at least two subsidiary companies— (1) Jiangsu Horizon New Energy Technology Co., Ltd. ("JS Horizon"), based in Changzhou City, Jiangsu Province, China, and (2) Shanghai Horizon New Energy Technology Co.—to provide fuel cell stacks, hydrogen generators, and hydrogen storage solutions to East Asian markets (collectively with Horizon, "Horizon"). Through these companies, Horizon would sell its fuel cell technology to third-party original equipment manufacturers ("OEMs"), which would then either retrofit an existing vehicle to utilize Horizon's fuel cell stacks or construct a new vehicle by installing Horizon fuel cell stacks into the empty shell and chassis of an established vehicle brand.

71.66. Using this business model, Horizon enjoyed some initial success by selling to a small number of light-to-medium sized commercial vehicle operators in China. According to its public filings with National Equities Exchange and Quotations ("NEEQ"),

- 43 -

the over-the-counter exchange for small and medium-sized Chinese enterprises not listed on the Shenzhen or Shanghai stock exchanges, Horizon and/or its subsidiaries reportedly installed its fuel-cell battery systems in approximately 400 vehicles by the end of 2019.[22] Horizon, in turn, experienced an incredible jump in revenue, with revenues up nearly 540% over the years preceding its commercial vehicle enterprise, as illustrated in the chart below.

**F.3 -    Horizon Regulatory Filing for FY 2019 with Singapore ——Government[23]**

**Corporate Compliance and Financial Profile of HORIZON FUEL CELL TECHNOLOGIES PTE. LTD. (200310637H)**

| Balance Sheet | 2019 Group | 2018 Group | 2017 Group |
|---|---|---|---|
| Total Assets | 32,311,228.00 | 12,202,391.00 | 13,442,244.00 |
| Total Current Assets | 27,431,885.00 | 9,873,964.00 | 11,569,226.00 |
| Total Liabilities | 34,049,223.00 | 20,220,442.00 | 19,941,232.00 |
| Total Current Liabilities | 14,053,526.00 | 1,785,531.00 | 1,506,321.00 |
| Retained Earnings (Accumulated Loss) | -26,030,159.00 | -26,042,863.00 | -23,233,200.00 |
| **Profit and Loss** | | | |
| Revenue | 28,896,728.00 | 4,489,463.00 | 3,422,103.00 |
| Profit(Loss) before tax from continuing operations | -145,215.00 | -3,425,936.00 | -3,279,219.00 |
| Profit(Loss) after tax from continuing operations | -145,215.00 | -3,425,936.00 | -3,279,219.00 |

72.67.  Behind the scenes, however, lay in wait one fatal liability. Because Horizon could not breach a diversified customer base, its revenue and sales numbers depended primarily on one purchaser, Shanghai SunLong Bus Co., Ltd. ("Shanghai SunLong"), which in 2019 accounted for nearly three quarters of JS Horizon's self-reported vehicle sales and 85% of its trade receivables (*see* Table of Horizon's Top 5 Major Customers

---

[22]  *See* JS Horizon 2019 Annual Report, at 2, *available at* http://www.neeq.com.cn/disclosure/2020/2020-04-30/1588243669_066387.pdf.

[23]  As displayed in "Hyzon Motors Inc: Trouble at the ParentCo," at 3, ICEBERG-RESEARCH.COM, (Oct. 6, 2021), https://iceberg-research.com/2021/10/06/hyzon-motors-inc-trouble-at-the-parentco/.

below). Thus, as illustrated in the table below, if Shanghai SunLong experienced financial hardship and could no longer pay its debts, Horizon's business would implode.

**F.4 –   JS Horizon 2019 Annual Report: Table of Top 5 Customers[24]**

| Rank 序号 | Customer 客户 | Annual Sales (RMB) 销售金额 | % Annual Shares 年度销售占比% | 是否存在关联关系 |
|---|---|---|---|---|
| 1 | 上海申龙客车有限公司 Shanghai SunLong | 150,000,000.00 | 74.24% | 否 |
| 2 | 南通亿能能源科技有限公司 | 18,390,605.52 | 9.10% | 否 |
| 3 | Horizon Fuel Cell Europe s.r.o. | 8,361,567.27 | 4.14% | 否 |
| 4 | 上海杰宁新能源科技有限公司 | 4,601,769.91 | 2.28% | 否 |
| 5 | Horizon Fuel Cell Americas Inc. | 3,953,594.78 | 1.96% | 否 |
| | 合计 | 185,307,537.48 | 91.72% | - |

73.68.  This fatal risk materialized at the end of 2019, when Shanghai SunLong's parent company Tungshu Optoelectonic Technology, defaulted on three bonds in the course of one month.[25] Thereafter, Horizon could no longer collect on its largest account's receivables. And as a result, Horizon's free cash flow plummeted to RMB -49.7 million (approximately -$7 million USD); its reported sales fell approximately 36%; and Horizon recovered approximately only RMB 1 million ($141,593 USD) of its RMB 56.5 million ($8 million USD) SunLong receivables.[26]

74.69.  By the end of 2020—during a relative peak of EV stock market mania— Horizon's fuel cell sales plummeted, resulting in only 100 additional fuel cells sold, in

---

[24]   JS Horizon 2019 Annual Report at 16, *supra* n.22.

[25]   Yujing Liu, "Third bond default by Chinese electronics firm within a month points to wider corporate governance issues," SOUTH CHINA MORNING POST (Dec. 3, 2019), https://www.scmp.com/business/china-business/article/3040265/third-bond-default-chinese-electronics-firm-within-month.

[26]   Horizon 1H 2020 Semi-Annual Report, at 12, 90, http://www.neeq.com.cn/disclosure/2020/2020-07-31/1596191199_148674.pdf.

2020, give or take, and only 38 fuel cells sold during the first half of 2021. This represented an 81% decline from Horizon's sales in 2019.[27]

**F.5 – Declining Annual Sales of Horizon Fuel Cells from 2019-2021[28]**



75.70. According to reporting by the Orange Group, a Chinese focused research organization, as of June 2021—a month before the SPAC Merger—Horizon and Legacy Hyzon had sold, in total, only 538 vehicle fuel-cell stacks since the inception of Horizon's electric vehicle enterprise, 369 of which were installed in vehicles in China.[29]

---

[27] This estimate derives from information in Hyzon's SPAC investor materials, in which it claims that Horizon had sold a total of 500 fuel cells by the end of 2020, *see* Hyzon July 2021 Investor Presentation, ~~https://s28.q4cdn.com/786762755/files/doc_presentations/2021/07/Hyzon-Motors-Investor-Presentation-July-2021.pdf~~https://www.scribd.com/document/801002672/Hyzon-Motors-Investor-Presentation-July-2021, viewed in combination with Horizon's financial reports, reporting delivery of nearly 400 fuel cell systems by the end of 2019.

[28] Blue Orca Report (Dkt. No. 55-1) (citing July 2021 Investor Presentation, *infra* n.84; JS Horizon 2019 Annual Report, *supra* n.22; Orange Group, "Top 15 Hydrogen Fuel Cell Systems in China," https://www.shangyexinzhi.com/article/4198728.html).

[29] *See id.*

76.71.  Horizon conceded the plummet in its enterprise value in its later filings with NEEQ, which revealed that the enterprise value of its EV vehicle sector bottomed out with a market capitalization of merely $190 million as of January 2021.[30]

**F.6 – Horizon EV Vehicle Enterprise Value as of January 2021[31]**

|  | RMB M | USD M |
|---|---|---|
| Total Shares Outstanding (m) | 36.1 | 36.1 |
| Share Price (RMB, USD) | 36.04 | 5.54 |
| Equity Value | 1,300 | 200 |
| (-) Cash and Equivalents | (60) | (9) |
| (-) Equity Investments | (3) | (0) |
| **Enterprise Value** | 1,237 | **190** |

77.72.  Further, Horizon conceded in its last publicly filed report with NEEQ that there was little demand for its fuel cell technology.

**F.7 – Horizon 1H 2020 Semi-Annual Report[32]**

**Material Risks:**
目前，燃料电池技术总体普及 程度不高，产业化 面临挑战

*"At present, **the overall popularity of fuel cell technology is not high**, and the commercialization faces challenges."*

[Significant Risk Alert Form]
【重大风险提示表】

| 重大风险事项名称 | 重大风险事项简要描述 |
|---|---|
| Name of material risk matters | 燃料电池技术属于国家战略性高新技术，所处领域为国家战略性新兴产业，目前，燃料电池技术总体普及程度不高，产业化面临挑战；整体生产成本相对于传统能源还不具备较强的竞争能力，核心原材料如铂金催化剂、质子交换膜、双极板等购置成本较高。另外，燃料电池产业链体系如氢的制取、储运及加氢站等产业仍在攻关中。 |
| 燃料电池技术产业化的风险 Risks of industrializing fuel cell technology | 虽然该技术是综合解决国家能源安全、国家能源结构调整以及国家节能减排等战略性目标的关键技术，且国家已经出台了鼓励行业发展的政策并给予极大的政府补贴。但在短期内实现下游行业的规模化应用仍面临较大的挑战，相关技术的产业化应用存在一定的不确定性。 |
| 核心技术人员流失的风险 | 公司作为燃料电池研究型企业，需要大量有经验、并掌握燃料电池核心技术的人才。保持核心技术人员稳定是公司生存和发 |

Brief description of material risk matters

At present, the overall popularity of fuel cell technology is not high, and commercialization faces challenges.

---

[30]  JS Horizon Equity Incentive Plan (Jan. 26, 2021), http://www.neeq.com.cn/disclosure/2021/2021-01-26/1611654052_860439.pdf; *see also* JS Horizon Report on Private Issuance of Shares (Aug. 27, 2020), http://www.neeq.com.cn/disclosure/2020/2020-08-27/1598516135_141306.pdf (claiming nearly $200 million valuation).

[31]  *See id*.

[32]  Horizon 1H 2020 Semi-Annual Report, at 4, *supra* n.26.

78.73.  In March 2021, with chances of recovery low and plans to spin-off Hyzon underway, Horizon de-registered from NEEQ. Consequently, Horizon filed no annual report for fiscal year 2020. But as discussed below, Horizon would find new, more lucrative means to access capitol through Hyzon's "separate," U.S.-based operations.

**B.    Take Two: Horizon Spins Off Hyzon to Rebrand Its EV Enterprise and Attract More Lucrative Investments from U.S. Capital Markets**

79.74.  Desperate to build momentum for Horizon's EV enterprise anew, Defendants Knight and Gu realized that to achieve their purported decarbonization goals, they had to reset operations and somehow expand beyond Horizon's limited customer base. From their failed experiment with JS Horizon, they knew they could not sustain commercialization by staying in East Asia, given low demand, low sales prices, and limited investor interest. Western capital markets, specifically the United States, on the other hand, provided a more lucrative sales and investment playground, particularly given the then-manic investor interest in zero- revenue EV companies.

80.75.  As such, in January 2020—just weeks after the beginning of JS Horizon's financial fall and weeks before it would be delisted on NEEQ—Defendants Knight and Gu filed paperwork establishing Hyzon as a spin-off and spiritual successor of Horizon's in-house HFCEV commercial vehicle unit.

81.76.  As initially conceived, Hyzon was to focus on the development and assembly of heavy-duty HFCEVs and hydrogen fuel cell stacks exceeding 100kW using Horizon's fuel-cell technology. This business plan centered on "manufactur[ing], integrat[ing], assembl[ing], sell[ing] and servic[ing] hydrogen-powered commercial vehicles and

hydrogen fuel cell systems,"[33] as opposed to performing retrofitting services that converted combustion vehicles already owned by end users. Or, as put on Hyzon's website, its "establishment as a standalone entity was to focus on accelerating the energy transition through the manufacturing and supply of hydrogen fuel cell-powered commercial vehicles across the North American, European, and Australasian regions."[34]

82.77.  But, in the words of Defendant Knight, "It costs a lot of money to set up factories,"[35] and Hyzon needed to raise a lot of cash from outside sources to expand its operations in the U.S., European, and Oceanic markets. Knight and Gu thus developed a compelling, yet misleading, narrative about their ability to build upon Horizon's purported commercial success. The goal of this narrative was to attract outside investment and eventually catch the attention of SPACs hungry for EV opportunities.

83.78.  To that end, in March 2020, the Company reported plans to start an integration facility in Honeoye Falls, NY by mid-year. In discussing this launch with media outlets, Founder Defendant Gu, at the time, both the CEO of Hyzon and the Chairman of Horizon's Board of Directors, repeatedly proclaimed: "We have seen incredible growth in

---

[33] *See, e.g.*, Hyzon Preliminary Proxy Statement at 29 (Mar. 17, 2021), https://www.sec.gov/Archives/edgar/data/1716583/000119312521084245/d46419dprem14a.htm. Hyzon repeated this business plan in its S-1 Registration Statement, other Proxy Statements, and in its quarterly and annual reports on file with the SEC.

[34] "About Company," HYZON, https://www.hyzonmotors.com/about (archived version from Feb. 9, 2021, webpage up through Jan. 25, 2022).

[35] Alan Adler, "Singapore spinoff Hyzon Motors makes US fuel cell trucking play," FREIGHTWAVES.COM (Nov. 24, 2020), https://www.freightwaves.com/news/singapore-spinoff-hyzon-motors-makes-us-fuel-cell-trucking-play ("'It costs a lot of money to set up factories,' [Knight] said. 'We see that as something we can safely outsource. Focusing on the core technology within the fuel cell powertrains is where we can add value.'").

Asia in recent years at Horizon, and now with the experience gained from hundreds of trucks in commercial service, we aim to bring our technology to the roads of the world."[36]

84.79.  Before it could even produce a single fuel cell or assemble one HFCEV, Hyzon began issuing a barrage of press releases announcing new purported deals with global customers and partners. For example, on July 13, 2020, Hyzon issued a press release announcing that it had co-founded a European subsidiary, Hyzon Motors Europe B.V. ("Hyzon Europe") and that it had opened a European headquarters in Groningen, Netherlands.[37] Likewise, on August 16, 2020, the Company announced that it had entered into an agreement for Hyzon to supply hydrogen fuel cell-powered coaches to Western Australian iron ore miner Fortescue Metals Group's ("Fortescue") Christmas Creek operations.[38]

---

[36]  "Hyzon Motors Inc is Officially Launched with a Hydrogen Fuel Cell Heavy Vehicle Integration Facility in NY State, USA," FUELCELLWORKS (Mar. 16, 2020), https://fuelcellsworks.com/news/hyzon-motors-inc-is-officially-launched-with-a-hydrogen-fuel-cell-heavy-vehicle-integration-facility-in-ny-state-usa/.

[37]  As reported by various news outlets, this European branch was not, in fact, directly operated by Hyzon USA. Rather, the company merely changed the sign on the front door of recently established European partner and Netherlands-based vehicle retrofitter, Holthausen Clean Technology ("Holthausen"), which then used a capital infusion provided by Defendants to establish Hyzon Motors Europe.

[38]  See News Release, Hyzon, "Hydrogen Mining Buses Mid-2021: West Oz Fuel-Cell Deal," (Aug. 17, 2020), https://hyzonmotors.com/hydrogen-mining-buses-mid-2021-west-oz-fuel-cell-deal/ (archived webpage).https://investors.hyzonfuelcell.com/news/news-details/2020/-Hydrogen-Mining-Buses-Mid-2021-West-Oz-Fuel-Cell-Deal/default.aspx. To date, Hyzon has not reported delivery or recognized revenue from such vehicles.

### C.     SPACs: A Short Primer

85.80. Around the same time that the Company began pushing its new brand, several more-established EV startups, including Nikola and Lordstown Motors, all announced that they each were going public through the resurging fad of SPAC deals.

86.81. As discussed above, a special purpose acquisition company, "SPAC" for short, is a company established for the purpose of raising capital to finance the purchase of another "target" company. As part of the SPAC process, a SPAC first lists itself on a stock exchange and raises proceeds through an initial public offering. The listed SPAC then identifies a target investment company, normally an unlisted private company, to execute a reverse takeover (often referred to as a "de-SPAC" transaction), thereby bringing the private company public. The SPAC, which is the surviving entity, then assumes the identity of the target company, changing its name and applicable security listings.

87.82. In theory, a SPAC merger allows the target company to go public quicker and cheaper by cutting out the rules of a traditional initial public offering ("IPO"). The SPAC sponsors, on the other hand, usually stand to make millions no matter how the post-merger company works out.

88.83. SPACs typically have a two-year deadline to identify a target company or business to acquire. If the SPAC completes an acquisition within the allocated time frame, SPAC stockholders and management of the SPAC can profit through their ownership of the common stock and any related securities. However, if an acquisition is not completed within the required time, then the SPAC automatically dissolves, and the money held in trust is returned to investors without payment or compensation of any kind (including sunk costs) to the SPAC founders or management team.

89.84.  As part of this SPAC process, SPAC stockholders are granted voting rights to approve or reject the business combination proposed by the management team. Thus, when the management team identifies a target, a proxy statement must be distributed to all stockholders which includes the terms of the business combination and the target company's financials.[39] If shareholders choose to reject the acquisition, they can exercise their right to redeem their pro rata investment interest in the SPAC ("Redemption Rights").

90.85.  At the beginning of the Class Period, SPAC mergers were so attractive to emerging companies and deep-pocketed investors that the market and its intermediaries (lawyers, bankers, etc.) struggled to keep pace. As depicted in the following figure, in just the first quarter of 2021 alone, nearly 300 SPACs launched on U.S.-based stock exchanges, raising nearly $83 billion in total funds, even for zero-revenue companies like Hyzon.

**F.8 –   The Rise and Fall of SPAC Mania[40]**



SPAC filings & total raised ($B), Q1'18 – Q2'21

Source: cbinsights.com

---

[39]   As discussed herein, here, DCRB filed with the SEC Proxy Statements and Soliciting Materials containing false and misleading statements from the start of the Class Period up through the July 16, 2021 SPAC Merger.

[40]   Image available at https://www.cbinsights.com/research/spac-mania-slowdown/. Note, in April 2021, the SEC issued new rules increasing government scrutiny of SPAC deals.

**D.**    **Hyzon Positions Itself to Attract SPAC Suitors**

91.86.  It was for these very reasons that Hyzon oriented itself and its public image so that it too could attract quick and massive capital influxes, especially of the magnitude offered by a SPAC acquisition.[41] In August 2020, Hyzon retained Goldman Sachs as its financial advisor for this endeavor. By October 13, 2020, Hyzon was in the process of executing non-disclosure agreements with various SPACs and exploring a potential business combination with them. And on November 2, 2020, DCRB and Hyzon executed a non-disclosure agreement to facilitate in-depth merger discussions.

92.87.  From August 2020 up through February 2021, Hyzon issued weekly-to-biweekly press releases and offered interviews, in which Hyzon and its senior executives highlighted key investment and partnership opportunities for the purpose of exciting investors. Market analysts responded to these updates with fervent excitement. Some analysts such as Climate Capital even went so far to boldly question whether Hyzon could be the "Tesla of trucking."[42]

---

[41] *See* Hyzon, "Fortescue Strikes Deal to Build Fleet of Hydrogen-Fueled Buses" (Sept. 9, 2020), https://www.hyzonmotors.com/hyzon-in-action/fortescue-bushttps://investors.hyzonfuelcell.com/news/news-details/2020/-Fortescue-Strikes-Deal-to-Build-Fleet-of-Hydrogen-Fueled-Buses/default.aspx ("The use of hydrogen and fuel-cell technology in commercial vehicles isn't new. However, investor interest has intensified since U.S. startup Nikola Corp. listed its shares in early June. ***Despite zero revenue, Nikola quickly saw its market value surge to almost $29 billion. ... Hyzon has similarly big ambitions.***" (Emphasis added)).

[42] *See* "The Climate Elevator Pitch: Is Hyzon the Tesla of Trucking," CLIMATE & CAPITAL MEDIA (Dec. 4, 2020), https://www.climateandcapitalmedia.com/the-climate-elevator-pitch-is-hyzon-the-tesla-of-trucking/.

**F.9 –  Excerpt from Analyst Article Excited About Hyzon's Prospects**



CLIMATE ECONOMY

**The Climate Elevator Pitch: Is HYZON the Tesla of trucking?**

by Climate&Capital Team | Dec 04, 2020

93.88.  During this time, Founder Defendants Knight and Gu also took measures to ensure that Horizon and themselves personally would be well compensated in the event their repackaging gambit would pay off. On November 12, 2020, well before Hyzon had made any vehicle sales or deliveries, the Company awarded both Knight and Gu 3.125 million options for Hyzon common stock, exercisable at a price of $2.00 per share at any point before 2035.[43]

94.89.  On January 12, 2021, after Hyzon had accumulated capital and was on the verge of finalizing a SPAC merger agreement with DCRB, it entered into an intellectual property agreement with JS Horizon. Under this agreement, Hyzon and JS Horizon both "conveyed" to the other certain intellectual property rights relating to their core fuel cell and mobility product technologies. Hyzon nevertheless inexplicably agreed to pay JS Horizon two fixed payments totaling $10 million. At that same time, Hyzon entered into the "Horizon Supply Agreement" with JS Horizon for the supply of certain fuel cell

---

[43]  *See* Hyzon, Proxy Statement for Special Meeting of Stockholders of DCRB, at 195-96, F-69 (June 21, 2021), *available at* https://www.sec.gov/Archives/edgar/data/0001716583/000119312521194105/d924103ddefm14a.htm.

- 54 -

components, for which Hyzon made a $5 million prepaid deposit payment for long lead time components that had not yet been received.

95.90.  In doing so, Hyzon created a direct channel for transmitting funds acquired from new investment capital, not sales of vehicles, to Horizon. (This was in addition to Horizon's majority equity stake in Hyzon). Moreover, Hyzon committed its business model to relying on others, rather than its own purported hydrogen fuel cell technology and production capabilities.

**E.      DCRB: Origin and Formation**

96.91.  Defendant Riverstone is one of the country's most prolific clean energy SPAC sponsors, having launched at least seven blank check companies under the "Decarbonization" and/or "Silver Run" banners since 2015. Riverstone was founded by investment bankers, Defendants Leuschen and Lapeyre, after they left Goldman Sachs. At Riverstone, Defendants Leuschen and Lapeyre teamed up with former Goldman Sachs alumni Defendants Anderson, Tichio, and Haskopoulos ("DCRB Defendants")..

97.92.  On August 19, 2020, DCRB filed an S-1 Registration Statement with the SEC and organized as a SPAC. (DCRB would amend the S-1 Registration Statement several times up through October 2020). That filing emphasized Riverstone's experience serving as a manager of clean energy SPACs, stating in pertinent part:

> Riverstone is one of **the most experienced private equity investors globally within renewable energy**, with over 15 years of dedicated investment experience to renewables. Since inception, Riverstone has committed over $5.2 billion of capital to 14 renewable power platform investments across subsectors including power generation, transmission & distribution, services and supply chain. Riverstone has owned or developed nearly 14 gigawatts of generation capacity and

- 55 -

has developed over 110 projects in 14 countries. Further, Riverstone has raised significant funds for decarbonization and renewables platforms following the emergence of the coronavirus and its impact on the global economy and financial markets. In 2020, Riverstone raised $1 billion of equity for the recapitalization of Enviva Holdings, the world's largest producer of sustainable wood pellets, and completed a $6.1 billion take-private of Pattern Energy Group, one of the world's largest companies dedicated to carbon-free electricity through the development of utility scale wind and solar power facilities.[44]

98.93. Prior to the SPAC Merger, DCRB's day-to-day affairs were managed by Defendants Anderson and Haskopoulos. At that time, DCRB lacked any business operations of its own. Instead, DCRB sought to raise up to $345 million through an IPO, which could be used to fund an acquisition or invest into an acquisition target—in particular, an acquisition whose principal effort was developing and advancing a platform that decarbonizes carbon intensive sectors of the economy. Once DCRB identified a merger target, DCRB investors would then gain the right, in connection with their investment in pre-Merger DCRB, to take possession of stock in any newly formed company DCRB eventually acquired. Alternatively, DCRB investors could seek a redemption of their pro rata share of trust assets (*i.e.*, the $10 in cash initially paid for each of their shares, plus interest).

99.94. On October 19, 2020, the SEC declared the Registration Statement effective.[45] And on October 22, 2020, DCRB successfully completed its IPO, generating

---

[44] S-1 Registration at 3 (Aug. 19, 2020), https://www.sec.gov/Archives/edgar/data/1716583/000121390020027693/fs12020_decarbonization.htm (emphasis added).

[45] The Registration Statement defined Defendants Aaker, Kearns, McDermott, and Tepper as the "independent directors" of Decarb. It also defined Defendants Anderson

gross proceeds to the Company of $200 million. Simultaneously with the consummation of the IPO, DCRB completed a private sale to DCRB's Sponsor, generating additional gross proceeds to DCRB of approximately $6 million.

100.95.     At this time, Riverstone (beneficially owned by Defendants Lapeyre and Leuschen and with Defendant Tichio serving as a managing partner), the then-four independent director nominees (Defendants Aaker, Kearns, McDermott, and Tepper); and Defendant Anderson, by virtue of his ownership of WRG and Sponsor, held voting control over the Company. As recognized in the Registration Statement:

> Our initial stockholders [i.e., the Sponsor, the "independent director nominees," and WRG] will control the election of our board of directors until consummation of our initial business combination and will hold a substantial interest in us. As a result, they will elect all of our directors prior to our initial business combination and may exert a substantial influence on actions requiring a stockholder vote, potentially in a manner that you do not support.[46]

101.96.     Defendants Lapeyre, Leuschen, and Tichio initially appointed themselves and Defendants Anderson, Aaker, and Kearns to the DCRB Board, with Anderson assuming the role of CEO. These Defendants later added Defendants McDermott and Tepper, and, after the IPO, Defendant Warren, to the DCRB Board, with McDermott assuming the lead independent director role.

---

and WRG as essentially being one in the same. *See* DCRB IPO Prospectus (Oct. 21, 2020), https://www.sec.gov/Archives/edgar/data/1716583/000121390020032465/f424 b41020_decarbonization.htm. As a result, the Sponsor (and its beneficial owners Defendants Lapeyre and Leuschen), and each of the other Defendants (except Defendant Tichio) would take Founders Shares at the same nominal price Riverstone had paid for them in 2017 (~$0.002 per share).

[46] S-1 Registration at 49 (Aug. 19, 2020), *supra* n.44 (emphasis removed).

102.97.    As the controller of a majority of DCRB Class B shares through the Sponsor, Defendants Lapeyre, Leuschen, and Tichio could remove any director at any time. Furthermore, each of their chosen directors had deep professional and/or financial ties to these controlling stockholders. By appointing Defendants Anderson, Aaker, Kearns, McDermott, Tepper, and Warren to the boards of directors of Riverstone's other SPACs, Defendants Lapeyre, Leuschen, and Tichio (via their control of Riverstone) provided them with the opportunity to receive additional Founder Shares and warrants in those SPACs. Thus, consummation of the SPAC Merger did not provide an isolated, one-time multi-million-dollar payday for these directors. Rather, each "Riverstone" SPAC business combination presented an ongoing, multi-million-dollar opportunity for them, and the prospect of plum appointments in connection with future Riverstone SPACs.

**F.    Merger Countdown Begins: DCRB's Due Diligence on Hyzon**

103.98.    As a result of the DCRB IPO, DCRB had eighteen months (*i.e.*, until March 2022) to complete a qualifying business combination. If DCRB failed to do so, it would have to wind up its affairs and return investors' money, and the substantial ownership interests held by Defendants Anderson, Haskopoulos, and Tichio, either personally or through investment vehicles, would become worthless.

104.99.    The following week, Defendants Anderson and Tichio met with bankers regarding a possible transaction between DCRB and Hyzon. After meeting Hyzon's management and reviewing its sales pitches, DCRB purportedly began undertaking extensive due diligence and negotiations for a potential SPAC-merger deal. As described in Hyzon's preliminary and definitive Proxy Statements:

[O]n November 2, 2020, Hyzon granted DCRB access to its electronic data room containing information relating to Hyzon for DCRB's due diligence review.

…

***On November 4, 2020, DCRB received and reviewed Hyzon's management presentation, including*** an overview of Hyzon's business and financial model, ***comparison against peer companies and information regarding Hyzon's potential customers,*** existing and planned facility developments, products and technologies. That same day, Robert Tichio and Erik Anderson had a call with Craig Knight, the Chief Executive Officer of Hyzon and George Gu, the Executive Chairman of Hyzon, expressing their interest in advancing diligence to assess Hyzon and its prospects. ***Members of Hyzon management provided an overview of Hyzon's business and current operations, and responded to initial due diligence questions raised by DCRB management,*** including with respect to technology, business development, organizational structure and capital spending plans.

***On November 5, 2020, DCRB received and reviewed Hyzon's management presentation, including*** an overview of Hyzon's business and financial model, ***comparison against peer companies and information regarding Hyzon's contracted customer orders***, domestic and international facilities, products and technologies and current operations.

…

From December 7, 2020 to February 8, 2021, DCRB's representatives and advisors ***performed extensive due diligence investigation of the materials*** included in the electronic data room, ***including a review of Hyzon's material contracts*** and facilities, and intellectual property, financial, tax, legal insurance and accounting due diligence. [47]

---

[47]  *See* Proxy Statement for Special Meeting of Stockholders of DCRB, at 95-96 (June 21, 2021), *supra* n.43 (emphasis added).

105.100.      On January 7, 2021, the DCRB Board ultimately determined to pursue the business combination with Hyzon over the other potential targets due in part to "Hyzon's non-binding memoranda of understanding, letters of intent and limited number of *firm orders with various clients, including blue-chip Fortune 100 companies* as well as Hyzon's rapidly growing visibility and potential near-term customers in Europe, Asia and Australia."[48] "After further discussions, negotiations and the performance of extensive due diligence, on January 8, 2021, DCRB and Hyzon executed a non-binding letter of intent."[49]

106.101.      On February 8, 2021, the DCRB Board unanimously approved the conceived merger. Under the merger's terms, following a series of transactions, Hyzon would become a wholly owned subsidiary of DCRB. Pre-Merger Hyzon owners were estimated to own 73% of the post-SPAC-Merger company. By contrast, DCRB Class A stockholders would own only 8.9% of the post-SPAC-Merger company, and the Sponsor, the "independent director nominees," and Anderson/WRG, would own 2.2%.

107.102.      Approval of the conceived merger required the affirmative vote of a majority of the stockholders present at the special meeting. The Company set the record date for the meeting (the date for counting each shareholder's number of shares) as June 1, 2021.

108.103.      As of the record date, the closing price of DCRB common stock was $10 per share. That price implied a market value of approximately $56.4 million for the Class B Founder Shares, which had been purchased a few months prior for a mere $25,000.

---

[48]   *Id.* at 98 (emphasis added).

[49]   *Id.* at 2.

At this valuation, members of the Board were poised to realize enormous returns on their investments should they persuade shareholders to approve the SPAC Merger. These returns are illustrated by the table below.

**T.1 – DCRB Director Founder Shares and Implied Value at $10 Per Share Price**

| Director | Founder Shares | Implied Value |
|---|---|---|
| Anderson | 630,947 | $6,309,470 |
| Aaker | 22,130 | $221,300 |
| Kearns | 22,130 | $221,300 |
| Lapeyre | 4,591,708 | $45,917,080 |
| Leuschen | 4,591,708 | $45,917,080 |
| McDermott | 331,950 | $3,319,500 |
| Tepper | 22,130 | $221,300 |
| Warren | 22,130 | $221,300 |
| Total | ~10 million | ~$102 million |

**V.VI.  DEFENDANTS' MISCONDUCT**

**A.      Hyzon Hypes Purported Big-Name Customers, Contracts, and MOUs in High Revenue Areas to Support itsIts $2.7 Billion Valuation and Lofty Projections**

109.104.        The Class Period begins on February 9, 2021, when Hyzon announced that it and DCRB had agreed to a merger, which, if approved by DCRB's shareholders, would take Hyzon public and list it on Nasdaq. Under the terms of the merger agreement and plan of reorganization, DCRB would offer new shares to Legacy Hyzon's pre-SPAC-Merger shareholders and would conduct a large private offering of securities to raise additional capital. With the $220 million in gross proceeds DCRB had raised in its October 22, 2020 IPO combined with proceeds from other contemporaneous stock offerings, it was expected that the SPAC Merger would provide Hyzon with $626 million in new cash.

110.105.        In the press release publicizing the SPAC Merger, Defendants represented that the gross proceeds raised from the transaction would be used to "fully fund and accelerate Hyzon's well-defined growth strategy in the hydrogen fuel cell-powered, zero-emission commercial transportation sector."[50] Additionally, they emphasized that Hyzon's sought-out SPAC transaction had an "implied enterprise value" of $2.1 billion and would garner up to $626 million in gross proceeds. This resulted in a total post-merger valuation of $2.7 billion—approximately 10 times that of the enterprise value ascribed to its Chinese parent JS Horizon just one month prior.

111.106.        To justify the hefty valuation, Defendants stressed "Hyzon's technology [was] already commercialized with [an] existing global footprint, and [Hyzon's] sales pipeline with blue-chip Fortune 100s and municipalities."[51] Defendants also went out of their way to highlight Hyzon's deals-in-place and near-term delivery schedule, in an attempt to bolster investor confidence in Hyzon's technology and business model:

> Craig Knight, Chief Executive Officer and Co-Founder of Hyzon, said, "We are excited to partner with DCRB at an important inflection point for our company, hydrogen and society. ***Deliveries of Hyzon fuel cell powered heavy trucks to customers in Europe and North America will occur this year, well ahead of our competitors, and our committed sales pipeline is proof that the world is truly recognizing the need***

---

[50]  *See* Media Release, Hyzon, "Hyzon Motors, the Leading Hydrogen Fuel Cell Heavy Vehicle Company, Announces Business Combination with Decarbonization Plus Acquisition Corporation; Combined Company Expected to be Listed on Nasdaq" (Feb. 9, 2021), https://www.sec.gov/Archives/edgar/data/1716583/000119312521033234/d109364dex991.htm. Defendants also filed a copy of the press release with the SEC as a Soliciting Material made pursuant to Rule 14a-12. It was filed on Form 8-K.

[51]  *Id.*

> *to develop innovative solutions to mitigate climate change and accelerate efforts to move the world economy down the path to net-zero emissions.*"[52]

Defendants Gu, Tichio, and Anderson also provided quotes for the press release.

~~112.~~107.    The same day that Defendants announced the SPAC Merger (February 9, 2021), DCRB and Legacy Hyzon's senior executives, including Defendants Knight, Gordon, and Tichio, hosted a conference call with investors.[53] During that call, Defendants emphasized the future revenue that would purportedly come Hyzon's way through its committed sales pipeline and big brand-named customers. For example, Tichio, as Chairman of DCRB, relayed that: "***The Company [Hyzon] has a sales pipeline for 2021 that is 100 percent under contract or MOU, providing real runway visibility***, ***and its customers include some of the most recognizable global brands and the largest municipalities in the world***."[54] (As discussed below, these statements were false and misleading because, ~~when placed in context, and viewed with Hyzon's contemporaneously published investor presentations, they suggested that Hyzon's 2021 sales pipeline, totaling~~

---

[52] *Id.* (emphasis added). Hyzon's focus on its 2021-2022 deliveries as a unique distinguisher from its competitors continued throughout the Class Period. *See, e.g.*, Steven Fox & Aneesha Patel, Fox Advisors, "Fireside Chat Highlights Major Early Mover Advantages" (June 27, 2022) (repeating Hyzon's claim in June 2022 that the Company "expects to be the only company for some time  that can offer vertically integrated hydrogen fuel cell electric vehicle (FCEV) solutions for heavy-duty applications"); Hyzon, "Fortescue Strikes Deal to Build Fleet of Hydrogen-Fueled Buses" (Sept. 9, 2020), *supra* n.41 (claiming that, "[a]ccording to [Hyzon's] own projections, it will have its hydrogen fuel-cell vehicles — including semitrucks — on roads sooner than Nikola").

[53] Full transcript filed with the SEC as a Soliciting Material pursuant to Rule 14a-12, and is available at https://www.sec.gov/Archives/edgar/data/1716583/00011931252103 3234/d109364dex992.htm.

[54] *Id.* (emphasis added).

- 63 -

at least $37 million in revenue, consisted solely of "100% certain" contracts and high probability (70%+) MoUs, when no such pipeline existed). among other things, at that time, the most "recognizable global brands" Hyzon was claiming to be customers—i.e., Heineken, Ikea, Coca-Cola—had not indicated they would be purchasing Hyzon HFCEV.)

113.108.    These contracts and MOUs already in place, according to Defendant Gordon, covered Hyzon's 2021 revenue projection of $37 million 100 percent, and foreshadowed exponential growth for Hyzon over the next five years to follow:

> [T]aking just the medium and heavy duty truck and bus segments into account, Hyzon's projections are compelling. ***Hyzon forecasts to grow from $37 million on revenue on 85 units sold in 2021***, to $3.3 billion in revenue on nearly 10,000 units sold during 2025. ***Our 2021 forecast is 100 percent covered by contracts and MOUs,*** while our 2022 forecast is almost 50 percent contract and MOU covered, and more than 100 percent covered when high-probability orders are taken into account. Thirty percent of 2025 revenue is accounted for under current MOUs.[55]

114.109.    During the same conference call, DCRB and Legacy Hyzon's executives also published an investor presentation entitled "Accelerating the Hydrogen Transition" ("February 9, 2021 Investor Presentation"), which touted its "Top Tier Customers/End Users/Partners", "Customer Deployments", and "Key Relationships" with "Suppliers" and "Vehicle Customers."[56] (DCRB also filed the presentation with the SEC.)

---

[55]   *Id.* (emphasis added).

[56]   Full presentation filed with the SEC as a Soliciting Material pursuant to Rule 14a-12 and is available at https://www.sec.gov/Archives/edgar/data/1716583/0001193125210 33234/d109364dex993.htm

115.110.     Significantly, on page 5 of the February 9, 2021 Investor Presentation (shown below), in a slide entitled "Investment Overview," Defendants claimed, among other things, that Hyzon had a "*2021 backlog of ~$40 million* under contract or [Memorandum of Understanding] *from blue-chip Fortune 100s and municipalities* with exceptional (and rapidly growing) 2022+ visibility."[57] Lower on that slide, in a section referred to as "Top Tier Customers/End Users/Partners," the company also listed logos of 14 companies, specifically: *AirProducts*, *Heineken, Ikea*, Fortescue, Korea Zinc, Neom, TotalEnergies SE, *Coca-Cola*, The Edeka Group, PSA International, State of Berlin, Port of Antwerp, Port de Barcelona, and Bank of America (depicted below).

**F.10 – Hyzon Feb. 9, 2021 Investor Presentation: Slide 5 (Investment Overview)**



(As discussed herein, Defendants *misrepresented or overstated the nature of Hyzon's relationships with these large logo-represented entities* and has since edited iterations of

---

[57]    *Id.* (emphasis added). In 2020, only Coca-Cola placed among the Fortune 100/500.

this presentation several times to eliminate reference to these brand-named customers, without any indication or notice to investors regarding the extent or meaning of the surreptitious changes. And to date, Hyzon has not reported revenue-generating deliveries of HFCEVs to any of the above listed companies.)

116. The February 9, 2021 Investor Presentation also included a slide on page 18 touting Hyzon's "100% Certain" and "High Probability [70%+]" Orders (shown below). In particular, the Presentation claimed Hyzon had 100% certain contracted orders *"[f]rom 13 private and public sector customers"* and that these 100% certain orders totaled nearly $40 million in value for its 2021 revenue forecast.[58] Immediately next to that claim, the Presentation displayed a global map of Hyzon's purported customer base that includesincluded logos for 14 entities and a description of Hyzon's current relationship with that entity'scompany, including whether that entity was finalizing or had placed a purported order 12. creating the false impression that all of which listed 2021 delivery datesthe companies authorized Hyzon to use their names and logos, when in fact Hyzon had not obtained all of the companies' consent. As depicted below, these entities were *Air Products, Coca-Cola, Heineken*, TotalEnergies, The Edeka Group, FrieslandCampina, *Ikea*, Russell Logistics, Neom, Centurion, Fortescue, and Hiringa. [59] Notably,The presentation *listed twelve of these entities as having 2021 delivery dates,* and the sum of the contract value for these entities' depicted purported orders for just 2021 alone totaled nearly $40 million.

---

[58]  *Id.* (emphasis added).

[59]  *Id.* (emphasis added).

**Moreover,** ~~F.11 –    Hyzon Feb. 9, 2021 Investor Presentation: Slide 18 (Customer~~



~~**Deployments)**~~

111.   ~~Note:~~ Hyzon did not identify any committed orders, high probability orders, or other future customer deployments to China-based end users—*i.e.,* Horizon's existing market. As analysts noted, that was not Hyzon's value-add.

**F.11 – Hyzon Feb. 9, 2021 Investor Presentation: Slide 18 (Customer Deployments)**



117.112.    Notably, forFor Heineken specifically, the presentation's map graphic abovefalsely indicated a "2021 Delivery (Finalizing [Purchase Order], 5 / $2mm) 500+ / $20mm+." In other words, according to Defendants,it falsely stated that Hyzon and Heineken were near finalizing a purchase order for five HFCEVs to be delivered in 2021, generating $2 million in revenue for Hyzon. These statements were false and misleading because Heineken never expressed an intent to purchase FCEVs from Hyzon. In fact, by at least February 4, 2021 (at least five days earlier), Heineken had informed Hyzon that it could not accept an offer for any FCEV deliveries in 2021 because the deliveries were not included in Heineken's annual budget. As such, the statements mischaracterized the then-present state of the customer relationship as being able to result in imminent sales when, by at least February 4, 2021, there was no such possibility.

118.113.         For Ikea, the map graphic similarly detailsfalsely detailed an order for a "2021 Delivery (Finalizing Contract, 2 / $1mm) 500+ / $20mm+." In other words, according to Defendants, Hyzon and Ikea were near finalizing a purchase order for two HFCEVs to be delivered in 2021, generating $1 million in revenue for Hyzon. These statements were false and misleading because Ikea never indicated it intended to purchase FCEVs from Hyzon. Moreover, by June 2021, an Ikea transportation provider specifically told Hyzon that it would not be moving forward with the project then under discussion. As such, the statements created the false impression that Hyzon was close to entering into a contract with Ikea when Ikea had never indicated an intent to purchase Hyzon HFCEVs and Ikea's affiliate had ended discussions by at least June 2021.

114.    Likewise, the map graphic falsely represented that Air Products was "finalizing" a $1 million purchase for three HFCEVs for delivery in 2021. But Air Products never indicated it intended to purchase FCEVs from Hyzon. And by March 2021, Air Products had informed Hyzon that it had selected a different FCEV supplier. As such, the statements created the false impression that Hyzon was close to entering into a contract with Air Products when Air Products had never indicated an intent to purchase Hyzon HFCEVs and Air Products had informed Hyzon it would not be purchasing by March.

115.    For Coca-Cola, Hyzon stated it was in "advanced discussions" to deliver FCEVs to Coca Cola in 2021 and projected to deliver "500+" FCEVs to Coca Cola and earn "$200mm+" in revenue over the next five years. These statements were false and misleading because Coca Cola never indicated it intended to purchase FCEVs from Hyzon and had never proceeded beyond introductory meetings with Coca Cola and its affiliates. This statement was still false and misleading because it mischaracterized the customer

relationship as being in advanced discussions when the discussions were preliminary. Defendant Knight was aware of these facts, as he directly interacted with Coca-Cola.

119.116.    Also, as it will become relevant later, the map included information regarding Horizon's historic deals, including that Horizon had 70 vehicles with Horizon fuel cells "delivered to date by other OEMs" to a leading steel company based in East Asia. The map, however, listed no pending or future customer deployments to any purchasers in China.

117.    In another distinct graphic of "Vehicle Customers" on page 29 (shown below), the February 9, 2021 Investor Presentation further listedOn page 29 (shown below), the February 9, 2021 Investor Presentation featured a distinct graphic claiming that "Key Relationships Have Already Been Formed." Therein, under the caption "Vehicle Components Provided Through Selected Manufacturing Suppliers," the slide listed graphics for eight entities: Ford (chassis), Detroit Chassis LLC (chassis), DAF (chassis and cab), Freightliner (chassis and cab), Dana (motors), FEV (international homologation, powertrain quality), Worthington Industries (cylinders), and OMB Saleri (hydrogen valves). These statements were false and misleading because at no point had Hyzon and two of the purported chassis suppliers reached the point of negotiating any supply relationship.

120.118.    Also on Slide 29, under the caption "Vehicle Customers," the Presentation listed graphics for fifteen entities: Air Products, The Edeka Group, Coca-Cola, Heineken, Ikea, Fortescue, Neom, Korea Zinc, State of Berlin, Port of Antwerp, Nestle, SoCalGas, Port de Barcelona, PSA, and Total Energy, thus reinforcing Defendants' prior false representations regarding Hyzon's purported customers. (Again, to date,, including

the false suggestions that Air Products, Coca-Cola, Heineken, and Ikea had had indicated they would purchase HFCEVs from Hyzon has not reported revenue-generating product sales to any of the above listed companies.).

**F.12 – Hyzon Feb. 9, 2021 Investor Presentation: Slide 29 (Customer List)**



121.119.    On Slide 31, Defendants showed how Hyzon's business plan and committed deliveries distinguished the Company from its competitors, noting, among other things, that competitors like Nikola had "pushed back its delivery schedule from 2021 to 2023 and the company's pre-orders are cancellable with no payment commitment from customers." (As discussed below, *see* Part VI.D, *infra*, Hyzon would not in fact recognize product sale revenues from deliveries of HFCEVs in 2021 or 2022 to any customers except HongYun which (i) Hyzon secretly granted purchase incentive warrants to, (ii) has paid Hyzon but a fraction of what is owed and (iii) upon information and belief, was likely a

~~Horizon customer handed to Hyzon to address its apparent lack of actual customer commitments.)~~

~~122.~~120.     Finally, Defendants included a slide for its summary projected financials (shown below), claiming it expected to sell 85 vehicles and earn $37 million in total revenue in 2021. Given investors limited knowledge at the time, it was reasonable to presume these delivery and revenue projections arose from the "100% certain" and "high probability" contracts and customers identified in the presentation. As discussed herein, Hyzon would decline to reduce this figure throughout the Class Period, even after removing customers from its investor materials, *see* Part XI.D.3, *infra*, and purportedly changing its delivery strategy.

**F.13 – Hyzon Feb. 9, 2021 Investor Presentation: Slide 39 (Projected Financials)**

## Summary Projected Financials

| ($USD IN MILLIONS) | 2021E | 2022E | 2023E | 2024E | 2025E |
|---|---|---|---|---|---|
| **VOLUMES** | | | | | |
| VEHICLE DELIVERY VOLUMES | | | | | |
| HEAVY TRUCK (36T-50T) | 74 | 513 | 2,638 | 5,660 | 7,400 |
| MEDIUM TRUCK (12T) | 0 | 110 | 722 | 1,140 | 1,860 |
| CITY BUS (12M) | 11 | 35 | 68 | 340 | 600 |
| CLASS 3 TRUCK / VAN | 0 | 0 | 840 | 4,435 | 7,235 |
| **TOTAL** | 85 | 658 | 4,268 | 11,535 | 17,095 |
| **INCOME STATEMENT** | | | | | |
| VEHICLE REVENUE | 35 | 190 | 948 | 2,176 | 3,129 |
| FUEL CELL REVENUE | 2 | 6 | 17 | 43 | 105 |
| HYZON ZERO CARBON REVENUE | 0 | 1 | 7 | 24 | 52 |
| **TOTAL REVENUE** | $37 | $198 | $972 | $2,242 | $3,286 |
| % GROWTH | nm | 412% | 392% | 131% | 47% |
| COST OF GOODS SOLD | | | | | |
| (-) VEHICLE | $24 | $132 | $665 | $1,489 | $2,139 |
| (-) FUEL CELL | 1 | 3 | 8 | 18 | 42 |
| TOTAL COGS | $25 | $135 | $673 | $1,508 | $2,181 |
| **TOTAL GROSS PROFIT** | $12 | $62 | $299 | $735 | $1,106 |
| GROSS MARGIN % | 32.0% | 31.5% | 30.8% | 32.8% | 33.6% |
| EBITDA | ($73) | ($25) | $87 | $326 | $505 |
| EBITDA MARGIN % | NM | NM | 8.9% | 14.5% | 15.4% |
| CAPEX | ($63) | ($178) | ($161) | ($102) | ($126) |

No additional equity required between PIPE and going to market, achieving positive cash-flow

Reflects share of TAM of ~1% by 2025

HYZON | DCRB     39

~~123.~~121.     Hyzon nevertheless achieved early credibility from the investment community by promoting orders from phantom name brand customers. For example, in a

February 9, 2021 article talking up the SPAC Merger, 24/7 Wall St. emphasized Hyzon's "'advanced discussions' with Coca-Cola for delivery of more than 500 heavy trucks for in excess of $200 million."[60]

122.    The next day, February 10, DCRB published a different version of the February 9, 2021 Investor Presentation. This new version dropped the logos for two entities from the Slide 5 graphic for "Top Tier Customers / End Users / Partners": Air Products and PSA. Likewise, on slides 18 and 29 of the February 10, 2021 (partial slide shown below), the Section 10(b) Defendants dropped, without explanation, the logos of purported customers Air Products, Centurion, and Nestle, from its infographics and added other purported partners and entities to fill the holes. Despite these edits, the company made no indication that the brand-named entities previously referenced were no longer customers, nor did the Company amend its claims about its relationships with these companies on the global deployment map or its summary projected financials.

123.    Two days later, on February 12, DCRB published another updated investor presentation. This time, the presentation dropped the logos of Coca-Cola, Ikea, and other logos as top tier customers or end users on slides 5 and 29. (Heineken's logo remained on display.) Additionally, on slide 18, the presentation removed all company logos and names from the presentation's customer map. In their place, general descriptors of the customers and the contracts touted in previous versions were added to the map. For example, this new map showed "advanced discussions" with a "beverage company," i.e., Coca-Cola, and a

---

[60]    Paul Astick "Hydrogen Vehicle Maker Hyzon Raises $626 Million in SPAC IPO," 24/7 WALL ST. (Feb. 9, 2021), https://247wallst.com/autos/2021/02/09/hydrogen-vehicle-maker-hyzon-raises-626-million-in-spac-ipo/.

- 73 -

"finalizing PO" for a global brewer, i.e., "Heineken." Further, the slide maintained, among other things, that Hyzon had "~$40mm under contract or MOU for 2021 revenue forecast."

124.    Knight was responsible for each of the false and misleading statements about Hyzon's purported customer and supplier relationships set forth in each investor presentation. As Hyzon's CEO, Knight's responsibilities included advancing Hyzon's customer and supplier relationships alongside Hyzon's sales and operational employees. In addition, in some instances, Knight had specific information that contradicted statements made in the investor presentation. Additionally, Knight provided information about customer and supplier relationships to the individuals who drafted the investor presentation. Knight also made edits to, reviewed, and approved the misleading statements before their use in the presentation and filing with the SEC.

## B.    Defendants' Emphasize Major Vehicle Supply Agreement with Hiringa

124.125.    Having no actual vehicle sales or ability to generate meaningful revenue, Hyzon could only trade on the promise of future business success. As such, it became incumbent on Defendants to convince DCRB shareholders that Hyzon could make good on its business promises, less shareholders reject the proposed Merger. Additionally, for Defendants to profit off their hundreds of millions of "locked-up" post-merger stocks and options—either through liquidation or secured lending—Defendants would need to convince investors that Hyzon "was not a pipe dream" (*see, e.g.*, @hyzonmotors Feb. 17, 2021 tweet, displayed below) and could break through as a leading global supplier of electric vehiclesEVs.

**F.14 – Post from Hyzon Motors Twitter**[61] *(Feb. 17, 2021)*

On the SPAC IPO and business model:

*"This isn't a pipe dream. This will be realized within the next two years."*

~ Defendant Craig Knight



126.    Defendants thus bega[...]

Australia, and other locations in an effort [...] SPAC

Merger and to garner investor interest. Hy[...]ing its

existing committed customer base in [...] media

appearances, investor calls, social media [...] in the

following screenshots, Defendant Knight [...]rviews

with several financial news outlets, empha[...]ce.

---

[61]    *Available at* https://twitter.com/hyzonmotors/status/1362009002465316870.

### F.15 – Def. Knight Interview with auszbiz[62] *(Feb. 11, 2021)*

*"[The SPAC process] was an expedient way for us to go about the process, get the money we need on the balance sheet, gives us the firepower we need to execute ... on our plan to deploy thousands of fuel-cell-powered commercial vehicles within the next three years."*



### F.16 – Def. Knight Interview with CNBC[63] *(Feb. 9, 2021)*

*"We have a long technology base which has been out over a long time and a strong global network .... We think that's evidenced by the fact that we have secured orders already from customers in three different continents."*



126.    It was in the midst of this media blitz that Hyzon provided its biggest update to date concerning its then-largest customer Hiringa, reportedly interested in receiving up to 1,500 HCEVs. Specifically, on February 17, 2021, the Company announced that it had advanced its partnership with Hiringa, and that "the two companies ha[d] signed a vehicle supply agreement," with "the first batch of [twenty] vehicles ... expected to enter service

---

[62]  Full interview available at https://www.youtube.com/watch?v=kbSaGHASeJY&ab_channel=HyzonMotors.

[63]  Full interview available at https://www.cnbc.com/video/2021/02/09/hydrogen-based-truck-maker-hyzon-motors-ceo-on-spac-merger.html.

in New Zealand by the end of 2021."[64] Moreover, the Company reiterated its lofty "plans to have up to 1,500 fuel cell trucks on the road in New Zealand by 2026 ...." To reach a broad investment and EV audience, Hyzon posted the news about its Hiringa deal on both its webpage and its Twitter account @HyzonMotors by issuing the following tweet.

**F.17    Feb. 17, 2021 Post from Hyzon Motors's Twitter Account**



127.    The news was well-received by the EV media, lauding the new "customer" of Hyzon's "ordering a total of 1,500 fuel cell trucks over the next five years till 2026."[65] Defendants quickly capitalized on this positive news momentum.

---

[64]  Press Release, Hyzon, Hyzon Motors and Hiringa Energy advance partnership to decarbonize heavy road transport in New Zealand (Feb. 17, 2021), https://hyzonmotors.com/hyzon-motors-and-hiringa-energy-advance-partnership-to-decarbonize-heavy-road-transport-in-new-zealand/.

[65]  Carrie Hampel "Hiringa Energy orders 1500 hydrogen fuel cell trucks from Hyzon Motors for New Zealand," ELECTRIVE.COM (Feb. 18, 2021), https://www.electrive.com/2021/02/18/hiringa-energy-orders-1500-hydrogen-fuel-cell-trucks-from-hyzon-motors-for-new-zealand/.

128. Eleven days later (February 28), Defendant Knight participated in a fireside chat with Alan Adler, Detroit Bureau Chief at FreightWaves, touting, among other things, Hyzon's business relationships with partners like Hiringa. DCRB filed Soliciting Materials (on Form Schedule14A) containing a transcript of this fireside chat with the SEC on March 4, 2021.[66]

129. Thereafter, on March 8, 2021, the Company issued a press release, which again reminded investors of the major vehicle supply agreement Hyzon had with Hiringa for the delivery of 1,500 trucks over the next five years, with first shipments planned for the second half of 2021:

> Hyzon and Hiringa Energy (New Zealand) recently announced that the two companies had signed a *vehicle supply agreement*. Hyzon is targeting the *delivery of 1,500 fuel cell* powered heavy trucks by 2026 as part of the agreement with Hiringa. As binding orders for those trucks are placed, Hyzon anticipates fulfilling them from the Groningen facility, *with first shipments planned for the second half of 2021*.[67]

The press release did not disclose that Hiringa was not a customer or end-user of HFCEVs, but rather a channel-partner. Hyzon would go on to make virtually identical representations

---

[66] *Available at* https://www.sec.gov/Archives/edgar/data/0001716583/0001193125210 68375/d134706ddefa14a.htm.

[67] Press Release, Hyzon, "Hydrogen Now™" Event to Showcase Virtual Ride Along in a Zero-Emission, Hydrogen Fuel Cell Powered Truck at Hyzon's Production-Ready Groningen Facility" (Mar. 8, 2021), https://www.hyzonmotors.com/in-the-news/hyzon-motors-announces-hydrogen-now-event-to-showcase-virtual-ride-along-in-a-zero-emission-hydrogen-fuel-cell-powered-truck-at-hyzons-production-ready-groningen-facility (emphasis added).

- 78 -

and omissions regarding its relationship with Hiringa in Soliciting Materials filed with the SEC on March 17, 2021.[68]

130.127.    On March 10, 2021, Defendants Knight, Gordon, and Tichio participated in the Cowen Mobility Disruption Virtual Summit, during which they emphasized Hyzon's customer commitments in place bolstering Hyzon's 2021 outlook. As Knight explained:

> [W]e now have more customer commitments than we have 2021 revenue forecasts, so we're feeling quite confident about our 2021 outlook. Basically, *customer commitments are documented orders, tender wins, that sort of thing, and the high probability orders* – coming back to your question – *are really those scenarios where you've been told you've been selected as the vendor but you haven't yet got the contract in place*, or you've, you know, the customer has given you a written confirmation by email that they're ordering, and you're going through contract discussion, etc., talking about specifications, performance acceptance criteria and that sort of thing.[69]

---

[68] *See also* Mar. 17, 2021 Preliminary Proxy Statement, *available at* https://www.sec.gov/Archives/edgar/data/0001716583/000119312521084245/d46419 dprem14a.htm ("To date, Hyzon has received binding orders for Hyzon-branded commercial vehicles and coach buses in an aggregate value of approximately $18.2 million from companies around the world, including Hiringa and Fortescue Metals Group Ltd. *Hiringa has placed a binding order for the first 20 trucks* ... and aims to deploy up to 1,500 fuel cell powered heavy trucks manufactured by Hyzon to fleet operators in New Zealand by 2026 as part of a partnership to decarbonize heavy road transport in New Zealand. *Hyzon expects the first shipments of four trucks to occur by the first quarter of 2022.*" (Emphasis added)).

[69] Emphasis added. Full transcript filed as Schedule 14A Soliciting Material with the SEC on March 17, 2021, and is available at https://www.sec.gov/Archives/edgar/data/0001716583/000119312521083405/d150330ddefa14a.htm.

These statements, however, were misleading, as, when viewed by themselves and in context of Hyzon's other contemporaneous statements, they (1) falsely suggested that as of March 10, 2021 Hyzon's 2021 revenue forecasts were covered by "100% certain" orders and (2) deceptively reinforced investors' belief that Hyzon had deals in place with big-name brands listed in its investor presentations like Heineken and Coca-Cola who, in truth, were not real customers.

**C.      Defendants Double Down on Revenue Projections and 2021 Deliveries Despite Dropping Committed Customers and Growing Supply Chain Concerns**

131.128.     Throughout the second quarter of 2021, Defendants continued to reaffirm their representations regarding Hyzon's relationships with global brand name customers (e.g., Heineken, Air Products, Ikea, and Coca-Cola) and key suppliers, as well as Hyzon's previous vehicles-delivered and revenue projections, as well as its purported 20-vehicle delivery based on projected sales to Hiringa by the end of 2021those customers.

132.129.     For example, on April 29, 2021, the Company published an "Analyst Day Presentation," conveying customer and financial information similar to the information provided in the February 9, 2021 Investor Presentation discussed above, *see* Part V.A, *supra*. On Slide 8 of the April 29, 2021 Presentation (partial slide shown below), Defendants again gave an investment overview, claiming that Hyzon had **"$55 million of backlog under contract or MOU** (up from $40 million in the February 9, 2021 transaction announcement presentation)."[70] Below that claim, Defendants featured an "[e]xpanding"

---

[70] Apr. 29, 2021 Analyst Day Presentation, https://www.sec.gov/Archives/edgar/data/0001716583/000119312521138263/d165937ddefa14a.htm (emphasis in original).

list of "Top Tier Customers / End Users / Partners" which again replaced formerly touted "top customers" and with lesser domestically known partners.[71]



**F.18 – Hyzon Apr. 29, 2021 Analyst Day Presentation: Slide 8 (Top Tier Customers)**

~~133.~~130.       Similarly, on Slide 35 (shown below), Defendants included a map of Hyzon's purported customer deployments~~, stripped of logos, claiming to have a southeast based beverage company, *i.e.*, Coca-Cola, a global brewer, *i.e.*, Heineken, and a leading retailer, *i.e.*, Ikea as customers — the latter two companies with contracts or purchase orders being "finaliz[ed]." The "Customer Deployment" map also included a reference to a "hydrogen infrastructure partner," *i.e.*, Hiringa and its purchase of "2021 First 20 Units (Signed Contract, 20 / $~10mm) 1,400 / $500mm+".[72]~~ that replaced the names and logos with generic descriptions of each company, but did not change the status of Hyzon's customer relationships, even though by this time, at least Heineken and Ikea had explicitly told Hyzon that they would not be purchasing its HFCEVs or had chosen another supplier.

---

[71]  *Id*.

[72]  ~~This contradicted the representations made in Hyzon's Preliminary Proxy Statements, which claimed deliveries would begin in the first quarter of 2022. *See* Part VIII.B, *infra*.~~

**F.19 – Hyzon Apr. 29, 2021 Analyst Day Presentation: Customer Deployments**

134.131.    Furthermore, on slide 59 (partial slide shown below), Defendants again edited the visual listing of Hyzon's vehicle customers, this time removing without explanation the logo for Heineken. Rushed to cover up the change, Hyzon inserted a duplicate logo for grocer group FrieslandCampina in Heineken's place.

**F.20 – Comparison of Customer Claims in Feb. 12 & Apr. 29 Presentations**




**Feb. 12, 2021 Edited Presentation       Apr. 29, 2021 Presentation**

135.   Additionally, on Slide 25 of the April 29, 2021 Presentation, Defendants repeated the contradictory claim that Hyzon had a "vehicle supply agreement to supply trucks to New Zealand-based Hiringa Energy; first deliveries expected by EOY 2021" without clarifying that Hiringa was not a customer but rather a channel partner.[73]

136.   Despite the Company's purportedly increasing short-term backlog and the changes to its list of committed customers, including the promised delivery of trucks to Hiringa, the Defendants maintained in the April presentation its earlier projections for 2021 revenue and vehicles delivered, approximately $37 million and 85 vehicles, respectively.

137.132.   Thereafter, Defendants continuously reaffirmed the certainty of Hyzon's revenue and vehicle-delivery forecast, even though its announced agreements, if

---

[73]   Id.; Compare with Mar. 17, 2021 Preliminary Proxy Statement, infra ¶ 191.

actually fulfilled, totaled only a fraction of Hyzon's 2021 targets. [74] Additionally, Defendants told investors that its 2021 targets would not be affected by global supply chain issues.

138.133.      On June 16, 2021, Defendant Knight participated in a fireside chat hosted by Bernstein. Knight said, among other things, the following regarding revenue targets:

> We've had a couple places in Europe recently, we're engaging with customers about the first one or two vehicles, and they want to already order 10 or 20 or more recently, we're now seeing [inaudible], a major retailer, they wanted 70 vehicles straight away, subject to the first four vehicles meeting all the various performance criteria. They wanted to commit to 70.
>
> …

---

[74] *See, e.g.*, Feb. 17, 2021 Hiringa Press Release, *supra* n.63;64; Press Release, Hyzon, "Hyzon Motors Gives Update on Status of 15 Hydrogen Fleet Vehicles to Be Delivered to Groningen Municipality in 2021" (Apr. 19, 2021), https://hyzonmotors.com/status-update-groningen-municipality-hydrogen-fleet/;19, 2021), https://investors.hyzonfuelcell.com/news/news-details/2021/Hyzon-Motors-Gives-Update-on-Status-of-15-Hydrogen-Fleet-Vehicles-to-Be-Delivered-to-Groningen-Municipality-in-2021/default.aspx; Press Release, Hyzon, "Hyzon Announces New 50 Tonne Fuel Cell Truck Orders with Leading Dutch Transport Companies, Jan Bakker and Millenaar & van Schaik" (May 29, 2021), https://www.hyzonmotors.com/in-the-news/hyzon-announces-new-50-tonne-fuel-cell-truck-orders-with-leading-dutch-transport-companies-jan-bakker-and-millenaar-amp-van-schaikhttps://investors.hyzonfuelcell.com/news/news-details/2021/Hyzon-Announces-New-50-Tonne-Fuel-Cell-Truck-Orders-with-Leading-Dutch-Transport-Companies-Jan-Bakker-and-Millenaar--van-Schaik/default.aspx ("expect[ing] to deliver up to three vehicles in Q4 of 2021"); Press Release, Hyzon, "Hyzon Motors Announces Order for up to 70 Hydrogen Trucks for Austrian Supermarket Chain," (June 2, 2021) https://www.hyzonmotors.com/in-the-news/hyzon-motors-announces-order-for-up-to-70-hydrogen-trucks-for-austrian-supermarket-chainhttps://investors.hyzonfuelcell.com/news/news-details/2021/Hyzon-Motors-Announces-Order-for-up-to-70-Hydrogen-Trucks-for-Austrian-Supermarket-Chain/default.aspx ("initial delivery" of three vehicles "planned for Q4 of 2021").

> [T]he other thing we've had to do is order a lot of work in progress materials earlier than we would normally have had, because of supply chain challenges in the market and all the rest of it. ***I'd like to remain a little conservative on this but providing there are no more nasty surprises in supply chains and those kind of things, we'll definitely hit this year's targets***.
>
> ***We see ourselves making this year's goal, making this year's targets, and we are working very hard to have the foundations there so that next year's targets are very achievable***.[75]

139.134.    Similarly, on June 29, 2021, Defendants Tichio and Knight attended a virtually held Fireside Chat, hosted by IPO Edge, during which they referred the audience to, and provided them with, the false and misleading February and April 2021 PowerPoint Presentations described above. In response to a question about Hyzon's lack of positive revenue, Tichio stated:

> [I]f you take a look at 2021, ***the company is you know projecting $37 million of revenue [from] vehicles that will actually roll off its lot this year.*** That is what we had communicated back in February. ***We still feel extraordinarily comfortable with that assessment,*** in that belief in terms of the pathway for the company and that the company has already demonstrated publicly through its online virtual tour with respect to its actual vehicles that were that that are on the road that are functioning and that are all regaining fantastic commercial traction right now.[76]

---

[75]  Emphasis added. Full transcript filed in Soliciting Materials (Form DEFA14A) with the SEC and is available at https://www.sec.gov/Archives/edgar/data/1716583/000119312521193298/d111504ddefa14a.htm.

[76]  Emphasis added. Full transcript filed in Soliciting Materials (Form DEFA14A) with the SEC and is available at https://www.sec.gov/Archives/edgar/data/0001716583/000119312521203891/d174425ddefa14a.htm. IPO Editor-in-Chief noted, in response, that Hyzon's 2021 revenue projections and 2023 positive income projections set it apart from other EV SPACs, which were not predicting positive income until 2025 or 2026.

140.135.    Further, he elaborated that, concerning the Company's backlog, "80% [of which] is outside of North America":

> *[There are] two sorts of buckets which is contracted ordered 100% certainty* ... from public and private sector customers ... *Then there are high probability orders, and those are companies that have many times express indications to scale their truck orders and grow the conversion of their fleets over time* ....[77]

141.136.    Defendant Knight also expounded upon Horizon, Hyzon's operations in China, and Hyzon's customers around the globe, disclosing that Hyzon's projected revenue and delivery targets already included sales to East Asia:

> So the parent company is a Singapore-based company with operations in China ... It's a natural place to have operations. So *there's quite substantial operations under Horizon the parent company in China*. And through the license agreement and the commercial agreement between Horizon and Hyzon, Horizon will continue to sell fuel cell stacks within China, for example, into various applications. However, Horizon will never make trucks and buses.... Also *Hyzon is supplying complete vehicles in China, as well*, which Horizon will never do.[78]

**F.21 – Images of Defendants from IPO Edge Virtual Fireside Chat**



| John Jannarone | Defendant Knight | Defendant Tichio |

---

*Id.*

[77]    *Id.* (emphasis added).

[78]    *Id.* (emphasis added).

*Editor-in-Chief, IPO Edge*          *Hyzon CEO*          *DCRB Chairman*

**D.      Defendants Persuade Shareholders to Approve the Merger on the Back of Committed-Orders, Top-Tier-Customer, and Projected-Revenue Claims**

137.     In the final days before the special shareholder meeting, Defendants put on a full court press to persuade shareholders to approve the SPAC Merger. Within a week's span, the Company announced a host of new deals, primarily in the European market,[79] as well as.[80] The Company also issued a press release on July 13, 2021, announcing that it delivered its first and only delivery of a Hyzon-branded HCFEV.[81]

---

[79]   *See* Press Release, Hyzon, "Hyzon Motors signs Australian subsidiary of Korea Zinc, world's largest zinc producer, as the second customer for its ultra-heavy-duty 154-ton class hydrogen truck" (July 9, 2021), *available at* https://www.sec.gov/Archives/edgar/data/0001716583/000119312521212084/d191589ddefa14a.htm;   Press   Release, Hyzon, "Hyzon Motors deepens strategic hydrogen mobility partnership with TotalEnergies SE" (July 12, 2021), *available at* https://www.sec.gov/Archives/edgar/data/0001716583/000119312521213185/d193162ddefa14a.htm.

[80]   *See* Press Release, Hyzon, "Hyzon Motors signs Australian subsidiary of Korea Zinc, world's largest zinc producer, as the second customer for its ultra-heavy-duty 154-ton class hydrogen truck" (July 9, 2021), *available at* https://www.sec.gov/Archives/edgar/data/0001716583/000119312521212084/d191589ddefa14a.htm;   Press   Release, Hyzon, "Hyzon Motors deepens strategic hydrogen mobility partnership with TotalEnergies SE" (July 12, 2021), *available at* https://www.sec.gov/Archives/edgar/data/0001716583/000119312521213185/d193162ddefa14a.htm.

[81]   Press Release, Hyzon, "Hyzon Motors delivers first hydrogen-powered vehicle to support multinational dairy company's operations, transition fleet to zero-emissions" (July 13, 2021), https://www.hyzonmotors.com/in-the-news/hyzon-motors-delivers-first-hydrogen-powered-vehicle-to-support-multinational-dairy-companys-operations-transition-fleet-to-zero-emissions.https://investors.hyzonfuelcell.com/news/news-details/2021/Hyzon-Motors-delivers-first-hydrogen-powered-vehicle-to-support-multinational-dairy-companys-operations-transition-fleet-to-zero-emissions/default.aspx. As discussed below, *see* Part VI.B, *infra*, the Special Committee's Investigation later found that the HFCEV delivery reported was not operable on hydrogen at the time Hyzon issued this press release. Moreover, it was revealed that Hyzon recognized zero revenue from this delivery.

138.     On the same day as the delivery update, Hyzon posted to social media a video made by the head of Hyzon Europe showing the operation of the HFCEV with the statement that it was powered by hydrogen. Unknown to viewers, the operation of the vehicle was staged. When Hyzon recorded the video of the FCEV milk truck, it was not connected to an operational hydrogen fuel cell and was powered solely by an electric battery that allowed it to travel only a limited distance. Hyzon had not even installed a critical component on the FCEV that was required to power the FCEV with a hydrogen fuel cell.

142.139.          Based on these deal announcements, on July 13, 2021, Defendants issued a business update asserting that Hyzon had doubled its 2021 revenue forecast due to new sales while simultaneously reducing its costs per vehicle. Specifically, it stated:

> ***Orders and non-binding MoUs have increased to represent up to $83M, up more than 50% from $55M as of April 29, 2021, and over 100% from February 12, 2021***. Expected 2022 deliveries include up to 70 trucks from Austrian grocery retailer MPREIS currently under an MoU.
>
> The growing list of orders and non-binding MoUs comes ***from the rapidly developing European market as well as Australia***, thanks to the company's international footprint.
>
> …
>
> ***Simultaneously, Hyzon has successfully reduced costs in excess of $50,000 per vehicle for manufacturing components and sub-systems***, with savings over 80% for certain auxiliary power systems, power distribution unit and on-board chargers and over 40% for battery, eMotor, and inverter components.

These savings are expected to grow as operations scale and Hyzon continues to evolve vehicle and component designs.[82]

~~143.~~140.        Two days later, on July 15, 2021, Hyzon's shareholders resoundingly approved the SPAC Merger with 95% of shareholders voting in favor.[83] The pre-merger entities closed their deal and completed the approved combination the following day (July 16). Concurrent with the completion of the business combination, DCRB changed its name to Hyzon.

~~144.~~141.        Hyzon's Class A common stock and warrants began trading on the Nasdaq Global Select Market ~~("Nasdaq")~~ under the symbols "HYZN" and "HYZNW," respectively, on July 19, 2021, the first open day for trading after the merger closed. On or about that same day, the Company made public on its website an updated version of its investor presentation ("July 19, 2019 Investor Presentation"),[84] which contained slides listing customer logos, geographic deployments, and financial projections that were

---

[82] Press Release, Hyzon, "Hyzon Motors issues business update, confirms 2021 prior guidance and on track for 2022" (July 13, 2021), ~~https://hyzonmotors.com/business-update-confirms-2021-guidance-on-track/ (emphasis added).~~ https://investors.hyzonfuelcell.com/news/news-details/2021/Hyzon-Motors-issues-business-update-confirms-2021-prior-guidance-and-on-track-for-2022/default.aspx (emphasis added).

[83] Press Release, Hyzon, "Hyzon Motors Completes Business Combination with Decarbonization Plus Acquisition Corporation," PR NEWSWIRE (July 16, 2021), https://www.prnewswire.com/news-releases/hyzon-motors-completes-business-combination-with-decarbonization-plus-acquisition-corporation-301335887.html.

[84] ~~*Available at* https://s28.q4cdn.com/786762755/files/doc_presentations/2021/07/Hyzon-Motors-Investor-Presentation-July-2021.pdf.~~ *Available at* https://www.scribd.com/document/801002672/Hyzon-Motors-Investor-Presentation-July-2021 .

virtually identical to the graphics and projections included in its April 29, 2021 Analyst Day Presentation.

145.142.    Following the SPAC Merger, Defendant Knight reiterated the Company's misleading claims about its 2021 backlog and committed orders (which as discussed below, never materialized because they were based, in part, on false statements) in media interviews conducted, including the following interview with Bloomberg News.

**F.22 – Def. Knight Bloomberg Interview[85]** *(July 19, 2021)*

*"Recent orders in Europe include with TotalEnergies in France, with major retailer Emprise in Austria.*
*...*
*Hyzon motors will have vehicles on the road in four continents by the end of this year."*



146.143.    Less than a month after the SPAC Merger's close, on August 11, 2021, the Company announced its Second Quarter 2021 Financial Results, reporting that the Company believed it would report its first vehicle revenues in the third quarter of 2021.[86] Despite delivering only two vehicles to date, the Company reaffirmed its 2021 sales outlook, including its target of 85 vehicles delivered.

---

[85] Full interview available at https://www.bloomberg.com/news/videos/2021-07-19/-bloomberg-markets-america-07-19-21-video.

[86] Press Release, Hyzon, Hyzon Motors Announces Second Quarter 2021 Financial Results (Aug. 11, 2021), *available at*, https://www.sec.gov/Archives/edgar/data/1716583/000119312521242649/d175854dex991.htm.

147.144.    Defendants Gordon and Knight emphasized their confidence in these sales and delivery targets, even in the presence of global supply chain challenges, during Hyzon's inaugural earnings call, held on the very same day. In particular, Gordon confirmed that Hyzon "***remain[ed] on track*** to reach our forecast of 85 vehicles shipped by the end of 2021."[87] Additionally, Knight explained that Hyzon was re-affirming that the Company would deliver 85 vehicles before the end of the year, even in the presence of global supply chain challenges:

> [A]t the moment, we believe that the shipment of at least 85 vehicles is not a great risk for us because of inventories we've already secured and deliveries that to us from our vendors that are expected to take place over the next month or two given very early order confirmation. Most of the work-in-progress orders go back to around April for us. We didn't wait until the transaction close to deal with sourcing inventory.
>
> ... back in March and April when we started to see some of these challenges around delivery times getting pushed out, we started ordering – ***rapidly ordering ahead of when we were planning to order so that we could get hold of what we need to deliver on our 85-plus vehicle shipments this year.***[88]

148.145.    Analysts reacted positively to Defendants' re-affirmation of the projected delivery of 85 trucks by year end. For example, in an August 12, 2021 report, analysts at Colliers noted that "HYZN re-affirmed its 2021 sales outlook for 85 vehicles,"

---

[87] Full transcript not filed with the SEC or Hyzon, but available at https://seekingalpha.com/article/4448350-hyzon-motors-inc-hyzn-ceo-craig-knight-on-q2-2021-results-earnings-call-transcript.

[88] *Id.* (emphasis added).

and explained that "[g]iven our higher level of confidence in the story, we are increasing our top line estimates" and increasing its Hyzon target price to $22 from $15.[89]

149.146.    Similarly, on August 12, 2021, Wedbush Securities initiated coverage on Hyzon, with famed securities analyst Daniel Ives penning a bullish research report on the Company. Wedbush recommended Hyzon as an outperform (buy) with a price target of $10 per share.[90] Less than three weeks later, on August 30, 2021, Ives of Wedbush bumped his target price up again to $15 per share.

150.147.    On September 2, 2021, JPMorgan initiated coverage of Hyzon with an Overweight (buy) rating and a price target of $18 at the end of 2022.[91] According to JPMorgan, Hyzon's first targets were the "hard-to-decarbonize commercial and heavy-duty transportation sectors, starting first with hydrogen fuel cell-based heavy-duty trucking and buses with plans to expand to rail, marine, and aviation in the future."[92] JPMorgan stated it expected Hyzon "to be a leader in emerging fuel cell-based mobility applications."[93] With each of these analyst announcements, Hyzon's stock increased.

---

[89]    Colliers, "Hyzon Motors Q2:21 Update" (Aug. 12, 2021).

[90]    *See* "Hydrogen Play Poised to Be a Winner; Initiating at OUTPERFORM and $10 PT," WEDBUSH (Aug. 31, 2021); "Hyzon Motors, Hydrogen Play Front and Center With Trucking Demand Building; PT to $15," WEDBUSH (Aug. 31, 2021).

[91]    Shanthi Rexaline,"Why JPMorgan Is Bullish On Hydrogen Fuel Cell Stock Hyzon Motors," BENZINGA.COM (Sept. 9, 2021) (reporting coverage), https://www.benzinga.com/analyst-ratings/analyst-color/21/09/22870061/why-jpmorgan-is-bullish-on-hydrogen-fuel-cell-stock-hyzon-motors.

[92]    *Id.*

[93]    *Id.*

E.    ~~Hyzon's Gaping Sales and Deliveries Gap~~

**E.    Hyzon Announces Blockbuster Deal with Fantastical Purchaser HongYun**

~~151.~~148.    By the beginning of September 2021, Hyzon appeared by all counts to be prospering. The issuance of its second quarter report reaffirming its 2021 projections and the positive analyst coverage that followed propelled Hyzon's stock price out of a post-merger slump, from a relatively low of $6.55 per share on August 11 to $10.40 on September 2—a 59% increase. But with only four months left in the year, the precarious gap between Hyzon's committed deliveries/customers and its actual state of affairs was becoming increasingly evident. Even if Hyzon succeeded in fulfilling all its press-release announced committed deliveries, ~~including deliveries to Hiringa (which as discussed in Part V.G.2, *infra*, was not actually a customer and had no intent to receive vehicles in 2021),~~ it was still short on its projected delivery target of 85 vehicles in 2021 by nearly half, as depicted in the table below.

~~T.2    Hyzon Announced 2021 HFCEV Deliveries as of September 2, 2021~~

| ~~End-User~~ | ~~#Trucks Committed~~ | ~~# Delivered by End of Year~~ |
|---|---|---|
| ~~Royal Friesland~~ | ~~1~~ | ~~1*~~ |
| ~~Municipality of Groningen~~ | ~~15~~ | ~~1*~~ |
| ~~Municipality of Rotterdam~~ | ~~2~~ | ~~1*~~ |
| ~~Jan Bakker~~ | ~~3~~ | ~~1*~~ |
| ~~JuVe/MPREIS~~ | ~~4~~ | ~~1*~~ |
| ~~Hiringa (no intent to receive)[94]~~ | ~~20~~ | ~~0~~ |
| ~~Total Announced~~ | ~~45 (53%)~~ | |
| ~~Hyzon FY 2021 Target~~ | ~~85~~ | |

---

~~[94]  *See* Section V.G.2, *infra* ¶¶ 163-167.~~

~~*Indicates material issue/defect with purported delivery, *see* Part VI.B~~

~~152.~~149.     Desperate to fill this gap and thus maintain the confidence of investors and analysts, Defendants rushed to find (or, upon information and ~~believe~~belief, possibly fabricate) some fantastic purchaser who could help Hyzon save face. Thus entered HongYun.

~~**F.**~~**A.     ~~Hyzon Announces Blockbuster Deal with Fantastical Purchaser HongYun~~**

~~153.~~150.     On September 9, 2021, before markets opened, Hyzon announced that it had secured a major new deal "for the purchase of 500 hydrogen-powered electric trucks" from a virtually unknown, Shanghai, China logistics company, Shanghai HongYun.[95] This incredible deal instantly made HongYun Hyzon's largest customer and, if fully realized, would allow Hyzon to exceed its projected delivery of 85 trucks before the end of the year. According to the press release, an ***"initial order of 100 vehicles [wa]s expected before the end of 2021***," with the remaining 400 to "be ordered in 2022."[96]

~~154.~~151.     Additionally, the press release included several representations about HongYun itself, explaining how the customer's leadership team and its operation experience would make it a source for other major deals in China:

> [Shanghai] HongYun Automobile focuses on providing logistics solutions primarily through hydrogen-powered fuel cell electric vehicles. The company provides ***operation,***

---

[95] Press Release, Hyzon, "Hyzon Motors to supply up to 500 hydrogen fuel cell electric vehicles to Shanghai logistics company," (Sept. ~~9, 2021), https://hyzonmotors.com/hyzon-motors-to-supply-up-to-500-hydrogen-fuel-cell-electric-vehicles-to-shanghai-logistics-company/.~~ 9, 2021), https://investors.hyzonfuelcell.com/news/news-details/2021/Hyzon-Motors-to-supply-up-to-500-hydrogen-fuel-cell-electric-vehicles-to-Shanghai-logistics-company/default.aspx.

[96] *Id.* (emphasis added).

*leasing and maintenance service for customers across the country*, including one of the world's largest steelmakers. After Hyzon delivers the vehicles, *HongYun will be responsible for the subsequent commercial arrangements with its end customers*.

...

Shanghai Hongyun Automobile Co., Ltd. is committed to become the leader in hydrogen-powered fuel cell vehicle operation. *The core team of the company has solid operation experience and master the real time vehicle data management*, they had built up a deep cooperation with several large logistics group in China including Baowu Group, Zhejiang Eurasian Supply Chain, Jiaoyun Hubei Logistics Group, Kuodao Logistics, Changxin International Logistics etc. *At present, the company is focusing on the operation of hydrogen-powered heavy duty trucks by leveraging its rich end user resources in logistics industry*.[97]

155.152.    In the aftermath of this press release, investment analysts became increasingly bullish on Hyzon, noting that, if the deal were successful, it could pave the way for Hyzon to gain a foothold in China. On September 9, 2021, analysts at Fox Advisors "reiterate[d]" their $15 target for Hyzon, despite supply chain concerns, due to the "sizable [HongYun] memorandum of understanding" and Hyzon's "express[ed] confidence in its ability to deliver at least 85 vehicles in 2021E." [98]

156.153.    The HongYun announcement also caused Hyzon's stock price to soar, increasing $2.07 per share (29%) to a $10.87 per share closing price on September 9, 2021. This stock chart below illustrates the magnitude of this stock price jump.

---

[97]  *Id.* (emphasis added).

[98]  Steven Fox CFA and Aneesha Patel, Fox Advisors, "Hyzon Motors: More Order Momentum to Consider" (Sept. 9, 2021).

**F.23 – Chart Tracking Price Increase After HongYun Announcement[99]**



157.154.    On the heels of Hyzon's announcement of its mega deal with HongYun, the financial media went so far as to ask whether Hyzon could "be the Tesla of [h]ydrogen [v]ehicles" given its breakthrough into "the potentially colossal Chinese hydrogen vehicle market" and the "significant revenue" the HongYun order was expected to bring.[100]

158.155.    Investors would soon learn through multiple disclosures over the next twelve months, however, that this was a sham deal. As discussed in Part V.G, *infra*, HongYun was a sham shell counterparty founded three days before the critical MOU announcement. Additionally, HongYun had no paid-in capital, no operating footprint, and

---

[99] Note: stock chart uses daily closing prices. In other words, the data point for September 8, 2021 reflects that on that day, HYZN stock closed at a per share price of $8.80.

[100] Rhian Hunt, "Could Hyzon Motors be the Tesla of Hydrogen Vehicles?" THE MOTLEY FOOL (Sept. 20, 2021), https://www.fool.com/investing/2021/09/20/is-hyzon-motors-the-tesla-of-hydrogen-trucks/.

no ability to execute on agreements to supply HFCEVs to end-users on its own merits. Accordingly, it would not be possible for Hyzon to earn the 2021 revenues it projected—a fact Hyzon would slowly concede beginning on January 12, 2022. Indeed, to date, Hyzon has recognized a mere fraction of expected revenues from this transaction. *See* Part VI.E, *infra* (reporting $2.5 million in gross revenue in 1Q22 for the purported delivery of 62 HFCEVs—or ~$40 thousand in revenue for each heavy vehicle). And after receiving no additional payments from HongYun for over a year, Hyzon's new management decided to exit the China truck market in December 2022. *See* Part VI.F, *infra*.

**~~G.~~F.    The Truth Starts to Emerge: Short Seller Blue Orca Exposes Hyzon's Fraudulent Conduct with a Detailed Investigative Report**

~~159.~~156.    On September 28, 2021, Blue Orca published a Report, which at its core claimed Hyzon had misrepresented or omitted material information about its supposed major customers. Among other things, the Blue Orca Report asserted that (i) Hyzon's largest customer, HongYun, appeared to be "a fake-looking Chinese shell entity" formed three days before Hyzon announced its deal with the purported customer; (ii) Hyzon's next largest customer, Hiringa, was "not really a customer," but rather a channel partner; and (iii) Hyzon overstated orders and financial projections. As a result of these other factors, the Report expressed that, in Blue Orca's opinion, Hyzon was "akin to a ***Chinese Lordstown Motors***," another EV SPAC found to have engaged in gross fraud.[101]

~~160.~~157.    Though unknown at the time, Blue Orca's Report would simply be the first alarm as to Hyzon's possible malfeasances. And in time, Hyzon itself would

---

[101] Blue Orca Report (Dkt. No. 55-1, at 1-2).

corroborate Blue Orca's allegations through its own corrective disclosures owning up to its misconduct.

161.158.     The key arguments from the Blue Orca Report are provided below.

**1.     HongYun Is a Sham Counterparty**

162.159.     With respect to HongYun, the Blue Orca Report pointed to several factors, later confirmed by Lead Plaintiff's independent investigation, *see* Part VII, *infra*, all of which suggested to Blue Orca that Hyzon's largest customer was fake:

> **Hyzon's Largest Customer is a Fake-Looking Chinese Shell Entity Formed 3 Days Before Deal Announced.**
>
> We think Hyzon's largest customer looks fake. On September 9, 2021, Hyzon's stock shot up 29% largely on the strength of a pre-market announcement by the Company that it had secured a major new vehicle deal.
>
> Hyzon announced [link omitted] that it had signed a Memorandum of Understanding ("MoU") with a new Chinese customer, Shanghai Hydrogen HongYun Automotive Co., Ltd. ("Shanghai HongYun"), for the sale of 500 trucks. In the announcement, Hyzon claimed that the customer expects to order 100 of these trucks in 2021, with the remaining 400 trucks to be ordered in 2022. This makes Shanghai HongYun by far one of Hyzon's largest near-term customers.
>
> [Image omitted.]
>
> To put the size of the order in context, the 100-truck-order supposedly placed in 2021 is larger than the Company's previously guided total deliveries for the year. The market duly reacted, causing Hyzon's stock to rip as high as 29% on the day.
>
> If authentic, Hyzon's deal with Shanghai HongYun is worth as much as $250 million. For a commitment of that size, we would typically expect the counterparty to be a deep-pocketed and well-established logistics company with sufficient

operating footprint, infrastructure and track record to purchase and deploy 500 new hydrogen fueled trucks.

But when we looked up Shanghai HongYun on China's National Enterprise Credit Information Publicity System, we found that Shanghai HongYun was ***established only three days before Hyzon announced the deal***.

[Image omitted.]

The Chinese corporate registry also shows that Shanghai HongYun has ***no paid in capital***.

[Image omitted.]

With no paid in capital, the customer appears to be merely an empty shell company. Shanghai HongYun does not yet have an official phone number, email, WeChat or website that we could find.

[Image omitted.]

Hyzon cannot claim that HongYun is the subsidiary of a larger corporation because its two sole shareholders are individuals.

\* \* \*

***In our opinion, such evidence suggests that Hyzon announced a bogus deal with a fake looking Chinese customer to pump its stock price.***[102]

## 2.      Hiringa Is a "Channel Partner" With No Intent to Receive Vehicles in 2021

163.160.      Blue Orca also examined Hyzon's investor presentations and public statements and discovered numerous misrepresentations about its supposed second largest customer Hiringa, for which, Hyzon had committed to build and supply 1,500 HFCEVs:

**Channel Checks Reveal Next Largest Customer Not Really a Customer; Significant 2021 Delivery and Guidance Miss**

---

[102] *Id.* (some emphasis added to last sentence) (internal footnotes omitted).

Hyzon's next largest customer is a tiny New Zealand startup who told us they are not really a customer. Based on our conversation, we do not think that Hiringa has the obligation, the intention, or the capability to purchase the trucks Hyzon claimed in its announcement.

Hiringa has long been a key customer in Hyzon's SPAC narrative. At the height of SPAC mania in February 2021, Hyzon announced that it had signed an agreement to build and supply 1,500 hydrogen powered vehicles for Hiringa, with the first batch of 20 trucks "expected to enter service" in 2021.

[Image omitted.]

Hyzon also highlighted the Hiringa contract in a YouTube promotional video by its CEO Craig Knight in March 2021.

[Image and link omitted.][103]

164.161.    To assess the veracity of Hyzon's claims about Hiringa, Blue Orca contacted senior Hiringa executives. These executives reported that, while Hiringa remained interested in Hyzon, it was "***not actually a customer,*** but a **'*channel partner*'** for Hyzon's vehicles," that is, Hiringa did not intend to pay for or take title over the trucks, but rather would just facilitate the sale of hydrogen trucks to third parties.[104]

> *"We're effectively a channel partner model if you like."*
>
> ***"Our business model is not to buy the trucks. We do the refueling .... We're effectively an unpaid market channel."***
>
> *"There's no point in us being the middleman. So [the end customer] will physically pay for the trucks and they will physically take title."*
>
> *-Hiringa Executive.*[105]

---

[103]  *Id.* at 5-6.

[104]  *Id.* at 5 (italics emphasis added).

[105]  *Id.* (emphasis in original).

165.162.    In Blue Orca's opinion, this description of Hiringa's relationship with Hyzon made more sense, "as Hiringa does not have anywhere near the financial resources to pay for 1,500 trucks, being a company **with less than 20 employees according to LinkedIn and supposedly operating out of a house in New Zealand**. Rather than purchasing 1,500 trucks, Hiringa plans to build fuel stations with the hope of facilitating future purchases from end customers."[106] Hiringa also informed Blue Orca that "**the 1,500-truck agreement claimed by Hyzon in its investor presentations is not a binding order,** and that it merely represents a right, not an obligation, to buy."[107]

> *"That's a right to buy, not an obligation to buy."*
>
> *"At the end of the day it's not binding. That's not a binding purchase. It's a purchasing framework."*
>
> *-Hiringa Executive[108]*

166.163.    Blue Orca also noted the following, in pertinent part, regarding the Company's delivery schedule and abilities:

> **Significant 2021 Delivery and Guidance Miss**. According to Hyzon, Hiringa will account for 24% of the Company's projected deliveries in 2021. Yet Hiringa **stated point blank that no deliveries would be taken in 2021**, and the first validation trucks would be delivered for testing in *March or April 2022*, at the earliest. Hiringa supposedly accounts for 24% of Hyzon's projected 2021 deliveries, so we expect a major guidance miss. We think it is highly misleading for Hyzon to continually reaffirm delivery and revenue guidance

---

[106] *Id.* at 6 (italics emphasis added).

[107] *Id.* (italics emphasis added).

[108] *Id.* at 5 (emphasis in original) (internal footnotes omitted).

and characterize such revenues as "100% certain" when Hiringa admits that it will not take any deliveries this year.[109]

167.164.    Again, Blue Orca checked Hyzon's claim that it would deliver 20 trucks to Hiringa by the first quarter of 2022 with Hiringa's executives. As relayed in the Report:

> Yet Hiringa's executive said that ***Hiringa will not take any deliveries of Hyzon trucks in 2021 and expects to receive the first four validation vehicles in March or April 2022, at the earliest.***
>
> *Hiringa: "Realistically with the supply chains, I think they will be arriving in March or April [2022]. There's also some work to do in quarter one in the Netherlands before they ship."*
>
> *Blue Orca: "So you don't actually expect trucks this year? You expect them in the first quarter of 2022?"*
>
> *Hiringa: "... March through May, if you like, or April through June [2022] is when we are going to be doing validation in New Zealand ... it's not [a] full commercial operation."*
>
> *Blue Orca: "So you don't expect any trucks to be delivered from Hyzon until at least March or April next year. And those are the four validation units?"*
>
> *Hiringa: "Yep, yep."*
>
> *- Hiringa Executive*
>
> This directly contradicts Hyzon's claims to investors. According to Hyzon's disclosures, Hiringa will account for 24% of the Company's deliveries in 2021, making it the key to whether Hyzon meets its revenue and delivery guidance for this year. But Hiringa told us point blank that no deliveries would be taken in 2021, and the first validation trucks would be delivered in March or April 2022, at the earliest.

---

[109] *Id.* at 1 (italics emphasis added).

Furthermore, Hiringa told us that the remaining 16 trucks ordered from Hyzon would be fulfilled based on testing results of the initial four validation vehicles, which they expect to carry out between March and June 2022 at the earliest.

We asked Hiringa if there was any possibility that they might bring forward the order for the 16 trucks, but Hiringa told us that they do not want to take delivery until they build the commercial hydrogen fuel station infrastructure in New Zealand – which Hiringa indicated would not be until the second half of 2022.

*"We don't have the [commercial] stations until the second half of the [2022] calendar year. So, we don't want to hold [on to] 16 trucks…"*

*- Hiringa Executive*[110]

**3.    The Company Lists "Phantom Customers" in Its Investor Materials**

~~168.~~165.    Blue Orca further examined Hyzon's early investor materials from before the SPAC acquisition and determined that Hyzon explicitly or implicitly exaggerated its big-name customers, particularly those with 100% committed orders. According to the report:

> **Phantom Big-Name Customers Suggest Overstated Orders and Financial Projections**
>
> In its much hyped initial investor [link omitted] presentation filed in February 2021, Hyzon generated considerable buzz around its SPAC with a deck that included a number of big household names listed as "top tier customers," including Coca Cola, Nestle, Ikea, and Heineken.
>
> [Image omitted.]
>
> For example, the February deck showed that Hyzon was ***finalizing*** purchase orders with the likes of ***Heineken*** and ***Ikea*** for vehicles to be delivered in 2021. Hyzon also projected

---

[110] *Id.* at 7 (italics emphasis added to bold text).

***hundreds of millions in revenues from Coca-Cola*** in the next five years.

[Image omitted.]

These names generated considerable enthusiasm, and Hyzon's stock price predictably exploded with investor interest. Yet like many other rotten EV SPACs (e.g. Lordstown Motors), these name brand customer relationships appear to have been largely illusory.

Two months later, Hyzon's April investor presentation showed a very different customer list with most of the notable name brands missing.

[Image omitted.]

**Coca Cola. Gone. Heineken. Gone. Ikea. Gone.**

In the four months between February 2021 and July 2021, nearly all of Hyzon's previously named blue chip customers disappeared from its disclosures altogether.

In total, Hyzon dropped blue chip customers with orders worth $700 million in future orders from its subsequent investor presentations.

[Image omitted.]

Hyzon achieved early credibility in a crowded field of zero revenue EV SPACs in part by promoting orders from name brand customers, yet without a word it has dropped almost all of these supposed customers from mention in its subsequent investor presentations.

\*       \*       \*

Between the top of SPAC mania in February and the lukewarm market conditions in July, multiple EV SPACs were exposed for faking customer orders, exaggerating their backlog and exaggerating future revenues, including XL Fleet, Nikola, and Lordstown Motors [links omitted].[111]

---

[111] *Id.* at 8-10 (italics emphasis added).

169.166.    To corroborate these investigative findings, Blue Orca contacted and interviewed former Hyzon employees, who relayed that they left Hyzon, in part, because of concerns over how the company was representing customer demand to investors:

> Hyzon's apparent misrepresentation of its key customers at the time of its SPAC is consistent with the comments of one of its former senior executives with whom we spoke. The former executive indicated that he and other early senior Hyzon executives, all of whom left the Company, became uncomfortable with how Hyzon was presenting customer orders to investors.

> *"I just didn't like the way it was being presented. A lot of the stuff that they are saying is open to interpretation how you read that. Saying that they've got all of these orders and things. But a lot of them are **all MoUs which as you know in the business mean basically nothing.***

> *They were going out, kind of selling it as really what it wasn't at the time. **A bit like unfortunately what Nikola was doing.** It's kind of a lot of hype, and getting money through that hype from people who don't really understand.*

> *You know it's great to show all these pictures of renderings of trucks and orders that you may have, but these orders, most of them… 90% of them are MoUs so there's no binding contract, and if you look from when they've announced those [contracts], still none of those have been built or delivered.*

> *The only three vehicles they have is what's on their website. These are all prototype vehicles. They're not production vehicles of any type. They've basically been hand built at the facilities. These are the things that I think, if you're going to announce that, say that. Be honest about it.*

> ***I was very uncomfortable with that.** A lot of these, if you look at their website, they've loaded lots of them on there of signed meetings they had. All these are MoUs that they've signed. **None of them are binding in any way whatsoever."***

*- Former Senior Hyzon Executive*[112]

170.167.    Based on this information, Blue Orca concluded that "Hyzon was either initially misleading the market or it lost these orders between February and July. Either way, [it could] not see a scenario in which Hyzon's revenue projections could remain unchanged."[113]

171.168.    After the release of the Report, Blue Orca's Chief Investment Officer Soren Aandahl appeared for a 19-minute interview with famed short-seller activist Carson Block of Muddy Waters on Zer0es TV, explaining the firm's investigation, findings, and conclusions, all of which are incorporated by reference herein.

---

[112] *Id.* at 11 (emphasis in original).

[113] *Id.*

**F.24 – Zer0esTV Interview of Soren Aandahl re: Hyzon Motors[114]**



172.169.    These revelations devastated investors' confidence in Hyzon and caused a major sell off.[115] The intraday volume of trading in Hyzon's shares reportedly topped 14 million compared with its daily average of 1.7 million. Additionally, Hyzon shares fell $2.58 per share, or 28%, from a close price of $9.21 per share on September 27, 2021 to a close price of $6.63 per share on September 28, 2021, damaging investors.

173.170.    In a statement issued the same day, Hyzon simply asserted that while it "disagree[d] with the conclusions of the [Blue Orca Report], which it believe[d] [we]re based on a number of factual inaccuracies," it was "reviewing the report carefully and

---

[114] "Is Hyzon Motors the Chinese Lordstown," ZER0ES TV (Sept. 28, 2021), https://www.zer0es.tv/big-announcements/is-hyzon-motors-the-chinese-lordstown/.

[115] Neha Chamaria, "Hyzon Motors Stock Crashes on Scathing Short-Seller Report: A short-seller has made some serious allegations about the electric vehicle stock. Here's what you should do," THE MOTLEY FOOL (Sept. 28, 2021), https://www.fool.com/investing/2021/09/28/hyzon-motors-stock-crashes-short-seller-report/.

intends to respond further in due course."[116] As such, investment analysts waited to hear Hyzon's full throated response before formally adjusting their outlooks.

**F.25 – HYZN Stock Price After Blue Orca Report Publication[117]**



174.171.    But as revealed through Hyzon's subsequent disclosures, especially its Board-appointed Special Committee investigatory findings into Hyzon's sales operations, *see* Part VI, *infra*, each of Blue Orca's attacks sounded in truth.

**H.G.    Hyzon's Telling Admissions in Response to Blue Orca's Revelations**

175.172.    One week after Blue Orca published its market-shocking report, Hyzon issued a public response, which characterized the Blue Orca Report as inaccurate or misleading. Hyzon's response also attempted to rebut the Report's primary claims.[118]

---

[116] "Hyzon Motors Disagrees With Blue Orca Capital's Claims—Shares Plunge Amid Heavy Trading Volume" MT NEWSWIRE, (Sept. 28, 2021), https://in.tradingview.com/news/mtnewswires.com:20210928:A2506564:0-hyzon-motors-disagrees-with-blue-orca-capital-s-claims-shares-plunge-amid-heavy-trading-volume/.

[117] Note: stock chart reflects daily closing prices; total loss calculated by multiplying difference in closing prices with total number of outstanding HYZN shares.

[118] Press Release, Hyzon, "Hyzon Motors issues statement strongly rejecting misleading

176.173.    With respect to its largest customer, HongYun, Hyzon did not deny that HongYun was a shell entity established just days before the September 9, 2021 press release. Instead, they "clarified" for the first time that the customer was actually "a special purpose entity[119] seeking to provide third-party clean energy logistics services to corporate customers" and that it "was established in the wake of the Shanghai government's August 26, 2021 announcement that Shanghai would be among the first participants in China's national hydrogen fuel cell vehicle pilot program."[120] This response did not elaborate on HongYun's origins or address the deficiencies in HongYun's government filings that were identified in Blue Orca's Report. Moreover, Hyzon doubled down on their earlier representations and revenue expectations, maintaining that:

> ***Consistent with the terms of the MoU, Hyzon expects that Shanghai HongYun will be able to leverage its existing relationships to enter into long-term logistics service agreements with end users for Hyzon's hydrogen-powered vehicles***. Hyzon expects to receive binding purchase orders from Shanghai HongYun for these vehicles, which ***Hyzon anticipates will include upfront deposits and installment payments***.[121]

---

and inaccurate short seller report" (Oct. 5, 2021), https://investors.hyzonmotors.com/news/news-details/2021/Hyzon-Motors-issues-statement-strongly-rejecting-misleading-and-inaccurate-short-seller-report/default.aspx ("Hyzon Response").

[119] A "special purpose entity," also called a "special purpose vehicle" is a "is a device used by corporations to create ostensibly independent entities that take on a particular liability and thereby obviate the necessity to include that debt on the corporate balance sheet." *Merck & Co. v. United States*, 652 F.3d 475, 486 (3d Cir. 2011).

[120] Hyzon Response, *supra* n.116. Hyzon did not further clarify the origin of this purported special purpose entity. Moreover, HongYun's filings with the Chinese government refute any claim that HongYun is a subsidiary of a corporate entity.

[121] Hyzon Response, *supra* n.116 (emphasis added).

177.174.     Hyzon similarly confirmed Blue Orca's accusations concerning Hiringa, including that it was not a customer but merely a channel provider:

> ***Hyzon has never suggested that Hiringa is an end user of hydrogen trucks.*** Instead, as Hyzon explained in its February 17, 2021 press release, the partnership between the companies is intended to accelerate the decarbonization of heavy transport in New Zealand through the buildout of hydrogen infrastructure and the supply of fuel cell electric trucks and buses. Hyzon continues to see significant potential in the New Zealand market through its partnership with Hiringa, which already has resulted in a Vehicle Supply Agreement for 20 trucks to be delivered to TR Group Ltd., one of New Zealand's largest truck and trailer leasing and rental companies. ***Hyzon plans to start supplying trucks to TR Group Ltd. in the first half of 2022***, timed to coincide with the availability of hydrogen filling infrastructure in New Zealand.[122]

Notably, Hyzon's response conceded that they no longer expected to supply HFCEVs to Hiringa in 2021 and that they instead intended to supply trucks to TR Group Ltd.[123]

178.175.     Additionally, Hyzon addressed Blue Orca's contention that they had overstated or misrepresented Hyzon's committed customer base, effectively conceding that

---

[122] *Id.* (emphasis added).

[123] On Hiringa's part, the New Zealand company first disclosed the existence of a supply agreement with Hyzon in a press release published on November 2, 2021—more than a month after Blue Orca's Report. Therein, Hiringa revealed that TR Group was "New Zealand's largest heavy vehicle fleet owner" and was purchasing HFCEVs "with support of the New Zealand Government through a NZ$6m [$3.5-4.2 million USD] investment in the purchase of the first 20 FCEV trucks"—another fact not disclosed by Hyzon. *See* Press Release, Hiringa, "Hiringa Refueling NZ commencing construction phase of nationwide green hydrogen refuelling network" (Nov. 2, 2021), https://www.hiringa.co.nz/post/hiringa-refuelling-nz-commencing-construction-of-nationwide-green-hydrogen-refuelling-network.

Hyzon was no longer in discussions for at least for some of the major logos whose deals were baked into Hyzon's guidance:

> The short seller report falsely claims that Hyzon overstated its relationship with certain customers in its investor presentations. Like any innovative company in a nascent industry, Hyzon continues to pursue a wide range of potential opportunities, any one of which may or may not ultimately result in a commitment to purchase vehicles from Hyzon. Contrary to the short seller's claims, no customers or potential customers "disappeared" from any investor presentation; rather, Hyzon anonymized certain customer and potential customer names in its July 2021 investor presentation. Hyzon already has entered into signed agreements with certain entities identified as potential customers in its investor presentations, including the Southern California Gas Company, Ark Energy and the Municipality of Groningen. ***Hyzon continues to engage in active discussions with a majority of the companies that the short seller report misleadingly claims "disappeared"*** from its investor presentations, as well as with a large number of other prominent companies across the globe.[124]

Notably, the Company did not deny it lacked binding purchasing agreements with any Fortune 100 companies or household brands.

## ~~I.~~H.    Iceberg Research Releases a Separate Investigative Report

~~179.~~176.    On October 6, 2021, the day after Hyzon issued a rebuttal to the Blue Orca Report, Iceberg Research issued its own investigative report (i) agreeing with and corroborating Blue Orca's findings, and (ii) criticizing Hyzon's "weak" rebuttal for failing to adequately address the issues raised in the Blue Orca Report.[125] Additionally, the report included new information about Hyzon's origins and its corporate governance:

---

[124] *Id.* (emphasis added).

[125] "Hyzon Motors Inc: Trouble at ParentCo" (Oct. 5, 2021), ICEBERG-RESEARCH.COM,

**Horizon's Surge in 2019 Sales Was With a Major Client in Financial Distress**

The bull case for Hyzon is largely supported by the fuel cell technology and expertise of its 63%-shareholder, Singapore-based Horizon, also Hyzon's key source of hydrogen fuel cells under a supply agreement signed in January 2021.

\*    \*    \*

We found that almost all Horizon's sales come from its Chinese subsidiary Jiangsu Qingneng New Energy Technologies Co., Ltd — [foreign language characters omitted] ("Qingneng"). Qingneng was listed on China's OTC exchange—National Equities Exchange and Quotations (NEEQ) market—between June 2018 and March 2021. *Qingneng's financials show most of the 2019 spike was due to one customer, Shanghai SunLong Bus Co., Ltd ([foreign language characters omitted]), (which accounted for 74% (RMB 150m) of Qingneng's sales and 85% (RMB 56.5m) of trade receivables at the end of 2019.*

[chart omitted]

Qingneng and Horizon never disclosed that SunLong was and is still in financial distress. SunLong's parent company Shenzhen-listed Tunghsu Optoelectronic Technology defaulted on three bonds (RMB 4.7bn or ~$666m) towards the end of 2019, despite reporting a $2.6bn cash stack at the end of September. The filings of both Qingneng and Beijing SinoHytec ([foreign language characters omitted), a much larger fuel cell peer and also a SunLong supplier, show SunLong's struggles continued in 2020.

Qingneng's free cash flow plunged to negative RMB49.7m ($7m) for the 1H20 period. The drop was mainly due to sales, which fell 36% YoY to RMB 16m ($2.4m), and poor collections on its SunLong receivables. We estimate that Qingneng collected just RMB 1m of its end-2019 SunLong receivables (RMB 56.5m or $8m).

---

https://iceberg-research.com/2021/10/06/hyzon-motors-inc-trouble-at-the-parentco/
(Dkt. No. 55-2)

- 112 -

> Yet, just 5% of the SunLong receivables were recognised [sic] as bad debts at the end of June 2020. Qingneng chose to sweep this problem under the carpet. By contrast, SinoHytec recognized SunLong's problems and impaired 28% of its SunLong receivables in the 1H20 period, up from 16% at the end of 2019.
>
> [chart omitted]
>
> **Hyzon's Corporate Governance Put Its Minority Shareholders at Risk**
>
> The same Horizon that did not disclose its customer default now has extensive control of Hyzon through its 63%-shareholding. Both entities share common directors *i.e.*, Chairman George Gu ... and CEO Craig Knight. The remaining shareholder base is fragmented with each owning less than 5%. Horizon is the only fuel cell supplier for Hyzon.[126]

180.177.    As a result of the Iceberg Report, Hyzon's stock retained a downward course, dropping $0.51 per share (8.0%) to close at $5.88 per share on October 6, 2021.

**J.I.    Hyzon Doubles Down: Declares It Consciously Pivoted to the Asian Market to Meet Its 2021 Goals**

181.178.    On November 12, 2021, the Company announced its 3Q 2021 financial and operational results, reporting only $962,000 in revenue for the quarter ended September 30, 2021 and that it had delivered only two vehicles as of third quarter 2021[127]

---

[126] *Id.* (emphasis added).

[127] Press Release, Hyzon, "Hyzon Motors, Inc. Announces Third Quarter 2021 Financial and Operational Results with Significant Milestones Achieved and Building Momentum Across Asia, Europe and North America" (Nov. 12, 2021), *available at* https://www.sec.gov/Archives/edgar/data/1716583/000119312521327194/d145723dex991.htm ; *see also* Form 10-Q (Quarterly Report 3Q21, at 24) (Nov. 12, 2021), https://www.sec.gov/Archives/edgar/data/0001716583/000119312521328352/d202784d10q.htm. Defendants Knight and Gu signed the certifications for the report, as required under SEC rules promulgated after the Sarbanes-Oxley Act. Such

Additionally, the Company noted in its 3Q21 Report, signed by Defendants Knight and Gordon, that the Company had only $20.6 million in remaining performance obligations related to orders for commercial vehicles and other contracts, for which customers had already purportedly paid $11 million in deposits.[128] *But see* Part V.M, *infra* (discussing how Hyzon's independent auditor prevented the Company from recognizing more than $6.0 million in revenue for all of 2021).These statements were false and misleading because Hyzon Europe did not own the five FCEVs it claimed to have sold. Instead, these vehicles were owned by Hyzon Europe's customers. Prior to the formation of Hyzon Europe, HCT contracted with intermediaries for customers in Europe to retrofit five

certifications vouched for the accuracy of the Company's Forms 10-K and 10-Qs, the adequacy of controls for identifying risks, and certified that these documents filed with the SEC did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered. The certifications also stated that the CEO and CFO had disclosed, based on their most recent evaluation of internal controls amongst themselves, their auditors, and the board of director's audit committee, "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting."

[128] Form 10-Q (Quarterly Report 3Q21, at 24) (Nov. 12, 2021), *available at* https://www.sec.gov/Archives/edgar/data/0001716583/000119312521328352/d202784d10q.htm. Defendants Knight and Gu signed the certifications for the report, as required under SEC rules promulgated after the Sarbanes-Oxley Act. Such certifications vouched for the accuracy of the Company's Forms 10-K and 10-Qs, the adequacy of controls for identifying risks, and certified that these documents filed with the SEC did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered. The certifications also stated that the CEO and CFO had disclosed, based on their most recent evaluation of internal controls amongst themselves, their auditors, and the board of director's audit committee, "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting."

- 114 -

vehicles, which were owned by the customers, with hydrogen fuel cell technology. HCT transferred the retrofit projects to Hyzon Europe prior to Hyzon's July 2021 merger with the SPAC. Even though neither HCT nor Hyzon Europe owned the vehicles, Hyzon Europe reported to Hyzon that it sold the five vehicles during the third and fourth quarters of 2021 for the purpose of including these purported sales in Hyzon's financial statements filed with the SEC and other public announcements. To that end, the head of Hyzon Europe falsified, or caused to be falsified, Hyzon's books, records, and accounts concerning the five purported FCEV sales made by Hyzon Europe in 2021. Additionally, the head of Hyzon Europe signed the Vehicle Purchase Agreement that purported to transfer the five vehicles from HCT to Hyzon Europe. Holthausen knew that HCT did not own the vehicles it purported to transfer to Hyzon Europe when he signed the Vehicle Purchase Agreement

182. Hyzon nevertheless reaffirmed the Company's forecast for 85 vehicles shipped before December 31, 2021. A principal reason for reaffirming the guidance, Defendants explained, was that Hyzon had purportedly received the first two purchase orders, for 62 trucks in total, pursuant to terms of the previously announced MOU to supply HongYun.

183.179.    On the 3Q21 Earnings Call held later that day (November 12, 2021), Defendant Knight told the audience that Hyzon was on track to meet its guidance of shipping 85 vehicles by the end of 2021 due to the Company's newly disclosed "conscious decision" to shift its mix of delivery locations from predominantly European to predominantly Asian customers, in China specifically:

> ***Today, we are again reaffirming our guidance of expecting to ship 85 vehicles by the end of 2021***. We continue to expect to meet this target due to the strength of the global footprint of

- 115 -

Hyzon's business, with facilities and operations in Asia, North America and Europe, a feature which has shown enormous benefits during the current dislocations and which we expect will underpin our competitive advantage well into the future.

…

*As a result of that global footprint and our deep historical relationships within Asia, when global supply chain challenges worsened*, especially in the last few months, we were able to make *a conscious decision to shift the mix of delivery locations from predominantly European to predominantly Asian customers, in China specifically*. We did that because we could. Hyzon's near-term focus is getting our vehicles on the road and into customers' hands. And wherever we can do that, letting customers see for themselves the advantages of fuel cell electric vehicles that are available today, we will do it, and we have done exactly that.

*During the third quarter, Hyzon delivered two vehicles to customers in Europe, one to the municipality of Groningen, one to the municipality of Rotterdam, both in the Netherlands*. ... These first two deliveries are not trials. They were deliveries of vehicles to be used by these customers in real-world everyday applications. *This resulted in Hyzon's first vehicle revenues, which totaled $1 million, in the third quarter*.

…

Importantly, given the pivot we were able to make in our near-term focus from Europe to Asia, we haven't had a slowdown in the pace of our orders. As we announced this morning, *Hyzon has received the first two purchase orders from Shanghai Hydrogen HongYun Automotive in China for a total of 62 trucks. The end user of these trucks is a large industrial conglomerate*.[129]

---

[129] Emphasis added. Full transcript available at ~~https://s28.q4cdn.com/786762755/files/doc_financials/2021/q3/Q3-Earnings-transcript.pdf~~https://seekingalpha.com/article/4468955-hyzon-motors-inc-hyzn-ceo-craig-knight-on-q3-2021-results-earnings-call-transcript.

184.180.    Shortly thereafter, on November 16, 2021, Iceberg issued a shorter, follow up report reiterating its and Blue Orca's suspicions that HongYun was a fake, shell company "brought in to plug the order gap" between Hyzon's projected and actual number of delivered vehicles.[130]

181.    About two days later, on or about November 18, 2021, Knight secretly attempted to inflate Hyzon's stock price the decline that began after the September Blue Orca Report. Specifically, Knight pledged 226,415 shares of his Hyzon stock to secure a $1.5 million loan he obtained from a Singapore-based entity run by Knight's friend. Knight used the loan proceeds to purchase an additional 166,000 shares of Hyzon stock on the open market on November 22, 2021 in an unsuccessful attempt to inflate Hyzon's stock price. The November 18, 2021 loan agreement did not reference the stock pledge and, at Knight's request, the pledge was not registered with a brokerage or other third-party. Instead, Knight and his friend's company documented the pledge in a separate agreement that Knight signed on December 8, 2021. Knight did not share the separate pledge agreement with Hyzon, and later failed to disclose pledging any Hyzon stock in response to a written questionnaire distributed to Hyzon's directors and officers in advance of an April 27, 2022 proxy statement filing. Because Knight hid the stock pledge, Hyzon did not disclose it as required. Knight hid the stock pledge because he knew, or reasonably should have known, that the stock pledge violated a February 8, 2021 lock-up agreement he entered into with Hyzon that prohibited him from pledging his shares. Knight also knew,

---

[130] "Hyzon Unleashes a Load of Hot Air with Its 3Q21 Results" ICEBERG-RESEARCH.COM, (Nov. 16, 2021), https://iceberg-research.com/2021/11/16/hyzon-unleashes-a-load-of-hot-air-with-its-3q21-results/ ("Iceberg Research Follow-Up Report").

or reasonably should have known, that Hyzon was required to disclose the pledge to investors pursuant to SEC rules.

### K.J.    Hyzon Touts China as Its Prized Market for 2021

185.182.    On November 23, 2021—two weeks after Hyzon's required 3Q21 regulatory filings, and days before Hyzon would make its first delivery to HongYun— the Company secretly entered into a warrant agreement with a HongYun subsidiary, which allowed the subsidiary to purchase up to two million shares of Hyzon stock, at an exercise price of $7.75 per share—that is, the per share closing price of Hyzon's stock that day. Hyzon first disclosed the existence of this agreement in its 2021 Annual Report filed on March 30, 2022 (one week after Lead Plaintiff's first consolidated class action complaint was due).

186.183.    Though the HongYun Warrant Agreement's full terms have yet to be disclosed, Hyzon has conceded the following:

> On November 23, 2021, Hyzon Motors Inc. entered into a warrant agreement to issue warrants (the "Hongyun Warrants") to Hydro Fortune Logistics (Hong Kong) Co., Limited, a subsidiary of Shanghai Qingli Hongyun Motors Co. ("Shanghai Hongyun"), to purchase up to two million shares of Class A Common Stock, $0.0001 par value per share, of Hyzon at an exercise price of $7.75 per share. The warrants become vested and exercisable as Shanghai Hongyun makes payment on the purchase price for such vehicles and are classified within equity. The vested and exercisable Hongyun Warrants will expire on December 31, 2028. As of December 31, 2021, the Company issued 31,000 warrants for 2021 vehicle deliveries and approximately 8,300 are vested.[131]

---

[131] Hyzon 2021 Annual Report filed on Form 10-K, at 113 (Mar. 30, 2022), *available at* https://www.sec.gov/Archives/edgar/data/0001716583/000119312522089751/d28535

These terms strongly suggest Hyzon granted HongYun warrants as an incentive and/or reward for HongYun's purported vehicle purchases. Additionally, the HongYun Warrants function as undisclosed rebates or discounts that further obscured Hyzon's real revenue from the sale of vehicles. For example, if HongYun exercised and sold the two million warrants at just $10.40—the price on September 3, 2022 when Hyzon simply announced the HongYun MoU—HongYun would have received a kickback of more than $5.32 million. Indeed, in its restated financials, Hyzon reported negative revenue in 2021 because the HongYun Warrants' costs outstripped the meager revenues the Company generated.

187.184.    After granting HongYun warrants, Hyzon still persisted in claiming HongYun as a legitimate customer of Hyzon. For example, on December 8, 2021, Hyzon issued a press release announcing that it had delivered in November "29 fuel cell electric trucks to be used by a major steel conglomerate in China through [HongYun]." [132] According to the press release:

> The 49-ton trucks ... are expected to haul steel coils in the conglomerate's fleet in coming months. ***HongYun plans to provide operation, leasing and maintenance services*** for industrial and municipal customers in targeted locations in China, which is expected to be a massive market for fuel cell

---

2d10k.htm.

[132] Press Release, Hyzon, "Hyzon Motors delivers 29 hydrogen fuel cell electric heavy duty trucks to reduce carbon emissions in the steel industry" (Dec. ~~8, 2021), https://www.hyzonmotors.com/in-the-news/hyzon-motors-delivers-29-hydrogen-fuel-cell-electric-heavy-duty-trucks-to-reduce-carbon-emissions-in-the-steel-industry.~~ 8, 2021), https://investors.hyzonfuelcell.com/news/news-details/2021/Hyzon-Motors-delivers-29-hydrogen-fuel-cell-electric-heavy-duty-trucks-to-reduce-carbon-emissions-in-the-steel-industry/default.aspx.

technologies in the coming years. ***Hong[Y]un has further orders for 33 more trucks confirmed with Hyzon***.[133]

The press release also featured a photo of the vehicle fleet, in which Hyzon trucks displayed the partner logo for Chinese steel manufacturer, Baowu, above the front windshield.

**F.26 – Image of Purported Vehicle Fleet from Hyzon December 8, 2021 Press Release**



~~188.~~185.          The Company, however, had not disclosed any pilot test program with steel manufacturers in China, despite the reported size of the purported purchase. Unlike many of Hyzon's press releases, this press release omitted a section about the customer/partner involved, HongYun. As discussed in Part VI.B, *infra*, after the Special Committee completed its Investigation, Hyzon disclosed that ~~(i)~~ nearly half of the vehicles Hyzon reported delivered did not in fact operate on hydrogen at the time of delivery or by the end of the year. ~~And~~ The SEC later revealed in September 2023 that a Hyzon ~~has recognized but a fraction of the revenue expected from such a large, purported delivery of~~employee arranged to deliver HFCEVs to HongYun shortly before the end of 2021 in order to meet Hyzon's public guidance, with ~~no further reports of payments~~the agreed-upon understanding that the customer would return the vehicles after ~~1Q21. *See* Part VI.F,~~

---

[133] *Id.* (emphasis added).

~~*infra*~~year-end to complete necessary work on the vehicles so that they could run on hydrogen power.

189.186.    On December 16, 2021, Defendant Knight spoke at the Bank of America Hydrogen Conference and, while discussing Hyzon's customer base, elaborated on the Company's purported sales to steel companies. Specifically, he reported:

> We've announced the supply of house owned vehicles to two of the biggest steel companies in the world here in the last several weeks. These are back to base operations, supplying trucks to a customer, who already has hydrogen on hand, right.[134]

190.187.    Defendant Knight also responded for the first time to questions regarding Blue Orca and Iceberg Research's allegations, primarily by digging in his feet as to Hyzon's positions. Regarding HongYun, Knight claimed:

> [T]urn[ing] ... to that criticism from the short report, which was that, essentially that Hyzon is faking the kind of customer opportunity and faking capabilities, for example. So, let's take a look at the customer insight first. ***We were criticized for announcing a deal with a brand new Chinese company. Well, there was a good reason why that was a brand new Chinese company, because in the two weeks preceding that announcement, the[] formal national policy in China on supporting the fuel cell heavy vehicles was announced.***
>
> And that's what we had been waiting for in working with the partners in China, with the counterparties in China. We had been waiting for the policy to be formalized, put into law, so that we could sign our agreements. We only announced it because we knew we had agreements to supply, because it wasn't a fabrication. It wasn't an MOU of a vague concept. I mean, we've already announced, we've already delivered the

---

[134] Dec. 16, 2021 Bank of America Hydrogen Conf. Tr., *available at* https://research.alpha-sense.com?docid=T-CP_2597133.

first 29 vehicles under that particular counterparty's arrangement, which is Shanghai Automotive. So, that's one case.[135]

## ~~L.~~K.   The Façade Starts to Crumble: Hyzon Previews ~~its~~Its Poor 2021 Financial Results and Disclose Receipt of SEC Subpoena

~~191.~~188.      On January 12, 2022, Hyzon provided an update on its 2021 deliveries and financial expectations, in which Hyzon disclosed its 2021 financial projections were, in fact, not based on the reality of its situation.[136] Therein, Hyzon falsely reported, among other things, that Hyzon had "deliver[ed] of 87 fuel cell powered heavy-duty vehicles in 2021 under commercial sales agreements." Additionally, it revealed:

> The ***Company anticipates the 2021 financial results will reflect both lower average selling price per vehicle due to product mix and multi-year revenue recognition for the majority of sales***, ***which will result in materially lower than forecast revenues and margins. As highlighted during Hyzon's third quarter earnings call, the Company proactively shifted its deployment focus to Asia where average selling prices are approximately half of other regions***. Global supply chain disruptions rocked many industries and sectors, with European and North American vehicle assembly particularly hard hit.[137]

~~192.~~189.      The same day, the Company filed a Form 8-K, signed by Defendant Knight, which included a copy of this financial update. Additionally, Hyzon disclosed that it had received a subpoena from the SEC "for production of documents and information,

---

[135] *Id.* (emphasis added).

[136] Press Release, Hyzon, "Hyzon Motors provides update on 2021 deliveries and financial expectations" (Jan. 12, 2022), *available at* https://www.sec.gov/Archives/edgar/data/1716583/000119312522007235/d277686dex991.htm (emphasis added).

[137] *Id.* (emphasis added).

including related to the allegations made in the report issued by Blue Orca Capital."[138] This investigation remains ongoing.

193.190.    These dual updates, individually and in combination with each other and the Blue Orca Report, shattered investors' confidence in Hyzon. As one example, Fox Media adjusted its target from $15 to $10 on January 9, 2021 due, in part, to the lower average sales price of Hyzon's HFCEVs in China compared to previously advertised purchasers in Europe or North America.[139] Additionally, Colliers decided to move "to the sidelines in light of the uncertainty around how the investigation itself might unfold ...."[140]

194.191.    On this news, Hyzon's intraday trading volume spike, and its stock price dropped $1.55, or nearly 23%, over the course of two days from a close price of $6.81 per share on January 11, 2021 to a close price of $5.26 per share on January 13, 2021. Hyzon's share price continued to tumble for the next five trading days, as the market continued to digest the news, hitting an historic low of $4.25 on January 21, 2022.

---

[138] Form 8-K (Current Report) (Jan. 12, 2022), https://www.sec.gov/ix?doc=/Archives/edgar/data/1716583/000119312522007235/d277686d8k.htm.

[139] "Significant Delivery Progress Meets More Sales Mix Issues" FOX ADVISORS, (Jan. 12, 2022).

[140] Colliers, "Hyzon: Stepping Aside on SEC Investigation and Transferring Coverage" (Jan. 13, 2022); *see also* Akanksha Bakshi, "Colliers Downgrades Hyzon Motors Citing SEC Probe," MARKETS INSIDER (Jan. 13, 2022), https://markets.businessinsider.com/news/stocks/colliers-downgrades-hyzon-motors-citing-sec-probe-1031101305 (reporting Colliers downgrade).

**F.27 – HYZN Stock Price After Jan. 12, 2022 Updates Published[141]**



**~~M.~~L.  Hyzon Discloses Its True Sales and Revenue Numbers for 2021 Included Related Party Transactions and Undisclosed Purchase Incentives**

~~195.~~192.    On March 23, 2022 (two days after Lead Plaintiff filed the First Consolidated Class Action Complaint), Hyzon issued a news release concerning its full year and fourth quarter 2021 results.[142] Therein, Hyzon revealed for the first time the extent to which it had experienced "materially lower than forecast revenues and margins," as previewed in the Company's January 12, 2022 update. *See* Part V.M, *supra* ¶¶ 188-191. Specifically, Hyzon stated that, even though it purportedly exceeded its 2021 vehicle delivery guidance with 87 HFCEVs delivered, the total contract value for these deliveries

---

[141] Note: stock chart reflects daily closing prices; total loss calculated by multiplying difference in closing prices with total number of outstanding HYZN shares.

[142] News Release, Hyzon, "Hyzon Motors Inc. reports full year and fourth quarter 2021 results, delivers fuel cell vehicles, playing a pivotal role in the transition to hydrogen" (Mar. 23, 2022), *available at* https://www.sec.gov/Archives/edgar/data/0001716583/000119312522082057/d306023dex991.htm.

was only $19.6 million—of which $13.6 million would be collected over five years. Accordingly, the Company noted that it would be reporting only $5.1 million in revenue for 4Q21 and only $6.0 million in revenue for all of 2021 (the remainder being reported in 3Q21). As explained by market analysts like Colliers over the next few days:

> The revenue miss was primarily due to the determination by HYZN's auditor (KPMG) that ... HongYun had insufficient operating history to allow booking later installment payments as revenue at the time of delivery. ***In other words, the auditor is only allowing HYZN to book revenue with HongYun on a cash basis due to potential limitations on HYZN's ability to enforce future payment***.[143]

196.193.      The same day (March 23), Hyzon held an earnings call at which Defendants Knight and Gordon answered analyst questions.[144] When asked about Hyzon's anticipated vehicle mix over the course of 2022—that is, what proportion was expected to come from China versus Europe versus Australia—Defendant Knight acknowledged that "2021 was somewhat disappointing in that regard" and that, despite Hyzon's representations in its 2021 investor presentations, the mix would not be more favorable to non-China markets until at least 2023. Further, Knight disclosed that, as to Hyzon's 2021 order fulfillment, it "only really start[ed] to work on the vehicle assembly towards the end of the year." Additionally, he stated that, as to the United States market, it was possible

---

[143] Donavan Schafer, "Hyzon Motors: Q4 Miss and Weak 2022 Guide; That Said, Strong Outlook for Hydrogen on Ukraine Invasion and Integration w/Legacy Infrastructure/Players" COLLIERS SECURITIES (Mar. 24, 2022).

[144] Full transcript available at https://seekingalpha.com/article/4497327-hyzon-motors-inc-hyzn-ceo-craig-knight-on-q4-2021-results-earnings-call-transcript.

- 125 -

that 10 to 15 vehicles could be in trial by the end of year, thus conceding Hyzon had no "100% committed" sales or planned deliveries to the United States in 2021 or 2022.

197.194.    During that earnings call, analysts also asked Defendants about the recognized and unrecognized portions of revenue Hyzon attributed to its purported sale of 87 vehicles in 2021, in addition to what specific GAAP provisions impacted Hyzon's 4Q21 and 2021 revenue recognition. In response, Defendant Knight answered:

> [T]he main factor here was the treatment of collectability, the assessment of collectability by our [auditor], they're saying we just don't have enough kind of enforcement power to go out and make sure that money gets collected. Now that the end user of the zero emission vehicle services is one of the largest steel companies in the world, and we think it's highly unlikely they'll default or stop using trucks anytime soon. So we don't find that an unacceptable business risk. But from an accounting treatment standpoint, because there's a new intermediary involved in the provision of the service for the vehicles, then it's considered a collectability risk.
>
> \*        \*        \*
>
> **So it's a short term issue, whether we recognize the revenue next year or the year after, frankly, it's not a huge deal**. It's unattractive to have shipped vehicles that you haven't recognized all the revenue on, it doesn't make us feel good, but **at the end of the day, it's a very minor pain point.**[145]

198.195.    One week later, on March 30, 2022, after markets had closed, Defendants quietly released Hyzon's 2021 Annual Report,[146] which further elaborated on

---

[145] *Id.* (emphasis added).

[146] Form 10-K (2021 Annual Report) (Mar. 30, 2022), *available at* https://www.sec.gov/Archives/edgar/data/0001716583/000119312522089751/d285352d10k.htm.    The Report was signed by Defendants Knight, Gordon, Gu, and Anderson, as well as other non-party directors. Further, Defendants Knight and Gordon signed the certifications,

Hyzon's shockingly low revenue numbers and disclosed for the first time several previously unknown details about the Company's 2021 vehicle revenues and deliveries.

199.196.      First, as discussed above, *see* Part V.M, *supra* ¶¶ 182-183, Defendants made known that Hyzon had entered into a warrant agreement with a HongYun subsidiary allowing the subsidiary to purchase up to two million shares of Hyzon stock, at an exercise price of $7.75 per share.[147] Unknown to investors in 2021, these HongYun Warrants rewarded HongYun for making purported vehicle purchases while simultaneously functioning as undisclosed rebates or discounts which further obscured Hyzon's profitability in the eyes of investors.

200.197.      Additionally, Defendants pulled back the curtain as to the mystery of Hyzon's other 2021 vehicle deliveries. Specifically, the Company disclosed that: (1) in July 2021, the Company had entered into two joint ventures in China ("Jiushuang JVs"), which were established for the purpose of promoting the commercial operation of fuel cell vehicles in the Shanghai, China market;[148] and (2) in December 2021, Hyzon entered into a new vehicle sales contract with a related party—the corporate parent of Hyzon's joint venture partners, Jiushuang (Shanghai) New Energy Technology Co., Ltd. ("Jiushuang")— for the late-in-the-year delivery of 20 HFCEVs. The Company also reported that, for this

---

under SEC rules promulgated after the Sarbanes-Oxley Act, certifying that they had disclosed "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting." *See supra* n.126.128.

[147] 2021 Annual Report, *supra* n.146, at 113.

[148] *Id.* at 104, 115. Per the Annual Report, Hyzon China partnered with Jiushuang Tiancheng Motors Service Ltd. ("JSTC") to form Jiushuang-Hyzon Motor Services, Ltd. ("JSYS") and partnered with Jiushuang Suda Logistics Ltd. ("JSSD") to form Jiushuang-Hyzon Logistics, Ltd. ("JSHYS").

20-vehicle transaction—claimed by Hyzon to have a total contract value of $3.0 million—

***Hyzon was prevented by its independent auditors from recognizing $2.9 million in revenue. As such, Hyzon reported only $0.1 million in revenue for the transaction.*** (But even that was overstated, as these vehicles did not operate on hydrogen and were not transferred to the end user until the third quarter of 2022. *See* Part VI.D.)

201.198.    Furthermore, Hyzon revealed the sources for its 2021 revenues. It also showed the partial extent to which the Company was prohibited from recognizing revenue under GAAP and its internal policies, based on what the Hyzon Defendants had told the auditor at the time. Specifically, for the year ended December 31, 2021, the Company recognized $6.0 million in sales of HFCEVs, of which $2.2 million derived from Europe and $3.8 million was recognized in China. Moreover, the Company explained that:

> In accordance with ASC 606, we are required to evaluate customers' ability and intent to pay substantially all of the consideration to which the Company is entitled in exchange for the vehicles transferred to the customer, *i.e.*, collectability of contracts with customers. ***Certain of our customers in China are special purpose entities established in response to China's national hydrogen fuel cell vehicle pilot program***. While in the Company's estimation these customers have strong business plans and management teams, ***in consideration of these customers' limited operating history and extended payment terms in their contracts, the Company determined the collectability criterion is not met with respect to contract existence under ASC 606, and therefore, an alternative model of revenue recognition has been applied to this arrangement***.[149]

---

[149] *Id.* at 100 (emphasis added).

As a result, Hyzon disclosed it was permitted to recognize only $3.8 million for the vast majority of its 2021 sales—resulting in per $46k in per-vehicle revenue for sales to China.

**T.3 -  Hyzon 2021 Revenues and Sales by Region**

| Region | Europe | China | Total |
|---|---|---|---|
| #Vehicles Delivered | 5 | 82 | 87 |
| %Deliveries | 6% | 94% | |
| Revenue w/o ~~auditor limitation~~Auditor Limitation | | $17.4 million | $19.6 million |
| Revenue Recognized in Original Reports | $2.2 million | $3.8 million | $6.0 million |
| Actual Revenue after Restatement and Founder Defendants Removed (see Part VI.D) | $0.1 million<br>• All from retrofitting services | ($0.2 million)<br>• No obligations fully performed in 2021<br>• 20 out of 82 vehicles not transferred until 3Q21 | ($80 thousand)<br>• Negative revenue for 2021 |

202.199.      In disclosing these figures, Hyzon recognized that its "new strategy" to focus heavily on Chinese markets, and in particular, a subset of major Chinese purchasers, incurred significant risks—which Lead Plaintiff notes were the same risks that ultimately bankrupted Hyzon's corporate relative JS Horizon:

> We have established relationships with a number of customers, many of whom could unilaterally terminate their relationship with us or materially reduce the amount of business they conduct with us at any time... . There is no guarantee that we will be able to retain or renew existing agreements, maintain relationships with any of our customers on acceptable terms or

at all or collect amounts owed to us from insolvent customers. The loss of one or more of our major customers could adversely affect our business, financial condition and results of operations.

***For the year ended December 31, 2021, the Company's top two customers made up 60.6% and 22.5% of revenue, respectively.*** As of December 31, 2021, three customers made up 39.4%, 19.6%, and 13.0% of accounts receivable, respectively.[150]

203.200.    Despite these shocking disclosures, Hyzon maintained in its March 23 news release, earnings call, and PowerPoint business update that the Company had an ever increasing backlog of orders and non-binding MoUs through 2025 ($287 million in total), "consist[ing] of $224M non-binding MoUs and $63M firm orders," including "$92M MoU and $9M firm order with HongYun and $115M MoU [but no firm orders] from Geesink."[151] Defendants also stated that they "expect[ed] to have 10-15 Hyzon fuel cell demonstration trucks deployed to multiple trial customers [in North America] by year end" and that they "[e]xpect[ed] to deliver 300-400 vehicles with deliveries heavily weighted towards the back half of the year as the industry navigates supply chain challenges and global uncertainties."[152]

204.201.    On this news, several market analysts downgraded their views of Hyzon until non-China-based sales signaled meaningful, convertible demand for Hyzon's technology in American, European, and Oceanic markets. Canaccord Genuity, for example, lowered its forecasts for Hyzon, due to its slow "non-China-based sales ramp"

---

[150] *Id.* at 101 (emphasis added).

[151] Hyzon Motors, "Business Update" (Mar. 23, 2022), *available at* https://www.sec.gov/Archives/edgar/data/0001716583/000119312522082057/d306023d8k.htm.

[152] *Id.*

and "revenue recognition issues in domestic China sales, until visibility improves."[153] Canaccord further noted that:

> Domestic China sales seem like business as usual for the parent company Horizon, which supplies fuel cells to third party contract manufacturers who assemble FCEVs. However, ***the value-add for Hyzon is in the non-China-based business ….***[154]

205.202.    Canaccord's analysis of the Hyzon Annual Report and resulting downgrade caused delayed, yet large selloffs of Hyzon stock.[155] In the day following Canaccord's April 5 downgrade, Hyzon's stock price dropped $1.08 (~17%) from $6.21 to a close price of $5.13 per share. On this news and the announcement of a new CFO, *see* Part V.N, *infra*, Hyzon's price continued to steadily fall, reaching a closing per share price of $3.70 on May 6, 2022—the day Hyzon announced its financial results for the first quarter of 2022.

---

[153] Jed Dorsheimer, "Hyzon Motors: Downgrading to HOLD until non-China-based sales signal a ramp; PT to $6" CONACCORD GENUITY, (Apr. 5, 2022).

[154] *Id.* (emphasis added).

[155] *See* Scott Levine, "Why Shares of Hyzon Motors Are Crashing Today," THE MOTLEY FOOL (Apr. 6, 2022), https://www.fool.com/investing/2022/08/05/why-shares-of-hyzon-motors-are-crashing-today/ (attributing drop to Canaccord's actions); Clark Schultz, "Hyzon Motors falls after Canaccord Genuity turns cautious with downgrade to hold," SEEKINGALPHA (Apr. 6, 2022), https://seekingalpha.com/news/3821063-hyzon-motors-falls-after-canaccord-genuity-turns-cautious-with-downgrade-to-hold (same).

**F.28 – HYZN Stock Price After 2021 Annual Report and April 5, 2022 Downgrade[156]**



**N.M.   Hyzon Terminates Top Executives, Launches Independent Investigation, and Disavows All Prior Financial Guidance**

206.203.       In the wake of Hyzon's dismal 2021 Annual Report and newly disclosed revenue recognition problems, Hyzon's Board of Directors began to take action to root out the sources of Hyzon's revenue recognition, corporate governance, and regulatory compliance problems. First, on April 12, 2022, the Company announced that it had ousted Defendant Gordon as CFO and appointed Samuel Chong—an outsider to Hyzon and the hydrogen fuel cell industry—as CFO effective immediately.[157] Two days later, Colliers Securities announced that it was dropping coverage of Hyzon.

---

[156] Note: stock chart reflects daily closing prices; total loss calculated by multiplying difference in closing prices with total number of outstanding HYZN shares.

[157] Form 8-K (Current Report) (Apr. 12, 2022), https://www.sec.gov/Archives/edgar/data/0001716583/000119312522102400/d351030d8k.htm; Press Release, "Hyzon Motors Appoints Samuel Chong as [CFO]" (Apr. 12, 2022), *available at* https://www.sec.gov/Archives/edgar/data/1716583/000119312522102400/d351030dex991.htm.

207.204.        Then, on May 6, 2022, Hyzon issued a news release and an investor presentation for its first quarter 2022 financial results—the first quarterly report for Chong—in which Hyzon reported no vehicle sales for the quarter.[158] In an earnings call held the same day, Defendant Knight acknowledged that the Company would not be recognizing revenue for vehicles that quarter—either from new vehicles sales or outstanding obligations from Chinese counterparties. On this abysmal sales news, Hyzon's stock price dropped again, this time from $3.70 to $3.28 over the course of the next trading day—a $0.42 drop or approximately 11%.

208.205.        Throughout the summer of 2022, Hyzon's media and public relations presence went silent, issuing no substantive news as to its financial condition, deals made, or sales prospects whatsoever. As such, investors patiently waited until August—the month in which Hyzon was required to file its quarterly report for the second quarter of 2022 (the first full quarter under the Company's new CFO, Samuel Chong)—for an update as to Hyzon's condition.

209.206.        On August 4, 2022, after markets had closed, Hyzon announced that its Second Quarter Financial Filings would not be released by the August 15, 2022 deadline due to "identified operational inefficiencies" and "revenue-recognition-timing issues in

---

[158] News Release, Hyzon, "Hyzon Motors Inc. reports first quarter 2022 financial and operational results" (May 6, 2022) (corrected version), *available at* https://www.sec.gov/Archives/edgar/data/0001716583/000171658322000035/q1_2022xexhibit991a.htm (reporting only $0.4 million revenue for fuel cell sales "to customers validating applications outside of vehicles, one of which to ZeroAvia," an aircraft manufacturer). On May 13, 2022, Hyzon filed its 1Q22 quarterly report, which reiterated these financial measures, *available at* https://www.sec.gov/Archives/edgar/data/1716583/000171658322000038/hyzn-20220331.htm.

China."[159] In "acknowledg[ing] the serious nature of this development," the Company disclosed that a "board-appointed special committee, working with external advisors, [wa]s conducting an independent investigation to address" its revenue recognition problems, as well as "other governance and compliance issued."[160] Further, the Company disclosed that its "*financial statements and guidance previously issued by the company [could] no longer be relied upon*," thus disavowing Hyzon's 2021 financial projections and the revenue numbers reported in its quarterly and annual reports.[161]

**F.29 – August 4, 2022 Statement from Hyzon Motors**

Hyzon announced today that its Second Quarter Financial Filings for the period ending June 30, 2022, will not be issued by the August 15, 2022 deadline. Hyzon's management has become aware of revenue recognition timing issues in China. A board-appointed special committee, working with external advisors, is conducting an independent investigation to address these and other governance and compliance issues.

Separately, the company has identified operational inefficiencies at Hyzon Motors Europe B.V., the company's European joint venture with Holthausen. The Board of Directors has retained a third-party consulting firm to assist the board and management with reassessing Hyzon's global strategy and operations.

We acknowledge the serious nature of this development and are working diligently with the assistance of outside legal and financial advisors to resolve this matter as quickly as possible. Due to these findings, financial statements and guidance previously issued by the company can no longer be relied upon.

Hyzon remains dedicated to our mission of delivering zero emission hydrogen-powered commercial vehicles and accelerating clean transport across the globe. We affirm our unwavering commitment to our customers, employees, partners, shareholders and suppliers – and are determined to resolve these issues as soon as possible.

210.207.      The market reacted harshly to these shocking revelations. On August 4, 2022, Hyzon's stock price closed at $4.49 per share. The following day, when markets

---

[159] "Statement from Hyzon Motors" (Aug. 4, 2022), https://www.hyzonmotors.com/in-the-news/hyzon-motors-media-statement. Archived at https://web.archive.org/web/20220805015911/https://www.hyzonmotors.com/in-the-news/hyzon-motors-media-statement.

[160] *Id.*

[161] *Id.* (emphasis added).

- 134 -

opened and already had begun to digest the news, Hyzon's stock price began trading at $2.86 per share—a per share price drop of $1.63 or ~36%—before dropping further to close at $2.78 per share (38% drop). Thereafter, the Company's share price continued to tumble over the next five trading days, hitting a then-all-time low of $2.33 per share closing price on August 11, 2022. In total, Hyzon's stock price dropped $2.16 per share, equaling nearly 48% of the stock's already diminished value.

**F.30 –HYZN Stock Price After August 4, 2022 Statement[162]**

211.208.    Market analysts also received these new disclosures coldly. For example, on August 5, 2022, Wedbush "thr[e]w in the towel" on Hyzon, downgrading the Company as a direct result of its "series of major announcements [in the August 4 Form 8-

---

[162] Note: stock chart reflects daily closing prices; total loss calculated by multiplying difference in closing prices with total number of outstanding HYZN shares.

K] regarding the company's future"[163] that Wedbush believed threw "more uncertainty into" Hyzon's story. As put by Wedbush analysts Dan Ives and John Katsingris:

> There are more questions than answers at the moment with the myriad of issues identified in the filing that we fear could slow down the growth story of Hyzon (that was actually progressing well the last six months) with this black cloud now over the story. ***In a risk-off market and worries about many EV names, the last thing investors wanted to see was this news*** and thus we move to the sidelines on the name until we have a better grasp of the issues at hand.[164]

212.209.    Similarly, Steven Fox and Aneesha Patel of historically pro-Hyzon-leaning analyst firm Fox Advisors also expressed doubt as to Hyzon's future given the Company's recent disclosures, noting, in part:

> There is obviously a lot to unpack from the company's most recent 8-K .... From our standpoint, we are surprised that there are still revenue recognition issues with the operations in China since the company's auditors previously required Hyzon to recognize sales out of China over 3-5 years even though management highlighted that ultimate delivery of its FCEVs in the region were for a "leading global steel manufacturer"....
>
> At the same time, Hyzon recently hosted an Investor Day from its manufacturing operations in Groningen, Netherlands, which included in-person attendees from the investment community (we attended virtually), where it detailed a plan for ramping to high volume production over time that now appears to be under review. This news also comes after Hyzon highlighted a wide-ranging set of customer engagements over the past 15 months, including with a good number of "household names", which have been followed by several well-documented pilots of its heavy-duty fuel cell electric vehicles (FCEVs). However,

---

[163] Daniel Ives & John Katsingris, "Hyzon Motors: More Accounting Issues Announced; Downgrading to NEUTRAL With $3 PT" WEDBUSH, (Aug. 5, 2022).

[164] *Id.* (emphasis added).

> *management has yet to prove its ability to produce vehicles at volume, blaming in detail since last year these delays on supply chain constraints, which may prove the crux of the company's fundamental challenge if Hyzon is to re-build trust with the investment community....*
>
> We think it is important to also keep in mind that Hyzon's heavy-duty FCEVs are also based on its own proprietary fuel cell stack, which we have assumed for some time would be at the heart of any intrinsic value assigned to the company.... *Hyzon now must likely also re-prove all technical capabilities to investors, probably through another set of third-party validations, especially since so many other legacy and emerging vehicle OEMs have struggled to come close to Hyzon's advertised fuel cell roadmap, developed over the past 19 years, mainly as part of Horizon Fuel Cell.*[165]

213.210.     Goldman Sachs also suspended its ratings given the Company's dual announcements that its financial guidance should no longer be relied upon and that it would not be able to timely file its 2Q22 quarterly report. Likewise, JP Morgan withdrew its price targets for the Company.

214.211.     On August 16, 2022, Hyzon filed a notification of late filing with the SEC, confirming for the SEC that the Company was (i) unable, without unreasonable effort or expense, to file its Quarterly Report on Form 10-Q for the quarter ended June 30, 2022 within the prescribed time period, and (ii) would not be able to file by the extended filing date pursuant to Rule 12b-25 (allotting five additional calendar days to file a late 10-Q).[166] Therein, the Company repeated that its Board had "appointed a committee of independent

---

[165] Steven Fox & Aneesha Patel, "Hyzon Motors: 8-K Thoughts" FOX ADVISORS, (Aug. 8, 2022) (emphasis added) (formatting altered to enhance readability).

[166] Form 12b-25 (Notification of Late Filing) (Aug. 16, 2022) https://www.sec.gov/Archives/edgar/data/1716583/000171658322000071/q22022nt10-q.htm.

board members to investigate, with the assistance of independent outside counsel and other advisors, certain issues that were ***brought to the attention of the Board by Company management***."[167] Additionally, the Company elaborated that:

- "These issues include ***revenue recognition timing, presentation, internal controls and procedures, primarily pertaining to its China operations***."

- "The Company anticipates ***significant changes*** to the results of operations for the three and six months ended June 30, 2022, as compared to the corresponding periods ended June 30, 2021. The final dollar impact to the results of operations are not yet determinable, due to the Company's ongoing investigation. The Company intends to work diligently upon the conclusion of the investigation to correct current and previously reported financial results, as necessary."

- "The Company anticipates a ***substantially greater operating loss*** for the three and six months ended June 30, 2022, as compared to the three and six months ended June 30, 2021, which is primarily due to the increase in research and development, and selling, general, and administrative expenses."

- "The Company anticipates net income for the three and six months ended June 30, 2022, as compared to a net loss for the three and six months ended June 30 2021, which is primarily due to the non-cash gains from the changes in fair value of private placement warrant liability, earnout liability, and equity securities." ***(Put differently, the Company did not anticipate income from vehicle sales.)***

215.212.    Following this announcement, Hyzon's Board, as assisted by outside counsel and consultants, took action against Founder Defendants Craig Knight and George Gu.[168] On August 17, 2022, after markets closed, the Company announced that the Board "had appointed Parker Meeks, most recently Hyzon's Chief Strategy Officer, as President

---

[167] *Id.* (emphasis added).

[168] Press Release, Hyzon, "Hyzon Motors Announces Leadership Transition" (Aug. 17, 2022), https://www.hyzonmotors.com/in-the-news/hyzon-motors-announces-leadership-transition. https://investors.hyzonfuelcell.com/news/news-details/2022/HYZON-MOTORS-ANNOUNCES-LEADERSHIP-TRANSITION/default.aspx.

and Interim Chief Executive Officer, effective immediately," to replace Craig Knight and "assume full responsibility for day-to-day management of all business lines and functions reporting to the Company's Board." The release included no quote from the removed founder/CEO or information about his future with the company. Within 24 hours of the statement, Defendant Knight deleted his Twitter and LinkedIn profile.

216.213.    In that same announcement, the Board also announced it was prematurely terminating Defendant Gu's three-year term as Executive Chairman and was transitioning Gu—Hyzon's second largest shareholder and the Chairman of Horizon—to a non-executive Board position.[169]

---

[169] *See also* Gu Employment Agreement (July 9, 2021), *available at* https://www.sec.gov/Archives/edgar/data/1716583/000119312521221839/d203747dex108.htm.

**F.31 – Hyzon Motors August 17, 2022 Statement**

# HYZON MOTORS ANNOUNCES LEADERSHIP TRANSITION

*Parker Meeks Appointed President and Interim Chief Executive Officer; Replacing Craig Knight*

*George Gu Transitions to Non-Executive Chairman*

**ROCHESTER, N.Y.**, August 17, 2022 - Hyzon Motors Inc. (NASDAQ: HYZN) ("Hyzon" or "the Company"), a leading global supplier of zero-emission fuel cell electric heavy-duty vehicles, today announced the Company's Board of Directors has appointed Parker Meeks, most recently Hyzon's Chief Strategy Officer, as President and Interim Chief Executive Officer, effective immediately, replacing Craig Knight who is also departing from his role as a director of the Company. Mr. Meeks will assume full responsibility for day-to-day management of all business lines and functions reporting to the Company's Board of Directors (the "Board"). The Board plans to initiate a search to identify potential external and internal candidates to serve as the Company's next CEO.

"Parker Meeks has the depth and breadth of experience in the energy, infrastructure, and transportation sectors to provide the leadership and operational expertise Hyzon needs at this critical juncture in the global energy transition. The Board is confident Mr. Meeks brings the right skillset that we need at this time," commented Elaine Wong, Hyzon's Lead Independent Director.

"I am honored that the Board has entrusted me to lead Hyzon," said Parker Meeks. "My priority is to ensure the Company's manufacturing capacity is in place with the ability to scale production efficiently. I believe our core fuel cell technology is a distinct competitive advantage, that will allow us to innovate and introduce high-performance vehicles that support the transition to clean energy."

Additionally, George Gu has transitioned from his executive role with the Company to the non-executive Chairman of the Board. In his role as non-executive Chairman, Mr. Gu will remain available to provide strategic counsel to Mr. Meeks specifically related to R&D initiatives.

217.214.    In the wake of these releases, several media outlets reported that Knight's ouster and Gu's demotion were directly tied to the irregularities described above with Hyzon's China operations. For example, on August 18, 2022, supply-chain, logistics, and trucking news outlet FreightWaves reported that "Hyzon Motors ha[d] ousted CEO Craig Knight because of a financial quagmire over how the trucking fuel cell maker reported revenue in China and managed internal financial controls."[170] Electric mobility

---

[170] Alan Adler, "Hyzon Motors ousts CEO Craig Knight as financial probe continues," FREIGHTWAVES, (Aug. 18, 2022) https://www.freightwaves.com/news/hyzon-motors-ousts-ceo-craig-knight-as-financial-probe-continues.

news outlet Electrive.com similarly wrote that "it appears that the SEC investigation unearthed some ill-reported financial problems. The former CEO Craig Knight now appears to be in hot water about how the trucking fuel cell maker reported revenue in China and how internal financial controls were managed."[171]

218.215.    On this news, Hyzon's stock dropped $0.30 (13%) over the course of two trading days, dropping from $2.29 per share at the close of trading on August 17, 2022 (before Hyzon issued its statement) to $1.99 per share at the close of trading on August 19, 2022.

---

[171] Carrie Hampel, "Hyzon Motors changes CEO," ELECTRIVE.COM, (Aug. 23, 2022), https://www.electrive.com/2022/08/23/hyzon-motors-changes-ceo/.

**F.32 – HYZN Stock Price After August 17, 2022 Statement[172]**



**VI.VII.    HYZON'SHYZON AND THE SEC 'S POST-CLASS PERIOD DISCLOSURES REVEAL THE EXTENT OF DEFENDANTS' DECEPTION**

219.216.    Following these shocking August 2022 revelations, Hyzon went radio silent  on all aspects of its operations. Despite announcing a Special Board Investigation into revenue recognition issues, the Company released zero findings to the public in 2022. Likewise, the Company made no new financial reports to the SEC. Excluding employment announcements, Hyzon also issued only three press releases about its business—all of which were issued in the last forty days of 2022.

---

[172] Note: stock chart reflects daily closing prices; total loss calculated by multiplying difference in closing prices with total number of outstanding HYZN shares.

## A.     Hyzon Retroactively Determines Knight Was Terminated for Cause

220.217.     It was not until February 1, 2023, that investors received the first news about Hyzon's Special Investigation into the misconduct alleged herein. That day, Hyzon filed with the SEC an amended current report on Form 8-K/A amending its prior statements regarding the termination of Defendant Knight. The filing simply stated:

> As previously disclosed on August 18, 2022, the Company announced that Craig Knight had departed from his role as Chief Executive Officer and as director of the Company, effective immediately. On January 17, 2023, after a review of additional information, the Board of Directors of the Company determined that Mr. ***Knight's departure should constitute a termination for cause*** under Mr. Knight's employment agreement. That determination was communicated to Mr. Knight on January 30, 2023.[173]

Hyzon did not disclose that, in the days prior to January 17, 2023, the Special Committee had sent the preliminary findings from its investigation to Hyzon's Board. Nor did Hyzon provide updates on when it would be providing updates for its finances for any quarter following the July 16, 2021 SPAC Merger.

## B.     Hyzon Discloses Special Investigation's Summary Findings: False Sales, Inoperable Vehicles, and Improperly Reported Revenue

221.218.     Approximately one month later, on March 13, 2023, Hyzon disclosed it had received a Statement from the Special Committee summarizing the results of its investigation. The announcement then released that Statement to the public.

222.219.     Per the released Statement, the Special Committee found that in 2021, Hyzon purported to have delivered 87 HFCEV to customers in Asia and Europe. 82 of

---

[173] Hyzon Form 8-K/A (Feb. 1, 2023), https://www.sec.gov/Archives/edgar/data/1716583/000171658323000013/hyzn-20220818.htm (emphasis added).

these 87 deliveries were purportedly delivered to China, and the remaining 5 HFCEVs were purportedly delivered to Europe.[174]

223.220.    For "trucks delivered to China," the Special Committee found that the "20 Jiushuang vehicles and approximately 30 of the HongYun vehicles were not operable on hydrogen (*i.e.*, not commissioned) at the time of delivery and as of December 31, 2021." The Special Committee noted Hyzon should have confirmed these vehicles "were operable on hydrogen at the time of delivery," and "should have had a more formal set of processes and controls to ensure commission was completed prior to delivery."[175] As such, 50 of the 82 HFCEVs for China were sham deliveries. The Special Committee further admitted: "considering Hyzon's reliance on third parties for many aspects of the sales, commissioning, and delivery process [*i.e.*, HongYun]—Hyzon should have had a more formal set of processes and controls to ensure commissioning was completed prior to delivery."

224.221.    For "trucks delivered to Europe," the Special Committee found that all five vehicles needed to undergo repairs post-delivery. "Based on information provided … by the Special Committee, the Company re-evaluated the treatment of revenue recorded for those five vehicles."[176] Additionally, the Special Committee found that Hyzon's first announced delivery—*i.e.*, the HFCEV provided for Royal FrieslandCampina N.V., in July 2021—was not "operable on hydrogen when Hyzon issued a press release regarding this

---

[174] Special Committee Disclosure (Mar. 13, 2023), https://www.sec.gov/Archives/edgar/data/1716583/000171658323000040/hyzn-20230313.htm. To date, Hyzon has not disclosed the full findings of the Special Committee's investigation.

[175] *Id.*

[176] *Id.*

vehicle in July 2021."[177] As such, "Hyzon did not recognize any revenue in connection with the provision of this vehicle."[178]

225.222.    On the topic of Hyzon's communications regarding sales and deliveries, "the Special Committee noted that the tenor of *certain communications* b*y certain Hyzon executives was overly concentrated on meeting the Company's 2021 deliveries forecast and recognizing revenue on those deliveries*."[179] This was despite other communications by the Company—including its SEC filings—which "reflected the importance of complying with the relevant accounting standards."[180]

226.223.    To ensure this wrongful conduct would not occur again, the Special Committee recommended, among other things, that "the Company implement a written disclosure policy regarding the preparation, approval, and release of disclosures regarding financial information and delivery of vehicles and consider establishing a disclosure committee."[181] To date, the Special Committee's full findings have not been released.

## C.    Hyzon Releases Restated Financials for 3Q21

227.224.    The next day, March 14, 2023, Hyzon supplemented the Special Committee's Statement with the release of its restated financials for the third quarter of 2021, the full fiscal year of 2021, and the first quarter of 2022 with the SEC.

---

[177] *Id.*

[178] *Id.*

[179] *Id.* (emphasis added).

[180] *Id.*

[181] *Id.*

228.225.    In its restated quarterly report for the third quarter of 2021 ("Restated 3Q21"), Hyzon disclosed several new facts about its European operations which confirm Lead Plaintiff's allegations of misconduct. Among other things, Hyzon disclosed the Company had not manufactured any HFCEVs for sale to customers, and instead provided retrofitting services to convert customers' already used combustion vehicles to HFCEVs. The Restated 3Q21 further divulged that Hyzon had to perform significant post-delivery repairs on these HFCEVs after revenue had been recognized. As stated in the report:

> The Investigation revealed that certain former members of Hyzon Europe's senior management team created a workplace culture where employees did not feel comfortable raising concerns. ***Additionally, the Investigation revealed that for five vehicles for which Hyzon Europe recognized revenue in 2021, Hyzon Europe subsequently performed various levels of work and repair efforts on such vehicles after revenue had been recognized.***
>
> Consequently, the Company conducted an internal accounting review for its European customer arrangements. This internal accounting review concluded that for the Hyzon Europe customer contracts ... the Company did not appropriately analyze and record revenue and related balances associated with these arrangements. ***More specifically, the Company determined that instead of manufacturing or assembling FCEVs that it owned for sale to customers, Hyzon Europe was providing these customers with vehicle retrofit services to convert the customers' internal combustion engine ("ICE") powered vehicles to hydrogen FCEVs***.
>
> …
>
> Therefore, the Company revised its revenue recognition analysis and concluded that Hyzon Europe should not have recorded the assumption of these contracts as inventory and associated contract liabilities, and also should have recognized revenue related to these service contract arrangements on an

- 146 -

> over-time basis utilizing an input method rather than recording revenue at a point in time.[182]

As a result, Hyzon did not earn $1 million in revenue, as previously reported. Instead, Hyzon could recognize only a mere fraction—$89 thousand dollars (9%). Or, as put by Hyzon: "Correction of the error decreased Revenue by $0.9 million ...."

## D.    Hyzon Releases Restated Financials for FY2021

229.226.    Hyzon also released on March 14, 2023, a restated annual report for the fiscal year 2021 on Form 10-K/A ("Restated 2021 10K"), which covered, among other things, the late-announced sales and deliveries to Hyzon's mysterious purchasers based in China.[183] Therein, Hyzon reiterated its August 2022 announcements that its Board of Directors had determined that the Company's previously issued financial statements, including its originally filed Annual Report, "should no longer be relied upon and require restatement because of issues regarding revenue recognition and internal controls and procedures, primarily pertaining to our China operations." Further, Hyzon disclosed additional information from the Board's Special Investigation which was not included in the March 13, 2023 Statement.

230.227.    In the Form 10-K/A's introductory pages, the Company reported that, "based on the Investigation's findings, ... [its] contractual performance obligation to deliver functioning fuel cell electric vehicles ("FCEVs")" to purported customers in China "was

---

[182] Hyzon Amended 3Q21 Quarterly Report (Form 10-Q/A) (Mar. 14, 2021), https://www.sec.gov/Archives/edgar/data/1716583/000171658323000059/hyzn-20210930.htm (emphasis added).

[183] Hyzon Amended 2021 Annual Report (Form 10-K/A) (Mar. 14, 2023), https://www.sec.gov/Archives/edgar/data/1716583/000171658323000060/hyzn-20211231.htm.

not fully satisfied for revenue recognition purposes under Accounting Standards Codification ("ASC") Topic 606, Revenue from Contracts with Customers ("ASC 606").[184] Additionally, the Company conceded it "did not appropriately analyze and record revenue and related balances associated with [its European customer] arrangements."[185] "[I]nstead of manufacturing or assembling FCEVs that it owned for sale to customers, Hyzon ... provid[ed] these customers with vehicle retrofit services to convert the customers' internal combustion engine ("ICE") powered vehicles to hydrogen FCEVs."[186]

231.228.    The Company's updated risk disclosures further affirmed that these previously announced sales were technology validation or evaluation models only, not freestanding sales. Specifically, Hyzon disclosed that "[t]o date, [it] produced only technology validation or evaluation FCEVs and there is no assurance that we will be able to establish and operate facilities capable of producing our FCEVs in appropriate volumes and at competitive costs or at all."[187]

232.229.    Additionally, the Company restated its consolidated financial statements "to correct misstatements."[188] *For 2021, Hyzon reported earning negative revenue of $80 thousand for the entire fiscal year*—a stark drop from Hyzon's previous claim (before restatement) of earning $6.0 million in sales ($2.2 million from Europe, and $3.8 million from China) for the delivery of 87 HFCEVs that year. Per Hyzon: "Revenue

---

[184] *Id.* at iii.

[185] *Id.*

[186] *Id.*

[187] *Id.* at 5.

[188] *Id.* at 55.

in 2021 represents $0.1 million of revenue from retrofit services performed by Hyzon Europe, offset by the recognition of $(0.2) million of contra revenue associated with the issuance of warrants to a customer for FCEV deliveries in China."[189] In other words, *Hyzon admitted it earned zero revenue* from product sales in 2021. And because of the Company's decision to grant incentive warrants to HongYun, *see* ¶¶ 182-183, the Company had to offset any revenues reportable from its retrofitting activities—a business activity not disclosed in Hyzon's investor materials or SEC filings until 2023.

233.230.    The restated financials further explained why Hyzon's purported HFCEV deliveries failed to generate revenue. For Hyzon's revenue transactions in China specifically, the Company reported:

> The Company determined that it incorrectly recorded revenue and cost of revenue related to certain FCEVs delivered to customers in China in the fourth quarter of 2021, as the Company did not meet all relevant revenue recognition requirements under U.S. GAAP related to these vehicles. ....
>
> *For 62 FCEVs [i.e. HongYun]*, while control of such FCEVs was transferred to the customer prior to December 31, 2021, the Company's obligation to deliver functioning FCEVs was not fully satisfied for revenue recognition purposes as of December 31, 2021, as *certain of the FCEVs were not commissioned prior to December 31, 2021*.
>
> *For the other 20 FCEVs [i.e., Jiushuang], the Company* concluded it incorrectly recorded revenue in the fourth quarter of 2021, as it had not yet transferred control of the FCEVs to the customer, *nor fully satisfied the obligation to deliver fully functioning FCEVs until the third quarter of 2022*.
>
> Additionally, for both of the Hyzon China revenue transactions, the Company incorrectly recorded VAT [value

---

[189] *Id.* at 77.

added tax] receivable from customers totaling $1.8 million as of December 31, 2021. The Company determined that consideration received from those customers should have first been applied against any VAT receivables and then recorded within contract liabilities until the revenue recognition criteria under the Alternative Method of Revenue Recognition are met.[190]

234.231.     The Restated Annual Report also elaborated on the remediation plans first alluded to in the Special Committee's Statement and recommendations. According to the Company:

> With oversight from the Audit Committee and input from the Board of Directors, management has begun designing and implementing changes in processes and controls to remediate the material weaknesses described above. Management and the Board of Directors, including the Audit Committee, are working to remediate the material weaknesses identified herein. While the Company expects to take other remedial actions, actions taken to date include:
>
> - *appointed new Chief Executive Officer* and created a new role of President of International Operations;
>
>   …
>
> - enhanced existing Disclosure Committee responsibilities through a formal review and sign off process; and
>
> - implemented a formal regional general manager financial statement review and certification process for each SEC filing.[191]

Beyond these remedial actions taken to date, the Company also announced it was taking, or planned to take, the following actions to remediate the material weaknesses:

---

[190] *Id.* at 62 (emphasis added).

[191] *Id.* at 96 (emphasis added).

- designing and implementing a comprehensive and continuous risk assessment process to identify and assess risks of material misstatements and to ensure that the impacted financial reporting processes and related internal controls are properly designed, maintained, and documented to respond to those risks in our financial reporting;

- further developing and implementing formal policies, processes and documentation procedures relating to financial reporting, including revenue recognition and other complex accounting matters, and consulting with independent accounting experts and advisors;

- formalizing the design of the processes and controls related to sales of our products and services, as well as vendor contracting, fuel cell acceptance, transfer of control of our products to customers, tracking our vehicles' post-sale performance, and archiving documentation in a central system; and

- ***completing ethics training globally and in addition, providing general public company periodic training for Company personnel, including on potential topics such as the responsibilities of a public company, the core values of the Company's accounting and finance function, and best practices to implement those values***.[192]

The Company repeated that it was engaged in the above-described remedial efforts in subsequent quarterly and annual reports.

The following table of Hyzon's publicly reported 2021 deliveries depicts just how much Hyzon depended on its sham transactions to fill its 2021 delivery gap.

---

[192] *Id.* at 96-97 (emphasis added).

**T.4 – Hyzon Reported 2021 HFCEV Deliveries (excluding trial leases)**

| End-User | Reported Deliveries (#) | Proper Deliveries (#) | Actual Revenue in 2021 | Notes |
|---|---|---|---|---|
| ***Europe*** | | | | |
| Royal Friesland | 1 | 0 | 0 | Sole vehicle not operable on hydrogen at time delivery announced by Hyzon. No recognizable revenue. |
| Other Entities<br>• Municipality of Groningen<br>• Municipality of Rotterdam<br>• Jan Bakker and/or JuVe (MPREIS) | 4 | 0 | $0.08M | Vehicles already owned by end-users. Vehicles upgraded through undisclosed retrofitting services. Vehicles required post-delivery repairs.<br><br>(Restated financials now include revenue definition for retrofitting services.) |
| ***China*** | | | | |
| HongYun | 62 | 0-32 | ($0.15M) | Nearly half of vehicles not operable on hydrogen at time of delivery, nor at the end of the year. Collection and revenue recognition issues. Incentive warrants. |
| Jiushuang | 20 | 0 | 0 | Same. Additionally, vehicles not completed and transferred until 3Q22. |
| **Total** | **87** | **0-32** | **($0.08M)** | Negative revenue. |

## E.       Hyzon Releases Restated Financials for 1Q22

~~235.~~232.        Finally, on March 14, 2023, Hyzon released its restated financial report for the first quarter of 2022 on Form 10-Q/A ("Restated 1Q22").[193] Like Hyzon's other amended reports, the Restated 1Q22 acknowledged the Special Committee's findings regarding the Company's false and misleading revenue recognition and Hyzon's failure to deliver HFCEVs as promised. Though Hyzon reported $2.9 million in revenues for the quarter, the Restated 1Q22 made clear that none of this revenue was for 2022 deliveries of HFCEVs. Rather, $2.5 million of that sum consisted of payments from HongYun for previously delivered, but not commissioned HFCEVs—thereby generating Hyzon nearly $40 thousand per vehicle (far short of Hyzon's originally claimed ~$475 thousand stick price. The remaining $400k derived from sales of fuel cell systems, not vehicles, in the United States.[194]

## F.       Hyzon Late-Files Remaining Outstanding Financials for the Rest of 2022

~~236.~~233.        In May 2023, Hyzon released late-filed financial reports for the second and third quarters of 2022 and the full fiscal year 2022 ("2Q22 10Q," "3Q22 10Q," and "2022 10K," respectively). These filings disclosed, among other things, that:

- Hyzon earned no revenue for its sale of 62 HFCEVs to HongYun beyond the $2.5 million recognized in 1Q22.

- Hyzon earned no revenue whatsoever for the 20 HFCEVs Hyzon delivered to related entity Jiushuang in 3Q22 (originally claimed delivered in 4Q21), as any

---

[193] *Available at* https://www.sec.gov/Archives/edgar/data/1716583/000171658323000061/hyzn-20220331.htm#i4648f63c224042b98104296c28ff3f1b_16. *Available at* https://www.sec.gov/ix?doc=/Archives/edgar/data/0001716583/000171658323000061/hyzn-20220331.htm .

[194] *See supra* n.158.

consideration received "was less than the amounts paid to satisfy local government VAT obligations."

- ***Hyzon recognized no revenues in 2022 for any sales of HFCEVs*** made that year (*i.e.*, excluding the late-recognized HongYun payments for 2021 announced deliveries).

- By the end of 2022, Hyzon still had no revenue generating sales of HFCEV goods to any customer identified in its public statements, investor presentations, and SEC-filed Soliciting Materials.

- ***At the end of 2022, Hyzon decided to exit the China truck market*** and transferred ownership of its Chinese subsidiary to its corporate parent.[195]

~~237.~~234.	Hyzon's May 2023 reports further revealed that the Company had received two additional subpoenas in connection with the SEC's investigation on August 5, 2022 and August 10, 2022. *See also* Part V.L, *supra* (discussing how on January 12, 2022, the Company received an SEC subpoena related to the allegations made by Blue Orca). Additionally, they disclosed that, on October 31, 2022, the U.S. Attorney's Office for the Southern District of New York ("SDNY") notified the Company that it was also investigating these matters.

~~238.~~235.	These disclosures further corroborate the concerns about HongYun's "ability and intent to pay substantially all of the consideration to which the Company

---

[195] *See* Hyzon Annual Report for FY 2022 ("2022 10K"), https://www.sec.gov/Archives/edgar/data/1716583/000171658323000145/hyzn-20221231.htm; *see also* Hyzon Quarterly Report for Quarterly Period Ended June 30, 2022 ("2Q22 10Q"), https://www.sec.gov/Archives/edgar/data/1716583/000171658323000105/hyzn-20220630.htm; Hyzon Quarterly Report for Quarterly Period Ended Sept. 30, 2022 ("3Q22 10Q"), https://www.sec.gov/Archives/edgar/data/1716583/00017165832300 0105/hyzn-20220630.htm,

[would be] entitled" in arms-length negotiations with established, deep-pocketed purchaser.[196]

239.236.    Additionally, these disclosures bolster investors' concerns about Hyzon's fantastic orders, customers, and revenue claims. In truth, Hyzon never had the 100% certain and 70+% high probability pipeline of committed, deep-pocketed customers Defendants paraded to the market. Instead, the Company was simply an attempt to revive Horizon's failed, China-based, hydrogen-fuel business in North America, European, and Oceanic markets. It took the Board of Directors catching wind of misconduct, launching a Special Investigation, and ousting the Founder Defendants to uncover the full  truth of Hyzon's sham shift from previously advertised top customers to revenue-depriving Chinese purchasers. And as a consequence, Hyzon's new management, free from the Founder Defendants' influence, as jettisoned the China truck market entirely.

**G.    The SEC Files a Complaint and Consent Judgment Against Hyzon**

237.    In September 2023, while briefing on motions to dismiss the Third Amended Complaint were underway, the SEC initiated Article III proceedings against Hyzon, Knight, and others for some of the same conduct at issue in this action. The SEC claimed, among other things, that Hyzon (i) made false and misleading statements to investors about its customer and supplier relationships (ii) overstated the number of FCEVs it had completed, delivered, and sold, and (iii) engaged in fraudulent schemes, acts, practices, or courses of business, in violation of Sections 10(b) and 14(a) of the Exchange Act. Therein, the SEC revealed then-new information alleged in this pleading, including that:

---

[196] *See* 2021 Annual Report, *supra* n.146, at 100 (flagging HongYun's collectability risk).

- From January through July 2021, in advance of two key capital-raising events, Hyzon exaggerated the status of its business dealings with its potential customers and suppliers, including well-known companies like Heineken, Air Products, Ikea, and Coca-Cola, to create the false appearance that significant sales transactions were imminent. Although Hyzon had solicited transactions with these companies, none had indicated they would purchase FCEVs from Hyzon. In February 2021, when certain customers demanded the removal of their names and logos from the investor presentation, Hyzon replaced the names and logos with generic descriptions of each company. But Hyzon kept the names, logos, and/or the generic descriptions of these companies on its investor presentations well after they had told Hyzon that they would not be purchasing vehicles. Additionally, these presentations falsely stated "key relationships have already been formed" with two suppliers when "Hyzon and these purported suppliers had not even reached the point of negotiating any supply relationship." See SEC Compl. ¶¶ 18-27.

- On July 13, 2021, shortly before the capital-raising events, Hyzon falsely claimed that it had delivered its first FCEV—a milk truck to be used by a European dairy company – and posted a misleading video to social media that gave the false impression that it ran on hydrogen when, in fact, it did not. *See id.* ¶¶ 28-29.

- Though in documents filed with the SEC from November 2021 through March 2022, Hyzon stated that its Chinese subsidiaries had sold and delivered 82 FCEVs in 2021, in reality, Hyzon had not completed them prior to shipment. Instead, a Hyzon China employee arranged to deliver FCEVs shortly before the end of 2021 so that Hyzon could meet its public guidance, with the agreed-to understanding that the customer would return the vehicles after year-end so Hyzon could complete the work needed to let the vehicle run on hydrogen power. *See id.* ¶¶ 45-46.

- Hyzon Europe's managing director falsified, or caused to be falsified, Hyzon's books, records, and accounts concerning the five purported FCEV sales made by Hyzon Europe in 2021. *See id.* ¶ 64.

- Knight had improperly pledged 226,415 shares of Hyzon stock to secure a loan from his friend's company so that he could purchase more Hyzon shares and inflate Hyzon's stock price. *See id.* ¶¶ 65-68.

VII.VIII.    **LEAD PLAINTIFF'S INDEPENDENT INVESTIGATION CONFIRMING FACTS CONSISTENT WITH BLUE ORCA AND ICEBERG'S FINDINGS**

240.238.    Prior to filing the first consolidated class action complaint, Lead Plaintiff commenced its own independent investigation in early 2022 into Hyzon's deceptive scheme, as partially revealed in the Blue Orca and Iceberg Research Reports and later disclosed through Hyzon's subsequent public statements and SEC filings. The following section solely pertains to Lead Plaintiff's independent investigation into HongYun from that period. Lead Plaintiff maintains that Hyzon's subsequent disclosures and reports, particularly those arising from the aftermath of the Special Committee's Investigation, corroborate the following investigatory findings and conclusions regarding HongYun.

241.239.    As noted in the Blue Orca and Iceberg Research Reports: Hyzon's largest customer to date, HongYun, is a sham Chinese counterparty formed just three days before Hyzon announced that the HongYun MoU, with no paid in capital, no official phone number, no email, no WeChat, and no website. Further, HongYun's two individual shareholders lack the experience and resources to make such a purchasing commitment. As discussed herein, Lead Plaintiff's independent investigation and analysis corroborates Blue Orca and Iceberg's findings and conclusions pertaining to HongYun's origins and purchasing/logistics abilities.

A.    **Retained Investigation Firm, Its Experience Investigating Chinese Companies, and Its Extensive Investigation of HongYun**

242.240.    To aid in his investigation, Lead Plaintiff engaged an investigative and consultancy firm based in China ("Investigation Firm"), owned and operated by

Investigator C-1, to review the Blue Orca and Iceberg Research Reports and thereafter conduct an independent assessment of data gathered from various government and other reputable sources.

243.241.    As background, Investigator C-1 is a permanent resident of China, who has resided in the country for over twenty years. Throughout their time in China, they have built relationships with many people in the government, as well as in the private and public sectors. As such, they have access to several types of resources. Additionally, they have been appointed as an expert, advisor, and/or honorary director to several local and regional trade organizations and civil society groups and alliances in China. In their investigative research role, Investigator C-1 utilized their firm's resources, and, on occasion, resources provided by third parties previously vetted by the Investigation Firm to ensure professionality and to avoid potential conflicts of interest, political or otherwise.

244.242.    Among other things, Investigator C-1 and their Investigation Firm researched: (1) the official business information for HongYun filed with local and national governmental entities; (2) the amount of HongYun's capital, both registered and paid-in; (3) the extent of HongYun's day-to-day operations; (4) the sources of HongYun's capital, *i.e.*, its two individual shareholders; (5) HongYun's corporate family; (6) the number of employees HongYun maintains; (7) the experience of HongYun's shareholders/executive team; and (8) HongYun's ability to engage in the types of business it purports to perform, as announced by Hyzon.

245.243.    To do so, Investigator C-1 collected data and documents from various corporate data service providers and government websites, including "TianYanCha," a premier source for governments, consulting agencies, legal service providers, and media

outlets seeking to perform comprehensive business background checks.[197] All data was then counterchecked among various sources to ensure accuracy and quality. Investigator C-1 and their team also conducted physical site checks to assess physical conditions and conduct in-person interviews.

246.244.    Based on the analysis of this data, Investigator C-1 observed significant abnormalities supporting Blue Orca and Iceberg Research's conclusions, including irregularities suggesting that HongYun is a sham counterparty, that HongYun has not purchased HFCEVs from Hyzon for itself or purported end users in the amounts or at the prices that Hyzon claimed, and that HongYun lacks a requisite level of institutional competence, business contacts, and financial resources to be able to negotiate or obtain sales agreements concerning the purchase or delivery of HFCEVs in the quantities reported by Hyzon.

**B.     HongYun Was in Fact Incorporated 3 Days Before Deal Announcement**

247.245.    In announcing a deal the magnitude of HongYun's, one would reasonably think the entity has an established track record for purchasing and deploying vehicles. The Investigation Firm confirmed that is not the case with HongYun.

248.246.    As part of their research, Investigator C-1 collected HongYun's official business registration information and related information on file with Chinese authorities. Investigator C-1 confirmed that, as reported in China's National Enterprise

---

[197] *See* "Data Search Platform TianYanCha Knows Chinese Businesses," SYNCED REVIEW (June 28, 2018), https://medium.com/syncedreview/data-search-platform-tianyancha-knows-chinese-businesses-3a0a5e725c70 .

Credit Information Publicity System[198] and elsewhere, HongYun (official name: 上海氢力鸿运汽车有限公司):

- was incorporated on September 6, 2021 in Shanghai;

- lists its majority shareholder, Kou Jian, as its legal representative;

- has a registered capital of RMB 30 million;

- has a registered address of Room 237, 4th Floor, No. 8, Lane 3156, Hongyin Road, Lingang New Area, China (Shanghai) Pilot Free Trade Zone; and

- has a registered scope of business that includes vehicle leasing, logistics and auto parts sales.

This basic registration information is also publicly accessible on HongYun's NECIPS profile (screenshot and translation provided below).

---

[198] The National Enterprise Credit Information Publicity System ("NECIPS") is a national database for all legal entities registered in China. The database includes profiles of legal entities, which include key information such as shareholders, directors, legal representatives, general managers, and supervisors, as well as identifying information like addresses, email addresses, and phone numbers. It can be accessed at http://sh.gsxt.gov.cn/index.html.

## F.33 – HongYun's NECIPS Profile[199]



Translation:

**I Face-to-face information**

**Unified Social Credit Code:** 91310000MA7AH8B707

**Type:** Limited liability company

**Registered capital:** 30 million RMB

**Business term from:** 09/06/21

**Registration authority:** Free Trade Pilot Zone Lingang New Area Market Supervision Administration

**Registration status:** in existence (in business, open, on the register)

**Residence:** Room 237, 4/F, No. 8, Lane 3156, Hongyin Road, Lingang New Area, China (Shanghai) Pilot

**Company Name:** Shanghai Hydrogen Power Hongyun Automobile Co.

**Legal Representative:** Jian Kou

**Date of Establishment:** 09/06/21

**Business term until:** 09/05/41

**Approval date:** 12/03/21

**Note:** Lead Plaintiff has confirmed this information is up to date as of June 23, 2023.

249.247.    Investigator C-1 observed that HongYun registered using a virtual address that shared the same location as a community cultural center cinema. They also

---

[199] *Available at* http://sh.gsxt.gov.cn/index.html.

noted that because the company was newly incorporated, it had yet to file any financial statements or documents. Investigator C-1 was unable to locate any licenses or certifications for HongYun, such as licenses to offer leasing or other financing, or to move large commercial vehicles, which strongly suggests that HongYun is not legally permitted to engage in such activities.

### C.     Confirmed: HongYun Has No Paid-In Capital

250.248.     HongYun's purchase of 62 vehicles to date, if genuine, would generate at least $15 to 30 million USD in revenue for Hyzon; the MoU for 500 vehicles would similarly generate as much as $125 to 250 million USD.[200] For a commitment of that size, one would reasonably expect the counterparty to be a deep-pocketed, creditworthy entity. HongYun, however, is not. The following NECIPS screenshot obtained by Investigator C-1 reveals the extent of HongYun's two investor's capital commitments to the Company.

**F.34 – NECIPS: HongYun Shareholder Capital Commitments**



251.249.     As discussed above, Investigator C-1 found that, as of February 2022, HongYun had registered RMB 30 million (approximately $5 million USD) in capital. In Chinese business, registered capital is the amount of capital *committed* by shareholders and typically approximates the amount of money that is *expected to be injected* into the

---

[200] Based on Hyzon's own disclosure of truck prices in its July 19, 2021 Investor Presentation, *supra* n.84, at 23, and Hyzon's January 12, 2022 statements, *see supra* ¶ 102188, that average selling prices in Asia are approximately half of other regions.

company in the coming years. This is distinct from paid-in capital, which refers to the amount of capital that shareholders have ***actually contributed*** to a company's corporate bank account.

252.250.    Under the Company Law of China, [201] companies must use a subscription system for each shareholder's capital contribution. Under this system, shareholders may satisfy their capital commitments after the company's formation, sometimes even decades after incorporation, as long as the company's incorporating articles permit it. It is therefore possible for a shell company without any assets to claim RMB 30 million (approximately USD $5 million) in registered capital, but nothing in committed capital. Investigator C-1 explained that such financial statements should raise red flags for business relations, as having no paid-in capital indicates that a company may not be able to meet its financial obligations, pay for its order of products, or deliver on its supply contracts.

253.251.    Investigator C-I reported that, as of February 2022, there are no official records indicating that either of HongYun's shareholders have paid any part of their capital commitments to HongYun. They further reported that, according to HongYun's government filings, the shareholders have ***up until December 31, 2040 to pay up their respective capital commitments***. As such, HongYun currently lacks the financial ability to pay for ordered products or to deliver on any supply contracts, including its purchases from

---

[201] The Company Law of China was enacted on December 29, 1993 enacted "to standardize the organization and activities of companies, protect the lawful rights and interests of companies, shareholders and creditors, safeguard the social and economic order and promote the development of the socialist market economy." Company Law of the People's Republic of China, Art. 1. For an English translation of the law, *see* http://www.china.org.cn/english/government/207344.htm.

Hyzon, and is under no obligation to fund itself until 2040. Without paid-in capital or a sufficient financial history, HongYun similarly lacks access to the magnitude of financing required to execute its Hyzon MoU. Finally, given the background of HongYun's shareholders (discussed in greater detail below), it is unlikely that HongYun will have sufficient paid-in capital anytime soon.

**D.    Confirmed: HongYun Has No Real Operations**

254.252.    To verify HongYun's business operations, Investigator C-1 and their team conducted site visits in February 2022 at HongYun's registered office and (as discussed below) other locations associated with HongYun's founding and controlling shareholder, Kou Jian. Upon arrival, Investigator C-1 found that HongYun's entire building—which primarily houses a community center—has been closed for renovations since as early as August 10, 2021—well before the company was founded. Investigator C-1 documented these findings in the photographs on the following page.

255.253.    Investigator C-1 was also unable to locate any signs or logos indicating actual business operations by HongYun. Additionally, no vehicles that were readily attributable to HongYun were found at the office site.

**F.35 – Select Photos from Investigator Site Visit: February 23, 2022**



**Photo 1**: Entire building (under refurbishment)



**Photo 2**: Main entrance (no public access)



**Photo 3**: Notice on the refurbishment



**Photo 4:** Locked side entrance

256.254.	Investigator C-1 also attempted to call the office number for HongYun, which, Investigator C-1 reports, was publicly listed as shared by multiple companies, two of which were not legally related to HongYun or its shareholders. Investigator C-1 relayed that most of the time their calls went unanswered. Additionally, they stated that the only time their call was answered, a male person answered the phone, did not introduce the receiving company name, and instead asked questions of the investigator.

257.255.	Investigator C-1 observed that these activities were highly suspicious, as in Chinese business culture, a receptionist who answers phones is traditionally a woman and, regardless of gender, would customarily greet callers with the company name, rather than by asking questions about the identity of the caller. Investigator C-1 thus concluded that HongYun likely does not have a receptionist and, to the extent the Company existed, was likely operating as a group of micro-enterprises sharing common resources, including phone lines. Investigator C-1 was ultimately unable to connect with a person who represented HongYun or its sales team, further corroborating suspicions about HongYun's ability, or lack thereof, to independently find HFCEV purchases or to negotiate such deals.

E.	**HongYun Has No Corporate Owners, Only Individual Owners with Shallow Pockets and Business Experience**

258.256.	Investigator C-1 confirmed that HongYun has one primary shareholder, Kou Jian (寇健), who owns 51% of the company and serves as the Chief Executive Officer. They also reported that HongYun's minority shareholder, Xiong Yuexiang (who replaced Zhong Dequan on December 3, 2021, after the purported vehicle deliveries by Hyzon), owns 49% and purportedly serves as a supervisor.

259.257.    To verify Hyzon's claims about HongYun's core management team, Investigator C-1 researched, collected, and identified background information on Kou Jian and his business network. Investigator C-1 also visited Kou Jian's business addresses to verify the existence of actual business operations.

260.258.    According to Investigator C-1, as of February 2022, Kou Jian is a majority or minority shareholder in five companies, with the first company listed in the investigator-provided tables below, LanZhong, being Kou Jian's core business.

**T.4 – Simplified Table of Kou Jian Companies Identifying Core Businesses**

| Company | Year Incorp. | Registered Capital | Shareholding | Core Business |
|---|---|---|---|---|
| 上海兰众实业有限公司 (LanZhong) | 2015-01-20 | RMB 5.0m | 90% | Volvox Distributor |
| 上海誉景鸿程投资管理咨询有限公司 (YuJing) | 2011-08-03 | RMB 0.5m | 80% | Bookkeeping Services |
| 上海氢力鸿运汽车有限公司 (HongYun) | 2021-09-06 | RMB 30m | 51% | Vehicle Leasing |
| 上海木雅国际货物运输代理有限公司 (MuYa) | 2010-03-16 | RMB 5m | 20% | Freight Services |
| 上海昊樑家具有限公司 (HaoLiang) | 2018-10-17 | RMB 0.1m | 5% | Furniture and furnishing |

**T.5 – Detailed Table of Kou Jian's Corporate Investments (as of 3/17/22)**

三、寇健投资的企业信息

| Serial #<br>序号 | Business Name<br>企业名称 | Business Registration Number<br>工商注册号 | Business Type<br>企业类型 | Company Status<br>企业状态 | Registered Capital (RMB)<br>注册资本 (人民币) | Capital Commitment<br>认缴 出资 | Contribution Ratio<br>出资 比例 |
|---|---|---|---|---|---|---|---|
| 1 | 上海誉景鸿程投资管理咨询有限公司 Shanghai Yujing | 310107000629505 | 有限责任公司(自然人投资或控股) | 存续 (在营、开业、在册) | 50 万元 500k | 40.0 400k | 80% |
| 2 | 上海木雅国际货物运输代理有限公司 Shanghai Muya | 310107000584647 | 有限责任公司(自然人投资或控股) | 存续 (在营、开业、在册) | 500 万元 5 million | 100.0 1 million | 20% |
| 3 | 上海兰众实业有限公司 Shanghai Lanzhong | 310107000777149 | 有限责任公司(自然人投资或控股) | 存续 (在营、开业、在册) | 500 万元 5 million | 450.0 4.5 million | 90% |
| 4 | 上海昊樑家具有限公司 Shanghai Haoliang Furniture | 310107001051119 | 有限责任公司(自然人投资或控股) | 存续 (在营、开业、在册) | 10 万元 100k | 0.5 50k | 5% |
| 5 | 上海氢力鸿运汽车有限公司 Shanghai HongYun | | 有限责任公司(自然人投资或控股) | 存续 (在营、开业、在册) | 3000 万元 30 million | 1530.0 15.3 million | 51% |

- 167 -

Notably, the combined sum of registered capital for all of Kou Jian's enterprises to date, excluding HongYun, total a mere RMB 11.6 million. Kou Jian's commitments, in turn, total only RMB 5.9—less than 40% of his capital commitments to HongYun.

261.259.    Investigator C-1 also reported that Kou Jian serves as legal representative for four companies:

**T.6 – HongYun Controlling Shareholder Kou Jian's Other Companies (as of 3/17/22)**

| Company Name | Share % | Date Est.: | Registered Capital: | Business Type: |
|---|---|---|---|---|
| HongYun | 51 | 2021 | RMB 30mm | |
| Shenzhen Hydrogen HongYun Automobile Co. | n/a | 2021 | RMB 30mm | HongYun Subsidiary |
| Shanghai LanZhong Industrial Co. | 90% | 2015 | RMB 5mm | Paint Distributor |
| Shanghai Yujing Hongcheng Investment | 80% | 2011 | RMB 500k | Bookkeeping |

262.260.    With respect to Kou Jian's primary business, LanZhong, Investigator C-1 found that the company was incorporated in 2015 with a registered capital of RMB 5 million (paid in full) and primarily deals with chemicals, paints, and associated ingredients. In particular, LanZhong is the sole distributor of Ecotec Naturfarben GmbH's Volvox (a name brand paint) product in China. Investigator C-1 further found that, based on the company's latest social security record, it has only one salaried staff member, and Kou handles all sales activities. Additionally, they noted that the company shares a phone number with two other companies and has vacated both of its registered business addresses.

263.261.　　　Investigator C-1 found that Kou Jian's other businesses were similarly situated with respect to sharing a phone number, having only one to five salaried employees, and having no in-person operations. Investigator C-1's team documented each of their site visits with photographs of each purported office location, including the following reported location for three of Kou Jian's related companies.

**F.36 – Select Photos from Investigator Site Visits to Kou Jian companies**

*Registered address for Yujing, LanZhong, and HaoLiang*

 

**Before demolition (source Baidu map)**　　　　　**Current Demolished Site**

264.262.　　　Based on this business information and their experience as an investigator, Investigator C-1 concluded that Kou Jian and, by association HongYun, have no technology-based experience, especially in the area of hydrogen fuel cells or electric vehicles. Additionally, they found no evidence of how HongYun or its core team "had built a deep cooperation with several large logistics group in China," as represented by Hyzon.

**F.　　No Corporate Parents, One Suspicious Subsidiary**

265.263.　　　As discussed above, Investigator C-1 confirmed that HongYun is not owned, in whole or in part, by any corporate entity, despite Hyzon's claim that HongYun is a special purpose entity.

266.264.    Further, they identified that HongYun is the direct and sole owner of one subsidiary, Shenzhen Hydrogen HongYun Automobile Co. 深圳氢力鸿运汽车有限公司 ("HongYun SZX"). According to its corporate records, HongYun SZX was incorporated on October 28, 2021 in Shenzhen with a registered capital of RMB30 million. Investigator C-1 reports that, as of February 15, 2022, HongYun has not paid up its capital commitments. Moreover, HongYunSZX shares its registered address with another company. Investigator C-1 reports this is highly unusual and against Chinese business law.

### G.    No Website Plus No Employees Equals No Ability to Conduct Business

267.265.    In addition to researching government filings and performing site visits, Investigator C-1 searched for other indicia of business activity, including web presence and employee recruitment. In doing so, they confirmed the short seller reports that HongYun lacks any website or WeChat official account. Moreover, they found that the company had virtually no online presence other than a few third-party announcements made in September 2021—when Hyzon announced the Hyzon-HongYun memorandum of understanding—which cite JS Horizon, not HongYun, as the source of information.

268.266.    Investigator C-1 opined that it is very unusual for a Chinese business to have no website, WeChat official account, or any web presence—as these are the primary ways for Chinese and foreign businesses to communicate with customers in China. With respect to WeChat in particular, the app, owned by Chinese media company Tencent, is China's most popular social media app with currently more than 1.1 billion users. According to Forbes, "[it is estimated that WeChat is used by 90% of the Chinese population and is one of the primary ways for Chinese and foreign businesses to build a

customer base."[202] Investigator C-1 confirmed that having a WeChat account is crucial to reaching potential clients in China, and that its important is so great that it may be considered an essential part of setting up a company in China.

269.267.     These facts, when viewed in combination with Lead Plaintiff's independent investigation into HongYun's registered business phone number, suggest that, to the extent the company is real, there are no publicly feasible means for actual or potential customers of HFCEVs to learn about HongYun or to contact the company to submit an inquiry or order.

270.268.     Investigator C-1 also investigated whether, and to what extent, HongYun actually has a "core team" of managing or associate employees. To do so, they checked whether HongYun had registered any employees with the local Social Insurance and Housing Fund Bureaus, as required by Chinese law. Additionally, they examined whether HongYun had made legally required social security payments to the local government for its employees. Investigator C-1 also searched every major employee recruitment site operating in China to corroborate government records and to determine whether HongYun was at the time recruiting employees.

271.269.     As of February 2022, Investigator C-1 was unable to identify any employees registered as working for HongYun. Nor did records indicate that HongYun made social security payments for any employees as of February 2022. These results are corroborated by Investigator C-1's social media and recruiting research. Simply put,

---

[202] Saul Estrin, "WeChat and the World: How to Do Business in China and Beyond," FORBES.COM (Nov. 29, 2020), *available at* https://www.forbes.com/sites/londonschool ofeconomics/2020/11/29/wechat-and-the-world-how-to-do-business-in-china-and-beyond/?sh=5b498d0e4d8f.

Investigator C-1 found no online profile or recruiting efforts by HongYun. Nor were they able to identify any employees listed as working for HongYun on professional websites equivalent to LinkedIn in the United States.

272.270.    As part of their efforts, Investigator C-1 discovered that, though HongYun had no active employee recruitment efforts, Hyzon's subsidiary, Hyzon Automobile Technology (Shanghai) Co., Ltd., was actively recruiting for nearly 30 positions, including engineers, supervisors, and a director of vehicle operations.

**F.37 – Screenshot of Hyzon Shanghai Employment Listings on Liepin.com**



273.271.    Based on this information, Investigator C-1 concluded that (1) HongYun either has no real employees or is not withholding legally required social security payments for employees; (2) HongYun is unable to conduct day-to-day sales, marketing, or leasing business operations; and (3) it is possible that Hyzon Shanghai has played some part in HongYun's operations and obligations under its MoU with Hyzon.

## H.      No Hydrogen Experience or "Deep Connections" to Large Chinese Conglomerates

274.272.      Based on the corporate and shareholder information discussed above, as well as Investigator C-1's detailed investigation into each of Kou Jian's companies, including site visits, Investigator C-1 concluded that neither HongYun nor its shareholders/executives have any apparent independent business connections or relations to the China-based steel conglomerates Hyzon purports is the ultimate end-user of its vehicles.

275.273.      Investigator C-1 was also unable to identify any information in HongYun's corporate information, the corporate information for Kou Jian's other companies, or online that corroborated Hyzon's dual claims about HongYun's expertise and business acumen, specifically:

- that HongYun's "core team" consisting of Kou Jian and other shareholders or employees identified herein had "solid operation experience and master the real time vehicle data management," or

- that HongYun had "built up a deep cooperation" with Baowu Group, Zhejiang Eurasian Supply Chain, Jiaoyun Hubei Logistics Group, Kuodao Logistics, Changxin International.

276.274.      Accordingly, if Hyzon actually delivered HFCEVs to steel conglomerates in China in 2021,[203] such sales likely originated not through HongYun, but rather through Hyzon and Horizon's historic business relationships with steel conglomerate customers in the region—a material omission from Hyzon's public statements. *See* Part VI.A, *supra* ¶¶ 1171-116 (discussing Horizon/Hyzon's historic deals, including that

---

[203] To date, Investigator C-1 has been unable to identify any media or other news that independently corroborates Hyzon's claim that it purportedly delivered 29 and 33 Hyzon HFCEVs to major steel conglomerate(s) based in China.

Horizon had 70 vehicles "delivered to date by other OEMS with Horizon fuel cells" to a leading steel company based in East Asia).

## I.    No Ability To Negotiate Supply Agreements for HFCEVs or To Participate in Government-Sanctioned RFPs (Not At Least Without Outside Aid)

277.275.    In addition to the abovementioned research, Investigator C-1 scrutinized HongYun's ability to negotiate agreements and/or memorandums of understanding concerning the purchase, supply, or leasing of hydrogen fuel cell powered vehicles.

278.276.    As discussed above, Investigator C-1 confirmed that HongYun had no direct phone line, no website, and no WeChat account, suggesting that it had little to no ability to build the customer base necessary in China to purchase for itself, or as a channel partner, up to 100 HCFEVs from Hyzon in 2021, or make upfront or installment payments for any vehicles.

279.277.    Additionally, Investigator C-1 researched HongYun's ability to pass through vehicles to the customers identified in Hyzon's public statements, specifically, as recounted by Defendant Knight, "two of the biggest steel companies in the world."[204] Investigator C-1 reported that in China, the biggest steel and logistical companies are typically state-owned enterprises ("SOE"), *i.e.*, legal entities that are created by the Chinese government in order to partake in commercial activities on the government's behalf. Baowu (more formerly known as China Baowu Steel Group Corp. Ltd.), for example, the world's largest steel manufacturer, which purportedly received Hyzon HFCEVs through HongYun, is one such state-owned entity. According to Investigator C-1, most

---

[204] *See* Part VI.JK, *supra* ¶ 186.

procurement for Chinese government entities and SOEs like Baowu typically follows public invitation tendering, during which procuring entities offer projects to all qualified bidders. Investigator C-1 stressed that this is a standard practice for all government entities and SOE procurements. Additionally, Investigator C-1 noted that Chinese laws on procurement and tendering clearly outline this tendering process. The graphic on the following page from the US-China Business Council explains this multi-step process for American businesses interested in operating in China (and is incorporated by reference).

**F.38 – Graphic for the Tendering Process for Chinese SOEs[205]**

| Public announcement | A procuring entity issues a public tendering announcement on state-approved media, including approved newspapers and government websites. The announcement includes information about the procuring entity, the project timeline, and the product quantity for purchase. Government entities often conduct procurement activities through a procuring agency,[8] while some SOEs establish subsidiaries specifically for the purpose of assisting with procurement. |
|---|---|
| Prequalification | Procuring entities can require bidders to provide documents certifying their qualifications ahead of the tendering process. |
| Prepare and issue tendering information | Procuring entities prepare tender documents, which include technical requirements and product specifications, relevant national and industry standards, metrics for assessing bidder qualifications, price requirements, evaluation criteria, and contract terms. Once the procuring entity releases these documents, suppliers are required to have a minimum of 20 days to submit their bids. |
| Bidder evaluation | The procuring entity organizes a bid evaluation committee, in which at least two-thirds of members are certified industry experts and the remainder are representatives of the procuring entity. The committee assesses bids based on predetermined criteria and ultimately submits a report and recommendation to the procuring entity. There are no standard criteria for evaluating bidders, but most committees will consider price, quality, and other requirements issued in tendering documents. |
| Winner selection and contract signing | The procuring entity selects a winner based on the expert committee's recommendation. The procuring entity then notifies the winning bidder, publicly releases the outcome in state-approved media outlets, and signs a contract with the bidder within 30 days. |

---

[205] The US-China Business Council, *Government Procurement and Sales to State-Owned Enterprises in China, Challenges and Best Practices* (Sept. 2021).

280.278.    In Investigator C-1's opinion, it would be very difficult for HongYun, given its lack of paid-in capital, lack of business history, and lack of financial records, to qualify for an invitation to prepare and submit tendering information to an SOE without outside aid. Additionally, they noted that if HongYun managed to obtain a deal from these companies through the procurement process, there would typically be a big announcement. HongYun, however, has virtually little web presence, and Investigator C-1 was unable to find any news of the awarding of a procurement contract to HongYun for the provision of hydrogen-fuel-cell-powered commercial vehicles.

281.279.    Finally, Investigator C-1 reported that, as to HongYun's present ability to lease vehicles, HongYun is not presently able to obtain a license to offer leasing services, a financial tool, without paid-in capital.[206] Further, they relayed that, even if HongYun had paid-in capital, it would likely take many months, possibly years, for it to obtain a license to be legally permitted to offer lease-based financing. As such, Investigator C-1 concluded that HongYun has no leasing operation.

---

[206] *See also* China Banking Regulatory Commission, "Measures Administering Finance Leasing Companies," Art. 2 ("Unless it is otherwise prescribed by any law or regulation, no entity or individual may engage in the finance leasing business or use the words "finance leasing" in its name without approval of the CBRC."); *id.* Art. 10 ("The minimum registered capital of a finance leasing company is **RMB 100 million** Yuan or any freely convertible currency with equivalent value, and ***the registered capital shall be the paid-in money***." (Emphasis added)). English translation of Finance Leasing Decree *available at* http://www.asianlii.org/cn/legis/cen/laws/maflc413/.

## VIII.IX.    MATERIALLY FALSE AND MISLEADING STATEMENTS REGARDING HYZON'S PURPOTED CUSTOMERS AND VEHICLE SALES[207]

282.280.    Lead Plaintiff alleges that the statements highlighted in bold and italics within this Section were materially false, misleading, and omitted to disclose material information. In some instances, graphical material is alleged to be false and misleading and no bold and italic text has been applied. As alleged herein, the false and misleading statements artificially inflated or artificially maintained the price of Hyzon's stock. As described below, Defendants created an impression of a state of affairs related to the Company's contracted orders and customer base that differed in a material way from the one that actually existed.

283.281.    Each statement attributed to Defendants Knight and Gu prior to the close of the SPAC Merger was also made by Legacy Hyzon, which was acquired by Defendant Hyzon, and thus was also made by Hyzon. Likewise, each statement attributed to Defendants Knight and Gu after the close of the SPAC Merger was also made by

---

[207] As part of the amendment process, Lead Plaintiff has reviewed each alleged misstatement and has added the following annotations where applicable:

- "Preserved" or "P" next to a misstatement means Lead Plaintiff does not intend to re-litigate the specific misstatement in future motion-to-dismiss briefing but do intend to preserve the right to challenge Court's ruling on the misstatement on appeal and/or to seek leave to revive the misstatement if new information produced through discovery shows it is actionable.
- "Removed" or "X" means Lead Plaintiff is no longer pursuing the specific misstatement as an independently actionable misstatement and are not preserving the misstatement for appeal, though it may be relevant to other claims.
- "Revised" or "R" means Lead Plaintiff has revised and/or updated the misstatement in light of the new allegations drawn from the SEC Complaint.
- "✓" means the Court found the specific misstatement was actionable in its MTD Order and Lead Plaintiff has not made any changes.

Defendant Hyzon, because in both cases the two were speaking on behalf of the pre- or post-merger entity as a senior executive. Likewise, each statement by Defendant Gordon was also made by Defendant Hyzon Motors because he was speaking as the CFO of the pre- and post-merger Company. Further, each statement by Defendants Anderson, Haskopoulos, and Tichio prior to the SPAC Merger were also made by Defendant Hyzon Motors because they were the CEO, CFO, and Chairman, respectively, of Hyzon Motors, which prior to the SPAC Merger was known as DCRB. Each statement contained in a public filing, presentation, or press release issued by an entity was made by that entity. The use of three asterisks in the middle of a quoted passage signifies the omission of a paragraph. That a statement is not included in this Section or marked as false and misleading in this Section does not imply its accuracy. The reference to a statement being "misleading" includes statements that are misleading due to the omission of truthful information.

A.    **[Revised] Statements** ~~Concerning~~ **About the Present-State of Relationships with Key Customers/ Suppliers and 100% Committed** ~~and~~ **/Highly Probable Orders**

284.282.    [Revised] Throughout the Class Period, Defendants sought to earn credibility with investors by promising a "committed sales pipeline" comprised of "100% Certain" and "High Probability ... (70%)" orders from blue-chip Fortune 100s and municipalities, totaling nearly $40 million for 2021. In press releases, investor reports, and public statements, Defendants claimed these logos and sales commitments reflected the rapidly accelerated demand for Hyzon's product. Further, they stressed Hyzon's 2021 deliveries uniquely distinguished its business from its EV competitors and served as a primary driver for its hefty $2 billion enterprise evaluation. ~~These false and misleading~~

- 179 -

statementsThe false and misleading statements about Hyzon's customer and supplier relationships also communicated to investors that Hyzon was capable of generating revenue, despite lacking significant sales history, because it was purportedly finalizing contract terms with well-known customers. Further, they suggested to investors that Hyzon rationally formed its 2021 revenue and delivery targets using the established customers and "100% certain" orders advertised in Hyzon's pre-Merger Soliciting Materials (not from sham sales to entities based in China).

283.    These statements touting the status of its relationships with certain well-known customers and the number and nature of Hyzon's committed orders were false and misleading for the following reasons, both together and individually:

(a)    [New] Although Hyzon had solicited transactions with certain well-known companies, none had indicated they would purchase HFCEVs from Hyzon. To the contrary, Hyzon never proceeded past introductory meetings with some companies, while others told Hyzon they would not be making purchases.

285.(b)[New] The use of names and logos of well-known customers and suppliers created the false impression that all of the companies authorized Hyzon to use their names and logos, when in fact Hyzon had not obtained all of the companies' consent

(a)(c)  Hyzon did not have any of the 100% certain or high probability pre-orders from the household brands and Fortune 100 companies it claimed and instead, at best, had non-binding memorandums of understanding;

(b)(d)  Hyzon counted orders from entities that did not sign agreements or purchase orders to buy the vehicles, either because they had not signed any agreement at all or because they had signed an agreement to try out HFCEVs on a trial basis;

(c)(e)  Hyzon counted orders from businesses that could not plausibly be expected to order the listed number of trucks at the prices advertised or with the delivery dates claimed;

(d)(f)  Hyzon counted pre-orders from entities that merely operated as intermediaries for ultimate purchasers, or who had no such operations but sought to open such lines of business, even though such orders could not reasonably be counted as orders;

(e)(g)  Hyzon counted orders even though the conditions precedent for Hyzon to receive such orders, deliver vehicles, or recognize revenue had not been satisfied;

(f)(h)  Hyzon counted orders from persons and entities that did not intend to order HFCEVs or the number of trucks Hyzon used in its count;

(g)(i)  Hyzon counted deliveries from which Hyzon could not recognize revenue under generally accepted accounting principles and/or Hyzon's own revenue recognition policies;

(h)(j)  Hyzon counted as product sales vehicles that were not manufactured by Hyzon, but rather retrofitting services done on third-party-owned vehicles—a business activity Hyzon did not disclose as part of its business strategy or as a source of revenue;

(i)(k)  Hyzon created the false impression that it had a substantial backlog of 100% "binding orders" with 2021 deliveries to customers predominantly located in the United States, Europe, and Oceania when in reality the majority of its purported sales were to customers based in China—Horizon's historic markets;

(j)(l)  Hyzon failed to disclose that its 2021 backlog included and/or consisted of mostly companies based in China;

(k)(m)  Hyzon failed to disclosed that its reported deliveries consisted of sales to related parties;

(l)(n)  Hyzon failed to disclose certain discounts and/or rebates offered to purported customers to encourage vehicle sales at the expense of expected revenues;

(m)(o)  Hyzon counted deliveries of HFCEVs that were in fact not operable on hydrogen at the time of delivery or by the end of the reporting period;

(n)(p)  Hyzon counted deliveries of HFCEVs which it had fully satisfied all sales obligations, including transfer of control to the customer, at the time the delivery was counted; and

(o)(q)  Hyzon omitted material information necessary to steer investors from inaccurate conclusions about its true customer base, actual committed sales,

- 181 -

the methodology for calculating revenues, and whether Hyzon was presently on track to hit revenue and delivery targets.

284.    The[New] Statements about Hyzon's customer and supplier relationships were material to investors, including investors evaluating the SPAC merger and PIPE investments, when making investment decisions about Hyzon. The false and misleading statements communicated to investors that Hyzon was capable of generating revenue, despite lacking significant sales history, because it was purportedly finalizing contract terms with well-known customers. Additionally, the false and misleading statements communicated that, despite lacking significant manufacturing history, Hyzon had established supplier relationships that would enable it to manufacture the FCEVs needed to fulfill the orders purportedly being finalized

286.285.    Similarly, statements about the number, probability, and value of pre-orders was material because they were key facts broadcasted to investors, served as a signal of demand for Hyzon's HFCEVs, particularly in high revenue markets, served as a signal of expected future revenues, served as an indicator of industry opinions of Hyzon and its HFCEVs, and served as an indicator of the capabilities and success of Hyzon's sales and marketing functions.

287.286.    The following statements regarding committed orders, specific customers, and Hyzon's delivery and revenue targets were false and misleading for the reasons stated in ¶ 283, as supplemented by the reasons identified below each statement explaining why specific words, phrases, and concepts were particularly false or misleading, both individually and when viewed in the context in which they were made.

1.        **[R] Hyzon's Press Release Announcing SPAC Merger (Feb. 9, 2021)**

287.    On February 9, 2021, Defendants issued a joint press release entitled "Hyzon Motors, the Leading Hydrogen Fuel Cell Heavy Vehicle Company, Announces Business Combination with Decarbonization Plus Acquisition Corporation; Combined Company Expected to be Listed on Nasdaq." This press release was also filed with the SEC as a Soliciting Material pursuant to Rule 14a-12. Defendant Haskopoulos signed and filed the Form 8-K, which included the press release, for DCRB.

288.    The Hyzon-DCRB joint release stressed "***Hyzon's existing global footprint, and sales pipeline with blue-chip Fortune 100s and municipalities.***"

288.289.        In addition to quotes from Defendants Anderson and Tichio, the release featured the following statements from Defendants Knight and Gu:

> Craig Knight, Chief Executive Officer, and Co-Founder of Hyzon, said, "We are excited to partner with DCRB at an important inflection point for our company, hydrogen and society. ***Deliveries of Hyzon fuel cell powered heavy trucks to customers in Europe and North America will occur this year, well ahead of our competitors,*** and our committed sales pipeline is proof that the world is truly recognizing the need to develop innovative solutions to mitigate climate change and accelerate efforts to move the world economy down the path to net-zero emissions."
>
> George Gu, Chairman and Co-Founder of Hyzon remarked, "This business combination will enable us to expand deployments of our zero-emission hydrogen fuel cell powered heavy vehicles globally, and to continue leading the hydrogen transition. ***We are incredibly excited about the dynamic mobility category as*** municipalities and ***Fortune 100 companies are rapidly embracing hydrogen as the essential pathway to a net-zero economy***. The number of countries cementing and then enhancing their national hydrogen strategies expands almost weekly, and we are extremely

- 183 -

encouraged by both investor and public interest in the hydrogen economy."

289.290.    ~~The statement(s) in the prior paragraph touted Hyzon's deep pocketed "Fortune 100" customers, committed sales pipeline, and claims about 2021 deliveries to European and North American customers. As such, they~~ [Preserved] These statements were false and misleading for the reasons set forth in ¶ 283.

291.    ~~Additionally, these statements~~[Revised] Hyzon, Knight, and Gu's statement(s) above regarding Hyzon's relationships with "blue chip, Fortune 100" customers were especially false or misleading. Although Hyzon had solicited transactions with highly recognizable global brands and/or blue-chip, Fortune 100 companies like Heineken, Ikea, Air Products, and Coca-Cola, none of these companies had indicated they would purchase HFCEVs from Hyzon at the time Defendants disseminated these statements. To the contrary, several of these purported customers had informed Hyzon in early 2021 that they had selected different HFCEV suppliers or would otherwise not be making purchases. For example, before February 9, Heineken had informed Hyzon that it could not accept an offer for any FCEV deliveries in 2021 because the deliveries were not included in its annual budget. Additionally, Hyzon had never gotten past introductory meetings with Coca-Cola. But Hyzon did not remove these companies and instead continued to list them as being in "advanced discussions" or "finalizing POs" in subsequent versions of Hyzon's investor presentations, which Hyzon also kept available on Hyzon's website up though at least the summer of 2022. And despite claiming that "key relationships ha[d] already been formed" with two HFCEV chassis suppliers, Hyzon had not reached the point of negotiating any supply relationship with either.

- 184 -

290.292.   [Preserved] These statement(s) above about "existing global footprint" and "committed sales pipeline" were especially misleading because the use of the words "will occur" and "committed" conveyed that Hyzon's pre-orders, communicated contemporaneously with this press release during Hyzon's investor call and investor presentation, see ¶¶ 292 & 296, were concrete and either 100 percent certain or highly probability. As alleged above, however, the purported "deliveries of Hyzon fuel cell powered heavy trucks" to "blue-chip Fortune 100s" or to "customers in Europe and North America," in 2021 or otherwise, were anything but concrete or certain. Often, theseThese purported deliveries were based, in part, if not in whole, on supposed deals where the counterparty signed a non-binding MoU, did not even sign a non-binding MoU, had contracted for retrofitting services instead of deliveries of Hyzon-made goods, or were clearly not in a position to order the number of trucks Hyzon was counting from them. Indeed, in neither 2021 nor 2022 did Hyzon recognize any revenue for hydrogen-fuel-cell-powered heavy trucks to customers in North America or Europe. At best, Hyzon provided retrofitting services—a business activity not disclosed until 2022/2023—on five vehicles in Europe, none of which were Fortune 100 companies. And, upon information and belief, including the representations in Hyzon's risk disclosures, these retrofitted vehicles were trial or validation vehicles.

291.293.   [Preserved] The representationstatements above about 2021 deliveries to European and North American customers, including that the merger would allow Hyzon to "expand deployments … globally" was," were also particularly false and misleading, as itthey suggested Hyzon would expand vehicle sales to customers and markets beyond inherited sales and Horizon's historic markets in China. In truth, however,

more than 90 percent of Hyzon's purported 2021 deliveries went to entities in China. Twenty of these vehicles went to a related party, while the other 62 were purportedly delivered through a sham transaction to an end user, which, upon information and belief, was a legacy customer inherited from Horizon's contacts and operations. And the entirety of Hyzon's purported deliveries to European customers were for undisclosed retrofitting services.

**2.    [R] Hyzon's Merger Announcement Call with Investors (Feb. 9, 2021)**

294.    Also on February 9, 2021, Defendants held a conference call with investors, at which Defendants Knight, Gordon, and Tichio touted the announced business combination, the Company's history of commercialization of HFCEVs, and its committed sales pipeline. The full transcript of this call was then filed as a Soliciting Material pursuant to Rule 14a-12 with the SEC. Defendant Haskopoulos signed and filed the Form 8-K, which included the transcript, for DCRB.

292.295.        Therein, Defendants, particularly Knight, Gordon, and Tichio made and/or disseminated the following statements:

> "**The Company [Hyzon] has a sales pipeline for 2021 that is 100 percent under contract or MOU, providing real runway visibility**, **and its customers include some of the most recognizable global brands and the largest municipalities in the world**."
>
> ...

296.    Therein, Gordon made and/or disseminated the following statements:

> "**Our success is not built on the outcomes of one or two trials in a location with peculiar characteristics; we're securing orders with customers of varying types, with varying criteria for long-term scaling up within their systems**.

> ...
>
> [T]aking just the medium and heavy duty truck and bus segments into account, Hyzon's projections are compelling. ***Hyzon forecasts to grow from $37 million on revenue on 85 units sold in 2021***, to $3.3 billion in revenue on nearly 10,000 units sold during 2025. ***Our 2021 forecast is 100 percent covered by contracts and MOUs,*** while our 2022 forecast is almost 50 percent contract and MOU covered, and more than 100 percent covered when high-probability orders are taken into account. Thirty percent of 2025 revenue is accounted for under current MOUs.

293.297.    The[Preserved] Gordon's statement(s) in the prior paragraph celebrating Hyzon's purported 2021 revenue forecasts, premised on its reported committed orders and customers base, were false and misleading for the reasons set forth in ¶ 283.

298.  Furthermore, the[Revised] Tichio's statement(s) above regarding Hyzon's relationships with "some of the most recognizable global brands" were especially false or misleading. Although Hyzon had solicited transactions with highly recognizable global brands and/or blue-chip, Fortune 100 companies like Heineken, Ikea, Air Products, and Coca-Cola, none of these companies had indicated they would purchase HFCEVs from Hyzon at the time Defendants disseminated these statements. To the contrary, several of these purported customers had informed Hyzon in early 2021 that they had selected different HFCEV suppliers or would otherwise not be making purchases. For example, before February 9, Heineken had informed Hyzon that it could not accept an offer for any FCEV deliveries in 2021 because the deliveries were not included in its annual budget. Additionally, Hyzon had never gotten past introductory meetings with Coca-Cola. But Hyzon did not remove these companies and instead continued to list them as being in "advanced discussions" or "finalizing POs" in subsequent versions of Hyzon's investor

- 187 -

presentations, which Hyzon also kept available on Hyzon's website up though at least the summer of 2022.

294.299.    [Preserved]    The statements that Hyzon would earn approximately $37 million in revenue, and that its 2021's revenue forecasts were "100 percent covered" by contracts and MoUs were especially misleading because the deals Hyzon boasted in tandem with the investor call were highly fabricated or exaggerated. In an investor presentation circulated at the time of the conference call, Defendants claimed, for example, that Heineken was a "top tier customer" that was "finalizing" a purchase order for five vehicles, valuing over $2 million in revenue, for 2021 delivery was baseless and ultimately removed from Hyzon's presentations. Likewise, for Ikea, they represented Hyzon was "finalizing" a contract under which two HFCEVs would be delivered in 2021. Defendants also published maps of purported 2021 customer deployments to specific "customers," which, if added up, totaled nearly $40 million in sales. Hyzon frequently removed high revenue agreements by large, purportedly committed or high probability customers like Heineken, Ikea, and others from its investor presentations, without correspondingly updating its revenue forecast projections. Hyzon never converted on any of the "near final" orders it claimed in its February 9, 2021 statements. And to date, Hyzon has not reported revenue from deliveries to any "of the most recognizable global brands … in the world." These and other factors demonstrate that Hyzon's statements were false or misleading.

295.    The representation that[R] Hyzon's "customers include some of the most recognizable global brands" was also particularly false and misleading, as Hyzon did not have any 100% certain or highly probable orders from such customers with rescindable, near-term deliveries.

- 188 -

### 3. ~~Hyzon's~~ February 9, 2021 Investor Presentation

~~296.~~300.    On February 9, 2021, Defendants disseminated an Investor Presentation entitled "Accelerating the Hydrogen Transition~~.~~"" This presentation was also filed as a Soliciting Material pursuant to Rule 14a-12. ~~Defendants made~~Defendant Haskopoulos signed and filed the ~~following statements therein~~Form 8-K, which included the presentation, for DCRB. Additionally, the bottom of each page featured Hyzon and DCRB's logos.

~~297.~~301.    On Slide 5, ~~Hyzon~~the presentation repeated ~~its~~the claim~~, discussed in the preceding paragraph,~~ that ~~it~~Hyzon had a "**2021 backlog of ~$40 million under contract or [Memorandum of Understanding] from blue-chip Fortune 100s** and municipalities ~~with exceptional (and rapidly growing) 2022+ visibility." The Company reported an "80% of near-term backlog to customers in Europe, Asia and Australia."…."~~

302.    ~~Further within~~On Slide 5, the presentation reported that Hyzon an "**80% of near-term backlog** to customers in **Europe, Asia and Australia.**"



- 189 -

298.303.    Below these statements, also on Slide 5, the presentation included the following ~~graphics, which contain false and misleading statements:~~graphic titled "Top Tier Customers / End Users / Partners" featuring several logos, including those for Air Products,



Heineken, Ikea, and Coca-Cola.

## Summary Projected Financials

| ($USD IN MILLIONS) | 2021E | 2022E | 2023E | 2024E | 2025E |
|---|---|---|---|---|---|
| **VOLUMES** | | | | | |
| VEHICLE DELIVERY VOLUMES | | | | | |
| HEAVY TRUCK (36T-50T) | 74 | 513 | 2,638 | 5,660 | 7,400 |
| MEDIUM TRUCK (12T) | 0 | 110 | 722 | 1,140 | 1,860 |
| CITY BUS (12M) | 11 | 35 | 68 | 340 | 600 |
| CLASS 3 TRUCK / VAN | 0 | 0 | 840 | 4,435 | 7,235 |
| TOTAL | 85 | 658 | 4,268 | 11,535 | 17,095 |
| **INCOME STATEMENT** | | | | | |
| VEHICLE REVENUE | 35 | 190 | 948 | 2,176 | 3,129 |
| FUEL CELL REVENUE | 2 | 6 | 17 | 43 | 105 |
| HYZON ZERO CARBON REVENUE | 0 | 1 | 7 | 24 | 52 |
| TOTAL REVENUE | $37 | $198 | $972 | $2,242 | $3,286 |

No additional equity required between PIPE and going to market, achieving positive cash-flow

304.    On Slide 18, the presentation included a slide titled "Customer Deployments Underway and Demand is Accelerating Rapidly," with the subheading "Vehicles ordered and near-term pipeline." Below this header, the presentation featured a global map graphic displaying the names and logos of certain well-known companies—including Heineken, Air Products, Coca-Cola, and Ikea—along with the status of Hyzon's relationships with those companies. For Heineken, the presentation said Hyzon was "finalizing" a $2 million purchase order for five FCEVs to be delivered in 2021. For Air Products, the presentation said Hyzon was "finalizing" a $1 million purchase order for three FCEVs to be delivered in 2021. For Coca-Cola, Hyzon stated it was in "advanced discussions" to deliver FCEVs to in 2021 and projected to deliver "500+" FCEVs and earn "$200mm+" in revenue over the next five years. And for Ikea, the presentation said Hyzon was "finalizing" a $1 million

"contract" to deliver two FCEVs in 2021. To the left of the graphic, the presentation stated Hyzon had "Contracted Orders (100%) Certain)" from "13 private and public sector customers" and "~$40mm under contract or MOU for 2021 revenue forecast."



305.    On Slide 29, the presentation also included a slide with the header "… Key Relationships Have Already Been Formed." Below that header, the slide included logos of companies for "Selected Manufacturing Suppliers," including chassis suppliers Ford, Detroit Chassis, LCC, DAF, and Freightliner, and select "Vehicle Customers," including Air Products, Coca-Cola, Heineken, Ikea, and Nestle.

306.    And on Slide 39, the presentation included "Summary Projected Financials," affirming Hyzon expected to deliver 85 vehicles and earn $37 million in 2021.



**Summary Projected Financials**

| ($USD IN MILLIONS) | 2021E | 2022E | 2023E | 2024E | 2025E |
|---|---|---|---|---|---|
| **VOLUMES** | | | | | |
| VEHICLE DELIVERY VOLUMES | | | | | |
| HEAVY TRUCK (36T-50T) | 74 | 513 | 2,638 | 5,660 | 7,400 |
| MEDIUM TRUCK (12T) | 0 | 110 | 722 | 1,140 | 1,860 |
| CITY BUS (12M) | 11 | 35 | 68 | 340 | 600 |
| CLASS 3 TRUCK / VAN | 0 | 0 | 840 | 4,435 | 7,235 |
| **TOTAL** | **85** | **658** | **4,268** | **11,535** | **17,095** |
| **INCOME STATEMENT** | | | | | |
| VEHICLE REVENUE | 35 | 190 | 948 | 2,176 | 3,129 |
| FUEL CELL REVENUE | 2 | 6 | 17 | 43 | 105 |
| HYZON ZERO CARBON REVENUE | 0 | 1 | 7 | 24 | 52 |
| **TOTAL REVENUE** | **$37** | **$198** | **$972** | **$2,242** | **$3,286** |

No additional equity required between PIPE and going to market, achieving positive cash-flow

307.    [Preserved]   The statement(s) in the paragraphs above and in the above-depicted graphics concerning Hyzon's purported top-tier vehicle customers, customer deployments, 100% certain and high probability orders, and projected revenues were false and misleading for the reasons set forth in ¶ 283.

299.308.        [Preserved]   Additionally, the statements above concerning Hyzon's sales pipeline composition and 2021 delivery and revenue targets mirrored the false and misleading statements made during Defendants' February 9, 2021 call with investors, and are thus also false and misleading for the reasons set forth in ¶¶ 294-295¶ 299.

300.   Furthermore, it was especially misleading to boast that the pre-orders had come from a number of established companies, including Coca-Cola, Heineken, and Ikea, when these pre-orders were highly fabricated. For example, the representation that Heineken was a "top tier customer" that was "finalizing" a purchase order for five vehicles, valuing over $2 million in revenue, for 2021 delivery was baseless and ultimately removed from Hyzon's presentations. Likewise, for Ikea, Defendants represented Hyzon was "finalizing" a contract under which two HFCEVs would be delivered in 2021. To date, Hyzon has had zero revenue generated HFCEV product sales to any Fortune 100 companies or household brands, let alone those included in the Company's investor materials.

- 193 -

301.309.    [Preserved]   It was also false and misleading for Hyzon to provide a slide of global customer deployment, in which Hyzon stated that it had 100% contracted orders from 13 private and public entities adjacent to a map displaying logos for 14 entities and a description of each logo's purported orders—12 of which had 2021 delivery dates. To date, Hyzon has had zero revenue generated HFCEV product sales to any entities identified as having future sales. The depiction of the logos was further rendered false and misleading by the depicted contract value for these entities' purported 2021 orders, totaling nearly $40 million, particularly when viewed in combination with Hyzon's claim on the same slide that it had nearly $40 million under contract or MoU for its 2021 revenue forecast. The display of these graphics thus suggested that nearly all of the logos displayed were for customers with 100% committed or high probability orders.

302.310.    [Preserved]   It was particularly false and misleading for Hyzon to repeat its forecast that it would earn approximately $37-40 million in revenue in 2021, even though it frequently removed high revenue agreements by large, purportedly committed or high probability customers like Heineken, Coca-Cola, and others from its investor presentations, without correspondingly updating its revenue forecast projections. It was false and misleading for the Company to list the logos of companies like Nestle, Coca-Cola, and Heineken as "vehicle customers" when those businesses were not actually customers and, at best, only had discussed the possibility of purchasing vehicles from Hyzon.

311.    [Revised]    It was also false and misleading for the Company to list the logos of companies like Nestle, Coca-Cola, and Heineken as "vehicle customers" that were finalizing purchasing orders or in advanced discussions to purchase vehicles. Although

Hyzon had solicited transactions with highly recognizable global brands and/or blue-chip, Fortune 100 companies like Heineken, Ikea, Air Products, and Coca-Cola, none of these companies had indicated they would purchase HFCEVs from Hyzon at the time Defendants disseminated these statements. To the contrary, several of these purported customers had informed Hyzon in early 2021 that they had selected different HFCEV suppliers or would otherwise not be making purchases. For example, before February 9, Heineken had informed Hyzon that it could not accept an offer for any FCEV deliveries in 2021 because the deliveries were not included in its annual budget. Additionally, Hyzon had never gotten past introductory meetings with Coca-Cola. But Hyzon did not remove these companies and instead continued to list them as being in "advanced discussions" or "finalizing POs" in subsequent versions of Hyzon's investor presentations, which Hyzon also kept available on Hyzon's website up though at least the summer of 2022.

312. [Revised]    The use of names and logos in the slides above were also false and misleading, as they created the false impression that all of the companies authorized Hyzon to use their names and logos, when in fact Hyzon had not obtained all of the companies' consent.

313. [Revised]    Additionally, the statements above about the status of Hyzon's relationships with certain suppliers, including a statement that "key relationships have already been formed" with two suppliers of FCEV chassis, were false and misleading because Hyzon and these purported suppliers had not reached the point of negotiating any supply relationship.

303.314.    [Preserved]   Further, it was false and misleading for the Company to omit near term customer deployments or expressions of interests from purchasers located

in China, which ultimately constituted 82 of Hyzon's 87 vehicle deliveries in 2021. At most, Hyzon indicated on its global deployment map that there were 70 HFCEVs on the road to date by other OEMs with Horizon fuel cells installed. This representation of a past sale did not convey that Hyzon had future plans to deploy or sell vehicles in China, or that virtually all of its 2021 product sales (and thus the sales underlying its projections) were to related parties and/or Chinese entities.

315.    [Revised]    The statements suggesting Hyzon had a "near-term backlog to customers in Europe," including the display of logos and purported orders of European customers with 2021 deliveries (e.g., Friesland Campina) were especially false and misleading, as (i) Hyzon had no contracts to sell vehicles to European customers, but was merely providing retrofitting services on customer-owned trucks so that they could run on hydrogen power, and (ii) Hyzon had staged a video showing that a truck delivered to Friesland Campina operated on hydrogen power when, in reality, it did not.

316.    Defendant Knight was responsible for each of the false and misleading statements about Hyzon's purported customer and supplier relationships set forth in the investor presentation. Knight provided information about customer and supplier relationships to the individuals who drafted the investor presentation. Knight also made edits to, reviewed, and approved the misleading statements before their use in the presentation and filing with the SEC.

**4.** **[R] Hyzon's February 10 Changes to the February 9, ~~2021~~ Investor Presentation**

~~304.~~317.    ~~The very next day~~ (On February 10~~), 2021,~~ Defendants filed Soliciting Materials (on Schedule 14A), which included an edited version of the February 9, 2021 PowerPoint Presentation that was shown to Hyzon's investors during the February 9, 2021 Conference Call. ~~Therein, Hyzon included the following graphics, which contain false and misleading statements:~~ and then filed with the SEC. Additionally, the bottom of





each page featured Hyzon and DCRB's logos.

Case 6:21-cv-06612-MAV-MJP    Document 126-2    Filed 08/15/25    Page 210 of 340



## Summary Projected Financials

| ($USD IN MILLIONS) | 2021E | 2022E | 2023E | 2024E | 2025E | |
|---|---|---|---|---|---|---|
| **VOLUMES** | | | | | | |
| VEHICLE DELIVERY VOLUMES | | | | | | |
| HEAVY TRUCK (36T-50T) | 74 | 513 | 2,638 | 5,660 | 7,400 | |
| MEDIUM TRUCK (12T) | 0 | 110 | 722 | 1,140 | 1,860 | |
| CITY BUS (12M) | 11 | 35 | 68 | 340 | 600 | |
| CLASS 3 TRUCK / VAN | 0 | 0 | 840 | 4,435 | 7,235 | |
| **TOTAL** | 85 | 658 | 4,268 | 11,535 | 17,095 | |
| **INCOME STATEMENT** | | | | | | No additional equity required between PIPE and going to market, achieving positive cash-flow |
| VEHICLE REVENUE | 35 | 190 | 948 | 2,176 | 3,129 | |
| FUEL CELL REVENUE | 2 | 6 | 17 | 43 | 105 | |
| HYZON ZERO CARBON REVENUE | 0 | 1 | 7 | 24 | 52 | |
| **TOTAL REVENUE** | $37 | $198 | $972 | $2,242 | $3,286 | |

~~Moreover, the Company made no changes to its false and misleading projected financials.~~

318.    On Slide 5, the February 10 version of the presentation repeated that Hyzon an "***80% of near-term backlog*** to customers in ***Europe, Asia and Australia***."

319.    Below these statements, also on Slide 5, the presentation included the following graphic titled "Top Tier Customers / End Users / Partners" featuring several logos shown in the February 9 presentation, including those for Heineken, Ikea, and Coca-Cola, but omitting Air Products.



320.    On Slide 18, the February 10 version of the presentation again included a slide titled "Customer Deployments Underway and Demand is Accelerating Rapidly," with the subheading "Vehicles ordered and near-term pipeline" and a global map graphic displaying the names and logos of certain well-known companies—including Heineken, Coca-Cola, and Ikea. This map purported to display the status of Hyzon's relationships with those companies, and contained the same representations as in the February 9, 2021 version of the presentation (e.g., Heineken was finalizing a PO for 5 trucks for $2 million; Hyzon stated it was in "advanced discussions" to deliver FCEVs to in 2021, etc.). However, for Air Products, the presentations substituted its name and logo for the generic description "Industrial Gas Company." To the left of the graphic, the February 10 presentation still stated Hyzon had "Contracted Orders (100%) Certain)" from "13 private and public sector customers" and "~$40mm under contract or MOU for 2021 revenue forecast."



321.    On Slide 29, the February 10 version of presentation still included a slide with the header "… Key Relationships Have Already Been Formed." Below that header,

the slide included logos of the same companies for "Selected Manufacturing Suppliers" that were identified in the February 9 presentation, including chassis suppliers Ford, Detroit Chassis, LCC, DAF, and Freightliner. The slide similarly included logos for select "Vehicle Customers," including Coca-Cola, Heineken, Ikea, and Nestle, but had removed logos for Air Products, Centurion, and Nestle from the Vehicle Customer component.



322.    And on Slide 39, the presentation included "Summary Projected Financials," affirming Hyzon expected to deliver 85 vehicles and earn $37 million in 2021.

323.    [Preserved]    The statement(s) in the above , including those depicted in the presentation's graphics, concerning Hyzon's purported top tier vehicle customers, customer deployments, 100% certain and high probability orders, and projected revenues were false and misleading for the reasons set forth in ¶ 283.

305.324.        [Revised]    Additionally, these the February 10, 2021 Presentation's statements and graphics virtually mirrored the false and misleading statements made during

Defendants' February 9, 2021 Investor Presentation, and are thus also false and misleading for the reasons set forth in ¶¶ 299-303. 300-316. This includes all statements and graphics concerning the status of Hyzon's key relationships with brand name customers and suppliers. Though Defendants replaced the name and logo of Air Product on the global map on Slide 18, the false and misleading statements about the status of Hyzon's purported customer relationship with Air Products remained alongside a generic description of the Company. And despite claiming that "key relationships ha[d] already been formed" with two chassis suppliers, Hyzon had not reached the point of negotiating any supply relationship with either.

306.325.    [Preserved]   Furthermore, it was especially false and misleading for the Company to drop customers, including Air Products, Centurion, and Nestle, from the presentations infographics, to place other purported partners and entities in those dropped customers places, and to omit other material information, without including any explanation or explicit indication that the presentation was edited, either in the edited PowerPoint presentation itself, or some other notice or filing to investors, particularly those who had viewed the original presentation on February 9, 2021. Further, it was false and misleading to drop such big-name customers without making any changes to its vehicle delivery or revenue forecasts.

326.    [Revised]    The statements suggesting Hyzon had a "near-term backlog to customers in Europe," including the display of logos and purported orders of European customers with 2021 deliveries (e.g., Friesland Campina) were especially false and misleading, as (i) Hyzon had no contracts to sell vehicles to European customers, but was merely providing retrofitting services on customer-owned trucks so that they could run on

hydrogen power, and (ii) Hyzon had staged a video showing that a truck delivered to Friesland Campina operated on hydrogen power when, in reality, it did not.

5.   **[R] Hyzon's February 12 Changes to the February 9, ~~2021~~ Investor Presentation**

~~307.~~327.     On February 12, 2021, Defendants filed additional Soliciting Materials with the SEC (on Schedule 14A), which included a second edited version of the February 9, 2021 PowerPoint Presentation. ~~Therein, Hyzon included the following graphics, which contain false and misleading statements:~~Additionally, the bottom of each





page featured Hyzon and DCRB's logos.

- 202 -

HYZON OVERVIEW

## Customer Deployments Underway and Demand is Accelerating Rapidly

Vehicles ordered and near-term pipeline – the future is **now**

**Application**
Projected Delivery
Order Status
5 year Projected Units / Revenue

**Contracted Orders (100% Certain)**

From private and public sector customers

Range of applications – heavy duty, refuse, prime movers, buses

Hydrogen supply secured

~$40mm under contract or MOU for 2021 revenue forecast

**High Probability Orders (70%+)**

From existing and new customers

Additive to contracted

Contracted and high probability revenue >$150mm fully covers 2022 revenue forecast

**HEAVY TRUCKS**
2021 Delivery (Contract Signed, 1 / $0.5mm)
200 / $80mm
*Major Dairy Brand*

**HEAVY TRUCKS**
2021 Delivery (Finalizing PO, 5 / $2mm)
500+ / $200mm+
*Global Brewer*

**HEAVY TRUCKS**
2021 Delivery (Finalizing PO, 3 / $1mm)
~50 / $20mm+
*Energy Major*

**HEAVY TRUCKS**
2021 Delivery (Advanced Discussions)
500+ / $200mm+
*Leading Retailer*

**HEAVY TRUCKS**
2021 Delivery (Finalizing Contract, 2 / ~$1mm)
500+ / $200mm+
*Leading Retailer*

**ULTRA HEAVY DUTY TRUCKS**
2022 Delivery (Signed MOU, 2 / $3mm)
30 / $15mm+

**HEAVY TRUCKS**
2021 Delivery (Advanced Discussions, 20 / $8mm)
500+ / $200mm+
*Industrial Gas Company*

**HEAVY / MED TRUCKS**
2021 Delivery (MOU Signed)
200 / $80mm+
*Trucking & Rail Logistics Operator*

**Specialty Metals Leader**

**HEAVY TRUCKS**
On Road Today (70 delivered to date by other OEMs with Horizon fuel cells)
300+ / $60mm+

**Hydrogen-Electric Flight**

**FLIGHT**
2021 Deliveries, 2 (Confirmed PO plus MOU)
~25 systems / $20mm+
*Infrastructure Company*

**HEAVY TRUCKS**
2021 Delivery (Advanced Discussions)
500+ / $200mm+
*Beverage Company*

**HEAVY TRUCKS**
2021 Delivery (Finalizing Contract, 5 / $2mm)
500+ / $200mm+
*Zero Emission City*

**HEAVY / MED TRUCKS**
2022 Delivery (MOU Signed, 100 / ~$45mm)
250 / $100mm
*Leading Steel Company*

**HEAVY TRUCKS**
2022 Delivery (Advanced Discussions)
300 / $80mm+
*Global Port Operator*

**Hydrogen Infrastructure Partner**

**MEDIUM TRUCKS**
Rollout Under Discussion (Qualifying Vehicles)
1,000+ / $300mm+

**HEAVY TRUCKS**
2021 Delivery (Advanced Discussions, 5 / $2mm)
50+ / $20mm+
*Heavy Truck Operator*

**HEAVY TRUCKS**
2021 First 20 Units (Signed Contract, 20 / ~$10mm)
1,400+ / $500mm+

**BUSES**
2021 Delivery (Signed Contract, 10 units / ~$8mm)
100+ / $60mm+
*Leading Miner*

Note: Logos representative. Some sales made to 3PL customers that are not the end users depicted here (as is typical for the industry).

HYZON | DCRB                    18

## Summary Projected Financials

| ($USD IN MILLIONS) | 2021E | 2022E | 2023E | 2024E | 2025E |
|---|---|---|---|---|---|
| **VOLUMES** | | | | | |
| VEHICLE DELIVERY VOLUMES | | | | | |
| HEAVY TRUCK (36T-50T) | 74 | 513 | 2,638 | 5,660 | 7,400 |
| MEDIUM TRUCK (12T) | 0 | 110 | 722 | 1,140 | 1,860 |
| CITY BUS (12M) | 11 | 35 | 68 | 340 | 600 |
| CLASS 3 TRUCK / VAN | 0 | 0 | 840 | 4,435 | 7,235 |
| **TOTAL** | **85** | **658** | **4,268** | **11,535** | **17,095** |
| **INCOME STATEMENT** | | | | | |
| VEHICLE REVENUE | 35 | 190 | 948 | 2,176 | 3,129 |
| FUEL CELL REVENUE | 2 | 6 | 17 | 43 | 105 |
| HYZON ZERO CARBON REVENUE | 0 | 1 | 7 | 24 | 52 |
| **TOTAL REVENUE** | **$37** | **$198** | **$972** | **$2,242** | **$3,286** |

No additional equity required between PIPE and going to market, achieving positive cash-flow

~~The Company made no changes to its false and misleading statements in the Presentation regarding its projected financials.~~

328.    On Slide 5, the February 12 version of the presentation repeated that Hyzon an "**80% of near-term backlog** to customers in **Europe, Asia and Australia**."

- 203 -

329.    Below these statements, also on Slide 5, the presentation included the following graphic titled "Top Tier Customers / End Users / Partners" featuring several logos shown in the February 9 presentation, including Heineken, but not Air Products, Ikea, or Coca-Cola.



330.    On Slide 18, the February 12 version of the presentation included a slide titled "Customer Deployments Underway and Demand is Accelerating Rapidly," with the subheading "Vehicles ordered and near-term pipeline." Unlike previous versions, the global map in the February 12 version of the presentation replaced the names and logos with generic descriptions of each company. For example, the presentation substituted the name and logo of Heineken with the generic description "Global Brewer." It similarly swapped Ikea with "Leading Retailer" and Coca-Cola with "Beverage Company." Nevertheless, the February 12 version of the global map still displayed the prior presentations' false and misleading representations about the status of Hyzon's customer relationships. Additionally, though the left graphic omitted the number of "private and public sector companies" Hyzon had "Contracted Orders (100%) Certain)" with, and though certain name brand companies had informed Hyzon they would not be making vehicle purchases in 2021, the presentation still stated Hyzon had "~$40mm under contract or MOU for 2021 revenue forecast."



331.    On Slide 29, the presentation also still included a slide with the header "…

Key Relationships Have Already Been Formed." Below that header, the slide still included

logos of companies for "Selected Manufacturing Suppliers," including chassis suppliers

Ford, Detroit Chassis, LCC, DAF, and Freightliner, and select "Vehicle Customers,"

including Heineken, but had remove the logos for Coca-Cola and Ikea.



332.    The February 12 version of presentation had no changes to the summary projected financials on slide 39.

333.    [Preserved]    The statement(s) ~~in the~~ above ~~-~~, including those depicted in the presentation's graphics, concerning Hyzon's purported top tier vehicle customers, customer deployments, 100% certain and high probability orders, and projected revenues were false and misleading for the reasons set forth in ¶ 283.

~~308.~~334.    [Revised]    Additionally, ~~these~~the February 12, 2021 presentation's statements and graphics virtually mirrored the false and misleading statements made during Defendants' February 9 and 10, 2021 Investor Presentations, and are thus also false and misleading for the reasons set forth in ¶¶ ~~299-303, 306.~~ 300-316, 325. This includes all statements and graphics concerning the status of Hyzon's key relationships with brand name customers and suppliers. Though Defendants replaced the name and logo of companies on the global map on Slide 18 with generic descriptions, the false and

misleading statements about the status of Hyzon's purported customer relationship with Heineken, Air Products, Coca-Cola, and Ikea remained alongside a generic description of the Company. And despite claiming that "key relationships ha[d] already been formed" with two chassis suppliers, Hyzon had not reached the point of negotiating any supply relationship with either.

309.335.    [Preserved]   Furthermore, it was particularly false and misleading for the Company to surreptitiously drop the logo of Coca-Cola as a top-tier customer, and to add logos of other entities in their stead, thus masking its unannounced edits. Moreover, it was false and misleading for the Company to omit the number of private and public contract orders that were "100 percent certain," a figure provided in prior Presentations shown to investors, as it obscured information about which of the customer deployments depicted in the adjacent map were in fact 100 percent certain or high probability orders.

336.   [Revised]     The statements suggesting Hyzon had a "near-term backlog to customers in Europe," including the display of logos and purported orders of European customers with 2021 deliveries (e.g., Friesland Campina) were especially false and misleading, as (i) Hyzon had no contracts to sell vehicles to European customers, but was merely providing retrofitting services on customer-owned trucks so that they could run on hydrogen power, and (ii) Hyzon had staged a video showing that a truck delivered to Friesland Campina operated on hydrogen power when, in reality, it did not.

6.    [R] DCRB 2020 Annual Report (Mar. 1, 2020)

310.   On March 1, 2021, DCRB filed its 2020 Annual Report, signed by Defendants Anderson and Haskopoulos, on a Form 10-K with the SEC. Therein, DCRB

- 207 -

provided ~~the following~~ information regarding its business combination agreement with Hyzon~~:~~

> ~~On February 8, 2021, the Company entered into a business combination agreement,~~ and ~~plan of reorganization (the "Business Combination Agreement") with DCRB Merger Sub Inc., a Delaware corporation and our wholly owned subsidiary ("Merger Sub"), and Hyzon Motors, Inc., a Delaware corporation ("Hyzon"), pursuant~~in that context specifically told readers to ~~which Merger Sub will be merged with and into Hyzon (the "Merger," together with the other transactions related thereto, the "Proposed Transactions"), with Hyzon surviving the Merger as our wholly owned subsidiary. The parties expect the Proposed Transactions to be completed in the second quarter of 2021, subject to, among other things, the approval of the Proposed Transactions by the Company's stockholders, satisfaction of the conditions stated in the Business Combination Agreement and other customary closing conditions.~~ : "***Please see the Form 8-K filed with the SEC on February 9, 2021 for additional information***~~.~~

337.    ." As discussed above, the February 9, 2021 Form 8-K included, among other things, Hyzon's February 9, 2021 press release announcing the merger, the transcript for the February 9, 2021 conference call, and the February 9, 2021 Investor Presentation.

~~311.~~338.    [Revised]    The statement(s) in the paragraph above referred to and incorporated by reference the false and misleading materials discussed in ¶¶ ~~288, 292, 296, 304, & 307.~~287-316. Accordingly, DCRB's Annual Report for Fiscal Year 2020 were false and misleading for the reasons set forth in ¶¶ ~~285, 299-303, 306, 309~~287-316.

~~312.~~339.    [Revised]    On May 13, 2021, the Company filed an amendment to the 2020 Annual Report, signed by Defendants Anderson and Haskopoulos. This amendment, however, did not change the language above, and was thus also false and misleading for the same reasons.

7.    **[R] Defendants' Statement at Cowen Mobility Summit (Mar. 10, 2021)**

340.    On March 10, 2021, Defendants Knight, Gordon, and Tichio participated in the Cowen Mobility Disruption Virtual Summit, during which they emphasized Hyzon's customer commitments in place bolstering Hyzon's 2021 outlook. The full transcript from the conference session was filed as Soliciting Materials under Rule 14a-12 with the SEC. As

~~313.~~341.    Therein, Defendant Knight explained:

> [W]e now have more customer commitments than we have 2021 revenue forecasts, so we're feeling quite confident about our 2021 outlook. Basically, *customer commitments are documented orders, tender wins, that sort of thing, and the high probability orders* – coming back to your question – *are really those scenarios where you've been told you've been selected as the vendor but you haven't yet got the contract in place*, or you've, you know, the customer has given you a written confirmation by email that they're ordering, and you're going through contract discussion, etc., talking about specifications, performance acceptance criteria and that sort of thing.[208]

342.    [Preserved] The statement(s) in the paragraph above were false and misleading for the reasons set forth in ¶ 283.

~~314.~~343.    [Revised] Additionally, these statements were false and misleading, as, when viewed by themselves and in context of Hyzon's other contemporaneous statements, they (1) furthered the false and misleading impression created by Defendants' past statements that Hyzon's 2021 revenue forecasts were covered by "100% certain" orders and (2) deceptively reinforced investors' belief that Hyzon had

---

[208] Emphasis added. Full transcript available at https://www.sec.gov/Archives/edgar/data/0001716583/000119312521083405/d150330ddefa14a.htm.

deals in place with big-name brands listed in its investor presentations like Heineken and Coca-Cola who, in truth, were not real customers. *See ¶¶ 299-303, 306, 309*Although Hyzon had solicited transactions with highly recognizable global brands and/or blue-chip, Fortune 100 companies like Heineken, Ikea, Air Products, and Coca-Cola, none of these companies had indicated they would purchase HFCEVs from Hyzon at the time Defendants disseminated these statements. To the contrary, several of these purported customers had informed Hyzon in early 2021 that they had selected different HFCEV suppliers or would otherwise not be making purchases. For example, before February 9, Heineken had informed Hyzon that it could not accept an offer for any FCEV deliveries in 2021 because the deliveries were not included in its annual budget. Additionally, Hyzon had never gotten past introductory meetings with Coca-Cola.

8.    ~~Hyzon's~~[R] **Preliminary and Definitive Proxy Statements (multiple)**

344.    On March 17, 2021, Defendants filed a Preliminary Proxy Statement with the SEC. Defendants would go on to file updated versions on May 14, June 4, June 16, and June 21, 2021. These Proxy Statements were each signed by Defendant Anderson and filed in the name of the DCRB Board.

~~315.~~345.    Therein, Defendants made many statements about the SPAC Merger, including:

> In approving the business combination, the DCRB Board determined not to obtain a fairness opinion. The officers and directors of DCRB have substantial experience in evaluating the operating and financial merits of companies from a wide range of industries and concluded that their experience and background enabled them to make the necessary analyses and determinations regarding the business combination.

The factors considered by the DCRB Board include, but were not limited to, the following:

…

*Revenue Potential.* **The DCRB Board considered Hyzon's non-binding memoranda of understanding, letters of intent and a limited number of orders with various clients, including blue-chip Fortune 100 companies** as well as Hyzon's rapidly growing visibility.

Defendants also explained that financial projections reflected numerous assumptions, including:

> Hyzon's *maintaining gross margin remains relatively consistent at 30% to 33%* from 2021 to 2025, through product design and other innovations to decrease the cost of materials in a FCEV.

Finally, the Proxy Statement contained information about Hyzon, including:

> Hyzon's commercial vehicle business will initially be focused on manufacturing and supplying heavy-duty (Class 8) trucks, medium-duty (Class 6) trucks and 40- and 60-foot (12 and 18-meter) city and coach buses to commercial vehicle operators.
>
> …
>
> Existing Customers
>
> *Hyzon has already received a limited number of orders in an aggregate value of approximately $18.2 million: for Hyzon-branded trucks, sleepers and buses to Australia, New Zealand and the Netherlands, and is in advanced discussions for delivery of Hyzon-branded trucks to France and Germany, before the end of 2021.*
>
> …
>
> Hyzon has also entered into non-binding memoranda of understanding and letters of intent with various companies and municipalities predominantly in Europe, Asia and Australia,

- 211 -

~~which indicate interest in over 3,000 Hyzon-branded commercial vehicles, and in some cases Hyzon has deployed demonstration units to customers.~~

346.    [Preserved]  The statement(s) in the paragraph above were false and misleading for the reasons set forth in ¶ 283.

~~316.~~347.        [Revised]      Additionally, the statement that the DCRB considered Hyzon's "orders with various clients, including blue-chip Fortune 100 companies" was particularly misleading, as it lent further credit to the false and misleading impress that Hyzon did in fact have committed orders with the customers identified in its investor presentations, including the February 9, 2021 Investor Presentation. ~~As such, it is false and misleading for the same reasons as identified in ¶¶~~ Although Hyzon had solicited transactions with highly recognizable global brands and/or blue-chip, Fortune 100 companies like Heineken, Ikea, Air Products, and Coca-Cola, none of these companies had indicated they would purchase HFCEVs from Hyzon at the time Defendants disseminated these statements. To the contrary, several of these purported customers had informed Hyzon in early 2021 that they had selected different HFCEV suppliers or would otherwise not be making purchases. For example, before February 9, Heineken had informed Hyzon that it could not accept an offer for any FCEV deliveries in 2021 because the deliveries were not included in its annual budget. Additionally, Hyzon had never gotten past introductory meetings with Coca-Cola. As such, the proxy statement's suggestion that Hyzon had relationships with blue-chip Fortune 100 companies is false and misleading for the same reasons as identified in ¶¶ 283~~, 299-303, 306, 309,~~ 300-336.

~~317.    The statement that Hyzon's projections rested on the assumption that Hyzon would "maintain[] gross margin remains relatively consistent at 30% to 33%" was also~~

especially false and misleading. The word "maintain" created the false and misleading impression that Hyzon already had gross margins at 30-33%. In truth, Hyzon's European operations exclusively offered, and only engaged in, in retrofitting services, rather than the manufacturing of goods advertised in Hyzon's pre-SPAC-Merger statements, and thus had different margins than those in the assumptions Hyzon espoused. Additionally, Hyzon was planning, or already planning to, deliver HFCEB products to China rather than to the North American, European, and Australasian markets. The China truck market featured different revenue dynamics than those advertised in Hyzon's pre-SPAC-Merger margin discussions, thus rendering Hyzon's discussions of margins in its proxy statements false and misleading.

318. Finally, Hyzon's description of the geographic locations of customers from which it received its limited number of orders was false and misleading as the mention of New Zealand referenced Hiringa, which had no binding orders, *see* Part VIII.B, *infra*, and because the list of locations omitted Hyzon's planned sales to China.

319.348. [Revised] Defendants made these false and misleading statements each time they were repeated in Hyzon's Proxy Statements, including on March 17, May 14, June 4, June 16, and June 21, 2021. Those later iterations are false and misleading for the same reasons.

9. **[R] Hyzon's April 29, 2021 Analyst Day Presentation**

320.349. On April 29, 2021, Defendants filed as Soliciting Materials with the SEC (on Schedule 14A) a copy of a PowerPoint presentation entitled "Hyzon Motors[,] The Leader in Hydrogen Mobility[,] Analyst Day Presentation." This presentation was filed with the SEC as a Soliciting Material pursuant to Rule 14a-12. Additionally, the

- 213 -

bottom of each page featured Hyzon and DCRB's logos. This presentation conveyed information similar to the slides in its February 9-12, 2021 Investor Presentations.

350.    On Slide 8 of the April presentation, the Company ~~again gave an investment overviewing, claiming~~claimed it had **"$55 million of backlog under contract or MOU** (up from $40 million in February 9, 2021 transaction announcement presentation~~)"~~"); commercial relationships include blue-chip Fortune 100s and ~~that~~municipalities …"; and an "80% of near-term backlog to customers in **Europe, Asia and Australia**." (Emphasis in original.)

351.    Slide 8 also provided Hyzon ~~included~~and updated graphic of Hyzon's "Top Tier Customers / End Users / Partners."



~~321.~~352.        On Slide 35, the ~~following graphics~~April presentation featured an updated global map slide, which ~~contain false and misleading statements:~~displayed generic descriptions of putative customers along with a description of the status of the customer's relationship with Hyzon. These descriptions mirrored the previous presentations' descriptions for Heineken, Air Products, Coca-Cola, and Ikea.







## Summary Projected Financials

| ($USD IN MILLIONS) | 2021E | 2022E | 2023E | 2024E | 2025E | |
|---|---|---|---|---|---|---|
| **VOLUMES** | | | | | | |
| **VEHICLE DELIVERY VOLUMES** | | | | | | |
| HEAVY TRUCK (36T-50T) | 74 | 513 | 2,638 | 5,660 | 7,400 | |
| MEDIUM TRUCK (12T) | 0 | 110 | 722 | 1,140 | 1,860 | |
| CITY BUS (12M) | 11 | 35 | 68 | 340 | 600 | |
| CLASS 3 TRUCK / VAN | 0 | 0 | 840 | 4,435 | 7,235 | |
| **TOTAL** | 85 | 658 | 4,268 | 11,535 | 17,095 | |
| **INCOME STATEMENT** | | | | | | No additional equity required between PIPE and going to market, achieving positive cash-flow |
| VEHICLE REVENUE | 35 | 190 | 948 | 2,176 | 3,129 | |
| FUEL CELL REVENUE | 2 | 6 | 17 | 43 | 105 | |
| HYZON ZERO CARBON REVENUE | 0 | 1 | 7 | 24 | 52 | |
| **TOTAL REVENUE** | $37 | $198 | $972 | $2,242 | $3,286 | |

~~The Company made no changes to its false and misleading statements in the Presentation regarding its projected financials.~~

353.    On Slide 52, the April presentation also included "Summary Projected Financials," affirming Hyzon expected to deliver 85 vehicles and earn $37 million in 2021.



354.    On Slide 59, the April presentation also included a slide with the header "… Key Relationships Have Already Been Formed," which again listed logos of companies for "Selected Manufacturing Suppliers," including chassis suppliers Ford, Detroit Chassis, LCC, DAF, and Freightliner, and select "Vehicle Customers."



355.   The statement(s) in the paragraph above and the above-depicted graphics concerning Hyzon's purported top tier vehicle customers, customer deployments, 100% certain and high probability orders, and projected revenues were false and misleading for the reasons set forth in ¶ 283.

322.356.   [Revised]   Additionally, thesethe April 29, 2021 Presentation's statements and graphics virtually mirrored the false and misleading statements made during Defendants' February 9, 10 and 12, 2021 Investor Presentations, and are thus also false and misleading for the reasons set forth in ¶¶ 299-303, 306, 309.300-336. This includes all statements and graphics concerning the status of Hyzon's key relationships with brand name customers and suppliers. Although Hyzon had solicited transactions with highly recognizable global brands and/or blue-chip, Fortune 100 companies like Heineken, Ikea, Air Products, and Coca-Cola, none of these companies had indicated they would purchase HFCEVs from Hyzon at the time Defendants disseminated these statements. To the contrary, several of these purported customers had informed Hyzon in early 2021 that they had selected different HFCEV suppliers or would otherwise not be making purchases. Before February 9, Heineken had informed Hyzon that it could not accept an offer for any FCEV deliveries in 2021. By March 2021, Air Products had informed Hyzon that it had selected a different FCEV supplier. Additionally, Hyzon had never gotten past introductory meetings with Coca-Cola. But Hyzon did not remove these companies and instead continued to list them as being in "advanced discussions" or "finalizing POs" in subsequent versions of Hyzon's investor presentations. Though Defendants replaced the name and logo of companies on the global map on Slide 18 with generic descriptions, the false and misleading statements about the status of Hyzon's purported customer relationship with

Heineken, Air Products, Coca-Cola, and Ikea remained alongside a generic description of the Company. And despite claiming that "key relationships ha[d] already been formed" with two chassis suppliers, Hyzon had not reached the point of negotiating any supply relationship with either.

323.357.    [Preserved]    In addition, it was particularly false and misleading for the Company to describe its top customer list as "expanding," as the term suggests that changes to the list were additive and that no previously listed entities were deleted. It was further false and misleading for the Company to maintain its earlier projections for 2021 revenue and vehicles delivered, nearly $37 million and 85 vehicles respectively, even though it removed multiple customers from previous presentations, and filled those gaps by inserting duplicate logos for grocer group FrieslandCampina—a future delivery of a single vehicle that would not operate on hydrogen and from which Hyzon would recognize no revenue.

324.358.    [Preserved]    Additionally, Hyzon's claim attributing "80% of near-term backlog to customers in Europe, Asia and Australia" was false and misleading, as it suggested that Hyzon had sizeable customer commitments in 2021 to customers in Europe and Australia, even though the bulk of its deliveries (more than 70%) were to Asia. The claim was also false and misleading because it suggested Hyzon had a near-term backlog to customers outside these continents, even though Hyzon has announced virtually no confirmed sales or deliveries of HFCEVs to customers in other continents, such as North America.

359.    [Revised]    The statements suggesting Hyzon had a "near-term backlog to customers in Europe," including the display of logos and purported orders of European

- 219 -

customers with 2021 deliveries (e.g., Friesland Campina) were especially false and misleading, as (i) Hyzon had no contracts to sell vehicles to European customers, but was merely providing retrofitting services on customer-owned trucks so that they could run on hydrogen power, and (ii) Hyzon had staged a video showing that a truck delivered to Friesland Campina operated on hydrogen power when, in reality, it did not.

**10.     [R] DCRB's 1Q21 Quarterly Report (May 24, 2021)**

325.360.     On May 24, 2021, the Company filed its quarterly report for the quarter ended March 31, 2021 ("1Q21 Report"). Defendant Anderson signed the filing. Therein, Defendants again included information about the Business Combination Agreement and again told investors: "***Please see the Form 8-K filed with the SEC on February 9, 2021 for additional information***"—which included as an attachment Hyzon's February 9, 2021 press release announcing the merger, the transcript for the February 9, 2021 conference call, and the February 9, 2021 Investor Presentation.

326.361.     The statement(s) in the above-depicted paragraphs referred to and incorporated by reference the false and misleading materials discussed in ¶¶ 288, 292, 296, 304, & 307.287-316. Accordingly, DCRB's Annual Report for Fiscal Year 2020 were false and misleading for the reasons set forth in ¶¶ 285, 299-303, 306, 309287-316, 349-359.

**11.     [R] Defendants' Statements at Bernstein Fireside Chat (June 16, 2021)**

327.362.     On June 16, 2021, Defendant Knight participated in a fireside chat hosted by Bernstein. The full transcript of this chat was filed with the SEC as a Soliciting Material under Rule 14a-12. Therrien, Knight said, among other things, the following regarding revenue targets:

- 220 -

> We've had a couple places in Europe recently, we're engaging with customers about the first one or two vehicles, and they want to already order 10 or 20 or more recently, we're now seeing [inaudible], a major retailer, they wanted 70 vehicles straight away, subject to the first four vehicles meeting all the various performance criteria. They wanted to commit to 70.
>
> …
>
> ***I'd like to remain a little conservative on this but providing there are no more nasty surprises in supply chains and those kind of things, we'll definitely hit this year's targets***.

363.    [Preserved] The statement(s) in the prior paragraph were false and misleading for the reasons set forth in ¶ 283.

328.364.    [Preserved] Additionally, these statements mirrored Hyzon's prior false and misleading claims about its 2021 revenue and delivery targets, and thus are false and misleading for the same reasons as set forth in ¶¶ 299294-303336, 306, 309349-359, including Hyzon's statements regarding the assumptions for those projections, *see* ¶ 317¶¶ 340-343.

365.    [Revised]    The statements concerning Hyzon's customers in Europe were especially false and misleading, as Hyzon had no contracts to sell vehicles to European customers, but was merely providing retrofitting services on customer-owned trucks so that they could run on hydrogen power.

### 12.    [R] Defendants' Statements at IPO Edge Fireside Chat (June 29, 2021)

329.366.    On June 29, 2021, Defendants Tichio and Knight attended a virtually held Fireside Chat, hosted by IPO Edge, during which they referred the audience to, and provided them with, the February and April 2021 PowerPoint presentations described above. In response to a question about Hyzon's lack of positive revenue, Tichio stated:

> [I]f you take a look at 2021, *the company is you know projecting $37 million of revenue [from] vehicles that will actually roll off its lot this year.* That is what we had communicated back in February. *We still feel extraordinarily comfortable with that assessment,* in that belief in terms of the pathway for the company and that the company has already demonstrated publicly through its online virtual tour with respect to its actual vehicles that were that that are on the road that are functioning and that are all regaining fantastic commercial traction right now.

367.   [Preserved]  The statement(s) in the prior paragraph were false and misleading for the reasons set forth in ¶ 283.

330.368.      [Preserved]  Additionally, these statements mirrored Hyzon's prior false and misleading claims about its 2021 revenue and delivery targets, and thus are false and misleading for the same reasons as set forth in ¶¶ 299-303, 306, 309, 316.294-336, 349-359. Furthermore, it was particularly false and misleading for Defendant Tichio to reaffirm the Company's forecasted delivery and revenue targets, thus perpetuating the Defendants' prior false and misleading statements about their committed orders and customer base.

369.   [Revised]   The statement(s) in the paragraph above referred to and incorporated by reference the false and misleading materials included in the February and April 2021 Presentations discussed above and thus were false and misleading for the same reasons articulated above for those presentations.

13.    [P] Hyzon's Business Update Doubling Revenue Forecast (July 13, 2021)

331.370.      On July 13, 2021, Defendants issued a business update asserting that Hyzon had doubled its 2021 revenue forecast due to new sales while simultaneously reducing its costs per vehicle. Specifically, it stated:

- 222 -

> *Orders and non-binding MoUs have increased to represent up to $83M, up more than 50% from $55M as of April 29, 2021, and over 100% from February 12, 2021*. Expected 2022 deliveries include up to 70 trucks from Austrian grocery retailer MPREIS currently under an MoU.
>
> The *growing list of orders and non-binding MoUs comes from the rapidly developing European market as well as Australia*, thanks to the company's international footprint.
>
> …
>
> *Simultaneously, Hyzon has successfully reduced costs in excess of $50,000 per vehicle for manufacturing components and sub-systems*, with savings over 80% for certain auxiliary power systems, power distribution unit and on-board chargers and over 40% for battery, eMotor, and inverter components.

332.371.    [Preserved]   The statement(s) in the prior paragraph were false and misleading for the reasons set forth in ¶ 283.

333.372.    [Preserved]   Additionally, it was particularly false and misleading for Defendants to state that it had a "growing list of orders and non-binding MoUs" from Europe and Australia. The use of the conjunctive "and" denoted that Hyzon had both binding and non-binding orders from these regions beyond those originally advertised in Hyzon's February investor presentations and underlying Hyzon's original revenue and delivery projections. But in neither 2021 nor 2022 did Hyzon has make any new sales or revenue-generating deliveries to customers in Europe. This fact suggests that there were growing list of binding orders, and that Defendants made the above statements to push the false narrative that it had a rapidly developing European and Australian market, committed orders and customer base.

**14.    [R] Hyzon Announces its First HFCEV Delivery (July 13, 2021)[209]**

373.    On July 13, 2021, Hyzon issued a press release titled "Hyzon Motors delivers first hydrogen-powered vehicle to support multinational dairy company's operations, transition fleet to zero-emissions."

374.    Therein, Hyzon claimed "that it ha[d] delivered its first 55-ton milk truck to Transport Groep Noord, a carrier providing transport for multinational dairy company Royal FrieslandCampina N.V." and that the vehicle operated on hydrogen.

375.    The same day, Hyzon and various Hyzon executives, including Defendant Gu, also posted and/or disseminated a video of the FCEV via social media which purported to show the vehicle operating on hydrogen.

376.    These statements and video recordings were false and misleading, as the HFCEV that Hyzon purportedly delivered to FrieslandCampina did not actually run on hydrogen. When Hyzon recorded the video of the FCEV milk truck, it was not connected to an operational hydrogen fuel cell and was powered solely by an electric battery that allowed it to travel only a limited distance. Hyzon had not even installed a critical component on the FCEV that was required to power the FCEV with a hydrogen fuel cell.

377.    The July 13, 2021 press release and social media postings about the FCEV milk truck were material to investors, including the SPAC's shareholders who voted whether to approve the Hyzon merger two days after the press release was issued. These statements were important because, among other reasons, Hyzon had not previously delivered any FCEVs to a customer.

---

[209]    Plaintiffs clarify that this press release has been newly added to the 4AC in light of the information revealed by the SEC's enforcement action.

**14.15.  [R] Hyzon's July 19, 2021 Investor Presentation**

378.    On or about July 19, 2021, the Defendants made public on Hyzon's website a new version of its investor presentation. Therein, the Company removed many of the slides from its previous presentations touting its top-tier customers and partners.

379.    With respect to its customer base, on slide 23, the Company only included the following whitewashed map of its customer deployments, which was virtually identical to the deployment map featured in the April 29, 2021 Investor Presentation (see below).



380.    On slide 36, the Presentation repeated the claim that it, in the near term, it had "$55M of revenue under contract or MOU already," with *"~75% of sales into Asia & Australia*, ~25% into Europe."

381.    On Slide 47, the Presentation again showed the "Key Relationship" Hyzon had purportedly already formed with "Selected Manufacturing Suppliers" and "Vehicle Customers," including FrieslandCampina.

334.382.     Further, the Company maintained on slide 40, entitled "Summary Projected Financials," that it expected to deliver 85 vehicles and earn nearly $37 million in total revenue in 2021.



383.  [Preserved]  The statement(s) in the paragraph above and in the above-depicted graphic concerning Hyzon's purported top tier vehicle customers, customer deployments, 100% certain and high probability orders, and projected revenues were false and misleading for the reasons set forth in ¶ 283.

335.384.     [Revised]     Additionally, thesethe July 19, 2021 Presentation's statements and graphics virtually mirrored many of the false and misleading statements made during Defendants' February 9, 10 and 12, 2021 Investor Presentations, and are thus also false and misleading for the reasons set forth in ¶¶ 299-162303, 306, 309. same reasons articulated above. This includes all statements and graphics concerning the status of

- 226 -

Hyzon's key relationships with brand name customers and suppliers. Although Hyzon had solicited transactions with highly recognizable global brands and/or blue-chip, Fortune 100 companies like Heineken, Ikea, Air Products, and Coca-Cola, none of these companies had indicated they would purchase HFCEVs from Hyzon at the time Defendants disseminated these statements. To the contrary, several of these purported customers had informed Hyzon in early 2021 that they had selected different HFCEV suppliers or would otherwise not be making purchases. Before February 9, Heineken had informed Hyzon that it could not accept an offer for any FCEV deliveries in 2021. By March 2021, Air Products had informed Hyzon that it had selected a different FCEV supplier. By June 2021, Ikea specifically told Hyzon that it would not be moving forward with the project then under discussion. Additionally, Hyzon had never gotten past introductory meetings with Coca-Cola. But Hyzon did not remove these companies and instead continued to list them as being in "advanced discussions" or "finalizing POs" in subsequent versions of Hyzon's investor presentations. Though Defendants replaced the name and logo of companies on the global map on Slide 18 with generic descriptions, the false and misleading statements about the status of Hyzon's purported customer relationship with Heineken, Air Products, Coca-Cola, and Ikea remained alongside a generic description of the Company. And despite claiming that "key relationships ha[d] already been formed" with two, chassis suppliers, Hyzon had not reached the point of negotiating any supply relationship with either.

336.    Furthermore, it was particularly misleading for Hyzon to combine deliveries to Asia and Australia into one statistic — "75% of sales into Asia & Australia." As of the date, Hyzon had focused repeatedly on sales to Australia (and New Zealand) but had yet

to disclose any sales or planned deliveries to entities in Asia. As such, this statement, when viewed in context, created the false and misleading impression that Hyzon had substantial sales to Australia when, to the contrary, Hyzon had zero, revenue-generating sales of HFCEVs to Australia in 2021 and 2022, and in fact planned to make the vast majority of its 2021 HFCEV deliveries to China (Hyzon's restated and late-filed financial reports for 2022 show the Company made no revenue generating deliveries of HFCEVs in 2022.) .

385.   [Revised]    Further, the statements suggesting Hyzon had sales to Europe, including the display of logos and purported orders of European customers with 2021 deliveries (e.g., Friesland Campina), were especially false and misleading, as (i) Hyzon had no contracts to sell vehicles to European customers, but was merely providing retrofitting services on customer-owned trucks so that they could run on hydrogen power, and (ii) Hyzon had staged a video showing that a truck delivered to Friesland Campina operated on hydrogen power when, in reality, it did not.

## 15.16.  [R]    Hyzon's Statement in Response to Blue Orca Report (Oct. 5, 2021)

337.386.    On October 5, 2021, DefendantsHyzon issued a public statement "strongly rejecting" the Blue Orca Report. Therein, DefendantsHyzon made the following false and misleading statements concerning its customers:

> The short seller report falsely claims that Hyzon overstated its relationship with certain customers in its investor presentations. Like any innovative company in a nascent industry, Hyzon continues to pursue a wide range of potential opportunities, any one of which may or may not ultimately result in a commitment to purchase vehicles from Hyzon. Contrary to the short seller's claims, *no customers or potential customers "disappeared" from any investor presentation; rather, Hyzon anonymized certain customer and potential customer names in its July 2021 investor presentation*. Hyzon

- 228 -

already has entered into signed agreements with certain entities identified as potential customers in its investor presentations, including the Southern California Gas Company, Ark Energy and the Municipality of Groningen. ***Hyzon continues to engage in active discussions with a majority of the companies that the short seller report misleadingly claims "disappeared" from its investor presentations,*** as well as with a large number of other prominent companies across the globe.

387. [Revised]    The statement(s) in the prior paragraph are false and misleading. As discussed above, Hyzon had, in fact, overstated its relationships with several customers claimed in its investor presentations, including Heineken, Air Products, Ikea, and Coca-Cola. Although Hyzon had solicited transactions with highly recognizable global brands and/or blue-chip, Fortune 100 companies like Heineken, Ikea, Air Products, and Coca-Cola, none of these companies had indicated they would purchase HFCEVs from Hyzon at the time Defendants disseminated these statements. To the contrary, several of these purported customers had informed Hyzon in early 2021 that they had selected different HFCEV suppliers or would otherwise not be making purchases. Before February 9, Heineken had informed Hyzon that it could not accept an offer for ~~the~~ any FCEV deliveries in 2021 because the deliveries were not included in its annual budget. By March 2021, Air Products had informed Hyzon that it had selected a different FCEV supplier. By June 2021, Ikea had specifically told Hyzon that it would not be moving forward with the project then under discussion. Additionally, Hyzon had never gotten past introductory meetings with Coca-Cola.

~~338.~~388.    [Revised]    For similar reasons ~~set forth in ¶¶ 285, 299-303, 306, 309, 316. Furthermore~~, it was exceptionally false and misleading for ~~Defendants~~Hyzon to claim that ~~they~~it only made anonymization-based changes to the lists of customers

identified in its July ~~21 investor presentations, given the series of changes documented herein among the Company's three February~~ 2021 investor presentations, ~~its April~~as Hyzon had "anonymized" the names and logos of companies that had informed it that they would not be purchasing vehicles and had removed their logos in other parts of its investor presentation~~, and its July presentation.~~ showing top customers.

~~339.~~389.    ~~In light of the information provided in those earlier presentations, it is readily apparent that beyond the anonymization of certain information, certain customers or potential customers, did in fact disappear from Hyzon's presentations.~~[Revised]. In addition, it was false and misleading for Defendants to cite agreements with specific "potential customers" identified in its investor presentations as evidence that it did not overstate its relations with customers, without addressing the big-brand customers like Heineken and Ikea that were discussed above and specifically referenced as focal points in the Blue Orca Report prompting Hyzon's response.

~~340.~~390.    [Preserved] Finally, it was egregiously false and misleading for Defendants to not disclose in this rebuttal that, as a result of the Company's "proactive shift" to deployment in Asia, where average selling prices were lower, Hyzon expected to earn lower than forecasted 2021 revenues and would not be able to recognize certain revenues under GAAP and internal revenue recognition policies, as Defendants had earlier affirmed that Hyzon would meet its target of nearly $37 million, and as by this date, Defendants were aware they would not be able to hit that target.

**16.17.  [✓]    Hyzon 3Q21 Quarterly Report (Nov. 15, 2021)**

341.391.          On November 15, 2021, Hyzon released its quarterly report for its first quarter as a post-SPAC-merger public company—the period ended September 30, 2021. In describing Hyzon's business in "Note 1. Nature of Business and basis of Presentation," Hyzon described its business as follows: "Hyzon focuses on accelerating decarbonization starting with mobility ***through the manufacturing and supply of hydrogen fuel cell-powered commercial vehicles across the North American, European, and Australasian regions.***" Additionally, under "Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations," Hyzon claimed that in the third quarter, it "reported [its] first deliveries and revenues of $1.0 million."

342.392.          The statement(s) in the prior paragraph are false and misleading for the reasons set forth in ¶ 283. Additionally, the phrases "manufacturing and supply of hydrogen fuel vehicles" and "reported [its] first deliveries" were especially false and misleading, as the purported deliveries and revenues discussed did not arise from HFCEVs manufactured by Hyzon. In truth, the purportedly delivered vehicles were retrofit services, by which Hyzon converted customers' already used combustion vehicles to HFCEVs. As such, Hyzon did not manufacture the vehicle and supply a product to customers. Hyzon did not disclose this fact (or its retrofitting operations) until 2023. Nor did it disclose that the vehicles discussed in the 3Q21 Report required post-delivery work, thus inhibiting Hyzon's ability to recognize revenue from then done at the time.

343.393.          Furthermore, the phrase "across North American, European, and Australasian regions" in combination with the present tense verb "focuses" was also particularly false and misleading, as at the time the statement was made (and up through

the present), Hyzon did not manufacture and supply HFCEVs to the North American and Australasia regions. Rather, every HFCEV *manufactured* by Hyzon in 2021 and 2022 was supplied to and or delivered to customers in Asia. And even if a person mistakenly considered Hyzon's retrofit serviced vehicles among Hyzon's product count, more than 94% of Hyzon's purported vehicle sales at the time (and up through the present) consisted of sales to Asia, and none were to North America.

17.18. [✓]   **Hyzon 2021 Annual Report (March 30, 2022 and May 31, 2022 (amended))**

344.394.    On March 30, 2022, Hyzon released Hyzon's 2021 Annual Report, signed by Defendants Knight, Gordon, Gu, and Anderson, as well as other non-party directors, which, among other things, Hyzon reported that itHyzon "recognized $6.0 million in sales of FCEVs, of which $2.2 million was recognized in the European region."

345.395.    The statement(s) in the prior paragraph are false and misleading for the reasons set forth in ¶ 283. Additionally, the statements were especially false and misleading for suggesting that Hyzon made sales in, and recognized revenues for product sales from, the European region, when in fact, all Hyzon vehicle operations in Europe in 2021 were retrofitting services—and at-the-time undisclosed business activity. Moreover, all revenues from Europe derived not from product sales, but rather services. Additionally, these revenues were materially overstated. *See* Part VIII.D, *infra*.

B.    **[Removed] Statements Concerning Hiringa**

346.    Until Blue Orca's revelations, Defendants repeatedly held out Hiringa as a "top tier customer" and committed direct purchaser that would receive 20 of Hyzon's 85 projected 2021 HFCEV deliveries. To obtain investor approval for the de-SPAC merger,

Defendants pushed this false narrative (at the time, Hyzon's largest "committed order") in traditional investor materials as well as through digital mediums like YouTube and Twitter

347. Statements touting the number of vehicles to be supplied to Hiringa were false and misleading for the following reasons, both together and individually:

(a) Hyzon did not have any "binding" orders from Hiringa and instead had a non-binding MoU;

(b) Hyzon advertised Hiringa, which merely operated as an intermediary for ultimate purchasers, as a customer;

(c) Hyzon counted orders from potential customers of Hiringa that could not plausibly be expected to order the listed number of trucks in 2021 or otherwise;

(d) Hyzon counted orders from Hiringa partners, even though the conditions precedent for those customers to receive such orders, including validation trials and hydrogen infrastructure buildouts which would not occur, at the earliest, had not been satisfied and would not be satisfied by promised delivery dates;

(e) Hyzon counted orders from persons and entities that did not intend to order the number of trucks Hyzon used in its count by the certain delivery dates; and

(f) Hyzon omitted material information necessary to steer investors from inaccurate conclusions regarding sales, deliveries, and revenues related to Hiringa.

Indeed, despite claiming no wrongdoing, Hyzon changed the way it described Hiringa following the Blue Orca and Iceberg Research Reports and began explicitly referring to Hiringa as a channel partner. Specifically, on November 12, 2021, Hyzon announced that "***Hyzon channel partner*** Hiringa in New Zealand [had] announced an equity investment from Mitsui & Co in their refueling network, in addition to funding from the New Zealand Government." This change in language constitutes an implicit admission that Hyzon's prior

statements concerning Hiringa, as reiterated in this Subsection (Statements Concerning Hiringa) were false and misleading, and that Hyzon acknowledged they were false and misleading.

348.    The number of vehicles ordered by Hiringa was material because it was a key fact broadcasted to investors before and after the SPAC Merger, served as a signal of demand for Hyzon HFCEVs, particularly in non-China markets, served as a signal of expected future revenues, served as an indicator of industry opinions of Hyzon and its HFCEVs, and served as an indicator of the capabilities and success of Hyzon's sales and marketing functions.

349.    The following statements regarding Hiringa were false and misleading for the reasons stated in ¶ 347, as supplemented by the reasons identified below each statement explaining why specific words, phrases, and concepts were particularly false or misleading, both individually and when viewed in the context in which they were made.

1.    **Hyzon Press Release Announcing Hiringa Partnership (Feb. 17, 2021)**

350.    On February 17, 2021, Defendants caused Hyzon to issue a press release announcing that Hyzon and Hiringa "ha[d] signed a vehicle supply agreement, with *Hyzon commissioned to build and supply Hiringa with zero emission Heavy Goods Vehicles (HGV)*." According to its press release, "*the first batch of vehicles [we]re expected to enter service in New Zealand by the end of 2021*." Moreover, it claimed that "*Hyzon plan[ned] to have up to 1,500 fuel cell trucks on the road in New Zealand by 2026* ...."

351.    The statements in the paragraph above touting the supply of vehicles to Hiringa were false and misleading for the reasons set forth in ¶ 347. Additionally, these statements were especially misleading because they use the words "build" and "supply" as

- 234 -

active verbs, with Hiringa as the direct object. This reasonably suggested that Hiringa was in fact the ultimate purchaser and end-user of the HFCEVs. The statements also did not disclose the identity of any end users of the first batch of vehicles or that Hiringa was a channel partner, further suggesting that Hiringa was in fact a customer and end user. But as Blue Orca's interview with a Hiringa executive confirmed, Hiringa had no intention to ever pay for or take title over Hyzon's trucks. Hiringa merely was as a conduit to encourage other New Zealand heavy truck operators to purchase trucks from Hyzon.

352.    The false and misleading nature of these statements were compounded by the fact that Hiringa would not, and had no intent to, take any deliveries in 2021. This is particularly so as Hiringa's receipt of vehicles was dependent on whether vehicles first passed a validation trial and whether Hiringa could build up a commercial hydrogen fuel station infrastructure  material preconditions not disclosed in this or other public statements by Hyzon. Hyzon would have known, or should have been aware of, these preconditions from any amount of due diligence and from its relationship with Hiringa.

2.    **Hyzon Twitter Post re: Hiringa Deal (Feb. 17, 2021)**

353.    Also on February 17, 2021, Defendants posted a tweet of the Hiringa deal on Hyzon's social media account, describing it as "***an agreement for the build and supply of up to 1,500 hydrogen fuel cell-powered trucks to New Zealand's Hiringa Energy by 2026***."

354.    The statements in the paragraph above touting the supply of vehicles to Hiringa were false and misleading for the reasons set forth in ¶ 347. These statements mirrored the false and misleading statements identified in Hyzon's February 17, 2021 press

- 235 -

release announcing its deal with Hiringa, and thus were also false and misleading for the same reasons identified in ¶¶ 351-352.

### 3.    Hyzon Press Release Regarding Virtual Ride Along Showcase (Mar. 8, 2021)

355.    On March 8, 2021, Defendants issued a press release entitled "Hydrogen Now™ Event to Showcase Virtual Ride Along in a Zero-Emission, Hydrogen Fuel Cell Powered Truck at Hyzon's Production-Ready Groningen Facility," in which they made the following false and misleading statement(s):

> Hyzon and Hiringa Energy (New Zealand) recently announced that the two companies had signed a vehicle supply agreement. Hyzon is targeting the delivery of 1,500 fuel cell powered heavy trucks by 2026 as part of the agreement with Hiringa. As binding orders for those trucks are placed, Hyzon anticipates fulfilling them from the Groningen facility, *with first shipments planned for the second half of 2021*.

356.    The statements in the paragraph above touting the supply of vehicles to Hiringa with first shipments planned in 2021 were false and misleading for the reasons set forth in ¶ 347. These statements mirrored the false and misleading statements identified in Hyzon's February 17, 2021 press release announcing its deal with Hiringa, and thus were also false and misleading for the same reasons identified in ¶¶ 351-352.

### 4.    Hyzon Preliminary Proxy Statements (Mar. 17, 2021)

357.    On March 17, 2021, Defendants filed a Preliminary Proxy Statement with the SEC (on Schedule 14A). This Preliminary Proxy Statement, as well as all subsequent Proxy Statements, was signed by Defendant Anderson and issued "by Order of the Board of Directors." The Mar. 17, 2021 Proxy Statement included the following false and misleading claim:

To date, Hyzon has *received binding orders* for Hyzon-branded commercial vehicles and coach buses in an aggregate value of approximately $18.2 million from companies around the world, including Hiringa and Fortescue Metals Group Ltd. *Hiringa has placed a binding order for the first 20 trucks* which are expected to be powered by green hydrogen supplied through Hiringa's nationwide refueling infrastructure and aims to deploy up to 1,500 fuel cell powered heavy trucks manufactured by Hyzon to fleet operators in New Zealand by 2026 as part of a partnership to decarbonize heavy road transport in New Zealand. Hyzon expects the first shipments of four trucks to occur by the first quarter of 2022.

...

Hyzon's existing customers which have placed binding orders include leaders in the transportation and logistics and mining sectors, such as *Hiringa (supported by logistics companies in New Zealand)*.

358.    The statements in the paragraph above touting the supply of vehicles to Hiringa were false and misleading for the reasons set forth in ¶ 347. Additionally, these statements were especially misleading because they represented that Hiringa had placed a binding order and that Hyzon had received "binding orders" from Hiringa. This reasonably suggested that Hiringa, as the maker of the order, was in fact the ultimate purchaser and end-user of the HFCEVs. The statements also did not disclose the identity of any end users of the first batch of vehicles or that Hiringa was a channel partner, further suggesting that Hiringa was in fact a customer and end user.

359.    The characterization of Hiringa as an example of a "leader[] in the transportation and logistics and mining sectors," in combination with the statement that Hiringa was "supported by logistics companies" compounded the false and misleading nature of Defendants' statements. Hyzon's emphasis that Hiringa was a transportation

- 237 -

company supported by logistics companies reasonably suggested that Hiringa was an end user supported by channel partners. In reality, it was Hiringa who was channel partner assisting other end users. And Hiringa had no intent to use Hyzon's HFCEVs itself.

5.    Hyzon Analyst Day Presentation (Apr. 29, 2021)

360.    On April 29, 2021, Defendants held an analyst day at which it released a PowerPoint presentation entitled "Hyzon Motors[,] The Leader in Hydrogen Mobility[,] Analyst Day Presentation." Defendants also filed this presentation with the SEC as Soliciting Material under Rule 14a-12 on Schedule 14A. In that presentation, Defendants claimed: "*Announced vehicle supply agreement to supply trucks to New Zealand-based Hiringa Energy; first deliveries expected by EOY 2021.*"

361.    The statement in the paragraph above touting the supply of vehicles to Hiringa by the end of 2021 was false and misleading for the reasons set forth in ¶ 347. Additionally, this statement mirrored the false and misleading statements identified in Hyzon's February 17, 2021 press release announcing its deal with Hiringa, and thus were also false and misleading for the same reasons identified in ¶¶ 351-352.

362.    Furthermore, this statement in this public-facing analyst presentation was false and misleading because it contradicted representations made in Hyzon's preliminary proxy statements that orders to Hiringa would not in fact ship until 1Q22.

C.    Statements Concerning HongYun

363.396.    Beginning on September 9, 2021, Defendants further misled investors as to the origins, operations, track record, and counterparty risk presented by its largest purported customer, HongYun. Defendants falsely portrayed HongYun as a well-established logistics company with an operating footprint, infrastructure, and track record

- 238 -

sufficient to purchase and deploy 500 new hydrogen fueled trucks and generate $250 million in revenue. Additionally, they revived investors faith in Hyzon's 2021 projections—that is, Hyzon, despite having virtually zero HFCEVs throughout the first ten months of 2021, (i) had legitimate committed orders underlying its projections; (ii) would in fact deliver nearly 85 HFCEVs to deep pocketed customers in 2021; and (iii) would recognize significant revenues from these deliveries.

364.397.    Statements touting HongYun's origins, operations, and vehicle orders were false and misleading for the following reasons, both together and individually:

(a)    Hyzon counted orders from entities that did not sign agreements or purchase orders to buy the vehicles, either because they had not signed any agreement at all, as of the date of the announcement. or because they had signed an agreement to try out HFCEVs on a trial basis;

(b)    Hyzon counted orders from businesses that could not plausibly be expected to order the listed number of trucks;

(c)    Hyzon counted pre-orders from entities that merely operated as intermediaries for ultimate purchasers, or who had no such operations but sought to open such lines of business, even though such orders could not reasonably be counted as orders;

(d)    Hyzon counted as completed orders deliveries in which vehicles were not actually operable on hydrogen at the time of delivery;

(e)    Hyzon counted orders even though the conditions precedent for Hyzon to receive such orders, deliver vehicles, and or recognize revenue had not been satisfied;

(f)    Hyzon counted orders from persons and entities that did not intend to order HFCEVs or the number of trucks Hyzon used in its count;

(g)    Hyzon counted orders from entities that posed counterparty risks with respect to collectability which Hyzon failed to disclose;

- 239 -

(h)    Hyzon counted revenue from orders and entities from which it could not recognize revenue under GAAP accounting standards given those entities' limited operating histories and extended contract-payment terms,

(i)    Hyzon counted orders for which it had awarded undisclosed rebates, credits, and/or discounts, including in the form of warrants for Hyzon's stock;

(j)    Hyzon reported revenue from orders without accounting for rebates, credits, discounts, and/or taxes;

(k)    Hyzon characterized HongYun as a new customer when, upon information and belief, HongYun's underlying purchaser(s) were legacy Horizon customers and contracts given to Hyzon to fill its order gap and create the false and misleading impression that Hyzon had strong, growing customer demand;

(l)    Hyzon omitted material information necessary to steer investors from inaccurate conclusions regarding sales, deliveries, and revenues related to HongYun.

Indeed, despite claiming no wrongdoing in response to the Blue Orca Report, Hyzon's Board of Directors ultimately formed a Special Committee to investigate revenue recognition timing issues in China, as well as other governance and compliance issues. And following the start of this investigation, Founder Defendants Knight and Gu were terminated, the former for cause.

365.398.    The number and revenue value of pre-orders were material because they were key facts broadcasted to investors, served as a signal of demand for Hyzon's HFCEVs, served as a signal of expected future revenues, served as an indicator of industry opinions of Hyzon and its HFCEVs, and served as an indicator of the capabilities and success of Hyzon's sales and marketing functions.

366.399.    The following statements regarding HongYun were false and misleading for the reasons stated in ¶ 397, as supplemented by the reasons identified below

each statement explaining why specific words, phrases, and concepts were particularly false or misleading, both individually and when viewed in the context in which they were made.

**1.    [✓]    Hyzon's Press Release Announcing HongYun MoU (Sept. 9, 2021)**

367.400.    On September 9, 2021, Defendants, through Hyzon, issued a press release entitled "Hyzon Motors to supply up to 500 hydrogen fuel cell electric vehicles to Shanghai logistics company," which included, in pertinent part, the following false and misleading statements regarding the Company's deals and delivery schedule:

> …*the initial order of 100 vehicles is expected before the end of 2021* while the other 400 vehicles will be ordered in 2022.
>
> HongYun Automobile focuses *on providing logistics solutions primarily through hydrogen-powered fuel cell electric vehicles*. The *company provides operation, leasing and maintenance service for customers across the country, including one of the world's largest steelmakers*. After Hyzon delivers the vehicles, HongYun will be responsible for the subsequent commercial arrangements with its end customers.

The press release also stated the following regarding HongYun and the purported present abilities of HongYun and its management team.

> **About Hongyun**
>
> Shanghai Hongyun Automobile Co., Ltd. is committed to become the leader in hydrogen-powered fuel cell vehicle operation. *The core team of the company has solid operation experience and master the real time vehicle data management*, they had built up a deep cooperation with several large logistics group in China including Baowu Group, Zhejiang Eurasian Supply Chain, Jiaoyun Hubei Logistics Group, Kuodao Logistics, Changxin International Logistics etc. *At present, the company is focusing on the*

- 241 -

> *operation of hydrogen-powered heavy duty trucks by leveraging its rich end user resources in logistics industry*.

368.401.    The statements in the paragraph above touting HongYun's order of vehicles were false and misleading for the reasons set forth in ¶ 397. Additionally, the statements describing HongYun's business—"operation, leasing and maintenance eservice for customers across [China]"—were exceptionally false and misleading because they were present tense descriptions that falsely portrayed HongYun as already being a well-established logistics company with an operating footprint, infrastructure, and track record sufficient to make the purchases Hyzon claimed were expected. But as revealed by Blue Orca, Lead Plaintiff's independent investigation, and Hyzon's disclosures in 2022 and 2023, this was not the case. In truth, HongYun (1) was a shell company with no publicly reported affiliations with any credible business; (2) was established and registered with the Chinse government just three days before the MoU was announced; (3) had, and continues to have, zero paid-in capital for operations; (4) had no employees, other than (possibly) its shareholders, up through at least February 2022; (5) has no legitimate physical office location or working contact information; (6) has no corporate investors, only individual shareholders; and (7) has no web presence on the internet or popular social media platforms in China, including WeChat. Indeed, to date, Hyzon has yet to collect or recognize the large bulk of revenues it later claimed it would receive from HongYun, further demonstrating its lack of independent financial ability.

369.402.    Additionally, it was particularly false and misleading for Hyzon to claim HongYun had, at the time, multiple "customers across the country," as to date, Hyzon

has reported deliveries to only one purported HongYun customer based in one region of China.

370.403.    Further, the statements concerning HongYun's core team were exceptionally false and misleading because HongYun's primary shareholder is primarily a distributor of European paint supplies, because neither of HongYun's shareholders have significant business experience in real-time vehicle data management, and because neither of HongYun's shareholders have reported, noteworthy business relationships with hydrogen-fuel-cell-related industries. Put differently, the statements were false and misleading by heralding HongYun— Hyzon's most material sales arrangement to date— as having any track record, experience, location, or employees whatsoever, when it did not; in actuality HongYun and its shareholders, *i.e.*, HongYun's "core management team" lacked the capacity, personnel, and wherewithal to make the purchase Hyzon claimed without undisclosed outside aid.

371.404.    Indeed, following the Blue Orca Report, Defendants tacitly conceded that the falsity of their representations regarding HongYun's then-present operations and experience. Specifically, in a December 8, 2021 press release regarding HongYun, Defendants updated their description of HongYun as follows: "HongYun ***plans to*** provide operation, leasing and maintenance services …." The insertion of the phrase "plans to" suggests HongYun did not provide such services prior to or at the time of the September 9, 2021 press release, despite the statements emphasized above claiming otherwise.

**2.     [✓] Hyzon's Statement in Response to Blue Orca Report (Oct. 5, 2021)**

372.405.     On October 5, 2021, Defendants issued a public statement "strongly rejecting" the Blue Orca Report. Therein, Defendants made the following false and misleading statements concerning HongYun:

> Hyzon is excited about its partnership with Shanghai Hydrogen HongYun Automotive Co., Ltd. ("Shanghai HongYun"), *which is a special purpose entity seeking to provide third-party clean energy logistics services to corporate customers*. Shanghai HongYun was established in the wake of the Shanghai government's August 26, 2021 announcement that Shanghai would be among the first participants in China's national hydrogen fuel cell vehicle pilot program.
>
> As Hyzon announced on September 9, 2021, Hyzon and Shanghai HongYun entered into a non-binding memorandum of understanding ("MoU") under which the parties would negotiate definitive vehicle supply agreements pursuant to which Shanghai *HongYun is expected to order 100 trucks in 2021* and an additional 400 trucks in 2022. Notwithstanding the short seller's claims, however, Hyzon specifically disclosed in its September 9, 2021 announcement that Shanghai HongYun was not yet a customer of Hyzon. Consistent with the terms of the MoU, *Hyzon expects that Shanghai HongYun will be able to leverage its existing relationships to enter into long-term logistics service agreements with end users for Hyzon's hydrogen-powered vehicles*. Hyzon expects to receive binding purchase orders from Shanghai HongYun for these vehicles, which *Hyzon anticipates will include upfront deposits and installment payments*.

373.406.     The statements in the paragraph above touting HongYun's order of vehicles were false and misleading for the reasons set forth in ¶ 397. These statements mirrored the false and misleading statements identified in Hyzon's September 9, 2023 press

release announcing an MoU with HongYun, and thus were also false and misleading for the same reasons identified in ¶¶ 401-404.

374.407.     In addition, the statement that HongYun was "a special purpose entity" was exceptionally false and misleading because, as discussed above, Hyzon knew, or should have been aware that, HongYun is owned and controlled by individual shareholders and has no corporate parents, no publicly registered corporate shareholders, and no readily apparent corporate relationships with clean energy entities (other than Hyzon). For similar reasons, the statement concerning Shanghai Hyzon's expectation that HongYun's ability to leverage its existing relationship was extraordinarily false and misleading, as HongYun's corporate records indicate that neither it nor its shareholders had such existing relationships that would allow them to plausibly sell Hyzon HFCEVs to end users. As such, any purported sales through HongYun were attributable to "existing relationships" belonging to other entities.

375.408.     Furthermore, Hyzon's representations regarding HongYun's ability to provide upfront deposits and installment payments was also exceptionally false and misleading. Hyzon knew or should have known when making those representations that HongYun's publicly available corporate records document that HongYun had, and continues to have no paid-in capital in its corporate accounts. Hyzon did not disclose that as part of its business arrangement with HongYun, it would be granting HongYun (through a subsidiary) warrants for Hyzon stock that functioned as a purchasing incentive which increased with each vehicle sale. The warrants, the existence of which were not disclosed until March 2023, inflated the perceived demand for Hyzon vehicles while also lowering expected revenues from any purported vehicle deliveries. Hyzon also failed to disclose the

severe counterparty risk created by HongYun's insufficient operating history and contract terms, which would prevent Hyzon from recognizing revenue under public company accounting standards.

376.409.    Finally, the statements were false and misleading as they failed to disclose a possible pre-existing relationship between HongYun, its corporate leadership, Hyzon, and/or Horizon. *See* ¶¶ 121116, 293.

**3.    [✓] Hyzon's Press Release Confirming HongYun Purchases (Nov. 12, 2021)**

377.410.    On November 12, 2021, Defendants issued a press release issued entitled, "Hyzon Motors, Inc. Announces Third Quarter 2021 Financial and Operational Results with Significant Milestones Achieved and Building Momentum Across Asia, Europe and North America." In that announcement, Hyzon, reported that it had "***[r]eceived the first two purchase orders, for 62 trucks in total, pursuant to terms of the previously announced MOU to supply Shanghai Hydrogen Hongyun Automotive.***"

378.411.    The statements in the paragraph above touting HongYun's order of vehicles were false and misleading for the reasons set forth in ¶ 397. These statements also materialized and referenced the false and misleading statements made in Hyzon September 9, 2021 and October 5, 2021 press release, and thus were also false and misleading for the same reasons identified in ¶¶ 401-404, 406-409.

379.412.    Additionally, the statements were false and misleading for failing to disclose that (i) these purported purchase orders had extended payment terms; (ii) these purported purchase orders has significantly lower average vehicle prices than those relied upon in Hyzon's prior public statements and materials, including those relied upon for

revenue targets; (iii) given the customer's limited operating history and extended payment terms, the customer contracts presented counterparty risks as to collectability that prevented Hyzon from recognizing revenue equal to the total contract value for the purported purchases; and (iv) contemporaneously with these purchases, Hyzon had entered into a warrant agreement with the customer that both encouraged the customer to buy vehicles and further constituted an undisclosed discount or rebate.

4.      [✓] **Hyzon's 3Q21 Earnings Call (Nov. 12, 2021)**

~~380.~~413.      On November 12, 2021, the Company held an Earnings Call on its Q3 2021 results in which Defendants Knight and Gordon participated. On that call, Defendant Knight, and thus Hyzon, told the audience that "Hyzon has received *the **first two purchase orders from Shanghai Hydrogen HongYun Automotive in China for a total of 62 trucks. The end user of these trucks is a large industrial conglomerate.***"

~~381.~~414.      The statements in the paragraph above touting HongYun's order of vehicles were false and misleading for the reasons set forth in ¶ 397. These statements mirrored the false and misleading statements made Hyzon's press release issued the same day, and by extension, the false and misleading statements made in Hyzon's September 9, 2021 and October 5, 2021 press releases. As such, the statements in the paragraph above were also false and misleading for the same reasons identified in ¶¶ 401-404, 406-409.

~~382.~~415.      Additionally, the statements during the 3Q21 Earnings Call were exceptionally false and misleading because (1) neither HongYun nor its shareholders had a prior, independent business relationship with the large industrial conglomerate; (2) HongYun lacked publicly available contact information or a web presence through

- 247 -

which a large industrial conglomerate could contact the company; and (3) HongYun, with its zero paid-in capital, lacked sufficient capital, as well as a sufficient financial history, to submit bids for proposals issued by Chinese state owned entities ("SOEs") without undisclosed external assistance.

**5.      [✓] Hyzon's Press Release Announcing Deliveries to HongYun (Dec. 8, 2021)**

383.416.      On December 8, 2021, Hyzon issued a press release announced that, in November, it "*deliver[ed] … 29 fuel cell electric trucks to be used by a major steel conglomerate in China through [HongYun]*." According to the press release:

> The 49-ton trucks ... are expected to haul steel coils in the conglomerate's fleet in coming months. ***HongYun plans to provide operation, leasing and maintenance services*** for industrial and municipal customers in targeted locations in China, which is expected to be a massive market for fuel cell technologies in the coming years. ***Hong[Y]un has further orders for 33 more trucks confirmed with Hyzon***.

384.417.      The statements in the paragraph above claiming that HongYun was to provide operation, leasing, and maintenance services were false and misleading for the reasons set forth in ¶ 397. These statements also materialized and referenced the false and misleading statements made in Hyzon September 9, 2021, October 5, 2021, and November 12, 2021 press releases, and thus were also false and misleading for the same reasons identified in ¶¶ 401-404, 406-409, 415.

385.418.      Furthermore, the Dec. 8, 2021 statements were especially false and misleading as they (1) failed to disclose that nearly half of the HFCEVs Hyzon purportedly delivered to HongYun were not operable on hydrogen; (2) falsely and misleading suggested that Hyzon would recognize revenue from these deliveries in 2021, when the

requirements for recognizing revenue had not been met; and (3) failed to disclose collectability concerns and significant counterparty risk as to Hyzon's ability to collect and recognize revenue for these deliveries. Further, they failed to disclose that a Hyzon China employee had conspired with customers to have Hyzon HFCEVs delivered shortly before the end of 2021 under an agreement where the customer would return the vehicles after year-end for the completion of necessary work, all so Hyzon could meet its public guidance.

**D.    Materially False and Misleading Statements Concerning Revenue Recognition Practices and Internal Controls**

386.419.    Statements concerning Hyzon's revenue recognition practices were false and misleading for the following reasons, both together and individually.

**1.    GAAP Revenue Recognition Principles**

387.420.    During the Class Period, Defendants represented that Hyzon's financial statements were presented in conformity with GAAP. GAAP refers to the framework of guidelines for financial accounting used by accountants to prepare financial statements. The SEC has the statutory authority to codify GAAP and has delegated that authority to the Financial Accounting Standards Board. SEC Regulation S-X (17 C.F.R. Part 210) provides that financial statements filed with the SEC that are not presented in accordance with GAAP will be presumed to be misleading, despite footnotes or other disclosures.

388.421.    Under GAAP, Hyzon is permitted to recognize revenue only when certain criteria are met, and in the period when those criteria are met. A company violates GAAP, for example, when it misleadingly shifts revenue from one period to another for

the purpose of making one period look better. The use of such accounting manipulations is often tied to an entity's need to achieve or report predetermined financial results.

389.422.      Accounting Standards Codification ("ASC") 606-10-25-1 provides that revenue may be recognized when, among other things:

> [It be] *probable* that the entity will collect substantially all of the consideration to which it will be entitled in exchange for the goods or services that will be transferred to the customer. In evaluating whether collectability of an amount of consideration is probable, an entity shall consider only the customer's ability and intention to pay that amount of consideration when it is due. The amount of consideration to which the entity may be less than the price stated in the contract if the consideration is variable because the entity may offer the customer a price concession.

(Emphasis added).

390.423.      ASC 606-10-55-3A through -3C further elaborates on how to assess collectability. Under 3A and 3B, when evaluating collectability, an entity bases its assessment on whether the customer has the ability and intention to pay the promised consideration in exchange for the goods or services that will be transferred under the contract, rather than assessing the collectability of the consideration promised for all of the promised goods or services:

> [3A] Paragraph 606-10-25-1(e) requires an entity to assess whether it is probable that the entity will collect substantially all of the consideration to which it will be entitled in exchange for the goods or services that will be transferred to the customer. The assessment, which is part of identifying whether there is a contract with a customer, is based on whether the customer has the ability and intention to pay the consideration to which the entity will be entitled in exchange for the goods or services that will be transferred to the customer. The objective of this assessment is to evaluate whether there is a

- 250 -

substantive transaction between the entity and the customer, which is a necessary condition for the contract to be accounted for under the revenue model in this Topic.

[3B] The collectability assessment in paragraph 606-10-25-1(e) is partly a forward-looking assessment. It requires an entity to use judgment and consider all of the facts and circumstances, including the entity's customary business practices and its knowledge of the customer, in determining whether it is probable that the entity will collect substantially all of the consideration to which it will be entitled in exchange for the goods or services that the entity expects to transfer to the customer. The assessment is not necessarily based on the customer's ability and intention to pay the entire amount of promised consideration for the entire duration of the contract.

And under 3C, an entity must determine whether the contractual terms and its customary

business practices indicate that it has the ability and intent to mitigate credit risk.

When assessing whether a contract meets the criterion in paragraph 606-10-25-1(e), an entity should determine whether the contractual terms and its customary business practices indicate that the entity's exposure to credit risk is less than the entire consideration promised in the contract because the entity has the ability to mitigate its credit risk. Examples of contractual terms or customary business practices that might mitigate the entity's credit risk include the following:

a. Payment terms—In some contracts, payment terms limit an entity's exposure to credit risk. For example, a customer may be required to pay a portion of the consideration promised in the contract before the entity transfers promised goods or services to the customer. In those cases, any consideration that will be received before the entity transfers promised goods or services to the customer would not be subject to credit risk.

b. The ability to stop transferring promised goods or services—An entity may limit its exposure to credit risk if it has the right to stop transferring additional goods or services to a customer in the event that the customer fails to pay consideration when it is due. In those cases, an entity should assess only the collectibility of the consideration to which it will be entitled in

- 251 -

exchange for the goods or services that will be transferred to the customer on the basis of the entity's rights and customary business practices. Therefore, if the customer fails to perform as promised and, consequently, the entity would respond to the customer's failure to perform by not transferring additional goods or services to the customer, the entity would not consider the likelihood of payment for the promised goods or services that will not be transferred under the contract.

An entity's ability to repossess an asset transferred to a customer should not be considered for the purpose of assessing the entity's ability to mitigate its exposure to credit risk.

391.424.    Consistent with the accounting rules set forth above, Defendants included Hyzon's revenue recognition policy in the Company's post-Merger financial statements, including its 2021 Annual Report. As stated therein:

Revenue is measured based on the transaction price specified in a contract with a customer, subject to the allocation of the transaction price to distinct performance obligations. The Company recognizes revenue when it satisfies a performance obligation by transferring control of product or service to a customer. Determining the timing of the transfer of control, at a point in time or over time, requires judgment. On standard vehicle sales contracts, revenues are recognized at a point in time when customers obtain control of the vehicle, that is when transfer of title and risks and rewards of ownership of goods have passed and when obligation to pay is considered certain.

...

In general, payment terms for sales of FCEVs to certain customers have included installment billing terms to fund the Company's working capital requirements. The Company does not adjust the transaction price for a significant financing component when the performance obligation is expected to be fulfilled within a year as the amount is not material. In China, the Company has granted extended payment terms on selected receivables (see Note 4, Revenue).

- 252 -

**2.    Defendants Improperly Recognize Revenue to Make Their Numbers**

392.425.    As conceded by Hyzon in its August 4, 2022 statement, s*ee* Part V.NVI.M, *supra* ¶ 206, and corroborated by Hyzon's restated financial reports, throughout the Class Period, Defendants engaged in improper revenue recognition practices in violation of GAAP and Hyzon's own stated revenue recognition policy. Among other things, Defendants (1) projected materially false and misleading revenue targets based on purported "100% committed" or highly probably deals which did not have signed contracts, did not go through the appropriate approval channels, contained unapproved extended terms, and/or for which customers could not or would not pay; (2) improperly recognized revenue in their now disavowed financial reports that did not have signed contracts, did not go through the appropriate approval channels, contained unapproved extended terms, had contractual performance obligations not fully satisfied by Hyzon, and/or for which customers could not or would not pay; and/or (3) improperly accelerated the recognition of deferred revenue when such revenue had not met GAAP's revenue recognition criteria or Hyzon's internal revenue recognition policies.

393.426.    In engaging in these practices, Defendants made false and misleading statements in which they misrepresented or omitted material facts concerning Hyzon's financial and operating results, including in (a) presentations and commentary on Hyzon's historic and projected financial results; and (b) certifications pursuant to SOX attesting to the accuracy of Hyzon's financial reporting and the disclosure of all fraud.

394.427.    Because of the revelation of these improper revenue recognition practices, as summarized in this Complaint and further uncovered by the independent investigation conducted by Hyzon's Board of Directors, Hyzon has since been forced to

disavow its financial statements and guidance in their entirety, stating that such "financial statements and guidance previously issued by the company can no longer be relied upon." *See* Part V.NVI.M, *supra* ¶ 206. Additionally, in its restated financial statements, Hyzon conceded it materially overstated revenues.

### 3.    [✓]    Hyzon 3Q21 Financial Statements (Nov. 15, 2021)

395.428.    On November 15, 2021, Defendants published Hyzon's quarterly report for the period ended September 30, 2021. This report contained materially false and misleading statements about Hyzon's reported revenue and cash flow.

396.429.    Therein, Defendants "***recognized $1.0 million in sales of fuel cell vehicles for the three months ended September 30, 2021***." Deeper within, Hyzon further elaborated that "commercial vehicle business is focused primarily on ***assembling and supplying battery-electric vehicles and fuel cell electric vehicles*** …."

397.430.    The statements in the paragraph above claiming were false and misleading Throughout the Class Period, Hyzon improperly recognized revenue in violation of GAAP and Hyzon's internal policies, s*ee* Part V.NVI.M, *supra* ¶ 206. Given the time period, the deliveries and revenues reported pertained to Hyzon customers in Europe. As discussed above, for customers in Europe, Hyzon did not manufacture or supply any HFCEVs in 2021. Rather, Hyzon provided retrofitting services on combustion vehicles already owned by customers. Additionally, these vehicles required substantial post-delivery repairs.

398.431.    Contrary to GAAP, Hyzon treated revenues from these retrofitting services as revenues earned from product sales, not services provided. Indeed, Hyzon's

financial report omitted any reference to retrofitting services as a source of revenue under

"Item 7. Management's Discussion and Analysis of Financial Condition and Results of

Operations" or elsewhere in Hyzon's SEC reports until filing restated financials in 2023.

These restated financials, which among other things, correct for omitted information about

retrofitting services provided by Hyzon, constitute a tacit admission that Hyzon's 3Q21

Report contained false or misleading statements or omissions regarding Hyzon's revenues.

399.432.    Additionally, the November 15, 2021 3Q21 claimed recognized

revenue on vehicles where Hyzon had failed to fully satisfy contractual performance

obligations and/or the customer was unable or unwilling to pay, because such vehicles

would also require post-delivery repairs. As conceded by Hyzon:

> The Company conducted an internal accounting review for its European customer arrangements. This internal accounting review concluded that for the Hyzon Europe customer contracts ... the Company did not appropriately analyze and record revenue and related balances associated with these arrangements. ***More specifically, the Company determined that instead of manufacturing or assembling FCEVs that it owned for sale to customers, Hyzon Europe was providing these customers with vehicle retrofit services to convert the customers' internal combustion engine ("ICE") powered vehicles to hydrogen FCEVs.***
>
> Therefore, the Company revised its revenue recognition analysis and concluded that ***Hyzon Europe should not have recorded the assumption of these contracts as inventory and associated contract liabilities, and also should have recognized revenue related to these service contract arrangements on an over-time basis utilizing an input method rather than recording revenue at a point in time***.[210]

---

[210] Hyzon Amended 3Q21 Quarterly Report, *supra* n.182 (emphasis added).

400.433.    Consequently, Hyzon's reported fourth quarter fiscal year 2021 GAAP revenue in the Company's Form 8-K was overstated, the Company's financial measures reported in the Form 8-K were not prepared in accordance with GAAP, and the Company was not complying with its internal revenue recognition policy. Under proper GAAP standards, Hyzon did not earn $1.0 million in 3Q21 from sales of fuel cell vehicles, but rather, only $80 thousand from retrofitting services rendered in total.

4.    [✓] **Hyzon 4Q21 Financial Statements (Mar. 23, 2022)**

401.434.    On March 23, 2022, Defendants published a news release and earnings presentation (filed with the SEC on Form 8-K) regarding Hyzon's full year and fourth quarter 2021 results. Defendants also held an earnings call that same day, March 23, 2022, to discuss its results for the fourth quarter and fiscal year ended December 31, 2021. The 4Q21 Form 8-K news release and earnings presentation, as well as Defendants' March 23, 2022 earnings call, contained materially false and misleading statements about Hyzon's reported revenue and cash flow.

402.435.    In the 4Q21 Form 8-K news release, Defendants reported on page one a quarterly GAAP revenue of $5.1 million for the fourth quarter ending December 31, 2021 and fiscal year 2021 GAAP revenue of $6.0 million. Defendants repeated these GAAP measures in the Company's 4Q21 earnings presentation. Additionally, during the March 23, 2022 earnings call, Defendant Gordon reported that:

> ***Full year revenues were $6 million***. Total operating expenses were $107 million. ***We took the full charge to the cost of sales for vehicles sold in China, which was only partially offset by the collected revenues for those sales in 2021. We expect another large portion of cash for the vehicles delivered in China during 2021 to be collected in 2022. Once this***

- 256 -

> *customer has a longer operating history, we anticipate booking more revenues upfront.*
>
> \*     \*     \*
>
> I think it's important to think through how we will be receiving revenues for the trucks delivered this year with no cost over the next few years and the bulk of those revenues for the trucks delivered last year will come in 2022, so that will effectively be pure margin. *It's a little strange accounting treatment, but what we're waiting for is for HongYun to have more operating history* and we plan to reevaluate this method of accounting for the revenues in the fourth quarter of this year, at which point we hope that we'll be able to account for the revenues more normally.

Defendant Knight elaborated that "So it's a short term issue, whether we recognize the revenue next year or the year after, frankly, it's not a huge deal. … [A]t the end of the day, it's a very minor pain point."

403.436.    Defendants' statements in the March 23, 2022 Form 8-K and earnings call regarding Hyzon's reported GAAP were false and misleading and omitted material facts. Throughout the Class Period, Hyzon improperly recognized revenue in violation of GAAP and Hyzon's internal policies, s*ee* Part V.NVI.M, *supra* ¶ 206. Contrary to GAAP, Hyzon recognized revenue on sales at period-end that did not go through required approval channels, contained unapproved extended terms, did not have contractual performance obligations fully satisfied by Hyzon, or where the customer was unable or unwilling to pay the full amount claimed. Indeed, Hyzon has conceded that more than half the vehicles delivered that quarter were not operable on hydrogen, and that 20 HFCEVs were not actually transferred to the customer until 3Q22. And in its Restated 2021 Annual Report, Hyzon admitted that " [its] contractual performance obligation to deliver functioning fuel

- 257 -

cell electric vehicles ("FCEVs")" to purported customers in China "was not fully satisfied for revenue recognition purposes under Accounting Standards Codification ("ASC") Topic 606, Revenue from Contracts with Customers ("ASC 606").[211]

404.437.    Additionally, Hyzon incorrectly recorded as revenue value added taxes receivable from customers totaling $1.8 million. Consequently, Hyzon's reported fourth quarter fiscal year 2021 GAAP revenue in the Company's Form 8-K was overstated, the Company's financial measures reported in the Form 8-K were not prepared in accordance with GAAP, and the Company was not complying with its internal revenue recognition policy. Additionally, Defendant Gordon and Knight's statements failed to disclose, and acted to coverup, fraud and or irregularities with Hyzon's operations in China.

405.438.    Additionally, Defendant Knight's representations that Hyzon expected future payments from HongYun, that it gave HongYun "strange accounting treatment," and that it would recognize more revenues upfront when HongYun had "more operating history" were especially false and misleading. Under GAAP, revenue is generally not realizable unless collectability is reasonably assured—that is, it is probable that the entity will collect substantially all of the consideration to which it will be entitled in exchange for the goods or services that will be transferred to the customer. As such, in determining that HongYun did not meet the collectability requirement, Hyzon has determined under normal account principles that it was not probable that it would collect substantially all of the consideration it was entitled to from future payments.

---

[211] Restated 2021 Annual Report, *supra* n.183, at iii.

**5.    [✓]    Hyzon 2021 Annual Report Financial Statements (March 30, 2022)**

406.439.    On March 30, 2022, Defendants filed with the SEC Hyzon's Annual Report on Form 10-K signed by Hyzon's directors, including Defendants Knight, Gordon, Gu, and Anderson, which contained materially false and misleading statements about Hyzon's: (i) reported revenue and cash flow and (ii) disclosure of any fraud.

407.440.    Therein, the Company reported fiscal year 2021 GAAP revenue of $6.0 million. In the section entitled "Notes to Consolidated Financial Statements," Defendants confirmed that "*[t]he accompanying consolidated financial statements and related disclosures have been prepared in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP") pursuant to the requirements and rules of the Securities and Exchange Commission ("SEC")*." Under "Item 9A. Controls and Procedures," Defendants similarly represented that:

> [Despite ineffective controls and procedures,] *our management* has performed additional analyses, reconciliations, and other post-closing procedures and *has concluded that, notwithstanding the material weakness in our internal control over financial reporting, the consolidated financial statements for the periods covered by and included in this Annual Report on Form 10-K fairly present, in all material respects, our financial position, results of operations and cash flows for the periods presented in conformity with U.S. GAAP*.

408.441.    Defendants also set forth Hyzon's policy for revenue recognition, which provides, among other things, that:

> The Company accounts for revenue in accordance with ASC Topic 606, Revenue from Contracts with Customers ("ASC 606"). Revenue is measured based on the transaction price specified in a contract with a customer, subject to the allocation of the transaction price to distinct performance obligations.

- 259 -

The Company recognizes revenue when it satisfies a performance obligation by transferring control of product or service to a customer. Determining the timing of the transfer of control, at a point in time or over time, requires judgment. On standard vehicle sales contracts, revenues are recognized at a point in time when customers obtain control of the vehicle, that is when transfer of title and risks and rewards of ownership of goods have passed and when obligation to pay is considered certain.

In general, payment terms for sales of FCEVs to certain customers have included installment billing terms to fund the Company's working capital requirements. The Company does not adjust the transaction price for a significant financing component when the performance obligation is expected to be fulfilled within a year as the amount is not material. In China, the Company has granted extended payment terms on selected receivables (see Note 4, Revenue). The Company does not include a right of return on its products other than rights related to standard warranty provisions that permit repair or replacement of defective goods.

409.442.     Defendants' statements regarding the Company's reported revenue and compliance with GAAP and its internal revenue recognition policy, as set forth above, were false and misleading and omitted material facts. Throughout the Class Period, Hyzon improperly recognized revenue in violation of GAAP and internal policies. *See* Part V.NVI.M, *supra* ¶ 206 (conceding improper revenue recognition practices). Contrary to GAAP, Hyzon recognized revenue on sales at period-end that did not go through required approval channels, contained unapproved extended terms, did not have contractual performance obligations fully satisfied by Hyzon, or where the customer was unable or unwilling to pay the full amount claimed. Indeed, Hyzon has conceded that more than half the vehicles delivered that quarter were not operable on hydrogen, and that 20 HFCEVs were not actually transferred to the customer until 3Q22. And in its Restated 2021 Annual

Report, Hyzon admitted that " [its] contractual performance obligation to deliver functioning fuel cell electric vehicles ("FCEVs")" to purported customers in China "was not fully satisfied for revenue recognition purposes under Accounting Standards Codification ("ASC") Topic 606, Revenue from Contracts with Customers ("ASC 606").[212]

443.    -Additionally, the statements were especially false and misleading for suggesting that Hyzon made sales in, and recognized revenues for product sales from, the European region, when in fact, all Hyzon vehicle operations in Europe in 2021 were retrofitting services—and at-the-time undisclosed business activity. Moreover, all revenues from Europe derived not from product sales, but rather services.

410.444.    Additionally, Hyzon incorrectly recorded as revenue value added taxes receivable from customers totaling $1.8 million. Consequently, Hyzon's reported fiscal year 2021 GAAP revenue in the Company's Form 10-K was overstated, the Company's 2021 Form 10-K was not prepared in accordance with GAAP, and the Company was not complying with its internal revenue recognition policy.

411.445.    Additionally, Defendants Knight and Gordon signed certifications pursuant to SOX Sections 302 and 906 attesting to the accuracy of financial reporting and the disclosure of "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting."

---

[212] Restated 2021 Annual Report, *supra* n.183, at iii.

412.446.        Defendants' SOX certifications in Hyzon's 2021 Form 10-K were false and misleading, as Defendants failed to disclose all significant deficiencies and material weaknesses in the design and operation of Hyzon's internal control over financial reporting likely to adversely affect Hyzon's ability to record, process, summarize and report financial information, as well as the financial fraud that Defendants and other employees with significant roles in Hyzon's internal control over financial reporting were committing.

**6.        [✓] Hyzon 1Q22 Financial Statements**

413.447.        On May 6, 2022, Defendants issued a press release and investor presentation announcing its financial results for the first quarter ended March 31, 2022 and furnished a copy thereof to the SEC on Form 8-K. That same day, the Company held an earnings call to discuss its results for the first quarter ended March 31, 2022. On May 12, 2022, the Company issued a corrected press release announcing its 1Q22 financial results and provided this to the SEC on Form 8-K. And on May 13, 2022, the Company filed with the SEC its quarterly report for the first quarter of 2022 ended on March 31, 2022 on Form 8-K. The 1Q22 Forms 8-K and Defendants' May 13, 2022 earnings call contained materially false and misleading statements about Hyzon's reported revenue and cash flow.

414.448.        In Hyzon's Forms 8-K and 10-Q and May 13, 2022 earnings call, Defendants reported quarterly GAAP revenue of $0.4 million. Defendants' statements regarding Hyzon's reported GAAP financial measures in these filings were false and misleading and omitted material facts. Throughout the Class Period, Hyzon improperly recognized revenue in violation of GAAP, see Part V.NVI.M, *supra* ¶ 206. Contrary to

GAAP, Hyzon recognized revenue on sales at period-end that did not go through required approval channels, contained unapproved extended terms, did not have contractual performance obligations fully satisfied by Hyzon, or where the customer was unable or unwilling to pay the full amount claimed. Consequently, Hyzon's reported first quarter fiscal year 2022 GAAP revenue in the Company's Forms 8-K and 10-Q was overstated, the Company's financial measures reported in the Forms 8-K and 10-Q were not prepared in accordance with GAAP, and the Company was not complying with its internal revenue recognition policy.

## IX.X.  ADDITIONAL ALLEGATIONS OF SCIENTER

415.449.     The allegations in this Section allege scienter as to Hyzon and each Individual Defendant (that is, Defendants Knight, Gu, Gordon, Anderson, Haskopoulos, and Tichio) (collectively with Hyzon, "Section 10(b) Defendants"). The inference and conclusion that the Section 10(b) Defendants acted with scienter, that is, that they intended to mislead the investing public or were reckless as to the possibility of misleading the investing public, is supported by the following facts. While organized into sub-Sections for readability, the following allegations of scienter are mutually corroborating.

### A.     The Special Committee's Findings and Hyzon's Subsequent Disclosures

416.450.     The Special Committee's summary findings after its independent investigation cogently exemplifies the extent of the Section 10(b) Defendants' misconduct and subsequent coverups.

417.451.     As discussed above, on August 4, 2022, Hyzon announced that a "board-appointed special committee, working with external advisors, [wa]s conducting an

independent investigation to [revenue recognition] and other governance and compliance issues."[213] Additionally, Hyzon disclosed that it had separately identified operational inefficiencies at Hyzon Europe. As such, Hyzon reported it had "retained a third-party consulting firm to assist the board and management with reassessing Hyzon's global strategy and operations."."[214] The Company "acknowledged the serious nature of this development" and committed to work "diligently with the assistance of outside legal and financial advisors to resolve this matter as quickly as possible."[215] And due to these findings, the Company declared that "financial statements and guidance previously issued by the company [could] no longer be relied upon."[216]

418.452.    Over the next five months, Hyzon remained silent as to the status of the Special Committee's investigation. However, during that time, the Special Committee uncovered that most of the hydrogen trucks Hyzon reported as "delivered" in 2021 did not operate as intended or had to undergo significant repairs post-delivery, which led to a significant overstatement in revenue. The Special Committee issued its preliminary findings to the Board in January 2023. Almost immediately after, the Hyzon's Board determined Founder Defendant Knight should have been terminated for cause. Approximately two months later, in March 2023, Hyzon published a Statement from the Special Committee summarizing in broad strokes its investigatory findings. The full extent

---

[213] "Statement from Hyzon Motors" (Aug. 4, 2022), *supra* n.159.

[214] *Id.*

[215] *Id.*

[216] *Id.*

of these failures, to the extent they were reported publicly, is summarized in Part VI, *supra*. (Hyzon has not released the full investigative report.)

419.453.    Significantly, the Special Committee did not claim the Section 10(b) Defendants' misconduct and related misrepresentations to investors resulted from issues flowing from the bottom-up. Instead, the Special Committee identified as a causal factor "the tenor of certain communications by certain Hyzon executives was overly concentrated on meeting the company's 2021 deliveries forecast and recognizing revenue on those deliveries." This admission corroborates Lead Plaintiff's allegations regarding the focus of Hyzon's public statements during the Class Period. Relatedly, they substantiate the underlying motives for this delivery and revenue focus—the desire to distinguish Hyzon from its competitors, garner shareholder approval for the SPAC merger, and keep the post-merger stock price high to avoid insolvency and enable mass profits after the expiration of the post-merger Lock-Up Period.

420.454.    The significant remediations the Special Committee recommended also supports scienter. Specifically, the Special Committee recommended that the Audit Committee adopt a new revenue recognition policy and "a written disclosure policy regarding the preparation, approval and release of disclosures regarding financial information and the delivery of vehicles and consider establishing a disclosure committee." [217] The Special Committee further recommended a commissioning and homologation (*i.e.*, approval for sale) policy and process that would require due diligence steps when commissioning or homologation is completed by third parties. Moreover, it

---

[217] Special Committee Disclosure, *supra* n.174.

recommended periodic general public company training for Company personnel and certain other enhanced training. These remediations go directly to the heart of the alleged fraud.

421.455.     In response, Hyzon has announced that it has implemented, or plans to implement, the above-described measures. For example, in its Restated Annual Report for FY 2021, Hyzon stated that, among other remedial actions taken to date, it had addressed the problems posed by the Section 10(b) Defendants' conduct by "appoint[ing] a new Chief Executive Officer and Interim Financial Officer and create[ing] new roles of President of International Operations, President of North America and Chief Operating Officer."[218] Additionally, the Company plans to "complet[e] ethics training globally and in addition, *provid[e] general public company periodic training for Company personnel, including on* potential topics such as *the responsibilities of a public company, the core values of the Company's accounting and finance function, and best practices to implement those values*."[219]

## B.     Cascading Terminations of Hyzon's Founders and C-Suite Officers

422.456.     The terminations and/or departures of Defendants Knight, Gu, and Gordon further support the inference of scienter based on the specific facts of this case.

423.457.     The Company announced Defendant Gordon's resignation just two weeks after Hyzon issued its 2021 Annual Report, in which it disclosed, among other things dismal revenue numbers primarily attributable to the Company's purported sales in China and previously undisclosed revenue recognition and counterparty risk problems. Moreover,

---

[218] Hyzon Amended 2021 Annual Report, *supra* n.195, at 96.

[219] *Id.* at 96-97 (emphasis added).

the Company announced the immediate termination of its co-founder and CEO, Defendant Knight, as well as the "transition" of Founder Defendant Gu to a non-executive board role, just two weeks after it had announced that (1) it would not be issuing its second quarter report by the regulatory deadline, (2) its Board of Directors had commenced an independent investigation into the previous-listed problems and other corporate governance and compliance issues; and (3) the Company's previously issued financial statements and guidance could no longer be relied upon.

424.458. The timing of these resignations, especially considering that (1) the Company identified the above-mentioned financial guidance issues after the appointment of a new CFO and (2) the Company did not have replacements lined up for Knight or Gu, strongly supports the conclusion that these executives were pushed out for their misconduct.

425.459. The fact that a Special Committee, as assisted by external legal and financial advisors, called for the immediate ouster of Defendants Knight and Gu—the Company's co-founders—also strongly suggests that additional evidence available within the Company demonstrates the Section 10(b) Defendants' misstatements were made with scienter. Indeed, the Company's August 17, 2022 statement and the quote by the new CEO therein all but concedes the obvious: that the resignations were at least partially a result of the Special Committee's internal investigation. And in January 2023, after receiving the Special Committee's preliminary findings, the Board retroactively determined that Knight's termination was for cause.

426.460. Founder Defendant Gu's simultaneously announced termination as Executive Chairman of Hyzon's Board powerfully indicates that these resignations were

not the result of any decision about operational capabilities, but instead were the result of his and Knight's misconduct. Indeed, as discussed above, news media outlets reported that Knight's ouster and Gu's demotion were directly due to irregularities with Hyzon's revenue recognition practices and China operations. *See* Part V.NVI.M, *supra* ¶ 214. That Gu was terminated despite his ownership stake and control over Hyzon's majority shareholder further suggests the Board saw Gu's misconduct as so severe that it overrode any possible retaliation by Gu through Hyzon's parents. Moreover, unlike Founder Defendant Knight and other Defendants like Tichio and Gordon, who frequently appeared in public facing roles to make the false and misleading statements identified above, Defendant Gu operated behind the scenes as Hyzon's CEO and, after the SPAC Merger, on its Board. These circumstances suggest that his termination was not merely due to his executive management of Hyzon (as he was no longer CEO), or any particular false or misleading statement made, but rather his overall role in orchestrating the fraud scheme and business strategy at the heart of this case.

427.461.    Defendant Knight's subsequent deletion of his Twitter and LinkedIn social media profile, despite his job loss and his prior role as Hyzon's primary media communicator, further indicates that these resignations relate to the Section 10(b) Defendants' misconduct and that Knight is limiting public statements while personally under government investigation.

428.462.    Moreover, the fact that Knight and Gu's terminations came about because a new, outside manager alerted Hyzon's Board to possible misconduct (notably in the weeks after Defendant Gordon departed and a new CFO, Chong, was installed), (i) bolsters an inference of the Section 10(b) Defendants' scienter and (ii) corroborates the

testimony of the former Hyzon executive cited in the Blue Orca Report, who resigned due to his personal discomfort with how Hyzon's top executives were marketing Hyzon to investors.

## C.    SEC and SDNY Investigations Support the Inference of Scienter

429.463.    While the existence of a government investigation is not alone sufficient to establish scienter, it does add support to the inference of scienter when combined with the other facts alleged herein, including Hyzon's own internal investigation.

430.464.    Here, Hyzon is under investigation by two separate prosecuting federal agencies for the misconduct first raised by Blue Orca and elaborated upon herein. First, on January 12, 2022, Hyzon publicly disclosed it had received a subpoena from the SEC for production of documents and information, including related to the allegations made in the report issued by Blue Orca Capital. Thereafter, the Company reportedly received two additional subpoenas in connection with the SEC's investigation on August 5, 2022 and August 10, 2022. And on October 31, 2022, the U.S. Attorney's Office for the Southern District of New York ("SDNY") notified the Company that it is also investigating these matters. Hyzon did not disclose receiving the SEC's additional subpoenas until March 2023, and did not disclose the SDNY investigation's existence until May 2023.

431.465.    Prior to the announcement of a government investigation, an agency typically engages in fact finding to determine if the matter is sufficiently suspicious to warrant their attention. The fact that the SEC had been investigating Hyzon for months before issuing its January 12, 2021 subpoena, and subsequently issued two additional subpoenas in August 2022, provides support for the inference of scienter.

432.466.    The fact that the U.S. Attorney's Office for the Southern District decided to devote its limited prosecutorial resourceresources and launch its own investigation after the SEC (an agency specializing in securities enforcement), for the same conduct alleged in this Complaint, also strongly supports the inference of scienter. Additionally, it suggests the possibility of broader fraudulent (and perhaps criminal) conduct.

433.467.    Defendants Knight and Gu's terminations by the Board two weeks after the announcement of a Board-Special-Committee-led independent investigation further bolsters the suggestion that the SEC's and SDNY's investigations have identified serious misconduct. As discussed in Part V.NVI.M, *supra* ¶ 214, at least one news outlet reported that "it appear[ed] that the SEC investigation unearthed some ill-reported financial problems," and that the ouster was due to these uncovered problems. And in January 2023, after receiving the Special Committee's preliminary findings, the Board determined that Knight's termination should be deemed for cause.

468.    Finally, in September 2023, the SEC filed a complaint against Hyzon, Knight, and others, as well as consent judgments, for much of the same conduct alleged in this Complaint, based off its two-year long investigation and review of subpoenaed documents.

**D.    Scienter as to Hyzon's Purported Committed Orders**

434.469.    Many facts show that the Section 10(b) Defendants viewed the touting of committed and high probability orders as a key tool to persuade investors to highly value Hyzon's stock. These facts directly indicate that the Section 10(b) Defendants understood the importance of the information to investors and the risk that investors would be misled

- 270 -

if these Defendants misrepresented those pre-orders. They also support the inference that the now-admitted misrepresentations were either a deliberate effort to mislead investors or the product of a reckless indifference to the possibility of investors being so misled.

**1.    Defendants' Purposefully Emphasize Flashy Customers and Committed Orders as a Means of Distinguishing Hyzon from Competitors**

435.470.    As detailed herein, the Section 10(b) Defendants routinely used their book of supposed 100% committed and high probability orders to market the Company to investors, including in media appearances, proxy and soliciting materials, other SEC filings, press releases, and in various other events. For example, in the Company's Investor Presentations, filed as soliciting materials, the Company repeatedly touted its forecasted revenue and vehicle deliveries for 2021 next to images and graphics depicting logos for blue chip Fortune 100 companies" (including Coca Cola, Ikea, and Heineken) and other deep-pocket purchasers based in the United States, Europe, and Oceania, many of which Hyzon claimed had purportedly final or near-final purchasing agreements. Additionally, the Section 10(b) Defendants repeatedly cited these purported customers and non-China sales as an advantage over Hyzon's competitors.

436.471.    These facts directly indicate that the Section 10(b) Defendants understood the importance of the information to investors and the risk that investors would be misled if the Section 10(b) Defendants misrepresented its committed orders and customer base. Indeed, the Special Committee found that "the tenor of certain communications by certain Hyzon executives was overly concentrated on meeting the Company's 2021 deliveries forecast and recognizing revenue on those deliveries." This

was despite other communications by the Company—including its SEC filings—which "reflected the importance of complying with the relevant accounting standards."

437.472.    Many facts also support the inference that the misrepresentations were either a deliberate effort to mislead investors or the product of a reckless indifference to the possibility of investors being so misled. Positive media buzz in response to the Section 10(b) Defendants' representations—of which the Individual Defendants, given their positions, would be aware—further confirmed that their representations were material to investors and how such representations were interpreted by the market.

**2.    Announcements of Sham and/or Incomplete Vehicle Deliveries**

438.    As just one example, on July 13, 2021—just two days before shareholders were to vote on the merger, the Individual Defendants caused Hyzon to issue a press release announcing its very first HFCEV delivery. But as Hyzon later disclosed after the Special Committee completed its investigation, this vehicle "was not operable on hydrogen when Hyzon issued a press release" and Hyzon recognized zero revenue from the farce transaction. And as revealed by the SEC, when Hyzon recorded the video of the HFCEV milk truck, it was not connected to an operational hydrogen fuel cell, it was powered solely by an electric battery that allowed it to travel only a limited distance, and Hyzon had not even installed a critical component on the FCEV that was required to power the FCEV with a hydrogen fuel cell. These Defendants knowingly or recklessly forced the false and misleading press release to issue because they knew such information would be material to investors, would presumably bolster their confidence in Hyzon's business and sales pipeline, and thus increase the likelihood that shareholders approved the SPAC Merger. Hyzon issued similar releases involving vehicles that were not operable on hydrogen at the

time of delivery towards the end of 2021, and for which the Company could not recognize revenues, when Hyzon was rushing to fill its delivery and revenue gaps for the year. Indeed, Hyzon claimed to have delivered 20 HFCEVs to a related party, Jiushuang, in its January and March 2022 financial reports, even though the Company did not transfer those vehicles to the customer until 3Q22.

### 3. Surreptitious Edits to Committed-Orders and Customer-Base Claims

439.473. That the Individual Defendants repeatedly edited the Company's investor presentations to remove questionably listed customers suggests that they knew, were aware, or were reckless in not knowing that certain companies were improperly listed as "Top Tier Customers" or depicted near graphics for committed or highly probable orders.

440.474. For example, on February 10, 2021, the Section 10(b) Defendants filed with the SEC a different version of the February 9, 2021 PowerPoint presentation shown to Hyzon investors during the February 9 investor call.[220] This February 10, 2021 version contained no disclosure or other obvious indicia for investors relaying that the February 10 filing was a new or edited version of the February 9 presentation. Notably, on slide 5 of the February 10, 2021 Presentation (partial slide shown below), the Company dropped, without justification, two entities listed on slide 5 of the February 9, 2021 Investor Presentation as "Top Tier Customers/End Users/Partners"—specifically, Air Products and PSA—and replaced them with a new purported customer/partner Viva Energy Australia.

---

[220] Full presentation filed with the SEC as a Soliciting Material pursuant to Rule 14a-12 and is available at https://www.sec.gov/Archives/edgar/data/1716583/000119312521036457/d17930ddefa14a.htm.

**F.39 – Hyzon Feb. 10, 2021 Investor Presentation – Slide 5 (Top Tier Customers)**



441.475.       Likewise, on slides 18 and 29 of the February 10, 2021 (partial slide shown below), the Section 10(b) Defendants dropped, without explanation, purported customers Air Products, Centurion, and Nestle, from its infographics and added other purported partners and entities to fill the holes. Despite these edits, the company made no indication that the brand-named entities previously referenced were no longer customers, nor did the Company amend its claims about its revenue under contract or MoU or its summary projected financials.

**F.40 – Comparison of Vehicle Customer Claims in February 9 & 10 Presentations**

 

**Feb. 9, 2021 Presentation ("x" added)**       **Feb. 10, 2021 Edits to Presentation**

442.476.       On February 12, 2021, the Section 10(b) Defendants filed additional Soliciting Materials (on Schedule 14A) appending a further edited version of Hyzon's

February 9, 2021 Investor Presentation.[221] Again, the Company included no disclosure or explanation in the February 12 edited version regarding any changes, particularly regarding customers, from Hyzon's original filing. Instead, on slide 5 of the February 12, 2021 presentation (partial slide shown below), the Company dropped the Coca-Cola, Ikea, and other logos as a top tier customer, but added other entities, to fill gaps:

**F.41– Comparison of Top Tier Customer Claims in February 9 & 12 Investor Presentations**

February 9, 2021 Version (shown to investors during call)



February 12, 2021 Version (posted without announcement on SEC website)



443.477.    Additionally, on slide 18 of the February 12, 2021 Investor Presentation (shown below), the Section 10(b) Defendants removed all company logos from the presentation's customer map and omitted the number of private and public contracted orders that were previously claimed to be 100 percent certain. Nevertheless, the Company left the general descriptors of the companies and the contracts from the previous versions, including descriptors for a "beverage company," *i.e.,* Coca-Cola, and a global

---

[221] Full presentation filed with the SEC as a Soliciting Material pursuant to Rule 14a-12 and is available at https://www.sec.gov/Archives/edgar/data/1716583/0001193125210 41568/d117961ddefa14a.htm.

brewer, *i.e.,* "Heineken." Further, it maintained, among other things, that it had "~$40mm under contract or MOU for 2021 revenue forecast."

**F.42 – Hyzon Feb. 12, 2021 Investor Presentation: Slide 18 (Customer**



**Deployments)**

444.478.    Finally, on slide 29 of the February 12, 2021 Investor Presentation (partial slide shown below), the Section 10(b) Defendants added and removed major logos from its chart of "Vehicle Customers," including removing the Coca-Cola, Ikea, and other logos:

**F.43 – Comparison of Vehicle Customer Claims on Slide 29 of Feb. 9, 2021 & Feb. 12, 2022 Investor Presentations**




Feb. 9, 2021 Presentation ("x" added)          Feb. 12, 2021 Edits

445.479.    Despite these edits, the Section 10(b) Defendants made no changes to Hyzon's claims about revenue under contract or MoU or summary projected financials.

446.480.    Throughout the Class Period, the Section 10(b) Defendants edited and/or updated the information and graphics originally published in the February 9, 2021 Investor Presentation at least four to five times. Notably, these updated versions contained no disclosures or other obvious indicia relaying that the later dated presentations contained new or substantially edited information as compared to the presentation originally shown to investors on February 9, 2021.

447.481.    Nevertheless, even after removing certain purported customers from the Company's investor presentations, the Section 10(b) Defendants continued to make similar false and misleading statements concerning other purported customers. For example, even though the Company removed the logo of Heineken from its Top Tier

Customers graphic and its customer deployment map, the Company continued to tout that it was finalizing a purchase order for five vehicles with a "global brewer." The Section 10(b) Defendants continued to do so in presentations up through the July 16, 2021 SPAC Merger.

482.   As confirmed by the SEC, Knight was responsible for each of the false and misleading statements about Hyzon's purported customer and supplier relationships set forth in the investor presentation. Knight provided information about customer and supplier relationships to the individuals who drafted the investor presentation. Knight also made edits to, reviewed, and approved the misleading statements before their use in the presentation and filing with the SEC. Additionally, Knight should have known that the statements about the customer and supplier relationships in the investor presentation, described above, were false and misleading. As Hyzon's CEO, Knight's responsibilities included advancing Hyzon's customer and supplier relationships alongside Hyzon's sales and operational employees. In addition, in some instances, Knight had specific information that contradicted statements made in the investor presentation. For example, Knight directly interacted with Coca-Cola, which had not indicated that it intended to purchase FCEVs from Hyzon. Knight's negligence is imputed to Hyzon.

4.      **Internal Complaints on How Defendants Represented Sales Pipeline**

448.483.      Further, given Hyzon's size and the importance of the subject, it is absurd to suggest that the Individual Defendants and other Senior Executives did not know, or would not reasonably be aware of, complaints by (now former) senior Hyzon executives who became uncomfortable with how Hyzon was presenting customer orders to investors.

- 278 -

As reported by Blue Orca, one of Hyzon's former senior executives with whom Blue Orca interviewed, stated:

> I just didn't like the way it was being presented. A lot of the stuff that they are saying is open to interpretation how you read that. Saying that they've got all of these orders and things. But a lot of them are all MoUs which as you know in the business mean basically nothing.
>
> They were going out, kind of selling it as really what it wasn't at the time. A bit like unfortunately what Nikola was doing. It's kind of a lot of hype, and getting money through that hype from people who don't really understand.
>
> You know it's great to show all these pictures of renderings of trucks and orders that you may have, but these orders, most of them« 90% of them are MoUs so there's no binding contract, and if you look from when they've announced those [contracts], still none of those have been built or delivered.
>
> The only three vehicles they have is what's on their website. These are all prototype vehicles. They're not production vehicles of any type. They've basically been hand built at the facilities. These are the things that I think, if you're going to announce that, say that. Be honest about it.
>
> I was very uncomfortable with that. A lot of these, if you look at their website, they've loaded lots of them on there of signed meetings they had. All these are MoUs that they've signed. None of them are binding in any way whatsoever.

449.484.    In contrast to the non-existent Fortune 100 companies and household brands Hyzon repeatedly claimed in its pre-SPAC Merger materials, from the beginning of the Class Period up until Hyzon first announced its purported MoU with HongYun, Hyzon failed to advertise or otherwise disclose in its investor presentations and other media that its "Top Tier Customers" and deliveries for 2021 and onward predominately consisted of

- 279 -

sales to purchasers based in China. Indeed, the Section 10(b) Defendants pre-merger statements excluded any references to sales by Hyzon to Chinese purchasers.

450.485.    The Section 10(b) Defendants' silence as to significant China sales until after the SPAC merger directly indicates that these Defendants understood the importance of the information to investors, particularly from a revenue perspective, and the risk that investors would be misled if these Defendants misrepresented its committed orders and customer base. Indeed, market analysts reported that, though domestic China sales seemed like business as usual for Horizon, the value-add for Hyzon was its non-China-based business. It also supports the inference that the misrepresentations were either a deliberate effort to mislead investors or the product of a reckless indifference to the possibility of investors being so misled.

451.486.    The fact that after Founder Defendants Knight and Gu were terminated that Hyzon's new CEO decided to exit the China truck market further supports the inference that Hyzon's purported strategy shift to China during the Class period was nothing other than an attempt to cover for Defendants' false and misleading representations to the market.

452.487.    The Section 10(b) Defendants' blatant misrepresentations as to the nature of their committed orders further demonstrates that their true motive was to mislead investors. Indeed, these Defendants failed to correct the bulk of their misstatements for months, despite being in possession of contrary information, the release of which was necessary to dispel the false impressions and half-truths created by their prior statements.

**E.    Scienter as to Hyzon's Characterization of Its Relationship with Hiringa [Removed]**

453.    Many facts show that the Section 10(b) Defendants used Hiringa as a key customer in Hyzon's SPAC narrative to persuade investors to place a high value on Hyzon's stock. These Defendants used Hiringa as the first major deal Hyzon announced after the Company revealed its plans of the take public merger, claiming that Hyzon had signed an agreement to build and supply 1,500 hydrogen powered vehicles for Hiringa, with the first batch of 20 trucks "expected to enter service" in 2021, thereby accounting for 24% of Hyzon's guided deliveries in the year (85). These Defendants then went on to repeatedly highlight the Hiringa contract in investor presentations and YouTube promotional videos hosted by Defendant Knight and reaffirm Hyzon's guidance of 85 truck deliveries and $37 million in revenues in 2021.

454.    As revealed through the Blue Orca Report, Hiringa is not a customer of Hyzon, but merely a channel partner for Hyzon's vehicles. In Blue Orca's interview of a Hiringa senior executive, the Hiringa senior executive confirmed that Hiringa does not intend to pay for or take title over the trucks, but merely facilitate the sale of hydrogen trucks to third parties by acting as an unpaid conduit between Hyzon and New Zealand heavy truck operators. Rather than purchasing 1,500 trucks, Hiringa confirmed that its plans were merely to build fuel stations with the hope of facilitating future purchases from end customers. Hiringa also informed Blue Orca that the 1,500-truck agreement claimed by Hyzon in its investor presentations is not a binding order, and that it merely represents a right, not an obligation, to buy. Blue Orca also reported that Hiringa likely could never purchase the Hyzon trucks since the small amount of capital that Hiringa had raised to date

is ringfenced for building hydrogen infrastructure projects *i.e.*, refueling stations, and not for buying trucks.

455.    Moreover, Hiringa directly contradicted the Section 10(b) Defendants' claims that Hyzon would be delivering 20 trucks to Hiringa before year end, as the Hiringa senior executive told Blue Orca that it will not take any deliveries of Hyzon trucks in 2021 and expects to receive the first four validation vehicles in March or April 2022, at the earliest. Furthermore, Hiringa told Blue Orca that the remaining 16 trucks ordered from Hyzon would be fulfilled based on testing results of the initial four validation vehicles, which they expected to conduct between March and June 2022 at the earliest. The Hiringa executive also confirmed that there was no possibility that they might bring forward the order for the 16 trucks, as Hiringa did not want to take delivery until Hiringa builds the commercial hydrogen fuel station infrastructure in New Zealand, which Hiringa indicated would not be until the second half of 2022. Hyzon would have been aware of Hiringa's goals and its end-users' preconditions from its negotiations with Hiringa and any reasonable diligence it likely conducted. And at times, Hyzon even contradicted itself as to Hiringa's expected delivery dates.

456.    In its October 5, 2021 response to the Blue Orca Report, the Section 10(b) Defendants effectively admitted that Hiringa has not and never will be a customer and is merely a channel partner, confirming that Hiringa is not an "end user of hydrogen trucks" and characterizing the partnership between the companies as one "intended to accelerate the decarbonization of heavy transport in New Zealand through the buildout of hydrogen infrastructure and the supply of fuel cell electric trucks and buses." These Defendants did not dispute that Hyzon would not be supplying Hiringa with 20 trucks in 2021, as

previously represented. To the contrary, despite claiming no wrongdoing, Hyzon changed the way it described Hiringa following the Blue Orca and Iceberg Research Reports and began explicitly referring to Hiringa as a channel partner. Specifically, on November 12, 2021, these Defendants announced that "*Hyzon channel partner* Hiringa in New Zealand [had] announced an equity investment from Mitsui & Co in their refueling network, in addition to funding from the New Zealand Government." This change in language constitutes an implicit admission that Hyzon's prior characterization of Hiringa was false and misleading, and that Hyzon acknowledged they were false and misleading.

457.    These facts directly indicate that the Section 10(b) Defendants understood the importance of the information to investors and the risk that investors would be misled if these Defendants misrepresented its relationship with and the importance of Hiringa. It also supports the inference that the now-admitted misrepresentations regarding Hyzon's true relationship with Hiringa were either a deliberate effort to mislead investors or the product of a reckless indifference to the possibility of investors being so misled.

488.    [Removed].

F.     **Scienter as to Horizon's Purported Sales and Deliveries to China**

458.489.     Many facts show that the Section 10(b) Defendants viewed Hyzon's deal announcement with HongYun as a key tool to deceive investors into believing that Hyzon had secured a major Chinese customer which would allow the Company to meet its guided 2021 deliveries and would pave the way for other large truck deals in the near future. On September 9, 2021, these Defendants made a major announcement that Hyzon had secured a 500-vehicle deal with HongYun under which HongYun was expected to order 100 trucks in 2021 and an additional 400 trucks in 2022, the news of which caused

Hyzon's stock price to skyrocket 26% in a single trading day. For Hyzon, the size of the announced HongYun deal was immense, as the 100-truck-order supposedly placed in 2021 was larger than the Company's previously guided total deliveries for the year.

**1.    Defendants Knew or Recklessly Disregarded HongYun was an Empty Shell**

459.490.        But due diligence into HongYun and its shareholders' corporate registry filings, as well as site visits to HongYun's purported place of operations, confirm this supposedly large Chinese customer of Hyzon was established to serve as a counterparty to sham transactions to pump up Hyzon's numbers and stock price.

460.491.        As disclosed in the Blue Orca and Iceberg Reports and corroborated by Lead Plaintiff's independent investigation, HongYun and its shareholders did not have the capital, business experience, or business connections necessary to independently purchase any HFCEVs from Hyzon for its own use or to facilitate purchases to purported industrial conglomerate end-users, as evidenced by the fact that:

(a)    HongYun was a new company formed just three days before Hyzon announced HongYun's expected initial order of 100 vehicles before the end of 2021;

(b)    HongYun had no paid-in capital and thus lacked the ability to pay for ordered products or to deliver on a supply contract (without additional financing assistance from Hyzon);

(c)    HongYun conducts no operations and has no operational footprint, as it has no official phone number, email, WeChat account, or website;

(d)    HongYun is not a subsidiary of a larger company, as it has no corporate parents and instead was owned by two individual shareholders who seemingly own a handful of small companies that collectively have nowhere near the capital or capability to purchase the number of trucks that Hyzon claims;

(e)    HongYun had no employees other than its shareholders;

(f)     HongYun's controlling shareholder Kou Jian, whose primary business was distributing paint supplies for a European manufacturer, had no experience or publicly verifiable business contacts in the hydrogen fuel cell, electric vehicle, or industrial steel industries; and

(g)     Based on its registered and paid-in capital, HongYun could not plausibly qualify to submit tenders as part of the procurement process typically employed by the Chinese government and SOEs, *i.e.*, the most likely purchasers of Hyzon's HFCEVs.

461.492.     The Section 10(b) Defendants either knew or recklessly disregarded these facts, as any reasonable company would perform due diligence before announcing a deal representing nearly 74% of its sales (by number of vehicles delivered) in a single year, and as much as $250 million over the course of the contract.

2.     **Defendants Tacitly Concede Inaccuracies About Their HongYun Announcement in the Wake of Blue Orca's Revelations**

462.493.     After being confronted with the Blue Orca report, the Section 10(b) Defendants made several admissions reflecting their knowledge or at a minimum reckless disregard for the truth of their statements concerning HongYun.

463.494.     Despite previously claiming in Hyzon's September 9, 2021 press release that HongYun "*focuses*" on providing logistics solutions primarily through hydrogen-powered fuel cell electric vehicles, in Hyzon's October 5, 2021 response to the Blue Orca Report, these Defendants admitted that HongYun was "*seeking*" to provide third-party clean energy logistics services to corporate customers. Similarly, despite previously claiming HongYun "provides operation, leasing and maintenance service for customers across the country, including one of the world's largest steelmakers," in a December 8, 2021 press release regarding HongYun, the Section 10(b) Defendants updated their description of HongYun as follows: "HongYun *plans to* provide operation, leasing

and maintenance services ….” The shift from present tense to future tense or ambition-based verb structures suggests HongYun did not provide such services prior to or at the time of the September 9, 2021 press release. As such, the language changes described above tacitly conceded  the falsity of Defendants' September representations regarding HongYun's then-present operations and experience.

464.495.        In in Hyzon's October 5, 2021 press release, the Section 10(b) Defendants also did not dispute that HongYun was formed three days before Hyzon announced its deal with HongYun, instead claiming HongYun was a “special purpose entity” that was “established in the wake of the Shanghai government's August 26, 2021 announcement that Shanghai would be among the first participants in China's national hydrogen fuel cell vehicle pilot program.”

465.496.        Despite these admissions, the Section 10(b) Defendants continued to propagate the false notion that HongYun was a legitimate and unaffiliated counterparty, claiming that “Hyzon expects that HongYun will be able to *leverage its existing relationships* to enter into long-term logistics service agreements with end users for Hyzon's hydrogen-powered vehicles,” despite the fact the company was admittedly only formed one month ago and its shareholders have no experience in the relevant industry. Moreover, these Defendants stated, “Hyzon expects to receive binding purchase orders from HongYun for these vehicles, which Hyzon anticipates will include upfront deposits and installment payments,” even though the Company lacked the financial history and wherewithal to make such purchase orders. Indeed, Hyzon's auditors would later forbid Hyzon from claiming as recognized revenues the vast bulk of the purported delivery to HongYun. Yet even after recognizing rebukes from Hyzon's accountants, Founder

- 286 -

Defendant Knight tried to downplay the collectability and counterparty risks posed by HongYun, stating: "So it's a short term issue, whether we recognize the revenue next year or the year after, frankly, it's not a huge deal. … [A]t the end of the day, it's a very minor pain point."

466.497.    The Section 10(b) Defendants' admissions, combined with their attempt to trump up the legitimacy of HongYun, firmly shows these Defendants' true intent was to mislead investors about the September 9, 2021 HongYun deal announcement and its significance as customer.

**3.      To Corroborate False Narrative, Defendants Published Press Releases Confirming Deliveries to HongYun Even Though Half of the Vehicles Were Not Operable on Hydrogen and None Would Generate Revenue for 2021**

467.498.    Since Hyzon's October 5, 2022 response to Blue Orca, the Section 10(b) Defendants continued to promulgate the falsehood that shell entity HongYun is a legitimate customer making large orders from Hyzon. In particular, in discussing its 3Q21 results on November 12, 2021, Hyzon declared the company made a "conscious decision to shift the mix of delivery locations from predominantly European to predominantly Asian customers, in China, specifically." To that end, the Company announced that HongYun had ordered 62 trucks, as part of the first of two purchase orders. And on December 8, 2021, Hyzon announced that it had delivered 29 fuel cell trucks to HongYun to be used by an unnamed major steel conglomerate in China, that HongYun plans to provide operation, leasing, and maintenance services for industrial and municipal customers in targeted locations in China, and that HongYun had further ordered 33 more trucks confirmed with Hyzon.

468.499.      Despite analysts such as Iceberg Research (i) suggesting that HongYun was brought in to plug the order and delivery gap, (ii) asking Defendants about Hyzon's counterparty risk with HongYun, and (iii) inquiring whether Hyzon provided HongYun with financing, the Section 10(b) Defendants failed to provide any answers or supplemental information that would dispel the false impressions created by their misstatements and omissions. These Defendants did not disclose that in November 2021, Hyzon had secretly awarded HongYun undisclosed discounts/rebates—specifically warrants to purchase to two (2) million shares of Hyzon stock, potentially worth millions of dollars, in connection with vehicle purchases. Additionally, these Defendants announced in November and December 2021 that Hyzon had completed the delivery of HFCEVs, which, in fact, were not operable on hydrogen at the time or delivery or by the end of the year. These deliveries fell under Hyzon's largest customer deal, and also constituted more than 70% of Hyzon 2021 vehicle delivery count. As such, it would be absurd to claim that the Section 10(b) Defendants were oblivious to these or the Company's costly remedial efforts.

**G.      Defendants' Imputed Knowledge ~~about~~About Hyzon's Core Operations**

469.500.      As described herein, Hyzon's HFCEVs are its only product, whereby the vast majority of its revenue would be generated from sales of Hyzon HFCEVs once it reached production and made actual deliveries. As a result, and given that Hyzon was a pre-revenue company, its ability to (1) lock in customers (that is, obtain "serious" real pre-orders) and (2) fulfill the orders on time (*i.e.*, meet touted production deadlines) was immensely important to Hyzon's financial success.

470.501.     Because committed orders and customer base for HFCEVs were core to the Company's success, the materially false statements and omissions detailed herein could not have occurred without the Individual Defendants' knowledge and approval. These Defendants frequently touted the importance of Hyzon's committed orders and customer network, with, for example, its repeated affirmations that it has more customer commitments than it had in 2021 revenue forecasts. Further, these Defendants frequently boasted of Hyzon's ability to be first to market and that it would be able to ship 85 vehicles worldwide in 2021. Given the multitude of statements concerning its committed orders and production capabilities during the Class Period, as well as its importance to the company's financial success, it is unreasonable to think that the Individual Defendants—who were responsible for tracking or reporting Hyzon's revenue—would be unaware of the financial significance and status of its HCFEVs.

471.502.     The Individual Defendants were highly sophisticated and in positions to know that their statements concerning both committed orders and Hyzon's customer base were false. For example, Defendant Knight co-founded Hyzon in 2020 and was an early investor in Horizon in 2006, meaning he has been significantly involved in the hydrogen fuel cell and automotive industry for over 15 years. Defendant Gu founded Horizon in 2003, co-founded Hyzon in 2020, and thus has similarly been involved in Hyzon's core industries for over 15 years. Defendant Gordon served as the CFO of Legacy Hyzon up until he was selected as Hyzon's CFO after the SPAC Merger. He has also served as a portfolio manager at several prominent investment management firms. Defendants Anderson, Haskopoulos, and Tichio served as the CEO, CFO, and Chairman, respectively, of DCRB, and were the signatories to quarterly and annual reports filed with the SEC prior

to the approval of the SPAC Merger. These Defendants were actively involved in the evaluation of hundreds of companies, including Hyzon.

472.503.    The sophistication of the Individual Defendants strengthens the allegations of scienter, by undermining an exculpating explanation for the fraud.

473.504.    At all relevant times during the Class Period, Hyzon has remained a small-to-medium sized company with about 120 employees, and a smaller, tight-knit upper management team. Given Hyzon's size, and that Hyzon's HFCEV sales are purported to be the major focus of Hyzon's business operations, it may be strongly inferred that Founder Defendants Knight and Gu and Hyzon's founding CFO, Defendant Gordon, were fully aware of the status of all material matters involving Hyzon's core business operations throughout the Class Period, including the truth as to the matters alleged herein to have been materially misrepresented to and/or concealed from Lead Plaintiff and the members of the Class. Moreover, in each quarterly and annual report filed with the SEC during their tenure, Defendants Knight and Gordon signed certifications certifying that they had evaluated Hyzon's operations and had disclosed "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting."

474.505.    Similarly, by virtue of the combination of Hyzon's size and limited operations, the due diligence that DCRB and Defendants Anderson, Haskopoulos, and Tichio conducted into Hyzon's business and operations before acquiring Hyzon through a SPAC Merger, and their ability to access material non-public information concerning Hyzon (and in particular information concerning Hyzon's core operations and purported sales commitments) by virtue of their position as directors and controlling shareholders of

Hyzon, it may be strongly inferred that Defendants Anderson, Haskopoulos, and Tichio were all fully aware at all times during the Class Period of the status of all material matters involving Hyzon's core operations, including the truth as to the matters alleged herein to have been materially misrepresented to and/or concealed from Lead Plaintiff and the members of the Class. Indeed, in soliciting DCRB investors to support the SPAC Merger rather than redeem their pre-deal shares, ~~the DCRB Defendants, as~~DRCB and members of DCRB's Board~~,~~ repeatedly highlighted the "extensive due diligence" ~~it~~DCRB had performed. This included review of Hyzon's business and current operations, question-and-answer sessions between DCRB and Hyzon management, and reviews of information regarding Hyzon's "contracted customer orders, domestic and international facilities, products and technologies and current operations." *See* Part ~~IV~~V.F, *supra* ¶ 99. And, as relayed in Hyzon's Proxy Statements, the DCRB Board ultimately decided to pursue Hyzon due in part to its "firm orders with various clients ***including blue-chip Fortune 100 companies*** as well as Hyzon's rapidly growing visibility and potential near-term customers in Europe, Asia and Australia." ¶ 100.

## H. Motive and Circumstantial Evidence of Scienter

~~475.~~506. Although not necessary to establish scienter, the Section 10(b) Defendants also had powerful motives to commit fraud.

### 1. Defendants' Misrepresentations Were Necessary to the Repackaging of Horizon's Flailing Business and the Insertion of Much Needed Capital

~~476.~~507. As noted above, for the past 18 years, Hyzon's parent company, Horizon, developed the same fuel cell technology Hyzon relies on, has been manufacturing the same fuel cells as Hyzon makes, and has similarly attempted to sell the fuel cells to

electric vehicle makers. Horizon, however, failed to gain traction. By the end of 2019, Horizon's largest and only notable customer went insolvent, which correspondingly caused Horizon's vehicle sales and cash flow to plummet throughout 2020, a period in which other electric vehicle manufacturers were flourishing. Consequently, in January 2021, just months before Hyzon would go public, Horizon was valued in the Chinese over-the-counter market as a micro-cap stock at only $200 million. Ultimately, this financial downturn would push Horizon to deregister its stocks from the NEEQ exchange. It was from this tumultuous background that Hyzon was spun off into a standalone entity based in the United States and its financial systems.

477.508.     From the very beginning, everything about Hyzon's business was built on rebooting Horizon's failed vehicle endeavor in a new market with a new, higher revenue customer base curious about the potential benefits of hydrogen fuel cell power. To do so, the Section 10(b) Defendants quickly realized that it needed to excite commercial-customer demand. Additionally, these Defendants needed to acquire substantial amounts of capital to simultaneously build Hyzon's American-based facilities and invest in hydrogen networks that could sustain the operation of the very HFCEVs Hyzon was attempting to sell. Hyzon and its corporate family, however, lacked access to a national stock exchange through which they could acquire sufficient funds.

478.509.     Hyzon and its then-senior team thus settled on a development strategy in which it would sell investors on the misleading narrative that Hyzon's vehicles were in high demand and that the Company had received firm commitments from purchasers, including over $700 million in orders from large Fortune 100 and household named companies in North America, Europe, and Oceania. Without such representations about

order quantities and committed customers, the Section 10(b) Defendants likely would have never received shareholder approval for the take-public SPAC Merger, and Hyzon would not have gone public. Instead, these false representations paved the way for Hyzon to be listed on the Nasdaq with an enterprise value of over $2 billion (or 10 times the value of Horizon just months ago) and allow the Company to raise $600 million in proceeds.

479.510.    Just as with other EV operators at the time, this motive—the motive to avoid the existential risk of insolvency by raising money under false premises in a take-public merger—goes far beyond the ordinary motive of executives to manage a company profitably. This motive strengthens the inference of scienter—*i.e.*, the common-sense conclusion that Defendants Knight, Gu, and Gordon succumbed to this motive and defrauded investors, especially in conjunction with the other allegations of scienter alleged herein.

**2.    Defendants Benefitted Immensely by Convincing Shareholders To Approve the Take-Public Merger ~~under~~Under False Pretenses**

480.511.    The Section 10(b) Defendants' scienter is further evident from the shockingly large profits they stood to make after the SPAC Merger, given their massive amounts of Hyzon stock.

481.512.    As part of the Business Combination, DCRB's Sponsor paid $25,000 for over 1 million "Founders Shares"—representing a more than 2,255-fold increase on investment—that were subsequently transferred to Defendant Anderson's firm WRG DCRB Investors, LLC and other DCRB directors. At the time of the Merger, the Founder Shares were worth approximately $56.4 million, but would expire and become worthless if no deal were completed.

482.513.       In connection with the SPAC Merger, Defendant Anderson personally reported ownership of over 630,947 shares of HYZN common stock, worth more than $6 million on the day the merger completed. Defendant Anderson thus had a powerful motive to inflate the Company's share price until he could cash out.

483.514.       In connection with the SPAC Merger, Defendant Gordon's firms Ascent Funds SPV 1 LP and Ascent Funds Management LLC received more than 9.6 million shares of HYZN common stock worth approximately $93 million on the day the merger completed. Additionally, Defendant Gordon's firms reported the right to receive over 1.1 million "Earnout Shares" that would be issued contingent on Hyzon's stock price rising to certain price tiers (38.71% to be issued if HYZN hit an $18 per share price for 20 out of 30 trading days; another 38.1% to be issued at $20.00; and 22.58% to be issued at $35.00 per share). As such, Defendant Gordon would receive additional shares of Hyzon stock as Hyzon's share price inflated to certain price levels. If all sold at their issuance triggering prices, these Earnout Shares would generate more than $25.1 million for Defendant Gordon and his firms. Defendant Gordon thus retained financial interest in Hyzon's purported success through his business relationships with Ascent and Raven.

484.515.       In advance of the SPAC Merger, Hyzon USA, under the control of Defendants Gu and Knight, granted each of those Defendants 3.125 million options for Hyzon common stock, exercisable at a price of $2.00 per share, for the purpose of reaping greater financial gains from the overhyped success of the SPAC Merger. Upon completion of the SPAC Merger, Gu and Knight were awarded more-or-less 200,000 shares of Class A Common Hyzon stock, and over 5.7 million stock options, exercisable at $2.00 per share, in exchange for their outstanding pre-merger holdings. In the immediate aftermath of the

- 294 -

SPAC Merger, Defendant Gu's shares and options, if exercised, in total, were worth more than *$46 million*. Similarly, Defendant Knight's shares and options, if fully exercised, were worth (net) nearly *$45 million*.

485.516.    Additionally, Defendant Gu also received Earnout Shares in connection with the SPAC Merger. In his SEC filings, Gu reported direct ownership over more than 1.3 million Earnout Shares, worth at least $29.5 million if all sold at their issuance triggering prices. Moreover, Gu reported indirect ownership over an additional 18.0 million Earnout Shares through his ownership interest in Hyzon's corporate parent, Hymas Pte. Ltd., worth more than $406 million if all sold at their respective issuance-triggering prices.

486.517.    Because of DCRB's February 8, 2021 Lock-Up Agreement, Defendants were barred from selling or otherwise transferring their stock until six months after the SPAC Merger closed. As such, Defendants could not cash out their stocks until January 17, 2022, and had a compelling motive to keep stock prices inflated through the continuation of their fraudulent scheme. That the fraud was partially uncovered and Hyzon's stock price crashed before Defendants had a chance to cash in does not change the fact that they had a motive to conceal Hyzon's risks from the market.

487.518.    Though Defendants Tichio and Haskopoulos did not personally receive Hyzon stocks in connection with the SPAC Merger, the two still had an economic interest in the merger's closing through DCRB's Sponsor and Riverstone—a private equity fund at which Tichio served as a Partner and Managing Director and which Haskopoulos served as Managing Director, CFO, Chief Accounting Officer, and Secretary. After the close of the merger, Riverstone received 5.64 million shares of Hyzon's stock that were

worth more than $54.7 million on the first trading day after the SPAC Merger. Defendants Tichio and Haskopoulos thus retained financial interest in Hyzon by means of their employment and their indirect business relationships.

488.519.    Executive compensation also increased sharply in 2021, with Gu receiving total compensation of $6,357,709 versus $429,519 in 2020, and Knight's jumping to $4,640,278 from $414,415.

3.    **The Unique Financial Structure of SPACs Created a Risk for Conflicts of Interest and Misaligned Incentives**

489.520.    With respect to the DCRB Defendants, the unique financial structure of SPACs created a risk for conflicts of interest and misaligned incentives because the sponsor has an incentive to enter into a losing deal for SPAC investors if its alternative is to liquidate. In this case, Defendant Anderson's private equity firm WRG, and other DCRB parties obtained a 20% interest in DCRB, consisting of 5,643,125 Founder Shares that would convert into Class A shares if a qualifying business combination were approved. As of July 16, 2021, the Founder Shares were valued at $56,431,250 million, including Anderson's 630,947 Founder Shares valued at $6.3 million. In addition, DCRB, Defendant Anderson's private equity firm WRG, and other DCRB parties held 6,514,500 warrants, each exercisable to purchase one share of Class A Common Stock at $11.50 per share. These warrants had an aggregate market value of $6.5 million as of July 16, 2021 but would become worthless if the merger were not approved. Accordingly, the DCRB-related Defendants had a concrete and tangible motive to obtain approval of the merger with Hyzon, irrespective of the merits of the deal for DCRB's public shareholders.

## X.XI.  LOSS CAUSATION

490.521.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Lead Plaintiff and other Class members have suffered significant losses and damages.

491.522.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and/or engaged in a course of conduct that artificially inflated the price of Hyzon's securities and deceived purchasers of Hyzon's securities. By failing to disclose the true state of Hyzon's business and operations, Defendants presented a misleading picture of Hyzon's condition and value, which had the intended effect and caused Hyzon's stock to trade at artificially inflated prices during the Class Period. Shareholders invested based on these false premises. Hyzon stock could not have been issued, or would have been sold at dramatically lower prices, had investors been aware of Hyzon's true state of affairs. Moreover, investors would have exercised their Redemption Rights rather than vote in favor of the SPAC Merger.

492.523.    Because Lead Plaintiff was unaware that Defendants' representations identified above were false and misleading (and that Defendants omitted and failed to disclose material information regarding Hyzon's true customer base, the probability it could convert orders, and the basis for its 2021 projections), Lead Plaintiff paid an artificially inflated and unreasonable price for their purchases of Hyzon's stock.

### A.    Corrective Disclosures

493.524.    As Defendants' materially false, misleading, and incomplete statements, and (for purposes of Lead Plaintiff's Section 10(b) claims) their fraudulent

- 297 -

scheme were disclosed, the price of Hyzon's securities fell, as the prior inflation came out of the Company's stock price.

(a) On September 28, 2021, Blue Orca published its report, which partially revealed the misleading nature of Hyzon's publicly touted committed orders and customer base. Following these revelations, Hyzon's stock fell $2.58 per share, or 28.0%, from a close price of $9.21 on September 27, 2021 to close price of $6.63 per share on September 28, 2021, in reaction to the truth, when measured close-to-close. The disclosures on September 28, 2021, did not reveal the full extent of Defendants' deception, including the risks that Hyzon bore, given the extent of its fabricated committed orders and customers and its inability to sell HFCEVs at its forecasted prices.

(b) On October 6, 2021, the day after Hyzon issued a rebuttal to the Blue Orca Report, Iceberg Research issued its own investigative report agreeing with and corroborating Blue Orca's findings, criticizing Hyzon's rebuttal for failing to adequately address the issues raised by Blue Orca, and reporting new information about the finances of Hyzon's parent companies. As a result, Hyzon's stock reversed course, dropping $0.51 per share (8.0%) from a close price of $6.39 per share on October 5, 2021 to close at $5.88 per share on October 6, 2021. The disclosures on October 6, 2021, did not reveal the full extent of Defendants' deception, including the risks that Hyzon bore,

given the extent of its fabricated committed orders and customers and its inability to sell HFCEVs at its forecasted prices.

(c)    On January 12, 2022, Hyzon filed a Form 8-K with the SEC, which provided an update on its 2021 deliveries and financial expectations, reporting that it anticipated its 2021 financial results would be "materially lower than forecast revenues and margins." In addition, the Company disclosed that it had received a subpoena from the SEC "for production of documents and information, including related to the allegations made in the report issued by Blue Orca Capital." This update shook investors' confidence in Hyzon. On this news, Hyzon's stock price dropped $1.55 or nearly 23%, from a close price of $6.81 per share on January 12, 2021 to a close price of $5.26 per share on January 13, 2021. Hyzon's share price continued to tumble for the next five trading days, as the market continued to digest the news, hitting an all-time low of $4.25 on January 21, 2022.

(d)    On March 30, 2022, after markets had closed, Hyzon filed its Annual Report for Fiscal Year 2021 with the SEC on Form 10-K, and contemporaneously held an earnings call concerning its full year and fourth quarter 2021 results, reporting, among other things, that (i) though Hyzon purportedly exceeded its 2021 vehicle delivery guidance with 87 HFCEVs delivered, the Company would be reporting only $5.1 million in revenue, and only $6.0 million in revenue for 2021; (ii) Hyzon had awarded HongYun nearly 2 million warrants for HYZN stock, potentially worth millions of dollars, in

connection with its purported vehicle purchases; (iii) Hyzon had filled its 2021 delivery gap by selling an additional 20 HFCEVs in a related-party transaction; (iv) despite touting customers and sales in high-revenue markets, 82 of Hyzon's 87 2021 vehicle deliveries were to purchasers based in China's low average vehicle price market; and (v) Hyzon's independent auditor had prohibited it from recognizing certain revenues related to the Company's sales in China. On this news, several market analysts downgraded their views of Hyzon. In the wake of this news and resulting analyst downgrades, Hyzon's stock price dropped $1.08 (~17%) from $6.21 (closing price on April 5, 2022) to close a price of $5.13 per share (closing price on April 6, 2022). Hyzon's price then continued to steadily fall, reaching a closing per share price of $3.70 on May 6, 2022—the day Hyzon announced its financial results for the first quarter of 2022.

(e)     On May 6, 2022, the Company provided a financial update for the period ended March 31, 2022, filed on Form 8-K, in which it reported no vehicle sales for the quarter and no revenues for past deliveries to purchasers in China. On this abysmal sales news, Hyzon's stock price dropped again, this time from $3.70 to $3.28 over the course of the next trading day—a $0.42 drop or approximately 11%.

(f)     On August 4, 2022, after markets had closed, Hyzon issued a press release announcing that (i) it would not be releasing its second quarter financial filings by the August 15, 2022 deadline due to revenue recognition timing

issues in China, (ii) it had identified operational inefficiencies at Hyzon Europe, and (iii) due to these findings, financial statements and guidance previously issued by the Company could no longer be relied upon. This press release was later filed with the SEC on Form 8-K. The market reacted harshly to these shocking revelations. On August 4, 2022, Hyzon's stock price closed at $4.49 per share. The following day, when markets opened, Hyzon's stock price began trading at $2.86 per share—a per share price drop of $1.63 or ~36%—before closing that at $2.78 per share (38%). Thereafter, the Company's share price tumbled further over the next five trading days, hitting an all-time low of $2.33 per share at the close of trading on August 11, 2022. In total, Hyzon's stock price dropped $2.16 per share, equating nearly 48% of the stock's already diminished value.

(g)   On August 17, 2022, after markets closed, the Company made three major announcements across two separate press releases. First, it announced that the Board "had appointed Parker Meeks, most recently Hyzon's Chief Strategy Officer, as President and Interim Chief Executive Officer, effective immediately," to replace Craig Knight and "assume full responsibility for day-to-day management of all business lines and functions reporting to the Company's Board." Second, it announced that it was prematurely terminating Defendant Gu's three-year term as Executive Chairman of Hyzon's Board and demoting him to an R&D advisor position. Third, the Company announced that it had received a notice from Nasdaq stating that

- 301 -

Hyzon was no longer in compliance with Nasdaq rules because the Company had not filed its second quarter report. On this news, Hyzon's stock dropped $0.31 (13%) over the course of two trading days, dropping from $2.29 per share at the close of trading on August 17, 2022 (before Hyzon issued its statement) to $1.99 per share at the close of trading on August 19, 2022.

494.525.    The decline in the price of Hyzon's stock was a direct result of the nature and extent of Defendants' deception (or results of its deception) being revealed to investors and the market. The timing and magnitude of Hyzon's stock price declines negates any inference that the loss suffered by Lead Plaintiff and other Class members was caused by changed market conditions, macroeconomic, or industry factors, or other matters unrelated to Defendants' misconduct.

495.526.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Lead Plaintiff and other Class members. Had Defendants disclosed complete, accurate, and truthful information concerning these matters during the Class Period, Lead Plaintiff and other Class members would not have purchased or otherwise acquired Hyzon's securities or would not have purchased or otherwise acquired these securities at the artificially inflated prices that they paid. It was also foreseeable to Defendants that misrepresenting and concealing these material facts from the public would artificially inflate the price of Hyzon securities and that the corrective disclosure of the Defendants' misrepresentations and omissions would cause the price of Hyzon securities to decline.

**B.    Materialization of Risks**

496.527.        As detailed herein, Defendants engaged in a scheme and/or course of conduct to deceive Lead Plaintiff which artificially inflated the price of Hyzon stock and operated as a fraud or deceit on Lead Plaintiff by failing to disclose and misrepresenting the adverse facts detailed herein.

497.528.        Hyzon's financial results and future business prospects were based upon false and misleading statements and omissions regarding its purported customer base, its binding or committed orders, its sham announcements about purportedly completed contract obligations, as well as undisclosed material weaknesses in its business strategy, its connection to Horizon, and its sales and revenue models.

498.529.        Throughout the period during which Lead Plaintiff purchased his Hyzon stock, the prices of these securities were artificially inflated as a result of Defendants' materially false and misleading statements and omissions as alleged herein.

499.530.        Defendants' false statements served to conceal the risks that their misconduct would be publicly exposed, as well as the risks related to Defendants' dissemination of false and misleading statements in investor materials, press releases, interviews, and social media posts.

500.531.        It was foreseeable that public exposure of the scheme would lead to negative financial and legal consequences to Defendants, including: (i) publication of short seller reports challenging Hyzon's business and revenue claims; (ii) substantial drops in vehicle selling price, revenue capture, and reported revenue; (iii) analyst downgrades; (iv) key executive departures, and (v) the threat of an SEC civil or criminal investigation. The

materialization of any one or more of these factors would lead to a significant decline in the price of Hyzon's stock.

501.532.    The value of Lead Plaintiff's investments in Hyzon stock was negatively impacted when the concealed risks materialized in at least the following respects:

(a)    Publication of short seller reports identifying material risks;

(b)    Decreased vehicle selling price, revenue capture, and reported revenue;

(c)    Analyst downgrades;

(d)    SEC civil, DOJ/USAO, and/or criminal investigations;

(e)    Terminations of founders and chief executives;

(f)    Disavowals of prior financial guidance and reports;

(g)    Inability to timely file mandated reports with the SEC by legal deadlines;

(h)    The commission of independent investigations into alleged misconduct; and

(i)    Disclosures and admissions conceding improper handling of company activities and business.

502.533.    The declines in the price of the Hyzon stock and resulting losses are directly attributable to the materialization of risks that were previously misrepresented or concealed by the Defendants.

503.534.    Had Lead Plaintiff known of the material adverse information not disclosed by the Defendants or been aware of the truth behind their material misstatements, they would not have purchased the Hyzon stock at artificially inflated prices.

504.535.    As a result of their purchases of the Hyzon stock, Lead Plaintiff suffered economic loss and damages, as contemplated by the federal securities laws.

## XI.XII.    NO SAFE HARBOR

505.536.    Neither the federal statutory safe harbor applicable forward-looking statements under certain circumstances nor the bespeaks caution doctrine applies to any of the allegedly false statements pled herein, as the statements alleged to be false and misleading herein all relate to then--existing facts and conditions. The statutory safe harbor or bespeaks caution doctrine does not apply to statements included in financial statements prepared in accordance with generally accepted accounting principles. Moreover, none of the statements complained of herein was awere forward-looking statementstatements. Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about the Company's current and historical financial accounting practices, financial condition, and internal controls, among other topics.

506.537.    To the extent any of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward looking statements" when made, and/or were unaccompanied by meaningful cautionary statements that identified important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by the Company were insufficient to insulate Defendants from liability for their materially false and misleading statements.

507.538.    Alternatively, to the extent that the statutory safe harbor is found to apply to any forward-looking statements pleaded herein, Defendants are nonetheless liable for such statements because, at the time each such statement was made, the speaker had

actual knowledge that it was materially false or misleading, and/or the statement was authorized or approved by an executive officer of Hyzon who knew that the statement was materially false or misleading when made.

## XII.XIII.    CLASS ACTION ALLEGATIONS

508.539.    Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who (a) purchased Hyzon Motors Inc. f/k/a Decarbonization Plus Acquisition Corporation's ("Hyzon" or the "Company") securities during the period from February 9, 2021 to August 17, 2022, inclusive ("Class Period") and/or (b) are former shareholders of DCRB who held DCRB securities as of June 1, 2021 and were entitled to vote with respect to the Merger, and (c) were damaged thereby. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

509.540.    The members of the Class are so numerous that joinder of all members is impracticable. During the Class Period, the Company's securities and Decarbonization Plus Acquisition Corporation's securities were actively traded on the Nasdaq. While the exact number of Class members is unknown to Lead Plaintiff at this time and can be ascertained only through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its

transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

510.541.    Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

511.542.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

512.543.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether Defendants' acts as alleged violated the federal securities laws;

(b)    whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

(c)    whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

(e)    whether Defendants acted knowingly, recklessly, or negligently in issuing or disseminating false and misleading SEC filings and public statements during the Class Period;

(f)     whether the prices of the Company's securities and the securities of Decarbonization Plus Acquisition Corporation during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

(g)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

513.544.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

514.545.     Lead Plaintiff will rely, in part, upon the presumption of reliance established by the fraud on-the-market doctrine in that:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     the omissions and misrepresentations were material;

(c)     the Company's securities are traded in efficient markets;

(d)     the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

(e)     the Company traded on the Nasdaq, and was covered by market analysts;

(f)     the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

(g)     Lead Plaintiff and members of the Class purchased and/or sold the Company's securities between the time Defendants failed to disclose or misrepresented material facts and the time the true facts were

- 308 -

disclosed, without knowledge of the omitted or misrepresented facts; and

(h)     Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

515.546.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

516.547.     Alternatively, Lead Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

517.548.     Additionally, Defendants corrupted the market for Hyzon securities through a course of conduct that misled the market as to the value of Hyzon securities, to the extent that these Defendants disrupted the integrity of the market for Hyzon securities. Lead Plaintiff and the Class members are not required to provide further proof of reliance, pursuant to the Supreme Court's decision in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## XIII.XIV.    CLAIMS BROUGHT PURSUANT TO THE EXCHANGE ACT

**COUNT I:    VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5(b) AGAINST DEFENDANTS HYZON, KNIGHT, GU, GORDON, ANDERSON, TICHIO, AND HASKOPOULOS**

518.549.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

519.550.    This Count is asserted against Defendants and is based upon § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) promulgated thereunder by the SEC.

520.551.    During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

521.552.    Defendants violated § 10(b) of the 1934 Act and Rule 10b-5(b) in that they made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

522.553.    Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were

- 310 -

materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

523.554.    Defendant Hyzon is liable for all materially false and misleading statements made during the Class Period, as alleged above. The Individual Defendants, who are senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Lead Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

524.555.    As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Defendants' statements, Lead Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

525.556.    Had Lead Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

526.557.    As a result of the wrongful conduct alleged herein, Lead Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

527.558.    By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Lead Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

**COUNT II: VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5(a) AND (c) AGAINST DEFENDANTS HYZON, KNIGHT, GU, AND GORDON, ANDERSON, TICHIO, AND HASKOPOULOS**

528.559.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

529.560.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(a) and (c) promulgated thereunder by the SEC. Accordingly, Lead Plaintiff need not allege in this Count, nor prove in this case, that any of the Defendants made any misrepresentations or omissions of material fact for which they may also be liable under Rule 10b-5(b) and/or any other provisions of law.

530.561.    During the Class Period, Defendants, individually and in concert, carried out a common plan, scheme, and unlawful course of conduct that was intended to, and did: (i) deceive the investing public, including Lead Plaintiff and the Class; (ii) artificially inflate and artificially maintain the market price of Hyzon's securities; and (iii) cause Lead Plaintiff and Class members to purchase Hyzon securities at artificially inflated prices..

531.562.    Defendants' fraudulent conduct included raising money on the false pretense that (i) there was incredible, committed demand for Hyzon HFCEVs from blue-chip companies and Fortune 100 brands based in the Europe, Oceania, and North America (e.g., Coca Cola, Heineken, Ikea); (ii) Hyzon had a growing sales pipeline comprised of "100% certain" or "high probability … (70%+)" orders ) with 2021 delivery dates from the above-mentioned regions which would generate Hyzon meaningful revenue, distinguishing Hyzon's business from its EV SPAC competitors and its parent companies' failed EV enterprise, and (iii) on the back of these contracted and high-probability orders, Hyzon would deliver 85 vehicles and generate substantial revenues of nearly $37 million in 2021.

532.563.    In furtherance of this unlawful plan, scheme, or course of conduct, Defendants employed devices, schemes, and artifices to defraud and manipulate, and knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business that operated as a manipulation, fraud, and deceit upon Lead Plaintiff and the Class in connection with their purchases of Hyzon securities, including listing phantom customers in investor materials, announcing deals with sham counterparties from which Hyzon would not be able to report revenue under GAAP accounting standards, providing

- 313 -

purported purchasers with undisclosed purchasing incentives, and falsely reporting deliveries of purported HFCEVs that were not actually operable on hydrogen at the time of delivery or by the year's end, not actually transferred to the purchaser at the time of delivery or by the year's end, and/or required extensive post-delivery repairs.

533.564.     Defendants acted with scienter by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein. Defendants intended to deceive Lead Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

534.565.     As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of Defendant's plan, scheme, or course of conduct, Lead Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of Defendants' unlawful plan, scheme, or course of conduct.

535.566.     Had Lead Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by Defendants' unlawful plan, scheme, or course of conduct and by the material adverse

information which Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

536.567.    As a result of the wrongful conduct alleged herein, Lead Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

537.568.    By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5(a) and (c) promulgated thereunder and are liable to the Lead Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT III: VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST DEFENDANTS KNIGHT, GU, GORDON, ANDERSON, HASKOPOULOS, AND TICHIO ARISING FROM PRIMARY VIOLATIONS OF SECTION 10(b)

538.569.    Lead Plaintiff realleges each allegation in the foregoing paragraphs as if fully set forth herein.

539.570.    During the Class Period, the Individual Defendants (Defendants Knight, Gu, Gordon, Anderson, Haskopoulos, and Tichio) participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions within pre-SPAC Merger DCRB and pre- and post-SPAC Merger Hyzon, the Individual Defendants knew the adverse non-public information regarding the Company's business practices.

540.571.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with

respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

541.572.    Because of their positions of control and authority as senior officers of DCRB and Hyzon, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised control over the general operations of the Company and exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

542.573.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

**COUNT IV: VIOLATIONS OF SECTION 14 OF THE EXCHANGE ACT AND RULE 14a-9 AGAINST DEFENDANTS HYZON, RIVERSTONE., SPONSOR, WRG, KNIGHT, GU, GORDON, HASKOPOULOS, ANDERSON, AAKER, KEARNS, LAPEYRE, LEUSCHEN, TICHIO, MCDERMOTT, TEPPER, AND WARREN**

543.574.    Lead Plaintiff realleges each allegation set forth above as if fully set forth herein, except that Lead Plaintiff expressly disclaims any allegations of fraud for

purposes of this Count, including all allegations contained in Parts VII and IX above (Lead

Plaintiff's independent investigation and additional allegations of scienter).

544.575.    SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated pursuant to §

14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

To avoid all doubt, this Rule also extends to solicitations made before furnishing a proxy

statement that are made pursuant to and in compliance with the conditions of SEC Rule

14a-12, 17 C.F.R. § 240.14a–12.

545.576.    As stated herein, Defendants prepared, reviewed, and/or disseminated

false and misleading Proxy Statements and other Soliciting Materials (collectively,

"Soliciting Materials") which failed to disclose material facts necessary in order to make

the statements made, in light of the circumstances under which they were made, not

misleading. These Soliciting Materials were essential links in the consummation of

Hyzon's July 16, 2021 SPAC Merger. These Soliciting Materials and/or direct statements

to investors include those identified in Part VIII, *supra* ¶¶ 287, 294, 300, 317, 327, 340,

344, 349, 362, and 357.366, 370, and 373.

- 317 -

546.577.     Pre-Merger DCRB (now Defendant Hyzon) acted negligently in issuing and disseminating the Soliciting Materials because these materials contained the false and misleading statements alleged herein. Prior to the completion of the SPAC Merger, DCRB, ~~through the DCRB Individual Defendants,~~ filed each and every of the above-alleged SEC filings regarding Hyzon's business, orders, and customers. DCRB acted through ~~the DCRB Individual Defendants~~its executive, and ~~the DCRB Individual Defendants'~~Defendant Anderson, Tichio, and Haskopoulos's negligence is imputable to DCRB.

547.578.     Defendants Anderson, Haskopoulos, and the DCRB Director Defendants acted negligently by issuing, disseminating, and/or signing the Soliciting Materials because they contained the false and misleading statements alleged herein.

(a)     During the Class Period, up through the SPAC Merger, Defendant Anderson was the Chief Executive Officer and Director of DCRB, and owed investors a fiduciary duty by way of these roles. Hyzon Soliciting Materials also identified Anderson as a director on its pro-forma, post-SPAC Merger Board. Prior to the SPAC Merger, Anderson signed each Preliminary Proxy Statement for the SPAC Merger filed with the SEC. Following the SPAC Merger, Anderson did in fact serve as a Director of Hyzon's Board.

(b)     During the Class Period, up through the SPAC Merger, Defendant Haskopoulos was DCRB's Chief Financial Officer, Chief Accounting Officer, and Secretary, and owed investors a fiduciary duty by way of these roles. Prior to the SPAC Merger, Haskopoulos signed Soliciting Materials made pursuant to Rule 14a-12 of the Exchange Act, including reports containing as attachments Defendants' false and misleading investor presentations.

(c)     During the Class Period, up through the SPAC Merger, the DCRB Director Defendants made or were responsible for the dissemination of the misstatements and omissions in Hyzon's Proxy Statements, which were published in the name of the DCRB Board.

Defendants Anderson, Haskopoulos, and the DCRB Director Defendants acted negligently by unreasonably making and/or disseminating the false and misleading statements alleged, given that there was not sufficient information capable of confirming the accuracy of those false and misleading statements. In fact, readily available information that would be apparent from a reasonably diligent investigation into Hyzon demonstrates the inaccuracy of these Defendants' statements, including the truth about the purported Fortune 100 and name brand customers, committed sales pipeline, and revenue and delivery targets that Hyzon claimed it had for 2021 and thereafter.

548.579.      Pre-Merger Hyzon (now Defendant Hyzon) acted negligently in issuing and/or disseminating the Soliciting Materials because they contained the false and misleading statements alleged herein. Defendant Hyzon acted through Defendants Knight, Gu, and Gordon, and it was negligent to the same extent as the Hyzon Individual Defendants.

549.580.      Defendants Knight, Gu, Gordon, and Tichio acted negligently in making and/or disseminating the statements contained within the Soliciting Materials, insofar as they "made" and/or had ultimate control over statements by permitting false and misleading statements to appear next to their name(s) and image. Additionally, these Defendants acted negligently allowing the Soliciting Materials to be disseminated with such misleading statements to appear next to their name(s) and image(s).

(a)      During the Class Period, Founder Defendant Knight was Hyzon's Chief Commercial Officer and, after August 2021, was Hyzon's Chief Executive Officer until he was terminated for cause in August 2022. In those roles, Knight directly oversaw Hyzon's business strategy and sales efforts, often serving as the Company's face in investor communications and media appearances. Moreover, Knight was intimately familiar with the true

condition of Hyzon's business and sales practices by virtue of his roles as a founder, officer of Hyzon, and as the former CEO of Hyzon's corporate grandparent, Horizon.

(b)    Likewise, Founder Defendant Gu started the Class Period as Hyzon's Chief Executive Officer before becoming Executive Chairman of Hyzon's Board of Directors in August 2021. (Gu was also terminated in August 2022). In those roles, Gu directly oversaw Hyzon's business strategy and sales efforts. Moreover, Gu was intimately familiar with the true condition of Hyzon's business and sales practices by virtue of his roles as a founder, officer, chairman of Hyzon, and as the founder and former CEO of Hyzon's corporate grandparent, Horizon.

(c)    Defendant Gordon served as the Company's CFO from the start of the Class Period up through April 2022. In that role, Gordon directly oversaw the Company's accounting and revenue projections/calculations, and also appeared alongside Defendants Knight and Tichio in public conversations with investors. This includes Hyzon's February 9, 2021 investor conference, during which Gordon told investors that Hyzon revenue forecast of $37 million was "100 percent covered by contracts and MoUs." Gordon confirmed Hyzon was "on track" to reach this goal by the end of 2021. Gordon also signed Hyzon's original 3Q21, FY 2021, and 1Q22 reports.

(d)    During the Class Period, Defendant Tichio sat as Chairman of DCRB's Board of Directors. In that role, Tichio directly participated in the selling of the SPAC Merger to investors, making multiple public statements along with Hyzon's senior management regarding the veracity and magnitude of Hyzon's committed orders, revenue forecasts, and general business operations.

Defendants Knight, Gu, Gordon, and Tichio acted negligently, given that there was not sufficient information capable of confirming the accuracy of the false and misleading statements they made, disseminated, or allowed to be disseminated next to their name(s) and image(s). In fact, readily available information that would be apparent from their positions, or a reasonably diligent investigation into Hyzon done before they made statements, after being placed on constructive notice but events (e.g., changes to presentations), or as follow up during the pre-merger period, demonstrates the inaccuracy

- 320 -

of these Defendants' statements, including the truth about the purported Fortune 100 and name brand customers, committed sales pipeline, and revenue and delivery targets that Hyzon claimed it had for 2021 and thereafter.

550.581.    The written communications made, issued, and/or disseminated by the Defendants constitute violations of Rule 14a-9 and § 14(a) because such communications are materially false and/or misleading and were provided in at least a negligent manner.

551.582.    As a direct result of the Defendants' negligent preparation, review, and dissemination of the false and/or misleading Proxy Statements, Lead Plaintiff and members of the Class were deprived of their right to be presented with accurate proxy materials while asked to vote on the SPAC Merger, were caused to vote in favor of the SPAC Merger, were caused to not exercise their redemption rights.

552.583.    As a direct and proximate result of the dissemination of the false and/or misleading Proxy Statements that Defendants used to obtain shareholder approval of and thereby consummate the Merger, Lead Plaintiff and the Class have suffered damages and actual economic losses (*i.e.*, the difference between the inflated price those investors paid when purchasing Hyzon securities and the true value of those securities once the inflation is removed). The omissions and false and misleading statements in the Proxy Statements are material in that a reasonable shareholder would have considered them important in deciding whether to vote for the Merger or exercise their redemption rights. In addition, a reasonable investor would view a full and accurate disclosure as having significantly altered the "total mix" of information made available in the Proxy Statements and in other information reasonably available to shareholders. By reason of the misconduct

detailed herein, the Defendants are liable pursuant to § 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

**COUNT V: VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST ALL DEFENDANTS EXCEPT DCRB/HYZON ARISING FROM PRIMARY VIOLATIONS OF SECTION 14(a)**

553.584.    Lead Plaintiff realleges each allegation set forth above as if fully set forth herein, except that Lead Plaintiff expressly disclaims any allegations of fraud for purposes of this Count, including all allegations contained in Sections VIII and XI above (plaintiff's independent investigation and additional allegations of scienter).

554.585.    The DCRB Control Defendants and DCRB Director Defendants acted as controlling persons of DCRB within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

555.586.    During the Class Period, the DCRB Control Defendants were DCRB's controlling shareholders. Specifically, the DCRB Control Defendants controlled all of the Class B Founder Shares, elected (and could remove at any time) the other members of the DCRB Board, had deep personal and financial ties to the members of the DCRB Board (including by granting them material financial interests in the Class B Founder Shares and by appointing them to other boards of directors of SPACs), and held officer roles at DCRB. At all relevant times, the DCRB Control Defendants and the DCRB Director Defendants (by virtue of their positions as directors and/or senior executives, and/or their direct or indirect relationships with the DCRB Control Defendants) had the power to control, influence, and cause—and actually did control, influence, and cause—

DCRB to make or disseminate the false and misleading Soliciting Materials identified above.

556.587.    As to ~~the  DCRB~~ Defendants Anderson, Tichio, and Haskopoulos, during the Class Period, by virtue of their high-level positions, ~~the DCRB Defendants~~they participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs, including the acquisition of Hyzon as a target company. Because of their senior positions, ~~the DCRB~~these Defendants knew the adverse non-public information regarding Hyzon's business practices. Moreover, because of their positions of control and authority as senior officers, ~~the DCRB~~these Defendants were able to, and did, control the contents of the various reports, press releases and public filings regarding DCRB that were disseminated in Soliciting Materials during the Class Period. Throughout the Class Period, ~~the DCRB~~these Defendants exercised their power and authority to cause DCRB to engage in the wrongful acts complained of herein.

557.588.    Likewise, the Hyzon Defendants acted as controlling persons of Hyzon within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). The Hyzon Defendants participated in the operation and management of Legacy Hyzon, and conducted and participated, directly and indirectly, in the conduct of the Legacy Hyzon's business affairs, including its acquisition by DCRB. Because of their senior positions, the Hyzon Defendants knew the adverse non-public information regarding Hyzon's business practices. Moreover, because of their positions of control and authority as senior officers, the Hyzon Defendants were able to, and did, control the contents of the various reports, press releases and public filings regarding Hyzon that were disseminated in Soliciting

- 323 -

Materials during the Class Period. Throughout the Class Period, the Hyzon Defendants exercised their power and authority to cause Hyzon to engage in the wrongful acts complained of herein.

558.589.    Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

559.590.    As a result, Plaintiff and the Class were harmed when, deceived by the false and misleading disclosures and the approval of the SPAC Merger, they did not exercise their redemption rights prior to the SPAC Merger.

560.591.    In addition, members of the Class approved the acquisition of Hyzon based on false and misleading information.

561.592.    By reason of the above conduct, Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by DCRB and Legacy Hyzon.

## XIV.XV.    PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiff as the Class Representative;

B.    Requiring Defendants to pay damages sustained by Lead Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Lead Plaintiff and the other members of the Class prejudgment and post judgment interest, as well as their reasonable attorneys' fees, expert fees, and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## XV.XVI.    DEMAND FOR TRIAL BY JURY

Lead Plaintiff hereby demands a trial by jury.

DATED this ~~23rd~~15th day of ~~June 2023~~August 2025    Respectfully submitted,

**HAGENS BERMAN SOBOL SHAPIRO LLP**

By:    _/s/ Steve W. Berman_
STEVE W. BERMAN (*pro hac vice*)

1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com

Reed R. Kathrein (*pro hac vice*)
Lucas E. Gilmore (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
reed@hbsslaw.com
lucasg@hbsslaw.com

Raffi Melanson
HAGENS BERMAN SOBOL SHAPIRO LLP
1 Faneuil Hall Square, 5th Floor
Boston, MA 02109
Telephone: (617) 482-3700
Facsimile: (617) 482-3003
raffim@hbsslaw.com

Nathaniel A. Tarnor (SBN 4742797)
HAGENS BERMAN SOBOL SHAPIRO LLP
322 8th Avenue, Suite 802
New York, NY 10001
Telephone: (212) 752-5455
Facsimile: (917) 310-2980
nathant@hbsslaw.com

Brian J. Schall (*pro hac vice* forthcoming)
THE SCHALL LAW FIRM
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Telephone: 310-301-3335

Facsimile: 310-388-0192
brian@schallfirm.com

*Attorneys for Plaintiff Alfred Miller*

**CERTIFICATE OF SERVICE**

I hereby certify that I am the ECF User whose ID and password are being used to electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the e-mail addresses registered, as denoted on the Electronic Mail Notice List, and I hereby certify that I have caused to be mailed a paper copy of the foregoing document via the United States Postal Service to the non-CM/ECF participants indicated on the Manual Notice List generated by the CM/ECF system.

By: _____ */s/ Steve W. Berman* _____
Steve W. Berman

- 1 -